# APPENDIX B

# CLINICAL CASE REVIEWS

**APPENDIX B - 1**
**Avenal State Prison (ASP)**
**Review Period: December 1, 2024 – May 31, 2025**

**Patient A**

This 39-year-old patient's record was selected for review as his IDTT was observed during the site visit. He was provided with diagnoses of unspecified anxiety disorder and schizoaffective disorder, bipolar type. He was fully adherent to his prescribed buspirone and paliperidone. This patient was incarcerated previously from March 2021 through January 2023 and was treated at the 3CMS level of care. Upon his reincarceration on March 13, 2025, he was placed at the 3CMS level of care at the reception center. He transferred to ASP on May 5, 2025.

Upon arrival at ASP, this patient was referred to mental health as he reported that he stopped taking his psychotropic medication so he could be placed at the fire camp, but was unable to function, reporting feelings of frustration and sadness along with experiencing hallucinations. A primary clinician met with the patient on May 8, 2025 to complete an initial assessment and a suicide risk evaluation. Both were adequate. The following day, the patient was seen for an initial psychiatric assessment and also for follow-up on the referral from nursing. The assessment was adequate, and the patient restarted medications, and the plan was to follow up with the patient in 30 days. An initial IDTT was held timely with the patient and required staff present on May 14, 2025; however, the psychiatrist present was not assigned to the patient and had not met the patient previously. The clinical summary contained information pulled forward from the patient's contact with mental health staff prior to his transfer to ASP, noting that he denied all mental health symptoms and no longer needed medication, which was not the case. While this information was countered by later information, there was no context and that created a confusing picture of the patient. Additionally, the content of IDTT documentation was exclusively created by the primary clinician and did not account for the fact that the patient had been seen by a psychiatrist and started on medications. Instead, IDTT documentation incorrectly noted that the patient was not taking medications. A treatment goal was created to address the patient's anxiety but made no mention of the depressive symptoms and hallucinations he referenced when meeting with the psychiatrist.

The patient was not seen by the psychiatrist within 30 days as planned but instead was seen by referral on June 11, 2025 after expressing suicidal ideation and reporting command auditory hallucinations to kill himself. He was placed at the MHCB level of care.

**Findings**

Treatment of this patient was inadequate. Despite adequate initial assessments, the patient's treatment team failed to incorporate updated information into his treatment plan. Further, the patient was not seen as indicated in the plan by the psychiatrist.

**Patient B**

This 64-year-old patient's record was selected for review as his IDTT was observed during the site visit. He was provided with a diagnosis of bipolar II disorder and was fully adherent to his

medication regimen which included lamotrigine, sertraline, and venlafaxine. He was also prescribed olanzapine as needed. This patient has been incarcerated since September 2009 and was placed at the 3CMS level of care while in the reception center. He has consistently been treated at the 3CMS level of care since that time and transferred to ASP in October 2015.

No IDTT was held with the patient during the monitoring period, so his treatment plan from July 2024 was reviewed for context. While the treatment plan included no goals, objectives, or interventions, there was an interdisciplinary plan of care (IPOC) to address depressed mood which had not been updated since March of 2024 when the patient had been noted as meeting his goals. There was a brief description of the patient's response to treatment documented.

The patient was seen by the psychiatrist monthly from December 2024 through February 2025 and then twice in May 2025, exceeding requirements. Psychiatric contacts were well-documented and demonstrated adequate care of the patient's needs. The patient was seen by a primary clinician at least every 90 days; however, two of the contacts offered to the patient were by an alternate clinician and the patient stated that he preferred seeing his assigned clinician. Sessions with the primary clinician reflected vague use of interventions and did reference the patient's treatment plan.

**Findings**

Treatment of this patient was adequate; however, coverage by an alternate clinician interfered with continuity of care during the monitoring period. Additionally, improvements to the treatment plan were needed.

**Patient C**

This 38-year-old patient's record was selected for review as his IDTT was observed during the site visit. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood and was not prescribed any medications. This individual was incarcerated on April 6, 2023 and was placed at the 3CMS level of care on June 3, 2023. He transferred to ASP on July 13, 2023.

No IDTT was held with the patient during the monitoring period, so his treatment plan from July 2024 was reviewed for context. The treatment plan was blank but IPOCs addressing depressed mood and anxiety were noted in the record. The goals were measurable but without baseline information and the interventions were vague, describing only support and alliance-building to be provided. Unfortunately, there was no description of the patient's response to treatment.

The patient was seen more frequently than required by a primary clinician. Two of the three contacts were provided by his assigned clinician. Interventions were supportive and in keeping with the treatment plan. The patient had no contact with a psychiatrist during the monitoring period nor at any point since 2023. Despite the patient not being prescribed medications, the patient should be seen at least once each year within 90 days of the annual IDTT.

**Findings**

Treatment of this patient was not adequate. The treatment plan was vague with regard to the interventions to be provided to the patient and as such, the interventions provided to the patient were supportive but not evidence-based. The patient was not seen as required by the psychiatrist.

**Patient D**

This 30-year-old patient's record was selected for review as he experienced an increase in his level of care while at ASP. He was provided with diagnoses of schizoaffective disorder, bipolar type and adjustment disorder with mixed anxiety and depressed mood. He was adherent to his medication regimen which included olanzapine and valproic acid. This patient was incarcerated for the first time on January 15, 2025. He was placed at the 3CMS level of care while at the reception center and transferred to ASP on March 27, 2025.

The patient was seen for a timely initial primary clinician assessment and suicide risk evaluation on April 3, 2025. Both assessments were adequate. An initial psychiatric assessment was completed the same day and was comprehensive. The patient's initial IDTT meeting was held on April 10, 2025 and included the required staff. While the documentation included that the patient was present for the meeting, it also noted that the meeting was conducted in absentia as the patient had been moved to another yard. There was no treatment plan but an IPOC was documented to address depressed mood with no goals or interventions listed.

On May 21, 2025, an urgent referral to mental health was generated by a correctional officer noting that the patient's dormmates complained that he talked to himself, took others' food, and displayed strange behavior in the dorm and in the dayroom. The patient was also noted as having difficulty following directions and responding to internal stimuli. He was seen the same day by his assigned primary clinician who noted that the patient had a history of intellectual disability, which may be contributing to his lack of interpersonal boundaries, yet no referral was made and no follow-up planned other than a routine contact in 90 days. The patient submitted a healthcare request on June 13, 2025 reporting command hallucinations and stating that he found a razor and was scared that he will use it on someone else. He stated, "I need help." He was seen emergently in response to that request. The patient denied writing the request and upon a review of the handwriting, the psychologist determined that the patient had not written the request himself. Yet, the psychologist had concerns about the patient's intellectual abilities, presence of hallucinations, and ability to function at the 3CMS level of care. The psychologist elevated the patient to the EOP level of care and placed him in the OHU while he awaited transfer. The patient was also referred for a development disability assessment. On June 18, 2025, an IDTT was held to increase the patient's level of care. The plan was to have the patient be seen weekly by a primary clinician until he could be transferred. The patient was seen by both a primary clinician and a psychiatrist prior to his transfer on June 25, 2025.

**Findings**

Treatment of this patient was adequate; however, the contact with the patient in response to a referral from custody should have been more comprehensive and should have included a referral

for a developmental disability evaluation. Also, there was a contradiction within the treatment plan regarding the patient's presence at the IDTT meeting.

**Patient E**

This 43-year-old patient's record was randomly selected for review to assess treatment of patients at the 3CMS level of care at ASP. There was no formal diagnosis within the record, but PTSD, depression, and anxiety were listed as problems and the psychiatrist noted ADHD as well. He was fully adherent to his prescribed atomoxetine, prazosin, and sertraline. This patient was incarcerated for the fifth time on December 3, 2024. This individual was not placed within the MHSDS during any prior periods of incarceration. He was initially placed at the 3CMS level of care on February 24, 2025 while at ASP.

The patient was seen in response to a health care request on January 15, 2025 prior to his transfer to ASP. The primary clinician at WSP noted that the patient reported difficulty concentrating and being distractable. The clinician noted that the patient appeared depressed and anxious and referred the patient to a psychiatrist. A psychiatrist evaluated the patient on January 21, 2025 and started the patient on atomoxetine, explained that he would need to be placed at the 3CMS level of care, and planned to follow-up with the patient in four to six weeks. The patient was transferred to ASP on January 27, 2025. As the patient was not formally placed at the 3CMS level of care, the nurse who saw the patient upon arrival noted his medications but did not refer the patient to be seen by mental health. Further, there was no follow-up scheduled with the patient as he was not officially enrolled in the MHSDS.

On February 20, 2025, the patient submitted a health care request, asking to be seen by mental health to determine if he had a learning disability and also an acute stress disorder. The patient was seen four days later and reported intrusive thoughts, hypervigilance, flashbacks, and nightmares. The patient reported that he did not have the coping skills to manage those symptoms. The primary clinician documented that patient was placed at the 3CMS level of care and reported an intent to follow up with the patient in 90 days. An initial psychiatric assessment was conducted on March 1, 2025 and that assessment was adequate. The patient was started on sertraline. An initial primary clinical assessment was conducted on March 3, 2025 along with a suicide risk evaluation. Both were comprehensive. On March 5, 2025 an initial IDTT was held with an alternate psychiatrist but assigned primary clinician present. It was unclear whether or not the patient attended the meeting. The treatment plan was adequate and included measurable goals and reasonable interventions.

The patient was seen for a number of pre-release planning contacts as he was noted to have a release date in July 2025. A psychiatrist saw the patient for a routine contact in May and provided prazosin to assist the patient with nightmares secondary to previous trauma. A primary clinician contact in May included the provision of interventions and handouts to assist the patient in managing his symptoms.

**Findings**

Treatment of this patient was adequate, once ASP determined that the patient should have been placed at the 3CMS level of care prior to his transfer to ASP. Unfortunately, the failure to place the patient within the MHSDS while at WSP resulted in a delay in the patient receiving the necessary assessments and treatment planning upon arrival at ASP.

**Patient F**

This 43-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at ASP. The patient was provided a diagnosis of unspecified depressive disorder; an additional psychiatric diagnosis of unspecified anxiety disorder was also documented. He was prescribed Remeron.

The patient was housed at ASP, where he received mental health services at the 3CMS level of care since 2023. The IDTT documentation completed in advance of the review period indicated that the patient had a prolonged period of stability with very mild depression.

Psychiatric contacts occurred with two different psychiatrists. The patient was described as stable based on regular assessment of mild anxiety, depression, and appropriate functioning. He reported good response to psychotropic medication treatment and denied side effects.

Routine primary clinician contacts occurred with two different providers during the review period. Overall, the treatment was supportive in nature.

The patient was seen for an urgent consult in February 2025 after a drug overdose that required outside hospital admission. The patient denied suicidal ideation. No further assessment of risk or protective factors was documented, nor was it clear that the evaluator reviewed the patient's clinical history. The overdose was not addressed during routine contacts by either treatment provider.

**Findings**

The treatment provided to this patient was inadequate.

There was a lack of appropriate assessment and provider follow-up after the drug overdose. Specifically, there was an over-reliance on the patient's self-report regarding suicidal ideation; there was no documentation of the assessment of suicide risk and protective factors; and there was no indication of review of relevant mental health history. Continuity of care and diagnostic clarification with clear rationale was needed.

**Patient G**

This 61-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at ASP. The patient was provided diagnoses of unspecified depression, unspecified anxiety disorder, and unspecified bipolar and related disorder. He was prescribed Zoloft.

The patient was housed at ASP where he received mental health services at the 3CMS level of care since 2022 to address anxiety and depression.

The two different psychiatrists that met with the patient described him as stable. He consistently reported low depression and anxiety with appropriate functioning. He denied medication side effects and reported good medication response.

Routine primary clinician contacts occurred more often than minimally required with good continuity of care. An assessment of the patient's symptoms and functioning was consistently completed. The documentation was indicative of meaningful therapeutic contacts with the use of appropriate clinical interventions.

**Findings**

The treatment provided to this patient was adequate.

The providers appropriately assessed the patient's mental status, and appropriate clinical interventions were utilized. Psychiatric provider continuity needed improvement, and diagnostic clarification was also indicated.

**Patient H**

This 24-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at ASP. The patient was provided a diagnosis of unspecified depressive disorder. He was not prescribed psychotropic medication.

The patient was housed at ASP where he received mental health services at the 3CMS level of care since February 2024. The annual IDTT meeting was attended by the patient, the assigned primary clinician, and a covering psychiatrist. A summary of the patient's current mental status was documented, but there was no summary of his treatment needs or progress during the past year since his previous IDTT meeting. The treatment plan section was blank, and instead outdated IPOCs that targeted depression were utilized. Despite documentation of a request to work on his trauma history, no goals that targeted trauma were developed. Additionally, the patient reported moderate anxiety; however, no goals were developed to target anxiety.

The patient had two routine psychiatric contacts during the review period with two different psychiatrists. During those contacts, he declined psychotropic medication treatment for his mild to moderate depression and anxiety. He remained engaged in institutional programming and was assessed as clinically stable.

Two routine primary clinician contacts occurred during the review period with two different clinicians. Moderate depressive and anxiety symptoms were assessed and were reportedly manageable. The PC documentation was indicative of meaningful therapeutic contacts with the use of clinical interventions.

**Findings**

The treatment provided to this patient was adequate.

Improvement was needed in treatment planning and provider continuity; however, the patient's treatment needs were addressed during routine contacts with providers. Diagnostic clarification with clinical rationale was needed.

**Patient I**

This 61-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at ASP. The patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Haldol, Zyprexa, Vistaril, and Remeron.

The patient was placed at the 3CMS level of care during 2023, and he was housed at ASP since January 2024. The annual IDTT meeting was attended by the assigned clinician, a covering psychiatrist, and the patient. No detailed summary regarding treatment engagement or response to treatment was provided. The patient reportedly had an increase in psychosis and moderate depression and anxiety. The previous treatment goal of decreased psychotic symptoms was continued without change. No goal was provided for depression or anxiety, and the patient was continued at the 3CMS level of care.

Psychiatric contacts occurred with the same provider more frequently than minimally required. The documentation included regular assessment of symptoms, functioning, and medication response and side effects. The patient's mental status declined in December 2024, and he stabilized after a medication adjustment. During mid-January 2025, the patient's mental status declined further through March 2025; that decompensation was not documented in primary clinician documentation. Of note, on March 23, 2025, the patient reported to the psychiatrist command auditory hallucinations to hurt himself or someone else, and denial of suicidal or homicidal ideation was accepted without further inquiry. There was no documentation to indicate that this information was communicated to the PC. A psychiatric contact prior to the required 90-day contact was clinically warranted to reassess the patient's mental status and medication response; however, that did not occur.

The patient had a primary clinician change in January 2025, and subsequent contacts occurred with the new PC every 90 days; however, more frequent contacts were clinically indicated. It was unclear whether the PC reviewed relevant mental health documentation and was aware of the IDTT documentation of ongoing distressing auditory and visual hallucinations and paranoia and that it was a significant decline in the patient's mental status.

**Findings**

The treatment provided to this patient was inadequate.

The description of the patient's symptoms as chronically distressful and of moderate intensity warranted consideration of referral to a higher level of care by the IDTT as well as coordinated care and consistent provider communication. Additionally, the provider contacts did not occur as clinically indicated to monitor, support, and assist the patient in symptom management.

**Patient J**

This 39-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at ASP. The patient was provided psychiatric diagnoses of major depressive disorder and generalized anxiety disorder that conflicted with the diagnoses of adjustment disorder with anxiety, PTSD, generalized anxiety disorder, and depression that were elsewhere documented in the healthcare record. He was prescribed Remeron.

The patient was housed at ASP where he received mental health services at the 3CMS level of care since 2023 due to anxiety. Provider contacts occurred more often than minimally required.

The assigned psychiatrist regularly assessed the patient's symptoms, functioning, medication response and side effects. He was consistently assessed with stability but with mild depression and anxiety.

Routine primary clinician contacts occurred by telehealth. For reasons that were unclear, there was a clinician change in April 2025. During PC contacts, the patient discussed various family and institutional stressors. The documentation was indicative of meaningful therapeutic contacts with the use of clinical interventions including cognitive behavior therapy, psychoeducation, and rapport building skills.

**Findings**

The treatment provided to this patient was adequate.

Routine contacts were clinically appropriate. There was need for improvement in diagnostic clarification with clinical rationale provided.

**APPENDIX B - 2**
**California Correctional Institution (CCI)**
**Review Period: December 1, 2024 – May 31, 2025**

**Patient A**

This 46-year-old male EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. He was provided with diagnoses of schizoaffective disorder, bipolar type; stimulant use disorder; and opioid use disorder. He was adherent to his prescribed buspirone, haloperidol decanoate, mirtazapine, and venlafaxine. Diphenhydramine was prescribed for extrapyramidal symptoms for the first two months of EOP care, and the patient was adherent with this medication until it was discontinued. Hydroxyzine and an additional dose of oral haloperidol were prescribed PRN for insomnia and agitation, respectively; he used hydroxyzine frequently but did not use oral haloperidol. Three suicide attempts, dating from 2003 through 2006, were listed in the health record. Medical conditions included allergic rhinitis, indigestion, and opioid use disorder. Within CDCR, the patient had previously received all levels of care. After spending four days in RHU EOP care due to being the victim of a peer attack, he received mainline EOP care at CCI from January 13, 2025 through May 31, 2025. During all but the last three days of mainline EOP care, treatment was provided under a PC 2602 order due to grave disability. On May 29, 2025, a petition to renew involuntary treatment based on danger to self was denied.

The initial PC assessment was timely but cursory. The assessment included an observation that the patient's presentation was inconsistent with a diagnosis of schizoaffective disorder; yet this issue was not addressed further. The initial psychiatric assessment was completed late but was adequate in content. The initial IDTT meeting was also late with the patient and required staff in attendance. The patient was noted to be a high treatment refuser yet was retained in EOP care with a plan to add additional groups to his schedule. Patient strengths, verbalized treatment goals, and EOP discharge criteria were not documented, and neither the case formulation nor the treatment plan were updated. The treatment plan was identical to one developed in March 2024 at another facility. It addressed anger, impulsivity, and depression but not grave disability or psychotic symptoms, and it did not include psychiatric care as an intervention.

The assigned psychiatrist followed the patient monthly in confidential settings, timely pursued a renewal of the PC 2602 order, and completed a reassessment of the patient's suicide risk, finding it low. Six PCs followed the patient, and almost half of the contacts occurred in non-confidential settings. Progress notes documented the patient's discomfort with meeting with so many clinicians and failed to document any interventions required by the treatment plan. Except in March 2025, when the patient was offered only one structured therapeutic group, the patient was regularly offered recreational therapy and psychotherapy groups. He attended only a few of these sessions. His disengagement with groups was inadequately addressed and continued unabated following his IDTT meeting.

**Findings**

The treatment provided to this patient was inadequate.

The initial primary clinician assessment was cursory, and a key finding brought forward in that assessment, that the patient's diagnosis and clinical presentation were inconsistent, was never addressed. The IDTT meeting occurred late, and the treatment plan was not updated and did not adequately address the patient's treatment needs. Although the patient received mainline EOP care continuously for 138 days, only one IDTT meeting was held. Continuity and confidentiality of primary clinician care was poor, and the frequent rotation of primary clinicians interfered with the patient's willingness to engage in treatment. The initial psychiatric assessment was delayed, and the risks of grave disability and/or danger to self were not documented in progress notes. The patient's very poor engagement in group treatment was not adequately addressed.

**Patient B**

This 56-year-old male patient's healthcare record was selected to assess the quality of mental health care provided in EOP at CCI. The patient was provided with diagnoses of unspecified depressive disorder and antisocial personality disorder although EHRs diagnosis did not include the depressive disorder. He had a long history of substance abuse. He was prescribed Thorazine, Strattera, Vistaril and Effexor. Within CDCR, the patient had previously received treatment at the 3CMS, EOP, MHCB, and ICF levels of care. He had been at the facility in the EOP level of care since January 2024.

Routine IDTT meetings were attended by assigned staff but not the patient, who chronically refused treatment. Across IDTT meetings, non-referral rationale for treatment refusals was attributed to the patient's anxiety around groups of people. His limited participation in PC contacts was not addressed. Symptoms of disturbed sleep, daily auditory hallucinations, and moderate depression which were reported during a psychiatric contact in advance of the IDTT meeting were not considered as contributing factors. Non-referral rationale was based on his current stability that stemmed from brief cell front contacts which failed to include collateral consultations. Across IDTT meetings, treatment modifications remained unchanged and did not target the anxiety that was assessed as the driving factor for treatment refusals, yet some improvement in treatment engagement was noted. Psychiatric input, treatment goals, rationale for EOP level of care and documentation of the patient's symptoms and functioning between IDTT meetings was not documented.

The patient had two psychiatric contacts between December 2024 and June 2025. Brief psychiatric documentation addressed the patient's symptoms and side effects of medication. Medications were adjusted based on the patient's reported symptoms.

PC contacts occurred via individual and caseload groups but did not occur as required by the Program Guide. The patient consistently refused primary clinician contacts and was seen at cell front after refusing an individual contact. Documentation included a brief assessment of the patient's symptoms and a mental status exam. When symptoms were discussed, there was no further assessment nor review of skills to assist with symptom management. On June 23, 2025, his cell was described as "disorganized and somewhat messy" but was otherwise not assessed. Current functioning was not documented and consultation with custody did not occur.

**Findings**

The treatment provided to this EOP patient was inadequate.

Provider contacts and IDTT meetings did not occur as required by the Program Guide. The pattern of cell front primary clinician contacts and lack of consultation did not provide an appropriate assessment of the patient's functioning or poor treatment engagement. Incomplete treatment planning documentation was not clinically useful and lacked provider collaboration. Diagnostic clarification with clinical rationale was needed.

**Patient C**

This 40-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. Diagnosis varied by treatment team member and chart location. While the diagnosis of antisocial personality disorder was provided by both the PC and psychiatrist, the psychiatrist provided the diagnosis of intermittent explosive disorder and the PC provided unspecified depressive disorder. Neither included the diagnoses of record which were adjustment disorder with disturbance of conduct or unspecified disruptive, impulse control, and conduct disorder. The patient was prescribed Zyprexa. Within CDCR, the patient had previously received services at the 3CMS and MHCB levels of care. He received EOP care in mainline at CCI from the time of transfer on December 19, 2024 through April 22, 2025, when he was placed in the RHU.

The patient's initial IDTT meeting and psychiatric assessment were completed in February 2025, two months after arrival at CCI. The psychiatric assessment indicated that the patient's symptoms were consistent with a depressive disorder and the patient endorsed problems with anger management. The initial PC assessment focused on the patient's behavior during the previous year to avoid CCI housing by way of three MHCB admissions and an RHU placement but excluded a sufficient summary of his current mental health needs or mental health history, other than noting level of care. Treatment goals established more than six months prior to his arrival at CCI that targeted anger and depressed mood were continued at his initial IDTT meeting. The goal for depressed mood was inconsistent with the psychiatric assessment and the goal for anger had not been updated.

There were no psychiatric contacts between the initial assessment in February 2025 and his RHU placement in April 22, 2025. Primary clinician contacts between his admission to the facility and RHU placement were not timely and the majority occurred at cell front due to modified programming, refusals, and staffing shortages. Documentation was reflective of wellness checks. When distress was reported, therapeutic interventions were not offered.

Throughout the review period, the patient had multiple reports of chest pain and risk assessments were completed secondary to reports of suicidal ideation. During some medical assessments, he was described as aggressive and verbally abusive. Between March 10, 2025 and April 2, 2025, six abbreviated risk assessments were completed. Documentation of changes to risk factors was not included. During these evaluations, he recanted his suicidal statements and was assessed as low risk. He frequently discussed distress regarding the ongoing statewide PSR but coping skills were rarely discussed.

**Findings**

The treatment provided to this EOP patient was inadequate.

The initial PC assessment was of insufficient quality to direct treatment planning and IDTT collaboration was lacking given discrepancies in assessment of his depressive symptoms. Initial PC and psychiatric assessments, IDTT meetings, and psychiatric routine contacts were completed beyond Program Guide requirements. During the four-month timeframe that he was in mainline EOP, individual contacts were conducted at cell front which did not provide an appropriate assessment of his functioning and collateral information was rarely sought. Given his multiple medical codes with close proximity to risk assessments, multidisciplinary collaboration with medical and mental health staff was needed. Risk assessment documentation needed improvement. Diagnostic clarification with clinical rationale was needed.

**Patient D**

This 41-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. The patient was provided with diagnoses of unspecified mood disorder, unspecified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and amphetamine type substance-induced psychotic disorder. He was prescribed Zyprexa and Depakote. Within CDCR, the patient had previously received all levels of care with his most recent Acute inpatient discharge in October 2024.

The patient was transferred to CCI on January 2, 2025. Initial assessments and the initial IDTT meeting were completed beyond Program Guide requirements. The initial PC assessment included a summary of his substance abuse and suicide history which included do not resuscitate request following an overdose, which remained in effect at the time of the review. Regarding symptoms, the patient reported disturbed sleep and depressed mood to IDTT members as well as mood lability to the psychiatrist. Psychiatric documentation endorsed criteria for bipolar disorder, but this diagnosis was not added to the diagnoses of record or addressed in IDTT documentation.

The initial IDTT meeting, completed almost two months after admission, was attended by assigned staff and the patient. The clinical summary did not include sufficient information about the patient and was not updated during IDTT meetings. Previously established treatment goals were not consistent with initial assessments and were not updated during the routine IDTT meeting. At the time of the initial IDTT meeting, the patient met criteria for a higher level of care review due to treatment refusals which he attributed to group quality and not being called for group. In contrast, the clinician attributed his refusals to a lack of readiness to change his behavior. Non-referral rationale and treatment modifications were reasonable, although not utilized during routine contacts.

There was a three-month gap between the patient's initial psychiatric assessment and his first routine contact. During that routine contact it was documented that the patient had been medication non-adherent and presented as hypomanic. He was receptive to a medication change. Two weeks later he was evaluated by the psychiatrist for an emergent evaluation after a reported suicide attempt. He was returned to his housing and assessed as attempting to affect a housing change. Psychiatric medication was prescribed for agitation, and it was documented that he would

see the primary clinician the next morning, which did not occur until almost a week later. It was unclear if the clinician was aware of this incident as it was not addressed in the subsequent routine contact. Around the same time, the patient was referred to custody after being cleared by medical for abdominal pain secondary to safety issues. It was not clear that the disciplines communicated or worked together regarding these incidents.

PC contacts occurred individually and via caseload groups. The pattern of missed groups was not addressed. During primary clinician contacts the patient's clinical presentation was unremarkable. Content often addressed his various concerns about his parole hearing. At times, therapeutic packets were offered; however, overall content was not reflective of meaningful therapeutic contacts.

**Findings**

The treatment provided to this EOP patient was inadequate.

In addition to delays in the completion of initial assessments, initial and routine IDTT meetings, and routine psychiatric contacts, the overall quality of care was insufficient. Treatment planning was outdated and not individualized, the patient was not appropriately monitored for medication response or non-adherence, and he was not appropriately followed after a psychiatric crisis where he reported a suicide attempt. This incident, as well as the drug overdoses, highlighted a lack of multidisciplinary collaboration. Primary clinician contacts were not reflective of meaningful therapeutic contacts. Lastly, diagnostic clarification with clinical rationale was needed.

**Patient E**

This 27-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. The patient was provided with diagnoses of schizoaffective disorder, bipolar type; unspecified depressive disorder; and unspecified psychosis not due to a substance or known physiological condition. He was prescribed Abilify, Trileptal, Vistaril, Remeron, prazosin and Zoloft. Within CDCR, the patient previously received treatment at the 3CMS and MHCB levels of care.

The patient was transferred to CCI on December 13, 2024. Initial assessments were not completed timely. The initial PC assessment included a lengthy series of copied documentation from previous providers that was disjointed and did not provide a useful summary of his mental health history. Current symptoms were noted as "anxiety and voices," but detail was not provided.

Prior to the initial psychiatric assessment, the patient submitted a healthcare request noting that his medications had expired; however, documentation indicated that the medication was discontinued without a face-to-face assessment due to medication non-adherence. The psychiatric assessment did not occur until after his second request to have his medications renewed. Despite the long delay, psychiatric documentation was original and clinically useful. In contrast to the diagnoses on record, the psychiatrist assessed his clinical presentation as consistent with PTSD and possibly intermittent explosive disorder although this was not updated in EHRS or IDTT documentation.

Initial and routine IDTT meetings were not timely. The patient and assigned clinical staff were documented as having attended, with a psychiatrist change noted at the routine IDTT meeting.

The patient met criteria for a higher level of care review at the routine IDTT meeting due to several RVRs which the patient attributed to being irritated and to institutional stressors. The clinician attributed his behavior to substance use without including sufficient data to support this conclusion. Regardless, non-referral rationale was reasonable. Treatment modifications addressed motivation for sobriety but did not address the patient's report of irritability or stressors. The initial IDTT clinical summary was overly brief and did not provide sufficient documentation of the patient's treatment needs other than the patient's stated goals. During the routine IDTT meeting, the clinical summary focused on his current status without an update of his functioning or symptoms since the initial IDTT meeting. Across IDTT meetings, the one goal that targeted auditory hallucinations was not updated since February 2024, over a year prior. Anxiety and substance use were not targeted. Rationale for continued EOP level of care was not documented.

Routine psychiatric contacts were not timely. The patient was not seen between March 21, 2025 and July 7, 2025. Relatedly, documentation from February 2025 regarding resumption of psychiatric medication that had previously been discontinued was not reflective of an in-person assessment but an administrative note. Routine contact documentation included relevant clinical information including current substance use, an assessment of symptoms and functioning, and medication adjustment for symptoms. Of note, during one contact, documentation indicated that he was assessed as actively intoxicated with poor engagement but there was no indication of follow-up with custody or medical staff.

Overall, PC contacts which occurred via caseload groups and individually at cell front, were not timely. During multiple PC contacts, there was documentation that the patient was assessed as intoxicated but there was no referral to medical providers despite an inability to rouse the patient on February 20, 2025 or an assessment that he was physically "frozen" on May 15, 2025 with his eyes closed. Despite a clear need to address the patient's substance use in treatment, it was not done.

During reviewed dates, the patient was seen for two risk assessments. During the first he reported suicidal ideation due to environmental stressors of a PSR. He was assessed as low risk on an abbreviated assessment although any changes to risk factors were not clearly documented. He denied suicidal ideation and reported feeling anxious; he was referred to the psychiatrist due to anxiety and a request for a medication increase. He was seen the next day but there was no discussion of a medication increase and medications were continued without changes. During the second assessment, he recanted upon meeting with clinician and stated he wanted to see the sergeant to address tablet issues that were distressing for him during the ongoing PSR. The clinician worked with custody to clarify issues regarding the tablet. Coping skills, which were clinically indicated, were not addressed during either risk assessment.

**Findings**

The treatment provided to this EOP patient was inadequate.

In addition to issues with timeliness across disciplines and IDTT meetings, the quality of this patient's care was insufficient. The patient was not appropriately monitored for medication non-adherence and psychiatric medications were discontinued and resumed without a face-to-face psychiatric assessment. Ongoing cell front PC contacts did not provide an appropriate assessment

of the patient. The patient's substance use was a barrier to treatment participation; however, it was not addressed. Multidisciplinary collaboration was not sought when the patient presented as intoxicated with impaired ability to function. Diagnostic clarification with rationale was needed.

**Patient F**

This 47-year-old male EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. He was provided with diagnoses of schizophrenia and antisocial personality disorder and had an extensive history of substance abuse. He was prescribed a Haldol injection under PC 2602 and Zoloft. Within CDCR, the patient had previously received treatment at the 3CMS, MHCB and acute levels of care.

The patient transferred to the facility on December 18, 2024. Although not timely, the initial psychiatric assessment included reasonable clinical information regarding the patient's treatment needs of psychosis and need for involuntary medications. At cell front, due to modified programming and staffing shortages, the patient denied any mental health history during the initial PC assessment. History of present illness was not updated as the most recent documentation was from 2019.

The initial IDTT meeting was completed a month beyond the timeframe required by the Program Guide. The patient was identified as a high treatment refuser and non-referral rationale did not consider the impact negative symptoms had on his attendance. Documentation copied from December 4, 2024, indicated ongoing auditory hallucinations, poor insight into his mental illness, and a delusion about people drinking his blood. There was no clear documentation that these symptoms were directly queried during the review period or targeted in treatment planning. The sole treatment goal in the treatment planning section, continued from a previous IDTT meeting, was to increase insight. Additionally, a vague goal to increase the patient's ability to tolerate current placement and find ways to work toward a desired placement was embedded in the clinical summary section. Neither goal was addressed during subsequent treatment contacts.

During the review period, psychiatric care was not timely as there was one routine psychiatric contact, in June 2025, nearly five months after his initial assessment. At that time, the patient reported elevated depression and that his medication helped with auditory hallucinations. An antidepressant was prescribed.

PC contacts were provided through individual and group contacts. There was no follow-up for his pattern of missed group contacts. The majority of contacts were conducted at cell front due to refusals, modified programming, and a PSR. Documentation was brief and did not provide a sufficient assessment of the patient. Consultation with custody staff was rare and interventions were not offered when clinically indicated.

Almost every section of the form completed during a routine IDTT meeting on June 26, 2025 was blank. Psychiatric documentation of the same date indicated that the patient had achieved maximum benefit from EOP and was ready for discharge to the 3CMS level of care. There was no further documentation to explain the discharge to 3CMS, which was confirmed in by the completion of a PC initial assessment on July 10, 2025 at the 3CMS level of care.

**Findings**

The treatment provided to this EOP patient with a serious mental illness was inadequate due to multiple shortcomings.

Reports of recent psychotic symptoms were not appropriately monitored or targeted in treatment planning. This patient's level of care was lowered without documented rationale or sufficient monitoring by mental health providers, including a long delay between psychiatric contacts, cell front bi-weekly clinical contacts that did not allow for a full assessment, lack of collateral consultation, and delayed IDTT meetings.

**Patient G**

This 24-year-old male EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. The patient was provided with diagnoses of depressive disorder and opioid use disorder. He was prescribed Zoloft and Vistaril. Within CDCR, the patient had previously received MHCB care.

The patient transferred to the facility on January 18, 2025. During the initial PC assessment, the patient reported elevated anxiety and mild depression. Historical and psychosocial information was not documented. The initial psychiatric assessment was not completed timely. Documentation included a thorough assessment of his current treatment needs including anxiety, depression, and insomnia, and medication was adjusted to target his symptoms. An overview of his psychosocial, suicide, and psychiatric medication history within CDCR was included, although a summary of his mental health history, other than reference to three MHCB admissions was not included. There was a four-month gap between the initial psychiatric assessment and the next routine psychiatric contact. Documentation assessed his current symptoms, basic functioning and response to medication.

The initial and routine IDTT meetings were not timely. The initial IDTT meeting was not completed until almost three months past required Program Guide requirements. Assigned providers and the patient attended initial and routine IDTT meetings. The patient was identified for a higher level of care review during the routine IDTT meeting due to group treatment refusals. Non-referral rationale did not fully consider the impact his symptoms may have had on his treatment refusals and was based on limited non-confidential cell front interactions. Treatment modifications were reasonable. Treatment goals that targeted anxiety and depression established prior to his transfer to CCI were continued and documented as being in progress without specific detail. Goals were measurable and interventions were planned to use dialectical behavior therapy and cognitive-behavior therapy techniques. Rationale for continued need for EOP was not documented.

Overall, group and individual routine PC contacts were not timely. Missed groups were not followed up on. Documentation was often non-confidential indicative of a check-in which occurred cell-front due to refusals or a PSR. Refusals were not appropriately queried or addressed. During the few confidential individual contacts, documentation was representative of a therapeutic contact. Of note, there were a few times when the patient was assessed as intoxicated but there was no documentation of consultation with custody or medical staff.

**Findings**

The treatment provided to this EOP patient was inadequate.

Initial assessments did not include mental health history, a key component to case conceptualization and treatment planning. There were delays in IDTT meetings, initial and routine psychiatric contacts, and routine PC contacts. A pattern for refusals was not appropriately addressed nor did cell front contacts allow for an appropriate assessment of the patient. Lastly, there was no multidisciplinary collaboration when the patient was assessed as intoxicated.

**Patient H**

This 36-year-old male EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. The patient was provided with a diagnosis of schizophrenia. He was prescribed Buspar, Vistaril and Risperdal. Within CDCR, the patient had previously received treatment at the 3CMS and MHCB levels of care.

The patient was returned to CCI from an MHCB admission secondary to serious impairment due to mental illness on December 30, 2024. The initial PC assessment included the patient's current clinical presentation to direct treatment planning. Symptoms included depression, ongoing auditory hallucinations, and intermittent suicidal ideation. Further inquiry of suicidal ideation and a risk assessment were not completed. The patient's mental health and psychosocial history were limited and select sections were copied from EHRS which resulted in a disjointed and limited summary.

The initial psychiatric assessment was completed later than required but was done in advance of the initial IDTT. The patient refused the assessment due to the PSR and did not want to meet at cell front. Psychiatric history, other than reference to two recent MHCB admissions, was not documented. The patient complained of feeling over-medicated and documentation indicated a plan to follow-up in a month to evaluate treatment options; however, he was not seen until two months later on May 27, 2025. During this timeframe, custody referrals for bizarre behavior and PC contact documentation indicated that the patient was distressed and pre-occupied with prison politics. During the follow-up psychiatric contact, the patient was described as depressed and paranoid with slightly disorganized thoughts. Medications were adjusted to address residual psychosis and his focus on prison politics subsided.

Required staff attended the initial IDTT meeting. The patient was identified for a higher level of care review due to treatment refusals which he attributed to discomfort around peers. The clinician attributed this to the patient's mental illness. Appropriate non-referral rationale and treatment modifications were documented. Treatment goals from November 2024, that targeted auditory and visual hallucinations and suicidal ideation, were continued although they appeared to be from a MHCB admission and therefore warranted update including current baseline and interventions. There was no goal for depression. Rationale for continued EOP level of care was not documented.

Overall, PC contacts conducted by caseload groups and individually were not timely. During PC contacts, the patient's symptoms and functioning were routinely monitored, and coping skills were variably discussed.

On May 11, 2025, the on-call clinician was called into the facility for a potential use of force. A custody referral was also submitted which indicated that the patient was exhibiting bizarre behavior, was withdrawn, unable to answer questions or hold a conversation, was confrontational with the officers in the housing unit, and was refusing to follow direct orders. Based on CIT documentation, he refused to return to his housing unit, wanted an RHU placement and reported vague safety concerns. He was assessed as low risk during an abbreviated suicide risk assessment. Statements of self-harm warranted further exploration particularly due to the patient's speech described as "vague and non-specific" with "long periods of silence." It was not clear that the patient's psychiatric history was appropriately reviewed, which may have prompted the clinician to consider that residual psychosis was contributing to his clinical presentation, yet there was no mention of this consideration. The patient willingly returned to his housing unit with education on the custody process and five-day follow-up checks. The patient declined a psychiatric referral and although long overdue, one was not submitted. Of note, a requirement of the abbreviated risk assessment to indicate whether risk factors have changed, was not completed.

**Findings**

The treatment provided to this EOP patient was inadequate.

The delays in psychiatric care for this patient who was recently discharged from the MHCB resulted in prolonged suffering. The plan to address the patient's complaint of feeling over medicated was not timely and the follow-up itself exceeded Program Guide requirements. Treatment planning needed improvement. Although not timely, the PC monitored the patient during contacts; however, it appeared that the clinician heavily relied on the patient's self-report and failed to consult with custody and psychiatry given the psychiatrist's assessment of residual psychosis. In the interim, there was a potential use of force, and while avoided, the patient's self-harm statements were not sufficiently queried and risk assessment documentation needed improvement.

**Patient I**

This 59-year-old male EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. He was provided with a diagnosis of schizoaffective disorder. He was prescribed Zyprexa, Buspar, Risperdal, Remeron and Effexor under PC 2602. Within CDCR, the patient had previously received treatment at the 3CMS, MHCB and ICF levels of care.

The patient was transferred to the institution on December 9, 2024. There were delays in timely completion of the initial psychiatric assessment and initial IDTT meeting, both of which were completed in February 2025. Initial psychiatric and PC assessments indicated that the patient's primary symptom was depression. Neither assessment included sufficient information regarding the patient's mental health history. Current clinical presentation described him as depressed with otherwise unremarkable mental status.

The patient, the EOP supervisor, and the assigned psychiatrist attended the initial IDTT meeting. The patient met criteria for a higher level of care review due to high treatment refusals which he attributed to not being released for groups. The supervisor recognized the custody barrier although

there was no indication that it would be addressed as treatment modifications were clinically focused. Non-referral rationale was appropriate. The patient's stated goals were cognitive therapy and relapse prevention. A goal, established a month prior to the patient's transfer to CCI, targeted depression but was not clearly updated. A new goal, that targeted treatment compliance, was established although interventions to assist in goal achievement were not documented.

The patient did not receive routine psychiatric contacts during the monitoring period. For reasons that were unclear, another initial psychiatric assessment was completed in June 2025. The contact was completed at cell front due to a PSR. The content was reflective of a brief check-in. Primary clinician contacts which occurred via caseload groups and individually were not timely. The majority of individual contacts were completed at cell front. The patient consistently denied any mental health symptoms. Documentation was indicative of check-ins but not meaningful therapeutic contacts.

**Findings**

The treatment provided to this EOP patient was inadequate.

This patient with a mental illness did not receive timely or appropriate mental health care. Treatment planning was insufficient and when routine primary clinician contacts did occur, documentation was not representative of meaningful therapeutic contacts.

**Patient J**

This 27-year-old male EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CCI. The patient was provided with diagnoses of major depressive disorder and opioid use disorder. He was prescribed Remeron and Prozac. Within CDCR, the patient had previously received treatment at the MHCB level of care.

The patient was transferred to the facility on December 19, 2024. Initial psychiatric and PC assessments were completed beyond Program Guide timeframes with the psychiatric assessment being completed in February 2025. While the initial psychiatric assessment included specific information regarding the patient's current clinical presentation, both initial assessments included general clinical information regarding this patient's depression, substance use, and level of care but were not sufficiently individualized. The initial PC assessment included incomplete sentences and the mental status section was blank. Medications were adjusted to address symptoms of depression, irritability, and daily auditory hallucinations during the psychiatric assessment. The patient was agreeable to starting a low dose of Prozac with a plan to titrate to address irritability. The patient's only routine psychiatric contact between his initial assessment and RHU placement in early June 2025, occurred in April 2025. Documentation indicated that his medications had been discontinued due to non-adherence, without an in-person assessment, including the Zyprexa which was increased during the IDTT meeting to address auditory hallucinations.

Assigned providers and the patient attended the initial IDTT meeting. Treatment planning was unclear. In the treatment planning section, a goal that targeted depression from February 2024 was marked as complete. No additional goals were added. Embedded in the clinical summary section were goals that targeted treatment refusals, sobriety, and RVRs. The patient met criteria for a higher level of care due to high treatment refusals which were attributed to previous fatigue for

which his medication had recently been adjusted. Rationale for non-referral was reasonable and would have been improved with custodial input. Treatment modifications were acceptable. The patient was continued at the EOP level of care although rationale was not clearly documented.

PC contacts occurred during caseload groups and individual contacts, the majority of which occurred at cell front due to refusals. When the patient refused caseload groups with the primary clinician there was no follow-up. During primary clinician contacts the patient was monitored but there was no clear documentation that clinical interventions were offered or that contacts were meaningful therapeutic interactions.

**Findings**

The treatment provided to this EOP patient was inadequate.

The patient was not appropriately monitored by the psychiatrist for initial and routine assessments or medication non-adherence. There was a lack of IDTT collaboration and discussion with the patient regarding his reports of auditory hallucinations and methamphetamine use. PC contacts did not occur in accordance with the Program Guide and were not representative of meaningful therapeutic contacts. Treatment planning was unclear and treatment goals were not documented in the treatment plan section of the IDTT form.

**Patient K**

This 54-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of unspecified mood disorder and opioid dependence. The patient was not prescribed psychotropic medications but was prescribed buprenorphine-naloxone for substance use.

The patient began serving his first CDCR term on November 21, 2023 and was placed in the 3CMS level of care shortly after his arrival to CDCR. He transferred to the CCI from the reception center on January 31, 2024.

During the monitoring period, PC contacts were timely, yet it is unclear why they continued after the patient was to be removed from the MHSDS. The patient denied experiencing any mental health symptoms and agreed to being removed from the 3CMS level of care. An IDTT meeting was held on March 14, 2025, although the assigned psychiatrist and an alternate PC were in attendance, the required CCI was not. The patient was also not in attendance. The clinical summary contained limited background information omitting the patient’s diagnoses and symptoms. While an IPOC for anxiety was listed, the treatment plan was blank. The discharge plan was vague, noting the patient report of being stable as of January 22, 2025, denying acute mental health issues, and being open to being removed from MHSDS. Overall, treatment planning documentation needed improvement, as patient’s progress was not documented nor was adequate rationale for the decision to discharge the patient from the MHSDS. Despite the decision by the IDTT to remove the patient from the MHSDS, he was not removed and continued to be enrolled at the 3CMS level of care. As such, he was seen for a routine PC contact on April 2, 2025 via telehealth by an alternate PC with the focus on patient’s adjustment to a lockdown. Although the patient reported situational depression due to boredom, he indicated that he was otherwise coping well. The PC

documented a plan to continue the patient at the 3CMS level of care, which was inconsistent with the treatment plan and evidenced a lack of review of the patient's record.

Routine psychiatric contacts did not occur during the review period. Although the patient was not taking psychotropic medication and remained stable, the patient was not seen prior to his annual IDTT meeting as required.

**Findings**

The treatment provided to this patient was inadequate.

While the patient received timely IDTT meetings and PC contacts, there were deficiencies in documentation and continuity of care with psychiatric contacts as well as plans for the patient's overall care. The IDTT meeting lacked the required attendees and omitted essential diagnostic information, specific goals, interventions, and the patient's response to treatment warranting his removal from the MHSDS. PC contacts, while timely, were inconsistently documented with missing details about confidentiality, therapeutic interventions, and progress towards treatment goals with the plan in one progress note being inconsistent with the patient's overall treatment plan. Routine psychiatric contacts were absent during the review period, failing to meet standards for ongoing assessment and monitoring, even though the patient was not prescribed psychotropic medication. Lastly, it was unclear why the patient continued at the 3CMS level of care despite an IDTT decision to discharge him in March 2025.

**Patient L**

This 47-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of PTSD, unspecified mood disorder, and opioid use disorder. The patient was adherent to his prescribed citalopram. The patient was prescribed buprenorphine-naloxone for substance use.

The patient entered CDCR on May 16, 2016, to serve his first prison term and re-entered, and to serve his second CDCR term of life with the possibility of parole on October 5, 2023. He was placed in the MHSDS on November 4, 2023 and has since remained at the 3CMS level of care. He transferred to CCI from the reception center on January 8, 2024.

The IDTT convened timely on December 12, 2024, and included the assigned PC, an alternate psychiatrist, CCI, and the patient. The treatment plan included information pertaining to the patient's psychosocial history as well as his diagnoses; however, the treatment plan omitted the patient's current symptoms and functional impairments. In addition, the treatment plan lacked a meaningful case formulation and did not include any treatment objectives, measurable goals, or specific interventions. Although a single IPOC for irritability was included from January 2024, there were no subsequent updates or integration of patient's progress into the treatment plan to determine treatment effectiveness.

An initial psychiatrist assessment was documented on April 14, 2025, nearly nine months after the patient was last seen by psychiatry in July 2024. While the psychiatrist's contact on April 14, 2025

included a reduction of the patient's citalopram dosage in response to EKG findings, the delay in patient monitoring and assessment exceeded Program Guide requirements.

Routine PC contacts occurred timely but were held by two different clinicians. PC progress notes omitted specific therapeutic intervention utilized and patient's response to therapeutic interventions tied to the patient's treatment plan objectives.

**Findings**

The treatment provided to this patient was inadequate.

Although the patient reportedly was stable and IDTT meetings and PC contacts were timely, psychiatric contacts exceeded Program Guide requirements and were delayed in monitoring patient's medication effectiveness and side effects. In addition, there was an absence of a meaningful and updated individualized treatment plan to guide this patient's treatment and ensure continuity of care. PC documentation also lacked the specific interventions utilized during PC contacts and the patient's response to interventions tied to the patient's treatment plan to track progress.

**Patient M**

This 32-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood and opioid use disorder, severe, dependence. The patient was non-adherent to his prescribed duloxetine for depression and anxiety. He was also prescribed buprenorphine-naloxone for substance use disorder. The patient first entered CDCR on March 1, 2017, enrolling in the MHSDS at the 3CMS level of care on May 27, 2023, and subsequently transferring to CCI on December 12, 2023.

An IDTT meeting was held on January 28, 2025, just a little over a year following the patient's previous IDTT meeting. The assigned PC, psychiatrist, and CCI were present however the meeting was held in absentia due to the patient's refusal to attend, which was the only information documented in the clinical summary. The case formulation was carried forward from 2023 with limited updates. An anxiety IPOC was included, but the treatment plan lacked treatment targets, measurable goals, and specific interventions, and the discharge criteria section was left blank. There was no update regarding the patient's lack of participation, medication non-adherence, nor was there documentation of efforts to explore or address barriers to patient's treatment participation.

There was no evidence of routine psychiatric contacts being offered per Program Guide requirements. Although the IDTT psychiatry review acknowledged the patient being prescribed duloxetine, the patient was not routinely monitored. The patient was non-adherent to his psychiatric medications, yet there was no evidence of follow-up or intervention to address the patient's non-adherence or to assess and monitor patient's symptoms.

Routine PC contacts occurred timely yet most occurred at cell-front due to the patient's refusal. The contacts were brief, supportive, and focused on encouraging future engagement, with documentation of the absence of acute symptoms. One PC contact was held in a confidential setting, following the patient's submission of a healthcare request regarding a custody grievance. The session appropriately addressed the patient's feelings of humiliation and loss of value following a strip search, by providing supportive feedback, and encouragement. Overall, PC contacts lacked evidence-informed interventions linked to an individualized treatment plan and failed to address barriers to treatment engagement.

The patient received RVRs on December 1, 2024 and February 2, 2025 for being absent from work assignment and on January 18, 2025, for failure to meet program/work expectations.

**Findings**

The treatment provided to this patient was inadequate.

Psychiatric contacts did not occur during the review period. Despite patient's psychiatric medication non-adherence, the patient was not assessed and monitored per Program Guide requirements. In addition, treatment plan documentation lacked meaningful information including treatment targets with measurable goals, and therapeutic interventions to track patient progress. The rationale for retention at 3CMS level of care and discharge criteria were also omitted. While PC contacts occurred timely, they were primarily supportive, cell-front, and lacked evidence-informed interventions tied to the treatment plan or explored barriers to patient's participation.

**Patient N**

This 53-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of major depressive disorder and generalized anxiety disorder. Symptoms included intermittent anxiety, a history of depressive moods, and past suicide attempts. The patient was adherent to his prescribed medications which included aripiprazole for auditory hallucinations, buspirone for anxiety, and mirtazapine for mood symptoms.

The patient first entered CDCR on June 20, 2017, served multiple prison terms, last entering on August 26, 2022. The patient was placed at the 3CMS level of care on September 7, 2022. He transferred to CCI on October 19, 2022.

The patient's annual IDTT meeting convened in a confidential setting timely on March 10, 2025, with the patient, alternate PC, alternate psychiatrist, and CCI present. The clinical summary included the current working diagnoses and a brief review of symptoms. The patient agreed to work on managing his anxiety. The PC documented a plan to use therapeutic interventions to address the patient's distorted thoughts and mood disturbance. The rationale for retention at 3CMS was based on ongoing anxiety and the need for continuity of care; however, the case formulation was left blank.

A routine psychiatric contact occurred via telepsychiatry in a confidential setting on December 2, 2024. The psychiatrist assessed the patient symptoms, noting patient's medication adherence, and

the plan to continue patient's medications; however, follow-up psychiatric contacts did not occur again during the review period despite being required every 90 days.

PC contacts occurred timely via telehealth. One contact was clearly documented as occurring in a confidential setting. The patient reported stable mood, mild anxiety related to yard crew work and classes, and openness to exploring coping skills. The PC documented the patient's symptoms tied to treatment targets yet specific therapeutic interventions targeting the patient's anxiety were not consistently documented.

**Findings**

The treatment provided to this patient was inadequate.

While the patient received timely IDTT meetings and PC contacts, there were deficiencies in documentation and continuity of care with psychiatric contacts. The treatment plan omitted a case formulation to guide treatment. Although PC contacts were generally timely and included the use of therapeutic modalities, the documentation did not consistently specify the confidentiality of sessions or the exact interventions used, which is necessary for evaluating the appropriateness and effectiveness of treatment. Furthermore, the lack of regular follow-up psychiatric contacts after December 2024 failed to provide ongoing psychiatric monitoring, especially for a patient with a history of major depressive disorder, anxiety, and suicide attempts and prescribed multiple psychiatric medications.

**Patient O**

This 20-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. The patient was prescribed hydroxyzine on an as needed basis. The patient began his first CDCR prison term on November 12, 2024, and was placed at the 3CMS level of care upon arrival. He transferred to CCI on January 28, 2025.

The initial PC assessment occurred in a confidential setting on February 12, 2025 and documented the patient's history, presenting problems, and a case formulation that referenced cognitive-behavioral interventions. Although the assessment noted the patient denied a history of substance use, the case formulation indicated that patient's behaviors included substance use as a coping mechanism for his maladaptive beliefs without further justification. There was no evidence of an initial psychiatric assessment or psychiatric contacts occurring during the review period following the patient's transfer to CCI.

An IDTT meeting did not occur during the review period, despite the patient's arrival at CCI in January 2025 from a reception center. This left the patient without an individualized comprehensive treatment plan that included measurable goals, specific interventions, and discharge criteria to guide treatment and ensure continuity of care.

A timely routine PC contact occurred via telehealth in a confidential setting. The contact included review of collateral information, mental status, and a brief exploration of the patient's adjustment

and recent RVR for being under the influence of an intoxicant, which the patient denied and planned to file a grievance. The patient was noted to be minimally engaged and although the PC contact was primarily supportive and encouraged future participation, documentation lacked any specific therapeutic interventions and made no reference to the goals of treatment.

**Findings**

The treatment provided to this patient was inadequate.

During the review period, there were no psychiatric assessments or IDTT meetings following patient's transfer to CCI in January 2025 from a reception center. Although the patient's medications were discontinued in November 2024, there was no evidence of ongoing psychiatric assessment or monitoring of the patient's symptoms by psychiatry per Program Guide requirements. In addition, an IDTT meeting did not convene to coordinate patients care to develop a comprehensive treatment plan with measurable goals to guide patient's treatment. This was concerning given patient's recent transfer and first CDCR prison term. In addition, PC contacts, although timely, confidential, and supportive, lacked documentation of therapeutic interventions tied to treatment objectives.

**Patient P**

This 58-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of unspecified depressive disorder, antisocial personality disorder, and multiple substance use disorders, including alcohol, amphetamine-type, cannabis, cocaine, inhalant, opioid, and phencyclidine use disorders, all noted as moderate and some in sustained remission. Symptoms included irritability, limited insight and judgment, and a history of trauma and maladaptive coping. The patient was prescribed fluoxetine for depression which was discontinued on October 17, 2024 and subsequently restarted in April 2025, both changes occurring in response to the patient's requests.

The patient first entered CDCR on October 11, 2006, with a sentence of 49 years and four months to life. He was placed at the 3CMS level of care on October 22, 2006, where he remained, with no history of higher levels of care. He transferred to CCI on January 8, 2025.

The initial PC assessment on January 24, 2025, was completed via record review as the patient refused to engage in the full assessment. The patient denied experiencing any symptoms and stated that his previous PC agreed to remove him from 3CMS. The assessment referenced the patient's treatment plan dated December 2022 with goals targeting depression management and skill-building and a discharge plan contingent on six months of stability and absence of psychotropic medication. While at CCI; however, there was no documentation that an IDTT meeting convened timely to address the patient's request to be removed from 3CMS level of care or to update the treatment objectives. Rather, the last IDTT meeting was the one held on December 29, 2022, over two years prior to the patient's transfer to CCI and over 18 months since the decision to remove the patient from the MHSDS with continued stability.

Routine psychiatric contacts did not occur per Program Guide requirements. Prior to transfer, the patient was last seen by psychiatry in October 2024 when his medication was discontinued. Upon arrival to CCI, the patient was not seen timely by a psychiatrist. The patient submitted a healthcare request on April 24, 2025 requesting to restart his psychotropic medication. The psychiatrist met with the patient for an initial assessment on May 7, 2025, reviewing medication history and restarted fluoxetine with a plan for continued treatment and follow-up in three months.

No PC contacts were documented following the initial assessment in January 2025 which was not in keeping with the Program Guide 90-day required timeframe. The lack of PC contacts for ongoing monitoring and therapeutic interventions at the 3CMS level of care was particularly concerning given the patient's recent medication changes and request to be removed from 3CMS level of care only to initiate a request to restart his antidepressant medication indicating a significant change in mental status, mood, and possibly functioning.

**Findings**

The treatment provided to this patient was inadequate.

During the review period there was no IDTT meeting to address patients request for removal from 3CMS level of care, to assess patient's functioning given his transfer to CCI and medication changes, or to develop treatment objectives. In addition, there were no routine PC contacts to provide therapeutic interventions to address patient's clinical needs especially given patient's recent transfer, medications changes, and request to be discharged from 3CMS level of care only to request to be restarted on medications. In addition, psychiatric contacts were not in keeping with Program Guide requirements with the initial assessment prompted by patient's request to restart medication.

**Patient Q**

This 53-year-old male patient's 3CMS health care record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with a diagnosis of unspecified depressive disorder. The patient was adherent to his prescribed mirtazapine. The patient first entered CDCR on April 27, 1994, and last re-entered on August 3, 2010. He was enrolled in the MHSDS on August 7, 2010, and received treatment at the 3CMS, EOP, and MHCB levels of care, with the last EOP placement occurring in 2020. He transferred to CCI on March 29, 2022, and remained at the 3CMS level of care during the review period.

Routine psychiatric contacts did not occur in accordance with Program Guide 90-day requirement for psychiatric follow-up. Despite a five-month gap between visits, psychiatric documentation reflected patient symptom assessment, medication management, and continuing mirtazapine with a plan to monitor for side effects.

PC contacts occurred more frequently than required, in confidential settings via telehealth. The patient was seen timely in response to a healthcare request. PC contacts were supportive, with the clinician responding to the patient's concerns about frequent clinician changes and discomfort with telehealth, while working to build rapport. PC documentation included the patient's experiences,

his engagement in programming and self-help groups, and referenced the use of CBT, ACT, and DBT techniques, although the specific therapeutic interventions utilized were not documented.

The IDTT convened annually in July, which fell outside the specific review period for this record.

**Findings**

The treatment provided to this patient was inadequate.

Although continuity of care may have historically affected the patient with the multiple changes in PCs, the PC contacts during the review period were timely, confidential, and addressed patient concerns. Although the PC contacts were supportive, confidential, and referenced therapeutic modalities, documentation lacked the specific therapeutic techniques utilized, limiting the ability to evaluate the appropriateness and effectiveness of treatment. In addition, although the patient was clinically stable and actively participated in programming, psychiatric follow-up exceeded the required 90-day timeframe, with a five-month gap between visits, which does not meet Program Guide for patients at the 3CMS level of care.

**Patient R**

This 37-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, unspecified anxiety disorder, antisocial personality disorder, and opioid use disorder, severe in sustained remission. The patient was noted to be adherent to his prescribed escitalopram. He was also prescribed buprenorphine-naloxone for opioid use disorder. The patient began serving his first term within CDCR on October 8, 2015 and entered MHSDS on October 29, 2015. He transferred to CCI on March 25, 2016 and has remained at the 3CMS level of care.

The IDTT met in November 2024, outside the review period.

PC contacts were timely, occurring via telehealth, in confidential settings and consistent with requirements for the 3CMS level of care. The PC documented the patient's current symptoms, mental status, and psychosocial stressors, including anxiety related to his father's illness. The PC addressed the patient's current stressors with a focus on evidence-informed interventions such as CBT, ACT, and DBT. The PC provided supportive listening; however, specific interventions implemented as well as the patient's response to any interventions were lacking. The patient was noted to be stable as demonstrated by his continued participation in programming and a lack of RVRs.

Psychiatric contacts were not timely. Although the patient was noted to be adherent to his psychiatric medications, the psychiatrist did not meet the patient within the required 90-days per Program Guide during the review period. A psychiatric contact occurred outside the review period in June 2025, nearly nine months since the patient was last seen by psychiatry.

**Findings**

The treatment provided to this patient was inadequate.

While the PC contacts were timely and responsive to patient's clinical needs, PC documentation lacked the specific intervention utilized and patient's response to interventions, to track treatment effectiveness of therapeutic interventions utilized. In addition, psychiatric contacts did not occur during the review period leaving the patient without psychiatric contact over nine months. Although the patient was stable, adherent to medication, and engaged in programming, the coordination of care and required psychiatric follow-up was inadequate.

**Patient S**

This 37-year-old male patient's 3CMS health care record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of depression and opioid use disorder, severe. The patient was adherent to his prescribed sertraline. He was also prescribed buprenorphine-naloxone for opioid use disorder. The patient first entered CDCR on April 14, 2011, and was placed in MHSDS at the 3CMS level of care on April 22, 2011, where he has remained since. He transferred to CCI on April 20, 2023.

During the review period, routine PC contacts were timely and occurred in confidential settings via telehealth. The PC and patient discussed emotional stressors, family relationships, and coping strategies. The notes reflect the patient's ongoing participation in substance use programming and vocational activities. The PC also noted when the patient's engagement in programming decreased along with a substance use incident. Although documentation reflected PC ongoing monitoring and support, PC documentation lacked specific therapeutic interventions utilized during sessions which linked to patient's treatment goals.

Routine psychiatric contacts did not occur timely, with a psychiatric contact occurring on March 6, 2025, over five-months since the patient was last was seen by psychiatry. The psychiatrist noted the patient was stable with low acute suicide risk but elevated chronic risk due to his ongoing substance use. The psychiatrist reviewed previous documentation, maintained the current medication regimen, and discussed risks, benefits, and alternatives with the patient.

The IDTT did not meet annually per Program Guide requirements. The last IDTT meeting was held on April 30, 2024, and did not meet again until July 2025.

**Findings**

The treatment provided to this patient was inadequate.

While PC contacts were timely, confidential, and documented patient's psychosocial stressors, the PC documentation failed to include the specific intervention utilized linked to treatment goals. In addition, the IDTT failed to meet annually per Program Guide requirements. There was a significant delay in psychiatric contacts, with a more than five-month gap between patient's previous psychiatric contact, which failed to provide the patient with ongoing psychiatric monitoring and medication management consistent with 3CMS level of care.

**Patient T**

This 56-year-old male patient's 3CMS health care record was reviewed to assess the adequacy of mental health care at CCI. The patient was provided with diagnoses of PTSD; schizoaffective disorder, depressive type; and alcohol use disorder, severe, in sustained remission. Symptoms included depression, anxiety, auditory and visual hallucinations, and a history of suicidality and self-harm. The patient was adherent to his prescribed aripiprazole, fluoxetine, benztropine, and later valbenazine for tardive dyskinesia.

The patient first entered CDCR on March 28, 2023, and was placed in the MHSDS at the 3CMS level of care on April 20, 2023, where he has remained since. On November 19, 2024, he re-entered CDCR to serve a six-year prison term and transferred to CCI from the reception center on January 28, 2025.

The initial PC assessment occurred on February 10, 2025, in a confidential setting via telehealth. The routine PC contact was timely on April 30, 2025, also via telehealth and in a confidential setting, consistent with 3CMS requirements. The initial PC assessment included the patient's current symptoms, diagnoses, psychosocial history, and a case formulation. Routine PC contact documentation included the patient's subjective experience, encouraged the patient to identify goals and coping tools, and referenced the use of CBT, ACT, and DBT strategies; however, lacked the specific therapeutic interventions utilized during the session, and the patient's response to any interventions provided.

The patient was not seen for an initial psychiatric assessment until April 7, 2025 despite receiving an increase in the dose of aripiprazole two weeks prior to his transfer to CCI. The assessment was conducted by a covering psychiatrist in a confidential setting and included a detailed review of symptoms, medication side effects, and risk factors. Akathisia was identified as a side effect of aripiprazole, and the psychiatrist reduced the patient's dose with the plan to discontinue the medication and to follow-up within 30 to 90 days or as clinically indicated. A subsequent psychiatric contact occurred on April 22, 2025, by the patient's assigned psychiatrist who addressed patient's ongoing symptoms, medication adherence, and emerging tardive dyskinesia. The psychiatrist continued the patient's medications and with patient's agreement added valbenazine to address the tardive dyskinesia.

The IDTT did not convene during the review period leaving the patient without a treatment plan that identified treatment objectives and therapeutic interventions to address the patient's clinical needs and to ensure continuity of care.

**Findings**

The treatment provided to this patient was inadequate.

While the PC contacts were timely, confidential, and provided ongoing assessment of patient's functioning per Program Guide timeline requirements, there were gaps in the coordination of patient's care. Specifically, the IDTT did not convene upon arrival from the reception center,

leaving the patient without a treatment plan to establish treatment objectives, guide clinical interventions, and ensure continuity of care. In addition, psychiatric contacts were delayed, resulting in the patient not receiving timely psychiatric assessments and monitoring, which are essential to ensure continuity of care, to prevent lapses in treatment, assess for side effects, and mitigate risk, especially for patients with complex psychiatric diagnosis and recent medication changes. In this case, the patient was experiencing side effects possible due to a medication change, that went unaddressed for nearly three months.

**APPENDIX B - 3**
**California Health Care Facility (CHCF)**
**Review Period: July 1, 2024 to December 31, 2024**

**Patient A**

This 42-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with a diagnosis of depressive disorder, due to another medical condition, with mixed features. He was fully adherent to his prescribed mirtazapine. This patient has been incarcerated since April 2002. He was not enrolled in MHSDS until October 2005 when he was placed at the MHCB level of care and discharged to the 3CMS in November 2005. The patient remained primarily at the 3CMS level with two placements at the MHCB level of care through March 2013 when he was removed from MHSDS. He was placed at the 3CMS level of care in April 2014 through May 2020, when he was admitted to the MHCB level of care. He was discharged to 3CMS level of care and returned to MHCB in December 2020, when he was again discharged to the 3CMS level of care. On May 27, 2021, while at CHCF, his level of care was elevated to EOP.

There was no IDTT meeting completed with this patient during the review period. In fact, the last IDTT with this patient was held on June 18, 2024 (as of January 27, 2025). The most recent treatment plan was reviewed for context. Required staff and the patient were present for the meeting. Documentation indicated that the patient had mental health needs related to complicated grief, depression secondary to sickle cell anemia, frustration, anger, poor impulse control. and poor distress tolerance. Patient strengths and patient verbalized goals were documented and were both measurable and objective. The formal treatment plan included three goals, some of which were similar in content to the patient's verbalized goals but were less objective and not measurable.

The patient was housed on a medical unit secondary to his medical needs.

The patient was not seen weekly by an MHPC. He was seen seven times during the six-month review period. None of the contacts reflected the goals or interventions outlined in the treatment plan and did not address the patient's identified frustration and irritability. Further, many of the MHPC's notes were generic in content and included the same text copied from session to session including typographical errors and outdated information regarding the patient's "upcoming" IDTT in June 2024. The sessions did not address the patient's needs, referral requests, or address the fact that the patient had engaged in a hunger strike despite a documented plan to see the patient more often in response to a team meeting related to his hunger strike. Psychiatric contacts were offered monthly, although the patient often refused the contacts. The content of these contacts was adequate. The patient was offered between three and five group sessions with either recreational therapist or psychiatric technicians weekly, and documentation of these sessions was adequate.

**Findings**

Treatment of this patient was inadequate. He was not seen as required by the Program Guide and sessions with his MHPC did not reflect the use of interventions outlined in the treatment plan or

in keeping with the patient's needs. The patient was also not offered sufficient structured treatment hours. Psychiatric contacts were adequate.

**Patient B**

This 39-year-old transgender female patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with diagnoses of gender dysphoria, unspecified depressive disorder, and unspecified personality disorder. An additional diagnosis of unspecified anxiety disorder was found in progress notes by both the MHPC and psychiatrist. The patient was fully adherent to her prescribed escitalopram. This patient was incarcerated for the first and only time in May 2014. She was first enrolled in the MHSDS at the 3CMS level of care in July 2014. Other than one admission to the MHCB level of care in October 2018, she remained at the 3CMS level of care until November 12, 2024 when she was elevated to the EOP level of care while at CHCF in a medical unit.

An initial MHPC assessment was completed with the patient on November 15, 2024, within the required timeframe. The content of the assessment was almost entirely copied from prior assessments and included information from prior years without any updates as to the patient's current level of functioning or mental health needs. The assessment was inadequate. An initial psychiatric assessment was completed on November 19, 2024. The psychiatrist indicated that the patient's recent increase in level of care was to introduce coping skills, recognize cognitive distortions, challenge negative thoughts, and manage emotions. The psychiatric assessment was superficial and much of it was copied from other clinicians' assessments and documentation. There was a brief mental status examination and note about increasing the patient's medications. The assessment was minimally adequate.

An initial IDTT was held on November 21, 2024 with required staff present, but the patient refused to attend. There were no updates to the clinical summary, case formulation, or other areas of the IDTT documentation except for the date that the treatment goals were initiated. This date was changed to November 21, 2024 despite the goals themselves being unchanged since October 31, 2024 when the patient was at the 3CMS level of care. The goals did not reference the reason for EOP placement noted by the psychiatrist but instead focused only on the patient identifying triggers for depression and anxiety. The listed interventions were inadequate and consisted only of the MHPC assisting the patient in identifying triggers. There was no reference to psychiatric interventions, groups, or evidence-based treatments to address the patient's symptoms. There was no rationale for the patient's placement at the EOP level of care or criteria for discharge.

On December 1, 2024, the patient requested to be seen by the psychiatrist. The patient was seen on December 5, 2024 and the psychiatrist documented allowing the patient to vent frustrations during the session. There were no contacts with the MHPC documented during the review period. The patient was offered five to eight hours of groups weekly, facilitated by recreational therapists and psychiatric technicians. Some of the groups appeared to be in line with the patient's identified needs.

**Findings**

Treatment of this patient was inadequate. Initial assessments and the patient's treatment plan were largely inadequate and did not clearly outline the patient's needs or rationale for placement at the EOP level of care. The patient was not seen as required by the Program Guide nor offered treatment in keeping with the treatment plan.

**Patient C**

This 62-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with diagnoses of major depressive disorder, recurrent episode with psychotic features and intellectual disability requiring a DDP3 designation. He was prescribed sertraline and ramelteon and was fully adherent. This individual was incarcerated for the first time in 1983. During his four periods of incarceration, he was not enrolled in MHSDS. During his fifth period of incarceration, he was admitted to Atascadero State Hospital in November 1991 for almost a year. He was incarcerated most recently in May of 1994. Since that time, he has been treated at all levels of care with the exception of acute inpatient placement. He has primarily received services at the EOP level of care with his most recent MHCB placement occurring in August 2021. He has been receiving services at the EOP level of care at CHCF since that time.

The patient's most recent IDTT was completed in August 2022. At that time, the patient's treatment plan included goals to address the patient's depression and hallucinations. The patient had not been seen by his IDTT in over two years, thus his treatment progress and rationale for placement at the EOP level of care were unknown. There were two Interdisciplinary Support Team (IDST) reviews completed during the review period. Both included a review of the patient's required adaptive support and the patient reported receiving the support he needed.

Monthly contacts were held with the psychiatrist which indicated the patient was stable on his medications and these observations were confirmed through record review and collateral information. In October 2024, the patient mentioned a belief he would be transferred as his medical condition no longer warranted placement at CHCF, yet with the lack of IDTT meetings, this could not be confirmed. There was a single contact with an MHPC in October 2024 which included no information about the patient's mental health treatment progress, mental health needs, or treatment goals. The content was generic and appeared to be based on a template. There was no reference to the patient's belief he was transferring. Additionally, the MHPC deferred level of care discussion to the IDTT without any recognition that no IDTT had been held with the patient in over two years.

The patient was offered three to eight groups each week, all facilitated by recreational therapists which he attended intermittently.

**Findings**

This patient's treatment was inadequate, although it was difficult to discern what the patient's treatment needs were in light of the absence of a treatment plan, treatment review, or assessment of the patient's functioning. The patient was seen monthly by a psychiatrist who assessed the

patient to be stable on his current medications. Recreational groups were offered but documentation revealed little in terms of the patient's functioning.

**Patient D**

This 65-year-old transgender female patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. There was no diagnosis of record available, yet progress notes from the psychiatrist indicated gender dysphoria; bipolar disorder, current episode depressed, severe, with psychotic features; borderline personality disorder; and opioid use disorder, severe. The patient was fully adherent with her prescribed divalproex sodium, mirtazapine, and olanzapine.

This patient was incarcerated for the first and only time within CDCR on September 6, 2023. She was placed at the 3CMS level of care soon after incarceration. In December 2023, she was placed at the MHCB level of care and was discharged to the EOP level of care but returned to MHCB two weeks later. In January 2024, the patient was placed in the inpatient setting and received services at APP and ICF levels of care through September 4, 2024 when she was discharged to the EOP level of care. She had a brief MHCB stay in October 2024, was elevated to the APP level of care for two weeks and discharged to the EOP level of care at CHCF on October 28, 2024. Records indicated that the patient was wheelchair-bound secondary to an amputation.

Despite the level of care change to EOP on October 28, 2024, records indicated that the patient did not transfer from the inpatient setting until November 7, 2024 when she was transferred to a medical unit. Five-day follow-up contacts were completed for six days. Two of these days the contacts were completed by a telepsychologist. The patient was noted to be disheveled and delusional and not all contacts included review of the patient's safety plan.

An initial psychiatric assessment was completed on November 15, 2024 and noted that the patient was diagnosed with schizoaffective disorder and not bipolar disorder. Further, the psychiatrist noted that the patient's lithium was abruptly discontinued on October 28, 2024 by a covering psychiatrist. The patient was demonstrating disorganized behavior, evidenced grandiose delusions, was incontinent for urine, and was taking items from peers and irritating them. The psychiatrist completed a comprehensive history and chart review and restarted the patient on lithium.

An initial MHPC assessment was completed on November 15, 2024 and included little to no updated information, including no reference to the patient's recent inpatient placement or ongoing treatment needs. The assessment was inadequate.

An initial IDTT was held on November 19, 2024 with the patient's assigned MHPC, psychiatrist, and the patient in attendance. There was no correctional counselor present. There was no evidence that the MHPC had met with the patient prior to the meeting. The treatment plan appeared to have been created while the patient was in the inpatient setting as the progress sections noted that the patient was awaiting transfer to the EOP level of care. Therefore, it was unclear what the patient's treatment goals were for her placement in EOP. There was no mention of the patient's upcoming release in May and no rationale for the patient's placement at the EOP level of care nor criteria for

discharge. There was evidence that the patient was being seen for individual sessions with a social worker to address substance use and trauma yet this was not integrated into the patient's overall treatment in any way nor included on her treatment plan. Additionally, the last time the patient had been seen to discuss her upcoming release was in October 2024, prior to her discharge from the inpatient setting.

The patient's only routine contact with an MHPC occurred on December 4, 2024. The content of the documentation was sparse and appeared to be derived from a template as the language was generic and unchanged from documentation seen in other patients' records. The MHPC's documentation inconsistently used the patient's preferred pronouns and evidenced little therapeutic intervention. The patient was seen again by a psychiatrist on December 6, 2024 and asked to have her lithium stopped secondary to kidney side effects. The patient was placed on valproic acid as an alternative.

The patient was seen in response to an urgent referral via telemental health on December 17, 2024. The patient expressed anxiety about a recent evaluation for placement at DSH upon release in February 2025. The contact was adequate.

Recreational therapy sessions were offered three to six hours weekly with some evidence of participation.

**Findings**

Treatment of this patient was inadequate. Continuity of care was poor as the patient was seen by a number of clinicians and psychiatrists with little evidence of integration or an overall treatment plan for the patient's identified treatment needs. The patient's documented treatment plan was inadequate and failed to address her needs while in the EOP program. The patient's upcoming release was not being adequately addressed nor were her struggles with hygiene.

**Patient E**

This 30-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with diagnoses of schizophrenia and adjustment disorder with depressed mood. He was fully adherent to his aripiprazole and mirtazapine. This patient was incarcerated for the first and only time within CDCR on September 5, 2024. He was placed at the 3CMS level of care for less than a week before being elevated to the EOP level of care. He transferred to CHCF on October 16, 2024.

An initial MHPC assessment was completed on October 22, 2024 and included mostly copied text from a previous assessment but did include an updated mental status examination. There was no clear indication of the patient's current treatment needs. An initial psychiatric assessment was completed by a telepsychiatrist on October 24, 2024 and was adequate. An initial IDTT meeting was held on October 31, 2024 with required staff and the patient present. A treatment plan was developed with adequate goals and interventions to address the patient's identified needs. Group enrollment, including signing up for NLTGs, was discussed during the meeting. There was adequate justification for retaining the patient at the EOP level of care.

The patient was seen by his assigned MHPC once every three weeks. These contacts evidenced review of the patient's symptoms and program participation. Interventions were provided to assist the patient in attending groups more regularly as he often missed more than half of his groups. Monthly contacts with the telepsychiatrist were adequate.

There was evidence that the patient was offered groups facilitated by either a recreational therapist or a psychiatric technician three to six times per week. The patient did not routinely attend groups and reported having a job in the afternoons which conflicted with his groups. The MHPC worked with the patient to rectify conflicts to ensure group participation.

**Findings**

Despite not meeting Program Guide requirements for frequency of MHPC contacts, treatment of this patient was adequate.

**Patient F**

This 41-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with diagnoses of posttraumatic stress disorder, major depressive disorder recurrent episode with psychotic features, and amphetamine-type substance use disorder moderate in early remission. He was fully adherent to his prescribed sertraline. This patient was incarcerated for the first time within CDCR in 2017 and was not enrolled in MHSDS services. He returned to CDCR for his current period of incarceration in August 2021 and was placed that the 3CMS level of care in December 2022. He did not receive mental health services between February 16, 2024 and April 26, 2024 when he was placed at the MHCB level of care. He was discharged to the EOP level of care in May 2024 and transferred to CHCF on October 22, 2024.

An initial psychiatric assessment was completed on October 30, 2024 by a telepsychiatrist. The assessment was adequate; however, the diagnoses of major depressive disorder and posttraumatic stress disorder were both noted to be provisional without further explanation. An initial MHPC assessment was completed on November 1, 2024 but not all sections of the mental status examination sections were completed and much of the clinical documentation appeared to be pulled forward from a previous assessment without updates.

An initial IDTT was completed with the patient and all required staff on November 7, 2024; however, the MHPC at the meeting was not the patient's assigned MHPC and had not met the patient previously. IDTT documentation was adequate with treatment goals developed to address the patient's identified needs. The goals were measurable and the interventions were appropriate however there was no mention of groups nor psychiatric interventions. Rationale for placement at the EOP level of care was vague and there were no discharge criteria documented. In a separate note, the nurse who was present at the meeting documented that the patient was educated about how to enroll in NLTGs.

A routine follow-up SRE was completed via telemental health with the patient on November 14, 2024 and it was adequate.

The patient was seen every two to three weeks by his MHPC and these contacts were adequate with evidence of interventions provided in line with the treatment plan. The patient's overall participation in the EOP program was routinely assessed. In December, the patient was transferred to a telemental health provider and that transition appeared adequate. Monthly psychiatric contacts were adequate; however, provisional diagnoses were not resolved nor was there documentation regarding what about the patient's presentation was insufficient to make full diagnoses.

The patient was offered three to five groups weekly and attended most. These groups were facilitated by recreational therapists and psychiatric technicians.

**Findings**

Treatment of this patient appeared adequate despite not being offered individual and group treatment in keeping with the requirements of the EOP program. Improvements in the initial MHPC assessment and psychiatric diagnostic formulation could have been improved.

**Patient G**

This 32-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with diagnoses of unspecified mood disorder and opioid use disorder, moderate, in early remission. He was not prescribed any psychotropic medications but was prescribed buprenorphine-naloxone. This patient was incarcerated for the first and only time within CDCR in October 2012. Other than a brief (less than 90-day) placement at the 3CMS level of care in 2013, he did not receive MHSDS services until October 2020 when he was placed at the 3CMS level of care through May 2023. At that time, he had an extended placement (20 days) at the MHCB level of care and discharged to the EOP level of care for only two days before returning to the MHCB level of care. He was discharged to the EOP level of care on June 29, 2023 and transferred to CHCF on October 16, 2024.

His initial MHPC assessment was completed timely on October 24, 2024 by the unlicensed psychologist who was assigned to the patient. There was no evidence in the health care record that his assessment was co-signed by a licensed clinician. The assessment was adequate and included goal setting and discharge criteria; however, the case formulation needed improvement. An initial psychiatric assessment was completed the following day by the patient's assigned telepsychiatrist and was adequate. An initial IDTT meeting was held as required on October 29, 2024. Required staff and the patient were present along with a nurse, medical assistant (for the telepsychiatrist), and social worker. While the clinical summary contained measurable and objective goals to reduce anxiety and depression, no baseline information was provided by which to judge improvement. Justification for the patient's continued placement at the EOP level of care was generic. Further, the patient's diagnosis was unclear as both initial assessments included a diagnosis of major depressive disorder, recurrent episode, moderate, yet the initial IDTT documentation indicated a

diagnosis of unspecified mood disorder without explanation. The psychiatrist continued to document a major depressive disorder during follow-up contacts.

The patient was seen nearly weekly by his MHPC and monthly by his psychiatrist with evidence of interventions being provided in accordance with the treatment plan. While the patient was offered at least five hours of group weekly, he rarely attended due to competing obligations of work and substance use programming. The patient asked to be reduced to 3CMS and a special IDTT was held, yet the patient was not moved to a lower level of care secondary to not participating in EOP groups. This was confusing, as the patient was demonstrating a high level of functioning and his lack of EOP group participation was secondary to engaging in other meaningful activities.

**Findings**

Treatment of this patient was adequate; however, he was retained at the EOP level of care despite indications of higher functioning and the patient's request to be reduced to the 3CMS level of care. Additionally, documentation by an unlicensed psychologist was not co-signed and the patient's diagnostic picture was unclear.

**Patient H**

This 55-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with diagnoses of posttraumatic stress disorder, unspecified depressive disorder, and alcohol dependence, in early remission. He was fully adherent to his prescribed sertraline and was prescribed hydroxyzine as a PRN. This patient was first incarcerated in March 2017. On the same day he was received within CDCR, he was placed at the MHCB level of care and subsequently transferred to the ICF level of care where he remained for nine months. He was discharged to the EOP level of care on January 23, 2018. He was released from custody in April 2021 but returned to in April 2024 and was immediately placed at the EOP level of care where he has remained since. He transferred to CHCF on June 28, 2024.

An initial psychiatric assessment was completed by a telepsychiatrist on July 3, 2024 and was adequate. An initial MHPC assessment was completed later than required on July 23, 2024 by an unlicensed social worker and the documentation was not co-signed by a licensed clinician. The assessment was inadequate in that it included no updated information other than a superficial mental status examination. An initial IDTT was held later than required on July 25, 2024. The clinical summary and case formulation were inadequate but the treatment plan evidenced a measurable goal. The intervention listed on the plan did not match well with the goal and there was no mention of groups or medication to assist the patient.

The patient's MHPC did not provide weekly contacts. In fact, the first contact with the patient was on September 5, 2024 and was unscheduled, as the patient stopped the clinician to request services. The patient expressed the need for a contact as he was not feeling stable, yet no contact was scheduled until nearly one month later. Subsequent contacts were superficial and evidenced no interventions despite the patient reporting increased symptoms and an upcoming parole hearing.

None of these issues evidenced follow-up. Fortunately, the telepsychiatrist saw the patient monthly and provided psychotherapeutic interventions to address the patient's increasing symptoms and challenges with coping.

There was no evidence that the patient was offered treatment groups for the first two months at CHCF, then he was routinely offered six to eight groups per week and attended almost all of them. There was also evidence that the patient had a job and was enrolled in ISUDT programming. Of note, the patient reported looking forward to ISUDT groups so that he could receive therapy.

**Findings**

Treatment of this patient was inadequate. Despite increased symptoms and poor coping, the patient was not provided with MHPC contacts as required or in keeping with his needs. Group programming consisted entirely of recreational groups and did not address the patient's mental health symptoms. There was no evidence that his assigned unlicensed clinician's documentation was being reviewed by a supervisor. Fortunately, timely and adequate psychiatric interventions were provided.

**Patient I**

This 66-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with a diagnosis of major depressive disorder, recurrent episode, with psychotic features. He was fully adherent to his prescribed aripiprazole, fluoxetine, and mirtazapine. This patient was first incarcerated within CDCR in January 1986. He was released on parole and ultimately discharged from CDCR in May 1994. There is no evidence that this patient received mental health services during this period. He was reincarcerated in July 1997 and was placed at the 3CMS level of care through September 2005, when he was elevated to the EOP level of care. He has been treated at the EOP level of care since that time and transferred to CHCF in August 2015.

This patient's last IDTT meeting was held on April 2, 2024. He has not been seen quarterly by his IDTT as required. At that time, one treatment goal to address the patient's grief secondary to a cancer diagnosis was developed yet the goal and interventions were vague. There was no justification for the patient's level of care and no discharge criteria.

The patient was seen sporadically by his MHPC, sometimes being seen weekly and other times not quite monthly. The contacts evidenced interventions and a review of the patient's group participation and functioning. The patient's treatment goal was vaguely addressed in sessions. Telepsychiatric contacts occurred at least monthly and were adequate. The patient was typically offered six groups weekly and attended approximately half of what was offered. He was also noted to have been enrolled in school during the review period.

**Findings**

Treatment of this patient was not adequate. Despite routine telepsychiatric contacts and occasional meaningful contacts with his MHPC, the patient's mental health needs were not addressed at the

level required by EOP level of care placement. He had not been seen by his IDTT in ten months at the time of this review.

**Patient J**

This 51-year-old male patient's record was selected at random to assess the quality of mental health services provided to patients at the EOP level of care at CHCF. This patient was provided with diagnoses of anxiety disorder and unspecified depressive disorder. He was prescribed mirtazapine and divalproex sodium as PRN medications. This patient was incarcerated for a prior term between April 1997 and February 1998 and did not receive MHSDS services at that time. When he returned to CDCR in September 1999, he was not enrolled in MHSDS until December 1999 and placed at the 3CMS level of care. He was discharged from MHSDS in May 2010 and returned to the 3CMS level of care in March 2018. He was elevated to the EOP level of care at CHCF on July 26, 2024. IDTT documentation on that date noted increased isolation, grief over recent family losses, a history of suicidal ideation in response to grief, and the need for increased level of mental health support.

An initial psychiatric assessment was completed timely on August 6, 2024. The assessment was not adequate as there was no identification of the patient's current mental health needs and his history was only reviewed through 2018. Additionally, the documentation included contradictory statements that the patient was both adherent and non-adherent to his medications. At that time, the patient was prescribed divalproex in the evenings. The psychiatrist noted that the patient was not taking his divalproex consistently, so it was changed to PRN dosing. Consultation with a psychiatrist revealed that it is atypical for divalproex to be prescribed as needed, as efficacy is contingent upon optimal serum levels which are unlikely to be reached when a patient takes the medication sporadically.

An initial MHPC assessment was completed timely on August 7, 2024 and was inadequate as there was no evidence of updated information and the assessment was completed by an unlicensed clinician with no evidence of supervisory review. The following day, the patient's initial IDTT was held but his assigned MHPC, who completed the initial assessment, was not in attendance. Other required staff and the patient were in attendance, as was a nurse. It was noted that the patient's mental health symptoms were impacting his ability to attend work, resulting in RVRs for missing his assignment. While a goal was set to decrease depression, no baseline rating was provided and there were only vague interventions which did not include groups or psychotropic medications. There was no evidence of input from other IDTT members and there was no rationale provided for the patient's placement at the EOP level of care nor discharge criteria. Further, the functional assessment indicated no impairments despite the narrative including reference to the patient's symptoms affecting his ability to attend his work assignment. There were no subsequent IDTT meetings for this patient through the date of this review (February 10, 2025).

The patient was offered one MHPC routine session between August and December 2024 which he refused. He was seen for monthly psychiatric contacts through October 2024 but then not again through the remainder of the review period. When the review was expanded to the current date (February 10, 2025) there was no evidence that a psychiatrist had seen the patient. When the patient was seen by the psychiatrist, most contacts were cell-front secondary to the patient being

at work during his scheduled appointments. There was no evidence that the psychiatrist reviewed whether the patient was taking any medications.

During the review period, the patient was offered four hours of groups weekly and typically did not attend. There was no evidence that his MHPC was tracking his group participation or his mental health needs.

**Findings**

Treatment of this patient was inadequate. He was not seen as required by his MHPC, his psychiatrist or the IDTT and was not offered groups in keeping with expectations. The patient was elevated to the EOP level of care in order to receive increased mental health support and yet there was no evidence that this was being achieved. Further, there was no evidence that the patient's mental health status was being adequately monitored.

**Patient K**

This 58-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of schizophrenia and opioid use disorder, moderate with symptoms that included depressed mood and auditory hallucinations. The patient was prescribed olanzapine, aripiprazole, sertraline, and benztropine. Additionally, the patient was a participant in the ISUDT and was prescribed buprenorphine-naloxone. He was reportedly medication adherent.

The patient entered CDCR to serve his first term on January 21, 2003, and he previously received mental health services at the 3CMS, EOP, MHCB, and acute levels of care. The patient transferred to the CHCF EOP on December 10, 2023.

An updated treatment plan was significantly delayed and did not occur during the review period. The last documented IDTT meeting convened on January 18, 2024; however, the treatment plan was largely incomplete and indicated a lack of thorough clinical oversight and continuity of care. Without measurable treatment targets, the patient's progress and the effectiveness of treatment interventions could not be determined.

The patient was not scheduled for weekly PC contacts or alternating individual and EOP caseload groups with the assigned PC as required. Rather, the patient was only seen for four PC contacts during the review period: once in August, once in September, and twice in December 2024. Although two PC contacts were scheduled during October 2024; the patient declined both, and follow-up contacts did not occur. Three of the four PC contacts occurred in a confidential setting. The PC documentation outlined the patient's current concerns and issues, assessed their mood, and provided psychoeducation. Although the documentation indicated that coping skills were reviewed with the patient, and there was a plan to continue CBT and other therapeutic techniques in the sessions; there was inadequate documentation of specific treatment interventions implemented. While the contacts appeared appropriate in addressing the patient's concerns, the PC contacts were inconsistent and infrequent. In addition, there was no evidence that the patient

received treatment aimed at addressing his goals, and the effectiveness of interventions was uncertain.

Routine psychiatric appointments generally occurred timely. The psychiatric contacts occurred by telepsychiatry, and a telehealth presenter was utilized. During psychiatric contacts, the patient denied acute concerns. The patient requested psychotropic medication changes due to side effects of weight gain. The patient was also prescribed Ozempic. During November 2024, the psychiatrist prescribed Abilify with taper and discontinuation of Zyprexa; however, the patient began refusing Zyprexa in December 2024. The psychiatrist provided psychoeducation regarding medication management during the psychiatric sessions. It was noted that the patient had drug screens that were positive for gabapentin that was not prescribed to the patient; however, that concern was not adequately targeted in treatment planning.

During the review period, the patient was scheduled the required structured therapeutic activities that included his work as a porter and therapeutic groups that focused on stress management, coping skills, anger management, current events, rational behavior/decision-making, life skills, recreational groups/leisure activities, and nurse-led treatment groups.

**Findings**

The treatment provided to this patient was inadequate.

The IDTT meetings were significantly delayed, and contacts with the PC were inadequate and untimely. Although routine psychiatric appointments occurred timely and appeared to address the patient's needs; interaction with the assigned PC remained minimal occurring only four times during the review period. This was concerning given the multiple ongoing medication adjustments and the reported use of non-prescribed substances. The infrequent PC meetings hindered access to care, the development of a comprehensive treatment plan, and the opportunity to provide evidence-based treatment interventions.

Additionally, there were documentation omissions; the IDTT documentation was not adequately completed which did not allow for measurable treatment targets or adequate assessment of the patient's progress and the effectiveness of treatment. In addition, the PC documentation was generally limited and did not indicate whether planned or clinically indicated interventions were utilized.

**Patient L**

This 55-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of major depressive disorder and bereavement. Additionally, the patient reported persistent pain from an injury sustained in 2021 for which he underwent surgery on September 9, 2024. He was prescribed sertraline and gabapentin with partial adherence.

The patient served multiple CDCR terms, and he received prior treatment at the 3CMS and EOP levels of care. He was housed at the CHCF EOP from November 14, 2016 until November 4, 2024, when the patient was transferred to the MCSP RHU.

During the review period, the IDTT did not convene as required. As there was no treatment plan completed during the review period, the treatment plan dated April 2, 2024 was reviewed for context. On that date, the treatment team convened with the required participants that included the assigned PC and psychiatrist, the CCI, RN, and the patient. The clinical summary effectively conveyed the patient's trauma history, diagnosis of depression and grief, and included the symptoms of depressed mood and isolation. The patient's attendance was recorded at 69 percent, and documented barriers included compounded grief from multiple losses. The patient expressed a goal to avoid isolation during depressive episodes. The treatment plan focused on addressing grief and depression; however, measurable goals to evaluate treatment effectiveness needed improvement. The treatment plan also failed to include the patient's progress toward the documented goals and lacked a clear rationale for either maintaining the current level of care or for setting discharge criteria necessary for transition to a lower level of care.

Notably, the patient received two RVRs in July 2024. On July 10, 2024, the patient received an RVR for alcohol possession and was noted to have received four prior RVRs for the same behavior. On July 31, 2024, the patient received an RVR for behavior that could lead to violence after demonstrating aggressive behavior. However, when assessed by mental health, the patient's actions were not deemed significantly influenced by their mental health. Despite the increase in the number of RVRs, the patient was not seen earlier for an IDTT meeting or by the assigned PC to determine whether a higher level of care was indicated.

Routine PC contacts did not occur timely; the patient was only seen once by the assigned PC on July 10, 2024 for an RVR mental health assessment and not again until September 9, 2024. Although individual PC appointments were scheduled for October 2024, the patient refused to attend and was not seen for a follow up check in by the PC at cell front. The next PC contact occurred on October 28, 2024 prior to the patient's transfer to the MCSP RHU. During the two PC appointments, although the patient reported feeling generally okay; he expressed concern about his anxiety and depression that worsened with the anniversaries of family deaths. Despite that, patient contacts were not increased which limited the patient's access to necessary therapeutic treatment interventions and support.

The patient was housed in segregation from July 31, 2024 to August 20, 2024 where he did not receive adequate access to mental health treatment with individual PC or group contacts. The limited PC contacts impeded the patient's continuity of care. The access to care remained concerning, as the patient discussed problems with accessing nurse-led treatment groups during the second PC contact on October 28, 2024.

Routine telepsychiatry contacts generally occurred timely except for lack of psychiatric contact in September 2024. When the patient refused four psychiatric sessions in July 2024, the psychiatrist saw the patient on the unit for follow up; this was, however, complicated by the patient's second tier housing which did not allow for patient wellness checks which custody mandated only occur on the first floor. The patient was reportedly not in acute distress at that time.

On July 18, 2024, the patient discussed treatment options with the psychiatrist and expressed a desire to manage grief through group therapy while maintaining his medication regimen. By

August 2024, the patient's mood stabilized with no significant depressive or anxiety symptoms, and medications remained unchanged. The patient's mood further improved after his return to the E-yard. While some stress related to personal anniversaries of loss was noted, the patient reported that the current medication was effective, and he had no side effects. The psychiatrist consistently documented ongoing assessment of the patient's symptoms, medication options were discussed, and psychoeducation regarding medication risks and benefits was provided.

During the review period, the patient was offered the minimum number of structured therapeutic activities required; however, his attendance was sporadic. The patient was scheduled to attend groups related to specific mental health issues, substance use/addiction, rational behavior and decision making, stress management, mood management, anger management, coping skills group, and nurse-led treatment groups, as well as recreational therapist groups, such as current events.

**Findings**

The treatment provided to this patient was inadequate.

The patient received multiple RVRs and often refused treatment; however, an IDTT meeting did not occur during the review period to address the patient's symptoms, barriers to treatment, or the need for higher level of care referral. Although psychiatric contacts generally occurred timely and were adequate; PC contacts only occurred twice during the review period which impaired the patient's access to care and continuity of care. The limited frequency of contacts and the poor treatment provided as well as the lack of adequate treatment planning and consideration of higher level of care referral particularly during periods of heightened emotional distress were concerning.

**Patient M**

This 50-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of schizoaffective disorder, bipolar type, and generalized anxiety disorder. His symptoms included auditory hallucinations, anxiety, depressed mood, apathy, restricted affect, poor attention and concentration, depressed mood, anhedonia, anergy, and sleep disturbances. The patient was reportedly adherent with benztropine, bupropion, buspirone, divalproex sodium, and olanzapine. The patient additionally had diagnoses of seizure disorder, hyperreactive airway disease, hypertension, dyslipidemia, and glaucoma.

The patient first entered CDCR on September 23, 1998, and he previously received mental health services at all levels of care. The patient transferred to CHCF on July 16, 2015.

During the review period, a quarterly treatment team meeting did not occur as required. As no treatment plan was completed during the review period, the January 9, 2024 treatment plan was reviewed for context. At the time, the IDTT noted that the patient met the higher level of care criterion for participation in less than 50 percent of EOP treatment; the patient reported dissatisfaction with the content of the groups. The patient's treatment refusal was attributed to his symptoms, and treatment participation was targeted with plans to consider the patient for the 3CMS level of care by the next IDTT meeting if his attendance did not improve. The remaining

sections of the treatment plan were not completed except for IPOCs pulled forward targeting depression, and treatment nonadherence was added.

Routine PC contacts did not occur timely. The PC was an unlicensed social worker who met with the patient for individual contact only on three occasions during the review period, on October 9, 2024, November 14, 2024, and December 20, 2024. Each PC contacts occurred in a confidential setting and noted that the patient's group attendance was 76 percent on October 9, 2024. On November 14, 2024, the patient reported managing auditory hallucinations by socializing and attending groups. During December 2024, the patient reported difficulty during the holidays and problems attending treatment due to anxiety; however, individual contacts were not increased. Moreover, the specific interventions used and the patient's reactions to them were not documented in the PC contact notes. Additionally, each note reiterated the same plan/disposition and outlined a generalized approach that included supportive therapy, psychoeducation, and recreational therapy as well as PC and psychiatric contacts.

Routine psychiatric contacts occurred timely. Psychiatric contacts occurred by telepsychiatry in a confidential setting. The clinical needs of the patient were addressed by medication adjustments as indicated. The patient reported a generally positive response to an increased dosage of BuSpar for managing anxiety. The patient reported that he was coping well with occasional auditory hallucinations. The patient also reported depression that was improved from prior holiday related depression. At the December 3, 2024 appointment, the psychotropic medications were continued unchanged, and the patient was reportedly stable.

During the review period, the patient was offered the required minimum of structured treatment activities. The patient was also enrolled in education classes and was scheduled for anger management, mood management, social skills, health issues, recreational, and leisure groups.

**Findings**

The treatment provided to the patient was inadequate.

Notably, the treatment team did not convene an IDTT meeting to clarify the patient's diagnoses, goals, or to develop evidence-based interventions necessary for adequate treatment planning and continuity of care. Access to necessary treatments was also insufficient, as patient contact with the IDTT did not occur timely, and the assigned PC only met with the patient on three occasions. Additionally, the treatment planning included vague interventions of psychoeducation, supportive therapy, and recreational therapy, making it unclear what interventions were utilized during PC contacts as well as the effectiveness of the interventions.

**Patient N**

This 36-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of unspecified depression and anxiety; a provisional diagnosis of adjustment disorder was also documented.

The patient served multiple CDCR terms beginning on January 10, 2008. The most recent term began on August 28, 2023, and the patient had received mental health treatment at the 3CMS and EOP levels of care. He transferred to the CHCF EOP on December 15, 2023.

Routine IDTT meetings did not occur during the review period until December 31, 2024, so the prior December 28, 2023 treatment plan was reviewed for context. An IPOC for depressed mood was documented; however, goals to reduce the patient's depression included generic interventions such as goal setting. Documentation regarding the patient's symptoms, functioning, and update on patient's treatment response was needed. A safety plan created October 17, 2023 was pulled forward. The treatment plan was largely incomplete, and the patient's verbalized goals, the rationale for retention at the current level of care, and the criteria for discharge from the EOP level of care were not documented.

A subsequent IDTT meeting did not convene for over one year on December 31, 2024. Although the assigned PC and psychiatrist, RN, medical assistant, and CCI were present; the patient did not attend. The IDTT documentation was sparse. Specific symptoms supporting the provided diagnoses and the patient's functioning were not documented; the only documentation regarding functioning was that the patient attended 58 percent of the groups. The case formulation was omitted as well as the IPOC for depression. The treatment plan only targeted increasing treatment participation without considering the patient's anxiety or depression. Measurable goals and appropriate interventions of motivational interviewing and psychoeducation were included; however, barriers to treatment participation were not specifically addressed.

The assigned PC was a telehealth social worker who met with the patient in a confidential setting with a medical assistant present; however, routine PC contacts did not consistently occur as required. The patient was generally scheduled for PC contacts only twice monthly; however, due to the patient refusing, leaving early, or not wanting to meet by telehealth because a medical assistant was present, he was typically seen only once monthly during the review period. Additionally, the patient was not offered alternating EOP groups with the assigned PC which also impacted the patient's access to care. The patient experienced frustration and dissatisfaction with telehealth sessions, and he stated his discomfort with the presence of the telepresenter during the session.

Follow-up PC sessions occurred on October 24, November 4, and November 15, 2024 by telehealth when the tele-presenter was absent. The patient expressed anxiety about his upcoming release, frustration with his substance use group, and reflected on past trauma linked to his substance use. The PC addressed the patient's concerns of anxiety, depression, and substance use, and adequate interventions that included substance use relapse prevention and reviewing coping strategies were provided to manage the patient's anxiety. The patient's progress toward the treatment plan goals was, however, not tracked. A December 5, 2024 telehealth PC session with the telepresenter present occurred when the patient described sleep concerns and nightmares. Notably, the patient declined to talk during the December 20, 2024 routine telehealth PC contact with the telepresenter present.

Routine psychiatric contacts occurred timely by telepsychiatry in confidential settings. The psychiatrist provided assessment of the patient's symptoms and adjusted medications as indicated.

On September 19, 2024, the patient reported anxiety and nightmares due to his upcoming court date. The patient requested, and the psychiatrist added BuSpar while continuing Zoloft. Medication side effects were explored, and the patient was provided with medication psychoeducation. Despite having a diagnosis of depression, the psychiatric notes indicated consideration of a diagnosis of unspecified depression/anxiety versus adjustment disorder, however diagnostic clarification was needed and did not occur.

The patient was offered more than the minimum required structured therapeutic activities weekly, and he was enrolled in clinical pre-release, college classes, life skills, mood and anger management, relapse prevention, social skills, and nurse-led treatment groups.

**Findings**

The treatment provided to this patient was inadequate.

Although psychiatric consultations occurred by telepsychiatry timely; IDTT meetings and PC contacts did not occur timely which interfered with access to care, quality of care, and the timely assessment of patients' needs and identification of barriers to treatment participation. Although adequate interventions were generally implemented during telehealth contacts; the patient expressed discomfort having a telepresenter present, yet subsequent contacts included a tele-presenter which was potentially a barrier to treatment engagement and participation. The documentation also required improvement in better tracking the patient's progress with measurable goals to determine treatment effectiveness.

**Patient O**

This 36-year-old non-binary EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of methamphetamine-induced psychotic disorder, cluster B personality disorder, amphetamine-type substance use disorder, severe, and opioid use disorder, severe. The patient's symptoms included anxiety, hypervigilance, panic with shortness of breath, rumination, worry, sadness, irritability, lack of concentration, anhedonia, impulsivity, poor coping, and auditory hallucinations when under the influence. The patient was prescribed benztropine and chlorpromazine with medication adherence. The patient was a participant in the ISUDT and was prescribed Suboxone.

The patient had received mental health treatment at the 3CMS, EOP, and MHCB levels of care. The most recent MHCB placements occurred from April 1, 2024 to April 12, 2024 due to danger to self, and from May 28, 2024 to May 30, 2024 due to significant impairment and dysfunction caused by mental illness. The patient transferred to the EOP level of care at CHCF on June 6, 2024.

An initial PC assessment and an IDTT meeting occurred on June 26, 2024. A 90-day follow-up quarterly IDTT meeting, however, did not occur during the review period; therefore, the June 26, 2024 treatment plan was reviewed for context. During the June 2024 IDTT meeting, the assigned PC and psychiatrist, the CCI, RN, and the patient were present. A safety plan dated June 11, 2024 was carried forward providing a comprehensive list of suggestive interventions. Although the

patient was noted with passive suicidal ideation prior to MHCB admission, the patient maintained that she was not suicidal at that time.

The treatment plan clinical summary provided limited clinical information and omitted the patient's diagnosis and supporting symptoms. The patient's history included eight RVRs in the past year. The patient was prescribed Suboxone with two months of sobriety. The case formulation was sparse, and the patient's verbalized goals were not incorporated into the treatment plan. The treatment plan aimed at addressing the patient's anxiety, depression, ineffective coping skills, and substance use. Although goals were established for anxiety and depression, there were no specified goals for ineffective coping skills or substance abuse included. Additionally, while coping skills were included as an intervention for depression; evidence-based treatments such as CBT were absent, and no interventions were included to address the patient's ineffective coping skills or substance use. Details regarding the patient's progress toward treatment goals were omitted, and no rationale or criteria for retention at the current level of care or for discharge to a lower level were provided.

A suicide risk assessment was completed on August 31, 2024, and the documentation noted the patient's use of illicit substances resulting in MHCB admissions that was consistent with the patient's report of the use of spice and methamphetamine that precipitated the MHCB placements in April and June 2024 due to auditory hallucinations and paranoia.

On November 22, 2024, a suicide risk assessment was completed after the MHCB placement, and the patient was assessed with low suicide risk. At that time, she expressed optimism, motivation for treatment and had a positive outlook for the future.

Routine PC contacts did not occur timely, and when they did occur; they were conducted by an unlicensed social worker. Other than the RVR mental health assessment in July 2024, the patient was not seen for individual PC contacts until September 2024; at that time, the patient requested to be seen unscheduled. The patient was only seen for four individual PC contacts during the six-month period; he was seen in September and December 2024, and twice in October 2024. The PC contacts occurred in a confidential setting.

On September 5, 2024, the patient reported an overdose with subsequent hospitalization. However, she reported feeling safe with improved mood and a desire to engage in treatment. On October 2, 2024, the patient was described as future-oriented and expressed a desire to obtain a GED; on October 16, 2024, she had enrolled in school, attending numerous groups, and was future focused regarding release from prison. The patient was not seen again until December 18, 2024. The PC documentation needed improvement, as it was unclear which interventions were utilized. Additionally, the rationale for retaining the patient at the EOP level of care was vague, and the plan disposition was generic largely repeating the same content in each PC note.

Routine psychiatric contacts did not occur timely. In July 2024, the patient was irritable after not receiving a package; due to safety concerns as determined by custody staff, the psychiatrist did not meet with the patient but rather observed her from the first floor and noted that the patient was not in distress. In addition, although the patient was seen in a confidential setting from August to October 2024, there were no documented psychiatric contacts in November and December 2024

despite the patient's treatment with antipsychotic medication. During the three psychiatric sessions, the patient's symptoms were assessed, medication options and side effects were discussed, and the patient's needs were addressed. However, follow-up was indicated in November and December 2024 to adequately evaluate the patient's clinical needs and to monitor psychotropic medication treatment.

During the review period, the patient received an RVR on July 21, 2024 for being out of bounds, and an RVR mental health assessment determined that the patient's behavior was not likely connected to symptoms of a mental illness. Another assessment was completed on December 22, 2024 for another RVR for being out of bounds; however, the assessment determined that the patient's mental health factors might have contributed to the alleged behavior that led to the RVR.

Despite the lack of routine individual contacts, the patient was offered more than the minimum required structured therapeutic activities. The scheduled groups included focus on mood management, relapse prevention, current events, anger management, social skills/communication, stress management, leisure activities, and recreational activities; the patient was also enrolled in education classes.

**Findings**

The treatment for this patient was inadequate.

Although the patient was offered the requisite structured therapeutic activities, PC and psychiatric contacts as well as the IDTT meetings did not occur as required. This impaired meaningful collaboration among treatment providers and the patient in therapeutic treatment planning. The patient's access to care and continuity of care was impaired. There was also an absence of developed measurable goals necessary to guide treatment and to measure progress to determine the effectiveness of interventions. When PC contacts did occur, there was a failure to document the patient's progress along specified goals and what interventions were utilized which undermined the quality of care and the effectiveness of the treatment. The patient's preferred pronouns were also not consistently used in the clinical healthcare documentation.

**Patient P**

This 61-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of schizoaffective disorder, depressive type; major depressive disorder with anxious distress; and major depressive disorder with psychotic features. He was prescribed buspirone, amitriptyline, mirtazapine, sertraline, and pimavanserin with medication adherence. His medical conditions included degeneration of the cervical intervertebral disc, long QT syndrome, spinal stenosis, hypertension, hyperthyroidism, and history of gastrointestinal disease. The patient utilized a wheelchair and hearing aids.

The patient's symptoms included depressed mood, a loss of interest in activities, social isolation, fear of others, and reduced attendance in group settings as well as intermittent auditory hallucinations. His history included both physical and sexual abuse, and the patient reported multiple past suicide attempts.

The patient entered CDCR on January 19, 1993, and served multiple CDCR terms; the last term began on February 20, 2003. While in CDCR, the patient received mental health treatment at the EOP, MHCB, and intermediate levels of care. The patient transferred to CHCF on August 17, 2015.

A follow-up routine IDTT meeting had not occurred since March 3, 2023. At that time, the patient was identified for consideration of referral to a higher level of care, as he attended less than 50 percent of required groups; however, it was noted that his significant medical conditions prevented his group attendance.

Routine PC contacts did not occur timely, but they were conducted in confidential settings. The patient was seen only once in July, August, and September 2024, and he was seen twice monthly in June, November, and December 2024. The patient was not included in alternating EOP caseload groups. The PC documentation, however, reflected that the PC addressed group attendance and the patient's concerns and adequately implemented interventions such as psychoeducation, goal setting, positive reinforcement, and review of coping skills. The patient denied barriers to group attendance including interpersonal conflicts.

On November 3, 2024, a SRASHE was completed after a PREA report in which three patients were observed on camera assaulting the patient. The evaluation occurred in a confidential setting. The patient was described as vulnerable and shocked with dysphoric affect. The clinician discussed coping skills with the patient who denied thoughts of self-harm. His suicide risk was assessed as low, and the patient was cleared to return to his housing unit. The assessing clinician notified healthcare providers and custody with the recommendation that the patient might benefit from individual therapy to address the incident. Despite that recommendation, the patient was not seen for increased frequency of PC contacts.

On November 7, 2024, the assigned PC saw the patient for a routine consult. The patient was seen in a confidential setting, and he reported that he had already spoken to medical, custody, and psychiatry since submitting the request to be seen. The patient reported that the PREA incident continued to impact him with nightmares and significant anxiety. After discussion with the patient who requested a single cell; the PC contacted the correctional counselor who agreed to follow up with the patient regarding temporary single cell status.

On November 19, 2024, the treatment team convened for the first time since the March 30, 2023, IDTT meeting; the assigned PC and psychiatrist, the CCI, RN, and senior supervising psychologist were present as well as the patient. The patient was identified for higher levels of care consideration due to attending insufficient structured therapeutic activities; however, justification for not increasing the patient's level of care and treatment modifications to address patient barriers were not documented. Although treatment nonadherence was included as a focus of the treatment plan; the interventions to be utilized were vague, and a plan to address the barriers to treatment with adequate interventions was not documented. Likewise, EOP modified programming was not considered.

The clinical summary provided a diagnosis of major depressive disorder with anxious distress; however, the psychiatrist documented a diagnosis of major depressive disorder with psychotic features. The patient's symptoms were included, and IPOCs for depressed mood and treatment nonadherence were continued. The treatment plan primarily targeted treatment nonadherence, depression, and trauma-related symptoms; the plan included measurable short and long-term goals to track progress. The interventions were evidence-based but were somewhat vague and required specific evidence-based interventions to address the patient's treatment nonadherence rather than merely stating that the PC would "assess barriers to group attendance and assist the patient in overcoming them". The discharge plan and rationale for maintaining the current level of care and criteria for discharge were also vague. Due to the patient's trauma history and the diagnostic discrepancies, diagnostic clarification was clearly indicated.

That same day, the PC met with the patient in a confidential setting for a routine PC contact. The patient reported anxiety and depression regarding the PREA incident. The PC utilized appropriate interventions and met with the patient again on December 3, 2024 and December 10, 2024, when the patient reported continued depression with a only minor improvement in anxiety and poor group attendance.

Routine psychiatric contacts occurred timely during the review period and were conducted by telepsychiatry with a medical assistant present. During the contacts, the patient's symptoms were assessed, treatment options were discussed, and the side effects of medications were reviewed. The patient continued treatment with Zoloft, Vistaril, and BuSpar. On August 28, 2024, the patient discussed reduction of his medication by neurology due tremor and noted that he continued to do well off Seroquel. On November 4, 2024, the patient reported increased depression with auditory hallucinations related to the recent PREA incident and requested treatment with Remeron. The previous medications were continued with the addition of Remeron, and a psychiatric follow-up occurred on November 18, 2024. It was noted that the patient recently went to the hospital for hyperkalemia and elevated creatinine levels; the potential impact of the patient's psychotropic medications and increased risk of metabolic side effects were discussed. The patient reported improvement with Remeron, however, and his medications were continued. On December 9, 2024, the patient reported improved mood, satisfaction with his current psychotropic medication regimen, and he requested continuation of his medications unchanged.

The patient worked part-time as a porter and was assigned groups such as cognitive behavioral therapy, anger management, mood management, coping skills group, leisure activities, and relapse prevention. Although the patient's group attendance was limited, modified programming was not considered to increase the patient's access to care.

**Findings**

The treatment provided to this patient was inadequate.

While psychiatric contacts occurred timely, the IDTT meetings and PC contacts did not occur timely. In addition, diagnostic clarification, higher level of care justifications, and a plan to address existing barriers to treatment attendance were needed. Those deficiencies negatively impacted the patient's access to necessary care and disrupted continuity of care leading to ineffective treatment

planning. Those omissions in care were particularly concerning, as the patient was the recent victim of a possible sexual assault and a subsequent SRASHE recommended individual therapy that was not provided as recommended. Consideration of EOP modified programming was not documented, even as the patient exhibited worsening mental health symptoms related to the traumatic event.

**Patient Q**

This 66-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of schizophrenia, paranoid type and delusional disorder. The patient had symptoms including paranoid delusions, auditory and visual hallucinations, increased alertness, agitation, and social isolation. During the review period, the patient declined psychotropic medication treatment. The patient also had diagnoses of vitamin D deficiency, atrial fibrillation, and acute diastolic heart failure.

The patient first entered CDCR on December 24, 1998 and received treatment at the 3CMS, EOP, and MHCB levels of care.

The patient was discharged from the MHCB where he was treated from May 7, 2024 to May 14, 2024 due to significant impairment resulting from symptoms of mental illness. His level of care was increased after the patient refused medications due to acute psychosis and paranoid delusions. The patient's mental illness reportedly interfered with his medication adherence which exacerbated his life-threatening medical conditions. Following MHCB discharge, the patient transferred to the CHCF EOP.

The IDTT convened timely on July 2, 2024, and all required participants were in attendance including the patient. The IDTT noted that the patient attended less than the minimum required treatment hours for the past three months. As such, the treatment team placed the patient on EOP modified programming with the rationale that the patient had not attended groups due to a language barrier and increased paranoia of larger groups with the plan to encourage the patient to attend smaller groups focused on leisure and arts.

The clinical summary did not provide meaningful updates regarding the patient's treatment. Although it was noted that the patient was provided a diagnosis of schizophrenia; symptoms supporting the diagnosis were not documented. The patient denied symptoms, history of mental illness, or the need for treatment; and the treatment planning aimed to address the patient's paranoid delusions. However, the treatment interventions needed improvement, as the treatment plan noted psychoeducation and psychotropic medications; however, the patient refused prescribed psychotropic medications throughout his incarceration. Discharge planning and rationale for the patient's retention at his current level of care included his placement on EOP modified programming; however, the plan did not indicate specifically how the patient's treatment would be modified, only that his program would focus on groups including leisure activities and arts.

Routine PC contacts did not occur timely and only occurred on average twice monthly by telehealth. Despite placement on EOP modified programming; monthly IDTT meetings did not

occur, nor were PC contacts increased. The patient was not provided with adequate access to treatment. Additionally, IDTT meetings did not occur timely.

During July 11, July 19, and August 1, 2024 PC contacts; the assigned PC saw the patient by telehealth in a confidential setting. On August 27, 2024, the patient was seen by an unlicensed psychologist. In November and December 2024, the patient was seen by a third PC who then informed the patient on December 5, 2024 that they were transferring to another yard. The patient was seen by three different PC clinicians which negatively impacted continuity of care. The quality of the PC documentation varied significantly, and some of the PC documentation was poor and included inconsistent information.

Routine psychiatric contacts occurred timely through October 2024 and generally occurred with the assistance of a telephone translator. Although the patient was typically offered psychotropic medication treatment; the patient declined, and supportive therapy and psychoeducation regarding psychotropic medication treatment were provided.

The patient received an RVR on November 8, 2024 for continued refusal to work or participate in work/training; however, when assessed by mental health on November 18, 2024, the patient's mental health symptoms were determined to be directly linked to the alleged behavior.

Although the patient was offered the requisite structured treatment activities; he attended an average of five and a half hours of structured therapeutic activities weekly during the review period. Assigned groups included community meeting, leisure activity, stress management, relapse prevention, and social skills/communication groups.

**Findings**

The treatment provided to this patient was inadequate.

Continuity of care was negatively impacted by limited PC contacts, multiple PC providers, and untimely IDTT meetings. Despite an RVR, bizarre behavior, and placement in EOP modified programming; monthly IDTT meetings did not occur, nor was there an increase in PC contacts. In addition, treatment planning failed to provide adequate rationale for retaining the patient at the current level of care, despite the patient's identification for consideration of referral to a higher level of care. Additionally, a plan to address the patient's treatment nonadherence was not documented. The patient was placed on EOP modified programming without specific details outlining treatment expectations. Additionally, the treatment plan included psychotropic medication as an intervention which was inappropriate, as the patient consistently refused psychotropic medication treatment, and the plan did not adequately address treatment nonadherence.

**Patient R**

This 36-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and

depressed mood; additional diagnoses of ADHD and bipolar disorder were also present in the healthcare record. He was not prescribed psychotropic medications during the review period. The patient had a history of self-injurious behavior, a head injury, and two suicide attempts by overdose that occurred more than ten years prior.

The patient entered CDCR on December 1, 2022 and had received mental health services at the various levels of care. The patient transferred to the CHCF EOP on February 7, 2023; however, he transferred to the MHCB from August 4, 2024 to August 15, 2024.

Timely IDTT meetings did not occur during the review period. The last IDTT meeting occurred in December 2023; the December 05, 2023 treatment plan was reviewed for context. Although the patient's history was included in the clinical summary identifying depression, ADHD, and anxiety as current symptoms to address; no treatment goals were identified, the patient's verbalized goals were not included, and the rationale to retain the patient at the current level of care was not included. The treatment plan did not provide sufficient guidance for treatment and lacked measurable goals and evidence-based interventions. That shortfall negatively impacted continuity of care and team collaboration in assessing and addressing the patient's treatment needs.

A subsequent IDTT meeting did not occur until over one year later on December 31, 2024; that meeting included the assigned psychiatrist, an alternate PC, the CCI, an RN, and the patient. The clinical summary maintained the patient's history. A meaningful updated biopsychosocial assessment of the patient's current presentation was included. At that time, the patient assessed his depression and anxiety as low, and agitation was moderate due to issues with his cellmate and dissatisfaction with his job. Although the patient's diagnosis was included, specific symptoms justifying the diagnosis were not documented. Additionally, functional impairments were attributed to the patient working late resulting in sleeping in and missing groups. Furthermore, treatment planning was inadequate, as the patient's verbalized goals for treatment were not included nor were treatment targets identified or measurable goals established. Additionally, adequate interventions were not provided, nor was the patient's progress toward treatment goals updated. Although discharge planning and criteria were adequate, the justification for retaining the patient at the current level of care was needed.

Routine PC contacts did not occur timely, and only three PC contacts occurred during the six-month review period; those contacts occurred in a confidential setting by an unlicensed social worker. There were notable documentation deficiencies regarding the interventions applied and the patient's responses to those interventions during PC contacts. That lack of detail made the treatment effectiveness and the patient's engagement unclear. Inadequate rational and criteria for discharge were cut and pasted unchanged for each note. In addition, the tracking of progress towards measurable goals was not documented.

Notably, in the December 31, 2024 PC note, the PC indicated that the patient wanted to work on further reduction of depressive symptoms with the plan to utilized CBT interventions to address cognitive distortions and mindfulness techniques including relaxation, meditation, and distress tolerance for his work in the kitchen.

Routine psychiatric contacts occurred timely, and the patient was reportedly doing well without psychotropic medication treatment and was anticipating his upcoming parole. The patient's symptoms were routinely assessed, and treatment options were discussed; however, the patient declined medication treatment.

The patient was offered sufficient structured treatment activities that included clinical prerelease, mood management, coping skills, leisure activities, daily living skills, social skills/communication, and recreation groups. Additionally, NTLG groups addressed PTSD, borderline personality disorder, and tobacco use. The patient attended an average of 17.31 hours of structured therapeutic activities weekly. The patient also was enrolled in college courses.

**Findings**

The treatment provided to this patient was inadequate.

The patient was seen for adequate psychiatric monitoring and was offered structured treatment activities. IDTT meetings and PC contacts, however, did not occur timely. The treatment plan lacked explicit goals, omitted the patient's verbalized goals, and failed to provide a rationale for the current level of care or consideration for a lower level. Care continuity emerged as a major concern resulting in ineffective treatment planning and inconsistent implementation of interventions during the required weekly PC contacts. The absence of documented patient goals and rationales hindered communication and collaboration among the treatment team members and compromised continuity and effectiveness. Additionally, the PC documentation and treatment plans failed to document the patient's progress toward measurable goals which hampered adjustments to the treatment plan and responsiveness to the patient's needs. Consequently, there were problems with access to care, treatment was provided by unlicensed practitioners, and there was insufficient documentation and progress tracking; those factors negatively impacted the effectiveness of the treatment provided.

**Patient S**

This 40-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided a diagnosis of schizoaffective disorder, bipolar type. The patient also had a seizure disorder. He was reportedly adherent with prescribed aripiprazole, levetiracetam, and sertraline.

The patient previously received mental health services at all levels of care including 3CMS, EOP, MHCB, intermediate, and acute levels of care. The patient had a suicide attempt by hanging while at PVSP; that attempt resulted in the patient being life-flighted to an outside hospital and subsequently admission to the CMC MHCB from April 15, 2016 to May 2, 2016. The patient transferred to CHCF on November 26, 2019 from the CHCF ASU.

The IDTT did not convene timely during the review period; the last IDTT meeting occurred on February 22, 2024. A quarterly IDTT meeting did not occur in May 2024, but rather occurred on September 5, 2024 and not again during the review period. The September 5, 2024 IDTT meeting was identified as a quarterly IDTT/special IDTT to determine whether the patient remained in a

double cell or was appropriate for dormitory housing. An unlicensed psychologist was the assigned PC; however, they had not met with the patient since February 22, 2024. In addition, an alternate psychiatrist, a CCI, senior psychologist, RN, and the patient was in attendance at the IDTT meeting.

The IDTT documentation provided a meaningful clinical summary that noted the patient's progress; it was noted that the patient was psychiatrically stable with a reduction in depressive symptoms during the past year. He made progress in developing coping skills to manage his anger, was engaged in treatment, and he worked as an ADA worker. The IPOCs documented issues related to depression, anxiety, treatment nonadherence, and anger that were carried forward from February 22, 2024. Within the clinical summary, patient goals and interventions for anxiety and depression were included; but baseline measures were not provided. Measurable goals to decrease anger were needed with interventions specific to each target rather than a list of interventions to be utilized for all targets. Justification for the current level of care was adequate and was supported by a discharge plan that included the patient attending 75 percent of groups over the next six months, remaining free of RVRs and inpatient referrals or admissions for one year, managing ADLs over the next year, and achieving medication adherence. Lastly, the treatment team recommended that the patient remain in a double cell rather than dormitory placement.

Routine PC contacts did not occur timely. Although the patient met with an unlicensed psychologist on July 7, 2024, the PC did not meet with the patient again until August 7, 2024. PC contacts occurred only once in July and October 2024, but they occurred more frequently in other months. During routine PC contacts, the patient's symptoms were assessed, and his clinical needs were addressed with appropriate therapeutic interventions aligned to treatment goals. In addition, the routine PC documentation generally tracked the patient's depression and anxiety on a self-rated scale during each PC contact following the development of treatment goals. Notably, the patient consistently rated his depression and anxiety as low with elevated levels in December 2024 due to work related concerns. Additionally, routine PC progress referenced meaningful therapeutic interventions during the PC contacts.

Routine psychiatric contacts occurred timely and were conducted by telepsychiatry with a telepresenter present in a confidential setting. The patient was reportedly adherence with prescribed Abilify and Zoloft. The patient was described as stable and consistently denied medication side effects.

On September 5, 2024, the patient was assessed for an RVR due to behavior that could lead to violence on August 29, 2024. An RVR mental health assessment determined that the patient's behavior was related to his mental illness that was exacerbated by his grandmother's recent cancer treatment, refusal of treatment, and being informed that he would transfer to another facility.

During the review period, the patient was offered more than the minimum structured therapeutic activities required; he attended less than 10 hours weekly. The assigned groups included mood management, social skills/communication, substance use/addiction, health issues, daily living skills, and leisure activities. The patient worked as an ADA worker and porter.

**Findings**

The treatment of this patient was adequate.

Although the PC contacts and IDTT meetings did not occur timely; psychiatric contacts were provided timely. The patient was also offered the requisite structured therapeutic activities, and PC and psychiatric contacts were adequate. Although access to care was impacted by the delay in IDTT meetings and PC contact; the IDTT convened once during the review period when an updated case summary was provided, and treatment targets were developed that included collaboration among treatment team providers to provide interventions to address the patient's clinical needs. Although additional measurable goals were needed to address the patient's anger, PC contact documentation tracked the patient's progress toward treatment goals and included adequate interventions to address the patient's clinical needs.

**Patient T**

This 47-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of major depressive disorder, recurrent episode, severe; anxiety; amphetamine-type use disorder, severe; opioid abuse; and opioid use disorder, severe. He was prescribed bupropion with medication adherence. The patient had mobility limitations, a traumatic brain injury, history of Crohn's disease, treatment for hepatitis C, low back pain, lumbar radiculopathy, hypertension, and he utilized hearing aids.

The patient previously received mental health services at the 3CMS, EOP, MHCB, and acute levels of care. He had six prior MHCB placements and one acute hospitalization during December 2023. The patient subsequently transferred to the CHCF EOP on April 19, 2024.

The patient's symptoms included depressed mood, anxiety, difficulty sleeping, and maladaptive coping strategies. The patient also had a history of racing thoughts, rigid thinking, poor insight, low frustration tolerance, and intermittent reactive behavior. The patient also had multiple medical issues as well as recent family losses.

The patient's history included both physical and sexual abuse. In addition, he also had a history of self-injurious behavior and one suicide attempt.

No IDTT meetings occurred during the review period; the May 7, 2024 treatment plan was reviewed for context. During that treatment team meeting, all required participants were in attendance except for the patient who refused to attend. The treatment plan noted that patient verbalized an understanding of treatment goals that included decreasing anxiety and depressive symptoms, exhibiting treatment improvement, and fully participating in EOP programming. The patient's goals were not reflected in the treatment plan, and IPOCs for depressed mood and anxiety were carried forward with measurable goals but vague interventions.

A suicide risk assessment was completed on July 12, 2024, as one of the four 90-day follow-up assessments after following inpatient discharge. The patient was assessed with high chronic and moderate acute suicide risk. A safety plan was developed, and it included the patient consistently

meeting with the PC to review coping strategies, to monitor symptoms of depression, and to encourage attendance in groups and self-care activities.

Routine PC contacts did not occur timely but occurred in confidential settings. On August 2, 2024, the patient informed the PC of a family member's death, but he declined a meeting on August 8, 2024 opting to wait for their scheduled meeting on the following day. The PC contacts and treatment was at times delayed due to various factors that included the PC attending to other crises, PC training, and the patient's refusal to meet without a ducat. Meaningful contact with the assigned PC did not occur until September 19, 2024. The patient was noted to be 73.6 percent adherent with bupropion and attended 29 percent of his group sessions. The PC informed the patient the assignment of a new PC, and the patient requested a meeting with the new PC on the following day.

The patient had significant medical concerns that resulted in medical hospitalization. The patient reportedly collapsed during a meeting with the supervising psychologist hitting his head against the wall before landing face down on the floor and requiring transport and treatment at an outside hospital.

On September 27, 2024, the patient was seen by the PC for a suicide risk assessment. The patient denied current suicidal ideation but admitted to suicidal ideation two months prior due to family losses and health issues. He reported ongoing distress related to medical concerns and sleep issues but despite feeling distressed, isolated, and anxious; he reportedly had slight improvement. Given the patient’s symptoms, the PC indicated the need for a safety plan, and the patient's current suicide risk was assessed as moderate. The PC indicated that the patient would be seen weekly and as needed.

Despite noting weekly check-ins, the patient was not seen again until November 6, 2024, when he met with the newly assigned PC who was a licensed psychologist. The PC then met with the patient every other week by telehealth in a confidential setting with the assistance of a telepresenter. The clinician assessed the patient's mood and sleep difficulties and incorporated strategies including CBT and psychoeducation. Despite the patient’s request for in-person sessions that occurred more frequently, a program supervisor who addressed the patient’s concern encouraged the patient to allow more time with the newly assigned telemental health PC. At the next PC contact, the patient’s mood was described as frustrated; he requested a short session due to a medical appointment, but he continued to meet with the assigned PC for subsequent contacts.

The patient was seen for timely psychiatric contact that occurred by monthly telepsychiatry sessions aided by a telepresenter in a confidential setting. His symptoms were addressed by psychotropic medications with reported effectiveness despite ongoing depression. Progress was initially noted in symptom management; however, on November 20, 2024, the patient reported increased depression and anxiety due to family issues, and he requested resumption of Benadryl. On December 18, 2004, the patient reported overall improvement in his mood which he attributed to his social supports and effective medication treatment.

During the review period, the patient received two RVRs; he received an RVR on July 1, 2024 for delaying a peace officer in the performance of duties which was not assessed to be related to his

mental illness, and he received another RVR on December 30, 2024 for disrespect with potential for violence/disruption when the patient's mental health factors were determined to have potentially contributed to the alleged RVR behavior.

The patient was scheduled to attend leisure activities, mood management/education by a recreational therapist, therapeutic community, relapse prevention, stress management and social skills/communication groups. Although the patient was offered sufficient structured therapeutic activities, he attended an average of less than five hours weekly during the review period. The patient, however, was not identified for higher level of care consideration, as the IDTT did not convene during the review period.

**Findings**

The treatment provided to this patient was inadequate.

Although psychiatric contacts occurred timely and addressed the patient's clinical needs; the overall treatment provided to the patient was inadequate due to significant delays in accessing PC therapeutic services which were critical for ongoing care especially given the patient's recent family death, symptoms, and medical concerns. In addition, continuity of care was negatively impacted, as three different PCs saw the patient during the review period. The patient also requested to see the PC in person rather than by telemental health and to be seen more frequently; however, the patient was assigned a telehealth clinician who met with him every other week which was less than the required frequency.

IDTT meetings did not occur timely, and treatment planning was inadequate to address the patient's clinical needs or barriers to treatment participation. The lack of timely interventions and clear treatment planning contributed to ongoing continuity of care issues and ultimately impacted the overall effectiveness of the treatment provided.

**Patient U**

This 48-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided a diagnosis of panic disorder, mild, without agoraphobia. He declined psychotropic medication treatment. The patient was housed in the OHU due to significant medical conditions including status post kidney transplant, diabetes, immunosuppression due to drug therapy, glaucoma, unilateral hearing loss, history of lumbar spine surgical repair with resulting leg neuropathy, migraine headaches, and hypertension. He was prescribed multiple medications for his medical conditions.

He arrived at CHCF on June 25, 2024 from CIM, and he had received mental health services only at the 3CMS level of care. The initial PC assessment was completed in a confidential setting on July 14, 2024, and he participated with the use of a Spanish speaking interpreter. The patient was engaged and cooperative in the assessment and reportedly was glad to be at CHCF. His mental status was described as clear, and he denied any depression or anxiety. The PC noted that the patient had a history of chronic medical concerns but no current mental health diagnosis. The

patient reported that he knew how to manage his symptoms effectively using his coping skills and CDCR resources.

An initial psychiatric assessment occurred on July 24, 2024, the day before the initial IDTT meeting and almost one month after the patient's arrival. The psychiatrist noted that the patient was in the MHSDS to address anxiety and panic attacks which occurred while he was at CIM; those symptoms had not occurred since he arrived at CHCF. The patient declined treatment with psychotropic medications and told the psychiatrist that he did not want to take those medications due to his medical concerns and kidney transplant. The psychiatrist noted that the patient was stable, and his mental status was described as normal with mild anxiety.

The initial IDTT meeting occurred one month after the patient's arrival at CHCF. The patient, a covering PC, the assigned psychiatrist, CCI, and a translator attended the meeting. The treatment team noted that the patient was provided the diagnosis of panic disorder after he experienced frequent panic attacks at CIM, but he had no recurrence since CHCF arrival. The patient was reportedly medication adherent with his medical medications, and the CCI and psychiatrist provided support regarding participation in 3CMS activities and groups. The primary treatment goals were to maintain no panic attacks and to decrease overall anxiety. The interventions were generalized and inadequate, and level of care and discharge criteria were not provided. Overall, treatment planning was inadequate due to the lack of specific interventions to address the patient's current anxiety and history of panic attacks.

As of April 13, 2025, the patient was not seen by a psychiatrist for individual contact after the initial psychiatric assessment on July 24, 2024.

One routine PC contact occurred during the review period on December 24, 2024 by telemental health in a confidential setting, and that was the first time that the patient met his PC. He denied any significant symptoms including depression or anxiety and reported that his medical medications were working well. The PC provided motivational interviewing and active listening and stated that the patient would be seen quarterly according to the 3CMS triage plan.

The patient was not offered clinical mental health groups during the review period, but he participated in AA and self-help groups to prepare for parole.

**Findings**

The treatment provided to this patient was inadequate.

Although the patient maintained overall clinical stability, there were significant lapses in care. The initial assessments, routine clinical contacts, and initial IDTT meeting were severely delayed. The treatment plan lacked specific, measurable treatment goals and did not include any specific interventions or discharge criteria. Although the patient declined psychotropic medication treatment at the initial psychiatric assessment; he was not seen for follow-up psychiatric contacts or check-ins to further address the need for medication treatment. The frequency of PC contacts was also inadequate, as the patient did not meet his assigned telemental health PC until December 2024, approximately six months after his arrival to CHCF.

**Patient V**

This 64-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of major depressive disorder, recurrent, severe with psychotic features; unspecified schizophrenia; and opioid use disorder. He was prescribed Remeron and Prozac during the review period, and he was previously prescribed Zyprexa. He was placed at the 3CMS level of care at the reception center, and he had no higher level of care placements. Significant medical concerns included impaired mobility, left-sided weakness, hypertension, hepatitis C, and gastroesophageal reflux disease.

The patient arrived at CHCF on January 24, 2023 from the reception center. The initial psychiatric assessment occurred on February 10, 2023; however, the initial PC assessment was delayed until April 26, 2023, and the initial 3CMS IDTT meeting did not occur until August 2, 2024 which was approximately 19 months after his arrival to CHCF.

The initial IDTT meeting on August 2, 2024 was attended by the assigned PC and telepsychiatrist, the telepresenter, and a CCI. The patient was not present at the IDTT meeting due to a scheduling conflict with an ISUDT class. Treatment planning was inadequate. There were no treatment goals, objectives, or interventions documented. An IPOC for depressed mood was initiated on June 23, 2024, but it was not updated and lacked substantive interventions or treatment strategies. One treatment goal to decrease depression to a specified level was included in the clinical summary. The treatment team noted that the patient consistently attended ISUDT and GED classes as well as 3CMS groups and that his depression was recently assessed at the specified goal. The treatment planning lacked discharge or level of care retention criteria. No higher level of care indicators were noted by the IDTT.

The patient was seen for four psychiatric contacts during the review period. The contacts were provided by telepsychiatry in a confidential setting and were well documented including relevant updates to the patient's functioning and response to treatment. The psychiatrist noted that the patient was engaged in treatment and programming and consistently reported stable mood and no significant symptoms. The patient and psychiatrist actively collaborated regarding medication management, and the patient requested discontinuation of his antidepressant medications as his symptoms had improved; subsequently, the psychiatrist tapered Remeron and later Prozac. The patient remained stable after the medication discontinuation. The psychiatrist noted that by the end of the review period, the patient had completed ISUDT and had taken his GED test.

The patient was seen in a confidential setting on November 23, 2024 for one routine PC contact during the review period. The only other routine PC contact documented during 2024 occurred on June 23, 2024. The PC documented appropriate therapeutic interventions that included person-centered therapy and psychoeducation and indicated that the patient was stable without significant symptoms or concerns. The progress note did not reference the IPOC or treatment plan, but indicated that the patient would meet with the PC every 90 days and would be monitored for signs of decompensation or increased symptoms.

The patient was not offered mental health or recreation-based groups during the review period, but he participated in ISUDT groups.

**Findings**

The treatment provided to this patient was minimally adequate.

Despite inadequate treatment plan documentation and the lack of PC contacts, the patient remained clinically stable during the review period and responded well to the interventions provided by his clinicians. He received adequate psychiatric care that was collaborative, and he eventually tapered off antidepressant medications and remained stable. Although seen for only one routine PC contact during the review period; that contact was well documented, and the PC included appropriate interventions and support. The patient completed ISUDT classes and was highly engaged in available programming and would likely have benefitted from additional PC contacts and mental health group therapy.

**Patient W**

This 49-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of major depressive disorder, recurrent, with psychotic features and PTSD. He was prescribed BuSpar, Trileptal, prazosin, and Zoloft. The patient had several significant medical concerns including chronic pain, COPD, diabetes, bilateral hearing loss, and spinal stenosis. He was prescribed several medications for pain management including opiate medications.

The patient had a history of receiving mental health services at the 3CMS and EOP levels of care. He was placed in the CTC on June 22, 2024 for postoperative recovery after cervical spine surgery with planned return to VSP after medical clearance.

The initial psychiatric assessment occurred at the patient's bedside by telepsychiatry on June 25, 2024. The assessment was well documented and included the patient's clinical and psychosocial histories. The patient denied acute anxiety or depression, but he reported nightmares, poor sleep due to pain, paranoia, olfactory hallucinations, and derogatory auditory hallucinations that were not command in nature. He was medication adherent, but prazosin was recently discontinued due to hypotension. The psychiatrist referred the patient to the PCP to manage his blood pressure to resume prazosin. The psychiatrist also noted that the patient had three suicide attempts prior to his incarceration, but he denied any current or recent suicidal ideation.

The initial PC assessment occurred approximately three weeks after the patient's arrival on July 16, 2024. The PC provided the reasons for CTC admission and the patient's clinical, psychosocial, and legal histories. He noted that the patient declined to discuss his depressed mood in detail because he did not want to return to the EOP level of care. The patient reported that his medications were effective, and he used coping skills such as mindfulness and reality testing to manage his symptoms. He also reported fear of returning to VSP, because he felt targeted by some of the custody officers and planned to file a lawsuit against them. The assessment was well

documented and included a detailed clinical summary, predisposing factors, protective factors, and an adequate case formulation.

The initial IDTT meeting occurred over one month after the patient's arrival to the CHCF on July 25, 2024. The patient, assigned clinicians, the telepresenter for the telepsychiatrist, and a CCI attended the meeting. Treatment planning was limited but adequate and focused on helping the patient to learn his triggers for depression and to identify two symptoms of increased depression. The patient's self-reported treatment goal was to continue treatment at the 3CMS level of care to assist in addressing his depressive symptoms. The patient's strengths were documented, no indicators for higher level of care consideration were identified, and no functional impairments were noted. The level of care retention rationale and discharge criteria were individualized and appropriate.

Psychiatric contacts were provided by telepsychiatry in a confidential setting. The patient was seen for four confidential psychiatric contacts before he returned to VSP on or about August 20, 2024. Those contacts were well documented and included updates to the patient's subjective reports, mental status, clinical observations, and medication management. The psychiatrist and patient collaborated regarding medication management with several medication adjustments. On July 5, 2024, the patient reported increased paranoia, depression, and poor sleep; he requested discontinuation of BuSpar and initiation of treatment with Risperdal, as that medication addressed those symptoms previously. During a follow-up psychiatric contact three weeks later, the patient reported significant decrease in paranoia; however, he reported very poor sleep, depression, auditory and olfactory hallucinations. The psychiatrist increased the dosage of Risperdal and prescribed melatonin for insomnia.

The patient was seen for two confidential PC contacts during his stay at CHCF in response to his requests. The PC noted that the patient's primary concern was another patient on his unit who was noisy at night and interrupted his sleep. The progress notes did not include any reference to treatment goals, the treatment plan, or clinical interventions; however, the PC documented speaking with the other patient's PC and custody officers to address the patient's concerns. Although the documentation of those PC contacts indicated that they were check-ins rather than substantive clinical contacts, the PC was responsive to the patient's immediate needs.

The patient was not offered groups while at CHCF. He returned to VSP on August 20, 2024.

**Findings**

The treatment provided to this patient was adequate.

The initial assessments were well documented and thorough; however, the initial PC assessment was delayed. The IDTT meetings included the necessary participants, and the treatment plan was limited with regard to treatment goals and interventions but was adequate for the patient's needs. The psychiatric care was adequate, and the psychiatrist and patient collaborated regarding medication management. Although the documentation of PC contacts did not include specific references to the treatment plan or interventions, it appeared that the PC was responsive and followed up with custody and another PC to address the patient's concerns.

**Patient X**

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. He arrived at CHCF on July 8, 2022 from FSP. He was provided a diagnosis of adjustment disorder with anxiety. The patient was prescribed Vistaril and BuSpar PRN by the psychiatrist, as well as Suboxone for opioid use disorder and semaglutide for weight loss.

The initial IDTT meeting occurred two years after the patient's arrival at CHCF on July 25, 2024. The meeting was attended by the patient, the assigned clinicians, a CCI, and a medical assistant telepresenter. The PC was onsite at the meeting, and the psychiatrist participated remotely by telepsychiatry. The treatment team noted the patient's history of panic attacks, anxiety, dread, worry, depressive symptoms, and history of polysubstance abuse. The adjustment disorder diagnosis was incorrect and outdated, as it was provided at the time inclusion in the MHSDS in 2021; however, the IDTT did not address the need for diagnostic clarification. The treatment plan included IPOCs for substance use/abuse, depressed mood, and anxiety and included appropriate and measurable treatment goals and interventions to address those problem areas. The IDTT noted that the patient did not meet the criteria for consideration of referral to a higher level of care. The level of care retention and discharge criteria were appropriate. The treatment team noted that the patient was an ADA worker, attended college classes, completed the ISUDT program twice, and was involved in gardening and anger management groups.

The patient was seen for five monthly psychiatric contacts during the review period; the psychiatric care was provided by telepsychiatry. The psychiatric contacts were generally well documented, and the patient's mental status and subjective presentation were updated at each contact. The psychiatrist noted a provisional diagnosis of unspecified anxiety disorder and generalized anxiety disorder; however, those diagnoses were not documented in the IDTT treatment plan documentation. The patient reported that his medications were effective with no significant side effects.

The patient was seen for one routine confidential PC contact during the review period on November 30, 2024; the prior PC contact occurred approximately eight months previously on April 5, 2025. The patient was described as doing well, and he reported enjoying his job as an ADA worker. The PC provided solution-focused brief therapy and psychoeducation about maintaining stability.

The patient was not offered mental health groups during the review period.

**Findings**

The treatment provided to this patient was adequate.

Although the overall treatment was adequate; the IDTT should have updated the patient's outdated diagnosis, and PC contacts did not occur timely. The treatment plan was adequate and included measurable, objective goals and appropriate interventions. The patient was appropriately referred to the ISUDT where he programmed well. The psychiatric care was well documented and

collaborative. Although the patient was only seen for one routine PC contact, the PC provided appropriate clinical interventions, and the patient appeared to be functioning adequately.

**Patient Y**

This 35-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided a diagnosis of adjustment disorder with anxiety; previous diagnoses included PTSD, amphetamine-induced psychotic disorder, mood disorder not otherwise specified, and generalized anxiety disorder. He was prescribed Remeron and melatonin.

The patient had a history of grand mal seizures and was placed at CHCF after an emergency room visit due to a seizure. The patient reported several seizures daily.

The patient transferred to CHCF from FSP on September 13, 2024 for increased nursing care resulting from his seizure disorder. The initial psychiatric assessment occurred in a confidential setting by telepsychiatry on September 23, 2024. The psychiatrist documented the patient's psychosocial and clinical histories and noted that he was previously hospitalized at Napa State Hospital for competency assessment. The psychiatrist further documented the patient's history of trauma that included sexual and physical abuse while in the foster care system, as well as a history of polysubstance abuse and dependence. The patient's mental status was described as normal, and his suicide risk was assessed as low. He reported sleep and appetite disturbances since arriving at CHCF. The psychiatrist provided diagnoses of adjustment disorder with anxious mood and opioid use disorder, continued Remeron, and added melatonin for insomnia.

The initial PC assessment was completed on September 20, 2024. The assessment was very thorough and included specific detailed information about the patient's clinical and psychosocial histories. The PC noted that the patient did not want to be placed at the EOP level of care due to gang affiliation and pressure, but he agreed to remain at the 3CMS level of care and to continue treatment with Remeron.

The initial IDTT meeting occurred on September 24, 2024; the patient, assigned clinicians, CCI, psychiatric technician, and telepresenter were in attendance. The treatment goals did not align with the diagnosis of adjustment disorder with anxiety and the patient's reported symptoms. The treatment goals were very limited and focused on identifying triggers and symptoms of depression but did not address anxiety, sleep disturbance, or appetite disturbance. The only intervention documented was for the PC to assist the patient in identifying personal triggers for depression. The level of care justification and discharge criteria were generic but appropriate for the patient's presentation. The IDTT noted that the patient did not meet the criteria for consideration of referral to a higher level of care. Overall treatment planning was inadequate, as the treatment goals and interventions did not align with the patient's symptoms and clinical concerns.

The patient was seen for five psychiatric contacts during the review period. On September 25, 2024, the day after the initial IDTT meeting, the patient requested discontinuation of his psychotropic medications with the goal of removal from the MHSDS in three months. The psychiatrist discontinued the medications. It was unclear whether the contact was provided in a confidential setting. On November 21, 2024, the patient reported racing thoughts, auditory

hallucinations, and very poor sleep after his medications were discontinued in September 2024. The psychiatrist noted fair judgment and insight, euthymic mood, and happy affect; Remeron and Abilify were prescribed at that time. The patient remained medication adherent with his psychotropic medications but refused his seizure medications during December 2024. On December 30, 2024, the psychiatrist added melatonin to address the patient's chronic insomnia.

The patient was not seen for routine PC contact during the review period and was not offered group therapy.

**Findings**

The treatment provided to this patient was inadequate.

Treatment planning was inadequate. The treatment goals and interventions did not align with the patient's diagnosis or reported symptoms. Overall, the psychiatric care was adequate; however, the patient was not seen for routine PC contact during the review period; at least one routine PC contact was required. Consistent PC contacts and improved treatment planning to address seizure medication nonadherence and to process the patient's frustration with medical staff would have been beneficial.

**Patient Z**

This 54-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided a diagnosis of major depressive disorder, recurrent with psychotic features. The patient was not prescribed psychotropic medication during the review period. The patient required specialized housing due to his use of a catheter for prostatic enlargement; he also had bilateral hearing loss. He had received mental health services at the 3CMS, EOP, and MHCB levels of care.

The patient arrived at CHCF on December 30, 2021 at the EOP level of care; he was subsequently placed at the 3CMS level of care on September 13, 2022. The initial PC assessment was not documented at the time of 3CMS placement or prior to the initial IDTT meeting. The initial 3CMS IDTT meeting occurred approximately two years after his placement at the 3CMS level of care on August 1, 2024. The assigned clinicians and CCI attended; but the patient did not attend, as he was at work. The information in the clinical summary was not updated since the patient's placement in the EOP. The treatment plan included treatment goals and interventions targeting the triggers for depression, but they were generic and not individualized. The IDTT noted that the patient did not meet the criteria for consideration of referral to a higher level of care. The level of care justification and discharge criteria were also generic and not individualized. The treatment planning was inadequate, was not individualized for this patient, and was not informed by a comprehensive assessment or recent PC contact, as the most recent routine PC contact occurred on November 13, 2023.

The patient was seen for three routine psychiatric contacts during the review period. The contacts were well documented and indicated that the patient was not prescribed psychotropic medication since May 3, 2024. His mood was consistently described as stable, and at each contact he reported

no distress and that he was doing well without medication. The psychiatrist updated the patient's mental status at each contact and noted the provision of psychoeducation.

The patient was seen for one routine confidential PC contact on September 20, 2024. The patient reported no depression, normal sleep and appetite, attendance at work and groups, and preparation for his upcoming parole board hearing.

The patient was not offered mental health or NLTG groups at CHCF during the review period; however, there was documentation of two recreation therapy group progress notes from CMF on September 20, 2024, while the patient was at CHCF. One of the notes stated that the patient had "full session attendance."

**Findings**

The treatment provided to this patient was inadequate.

Although the patient remained stable without medications and was functioning well; treatment planning and the quality of PC care were severely inadequate. The only belated IDTT meeting occurred without the patient due to his work schedule; and the meeting should have been scheduled when he was available. The treatment goals were generic and were not individualized, likely due to the lack of an initial PC assessment when initially placed at the 3CMS level of care and no routine PC contact since November 13, 2023. The discharge criteria and level of care retention criteria were also generic, and the patient should have been assessed for removal from the MHSDS by the IDTT given his stable functioning without medications for approximately five months.

**Patient AA**

This 78-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF.

The patient was provided a diagnosis of bipolar II disorder. He was not prescribed psychotropic medications; he was reportedly resistant to taking those medications, as he blamed them for his past problems in the community. His significant medical concerns included COPD, hypertension, diabetes, self-reported memory problems, and coronary artery disease. He had received mental health services at the EOP and 3CMS levels of care.

The patient arrived at the CHCF on February 5, 2016. The most recent IDTT meeting prior to the review period occurred on December 7, 2021. The treatment plan focused on addressing the patient's depression regarding his incarceration, and it noted that the patient was hyperverbal and perseverated on being wrongfully convicted for his instant offense. The most recent psychiatric contact prior to the review period occurred on September 3, 2021.

The patient was seen for two PC contacts during the review period. The contact progress notes were brief but adequate. At both sessions, the patient reported stable mood and no acute distress. The PC noted that the patient expressed frustration regarding his belief that he was wrongfully

convicted, and he was otherwise functioning normally. There was no documentation of treatment goals or interventions at either contact.

The patient was not offered group therapy during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The patient did not receive any form of substantive or consistent mental healthcare during the review period or for several years prior. There was no documentation of an IDTT meeting and treatment planning for more than four years; and he was seen for very sporadic PC contacts. It did not appear that treatment goals were identified or addressed, and it was unclear why the patient was retained in the MHSDS.

**Patient BB**

This 73-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. The documentation noted that the patient was receiving treatment for depression, but there was no formal mental health diagnosis provided in the IDTT or progress note documentation. He was prescribed Effexor for depression, BuSpar for anxiety, and melatonin PRN for insomnia. The patient also had medical conditions that included dementia, COPD, deep venous thrombosis, gastroesophageal reflux disease, hepatitis C, hypertension, hyperlipidemia, and sleep apnea. He was prescribed memantine and Aricept for dementia as well as several additional medications to address his medical concerns. The patient had received mental health services at the 3CMS, EOP, and MHCB levels of care.

The patient arrived at CHCF on July 26, 2023 from CMF at the 3CMS level of care. The most recent IDTT meeting was an initial IDTT meeting that occurred on December 14, 2023; however, there was not documentation of a subsequent annual IDTT meeting during December 2024. The patient, assigned clinicians, and CCI attended the initial IDTT meeting. The patient was generally described as stable but with reported mild depression and ongoing anxiety primarily related to his dormitory housing placement and medical needs. The PC noted that the patient and treatment team discussed double celled housing for the patient rather than a dormitory setting, as he used a catheter and required privacy. The patient requested a single cell, but the IDTT determined that a single cell was inappropriate due to the patient's dementia and need for frequent social interaction. His medications were reportedly effective, and the patient did not want any medication adjustments. The treatment goals were measurable and appropriately focused on reducing anxiety and depression and maintaining emotional stability. An IPOC for depressed mood included appropriate goals but no specific interventions. The level of care justification and discharge criteria were appropriate. The treatment team made appropriate referrals to medical regarding the patient's housing status recommendations.

The patient was seen for three psychiatric contacts during the review period. The contacts were provided in a confidential setting and were well documented using the progress note form. Progress notes included updates to the patient's mental status, subjective reports, and assessment.

His medications were adjusted in response to concurrent stressors, and he reported partial response with no side effects. The patient was generally stable, but he reported moderately increased depression on December 15, 2024 due to housing stressors.

The patient was seen for three routine PC contacts during the review period. The contacts were offered in a confidential setting but were provided by covering PCs rather than the assigned PC. At each contact, the patient requested a composition book to assist him with his memory concerns. The PC noted that the patient's dementia diagnosis had not been officially confirmed, although documented in the healthcare record, and that the patient may have had pseudodementia due to depression rather than actual dementia.

The patient was not offered groups during the review period.

**Findings**

The treatment provided to this patient was adequate.

The IDTT meeting was attended by all required participants, and the treatment plan included appropriate treatment goals, referrals, and level of care/discharge criteria. Psychiatric contacts occurred timely and were well documented, and the psychiatrist was responsive to the patient's medication concerns. The PC care was well documented; although, there was poor continuity of care.

**Patient CC**

This 65-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. She arrived at CHCF on October 31, 2022, after she began the gender transition process. Her mental health diagnoses included gender dysphoria, generalized anxiety disorder, and panic disorder. She was prescribed Vistaril and Remeron. Significant chronic medical conditions included COPD, diabetes, diabetic neuropathy, incontinence, and hypertension.

The patient had received mental health services only at the 3CMS level of care. There was no documentation of an IDTT meeting during the review period, and the most recent IDTT meeting documentation occurred on November 16, 2023. The patient, assigned clinicians, telepresenter, and CCI attended the meeting. Treatment planning was adequate and included measurable and individualized goals and interventions including DBT skills and pre-release groups in preparation for upcoming parole. The clinical summary was updated appropriately and included several observations that supported the diagnoses and treatment goals. The IDTT noted that the patient did not meet the criteria for consideration of referral to a higher level of care. No level of care retention justification or discharge criteria were documented.

The patient was seen for five telepsychiatry contacts in a confidential setting during the review period. The progress notes were comprehensive and included appropriate updates to the patient's functioning, subjective report, mental status, and overall assessment. The patient was not prescribed psychotropic medications at the beginning of the review period; but on August 21, 2024, she reported significantly increased anxiety and frequent panic symptoms in response to her

upcoming parole board hearing and was prescribed Remeron. On September 4, 2024, she reported increased situational anxiety and panic and was prescribed Vistaril PRN in addition to Remeron. The patient reported that the Remeron was effective but asked to discontinue the medication on October 31, 2024 after she gained ten pounds. The patient remained stable without the medication, and the psychiatrist reported that she was motivated for release and placement into a transitional program.

The patient was seen for four PC contacts during the review period. All were provided in a confidential setting, and the documentation of the contacts were thorough with the session content focused on the patient's increased anxiety and panic regarding parole. Her symptoms improved in response to talk and medication therapy, and she reportedly hoped to complete gender affirming surgery prior to parole. Although she was not offered pre-release groups, the PC sessions focused on release and transition planning. The PC noted the patient's increasing optimism; and at the scheduled termination session, the patient reported gratitude regarding the support system implemented by CDCR and community affiliates.

A mental health pre-release planning assessment occurred on April 4, 2024. The assessment was completed appropriately when relevant needs and impairments were identified. The documentation also indicated that the appropriate benefits applications were submitted for the patient.

The patient was not offered clinical groups during the review period, but she attended weekly NLTG groups from April 16 to August 13, 2024. She had consistent attendance and good participation.

The patient paroled from prison on December 4, 2024.

**Findings**

The treatment provided to this patient was adequate.

The patient was seen timely for well documented clinical contacts during the review period. Although the most recent annual IDTT meeting occurred prior to the review period, it included appropriate and individualized treatment goals and interventions. The treatment goals were reflected in the PC and psychiatric progress notes, and the patient responded well to treatment. The patient was offered weekly NLTG groups. She showed overall improvement and reduction in symptoms and was reportedly optimistic and felt prepared for parole.

**Patient DD**

This 40-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at CHCF. The patient was provided diagnoses of schizophrenia spectrum disorder and major depressive disorder, recurrent with psychotic features. He had a significant history of psychosis and eight suicide attempts. The patient had not been prescribed psychotropic medications since 2018.

The patient had a history of receiving mental health services at the EOP (including EOP modified programming), 3CMS and MHCB levels of care. His six MHCB placements were prompted by depression, auditory hallucinations, paranoia, and drug use; he additionally had a history of four inpatient community hospitalizations.

The patient arrived at CHCF on January 23, 2024 from VSP. He reportedly transferred to CHCF for treatment of a small bowel obstruction.

No IDTT meeting was documented during the review period; the most recent IDTT meeting was the initial IDTT meeting that occurred on February 12, 2024 that included the patient, assigned clinicians, and CCI. The treatment plan was adequate and included appropriate and individualized goals and interventions focused on maintaining the patient's stability and reducing his depression and auditory hallucinations. The treatment team noted that the patient did not demonstrate functional impairments. The discharge criteria and level of care retention rationale were adequate.

The patient was seen for two routine psychiatric contacts during the review period. On October 16, 2024, the patient reported to the psychiatrist that he was functioning well, attending groups, working, maintaining contact with his family, and he was looking forward to a parole board hearing on December 5, 2024. The patient denied depression, anxiety, paranoia, and auditory hallucinations. At the next psychiatric contact on December 8, 2024, the patient reported having a positive mood and stated that he was granted parole at his board hearing. He continued to deny any significant symptoms, and the psychiatrist noted that the patient attended anger management, ISUDT, and NA groups. The patient declined treatment with psychotropic medications throughout the review period and remained stable.

The patient was seen for only one routine individual PC contact during the review period on November 8, 2024; that contact was the only routine PC contact since the initial PC assessment on February 1, 2024. The patient was described as engaged and cooperative, and he denied concerns or difficulties. He reported that he was anticipating his parole board hearing and was optimistic for the future. The PC noted the use of person-centered therapy and psychoeducation.

The patient was offered a weekly anger management group that was facilitated by a psychologist from May 31, 2024 to the end of the review period. The patient attended groups consistently with active participation.

**Findings**

The treatment provided to this patient was adequate.

Although the patient was not seen timely for routine individual PC contacts, the care was otherwise appropriate. The treatment plan was individualized and appropriate for the patient's clinical needs. Although he was not prescribed psychotropic medication, the patient was seen for two routine psychiatric contacts. He also attended a weekly PC-led group, which mitigated the lack of individual routine PC contacts. The patient was actively involved in treatment with good response; he maintained stability and was granted parole at his board hearing.

**Patient EE**

This 58-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with bipolar I disorder, most recent episode depressed, moderate, and unspecified depressive disorder. He was prescribed and adherent with aripiprazole, lithium, and olanzapine. Hydroxyzine and an additional dose of olanzapine were prescribed PRN for insomnia and agitation, respectively; he used both irregularly. One prior episode of self-injurious behavior was listed in the health record at the time of MHCB admission. Medical conditions included dizziness, vertigo, nausea, right knee pain, blood in his urine, and recent arthroplasty of carpometacarpal joint of left thumb. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At CHCF, he was admitted to MHCB care from November 12, 2024 through December 17, 2024 for danger to self, suicidal ideation, and significant impairment due to mental illness, after experiencing hallucinations of zombies or demons attempting to attack him and attempted to jump off the tier to escape them. This was the first known episode of psychosis. He was referred to and agreed with ICF care timely on November 20, 2024 but remained in MHCB care for nearly a month while waiting to be admitted to ICF care.

The initial psychiatric assessment was timely but only partially adequate; it did not document whether the encounter was confidential and did not provide current diagnostic impressions. The initial primary clinician assessment was timely, confidential, but only partially adequate. It did not include diagnostic impressions, and the case formulation did not address psychotic symptoms or suicidal ideation. It was not useful for guiding treatment. The initial IDTT meeting was timely and attended by required staff, apart from an alternate for the assigned primary clinician. The patient refused to attend due to distressing visual hallucinations, and he was seen at the cell front for this meeting. He was not found to meet criteria for a higher level of care. The patient's strengths, verbalized treatment goals, treatment plan, and rationale for MHCB care were adequately documented. One of four primary clinicians and/or one of four psychiatrists followed the patient daily. Most psychiatric encounters did not document whether the encounter was confidential; primary clinician encounters occurred at the cell front and were consistent with wellness checks. Psychiatrists engaged in psychoeducation, persuaded the patient to accept antipsychotic as well as mood stabilizing medications, and adjusted these medications based on the patient's clinical response. The patient was offered multiple recreational therapy groups and out-of-cell activities but declined all of them due to his fearful symptoms. The assigned psychiatrist attempted to obtain a CT scan of the brain because an organic basis for the patient's psychiatric symptoms was suspected. In addition to psychiatric symptoms, the patient became progressively dizzier and more nauseated, with vomiting, and he fell at least twice. Medical providers initially declined to order the scan because medical criteria were not met; on December 7, 2024, the psychiatrist ordered the scan. It was not completed by the time the patient was transferred to ICF care in DSH. The first of four follow-up IDTT meetings was timely, attended by the patient and required staff, and resulted in a referral to ICF care in locked dorm housing. Neither the case formulation nor the treatment plan were updated, but the rationale for the ICF referral was adequately documented. The discharge suicide risk evaluation completed at this time was adequate and found the patient at moderate risk. Three additional follow-up IDTT meetings occurred, two of which were late. The patient attended two of the three meetings but declined one due to sleeplessness and disturbing visual hallucinations; required staff attended all

three follow-up meetings except once, when an alternate for the assigned psychiatrist attended. While the patient's verbalized treatment goals were updated to reflect both psychotic and mood symptoms, the treatment plan was not updated. IDTT documentation adequately summarized the patient's clinical presentation and participation in the meetings. The PC discharge summary was completed on November 20, 2024. It did not discuss efforts at differential diagnosis required by the treatment plan or psychiatric care, and it was not updated to describe the course of treatment for the last 27 days of MHCB care. The discharge plan was not patient-specific. The contemporaneous mental health consult for the ICF referral indicated that the patient had received DBT skills training in mindfulness and coping, as well as CBT interventions addressing cognitive distortions; none of these interventions were documented elsewhere, and as noted the patient declined all group treatment and saw primary clinicians at the cell front.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The patient's psychiatric diagnoses remained unreconciled and inconsistent with the onset, nature, and course of his symptoms; documentation indicated that limited effort was given to clarifying the patient's diagnoses. The psychiatrists' deferral to medical providers for the brain CT scan and subsequent delay in ordering this scan resulted in unnecessary delay. Consistency of psychiatrists and primary clinicians was weak; eight staff members provided daily MHCB contacts, and in most cases, documentation was not sufficient to determine whether these contacts were confidential. Two of four follow-up IDTT meetings were late. The discharge plan was deficient, and the mental health consultation that accompanied the ICF referral indicated that the patient received DBT and CBT interventions that were not otherwise documented. The discharge summary covered only eight days of MHCB care and did not address psychiatric care or the large majority of the patient's MHCB care. The long delay between ICF referral and admission was clinically detrimental.

**Patient FF**

This 33-year-old transgender MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. She was diagnosed with persistent depressive disorder, tobacco and cannabis use disorders, and, on a rule out basis, a cluster B personality disorder and bipolar disorder. She was prescribed escitalopram, fluoxetine, and lithium, and she was adherent with escitalopram and lithium. Fluoxetine was discontinued because of consistent nonadherence. One suicide attempt and one episode of self-injurious behavior were listed in the health record. Medical conditions included dyslipidemia and gender dysphoria in adolescence and adulthood. She was not prescribed gender affirming hormones. Within CDCR, the patient had previously received 3CMS and MHCB care. She was admitted from 3CMS care at VSP to MHCB care at CHCF from October 23, 2024 through November 2, 2024 for danger to self and suicidal ideation, after arguing with her grandmother, breaking up with her boyfriend, and threatening to cut her own throat with a razor. She was discharged to EOP care on November 1, 2024 but remained in MHCB care for one more day.

The initial psychiatric assessment was timely, confidential, and adequate. The initial PC assessment was timely and confidential but did not provide current diagnostic impressions and

inappropriately adopted the MHCB referral language as the case formulation. The initial IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned PC. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated, the patient's verbalized treatment goals were not documented, and the treatment plan failed to address psychiatric care. The patient's strengths and rationale for MHCB care were adequately documented. One of four PCs and/or one of four psychiatrists followed the patient daily. These encounters were confidential except when the patient refused to leave her cell. Progress note documentation was adequate and confirmed the provision of clinically indicated nonpharmacological interventions as well as adequate medication management and monitoring. Recreational therapy groups were offered on five occasions; the patient attended once. The follow-up IDTT meeting was timely and attended by the patient and required staff apart from a different alternate for the assigned PC. The treatment team determined to discharge the patient to EOP care. Documentation of the patient's participation in the meeting and of the rationale for the discharge decision was adequate, but the rest of the IDTT documentation was not updated. The discharge suicide risk evaluation was timely, confidential, and adequate; it found the patient at low current risk and moderate chronic risk and provided adequate rationales for these determinations. The safety plan was collaborative, helpful, and well-developed. No discharge summary was developed.

**Findings**

The treatment provided to this MHCB patient was adequate.

The patient received timely assessments, IDTT meetings, and daily therapeutic encounters with either a psychiatrist or a PC. Encounters were therapeutic and collaborative. The patient remained stable and was appropriately discharged to EOP care. Significant weaknesses included the case formulation and treatment plan, which were inadequate and did not guide treatment, and lack of a discharge summary. Despite these documentation challenges, the patient received the treatment she needed.

**Patient GG**

This 38-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with substance-induced depression and anxiety as well as methamphetamine and opioid use disorders. The treating psychiatrist prescribed mirtazapine for depression and anxiety as well as naltrexone and quetiapine for opioid withdrawal symptoms, including severe anxiety. Naltrexone and quetiapine were discontinued after one and two doses, respectively; the patient was adherent with both medications while they were prescribed. Mirtazapine was discontinued after six doses; the patient was adherent with all but the sixth dose. Both medications were discontinued during MHCB care. Hydroxyzine was prescribed PRN for anxiety and itching, and he used this medication four times early in MHCB care. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included a history of hepatitis C. Within CDCR, the patient had not previously received mental health care. At CHCF, he was admitted to MHCB care from November 19, 2024 through December 2, 2024 for danger to self and suicidal ideation, after stopping non-prescribed buprenorphine-naloxone, receiving an RVR on November 16, 2024 for battery on a prisoner, and reporting anxiety, depression, sleeplessness, and persistent suicidal ideation in RHU. He was

discharged to general population status on November 29, 2024, but remained in MHCB care for three more days.

The initial PC assessment was timely, did not indicate whether it was confidential, and did not result in diagnostic impressions. The case formulation focused on violence risk rather than suicidality, anxiety, and depression. The initial psychiatric assessment was timely, confidential, and adequate. The initial IDTT meeting was timely and attended by the patient, alternates for the assigned psychiatrist and PC, and a correctional counselor. The patient was not found to meet criteria for a higher level of care. The patient's strengths were adequately documented; his verbalized treatment goals were not. The treatment plan did not include psychiatric care but was otherwise appropriate; it focused on providing DBT and CBT skills to reduce suicidal ideation and anxiety. One of six PCs or one of two psychiatrists followed the patient daily. Most encounters occurred at the cell front due to the patient's preference. The provision of DBT and CBT skills training was not documented. Psychotropic medications were temporarily initiated to treat withdrawal from illicit Suboxone; mirtazapine was discontinued at the patient's request. Progress noted confirmed adequate monitoring of the patient's symptoms and mental status. Recreational therapy groups were offered routinely, and he attended about 43 percent of them. The follow-up IDTT meeting was timely and attended by the patient and alternates for the PC and psychiatrist, but not a correctional counselor. The treatment team determined to discharge the patient to general population despite psychotropic medications being discontinued only days earlier. The rationale for this decision was inadequate and indicated that the treatment team was declining to place the patient in MHSDS "for no good reason." The discharge suicide risk evaluation found the patient at low risk but undervalued the contributions of sleeplessness and opioid withdrawal to suicide risk. The patient declined to participate more than minimally in safety plan development. The resulting safety plan included appropriate recommendations but was written as if the patient would continue to receive mental health services. The psychiatric discharge summary was timely, confidential, and adequate.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The interventions required by the treatment plan were not provided, and the interventions that were provided were not included in the treatment plan. As documented, there was inadequate exploration of the patient's depressive symptoms and suicidal ideation, inadequate appreciation of withdrawal-related suicide risk, and inadequate treatment of the factors contributing to the patient's MHCB admission. Consistency of PCs was absent. Most importantly, the decision to discharge the patient to general population rather than 3CMS care was not appropriate given the patient's recent suicidal ideation and treatment with psychotropic medications and ongoing need for clinical support.

**Patient HH**

This 28-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with unspecified mood disorder, autism spectrum disorder, antisocial personality disorder, and opioid use disorder. He was

prescribed fluoxetine, lithium, and mirtazapine. He was adherent with lithium and mirtazapine and partially adherent with fluoxetine. Hydroxyzine was prescribed PRN for anxiety, and he used this medication nearly every day. Through the ISUDT, he was prescribed and partially adherent with buprenorphine-naloxone for opioid use disorder. Multiple episodes of suicidal and self-injurious behavior were listed in the health record. Medical conditions included chronic left knee pain and opioid use disorder. He used knee braces. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At CHCF, he was admitted to MHCB care from October 23, 2024 through November 4, 2024 for danger to self and others, after engaging in ongoing substance use, fighting, attempting to hang himself, and then jumping from the moving medical cart in a suicide attempt. He was discharged to EOP care on November 2, 2024 but remained in MHCB care for two more days. He was serving life without parole.

The initial PC assessment was timely but incomplete. It did not indicate whether the assessment was confidential, did not include an evaluation of the patient's violence risk and suicide histories, did not include a mental status examination, and did not provide diagnostic impressions. The case formulation focused on criminal behavior rather than the suicidal crisis that led to his MHCB admission. The initial psychiatric assessment was timely and partially adequate but did not offer current diagnostic impressions. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The patient was flagged in the sustainable process report for poor treatment participation; the rationale for retaining the patient in MHCB care was adequately documented. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan did not address psychiatric care, and one of the goals was pulled forward from EOP care an inappropriate for MHCB care. However, the remainder of the treatment plan was adequate. One of two PCs and/or one of three psychiatrists followed the patient daily except on November 1, 2024, when no members of either discipline saw the patient. PC progress notes confirmed the provision of clinically appropriate interventions as required by the treatment plan, and psychiatric progress notes demonstrated adequate monitoring of the patient's symptoms and responses to medication. Psychiatric progress notes did not consistently indicate whether the encounter was confidential. The patient was offered and consistently attended recreational therapy groups.

The follow-up IDTT meeting was timely and attended by the patient and alternates for the assigned PC, assigned psychiatrist, and assigned correctional counselor. The patient's verbalized treatment goals and treatment plan were appropriately updated, and the treatment team determined to discharge the patient to EOP care. The suicide risk evaluation was adequate and found the patient at low current risk but high chronic risk. The safety plan was collaborative and helpful but included an unnecessary and clinically inappropriate tone of moral judgment. The psychiatric discharge summary was timely and marginally adequate; the narrative summary of the patient's course of treatment and response to interventions was weak, and no discharge recommendations or patient-specific discharge plan were provided. A mental health assessment for an October 23, 2024 RVR alleging resisting staff was thorough and found a nexus between the patient's mental health symptoms and the alleged behavior.

**Findings**

The treatment provided to this MHCB patient was inadequate.

Initial PC and psychiatric assessments failed to offer current diagnostic impressions, and multiple components of the initial PC assessment were not completed. The case formulation failed to address current symptomatology and was not helpful in guiding treatment. The treatment plan was deficient in failing to address psychiatric care, which was central to this patient's MHCB treatment. The patient was not seen by either a PC or a psychiatric provider on November 1, 2024. The safety plan included unprofessional moral judgment, and the psychiatric discharge summary provided scant information regarding the patient's response to treatment. Strengths included structured therapeutic interventions provided by one of the PCs, provision of recreational therapy groups, and clinically appropriate psychiatric care. Nevertheless, gaps in assessment, treatment planning, treatment, and discharge planning rendered the overall care inadequate.

**Patient II**

This 53-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with unspecified psychosis and history of methamphetamine use disorder, severe. He was prescribed and adherent with aripiprazole, buspirone, fluoxetine, and olanzapine. On the first full day of MHCB care, he also received a one-time injection of intramuscular diphenhydramine, haloperidol, and lorazepam for acute agitation, after refusing one-time doses of oral medication. Hydroxyzine and additional doses of olanzapine were prescribed PRN for anxiety and agitation, respectively. The patient used PRN hydroxyzine early in MHCB care and PRN olanzapine intermittently throughout MHCB care. Two suicide attempts were listed in the health record. Medical conditions included hypothyroidism, hyperlipidemia, and a history of hepatitis C. Within CDCR, the patient had previously received 3CMS, EOP, MHCB, and ICF care, and he received involuntary treatment under PC 2602 orders for grave disability between 2014 and 2019. At CHCF, he was admitted to MHCB care from November 4, 2024 through December 11, 2024 for danger to self and others, after cheeking medications, becoming acutely agitated, manic, paranoid, psychotic, disorganized, threatening to shank himself, and exhibiting hostility and resistance towards staff. He was referred to and agreed with ICF care timely on November 14, 2024 but remained in MHCB care for nearly a month while waiting to be admitted to ICF care.

The initial psychiatric assessment was timely and adequate given the patient's lack of cooperation and severe psychosis. The initial PC assessment was also timely and could not be fully completed due to the patient's manic and psychotic behaviors. No diagnostic impressions were provided, and MHCB referral information from MCSP was used without alteration in place of a case formulation. The initial IDTT meeting was timely and attended by the patient and assigned staff apart from an alternate for the assigned PC. Despite noting that the patient was incoherent and psychotic, the team did not find him to meet criteria for a higher level of care. The case formulation was not updated. The patient's strengths were minimally documented, and his verbalized treatment goal could not be documented due to his incoherence. The treatment plan was inadequate to guide MHCB treatment. It focused on suicidal and homicidal ideation, self-injurious behaviors, and danger to others but did not address psychosis, paranoia, mania, disorganization, or psychiatric care. It called for structured CBT interventions that were not feasible in the context of the patient's severe psychosis. Four follow-up IDTT meetings were held; three were timely and one was late. The patient attended all four meetings. Required staff attended two of these meetings; different

alternates for the assigned psychiatrist were present in the other two meetings. During the first follow-up meeting, the treatment team updated the patient's verbalized treatment goals and treatment plan and referred the patient to ICF care in locked dorm housing. The discharge suicide risk evaluation completed at that time was adequate and found the patient at low current risk but moderate to high long-term risk. The mental health consult for inpatient care was also adequate. During the remaining IDTT meetings, the patient's treatment response was adequately documented, and the team awaited the patient's ICF admission. The case formulation was not updated and remained inadequate, and the treatment plan continued to omit psychiatric care and fail to address psychotic symptoms.

On November 5, 2024, the patient bit his own hand; on November 7, 2024, he bit his foot; both episodes were associated with severe psychosis, and the first resulted in emergency intramuscular medication. One of five PCs and/or one of seven psychiatrists followed the patient daily except on November 13, 2024, when no one from either discipline saw the patient. Most PC encounters occurred at the cell front due to the patient's preference, and none resulted in provision of the interventions required in the treatment plan. Similarly, most of the time the patient preferred to see psychiatrists at the cell front. Psychiatric progress notes confirmed adequate monitoring of the patient's mental status and response to medications, and the patient's psychotic symptoms slowly improved as antipsychotic medication was adjusted. Recreational therapy groups were regularly offered to the patient. He consistently refused these until December 1, 2024, when he started attending them without exception. The PC discharge was completed on November 14, 2024 and therefore failed to include the course of treatment for the ensuing 27 days that the patient remained in MHCB care. It failed to address the two instances in which the patient bit himself, did not summarize psychiatric care, and provided only generic information about the patient's treatment.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The patient's psychiatric diagnoses received inadequate attention and remained unspecified throughout his prolonged 37-day MHCB stay. The language used for the case formulation did not constitute a case formulation and was inadequate to guide treatment. The treatment plan was also inadequate to guide treatment. Although the patient was timely and appropriately referred to ICF care, his prolonged wait for ICF admission was problematic. Consistency of PCs and especially of psychiatrists was poor, and he was not seen by either discipline on November 13, 2024. The discharge summary was developed nearly a month before the patient left MHCB care and omitted key clinical information that was crucial for continuity of care. Strengths included adequate psychiatric monitoring and care and consistent offering of recreational therapy activities.

**Patient JJ**

This 50-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. Although he understood English, his primary language was Iraqi Arabic. He was diagnosed with adjustment disorder with depressed mood and opioid use disorder in remission. He was not prescribed any psychotropic medication. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. No

suicide attempts or episodes of self-injurious behavior were listed in the health record prior to this MHCB admission. Medical conditions included back pain, chronic right shoulder pain, opioid use disorder, and a history of foreign body in penis. Within CDCR, the patient had previously received only 3CMS care. At CHCF, he was admitted to MHCB care from November 2, 2024 through November 12, 2024 for danger to self and suicidal ideation, after reporting depression, auditory hallucinations, and suicidal ideation in the context of acute safety concerns. He was discharged to 3CMS care on November 9, 2024 but remained in MHCB care for three more days.

The initial PC assessment was timely but incomplete. It omitted violence risk factors, a mental status examination, and diagnostic impressions. The case formulation was only partially adequate and did not address the patient's current symptoms or suicidal ideation. The initial psychiatric assessment was timely, confidential, and adequate. The patient declined psychotropic medications. The initial IDTT meeting was timely and attended by required staff, apart from an alternate for the assigned PC. The patient was not found to meet criteria for a higher level of care. IDTT documentation indicated that a safety plan was reviewed even though one had not yet been developed. The case formulation was not updated, and the patient's strengths were poorly documented. The patient's verbalized treatment goals were adequately documented, and treatment plan was adequate. IDTT documentation indicated that PCs would offer daily individual encounters. The discharge suicide risk evaluation was internally inconsistent and indicated both that the patient and that he had not attempted suicide in the last three months. Multiple risk factors were noted but under-weighed, and the finding of low risk was not warranted in the presence of these risk factors. The safety plan was collaborative, thoughtful, and useful. One of two psychiatrists and/or one of three PCs followed the patient daily except on November 8, 2024, when neither discipline saw the patient. Outside of IDTT meetings, the patient received only one individual encounter with a PC. This encounter was well-documented and included the provision of interventions that were consistent with the treatment plan. Most psychiatric encounters were not confidential. Recreational therapy groups were routinely offered, and the patient attended three of these. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in discharge to 3CMS care. The case formulation, patient's strengths, and treatment plan were not updated, but the rationale for discharge to 3CMS care was adequately documented. The psychiatric discharge summary was timely and adequate. Mental health assessments for RVRs alleging an October 29, 2024 battery on a prisoner and disobeying an order were adequate, culturally sensitive, and found a nexus between the patient's mental health symptoms and the alleged behaviors.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The initial PC assessment and case formulation were incomplete and inadequate. The patient's refusal of psychotropic medications was inadequately explored. Particularly because the patient was not receiving psychopharmacology, psychiatric contacts were nonconfidential, and cultural and linguistic factors may have hampered the development of trusting therapeutic relationships, the patient should have been offered more frequent individual PC treatment. Most importantly, the discharge suicide risk evaluation was internally inconsistent and minimizes the implication of

multiple risk factors; the conclusion that the patient was at low risk was not supported by findings within the evaluation itself.

**Patient KK**

This 33-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with substance-induced psychosis along with multiple rule-out diagnoses. He was prescribed and adherent with benztropine, escitalopram, haloperidol, and olanzapine. Hydroxyzine, mirtazapine, and olanzapine were prescribed PRN for anxiety, insomnia, and psychosis, respectively. He used these medications throughout the MHCB stay. One suicide attempt and three episodes of self-injurious behavior were listed in the health record. Medical conditions included a seizure disorder and history of lipoma of back, hepatitis C, pneumothorax after being stabbed, and jaw fracture. Within CDCR, the patient had previously received all levels of mental health care. At CHCF, he was admitted to MHCB care from November 30, 2024 through December 11, 2024 for danger to others, after becoming assaultive, paranoid, and psychotic. He was discharged to EOP care on modified status on December 10, 2024, but remained in MHCB care for one more day.

The initial PC assessment was timely but did not provide a clinical summary, diagnostic impressions, or an updated case formulation. The case formulation that was pulled forward addressed criminal activity, substance use, intolerance of distress, and emotional dysregulation but did not discuss psychotic symptoms and their relationship to recent violent behaviors. The initial IDTT meeting was timely and attended by the patient and required staff. The patient met criteria for considering a higher level of care due to multiple mental health assessments for RVRs; the rationale for not referring the patient to PIP and plan for adjusting MHCB care were adequately documented. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan addressed danger to others but not psychotic symptoms or psychiatric care. It identified CBT techniques as interventions; these were unlikely to be feasible given the patient's disorganized psychosis. One of two PCs and/or one of three psychiatrists followed the patient daily except on December 9, 2024, when neither discipline saw the patient. Most individual encounters were confidential, and psychiatric progress notes adequately documented medication adjustments and the patient's response to treatment. Only one PC encounter occurred outside of IDTT meetings. The corresponding progress note did not reflect provision of the CBT interventions required by the treatment plan; it did reflect a plan for PCs to see the patient daily for individual encounters. These encounters did not take place. The patient was offered and attended three recreational therapy groups. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in clinical discharge to EOP care. The case formulation, patient's strengths, and patient's verbalized treatment goals were not updated; the treatment plan was updated only with respect to reflecting discharge to EOPMod. The discharge suicide risk evaluation was adequate and found the patient at low current risk. Part but not all of the safety plan was developed collaboratively with the patient; the plan's clinical impressions and recommendations were useful. The psychiatric discharge summary was timely, confidential, and adequate.

Five mental health assessments for RVRs alleging two incidents of battery on a peace officer and three incidents of aggravated battery on a non-inmate by means of gassing were adequate. The

assessments consistently found a nexus between the patient's mental health symptoms and the alleged behaviors and indicated that the patient was at risk of further decompensation if key supports were removed as part of any penalty, should the patient be found guilty of the alleged offenses.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The initial PC assessment, case formulation, IDTT documentation, and treatment plan were incomplete and inadequate. Inadequate individual PC treatment was offered, and the CBT interventions required by the unrealistic treatment plan were not delivered. The symptoms underlying the patient's use of illicit substances were inadequately explored. The patient was not seen by either a PC or a psychiatrist on December 9, 2024. Use of mirtazapine exclusively as a PRN medication fell outside the standards of practice. In all other respects, psychiatric care appeared appropriate. The mental health RVR assessments were thoughtful and adequate.

**Patient LL**

This 39-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with depression [sic] and borderline and antisocial personality disorders, and schizoaffective disorder. He was prescribed but nonadherent with venlafaxine. Diphenhydramine was prescribed PRN for agitation, and he used this medication regularly. Through medical services, he was prescribed and adherent with carbamazepine and levetiracetam for seizures. Three suicide attempts and multiple episodes of self-injurious behavior were listed in the health record. Medical conditions included a seizure disorder, hypothyroidism, hypertension, dyslipidemia, glaucoma, anemia, asthma, eczema, lumbar radiculopathy with chronic lower back pain, and opioid use disorder. He used a walker to ambulate. Within CDCR, the patient had previously received all levels of mental health care. At CHCF, he was admitted to MHCB care from November 5, 2024 through November 15, 2024 for danger to self and suicidal ideation, after engaging in repeated self-laceration. Once admitted to MHCB care, he was timely referred to acute care on November 13, 2024 but remained in MHCB care for two more days.

The initial PC assessment was timely and confidential but did not provide diagnostic impressions or a case formulation; in place of the case formulation, referral information from MCSP was inserted. The initial IDTT meeting was timely and attended by required staff. The patient refused to leave his cell, and the treatment team spoke with him at the cell front. The patient met three criteria for consideration of a higher level of care; the rationale for not referring the patient to PIP was adequately documented. During the IDTT meeting, the patient was informed that suicide watch would be discontinued, whereupon the patient reopened a preexisting self-inflicted wound and continued to cut himself until sent out later in the day for medical care. The case formulation was not updated, and the patient's verbalized treatment goals were not documented. The treatment plan did not address psychiatric care and instead focused on building a therapeutic alliance and providing CBT interventions to address suicidal ideation and self-harm behavior. One of two PCs and/or one of two psychiatrists followed the patient daily, except on November 12, 2024, when the

only contact the patient had with either discipline was for a mental health RVR assessment. All PC contacts occurred at the cell front, and the patient was dismissive and threatening. Interventions listed in the treatment plan could not be delivered. Psychiatric encounters also occurred at the cell front at custody's recommendation, due to the patient's agitated and violent behaviors. Psychiatric providers interpreted the patient's behaviors as manipulative. He was offered recreational therapy groups and attended these on three occasions. However, he also broke two MHCB cell door windows during his stay.

The follow-up IDTT meeting was timely and attended by required staff, apart from an alternate for the assigned psychiatrist. The patient was again seen at the cell front for this meeting, this time due to a custody modified program. The treatment team noted that the patient had not made treatment progress in MHCB care, referred him to acute care for danger to self and others, and requested expedited APP admission due to the patient's hostility and threats towards the assigned PC. The team recommended single-cell housing due to the patient's violent behaviors. The treatment team did not update the case formulation, the patient's strengths, the patient's verbalized treatment goals, or the treatment plan. The mental health consult for inpatient care was adequate. The discharge suicide risk evaluation was adequate and found the patient at high risk. A second suicide risk evaluation completed on the last day of MHCB care in connection with the acute care referral overlooked some dynamic risk factors but still found the patient at moderate risk. The PC discharge summary was timely but inaccurately stated that DBT skills training and motivational interviewing techniques were provided to the patient; none of these interventions were evident in progress notes. A mental health assessment for a November 10, 2024 RVR alleging destruction of state property was internally contradictory and difficult to parse, but the evaluator nevertheless found a nexus between the patient's mental health symptoms and the alleged behavior.

**Findings**

The treatment provided to this MHCB patient was inadequate.

Rationale for the patient's diagnoses was not documented, and the diagnosis of schizoaffective disorder was unsupported by any observations during MHCB care. A functioning and adequate case formulation was not developed. The treatment plan was incomplete, did not address interventions that were provided, and required interventions that were not provided. The assigned PC failed to establish a working therapeutic rapport with the patient, and the treatment team did not document efforts to adjust treatment considering the patient's anger towards the PC. More than one progress note interpreted the patient's violent behaviors as "manipulative" rather than as depressive or desperate, and the nature and potential severity of the patient's depression was inadequately explored. The patient was not seen by either a PC or a psychiatric provider for treatment purposes on November 12, 2024. The referral and expedited admission to acute care represented a strength.

**Patient MM**

This 31-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with schizoaffective disorder, depressive type, and stimulant use disorder, in remission. He was prescribed and adherent with

mirtazapine and ziprasidone. Hydroxyzine was prescribed PRN for anxiety, but he did not use this medication. Three episodes of self-injurious behavior and one suicide attempt were listed in the health record. Medical conditions included obesity, dyslipidemia, and diabetes. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At CHCF, he was admitted to MHCB care from October 30, 2024 through November 8, 2024 for suicidal ideation and danger to others, after reporting suicidal and homicidal ideation in the context of psychotic symptoms. He had just been discharged from MHCB care on October 18, 2024.

The initial psychiatric assessment was timely and adequate but not confidential due to the patient's refusal to leave his cell. The initial PC assessment was timely, but the patient refused to participate, and the resulting assessment was only marginally adequate and did not provide diagnostic impressions. The case formulation was pulled forward without modification, and it did not directly address psychotic symptoms. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. Because the current MHCB admission was the patient's fourth in six months, the patient met one criterion for a higher level of care. The treatment team adequately documented the rationale for retaining the patient in MHCB care. The patient's strengths and verbalized treatment goals were not documented. The treatment plan brought forward six treatment goals from recent MHCB stays; each of these goals was appropriate for the patient and MHCB care, but the status of the patient's progress towards these goals was not updated, and consequentially several of the goals were erroneously documented as already met. These goals had been met during a previous MHCB stay but were not yet met during the current MHCB stay. The treatment plan identified various DBT, CBT, and motivational interviewing techniques as interventions.

One of three psychiatrists and/or one of two PCs followed the patient daily. Most psychiatric encounters occurred at the cell front due to the patient's preference; progress notes confirmed adequate monitoring of the patient's symptoms and treatment response. Only one individual PC encounter was documented. This encounter was confidential, but the progress note did not reflect provision of any of the interventions required by the treatment plan. The PC documented a plan for daily PC encounters; these did not occur. Recreational therapy groups were offered regularly. The patient refused all but one, which he attended on the final day of MHCB care. The follow-up IDTT meeting was timely, attended by the same individuals who attended the initial IDTT meeting, and resulted in discharge to EOPMod care. The case formulation, patient's strengths, verbalized treatment goals, and treatment plan were not updated. IDTT documentation indicated that, while the patient continued to struggle with auditory hallucinations and urges to harm others, he had not engaged in dangerous behavior and could be treated at the EOP level of care. The rationale for this determination was poorly documented. The discharge suicide risk evaluation found the patient at low risk but did not provide a clear rationale for this determination. The safety plan was collaborative and useful. The psychiatric discharge summary was timely and adequate and noted that the patient's chronic suicide risk was moderate. A mental health assessment for an October 29, 2024 RVR for threatening staff was adequate and found a nexus between the patient's symptoms and the alleged behavior.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The case formulation was not updated, did not address psychotic symptoms, and did not clearly address the patient's multiple MHCB admissions. While the rationale for retaining the patient in MHCB care was adequate during the first IDTT meeting, the rationale for discharging the patient to EOPMod care rather than referring the patient to ICF care was not adequately documented. At discharge, the patient continued to struggle with the symptoms that prompted his admission, and the nature and severity of the patient's functional impairment were inadequately appreciated by the treatment team. The discharge suicide risk evaluation did not provide a rationale for the finding of low risk. Because this was the patient's fourth MHCB admission in six months, greater consideration for referral to a higher level of care was needed. Overall, he did not receive the treatment and disposition that he needed. The ensuing fifth MHCB admission and subsequent ICF referral, which occurred after this admission, were not surprising. Psychiatric care and the availability of recreational therapy groups represented strengths.

**Patient NN**

This 38-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CHCF. He was diagnosed with schizoaffective disorder, bipolar type, amphetamine type use disorder, severe, and opioid use disorder, severe. He was prescribed benztropine, lamotrigine, olanzapine, and risperidone, and he was consistently adherent with these medications except olanzapine, which he accepted about 86 percent of the time. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included decreased range of finger movement and abnormal weight loss. Within CDCR, the patient had previously received 3CMS care. At CHCF, he was admitted to MHCB care from November 4, 2024 through November 13, 2024 for significant impairment due to mental illness, after defecting on his cell floor and on his electronic tablet, reporting that his family was going to blow up the institution, exhibiting confusion, and denying these behaviors. At the time of his MHCB admission, he had a rapidly approaching release date of December 19, 2024. During MHCB care, he was classified as OMHD, with a plan to transfer him to Atascadero State Hospital (ASH) upon release from the CDCR.

The initial psychiatric assessment was timely and adequate but did not indicate whether it was confidential. The initial PC assessment was timely but did not provide an adequate psychiatric history, risk factors for violence towards others, mental status examination, or an adequate case formulation; the case formulation did not address the patient's current presentation or behavioral decompensation. The initial IDTT meeting was timely and attended by required staff but held in absentia due to the patient's refusal. The patient met no criteria for consideration of a higher level of care. The case formulation was not updated, the patient's strengths and verbalized treatment goals were not documented, and the treatment plan pulled forward without modification four goals that were not measurable as written and that had been developed for 3CMS care. A fifth goal, addressing serious impairment due to mental illness, was newly developed, measurable, and appropriate for MHCB care. One of three PCs and/or one of three psychiatrists followed the patient daily except on November 12, 2024, when neither discipline saw him. Outside of IDTT meetings, only one individual PC contact was offered, and it occurred at the cell front. Psychiatric progress notes demonstrated adequate monitoring and care. The patient's medications were adjusted, including a transition to a long-acting injectable antipsychotic. His symptoms abated,

and his functioning improved. He was consistently offered recreational therapy groups and began attending them during the final days of MHCB care. The follow-up IDTT meeting was timely and attended by the patient, the assigned psychiatrist and correctional counselor, and an alternate for the assigned PC. The treatment team determined to discharge the patient to EOP care for additional support and release planning and adequately documented the rationale for this decision. The patient's strengths and verbalized treatment goals were updated, but the case formulation and treatment plan remained unchanged. The discharge suicide risk evaluation was adequate and found the patient's risk to be low. A mental health assessment for a November 4, 2024 RVR alleging damage of state property was adequate, found a nexus between the patient's symptoms and the alleged behavior, and recommended that no privileges be removed as part of any penalty that might be assessed if the patient were found guilty of the infraction. The psychiatric discharge summary was timely and adequate.

**Findings**

The treatment provided to this MHCB patient was adequate.

Despite an incomplete PC assessment, an inadequate case formulation, and a deficient treatment plan, the patient received the treatment he needed. With one exception, he was followed daily by psychiatrists and PCs. Psychiatric care was appropriate and resulted in significant clinical improvement. The discharge plan to EOP level of care was appropriate given the patient's clinical needs and upcoming CDCR discharge. Treatment plan documentation and case formulation were areas in need of improvement.

**APPENDIX B-4**
**California Institution for Men (CIM)**
**Review Period: November 1, 2024 – April 30, 2025**

**Patient A**

This 38-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was admitted to the institution in October 2024. He was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, major depressive disorder, and opioid and substance use disorders. He was prescribed buspirone, fluoxetine and olanzapine. He was consistently adherent with buspirone, partially adherent with fluoxetine, and nonadherent with olanzapine, which was discontinued as a result. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He had two recent MHCB admissions at the facility and previously received 3CMS care. The patient received EOP care from October 16, 2024 through the end of the review period.

During the review period, he attended one of two routine IDTT meetings. Assigned providers attended both meetings. The clinical summary was appropriately descriptive, and current treatment needs were included. Treatment goals targeted anxiety, depression, and substance use but excluded psychiatric interventions. Despite an increase in anxiety and depression, and increased cravings that resulted in a relapse across IDTT meetings, treatment goals were unchanged. Additionally, although the patient had an EPRD in September 2025, discharge planning was not targeted in treatment. During the most recent IDTT meeting in April 2025, the patient was identified for a higher level of care review due to a 19 percent group attendance rate. Non-referral rationale was not clearly documented. Treatment modifications to use motivational interviewing and dialectical behavior therapy were reasonable, but the documented rationale for continued EOP care was generic.

Routine psychiatric documentation was descriptive and clinically relevant. The patient's symptoms, functioning, and medication side effects and response were routinely documented. Rationale for medication changes was documented. Treatment nonadherence documentation needed improvement. The PC offered the patient individual and group treatment. Individual and caseload group sessions did not alternate across weeks in accordance with the Program Guide. While contacts were not timely, there was improvement across the review period. Between March 2025 and May 2025, PC documentation utilized psychoeducation and motivational interviewing, but the documented need for dialectical behavior therapy was not utilized. The patient was offered some clinical groups, although the group treatment was primarily recreational in nature. Group assignment was not referenced in IDTT documentation, and it was not clear how recreational therapy would assist this patient in managing depression anxiety.

**Findings**

The treatment provided to this EOP patient was inadequate.

During the review period, the patient's symptoms increased. While his medication was adjusted, the patient did not receive sufficient evidence-based clinical interventions, individualized treatment, and clinically relevant group treatment to assist him in managing his distress. Relatedly,

treatment planning was not appropriately updated during IDTT meetings. The relationship between substance use and mental health symptoms was not sufficiently assessed or targeted. Discharge planning and recent MHCB admissions for danger to self were insufficiently integrated into treatment planning and routine care. Diagnostic clarification with clear rationale was needed.

**Patient B**

This 28-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was admitted to the facility on April 3, 2025. He was provided diagnoses of adjustment disorders with mixed anxiety and depressed mood, unspecified schizophrenia spectrum and other psychotic disorder, and amphetamine-type and opioid use disorders. He was prescribed and adherent with benztropine, mirtazapine, olanzapine, and trazadone. Within CDCR, he had previously received EOP and MHCB care. The patient received EOP care from April 3, 2025 through the end of the review period.

The initial psychiatric assessment was brief but timely, and it included current clinical presentation and relevant history. The initial PC assessment was timely but brief; apart from failing to provide diagnostic impressions, it was adequate. Initial IDTT documentation included a comprehensive clinical summary that included psychosocial history as well as current treatment needs. Identified treatment needs included psychotic, depressive, and anxious symptoms. Confusingly, treatment goals did not address these needs and instead targeted substance use and ADLs. ADLs were not identified elsewhere as current areas of concern, and while the patient had a history of substance use, substance use was not clearly identified as a current treatment need. The patient did not meet criteria for a higher level of care review. He was appropriately continued in EOP care, but documentation of the rationale for this decision needed improvement.

PC assignment was unclear. The patient was seen for one contact by the same PC who conducted the initial IDTT meeting. Subsequent contacts occurred with two different PCs. Rationale for the provision of encounters by multiple PCs was not documented, and no PC encounters were indicative of a meaningful therapeutic contact. Documentation of the one required psychiatric contact during the review period was clinically useful. Symptoms, functioning, institutional adjustment, medication side effects, and the rationale for medication changes were documented. Group treatment was primarily recreational in nature but not individualized to the patient's treatment needs.

**Findings**

The treatment provided to this EOP patient was inadequate.

Treatment planning did not address identified treatment needs. While psychiatric care was appropriate, PC care was inadequate. Specifically, Multiple PCs saw the patient without providing meaningful treatment, and all PC contacts were consistent with status or wellness check-ins.

**Patient C**

This 61-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was admitted to the facility in March 2024. He was provided diagnoses of obsessive-compulsive disorder and ADHD. Additional psychiatric

diagnoses located in the healthcare record were inconsistent with those provided in EOP care, and included borderline personality disorder, bipolar II disorder, and opiate use disorder. The patient was prescribed bupropion and fluoxetine; he was adherent with the former and partially adherent with the latter. Within CDCR he had previously received all levels of mental health care. At CIM, the patient received EOP care throughout the review period.

Documentation in the two routine IDTT meetings during the review period did not provide a sufficient clinical summary of this patient and thus did not convey a sense of who the patient was or what his unique treatment needs were. Treatment goals targeted anxiety and had not been updated since March 2024. The February 2025 IDTT meeting was conducted in absentia, and documentation indicated consideration of a discharge to 3CMS at the next IDTT meeting. However, there was no clear IDTT or provider documentation that supported readiness to discharge. Further, during a psychiatric encounter and in multiple PC contacts, the patient expressed anxiety about a discharge to 3CMS.

Psychiatric documentation addressed the patient's overall functioning, medication responses, and rationale for medication changes. The patient was actively engaged in multiple college courses and consistently presented as stable. Of concern, after meeting with the patient on April 9, 2025, the psychiatrist was informed that while in route to an outside medical appointment the day prior, the patient engaged in self-injurious behavior. It was unclear from other documentation whether the patient sustained an injury to his arm or to his hand, or whether the injury was self-inflicted or sustained accidentally. Regardless, he was diverted to the emergency department for sutures. The psychiatrist did not follow up with further assessment of the patient in light of this incident. PC contacts occurred via group and individual encounters. Overall, documentation described the patient's current functioning as stable but was not representative of meaningful therapeutic encounters. Group treatment was primarily recreational in nature.

**Findings**

The treatment provided to this EOP patient was inadequate.

The psychiatrist did not appropriately follow-up on the self-harm incident, and meaningful therapeutic contacts did not occur with the PC. IDTT documentation was not sufficiently descriptive of the patient's treatment needs, and it was inadequate to support continuity of care and multidisciplinary collaboration. Treatment planning was not sufficiently updated, and the plan to discharge him to 3CMS lacked rationale. Diagnostic clarification with rationale was needed.

**Patient D**

This 45-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was admitted to the facility on February 19, 2025 from the reception center at the 3CMS level of care. His level of care was appropriately changed to EOP during the initial IDTT meeting due to psychotic symptoms. He was diagnosed with unspecified schizophrenia and other psychotic disorder. He was prescribed and adherent with olanzapine. Hydroxyzine was prescribed PRN for anxiety, and he used it once during the review period. He received EOP care from March 11, 2025 through the end of the review period.

The initial PC assessment was timely but cursory and of limited use in guiding treatment. It did not include relevant psychosocial information for a case conceptualization. The initial psychiatric assessment was timely, clinically relevant, and included recent documentation regarding the patient's clinical presentation of psychosis. The psychiatrist noted that the patient's symptoms had improved following a recent increase in antipsychotic medication.

The initial IDTT meeting was attended by assigned treatment providers and conducted in absentia due to the patient's medical needs. The overly brief clinical summary excluded available clinical information in the healthcare record and instead relied on the patient's self-report, despite the patient being described as a poor historian. The treatment plan section of the document was blank; instead, an IPOC for hallucinations was established without identifying goals or interventions. The patient was identified for a higher level of care review due to low treatment attendance; however, there was no consideration that his need for an interpreter contributed to his lack of attendance. Factors that conveyed the patient's ability to manage EOP were documented in the non-referral rationale, but the rationale was not clearly documented. Treatment modifications did not address the language barrier.

Routine PC contacts consistently occurred in the dayroom, at times due to lack of confidential office space. In contrast to psychiatric contacts, there was no use of an interpreter. PC documentation was consistent with brief wellness checks. The patient's mental status was monitored, but therapeutic interventions were not utilized, and low group attendance was not addressed. In contrast, psychiatric documentation included relevant clinical information regarding the patient's symptoms, functioning, medication response, and rationale for medication changes. Group assignment was not discussed during the IDTT meeting, and it was unclear how offered recreational therapy groups would assist him.

**Findings**

The treatment provided to this EOP patient was inadequate.

The inadequate care provided by the PC outweighed the strengths of psychiatric care. The patient's serious mental illness and treatment needs were not sufficiently addressed in IDTT documentation, and treatment planning was not completed. Significant areas of concern included the pattern of nonconfidential contacts, poor use of an interpreter by the PC, and failure to consider that the patient's primary language posed a barrier on group attendance. There was no documentation to indicate that group treatment was individualized to his treatment needs.

**Patient E**

This 44-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient had been at the 3CMS level of care at CIM since 2022. In November 2024, following a period of medication nonadherence, he was admitted to the institution's MHCB due to psychotic symptoms. He was discharged to the institution's EOP. He was provided multiple diagnoses, which varied by provider and location in the health record and remained unreconciled during the review period. Diagnoses included: bipolar I disorder, schizoaffective disorder, adjustment disorder with mixed anxiety and depressed mood, generalized anxiety disorder, major depressive disorder, and unspecified schizophrenia spectrum and other

psychotic disorder. He was prescribed and adherent with Zyprexa. He received EOP care from November 14, 2024 through the end of the review period.

Provider initial assessments included psychosocial history and copied information regarding the patient's MHCB admission. The initial psychiatric assessment included a useful description of the patient's current mental status, which while improved was not yet at his baseline and included disorganized thinking, mild grandiosity, and paranoia. The covering psychiatrist at the initial IDTT meeting did not convey this information to the team. During the initial IDTT meeting, measurable and objective treatment goals with appropriate clinical interventions were developed to target depression. A goal for psychosis, implemented during the MHCB admission and documented as already met, remained on the treatment plan. Treatment planning was clinician driven and there was no clear psychiatric input. Although anxiety was identified as a treatment need, it was not targeted until the February 21, 2025 routine IDTT meeting. This was the first of two routine IDTT meetings that occurred during the review period. Rationale for continued EOP care was reasonable for two of three IDTT meetings. Documentation for routine IDTT meetings did not include sufficient summaries of the patient's progress or lack thereof. Due to low group attendance, the patient met criteria for a higher level of care review. The patient attributed low group attendance to his belief that recreational therapy did not meet his treatment needs. This was likely a reasonable assessment but not indicated as such in IDTT documentation. Regardless, non-referral rationale and treatment modifications were reasonable.

Across routine psychiatric contacts, the patient's mental status improved. He remained ambivalent about psychiatric medication, in part due to side effects and poor insight. However, the patient was receptive to psychiatric education regarding risks of discontinuing psychotropic medications, and he remained medication adherent. The patient's PC, a psychology intern, changed to a different psychology intern in March 2025. Across contacts, documentation was thorough and indicative of individualized, meaningful therapeutic contacts. Clinical interventions were utilized, although not consistently aligned with the treatment plan. Low group treatment was not routinely addressed during individual contacts.

**Findings**

The treatment provided to this EOP patient was adequate with need for improvement.

The care for this patient with a serious mental illness who stabilized and improved over time was adequate. Psychiatric documentation indicated appropriate monitoring of the patient's symptoms and functioning, with an individualized focus on medication adherence. PC contacts were indicative of good rapport, individualized interventions, and ongoing assessment of the patient. Areas in need of improvement were multidisciplinary treatment planning, alignment between identified treatment goals and provision of treatment, diagnostic clarification, and individualization of group assignment.

**Patient F**

This 64-year-old, DDP 2 patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was transferred to CIM on January 6, 2025 from the reception center, where he had received 3CMS and EOP care. A month after arriving at CIM,

he was admitted to the institution's MHCB. He was provided a diagnosis of major depressive disorder. He received EOP care from January 6, 2025 to February 5, 2025 and from February 24, 2025 through the end of the review period. During EOP care prior to MHCB admission, he was prescribed and adherent with aripiprazole, buspirone, and mirtazapine. Additionally, he received amitriptyline for chronic pain through medication services. During EOP care after MHCB discharge, he was prescribed and adherent with haloperidol, mirtazapine, and duloxetine. Although the psychiatrist prescribed duloxetine, it was noted to be prescribed not just for depression but also for diabetic peripheral neuropathy. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. The patient had multiple medical conditions, including diabetes, heart failure with reduced ejection fraction, hyperlipidemia, stroke history, paroxysmal atrial fibrillation, and vascular dementia. He had an EPRD of June 2025.

During EOP care prior to MHCB admission, provider initial assessments included relevant clinical history. The initial psychiatric assessment described current treatment needs as hallucinations, anxiety, and ongoing memory lapses. The initial PC assessment documented current treatment needs as "depression and anxiety" without elaboration; the patient was provided a provisional major depressive disorder without clinical rationale. In the initial IDTT meeting, the treatment plan was unchanged from that developed at the reception center. For reasons that were unclear, IPOCs were initiated that did not include goals or interventions, along with a treatment plan goal targeting depression. Treatment plan interventions were generic, and the treatment goal required improvement. The patient did not meet criteria for a higher level of care review. EOP level of care was continued, although rationale was insufficient. IDTT documentation did not discuss the hallucinations, memory lapses, or confusion.

Shortly after his initial IDTT, the was referred for an urgent consult. He presented with a decline in ADLs, cognitive functioning, and social interaction and was described as confused and disoriented. He was assessed as moderate risk of harm and admitted to MHCB care. During the MHCB stay, the patient's mental status improved with a medication adjustment, and he was discharged back to EOP.

During EOP care after MHCB discharge, provider initial assessments and the initial IDTT meeting were late. They were completed well over a month following his return to EOP from the MHCB. PC content did not provide sufficient detail regarding the MHCB placement. The psychiatric assessment referenced two recent head CT scans and discussed the likelihood of vascular dementia. The patient was encouraged to discuss concerns with medical providers and request a neurological evaluation. It was unclear why the psychiatrist did not consult with medical providers directly and instead relied on the patient to do so. This was concerning given that the patient had been reporting memory problems since the outset of his EOP care. IDTT documentation indicated a decline in his functioning but lacked detail. There was documentation of a recent consult with medical, but relevant documentation was not located. The psychiatric technician represented medical services, and input indicated that the patient suffered from "advancing issues" that impacted his ability to program. Custody reported frequent incontinence. There was documentation of depression related to his declining health. He was continued in EOP care with multidisciplinary monitoring, medication management, and cognitive-behavior therapy. However, CBT was contraindicated given the patient's cognitive decline.

**Findings**

The treatment provided to this EOP patient was inadequate.

Care for this patient with complex medical and mental health needs with an upcoming release was inadequate. Closely coordinated multidisciplinary care was needed for this patient, whose integrated medical and mental health needs impacted his ability to function. Assigned medical providers and the discharge planner were needed at IDTT meetings for continuity of care and a safe community release. IDTT documentation needed specific information regarding this patient's deficits and their impact on his functioning. The rationale for the patient's diagnosis was needed but not documented.

**Patient G**

This 54-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was admitted to the facility on March 19, 2025. He was provided diagnoses of antisocial and borderline personality disorders and major depressive disorder. He was prescribed fluoxetine and mirtazapine and was partially adherent with mirtazapine and nonadherent with fluoxetine. Hydroxyzine was prescribed PRN for anxiety, and he used this medication sporadically during the review period. Within CDCR, he had previously received all levels of mental health care. At CIM, the patient received EOP care from March 19, 2025 through the end of the review period.

The initial PC assessment was reasonable. However, some content was copied from a previous assessment, and because the extent of the outdated information could not be determined, the patient's current treatment needs were unclear. Current treatment needs were similarly unclear in the initial psychiatric assessment, due to the patient's limited cooperation. Documentation regarding psychiatric history lacked specific detail.

The initial IDTT meeting was attended by assigned providers and completed in absentia due to the patient's refusal. During a PC contact prior to the IDTT meeting the patient indicated that he wanted work on depression, and depression was appropriately identified as a treatment target. Without clear rationale, mood dysregulation was also targeted as a treatment goal. Objective and measurable treatment goals were identified and accompanied by evidence-based interventions. Group assignment was not documented. The patient did not meet criteria for a higher level of care review. He was continued at the EOP level of care, but the rationale for this decision was not individualized.

During the initial psychiatric assessment, the patient became angry regarding the plan to continue to crush and float fluoxetine. He requested that the medication be discontinued, and the psychiatrist accommodated this request. During a follow-up psychiatric encounter two weeks later, the patient requested to resume fluoxetine. The psychiatrist restarted the medication and, at the end of the review period, increased the dosage. Psychiatric documentation indicated an improvement in anxiety and that symptoms, side effects, and general functioning were assessed. PC contacts occurred in group format and individually. There was a gap in contacts between April 7, 2025 and May 5, 2025. During individual contacts, the patient's status was assessed and discussed. Contacts were supportive in nature, but clinical interventions identified in the treatment plan were not utilized. The patient was primarily offered recreational therapy groups. It was unclear how this modality would help him meet his treatment goals.

**Findings**

The treatment provided to this EOP patient was inadequate.

The use of copied documentation in the PC assessment, without identification of source and date, impacted current clinical utility of information. Psychiatric care was appropriate, but there were gaps in PC encounters and deficits in PC treatment delivery. The PC monitored the patient's status but did not provide treatment interventions to decrease distress or symptoms. Group assignments were not individualized or in clear alignment with his treatment needs. Treatment planning documentation needed improvement, including documentation of the rationales for continued EOP care and for emotional dysregulation as a treatment goal. The rationale for psychiatric diagnoses was also needed.

**Patient H**

This 39-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was admitted to the facility on October 25, 2024 from ICF. EHRS diagnoses were PTSD, unspecified schizophrenia spectrum and other psychotic disorder, amphetamine-type substance-induced psychotic disorder, and opioid use disorder. He was prescribed and adherent with divalproex sodium. Olanzapine was prescribed exclusively as a PRN medication for agitation, but the patient did not use it during the review period. Within CDCR, the patient had previously received 3CMS, MHCB, and ICF care. At CIM, the patient received EOP care from October 25, 2024 through the end of the review period. He paroled on June 7, 2025.

Assigned providers attended the initial and both routine IDTT meetings. The patient missed one routine IDTT meeting due to modified programming. The clinical summary was current and useful for the initial and one routine IDTT. Initial treatment planning was unclear. While the patient's stated goals were to target anxiety and peer relationships, the treatment plan included goals for anger management and anxiety, both of which had been formulated during ICF care, and an additional goal for auditory hallucinations, which was not a current documented treatment need. During the February 2025 routine IDTT meeting, treatment goals that targeted anxiety, anger management, and auditory hallucinations were assessed as met. At that time, a goal of stability was initiated and continued during the second routine IDTT meeting. No interventions or long-term objectives were developed. The short-term objective was poorly formulated as continuing "to work on previously established goals." Minimal updates were made to the May 2025 IDTT documentation, and goals for relapse prevention and discharge planning were not developed. The patient did not meet a review for a higher level of care. EOP care was continued, but documentation of the rationale for this decision was generic.

Psychiatric contact documentation varied in detail based on prescriber with mental status and medication response routinely reviewed. The patient saw different psychiatrists in December 2024 and January 2025, but notes were sufficient for continuity of care. PC contacts were completed via caseload groups and individually. The patient consistently denied any mental health concerns across individual contacts. Documentation indicated that the PC routinely assessed the patient's mental status and functioning and consulted with collateral sources. Offered groups were primarily recreational in nature.

**Findings**

The treatment provided to this EOP patient was adequate with need for improvement.

The patient remained stable limited insight throughout the review period. Psychiatric care was appropriate, and the PC monitored the patient's mental status and attempted to engage him in treatment. Areas in need of improvement were treatment planning documentation, discharge planning/relapse prevention, individualized group assignment, and diagnostic clarification.

**Patient I**

This 42-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient was admitted to the facility on March 10, 2025. He was diagnosed with schizophrenia, anxiety, and depression, along with alcohol, cannabis, and amphetamine use disorders. He was prescribed and adherent with olanzapine and sertraline. Within CDCR, he had previously received only 3CMS care. At CIM, he received EOP care from March 20, 2025 through the end of the review period.

Both the initial psychiatric assessment and the initial PC assessment note were timely, thorough, and clinically useful. Of note, there was a discrepancy in providers' documentation of family history of mental illness. The patient and assigned providers attended the initial IDTT meeting. Treatment planning targeted the patient's history of self-harm and auditory hallucinations. Objectives were not developed and intervention of "increase coping skills, support sobriety" needed specificity. There was minimal psychiatric input into the IDTT meeting other than listing medication management as an intervention. The rationale for continued EOP care was not documented. The initial psychiatric assessment included a plan to see the patient in 30 days, and this appointment occurred timely immediately after the end of the review period. At that time, when the patient was found stable with improving symptoms. PC contacts occurred through caseload groups and individual contacts. Documentation of individual contacts reflected the provision of meaningful therapeutic encounters. The use of various skills and evidence-based treatments were documented in caseload group treatment notes. Offered groups were primarily recreational in nature, although rationale for group assignment was not included in IDTT documentation.

**Findings**

The treatment provided to this EOP patient was adequate with need for improvement.

The patient received the treatment he needed and remained stable during the review period. Despite need for improvement in treatment planning documentation, overall, provider care was individualized to the patient's treatment needs, and the patient's symptoms improved. Rationale for group assignment and greater access to clinical groups was needed.

**Patient J**

This 60-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CIM. The patient had been at the institution since September 2024. He was diagnosed with schizophrenia, psychosis, delusional disorder, and borderline personality disorder.

Within CDCR, he had previously received all levels of mental health care. He was prescribed long acting injectable formulations of first paliperidone and then aripiprazole under a PC 2602 order for involuntary treatment due to danger to others. Through medical services, the patient was prescribed nortriptyline for neuropathic pain. He was adherent with all three medications. He remained in EOP care throughout the review period.

The patient's routine IDTT was due in January 2025 but not completed until April 2025. A clinical summary of his functioning since his initial IDTT was not documented, and his current treatment needs were unable to be determined. Treatment planning targeted medication adherence, delusions, and irritability. Sections of the treatment plan were blank or were unclear. For example, the short-term goal for irritability was left blank and the date for medication compliance was blank. It was unclear how mindfulness would reduce delusions and the long-term goal of "insight insight" [sic] was unclear. The patient met criteria for consideration of a higher level of care due to high treatment refusal. Treatment modifications targeted symptoms that impacted low treatment attendance, and factors to support non-referral were documented. However, the rationale for retaining the patient in EOP care was not individualized.

The patient was seen by three different psychiatrists between November 2024 and May 2025. Psychiatric documentation was comprehensive and sufficiently descriptive for continuity of care. The patient's mental status, medication response, side effects, and rationale for medication changes were regularly documented. There was a pattern of delayed PC contacts between February 2025 and April 2025. Between December 2024 and May 2025, the patient was seen by five different PCs. One of these PCs provided a caseload group to the patient, despite not having seen the patient previously. Progress note content varied by PC and ranged from assessment of the patient's mental status and review of coping skills to individualized treatment that utilized motivation interviewing to engage the patient. Because the patient was treatment resistant and had poor insight, use of motivational interviewing was appropriate. Group treatment was primarily recreational in nature.

**Findings**

The treatment provided to this EOP patient was inadequate.

Despite some strengths in this treatment-resistant patient's treatment, his overall treatment was assessed was inadequate. The delayed routine IDTT meeting and pattern of delayed PC contacts did not meet Program Guide requirements. IDTT documentation was insufficient and not useful for continuity of care. It was unclear why modified programming was not considered for this patient, as his paranoia contributed to low group attendance. It was also unclear how recreational therapy groups targeted his treatment needs. The lack of provider continuity for a patient with paranoia was an area of concern.

**Patient K**

This 24-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with an unspecified anxiety disorder. He was prescribed chlorpromazine and mirtazapine and was adherent with chlorpromazine but not with mirtazapine. Olanzapine was prescribed PRN for anxiety, and he used this medication once or twice a day during most of his MHCB stay. Through the ISUDT, buprenorphine-naloxone was

prescribed for opioid use disorder, and he was adherent with this medication. Four episodes of self-injurious behavior without suicidal intent were listed in the health record. Medical conditions included low back pain, anxiety, and opioid use disorder. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. He received MHCB care from April 22, 2025 to May 2, 2025 after engaging in substance use, experiencing withdrawal symptoms, dysphoria, bereavement, and suicidal ideation.

The initial psychiatric and primary clinician assessments were timely, confidential, and adequate apart from a failure in the psychiatric assessment to address the patient's diagnoses. The initial IDTT meeting was timely and attended by required staff and the patient. The patient met one criterion for a higher level of care due to multiple MHCB placements; the rationale for retaining the patient in MHCB care was adequately documented. The case formulation was adequate apart from failing to address factors that contributed to improvement. The treatment plan was adequate apart from failing to include psychiatric care in the interventions. The patient was followed daily by one of four primary clinicians or one of four psychiatrists. Documentation did not consistently indicate if these encounters were confidential. On at least one occasion the encounter occurred at the cell front due to limited mental health staffing. Psychiatric and primary clinician interventions were appropriate for the patient's level of care. Following the initial recreational therapy assessment, no recreational therapy interventions were documented. The follow-up IDTT meeting was timely and attended by the assigned clinician, an alternate for the assigned psychiatrist, and a correctional counselor who may or may not have been assigned to the patient. The patient was unable to attend due to custody-modified programming but agreed with the team's recommendation that he return to EOP care. The treatment plan was not updated to reflect the patient's response to treatment over the prior week or the achievement of short-term goals. The discharge suicide risk evaluation found the patient at low risk, and a collaborative and adequate safety plan was developed. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely assessments, IDTT meetings, and interventions, and his clinical presentation improved as a result. Except with respect to diagnostic clarification, assessments were adequate. Although there was room for improvement, both the case formulation and the treatment plan were thoughtful. Efforts were made to provide the interventions required by the treatment plan, and an adequate safety plan and psychiatric discharge summary were developed. There were three primary areas requiring improvement: continuity of service provider, as four primary clinicians and four psychiatrists were involved in the patient, provision of recreational therapy interventions, as none were documented, and clarification of psychiatric diagnoses. Despite these weaknesses, overall treatment was adequate.

**Patient L**

This 23-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with acute psychosis and major depressive disorder, recurrent, unspecified. He was prescribed mirtazapine and olanzapine, and

he was consistently adherent with the first and partially adherent with the second. An additional dose of olanzapine was prescribed PRN for agitation, but the patient did not use this dose during the MHCB stay. No suicide attempts or self-injurious behavior were listed in the health record. Medical conditions included a history of hepatitis C and methamphetamine and opioid use disorders. Within CDCR, the patient had not previously received mental health services. He received MHCB care from April 28, 2025 to May 8, 2025 after exhibiting paranoia, agitation, reporting that the meat served to incarcerated individuals was human flesh, voicing suicidal ideation, and being deemed a danger to self and others.

The initial psychiatric and primary clinician assessments were timely but occurred at the cell front due to the patient's refusal of a confidential setting. The initial psychiatric assessment was adequate; the primary clinician assessment was limited and did not adequately address psychiatric diagnoses. The recreational therapy assessment was not completed until two days prior to discharge, and it was not used to guide care. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet any criteria for a higher level of care. The case formulation was generic, incomplete, and inadequate to guide care. The treatment plan addressed anxiety but not paranoia, delusional thinking, or suicidal ideation; although it contained a measurable and realistic short-term objective, interventions failed to include psychiatric care. The patient was followed daily by one of five primary clinicians and/or one of two psychiatrists. Most encounters occurred at the cell front. At least twice, custody-modified programming prevented these encounters from occurring in a confidential setting. In one cell-front encounter, a primary clinician documented that the patient was willing to contract for safety. No recreational therapy interventions were documented. The follow-up IDTT meeting was timely and attended by the patient, the assigned psychiatrist and assigned correctional counselor, and an alternate for the primary clinician. It resulted in a decision to discharge the patient to 3CMS care, and the treatment plan was appropriately updated to indicate that the short-term goal had been met. The discharge suicide risk evaluation found the patient at low risk, and the safety plan was detailed, collaborative, and patient specific. The psychiatric discharge summary was timely but inadequate. The subjective and mental status sections of the discharge summary were copied without alteration from a psychiatric progress note written two days earlier, raising concerns that they did not reflect the patient's presentation at the time the discharge summary was prepared and that the patient may not have been seen at the time the discharge summary was developed. The summary lacked any clear hypotheses regarding what had contributed to the patient's psychotic symptoms or what had contributed to the patient's improvement.

**Findings**

The care provided to this MHCB patient was inadequate.

Most encounters occurred at the cell front, and efforts to develop a clear understanding of the patient's psychopathology were weak. The patient's delusion that he was being fed human flesh was not adequately explored. Neither the case formulation nor the treatment plan were adequate to guide treatment for the patient's psychotic symptoms. Continuity among primary clinicians was poor, with five clinicians providing care over the course of ten days. The use of contracting for safety with potentially suicidal patients falls below the standard of care. The psychiatric discharge

summary was characterized by copied material and was of poor quality. The safety plan represented a major strength in the patient's care, and the patient appeared to benefit from psychotropic medications. However, the discharge to 3CMS rather than to EOP care, given the severity of the patient's initial clinical presentation, may not have been appropriate.

**Patient M**

This 61-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with an unspecified psychotic disorder and unspecified bipolar disorder. He was prescribed olanzapine and was partially adherent with this medication. No suicide attempts or self-injurious behavior were listed in the health record. Medical conditions included chronic obstructive pulmonary disease, dyslipidemia, sinus of Valsalva aneurysm, occult blood in stools, benign adenomatous neoplasm, chronic pancreatitis, and hearing loss. He required hearing aids. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. However, immediately prior to his MHCB admission, he was not receiving any mental health services. He received MHCB care from April 21, 2025 to May 1, 2025 for agitation, aggression, disorientation, and incoherent speech.

The initial psychiatric and primary clinician assessments were timely but inadequate. The patient refused to cooperate with these assessments, and although observations and record reviews were used to complete the assessments, neither assessment adequately explored the nature of the patient's symptoms and clinical presentation. The initial IDTT meeting was held timely and in absentia due to the patient's refusal to attend and continuing agitation and hostility. Required staff attended. The patient was not found to meet criteria for a higher level of care, and the patient's strengths and verbalized treatment goals were not identified. An old case formulation was carried forward without modification and did not address the patient's current symptoms. A treatment plan was not formulated. The patient was followed by one of our primary clinicians and/or one of two psychiatrists on a nearly daily basis. He was not seen by either discipline on April 26, 2025. Most encounters occurred at the cell front either due to the patient's hostility or due to staffing shortages. Progress notes adequately documented the patient's gradual improvement, but the patient continued to exhibit tangential thinking and hyperverbal speech at discharge. No recreational therapy assessment or interventions were documented. The follow-up IDTT meeting was timely and attended by the patient, assigned primary clinician and correctional counselor, and an alternate for the assigned psychiatrist. However, the IDTT meeting was held at the cell front due to custody-modified programming, and the patient's strengths and verbalized treatment goals were not updated. No treatment plan was preset. Due to the severity of the patient's symptoms and difficulty in gaining therapeutic rapport and treatment adherence, the treatment team determined that the patient required EOP care upon discharge, and the patient was agreeable to this change. The discharge suicide risk evaluation found the patient at low risk. The psychiatric discharge summary was timely and adequate apart from failing to discuss differential diagnoses.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial psychiatric and primary clinician assessments failed to address the nature of the patient's symptoms, and the case formulation was not updated to address the patient's current presentation. No treatment plan was developed. Treatment with olanzapine was partially effective, but it was not clear what was being treated or why the patient had experienced a sudden decompensation prior to admission. Attempts to provide coping skills for self-regulation were not successful due to interference from the patient's ongoing symptomatology. Most encounters were not confidential, and the patient was not seen by either a psychiatrist or a primary clinician for one day during his MHCB stay. There was no clear understanding of the patient's psychopathology by the time of discharge. He was in the process of stabilizing at the time of discharge, and the discharge to EOP care appeared clinically appropriate despite inadequate assessment and understanding of the patient's mental illness.

**Patient N**

This 35-year-old transgender (she/her/hers) MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. Differential diagnoses were schizophrenia, schizoaffective disorder, bipolar type, and stimulant-induced psychotic disorder. She was prescribed olanzapine and adherent with this medication. No suicide attempts or self-injurious behavior were listed in the health record. Medical conditions included HIV, late syphilis, and abnormal cytology findings. At the time of MHCB admission, she had an abrasion on her scrotum that she reported was the result of scrubbing herself with a toothbrush as well as extensive masturbation. Within CDCR, the patient had previously received 3CMS and EOP care. She received MHCB care from April 23, 2025 to May 1, 2025 after psychiatric decompensation characterized by auditory hallucinations and delusions that her mother was being sexually assaulted and that the patient was a burden to the mother.

The initial psychiatric and primary clinician assessments were timely but limited. They did not discuss or explore differential diagnoses, the potential role of psychosis in her scrotum wound, or any social challenges and potential safety concerns arising from the patient's transgender identity. The initial IDTT meeting was timely and attended by the patient, the assigned primary clinician and correctional counselor, and an alternate for the assigned psychiatrist. The patient was not found to meet criteria for a higher level of care. The case formulation included potentially useful hypotheses but was not updated to reflect the patient's current symptoms and clinical presentation. Patient strengths were not documented, and the treatment plan was inadequate, inappropriate for crisis care, and not updated from one developed two months earlier in 3CMS care. One of three primary clinicians and one of four psychiatrists followed the patient, but daily encounters were missing on two occasions. She was not seen by either discipline on April 26, 2025 or April 30, 2025, and was not seen by a psychiatrist during the four days between April 27, 2025 and May 1, 2025. Several encounters occurred at the cell front due to custody-modified programming. A confidential primary clinician encounter on April 28, 2025 included clinically appropriate crisis interventions and was well documented. No recreational therapy assessment or interventions were documented. The follow-up IDTT meeting was timely and again attended by the patient, the assigned primary clinician and correctional counselor, and a different alternate for the assigned psychiatrist. The meeting occurred at the cell front due to custody-modified programming, and IDTT documentation did not update the patient's strengths, change in her verbalized treatment goals, or the treatment plan. The discharge suicide risk evaluation was adequate and found the

patient at low risk. The psychiatric discharge summary was timely and partially adequate, but in part it relied on material copied and pasted from prior psychiatric progress notes. There were no attempts to explore reconciliation of her diagnoses or to formulate the relationship, if any, between the patient's transgender identity and the nature of her symptoms.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation and treatment plan were not updated or adequate to guide treatment for the patient's current symptomatology and crisis needs. Efforts to clarify the patient's diagnoses were absent, and there was no attempt to conceptualize the patient's symptomatology in the context of her transgender identity. The provision of antipsychotic medication and, on at least one occasion, clinically appropriate therapeutic interventions were strengths. However, the patient did not receive daily psychiatric or primary clinician encounters on two of nine days, and a four-day gap between psychiatric encounters occurred between April 27, 2025 and May 1, 2025. The assigned psychiatrist did not participate in either IDTT meeting, and both individual encounters and one IDTT meeting were held in non-confidential settings. The patient's need for antipsychotic medication in the context of her poor insight, chronic mental illness, and history of psychotic decompensation when not receiving medication was inadequately addressed in documentation and discharge planning.

**Patient O**

This 34-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder and, on a rule out basis, substance-induced psychotic disorder. He was not prescribed any psychotropic medication. No suicide attempts, self-injurious behavior, or medical conditions were listed in the health record. Within CDCR, the patient had previously received 3CMS, MHCB, EOP, and acute levels of care. A Vitek hearing for acute inpatient care in March 2025 ruled in the patient's favor and returned the patient to general population status. He received MHCB care from April 25, 2025 to May 5, 2025 for acute paranoia, disorientation, delusions that he is paroling, repeated attempts to pack his belongings and leave the prison, and lack of insight. Staff at the sending facility reported that the patient was acting as if he was already in the community, as he invited other incarcerated individuals to come cruising with him and told them he had car.

The initial psychiatric and primary clinician assessments were timely and adequate, although neither indicated whether the assessment was confidential. The initial IDTT meeting was timely but held in absentia due to the patient's refusal to participate. It was attended by alternates for the assigned primary clinician and psychiatrist, as well as by a correctional counselor who may or may not have been assigned to the patient. The patient was found to meet criterion for a higher level of care due to multiple recent MHCB admissions resulting from significant impairment due to psychosis; rationale for not referring the patient to a higher level of care was inadequately documented. The case formulation was not updated and was inadequate because it failed to address the patient's lack of insight, significant memory problems, refusal of psychotropic

medication, and their contributions to delusionally-driven behavior. The treatment plan did not address the patient's delusionally-driven behavior, lack of insight, or treatment disengagement, and it did not include a long-term goal or goal start date. It was evidentially a fragment of a prior treatment plan with poor editing, as the patient's progress/response was documented for three problems/symptoms that were blank. One of five primary clinicians or one of two psychiatrists saw the patient daily, but the assigned psychiatrist had provided no encounters with the patient. Almost all encounters occurred at the cell front due to the patient's refusal or custody-modified programming. Documentation indicated limited to no probing of the patient's prior delusions and disorientation. On the day prior to discharge, a progress note frankly stated that the patient's mental status could not be assessed due to the patient's lack of engagement. No recreational therapy assessment or interventions were documented, but as an incidental finding, the patient was documented as alert, calm, appropriate, and attending a full session of the CRC EOP coping group on May 1, 2025, while he was still in MHCB care at CIM. At CIM, the follow-up IDTT meeting was timely but again held in absentia due to the patient's refusal to attend. He was again found to meet criteria for a higher level of care, but on this occasion the rationale for not referring him was documented. The assigned primary clinician and correctional counselor, and a different alternate for the assigned psychiatrist attended. Neither patient strengths nor the treatment plan were updated, and the patient's disengagement with treatment remained unaddressed. Rationale for discharge to EOP care was plausibly documented but lacked any inquiry into the nature of the patient's paranoia, delusions, or disorientation. The discharge suicide risk evaluation found the patient at low risk and noted that no delusions were exhibited during the MHCB stay. The psychiatric discharge summary was timely but inaccurate, asserting that the patient had been stabilized with psychotherapy and behavioral modification; there was no documentation that these interventions were provided.

**Findings**

The care provided to this MHCB patient was inadequate.

The treatment plan and case formulation were incomplete and inadequate to guide crisis care. Whether due to the patient's refusal or to custody-modified programming, encounters occurred almost exclusively at the cell front, a location that did not permit in-depth assessment of the patient's thinking. The patient's guardedness, paranoia, prior delusional statements, prior disorientation, lack of insight, and treatment disengagement were inadequately assessed or addressed. Continuity among primary clinicians was poor, with five clinicians involved over the course of two days, and the assigned psychiatrist did not attend either IDTT meeting. Although the patient at one point acknowledged using illicit substances prior to his MHCB admission, this report was not sufficient to determine the nature of the patient's psychotic symptoms. He was returned to EOP care inadequately assessed and without diagnostic clarity.

**Patient P**

This 34-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with an unspecified bipolar disorder. He was prescribed mirtazapine and lurasidone and was mostly adherent with these medications. Two episodes of self-injurious behavior without suicidal intent were listed in the health record.

Medical conditions included being overweight, hearing impairment, eosinophilia, a history of a penetrating flank wound, and a history of successfully treated hepatitis C. He required hearing aids. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. He received MHCB care from April 29, 2025 to May 9, 2025 for self-injurious behavior, suicidal ideation, paranoia, and agitation.

The initial psychiatric and primary clinician assessments were timely, confidential, and adequate. They indicated that the patient was hypomanic to manic. The initial IDTT meeting was timely, attended by required staff, but held in absentia due to custody-modified programming. The patient was not found to meet any criteria for a higher level of care. The case formulation adequately addressed distal contributions to the patient's interpersonal instability but did not address the presence of a bipolar disorder and need for psychiatric care. The patient's strengths were poorly documented, and the patient's verbalized treatment goals were not documented. The treatment plan identified mood, without further specification, as the treatment target, and formulated a short-term goal of rating mood as a 4 or below within nine days without clarification of the scale or the mood symptom to be rated. Identified treatment interventions were comprehensive and clinically appropriate. He was followed daily by one of three primary clinicians and one of three psychiatrists. Documentation did not consistently indicate whether these encounters were confidential, but on at least two occasions they occurred at the cell front due to custody-modified programming. No recreational therapy assessment or interventions were documented. The follow-up IDTT meeting was timely and attended by the patient, assigned primary clinician and correctional counselor, and an alternate for the assigned psychiatrist. Documentation of the patient's improvement was adequate, and the treatment plan was appropriately updated to indicate that the short-term goal had been achieved. The discharge suicide risk evaluation was adequate and found the patient at low risk. A collaborative and useful safety plan was developed. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was adequate.

Although there was room for improvement in the case formulation and treatment plan, the MHCB care provided was consistent with both and clinically appropriate for the patient's treatment needs. It was evident that the patient felt heard by the mental health providers working with him, and his symptoms improved significantly over the course of the MHCB stay. The assessments and discharge summary were adequate, and the safety plan was collaborative and useful.

**Patient Q**

This 27-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with schizophrenia. He was not prescribed any psychotropic medication. Two suicide attempts were listed in the health record, but the patient was free of medical conditions. Within CDCR, the patient had not previously received mental health services. He received MHCB care from April 29, 2025 to May 7, 2025 for paranoia, auditory and visual hallucinations, and danger to others.

Although both occurred at the cell front due to the patient's refusal of confidential settings, the initial psychiatric and primary clinician assessments were adequate and timely. The initial IDTT meeting was timely but held in absentia due to custody-modified programming; the assigned psychiatrist and correctional counselor, and an alternate for the assigned primary clinician, attended. The patient was not found to meet criteria for a higher level of care. The case formulation did not address the need for psychiatric care but was otherwise adequate. The treatment plan identified paranoid delusions as the treatment target and improbably indicated eliminating them within nine days was the short-term treatment goal. During the MHCB stay, the patient was not seen by a psychiatrist between the initial psychiatric assessment on April 30, 2025 and the psychiatric discharge summary on May 6, 2025. One of three primary clinicians followed the patient. All encounters occurred at the cell front, either due to the patient's refusal or due to custody-modified programming. On May 3, 2025, neither a primary clinician nor a psychiatrist saw the patient. On May 5, 2025, although a mental health RVR assessment and a recreational therapy assessment were completed, no individual treatment encounters were provided. The recreational therapy assessment was not used to guide treatment, as no recreational therapy interventions were documented. The follow-up IDTT meeting was timely and attended by the patient and required staff. The patient was found to be stable, but the treatment plan was not updated to indicate achievement of the short-term objective, and the rationale for discharge to 3CMS care was inadequately documented. The discharge suicide risk evaluation found the patient at low risk but failed to account for the two suicide attempts documented elsewhere in the health record. A mental health assessment for an April 29, 2025 RVR alleging behavior which could lead to violence found a nexus between the alleged behavior and the patient's mental illness. The psychiatric discharge summary was timely but did not address the patient's psychiatric diagnosis, the nature of the acute psychosis that prompted the MHCB admission, the reason psychotropic medications were not prescribed, or the nature of the apparent recovery from psychosis that the patient achieved during the MHCB stay.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient's psychotic symptoms were inadequately monitored and assessed following initial admission assessments, and the short-term goal of eliminating delusional thinking within nine days was not realistic. The patient went from suffering from acute psychosis at admission to being free from psychosis at discharge, without psychotropic medications, careful inquiry, or a plausible explanation for this change. The patient's resistance to accepting psychotropic medications was inadequately explored. Encounters consistently occurred at the cell front, where in-depth inquiry could not take place. Daily interventions were not provided on two occasions, and the patient was not seen by psychiatry once every three days as required by the program guide. Initial assessments were adequate; follow-up assessment, monitoring, and treatment were not.

**Patient R**

This 41-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with schizophrenia. He was prescribed intramuscular haloperidol and adherent with this medication. Hydroxyzine was prescribed PRN

for anxiety, but he did not use this medication. No suicide attempts or self-injurious behavior were listed in the health record. He was enrolled in the developmental disability program with a code of DDP2. Medical conditions included visual impairment. Within CDCR, the patient had previously received all levels of mental health care except 3CMS. He received MHCB care from April 22, 2025 to May 2, 2025 for suicidal ideation with a plan and intent, accompanied by command auditory hallucinations telling him to harm himself. He voiced a desire to be dead like his parents, who had died recently in a motor vehicle accident.

The initial primary clinician and psychiatric assessments were timely. Documentation did not make clear if the former was confidential, but the psychiatric assessment was confidential. Neither assessment adequately addressed the patient's psychiatric diagnoses; both included but did not discuss diagnoses of schizophrenia and adjustment disorder. The primary clinician assessment indicated that the patient had a history of cheeking oral medication even while the medication administration record reflected medication adherence. The initial IDTT meeting was timely and attended by the patient and required staff. The patient met criteria for consideration of a higher level of care due to multiple MHCB admissions, but the rationale for retaining the patient in MHCB care was adequately documented. The case formulation did not address the patient's developmental disability, psychotic symptoms, suicidal ideation, bereavement, lack of insight, or medication nonadherence. Instead, it focused on lack of personal responsibility and childlike behaviors. The treatment plan was adopted without alteration from one developed on April 9, 2025, when the patient was being discharged from MHCB to EOP care. The plan, as documented, inaccurately indicated that the patient had already achieved the short-term objective of eliminating suicidal ideation and was ready for discharge to EOP. It did not address the patient's medication nonadherence or the need for psychiatric care. The patient was followed daily by one of two primary clinicians and/or one of three psychiatrists. Most encounters were documented as confidential, and non-pharmacological interventions were appropriate to the patient's crisis care and current treatment needs. No recreational therapy assessment or interventions were documented. The follow-up IDTT meeting was timely but held in absentia due to custody-modified programming. The assigned primary clinician and correctional counselor attended, along with an alternate for the assigned psychiatrist. The discharge suicide risk evaluation was adequate and found the patient at low risk. The safety plan was thoughtful, collaborative, patient-specific, and useful, but failed to address the importance of medication adherence in maintaining the patient's safety. The psychiatric discharge summary was timely but did not adequately address the patient's diagnoses or the rationale for placing the patient on a long-acting injectable antipsychotic preparation.

**Findings**

The care provided to this MHCB patient was inadequate.

Although much of the care provided appeared clinically appropriate, a central challenge to this patient's MHCB care was the lack of effort given to diagnostic clarification. The psychiatric and primary clinician assessments and the psychiatric discharge summary did not adequately address the patient's differential diagnoses. The case formulation was deficient and did not address psychotic symptoms. The treatment plan was inaccurate and incomplete. The determination to place the patient on intramuscular haloperidol and thereby eliminate medication nonadherence was

a strength, but the rationale for this decision was not adequately reflected in the discharge summary. It was unclear what mental illness ailed the patient, and the role of his developmental disability was not adequately considered in conceptualizing his case. The roles of bereavement, psychosis, and need for medication were not adequately addressed in the safety plan.

**Patient S**

This 40-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with major depressive disorder, recurrent, in partial remission, posttraumatic stress disorder, and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed fluoxetine, hydroxyzine, and olanzapine and was adherent with these medications. An additional dose of olanzapine was prescribed PRN for agitation, and he used this dose twice during his MHCB stay. No suicide attempts or self-injurious behavior were listed in the health record. Medical conditions included hypertension and asthma. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. He received MHCB care from April 21, 2025 to May 1, 2025 for significant deterioration in functioning, disorganization, agitation, confusion, self-neglect, delusions that he was being impersonated by invisible digital people when he was actually the messiah and an angel in one body, delusions that he was possessed by demons, and auditory hallucinations telling him he did not belong in prison.

The initial psychiatric and primary clinician assessments were timely and detailed, but neither assessment adequately addressed the patient's psychiatric diagnoses. Both reflected diagnoses of major depressive disorder, recurrent, in partial remission, posttraumatic stress disorder, and unspecified schizophrenia spectrum and other psychotic disorder. It was noted that a recent urine toxicology screen was positive for methamphetamine. Olanzapine was initiated to address psychotic symptoms. The initial IDTT meeting was timely and attended by required staff but not the patient, who refused. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated but appropriately addressed delusions and depression while failing to address potential substance use issues. The patient's strengths and verbalized treatment goals were not documented. The treatment plan was adopted without modification from one developed in February, 2025, during EOP care. It did not address potential substance use problems or the need for psychiatric care. The short-term objective, that the patient's depressed mood would remain in remission for one year, was incommensurate with crisis bed treatment and inconsistent with the patient's current presentation.

One of three primary clinicians and one of two psychiatrists followed the patient almost daily. However, neither discipline had contact with the patient on April 26, 2025. Most encounters occurred at the cell front due to custody-modified programming or patient refusal. The sole primary clinician encounter that was documented as confidential, occurring one day prior to discharge, indicated the patient was hyperverbal, tangential, and clearly delusional. No recreational therapy assessment or interventions were documented. Mental health assessments for April 21, 2025 RVRs alleging behavior which could lead to violence and unauthorized possession of drug paraphernalia found, surprisingly, no nexus between the alleged behavior and the patient's mental illness. The follow-up IDTT meeting was timely but occurred at the cell front due to custody-modified programming; the assigned primary clinician and correctional counselor along

with an alternate for the assigned psychiatrist attended. The case formulation, treatment plan, patient strengths, and the patient's verbalized treatment goals were not updated. The treatment team determined the patient had regained medication adherence, overcome his psychotic crisis, and was appropriate for discharge to EOP care for long-term work on ongoing psychotic symptoms. The discharge suicide risk evaluation found the patient at low risk. The psychiatric discharge summary was timely but completed at the cell front due to custody-modified programming. It did not address clear signs of delusional thinking and hyperverbal speech documented the day prior. Instead, the discharge summary presented the patient as free from psychosis. Aside from a note to rule out substance-induced psychotic disorder, the discharge summary did not address or reconcile the patient's diagnoses.

**Findings**

The care provided to this MHCB patient was inadequate.

There was little to no effort documented to clarify the patient's diagnoses, and neither the case formulation nor the treatment plan were updated and appropriate as guides for the patient's crisis care. Most encounters occurred at the cell front, where the patient's underlying psychotic thinking was not easily elicited; when he was seen in a confidential setting at the end of his MHCB stay, he continued to exhibit tangential and delusional thinking. Cell-front encounters were not appropriate locations for the provision of evidence-based interventions, and most encounters were brief. The psychiatric discharge summary did not reflect this finding and instead presented the patient as free from psychotic signs and symptoms. The role of methamphetamine use in the patient's presentation was suspected but inadequately explored. Placing the patient on an antipsychotic medication and titrating the dose up in response to the patient's request and report of racing thoughts represented a significant strength.

**Patient T**

This 32-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with borderline personality disorder, schizoaffective disorder, bipolar type, rule out substance-induced mood and psychotic disorders, and cannabis, opioid, and stimulant use disorders. He was prescribed bupropion, buspirone, mirtazapine, olanzapine, and intramuscular aripiprazole. He was consistently adherent with aripiprazole and mirtazapine and nonadherent with bupropion, buspirone, and olanzapine. Hydroxyzine was prescribed PRN for anxiety and insomnia, and the patient used this medication nearly daily. Olanzapine and haloperidol were prescribed PRN for agitation and hallucinations, but he used neither. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was partially adherent with this medication. Ten suicide attempts and three additional episodes of self-injurious behavior were listed in the health record. Medical conditions included unintended weight loss, a history of hepatitis C, and opioid and stimulant use disorders. Within CDCR, the patient had previously received all levels of care, although 3CMS care was limited to a single day. He received MHCB care from April 23, 2025 to May 16, 2025 after overdosing on methamphetamine and spice, reporting suicidal intent, and voicing paranoid ideation.

The initial psychiatric and primary clinician assessments were timely but completed at the cell front due to the patient's refusals of confidential settings; a non-assigned psychiatrist completed the psychiatric evaluation. Neither adequately addressed the patient's psychiatric diagnoses. The psychologist indicated that the patient had schizoaffective disorder; the psychiatrist, that the patient had substance-induced mood and psychotic disorders. These diagnostic impressions were not reconciled. The case formulation was generic and focused on antisocial behavior and substance use but not suicidal risk, grief for his deceased brother, or most symptoms of schizoaffective disorder. The initial IDTT meeting was timely and attended by the patient and required staff, although the assigned psychiatrist had not previously met the patient. The patient met criteria for a higher level of care due to multiple MHCB placements and RVRs; rationale for initially not referring him to a higher level of care upon admission was adequately documented. IDTT documentation did not include the patient's verbalized treatment goals in his own words. The treatment plan addressed mood issues and impulsivity but not suicidal ideation, other symptoms of schizoaffective disorder, or substance use problems. Three follow-up IDTT meetings were timely and attended by required staff. The patient was unable to attend one of these meetings due to custody-modified programming. Because his paranoia, hallucinations, and disturbed mood did not stabilize, the patient was appropriately referred to ICF care during the first follow-up IDTT meeting. The referral was timely and its rationale adequately documented, but the patient then waited over two weeks in MHCB care for ICF admission. The treatment plan was not updated to reflect additional problems, including punching walls, command auditory hallucinations of his deceased brother's voice, nightmares, racing thoughts, anxiety, self-injurious behavior, sleep disturbance, or medication non-adherence. The patient was followed daily by one of five psychiatrists or one of five primary clinicians. Documentation did not consistently indicate whether these contacts were confidential or at the cell front, but it appeared that about half of these encounters occurred at the cell front, either due to the patient's refusal or custody-modified programming. Encounters actively addressed medication nonadherence, suicide risk, self-injurious behavior, and reality testing. Following an initial recreational therapy assessment, no recreational therapy interventions were documented. A psychiatric discharge summary was not completed.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation and treatment plan did not adequately address the full range of symptoms, behavioral issues, and suicide risk that were identified in assessments and progress notes. The treatment plan was not updated over the course of MHCB care despite three episodes in which the patient engaged in violent or self-injurious behavior. Reconciliation of divergent diagnoses was not undertaken. Continuity of care was problematic, as indicated by the involvement of five psychiatrists and five primary clinicians in the patient's care. Although medication nonadherence was addressed, it was not addressed adequately, and psychiatric progress notes indicated that the patient was adherent when this was not the case. No psychiatric discharge summary was developed. Strengths included the provision of appropriate crisis and risk mitigation interventions, along with a clinically appropriate referral to a higher level of care. However, the 15-day waiting period after ICF referral and before ICF admission was not optimal, particularly because no recreational therapy interventions were documented.

**Patient U**

This 30-year-old transgender (she/her/hers) 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. She was diagnosed with unspecified depressive disorder and amphetamine-type substance use disorder, moderate, in sustained remission. She was prescribed and adherent with fluoxetine. Hydroxyzine was prescribed PRN for anxiety, but she did not use this medication during the review period. Through medical services, she was prescribed gender affirming hormone treatment. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included gender identity dysphoria in adolescence and adulthood, fracture of left humerus with open reduction internal fixation during the review period, HIV infection, and a history of latent syphilis. Within CDCR, the patient had previously received only 3CMS care. At CIM, she was admitted to 3CMS care from August 21, 2024 through the end of the review period and housed in Facility B. She was out to court and housed in San Bernardino County Jail between November 5, 2024 and January 21, 2025.

During the review period, a primary clinician saw the patient only once. This encounter occurred 36 days after the patient returned from county jail and more than 180 days after the most recent primary clinician encounter. Progress note content was consistent with a wellness check, did not indicate whether the encounter was confidential, and did not indicate any interventions were provided, and indicated incorrectly that the patient had never received psychotropic medication. The primary clinician noted that the patient would receive pre-release planning considering her expected May 8, 2025 parole; pre-release planning was not subsequently documented. The psychiatrist saw the patient once during the review period, 44 days after the patient's return from county jail. This encounter was confidential, conducted by telehealth, and adequately documented, apart from the omission of any diagnostic impressions. A follow-up IDTT meeting was held due to the patient's return from court 51 days after the patient was returned to CIM from county jail. This meeting was attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. Patient strengths were not documented; instead, it was noted that the patient reported she did not know what her strengths were. The case formulation and treatment plan were not updated. The case formulation was underdeveloped, provided no recommendations for treatment, and did not address gender identity, the patient's history of substance use, or the patient's pending release to the community. The treatment plan did not include a measurable short-term goal or psychiatric care as an intervention, and instead it listed watching television and family support as interventions.

**Findings**

The care provided to this 3CMS patient was inadequate.

Following the patient's return from a 77-day stay in county jail, no mental health professional saw the patient promptly to confirm behavioral stability and psychiatric safety. Instead, more than one month passed before the patient was seen. Given the patient's transgender identity and multiple medical conditions, more rapid assessment and more thorough assessment was clinically indicated. During this encounter, the primary clinician inaccurately stated that the patient was not receiving

psychotropic medication and would be receiving pre-discharge planning. Neither the treatment plan nor the case formulation were adequate. The identification of watching television as a mental health intervention was particularly concerning. The patient's psychiatric diagnosis remained unspecified, and no reason was documented to justify retention of the PRN order for hydroxyzine when the patient was not using this medication. Pre-release planning was promised to the patient and not delivered.

**Patient V**

This 67-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with unspecified anxiety disorder and, on a rule out basis, posttraumatic stress disorder and generalized anxiety disorder. He was not prescribed any psychotropic medication during the review period but previously received mirtazapine for anxiety and insomnia. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included prediabetes, suspected glaucoma, hyperlipidemia, latent syphilis, chronic low back pain, and a metacarpal fracture in the right hand. Within CDCR, the patient had not previously received mental health care. At CIM, he was admitted to 3CMS care from September 6, 2024 through the end of the review period and housed in Facility C. The patient was a former law enforcement officer.

During the review period, two psychiatrists each saw the patient once. These encounters were timely and adequately documented apart from failure to note whether the first encounter was confidential; the second encounter was confidential and occurred by telehealth. The patient was found stable and asymptomatic on both occasions. Two primary clinicians each saw the patient once during the review period. The first encounter was late, occurring 119 days after the next most recent encounter. The second encounter was timely. Neither clinician indicated whether they met with the patient in a confidential setting, and neither provided clinical interventions beyond case management. It should be noted that the treatment plan, developed prior to the review period, lacked any long-term goals or interventions.

**Findings**

The care provided to this 3CMS patient was inadequate.

There were no long-term goals to guide treatment and no interventions required by the treatment plan. While psychiatric documentation was sufficient to track the patient's symptomatic status and adaptive functioning, neither the psychiatrists nor the primary clinicians appeared to follow a treatment plan, and beyond monitoring and assessment, the patient did not receive active interventions. As documented, the patient's status as an incarcerated former law enforcement officer was not explored during the review period. By the end of the review period, the patient had not received any psychotropic medications for seven months, and the goals and rationale for retaining him in MHSDS were unclear and undocumented.

**Patient W**

This 69-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with adjustment disorder, in remission. He was not prescribed any psychotropic medication. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included diabetes, hypertension, dyslipidemia, obstructive sleep apnea, mild persistent asthma, chronic back pain, anemia, vitamin B deficiency, gastritis, and hearing loss. He used hearing aids and a C-pap machine. Within CDCR, the patient had not previously received mental health care. At CIM, he was admitted to 3CMS care from October 20, 2023 through the end of the review period and housed in Facility C.

The annual IDTT meeting was timely but held in absentia due to custody modified programming. Required staff attended. The patient was not found to meet criteria for consideration of a higher level of care. No case formulation was developed, and only one patient strength was identified. The treatment plan did not include a measurable short-term goal or any long-term goal or interventions. It was insufficient to guide treatment and not updated to reflect the patient's treatment progress. Discharge criteria and reasons for retaining the patient in 3CMS care were not documented. The assigned psychiatrist saw the patient once during the review period. This encounter was timely. Although the progress note did not indicate if the encounter was confidential, documentation was otherwise adequate. Because the patient was prescribed no psychotropic medication, the psychiatrist documented a plan to see the patient in a year or sooner if clinically indicated. Outside of the annual IDTT meeting, no primary clinician saw the patient during the review period until March 7, 2025, 149 days after the next most recent individual primary clinician encounter. The patient submitted two requests to see mental health during the review period; the first request resulted in the March 7, 2025 MHPC encounter. Both requests were responded to timely and adequately. Two primary clinicians saw the patient on a total of three occasions during the review period, including the two encounters responding to health care requests. These encounters were supportive in nature and focused on case management issues. Documentation did not indicate whether any of these encounters were confidential and did not include provision of evidence-based clinical interventions.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was no case formulation, and the treatment plan was inadequate to guide treatment. Psychiatric care was timely, adequately documented, and appeared appropriate. However, 90-day individual primary clinician encounters were not provided as required during the first four months of the review period, and the remaining primary clinician encounters failed to demonstrate the provision of evidence-based clinical interventions. No psychiatric or primary clinician progress note indicated whether the encounter was confidential. It is not clear what symptoms or behavioral problems were being treated or why the patient was in 3CMS care.

**Patient X**

This 31-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with unspecified bipolar disorder. He was prescribed and adherent with buspirone, divalproex sodium, mirtazapine, olanzapine, and paroxetine. Through medical services, he was prescribed amitriptyline for foot pain, but this medication was discontinued due to nonadherence. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. One episode of self-injurious behavior was listed in the health record. Medical conditions included opioid use disorder, cellulitis, and blindness in the left eye. Within CDCR, the patient had previously received only 3CMS care. At CIM, he was admitted to 3CMS care from January 6, 2025 through the end of the review period and housed in Facility B.

The initial psychiatric assessment was timely, confidential, and conducted by telehealth. Although the assessment reviewed the patient's psychiatric history adequately, it did not provide clear diagnostic impressions other than opioid use disorder, severe. The initial primary clinician assessment was late by one day and appeared to have been prompted by an urgent referral in response to bizarre, disoriented, and psychotic behaviors. The assessment was thorough and adequate apart from failing to provide diagnostic impressions. The primary clinician found the patient to be psychotic and appropriate for referral to EOP or a higher level of care. The case formulation was underdeveloped, difficult to follow, and provided little guidance for treatment. The initial IDTT meeting was two weeks late but attended by the patient and required staff. Surprisingly, the patient was not found to meet criteria for a higher level of care despite being described as acutely psychotic and despite a second referral being made on the same day as the IDTT, in which custody reported that the patient continued to make delusional statements. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan appropriately identified anger, hallucinations, and delusions as treatment targets, but two of the three long-term goals were not measurable, and the plan did not include psychiatric care as an intervention. The patient was retained in 3CMS care and not referred to EOP care as the MHPC had planned. Following the IDTT meeting, the assigned psychiatrist and assigned primary clinician each saw the patient on occasion during the review period. These encounters occurred more than two months after the IDTT meeting in which the patient was found to be acutely psychotic. The primary clinician progress note did not indicate whether the encounter was confidential. The patient was found to be free of psychotic signs and symptoms, but the nature of this improvement was not explored. The psychiatric encounter was confidential, conducted through telehealth, and found the patient asymptomatic. A current psychiatric diagnosis was not provided.

**Findings**

The care provided to this 3CMS patient was inadequate.

Neither the psychiatrist nor the primary clinician provided current diagnostic impressions. The initial IDTT meeting was late and resulted in the determination to retain the patient in 3CMS care despite his acute psychosis and two referrals from custody staff who were concerned about the patient's bizarre behaviors and statements. The rationale for this determination was poorly

documented. More frequent mental health contacts to monitor the patient's stability were not provided, and more than two months lapsed between the IDTT meeting in which the patient presented as acutely psychotic and the next mental health encounters. These follow-up encounters failed to investigate how the patient had improved to the point of no longer exhibiting signs and symptoms of psychosis. The treatment plan itself was insufficient to guide care.

**Patient Y**

This 54-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder, and unspecified anxiety disorder. He was prescribed and adherent with mirtazapine and olanzapine. Risperidone was originally prescribed but stopped due to nonadherence and replaced with olanzapine. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone. One suicide attempt was listed in the health record. Medical conditions included hypertriglyceridemia, and opioid use disorder, and a history of traumatic brain injury with coma. Within CDCR, the patient had previously received only 3CMS care. At CIM, he was admitted to 3CMS care from December 31, 2024 through the end of the review period and housed in Facility C.

The initial psychiatric assessment was timely and adequately documented, apart from failing to indicate whether the encounter was confidential. It identified distressing and derogatory auditory hallucinations as the primary treatment target. The initial primary clinician assessment was timely but deficient. The mental status exam was not completed, and the case formulation was underdeveloped, incomplete, and inadequate to guide comprehensive mental health care. The initial IDTT meeting was one week late and held in absentia because the patient did not present. Required staff attended. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were poorly documented. The treatment plan identified anxiety and auditory hallucinations as treatment targets, provided no short-term goals or interventions, and formulated long-term goals that were not measurable as phrased. Following the initial primary clinician assessment, the primary clinician did not see the patient for 119 days, after the review period had ended. The assigned psychiatrist saw the patient on one occasion, in response to medication nonadherence. During this encounter, the psychiatrist discontinued risperidone and initiated olanzapine. After this encounter, the psychiatrist did not see the patient for 152 days, until well after the end of the review period.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial primary clinician assessment, case formulation, IDTT documentation, and treatment plan were inadequate. The initial IDTT meeting was late, and the reason the patient was not present was not investigated. Follow-up encounters by the psychiatrist and the primary clinician were late and inadequate to meet the patient's needs. In a 3CMS patient with distressing auditory hallucinations and significant changes in medication, more frequent follow-up by both disciplines was clinically indicated but not provided.

**Patient Z**

This 42-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with schizophrenia and, on a rule out basis, posttraumatic stress disorder and generalized anxiety disorder. He was not prescribed any scheduled psychotropic medication. Hydroxyzine was prescribed PRN for anxiety, but he did not use this medication during the review period. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included asthma, glaucoma, and migraine. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At CIM, he was admitted to 3CMS care from September 3, 2024 through the end of the review period and housed in Facility C. The patient was serving life without parole.

The assigned psychiatrist followed the patient timely and appropriately throughout the review period. The patient declined psychotropic medications that were offered, and psychiatric documentation confirmed that the psychiatrist was providing appropriate supportive care and adequately monitoring the patient's symptoms and overall clinical presentation. At the beginning of the review period, a non-assigned clinician completed a suicide risk evaluation. The evaluation found the patient at low acute and chronic risk. Other than noting that the evaluation was clinically indicated, there was no explanation in the health record as to why the evaluation was conducted. Only one primary clinician follow-up encounter occurred during the review period. This encounter was timely, but the progress note did not indicate whether the encounter was confidential or whether clinical interventions were provided. After this encounter, 118 days lapsed before the primary clinician again saw the patient, and that encounter occurred after the end of the review period. It should be noted that the treatment plan, developed prior to the review period, lacked any long-term goals or interventions. The primary clinician thus lacked any documented guidance or goals for these encounters.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although psychiatric care was timely and appeared appropriate, the patient's overall treatment needs were not met. The reasons for his refusal of medications were inadequately explored and documented, and the primary clinician encounters were insufficiently frequent, did not follow a plan of care, and were not accompanied by documentation demonstrating provision of evidence-based care. A suicide risk evaluation was completed because it was clinically indicated, without further explanation. Potentially crucial clinical indications for this evaluation were not documented in the health record. In a patient with schizophrenia and chronic residual psychotic symptoms, more frequent encounters, thorough documentation, and structured treatment were needed.

**Patient AA**

This 35-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with adjustment disorder with anxiety. He was not prescribed any psychotropic medications. No suicide attempts or episodes of self-

injurious behavior were listed in the health record. Medical conditions included chronic left shoulder pain and a history of a gunshot wound to the left ankle. Within CDCR, the patient had not previously received mental health care. At CIM, he was admitted to 3CMS care on June 4, 2024, after submitting a health care request seeking mental health assistance with anxiety. He remained in 3CMS care throughout the review period and was housed in Facility C.

During the review period, two psychiatrists saw the patient once each. These encounters were timely and adequately documented apart from failure to indicate whether the second encounter was confidential. The first encounter was confidential and conducted by telehealth. Neither psychiatrist found any indication that psychotropic medication was clinically indicated, and the patient was determined to be stable and asymptomatic. In the second encounter, the patient's diagnosis was changed to adjustment disorder with anxiety, in remission. A primary clinician saw the patient only once during the review period, on January 23, 2025. This encounter was late, occurring 127 days after the next most recent primary clinician encounter, and it was not followed by another primary clinician encounter until 119 days later, after the review period had ended. These three encounters were each provided by a different primary clinician. The January 23, 2025 progress note did not document whether the encounter was confidential, found the patient stable and asymptomatic, and centered discussion around the patient's desire to be removed from MHSDS care. It should be noted that the patient's treatment plan, developed prior to the review period, included short- and long-term goals focused on reducing the patient's anxiety on a subjective units of distress scale, but neither the psychiatrists nor the primary clinician asked the patient to rate his anxiety during these encounters.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the patient was followed timely and adequately by psychiatry, he was not provided adequate nonpharmacological treatment for his complaints of anxiety. Primary clinician encounters did not meet minimum frequency requirements in the program guide, and there was poor continuity in primary clinician care. The treatment plan that was intended to guide treatment during the review period was not followed, as the patient was not asked to rate his anxiety and was not provided with the interventions listed in the treatment plan.

**Patient BB**

This 45-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood and alcohol use disorder, moderate. He was prescribed olanzapine for two days and was adherent with this medication. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included moderate persistent asthma, right knee pain, gastroesophageal reflux disease, chronic hepatitis C, and cirrhosis of liver. Within CDCR, the patient had previously received 3CMS and MHCB care. At CIM, he was admitted to 3CMS care from June 5, 2023 through the end of the review period. He was housed in Facility A and then Facility B during the review period.

During the review period, the assigned primary clinician saw the patient on four occasions. These encounters were timely and very thoroughly documented apart from a failure to indicate whether the encounters were confidential. The primary clinician used the treatment plan to guide each encounter and documented the provision of evidence-based interventions that were appropriate for the patient's clinical needs. No psychiatrist saw the patient during the review period. Following the review period, when the patient was next seen by psychiatry, the encounter occurred 659 days after the next most recent psychiatric appointment. For all but two days of the review period the patient was prescribed no psychotropic medications. On Saturday, February 22, 2025, the patient presented as a walk-in to the medical clinic with complaints of anxiety and depression in the context of recent news that his mother was in extremely poor health. In response, the nurse contacted the on-call psychiatrist, who ordered olanzapine 10 mg to be given for two days, to be stopped on February 24, 2025. One of the primary clinician's encounters occurred on that date, with adequate follow-up regarding the patient's clinical presentation but no inquiry into or mention of the weekend olanzapine doses. When the patient was next seen by a psychiatrist, some four months after the weekend olanzapine doses, there was no mention of this temporary treatment.

**Findings**

The care provided to this 3CMS patient was inadequate.

Non-psychiatric care for this patient was adequate. The treatment plan was followed and the assigned primary clinician provided evidence-based interventions that were appropriate to the patient's needs. Primary clinician progress notes were excellent. However, the review period was part of a 22-month span during which the patient was not seen by any psychiatrist. The off-label use of two doses of olanzapine for anxiety and depression in a patient with an adjustment disorder fell outside the standards of practice. There were no signs or symptoms of psychosis documented at the time olanzapine was prescribed, and the 10 mg dose exceeded recommended starting doses. Following these doses, a psychiatrist should have promptly seen the patient to assess clinical response, potential side effects, and any ongoing medication needs. This did not occur, and the next psychiatric appointment, about four months later, did not evidence any awareness that olanzapine had been prescribed on a temporary basis.

**Patient CC**

This 37-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with substance-induced psychotic disorder. He was prescribed and adherent with mirtazapine. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included obesity, dyslipidemia, diabetes, hyperthyroidism, phimosis, methamphetamine use disorder, and a history of latent tuberculosis. Within CDCR, the patient had previously received only MHCB care. At CIM, he was admitted to 3CMS care from May 22, 2024 through the end of the review period and housed in Facility B.

The assigned primary clinician saw the patient timely on two occasions during the review period. Apart from failing to note whether the encounters were confidential, progress notes for these encounters were adequate, followed the treatment plan, and reflected clinical interventions that

were appropriate for the patient's treatment needs. Bizarre and paranoid delusions as well as hallucinations were documented during the first but not the second of these encounters. These symptoms were contemporaneous with self-reported active methamphetamine use. The assigned psychiatrist saw the patient timely on two occasions. These encounters were confidential, provided through telehealth, and adequately documented. The patient received education about additional pharmacological options but declined adjustments. During these encounters, the patient was observed to be free of psychotic signs and symptoms. Mental health pre-release planning was documented as required.

**Findings**

The care provided to this 3CMS patient was adequate.

The patient received timely follow-up care from both the assigned primary clinician and the assigned psychiatrist. The treatment plan was followed, and interventions were appropriate to the patient's treatment needs. The patient's substance use declined and his mental status improved over the course of the review period. Diagnostic clarity could have been improved, as it was not clear whether the patient experienced psychotic symptoms during the review period in the absence of substance use. Nevertheless, overall treatment met his needs.

**Patient DD**

This 69-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIM. He was diagnosed with adjustment disorder with anxiety. He was not prescribed any scheduled psychotropic medications. Hydroxyzine was prescribed PRN for anxiety, and he used this medication intermittently during the first five months of the review period. One episode of self-injurious behavior was listed in the health record. Medical conditions included hypertension, dyslipidemia, diabetes, chronic obstructive pulmonary disease, ectasia of abdominal aorta, right shoulder arthritis with chronic pain, arthritis in lumbar spine with chronic low back pain, and a history of successfully treated hepatitis C. Within CDCR, the patient had previously received all levels of mental health care except ICF. At CIM, he was admitted to 3CMS care from September 21, 2024 through the end of the review period and housed in Facility C.

The assigned psychiatrist followed the patient timely on two occasions during the review period. Apart from failing to indicate whether the encounters were confidential, these encounters were adequately documented. Progress notes demonstrated that the patient's symptoms and response to medication were adequately monitored and that the psychiatrist was collaborative and supportive in providing care. The psychiatrist documented that the patient was not amenable to antidepressant medication but had chronic mild depression secondary to incarceration and medical conditions. On December 14, 2024, the patient submitted a health care request complaining of acute distress and increasingly strong compulsions to act in ways that would be harmful to himself or others. His distress arose in the context of a broken cell window which allowed dirt to enter his cell and caused breathing difficulties with chest pain; he had been sent out to the community hospital with these symptoms shortly before submitting his request. The request was triaged as emergent, and the patient was seen the same day. The mental health consult and accompanying suicide risk evaluation were adequate and found the patient at low risk. After this consult, two different

primary clinicians each saw the patient once during the review period. The first of these encounters was timely. However, the patient presented to the first appointment feeling ill, and he requested that it be rescheduled. Rather than being rescheduled, this appointment did not occur, and the patient was not seen again until 90 days had passed. The second encounter was provided by a newly assigned primary clinician and was introductory in nature. No interventions were documented. It should be noted that the treatment plan, developed prior to the review period, lacked any long-term goals or interventions.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the patient received timely and adequate psychiatric care, the patient's overall care was not adequate to meet his needs. The assigned psychiatrist noted the contribution of the patient's multiple medical conditions to depressed mood, appropriately offered antidepressant medication, and provided supportive and appropriate care. Additionally, the response to and disposition of the emergency health care request were clinically appropriate. However, the patient was not seen timely for regularly scheduled 90-day primary clinician follow-ups, as his first follow-up appointment was not rescheduled. Primary clinician contacts did not reflect the provision of evidence-based clinical interventions and could not rely on the treatment plan to direct treatment. Additionally, the patient's diagnosis of adjustment disorder with anxiety was not consistent with all his symptoms, which included chronic mild depression. This patient required structured, age- and stage-of-life-appropriate, interventions for depression that were not provided.

**APPENDIX B-5**
**California Institution for Women (CIW)**
**Review Period: August 1, 2024 – January 31, 2025**

**Patient A**

This 40-year-old transgender male patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with diagnoses of posttraumatic stress disorder; gender dysphoria; amphetamine type substance use disorder, moderate in early remission; opioid use disorder; and alcohol use disorder, moderate, in early remission, yet IDTT documentation also noted bipolar I disorder and borderline personality disorder. These latter diagnoses were not included on the patient's problem list. The patient was fully adherent to his prescribed fluphenazine and benztropine. This patient was incarcerated within CDCR for the first and only time in July 2012 and was placed at the 3CMS level of care but was removed from the MHSDS from August 2013 through June 2014, when he returned to the 3CMS level of care. He was briefly removed from the MHSDS from June 2020 through September 2020, when he was admitted to the MHCB level of care. He was discharged to the 3CMS level of care for five days before returning to the MHCB. His level of care was elevated to EOP upon discharge, and he returned to the 3CMS level of care in July 2022. He had five more MHCB placements before being admitted to acute inpatient services in February 2024 followed by an ICF placement at PSH. He was discharged to the EOP level of care at CIW on June 6, 2024.

Two IDTT meetings were held with this patient during the reporting period, as required, every 90 days. The first was held in September 2024 with required staff present; however, the psychiatrist was not assigned to the patient. The patient refused to attend the meeting. The patient was noted as being part of the SRMP and had an active safety plan. The patient's treatment plan was adequate and included relevant goals and interventions that were measurable and incorporated goals and interventions to reduce suicide risk. The rationale for retaining the patient at the EOP level of care was adequate as was the discharge plan. The meeting held in November 2024 included the patient, the patient's assigned clinician and psychiatrist; however, no correctional counselor was present. The patient's safety plan was reviewed and updated as was documentation related to the patient's placement in the SRMP. The treatment plan was updated to reflect progress and barriers toward goals, as well as adequate rationale for retention at the EOP level of care.

The patient was seen for weekly primary clinician contacts, with occasional check-ins between appointments as clinically indicated. Documentation revealed adequate use of interventions outlined in the treatment plan to treat the patient's identified needs as well as adequate review of the patient's record with evidence of follow-up on previously identified issues. The patient was consistently seen by the assigned primary clinician in a confidential setting, with the exception of a period when the patient was on medical quarantine status and was seen at cell front. Monthly psychiatric contacts were adequate and addressed the patient's needs. There was evidence of coordination and collaboration between the patient's assigned clinician and psychiatrist.

There was evidence that the patient was offered groups facilitated by clinicians, recreational therapists, and psychiatric technicians. The topics appeared to meet the needs of the patient and documentation was mostly adequate.

**Findings**

The treatment of this patient was adequate. There was clear evidence of thoughtful treatment planning and coordination of care to meet the needs of the patient. The one area for improvement was the need to update the patient's diagnoses within the record.

**Patient B**

This 47-year-old patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with diagnoses of schizoaffective disorder, bipolar type; unspecified schizophrenia and other psychotic disorder; amphetamine-type substance induced psychotic disorder; and amphetamine-type substance use disorder, severe. The patient was fully adherent to her prescribed buspirone, fluoxetine, fluphenazine, and levetiracetam. She was also prescribed buprenorphine-naloxone. This patient was received into CDCR in June 2024. She was placed at the 3CMS level of care in July 2024 and elevated to the EOP level of care at CIW on October 24. 2024.

An initial psychiatric assessment was completed on October 28, 2024. The content was no more than a standard progress notes and was insufficient to meet the expectations of an initial assessment. The psychiatrist provided a diagnosis of unspecified schizophrenia without explanation. An initial primary clinician assessment was completed on November 1, 2024 in a non-confidential setting due to a lack of available space. The primary clinician provided diagnoses of amphetamine-type substance use disorder, severe; schizoaffective disorder, bipolar type; and unspecified schizophrenia without explanation. The assessment was inadequate as it included historical information with few updates and no discussion as to why the patient was referred to the EOP level of care. The patient's initial IDTT meeting was held on November 5, 2024 with required staff present, along with a custody officer and recreational therapist. The patient did not attend due to medical restrictions. No treatment plan was developed. In the discussion for rationale for retaining the patient at the EOP level of care, it was documented that the prior treatment team had concerns about the patient's potential for victimization. This section noted some vague treatment targets without specific interventions beyond the "ML EOP incentive program" to provide reinforcement for medication compliance and engagement in programming. An initial recreational therapy assessment was completed on November 5, 2024 and was adequate.

Primary clinician contacts were held weekly; however not all were provided in a confidential setting secondary to modified programming. There was adequate discussion of the patient's symptoms and functioning but minimal evidence of interventions being provided to support the patient. Psychiatric contacts occurred monthly, were coordinated with the primary clinician, and addressed the patient's needs through medication adjustments.

The patient attended groups offered by clinicians and recreational therapists which appeared to be adequate.

**Findings**

Treatment of this patient was inadequate. There was a need for diagnostic clarification and clear indication of the patient's treatment needs. Initial assessments by the primary clinician and psychiatrist were inadequate. There was no treatment plan and individual primary clinician contacts did not evidence the use of clinical interventions.

**Patient C**

This 28-year-old patient’s record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with a number of overlapping diagnoses including psychotic disorder; schizophrenia; other substance-induced psychotic disorder, with moderate or severe use disorder; unspecified schizophrenia spectrum and other psychotic disorder; and amphetamine-type substance use disorder, severe, in early remission. The patient was fully adherent to her prescribed benztropine and risperidone, but only partially adherent to her prescribed buspirone, olanzapine, and sertraline. This patient was incarcerated in August 2023 and was placed at the 3CMS level of care. She was admitted to the MHCB level of care in October 2023 and discharged to the EOP level of care on October 12, 2023. She had two placements at the MHCB level of care, with the most recent being June 2024. She was discharged to the EOP level of care at CIW on June 26, 2024.

Three IDTTs were held during the reporting period and included alternate psychiatrists and the patient’s assigned primary clinicians. For the September meeting, it was noted that the patient could not be located so the meeting was held without her. The decision was made to decrease the patient’s level of care to 3CMS on October 15, 2024 secondary to stability and a decrease in symptoms. The treatment plan was updated to include a goal to address chemical dependency. When the patient attended her IDTT on October 15, 2024 she was noted to be frightened, overwhelmed, and wanted to remain at the EOP level of care, so she was retained at the EOP level of care. Documentation appeared to reflect that her anxiety was new information for the IDTT, despite her assigned primary clinician and psychiatrist being present. The rationale for retaining her at the EOP level of care was adequate but there was no update to the treatment plan to address the patient’s needs. A review of the primary clinician’s contact with the patient leading up to the IDTT revealed recent substance use and a focus on the patient’s upcoming parole, with little evidence of preparation for her change to a lower level of care. When seen for a routine IDTT in January 2025, a change in the patient’s release date to March 2025 was noted, yet the treatment plan was not updated to address her upcoming release. There was minimal discussion of the patient’s treatment needs or response to treatment beyond group attendance and her current experience of auditory hallucinations.

The patient was seen weekly for primary clinician contacts and most were adequate, with evidence of some interventions being provided to the patient. The mental status section of most progress notes was formulaic and unchanged, reflecting that the patient demonstrated a full range of effect which was not in keeping with descriptions of the patient’s presentation elsewhere in the documentation. The primary clinician changed during the reporting period and there was some variability in the quality of the notes. Monthly psychiatric contacts were minimally adequate with much of the documentation being copied from note to note. There was evidence of pre-release planning in January 2025.

The patient was offered groups facilitated by both clinicians and recreational therapists but attended only sporadically.

**Findings**

Treatment of this patient was adequate, but marginally. There was a need for diagnostic clarification and treatment planning required improvement. Primary clinician and psychiatric contacts evidenced minimal interventions with the patient but enough to keep her stable and functioning.

**Patient D**

This 35-year-old patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with diagnoses of antisocial personality disorder and recurrent major depression. The psychiatrist noted diagnoses of major depression, severe by history; methamphetamine use disorder; and binge eating disorder and primary clinician documentation including a diagnosis of adjustment disorder with mixed anxiety and depression without clarification or reconciliation of diagnostic discrepancies being noted in the record. The patient was fully adherent to her medication regimen which included aripiprazole, clozapine, lithium, propranolol, and venlafaxine. She was also prescribed olanzapine, hydroxyzine, and benztropine as PRN medications. The psychiatrist noted that these medications were provided to address mood instability, impulsivity, psychosis, agitation, anxiety, and suicidality, yet these symptoms were not adequately accounted for in the diagnoses provided to the patient.

This patient was initially incarcerated in December 2010 and was treated at all levels of care including being briefly removed from the MHSDS for 66 days in 2016. While it appeared that she spent the most time at the 3CMS level of care, she also experienced four inpatient stays, many of which lasted for five to six months. She was most recently discharged from an ICF placement on July 3, 2023. Since then, she has had one placement at the MHCB level of care with a referral to ICF which was rescinded. The patient was discharged to the EOP level of care at CIW on June 5, 2024.

There were two IDTT meetings held with this patient during the reporting period. Both were timely and included required staff. A nurse and correctional officer were present for both meetings and a recreational therapist attended the meeting in September. The patient attended both meetings. The patient was noted to be enrolled in the SRMP and had a safety plan that was reviewed at the September meeting. Both were adequate with regard to content. At the December meeting, IDTT documentation noted that the patient did not have a safety plan, yet the SRMP section noted that the patient would "review and use safety plan." The patient's treatment plan had not been updated since her discharge from the MHCB level of care and the goals and interventions listed in the SRMP section of the plan were not integrated into the treatment plan. There was mention of vague goals and use of appropriate interventions in the reason for retention section of the IDTT documentation.

The patient was seen at least weekly by her assigned primary clinician, occasionally being seen more frequently based on clinical need. The contacts included an adequate assessment of the patient's current functioning and symptoms, but did not include explicit mention of treatment targets or interventions being used during sessions beyond generic and canned phrases in progress notes. The patient was occasionally monitored by psychiatric technicians when noted to be under stress, but there was no mention of the interventions listed to address the patient's suicide risk being used during sessions. The primary clinician noted the patient's group attendance in documentation. Psychiatric contacts were held monthly either with the patient's assigned psychiatrist or another who was covering. Notes from both psychiatrists were superficial and included similar content including a brief description of the patient's current functioning, a mental status examination, and a substantial amount of information being pulled forward, unchanged, month to month.

**Findings**

Treatment of this patient was not adequate. There was no active treatment plan for the patient and individual contacts did not clearly reference what was being targeted in treatment by either the primary clinician or the psychiatrist. There was no evidence of therapeutic interventions being provided to the patient. Diagnostic clarification was also needed. The patient's history warranted enrollment in the SRMP and a safety plan, and yet neither appeared to be part of the patient's active treatment program.

**Patient E**

This 27-year-old transgender male patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with conflicting diagnoses of record including schizoaffective disorder, bipolar type and bipolar I disorder, current or most recent episode manic, with psychotic features. He was also diagnosed with gender dysphoria. The patient was under a PC 2602 order and was prescribed olanzapine, fluphenazine, and divalproex sodium, with hydroxyzine as PRNs. The patient was adherent. His IDTT was observed during the site visit.

The patient, who has been incarcerated since August 2022, has received services at all levels of care since his arrival. While initially placed at the 3CMS level of care, he was elevated to the EOP level of care after two MHCB placements and was eventually admitted to the ICF level of care in March 2023 but was quickly elevated to the acute level of care where he remained for 147 days. He was discharged to the EOP level of care at CIW on August 16, 2023. This patient had five admissions to MHCB since that time and was most recently discharged to the EOP level of care at CIW on September 6, 2024.

Upon return to the EOP level of care in September 2024, the patient was seen for five-day follow-up contacts. While documentation of the contacts was adequate, the patient's assigned primary clinician who completed the last three days of contacts, documented what appeared to be copied content into the documentation, all of which included female pronouns for the patient. There was evidence of a clinician-to-clinician contact on September 9, 2024 which included goals identified by the MHCB team to continue with the patient in the EOP level of care.

An initial primary clinician assessment was completed timely on September 9, 2024 and was adequate, yet failed to address the conflicting diagnoses of record. An initial psychiatric assessment was completed timely on September 10, 2024 and was adequate. The psychiatrist provided a diagnosis of bipolar I disorder, current or most recent episode manic, with psychotic features but also noted the schizoaffective disorder diagnosis in the record without further discussion or resolution. The psychiatrist also noted that the patient had a PC 2602 order due to expire in January 2025.

During the patient's initial IDTT meeting on September 12, 2024, there was no correctional counselor present, although the patient, his assigned primary clinician, and assigned psychiatrist were present. The patient was flagged for the need for consideration for a higher level of care given the frequency of MHCB placements and failure to attend at least 50 percent of programming. The rationale for retaining the patient at the EOP level of care and the description of treatment modifications to be used with the patient were adequate and in keeping with the MHCB IDTT's recommendations. The patient was enrolled in the SRMP, and the listed interventions were appropriate. The treatment plan included the contradictory diagnoses without discussion or clarification. The patient's treatment plan was adequate and included reasonable and measurable goals with appropriate interventions. Rationale for continuation at the EOP level of care and discharge criteria were clear. The routine IDTT conducted in December 2024, included required staff and the patient. Documentation discussion of the patient's ongoing needs along with progress the patient was making toward treatment goals.

The patient was offered weekly contacts with a primary clinician; however, there were at least eight different clinicians who attempted to see the patient over the reporting period. Some of the clinicians provided interventions in keeping with the treatment plan, while others provided only superficial check-ins with the patient. The patient would occasionally refuse to be seen. When treatment interventions were documented, they appeared to be appropriate to the patient's needs. Psychiatric contacts were offered monthly, but the patient often refused to attend. When seen, the contacts appeared responsive to the patient's needs. Of note, every primary clinician and psychiatric contact continued to document the bipolar and schizoaffective diagnoses without acknowledging the contradictory nature of these diagnoses. The patient was seen for evaluation and renewal of his PC 2602 order in December 2024.

The patient was offered both clinical and recreational groups throughout the reporting period but typically refused to attend.

**Findings**

Treatment of this patient was adequate; however, there was clarification needed regarding the patient's diagnosis.

**Patient F**

This 44-year-old patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with diagnoses of

schizoaffective disorder; cannabis use disorder, moderate; and other hallucinogen use disorder, moderate, in sustained remission. The patient was fully adherent to her medication regimen which included haloperidol, lithium, risperidone, sertraline, and benztropine. Fluphenazine was prescribed as PRN. She was provided with medication under a PC 2602 order.

This patient was incarcerated for the first and only time within CDCR in November 2007. She has been treated at all levels of care with 22 placements at the MHCB level of care and five inpatient placements, some of which lasted well over a year. The most recent inpatient stay was for two months at the ICF level of care in March 2023. She was discharged to the EOP level of care at that time, returned to the MHCB in March 2024, and discharged to the EOP level of care at CIW on April 16, 2024.

There were two IDTT meetings held with the patient during the monitoring period, one in October 2024, and one in January 2025. Both were timely and included required staff, although neither of the patient's assigned clinicians was present during the meeting in January - covering clinicians were present. The patient was present for both meetings. The patient was placed within the SRMP and was noted to be working on tolerating her emotions to avoid suicidal ideation and MHCB admissions. The October IDTT documentation was not updated and appeared unchanged since March of 2024. There were no treatment goals, no discussion of the patient's current level of functioning, symptom presentation, or ongoing treatment needs. The treatment plan was outdated and included goals which had been met six months previously. The January IDTT documentation was minimally updated with no treatment plan. IDTT documentation included an IPOC for hallucinations which was initiated in April 2024 and rarely updated without rationale for its inclusion.

The patient was seen at least monthly by a psychiatrist in a confidential setting. Documentation of these contacts was minimally adequate. Weekly confidential contacts were held with the patient and the primary clinician. Initially, the content of documentation was lacking in evidence of clinical interventions, yet over the course of the monitoring period, documentation improved. The sessions focused on the patient's paranoia and delusions and while the interventions appeared appropriate, they were not in keeping with the treatment plan. There was occasional reference to the patient's participation in group programming. There were some discrepancies between the primary clinician and psychiatric documentation with regard to the patient's level of stability and symptom presentation that were unresolved. For example, the primary clinician viewed the patient's altercation with another patient as a sign of increased paranoia, while the psychiatrist made little to no mention of the patient's symptoms having a nexus to the altercation. This discrepancy was also documented in the RVR mental health assessment. Toward the end of the reporting period, the patient had a significant increase in symptoms which required medication adjustments on an urgent basis.

**Findings**

Treatment of this patient was inadequate. While the patient was seen in accordance with requirements, her treatment plan was not updated and did not include identified goals or interventions in keeping with the patient's need. Clinical documentation was variable and did not consistently reflect treatment interventions. There was poor evidence that the patient's IDTT was

communicating adequately to support the patient's changes in symptoms over the course of the reporting period. Lastly, the RVR mental health assessment was unclear with respect to the ultimate decision regarding the impact of the patient's mental health symptoms on the behavior and needed improvement.

**Patient G**

This 43-year-old transgender male patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with diagnoses of posttraumatic stress disorder, borderline personality disorder, ADHD predominantly hyperactive/impulsive presentation, and major depressive disorder, recurrent episode, with psychotic features. Yet, his psychiatrists noted that the patient's presentation was in keeping with a bipolar illness and an unspecified psychotic disorder. He was mostly adherent to his prescribed propranolol and venlafaxine yet had vacillating adherence to medications over the course of the monitoring period.

This patient was received into CDCR in July 2011 and was not enrolled in the MHSDS until November 2013 when he was placed at the 3CMS level of care but was soon elevated to the EOP level of care in early December 2013. Since then, he has vacillated between the 3CMS and EOP levels of care with nine placements at the MHCB level of care, a number of which lasted for a day or less. He was most recently placed at the MHCB level of care from the 3CMS level of care in March 2024, and was discharged to the EOP level of care on April 2, 2024. He transferred to CIW on May 8, 2024.

Two timely IDTTs were held during the reporting period, one in August and one in November 2024. Required staff and the patient were present for both meetings, although an alternate psychiatrist was present at the November meeting. This was noted to be problematic as the patient requested medication changes which had to be deferred until the patient could see his assigned psychiatrist which did not occur for over three weeks. In August, it was noted that the patient was attending less than 50 percent of the offered treatment, yet adequate rationale for not referring the patient to a higher level of care was documented, along with appropriate treatment modifications to increase participation. The patient was noted as being enrolled in the SRMP and both a safety plan and interventions to decrease suicide risk were documented. Both were adequate. There was an IPOC to address impulsivity along with a treatment plan addressing distress tolerance and anxiety with appropriate goals and interventions listed. Rationale for retaining the patient at the EOP level of care was adequate. By the November meeting, the patient was noted to be attending more than 50 percent of programming. The safety plan was documented as being not applicable, yet no rationale was provided as the patient remained enrolled in the SRMP. The SRMP section of the treatment plan was not updated during the November meeting. Much of the clinical summary was not updated, resulting in contradictory information including both that the patient was having conflict with family and that family relationships served as a protective factor. While IPOC tracking was updated, there were no other updates to the patient's treatment plan including no reference to the patient's progress toward treatment goals. The rationale for retaining the patient at the EOP level of care was unchanged.

Monthly psychiatric contacts were held with the patient mostly in a confidential setting; however, one appointment was noted to be at cell front without rationale. Contacts were well documented with consideration of medication adjustments and side effects being thoroughly and thoughtfully considered. Weekly primary clinician contacts were mostly offered in confidential settings; however, at least one session was held cell front secondary to custody modified programming. The primary clinician did not consistently document the patient's preferred pronouns. The majority of contacts evidenced use of interventions to address the patient's needs and adequately addressed the patient's participation in programming.

**Findings**

Despite the minimally adequate IDTT documentation and a need for diagnostic clarification, the treatment of this patient was adequate. Both the psychiatrist and primary clinician worked with the patient to address his symptoms through thoughtful and appropriate interventions. One additional concern was the removal of review of the patient's safety plan without explanation.

**Patient H**

This 35-year-old patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with diagnoses of posttraumatic stress disorder; schizoaffective disorder, bipolar type; amphetamine-type substance use disorder, severe; and alcohol use disorder, moderate. The patient was fully adherent to her prescribed clozapine, fluphenazine, lithium, propranolol, and duloxetine. This patient was received within CDCR for the fourth time in March 2012. Previously, she received services at the 3CMS and EOP levels of care with one MHCB placement prior to her parole in June 2010. Upon her return, she was placed at the EOP level of care on March 8, 2012. She had two MHCB placements and an inpatient admission to PSH in October 2021. She was discharged from PSH to the EOP level of care at CIW on August 8, 2022.

Two timely IDTT meetings were held with the patient during the reporting period, one in September and one in December 2024. Required staff and the patient were present for both meetings. IDTT documentation was adequately updated and reviewed the patient's symptoms, functioning, and engagement with treatment. The patient appeared stable and had ongoing symptoms which appeared to be the patient's baseline given the severity of her illness and long-term substance use. Treatment goals were reasonable, and interventions were appropriate for her needs.

Monthly psychiatric contacts were held confidentially and were adequate. The patient was seen by her primary clinician weekly during the monitoring period with most sessions being held confidentially. There was a least one week where the patient was seen cell front secondary to a lock down on the unit and a few sessions where the patient was on isolation status secondary to having the coronavirus. Most sessions addressed the patient's needs including monitoring and prompting of her hygiene needs and addressing her auditory hallucinations. There was some discussion of the patient's upcoming release from prison in May 2025, but there was no evidence of formal release planning. Preliminary documentation in February 2025 indicated that no release

planning had been initiated, which was concerning given the patient's significant psychiatric needs, impaired functioning, and medication regimen which included clozapine.

**Findings**

Treatment of this patient was adequate; however, there were concerns that limited planning had been done to date regarding her upcoming release in May 2025.

**Patient I**

This 36-year-old patient's record was randomly selected to assess the quality of treatment being provided at the EOP level of care at CIW. The patient was provided with diagnoses of unspecified bipolar and related disorder; amphetamine-type substance (or other stimulant)-induced psychotic disorder with moderate or severe use; and other specified personality disorder along with a number of diagnoses related to substance use including opioid use, amphetamine use, and cocaine use. The patient was treated under a PC 2602 order since August 2024. She was fully adherent to her prescribed fluphenazine but non-adherent to her prescribed benztropine which was eventually changed to PRN dosing. This patient was incarcerated for the first and only time within CDCR on June 3, 2024. She was placed at the 3CMS level of care on June 14, 2024. She had three MHCB placements and a brief stay at the acute level of care in August 2024. She was transferred to the ICF level of care and was discharged to the EOP level of care on October 16, 2024. She transferred to CIW on November 14, 2024.

An initial psychiatric assessment was completed timely on November 18, 2024 and was adequate. The initial primary clinician assessment was completed on November 21, 2024 and was adequate. An initial IDTT was held timely on November 22, 2024 with the patient's assigned primary clinician and a covering psychiatrist present. The patient was present along with a correctional counselor, supervising psychologist, nurse and custody officer. The patient's three MHCB admissions over the previous six months were identified with appropriate rationale being documented for retaining the patient at the EOP level of care. Adequate treatment modifications were documented to support the patient at the EOP level of care. A clinically relevant safety plan was developed and reviewed with the patient and the patient's enrollment in SRMP was noted; however, the interventions were unchanged from the prior plan and were generic, yet progress and ongoing needs were well-documented. The patient's treatment goals were appropriate, but three of the goals had interventions that were not updated since the patient's inpatient placement. An additional goal was created with appropriate interventions.

The patient was seen to address her medication non-adherence on December 5, 2024, as the patient was refusing medications that were not required under the PC 2602 order. The psychiatrist appropriately discontinued those medications after discussing the risk and benefits with the patient. Monthly psychiatry contacts were held in confidential settings and were adequate. Weekly primary clinician contacts were mostly held in confidential settings except for one week where the patient was seen cell front secondary to custody modified programming. The primary clinician contacts included review of the patient's concerns and recognition of the patient's substance use but only minimal evidence of interventions being provided. The issues identified on the patient's treatment plan were not reviewed or discussed.

**Findings**

Treatment of this patient was inadequate. Her treatment plan included a list of treatment targets, yet subsequent clinical contacts did not address the issues identified on the patient's treatment plan. The patient's substance use was not adequately addressed despite it being a clear trigger for her mental health symptoms. It appeared that neither the psychiatrist nor the primary clinician had a clear sense of the patient's needs, yet little was being done to understand them.

**Patient J**

This 28-year-old transgender patient's MHCB healthcare record was reviewed to assess the quality of mental health care provided at CIW. The patient had previously received 3CMS, EOP, and MHCB care. She was admitted to MHCB care at CIW from December 17, 2024 to December 23, 2024, due to suicidal statements and self-harm risk. The patient was diagnosed with major depressive disorder, recurrent, mild, antisocial personality disorder, gender dysphoria in adolescence and adulthood, reactive attachment disorder, opioid use disorder in sustained remission, and methamphetamine use disorder, severe. Healthcare records noted that the patient had a history of self-injurious behavior and one suicide attempt. The patient was adherent with prescribed oxcarbazepine for mood swings. Diphenhydramine, olanzapine, and chlorpromazine were prescribed PRN for agitation, and she used PRN diphenhydramine and olanzapine but not PRN chlorpromazine. At the patient's request, chlorpromazine was changed from PRN to scheduled medication on the final day of MHCB care, and she was adherent with this medication. Through the ISUDT, she was prescribed, and adherent with, buprenorphine-naloxone.

On the first day of MHCB care, an initial PC assessment was conducted in the CTC. The following day, after the patient was transferred to an unlicensed MHCB unit, the same PC performed a second evaluation, which was adequate. The initial psychiatric assessment was timely and reflected the patient's report of feeling overwhelmed due to heightened anxiety related to legal issues and custody concerns related to a pending transfer to CCWF. The initial IDTT meeting was timely but held in absentia due to the patient's refusal. Alternates for the patient's assigned psychiatrist and PC attended. Following the IDTT meeting, the team met with the patient at the cell front to share the outcome of the treatment team meeting. The patient was informed that treatment would focus on developing coping skills to manage stress and acceptance of CCWF transfer and that upon discharge, the patient would transfer to CCWF. The patient denied being suicidal but refused to engage further with the treatment team. The patient's verbalized treatment goals were not documented. Treatment targets were carried forward from an outdated 3CMS treatment plan developed more than four months prior. The reason for MHCB admission was not addressed. Planned interventions were limited to a generic statement indicating that the PC would foster a therapeutic alliance and empathize with the patient, and the treatment plan omitted psychopharmacological interventions. No measurable treatment or discharge goals were documented.

The patient was seen daily by four PCs, with all but one adequately justifying the reason for nonconfidential contact. PC progress notes confirmed provision of clinically appropriate interventions and documented the patient's responses to these interventions. Routine psychiatric

follow-up contacts were timely, confidential, and documented medication changes adequately. The follow-up IDTT meeting was timely but held in absentia due to the patient's refusal, and attended by required staff, apart for an alternate for the assigned psychiatrist. The treatment team made the determination to discharge the patient to EOP care. IDTT documentation provided a clinical summary of the patient's treatment progress, adequate justification for discharge, and appropriate treatment recommendations. A discharge SRE determined the patient's risk to be low. The psychiatric discharge summary was cursory and only minimally adequate.

**Findings**

The treatment provided to this MHCB patient was adequate.

The treatment provided was effective in addressing the problem areas that led to the MHCB admission. PC and psychiatry contacts were timely and documented useful interventions along with the patient's response. The IDTT discharge summary adequately documented the patient's progress and adequately justified the patient's discharge to the EOP level of care. Areas for improvement included continuity of care, as the patient worked with four PCs, along with documentation issues in the treatment plan and psychiatric discharge summary. Use of PRN antipsychotic medication without scheduled antipsychotic medication fell outside the standards of care.

**Patient K**

This 36-year-old patient's MHCB healthcare record was reviewed to assess the quality of mental health care at CIW. The patient entered CDCR on August 2, 2023, serving a 26-year-to-life sentence with the possibility of parole. While in CDCR, she had previously received 3CMS and MHCB care. The patient was admitted to MHCB from RHU from October 19, 2024 to October 25, 2024, due to significant impairment from mental illness after exhibiting bizarre behaviors such as disrobing, throwing food, and significant agitation. The patient was diagnosed with unspecified mood disorder and stimulant, opioid, and cannabis use disorders. Prescribed psychiatric medications included olanzapine for agitation, hydroxyzine for anxiety, and benztropine for side effects. She was noted to be adherent to olanzapine and benztropine and partially adherent with prescribed hydroxyzine.

Upon arrival to MHCB, she required intramuscular medications due to severe agitation and attempts to harm herself. She was non-responsive and displayed inappropriate sexual gestures even after receiving medication. Initial assessments were timely and adequate but were conducted by clinicians other than the assigned PC and psychiatrist. Neither assessment properly documented confidentiality. During the initial psychiatric assessment, the patient was calm, cooperative, and agreed to switch from aripiprazole to olanzapine. The initial IDTT meeting was timely and attended by the patient and alternates for the assigned PC and psychiatrist; neither of the alternates had conducted the patient's initial assessments. The patient acknowledged that her admission had been triggered by heroin use linked to hallucinations. IDTT documentation adequately described MHCB treatment goals aimed at addressing the patient's substance use triggers and preventing relapses. The treatment plan's targets were not updated and continued to reflect goals developed prior to MHCB admission focused on depression, anxiety, and substance use. The treatment plan

lacked measurable objectives for assessing treatment effectiveness and omitted psychiatric interventions, and IDTT documentation lacked clear discharge criteria.

Despite not documenting whether psychiatric contacts were confidential, psychiatric progress notes were timely and adequately documented monitoring of symptoms and adjustment of medications. Routine PC contacts were held daily in confidentiality, except on October 23, 2024, when the patient and PC met together with the psychiatrist, and confidentiality was not documented. A pre-doctoral psychology student was reassigned to be the patient's assigned PC; the pre-doctoral student did not conduct the initial assessment or participate in the initial IDTT. PC contacts employed interventions to address the patient's substance use. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to 3CMS RHU care. IDTT documentation adequately summarized the patient's progress, engagement in treatment, and rationale for discharge. Discharge recommendations emphasized the need for routine PC contacts to support the patient's mental health and substance use recovery, with the development of coping and distress tolerance skills. A discharge SRE was adequate and deemed the patient to be at low risk. The psychiatric discharge summary was timely but cursory.

**Findings**

The treatment provided to this MHCB patient was adequate.

Despite documentation issues, the patient was seen timely by PCs and psychiatrists and demonstrated improvement during her admission. Treatment effectively addressed the concerns leading to the patient's MHCB admission. The patient's discharge to 3CMS RHU was adequately justified, based on documented interventions and the patient's overall response to treatment. Documentation issues included a lack of measurable objectives in the treatment, failure to document whether psychiatric encounters were confidential, and only marginally adequate content in the psychiatric discharge summary.

**Patient L**

This 53-year-old's MHCB healthcare record was reviewed to assess the quality of mental healthcare provided at CIW. The patient entered the CDCR on February 1, 2016, serving a life term for two counts of first-degree murder. The patient had previously received mental health treatment at all levels of care. She was admitted to MHCB care from EOP care between October 9, 2024 and October 18, 2024, after a peer had informed the patient that she had looked her up on the internet and knew that the patient had killed her own children. Although denying current self-harm thoughts, the patient was deemed a moderate risk and transferred to MHCB the same day. She was diagnosed with bipolar I disorder, depressive episodes, and a history of trichotillomania. She was noted to have a history of experiencing suicidal ideation, with multiple attempts during incarceration and one near-lethal attempt during her arrest. With the exception of one dose of valproic acid, she was adherent with prescribed valproic acid and lurasidone.

The initial psychiatric and PC assessments were timely; however, confidentiality details were omitted from the psychiatric assessment. The psychological assessment was confidential and

partially adequate. The case formulation was outdated, and the assessment carried forward a prior evaluation reflecting reasoning for a past admission rather than the current admission. The initial IDTT meeting was timely and attended by all required participants. The treatment plan focused on managing the patient's depression and anxiety with measurable objectives and adequate interventions, although it omitted specific psychiatric interventions. The rationale for MHCB care was vague, merely stating that the treatment team would provide ongoing care for mood stabilization and assist the patient in achieving her mental health goals.

A PC saw the patient daily for individual PC contacts. These encounters were confidential except on one occasion when the patient initially refused participation but agreed to meet with the PC at cell front. The patient had two psychiatric contacts, which were adequate, although the confidentiality of these sessions was not documented. The PC and psychiatric contacts adequately documented the patient's symptoms and the interventions provided; these interventions aligned with the treatment plan. The patient participated in various therapeutic groups. However, consistency of PCs was poor due to three different psychologists being involved. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in her discharge to the EOP level of care. IDTT documentation provided an adequate clinical summary and adequate justification for the patient's discharge plan. The discharge SRE indicated that the patient was at a low risk. The psychiatric discharge summary was timely and adequate.

**Findings**

The treatment provided to this MHCB patient was adequate.

Although documentation issues were noted, the patient was seen in a timely manner for both initial, routine, and IDTT contacts. PC and psychiatric progress notes adequately addressed patient's clinical needs. The treatment plan provided updated clinical information, with a plan to monitor the patient's depression and anxiety, and the discharge plan adequately justified the patient's discharge to the EOP level of care.

**Patient M**

This 52-year-old non-binary patient's MHCB healthcare record was reviewed to assess the quality of mental health care at CIW. The patient had served multiple terms and most recently entered CDCR on September 3, 2024, for a 32-month sentence. While in CDCR, they had received 3CMS and MHCB care. They were admitted to MHCB care twice during the review period: first from January 10, 2025 to January 15, 2025, due to significant impairment from mental illness, and then from January 25, 2025 to February 3, 2025, due to danger to self and others. The patient was diagnosed with unspecified bipolar disorder and moderate amphetamine substance use disorder, in sustained remission. During the two MHCB admissions, they were prescribed, and adherent with lithium carbonate, paliperidone, and risperidone. Olanzapine and hydroxyzine were prescribed PRN for agitation and anxiety. They were noted to be adherent to psychiatric medications.

During the first MHCB admission, the initial PC assessment was timely but inadequate. It did not indicate whether the assessment was confidential and omitted documentation of the patient's risk

for violence, suicide and self-harm risk, and current intellectual functioning. The initial psychiatric assessment was confidential but not timely, occurring after the initial IDTT meeting. Both the initial and the follow-up IDTT meetings were timely and attended by all necessary participants. However, IDTT documentation did not include a clear diagnosis supported by diagnostic symptoms and only referenced past diagnoses without clear justification. The case formulation was inadequate, noting only that the patient likely presented to MHCB with underlying mood issues and possible psychotic symptoms. The treatment plan targeted the patient's bizarre behavior, paranoia, and mood symptoms, and it included appropriate treatment interventions. However, measurable treatment goals were lacking. IDTT documentation adequately justified the patient's retention in MHCB but failed to include specific, measurable discharge criteria. Documentation from two PCs during this admission was inconsistent regarding the confidentiality of contact. When a psychiatrist met with the patient on January 13, 2025, the patient displayed bizarre behaviors and engaged in self-dialogue. Medications were adjusted, with risperidone prescribed for psychosis and mood stability and olanzapine prescribed PRN for agitation. The next day, the PC noted the patient's thought process remained scattered at times, but the PC nevertheless opined that the patient had maximized their gains in MHCB and participated cooperatively in treatment without distressing behaviors. During the discharge IDTT meeting, the team reviewed the patient's MHCB progress, confirmed that treatment goals were met, and provided some justification for discharge to 3CMS care. The psychiatric discharge summary was timely and adequate.

Ten days later, the patient was readmitted to MHCB care due to suicidal and homicidal ideation, anxious and depressed mood, and auditory and visual hallucinations. The same PC and psychiatrists were assigned during both admissions, supporting continuity of care. Initial PC and psychiatric assessments were timely and adequate, although only the psychiatric assessment was documented as confidential. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The treatment plan utilized the previous admission's targets without modification, and diagnostic clarification was needed. Although the patient was agreeable to changing her medications to lithium, she was also noted to lack insight. PC and psychiatric contacts occurred timely during this admission, except on January 30, 2025, when there was no documentation of the patient being seen by either discipline. PC documentation did not consistently indicate whether the contacts were confidential or note the patient's response to the interventions used. Psychiatry contacts were confidential except on February 1, 2025, when the patient was seen at cell front due to modified programming. The patient agreed to a long-acting antipsychotic, received her first dose intramuscularly on January 29, 2025, and denied side effects. The follow-up IDTT meeting was timely and attended by the patient, alternates for the assigned PC and assigned psychiatrist, and a correctional counselor. The treatment team made the decision to discharge the patient to EOP care, adequately justified this decision, and outlined a plan for transition to the EOP level of care. The psychiatric discharge summary was timely and minimally adequate.

**Findings**

The treatment provided to this MHCB patient was inadequate.

During both MHCB admissions, the overall treatment provided to this patient was inadequate, primarily due to insufficient documentation and treatment planning. There were several deficiencies in the patient's care, including inconsistency in documenting the confidentiality of individual encounters. Assigned treatment team participants were not in attendance at IDTT meetings. IDTT documentation failed to include critical clinical updates and omitted vital information concerning the patient's diagnosis and supporting symptoms. Lack of measurable goals in the treatment plan prevented the monitoring of treatment effectiveness. Discharge from the first MHCB stay was clinically deficient, as the team did not outline a specific plan or measurable discharge criteria. These omissions may have contributed to a premature discharge or discharge to a lower level of care than what was needed. While continuity of care was noted during the patient's second admission, and the discharge to EOP care was positive, documentation deficiencies persisted. Additionally, the failure to see the patient on January 30, 2024, reflected an important lapse in timely care.

**Patient N**

This 37-year-old patient's MHCB healthcare record was reviewed to assess the quality of mental health care at CIW. The patient had multiple terms in CDCR's general population and most recently re-entered on October 3, 2024. Her psychiatric history included a bipolar disorder diagnosis in 2018 and a previous 5150 hold at St. Francis Hospital. Within the CDCR, the patient had previously received 3CMS and MHCB care. The patient was transferred to CIW on December 31, 2024, at the 3CMS level, and then moved to RHU for a PREA investigation. On January 23, 2025, she moved from RHU to general population and was not prescribed psychiatric medications. Her MHCB admission occurred from January 25, 2025 to January 30, 2025 for significant impairment due to mental illness. The patient was diagnosed with unspecified mood disorder, phencyclidine-induced anxiety disorder, and opioid use disorder. She adhered to prescribed lurasidone for mood stability. Hydroxyzine and olanzapine were prescribed PRN for anxiety and agitation, respectively, and she used these medications sporadically during the MHCB stay. Through the ISUDT, she was prescribed, and adherent with buprenorphine-naloxone for opioid use disorder.

The initial psychiatric assessment was timely, in a confidential setting, and comprehensive, particularly concerning medication changes aimed at stabilizing the patient's mood. The initial PC assessment was timely but omitted essential elements, including the patient's DDP designation, risk of violence, and suicide and self-harm history. The initial IDTT meeting was timely, with all required participants present except for an alternate psychiatrist who attended rather than the patient's assigned psychiatrist. The case summary included important clinical updates, but the case formulation lacked detail, only noting the patient's recent substance use leading to admission. Treatment goals focused on stabilizing the patient's mental status and addressing substance use but lacked measurable objectives. While psychiatric interventions were adequate, nonpharmacological interventions were limited to redirecting the patient and reinforcing positive behaviors, along with monitoring mental status. Discharge planning justified continued MHCB care, with a plan for the patient to return to 3CMS post-MHCB.

The patient was seen daily by either the PC or a psychiatrist. PC progress notes did not consistently reflect whether contacts were confidential but were otherwise adequate, including documentation

of appropriate clinical interventions. Psychiatric encounters were confidential, adequately documented, and focused on a medication regimen to assist with stabilizing mood. Documentation showed appropriate out-of-cell contacts. The patient was receptive to treatment interventions. All required participants attended the discharge IDTT meeting, which was timely. IDTT documentation detailed the patient maintaining behavioral control and her commitment to continue psychiatric medication after discharge. The patient was animated but manageable, with no bizarre behaviors observed. A discharge SRE indicated a low risk of harm, and the psychiatric discharge summary was timely, confidential, and adequate.

**Findings**

The treatment provided to this MHCB patient was adequate.

Despite an incomplete initial assessment, a lack of a comprehensive case formulation, and a treatment plan with measurable goals, the PC maintained consistent daily meetings with the patient, and therapeutic and psychiatric interventions adequately utilized appropriate interventions per progress note documentation. The patient received the treatment needed.

**Patient O**

This 44-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with major depressive disorder, recurrent, severe with psychotic features, amphetamine-type substance-induced psychotic and depressive disorders, unspecified schizophrenia spectrum and other psychotic disorder, alcohol use disorder, severe, in early remission, and amphetamine-type substance use disorder, moderate, in early remission. She was prescribed aripiprazole, benztropine, fluphenazine, mirtazapine, and olanzapine, and she was adherent with these medications. Hydroxyzine and an additional dose of olanzapine were prescribed PRN for anxiety and agitation; she used hydroxyzine at least once a day and olanzapine twice during her MHCB stay. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Medical conditions included gastroesophageal reflux disease and vitamin D deficiency. One suicide attempt by overdose in 2019 was noted. Within the CDCR, the patient had previously received 3CMS care and one admission to the MHCB. Her MHCB stay in the CTC at CIW from January 9, 2025 through January 17, 2025 was reviewed. She was admitted to the MHCB for suicidal ideation accompanied by mood and psychotic symptoms.

The pre-admission mental health consult, accompanying suicide risk evaluation, and initial primary clinician assessment were completed timely, but the mental status exam was incomplete, the case formulation was not updated and did not address the patient's suicidal ideation, current symptoms, or imminent parole. The initial IDTT meeting occurred timely but prior to a psychiatric assessment. The IDTT was attended by the patient but attended by alternates for the assigned primary clinician and assigned psychiatrist. IDTT documentation was partially adequate, but the treatment plan was not updated, did not address current symptoms apart from suicidal ideation, and did not include an aftercare plan. The initial psychiatric assessment was confidential and adequate but completed after the IDTT meeting. The patient was seen daily by a primary clinician and/or psychiatrist until the final day of MHCB care. Twice weekly psychiatric contacts were

confidential, documented adequately, and resulted in clinically justified changes in medications to address ongoing symptoms. Four primary clinicians saw the patient for daily follow-ups. These encounters were confidential except on two occasions when they occurred at cell front due to patient refusals. Interventions were consistent with the treatment plan, except no safety plan was developed. The psychiatric discharge summary concluded, with limited explanation, that the patient's suicide risk was low, despite ongoing suicide precautions and concerns about the patient's danger to self. A discharge SRASHE and safety plan were not completed. The patient paroled directly from MHCB care for a 5150 evaluation.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation did not address the patient's current clinical presentation. The treatment plan was not updated, addressed only suicidal ideation despite the presence of mood and psychotic symptoms, and was not fully executed. No safety plan was developed. Assessment of the patient's ongoing suicide risk was inadequately documented in the discharge summary, particularly given the patient's pending parole, recent finding of high suicide risk, and ongoing need for suicide precautions. Both psychiatric and primary clinician follow-up services in the MHCB were adequate and demonstrated evidence-based care, but the involvement of four primary clinicians reduced continuity of care. The referral to a 5150 evaluation at parole was clinically appropriate.

**Patient P**

This 33-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with borderline personality disorder, unspecified depressive disorder, and schizophrenia. She was prescribed aripiprazole, hydroxyzine, mirtazapine, olanzapine, and venlafaxine; she was adherent with hydroxyzine, mirtazapine, and olanzapine and partially adherent with aripiprazole and venlafaxine. Additional doses of hydroxyzine and olanzapine were prescribed PRN for anxiety, and she used these medications frequently. Medical conditions included a finding of atypical squamous cells on Pap smear. One suicide attempt in 2023 was listed in the health record. Within the CDCR, the patient had previously received 3CMS care and had one admission to the MHCB. Her MHCB stay in the CTC at CIW between November 23, 2024 and December 2, 2024 was reviewed. She was re-admitted to MHCB care for self-injurious behavior, suicidal ideation, depression, and anxiety three days after a prior MHCB discharge.

All MHCB care was timely. The pre-admission mental health consult and accompanying suicide risk evaluation were adequate; the patient was found at high risk for suicide. The initial primary clinician assessment was completed at cell front due to the patient's refusal and was deficient. The assessment omitted any description of the presenting problem/chief complaint, inaccurately indicated that the patient had no history of suicidality and self-harm, and did not assess all elements of the mental status exam. The case formulation did not address suicidal ideation or current symptoms. The initial psychiatric assessment was adequate, completed by the assigned psychiatrist, and resulted in justified medication changes, but did not indicate whether it occurred in a confidential setting. The initial IDTT meeting was attended by the patient and required staff,

except for alternates for the assigned primary clinician and assigned psychiatrist. IDTT documentation, including the treatment plan, safety plan, and discharge criteria, was good. Psychiatric and primary clinician follow-up encounters often did not indicate if they were confidential. Psychiatric care resulted in medication changes with rationale documented, but the patient's diagnoses remained unreconciled. Five primary clinicians provided daily follow-up encounters. Interventions were consistent with the treatment plan. Participation in dayroom and recreational therapy activities was adequately documented. The weekly IDTT meeting was attended by the patient and required staff, except that an alternate attended for the assigned psychiatrist. IDTT documentation was good, the treatment plan was appropriately updated, and the patient's level of care was appropriately increased from 3CMS to EOP. The discharge summary did not clarify the patient's diagnosis, which was given as mood disorder. A discharge suicide risk evaluation found the patient at low risk.

**Findings**

The care provided to this MHCB patient was inadequate.

The primary concerns with care involved the initial primary clinician assessment, which was inadequate, with multiple omissions and an inaccurate report of the patient's self-injurious history. The case formulation was also deficient, inadequately capturing the patient's current symptoms and specific problems. Documentation did not always make clear whether the encounters were confidential, and the patient's psychiatric diagnoses were not reconciled. Strengths included timely care and the treatment plan, which was developed and updated adequately. The patient improved in response to medication changes and psychotherapeutic interventions that followed the treatment plan. The discharge to EOP care was clinically appropriate.

**Patient Q**

This 20-year-old transgender MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. He was diagnosed with gender dysphoria, posttraumatic stress disorder, unspecified bipolar disorder, and unspecified depressive disorder. He was prescribed olanzapine and sertraline and was adherent with both. Mirtazapine and an additional dose of olanzapine were prescribed PRN for insomnia and anxiety; the patient regularly used mirtazapine but not PRN olanzapine. Opioid and stimulant use were noted as medical conditions. One episode of self-laceration was listed in the health record at the time of MHCB care; the patient reported that he engaged in chronic self-injury and eight suicide attempts since age 13. Within the CDCR, the patient had previously received only 3CMS services, with no higher levels of care. He received MHCB care in the Walker Unit at CIW between December 23, 2024 and December 31, 2024 for self-injurious behavior with moderate depression, anxiety, and hopelessness.

The pre-admission mental health consult and accompanying suicide risk evaluation were timely and thorough; the patient was found at high risk for suicide. The initial primary clinician assessment was timely and, in most respects, adequate, but the case conceptualization did not address chronic self-injury, recurrent suicidal ideation, gender dysphoria, or transgender identity. The initial IDTT meeting was timely and attended by the patient and required staff, except for

alternates for the assigned primary clinician and assigned psychiatrist. No case formulation was included in IDTT documentation. The treatment plan was clinically appropriate except for failing to identify psychiatric care as an intervention. The initial psychiatric assessment was completed after the IDTT meeting and was based on the IDTT discussion rather than an individual patient interview. Medication changes were made to address the patient's symptoms. Psychiatrists and/or primary clinicians followed the patient daily. Psychiatrists adequately monitored the patient's symptoms, acute suicide risk, and response to medications; they collaborated with the patient when medication changes were needed. Four primary clinicians followed the patient; one of these encounters occurred at the cell front without a reason being specified, and two other primary clinician encounters did not make clear whether the encounter was confidential. Primary clinicians did not provide the interventions that were listed in the treatment plan. Dayroom and recreational activities were adequately documented. The follow-up IDTT meeting was timely and attended by the patient and required staff. The case formulation was included but not updated and therefore retained the deficiencies identified above. The treatment plan was appropriately updated, and the patient was discharged to EOP care. The discharge summary was timely and adequate but did not resolve or reconcile multiple psychiatric diagnoses. A discharge suicide risk evaluation found the patient at moderate risk due to his long history of self-injurious behaviors. A useful and collaborative safety plan was developed.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation was inadequate and failed to address multiple aspects of the patient's clinical presentation. The initial psychiatric assessment was not completed prior to the IDTT meeting. Multiple primary clinicians saw the patient, resulting in a challenge to treatment continuity. More than one of these encounters was brief and consistent with a wellness check; none of the encounters delivered interventions identified in the treatment plan. Psychiatric care appeared adequate apart from a failure to discuss or reconcile multiple diagnostic impressions. The safety plan was a strength. Although identified as transgender with a preference for male pronouns, use of preferred pronouns was inconsistent in MHCB documentation.

**Patient R**

This 31-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder and amphetamine-type substance-induced sexual dysfunction. In accordance with a PC 2602 order for involuntary treatment due to grave disability, she was prescribed haloperidol decanoate, hydroxyzine, lithium, mirtazapine, and propranolol and was adherent with these medications. Oral olanzapine and additional doses of hydroxyzine were prescribed PRN for anxiety, and the patient made rare use of these medications. Injectable olanzapine was ordered PRN for medication refusal but was not needed. Medical conditions included a left breast mass, obesity, cannabis use disorder, spasm, schizoaffective disorder, bipolar type, and a history of human papillomavirus. Two episodes of suicidal or self-injurious behaviors in July 2024 were noted. Within the CDCR, the patient had previously received MHCB, EOP, ICF, and acute, but not 3CMS, care. She received MHCB care in the CTC at CIW between

December 13, 2024 and January 21, 2025. She was admitted to MHCB care for suicidal ideation with a plan. She was referred to ICF care on December 20, 2024, but remained in MHCB for 32 days after referral, while Patton State Hospital determined if it could accept the patient for ICF care given the patient's medical needs. In the end, the patient transferred to CIW-PIP.

All MHCB care was timely. The pre-admission mental health consult and suicide risk evaluation were adequate. The patient was found to be at high risk for suicide, and a useful and collaborative safety plan was developed. The initial primary clinician assessment did not address predisposing, perpetuating precipitating, and protective factors and included a case formulation that did not address suicidal ideation, the patient's history of self-injurious behaviors, or the patient's need for involuntary treatment. The initial psychiatric assessment was adequate except for omitting any diagnostic impressions; rationales for medication changes were clearly documented. The initial IDTT meeting was attended by the patient and required staff, except for an alternate for the assigned psychiatrist. The patient was not found to meet criteria for a higher level of care. IDTT documentation of the patient's participation in the meeting was adequate, but documentation of patient strengths was minimal, and there was no documentation of the patient's verbalized treatment goals. The treatment plan was not updated from one developed a month earlier, did not address psychotic symptoms or psychiatric care, and identified poor distress tolerance as a problem without identifying accompanying short- and long-term goals or interventions to address this problem.

Weekly IDTT meetings were attended by the patient and, with one exception, required staff; an alternate for the assigned psychiatrist attended on one occasion. Neither the case formulation nor the treatment plan was updated, but documentation of the IDTT discussion and the patient's participation was adequate, and the treatment team consistently found the patient in need of a higher level of care from the seventh day of MHCB treatment forward. Except for one day in mid-January 2024, the patient was followed daily by one of four psychiatrists and/or one of ten primary clinicians. Many of these encounters occurred at the cell front due to the patient's preference. Psychiatric monitoring of medications and the patient's response to them was adequate, and the rationale for medication changes was documented. Primary clinician encounters initially documented the provision of interventions required in the treatment plan, but as time went on the encounters increasingly consisted of supportive wellness checks and empathic listening to the patient's frustration that she had been kept in the MHCB too long. The patient exhibited significant alogia, blunted affect, perseveration, social withdrawal, and lack of insight. Dayroom and recreational therapy activities were adequately documented, although the patient frequently declined them. The psychiatric discharge summary did not adequately address the patient's negative symptoms or reconcile the patient's diagnoses. The discharge suicide risk evaluation found the patient at moderate risk and documented the clinical rationale for a higher level of care.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment was deficient, and the case formulation at the time of MHCB failed to address the symptoms that resulted in the patient's MHCB admission. The case formulation was not updated thereafter and never addressed the patient's negative

symptomatology. The treatment plan was borrowed from earlier care and not updated; it did not address the patient's psychotic symptoms or psychiatric care; and it was never modified to address the patient's psychosis or negative symptoms. IDTT documentation documented only one patient strength and never documented the patient's verbalized treatment goals, indicating a lack of collaboration with the patient. During her 39-day MHCB stay, the patient was seen by no less than four psychiatrists and ten primary clinicians, resulting in a lack of continuity of care. Care provided by primary clinicians varied by the staff member involved but did not sustain the provision of evidence-based interventions that were documented in the treatment plan. Psychiatric diagnoses were inadequately explored and reconciled. The long wait for acceptance into CIW-PIP care was problematic.

**Patient S**

This 29-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with amphetamine-type substance-induced psychotic disorder, amphetamine-type substance use disorder, severe, and cannabis use disorder, severe. She was prescribed mirtazapine, olanzapine, and sertraline and was adherent with these medications. Hydroxyzine and an additional dose olanzapine were prescribed PRN for anxiety and agitation; she used hydroxyzine on five occasions and PRN olanzapine once. Medical conditions included a finding of atypical squamous cells on Pap smear. Two suicide attempts by overdosing in 2009 and 2011 were listed in the health record. Within the CDCR, the patient had previously received 3CMS, EOP, and two prior episodes of MHCB care. Her MHCB stay in the CTC at CIW between December 31, 2024 and January 6, 2025 was reviewed. She was admitted for bizarre behavior and severe impairment due to mental illness.

The patient was admitted to MHCB overnight by the on-call after-hours psychiatrist. The pre-admission mental health consult and accompanying suicide risk evaluation were completed the next day and were adequate. She was found to be at low risk for suicide. All subsequent MHCB care was timely. The initial psychiatric assessment was completed at the cell front due to the patient's refusal but adequate given these circumstances. The initial primary clinician assessment did not update the case formulation or identify predisposing, perpetuating, precipitating, or protective factors. The initial IDTT meeting was attended by the patient and alternates for the assigned primary clinician and assigned psychiatrist. Based on multiple recent MHCB admissions, the patient was considered for a higher level of care. Rationale for retaining the patient in MHCB care and specific treatment interventions to accomplish this were adequately documented. IDTT documentation erroneously indicated that the patient was not in MHCB care, resulting in failure to review the patient's participation in structured treatment hours. The treatment plan was not updated from one developed two weeks prior, did not incorporate the interventions identified in the higher level of care section of IDTT documentation, and did not reflect psychiatric care. The patient was followed daily by one of three psychiatrists and/or one of four primary clinicians. One of the biweekly psychiatric encounters occurred at the cell front due to the patient's refusal, and two primary clinician progress notes did not document whether the encounter was confidential. However, all primary clinician encounters included interventions consistent with the treatment plan. The patient was offered and sometimes participated in out-of-cell recreational activities. The weekly IDTT meeting was attended by the patient and alternates for the assigned primary clinician and assigned psychiatrist. IDTT discussion and rationale for discharge were adequately

documented, and the treatment plan was updated with the patient's progress. The psychiatric discharge summary was minimal; a discharge diagnosis of unspecified depression was provided without explanation. A discharge suicide risk evaluation found the patient at low risk.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment was deficient and included a case formulation that was not updated to reflect the patient's current clinical presentation, or the potential role of substance use in self-medication. The IDTT failed to review the patient's treatment participation, and the assigned psychiatrist and assigned primary clinician were absent from both IDTT meetings. Important interventions identified in the higher level of care section of IDTT documentation were not incorporated into the treatment plan, and the treatment plan was not updated during the initial IDTT meeting from one developed two weeks prior; the plan did not address the symptoms that resulted in MHCB placement. The patient did not see the same clinician or psychiatrist more than once during MHCB care, resulting in discontinuity in treatment providers. However, primary clinician interventions were evidence-based and consistent with the treatment plan. Rationales for substance-induced psychotic disorder and unspecified depressive disorder diagnoses were not documented.

**Patient T**

This 51-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CIW. The patient first entered CDCR on February 3, 2016, and the MHSDS shortly thereafter on March 8, 2016, at the 3CMS level of care. She remained in 3CMS care during her term and transferred to CIW on April 11, 2018. During the review period, the patient was housed in Facility A and diagnosed with major depressive disorder, recurrent, unspecified depressive disorder, mild, in remission, and opioid use disorder, moderate, in sustained remission. There was no history of self-injurious behavior or suicidal ideation noted. The patient was prescribed and reported to be adherent with KOP sertraline for anxiety and depression. Chlorpromazine was prescribed PRN for insomnia; she used this medication sporadically during the review period. Medically, the patient was diagnosed with menopause, obesity, rheumatoid arthritis, and degenerative lumbar spinal stenosis. Through medical services, she was prescribed trazodone for menopausal night sweats and duloxetine for pain associated with arthroscopy of the right knee. Through the ISUDT, she was prescribed buprenorphine-naloxone in the early portion of the review period. This medication was discontinued at the patient's request in mid-September 2024.

The annual IDTT meeting was held in absentia and 18 days late. Reasons that the patient was absent were not documented. The meeting was attended by the assigned PC, a correctional counselor, and an alternate for the assigned psychiatrist. IDTT documentation was almost entirely blank; no clinical summary, case formulation, patient strengths, verbalized treatment goals, treatment plan, rationale for treatment, or discharge criteria were provided. Only IPOCs for depression, anxiety, and substance use were documented. Routine PC contacts were timely but provided by three different PCs across four encounters. On January 29, 2025, the patient voiced her frustration with the turnover of PCs. Three of the four contacts were documented as

confidential. The patient's depression and anxiety symptoms were measured through self-report measures, and the interventions utilized were documented. However, the patient's responses to interventions were not consistently documented. Routine psychiatry contacts were timely during the review period, but progress notes did not indicate whether these encounters were confidential. The psychiatrist inaccurately noted that medical services prescribed trazodone for insomnia rather than for menopausal night sweats, failed to note that medical services also prescribed duloxetine for pain, and inaccurately brought forward language indicating that the patient was continuing to receive prazosin PRN for insomnia and nightmares, despite discontinuation of this medication prior to the review period. The psychiatrist documented the patient's medication adherence and consistent denial of side effects. Sertraline was increased to address the patient's seasonal depression.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

During the review period, the patient remained stable; however, the annual IDTT meeting was not timely and did not result in any of the required documentation. There was no case formulation or master treatment plan available to guide 3CMS care. The inconsistency of PCs providing care was problematic and negatively impacted the delivery of patient's treatment. In addition, while PC contacts consistently addressed the patient's depression and anxiety with appropriate interventions, IPOC substance use goals were not evaluated consistently. Psychiatric progress notes contained inaccurate information regarding the patient's medications, and use of an antipsychotic medication exclusively as a PRN for insomnia fell outside the standards of care.

**Patient U**

This 64-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CIW. On May 15, 2014, the patient began serving her first CDCR term; she was sentenced to life with the possibility of parole. The patient had since received 3CMS care and transferred to CIW on November 21, 2017. She was housed in Facility A and provided diagnoses of major depressive disorder, single episode, moderate, and generalized anxiety disorder. She was prescribed, and adherent with, citalopram. Hydroxyzine was prescribed PRN for agitation, and she used this medication daily or almost daily throughout the review period. Through medical services, the patient was also prescribed duloxetine for pain. Medically, she had a history of decompression of the median nerve, lower back and hip pain, pityriasis simplex, hypothyroidism, irritable bowel syndrome, glaucoma suspect, cataracts, coronary arteriosclerosis, obstructive sleep apnea syndrome, dyspnea, dry eyes, in addition to other historical medical issues.

The patient's most recent annual IDTT meeting occurred prior to the review period and was not due to be held again until after the review period. During the review period, routine PC contacts were timely and supportive; however, they did not document provision of treatment interventions or whether the contact was confidential. Two psychiatrists provided routine follow-up encounters with the patient. The first encounter was late, occurring 260 days after the most recent psychiatric encounter; the second psychiatric encounter in the review period was timely. The first encounter was confidential; the confidentiality of the second was unclear. The patient denied mood or

psychotic symptoms, denied medication side effects, and was assessed as stable and adherent with medications. She expressed hope to transition to the New Way of Life program upon parole. However, psychiatric progress notes did not demonstrate awareness that the patient was using PRN hydroxyzine for agitation nearly daily, and this issue was not addressed.

**Findings**

The treatment provided to this patient was inadequate.

The patient did not receive timely psychiatric follow-up appointments. More than eight months passed between the next most recent psychiatric encounter and the first psychiatric encounter during the review period. The patient's nearly daily use of PRN hydroxyzine for agitation was not assessed or addressed. Although PC encounters were timely and supportive, PC progress notes did not reflect provision of clinically appropriate interventions, and it was therefore unclear how the patient's trauma and anxiety were being addressed as required by the existing treatment plan. The patient remained psychiatrically stable and treatment adherent throughout the review period, but treatment was inconsistent and incomplete.

**Patient V**

This 42-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CIW. The patient entered CDCR on August 10, 2021, and had previously received 3CMS care during her term. She transferred to CIW on October 6, 2021 and was paroled on December 26, 2024, during the review period. The patient was provided diagnoses of adjustment disorder, depressed mood, major depressive disorder, single episode, and unspecified posttraumatic stress disorder. She was prescribed, and adherent with, duloxetine for mood and buspirone for anxiety. Hydroxyzine was prescribed PRN for anxiety, and she used this medication daily. Medical conditions included Vogt-Koyanagi-Harada syndrome, a rare autoimmune disorder.

An annual IDTT meeting was timely and attended by the patient and required staff. IDTT documentation provided meaningful updates, noting that the patient had maintained mental health stability, was enrolled in education self-help groups, completed the Beyond Trauma and Anti-Recidivism Coalition series, and had plans to parole into a transitional program in December 2024. However, current diagnoses and symptoms supporting the diagnoses were not documented. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan focused on reducing the patient's depression and anxiety and included measurable short-term goals. Long-term goals were vague and not measurable. Interventions identified in the treatment plan were limited to developing a therapeutic alliance and setting goals; psychiatric and other clinically appropriate interventions were omitted. The treatment plan did not address the patient's verbalized goal related to sobriety or her upcoming release. The rationale for 3CMS care and discharge criteria were not documented.

During the review period, the PC saw the patient monthly. These contacts were confidential, and clinically appropriate interventions were consistently documented. The patient denied experiencing any mood symptoms, and her symptoms were adequately monitored. One of two

psychiatrists saw her on three occasions during the review period. Progress notes did not indicate whether these encounters were confidential but adequately addressed the patient's symptoms, treatment progress, medication, and concerns regarding weight gain as a side effect of medication. She was seen promptly by psychiatry after submitting a request to see psychiatry to discontinue the duloxetine, as she had been doing well with her mood and sleep, with no symptoms for over six months. However, after further discussion, the patient agreed to lower the dose instead, and her medication was adjusted accordingly. On November 13, 2024, the patient was seen for a pre-release assessment and eventually discharged on December 26, 2024.

**Findings**

The treatment provided to this 3CMS patient was adequate.

During the review period, the patient remained stable and received timely assigned PC, psychiatry, IDTT meeting, and pre-release contacts. While the psychiatry contacts were timely and sufficiently addressed the patient's needs, documentation reflecting the confidentiality of the contacts was not consistently included. Treatment planning documentation presented additional opportunities for improvement as sections were omitted, interventions not included, and the patient's goal of wanting to work on her sobriety was not addressed. Despite documentation challenges, PC contacts effectively documented confidentiality, tracked the patient's treatment progress, and aligned with her treatment plan. Adequate interventions were documented and utilized to ensure ongoing mental health stability.

**Patient W**

This 39-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CIW. The patient was provided with diagnoses of persistent depressive disorder, generalized anxiety disorder, and opioid use disorder. She was not prescribed psychotropic medications during the review period. Healthcare records noted a substance use history that included both alcohol and amphetamines. Within the CDCR, she had previously received 3CMS and MHCB care.

During the review period, the annual IDTT meeting was timely but held in absentia due to the patient's refusal. The assigned PC and correctional counselor and an alternate for the assigned psychiatrist attended. IDTT documentation noted that the patient did not meet any criteria for a higher level of care and provided minimal clinical updates regarding the patient's treatment progress over the prior year. Instead, the clinical summary carried forward previous information, including documentation related to another patient. The case formulation was not updated. The treatment plan targeted anxiety and substance use concerns, included measurable short-term goals, but provided only vague long-term goals. The patient's treatment disengagement was not specifically addressed, and no interventions were developed to address this challenge. The interventions included for anxiety were inadequate, noting only that the PC would foster a therapeutic alliance by empathizing with the patient. No interventions for substance use were identified; instead, the goal of improvement in sobriety was simply repeated as an intervention. Discharge criteria and adequate justification for retaining the patient at the current level of care were omitted.

During the review period, the patient refused both PC contacts, as well as her annual IDTT and a scheduled pre-release family planning session. The assigned PC met the patient at cell front in response to the patient's refusals. The patient denied having any mental health concerns during these wellness checks. On November 1, 2024, the assigned PC saw the patient for an urgent referral after other patients expressed concern about her behavior, noting that she was yelling at herself all night, listening to the radio, and talking to herself. Custody indicated they had discovered a pipe in her cell. The patient reported that she had been sleeping all day and staying awake at night, making the days go by faster. She denied any mental health symptoms but did not deny substance use. She declined to pursue addiction treatment or meet with psychiatry. A mental health assessment for a September 24, 2024 RVR alleging unauthorized possession of drug paraphernalia, found a nexus between the patient's mental health symptoms and the alleged behavior, but the assessment failed to articulate a clear and adequate rationale for this finding. A mental health pre-release planning assessment was completed adequately on December 11, 2024.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient did not participate in treatment during the review period, received multiple RVRs, and had an urgent referral after exhibiting concerning behaviors associated with suspected substance use. The patient's treatment disengagement was inadequately assessed and addressed. IDTT documentation did not address these concerns or provide updated clinical information. Rather, IDTT documentation was minimally updated and contained other patient information, lacked justification for retaining the patient in 3CMS care, and failed to address barriers to treatment. The patient did not receive treatment needed for her depression and anxiety and, as documented, the treatment team did little to address her treatment refusals.

**Patient X**

This 36-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental healthcare provided at CIW. The patient entered CDCR on June 5, 2012, transferred to CIW on October 11, 2013, and received 3CMS care. She was diagnosed with PTSD, ADHD, and methamphetamine use disorder, and was also noted to have anxiety. She was not prescribed psychiatric medications during the review period. In addition, she had multiple medical concerns and was diagnosed with hirsutism, which was noted to negatively impact her.

The annual IDTT meeting was not due during the review period. During the review period, the assigned PC saw the patient on six occasions, including one encounter in response to an urgent referral after the patient reported a PREA incident. These encounters were timely; five were confidential, and one occurred at the cell front after the patient reported not receiving a ducat for the scheduled appointment. During routine PC contacts, the patient expressed feelings of anxiety related to a change in her sentence and being around others. Contacts focused on helping her process her childhood trauma and managing symptoms such as nightmares, guilt, shame, and having "mixed thoughts." Additionally, the patient raised concerns that she may have tinnitus because of the ringing in her ear and was provided with appropriate support to pursue medical

care. PC progress notes included general monitoring of the patient's mental health symptoms but did not use metrics outlined in the existing treatment plan to measure treatment progress. Although therapeutic interventions were utilized, the patient's response to these interventions was not consistently documented. The urgent mental health consult and associated SRE occurred timely, on the same day as the referral; both the consult and the SRE were adequately documented, and the patient was found at low risk. The patient was then cleared and returned to housing.

**Findings**

The treatment provided to this 3CMS patient was adequate.

Throughout the review period, the patient was seen timely, confidentially, and adequately by her assigned PC. The frequency of these contacts consistently exceeded Program Guide requirements. Although the PC did not measure treatment progress as outlined in the treatment plan and patient's responses to clinical interventions were not consistently documented, PC contacts utilized adequate therapeutic interventions and maintained continuity of care.

**Patient Y**

This 24-year-old female-to-male transgender RHU EOP Mod patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. He was diagnosed with gender dysphoria, unspecified mood disorder, antisocial personality disorder, alcohol-induced bipolar and related disorder, with moderate or severe use disorder, and amphetamine-type substance-induced psychotic disorder, with moderate or severe use disorder. He was prescribed benztropine, fluphenazine, olanzapine, oxcarbazepine, and sertraline; he was adherent with olanzapine and oxcarbazepine but not with other medications. Hydroxyzine and an additional dose of olanzapine were prescribed on an as-needed basis for anxiety and agitation, respectively; he rarely made use of these medications. Through the ISUDT services, he was prescribed buprenorphine-naloxone and was partially adherent with this medication. Through medical services, he was prescribed amitriptyline for pain and was nonadherent with this medication. Medical conditions included obesity, chronic low back pain with injured lumbar disc, steatosis of liver, keratosis pilaris, pterygium of left eye, pityriasis simplex, anterior knee pain, transgender male, and seizure disorder. He was receiving gender-affirming hormone treatment while in RHU EOP care.

The patient had a history of early adolescent-onset behavioral problems including fighting and self-injury, substance use, and physical and emotional abuse. Two instances of self-injurious behaviors, one in 2013 and one in 2015, were listed in the health record. Within the CDCR, the patient previously received 3CMS, MHCB, and EOP care. At the time of RHU EOP care, he had been incarcerated in CDCR for five years.

The patient received RHU EOP care between October 11, 2024 and November 7, 2024, after being discharged from a three-day MHCB stay, where he had been treated for delusions, auditory hallucinations, paranoia, agitation, and dangerousness to others. Five-day follow-ups occurred as required and were adequately documented. The initial psychiatric assessment occurred timely but at the cell front due to the patient's refusal of a confidential setting. The assessment was internally

contradictory. The psychiatrist noted that the patient endorsed auditory and visual hallucinations and paranoid ideation, including the patient's belief that he was communicating telepathically with his uncle and others, but the mental status findings indicated a clear sensorium and the absence of hallucinations and delusions. A diagnosis of paranoid schizophrenia was offered. The initial primary clinician assessment was timely and mostly adequate but did not indicate whether it occurred in a confidential setting. The assessment and case formulation did not address the presence or absence of potential interactions between the patient's gender dysphoria and psychotic disorders.

The initial IDTT meeting occurred timely and was attended by the patient and required staff, except for the assigned primary clinician; an alternate for this clinician attended instead. The treatment team found that the patient did not meet any criteria for consideration of a higher level of care, despite ongoing medication nonadherence, refractory psychotic symptoms, and significant functional impairment. IDTT documentation adequately detailed the patient's participation in the meeting, strengths, and verbalized treatment goals. The rationale for placing the patient in modified EOP care, with six rather than ten groups each week, was explained to the patient and documented with adequate rationale. The treatment plan was not updated from versions developed in August 2024 and in the MHCB in October 2024; one of the goals was documented as having been sufficiently met to permit discharge, and short-term goals and interventions were not updated to reflect the patient's current clinical care. The treatment plan did not identify psychotic symptoms as treatment targets.

The primary clinician provided individual contacts to the patient every five to ten days. These contacts were confidential except on one occasion, when the patient refused a confidential setting, and the encounter occurred at the cell front. Regardless of location, these contacts were primarily supportive in nature and focused on encouraging medication adherence, treatment engagement, and reduction of impulsive behavior. Following the initial IDTT meeting, the psychiatrist provided the patient with a brief contact at the cell front. The psychiatrist documented consideration of petitioning for involuntary treatment authorization under PC 2602. There was no further psychiatric follow-up during the remainder of the patient's RHU EOP care, despite frequent nonadherence with medications. Mental health groups were offered as required by the treatment plan, and they included one that was led by the assigned primary clinician. The patient attended most offered groups and participated well, except on one occasion when he became agitated and hostile towards a peer in response to auditory hallucinations. RHU EOP care at CIW ended when the patient was transferred to CCWF for EOP care.

**Findings**

The care provided to this RHU EOP Mod patient was inadequate.

The initial psychiatric assessment was internally contradictory, documenting both the presence and the absence of psychotic symptoms, multiple psychiatric diagnoses were not reconciled, and the patient's primary psychiatric diagnosis was not clarified. The treatment plan was not updated to address the patient's current treatment needs and did not identify psychotic symptoms as treatment targets. The patient's transgender identity and potential interactions between gender dysphoria and psychotic symptoms were not explored. The patient's nonadherence with medications was not

adequately monitored or addressed. Given the patient's high rate of group attendance but repeated breakthrough psychotic symptoms, consideration of returning him to full EOP programming or to a higher level of care was clinically indicated but not undertaken. The primary clinician and psychiatrist did not document any efforts to communicate with the receiving care team at CCWF regarding the patient's treatment needs. The provision of mental health groups was a strength.

**Patient Z**

This 27-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with unspecified anxiety disorder, unspecified schizophrenia spectrum and other psychotic disorder, unspecified mood disorder, alcohol use disorder, severe, amphetamine-type substance use disorder, severe, cannabis use disorder, and severe cocaine use disorder, severe. A diagnosis of posttraumatic stress disorder was included in the RHU EOP records but not updated in the mental health problems section of the health record. She was prescribed buspirone, chlorpromazine, olanzapine, and sertraline and was adherent with these medications. Hydroxyzine and mirtazapine were both prescribed on an as-needed basis for insomnia, and she used these medications nightly except for a 20-day period between late December 2024 and mid-January 2025. Through ISUDT services, she was prescribed buprenorphine-naloxone for opioid use disorder during a portion of RHU EOP care, but this medication was discontinued due to nonadherence. Medical conditions included elevated liver enzymes, sinus tachycardia, and hypertriglyceridemia.

The patient had a history of mental health treatment dating back to age 9, childhood sexual abuse, foster care, special education for anxiety, maternal incarceration and severe mental illness, early onset substance use, and homelessness prior to incarceration. Her father died by suicide. No suicide attempts or self-injurious behaviors were listed in the health record, but overdoses or threatened overdoses at ages 14, 18, and 19 along with four psychiatric hospitalizations in the community were documented in mental health records. Within the CDCR, the patient previously received 3CMS and MHCB care. At the time of RHU EOP care, she had been incarcerated in CDCR for just over six months.

The patient received RHU EOP care between November 13, 2024 and January 30, 2025, when she was transferred to mainline EOP. She was placed in RHU on September 11, 2024, for an RVR on September 7, 2024 for attempted murder following an alleged assault on a peer at CIW. Within the RHU, she initially received 3CMS level of care. At a routine RHU 3CMS IDTT meeting on November 13, 2024, it was agreed that she needed EOP care due to poor insight into either symptoms or the severity of her behavior that resulted in RHU placement.

The initial primary clinician assessment was timely and adequate but did not indicate whether the patient was seen in a confidential setting. The psychiatric assessment was timely and confidential but did not provide psychiatric diagnoses beyond mood disorder and psychosis. The initial IDTT meeting occurred timely and was attended by the patient and required staff. IDTT documentation provided an adequate description of the patient's clinical presentation and treatment progress, reflected the IDTT's discussion with the patient, and appropriately retained the patient in RHU EOP care. The treatment plan identified the patient's danger to others and substance use as treatment targets, but did not address symptoms of mental illness, did not formulate a long-term

goal that was measurable, and did not formulate a short-term objective, long-term goal, interventions, or patient response for treatment of substance use. Although medication adherence was included in the patient's long-term treatment goal for addressing her danger to others, psychiatric care was not included as an intervention. IDTT documentation did not address the use of mental health groups.

During RHU EOP care, the patient was followed by a psychiatrist at least once a month. Documentation did not always indicate whether the encounter was confidential, and the patient's final psychiatric contact occurred at the cell front because the patient declined a confidential setting. The psychiatrist failed to address or resolve psychiatric diagnoses, and RHU EOP documentation did not clarify why high doses of olanzapine (20 mg in the morning and 30mg in the evening) continued to be required throughout the course of RHU EOP care. The psychiatrist noted that the patient was responding to internal stimuli during one encounter and, in another encounter, appeared to have difficulty understanding the difference between scheduled and PRN medications. The primary clinician saw the patient once every seven to ten days; four of these encounters did not indicate whether they occurred in confidential settings. One encounter occurred at the cell front after the patient declined a confidential setting. Primary clinician encounters were supportive rather than planned and structured in nature. On more than one occasion, the primary therapist noted that the patient needed repeated reminders regarding how her RHU term was determined and how it could be shortened. Progress notes did not indicate that the patient was assisted in identifying triggers and early warning signs for anger, as required by the treatment plan. A change of assigned primary therapists was not documented as discussed with the patient. Beginning on the second day of RHU EOP care, the patient was offered and usually attended one to three mental health groups a day on regular business days; groups were led by recreational therapists, psychiatric technicians, or a psychology intern. The patient was released from RHU and placed in mainline EOP following an ICC meeting in which her remaining RHU time was suspended.

**Findings**

The care provided to this RHU EOP patient was inadequate.

Although assigned staff followed the patient regularly and generally timely, and although the patient received sufficient out-of-cell structured therapeutic activities, the patient's treatment needs were not adequately identified or addressed. Given evidence of functional impairment and symptoms of serious mental illness, increasing her level of care to EOP was clinically indicated. However, it was delayed by two months following the incident that led to her placement in RHU. Divergent psychiatric diagnoses were not addressed or resolved during RHU EOP care. The treatment plan was deficient and failed to target symptoms of serious mental illness. The patient's limited insight and her confused, perseverative cognitive functioning were inadequately explored; they may have indicated impairments in her capacity to make informed healthcare decisions. Primary clinician encounters showed little to no evidence of planned or structured treatment beyond the routine of weekly contacts, and the interventions required by the treatment plan were not documented.

**Patient AA**

This 28-year-old RHU EOP female-to-male transgender patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. He was diagnosed with unspecified mood disorder, intermittent explosive disorder, antisocial personality disorder, and unspecified attention-deficit/hyperactivity disorder. Through a PC 2602 order for involuntary treatment, he was prescribed benztropine, fluphenazine, and oxcarbazepine, and he was adherent with these medications. Hydroxyzine was prescribed on an as-needed basis for anxiety, and he used this medication most evenings. Intramuscular fluphenazine and olanzapine were ordered as back-ups for oral medication in case of refusal; these preparations did not need to be used during RHU EOP care. Medical conditions included seizure disorder, obesity, chronic back pain, gastroesophageal reflux disease, vitamin D deficiency, chronic leukocytosis, herpes simplex, substance use disorders, and a wheat allergy. He was not receiving gender-affirming hormone treatment during RHU EOP care.

The patient had a history of foster care, group home placement, juvenile delinquency, victimization from being bullied, childhood-onset substance use, homelessness, depression, and community psychiatric and substance use treatment. No suicide attempts or self-injurious behaviors were listed in the health record, but the patient reported two hanging attempts in the community. Within the CDCR, the patient previously received 3CMS, MHCB, and EOP level of care services. At the time of RHU EOP care, he had been incarcerated in CDCR for 15 months.

The patient received RHU EOP care between September 16, 2024 and October 7, 2024, after being released from MHCB care at CCWF. Five-day follow-ups occurred as required and were discontinued without incident on day five. The initial psychiatric assessment was timely, confidential, but inadequate with respect to psychiatric diagnoses, psychiatric history, and the need for involuntary treatment. Diagnoses of unspecified mood disorder, unspecified depressive disorder, and unspecified attention-deficit/hyperactivity disorder were offered without explanation, and potential gender dysphoria was not explored. The psychiatrist documented that the patient was receiving both EOP and 3CMS care. Medications were adjusted to address side effects and improve efficacy. The initial primary clinician assessment was timely but inadequate, relying extensively on prior assessments and adding little current information. The assessment did not indicate whether it occurred in a confidential setting and did not address the patient's transgender identity or potential gender dysphoria. The case formulation was weak and did not appear to be current. Neither assessment addressed the need for involuntary treatment or the patient's history of auditory hallucinations.

The initial IDTT occurred timely and was attended by the patient and required staff. The patient met criteria for consideration of a higher level of care based on multiple RVRs and MHCB admissions; rationale for retaining the patient on EOP level of care was adequately documented, and additional treatment interventions through the suicide risk management program were clinically appropriate. The patient's participation in the meeting and strengths were poorly documented, and there was no documentation of his verbalized treatment goals. However, IDTT documentation did note the patient's transgender identity. The treatment plan used content developed in early and mid-August 2024 and was not updated to reflect the patient's current challenges and treatment needs. The treatment plan did not identify as interventions either group offerings or psychiatric care beyond education of medication benefits.

After the initial IDTT, the patient was followed weekly by the primary clinician and received two psychiatric consultations due to his request to change medications due to over-sedation and drooling. Most encounters appeared to be confidential, although one occurred at the cell front when the patient refused a confidential setting. Medications were adjusted and the patient was provided with brief supportive interventions during clinician contacts. There was no evidence of planned, evidence-based clinician interventions, and progress notes were more consistent with wellness checks than active treatment. The patient was offered multiple mental health groups a week and attended most of these. Over the 21 days of RHU EOP care, the patient gradually became more withdrawn, confused, incontinent of urine, neglectful of hygiene, and psychotic, reporting that he was hearing voices at night that say evil names. Excessive drooling and poor insight were noted. On October 7, 2024, he was referred to MHCB care because of this decompensation.

**Findings**

The care provided to this RHU EOP patient was inadequate.

Initial psychiatric and primary clinician assessments failed to address the patient's history of psychosis and need for involuntary treatment, and the primary clinician focused more on behavioral regulation and risk of violent behavior than on treatment of psychotic symptoms. The patient's diagnoses remained unclear and unresolved throughout RHU EOP care, and the treatment plan was not updated to address current symptoms and treatment needs. Several interventions itemized in the higher level of care section of the IDTT documentation were not provided, and the interventions provided were not included in the treatment plan. The role of the patient's transgender identity in his overall functioning was not adequately explored.

**Patient BB**

This 35-year-old female-to-male transgender RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. He was diagnosed with schizoaffective disorder, bipolar type, and posttraumatic stress disorder. He was prescribed buspirone, duloxetine, lamotrigine, lithium, and risperidone and was adherent with these medications. Clonidine and hydroxyzine were prescribed on an as-needed basis, both for anxiety, and the patient used both medications at least once daily. An additional dose of risperidone was prescribed on an as-needed basis for agitation or psychosis, and he used this medication daily during the early portion of RHU EOP care and intermittently thereafter. Medical conditions included transgender identity, gender dysphoria, hereditary neutrophilia, seizure disorder with treatment-refractory seizures and possible psychogenic non-epileptic episodes, menorrhagia, hyperprolactinemia, dry eyes, and hammer toe. A history of hyponatremia secondary to oxcarbazepine was noted in his records. He received gender-affirming hormones during RHU EOP care.

The patient had a history of prolonged childhood and adolescent seizures, childhood sexual, physical, and emotional abuse, maternal mental illness, maternal substance use and abandonment, paternal substance use, and foster care. His own substance use began in adolescence and resulted in homelessness. Three suicide attempts were listed in the health record, two of them by hanging

in June 2024 and the third by an overdose in 1999. Within the CDCR, the patient previously received 3CMS, MHCB, EOP, APP, and ICF services. At the time of RHU EOP care, he had been incarcerated in CDCR for just over three years.

The patient received RHU EOP care between October 7, 2024 and December 17, 2024, after being discharged from MHCB care for suicidal ideation. Five-day follow-ups occurred for the first seven days of RHU EOP care. During these, the safety plan was reviewed and modified in collaboration with the patient; the safety plan was useful and clinically appropriate. The initial primary clinician assessment was timely and thorough but did not indicate whether it was confidential. The case formulation was adequate with respect to trauma and interpersonal functioning but did not address symptoms of schizoaffective disorder. The initial psychiatric assessment was timely and adequate. One portion of the assessment occurred at the cell front, the other, in a confidential setting.

The initial IDTT meeting occurred timely and was attended by the patient and required staff. The patient met one criterion for consideration of a higher level of care due to his multiple RVRs; the rationale for retaining the patient at the EOP level of care was adequately documented. The patient was enrolled in the suicide risk management program, and IDTT documentation indicated that anger management, emotional regulation, distress tolerance, effective communication, and impulse control would be the focus of treatment. While the patient's participation in the IDTT meeting, strengths, and verbalized treatment goals were adequately documented, the treatment plan was copied without modification from treatment plans developed during MHCB care. It was not updated, did not include goals and interventions that were described in the higher level of care and suicide risk management program sections of the IDTT document, included two goals with documentation that they had already been met, and did not address assignment of mental health groups.

The patient was followed timely by the psychiatrist and primary clinician. Neither discipline consistently indicated whether the encounters occurred in confidential settings. Psychotropic medications were adjusted based on the patient's reported symptoms and side effects, but the response to these medication changes was not documented. The psychiatric diagnosis remained unclear. Primary clinician encounters were typically brief, supportive, and consistent with wellness checks and case management rather than clinical interventions. Only one of these encounters documented the provision of evidence-based interventions; none documented interventions listed in the treatment plan. The patient was offered one to five mental health groups a day and attended most of these. Except for groups led by the psychologist, group notes included patient-specific comments. Psychiatric technician weekly and monthly notes were helpful. Mental health assessments for two RVRs alleging battery on a peace officer found that mental illness contributed to the alleged behavior.

Approximately two months after the initial IDTT meeting, a follow-up IDTT meeting occurred and was attended by the patient and required staff. The patient's participation in the meeting, strengths, verbalized treatment goals, and treatment progress were adequately documented. The treatment team determined that the patient had met RHU EOP treatment goals, reduced his level of care to 3CMS, and discussed a probable transfer to CCWF. The treatment plan was not modified. An ICC meeting occurred two days later. During this meeting, the ICC made a final determination to endorse the patient to CCWF due to the patient's increased custody points; the

patient was retained in RHU EOP care pending transfer. Following the IDTT meeting, while still housed in the RHU at CIW, the patient refused all EOP groups, decreased his participation in yard, and refused to participate in a primary clinician assessment that was required because the patient's level of care had changed to 3CMS. He was transferred to CCWF the following day.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The case formulation and treatment plan were deficient and did not guide the treatment provided. The patient's diagnosis of schizoaffective disorder was not consistent with his symptoms or clinical presentation, and no efforts to resolve the patient's diagnoses were documented. The role of the patient's transgender identity in his mental health was not addressed. Little to no efforts to provide evidence-based, trauma-informed psychotherapeutic interventions were documented. Primary clinician encounters were brief, supportive, but lacked clear direction or consistency with an underlying treatment plan. Assessment of the patient's response to medication changes was not documented; the patient's daily use of PRN medications was not explored or addressed. After learning that he would be transferred to CCWF, the patient withdrew from treatment and refused groups. Efforts to reengage the patient in RHU EOP treatment were not documented.

**Patient CC**

This 31-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with generalized anxiety disorder and major depressive disorder, recurrent, moderate. Under a six-month PC 2602 order for involuntary treatment due to danger to self and others, she was prescribed benztropine, fluphenazine, and oxcarbazepine and was adherent with these medications. Diphenhydramine was prescribed on an as-needed basis for extrapyramidal symptoms, but the patient did not use this medication. Intramuscular fluphenazine and oral olanzapine were prescribed on an as-needed basis for agitation; the patient never received intramuscular fluphenazine but used olanzapine frequently during the first four weeks of RHU EOP care. Hydroxyzine was prescribed on an as-needed basis for anxiety, and the patient used this medication at least once on most days. Medical conditions included obesity, chronic tension-type headache, migraine headache, herpes simplex, menorrhagia, and right lower quadrant pain. A history of seizures was documented but not included in her medical problem history.

The patient had a history of adolescent sexual abuse, paternal abandonment, behavioral problems including running away from home, psychiatric care in the community, a miscarriage, and substance use. One episode of non-suicidal head banging was documented in her record in early October 2024. Within the CDCR, the patient previously received 3CMS, MHCB, and EOP level of care services. At the time of RHU EOP care, she had been incarcerated in CDCR for 19 months.

The patient received RHU EOP care from October 14, 2024 to December 5, 2024, after being discharged from MHCB care for danger to self and others. Five-day follow-ups occurred as required through the seventh day of RHU EOP care, and a suicide risk evaluation on the seventh day determined the patient was at low risk for suicide and self-harm. The initial psychiatric

assessment was timely and confidential but minimal. Documentation was indistinguishable from a follow-up psychiatric progress note, and the limited content suggested a brief encounter and cursory assessment. The assessment incorrectly documented that the patient was receiving 3CMS care. Diagnoses offered were anxiety, mood swings, and psychosis, without further specification. The initial primary clinician assessment was timely and largely adequate but did not indicate whether it was confidential. The case formulation indicated that negative cognitive schemas were the driving factors contributing to problem behaviors, but the formulation did not include recommendations for addressing the negative schemas.

The initial IDTT meeting occurred timely and was attended by required staff, but not the patient, who was on medical quarantine for COVID precautions. The patient was not found to meet any criteria for consideration of a higher level of care. The patient's safety plan, which was clinically appropriate, was reviewed, and the patient was enrolled in the suicide risk management program. Distress tolerance, self-soothing, communication, and coping skills were identified as intervention targets. IDTT documentation included diagnoses of bipolar disorder, generalized anxiety disorder, and major depressive disorder. The treatment plan was copied without alternation from one developed in MHCB care and included two goals that had already been met. Interventions listed in the plan did not include all the interventions described in the suicide risk management program section of IDTT documentation, did not refer to enrollment in groups, and did not refer to psychiatric care. Reasons for retaining the patient at the EOP level of care were not documented.

The primary clinician followed the patient every five to nine days and provided supportive encounters. Progress notes did not consistently indicate whether the encounter was confidential and contained no signs of planned, evidence-based interventions. However, it was evident that the encounters were collaborative, and the patient appeared to respond positively. The psychiatrist saw the patient timely in a confidential setting, continued diagnoses of unspecified bipolar disorder and major depressive disorder without comment, found the patient stable, and made no medication changes. The patient was offered between one and four mental health groups a day on most workdays, and she attended almost all of these. A mental health assessment for an RVR alleging fighting concluded that mental illness contributed to the alleged behavior. On December 5, 2024, she was released from RHU EOP to mainline EOP following an ICC meeting.

**Findings**

The care provided to this RHU EOP patient was inadequate.

Although the patient received timely assessments, treatment planning, and follow-up encounters and was offered adequate out-of-cell structured therapeutic activities, mental health services were poorly organized and did not follow a plan of care. The patient's diagnoses remained unclear through RHU EOP care, and there was no evidence that interventions described in the suicide risk management program were provided during individual encounters. The treatment plan was not updated or clinically appropriate for the patient's current treatment needs, and the patient's need for involuntary medication was not referenced in either the case formulation or the treatment plan. As documented, it was not clear how, or if, the patient was benefiting from treatment.

**Patient DD**

This 27-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with unspecified depressive disorder, attention-deficit/hyperactivity disorder, predominately hyperactive/impulsive, and schizoaffective disorder, depressive type. She was prescribed atomoxetine, buspirone, olanzapine, and sertraline and was adherent with these medications. Hydroxyzine was ordered on an as-needed basis for insomnia, and she made regular use of this medication. An additional dose of olanzapine was prescribed on an as-needed basis for anxiety and agitation, and she used this medication with increasing frequency during RHU EOP care. Through the ISUDT services, she was prescribed buprenorphine-naloxone for opioid use disorder. She was adherent with this medication. Medical conditions included severe obesity, opioid use disorder, chronic back pain, tinea pedis, Osgood-Schlatter disease of both knees, and a history of metatarsal fracture.

The patient had a history of childhood fearfulness and depression and psychiatric treatment for depression and paranoia beginning at the age of 12, psychiatric hospitalizations as an adult, homelessness, and extensive substance use including methamphetamine. One suicide attempt by overdosing in 2013 was listed in the health record, and an instance of head-banging while in county jail was also noted. Within the CDCR, the patient previously received 3CMS, MHCB, and EOP levels of care. The patient had been incarcerated in CDCR for just over four months at the time she was placed in RHU EOP care.

The patient was transferred to CIW on December 31, 2024 and moved from mainline EOP to RHU EOP on January 14, 2025, where she remained as of mid-February 2025. The initial primary clinician and psychiatric assessments were timely, confidential, and minimally adequate. The case formulation was not developed. The initial IDTT meeting occurred timely and was attended by the patient and required staff. Although she had three MHCB placements in the prior six months, the rationale for retaining the patient at the EOP level of care was adequately documented. Motivational interviewing techniques, psychoeducation, coping skills training, and reality testing were identified as interventions. She was also enrolled in the suicide risk management program due to recent MHCB placements; goals of medication adherence, practicing new skills, receiving psychoeducation, and remaining free from suicidal ideation were identified. The RHU EOP treatment plan was adopted without modification from the mainline EOP treatment plan reviewed in December 2024. There were no updates to the patient's progress or response to treatment, no changes in interventions or goals, no references to mental health groups, and no integration with the SRMP plan. However, treatment targets, goals, and interventions were clinically appropriate. The patient's participation and clinical presentation in the IDTT meeting was adequately documented.

Following the initial IDTT meeting, the primary therapist followed the patient every seven to 12 days. These encounters were confidential but appeared to be brief and supportive in nature. Documentation confirming delivery of the interventions in the treatment plan and suicide risk management program plan was lacking. The primary clinician incorrectly documented that the patient was receiving involuntary treatment under a PC 2602 order; this was not the case. In another encounter, the clinician documented for the first time that the patient preferred "he/him" pronouns; the patient's potential gender dysphoria and/or transgender identity were not explored, and there were no referrals or follow-up documentation regarding the patient's disclosure. Other

treatment staff continued to use female pronouns when referring to the patient in their documentation. Portions of the primary clinician's progress notes were difficult to decipher due to multiple typographical errors.

The psychiatrist saw the patient timely on two occasions after the initial psychiatric assessment. Both encounters were confidential and in response to patient health care requests; because of their timing, they also served as routine follow-up appointments. In the first encounter, the patient requested to be placed back on medication for attention-deficit/hyperactivity disorder. Informed consent was obtained, and atomoxetine was started the following day. Psychiatric documentation was minimal, and clinical rationale for starting atomoxetine was not documented beyond the patient's request. The psychiatrist incorrectly documented that the patient was receiving 3CMS care. In the second encounter, the patient requested to increase the PRN dose of olanzapine and the scheduled dose of atomoxetine, and these medication changes were made. The patient attended two to three mental health groups most workdays; groups were offered by recreational therapists, psychiatric technicians, or a psychology intern.

Mental health assessments for an RVR on January 6, 2025 alleging disrespect with the potential for violence/disruption and an RVR on January 14, 2025 alleging aggravated battery on a non-inmate by means of gassing concluded that mental illness contributed to the alleged behaviors. A third mental health assessment, conducted by the same psychologist who completed the other two assessments, concluded that mental illness did not contribute to a January 7, 2025 RVR alleging unlawful influence.

**Findings**

The care provided to this RHU EOP patient was inadequate.

A provisional case formulation was not developed. The patient's potential gender dysphoria and/or transgender identity were not explored after a preference for male pronouns was identified. This issue is foundational for understanding the patient's treatment needs and providing patient-centered care. It remained unclear from the record what the patient's pronoun preference was, as the health record banner indicated a preference for female pronouns. Psychiatric and clinician progress notes contained substantive errors, and portions of the clinician's notes were incoherent due to typographical errors. The patient's increasing use of PRN olanzapine during for anxiety and agitation was not addressed. Evidence for attention-deficit/hyperactivity disorder symptoms in the context of schizoaffective disorder was unclear. Interventions consistent with the treatment plan and suicide risk management program plan may have been provided but were not documented. Care strengths included the provision of two to three mental health groups a day during regular business days and the confidentiality of individual clinician and psychiatrist encounters.

**Patient EE**

This 36-year-old transgender RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. Pronoun preference was reported to be female. She was diagnosed with bipolar I disorder, most recent episode manic, unspecified,

posttraumatic stress disorder, alcohol use disorder, severe, in early remission, and cannabis use disorder, severe, in early remission. She was prescribed fluphenazine, oxcarbazepine, and valproic acid, but was adherent only with oxcarbazepine. Olanzapine and an additional dose of oxcarbazepine were prescribed on an as-needed basis for agitation; she used PRN oxcarbazepine frequently but did not use olanzapine. Medical conditions included primary oligomenorrhea, cervical intraepithelial neoplasia, chronic pain of left arm, obstructive sleep apnea, and transgender identity. She used a C-pap machine. She was not prescribed gender-affirming hormones during RHU EOP care.

The patient had a history of childhood trauma and instability, substance use, and community treatment for anxiety and, following a motor vehicle accident, for posttraumatic stress disorder. Four episodes of non-suicidal self-injury, spanning 2019 through late August 2024, were listed in the health record. The patient reported using spice while in prison. Within the CDCR, she previously received 3CMS and MHCB levels of care. At the time of RHU EOP care, she had been incarcerated in CDCR for eight years.

The patient received RHU EOP care between September 12, 2024 and September 25, 2024. During the first three days of this care, she was physically located in RHU 3CMS housing. The initial primary clinician assessment occurred timely. It did not indicate whether the patient encounter was confidential, did not update the case formulation, and did not help clarify the patient's primary diagnosis. The initial psychiatric assessment was timely, confidential, and minimally adequate, but also did not help clarify the patient's diagnoses. Posttraumatic stress disorder, mood swings, anxiety, agitation, transgender identity, impulsiveness, and bipolar I disorder, unspecified were listed as problems or diagnoses. Valproic acid was discontinued due to side effects, and the patient was informed that a petition for involuntary treatment would be submitted if she remained medication nonadherent.

The initial IDTT meeting occurred timely and was attended by the patient and required staff. The patient was not found to meet any criteria for a higher level of care. The patient's participation in the IDTT meeting, strengths, and verbalized treatment goals were documented adequately, as was the treatment team's decision to retain her on EOP level of care. The treatment plan was copied from one developed 12 days earlier and was not updated; the two goals identified in the plan were documented as already met. Distress tolerance skills training was the only intervention listed. Psychiatric care and groups were not included in the plan, and the patient's poor medication adherence was not targeted for interventions.

The primary clinician provided timely follow-up encounters. These were supportive in nature and did not reflect the provision of the distress tolerance skills directed by the treatment plan. It was unclear whether one of the encounters occurred in a confidential setting; the other encounter occurred at the cell front, and the reason for this location was not documented. The patient was offered one to four mental health groups most workdays. She was disruptive in one group and refused to attend most. A mental health evaluation for an RVR alleging unlawful influence found that mental illness did not contribute to the alleged behavior. On the second to last day of RHU EOP care at CIW, a medical provider documented that the patient was delusional because the patient stated she was getting married shortly and needed a Depo-Provera injection to avoid

becoming pregnant. After an enemy/safety investigation was cleared by custody, she transferred to RHU EOP care at CCWF on September 25, 2024.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The patient's psychiatric diagnoses remained unclear and unresolved during this episode of care. Despite the patient declaring multiple medical emergencies while in RHU EOP care, all with no medical findings, consideration of a somatization or personality disorder was not documented. The case formulation was not updated and did not address what helped improve the patient's symptoms and lacked clear conceptual linkage to the treatment plan. The treatment plan was deficient, was not updated, and did not address the patient's current clinical presentation adequately. Established goals were said to be already met. The plan did not guide treatment. There was no primary clinician documentation confirming that evidence-based care was provided. Insufficient efforts to understand and address the patient's anger, behavior, and treatment resistance were undertaken. The direction and goals of treatment were not clear.

**Patient FF**

This 34-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with opioid use disorder, moderate, and amphetamine-type substance use disorder, severe. She was prescribed oxcarbazepine and was adherent with this medication. Hydroxyzine and then buspirone were prescribed on an as-needed basis for anxiety, and she used these medications once or twice a day. Mirtazapine was prescribed PRN for insomnia, and she used this medication nightly. Olanzapine and ziprasidone were prescribed PRN for agitation, and an additional dose of oxcarbazepine was prescribed PRN for anxiety. The patient made daily or near daily use of these medications. Through the ISUDT services, she was prescribed buprenorphine-naloxone for opioid use disorder, and she was adherent with this medication. Medical conditions included severe obesity, hypothyroidism, human papilloma virus infection, constipation, and stress incontinence.

The patient had a history of childhood trauma, parental incarceration, depression, and substance use dating back to mid-adolescence, and psychiatric treatment in the community for attention-deficit/hyperactivity disorder. Two overdoses, both in 2020, were listed in the health record as non-suicidal in nature. Within the CDCR, the patient previously received 3CMS, MHCB, and EOP levels of care. At the time of RHU EOP care, she had been incarcerated in CDCR for over eight years.

The patient was transferred from mainline EOP to RHU EOP on December 30, 2024, and she remained in RHU EOP until February 13, 2025, when she returned to mainline EOP care at CIW. Three days prior to RHU EOP placement, she had been discharged from MHCB care, and five-day follow-ups continued in RHU EOP care through the sixth day after MHCB discharge. The safety plan was reviewed with the patient without modification during these encounters. The plan was not collaborative, complete, or helpful to the patient. The psychiatric assessment was timely and confidential, but minimal, and documentation was more consistent with a progress note than

with an assessment. The initial primary clinician assessment was timely and adequate in most respects. However, it did not indicate whether the assessment occurred in a confidential setting and did not update the case formulation, which continued to indicate that the patient would benefit from 3CMS care.

The initial IDTT occurred timely and was attended by the patient and required staff except the assigned psychiatrist, for whom an alternate attended. The patient met no criteria for consideration of a higher level of care. Although documentation of the patient's participation in the IDTT was adequate, the treatment plan was not. It was copied without modification from a plan developed in September 2024 during the patient's first MHCB placement. The plan identified suicidal ideation and substance use as treatment targets, both of which the patient denied, indicated that the goal associated with suicidal ideation had already been met, and indicated that substance use treatment would be continued once the patient was receiving outpatient level of care. Treatment targets, goals, and interventions were not updated to the patient's current clinical needs. Rationale for retaining the patient at the EOP level of care was not documented.

Following the initial IDTT, the psychiatrist saw the patient once every seven to ten days due to multiple requests from the patient for medication changes. Although not always clear from documentation, these encounters appeared to be confidential. Psychiatric documentation was sparse and inadequate, although reasons for medication changes were documented. Psychiatric diagnoses were not addressed beyond a notation of depression and psychosis, although the psychiatrist documented that psychotropic medications were being used to treat depression, anxiety, psychosis, and insomnia. The patient was seen timely by three assigned primary clinicians during her 45 days of RHU EOP care and complained about this turnover. These encounters were confidential and, depending on the clinician, either supportive or confrontational and judgmental. Evidence for the delivery of planned and structured interventions was scant, although one clinician provided psychoeducational materials and a journal to the patient. Supportive interventions that were provided appeared clinically appropriate but were not consistent with the treatment plan. The patient was offered mental health groups one to three times a day during the workweek, and she attended most of these.

Mental health assessments for RVRs alleging possession of a deadly weapon and unauthorized possession of drug paraphernalia found that mental illness did not contribute to the first but did contribute to the second alleged violation.

**Findings**

The care provided to this RHU EOP patient was inadequate.

Except for substance use disorders, the patient's psychiatric diagnoses were not identified during RHU EOP care, and there was no case formulation that offered hypotheses regarding what made her symptoms better, worse, or continue. Psychiatric and primary clinician contacts were frequent and confidential, but care was not driven by a treatment plan, and the treatment plan of record was not consistent with the patient's current clinical needs. Frequent changes in primary clinician assignment were disruptive to the therapeutic alliance, and progress notes were not always patient-centered. The rationale for retaining the patient at the EOP level of care was not documented, and

specific goals for RHU EOP treatment were lacking. The patient's heavy reliance on PRN medications was not adequately assessed or addressed.

**Patient GG**

This 37-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with unspecified bipolar and related disorder, borderline personality disorder, and opioid use disorder, severe, in early remission. Under a PC 2602 order for involuntary medication due to danger to others, she was prescribed lithium, olanzapine, propranolol, and sertraline. She was partially adherent with lithium and consistently adherent with olanzapine, propranolol, and sertraline. Hydroxyzine and an additional dose of olanzapine were prescribed on an as-needed basis for anxiety and agitation, respectively. She used the PRN olanzapine intermittently during the first half of her RHU EOP care and used hydroxyzine once or twice daily during the second half of her RHU EOP care. An additional dose of propranolol was prescribed as needed for akathisia and anxiety; she used this medication regularly throughout her RHU EOP care. Intramuscular olanzapine was ordered as a back-up in the event the patient refused oral medications, but the injection was not needed. Medical conditions included mid intermittent asthma and psoriasis of scalp. A 2023 finding of atypical squamous cells on Pap smear and a history of QTc prolongation due to hydroxyzine were also noted.

Little psychosocial information was provided in her RHU EOP mental health records. The patient had a history of childhood abuse and early-onset substance use. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient previously received 3CMS, MHCB, EOP, APP, and ICF level of care services. At the time of RHU EOP care, she had been incarcerated in CDCR for 11 months.

The patient received RHU EOP care at CIW between September 16, 2024 and November 7, 2024, having transferred from RHU EOP care at CCWF. The initial psychiatric assessment was timely, confidential, and adequate except with respect to psychiatric diagnoses. A diagnosis of unspecified bipolar disorder was made without documenting the rationale, and there was no consideration of personality disorder diagnoses despite an ongoing diagnosis of borderline personality disorder. The initial primary clinician assessment was timely but included minimal information and did not indicate whether the patient encounter for the assessment was confidential. The two-sentence case formulation was not updated from a prior assessment, focused on rule violations and antisocial traits, and did not address what made the patient's symptoms worse, better, or continue.

The initial IDTT meeting occurred timely and was attended by the patient and required staff. The patient was not found to meet any criteria for consideration of a higher level of care. Her participation in the IDTT meeting, strengths, and verbalized treatment goals were adequately documented. The treatment plan was adopted without modification from one developed earlier at CCWF, focused on medication adherence and assaultive behavior, and did not include psychiatric care or group treatment as interventions. The plan did not address the need for involuntary medication to address symptoms of serious mental illness. The patient was appropriately retained at the EOP level of care.

The assigned psychiatrist and assigned primary clinician provided regular follow-up encounters. Psychiatric progress notes were brief but minimally adequate. The dose of lithium was lowered due to the patient's concerns that lithium was causing her hair to fall out. The psychiatrist provided appropriate medication adherence counseling in response to the patient's nonadherence. A low dose of hydroxyzine was started on a PRN basis for anxiety with a notation that the patient had previously experienced QTc prolongation resulting in prior discontinuation of hydroxyzine. After hydroxyzine was started, an EKG found normal sinus rhythm. The primary clinician saw the patient once every five to ten days. Most encounters occurred on the yard or in another non-confidential setting. Apart from the first encounter, in which the provision of ground technique interventions was documented, primary clinician progress notes did not reflect the provision of planned or evidence-based treatment. Most encounters appeared to be brief and more consistent with wellness checks or focused case management regarding institutional issues than with treatment. The patient was offered one to four mental health groups on most workdays, and she actively participated in most of them. In an ICC meeting held on November 7, 2024, she was released from the RHU.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The initial primary clinician assessment was cursory and included minimal information. The case formulation was inadequate and failed to address the patient's need for involuntary medication or the patient's history of serious mental illness. The treatment plan was copied from earlier care and not updated; it did not reflect all the patient's current treatment needs. Diagnostic clarity and reconciliation of divergent diagnoses were not obtained; the primary clinician repeatedly documented the presence of anxiety, while the psychiatrist repeatedly documented an unspecified bipolar disorder. Most primary clinician encounters were brief, non-confidential, and consistent with wellness checks or case management rather than treatment. Strengths included the provision of adequate out-of-cell structured treatment activities, weekly psychiatric technician notes, and frequency of primary clinician and psychiatrist encounters.

**Patient HH**

This 42-year-old female-to-male transgender RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. He was diagnosed with schizoaffective disorder, bipolar type, posttraumatic stress disorder, attention-deficit/hyperactivity disorder, predominately hyperactive/impulsive type, and amphetamine-type substance use disorder, moderate, in sustained remission. He was prescribed atomoxetine, benztropine, escitalopram, haloperidol decanoate, and lithium, and was adherent with these medications. Hydroxyzine and olanzapine were prescribed on an as-needed basis for anxiety and agitation, respectively. He made rare use of hydroxyzine and no use of olanzapine. Medical conditions included obesity, hyperlipidemia, chronic obstructive pulmonary disease, gender dysphoria, migraine, allergic rhinitis, steatosis of liver, seizure disorder, hearing loss, xerostomia, hearing loss, vitamin D deficiency, gastroesophageal reflux disease, hyperprolactinemia, chondromalacia, tear of lateral meniscus of knee, history of arthroscopy of knee joint, synovial cyst of knee, and

osteoarthritis of knee. He used hearing aids, a walker, and a left knee brace, and he was receiving gender-affirming hormone treatment while in RHU EOP care.

The patient had a history of prolonged sexual abuse in childhood and adolescence, adolescent-onset substance use as a means of self-medicating, and multiple psychiatric hospitalizations in the community. Six suicide attempts and four instances of self-injurious behaviors were listed in the health record, ranging from 1994 through August 2024. Within the CDCR, the patient previously received 3CMS, EOP, MHCB, APP, and ICF level of care services. There was no history of involuntary treatment under PC 2602. At the time of RHU EOP care, he had been incarcerated in CDCR for three years.

The patient received RHU EOP care between November 12, 2024 and December 5, 2024. The initial psychiatric assessment was timely, confidential, and adequate except with respect to psychiatric diagnoses, which included both bipolar disorder and schizoaffective disorder without discussion. The initial primary clinician assessment was timely and adequate, but it did not indicate whether the assessment occurred in a confidential setting. The case formulation did not address symptoms of schizoaffective disorder. The initial IDTT meeting occurred timely and was attended by the patient and required staff. The patient did not meet any criteria for consideration of a higher level of care. The patient's participation in the meeting, strengths, and verbalized treatment goals were adequately documented. The treatment plan was adopted without modification from plans developed in March 2024 and August 2024, and two of the three goals had notations indicating that the goals had been met. Identification of substance use, medication nonadherence, self-injurious behaviors as treatment targets was historically accurate but not clinically indicated or accurate at the time of the IDTT meeting.

The primary clinician followed the patient weekly while the patient was receiving RHU EOP care. These contacts were timely and confidential, except on one occasion when the patient refused a confidential setting and was seen at cell front. As documented, clinician encounters were brief and supportive in nature. There was no evidence that planned or structured interventions were provided. On the eleventh day of RHU EOP care, the patient was agitated, yelling, observed responding to internal stimuli, incoherent, delusional in stating that he was getting married to "a real nice girl" that day, and awake throughout the previous night. While a primary clinician consultation was completed promptly, there is no evidence that the treating psychiatrist was informed of this development. Insufficient time passed for a routine psychiatric follow-up appointment to occur prior to the patient's release from RHU. At least ten hours of out-of-cell structured therapeutic activities were offered each week, and the patient attended about three-quarters of these groups. He was released to mainline EOP care at CIW following a December 5, 2024 ICC meeting.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The case formulation did not address psychotic symptoms, and a treatment plan relevant to the patient's current clinical presentation and treatment needs was not developed. The treatment plan included in the patient's RHU EOP record was not used to guide treatment. Primary clinician

encounters did not reflect the provision of planned, evidence-based interventions. There was no evidence that the episode of agitated behavior with psychotic symptoms was discussed with the psychiatrist so that medication changes might be considered. Neither the role of trauma in the patient's symptoms nor the role of transgender identity in the patient's mental health were adequately explored. Psychiatric diagnoses remained unreconciled and unclear during RHU EOP care.

**Patient II**

This 46-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CIW. She was diagnosed with bipolar I disorder, current or most recent episode manic, moderate, delusional disorder, cannabis use disorder, severe, cocaine use disorder, severe, and other hallucinogen use disorder, moderate. She was not prescribed psychotropic medications. Medical conditions included hepatitis C, hypothyroidism, hypertension, lipoma, dysmenorrhea, noncompliance with treatment, and cannabis, amphetamine, and heroin use disorders.

Due to the patient's guardedness and refusal of assessments, limited psychosocial information was available. The patient had a reported history of being poisoned and raped by a roommate in the community, as well as a history of involuntary psychiatric hospitalizations in the community and involuntary treatment at Patton State Hospital. Although she identified as a woman, she also identified herself as a Buddhist "monastery monk." Substance use began at age 15 and included intravenous drug use. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient previously received 3CMS and EOP levels of care; however, she had a lengthy history of refusing both medical and mental health care and refusing to share a cell with anyone. At the time of RHU 3CMS care, she had been incarcerated in CDCR for four years of an indeterminate life sentence and had not yet received involuntary treatment under a PC 2602 order.

On October 1, 2024, the patient was stepped down from the EOP level of care at CIW to the 3CMS level of care. She was simultaneously placed in RHU after refusing housing due to a fixed belief she could not cell with anyone because she would be raped and poisoned. She remained in RHU 3CMS care until October 10, 2024, when she was released from RHU and her level of care was returned to EOP. On the first day of 3CMS care, custody submitted an urgent mental health referral because the patient presented as not receptive, withdrawn, and antisocial. The mental health encounter in response to this referral was timely; there was no indication whether the encounter occurred in a confidential setting. No imminent warning signs for danger to self or others, no delusions or other signs of a psychotic or mood disorder, and no distressing mental health problems or concerns were identified. The clinician concluded that the patient did not meet criteria for a higher level of care, and the patient was released to custody. Upon being placed into RHU, the patient was seen by a psychiatric technician, who found her guarded, with pressured speech. The patient reported that she had a court order to house alone.

The patient refused to participate in initial psychiatric assessment, which was offered timely. The encounter occurred at the cell front and was brief; a provisional diagnosis of delusional disorder and noncompliance with treatment were noted. The patient also refused to participate in the initial

primary clinician assessment, which was offered twice and timely. The primary clinician assessment was minimal, with inadequate review of prior records and a deficient case formulation. The case formulation did not discuss the patient's multiple delusions that were on record at the time or the patient's Buddhist beliefs and practices, also well-documented at the time.

The patient was offered a timely primary clinician weekly encounter and a 90-minute mental health group, but she declined to participate in all offered treatment while simultaneously refusing all medical care and asserting that she did not have mental health problems. She declined to leave her cell for any reason, declined to shower, and declined to drink water unless she had purchased it in bottles. The initial 3CMS IDTT meeting occurred timely and was attended by the required staff but not the patient, who refused to participate. In the IDTT meeting, the patient was found to be unable to function adequately due to chronic psychiatric symptoms. She was referred to EOP level of care. The reasoning for this determination was not documented, and the case formulation continued to indicate that the patient was appropriately placed at the 3CMS level of care. The treatment plan was updated to include treatment nonadherence and substance use as treatment targets, but long-term goals for these targets were not measurable and confusingly were described in terms of interventions to be provided. She was placed in RHU EOP care for less than 24 hours and released from RHU the following day. The patient subsequently required MHCB and then APP care and involuntary treatment for significant impairment due to paranoia and delusional thinking.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

Although care was offered timely and in accordance with Program Guide requirements, the extent of the patient's functional impairments due to paranoia and delusional thinking was poorly assessed and not adequately appreciated upon the patient's placement in RHU 3CMS care. Both the primary clinician and the psychiatrist attempted to engage the patient at cell front to gain cooperation with initial assessments, but it was the consulting psychologist and RHU psychiatric technician who succeeded in engaging the patient in conversation. The consulting psychologist took the patient's denials of mental problems at face value; the psychiatric technician noticed more. Additional efforts were needed to engage the patient in the assessment process so that her psychosis could be better understood. The patient's capacity to make informed health care decisions, given her refusal of all medical care, also needed to be assessed. The case formulation and treatment plan were deficient. Documentation of the IDTT decision to refer the patient to EOP care was insufficient to determine the reasoning behind this decision, and it is unclear why MHCB or APP referrals were not considered, given the extent of the patient's delusional thinking, lack of insight, functional impairments, and need for treatment documented at the time. Strengths included the frequency of contacts, availability of RHU 3CMS group programming, and the relative speed with which the patient was referred to a higher level of care, albeit to a lower level of care than was clinically indicated.

**APPENDIX B-6**
**California Medical Facility (CMF)**
**Review Period: June 1, 2024 – November 30, 2024**

**Patient A**

This 59-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. The patient had a history of active combat and trauma while in the military and his son was also killed while serving in Iraq. He had a history of substance use. Mental health assessments consistently referenced three prior suicide attempts. He was psychiatrically hospitalized in the community following one of these attempts.

At CMF the patient was diagnosed with depressive disorder and posttraumatic stress disorder. Medical conditions included obesity, hyperlipidemia, hypertensive disorder, chronic kidney disease, and abdominal hernia. He was prescribed citalopram and was adherent with this medication. Hydroxyzine was prescribed on an as-needed basis for anxiety; the patient rarely used it. While the patient used methamphetamine at CMF in the weeks prior to the review period, the sole toxicology screen conducted during the review period was negative for illicit substances, and he was not a recipient of ISUDT services.

The patient was transferred to RHU EOP on July 8, 2024, after refusing mainline EOP housing. During the first eight days the patient was in RHU EOP care, the patient received a prompt and adequate psychiatric evaluation completed by telepsychiatry, one primary clinician wellness check at the cell front after refusing a confidential encounter, and two groups, both of which he refused. On July 15, 2024 he reported suicidal ideation with a plan, was seen by a primary clinician and then a member of the CIT team and was referred to the MHCB. A suicide risk assessment found the patient at high acute and high chronic risk for suicide. He remained in RHU EOP until July 16, 2024, when he was placed in MHCB care for ten days due to suicidal ideation.

The patient returned to RHU EOP care on July 26, 2024, and remained there for the remainder of the review period. Upon his return, the post-MHCB discharge five-day follow-ups were completed for the first seven days. An initial psychiatric assessment was completed by telepsychiatry two days after the patient's return; the assessment was confidential and adequate. The initial primary clinician assessment was completed late, involved only a cell-front contact, and was cursory and incomplete. The initial IDTT meeting also occurred late and was attended by required staff, although no senior psychologist supervisor attended. The patient declined to attend the treatment team meeting. The treatment plan identified negative thinking and depression as treatment targets. CBT and DBT emotion regulation were identified as interventions; psychiatric care and group programming were not referenced. Short-term objectives were incomplete, long-term goals were not measurable, and there was no case formulation to guide the plan.

Most psychiatric encounters were confidential except when the patient refused and was seen at the cell front. He did not want to leave his RHU cell due to concerns custody staff would return him to mainline EOP, where he had safety concerns. The patient was offered routine psychiatric follow-up appointments one to two times a month with two of nine psychiatric encounters completed via telepsychiatry. Psychiatry monitored the patient's symptoms and functioning

adequately and continued the patient's medications without modification; however, multiple psychiatric diagnoses were provided but not reconciled or specified. Further, due to the patient's history of QTc prolongation, the treating psychiatrist ordered a routine EKG on September 9, 2024 and again on November 5, 2024, but the EKG had not been completed as of January 24, 2025.

Weekly primary clinician encounters were timely but almost always occurred at the cell front. The primary clinician regularly attempted to see the patient out of cell in confidential settings. With few exceptions, the patient refused to leave his cell, citing concern that he would be moved to mainline housing or exposed to mainline peers. As such, he was placed on the high treatment refuser list and primary clinicians met with the patient at cell front nearly daily during October and November 2024.

Regarding structured therapeutic activities, only recreation therapy groups were offered to this patient in the RHU EOP. During August and September 2024, the patient was offered only six to seven groups each month, and he refused all but one. However, between October and December 2024, he was offered seven to ten groups each month, and he attended most. Unfortunately, in early November 2024, he reported that group sessions were often cancelled as he was frequently the only patient willing to attend.

**Findings**

The RHU EOP care provided to this patient was inadequate.

The care provided during the first eight days of the patient's RHU EOP placement in early July 2024 was inadequate, apart from a timely telepsychiatry assessment. No documented efforts were made to encourage out-of-cell treatment, despite the patient's consistent refusal, and his mental status deteriorated rapidly, leading to emergent MHCB placement for active suicidal ideation with a plan. From August to December 2024, the care in RHU EOP remained inadequate, except for psychiatric services. Critical deficiencies included the failure to complete an EKG despite the patient's history of QTc prolongation, unresolved divergent diagnoses, and a deficient primary clinician assessment and treatment plan. Documented efforts to engage the patient in out-of-cell treatment using evidence-based interventions were insufficient, interventions listed in the treatment plan were not delivered, and the patient did not have access to the required minimum hours of out-of-cell structured programming. No senior psychologist supervisor participated in the IDTT, and the suicide risk overview and history sections of the health record were not updated to accurately reflect the patient's suicide risk.

**Patient B**

This 41-year-old RHU EOP transgender patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. The patient had a reported history of sexual and physical abuse, exposure to domestic violence, paternal incarceration, learning disability, special education, school expulsion, juvenile detention, group homes, gang affiliation, and substance use. She had used methamphetamine and heroin intravenously in the past, but in 2024 she reported that she had been abstinent for four years. Four instances of suicidal or self-injurious behaviors were listed in the health record, the most recent of which occurred on August

8, 2024, in MHCB care and involved wrapping headphone wires around her neck while being assessed by a psychologist. Additional episodes of self-injurious behaviors were documented in suicide risk assessments. Within the CDCR, the patient received 3CMS, MHCB, EOP, EOP Mod, APP, and ICF levels of care. She was previously treated with other antidepressant and antipsychotic medications and requested intramuscular medication when agitated. A history of disciplinary infractions, smearing feces, reporting auditory hallucinations and suicidal ideation, and conflicts with custody was documented. As of 2024 she had been in prison for 11 years.

The patient transferred to CMF on August 2, 2024. She was diagnosed with gender dysphoria, major depressive disorder, recurrent, moderate, and antisocial personality disorder. Complex posttraumatic stress disorder was later diagnosed but not added to the mental health problems section of the health record. She was initially prescribed aripiprazole, escitalopram, and valproic acid, and she was adherent with these medications except valproic acid, which was discontinued. She was later prescribed aripiprazole, diphenhydramine, and sertraline. She was adherent with these medications except sertraline, with which she was adherent about 82 percent of the time. Hydroxyzine was prescribed on an as-needed basis for anxiety, but she rarely used this medication, and it was discontinued. Through the ISUDT, she was prescribed buprenorphine-naloxone; toxicology screens indicated medication adherence and abstinence from illicit substances. The patient also had numerous medical conditions, including but not limited to diabetes, neuropathy, glaucoma, hyperlipidemia, hypertension, edema of lower extremity, obstructive sleep apnea, hypothyroidism, hypotestosteronemia, anemia, and seizure disorder. A history of opioid use disorder and cervical spinal surgery for astrocytoma were noted, and she was treated for hyperkalemia during the review period. Additionally, the patient had mobility and hearing impairments and was reportedly blind, although she could maintain eye contact and follow movement in her visual field. She had a long list of durable medical equipment, and used a wheelchair, tapping cane, hearing aids, and dentures. Gender-affirming hormone treatment was initiated following the end of the review period.

During the review period, the patient accrued multiple RVRs. RVR mental health assessments consistently found that mental illness did not contribute to the alleged behaviors and that the alleged behaviors were volitional, planned, associated with a disregard for their consequences, and driven by a personality disorder. However, several assessments additionally opined that the patient's decreasing sense of safety, secondary either to her declining health or to her perception that she was targeted because she was transgender, may have been relevant to her violent behavior.

On the date of arrival at CMF for EOP care, the patient required MHCB care after breaking cell windows and voicing suicidal ideation with a plan to hang herself. She subsequently indicated her behavior was motivated by a desire to avoid EOP housing units where she feared custody reprisal due to past conflicts. She was discharged from MHCB to RHU EOP services three days later, immediately reported chest pain and anxiety, threatened to smear feces, break windows, and disrupt the housing unit, and then started a fire in her cell. She was placed on suicide watch in alternative housing on August 5, 2024, re-admitted to the MHCB the following day, and discharged to RHU EOP on August 8, 2024. She remained in RHU EOP care through September 30, 2024, returned to MHCB care from September 30 through November 20, 2024, and returned to RHU EOP care from November 20 through the end of the year.

Following her placement in RHU EOP on August 8, 2024, the patient received five-day follow-ups for the first seven days. None of these encounters occurred in a confidential setting or reviewed the safety plan developed during her MHCB stay; the safety plan itself was also deficient. The initial psychiatric assessment was conducted by telepsychiatry, occurred timely and in a confidential setting, and was adequate. The initial primary clinician assessment was developed a few minutes before the initial IDTT meeting, was cursory and incomplete, and did not indicate whether the encounter was confidential.

The initial IDTT meeting occurred timely and was attended by required staff except for a senior psychologist supervisor. The patient declined to attend. Regarding the patient's treatment plan, the case formulation was deficient, the patient's strengths and verbalized treatment goals were not documented, and the treatment plan lacked short-term objectives, a measurable long-term goal, and goal initiation dates. A rationale for retaining the patient in EOP care was adequately documented in the clinical summary section. The 30-day IDTT meeting occurred two days late but was attended by the patient and all required staff, except for the senior psychologist supervisor. The clinical summary, case formulation, and treatment plan were not updated on this date, and the patient's strengths and verbalized treatment goals remained undocumented. There was no documentation regarding any discussion during the 30-day IDTT meeting and no documentation regarding the patient's progress. There was also no documentation indicating that non-pharmacological interventions identified in the treatment plan were implemented.

During RHU EOP placement between August 8, 2024 and September 30, 2024, the patient was seen timely by psychiatry; the encounter was confidential, occurred by telepsychiatry, and resulted in collaborative changes to her medications. The primary clinician documented timely attempts to see the patient, but the patient frequently refused, and the primary clinician failed to document follow-up wellness checks for a number of these refusals.

On September 30, 2024, the patient was readmitted to the MHCB after being found at high acute risk for suicide, again reporting a plan to hang herself. She was discharged from the MHCB on October 10, 2024. After returning to the RHU EOP, the five-day follow-up was not completed as required. Follow-up on the second day did not occur, and only two of the six completed encounters occurred in a confidential setting. The initial psychiatric assessment was timely and thorough but did not indicate whether it was confidential. The initial primary clinician assessment was timely, confidential, and adequate apart from the case formulation, which was deficient. The initial IDTT meeting occurred timely and was attended by the patient and required staff. Patient strengths and verbalized treatment goals were adequately documented. The treatment plan was updated and clinically appropriate, although long-term goals were poorly operationalized, and psychiatric care and group programming were not mentioned. Further, there was no documentation indicating that the interventions identified in the treatment plan were implemented.

In the RHU EOP, between November 21, 2024 and December 31, 2024, the psychiatrist saw the patient timely, in a confidential setting, via telepsychiatry. The encounter reflected collaborative care, but an unspecified diagnosis of mood disorder was added without explanation. The patient was followed timely by the primary clinician, but most contacts occurred at the cell front due to refusals. In mid-December, the patient was placed on the high refuser list due to infrequent participation in groups, and the primary clinician offered daily encounters.

**Findings**

The care provided to this RHU EOP patient was inadequate.

During the two RHU EOP placements, case formulation and treatment planning were deficient, and a senior psychologist supervisor was not present at either IDTT meeting. The post MHCB five-day follow up was noncompliant, divergent psychiatric diagnoses were not resolved, and non-pharmacological treatment for the diagnosis of complex posttraumatic stress disorder was not formulated. Preferred pronouns (she/her) were used only intermittently by mental health staff, and the potential roles of trauma, transgender identity, and gender dysphoria were not addressed in treatment planning and rarely addressed in treatment encounters. The relationship between her medical conditions and her mental health presentation was not adequately considered. Structured cognitive-behavioral treatment for the diagnosed personality disorder and behaviors resulting in frequent RVRs was clinically indicated but not offered. Most individual encounters with the primary clinician were not confidential. The patient also lacked access to the required minimum hours of out-of-cell structured programming while in the RHU. During the initial 53-day RHU EOP placement, the patient was offered only eleven group sessions, and during the second 40-day placement, only ten group sessions. No groups were documented between November 25 and December 24, 2024. Furthermore, most recreational groups consisted of cinema therapy or watching sports or documentaries, providing little therapeutic value.

**Patient C**

This 43-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. The patient had a history of childhood exposure to domestic violence, prolonged sexual abuse, early gang involvement, juvenile detention, special education and psychiatric treatment for behavioral problems, and substance use. One overdose in 2019 without fatal intent was listed in the health record. Within the CDCR, the patient received 3CMS, MHCB, and EOP levels of care. He was serving an indeterminate life sentence and by 2024 had been in prison for four years.

He was diagnosed with major depressive disorder, recurrent, severe with psychotic features, antisocial personality disorder, and opioid use disorder. He was prescribed duloxetine, olanzapine, prazosin, and risperidone and was adherent with these medications. Haloperidol, hydroxyzine, and benztropine were prescribed on an as-needed basis for agitation, anxiety, and extrapyramidal symptoms; the patient used haloperidol and benztropine only once and hydroxyzine only twice during the review period. Through the ISUDT, he was prescribed buprenorphine-naloxone. Toxicology screens were positive for non-prescribed morphine or other opiates on two occasions during the review period. They indicated adherence with buprenorphine-naloxone, and no other illicit substance use was detected.

The patient had three RHU EOP placements at CMF during the review period that were separated by two MHCB admissions within the facility for danger to self and others. The patient was in the RHU EOP from August 15, 2024 through September 27, 2024, from October 7, 2024 through

November 22, 2024, and from December 2, 2024 through December 30, 2024. He subsequently transferred to another facility.

During the first RHU EOP placement, the initial IDTT occurred on time and was attended by the patient and required staff, excluding a senior psychologist supervisor. The IDTT included the inaccurate case formulation from the primary clinician and failed to document patient strengths or verbalized treatment goals. The treatment plan was deficient, lacking a short-term objective, including a vague long-term goal (reducing depression below an eight on an unnamed scale), and identifying only DBT emotion regulation as an intervention. During the second RHU EOP placement, the initial IDTT occurred one day late and was attended by required staff, except for the missing senior psychologist supervisor. The patient declined to attend, and patient strengths and verbalized treatment goals were again not documented. The treatment plan targeted depression included a measurable long-term goal and introduced CBT concepts as the sole intervention but failed to include psychiatric care or group programming. During the third RHU EOP placement, the initial IDTT was late and attended by required staff, except for the absent senior psychologist supervisor. The patient again declined to attend, and patient strengths and verbalized treatment goals were not documented. The treatment plan targeted depression and anxiety, included a measurable long-term goal, and updated interventions but still omitted psychiatric care and group programming.

Regarding psychiatric assessments and care, during the first RHU EOP placement, the initial psychiatric assessment and follow-up were timely, confidential, and conducted via telepsychiatry. The initial assessment simplified the patient's medication regimen with documented rationale, while the follow-up resulted in a medication adjustment for anxiety. During the second RHU EOP placement, the initial psychiatric assessment was timely, confidential, and thorough, documenting working diagnoses of complex posttraumatic stress disorder and stimulant use disorder. The follow-up appointment was also timely and confidential, but no medication changes were made. During the third RHU EOP placement, the initial psychiatric assessment was timely but brief, conducted at the cell front, continued the rule-out diagnoses of complex posttraumatic stress disorder and stimulant use disorder with no medication changes. The psychiatrist attempted a confidential follow-up the next day, but the patient requested to be seen in the yard. The patient was transferred to another facility before his next psychiatric follow-up appointment.

During the first RHU EOP placement, the initial primary clinician assessment was timely but cursory, incomplete, and inaccurately indicated the patient was appropriate for 3CMS care. It did not specify whether the encounter was confidential. The primary clinician and a psychology practicum student provided timely, confidential follow-up encounters and documented the implementation of treatment plan interventions. During the second RHU EOP placement, the initial assessment was timely but incomplete, without a mental status exam or updates beyond the clinical summary and case formulation. Confidential and timely individual encounters by the primary clinician and a practicum student occurred, with interventions from the treatment plan documented as implemented. A second psychology intern conducted extensive testing and interviews, but the results were not documented. During the third RHU EOP placement, the initial primary clinician assessment was late, lacked clarity on confidentiality, and consisted solely of an updated clinical summary and case formulation. It was unclear whether the patient was

interviewed for the assessment. The practicum student provided timely individual encounters, mostly in confidential settings, except for two instances when the patient refused confidentiality.

Structured programming in the RHU EOP consistently failed to meet the required minimum of ten weekly hours. During the first RHU EOP placement of 43 days, the patient was offered four recreational therapy groups and attended all four. During the second RHU EOP placement of 46 days, the patient was offered five recreational therapy groups and attended all five. During the third RHU EOP placement of 29 days, the patient was offered nine recreational therapy groups and attended three or four.

During the review period, the patient received an RVR for battery of a peace officer. The accompanying RVR mental health assessment determined that mental illness contributed to the behavior but concluded it was more likely driven by situational factors.

**Findings**

The care provided to this RHU EOP patient was inadequate.

Despite generally adequate psychiatric care and some improvement over time, provided treatment in the RHU EOP did not align with the patient's level of care, restricted housing placement, or treatment needs/goals. Unresolved diagnostic uncertainties, treatment plan deficiencies, and missing critical information in some clinical documents highlighted gaps in care. The most significant concern was the patient's limited access to out-of-cell therapeutic activities during RHU EOP placement. Over the combined total of 118 days in the RHU EOP, the patient was offered only 18 recreational therapy groups, well below the required minimum of ten weekly hours of structured out-of-cell therapeutic activities. The patient psychiatrically decompensated twice during this time, requiring two MHCB admissions.

**Patient D**

This 48-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided in the RHU EOP at CMF. The patient had a history of physical, sexual, and emotional abuse as a child, substance use starting in adolescence, homelessness, and psychiatric hospitalizations for danger to self and trial competency assessment. One suicide attempt by overdose in February 2024 was listed in the health record; the patient reported multiple attempts by overdose, hanging, and cutting. Within CDCR, the patient had received care in 3CMS and EOP, with EOP first initiated during his second sentence on October 2, 2024. There was no history of involuntary treatment under PC 2602.

At CMF, the patient was diagnosed with schizoaffective disorder, bipolar type. He was prescribed buspirone, hydroxyzine, mirtazapine, olanzapine, sertraline, and duloxetine, and he was adherent with these medications. Through the ISUDT, he was prescribed buprenorphine-naloxone, and the single toxicology screen available for the relevant period indicated medication adherence and abstinence from illicit substance use. The patient had complex medical issues and required a wheelchair.

The patient was placed in RHU EOP care at CMF from December 2, 2024 through January 8, 2025. During the nursing RHU pre-placement screening, the patient reported suicidal ideation, and he was immediately assessed by the on-call CIT psychologist and found to be a low risk for suicide. The patient's suicidal statements were determined to be associated with distress regarding housing, and he was found safe for placement in RHU.

The initial psychiatric assessment was timely, confidential, and adequate. It included a rule out diagnosis of complex posttraumatic stress disorder, along with historical diagnoses of schizoaffective disorder, polysubstance abuse [sic], and opioid use disorder. Medications were continued without change. The initial primary clinician assessment was late, completed just before the initial IDTT meeting, relied almost exclusively on content from prior assessments, and was insufficient for determining whether the clinician interviewed the patient. The initial IDTT meeting occurred late and was attended by the patient and required staff except for a senior psychologist supervisor. A treatment plan was not developed for this patient during RHU EOP placement.

A follow-up psychiatric encounter occurred timely in a confidential setting through telepsychiatry. The provider assessed the patient as stable and continued medications without changes. The patient was followed timely by primary clinicians and a psychology intern through the end of the year. Most encounters were confidential, but two occurred at the cell front due to refusal. Except for the intern's progress notes, documentation of therapeutic interventions was scant and consistent with brief wellness checks. The father's death was noted but not explored; the father had perpetrated much of the patient's physical and emotional abuse when he was a child.

The first recreational group did not occur until 22 days after the patient's entry into RHU EOP care on December 24, 2024, with a total of ten recreational groups offered through the end of the year. Although the patient was placed on the high refuser list near the end of December 2024, group progress notes did not consistently indicate whether the patient attended. Further, the patient insisted he was attending groups but not going to the yard because of weather conditions.

**Findings**

The care provided to this RHU EOP patient was inadequate.

This record review highlighted serious documentation issues and a general absence of treatment planning and interventions beyond pharmacological interventions in the RHU EOP. The primary clinician performed a deficient initial assessment and conducted only brief wellness-check-like encounters without interventions tailored to the patient's needs. IDTTs were non-compliant in terms of timeliness and required attendees. Further, the treatment team failed to develop a treatment plan as required, and providers did not appropriately explore and address the rule-out diagnosis of PTSD, the patient's abuse history, and the impact of his father's death. Additionally, structured out-of-cell groups were delayed, failed to meet the required minimum hours for RHU EOP, and were not tailored to the patient's treatment needs.

**Patient E**

This 40-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. The patient had a childhood history of physical abuse, exposure to violence, paternal death, maternal incarceration, juvenile detention, gang involvement, and substance use, along with two suicides among family members. As an adult, he reported chronic intermittent suicidal ideation, and he signed a DNR directive earlier in 2024. Two suicide attempts were listed in the health record, with the most recent in April 2024. He was serving an indeterminate life sentence and as of 2024 had been in prison for 16 years.

At CMF, the patient was diagnosed with an unspecified mood disorder, unspecified schizophrenia spectrum and other psychotic disorder, amphetamine-type (or other stimulant) substance-induced psychotic disorder, with moderate or severe substance use, and extrapyramidal disease. He was prescribed benztropine, fluoxetine, and olanzapine. He was adherent with these medications until early December 2024, when he began refusing them. Diphenhydramine was prescribed on an as-needed basis for anxiety and insomnia, and an additional dose of olanzapine was prescribed as-needed for dysregulated mood and agitation. The patient made regular use of diphenhydramine but used PRN olanzapine only once. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder; he was adherent with this medication until mid-December 2024, when he began refusing it. Toxicology screens were negative for illicit substances during his RHU EOP care.

The patient was issued multiple RVRs, including for possession of a deadly weapon, indecent exposure without prior convictions, resisting staff, and battery on a peace officer. Despite RVR MHAs finding that the patient's psychotic symptoms contributed to the alleged behaviors, he was found guilty, which resulted in his continued RHU EOP placement.

The patient was placed in RHU EOP care at CMF on October 11, 2024, after being discharged from acute care at CMF-PIP. He remained in RHU EOP care through December 31, 2024, when he was transferred to another facility. Following his placement in RHU EOP care, five-day follow-ups occurred timely for the first six days; three of these encounters occurred in a confidential setting. One follow-up encounter note was thorough, but another indicated incorrectly that the patient was not prescribed psychotropic medications.

The initial IDTT meeting occurred on time and was attended by the patient and required staff, except for a senior psychologist supervisor. However, the IDTT did not develop an individualized or clinically appropriate treatment plan for the current setting and level of care. Instead, the team copied the CMF-PIP treatment plan, which had been designed for acute care and included goals that had already been met prior to discharge.

The initial psychiatric assessment was timely and adequate, but it failed to indicate whether the encounter occurred in a confidential setting. Working diagnoses of complex posttraumatic stress disorder, stimulant use disorder, and opioid use disorder were added. Olanzapine was continued, and treatment with fluoxetine and benztropine was started. The psychiatrist followed the patient timely and saw him twice. The first encounter was confidential and resulted in an increase in the fluoxetine dose for treatment of posttraumatic stress disorder. The second encounter, for medication non-adherence counseling, occurred shortly after the patient began refusing benztropine, fluoxetine, and olanzapine. The patient refused a confidential setting, and the

encounter occurred at the cell front. The patient insisted discontinuation of psychiatric medications, and after the psychiatrist consulted with unit staff and the primary clinician, medications were discontinued.

The initial primary clinician assessment was timely, confidential, and thorough. The patient was followed timely by primary clinicians and a psychology intern through the end of the year. Most encounters occurred at the cell front due to the patient's refusals of confidential settings. His refusal of individual and group treatment coincided with his refusal of psychotropic medications. The quality of primary clinician documentation was variable. DBT skills training was documented in some sessions, while other sessions were brief wellness checks. In mid-December, 2024, the patient was placed on the high refuser list. At that time, the patient reported there was no point in attending groups because he was being transferred to a different facility.

Structured out-of-cell group treatment was documented only infrequently, with no group sessions documented between November 25, 2024 and December 24, 2024. During the 81 days of his RHU EOP care at CMF, only nine recreational groups were documented, of which he attended three.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The treatment team did not develop a current or clinically appropriate treatment plan during the patient's RHU EOP placement, and a senior psychologist supervisor did not attend the IDTT. The working diagnosis of complex posttraumatic stress disorder, along with other divergent diagnoses, was not addressed. Additionally, when psychotropic medications were discontinued, there was no documentation indicating the psychiatrist was aware of the patient's history of decompensating during periods of medication nonadherence and illicit substance use. Primary clinician encounters lacked a consistent treatment focus, likely due to the absence of a guiding treatment plan. Most encounters occurred non-confidentially at the cell front, and the patient did not receive the required minimum hours of structured therapeutic activities. Available group programming was insufficient and consisted primarily of cinema therapy or watching sports and documentaries, with no groups tailored to the patient's clinical needs.

**Patient F**

This 40-year-old RHU EOP transgender patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. The patient had a history of childhood abuse and, within the CDCR, a lengthy history of seeking medication and reporting suicidal ideation. A suicide attempt by hanging and three episodes of self-injurious behavior were listed in the health record, with many additional episodes of suicidal ideation, self-harm, and self-reported overdoses documented in progress notes. As of 2024, the patient had been in prison for eight years.

At CMF, the patient was diagnosed with schizoaffective disorder, bipolar type, posttraumatic stress disorder, sedative, hypnotic, or anxiolytic use disorder, and antisocial and histrionic personality disorders. Psychiatric assessments added diagnoses of borderline personality disorder and opioid use disorder, but these were not included in the mental health problems section of the health record.

The patient was prescribed aripiprazole, desvenlafaxine, hydroxyzine, long-acting injectable paliperidone, risperidone, and trazodone, but was only adherent with trazodone. Intramuscular diphenhydramine was prescribed on an as-needed basis for extrapyramidal symptoms, and she received this injection more than a dozen times during her RHU EOP care before it was discontinued. Intramuscular chlorpromazine was prescribed as needed for anxiety; she received this injection once. Hydroxyzine and additional doses of risperidone were prescribed as needed for agitation, and she used these medications occasionally. At the end of December 2024, she began to receive buprenorphine-naloxone for opioid use disorder through participation in ISUDT. She was also prescribed gender-affirming hormone treatment. Documented medical conditions included transgender identity, gender dysphoria, chronic pain syndrome, seizure disorder, tachycardia, and extrapyramidal syndrome.

The patient was placed in RHU EOP care at CMF on October 16, 2024, after being discharged from CMF's MHCB earlier that day. Between October 16 and December 31, 2024, she was transferred to MHCB care or placed in alternative housing on ten occasions due to suicidal threats or behavior, each time briefly returning to RHU EOP care. Periods in the MHCB or alternative housing lasted from a few hours to three days. She required emergency room care twice for self-reported overdoses, both with negative lab results, and multiple emergent contacts for repeated chest pain complaints. Over two dozen suicide risk evaluations were completed, at times just hours apart, with most concluding moderate suicide risk. Suicide risk severity declined overall from high to low during this period, as did the frequency and duration of MHCB placements. Five-day follow-ups were ordered three times and completed as scheduled except for one instance where a contact was missed. Safety plans varied in quality, ranging from inadequate to thoughtful and collaborative.

The patient accrued multiple RVRs before and during RHU EOP placement, including for delaying a peace officer, destruction of property, battery on a peace officer, making threats, and indecent exposure. All RVR mental health assessments determined the behaviors were not influenced by mental illness but were deliberate attempts to force a transfer to a higher level of care where the patient's significant other was housed.

The frequent transitions between RHU EOP and MHCB resulted in two initial psychiatric assessments being completed, both timely and adequate but lacking documentation of confidentiality. Both included a rule-out diagnosis of complex PTSD. Timely psychiatric follow-ups occurred in confidential settings and were adequately documented, with one conducted via telepsychiatry. Additionally, psychiatric consultations were provided by telephone or telepsychiatry in response to behavioral crises and/or patient requests for sedating medications. Providers appropriately monitored the patient's response to medications and lack of adherence, with clear documentation of rationale for medication changes. However, orders for desvenlafaxine and PRN risperidone expired, resulting in a five-day lapse before being restarted.

An initial primary clinician assessment started in October 2024 was never completed. The first completed primary clinician assessment occurred over a month later on November 25, 2024, following the patient's most recent MHCB discharge by 20 days, and this assessment was limited to an updated clinical summary and case formulation. Primary clinicians maintained regular contact with the patient through timely, confidential follow-ups, and documented skills training,

limit setting, and supportive interventions for emotional dysregulation. A PBST consultation occurred, but no follow up results or behavior plans were documented. One progress note identified a goal of reducing the patient's MHCB care needs.

The initial IDTT meeting, conducted on November 26, 2024, was late, lacked attendance by a senior psychologist supervisor, and was declined by the patient. Patient strengths and treatment goals were not documented. The treatment plan was incomplete, copied from the MHCB plan, and failed to incorporate short-term objectives, long-term goals, or updates on the patient's response to treatment. It excluded psychiatric care as an intervention and lacked criteria for discharge from EOP. Additionally, documentation of planned interventions, such as CBT and distress tolerance skills training, were generic and inadequately individualized.

In the RHU EOP, only recreational therapy groups were available; however, these groups were not offered in October 2024, increased to two in November, and eight in December. The patient did not attend any group sessions.

**Findings**

The care provided to this RHU EOP patient was inadequate.

While significant resources were used to ensure the patient's safety, and mental health staff showed a commendable, principled approach to address her problematic behaviors and demands on resources over time, there were significant care deficiencies in the RHU EOP that compromised the overall quality of care. These shortcomings included a significant delay in completing the initial primary clinician assessment, which was ultimately limited to an incomplete update; an inadequate treatment plan that lacked treatment goals and failed to address the patient's misuse of suicidal statements; insufficient follow through on a behavior plan referenced in progress notes; inconsistent and unresolved psychiatric diagnoses; the absence of a senior psychologist supervisor at the IDTT meeting; and a lack of access to required minimum hours of out-of-cell structured treatment and core clinical groups. Moreover, recreational therapy offered in the RHU EOP was generally limited to watching sports or documentaries.

**Patient G**

This 55-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. The patient had a history of childhood emotional and physical abuse, maternal substance use, foster care, group home placements, juvenile detention, early and prolonged substance use, and gang affiliation. As an adult he experienced periods of homelessness and was previously incarcerated in prison. Three suicide attempts were listed in the health record, the most recent of which occurred in 2017. He reported intravenous methamphetamine use at another facility earlier in 2024. Within CDCR, the patient had placements in 3CMS, EOP, and MHCB levels of care. He was serving an indeterminate life sentence and had been in prison almost two years prior to RHU EOP placement.

At CMF, the patient was diagnosed with unspecified depressive disorder and unspecified schizophrenia spectrum and other psychotic disorder, although these diagnoses were not listed in

the mental health problems section of the health record. He was prescribed aripiprazole and mirtazapine and was adherent with these medications. Hydroxyzine was prescribed on an as-needed basis for anxiety, and he used this medication sporadically. Through the ISUDT, he was prescribed buprenorphine-naloxone, and toxicology screens indicated medication adherence and abstinence from illicit substances. Staff, however, suspected active substance use based on the patient's presentation. The patient had been issued a cane and walker to ambulate.

The patient was placed in CMF's RHU EOP on August 22, 2024. Between then and the end of the year, he was placed in alternative housing or MHCB care on five occasions, returning to RHU EOP care each time. While stays in alternative housing were brief, his four MHCB stays lasted ten to 14 days and were prompted by suicidal or homicidal ideation with psychotic symptoms. Six suicide risk evaluations were completed during this period, with three assessing his risk as high, two as moderate, and one as low. Notably, the low-risk assessment was followed the same day by another evaluation that determined the patient was at high risk. Five-day follow-ups occurred as required except on October 26, 2024 and December 6, 2024, when no encounter was documented.

During the first eight days of the patient's RHU EOP care in August 2024, he refused to see the psychiatrist for an initial assessment on three occasions, and no assessment was completed that month. Subsequently, initial psychiatric assessments were completed after each of the patient's four MHCB discharges. All four assessments were timely and adequate, but only two were conducted in a confidential setting, as the patient declined confidentiality for the others, resulting in cell-front assessments. These assessments included working diagnoses of complex posttraumatic stress disorder, rule-out mood disorder, and referenced historical diagnoses of alcohol, opioid, PCP, and amphetamine-like use disorders. While in RHU EOP care, psychiatric follow ups were generally adequate. From September through November 2024, RHU EOP placement periods between MHCB stays were too brief to require psychiatric follow-ups; however, psychiatry completed required initial assessments during this timeframe. After the fourth MHCB discharge in early December 2024, the patient was seen timely and confidentially via telepsychiatry for a follow-up psychiatric appointment, resulting in an increased antipsychotic dosage.

Initial primary clinician assessments were completed timely on four occasions but were limited to updating the clinical summary and case formulation without the patient's participation. The clinical content in the third and fourth assessments was identical, despite being conducted before and after the fourth MHCB stay. Follow-up contacts by the primary clinician were timely, with one exception, and most were completed as brief non-confidential contacts at cell-front due to patient refusal. Despite the patient's disengagement, the primary clinician made appropriate attempts to provide skills training focused on managing depression, suicidal ideation, and auditory hallucinations.

Initial IDTT meetings occurred twice during the review period and were timely following MHCB discharges, but both lacked attendance from a senior psychologist supervisor. The patient attended the first meeting but refused the second. The RHU EOP treatment plan was copied directly from the MHCB plan without modification, and the plan did not identify patient strengths. Further, depression and psychosis were not identified as treatment targets, despite documentation and treatment of related symptoms referenced in other clinical documents. Instead, the RHU EOP

treatment plan focused on poor frustration and distress tolerance and substance use, and it did not include psychiatric care as a treatment intervention.

Progress notes suggested that only recreational therapy groups were available in the RHU EOP. The first documented group occurred on November 15, 2024, three weeks after the patient's third MHCB discharge. Two recreational therapy groups were documented in November 2024, and seven were documented in December 2024.

**Findings**

The RHU EOP care provided to this patient was inadequate.

Multiple psychiatric diagnoses remained unresolved, and the impact of suspected substance use on the patient's symptoms was not adequately investigated. None of the initial primary clinician assessments involved interviews with the patient, and the brief updates were insufficient to guide meaningful treatment. Most primary clinician contacts were completed as brief nonconfidential cell front encounters. The treatment plan, copied directly from the MHCB setting, was not modified, updated, or tailored to address the patient's suicide risk, depression, psychotic symptoms, or disengagement from non-pharmacological treatment. Neither of the IDTT meetings included a senior psychologist supervisor. The patient's frequent MHCB admissions and high rates of treatment refusal indicated that RHU EOP care was insufficient for maintaining stabilization, which warranted an IDTT higher level of care discussion and a thorough revision of the treatment plan to better address the patient's needs. Additionally, the patient did not have access to clinically meaningful groups tailored to his treatment needs or the required minimum hours of structured activities while confined in the RHU EOP. Recreational therapy groups were generally limited to watching sports or documentaries.

**Patient H**

This 35-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. As an adult, he was diagnosed with posttraumatic stress disorder a year after his discharge from the U.S. Army. He reported a history of three suicide attempts, with at least one inpatient psychiatric hospitalization in the community, and two sibling suicides. Two additional episodes of head-banging were listed in the health record, both occurring in July 2024. He had an extensive history of substance use and, prior to RHU EOP placement, became assaultive when intoxicated or withdrawing from spice.

At CMF, the patient was diagnosed with unspecified bipolar and related disorder and unspecified trauma and stressor-related disorder. He was prescribed escitalopram, olanzapine, and prazosin, and he was adherent with these medications. Hydroxyzine was prescribed on an as-needed basis for insomnia, and the patient used this medication nearly every night. He was referred to the ISDUT but found not to meet treatment criteria, and no toxicology screens were documented after RHU EOP placement.

The patient was discharged from acute care at CMF-PIP and placed in RHU EOP care at CMF on October 2, 2024. Five-day follow-up encounters occurred timely for the first seven days in the

RHU EOP, although several entries were poorly documented by primary clinicians and all but one occurred in non-confidential settings due to the patient's refusals. The patient remained in the RHU EOP through the end of the year.

The initial RHU IDTT occurred timely with the patient and required staff in attendance, except for a senior psychologist supervisor. The treatment team attempted to build on the CMF-PIP treatment plan; however, the only interventions listed were motivational interviewing and medication-assisted treatment for substance use. Further, the treatment plan was not updated to add interventions for other goals or after ISUDT determined the patient did not meet medication-assisted treatment criteria.

The psychiatric assessment failed to indicate whether the interview occurred in a confidential setting. The psychiatrist's assessment provided a working diagnosis of posttraumatic stress disorder and a rule-out diagnosis of mood disorder. Following the initial psychiatric assessment, the patient was followed adequately by psychiatry throughout the remainder of the year, although divergent diagnoses were not reconciled. All three follow-up psychiatric encounters were confidential; one was conducted by telepsychiatry. The patient's response to medications and treatment was adequately monitored, and no medication changes were made.

The primary clinician conducted the initial assessment in a timely manner, but the patient refused to participate in the interview. The clinician therefore relied exclusively on a review of the patient's records to complete the assessment. Following this evaluation, no primary clinician documented any encounter attempts for 20 days. Staff then placed the patient on the high-refuser list, initiating daily or near-daily interactions with a primary clinician to encourage treatment engagement. These interactions, along with wellness checks following refusals of routine individual contacts, were brief and conducted at cell front. In November 2024, a psychology practicum student took over responsibility for individual encounters. By December 2024, the student documented that rapport had been established, and the patient had agreed to attend one confidential session per week. Unfortunately, progress notes for December 2024 did not clearly indicate whether individual encounters were completed in a confidential setting.

Regarding structured out-of-cell programming access, only five recreational groups were documented in October 2024, four in November 2024, and ten in December 2024.

**Findings**

The care provided to this RHU EOP patient was inadequate.

Despite generally adequate psychiatric care and increased treatment engagement in December 2024 following the transition to a practicum student for individual treatment. Critical deficiencies included an unclear diagnosis that was not adequately investigated, an incomplete and ineffective IDTT treatment plan that was neither updated nor structured to guide care, and a 20 day gap between the primary clinician's initial assessment and first routine encounter. Further, most primary clinician contacts occurred at the cell front, limiting meaningful treatment. The patient also lacked access to the required minimum hours of structured out-of-cell programming, with no

clinical groups offered. Recreational groups consisted only of cinema therapy or viewing sports and documentaries.

**Patient I**

This 31-year-old RHU EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at CMF. The patient had a history of childhood exposure to domestic and neighborhood violence, gang affiliation, juvenile detention, substance use, and prior CDCR incarceration. He had no history of mental health care in the community. Within the CDCR, the patient had received 3CMS and MHCB levels of care; this was his first EOP placement. One suicide attempt, in 2010, was listed in the health record, and a second episode in which he cut his neck on both sides and required sutures occurred eleven days before the current RHU EOP placement.

The patient was diagnosed with an unspecified anxiety disorder and was medication adherent with his prescribed fluoxetine, olanzapine, and oxcarbazepine. Hydroxyzine and additional doses of olanzapine were prescribed on an as-needed basis for anxiety and mood dysregulation with impulsivity, respectively; the patient made regular use of both medications. Through ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Toxicology screens indicated medication adherence and abstinence from illicit substances. Medical conditions included a history of hepatitis C, dyslipidemia, opioid use disorder, and a family history of diabetes.

The patient was discharged from MHCB care and placed in RHU EOP care at CMF on October 8, 2024. Five-day follow-up encounters occurred as required for the first eight days of RHU EOP care, except on day three, when no encounter was documented. Most of these encounters occurred at the cell front. He remained in RHU EOP care for the remainder of the year.

The initial psychiatric assessment was adequate and completed timely; however, it did not specify whether the encounter occurred in a confidential setting. The psychiatric provider documented rule-out diagnoses of complex post-traumatic stress disorder and substance-induced mood disorder, along with opioid and stimulant use disorders. Olanzapine and fluoxetine were initiated, and oxcarbazepine was continued. The initial primary clinician assessment was also completed timely but was cursory and relied on limited information gathered during a cell-front interview.

The initial IDTT meeting occurred as scheduled and was attended by the patient and required staff, except for the senior psychologist supervisor. Patient strengths and self-reported treatment goals were documented; however, the treatment plan was directly copied from the one developed during the patient's MHCB admission with no modifications. The RHU EOP treatment plan identified anxiety as the treatment target but failed to include a measurable long-term goal. The only intervention offered was mindfulness exercises, with no consideration given to psychiatric care or the patient's recent suicide attempt. Additionally, the level of care rationale was not documented.

The psychiatrist provided timely follow-up, completing two encounters, one of which occurred at the cell front due to the patient's refusal of a confidential setting. The psychiatrist adequately monitored the patient's response to treatment, increasing the dosages of fluoxetine and olanzapine, which resulted in clinical improvement. However, rule-out and unspecified diagnoses remained

unresolved. Primary clinician follow-up encounters were also timely, but most were completed as brief cell front wellness checks due to the patient's refusals. During the few confidential encounters, the clinician documented the provision and review of coping skills, though it was unclear from progress notes whether these included the mindfulness exercises documented in the IDTT treatment plan.

The patient was placed on the high-refuser list in early November 2024. However, the patient reported attending groups but noted that many were cancelled because he was often the only patient interested. Documentation supported his report; he attended all but one group session documented in October and November 2024. In October, he was offered three recreational therapy groups; in November, four; and in December, nine. At the end of December 2024, staff returned the patient to the high-refuser list after the patient reported anticipating an imminent transfer to another facility and no longer planning to attend groups as a result.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The initial primary clinician assessment was inadequate, and the treatment plan was borrowed from the patient's mental health crisis bed stay and not modified for RHU EOP care. It did not address the patient's recent and serious suicide attempt, possible complex posttraumatic stress disorder, or the need for psychiatric care. A senior psychologist supervisor did not attend the IDTT meeting. Most contacts with the primary clinician were completed as brief cell front wellness checks. Further, the patient did not have access to clinical groups tailored to his treatment needs or the required minimum hours of structured programming while in the RHU EOP. Only recreation therapy groups were offered, and most focused on cinema therapy which often included watching sports or documentaries.

**Patient J**

This 30-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided in CMF's RHU EOP program. The patient had a history of substance use and psychiatric care in the community, with an onset of psychotic symptoms at age 20, and a documented history of command auditory hallucinations instructing him to harm himself and/or others. He was serving an indeterminate life sentence, and as of 2024, he had been in prison for five years. Within CDCR, the patient received 3CMS, MHCB, EOP, EOP Mod, APP, and ICF levels of care. A total of five suicide attempts or self-injurious behaviors were listed in the health record, the most recent of which occurred in 2021.

The patient transferred from mainline EOP to RHU EOP care at CMF on June 27, 2024, where he remained until he transferred back to mainline EOP care on December 30, 2024. The patient was diagnosed with schizophrenia and unspecified depressive disorder. He had been treated with clozapine continuously since 2021 but was on a low dose at the time of RHU EOP placement. In the RHU EOP, he was prescribed clozapine, duloxetine, mirtazapine, propranolol, and sertraline, and he was adherent with these medications. He was not a recipient of ISUDT services, and no toxicology screens were documented during his RHU EOP care. Medical conditions included

obesity, steatosis of liver with elevated liver enzymes, mixed hyperlipidemia, and Vitamin D deficiency. He had a history of two episodes of hyponatremia and seizures secondary to psychogenic polydipsia.

Prior to RHU EOP placement in June 2024, the patient stabbed a peer, claiming he was suicidal at the time and expected the peer to retaliate by killing him. This incident resulted in an RVR for battery on a prisoner with a deadly weapon causing serious bodily injury. The RVR mental health assessment completed on July 16, 2024, concluded that mental illness contributed to the behavior, citing a reduction in the patient's medication prior to the incident. The psychologist recommended retaining the patient's yard privileges to help maintain grounding in reality and noted that prolonged isolation was clinically contraindicated. Of note, the patient refused a confidential setting for the RVR assessment.

The initial and 30-day IDTT meetings occurred on time and included all required staff, except for a senior psychologist supervisor. The patient declined to attend the initial IDTT meeting and was unable to attend the 30-day meeting due to custody modified programming at the institution. At the initial IDTT meeting, the team placed the patient in the suicide risk management program and identified psychoeducation, CBT, and medication management as planned risk reduction interventions. The treatment plan targeted hallucinations, assaultive behavior, and lack of motivation, with CBT and psychoeducation as clinically indicated interventions. However, long-term goals were imprecise and not measurable, and psychiatric care was excluded from the plan. Additionally, the patient had been placed on modified EOP programming status from July 8, 2024 through September 12, 2024. During the 30-day IDTT meeting, the treatment plan was updated to reflect the patient's treatment progress.

The initial psychiatric assessment was adequate, timely, and conducted in a confidential setting via telepsychiatry. A rule-out diagnosis of schizoaffective disorder was added to the existing diagnosis of schizophrenia. In response to the recent suicidal stabbing incident, the psychiatrist slightly increased the clozapine dosage and simplified the antidepressant regimen. Following the assessment, psychiatric follow-up encounters occurred timely and in confidential settings, with four of the seven encounters conducted via telepsychiatry. When the patient refused or was unavailable for a scheduled appointment, the encounter was rescheduled and completed within one to four days of the original date. Psychiatric monitoring of the patient's symptoms and response to medications was adequate, and the patient remained stable. The rationales for maintaining a low dose of clozapine and for adding mirtazapine were documented. However, no effort was made to resolve the rule-out or divergent diagnoses.

The initial primary clinician assessment was completed timely, conducted in a confidential setting, and was deemed adequate except for a deficient case formulation. A diagnosis of unspecified depressive disorder was made. Weekly individual encounters with the primary clinician were documented for most of the patient's RHU EOP care, except for a 28-day period between July 9 and August 6, 2024, during which no individual encounters occurred, and only one caseload group was documented. Due to the patient's frequent refusal of confidential settings, most encounters took place at the cell front. Both confidential and non-confidential encounters appeared to be brief wellness checks without implementation of planned interventions for addressing treatment targets.

Over the 26 weeks of reviewed RHU EOP care, the patient was offered a total of 38 recreational therapy groups, averaging approximately one group every five-days. While the patient attended the majority of offered out-of-cell group hours, recreation therapy group activities in the RHU EOP were generally limited to watching sports or documentaries.

**Findings**

The care provided to this RHU EOP patient was inadequate.

The possibility that a psychotic episode contributed to the June 27, 2024, assault was not adequately investigated or addressed. The patient's guarded explanation of the event, given his history, suggested an effort to mask psychosis. While antipsychotic medication was slightly increased and the patient remained stable afterward, the psychological meaning of the incident was not explored. The case formulation was deficient, consisting only of the patient's diagnosis, with no reconciliation of divergent diagnoses between the primary clinician and psychiatrist. Neither IDTT meeting included a senior psychologist supervisor. Most primary clinician encounters were non-confidential cell-front wellness checks instead of structured therapy sessions incorporating treatment plan interventions. The patient lacked access to the required minimum hours of out-of-cell structured therapeutic activities while in the RHU EOP, and the limited group programming offered was insufficient for addressing his treatment needs, consisting mainly of cinema therapy or viewing documentaries and sports.

**Patient K**

This 43-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. He was treated at the CMF MHCB from December 8, 2024 to December 18, 2024. The patient had a history of receiving mental health services at the MHCB level of care where he had multiple placements in 2024 due to psychosis, as well as treatment at the intermediate and acute levels of care and prior state hospital hospitalizations.

The patient was provided diagnoses of schizophrenia and amphetamine use disorder, severe. He received his psychotropic medications by a PC 2602 order due to danger to others; he was prescribed Abilify, Cogentin, valproic acid, and Invega.

The patient was previously transferred to another MHCB due to aggressive behavior and instability while at the intermediate level of care. He was referred from intermediate to acute inpatient treatment due to his assaultive behavior that included hitting one of the nursing staff resulting in loss of consciousness. The patient was seen by the crisis intervention clinician due to suicidal ideation with a plan to cut himself with a razor. The clinician documented some concern regarding the validity of the patient's self-report but eventually admitted the patient after he stated that he would use a razor to kill himself if returned to housing.

The admission nursing assessment and history and physical examination were completed timely, as was the initial psychiatric assessment. The initial psychiatric assessment was comprehensive and noted significant impairment in functioning due to poor judgement, impulsivity, and anger management issues. Additionally, it was noted that the patient was assaultive and engaged in inappropriate sexual behavior. He had a history of significant delusional thinking; and while

reporting that medications helped, he at times quickly decompensated with disorganization. The patient repeatedly complained about his Invega injection, and he indicated that he did not understand why he was on an involuntary medication order and denied any history of violent behavior stating that he did not recall hitting anyone.

There was very poor continuity of care for this patient who was seen by various psychiatric and psychological providers, including a predoctoral intern. Those contacts usually occurred in confidential settings unless patient refused, or on one occasion due to staffing limitations. PC contacts were brief and did not include the provision of therapeutic interventions. There was no documentation of the completion of a PC intake assessment.

The treatment team meetings that occurred on December 11 and December 18, 2024, did not include the assigned PC and psychiatrist; although, alternates were present as well as a correctional counselor, nursing, and a recreation therapist. It was unclear if the CCI was the assigned counselor.

Modified treatment plans were documented in the healthcare record; however, they failed to provide a rationale for nonreferral to a higher level of care, clinical conceptualization, targets of treatment, and objective measurable treatment goals. One documented intervention was the provision of psychoeducation regarding frustration tolerance and calming techniques; however, the implementation of those interventions was not documented. No safety plan was developed despite the patient's MHCB admission due to suicidal ideation with a plan; however, an adequate suicide risk assessment was completed prior to discharge to the EOP.

**Findings**

The treatment provided to this patient was inadequate.

The patient had a history of severe and persistent mental illness with episodes of rapid decompensation that were often accompanied by aggression toward others or self. He was admitted to the MHCB due to suicidal ideation with a plan, but this was not addressed during the MHCB placement. The primary mode of treatment appeared to be environmental via housing change and placement in the MHCB. There was minimal medication management, and no other therapeutic interventions were implemented to minimize the patient's risk, improve functional level, and reduce the probability of returning to the MHCB. Staff failed to adequately address the patient's need to remain in a higher level of care and to receive intensive treatment to help manage his symptoms, prevent decompensation, and to improve his functional level. The patient clearly demonstrated an inability to function at the EOP level of care; however, he was discharged back to the EOP rather than back to a higher level of care for stabilization.

**Patient L**

This 43-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the CMF MHCB on December 14, 2024 from CSP/Sac due to danger to others that included fighting with custody and decompensation that made it difficult to effectively cope with frustration and irritability, as well as his self-report that he might act out towards others. The patient was provided diagnoses of major depressive disorder, recurrent, severe with psychotic features; seizure disorder; and unspecified neurodevelopmental disorder. He was prescribed hydroxyzine PRN for anxiety.

The patient was seen timely for the initial nursing assessment; however, the history and physical examination was not completed, and a blank history and physical examination form was present in the healthcare record. The initial psychiatric assessment was completed timely and noted a diagnosis of adjustment disorder; the major depressive disorder diagnosis was noted as by history. The patient reported suicidal ideation to the psychiatrist; he stated that the recent death of his stepfather and problems with custody precipitated the MHCB admission. The patient repeatedly requested transfer to a higher level of care. No medication changes were made during the MHCB placement.

There was no documentation of the completion of an initial PC assessment. The patient was not seen daily by a PC or psychiatrist. On two occasions, he refused clinical contacts with mental health staff, and there was no documentation indicating that efforts were made to see him later on those days. Continuity of care was also poor, as the patient was seen by multiple psychiatric and PC providers. Progress notes were brief and generic in content, and the documentation indicated that no therapeutic interventions were implemented. Mental health staff documented that the patient perseverated and exhibited tangential thinking that was difficult to redirect. His speech was described as over productive during most contacts with mild paranoid thinking that focused on his cellmate diverting a check that he expected to receive. There was no documentation to indicate that the mental health clinicians explored the possibility that his paranoid thinking directed at custody and his cellmate was delusional and psychotic requiring alternative treatment interventions. The documentation noted that the patient was frequently irritable and agitated with labile mood during clinical contacts.

The patient was seen timely for IDTT meetings that did not include his assigned PC; it was also unclear if the CCI present at the meetings was assigned to the patient. The IDTT documentation indicated that the patient met multiple criteria for higher level of care consideration, including his lack of participation in treatment activities which he attributed this to his anger, and three or more MHCB referrals. At the initial IDTT meeting on December 17, 2024, the higher level of care indicators were noted as positive, but no rationale was provided for not referring the patient to a higher level of care. No treatment modifications were documented, and the overall treatment plan did not include objective, measurable treatment goals, or specific interventions.

The discharge IDTT meeting occurred on December 24, 2024, when again the IDTT noted that the patient met criteria for consideration of a higher level of care referral. The rationale provided for nonreferral was inadequate, as it did not address the specific positive indicators; however, the provided treatment modifications were adequate. The patient was discharged with a primary diagnosis of antisocial personality disorder with a history of major depressive disorder. No clinical rationale was provided for the diagnostic change.

**Findings**

The treatment provided to this patient was inadequate.

An adequate treatment plan was not developed for the patient during the MHCB placement, and no psychotherapeutic interventions were implemented. There were no clear targets for treatment while the patient was housed in the MHCB. While staff suspected that the reason for his admission was frustration with custody staff, that issue was not addressed directly in treatment. Diagnostic

clarification was indicated given the patient's history of psychotic symptoms and the possible presence of delusional beliefs noted during the stay. Instead, the patient was provided a diagnosis of antisocial personality disorder, and his irritability and frustrations were attributed to characterological factors without sufficient evidence to support that conceptualization. The patient was not appropriately considered for referral to a higher level of care, despite having at least two indicators for higher level of care consideration. The poor continuity of care likely contributed to the inadequate treatment planning and lack of implementation of any therapeutic interventions to improve the patient's functional level and to reduce the probability that he would quickly return to the MHCB.

**Patient M**

This 30-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the MHCB on December 16, 2024, due to reported command auditory hallucinations to kill himself. He was provided diagnoses of bipolar I disorder, polysubstance abuse, unspecified, and gender identity disorder. He was prescribed Vistaril for anxiety. The patient also had a seizure disorder and was prescribed Keppra. Despite a gender identity disorder diagnosis included in the ongoing problem list; his pronouns were listed as he/him/his, and nothing related to that diagnosis was documented during the MHCB placement. It was unclear if the gender identity disorder diagnosis was included in error, or if MHCB staff simply failed to properly review the patient's history.

The patient was seen timely for the nursing assessment, history and physical examination, and initial psychiatric assessment. The initial psychiatric assessment was comprehensive and appropriate to the setting but did not address the gender identity disorder diagnosis. The patient reported feeling depressed, and a restricted affect was noted. The patient denied suicidal and homicidal ideation. The psychiatrist also noted that there was no evidence that the patient was responding to internal stimuli. The patient's level of care had recently changed to 3CMS from EOP, and Trileptal had been discontinued due to nonadherence. The patient reported increased depression and auditory hallucinations and did not believe that he could function at the 3CMS level of care. The psychiatrist noted the gender identity disorder diagnosis in the assessment portion of the psychiatric intake documentation. Trileptal was restarted, and diagnoses of unspecified depressive disorder and polysubstance abuse by history were provided as well as provisional diagnoses of bipolar I and major depressive disorder.

The patient was seen daily by a PC or psychiatrist except on December 26, 2024, when no provider met with the patient. He was seen in a confidential setting unless he refused; however, the documentation indicated that contacts were superficial and brief. Continuity of care was problematic in that different PCs saw the patient during the MHCB stay. Psychiatric contacts were usually completed by the assigned provider. While no diagnostic clarification occurred during the MHCB stay, discharge diagnoses were changed to adjustment disorder and polysubstance abuse with the continued provisional diagnosis of major depressive disorder.

Modified treatment plans were completed for the patient; however, the assigned providers were not present at treatment team meetings. On December 23, 2024, the discharge IDTT meeting occurred without a psychiatrist present. The initial and discharge treatment plans did not include targets of treatment, treatment goals, or clinical interventions. The treatment team failed to

complete safety planning with the patient, even though the reason for MHCB admission was due to danger to self. While no safety plan was completed, the treatment plan did indicate that the safety plan was addressed during the treatment team meeting. The discharge treatment plan and discharge summary dated December 23, 2024, did not document the rationale for MHCB discharge, nor did it address the command auditory hallucinations to harm himself or other critical aspects of the patient's mental status. The patient was clinically discharged on December 23, 2024, but he did not physically leave the MHCB until December 27, 2024.

**Findings**

The treatment provided to this patient was inadequate.

The patient was admitted to the MHCB due to danger to self which included command auditory hallucinations to harm himself; however, there was no documentation indicating appropriate treatment planning and therapeutic interventions for assessment of the symptoms and appropriate treatment. Antipsychotic medication treatment was not discussed with the patient despite his reported auditory hallucinations. It appeared that the psychiatric provider may have doubted the presence of auditory hallucinations, but this was not explicitly addressed in progress notes or treatment planning. Treatment planning also failed to address the patient's underlying psychiatric symptoms and the suicidal ideation and behavior that resulted in the MHCB admission. No safety plan was completed, and no other psychotherapeutic interventions were implemented to maximize stability and to reduce the likelihood of return to the MHCB. The documentation indicated that the MHCB treatment consisted solely of daily brief contacts. Lastly, the treatment team did not document the treatment goals that were met to support discharge from the MHCB.

**Patient N**

This 41-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. He was admitted to the CMF MHCB on December 10, 2024, due to danger to others from CSP/Sac. The patient was provided diagnoses of adjustment disorder with mixed disturbance of emotions and conduct; alcohol use disorder, severe in controlled environment; amphetamine-type substance use disorder, moderate; opioid use disorder, mild; methamphetamine use disorder, severe; cannabis use disorder, severe in controlled environment; and antisocial personality disorder. He was prescribed Zyprexa, BuSpar, Lexapro, melatonin, and Benadryl.

The patient was involved in a use of force incident the day prior to MHCB admission. On December 10, 2024, the patient reported suicidal ideation to custody and agreed to leave his cell for assessment; however, upon exiting his cell, he reportedly was resistive, and another use of force incident occurred. He was referred to medical for evaluation and care of his injuries sustained during the incident and was ultimately strapped to a stokes litter due to agitation and unspecified combativeness. The patient was assessed with moderate acute and chronic suicide risk; the documentation indicated that the MHCB admission was due to danger to others.

The patient refused the initial nursing assessment and history and physical examination. He was minimally cooperative and was seen cell front for the initial psychiatric assessment. At the time of the assessment, the patient denied all psychiatric symptoms but did endorse passive suicidal

ideation due to his altercation with custody. The psychiatrist concluded that there was no evidence of psychosis or depression and that the patient was unlikely to receive any significant benefit from MHCB placement. The psychiatrist recommended discharge to the prior level of care.

The initial treatment team meeting occurred on December 12, 2024, when an alternate psychiatrist was present at the meeting; the assigned PC, nursing, and a CCI were also present. The patient was seen cell front due to recent aggressive behavior. While it appeared that the treatment team was going to discharge the patient back to CSP/Sac, the patient reported suicidality during the treatment team meeting; consequently, the treatment team decided to retain the patient for further assessment. The patient had erratic medication adherence, and it was noted that he met the criteria for consideration of referral to a higher level of care due to receiving three RVRs within the last two months. The rationale for nonreferral was appropriate, but the treatment modifications were inadequate. While the patient was retained for further assessment, that assessment did not occur. He refused most contacts and remained uncooperative with treatment throughout his MHCB stay. The treatment team determined that the patient's diagnosis of antisocial personality disorder resulted in his maladaptive behaviors which included his disciplinary actions and use of vague suicidality for possible secondary gain.

Minimal recreation therapy was provided during the MHCB placement; those activities included music played on the tier and book pass; however, the recreation therapist did not document whether in-cell activities were also provided.

The discharge IDTT documentation on December 19, 2024, noted that the patient's medications were discontinued on December 16, 2024, prior to MHCB discharge due to consistent refusal; prescriptions for Vistaril and melatonin PRN were continued. Consideration of referral to a higher level of care was not adequately addressed in the discharge treatment plan. For example, the treatment team did not discuss the possibility of referring the patient to the Start Now personality disorders program, despite the consensus that his personality disorder substantially impaired his functional level and placed others at risk due to his aggressive behavior.

**Findings**

The treatment provided to this patient was inadequate.

Although the initial psychiatric evaluation appeared to properly conclude that the patient was not experiencing psychiatric distress and would not benefit from MHCB placement; the treatment team that included a different psychiatrist chose to retain the patient due to a vague report of suicidality. This would have been appropriate had the treatment team actually indicated that further assessment of the patient had occurred as was documented in the initial treatment plan. No further assessment occurred, and the patient remained uncooperative with treatment efforts. The treatment plans were inadequate given the severity of the patient's functional impairment and severity of his personality disorder symptomatology. While the treatment team recognized the role that his personality disorder had in his behavioral impairment; they did not pursue referring him to the Start Now personality disorders program or implement behavior therapy to assist in adjustment to incarceration.

**Patient O**

This 32-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the CMF MHCB on October 4, 2024, due to danger to self; he reported suicidal ideation and a plan to hang himself if returned to CSP/Sac. The patient was provided diagnoses of adjustment disorder and antisocial personality disorder, and it was noted that he had a history of other or unknown substance-induced psychotic disorder; moderate or severe substance use disorder; and other psychoactive substance-induced anxiety disorder. He was prescribed Lexapro, BuSpar and Vistaril PRN for insomnia.

Prior to MHCB placement, the patient had received treatment at the acute inpatient unit at CMF. Psychiatric notes from that time indicated that the patient continued to use substances during that hospitalization, and his substance use interfered with treatment. On at least one occasion, he was taken to an outside hospital after smoking spice. He repeatedly informed PIP staff that he did not want to return to CSP/Sac due to safety concerns; however, per the PIP correctional counselor, the patient would not return to the same yard but would go to the RHU pending further investigation. The patient reported that he believed that other incarcerated people were working with custody officers to harm him, and that custody had targeted him. He was discharged to CSP/Sac where he reported suicidality during the RHU pre-placement screening. He was subsequently referred to the MHCB for admission.

The initial nursing assessment and history and physical examination were completed timely. The initial psychiatric assessment on October 5, 2024, also occurred timely and was comprehensive. The patient was reportedly well known to the CMF MHCB treatment team and had a history of multiple inpatient admissions including to the MHCB. The patient reported that staff at CSP/Sac were targeting him, and he did not want to return there. According to the intake psychiatrist, the patient had a history of engaging in moderate to severe self-harm behaviors to address his safety concerns; however, no specific information was provided.

The patient was seen regularly by psychiatry and psychology; but there were issues with continuity of care, as he would be seen by different providers. The patient was seen on at least one occasion by a pre-doctoral intern rather than by MHCB licensed providers. Clinical contacts usually occurred in a confidential setting; although, there were times when he was seen cell front due to insufficient staff, but the documentation was unclear whether the insufficient staff was custody or mental health staff. The progress notes written by providers were typically cut and pasted from prior notes and did not include accurate documentation of the patient's behavior. For example, on October 14, 2024, the psychiatrist documented that the patient had no behavioral disturbances overnight; when in fact, the patient was taken to the treatment and triage area for a telepsychiatry assessment after having made a noose. The treatment providers' documentation suggested that clinical contacts were brief check-ins that did not include collateral information or any therapeutic interventions. The patient did receive cell front recreation services such as music played for multiple patients, games, and in-cell activities when not prohibited due to self-injurious behaviors.

The initial IDTT meeting on October 7, 2024, did not include the assigned PC. The treatment plan was inadequate, as it did not directly address the patient's underlying concerns for safety and symptoms of severe anxiety that precipitated the MHCB placement; nor did it address the patient's ongoing substance abuse that interfered with treatment efforts and negatively affected his mental

health symptomatology. While the patient met the criteria for consideration of referral to a higher level of care; the rationale for nonreferral was inadequate and included no treatment modifications to address the underlying reasons for multiple inpatient referrals.

The patient continued to engage in suicidal behaviors during the MHCB placement that included reportedly swallowing five pills, making nooses from gauze and mattress material, and cutting himself with plastic. At the time of the MHCB admission, the patient's suicide risk was assessed as high but was viewed as moderate to high. Despite the patient's continued suicide risk, no safety plan was completed, and no interventions were implemented to mitigate risk. The treatment team did not document the need for continued MHCB placement or plan for discharge in the context of the patient's safety issues and anxiety.

The discharge IDTT meeting occurred on October 24, 2024, and the patient was discharged with an inadequate safety plan. He reportedly remained in the MHCB beyond ten days due to the completion of the investigation into the patient's safety concerns. The documentation indicated that the IDTT was aware that the patient's safety concerns were unsubstantiated at the time of the meeting, and that the patient remained at elevated risk for self-harm with ongoing self-injurious behavior. Despite those factors, there was no documentation that there was communication with the receiving treatment team at CSP/Sac for continuity of care, no documentation of adequate safety planning for the patient upon return to the facility where he had repeatedly expressed concerns, and no provision of evidence-based interventions beyond medication management to assist the patient in managing his stress and anxiety.

The patient was described in progress notes as "gamey" by the MHCB supervisor; that comment appeared to be due to the patient's ambivalence regarding remaining in the MHCB. While he repeatedly requested more treatment; he acknowledged that acute care had not been beneficial to him, and he grew tired of remaining on one-to-one suicide observation. While it was likely that the patient experienced some ambivalence about his situation and wanted to remain safe but also experience a less restrictive environment; it appeared that his concerns and the impact of those concerns on his mental status were minimized by his treatment team. The patient was clinically discharged from the MHCB on October 24, 2024; he did not physically leave the unit until October 28, 2024.

**Findings**

The treatment provided to this patient was inadequate.

The patient presented with significant risk for self-injury, a history of engaging in self-harm to influence housing and to protect himself, and ongoing substance use. The treatment team focused only on the patient's safety concerns despite his repeated self-harm behaviors while in the MHCB. His substance use and its impact on his mental status were not assessed or reviewed with the patient. Treatment plans were inadequate to address the patient's serious mental health needs and safety concerns. There also appeared to be a lack of communication, consultation, and continuity of care upon discharge from the MHCB with the prior and receiving treatment teams which was clinically important in the treatment of this complex patient; however, the documentation indicated that such communication did not occur, nor was the patient scheduled for a CCAT when considering referral to a higher level of care. Instead, the MHCB treatment team provided

inadequate clinical rationale for not referring the patient to a higher level of care and absent or inadequate treatment modifications. The patient was seen by multiple psychiatric and psychological providers with poor continuity of care.

**Patient P**

This 52-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the MHCB on September 3, 2024, from MCSP due to danger to self with suicidal ideation. The patient was provided diagnoses of antisocial personality disorder, cluster B personality disorder, cannabis use disorder, and methamphetamine use disorder. He was prescribed Zyprexa, Depakote, Lithium, Effexor PRN for anxiety, and Vistaril PRN for anxiety.

The nursing assessment and history and physical examination were completed timely. The initial psychiatric evaluation also occurred timely and was adequate; the documentation was unclear whether the evaluation occurred in a confidential setting. Most clinical contacts did appear to occur in a confidential setting. The patient was seen regularly by mental health providers; however, there was a lack of continuity in care, as different psychiatric and psychological providers saw the patient. On September 5, 2024, the PC documented that the patient informed them that he had enemies at MCSP; however, he was told by the provider that they were not responsible for addressing that issue. The PC failed to specifically document those safety concerns and to appropriately refer the patient to custody. On September 7, 2024, the patient requested to return to MCSP stating that he felt better and that the "break" in the MHCB had helped. He denied suicidality at that time, but the providers did not convene a discharge IDTT meeting. His treatment providers also failed to provide the rationale for maintaining the patient in the MHCB.

The patient was not seen by the IDTT until September 9, 2024, when an initial IDTT meeting occurred that was attended by an alternate psychiatrist and the assigned PC; however, the assigned PC had not yet seen the patient for an intake assessment or other clinical contact. The patient was seen by other providers rather than his assigned PC. The treatment team noted that the patient met the criteria for consideration of referral to a higher level of care due to poor treatment participation. While the clinical rationale for nonreferral was inadequate, the treatment modifications were appropriate but were never implemented. The treatment plan did not include any targets of treatment, or objective and measurable treatment goals. The treatment interventions were generally appropriate to the MHCB setting but were not individualized to the patient's needs. Based upon the documentation, it was unclear why the patient was not discharged at the time of the delayed initial IDTT meeting. Instead, he was discharged on September 12, 2024, with no additional assessment or interventions implemented.

**Findings**

The treatment provided to this patient was inadequate.

The initial treatment plans were delayed and inadequate for the patient's significant mental health needs. The plans did not include clear targets of treatment or measurable, objective treatment goals. There was poor continuity of care, as the patient was seen by multiple different providers and was rarely seen by his assigned PC except at the IDTT meeting. There were no interventions

implemented beyond medication management for the patient. The treatment team did not document the clinical rationale for maintaining the patient in the MHCB, even when he requested return to his sending institution.

**Patient Q**

This 64-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the CMF MHCB from CMF EOP on October 1, 2024, due to danger to self after hitting a window and severely injuring his hand after he mistakenly thought that he had not received his Abilify Maintena injection. He was provided a diagnosis of schizoaffective disorder, bipolar type. He was prescribed Haldol decanoate, Abilify Maintena, Cogentin, Lithium, and Prolixin PRN for breakthrough psychosis. The psychiatrist documented that the concerns regarding polypharmacy for this patient were outweighed by the benefits and continued medication adherence, as the patient insisted on continuing treatment with both Haldol and Abilify.

The initial nursing assessment and history and physical examination were completed timely. The initial psychiatric assessment completed on October 2, 2024, also occurred timely and was comprehensive. The patient was described with a thought disorder, below average intelligence, and concrete thinking. He was often tangential and disorganized, but no delusional beliefs were noted at the time of intake. The patient did acknowledge experiencing auditory hallucinations. During subsequent psychiatric contacts, the patient also expressed some paranoid ideation; however, the documentation did not include specific information. The patient was seen regularly by mental health providers except on October 10, 2024 when he was not seen by a provider.

No initial assessment was completed by the PC, and different psychological providers saw the patient which resulted in a lack of continuity of care. He was described as suspicious during those contacts with unusual complaints about his medications such as the plastic on the lithium capsule causing him to itch; however, it was not documented that those complaints were conveyed to the treating psychiatrist. The patient was also observed having difficulty enunciating words with slurring, and he did not like discussing his mental health issues. He had poor insight and judgement. The patient had poor insight and reported having a positive view regarding his auditory hallucinations, describing them as educational, informative, and humorous.

The patient received an RVR for hitting a window; the RVR mental health assessment indicated that the behavior was related to his mental illness, and it recommended that the infraction be documented in an alternative manner. The patient continued to report concern about how his medications were delivered when not in the MHCB, stating that the yard medication window was chaotic.

The initial IDTT meeting occurred timely on October 3, 2024; the subsequent IDTT meeting on October 11, 2024 occurred one day late. The assigned PC and psychiatrist were present at the initial IDTT meeting, but neither provider had previously assessed the patient. There was a lack of an actual treatment plan developed at the initial IDTT meeting. No specific targets of treatment, objective, measurable treatment goals, or evidence-based interventions were documented. The discharge IDTT meeting did not include the assigned psychiatrist or PC. As the patient was housed in the MHCB for more than ten days, he was identified for consideration of referral to higher level

of care. While the provided clinical rationale did not explain the reason the patient was hospitalized for 11 days; the nonreferral rationale was adequate, as it explained that the patient was now stable and would return to the EOP level of care. No actual treatment plan or an adequate safety plan was included in the discharge IDTT documentation.

**Findings**

The treatment provided to this patient was inadequate.

Continuity of care was very poor. Not only was the patient seen by different providers; the IDTT meetings did not include assigned providers who had evaluated the patient as required. Treatment planning was problematic without targets for treatment, treatment goals, or evidence-based interventions. The discharge treatment plan did not even include any type of treatment planning. The treatment team did not document working with the patient regarding his concerns about the medication window or how to manage his medication concerns to prevent problematic behaviors or future self-harm. The clinical contacts with the patient appeared to be brief and superficial in substance, and no therapeutic interventions were utilized.

**Patient R**

This 54-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the MHCB on November 6, 2024, from SQ due to danger to self with suicidal ideation and a plan to cut himself. The patient reported that he was transferred to SQ where he thought he would be placed into a two-person cell but was told that he would be housed in a dormitory. The patient reported that he was stabbed and assaulted in prison and could not cope with dormitory housing. He was provided diagnoses of unspecified mood disorder and unspecified mental disorder; those diagnoses were later modified to depressive disorder, not otherwise specified; adjustment disorder with anxiety; and opioid use disorder, severe. The patient was prescribed BuSpar and Celexa.

The initial nursing assessment and history and physical examination were completed timely. The initial psychiatric assessment completed on November 7, 2024, was comprehensive. The patient was described as tangential at times with continued statements that he would be suicidal if returned to the dormitory.

The patient was seen primarily by the same psychiatrist in a confidential setting in a treatment module. There was no explanation why the patient who was not max custody was placed in a treatment module. There was very poor continuity in PC contacts, and the patient was seen by different providers. Clinical contacts appeared brief, superficial in content, and without therapeutic interventions provided.

The initial IDTT meeting occurred on November 8. 2024; however, the assigned PC was not present, nor had the patient been seen previously for an initial PC assessment. The treating psychiatrist, nursing, and a correctional counselor were present; although it was unclear if the CCI was present in person or by telephone, and the documentation indicated that the CCI was present by telephone at the discharge IDTT meeting. The initial treatment plan did not include any relevant treatment targets or objective, measurable treatment goals. The interventions were unclear and were not individualized to address the underlying reason for the MHCB admission. The discharge

IDTT meeting did not include the assigned PC or psychiatrist. No safety plan was developed due to the patient's continued refusal of individual contacts, but the patient attended his psychiatric appointments. No actual discharge treatment plan was documented, nor were there recommendations for the receiving treatment team regarding the patient's safety concerns and anxiety; the treatment team did not properly address the patient's safety concerns. At the discharge IDTT meeting, the patient "demanded" to not be returned to dormitory housing and became angry when the team told him that they had no control regarding his housing assignment. The treatment team meeting was discontinued, as the patient became irate and refused to listen to the correctional counselor. He was discharged to the EOP level of care on November 15, 2024, and was returned to SQ where he again reported suicidality and was admitted to the SQ MHCB.

The patient was never seen for a confidential contact by any PC, as he repeatedly refused or ignored the PC who did not return or make another effort at contact. There were also two occasions that the patient was not seen by the PC due to institutional custody alarms.

**Findings**

The treatment provided to this patient was inadequate.

While he was generally seen by the same psychiatrist, there was very poor continuity of care with his assigned PC, and the patient was not even seen after the initial IDTT meeting for a PC assessment. The patient was seen by different PC providers, and he refused all attempted contacts despite meeting with his psychiatrist. The poor treatment continuity had a negative impact on the patient's ability to receive treatment from a psychologist.

Treatment planning was inadequate, and the patient's safety concerns appeared to be minimized by the treatment team who simply informed him that they had no influence on his housing. This was likely complicated by the fact that his CCI was not present in the room but instead attended by telephone. The treatment team made no effort to address the patient's anxiety or provide adequate interventions to assist him in adjusting to dormitory housing. As those issues were not addressed, the patient was consequently returned to the SQ EOP dormitory where he immediately reported suicidality and was then readmitted to an MHCB.

**Patient S**

This 29-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the MHCB on June 20, 2024, due to danger to self with suicidal ideation and a plan to cut himself with a razor. The patient was provided diagnoses of adjustment disorder with depressed mood, antisocial personality disorder, and major depressive disorder, recurrent, with psychotic features. He was prescribed Zyprexa PRN for psychosis, Depakote, Vistaril PRN for anxiety, and Suboxone.

There was poor continuity of care in psychiatric and PC contacts, as different providers met with the patient. The patient was generally seen confidentially unless he refused. There were two days when the patient was not seen by mental health staff; on June 25, 2024, no attempts were made to see patient; and on June 24, 2024, the patient refused a visit, and no subsequent efforts were made that day. Otherwise, the patient was seen by the psychiatrist consistently at intervals that did not exceed three days; and medication modification occurred early in the admission, as the patient

stated that the previous medications were ineffective. The psychiatrist questioned the accuracy of the patient's self-reported auditory and visual hallucinations, suspecting that the patient was overreporting symptoms to accomplish referral to a higher level of care. Specifically, the patient had not adjusted well to dormitory housing at SQ and was likely hoping for a housing change. That issue was never directly addressed based on the healthcare record documentation, and the patient was discharged to the EOP level of care without resolution of the possible underlying suicidal ideation precipitants.

The initial psychiatric assessment was completed timely on June 21, 2024. It was comprehensive and included information that the patient reported command auditory hallucinations of demons telling him to kill himself and visual hallucinations of demons. The patient was hospitalized at a PIP several weeks before his MHCB admission and was subsequently discharged to the SQ EOP. The patient reported that upon arrival at SQ, he began to hear voices and to see razors; he had a history of self-injury by cutting. His thought processes were described as linear and goal directed during the initial assessment and despite reporting hallucinations, there was no objective evidence of the presence of a thought disorder or response to internal stimuli. Psychiatric notes for routine contacts inexplicably pulled forward a great deal of information from a January 2024 MHCB admission with little current information regarding the patient's functional level and symptomatology.

There was no documentation of the completion of an initial intake assessment by a psychologist. The initial IDTT meeting did not occur until June 26, 2024. The treatment plan did not include a safety plan, and there was poor case conceptualization. The treatment plan included a great deal of old information and did not include an adequate treatment plan. There were no targets of treatment, treatment goals, or evidence-based interventions included.

PC contacts were brief, included no interventions, and did not indicate whether they occurred in a confidential setting.

The discharge IDTT meeting occurred on July 5, 2024, and the extended MHCB length of stay was documented as due to a critical staffing shortage. The discharge treatment plan included an inadequate safety plan that was only partially completed. A generic treatment plan based on the patient's reported goals was included, but it was inappropriate to the patient's current psychiatric presentation or the underlying factors that precipitated the MHCB admission. The patient's housing concerns were never addressed during the MHCB stay.

**Findings**

The treatment provided to this patient was inadequate.

There was very poor continuity of care, and different providers saw the patient. The IDTT documentation did not include an appropriate treatment plan with targets of treatment, treatment goals, and interventions. Clinical contacts were brief, and no interventions were implemented following medication management early in the patient's stay when his medications were changed due to reported ineffectiveness. The psychiatrist suspected that the patient was overreporting symptoms to achieve a housing change or referral to a higher level of care. Despite that, the patient was maintained in the MHCB for fifteen days, five days longer than timelines and far longer than

clinically indicated due to a staffing shortage. It seemed likely that the staffing shortage also contributed to the poor care provided to this patient during his MHCB stay.

**Patient T**

This 33-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of treatment provided at CMF. The patient was admitted to the MHCB on October 8, 2024, due to grave disability with significant impairment due to mental illness. The patient was observed grunting and barking in the housing unit with response to internal stimuli. He had a history of community inpatient psychiatric treatment prior to incarceration, and he was on a five-day follow-up post-MHCB discharge immediately prior to this MHCB admission. He was provided a diagnosis of unspecified schizophrenia and other psychotic spectrum disorder. He was prescribed Zyprexa and Risperdal..

The patient was seen confidentially by psychiatry and PCs unless he refused. The psychiatrist documented in several notes that the patient was seen in a treatment module without documenting the reason for placement in the treatment module; the patient was not on max custody status, and there were no documented security concerns necessitating placement in a module. During the MHCB stay, Invega was prescribed to address psychosis and medication nonadherence; additionally, Risperdal was discontinued and the dosage of Zyprexa was decreased.

No intake assessment was completed by the assigned PC, and all PC contacts were brief with no interventions documented. The documentation indicated that the contacts were brief check-ins.

There was poor continuity of care for mental health providers, as the patient was seen by different providers. The patient was not seen daily by his mental health treatment providers prior to physical discharge. He was not seen by any provider on October 17, 2024, prior to clinical discharge, and he was not seen on October 19, October 20, October 21 and October 22, 2024, prior to physical discharge.

The nursing assessment, history and physical examination, and initial psychiatric assessment were completed timely. The initial psychiatric assessment was comprehensive and noted that the patient was a poor historian who had significant delusional thinking, auditory and tactile hallucinations. His behavior was described as unpredictable with paranoia, poverty of speech, tangentiality, and concreteness. The patient also had a history of poor medication adherence.

The patient was seen for the initial IDTT meeting on October 10, 2024. While the assigned PC, an alternate psychiatrist, and a correctional counselor attended, no nurse was in attendance. The treatment plan generated by the IDTT included no actual treatment targets, treatment goals, or treatment interventions.

The discharge IDTT meeting occurred on October 18, 2024 and it included an alternate PC, the assigned psychiatrist, nursing, and a correctional counselor. This IDTT also failed to develop an appropriate treatment plan to address the patient's significant psychiatric impairment. No targets of treatment, treatment goals, or evidence-based interventions were documented. The patient was clinically discharged on October 18, 2024 with physical discharge on October 22, 2024.

**Findings**

The treatment provided to this patient was inadequate.

The patient was not seen daily as required for his level of care, and there was poor continuity of care across providers. Individual contacts were brief, superficial, and involved no therapeutic interventions after a psychotropic medication change that included the Invega long-acting injection. The treatment team did not develop an adequate treatment plan at the beginning of the MHCB placement or upon discharge. The only intervention provided to this patient was medication management. The documentation failed to note whether the patient improved during his MHCB stay or to note the clinical rationale for discharge.

**Patient U**

This 50-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was provided a diagnosis of gender dysphoria. She identified as female and preferred she/her pronouns. She was not prescribed psychotropic medications.

The patient was housed in the OHU for management of her physical concerns related to multiple sclerosis and impaired mobility. She was placed at the 3CMS level of care for treatment of depression which appeared to be in remission.

No IDTT meeting occurred during the review period, and the documentation indicated that no IDTT meeting was conducted within the past two years. A treatment plan dated December 2024 did not document goals for treatment.

During the reporting period, the patient was seen every other month by the psychiatrist. Additionally, she was seen for confidential office contacts as well as check-ins by the PC. The patient requested placement at the EOP level of care on September 24, 2024. The request was discussed by the PC and psychiatrist who consulted with nursing and custody staff; they determined that an increase in level of care was not indicated at that time.

**Findings**

The treatment provided to this patient was minimally adequate.

Although the patient functioned adequately and did not display significant symptoms of mental illness, and she was seen consistently by the providers, the lack of lack of treatment planning was concerning.

**Patient V**

This 71-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood and major depression. He was prescribed fluoxetine and hydroxyzine for anxiety and depressive symptoms. The patient also had significant medical

conditions that included asthma, degenerative joint disease, and emphysema. He was housed in the G3 OHU for management of those comorbid conditions.

An IDTT meeting occurred on April 30, 2024 at the bedside per the patient's request that included the PC, psychiatrist, and correctional counselor. Goals to address depression and anxiety were documented in the treatment plan that included relevant indicators and measures of progress. The patient experienced chronically fluctuating depression and insomnia which were closely related to his physical health difficulties.

The psychiatrist met with the patient in a confidential setting on August 20, 2024 and November 14, 2024. The patient's mood and adaptive functioning behaviors were assessed, and the psychiatrist additionally prescribed trazodone to address ongoing depression and insomnia.

The patient was seen for wellness checks on three occasions by three different mental health staff. The documentation of two of those contacts was ambiguously written and simply indicated that the patient was in no acute distress or demonstrating concerning psychiatric symptoms.

**Findings**

The treatment provided to this patient was minimally adequate.

The patient's symptoms were appropriately managed by the psychiatrist, and he did not require or request significant further intervention to function appropriately. He was followed consistently by the providers.

**Patient W**

This 33-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient had received mental health services at the 3CMS level of care since 2021. He was provided with a diagnosis of unspecified depressive disorder. He was not prescribed psychotropic medications. The patient also had hepatitis C, paraplegia, and bedsores.

An annual treatment plan was documented on December 17, 2024, and the IDTT meeting included the patient, PC, and psychiatrist. No treatment goals were documented in the plan, and the patient reported that he was functioning adequately without significant depression, stress, suicidal thoughts or anxiety.

The patient was seen by the psychiatrist on August 13 and November 7, 2024. During those contacts, the patient denied mental health concerns, and he indicated that he requested mental health treatment due to difficulty sleeping.

The patient was seen for two mental health rounding visits when his status was assessed, and he was advised how to receive mental health services if needed. The PC reported that the patient was adherent with his psychotropic medication and stated that the information was confirmed by the

psychiatric technician; however, that was a notable discrepancy, as the psychiatric notes indicated the patient was not prescribed psychotropic medications.

**Findings**

The treatment provided to this patient was adequate.

The patient neither displayed nor reported mental health concerns, and at times seemed confused regarding the reasons for his MHSDS placement. He was monitored appropriately by the psychiatrist and received adequate rounding wellness checks.

**Patient X**

This 71-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was provided diagnoses of major depressive disorder and opioid use disorder. The patient also had medical conditions that included hearing loss, cervical stenosis, and hyperthyroidism. He was prescribed escitalopram for depression, and suboxone for his opioid use disorder.

A master treatment plan was documented on August 20, 2024; the IDTT meeting included the patient, psychiatrist, psychologist, and correctional counselor in attendance. Addressing depression was identified as the sole goal, and the treatment objectives included attending therapy, engaging in music or art, and using CBT techniques. Despite the identified diagnosis of opioid use disorder and suboxone treatment; substance use treatment was not mentioned in the treatment plan.

The psychiatrist saw the patient approximately every three months in a confidential setting; the psychiatrist noted that the patient's depression had improved.

The patient was seen for mental health rounding visits by mental health staff monthly when they noted his cognitive and emotional state and appropriately inquired about his needs and medication adherence.

**Findings**

The treatment provided to this patient was adequate.

The patient was provided with appropriate mental health contacts and medication monitoring, and he appeared to have improvement in his depressive symptoms.

**Patient Y**

This 75-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was provided diagnoses of depressive disorder, anxiety disorder, cannabis use disorder, narcissistic personality disorder, and antisocial personality disorder. He was not prescribed psychotropic medications.

The patient was referred twice to the MHCB due to suicidal threats, and he had a history of EOP placement with frequent treatment refusals. He was placed in the OHU at the 3CMS level of care on May 24, 2023.

A master treatment plan was documented on May 14, 2024; the IDTT meeting at the patient's bedside included the psychologist, psychiatrist, correctional counselor, and patient. No treatment goals were documented in the treatment plan.

The psychiatrist evaluated the patient on two occasions during the review period in a confidential setting, and the patient denied having any issues or mental health concerns.

A rounding wellness check was provided to the patient at the cell front during August 2024. The patient was described as disinterested and minimally responsive to questions. Reports from unit staff indicated no concerns or behavioral problems, and the patient was encouraged to request support as needed.

**Findings**

The treatment provided to this patient was minimally adequate.

The patient's mental health needs were minimal, and the psychiatrist adequately assessed him and was responsive to his requests. Of concern was the lack of PC contacts and the lack of adequate treatment planning.

**Patient Z**

This 68-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was provided a diagnosis of major depressive disorder, recurrent type. He was prescribed Prozac. The patient was housed in the OHU for management of multiple physical health conditions that included cardiac pacemaker implantation, polyneuropathy, osteoporosis, and rheumatoid arthritis.

The patient was seen for PC rounding wellness visits on August 16 and November 11, 2024, when he reported no significant depression or other mental health concerns.

A master treatment plan was documented on October 8, 2024. The IDTT meeting included the assigned PC, psychiatrist, and correctional counselor; the patient's depressive symptoms and participation in care were appropriately assessed at that time.

The psychiatrist met with the patient at least every 90 days, and the sessions focused on the patient's depressive symptoms and difficulty sleeping. The psychiatric documentation did not consistently note whether the sessions occurred in confidential settings.

**Findings**

The treatment provided to this patient was adequate.

Although the PC contacts did not occur in a confidential setting for a significant duration, the patient was seen for wellness visits, and the treatment plan was appropriate. The patient's depressive symptoms were in remission, and psychiatric contacts occurred at appropriate intervals.

**Patient AA**

This 77-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was provided a diagnosis of neurocognitive disorder. He was not prescribed psychotropic medication. He also had several medical conditions including hearing loss, high blood pressure, and peripheral vascular disease. The patient was housed in the L1 memory care unit.

The most recent IDTT meeting occurred on May 23, 2023. The IDTT documentation noted that the patient was fixated on a belief that he should not be in prison and at times required redirection in navigating around the unit, taking showers, and going to yard.

The psychiatrist met with the patient on August 7, 2024 and November 1, 2024 when the patient's current conditions, status, mood, and behavior on the unit were reviewed. No additional psychiatric interventions were indicated at either visit.

No individual PC contacts were documented in the healthcare record.

Group therapy was documented several times weekly, but the patient usually did not attend. Several of the recreation therapy entries were noted as in-cell activities in which the patient was provided therapeutic materials to work on independently.

**Findings**

The treatment provided to this patient was minimally adequate.

While the psychiatrist saw the patient consistently and groups were offered, there were significant gaps in care. No individual PC contacts were documented during the review period. Additionally, while group therapy was offered, there was no documentation of efforts to address the patient's lack of participation or alternative strategies to engage him in treatment.

**Patient BB**

This 72-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was not provided a current psychiatric diagnosis, but he had a historical diagnosis of major depressive disorder. He was not prescribed psychotropic medication.

An IDTT meeting occurred on August 24, 2023 when the patient was receiving mental health services at the EOP level of care. No treatment plan was developed after the patient was moved to the 3CMS level of care.

The patient was seen consistently by the same psychiatrist, and his current functioning was thoroughly assessed. The patient expressed occasional situational depression and anxiety about being in prison and missing his family. He was not experiencing any significant mood problems or suicidal thoughts and was adherent with his medical treatment.

A DDP psychologist met with the patient on September 26, 2024, and it was determined that he was functioning adequately in his current environment and did not require further support. There were no other individual PC contacts during the review period.

The patient was offered groups at least weekly for recreational activities such as music therapy, trivia, puzzles, and bingo. His attendance was noted, but the documentation did not note the patient's participation.

There were no significant issues such as RVRs or suicide risk evaluations documented.

**Findings**

The treatment provided to this patient was inadequate.

While the patient did not exhibit significant mental health concerns during the review period, there were significant lapses in care. No individual PC contacts were documented beyond the DDP psychologist's check-in, and no treatment plan was developed.

**Patient CC**

This 72-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. He was provided a diagnosis of an unspecified mental disorder due to a medical condition. He was not prescribed psychotropic medication. The patient had medical conditions that included dementia, hearing impairment, and lumbar spondylosis.

The patient was referred by the DDP staff for evaluation and treatment due to confusion, incomprehensible speech, and disorientation. The patient was placed at the 3CMS level of care on April 22, 2021.

The most recent IDTT meeting occurred on September 14, 2023. While the treatment plan included a review of the patient's current functioning and identified developmental disability related issues, no mental health goals were documented. The IDTT agreed to continue monitoring the patient for mood changes, cognitive deterioration, and adaptive functioning deficits.

The patient was evaluated by the psychiatrist twice during the review period. On September 16, 2024, the psychiatrist noted that it was unclear if the patient had a mental illness and planned to

attempt to rule out feigning of mental illness. The plan was to continue monitoring the patient at the 3CMS level of care.

Therapeutic recreation groups and activities were offered several times weekly, but the patient rarely attended. While documentation stated that he did not show for groups, there was no report of his behavior or interactions on the unit.

**Findings**

The treatment provided to this patient was inadequate.

The annual treatment plan was not updated, and no individual PC contacts were documented. While the patient's functioning remained relatively stable, and he did not require medication treatment. The frequency of contacts and documentation were inadequate.

**Patient DD**

This 68-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CMF. The patient was provided a diagnosis of adjustment disorder with anxiety and depressed mood and was prescribed Zoloft.

The patient was recently placed in an MHCB in May 2024, was referred to the EOP level of care, and was subsequently placed at the 3CMS level of care on July 11, 2024. He was classified as DD3 and received assistance with reading, writing, prompts for going to meals and showers, and additional orientation to his environment.

A master treatment plan was documented on August 8, 2024 which identified the patient's developmental disability goals as well as goals to address depression.

The psychiatrist met with the patient three times during the review period. During those assessments, the patient denied experiencing symptoms of mental illness. On August 19, 2024, Zoloft was discontinued by the psychiatrist at the patient's request.

The patient was provided a DDP interview for his interdisciplinary support team (IDST) on November 1, 2024 when the patient's current functioning and needs were assessed. There were, however, no mental health PC contacts documented during the review period.

Recreation therapy groups were provided weekly including music, art, games, and puzzles. The patient often did not attend the groups. In the groups that he did attend, attendance was simply noted without a description of his participation or demeanor.

**Findings**

The treatment provided to this patient was inadequate.

While psychiatric contacts were documented appropriately, and the master treatment plan addressed developmental disability related goals and depression, no PC contacts were documented during the review period.

**APPENDIX B-7**
**California Men's Colony (CMC)**
**Review Period: October 1, 2024 – March 31, 2025**

**Patient A**

This 31-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder and cannabis use disorder, in sustained remission. He was prescribed aripiprazole and sertraline and was adherent with these medications about half the time he remained in MHCB care. No suicide attempts, self-injurious behaviors, or medical conditions were listed in the health record. Within CDCR, he had previously received 3CMS and MHCB care. He was admitted to MHCB care on March 24, 2025 for suicidal ideation, homicidal ideation, command auditory hallucinations, and paranoia in the context of medication nonadherence. He was discharged to EOP care on April 3, 2025.

The mental health consult, accompanying suicide risk evaluation, and pre-admission screening occurred at another facility. The initial psychiatric and primary clinician assessments were timely and adequate, if brief. No recreational therapy intake assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff except apart from an alternate for the assigned primary clinician. The case formulation, documentation of patient strengths and verbalized treatment goals, the treatment plan, and documented rationale for MHCB care were incomplete and inadequate. The case formulation appropriately discussed proneness to psychosis and substance use but not suicidal ideation or depression, while the treatment plan addressed suicidal ideation and depression but not psychosis, substance use, or psychiatric care. The weekly IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned psychiatrist. The patient was found stable and appropriate for discharge to EOP care, and the treatment plan was updated appropriately. The patient was followed daily by one of three psychiatrists and/or one of three primary clinicians. Provision of skills-building or other interventions outside of medication was documented in only one primary clinician encounter, and several primary clinician notes did not indicate whether the encounter was confidential. Recreational therapy was offered each weekday beginning on the fourth day of MHCB care. Confusingly, recreational therapy notes appeared to capture both cell-front delivery of therapeutic material and patient participation in yard in the same note. The discharge suicide risk evaluation found the patient at low risk. The accompanying safety plan provided appropriate recommendations for the EOP treatment team, but the patient was not involved in its development and was not a plan the patient could use. The psychiatric discharge summary was completed two days prior to the patient's physical discharge and was adequate; a follow-up psychiatric progress note on the day of physical discharge provided information regarding the patient's final two days of MHCB care.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient was admitted to MHCB care in the context of medication nonadherence and discharged from MHCB care despite poor medication adherence, including two consecutive days of nonadherence prior to discharge. The case formulation and treatment plan were incomplete and inadequate, and neither addressed the patient's pattern of medication nonadherence. The characteristics of the patient's depression, psychosis, and medication nonadherence were inadequately explored. Although treatment was timely and minimum program guideline requirements were met, non-pharmacological interventions were rare. Most clinical encounters were brief and consistent with wellness checks rather than therapeutic crisis interventions. Psychiatric and primary clinician contacts were provided by a total of six staff, resulting in poor consistency and continuity among care providers. The safety plan provided thoughtful recommendations to treatment team members but was not adequate for its intended purposes.

**Patient B**

This 43-year-old, primarily Spanish-speaking, MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with unspecified schizophrenia and other psychotic disorder, history of traumatic brain injury, and alcohol, cannabis, opioid, and stimulant use disorders, all considered severe. He was not prescribed any psychotropic medication. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. One suicide attempt in 2001 was listed in the health record. Medical conditions included hyperplasia of prostate, duodenitis, gastritis, asthma, a history of hepatitis C, a history of overdose, methamphetamine and opioid use disorders, and synthetic cannabinoid intoxication. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. He received MHCB care from March 23, 2025 to April 1, 2025, for suicidal ideation and paranoia. This was his second MHCB admission in three months for these symptoms.

The pre-admission mental health consult, accompanying suicide risk evaluation, and pre-admission screening occurred at another facility. The initial psychiatric and primary clinician assessments were completed timely and simultaneously due to the need for a Spanish-speaking interpreter. The psychologist diagnosed unspecified anxiety disorder while the psychiatrist diagnosed unspecified schizophrenia and other psychotic disorder. These diagnoses were inadequately reconciled during the MHCB stay, although documentation confirmed persistent paranoid and somatic delusions. A recreational therapy intake assessment was not completed. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned primary therapist. The patient's strengths and verbalized treatment goals were adequately documented, but the rationale for MHCB care was not elaborated, and IDTT documentation incorrectly indicated that the patient had attended at least the minimum number of structured treatment hours. The treatment plan continued goals and interventions developed for EOP care and added an additional goal that addressed suicidal ideation.

The patient was followed daily by one of two psychiatrists and/or one of five primary clinicians. Psychiatric progress notes were thorough, although it was not always clear whether psychiatrists and primary clinicians saw the patient in a confidential setting. One primary clinician note indicated that the patient was seen at cell front because they were unable to access a confidential setting. The provision of skills-building or other evidence-based interventions was not

documented. The patient was observed responding to internal stimuli, exhibited bizarre behavior while talking loudly to himself or unseen others, and reported bizarre somatic experiences that may have been consistent with reexperiencing the childhood sexual abuse he reported. He refused all psychotropic medications and was not found to meet criteria for involuntary treatment. Beginning on the third day of MHCB care, recreational therapy groups were offered each weekday; the patient refused all of them. The weekly IDTT meeting was timely and attended by the patient and required staff. It accurately noted that the patient had refused the minimum number of hours of EOP programming during the prior nine weeks, but the MHCB team concluded that the patient was not in need of a higher level of care and instead should be returned to EOP care. The treatment plan was not updated to reflect the patient's response to MHCB interventions. The discharge suicide risk evaluation found the patient at low risk, and the accompanying safety plan was collaborative and adequate. The psychiatric discharge summary was timely but did not discuss or clarify the patient's diagnoses.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial psychiatric and primary clinician assessments, IDTT meetings, daily follow-up encounters with a psychiatrist and/or primary clinician, and psychiatric discharge summary were timely and largely adequate. One of the psychiatric progress notes quoted the patient extensively and was particularly thorough. However, the patient remained psychotic with poor insight and continued to refuse group activities or express willingness to accept a cellmate. Primary clinician contacts were provided by a total of five staff, resulting in poor consistency and continuity. Provision of evidence-based interventions outside of safety planning was not documented. Neither the reasons the patient refused medications nor the patient's capacity to make informed decisions regarding his mental health care were inadequately explored. While the patient may not have met PC 2602 criteria for involuntary treatment, the rationale for this conclusion was poorly documented. The patient's psychiatric diagnoses were not adequately reconciled, and the potential role of childhood sexual trauma in his symptoms and safety concerns did not appear to have been considered. Given ongoing symptoms and functional impairments, and his need for two MHCB placements in three months for these symptoms, greater consideration of a higher level of care may have been indicated.

**Patient C**

This 26-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with unspecified mood disorder and opioid and stimulant use disorders. He was prescribed lurasidone and then aripiprazole and was adherent with these medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. No suicide attempts or self-injurious behavior were listed in the health record. Medical conditions included osteoarthritis of hip, congenital hip dysplasia, latent tuberculosis, and opioid use disorder. A metacarpal fracture was diagnosed during the MHCB stay, the result of the patient punching a cell wall with his fist prior to MHCB admission. Within CDCR, the patient had previously received only 3CMS care. He was admitted to MHCB care on March 29, 2025 for suicidal

ideation, homicidal ideation, and agitation with labile mood, symptoms that the patient attributed to side effects of lurasidone. He was discharged to EOP care on April 8, 2025.

The pre-admission mental health consult was completed at another facility. The initial primary clinician assessment was timely and adequate. A pre-admission screening was not completed. The initial psychiatric assessment was timely but cursory and did not include a psychiatric diagnosis. A recreational therapy intake assessment was not completed. The initial IDTT meeting was timely and attended by the patient and alternates for the assigned clinician, assigned psychiatrist, and assigned correctional counselor. The treatment plan identified suicidal and homicidal ideation and agitation as treatment targets, formulated measurable short-and long-term goals, and indicated that medication changes and DBT distress tolerance skills as interventions. Confusingly, a weekly IDTT meeting occurred one day after the initial IDTT meeting, was attended by the patient, provided almost identical documentation, but had three different alternates for the assigned psychiatrist, primary clinician, and correctional counselor. The treatment plan was unchanged. The next weekly IDTT meeting was timely and resulted in the patient's discharge to EOP care. The patient, the assigned primary clinician, an alternate for the assigned psychiatrist, and a correctional officer who may or may not have been assigned to the patient attended. The treatment plan was updated to indicate that short-term MHCB treatment goals had been met, but the rationale for EOP care was not documented. The patient was followed daily by one of four psychiatrists and/or one of three primary clinicians. The patient reported safety concerns at his prior facility in the context of a drug debt, and custody was alerted for purposes of conducting a safety investigation. The dose of aripiprazole was increased, and propranolol was initiated on the final day of MHCB care to treat social anxiety, but the first dose was not given until after the patient was discharged from MHCB. When location was documented, primary clinician encounters occurred at the cell front; half of the primary clinician progress notes did not indicate where the encounter occurred, and all contacts were brief. Provision of DBT skills-building or other evidence-based interventions outside of medication was not documented. Beginning on the second day of MHCB care, recreational therapy encounters were provided daily. Confusingly, recreational therapy notes often documented the provision of in-cell materials at the cell front and indicated that the encounter lasted an hour, or they documented both the provision of in-cell materials at the cell front and participation in an hour-long group. The discharge suicide risk evaluation found the patient at low risk, and the accompanying safety plan was collaborative and clinically appropriate. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the treatment plan appeared appropriate, none of the three IDTT meetings included both the assigned psychiatrist or the assigned primary clinician. There was no evidence that primary clinicians provided the interventions required by the treatment plan. The patient's diagnosis was vague and unspecified, and the rationale for using an antipsychotic medication was not documented beyond the patient's self-reported history of benefiting from in the past. In part because the diagnosis remained vague and in part because the patient reported safety concerns in the context of a drug debt contributed to his symptoms, it was unclear which mental

illness was being treated. The nature of the patient's symptoms was inadequately investigated. The referral to EOP care may have been clinically appropriate, but documentation was not sufficient to confirm this. Psychiatric and primary clinician contacts were provided by a total of seven staff, resulting in poor consistency and continuity. Recreational therapy notes combined and therefore confused cell-front and group activities.

**Patient D**

This 28-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with substance-induced psychotic disorder, substance-induced depressive disorder, and stimulant use disorder. Hydroxyzine and olanzapine were originally ordered as PRN medications for insomnia and psychosis, respectively, and were then converted to scheduled medications. The patient did not use either medication as a PRN and accepted only three scheduled doses of hydroxyzine and one of olanzapine before these medications were discontinued. Buspirone and escitalopram were then ordered as scheduled medications; the patient was nonadherent with them. No suicide attempts or self-injurious behavior were listed in the health record. Medical conditions included chronic back pain. Within CDCR, the patient had previously received only 3CMS care. He was admitted to MHCB care on March 24, 2025 for paranoid delusions and command auditory hallucinations instructing him to kill himself in the context of methamphetamine use and sleeplessness. He was clinically discharged to EOP care on April 2, 2025 and physically transferred to EOP housing the following day.

The pre-admission mental health consult, accompanying suicide risk evaluation, and pre-admission screening were completed at another facility. The initial psychiatric and primary clinician assessments were timely and adequate. A recreational therapy intake assessment was not completed. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The treatment plan identified suicidal ideation and methamphetamine use as treatment targets. One of two short-term objectives was appropriate for MHCB care, and interventions in the treatment plan were specific and clinically appropriate, although silent regarding psychiatric care. The reasons for retaining the patient in MHCB care were adequately documented. The patient was followed daily by one of four psychiatrists and/or one of five primary clinicians. Medications were adjusted, and the provision of skills-building interventions was documented on one occasion. However, the interventions identified in the treatment plan were not documented. Beginning on the second day of MHCB care, recreational therapy activities were offered daily. Recreational therapy notes were unclear in documenting the provision of in-cell materials at the cell front and indicating that the encounter lasted an hour or documenting both the provision of in-cell materials at the cell front and participation in an hour-long group in the same note. The weekly IDTT meeting was timely, resulted in MHCB discharge, and attended by the patient and required staff. The patient's disengagement with treatment was adequately discussed, and the referral to EOP care appeared clinically appropriate. However, the treatment plan was not updated to reflect the patient's treatment progress. The discharge suicide risk evaluation found the patient at low risk. The accompanying safety plan was collaborative and adequate. The psychiatric discharge summary was timely but completed without seeing the patient at the same time.

**Findings**

The care provided to this MHCB patient was adequate.

The patient was adequately assessed, provided appropriate crisis stabilization, and responded with clinical improvement. He was appropriately referred to EOP for enhanced clinical structure and accountability. Areas for improvement included the provision of interventions identified in the treatment plan and/or updating the treatment plan to reflect the interventions that were provided, providing clearer recreational therapy progress notes, and increasing the consistency of psychiatric and primary clinician care. The patient was followed by no less than nine psychiatrists and primary clinicians, resulting in poor consistency across encounters and challenges in establishing therapeutic alliance.

**Patient E**

This 36-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with unspecified anxiety disorder and borderline and antisocial personality disorders. Oxcarbazepine was initially prescribed as a PRN medication for anxiety but was converted to a scheduled medication within one day. He did not use this medication as a PRN and was only partially adherent with it as scheduled medication. Nine suicide attempts and two episodes of self-injury were listed in the health record. Medical conditions included gastroesophageal reflux disease, intentional drug overdose, lower back pain, and fracture of the left hand. Within CDCR, the patient had previously received all levels of mental health care as well as extensive involuntary treatment under PC 2602 orders until 2021. He was admitted from RHU EOP care to MHCB care on April 14, 2025 for danger to others and significant impairment in the context of paranoid psychosis; this was his second MHCB admission in April 2025. He was discharged to RHU EOP care on April 22, 2025.

The pre-admission mental health consult and initial psychiatric and primary clinician assessments were timely and adequate. Consideration of involuntary treatment was appropriately documented. A pre-admission screening and recreational therapy intake assessment were not completed. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The patient met criteria for consideration of a higher level of care due to multiple RVRs and treatment refusals, both of which were believed to be driven by personality disorder symptoms. Specific interventions to address the patient's problem behaviors were identified for future use in EOP care. The case formulation and treatment plan were adequate, but patient strengths, verbalized treatment goals, and rationale for retaining in MHCB care were missing or poorly documented. The patient was followed daily by one of four psychiatrists and/or one of three primary clinicians. Psychiatric progress notes adequately documented the patient's presentation, a rule out diagnosis of bipolar disorder with hypomanic features, and consideration of alternative and involuntary medications. Provision of skills-building or other evidence-based interventions outside of medication was not documented, and all primary clinician encounters occurred at the cell front. Beginning on the second day of MHCB care, daily recreational therapy was documented as offered, but the patient was not permitted to leave his cell due to custody concerns regarding his assaultive behavior. He attended only one recreational therapy group, on

the day prior to MHCB discharge. The weekly IDTT meeting occurred timely, resulted in MHCB discharge, and was attended by required staff, apart from an alternate for the assigned psychiatrist. However, the patient did not attend, and the reason for non-attendance was not documented. The treatment plan was updated to indicate the patient met short-term MHCB treatment objectives, which included learning two ACT/CBT coping skills a week. The acquisition of these skills and interventions to support their acquisition were not otherwise documented. Two suicide risk evaluations completed on the day of discharge found the patient at low risk. Although the initial primary clinician assessment and documentation for both IDTT meetings indicated a safety plan would be developed prior to MHCB discharge, this did not occur. The psychiatric discharge summary was timely but completed without seeing the patient at the same time.

**Findings**

The care provided to this MHCB patient was inadequate.

Given the patient's extended history of involuntary treatment and recent prior MHCB stay, the patient's diagnosis, nature of his symptoms and behavior, and need for effective psychotropic medication were inadequately investigated and addressed. The PRN order for oxcarbazepine, while short-lived, fell outside the standard of care. Although several evidence-based non-pharmacological interventions were identified as appropriate to the patient's needs, there was no documentation that they were provided or that the patient acquired or strengthened coping skills. The patient remained confined to his MHCB cell until the day prior to discharge and was not consistently adherent with medication at the time of discharge. He was discharged back to RHU EOP essentially unimproved, and the patient's antisocial personality disorder appeared to overshadow greater consideration of bipolar II disorder symptoms.

**Patient F**

This 26-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with posttraumatic stress disorder and unspecified bipolar and related disorder. He was prescribed aripiprazole and diphenhydramine and was partially adherent with these medications. Two episodes of suicidal spectrum behavior were listed in the health record, the most recent two days prior to MHCB admission. Medical conditions included chronic back and shoulder pain. Within CDCR, the patient had previously received 3CMS and MHCB care. He was admitted to MHCB care on March 20, 2025 for suicidal ideation, agitation, and threatening staff. He was clinically discharged to RHU EOP care on April 4 2025, and physically transferred the following day.

The pre-admission mental health consult and accompanying suicide risk evaluation occurred at another facility. A pre-admission screening and recreational therapy intake assessment were not completed. The initial psychiatric and primary clinician assessments were timely and largely adequate, although the case conceptualization and reference to feigned symptoms in the primary clinician assessment were not adequately elaborated. A recreational therapy intake assessment was not completed. The initial IDTT meeting was timely and attended by the patient, assigned psychiatrist, and assigned primary clinician, but not by a correctional counselor. The case

formulation was generic and of limited help in identifying patient-specific treatment needs. Patient strengths, verbalized treatment goals, and rationale for MHCB treatment were adequately documented. The treatment plan addressed suicidal ideation but not agitation, aggression, mood instability, or psychiatric care; it did not identify specific interventions beyond validation and encouragement. As such, it was inadequate as a guide to treatment. The patient was followed daily by one of four psychiatrists and/or one of seven primary clinicians. Provision of skills-building or other interventions outside of medication was not documented. Beginning on the second day of MHCB care, recreational therapy activities were offered on a nearly daily basis. Confusingly, recreational therapy notes often documented the provision of in-cell materials at the cell front and indicated that the encounter lasted an hour, or they documented both the provision of in-cell materials at the cell front and participation in an hour-long group. Weekly IDTT meetings were timely and found the patient met criteria for consideration of a higher level of care due to multiple RVRs and multiple MHCB referrals; however, it was determined to retain the patient in MHCB care. The first weekly IDTT meeting was attended by the patient and assigned psychiatrist and primary clinician, but not by a correctional counselor. The second weekly IDTT meeting was attended by the patient, alternates for the assigned primary clinician and psychiatrist, and a correctional counselor. The second but not the first weekly IDTT meeting documented the patient's progress, and it was determined that the patient was sufficiently stable for release to EOP care. The discharge suicide risk evaluation found the patient at low risk. The accompanying safety plan included multiple recommendations for EOP treatment providers but was not developed with the patient and not clinically appropriate for its intended purpose. The psychiatric discharge summary was timely and provided a summary description of the patient's MHCB treatment; however, the "subjective/HPI" section of the discharge summary was copied without alteration from a progress note two days earlier and therefore did not accurately portray the patient's presentation and statements at the time of clinical discharge.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation and treatment plan were deficient and insufficient to guide MHCB care. Notations that the patient was previously thought to feign symptoms were inadequately investigated or resolved, and the characteristics of the patient's symptoms, trauma history, and functional impairments were inadequately explored or documented. Evidence for the patient's two diagnoses was unclear. Non-pharmacological interventions were either documented in canned, formulaic, and identical language across encounters, or were not documented at all. During his 16-day MHCB stay, the patient was seen by four psychiatrists and seven primary clinicians, resulting in poor consistency and continuity among these providers. It was unclear what was being treated or how the patient improved.

**Patient G**

This 35-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder and unspecified stimulant-related disorder. Hydroxyzine and olanzapine were initially prescribed PRN for anxiety and psychosis, respectively; the patient

did not use either medication on a PRN basis. While hydroxyzine continued to be prescribed PRN for anxiety, olanzapine was converted to a scheduled medication. The patient was nonadherent with scheduled olanzapine, and it was discontinued and replaced with haloperidol, ordered both as a scheduled medication and as a PRN. The patient was nonadherent with scheduled haloperidol and used no PRN medications during MHCB care. One episode of self-injurious behavior was listed in the health record. Medical conditions included a history of latent tuberculosis and hepatitis C; he was only partially adherent with hepatitis C treatment provided in 2024. Within CDCR, the patient had previously received all levels of mental health care except APP. He was admitted to MHCB care on March 27, 2025 for significant impairment due to severe mental illness. He was referred to acute care on April 10, 2025 in single cell housing and physically transferred to acute care on April 22, 2025.

The pre-admission mental health consult adequately documented the patient's significant functional impairment. A pre-admission screening and recreational therapy intake assessment were not completed. The initial psychiatric assessment was timely and adequate; the initial primary clinician assessment was timely but inadequate because it failed to include sufficient record review when the patient refused to participate. The initial IDTT meeting was timely and attended by alternates for the assigned psychiatric and primary clinician. No correctional counselor attended, and the patient refused to attend. The case formulation was generic and of limited use in guiding interventions, and patient strengths and verbalized treatment goals were not documented. The treatment plan addressed medication non-adherence and substance use as treatment targets, identified measurable short- and long-term treatment goals, and provided specific evidence-based interventions appropriate to the patient's care. Mental health assessments for RVRs alleging battery on a peace officer and behavior which could lead to violence found that the patient was aware of institutional rules and potential consequences of his behavior at the time of the alleged behaviors, but also that mental illness contributed to the alleged violations.

The patient was followed daily by one of four psychiatrists and/or one of five primary clinicians. All contacts occurred at the cell front due to the patient's refusal to engage in treatment or any out-of-cell activities. Attempts to provide motivational interviewing, reality testing, and DBT skills training were documented inconsistently. Beginning on the second day of MHCB care, recreational therapy activities were offered on a nearly daily basis. The patient refused all out-of-cell activities including a Vitek hearing, continued to exhibit hostile, unpredictable, dismissive, and isolative behaviors as well as poor hygiene and poor sanitation in his cell. He refused showers and changes of clothing, maintained trash on his cell floor, restricted food intake to one meal a day, was malodorous, smeared food on his cell window, and ignored staff. A petition for a non-emergent involuntary treatment order due to grave disability and danger to others was filed, with a hearing pending at the time the patient was transferred to acute care. Weekly IDTT meetings were timely but held in absentia due to the patient's refusals. All assigned staff were present for two of the three follow-up IDTT meetings. The treatment plan was not updated to reflect the patient's lack of treatment progress or continued lack of self-care. The patient was referred to acute care during the second weekly IDTT meeting, which fell on the fourteenth day of MHCB care. The accompanying mental health consult and suicide risk evaluation were adequate, and the patient was found at low risk for suicide. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment was deficient. The case formulation was not patient-specific, symptom-specific, or helpful in guiding treatment. The treatment plan was incomplete, addressing substance use and medication nonadherence but not psychosis, self-neglect, social isolation, and hostile and aggressive behaviors towards others. These latter symptoms were the triggers for the patient's MHCB admission. The PRN order for olanzapine, unaccompanied by a scheduled dose of antipsychotic medication, fell outside the standard of care. Required staff were present for only two of the four IDTT meetings. The referral to acute care was unnecessarily late and followed by an even longer wait to admit the patient to acute care. This was a concerning delay given the patient's ongoing deterioration and self-neglect. The patient was followed by four psychiatrists and five primary clinicians, a pattern that compromised continuity and may have contributed to the failure to establish working rapport with the patient. That said, there were several strengths in the patient's care. The referral for acute care and petition for involuntary treatment were clinically appropriate, essential steps to support the patient's treatment. Primary clinicians and psychiatrists demonstrated professionalism in their interactions and documentation, in the face of the patient's psychotic and contemptuous hostility.

**Patient H**

This 35-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with unspecified bipolar and related disorder and stimulant use disorder, severe. He was prescribed buspirone, risperidone, and venlafaxine and was nonadherent with these medications. He accepted one dose of trazadone before the order was discontinued. Clonidine was prescribed PRN for agitation, but he did not use this medication. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder but was nonadherent with this medication. One suicide attempt through a head-on collision with a semi-truck was listed in the health record. Medical conditions included opioid use disorder and a history of open reduction and internal fixation of the left knee and hip following his suicide attempt. He was mobility impaired and used a cane to ambulate. Within CDCR, the patient had previously received 3CMS and MHCB care. He was admitted to MHCB care on March 21, 2025 for suicidal ideation in the context of methamphetamine use and a drug debt. He was discharged to EOP care on April 3, 2025. Of note, he returned to MHCB care from April 7, 2025 through April 10, 2025 and from April 16, 2025 through at least April 29, 2025.

The pre-admission mental health consult, accompanying suicide risk evaluation, and pre-admission screening for the March 21, 2025 MHCB admission occurred at another facility. The initial psychiatric and primary clinician assessments were timely, completed simultaneously, and generally adequate. However, the case formulation was impoverished and inadequate. The initial IDTT meeting was timely and attended by the patient, alternates for the assigned psychiatrist and primary clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for a higher level of care. Patient strengths and verbalized treatment goals were not documented, and the treatment plan

addressed only the patient's suicidal ideation and not his mood disorder symptoms. The patient was followed daily by one of four psychiatrists and/or one of six primary clinicians. While a primary clinician attempted to explore the reasons for the patient's medication nonadherence, such inquiry or acknowledgement of the patient's nonadherence was not found in psychiatric progress notes. Primary clinicians indicated in the same note that the patient was at high risk for self-harm and that the patient was ready to be discharged from MHCB to EOP care; one psychiatric progress note also indicated that the patient was both at high risk and at low risk of self-harm. Although the treatment plan indicated that the primary clinician would assist the patient in identifying triggers to suicidal ideation, developing coping skills and replacement behaviors, and use motivational interviewing to assist the patient in moving from the contemplation to the preparation stage of change, none of these interventions were documented. As documented, most primary clinician encounters appeared to be status or wellness checks. Recreational therapy activities were offered daily beginning on the third day of MHCB care. Multiple recreational therapy notes often documented the provision of in-cell materials at the cell front and indicated that the encounter lasted an hour, or they documented both the provision of in-cell materials at the cell front and participation in an hour-long group. A mental health evaluation of an RVR alleging battery on a prisoner found no nexus between the alleged behavior and mental health symptoms. Weekly IDTT meetings were timely and attended by the patient but not by all assigned staff. The patient's strengths and verbalized treatment goal were documented, and the treatment plan was updated to reflect the patient's achievement of the short-term treatment objective. The rationale for moving the patient to EOP care was poorly documented. The discharge suicide risk evaluation found the patient at low risk. The accompanying safety plan provided several recommendations for future treatment, but only a portion of the plan was developed with the patient, and the plan would not have been useful if provided to the patient. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation consisted of two short sentences that were not adequate for purposes of guiding treatment, and the treatment plan did not adequately address the patient's mood disorder or substance use. Although specific and clinically appropriate interventions were identified in the plan, those that were non-pharmacological were not documented as provided. In none of the three IDTT meetings were all assigned staff present, and the patient was followed by a total of ten psychiatrists and primary clinicians. Consistency of staff and continuity of care were thereby compromised. The severity of the patient's substance use disorders, their role in his mental health symptoms, and his nonadherence with medications were inadequately explored. While the discharge to EOP care may have been clinically appropriate, the rationale was poorly documented. It is concerning that the patient was transparent in seeking a respite from environments in which illicit substances were readily available, but the EOP housing to which he was discharged enabled him to relapse rapidly on two occasions, resulting in immediate returns to MHCB care. An alternative placement in a more controlled environment was clinically indicated.

**Patient I**

This 30-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with an adjustment disorder with mixed anxiety and depressed mood, major depressive disorder by history, and substance use disorders by history, with a rule out diagnosis of malingering. He was prescribed mirtazapine and was partially adherent with this medication. Hydroxyzine was prescribed PRN for anxiety, and he used this medication twice during MHCB care. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Two incidents of self-injurious behavior were listed in the health record. Medical conditions included gastroesophageal reflux disease, meniscus tear, chronic bac pain, and opioid and methamphetamine use disorders. Within CDCR, the patient had previously received all levels of mental health care except ICF. He was admitted to MHCB care on March 27, 2025 for suicidal ideation after being screened for RHU placement due to drug trafficking and possession of a weapon. He was discharged to RHU EOP care on April 4, 2025.

CMC crisis intervention team documentation that led to MHCB placement was adequate. The initial psychiatric and primary clinician assessments were adequate and timely. A recreational therapy intake assessment was not completed. The initial IDTT meeting was timely and attended by the patient, alternates for the assigned psychiatrist and primary clinician, but no correctional counselor. He was found to meet criteria for a higher level of care due to multiple mental health RVR assessments and treatment refusal but was retained in MHCB care with a plan to discharge to EOP care. Rationale and interventions to be used in support of retention at the current level of care were appropriately identified. IDTT documentation included review of a safety plan developed almost a year earlier; the safety plan was inadequate and used identical language across multiple sections of the plan. In the MHCB prevention planning section of IDTT documentation, the patient was found to seek out MHCB admission to gain access to housing in a hospital setting, and interventions to address this issue were identified. The case formulation was partially adequate but did not address the patient seeking MHCB admission and refusing treatment. The treatment plan did not incorporate the interventions identified in the higher level of care and MHCB prevention planning sections of the IDTT documentation, narrowly focused on suicidal ideation as the treatment target, and did not include psychiatric care as an intervention. Despite the patient's presence at the IDTT meeting, patient strengths and verbalized treatment goals were not documented, and discharge criteria and reason for retention were left blank. The patient was followed daily by one of five psychiatrists and/or one of four primary clinicians. Provision of skills-building or other interventions outside of medication was absent or poorly documented, and the patient declined any medication changes. Recreational therapy activities were offered daily beginning on the second day of MHCB care; the patient refused all but two activities, and one recreational therapy progress note documented both a cell-front encounter and group participation. The weekly IDTT meeting was timely, resulted in discharge to EOP care, and attended by the patient, the assigned primary clinician, an alternate for the assigned psychiatrist, and a correctional counselor. The patient was found to have met his short-term treatment objective, and the treatment plan was updated accordingly. The discharge suicide risk evaluation found the patient's acute risk to be moderate. The accompanying safety plan did not involve the patient in its development and consisted of recommendations for future

treatment team members rather than a safety plan. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation, which had strengths, did not address several of the patient's treatment-interfering behaviors. Neither of the IDTT meetings were attended by all assigned staff. The treatment plan was only partially adequate and did not incorporate interventions identified in other portions of the IDTT documentation or psychiatric care. Interventions required by the treatment plan were not documented as provided. The patient's partial adherence with medication, disengagement with primary clinicians, and limited participation in recreational therapy activities were not adequately explored or addressed. His care over nine days was provided by five psychiatrists and four primary clinicians, resulting in poor consistency and continuity among these providers. The patient was discharged from MHCB care essentially unimproved. At discharge, he was found to be at moderate risk for suicide, without discussion of rationale for the discharge in the context of this elevated risk. The safety plan was inadequate.

**Patient J**

This 42-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with an adjustment disorder with anxiety, unspecified schizophrenia and other psychotic disorder, history of traumatic brain injury, and stimulant, opioid, and cannabis use disorders. He was prescribed olanzapine and mirtazapine and was adherent with these medications. Hydroxyzine was prescribed PRN for anxiety, and he consistently used this medication once or twice a day. No suicide attempts or self-injurious behavior were listed in the health record. Medical conditions included overweight, prediabetes, dyslipidemia, hypertension, hypothyroidism, kidney cyst, visual impairment with blindness in one eye, and combined opioid and non-opioid substance use disorder. Within CDCR, the patient had previously received only 3CMS care. He was admitted to MHCB care on March 31, 2025 for suicidal ideation with a plan, but he later denied any plan and reported that he had snorted illicitly obtained buspirone and buprenorphine-naloxone and had a drug debt. Both factors had contributed to anxiety and his report of suicidal ideation. He was discharged to 3CMS care on April 8, 2025.

The pre-admission mental health consult, accompanying suicide risk evaluation, and pre-admission screening were completed at another facility. The initial psychiatric and primary clinician assessments were timely and adequate. A recreational therapy intake assessment was not completed. The initial IDTT meeting was timely and attended by the patient, the assigned primary clinician and assigned correctional counselor, and an alternate for the assigned psychiatrist. The case formulation, patient strengths, and patient verbalized treatment goals were adequately documented. The treatment plan identified anxiety and substance use as treatment targets and was adequate apart from failing to include psychiatric care. A suicide risk evaluation completed on the same day as the initial IDTT meeting found the patient at low risk and was accompanied by a useful and clinically appropriate safety plan. The patient was followed daily

by one of three psychiatrists and/or one of two primary clinicians. Primary clinician progress notes were detailed, consistent with the treatment plan, and included clinically appropriate interventions. Recreational therapy activities were offered daily beginning on the second day of MHCB care. Recreational therapy notes documented the provision of in-cell materials at the cell front and indicated that the encounter lasted an hour, or they documented both the provision of in-cell materials at the cell front and participation in an hour-long group. The weekly IDTT meeting IDTT was timely, attended by the patient and required staff, and resulted in discharge. While the rationale for discharge was adequately documented, the treatment plan was not updated to reflect achievement of short-term objectives. The discharge suicide risk evaluation found the patient at low risk and continued the safety plan developed earlier in the MHCB stay. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The case formulation was adequate. Apart from failing to include psychiatric care, the treatment plan was clinically appropriate. The assigned primary clinician saw the patient for all but one primary clinician encounter. Primary clinic encounters documented the provision of clinically appropriate, patient-specific, evidenced-based interventions. Safety planning was collaborative and resulted in a useful plan. Psychiatric care appeared to be appropriate, and overall care was collaborative, realistic, and supportive.

**Patient K**

This 56-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility A and diagnosed with an adjustment disorder with anxiety and depression. He was prescribed benztropine, chlorpromazine, mirtazapine, and topiramate and was adherent with these medications. Near the end of the review period, benztropine ceased to be ordered as a scheduled medication and was ordered PRN for anxiety, and the patient used this medication on four occasions. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included esophagitis, dysphagia, unintended weight loss, glucose intolerance, dyslipidemia, hypertension, and asthma. He was placed in mainline 3CMS care at CMC on November 19, 2024, and remained in this level of care at CMC throughout the review period. He was serving an indeterminate life sentence, his first CDCR term, and arrived at CDCR on September 25, 2024.

The initial psychiatric assessment was timely, confidential, and adequate apart from failing to provide a rationale for prescribing an antipsychotic to a patient diagnosed with adjustment disorder. The initial primary clinician assessment, completed by an unlicensed social worker, occurred 59 days after the patient's arrival and included an under-developed case formulation. No IDTT meeting was held and no treatment plan developed after the patient's arrival. The patient was seen timely for follow-up psychiatric encounters through telepsychiatry, with the telepresenter in the room. Progress notes were adequate, but the reason(s) chlorpromazine was prescribed were not documented. During the review period, the patient was seen twice by a

senior psychologist specialist in response to referrals from custody and a patient health care request. On both occasions the patient was found to be stable. He was not seen for regularly scheduled meetings with his primary clinician. During the final month of the review period, the patient was offered recreational therapy yard activities once or twice a week. Documentation was minimal and confusing, because the content of the therapeutic intervention/group progress note consistently indicated the activities occurred on Wednesdays, while dates of service and time stamps indicated that the groups occurred on both Wednesdays and Thursdays.

**Findings**

The care provided to this 3CMS patient was inadequate.

Psychiatric documentation did not provide a rationale for ongoing treatment with antipsychotic medication in a patient diagnosed with an adjustment disorder. The initial primary clinician assessment was more than six weeks late and provided an inadequate case formulation. No IDTT meeting was held. The patient did not receive quarterly primary clinician encounters. Recreational therapy notes were internally inconsistent.

**Patient L**

This 73-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility C and diagnosed with unspecified depressive disorder, unspecified anxiety disorder, and insomnia. He was prescribed fluoxetine, hydroxyzine, melatonin, and mirtazapine and was adherent with these medications. Melatonin was converted to a keep-on-person medication near the end of the review period. Three suicide attempts between 1995 and 2001 were listed in the health record. Within CDCR, the patient previously received 3CMS and MHCB services. Medical conditions included coronary atherosclerosis, arterial retinal branch occlusion, hypertension, hyperlipidemia, diabetes with neuropathy, glaucoma, hearing loss, retinal detachment, liver abscess, lung nodule, and bilateral hip and neck pain. He used hearing aids. He was placed in mainline 3CMS care at CMC on March 12, 2020, and remained in this level of care at CMC throughout the review period. He received medical care in the CTC from September 4, 2024 through November 21, 2024.

A covering psychiatrist saw the patient twice while he was in the CTC at the beginning of the monitoring period. These encounters were confidential and adequately documented. Following the second encounter, the patient was not seen for 124 days, when his assigned psychiatrist saw him through telehealth. Two primary clinicians saw the patient a total of four times during the review period. The progress note included canned language the telepsychiatrist used for other 3CMS patients and was inadequately patient-specific. Two primary clinicians saw the patient a total of four times during the review period. Three of these encounters were confidential, but the content of all four encounters were consistent with wellness checks rather than treatment. Provision of sleep hygiene skills as required by the treatment plan was not documented. Beginning in March, 2025, the patient was offered a psychologist-led 90-minute mental health group that met once every two weeks, and the patient consistently attended this group.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient's diagnoses remained unspecified and unresolved, and the nature, intensity, duration, and triggers for the patient's depressive and anxious symptoms were unclear. The potential roles of chronic medical conditions and chronic pain in mental health symptoms were inadequately explored and addressed. As documented, he was not provided with meaningful treatment in individual primary clinician encounters. Psychiatric care was not timely, and in one encounter psychiatric documentation was insufficiently patient-centered. The provision of a 90-minute mental health group represented a major strength, but documentation of the patient's participation in this group was poor.

**Patient M**

This 44-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility A and diagnosed with an adjustment disorder, resolved, and substance use disorder, in remission. He was not prescribed any psychotropic medication. However, he had a history of receiving antidepressant and antipsychotic medication and being diagnosed with serious mental illness in the community. Through the ISUDT, he was prescribed buprenorphine-naloxone and was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included hyperlipidemia, hypertension, opioid use disorder, cervical spine stenosis, and chronic pain. He was enrolled in mainline 3CMS care at CMC from general population status on September 17, 2024, and remained in this level of care at CMC throughout the review period.

The initial psychiatric and primary clinician assessments occurred prior to the monitoring period. The initial IDTT meeting occurred a day late during the review period. The meeting was attended by the patient, the assigned primary clinician, an alternate for the assigned psychiatrist, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for a higher level of care. The case formulation was generic and inadequately patient-specific and did not address the identified role of chronic pain in the patient's depression. However, the treatment plan did address this issue and was adequate and clinically appropriate. The patient's strengths and rationale for retaining the patient in 3CMS care were adequately documented. He was offered recreational therapy groups once or twice a week throughout the review period, and he attended most of these. The primary clinician saw the patient twice during the review period, once for a scheduled treatment encounter and then in response to custody referral due to the patient's hostile behaviors. Both sessions lasted only ten minutes each. During the first encounter, the patient reported high levels of depression and sleep disruption. The provision of evidence-based interventions beyond encouragement and support was not documented. The patient initially refused the second encounter and was seen at the cell front, where he was partially cooperative but irritable and reported high levels of pain. It was noted he was socially withdrawn and appeared to be talking to the call in his cell. It was determined to maintain him in 3CMS care and to monitor him for further decompensation and consideration of a higher level of care.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the patient reported no anxiety or depression at the time of his initial psychiatric assessment, he had just been enrolled in 3CMS care due to significant stressors and chronic pain resulting in distress. At the time of his initial primary clinician assessment, he reported high levels of depression and anxiety, and high depression related to chronic pain was identified as the treatment target in his IDTT meeting. Subsequent encounters during the review period were cursory but nevertheless indicated a progression of the patient's depression, irritability, and social withdrawal. Provision of appropriate evidence-based interventions, such as cognitive behavioral therapy for pain management and depression, was not evident in the record. The patient's mental illness was inadequately assessed, and his depression was inadequately treated and became worse.

**Patient N**

This 42-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility B and diagnosed with adjustment disorder, resolved, and substance use disorder, in remission. He was not prescribed any psychotropic medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included bilateral foot pain, herpes simplex, and a history of colitis. He was placed in mainline 3CMS care at CMC on January 17, 2024, and remained in this level of care at CMC throughout the review period.

The initial IDTT meeting occurred prior to the review period but did not result in the development of a treatment plan. A primary clinician saw the patient just once during the review period, 163 days after the next most recent primary clinician encounter. The progress note did not indicate whether the encounter was confidential and provided no indication that evidence-based care was provided. Although the encounter was documented as 30 minutes long, documentation was consistent with a wellness check.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was no treatment plan available to guide 3CMS care, and the patient received only one primary clinician encounter during the review period. The rationale for retaining the patient in 3CMS care, goal of this care, and provision of evidence-based care were not documented.

**Patient O**

This 66-year-old, DDP2, 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility B and diagnosed with

schizoaffective disorder, depressed type, and severe cognitive impairment. He was prescribed aripiprazole and was adherent with this medication. An additional dose of aripiprazole was prescribed PRN for psychosis, and hydroxyzine was prescribed PRN for anxiety. He made regular use of both medications beginning in January 2025, after the psychiatrist reminded the patient of their availability. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS and EOP services. Medical conditions included cardiac arrhythmia, neurocognitive disorder, kidney stone, degenerative lumbar disc, gastroesophageal reflux disease, chronic back pain, impaired glucose tolerance, and mixed hyperlipidemia. He was placed in mainline 3CMS care at CMC on February 22, 2022, and remained in this level of care at CMC throughout the review period.

The most recent IDTT meeting occurred long before the review period, on August 31, 2021, and by October 1, 2025 was over four years late. There was no current treatment plan to guide 3CMS care. In January 2025, a developmental disability evaluation found the patient with severe cognitive impairment on the Montreal Cognitive Assessment, and a medical provider started the patient on donepezil. Two psychiatrists saw the patient during the review period; both encounters were confidential and the second was conducted by telehealth. Medications were adjusted to address ongoing psychotic symptoms. Two primary clinicians saw the patient three times during the review period, two for scheduled encounters and one for a health care request in which the patient complained of worsening dementia. None of the progress notes indicated whether the encounter was confidential, and none described the provision of evidence-based interventions. He was offered multiple hour-long recreational therapy groups each week and attended a little more than half of them.

**Findings**

The care provided to this 3CMS patient was inadequate.

Most of this patient's care was adequate. The patient was followed timely and adequately by both psychiatrists and primary clinicians. The patient's symptoms of schizoaffective disorder were adequately monitored and treated, and the patient remained psychiatrically stable. He was seen timely in response to a mental health sick call request. Given the finding of major neurocognitive disorder, individual psychotherapy was likely not indicated, and supportive contacts were appropriate. The exceptional number of recreational therapy groups offered in 3CMS care represented a significant strength in the patient's care. Psychiatrists and psychologists documented awareness of the patient's cognitive symptoms and intention to communicate across disciplines. However, the major concern was the lack of IDTT meetings and treatment planning for four years. Particularly given the patient's clinical complexity, severity of cognitive impairment, and the likely trajectory of his neurocognitive impairments, comprehensive multidisciplinary collaboration and treatment planning were foundational to this patient's care. The absence of this crucial element did not meet the standard of care.

**Patient P**

This 32-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility M and diagnosed with

bipolar I disorder, most recent episode manic, with psychosis. He was prescribed olanzapine and then aripiprazole and was adherent with these medications. Diphenhydramine and trazodone were prescribed PRN for insomnia, and he made frequent use of these medications. These medications were ordered for the pm medication line rather than as hour of sleep medications. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, and APP services. Medical conditions included obesity and hyperlipidemia. He was placed in mainline 3CMS care at CMC on August 6, 2024, and remained in this level of care at CMC throughout the review period.

No IDTT meetings were held for this patient. The assigned psychiatrist saw the patient by telehealth on three occasions during the review period, and a covering psychiatrist saw the patient in person once in response to a health care request complaining of insomnia. These encounters were confidential apart from the presence of the telepresenter, timely, and documented appropriate monitoring of symptoms and side effects. However, psychiatric progress notes relied on nearly identical language across encounters and provided only limited information regarding the patient's treatment progress. Medications were adjusted in response to patient concerns, including converting aripiprazole from oral to injectable administration. The patient was seen by a primary clinician only once during the review period. This encounter occurred by telemental health 217 days after the next most recent primary clinician encounter and lasted only 12 minutes.

**Findings**

The care provided to this 3CMS patient was inadequate.

CMC did not hold an IDTT meeting for this patient, and there was no treatment plan available to guide his 3CMS treatment. He did not receive timely or adequate treatment from a primary clinician. Psychiatric care was largely appropriate, although the patient's heavy use of PRN medications for insomnia at approximately 5:30 pm was counterproductive.

**Patient Q**

This 36-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility A and diagnosed with an adjustment disorder with anxiety and depression, posttraumatic stress disorder, and substance use disorders. He was prescribed prazosin and was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included transaminitis, recurrent hepatitis C, and a history of syphilis. He received mainline 3CMS care at CMC from November 13, 2024 through April 6, 2025, when he was released from incarceration.

No initial primary clinician assessment was completed, and an initial IDTT meeting was not held. The initial psychiatric assessment was completed 48 days after the patient's arrival in 3CMS care at CMC. The assessment was limited, and documentation did not indicate whether the encounter was confidential. The follow-up psychiatric encounter was timely and confidential but brief. The patient saw a primary clinician once during the review period, 158 days after the

next most recent primary clinician encounter. The accompanying progress note was limited and consistent with a wellness check; the encounter lasted ten minutes. The patient was offered one recreational therapy group during the review period, and did not attend.

**Findings**

The care provided to this 3CMS patient was inadequate.

No primary clinician assessment was completed, no IDTT meeting was held, and no treatment plan was developed. The initial psychiatric assessment was late and inadequate, and there was little evidence documented in support of the patient's diagnoses. The patient did not receive timely or adequate individual treatment from the primary clinician.

**Rodriguez, Brian AZ0101**

This 36-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility C and diagnosed with bipolar I disorder, severe with psychotic features. He was prescribed intramuscular aripiprazole and divalproex sodium and was adherent with the former but not with the latter. Hydroxyzine was prescribed PRN for anxiety, but he did not use this medication during the review period. Through the ISUDT, he was prescribed buprenorphine-naloxone and was adherent with this medication. Five suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, and EOP services. Medical conditions included diabetes with peripheral neuropathy, gastroesophageal reflux disease, hypertension and hyperlipidemia, systolic murmur, opioid and methamphetamine use disorders, left knee meniscal tear, tubular adenoma of colon, and a history of treated hepatitis C. He was placed in mainline 3CMS care at CMC on April 11, 2023, and remained in this level of care in CMC throughout the review period.

During the review period, the assigned psychiatrist saw the patient once every one to two months, or a total of four times. These encounters occurred by telepsychiatry and were confidential apart from the presence of the telepresenter. Progress notes were nearly identical from one encounter to the next, and the patient's nonadherence with divalproex sodium was inadequately explored or addressed. Two of these encounters were quite brief, lasting nine to 12 minutes each. Three psychologists saw the patient twice for scheduled appointments and once in response to a health care request reporting depression. These clinicians introduced new diagnoses, including adjustment disorder with depressed mood, without reconciliation with the diagnosis offered by the psychiatrist. Clinician interventions focused on the patient's grief at losing his mother, depression, and anxiety at being incarcerated, but did not address the treatment targets identified in the patient's treatment plan or provide the interventions required by the treatment plan. Beginning in November 2024, the patient was offered recreational therapy groups two to four times a month, along with one mental health group led by a psychologist. He attended more than half of these groups.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the patient received frequent psychiatric follow-up appointments, psychiatric documentation was perfunctory and nearly identical from encounter to encounter. The patient's nonadherence with the prescribed mood stabilizer was inadequately addressed in progress notes. There was poor agreement between primary clinicians and the psychiatrist with respect to the patient's diagnosis, and no documentation addressed reconciliation of these diagnoses. Primary clinician turnover resulted in poor consistency and impaired continuity of care. Interventions provided were not reflected in the treatment plan, and interventions required by the treatment plan were not provided.

**Patient S**

This 79-year-old, primarily Cantonese-speaking, 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility B and diagnosed with unspecified depressive disorder and prescribed citalopram and mirtazapine. He was adherent with these medications. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included chronic hepatitis B, cirrhosis of liver, chronic kidney disease, prediabetes, chronic gastritis, thrombocytopenic disorder, hyperlipidemia, gout, anemia, and overweight. He was a participant in the developmental disability program and carried a code of DDP1. He was placed in mainline 3CMS care at CMC on June 3, 2019, and remained in this level of care at CMC throughout the review period.

No IDTT meeting was held for the patient at CMC after 2022, and there was no treatment plan available to guide treatment. During the review period, the primary clinician completed only one encounter with the patient. Two initial attempts by the primary clinician to see the patient were unsuccessful due to the lack of a Mien interpreter. By the time the patient was seen with an interpreter during the third attempt, on November 6, 2024, 118 days had passed since the last individual treatment encounter. During this encounter, the clinician completed a pre-release planning assessment and provided the patient with additional information regarding arrangements for his pending release, but did not document any mental health treatment. Following this completed encounter, a new primary clinician attempted to see the patient but was unsuccessful due to the lack of an interpreter. The patient was finally seen by a third primary clinician 174 days following the November 6, 2024 encounter. This second encounter occurred after the monitoring period ended, and during it the patient declined the use of an interpreter, indicating that he could understand English if it were spoken slowly with common words. The assigned psychiatrist followed the patient was followed timely and adequately during the review period. These encounters were confidential and documented adequately. A third psychiatric encounter occurred after the monitoring period by telepsychiatry. Psychiatric monitoring of medications, including attention to an elongated QTc interval, was adequate. The patient was offered two to four recreational therapy groups a month and attended most of them.

**Findings**

The care provided to this 3CMS patient was inadequate.

No IDTT meetings had been documented for this patient for three years. There was no treatment plan available to guide treatment during the monitoring period. Primary clinician encounters were not timely and did not reflect treatment. It was unclear why psychiatrists, and perhaps the patient, felt comfortable communicating in English without an interpreter, while two primary clinicians felt that one was required. The patient's diagnosis of unspecified depressive disorder remained unspecified and unresolved. Psychiatric care appeared otherwise adequate.

**Patient T**

This 56-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was housed in Facility C and diagnosed with adjustment disorder, resolved, and substance use disorders, in remission. He was not prescribed any psychotropic medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included hypertension, hepatitis B exposure, carbohydrate metabolism disorder, subclinical hypothyroidism, and lower urinary tract infection. He was placed in mainline 3CMS care at CMC on November 28, 2023, and remained in this level of care at CMC throughout the review period. He was serving a life without parole sentence, his first incarceration.

During the review period, the primary clinician saw the patient twice. These contacts were not timely and were brief, lasting 11 to 16 minutes each. The first of these encounters occurred 183 days after the next most recent primary clinician contact, and second encounter during the review period occurred 99 days after the first. Documentation did not indicate whether the encounter was confidential and did not reflect the provision of the coping skills required by the treatment plan. Content was consistent with a wellness check rather than treatment. The psychiatrist saw the patient once during the review period by telepsychiatry. The encounter was timely and confidential apart from the presence of the telepresenter. However, it was quite brief, lasting only seven minutes, and insufficient for an adequate clinical review.

**Findings**

The care provided to this 3CMS patient was inadequate.

While psychiatric care was timely and adequate, primary clinician care did not follow the treatment plan and was late. Meaningful treatment and evidence-based interventions were absent from progress notes. While ongoing monitoring and support may have been clinically appropriate for suicide prevention, given the patient's life sentence and first incarceration, this rationale was not documented. The patient's psychiatric diagnoses were noted to be resolved, and the patient had not been prescribed psychotropic medication since his arrival in CDCR in October 2023. The reasons the patient remained in 3CMS care were not documented.
**Garcia, Manuel BL2473**

This 36-year-old EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with major depressive disorder, recurrent, severe, antisocial personality disorder, and opioid use disorder. He was prescribed mirtazapine and olanzapine and was partially adherent with the former and consistently adherent with the latter. Up to four doses of hydroxyzine 75 mg and up to four additional doses of olanzapine 10 mg per day were prescribed PRN for agitation; the patient used one or both PRN medications nearly daily, and often multiple times a day, during the review period. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. Eight suicide attempts and two episodes of self-injurious behavior were listed in the health record. Medical conditions included lymphedema of right lower extremity, left eye blindness with prosthesis, unintended weight loss, and history of hepatitis C. Within CDCR, he had previously received all levels of mental health care. At CMC, he received EOP RHU care from December 27, 2024 through the end of the review period. On December 26, 2024, he had been referred to MHCB care following a suspected overdose accompanied by suicidal statements. This referral was rescinded after no evidence of an overdose was identified at an outside hospital and the patient recanted suicidal ideation and requested quetiapine and bupropion.

A suicide risk evaluation completed when the MHCB referral was rescinded was adequate and found the patient's current risk to be low. The accompanying safety plan was cursory, completed without the patient, and unlikely to be useful. Upon the patient's return to EOP RHU care, five-day follow-up encounters occurred as required and were adequately documented. The initial IDTT meeting was timely and attended by the patient, alternates for both the assigned psychiatrist and the assigned primary clinician, and other required staff. The patient met higher level of care criteria due to multiple RVR assessments and MHCB referrals/admissions; rationale for retaining the patient in EOP care was adequately documented. IDTT documentation indicated that the patient was enrolled in the SRMP, with a plan to provide the patient with a 12-week anger management program and an alphabet of coping skills interventions. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan carried forward previously developed goals addressed depressed mood and bizarre behavior and added a third and redundant goal addressing depression. Short- and long-term goals were not measurable, but interventions were adequately specified and appropriate to the patient's treatment needs. The initial psychiatric assessment and initial primary clinician assessment were not completed until after the initial IDTT meeting. Both assessments were deficient. The psychiatric assessment failed to provide current diagnostic impressions and described the patient as "lying" to obtain quetiapine and bupropion. The primary clinician assessment did not include a summary of the patient's suicide and self-harm behaviors or current diagnostic impressions, and a mental status exam was not performed due to the patient's refusal to participate in the assessment. The case formulation was generic and incomplete, ending in mid-sentence, and did not address the patient's history of suicidal/self-injurious behaviors. It was not helpful for guiding treatment.

The assigned psychiatrist followed the patient monthly. Progress notes did not indicate whether these encounters were confidential, but psychiatric care appeared appropriate in some respects. The patient submitted four health care requests asking for quetiapine, bupropion, and/or venlafaxine; the psychiatrist responded with consistent and principled reasoning that these

medications were not clinically indicated. However, the psychiatrist included no documentation acknowledging the increasingly large doses of olanzapine the patient was using each day. For example, on March 15 and 16, 2025, several days prior to the last psychiatric encounter in the review period, the patient received four doses of PRN olanzapine 10 mg in addition to the 30 mg of scheduled olanzapine, resulting in a total of 70 mg of olanzapine consumed each day. This example was not anomalous. During February 2025, he used 60 mg of olanzapine a day for more than half of the month; during March 2025, he used 60 or 70 mg of olanzapine a day for a third of the month. These quantities far exceeded recommended maximum daily doses and appeared excessive given the patient's clinical presentation.

One of five primary clinicians followed the patient weekly. Most encounters were confidential, but they were provided in the yard or at the cell front when the patient refused a confidential setting. Encounters were focused on assessing the patient's safety, stability, mental status, and functioning in EOP RHU; there was no evidence that the evidence-based interventions identified in the treatment plan were provided in these encounters. In the assessment sections of both the psychiatric and the primary clinician progress notes, team members documented that the patient suffered from a "psychiatric problem" without further specification. The patient was offered multiple groups, including a SRMP group, but was identified as a high treatment refuser in January and February. Primary clinicians provided daily encounters during four weeks of the review period to encourage programming, but the reasons for the patient's treatment refusals were not documented. In addition to mental health groups, the patient was offered nursing led treatment groups and attended half of the offered sessions. The follow-up IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned psychiatrist. IDTT documentation indicated that the patient was not enrolled in the SRMP or that the patient was receiving any SRMP interventions, despite the patient's ongoing enrollment in a SRMP group. The case formulation and treatment plan remained deficient, and the patient's strengths and verbalized treatment goals remained undocumented. A mental health evaluation for a January 15, 2025 RVR alleging misuse of state property was adequate and found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The care provided to this EOP RHU patient was inadequate.

The initial assessments, case formulation, and treatment plan were deficient, and the initial assessments were completed after the initial IDTT meeting. The patient's psychiatric diagnoses were inadequately clarified, and it was not clear that the patient's treatment needs were adequately conceptualized. The role of personality and substance use disorders in the patient's clinical presentation, together with the patient's high rate of treatment disengagement, were inadequately explored and addressed. Individual primary clinician encounters did not involve delivery of the interventions required by the treatment plan, and follow-up IDTT documentation did not reflect awareness of the patient's SRMP status. The high daily doses of olanzapine consumed were inconsistent with the patient's diagnosis and clinical presentation and were not acknowledged, justified, or adequately addressed.

**Brown, Earnest AX2644**

This 31-year-old transgender (she/her/hers) EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. She was diagnosed with bipolar I disorder, most recent episode depressed, unspecified, and borderline and antisocial personality disorders. Under PC 2602 orders for involuntary treatment due to danger to others, she was prescribed and adherent with haloperidol decanoate. Buspirone and diphenhydramine were prescribed PRN for anxiety, and she used one or both medications almost daily during the review period. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder; through medical services, she was prescribed gender affirming hormones. She was adherent with these medications. Three episodes of self-injurious behavior were listed in the health record. Medical conditions included gastroesophageal reflux disease, gender dysphoria, pituitary microadenoma with hyperprolactinemia, opioid use disorder, and history of a fractured jaw. Within CDCR, she had previously received all levels of mental health care. At CMC, she received EOP RHU care from October 18, 2024 to February 20, 2025, when she was admitted to MHCB care after she overdosed on illicit substances and was sent to the community emergency room.

The initial primary clinician assessment was timely and adequate, apart from a failure to complete mental status items assessing insight, judgment, and intellectual functioning. It included a good case formulation. The initial psychiatric evaluation was timely and brief but adequate. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was considered for a higher level of care due to multiple mental health RVR evaluations, but the treatment team determined to retain her in EOP RHU care and adequately documented the rationale for this decision and the interventions to be provided. The patient's enrollment in SRMP, with a plan to provide cognitive-behavioral therapy and coping skills, was adequately documented. The patient's strengths and verbalized treatment goals were minimally documented. The treatment plan identified impulsive behavior, anger, and treatment nonadherence as targets for treatment, and both short- and long-term goals were measurable and clinically appropriate. However, the treatment plan identified CBT as the only intervention for all three treatment goals, and it did not address psychiatric care, suicidal risk, or the need for involuntary treatment. The follow-up IDTT meetings were timely and attended by the patient and required staff. During the first follow-up IDTT meeting, the patient continued to meet criteria for consideration of a higher level of care, and the rationale for retaining her in EOP care was adequately documented. By the second follow-up IDTT meeting, she no longer met criteria for consideration of a higher level of care. The patient's participation in both follow-up meetings was adequately documented; her strengths and verbalized treatment goals were updated, and the treatment plan was updated to reflect ongoing progress.

One of two psychiatrists followed the patient at least monthly. Documentation was minimally adequate, and care appeared appropriate. However, it was unusual to use haloperidol decanoate as maintenance therapy for a patient with bipolar disorder who was not acutely manic, and the reason for this medication selection was not documented. In addition to ongoing psychiatric care, the patient was reevaluated for appropriateness of involuntary treatment, and the court was petitioned for a renewal of the PC 2602 order due to danger to others. On December 11, 2024, the administrative law judge granted this petition over the patient's objections. The assigned

primary clinician or, on two occasions, a covering clinician, saw the patient once a week while the patient remained in EOP RHU care. Nearly all encounters occurred at the cell front due to the patient's refusals. While progress notes were thorough and confirmed collaborative and supportive efforts and indicating on each occasion that the primary clinician would provide CBT interventions to address catastrophic thinking and other cognitive challenges, there was no documentation that these interventions were provided. The patient refused most groups offered and received daily high refuser contacts during the second half of December 2024 as well as intermittently in February 2025. These encounters had little impact on improving the patient's participation. Seven mental health evaluations for RVRs alleging battery on a peace officer (three incidents), aggravated battery on a non-inmate by means of gassing, fighting, and threatening staff (two incidents), found a nexus between the patient's mental health symptoms and the alleged behaviors in five cases, and no such nexus in two cases. The assessments were thoroughly documented.

**Findings**

The care provided to this EOP RHU patient was inadequate.

The treatment plan was only partially adequate and insufficient to guide the totality of the patient's EOP RHU care. Psychiatric care was atypical for maintenance therapy with bipolar disorder, as the patient was not prescribed medications approved for ongoing mood stabilization. Although both the treatment plan and the primary clinician progress notes demonstrated efforts to increase the patient's group attendance, the reasons for the patient's refusals of groups and confidential individual encounters were inadequately investigated and addressed. The possible contributory roles of the patient's transgender identity and/or traumatic history was not assessed. The nonpharmacological interventions provided did not meet the patient's treatment needs, and the patient showed little overall progress. It appears likely that the patient was struggling with an active substance use disorder that went undetected until her overdose.

**Patient W**

This 43-year-old transgender (she/her/hers) EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. She was diagnosed with major depressive disorder, recurrent, severe with psychotic features, and methamphetamine and opioid use disorders. She was prescribed and adherent with diphenhydramine, mirtazapine, and oxcarbazepine. Additional doses of diphenhydramine were prescribed PRN for anxiety, and she used these doses one to three times a day. Through the ISUDT, she was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. Two suicide attempts and two episodes of self-injurious behavior were listed in the health record. Medical conditions included seizure disorder, asthma, dyspepsia, pain in right knee and right shoulder, mild neurocognitive disorder due to traumatic brain injury, and opioid use disorder. Within CDCR, she had previously received all levels of mental health care. At CMC, she received EOP RHU care from July 3, 2024 to November 13, 2024, when she was transferred to EOP RHU care at another facility. She was serving an indeterminate life sentence.

At the beginning of the review period, a mental health evaluation for an RVR alleging indecent exposure was adequate and found no nexus between mental health symptoms and the alleged behavior. During the review period while in EOP RHU care at CMC, one follow-up IDTT meeting was held. This was the first follow-up IDTT meeting and as such was required to occur within 60 days of arrival in EOP RHU care; it occurred 98 days after the patient's arrival. It was attended by the patient and required staff, apart from an alternate for the assigned primary clinician. Due to multiple mental health evaluations for RVRs, she met a criterion for higher level of care. IDTT documentation adequately justified her retention in EOP RHU care. She was noted to be enrolled in the SRMP with a plan to use DBT-informed treatment; it was noted that the patient had made only minimal progress due to high levels of treatment refusal. The case formulation was adequate apart from failing to address the patient's transgender identity and its potential relationships with stress, symptoms, and behaviors. The treatment plan identified poor distress tolerance and depression with suicidal ideation as treatment targets. Strangely, short-term goals were framed in terms of medication adherence for both targets, but psychiatric care was not included in interventions. Instead, interventions focused on coping skills that at best were only distantly related to medication adherence, and IDTT documentation acknowledged the patient's medication adherence since arrival in EOP RHU. IDTT documentation did not record what happened in this meeting, and the patient's strengths and verbalized treatment goals were poorly documented.

The assigned psychiatrist saw the patient once during the period reviewed. This encounter was timely, but documentation did not indicate whether it was confidential. The progress note was brief but minimally adequate apart from failing to document current diagnostic impressions. During most of the period reviewed, a clinician covering for the assigned primary clinician attempted to follow the patient weekly. The patient was not receptive to the covering clinician, and these encounters occurred at the cell front due to the patient's refusals. In mid-October, 2024, the patient submitted a health request asking to speak with her assigned psychologist. The following day, the chief psychologist attempted to meet with her to complete an evaluation under the SB 132 Transgender Respect, Agency, and Dignity Act, but the patient angrily refused. After the assigned clinician returned from vacation at the end of October, the patient was willing to meet in a confidential setting for one encounter but not for the second. The progress note for the confidential setting confirmed active, collaborative, and clinically appropriate treatment. In early November, 2024, a mental health gender dysphoria diagnostic criteria evaluation was started but not completed because the patient refused to interview. The patient was offered multiple mental health groups but consistently refused to attend. It was suspected that she feared for her safety despite custody investigations finding no evidence for this fear. She was identified as a high treatment refuser throughout the period reviewed and received daily primary clinician contacts to encourage programming. These contacts did not result in improved participation, and her treatment plan was not updated to address group refusals.

**Findings**

The care provided to this EOP RHU patient was inadequate.

Although significant efforts were made, the care this patient received in EOP RHU at CMC did not meet her treatment needs. The follow-up IDTT meeting was more than one month late, and

the treatment plan lacked internal coherence. The patient refused most of the treatment offered. Progress notes confirmed high levels of interpersonal sensitivity, hostility, irritability, and withdrawal, suggesting that her mood symptoms were inadequately treated. The potential roles and relationships among her history of traumatic brain injury, possible personality disorder, substance use, transgender identity, symptoms, and behaviors, including her treatment refusals, were insufficiently investigated and addressed.

**Patient X**

This 31-year-old EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with schizoaffective disorder, depressive type, posttraumatic stress disorder, attention deficit-hyperactivity disorder, and borderline personality disorder. He was enrolled in the developmental disabilities program with a code of DDP2. He was prescribed and adherent with benztropine, chlorpromazine, mirtazapine, olanzapine, and topiramate. Additional doses of benztropine and olanzapine were prescribed PRN for extrapyramidal symptoms and psychosis, respectively; he used both PRN medications frequently. Three suicide attempts and five episodes of self-injurious behavior were listed in the health record. Medical conditions included a history of unintended weight loss and a traumatic brain injury with loss of consciousness. Within CDCR, he had previously received all levels of mental health care. At CMC, he received EOP RHU care from December 4, 2024 through the end of the review period.

Upon the patient's arrival in EOP RHU care, five-day follow-up encounters occurred as required and were adequately documented. The initial primary clinician assessment was timely and adequate except for the case formulation, which failed to address psychotic and mood symptoms. A non-assigned psychiatric completed the initial psychiatric assessment. The assessment was timely and brief but minimally adequate. A mental health evaluation for a November 26, 2024 RVR alleging aggravated battery on a non-inmate by means of gassing and was adequate and found a nexus between the patient's mental health symptoms and the alleged behavior. The initial IDTT meeting was timely and attended by the patient and required staff, including the assigned psychiatrist, who had not previously met the patient. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan identified was vague in identifying "mood-related symptoms" as a treatment target, and it identified ACT/CBT coping skills as the only intervention to be provided; it did not address psychotic symptoms or psychiatric care. Discharge criteria and rationale for retention in EOP care were not documented. The follow-up IDTT meeting was timely and attended by required staff apart from an alternate for the assigned primary clinician; the patient refused to attend. The case formulation was updated to reflect a change from DDP1 to DDP2 status, but the treatment plan, patient's strengths, verbalized treatment goals, and discharge criteria/rationale for retention in EOP remained unchanged and either inadequate or not documented. IDTT documentation provided no record of what was discussed during this meeting.

One of three psychiatrists followed the patient at least monthly. Progress notes were brief and did not indicate whether the encounter was confidential, except for one contact at the cell front. The patient submitted two health requests asking to speak with his psychiatrist about changing

his medications to avoid oversedation; the psychiatrist saw the patient promptly for both requests and adjusted medications collaboratively. The assigned primary clinician provided confidential individual contacts weekly except between January 16 and January 28, 2025, when no individual encounter occurred. Progress notes were brief, and content was consistent with monitoring, supportive therapy, and case management; there was no documentation that interventions required by the treatment plan were provided. The patient was offered multiple mental health groups but refused most. At the end of December, 2024, he was identified as a high treatment refuser, and he received daily primary clinician encounters to encourage treatment participation for most of the remaining review period. In mid-January, 2025, the patient reported that he was isolating because he was grieving for his aunt; this issue and his programming refusals were not addressed in the subsequent IDTT meeting. The California Adaptive Support Evaluation for DDP enrollment was not completed during the reception process due to multiple MHCB admissions, and in January 2025 it was completed following two confidential interviews in December 2024. The evaluation was thorough, and documentation was excellent. Mental health DDP RHU checks occurred weekly as required. These encounters were confidential unless the patient refused them, and progress notes were excellent. Beginning in mid-February, 2025, he was offered nursing led treatment groups two to three times a week; he attended about a third of these. A March 5, 2025, suicide risk evaluation was adequate and found the patient at low risk.

**Findings**

The care provided to this EOP RHU patient was inadequate.

Despite excellent monitoring and support through the DDP clinician, the patient's overall mental health treatment did not meet his needs. Neither the case formulation nor the treatment plan were adequate to guide the patient's EOP RHU care. The patient's psychotic and depressive symptoms were inadequately addressed in these documents, and the treatment plan was not updated to address the patient's bereavement or disengagement from treatment. IDTT documentation was cursory and incomplete. No individual primary clinician encounters were provided for 12 consecutive days in January 2025. Primary clinician encounters did not reflect the provision of interventions required by the treatment plan, and except for pharmacotherapy, the patient received little evidence-based treatment. The psychiatrist's prompt and collaborative responses to the patient's requests for medication adjustments represented a strength in this patient's treatment.

**Patient Y**

This 34-year-old EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with schizoaffective disorder, bipolar type, substance-induced mood disorder, and antisocial personality disorder. Through a PC 2602 order for involuntary treatment due to danger to self, he was prescribed and adherent with benztropine, haloperidol decanoate, hydroxyzine, lithium, and olanzapine. An additional dose of olanzapine was prescribed PRN for psychosis, and he used this dose on nine occasions during the period reviewed. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included hypertension and knee pain. Within CDCR, he had previously received 3CMS, MHCB, EOP, and ICF care. At CMC, he received EOP RHU care

from October 14, 2024 to November 24, 2024, when he was returned to MHCB care for danger to self and suicidal ideation.

After the patient was discharged from MHCB care to EOP RHU care, five-day follow-up encounters were completed for seven days. Documentation was adequate. The initial psychiatric and primary clinician assessments were timely but cursory. The psychiatric assessment did not provide psychiatric history or diagnoses. In the primary clinician assessment, the mental status exam was incomplete, and the case formulation was generic and did not address the patient's psychotic symptoms, suicidal ideation, substance use, or need for involuntary treatment. The initial IDTT meeting was timely and attended by the patient and required staff except for an alternate for the assigned psychiatrist. The patient was found to meet criteria for a higher level of care due to multiple MHCB referrals/admissions and mental health RVR assessments, as well as high rates of treatment refusal. Reasons for retaining the patient in EOP RHU care were adequately documented. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan was only partially adequate and did not address psychotic symptoms or psychiatric care.

A non-assigned psychiatrist provided the monthly follow-up encounter. The progress note was terse and lacked detail or current diagnostic impressions, but the patient's request to have medications adjusted was addressed in a timely and apparently collaborative manner. One of two assigned primary clinicians followed the patient weekly. The patient refused most of the weekly encounters, and as a result they occurred at the cell front and were brief and consistent with wellness checks. Two primary clinician encounters were confidential, and progress notes for these sessions reflected active provision of clinically appropriate interventions. The patient was offered multiple mental health groups but refused most. In early November 2024, he was identified as a high treatment refuser. Daily primary clinician encounters to encourage programming participation were provided during two of the remaining three weeks he remained in EOP RHU care. A mental health evaluation for a September 14, 2024 RVR alleging battery causing serious injury was confidential, adequate, and found no nexus between the patient's symptoms and the alleged behavior. On the final day of EOP RHU care, the patient punched a wall and reported suicidal ideation with a plan. The CIT progress notes, mental health consult, and suicide risk evaluation were only partially adequate, and did not identify the antecedents for the patient's anger, agitation, and suicidal ideation. The patient was found at high risk and admitted to MHCB care.

**Findings**

The care provided to this EOP RHU patient was inadequate.

The initial primary clinician and psychiatric assessments were cursory and inadequate, and EOP RHU care did not include any attempt to clarify the patient's psychiatric diagnoses or the nature of his self-reported auditory hallucinations. Neither the case formulation nor the treatment plan were sufficient to guide the patient's treatment, and the care prescribed in the treatment plan was not consistently or adequately delivered. As documented, the reasons for the patient's treatment disengagement and eventual suicidal crisis were inadequately investigated.

**Patient Z**

This 44-year-old nonbinary (he/his/him) EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with obsessive-compulsive disorder, major depressive disorder, recurrent, moderate, posttraumatic stress disorder, and borderline personality disorder. He was prescribed fluoxetine and mirtazapine and was partially adherent with fluoxetine and consistently adherent with mirtazapine. Hydroxyzine was prescribed PRN for anxiety, but the patient did not use this medication, and it was discontinued. Two suicide attempts and eight episodes of self-injurious behavior were listed in the health record. Medical conditions included asthma, obesity, migraine, gastroesophageal reflux disease, history of hepatitis C, and left ear hearing loss. He used a hearing aid. Within CDCR, he had previously received all levels of mental health care. At CMC, he received EOP RHU care from July 11, 2024 through the end of the monitoring period. He was placed on EOP Mod RHU status on October 9, 2024 and remained on modified status through March 31, 2025.

By the beginning of the review period, the patient was identified as a high treatment refuser and being seen each workday by a primary clinician to encourage the patient's participation. Daily high refuser contacts continued intermittently through December 20, 2024, and then ceased. Progress notes documenting these contacts were minimal in content and identical across contacts. During the first IDTT meeting of the review period, on October 9, 2024, the patient was placed on EOP Mod status. This meeting was timely and attended by required staff but not the patient, who refused. The case formulation and most IDTT documentation, including the rationale for placing the patient on modified status, was adequate. IDTT documentation did not indicate how or to what extent EOP programming would be modified or whether the patient would be offered any mental health groups. The treatment plan targeted poor distress tolerance, violent behavior, and medication nonadherence, but not resistance to participating in groups. Treatment goals were measurable and clinically appropriate, and interventions were adequately specified and complete. The assigned clinician and assigned psychiatrist completed adequate and timely assessments at the time the patient was placed on EOP Mod status. Throughout the remainder of the review period, monthly follow-up IDTT meetings were timely. Four of the six monthly IDTT meetings were held in absentia due to the patient's refusal. All required staff were present for two of these meetings. One of three alternates for the assigned psychiatrist attended the other four meetings, and in one of these meetings no senior psychologist supervisor or designee attended. IDTT documentation provided adequate status updates regarding the patient's symptoms, behaviors, treatment engagement, and treatment response.

Following the October 9, 2024 IDTT meeting, no mental health groups were documented as offered or attended. The assigned psychiatrist or a covering psychiatrist saw the patient at least monthly throughout the review period. Documentation for five of the seven psychiatric encounters did not indicate whether the encounter was confidential; the other two psychiatric encounters occurred at the cell front due to the patient's refusals. The psychiatrist adequately addressed the patient's partial nonadherence with fluoxetine and made medication changes in response to the patient not using hydroxyzine. Progress notes were brief but adequate. The assigned primary clinician or an alternate followed the patient at least weekly throughout the review period. Only seven of 26 encounters were confidential; the remainder occurred at the cell

front or other nonconfidential setting due to the patient's refusals. Progress notes adequately documented the provision of interventions as well as the patient's mental status, treatment engagement, and medication adherence. However, most contacts were brief and consistent with wellness checks. Reassessments of suicide risk were completed twice during the review period as follow-ups to the patient's MHCB discharge. Both reassessments were thoroughly documented and found the patient's current suicide risk to be low. The second reassessment provided additional historical information and concluded that the patient's chronic suicide risk was high. As documented, the patient made little progress during the review period.

**Findings**

The care provided to this EOP RHU patient was inadequate.

While the patient received timely and appropriate individual treatment from the psychiatrists and primary clinicians, he remained disengaged in treatment. His resistance to group programming, to confidential individual treatment, and to participating in IDTTs was not adequately explored or addressed. The treatment plan was not adjusted after October 9, 2024 to provide interventions supporting group participation. A graduated, structured behavioral approach to encouraging group participation was needed but not provided. The treatment team did not consider whether the patient's nonbinary gender identity was contributing to the patient's resistance to out-of-cell programming. There were significant strengths in this patient's care, including the regularity with which IDTT meetings, primary clinician encounters, and psychiatric encounters were provided, as well as the thoroughness of reassessments of the patient's suicide risk. However, the patient made little progress during the review period, and the patient's obsessive-compulsive symptoms continued to interfere with treatment engagement.

**Patient AA**

This 51-year-old EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with major depressive disorder, recurrent, severe with psychotic features, adjustment disorder with depressed mood, unspecified disruptive impulse control disorder, antisocial personality disorder, and opioid use disorder. He was prescribed and adherent with bupropion, mirtazapine, and olanzapine. Diphenhydramine was prescribed PRN for agitation, and he used this medication frequently. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. Five suicide attempts and three episodes of self-injurious behavior were listed in the health record. Medical conditions included gastroesophageal reflux disease with esophagitis, enterocutaneous fistula, short bowel syndrome, ileostomy with coloscopy bag, anemia, opioid use disorder, nodule of right upper lung, and a history of bacteremia due to Klebsiella pneumoniae. Within CDCR, he had previously received all levels of mental health care and prior to late 2022 had an extensive history of involuntary treatment under PC 2602 orders. At CMC, he received EOP RHU care from July 23, 2024 to February 25, 2025, when he underwent surgery in a community hospital and was returned to the CTC. Throughout the time he was in EOP RHU care between October 1, 2024 and February 25, 2024, he was on EOP Mod status throughout this time due to a medical condition and use of a coloscopy bag, which prevented him from programming in group settings. He was serving life without parole.

During the review period, monthly IDTT meetings occurred timely except during the 49 days between October 30, 2024 and December 18, 2024, when no IDTT meeting was held. All IDTT meetings were held in absentia due to the patient's refusal to attend; reasons the patient did not attend were not identified or addressed. All required staff were present for one of the five IDTT meetings held during the review period; in the other four, an alternate for the assigned primary clinician or one of three alternates for the assigned psychiatrist attended. The case formulation was partially adequate but did not address psychotic symptoms or the mental health accommodations and implications of the patient's medical condition. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan appropriately identified emotional dysregulation as a treatment target but listed cell-front provision of coping skills handouts as the only intervention to be provided; psychiatric care was not addressed.

Except in October 2024, the assigned psychiatrist or a covering psychiatrist saw the patient monthly for individual follow-up encounters. On October 28, 2024, the patient requested that PRN diphenhydramine be increased from twice daily to three times daily because he was experiencing nighttime agitation associated with his medical condition; this increase was ordered two days later. During the review period, a psychiatrist first saw the patient on November 6, 2024, 48 days after the next most recent encounter. There was no documentation that the psychiatrist asked the patient about nighttime agitation or the increase in diphenhydramine doses, and the psychiatrist mistakenly documented a plan to continue PRN diphenhydramine twice a day after ordering it for three times a day. On February 5, 2025, the patient requested that mirtazapine be increased. A psychiatric free text note indicated that this issue would be discussed at the next monthly psychiatric encounter; it was not, and the dosage remained the same. Psychiatric encounters and accompanying progress notes were brief, perfunctory, and consistent with wellness checks; the patient was consistently found to be stable and asymptomatic. The location of these encounters was not documented except in one case, when the patient was seen at the cell front. The psychiatrist consistently documented a plan to encourage the patient to attend individual, group, and yard therapy despite the patient's documented inability to participate in group programming. The assigned primary clinician or a covering clinician saw the patient weekly. All encounters occurred at the cell front because the patient was concerned the coloscopy bag would leak. Progress notes were perfunctory, consistent with wellness checks, and focused on monitoring and case management issues. Content was copied from one note to the next in an inaccurate manner. Provision of coping skills worksheets and other clinical interventions was not documented. Like the psychiatrists, the primary clinicians consistently found the patient to be stable and symptom free. The patient was not offered any mental health or nursing led treatment groups.

**Findings**

The care provided to this EOP RHU patient was inadequate.

The case formulation and treatment plan were incomplete and inadequate to guide the totality of the patient's mental health care. The treatment plan was not followed, and the primary clinicians did not document the provision of any planned or evidence-based interventions. Psychiatric care was not consistently timely, and progress notes were perfunctory, with no documentation that the

psychiatrists inquired into the patient's requests for increases in PRN diphenhydramine or scheduled mirtazapine. Continuity of psychiatric presence in monthly IDTT meetings was poor. It appeared likely that all mental health services were delivered at the cell front and that, outside of supportive case management and psychopharmacotherapy, no meaningful treatment was delivered.

**Patient BB**

This 29-year-old EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with major depressive disorder. He was prescribed and adherent with benztropine, haloperidol, hydroxyzine, mirtazapine, and olanzapine. Additional PRN doses of benztropine, haloperidol, hydroxyzine, and olanzapine were prescribed for extrapyramidal symptoms, auditory hallucinations, anxiety, and agitation/psychosis, respectively. The patient made frequent use of most PRN medications during the first two weeks of EOP RHU care at CMC. Thereafter, his use of PRN medications was restricted to one dose of olanzapine in mid-December, 2024. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included obesity and opioid use disorder. Within CDCR, he had previously received 3CMS, EOP, and MHCB care. At CMC, he received EOP RHU care from October 15, 2024 through the end of the review period.

Upon arrival to EOP RHU care at CMC, five-day follow-ups occurred for the first six days. These encounters were adequately documented. The initial primary clinician assessment was timely but cursory and incomplete. It did not include any elements of the mental status exam or update the case formulation, which had been developed in MHCB care and which indicated that stabilization in MHCB was warranted. The initial psychiatric evaluation was also cursory, provided little psychiatric history, and reflected simultaneous diagnoses of unspecified depressive disorder and major depressive disorder, severe with psychosis. These diagnoses were not resolved during the review period. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan carried forward two treatment goals addressing impulsive behaviors and serious impairment due to methamphetamine use, and it added a third goal addressing suicidal ideation. Treatment goals were feasible, clinically appropriate and, with one exception, measurable. However, psychiatric care was not included as an intervention. Follow-up IDTT meetings were timely and attended by the patient and required staff. During the first follow-up IDTT meeting, the case formulation was updated and more appropriate for EOP care, but it remained cursory and did not address depressive symptoms. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan was appropriately updated and modified as the patient made treatment progress.

One of three psychiatrists followed the patient monthly. Documentation was minimal and provided little insight into the course of treatment. Progress notes for five of the six psychiatric encounters did not indicate whether the encounter was confidential; the sixth encounter occurred at the cell front due to the patient's refusal. The assigned primary clinician or a covering clinician saw the patient at least weekly throughout the review period. About a third of these encounters was confidential. The rest occurred at the cell front due to the patient's refusals.

Progress notes reflected supportive encouragement to participate in programming, as well as case management. However, the interventions required by the treatment plan were not documented as provided, and most contacts were consistent with wellness checks. Beginning in mid-November, 2024, the patient was identified as a high treatment refuser, and daily high refuser contacts were provided by primary clinicians almost continuously through the end of the review period. In addition to refusing most EOP mental health groups, he was offered multiple nursing led treatment groups but did not attend these. A mental health evaluation for a September 24, 2024 RVR alleging battery with a deadly weapon was adequate and identified a nexus between the patient's mental health symptoms and the alleged behavior. During the review period, one suicide risk evaluation was completed as a follow-up to MHCB discharge. The evaluation was adequate and found the patient at low risk.

**Findings**

The care provided to this EOP RHU patient was inadequate.

The initial primary clinician and psychiatric assessments were cursory and provided minimal insight into the patient's treatment needs. The patient's diagnosis was not clearly documented or clarified during the review period. IDTT documentation for the initial meeting was deficient, and the treatment plan, although modified and improved over the course of the review period, did not encompass psychiatric care. The specific interventions included in the treatment plan were not documented as delivered. Reasons behind the patient's refusals of groups and confidential individual sessions were not adequately probed or addressed. Psychiatric progress notes were cursory, and the nature of psychotic symptoms that were being treated with haloperidol and olanzapine was poorly documented. The patient's functioning, progress attendance, and treatment engagement showed little change over the review period, consistent with a lack of treatment progress.

**Patient CC**

This 45-year-old EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. He was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct, unspecified schizophrenia and other psychotic disorder, and major depressive disorder. He was prescribed and adherent with aripiprazole, fluoxetine, and propranolol. Melatonin was prescribed PRN for insomnia, and the patient used this medication frequently until mid-January 2025. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included multiple recent stab wounds and a history of hepatitis C. Within CDCR, he had previously received EOP, MHCB, and ICF care. At CMC, he received EOP RHU care from November 19, 2024 through the end of the review period. He was placed in EOP RHU care for enemy concerns after being stabbed multiple times in mainline EOP at CMC on November 17, 2024 and receiving an RVR on the same date for battery with a deadly weapon. He was hospitalized for two days before returning to CMC.

The initial primary clinician assessment was timely and provided adequate clinical history but not current diagnostic impressions. The case formulation was largely identical to the clinical summary but provided some formulation consistent with long-term adaptive challenges rather

than an adjustment disorder. An accompanying suicide risk evaluation was adequate and found the patient at low risk. The initial psychiatric evaluation was timely and adequate. The initial and two follow-up IDTT meetings occurred timely. The patient attended the initial and first follow-up IDTT meeting, but not the second; the second follow-up IDTT meeting was the only meeting during the period reviewed at which all assigned and required staff were present. The initial and first follow-up meetings were attended by required staff except for an alternate for the assigned psychiatrist. During these IDTTs meeting, the patient met a criterion for a higher level of care due to treatment refusal; IDTT documentation adequately justified retaining the patient in EOP RHU care. During the second follow-up IDTT meeting, IDTT documentation mistakenly indicated that the patient was not in EOP care and did not reflect the patient's high rate of treatment refusal. During none of the IDTT meetings was the case formulation updated, despite identification of bereavement as contributory to the patient's non-participation in programming. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan was broadly appropriate to the patient's needs but deficient in failing to identify short- and long-term goals that were measurable or include interventions other than individual primary clinician encounters. It was not updated in the follow-up meetings. A mental health evaluation for a November 17, 2024 RVR alleging battery with a deadly weapon was adequate and found no nexus between the patient's mental health symptoms and the alleged behavior.

The assigned or a covering psychiatrist saw the patient at least monthly during the review period. Psychiatric care appeared collaborative and appropriate. However, progress notes included the three psychiatric diagnoses noted above without efforts to clarify them. The assigned primary clinician provided weekly individual encounters throughout the period reviewed. Most encounters were confidential, and there was adequate documentation that evidence-based interventions, including those in the treatment plan, were provided in some of these encounters. However, the patient grew progressively more withdrawn from treatment and resistant to out-of-cell individual encounters, and by mid-March, 2025, the primary clinician was documenting that the patient appeared to be under the influence of illicit substances. These concerns were not reflected in the March 2025 follow-up IDTT meeting, and there was no evidence that the psychiatrist was aware of these issues. The patient was offered multiple mental health groups but refused most; he was identified as a high treatment refuser in mid-December 2024 and remained on this status for most of the remaining review period. Daily primary clinician encounters encouraging his participation in programming did not result in any behavioral change.

**Findings**

The care provided to this EOP RHU patient was inadequate.

The case formulation and treatment plan were deficient, and the patient's diagnoses and nature of his symptoms and behavioral challenges were not adequately clarified. Although the patient received timely care, the care he received did not result in adequate functioning in EOP RHU care. As documented, provision of non-pharmacological interventions varied from excellent to absent, and this variability, along with his overreliance on individual therapy, may have contributed to the patient's lack of treatment progress. Concerns regarding his refusals of group

programming and active substance use were not addressed in IDTT meetings or reflected in psychiatric documentation. Rather than improving, the patient's functioning deteriorated.

**Patient DD**

This 45-year-old transgender (she/her/hers) EOP RHU patient's healthcare record was selected for review to assess the quality of mental health care provided at CMC. She was diagnosed with adjustment disorder and antisocial personality disorder. She was not prescribed any scheduled psychotropic medications. Hydroxyzine and melatonin were prescribed PRN for anxiety and insomnia, respectively; she used melatonin occasionally but did not use hydroxyzine. Through medical services, she was prescribed gabapentin for seizure disorder, and through the ISUDT, she was prescribed buprenorphine-naloxone. She was partially adherent with the former and consistently adherent with the latter medications. She also received gender affirming hormone treatment. Three episodes of self-injurious behavior were listed in the health record. Medical conditions included seizure disorder, gastroesophageal reflux disease, transgender identity, cervical spine pain, derangement of left should joint, and opioid use disorder. Within CDCR, she had previously received 3CMS, EOP, and MHCB care. At CMC, she received EOP RHU care from October 30, 2024 to January 13, 2025, when she was transferred to EOP RHU care at another facility.

Upon the patient's arrival to EOP RHU care at CMC, five-day follow-ups occurred as required and were adequately documented. The initial primary clinician assessment was timely but incomplete. It did not include any information regarding the patient's presenting problem/chief complaint, history of present illness, mental status, or EOP functional evaluation. The clinical summary and case formulation were pulled forward from prior documentation without any updates, and the case formulation indicated that the patient required MHCB care. It was inappropriate and inadequate for EOP RHU care. The initial psychiatric assessment was cursory, failed to assess mood, and provided almost no psychiatric history. Both the initial and the follow-up IDTT meetings were timely and attended by required staff, and both were held in absentia due to the patient's refusal to attend. During the initial IDTT, the patient was found to meet criteria for a higher level of care due to multiple MHCB referrals/admissions. The treatment team retained the patient in EOP RHU care but did not adequately documentation the rationale for this decision. She was placed into the SRMP with a plan to provide DBT skills training. The case formulation was not updated. The treatment plan identified self-injurious behaviors and medication nonadherence as problem behaviors; the latter problem was inadequately documented and confusing, because she was not prescribed scheduled psychotropic medications. No long-term goal was developed for this problem, and only primary clinician interventions were identified. These deficiencies were not rectified in the follow-up IDTT documentation, which indicated that the patient was programming, stable, and adherent with medications despite continuing to have no scheduled psychotropic medications.

The assigned psychiatrist followed the patient monthly. Progress notes were cursory and consistent with very brief interactions; the patient's mood was not assessed during these encounters. No psychiatric documentation indicated whether the encounters were confidential. The assigned primary clinician or a covering clinician followed the patient weekly. The patient consistently refused confidential settings, and these encounters occurred at the cell front and

were consistent with wellness checks along with encouragement to participate in out of cell programming. Progress notes included no documentation of evidence-based treatment interventions, including those required by the SRMP and treatment plan. The patient was offered multiple mental health and nursing led treatment groups but attended only the LGBTQI+ group. She was identified as a high treatment refuser in mid-December 2024, and primary clinicians provided daily contacts with her to encourage group participation. These were ineffective. Shortly before transfer to another facility, a suicide risk evaluation was completed as a follow-up for MHCB discharge. The evaluation was adequate and found the patient's current risk to be low.

**Findings**

The care provided to this EOP RHU patient was inadequate.

The initial primary clinician assessment was cursory, incomplete, and inadequate. The initial psychiatric assessment was cursory. The patient's treatment needs were poorly identified. The case formulation was inappropriate and inadequate to guide EOP RHU treatment, and the treatment plan was deficient and not followed. The rationale for retaining the patient in EOP RHU care was unclear and poorly documented. The primary clinician's focus on the patient's medication adherence suggested that she was unaware that the psychiatrist had not prescribed scheduled psychotropic medications. Beyond her participation in the LGBTQI+ group, the patient received only brief psychiatric and primary clinician encounters and no planned, structured, evidence-based interventions.

**Patient EE**

This 53-year-old transgender patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. The patient had been housed at the facility since December 4, 2023. She was provided diagnoses of bipolar II disorder, antisocial and borderline personality disorders, PTSD, and gender dysphoria. She was prescribed Tegretol, Vistaril, and Remeron. The patient had a long history of mental treatment in the community and treatment at all levels of care in CDCR. She has a significant history of suicide attempts and self-injurious behavior via cutting. At the time of the review, she was housed on Facility D. She received EOP care throughout the review period.

Routine IDTT documentation from April 2025 was long overdue, as the patient's most recent prior IDTT meeting occurred in January 2024. IDTT documentation included relevant psychosocial history but lacked a summary of treatment since her last IDTT meeting. Current treatment needs were not identified to direct treatment planning. Without clear indication of need, the treatment plan targeted depression, anxiety, substance use, and gender identity. Measurable and objective short-term goals with cognitive behavioral treatment interventions were established. IDTT documentation did not include input from other disciplines. The patient did not meet criteria for a higher level of care. EOP care was continued, but the documented rationale was not individualized.

Monthly psychiatric assessments with the same provider were generally timely. Psychiatric documentation used shorthand and at times was difficult to follow. For example, documentation

from April 14, 2025 included the following language: "MAR does with a miss for IP TARGETS SX energy to be useful, do not overreact, follow rules more." Mental status documentation was similarly brief and disjointed. Weekly confidential PC contacts occurred with the same clinician between February 2025 and April 2025. While PC progress notes described the patient's current or recent stressors and provided appropriate mental status exams, documentation of mental health symptoms and/or their impact on the patient's functioning was rare. Therapeutic interventions were not offered. Overall, the patient presented as stable. Clinical and recreational therapy groups were offered, but the rationale for group assignment and appropriateness for treatment needs was unclear.

**Findings**

The treatment provided to this EOP patient was inadequate.

Overall, documentation was not sufficiently descriptive of the patient's current treatment needs. Routine IDTT meetings were not timely conducted. The quality of IDTT documentation was inadequate and lacked multidisciplinary input. Routine psychiatric documentation was insufficient. Documentation of PC contacts was not consistent with a meaningful therapeutic contact. Rationale for continued need for EOP level of care was not specific, and provider assessment of the patient as stable suggested a need for 3CMS consideration. There was insufficient information in provider documentation to support the patient's diagnoses, and clarification and rationale for diagnoses was needed.

**Patient FF**

This 27-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. He was admitted to the facility from the reception center on January 17, 2024. He was provided with multiple diagnoses, including opioid and methamphetamine use disorders, unspecified personality disorder, and unspecified schizophrenia spectrum disorder and other psychotic disorder. These diagnoses diverged from the diagnoses developed during recent psychological testing, which were antisocial and narcissistic personality disorders. He was prescribed Zyprexa, Trileptal, and Buspar. He was partially adherent with Buspar and Trileptal and nonadherent with Zyprexa. Remeron and additional doses of Zyprexa were prescribed as PRN for anxiety and auditory hallucinations, respectively. The patient used PRN olanzapine rarely and did not use PRN Remeron. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He had previously received 3CMS and EOP care; throughout the review period, he received EOP care. At the time of the review, he was housed on Facility D.

A routine IDTT meeting occurred on March 5, 2025 and was long overdue, as the previous IDTT meeting occurred 11 months earlier, in April 2024. The clinical summary included appropriate information regarding treatment needs, which included auditory hallucinations, trauma symptoms, and ongoing substance use. However, this information was unchanged from that provided during the April 2024 IDTT meeting, and the current relevance therefore could not be determined. A sufficient summary of treatment course, symptoms, and functioning over the past year was not included. In accordance with previously documented treatment needs, treatment planning targeted auditory hallucinations and substance use. For reasons that were unclear,

trauma symptoms were not targeted; instead, anger and depression, symptoms that were not identified as treatment needs, were targeted for treatment. Goals were measurable and objective, and interventions included psychoeducation and dialectical behavior therapy skills. The patient did not meet criteria for consideration of a higher level of care. Rationale for continued EOP care was individualized and appropriate.

Between September 2024 and April 2025, psychiatric care was provided by three providers. The patient experienced ongoing paranoia. Targeted symptoms included psychosis, mood lability, and anxiety. Ongoing medication nonadherence was routinely addressed, and attempts were made to adjust medications. The patient remained resistant to the psychiatrists' suggestions for medication changes, and instead repeatedly responded that he would improve adherence; his adherence did not improve. Most reviewed PC documentation between February and April 2025 was completed by the same PC. There was only one PC contact in February2025, while PC contacts in April 2025 exceeded Program Guide requirements. Progress notes indicated that the patient's mental status was appropriately assessed and monitored, and treatment interventions were regularly utilized to assist the patient in managing institutional and interpersonal relationship stressors. He was appropriately referred for psychological testing, and the resulting evaluation was comprehensive. Clinical, recreational therapy, and nursing led treatment groups were offered.

**Findings**

The treatment provided to this EOP patient was adequate.

The overall care provided to this patient outweighed weaknesses in documentation and lack of IDTT meetings. The patient was appropriately monitored, assessed, and offered appropriate clinical interventions. The psychological testing referral and results were a strength in this patient's treatment planning. Deficiencies included the long overdue IDTT meeting and IDTT documentation, which lacked multidisciplinary input and treatment planning needed improvement to ensure current treatment needs were addressed. Diagnostic clarification was needed. This patient warranted consideration for the personality disorders program.

**Patient GG**

This 38-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. He was admitted to the EOP program from MHCB care on January 15, 2025, and he remained in EOP care at CMC throughout the review period. At the time of the MHCB admission, he was not a participant in the MHSDS and had no prior mental health treatment. The admission occurred after he reported that he would take his life due to a debt that resulted in safety concerns. He was diagnosed with PTSD and prescribed Remeron and Zoloft.

The patient refused to participate in the initial PC assessment due to gang pressure, and most of the assessment was completed through record review. Documentation indicated a long history of untreated anxiety and depression due to gang pressure. The patient participated in the initial psychiatric assessment, which was adequate and timely.

The patient and assigned providers attended the initial IDTT meeting, although psychiatric input was not documented. Target areas for treatment included mood symptoms due to PTSD and

grief and were aligned with the patient's stated treatment need to improve anxiety, depression, trauma, and grief. Treatment plan goals were objective and measurable and accompanied by evidence-based treatment interventions. The patient did not meet criteria for a higher level of care review. The documented rationale for continued EOP care was reasonable but would have been improved with increased specificity.

The patient's symptoms and functioning were appropriately assessed and described in initial and routine psychiatric documentation. Timely routine psychiatric contacts occurred with same provider. Medication nonadherence was appropriately addressed, and the subsequent medication adjustment improved medication response. PC contacts primarily occurred individually except for a caseload group in March. Individual PC encounters consistently reflected meaningful therapeutic treatment. The patient was invested in treatment, and evidence-based clinical interventions were routinely utilized. The patient was offered clinical, recreational therapy, and nursing led treatment groups.

**Findings**

The treatment provided to this EOP patient was adequate.

Treatment planning and provision of treatment were adequate. Individualized treatment consistently occurred with the assigned providers. Areas of improvement included the need for diagnostic rationale and multidisciplinary collaboration during treatment planning.

**Patient HH**

This 62-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. The patient had been housed at the facility since 2015 and received EOP care throughout the review period. He was provided a diagnosis of unspecified anxiety disorder, although additional diagnoses of alcohol use disorder, major depressive disorder, and unspecified personality disorder were located elsewhere in the healthcare record. He was prescribed buspirone as needed for anxiety but used this medication on only three occasions during the review period. He had several previous MHCB admissions and one inpatient admission to Atascadero State Hospital. At the time of the review, the patient was housed on Facility D.

No IDTT meeting occurred during the review period, and when one finally occurred on April 3, 2025, it had been more than two years since the previous IDTT meeting. The April 3, 2025 clinical summary included historical information and identified the patient's current symptom as chronic passive suicidal ideation. There was no summary of his clinical presentation or progress in treatment since his last IDTT in 2023. Treatment targeted depression, and objective and measurable goals were established. Treatment interventions were limited to the PC offering "positive, authentic feedback;" there was no psychiatric input. The patient did not meet criteria for a higher level of care review. The rationale for continuing EOP care was not documented.

There were no psychiatric contacts during the 69 days between November 26, 2024, and February 3, 2025. When psychiatric encounters occurred, the patient's symptoms and functioning were assessed. The patient reported passive suicidal ideation during the March 2025 and April 2025 psychiatric encounters, and he was observed to be responding to internal stimuli on April 28, 2025. Despite the increase in symptoms, there was no further assessment,

consultation, medication education, or encouragement to accept additional medication during these contacts. Routine PC documentation between February 2025 and April 2025 occurred with the same provider. Documentation included a description of the patient's current life events and management of stressors. The PC was supportive and offered feedback and psychoeducation. Documentation confirmed symptoms consistent with major depressive disorder. There was consultation with the psychiatrist regarding discrepant diagnoses in the healthcare record. On April 2, 2025, the patient disclosed that he experienced daily suicidal ideation. Further assessment, including an SRE, was not completed; no SRE had been completed since 2021. A safety plan was clinically indicated but not completed. While the patient denied suicidal ideation in the subsequent contacts, it was not clear that his statements were sufficiently assessed. The patient was not offered mental health groups for the nearly 31 weeks between August 21, 2024 and March 25, 2025. Groups since March 25, 2025 were primarily offered by recreational therapists.

**Findings**

The treatment provided to this EOP patient was inadequate.

Both providers failed to fully evaluate the quality and context of the patient's suicidal ideation, failed to consult with each other, and failed to target suicidal ideation as a treatment goal. Psychiatric care was not timely. The patient's treatment needs were not sufficiently addressed particularly after he disclosed suicidal ideation or was observed to be responding to internal stimuli. It was unclear how the PC's prescribed treatment intervention would effectively address the patient's chronic passive suicidal ideation or why danger to self was not identified as a treatment need. The long overdue IDTT meeting and lack of group treatment were not in accordance with Program Guide requirements.

**Patient II**

This 32-year-old transgender patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. She was admitted to the facility in 2023. She was provided diagnoses of borderline personality disorder, dysthymia versus major depressive disorder, gender dysphoria, polysubstance dependence and PTSD. Hydroxyzine was prescribed PRN for anxiety, but she used this medication on only two occasions during the review period. Through medical services, she was prescribed gender affirming hormone treatment. Medical conditions included Grave's disease. She received EOP care throughout the review period and was housed on Facility D.

The patient's routine IDTT meeting occurred on April 22, 2025. This meeting was long overdue, as an IDTT meeting had not occurred since October 25, 2023. On April 22, 2025, the patient, the assigned PC, and a covering psychiatrist were in attendance. A useful summary of the patient's treatment engagement, progress in treatment, current treatment needs, and recent functioning was documented. Treatment targeted mood management and preparation for her board of parole hearing. Objective and measurable treatment goals were developed, with evidence-based treatment interventions identified to assist with goal attainment. The patient did not meet criteria for a higher level of care. The documented rationale for continuing EOP care would have been improved with greater specificity.

Monthly psychiatric contacts occurred with the assigned psychiatrist. Psychiatric documentation was fragmented, difficult to follow, and did not lend clarity to the course of treatment. Progress notes indicated that the patient remained stable during the review period.

PC contacts between February 2025 and April 2025 were timely and occurred more often than required by the Program Guide. Documentation between February 2025 and March 2025 indicated that the patient was seen for psychotherapy with an intern in addition to routine EOP PC contacts provided by a clinician. Psychotherapy with the intern ended on March 7, 2025, at the patient's request; there was no indication of a termination session. The patient also experienced a change in assigned PCs in March 2025. Overall, contacts were individualized and represented meaningful therapeutic contacts. However, the patient disclosed passive suicidal ideation to an intern on January 10, 2025. Further assessment or consultation with a supervisor and assigned psychiatrist was not completed. The patient was provided with clinical and recreational therapy groups.

**Findings**

The treatment provided to this EOP patient was inadequate.

The primary deficit was the poor quality of psychiatric documentation that was not useful for continuity of care. The second major deficiency was the lack of assessment and supervisor consultation when the patient disclosed suicidal ideation to the intern. Additionally, provider collaboration was needed in treatment planning. Diagnostic clarification with clinical rationale was needed. This patient was a good candidate for the personality disorders program.

**Patient JJ**

This 44-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. He was admitted to the mainline EOP program on November 12, 2024 and remained in EOP care through the rest of the review period. He was diagnosed with schizoaffective disorder. He has a long history of treatment at all levels of care within CDCR, along with a history of receiving involuntary treatment under a PC 2602 order. His most recent MHCB admission occurred in September 2024 for significant impairment due to mental illness. He was prescribed olanzapine and mirtazapine. Hydroxyzine was prescribed PRN for anxiety, and he used this medication daily or nearly daily during the review period. At the time of the review, he was housed on Facility D.

The initial psychiatric and PC assessments included a succinct overview of mental health history, although the initial psychiatric assessment occurred after IDTT. The patient reported a history of auditory hallucinations. In their assessments of the patient's symptoms, both the psychiatrist and the PC identified depression with no clear impact on ADLs. In addition, the PC noted anxiety and a need for distress tolerance.

The initial IDTT meeting was attended by the patient, assigned PC, and a covering psychiatrist. Consistent with the initial assessments, treatment targeted anxiety and depression. Measurable and objective treatment goals were developed, along with evidence-based interventions including cognitive behavior therapy, dialectical behavior therapy, and rational emotive behavior therapy. The patient did not meet criteria for a higher level of care review. No rationale for continued

EOP care was documented. A routine IDTT meeting did not occur until May 15, 2025, six months after the initial IDTT meeting.

Monthly psychiatric encounters occurred with the same provider. Documentation confirmed that the psychiatrist assessed the patient's clinical presentation, medication response, and side effects. The patient was described as stable. PC documentation between February 2025 and April 2025 indicated PC continuity. However, PC encounters were not timely in February 2025, and the interventions prescribed by the treatment plan were not provided. Instead, supportive therapy was offered in response to the patient's discussion of various stressors that impacted his emotions. The patient was provided nursing-led treatment groups, an anger management group, and multiple recreational therapy groups.

**Findings**

The treatment provided to this EOP patient was inadequate.

The strengths of treatment planning and appropriate psychiatric documentation were outweighed by lack of targeted treatment interventions by the PC. The patient needed evidence-based treatment interventions, as identified in IDTT documentation, to help him improve distress tolerance. Neither the routine IDTT meeting nor PC contacts were timely.

**Patient KK**

This 54-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. The patient had been at the facility since June 2024 and received EOP care throughout the review period. He was provided diagnoses of paranoid schizophrenia and other specified personality disorder, with paranoid and antisocial traits. The patient had a history of paranoia and ongoing lack of insight into his mental illness. At the beginning of the review period, he was prescribed risperidone under a PC 2602 order for involuntary treatment due to danger to self and others. The patient's MAR and self-report indicated adherence, but his bloodwork suggested nonadherence, and a decision was made to not seek renewal of the PC 2602 order because the patient presented as stable. The order for involuntary treatment expired on December 30, 2024, and between December 30, 2024 and February 4, 2025, risperidone was tapered and discontinued at the patient's request. Risperidone was ordered PRN for psychosis beginning on February 5, 2025, but the order was discontinued on March 12, 2025 because the patient did not use any PRN doses.

There was a long delay between the initial EOP IDTT meeting in June 2024 and the first routine EOP IDTT meeting on April 16, 2025. The patient, the assigned PC and a covering psychiatrist attended the April 16, 2025 IDTT meeting. Documentation was PC-driven and lacked multidisciplinary input. Documentation regarding the patient's treatment engagement, symptoms, and functioning since the previous IDTT, including the impact of discontinuing involuntary treatment, was needed. The sole treatment goal from June 2024 was continued. This goal targeted lack of insight with an objective and measurable goal. Interventions included goal setting, rapport building, psychoeducation, and psychiatric consultation. The patient did not meet criteria for a higher level of care review. The documented rationale for continued EOP care

indicated that the patient suffered from ongoing delusions that impacted his ability to program. However, delusions were not described in any provider documentation.

Monthly psychiatric documentation during the review period and through April 2025 provided a useful summary of the patient's treatment needs, symptoms, functioning, and medication adherence. Psychiatric progress notes demonstrated that the psychiatrist reviewed PC documentation. Following discontinuation of involuntary treatment, the patient continued to present as stable, and at his request, psychotropic medication was tapered and discontinued. Neither the rationale for discontinuing medication nor a discussion of alternative medications were clearly documented. Reviewed PC documentation between February 2025 and April 2025 was timely except in February 2025. Documentation indicated that the patient was appropriately monitored throughout contacts, however clinical interventions were not documented. The patient reported ongoing paranoia in early March 2025. The patient was offered recreational therapy and nursing led treatment groups.

**Findings**

The treatment provided to this EOP patient was inadequate.

The patient suffered from a serious mental illness with poor insight, and he did not receive the treatment he needed. While providers appropriately monitored him, early signs of decompensation were not documented in routine IDTT documentation, and there was no clear communication between providers regarding their observations of his decline in mental status. The patient was not offered medication alternatives when he requested to taper and discontinue medications. The rationale for this discontinuation was not clearly assessed. The order for PRN risperidone indicated that the psychiatrist remained concerned about psychotic symptoms, but the use of an antipsychotic medication exclusively as a PRN medication was concerning and requires review. The patient's routine IDTT meeting was many months overdue. It was not clear how the current group assignments targeted his treatment needs.

**Patient LL**

This 52-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. The patient had been at CMC since 2018. He was provided diagnoses of antisocial and borderline personality disorders, major depressive disorder, and PTSD. He was prescribed atomoxetine, bupropion, and mirtazapine. All three medications were prescribed to treat depression. He was adherent with bupropion and mirtazapine but not with atomoxetine. Scheduled atomoxetine was converted to a PRN medication at the patient's request, and additional doses of mirtazapine were also ordered PRN at that time. Documented indications for the PRN atomoxetine and mirtazapine were agitation and anxiety, respectively. The patient used PRN atomoxetine but PRN mirtazapine. The patient had previously been treated at all levels of care within CDCR, and he received EOP care throughout the review period. He was serving life without parole.

The patient's first routine IDTT meeting since December 6, 2022 occurred on May 1, 2025. This meeting was held in absentia and attended by a covering psychiatrist and the assigned PC. Documentation provided a thorough summary of the patient's history, but recent treatment

engagement and clinical presentation was not clearly documented. The treatment plan narrowly targeted passive suicidal ideation, with a goal to have no passive suicidal ideation in 90 days. This was an unrealistic goal, given the chronic nature of the ideation and its contingency on his mother's ailing health. Interventions included improving social support, utilizing motivational intervening and engagement in behavioral activities. He did not meet criteria for a higher level of care review, and the rationale to continue EOP care was appropriately documented.

The assigned psychiatrist saw the patient monthly throughout the review period except in October 2024, when a covering psychiatrist saw the patient. Progress notes did not indicate whether these encounters were confidential. The assigned psychiatrist's progress notes presented information in list format, without full sentences. Content was limited, difficult to follow, and not useful for continuity of care. Psychiatrists consistently documented the absence of auditory hallucinations that were consistently documented as present and ongoing by the PCs. As noted, atomoxetine was converted from a scheduled to a PRN medication at the patient's request; rationale for this decision was limited to documenting that the patient was not consistently adherent with the medication and had requested to take it PRN. During February 2025 through April 2025, three PCs provided individual treatment. Documentation confirmed routine monitoring of the patient's depression, anxiety, ongoing auditory hallucinations, functioning, and psychosocial stressors. The patient's mother was terminally ill, and he reported chronic conditional passive suicidal ideation related to her passing. Individualized clinical interventions were not documented. Despite documentation of passive suicidal ideation, a SRE was not completed during the review period, and no SRE had completed since the patient's arrival at to CMC in 2018. On May 1, 2025, a safety plan was developed without a SRE being completed. Although the safety plan was developed in collaboration with the patient, it was generic and limited to encouraging the patient to enhance his relationships with family members, identify a pen pal, engage in self-care, and adhere with psychotropic medications to manage auditory hallucinations. None of the patient's medications directly targeted auditory hallucinations, and auditory hallucinations were not noted in any psychiatric documentation. The patient was offered clinical, recreational therapy, and nursing led treatment groups.

**Findings**

The treatment provided to this EOP patient was inadequate.

Despite documented chronic passive suicidal ideation, a SRE was not completed. Safety planning was not sufficiently individualized. Psychiatric documentation was poor, and treatment planning was insufficient. Collaboration and communication between psychiatric and PC providers was poor, as evidenced by the discrepant documentation regarding auditory hallucinations. Consistency of PCs was problematic, and targeted clinical interventions were not offered by the PC. Diagnostic clarification with clinical rationale was needed, as clinical support for diagnoses was not clear in provider documentation. Off-label use of atomoxetine solely on a PRN basis for depression was concerning.

**Patient MM**

This 66-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. He had been at the facility since 2019. He was provided diagnoses of

unspecified anxiety and depressive disorders, with additional and alternate diagnoses noted elsewhere in the record. On a PRN basis only, he was prescribed hydroxyzine, melatonin, and mirtazapine; all three medications were prescribed for insomnia. He used mirtazapine rarely but used hydroxyzine and mirtazapine nearly nightly during the last two months of the review period. The patient's level of care changed from 3CMS to EOP in June 2024, and he remained in EOP care throughout the review period.

The patient's first routine IDTT meeting in EOP care occurred in April 2025 and was long overdue; the initial IDTT meeting occurred in July 2024. The April 2025 IDTT meeting was held in absentia with the assigned PC and a covering psychiatrist. While historical information was copied from his initial IDTT meeting, clinical information to direct treatment planning was not updated. Treatment planning that targeted "severe depression" and anxiety remained unchanged from that documented during his initial IDTT meeting. He did not meet criteria for a higher level of care review. The documented rationale to continue EOP care was appropriate and individualized.

Monthly psychiatric contacts occurred with the same provider. Progress notes did not consistently indicate whether these encounters were confidential, and most content in the progress notes remained unchanged. Although the patient reported that melatonin was beneficial during the first half of the review period, by February 2025 he was requesting a stronger dose of hydroxyzine, and mirtazapine was initiated. Overall, he was described as stable and denied anxiety and depression. PC contacts between February 2025 and April 2025 occurred with the same telemental health provider and were timely during March 2025 and April 2025. During telemental health encounters, the patient reported various treatment needs including sleep, depression, irritability, anxiety, sadness, and helplessness regarding his life sentence. An assessment of these symptoms and use of clinical interventions were not documented. The patient was offered recreational therapy groups and NLTGs. It was not clear how these groups were intended to assist the patient in meeting treatment goals, although the patient reported that they were helpful.

**Findings**

The treatment provided to this EOP patient was inadequate.

The single routine IDTT meeting held during the review period was long overdue, and IDTT documentation including treatment planning was not sufficiently updated. Provider collaboration was needed in the IDTT meeting as well as with respect to routine care. There was no evidence that the patient's denial of symptoms during psychiatric encounters and reports of various mood-related symptoms during PC encounters were reconciled. PC documentation, while confirming routine monitoring, did not reflect meaningful, therapeutic contacts. Lastly, clarification of diagnoses with clinical rationale was needed.

**Patient NN**

This 62-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CMC. The patient was admitted to the facility in 2019. He was provided a diagnosis of major depressive disorder with mood-congruent psychotic features. He was

prescribed and adherent with fluoxetine. Hydroxyzine was prescribed PRN for anxiety, and he used this medication sporadically during the review period. He remained in EOP care throughout the review period.

No IDTT meetings occurred during the review period, and none had been held since January 13, 2023. An IDTT meeting was not held until well after the end of the review period, on May 8, 2025. Monthly psychiatric contacts occurred with the same provider. Psychiatric progress notes did not consistently indicate whether the encounter was confidential but adequately addressed medication adherence, symptoms, functioning, social support, and stressors. No medication changes were made during the review period. PC contacts between February 2025 and April 2025 occurred with the same clinician. Progress notes did not indicate whether the encounters were confidential. Documentation was overly brief and consistent with wellness checks. The mental status sections of progress notes were consistently incomplete, and the patient's thought content was occasionally documented as "minimal." The patient was offered NLTGs and recreational therapy groups.

**Findings**

The treatment provided to this EOP patient was inadequate.

Appropriate psychiatric documentation was a strength in this patient's care. However, IDTT meetings were not held, resulting in a substantial deficiency in meeting the patient's treatment needs and the requirements of the Program Guide. PC encounters were not consistent with meaningful therapeutic contacts.

**APPENDIX B-8**
**California Rehabilitation Center (CRC)**
**Review Period: December 1, 2024 – May 31, 2025**

**Patient A**

This 34-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. The patient was provided with diagnoses of substance-induced mood disorder, unspecified depressive disorder, and other specified anxiety disorder. The patient was fully adherent to his prescribed venlafaxine and was also prescribed oxcarbazepine and hydroxyzine as needed. The patient was being treated with buprenorphine-naloxone for substance use. This individual was incarcerated for the third time within CDCR on July 23, 2023. During his two previous periods of incarceration, he was treated at the 3CMS level of care although there were periods when he was not placed in the MHSDS. Since arriving in July 2023, he has been treated at the 3CMS level of care. He transferred to CRC on February 6, 2025.

An initial primary clinician assessment was conducted timely on February 14, 2025 and was mostly adequate; however, it relied almost exclusively on the patient's self-report and failed to note discrepancies including the patient's reports of sobriety for six months despite evidence of methamphetamine use three months prior. An initial psychiatric assessment was completed timely by a telepsychiatrist and was adequate; however, the psychiatrist was not assigned to the patient. The psychiatrist noted diagnostic formulations including major depressive disorder without psychotic features vs. PTSD vs. unspecified mood disorder. The psychiatrist also documented amphetamine, marijuana, and opioid abuse. An initial IDTT meeting was held timely with required staff present; however, there was no evidence that the assigned psychiatrist had met the patient prior to the meeting. The patient was present for the meeting. The bulk of the IDTT documentation was taken from the initial primary clinician's assessment with little evidence of input from other team members. There was a treatment goal created to address depression, which was objective and measurable, but lacked baseline information.

The patient had a single primary clinician routine contact during the monitoring period which was timely. There was evidence of treatment being provided in line with the treatment plan. The patient's assigned psychiatrist saw him on time for a routine session and noted that the patient was actively using marijuana. Documentation of education and psychiatric interventions were adequate.

**Findings**

Treatment of this patient was adequate; however, improvements in the multidisciplinary input into treatment planning were needed. Additionally, diagnostic clarification was necessary.

**Patient B**

This 42-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with a diagnosis of panic disorder and was not prescribed psychotropic medications. This patient was incarcerated within CDCR on a number

of occasions beginning in 2011. He was first treated within the MHSDS during his third period of incarceration, in April 2013 while at the reception center. He was discharged from MHSDS on July 17, 2013 and did not receive services again through his release in April 2015. Similarly, he was treated at the 3CMS level of care when incarcerated in November 2021, only to be discharged in February 2023, prior to his release to the community in June 2023. His current period of incarceration began on March 6, 2025 and he was placed at the 3CMS level of care at the reception center. He transferred to CRC on April 30, 2025.

The patient was seen timely for an initial primary clinician assessment by a telesocial worker. The primary clinician noted that the patient had diagnoses of opioid use disorder and was prescribed buprenorphine-naloxone. There were also documented diagnoses of PTSD and unspecified anxiety disorder. No initial psychiatric assessment was completed prior to the initial IDTT meeting on May 14, 2025. The meeting included an alternate primary clinician and the patient's assigned psychiatrist, neither of whom had met the patient previously. The patient was present for the meeting. The diagnosis of panic disorder was noted without rationale. A treatment goal was created to address anxiety with measurable outcomes, but no baseline was provided. The interventions listed were appropriate.

There were no routine contacts scheduled or held with the patient during the monitoring period.

**Findings**

Treatment of this patient was not adequate. There was no initial psychiatric assessment completed and the IDTT meeting including participants who had not met the patient previously. The patient's diagnoses also required clarification.

**Patient C**

This 30-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with diagnoses of opioid use disorder, moderate and other circumstances related to child sexual abuse (personal history of sexual abuse in childhood). The patient was fully adherent to his prescribed venlafaxine. This patient was incarcerated within CDCR on two occasions. His first incarceration extended from October 2016 through January 2017 and he did not receive mental health services. Upon reincarceration in July 2021, he was not placed within the MHSDS until November 2024. He was placed at the 3CMS level of care, was admitted to the MHCB level of care on December 22, 2024, and was discharged to the 3CMS level of care at CRC on December 31, 2024.

Upon arrival at CRC, the patient was seen for five-day follow-up contacts given his recent discharge from the MHCB level of care. The initial contact with the patient noted that the MHCB admission had been secondary to suicidal ideation which the patient denied was the case. The patient reported he was never suicidal but had been using substances which caused psychosis. The patient's safety plan was reviewed daily and documentation of each contact was adequate. An initial primary clinician assessment was completed timely on January 13, 2025 and was comprehensive. An initial psychiatric assessment was completed on January 15, 2025 via

telepsychiatry and was adequate. The psychiatrist provided diagnoses of major depressive disorder without psychotic features vs. PTSD as well as amphetamine and opioid abuse.

An initial IDTT meeting was held later than required on January 21, 2025. Required staff were present; however, the patient's assigned psychiatrist was not the individual who completed the initial assessment. The treatment plan included appropriate, measurable goals and evidence-based interventions. The treatment plan was of good quality and reflected thoughtful, team input.

A routine primary clinician contact was held as required and reflected interventions in keeping with the treatment plan. An adequate SRE was completed during the contact as well. The routine psychiatry visit held in April was not conducted by the patient's assigned psychiatrist nor a psychiatrist who had met the patient previously. The documentation of that contact was adequate. There was evidence of the patient being offered group treatment, but he did not attend.

**Findings**

Treatment of this patient was adequate. The treatment plan was well-written and reflected thoughtful team input. The one concern was a lack of continuity in psychiatric providers.

**Patient D**

This 31-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with diagnoses of anxiety and psychoactive substance abuse. He was prescribed mirtazapine as needed. This patient was incarcerated for the first and only time in November 2023. He was enrolled in the MHSDS at the 3CMS level of care on December 28, 2023 and transferred to CRC on February 5, 2024.

The patient was seen for a routine, annual IDTT meeting on February 12, 2025. Required staff and the patient were present for the meeting. The clinical summary contained inaccurate and inconsistent information. The patient's age was not correct and the note indicated that the patient was not taking medication but also that the patient was currently taking his prescribed mirtazapine. The psychiatrist documented that the patient rarely takes the medication. The only treatment goal for the patient was related to his sleep and progress toward the identified goal was not documented on the treatment plan. There was no rationale for continuing the patient at the 3CMS level of care.

The patient was seen for timely routine psychiatry appointments in December 2024 and March 2025. The content was adequate given that the patient did not engage in the interaction and reported he rarely needed his medication. Timely routine primary clinician sessions were also held in December 2024 and March 2025. The mental status examination across both contacts was surprisingly similar and included an inaccurate age for the patient. The documentation was questionable as the contact in March was limited by the fact that the patient recently had oral surgery and was unable to participate in the session, yet the patient was noted as "somewhat talkative" and the content included discussion of the patient's college classes and coping skills in

the mental status examination section that were inconsistent with later narrative. Treatment goals were not discussed.

**Findings**

Adequate treatment of this patient was not evidenced in the documentation. The treatment plan was not updated at the time of the annual review with any useful clinical information. Routine primary clinician contacts were minimally documented and included information that was copied from session to session resulting in inaccurate and inconsistent information.

**Patient E**

This 39-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with a diagnosis of adjustment disorder, unspecified and was not prescribed psychotropic medications. This patient was incarcerated for the fourth time within CDCR on December 12, 2024. During his previous periods of incarceration, which were brief and began in 2008, he was not placed within the MHSDS. Upon reception for his current period of incarceration, he was placed at the 3CMS level of care and transferred to CRC on February 18, 2025.

He was seen for an initial primary clinician assessment on February 20, 2025 by a telepsychologist. The assessment was adequate and noted that the patient had an upcoming release date in June 2025. There was no initial psychiatric assessment completed with the patient prior to the initial IDTT meeting on May 5, 2025. The IDTT meeting was attended by an alternate primary clinician and the patient's assigned psychiatrist who had not met the patient previously. A correctional counselor and the patient were present at the meeting. Documentation indicated that the patient was prompted to attend the meeting after refusing to attend "the initial IDTT on 2-20-25" which was confusing, as there was no initial IDTT scheduled or offered to the patient on that date. The patient was offered and attended the initial primary clinician assessment on that date. No treatment plan was created for the patient, only an IPOC related to pre-release planning with no goals or interventions listed.

Pre-release planning contacts were held with the patient over subsequent months and those contacts were adequate. There was one routine primary clinician contact with the patient in May 2025 which reflected adequate discussion of the patient's upcoming release and mental health needs. No psychiatrist met with the patient.

**Findings**

Treatment of this patient was adequate despite not having a required contact with a psychiatrist prior to his initial IDTT meeting. Documentation reflected adequate pre-release planning which was identified as the primary need for the patient during the monitoring period.

**Patient F**

This 54-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with a diagnosis of "mood disorder of depressed type" which was unchanged since 2017 and is not a known psychiatric diagnosis. The patient was not prescribed psychotropic medications. This patient was incarcerated on ten different occasions within CDCR beginning in 1995. He was not enrolled within the MHSDS until his current period of incarceration which began in May 2010. He was first enrolled at the 3CMS level of care on March 6, 2014 and has remained at that level of care. He transferred to CRC on June 27, 2023.

The patient was not scheduled for a routine IDTT meeting during the monitoring period, so IDTT documentation from July 2024 was reviewed for context. Routine primary clinician contacts were held throughout the reporting period and reflected the use of evidence-based interventions which corresponded to the treatment plan and met the patient's needs.

There were no documented contacts with a psychiatric provider since July 2023. This was not in keeping with requirement for a patient to be seen within 90 days of IDTT meetings, even when medications are not prescribed.

**Findings**

Treatment of this patient was adequate; however, required psychiatric contacts were not offered and the patient's diagnosis required review.

**Patient G**

This 32-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with diagnoses of unspecified mental disorder; bipolar affective disorder, currently depressed, moderate; and anxiety state. The latter two are not diagnoses currently being used in psychiatry and were provided to the patient in 2017. The patient was not prescribed psychotropic medications. This patient was incarcerated within CDCR for the third time on August 28, 2024. His two prior periods of incarceration were brief and he was placed at the 3CMS level of care during his most recent period of incarceration from November through December 2017, when he was released from custody. Upon his return, he was immediately placed at the 3CMS level of care and remained there through his transfer to CRC on April 9, 2025.

His initial primary clinician assessment was completed on April 22, 2025 and noted a diagnosis of bipolar disorder, depressive type despite the patient denying any symptoms and not being prescribed any medications. The assessment included an adequate history based on patient self-report and a record review. An initial psychiatric assessment was completed later than required and the psychiatrist provided a diagnosis of adjustment disorder, unspecified without explanation or rationale. The patient was largely uncooperative with the assessment.

An initial IDTT meeting was held on April 29, 2025, later than required. Neither the primary clinician nor the psychiatrist at the meeting were assigned to the patient or were the individuals who completed the initial assessments. A correctional counselor and the patient were present for the meeting. The patient was noted as expressing odd thoughts during the meeting and not wanting to remain at the 3CMS level of care. Despite an IDTT meeting being the appropriate time to discuss level of care, the discussion was deferred as the patient's assigned clinician and psychiatrist were not present. IDTT documentation reflected concerns about the patient's current symptoms and diagnosis, raising the issue of a possible developmental disorder. Treatment goals addressing impulsivity and release planning were initiated with adequate planned interventions. The psychiatrist documented the presence of delusional ideation and noted that a PC 2602 order may need to be explored.

Upon arrival at CRC, the patient was seen for a number of pre-release planning contacts, as he had a release date of July 21, 2025. Assessments by the primary clinician did not reflect information documented in the patient's treatment plan and noted that the patient had no mental health needs that required attention upon release. The clinician also documented that the patient's intellectual functioning was "normal or above," had no issue with impulsivity, and no impairments in his thinking. The discrepancy of these findings versus what was documented during the IDTT were neither acknowledged nor addressed.

There were no routine primary clinician or psychiatric contacts offered to the patient for the remainder of the monitoring period.

**Findings**

Treatment of this patient was not adequate. His diagnostic picture was unclear. The patient appeared to have mental health needs that were not adequately assessed or addressed. Continuity of care was poor, as there was no follow-up with the patient after his IDTT meeting despite an odd presentation, delusional thinking, and indication by both the clinician and the psychiatrist present at the meeting that further evaluation was needed. Further, the lack of assigned staff at the IDTT meeting resulted in a lack of discussion about the patient's appropriate level of care.

**Patient H**

This 41-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with diagnoses of amphetamine-type substance-induced depressive disorder without use disorder, psychotic disorder, and substance abuse. The patient was fully adherent to his prescribed mirtazapine.

This is the seventh time this individual has been incarcerated within CDCR since 2003. He was first placed within the MHSDS during his fifth period of incarceration in September 2015 but was discharged from services prior to his release in February 2018. Upon his return to CDCR in October 2021, he was not placed within the MHSDS until March 2022, when he again received services at the 3CMS level of care through his release in May 2022. At reception for his current period of incarceration, he was placed immediately at the 3CMS level of care in September 2024 and remained there. He transferred to CRC from the reception center on October 22, 2024.

As there was no IDTT meeting held with the patient during the monitoring period, his most recent treatment plan was reviewed for context. Treatment was to focus on depression with adequate interventions listed. The patient was seen more than required by the Program Guide by both psychiatry and his primary clinician. Treatment provided to the patient was in keeping with the treatment plan. The only concern was that the three psychiatric contacts were provided by a different psychiatrist each time.

There was evidence of formal pre-release planning initiated in March 2025 which was adequate given the patient's scheduled release in June 2025.

**Findings**

Treatment of this patient was adequate; however, consistency in psychiatric providers could have been improved.

**Patient I**

This 59-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was fully adherent to his medication regimen which included mirtazapine, duloxetine, and hydroxyzine. This patient was incarcerated on one prior occasion between August 1983 and July 1986 with no evidence of having received mental health services. Upon reincarceration in December 2024, he was placed at the 3CMS level of care at the reception center. He transferred to CRC on March 10, 2025.

He was seen for an initial primary clinician assessment on March 13, 2025 by a telepsychologist. The assessment was adequate; however, the documented diagnosis was not fully supported by the symptoms documented in the assessment. The patient's history and presentation appeared to warrant a diagnosis other than an adjustment disorder given his history of suicidal ideation, self-injury, racing thoughts, negative ruminations, intrusive memories, sleep disturbance, problems with attention, and substance use. The patient was scheduled to be seen for an initial psychiatric assessment on March 20, 2025 but it could not be completed as the patient was sent to a community hospital secondary to cardiac concerns. He returned to CRC the same day but was not seen for an initial psychiatric assessment prior to the initial IDTT meeting on March 26, 2025. Required staff and the patient were present for the meeting; however, a covering psychiatrist not assigned to the patient was in attendance. A treatment goal to address anxiety was initiated with measurable objectives but vague interventions. While other symptoms were listed, they were not addressed in the treatment plan. An initial psychiatric assessment was conducted on March 28, 2025 with the patient's assigned psychiatrist. The assessment was adequate. The psychiatrist documented a diagnosis of major depressive disorder, recurrent with anxiety and noted that the patient was functioning adequately at the 3CMS level of care.

Four days later, on April 2, 2025, the patient reported suicidal ideation with a plan to cut his wrists. He stated that he did not feel safe given that his medical condition caused him to snore and his peers were threatening him. During an interview and attempt at de-escalation, the patient

threatened a correctional officer and had urine thrown on him by a peer. An adequate SRE was completed and the patient was admitted to the MHCB.

Upon return to CRC on April 8, 2025, the patient was seen for five-day follow-ups. The safety plan was reviewed with the patient and he appeared stable during all contacts. An initial primary clinician assessment was conducted by his previously assigned clinician on April 15, 2025. The content was adequate and reviewed his recent MHCB stay. An adequate initial psychiatric assessment was completed timely. At the initial IDTT meeting on April 23, 2025 the patient was assigned to a different primary clinician who was present for the meeting but had not met the patient previously. All other staff and the patient were present. The treatment plan was updated with goals to address anxiety, grief, and depression with measurable objectives and adequate planned interventions.

The patient submitted a healthcare request to be placed in treatment groups and was informed that he was on the waiting list. There were no routine contacts provided to the patient for the remainder of the reporting period.

**Findings**

Treatment of this patient was initially inadequate but eventually it improved and was determined to be adequate overall. Initially, his symptoms were not adequately assessed and resulted in an unclear diagnostic picture. Additionally, the seriousness of his symptoms were not considered and the patient required placement at a higher level of care. Upon return, follow-up contacts were completed, assessments were improved, and an adequate treatment plan was developed.

**Patient J**

This 41-year-old male patient's record was randomly selected for review of services provided at the 3CMS level of care at CRC. He was provided with a diagnosis of unspecified mood disorder. He was fully adherent to his prescribed buspirone, divalproex sodium, and mirtazapine. This patient was incarcerated for the second time within CDCR on November 8, 2023. He had not received mental health services during his prior period of incarceration between September 2013 and April 2014. He was placed at the 3CMS level of care on November 27, 2023 while at the reception center and transferred to CRC on January 9, 2024.

An annual IDTT meeting was held on January 8, 2025 with required staff and the patient present. Goals to address the patient's anxiety were documented along with reasonable interventions. The patient's treatment progress was noted to have fluctuated over the previous year.

The patient was seen as required for routine psychiatric and primary clinician contacts. During the reporting period, he was seen by two different psychiatrists and two different primary clinicians. Psychiatric contacts were adequate and addressed his mental health needs. Primary clinician contacts did not reference the patient's treatment plan but evidenced the use of treatment interventions to address the patient's needs; however, documentation was somewhat generic and did not promote continuity of care.

**Findings**

Treatment of this patient was adequate despite the need for improved documentation by primary clinicians to support continuity of care.

**Patient K**

This 28-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and amphetamine-type substance use disorder. He was prescribed Zyprexa and Effexor.

The patient was referred to the MHCB due to suicidal ideation and likely safety concerns. He returned to CRC on May 3, 2025 following MHCB discharge where five-day follow-up contacts were completed as required.

The initial provider assessments were comprehensive for this guarded patient with depression, anxiety, and intermittent auditory hallucinations who was described as a poor historian. Both providers included the patient's psychiatric and psychosocial history and current clinical presentation. The patient had a history of intermediate care hospitalization due to acute psychosis and grave disability. During the initial psychiatric assessment, his medications was adjusted to target auditory hallucinations.

The initial and routine IDTT meetings were attended by the assigned providers and the patient. At each IDTT meeting, the patient did not meet the criteria for a higher level of care consideration. During the initial IDTT meeting, a goal of relapse prevention was developed with the patient. Additional goals that targeted anxiety, suicidal ideation, bizarre behavior, and low energy were measurable and included appropriate interventions. Except for the goal that targeted suicidal ideation and relapse prevention; the rationale for goals was unclear. Despite identification of depression by the psychiatrist as a treatment need during the initial assessment, no goal for depression was developed. During the routine IDTT meeting, treatment goal progress was documented; however, individualization was needed. Individualization was also needed for the documented rationale for continuation at the EOP level of care.

The patient initially refused his first psychiatric follow-up contact but was agreeable to a brief contact. The subsequent routine psychiatric contact was delayed and occurred two months later; at that time, the patient denied any symptoms and presented with stability. Medication related side effects were discussed, and there was improvement in rapport with the patient.

Routine primary clinician contacts occurred by caseload groups and individual contacts with the assigned clinician. The documentation included routine discussion of overall coping and sobriety. The patient's guardedness decreased, and rapport with the PC improved.

A 90-day abbreviated suicide risk assessment was completed after the MHCB discharge. The patient continued to present with low risk, and the clinician documented his treatment progress and ability to manage institutional stressors which was a precipitant to the MHCB admission.

**Findings**

The treatment provided to this patient was adequate.

Although the overall treatment was adequate, improvement was indicated regarding the timeliness of psychiatric contacts. The patient remained stable, and there was an indication that therapeutic rapport improved which was critical for this initially guarded patient. The provider documentation was thorough for the initial and routine contacts. Treatment planning needed improvement regarding current treatment needs and the documentation of progress. Individual primary clinician contacts would have benefitted from the use of evidence-based clinical interventions.

**Patient L**

This 31-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided diagnoses of amphetamine induced psychotic disorder, major depressive disorder with psychotic features, schizophrenia, and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Haldol, Zyprexa, Prozac, Vistaril, and Cogentin.

The patient transferred to CRC in July 2024. The assigned providers and the patient attended the routine IDTT meetings during the review period. The clinical summary provided useful information about the patient's functioning between IDTT meetings and his current functioning to assist in directing treatment planning. Measurable treatment goals that included group attendance, energy, auditory hallucinations, and substance use with appropriate interventions were continued in treatment planning; and a brief synopsis of progress was documented. Although the patient had an upcoming EPRD of September 2025; a goal for discharge planning/relapse prevention was not developed. Individualized rationale for continued EOP level of care was needed.

Monthly routine psychiatric documentation indicated a consistent assessment of the patient's symptoms, functioning, substance use, and medication side effects. The documentation of those contacts provided a useful description of the patient's clinical presentation.

Routine primary clinician contacts occurred by caseload groups and individual contacts. The documentation of individual contacts indicated that the contacts were therapeutic and individualized. The topics addressed current symptoms, hygiene, substance use, family relationships, and the patient's upcoming release.

**Findings**

The treatment provided to this patient was adequate.

The patient was appropriately monitored by providers, and the clinical interventions were individualized to the patient's treatment needs. Diagnostic clarification with clinical rationale was needed.

**Patient M**

This 40-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided diagnoses of bipolar I disorder, depression, unspecified anxiety disorder, unspecified bipolar and related disorder, and unspecified depressive disorder. He was prescribed Vistaril PRN for insomnia.

The patient transferred to CRC in July 2024. The patient and assigned treatment providers attended routine IDTT meetings during the review period. Overall, the patient was stable. The IDTT documentation included an overview of the patient's symptoms and functioning between meetings. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care, he was continued at EOP level of care without clear rationale provided. During the June 2025 IDTT meeting, the plan was to consider discharge of the patient to a lower level of care at his next IDTT meeting. Measurable and objective treatment goals that targeted anxiety and depression with cognitive behavior therapy and dialectical behavior therapy remained unchanged.

During monthly routine psychiatric contacts, the patient's symptoms and functioning were routinely assessed. He reported depression, anxiety, and briefly reported auditory hallucinations; however, he consistently refused treatment with psychotropic medication. The patient remained active in educational pursuits, and his symptoms did not impair his functioning.

Primary clinician contacts occurred during caseload groups and individual contacts. The documentation of individual contacts was indicative of meaningful therapeutic contacts with the use of individualized clinical interventions.

**Findings**

The treatment provided to this patient was adequate.

The providers appropriately assessed the patient's clinical needs, and the clinical interventions were individualized to his treatment needs. The treatment planning documentation would have been improved with specificity regarding the patient's treatment progress. Diagnostic clarification with clinical rationale was also needed.

**Patient N**

This 33-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided a diagnosis of schizophrenia, and he had a history of polysubstance and alcohol use disorders. He was prescribed Lexapro and Zyprexa.

The patient was housed at CRC since January 2023. Routine IDTT meetings during the review period were attended by the assigned providers and the patient. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The documentation for each IDTT meeting described the patient as treatment adherent and included a brief clinical summary; although, specific details regarding treatment progress, symptoms, and functioning were not documented. Treatment goals that targeted substance abuse and auditory hallucinations were continued in each treatment plan. For reasons that were not clearly

documented, a goal that targeted medication adherence was added. Objective and measurable goals would be achieved with cognitive behavior therapy and psychoeducation. The rationale for continuation at the EOP level of care needed individualization.

Monthly psychiatric documentation routinely assessed the patient's auditory hallucinations and paranoia and included useful descriptive information. Medication side effects and adherence were routinely monitored.

The PC individual routine contact documentation was indicative of meaningful therapeutic sessions that addressed the patient's treatment needs. Symptoms, functioning, and the use of skills to manage symptoms were routinely assessed with review of new techniques as indicated.

**Findings**

The treatment provided to this patient was adequate.

The providers consistently assessed the patient's functioning and provided individualized, appropriate care. Improvement was need in the IDTT documentation regarding the specificity of symptoms, functioning, and the patient's response to treatment interventions.

**Patient O**

This 57-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided diagnoses of adjustment disorders with mixed anxiety and depressed mood, and alcohol use disorder; those diagnoses conflicted with the psychiatric diagnosis of unspecified schizophrenic spectrum and other psychotic disorder, with a history of unspecified anxiety disorder and polysubstance use disorder. He was prescribed Zyprexa.

The patient transferred to CRC during July 2024. The patient and assigned treatment providers attended the three routine IDTT meetings that occurred during the review. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care; he was continued at the EOP level of care, and a clear rationale was provided. The documentation consistently provided an overview of the patient's psychotic symptoms that impacted his behavior. While his mental status improved by the July 2024 IDTT meeting, it was unclear why the IDTT did not consider an inpatient referral given documented concern of victimization, lack of insight, and behavior disturbance on the housing unit. Objective and measurable treatment goals initiated between June 2024 and January 2025 were individualized to the patient's treatment needs and targeted insight, impulsivity, auditory hallucinations, bizarre behavior, and sleep disturbance. The treatment interventions were educational and focused on self-awareness. A brief summary of treatment progress was documented.

Prior to January 2025, the patient was not prescribed psychotropic medication; but due to reports of disturbed sleep, Vistaril was initiated in mid-January 2025.

There was a stark contrast in the provider documentation. The PC documentation described psychotic behavior with unkempt appearance; that description contrasted with the psychiatric documentation in which there was a denial of psychotic symptoms and the patient was described

as appropriately groomed. However, at the April 2025 IDTT meeting, the patient's behavior was discussed; and he agreed to treatment with an antipsychotic medication.

**Findings**

The treatment provided to this patient was inadequate.

There was a lack of provider collaboration that contributed to a delayed assessment of the need for antipsychotic medication treatment for this patient with psychotic symptoms. Further, the patient's clinical presentation warranted discussion of higher level of care referral. Diagnostic clarification with clinical rationale was needed. Additionally, treatment planning would have been improved with specificity regarding treatment progress.

**Patient P**

This 31-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided diagnoses of unspecified schizophrenic spectrum and other psychotic disorder, anxiety disorder, and polysubstance use disorder; those diagnoses differed from the healthcare record diagnoses of unspecified mood disorder and opioid use disorder. He was prescribed Zyprexa, BuSpar, and Vistaril.

The patient transferred from the 3CMS level of care to the EOP during February 2025. The initial provider assessments included relevant clinical information to assist with treatment planning including psychosocial and psychiatric history as well as current symptoms. The primary clinician included the reason for EOP referral and consultation with the patient's mother and 3CMS referring clinician who recommended a developmental disability referral. Notably, the developmental disability assessment resulted in a DD2 classification with adaptive supports and subsequent transfer to a developmental disability facility.

The initial and routine IDTT meetings were attended by the patient and assigned providers. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The clinical summary was appropriately individualized. Measurable and objective treatment goals targeted anxiety and depression. Interventions included the use of cognitive behavior therapy which might have been inappropriate given the patient's DD2 status. Progress regarding treatment goals was not clearly updated.

Routine psychiatric contacts were appropriately descriptive regarding the patient's symptoms, functioning, and medication side effects. As treatment continued, the patient openly discussed his auditory hallucinations, substance use and family support.

Primary clinician contacts occurred on an individual basis with routine assessment of the patient's mood and functioning; auditory hallucinations were not specifically assessed. The patient was anxious about the upcoming transfer to a developmental disability institution and the anticipated negative impact on regular family visits. The PC contacts were appropriately supportive for the patient considering his cognitive limitations. A decline in self-care was attributed to an attempt to avoid peers; although, decline in mental status was not considered.

**Findings**

The treatment provided to this patient was adequate.

The treatment would have been improved by teaching the patient skills to manage his anxiety regarding the upcoming facility transfer. Diagnostic clarification with clinical rationale was needed.

**Patient Q**

This 34-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided a diagnosis of unspecified schizophrenic and other psychotic disorder; additional diagnoses also included in the healthcare record were schizoaffective disorder, unspecified anxiety disorder, psychosis, and mood disorder. He was prescribed Zyprexa, Depakote, and Vistaril PRN.

The patient transferred to CRC on July 8, 2025 from the reception center. The initial provider assessments were comprehensive and covered relevant clinical areas. The documentation noted a long history of mental illness and current stabilization of psychotic symptoms with psychotropic medication treatment.

Shortly after the initial assessments were completed, the patient presented with psychotic symptoms during a symptom management group, with response to auditory hallucinations prior to the group and bizarre statements. During the group, he continued to make bizarre statements, was irritable, and was assessed as delusional with tangential and pressured speech. The patient's antipsychotic medication was increased, and Depakote was prescribed; additionally, the patient was placed on modified EOP programming. The rationale for continued placement in the EOP was not documented, nor was there consideration of referral to a higher level of care.

The psychiatric technician alerted the patient's providers after an incident of medication nonadherence when the patient discarded some of his medications. In discussion with the primary clinician, the patient reported that the medications caused fatigue. During a follow-up psychiatric contact, the timing of the medications was adjusted to assist with the fatigue.

The interventions provided during the PC contacts were individualized to the patient's treatment needs. The psychiatrist assessed and responded to barriers in medication nonadherence, and the primary clinician monitored the patient's mental status and functioning and provided support and psychoeducation.

A routine IDTT meeting occurred timely after the initial IDTT meeting; the patient remained on modified programming. His progress in treatment was discussed during the IDTT meeting, and modified EOP programming was discontinued. The patient was continued at the EOP level of care, and an appropriate rationale was provided for retention. Measurable treatment goals developed during the initial IDTT meeting that targeted delusions, substance use, and agitation were continued. Treatment interventions included cognitive behavior therapy and psychoeducation.

**Findings**

The treatment provided to this patient was adequate.

This patient's decompensation was timely identified, and medication adjustments occurred timely. Subsequently, the patient's mental status improved. Treatment nonadherence was addressed by providers, and his mental status improved. Areas of needed improvement included a treatment goal for medication nonadherence, documentation of the rationale for modified EOP programming versus transfer to a higher level of care, and diagnostic clarification with clinical rationale provided.

**Patient R**

This 39-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and unspecified anxiety, depressive disorder, and major depressive disorder. He was prescribed Abilify, Zyprexa, and Remeron.

The patient transferred to CRC on July 23, 2025. He had a long history of mental illness and substance abuse. During initial assessments, he reported anxiety, depression, and ongoing auditory hallucinations. He reported paranoia to the psychiatrist.

The initial IDTT meeting occurred on July 31, 2025, and the documentation regarding the patient's clinical presentation was unremarkable. The following day, an urgent referral was submitted which indicated that the patient had difficulty following directions, was confused, and reported suicidal ideation. He stated that he had received bad news and planned to kill himself by using a razor but would not elaborate further. He was referred and subsequently admitted to the MHCB where he received treatment until return to CRC at the EOP level of care on August 8, 2025. Five-day follow-up contacts were completed as required, when the patient consistently denied suicidal ideation.

The initial provider assessments included useful information. During the initial PC assessment, the patient was described as slightly disorganized but otherwise psychiatrically stable. It was noted that that he had a history of psychosis but otherwise denied current auditory hallucinations. The psychiatric documentation described the patient with response to auditory hallucinations during the assessment and with minimization of his psychotic symptoms. During the psychiatric assessment, the patient denied depression or anxiety; those symptoms were not clearly assessed by the PC.

The patient and assigned providers attended the initial IDTT meeting. The treatment planning targeted medication adherence, hallucinations, and substance use. Given the lack of documented medication nonadherence or documentation of current substance use needs; it was unclear why those goals were developed. The rationale for continued EOP level of care was appropriate.

**Findings**

The treatment provided to this patient was adequate.

Treatment planning required improvement. The patient was appropriately and timely transferred to an MHCB. His providers recognized ongoing psychotic symptoms and documented observations despite the patient's denial of symptoms.

**Patient S**

This 40-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided psychiatric diagnoses of unspecified schizophrenic spectrum and other psychotic disorder, unspecified depressive disorder, and polysubstance use disorder; however, additional diagnoses of schizoaffective disorder, other substance induced psychotic disorder, and antisocial personality disorder were also present in the healthcare record. The patient was prescribed Zyprexa and Effexor.

The patient transferred to CRC on June 4, 2025. The initial provider assessments included relevant clinical information, and the initial psychiatric assessment contained very thorough documentation of information. The patient had an extensive history of mental illness including symptoms of anxiety, depression, and auditory hallucinations which were stable.

The patient, covering psychiatrist, and the assigned primary clinician attended the initial IDTT meeting. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care, he was continued at EOP level of care with clear rationale provided. The clinical summary section and treatment goals had not been updated since the prior initial reception center treatment plan. Measurable treatment goals targeted delusions and depressive symptoms with appropriate interventions of reality testing and cognitive behavior therapy. The rationale for the treatment goal that targeted delusions was unclear.

The patient was appropriately monitored by providers who routinely assessed his symptoms and functioning. His symptoms were stable and responded well to psychotropic medication treatment. Overall, the treatment provided during the clinical contacts was individualized to the patient's needs; although, treatment interventions identified by the IDTT were not utilized.

**Findings**

The treatment provided to this patient was adequate.

Treatment planning required improvement. The providers appropriately monitored his clinical presentation, and treatment was individualized. Diagnostic clarification with clinical rationale was needed.

**Patient T**

This 47-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at CRC. The patient was provided a diagnosis of unspecified schizophrenic spectrum and other psychotic disorder likely schizoaffective or schizophrenia. He was not prescribed psychotropic medication.

The patient transferred to CRC on July 7, 2025 from the reception center. The initial PC assessment included a thorough description of the patient's current mental status; although, the

psychosocial information needed improvement. The initial psychiatric assessment was comprehensive and included relevant clinical information for treatment planning. The patient stated that he was allergic to and was unwilling to take psychotropic medications.

Both providers described the patient with delusional thinking. The psychiatrist noted that he minimized his mental health history, and the PC described the patient as an unreliable, poor historian. Despite those characterizations, neither provider sought collateral information. The patient was described as unkempt with hyperverbal speech, disorganized thinking, and inappropriate laughter during the initial PC assessment.

The patient and assigned providers attended the initial IDTT meeting. The patient remained with delusional thinking, poor insight, judgment, and foresight; however, he was described as clean and appropriately dressed. The patient was retained at the EOP level of care with a plan to "monitor to ensure PT [patient] is able to function in the current setting." Although clinically indicated, consideration of referral to a higher level of care was not documented. Despite the need for psychotropic medication treatment to address psychotic symptoms, a goal for medication adherence was not developed. The treatment goals targeted behaviors related to delusions and his delusional thought processes with rapport building as the intervention. It was unclear how a goal of reducing bizarre behavior and increasing insight would be met without medication treatment. The goals of "no negative interactions" and "no collateral reports of disruptive behavior" indicated staff awareness of the possibility that the patient was unable to safety function in the EOP.

During PC contacts, the patient remained delusional with disorganization. During the August 12, 2025 contact, the PC documented that the patient had been going through trash cans and collecting trash in his housing unit; the patient stated that he was doing his community service in response to questioning about his behavior The PC noted that appropriate behaviors were reviewed with the patient; however, the PC noted that the patient did not appear to understand the instructions provided. The patient was described as disheveled, malodorous, and with disorganized thought processes. Caseload group documentation described the patient as responding to internal stimuli, disruptive to peers, and making bizarre comments. During the week of August 18, 2025, the group documentation described him as responding to internal stimuli with impulsivity.

During the one required psychiatric contact during the review period, the patient was reportedly delusional and resistant to medication treatment. The patient's delusional content was of grandiose, bizarre, and paranoid content.

During the monitoring visit, the patient was observed engaging in odd behavior. Specifically, during an observed EOP huddle, the patient required redirection, as he frequently picked up rocks on the yard. When interviewed, he presented with disorientation and confusion, and he asked if he was on a movie set. The patient was unkempt; his uniform was dirty, and his hair appeared unwashed.

The patient was seen for an urgent consult on August 20, 2025, after concerns regarding his mental status observed during the monitoring visit were discussed with the EOP supervisor by the Coleman expert and the CDCR regional psychologist. It was noted that the patient was

disoriented and required an assessment for a higher level of care referral as well as evaluation by the IDTT the following day.

The patient was again discussed with the EOP supervisor, and it was reported that referral to a higher level of care was under discussion; the patient had an approaching release date with a plan to submit a petition for CARE court. At the time of review on August 28, 2025, there was no documentation regarding consideration of a higher level of care referral.

The patient had an EPRD of September 26, 2025.

**Findings**

The treatment provided to this patient was inadequate.

The patient was actively psychotic with impaired functioning and medication refusal. Referral to a higher level of care was clinically indicated but was not documented.

**APPENDIX B-9**
**California State Prison/Corcoran (CSP/Corcoran)**
**Review Period: August 1, 2024 – January 31, 2025**

**Patient A**

This 55-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to CSP/Corcoran in 2018 and housed in Facility B. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood. He was not prescribed psychiatric medication.

The patient's annual IDTT meeting was completed in early November 2024. It was held in absentia due to the patient's refusal; assigned providers attended. Documentation indicated that the patient had not attended PC contacts. Treatment goals were not completed. IDTT documentation indicated that the patient would remain in 3CMS care to address mood-related adjustment issues.

The patient was seen for one PC contact during the monitoring period, in late December 2024. The confidential contact was conducted by telehealth and lasted ten minutes. The patient reported that he was doing "good." He was future-oriented and assessed as stable. The plan developed in IDTT to address treatment needs and goals was not completed during this contact.

Documentation indicated that he was attending nursing led treatment groups, a coping skills group with a psychologist, and recreational therapy groups. These treatment interventions were not included on IDTT documentation.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient did not receive timely PC contacts or appropriate, individualized treatment planning. His sole PC contact did not address his pattern of treatment non-adherence and was akin to a wellness check. Diagnostic clarification was needed.

**Patient B**

This 47-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to the facility from the reception center in November 2024 and housed in Facility B. He was provided diagnoses of other specified bipolar disorder without psychotic symptoms and borderline personality disorder per patient's report. He was not prescribed psychiatric medication.

The initial telepsychiatric assessment was late but occurred in a confidential setting with the medical assistant present. The patient had discontinued Zyprexa, Buspar, and Vistaril ten days prior to the assessment after a four-week period of intermittent adherence. He explained that his symptoms were manageable and discontinued the medications due to abnormal labs and kidney issues. There was no specific psychiatric documentation regarding agreement or concerns with

the patient's decision. However, the assessment documented that risks, benefits, and alternatives were discussed. Of note, mental health treatment history was not documented.

The patient's only PC contact during reviewed dates occurred over two months after admission, as a "MHPC assessment note." There was no initial assessment or documentation that included the patient's full psychosocial history including mental health history. During that contact, the patient reported increased anxiety and a commitment to sobriety. Clinical interventions were not offered to assist him in managing his anxiety.

The initial IDTT meeting did not occur until mid-February, 2025, after the review period ended. The meeting was attended by the assigned psychiatrist but not the assigned primary clinician. The patient presented with elevated depression and anxiety. There was no input from the psychiatrist regarding a follow-up encounter to address the increase in symptoms. Treatment goals targeted anxiety and substance use with a goal to identify anxiety symptoms and attend substance use treatment programming. Interventions were identified as PC contacts and substance abuse class attendance. Discharge planning was not targeted despite the patient's EPRD of June 14, 2025.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient did not receive basic Program Guide required care in a timely manner. The initial psychiatric assessment and IDTT were delayed, and the initial PC assessment was not completed. Treatment planning was sparse and did not target identified treatment needs. Psychiatric follow-up regarding the patient's increase in symptoms following medication discontinuation was warranted but not completed.

**Patient C**

This 45-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to CSP/Corcoran in 2017 and housed in Facility B. He was provided a diagnosis of major depressive disorder, which was discrepant from those listed in the EHRS as adjustment disorders with mixed anxiety and depressed mood and anxiety disorder, unspecified. He was prescribed Vistaril and Remeron as needed.

The patient's annual IDTT meeting occurred in May 2024. The resulting treatment plan targeted depression with cognitive behavior therapy and dialectical behavior therapy. These interventions were not provided during the patient's two PC contacts in the review period. Telepsychiatric contacts with the assigned provider were generally timely. Documentation assessed medication adherence, symptoms, side effects, and current mental status. Labs were reviewed and discussed with the patient. The patient's sleep disturbance, anxiety, and depression were consistently assessed as stable.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Psychiatric care was appropriate but overall care was inadequate due to lack of timeliness, provider continuity, and appropriate PC contacts. Clarification of and rationale for psychiatric diagnoses was needed.

**Patient D**

This 56-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to CSP/Corcoran in 2020 and housed in Facility B. He was diagnosed with schizoaffective disorder but was not prescribed psychiatric medications.

The patient was seen for a nonconfidential wellness check with a tele-psychiatrist in October 2024. It was documented that he had discontinued Zyprexa in May of 2024 and was doing "all right." There was no accompanying mental status exam or further assessment of the patient's symptoms or functioning. Two PCs each provided one individual encounter during the review period. Neither encounter was timely, and both encounters were consistent with wellness checks. For reasons that were unclear, the second PC contact was initiated at the request of the EOP supervisor to assess the patient for "chronic sleepiness, hardly coming out of his cell and confusion." The patient refused the contact and was seen at the cell front. He was lying in bed and in response to suicidal ideation, he shook his head. No further assessment or consultation with staff occurred.

Assigned providers attended the patient's annual IDTT meeting in January 2025, which was conducted in absentia due to the patient's refusal. A summary of the patient's functioning since the previous IDTT was not included. A goal to reduce depression with the use of dialectical behavior therapy was established. As of March 12, 2025, no further attempts to assess the patient had occurred, and the patient was brought to the attention of mental health leadership during the Special Master's site visit.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient was not provided any confidential, meaningful clinical contacts during the review period. The psychiatrist failed to adequately assess his functioning following medication discontinuation. Further, he was not appropriately assessed following concerns about his functioning.

**Patient E**

This 51-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to CSP/Corcoran in 2023 and housed on Facility B. He was provided a diagnosis of schizoaffective disorder. He was prescribed Zyprexa and Vistaril as needed.

Assigned providers and the patient attended the patient's annual IDTT meeting in August 2024. Documentation indicated that symptoms included auditory hallucinations, high anxiety, and moderate depression. A goal to reduce depression with the use of cognitive behavior therapy was established. Telepsychiatric contacts were generally timely. Documentation indicated a review of the patient's symptoms and functioning, labs, medication adherence, and side effects. The patient was resistant to discussing treatment options and refused a standing order for medications. He continued to experience auditory hallucinations but denied other symptoms. He was assessed as "symptomatic but stable." The patient had not had a PC contact since May 2024.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

While the psychiatrist appropriately monitored this treatment-resistant patient, no PC encounters occurred during reviewed dates, and the interventions required by the treatment plan were not provided.

**Patient F**

This 44-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was serving his first CDCR term. He was incarcerated in September 2024 and transferred to EOP care at CSP/Corcoran from an MHCB on January 29, 2025, where he had been treated for suicidal ideation and increased depression and psychotic symptoms. He was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Zyprexa, Prazosin, Buspar, and Zoloft. At the time of the review, he was housed on 3B.

Five-day follow-up encounters were completed as required but did not address the underlying reason for the MCHB admission to shore up the patient's relapse prevention skills. The patient refused provider initial assessments. Documentation that was copied from previous assessments did not convey the necessary clinical information to direct adequate, individualized treatment planning.

The initial IDTT meeting was completed in absentia and attended by assigned treatment providers. Documentation indicated that the patient was treatment non-adherent. He denied mental health symptoms but reported an extensive history of suicide attempts. The team agreed to focus treatment planning on building a therapeutic alliance, which would be measured by responding to at least four questions with more than one-word answers. The patient did not meet higher level of care indicators. Rationale for continued EOP care was not documented.

A few days after the initial IDTT meeting, the patient submitted a mental health request to meet with the psychiatrist to discuss medication. During this psychiatric contact, the patient's improved mental status and functioning was attributed to psychiatric medication. Specifically, chronic nightmares and hallucinations decreased, and ADLs were appropriate. The patient was engaged in Bible study, attending groups, and on the waitlist for a school or job.

Documentation indicated that timely PC routine contacts occurred by telehealth with the assigned provider. Of note, the same PC completed the initial assessment and initial IDTT, however the use of telehealth was unclear in these assessments. The patient's attendance at PC contacts was an improvement for him. Documentation indicated an assessment of the patient's overall functioning and symptoms but did not utilize clinical interventions other than active listening, a rapport building technique. Given this patient's documented treatment resistance, during this early treatment phase, this could have been strategic on the part of the PC to improve rapport. However, if this was the plan, it was not documented, and there was no documentation of a plan to offer evidence-based treatment interventions. Group treatment was not discussed during PC contacts. Groups were provided by recreational therapists. As of March 3, 2025 there were no groups offered since February 18, 2025.

**Findings**

The treatment provided to this EOP patient was adequate with need for improvement.

Despite inadequate initial assessments and five-day follow-up encounters, the patient engaged in routine treatment. This engagement represented an improvement for him and an indication that the treatment team's approach to focus on rapport was working. Areas in need of improvement were the provision of group treatment and collaborative treatment planning documentation, as there was no documentation of psychiatric or group interventions. The treatment goal of rapport building was appropriate during the initial treatment stage; however, additional individualized goals were needed, including a goal to target self-harm. Given this patient's history of treatment resistance and minimization of symptoms, consultation with unit custodial staff regarding daily functioning was needed during initial assessments. Rationale for diagnosis and individualized group programming were needed.

**Patient G**

This 58-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to the facility in 2022. He was diagnosed with major depressive disorder, unspecified anxiety disorder, unspecified schizophrenia spectrum and other psychotic disorder, and opioid use disorder. He was prescribed Zyprexa, Vistaril, and Lamictal. At the time of review, he was housed on 3B and receiving EOP care.

Routine IDTT meetings during the monitoring period were attended by assigned providers and the patient. Overall, IDTT documentation provided a useful summary of the patient's symptoms and functioning between IDTT meetings. However, IDTT documentation did not address use of and response to PC treatment interventions or group treatment. The treatment plan was not completed. An IPOC that targeted depression from 2022 was documented. The patient did not meet criteria for higher level of care indicators. The rationale for EOP care was insufficiently documented.

Psychiatric contacts occurred with two different providers, and there was a 73-day gap between the October 27, 2024 and January 8, 2025 psychiatric encounters. Documentation was clinically useful and generally included symptoms, functioning, medication adjustment, and treatment response. Of note, documentation that intermittent passive suicidal ideation reported during the

October 27, 2024 contact was communicated to the PC was not located. Relatedly, it was unclear if the PC was aware of psychiatric documentation of the patient's hallucinations.

PC documentation between December 2024 and February 2025 was generally timely and consistently occurred with the assigned PC. Documentation reflected a solid therapeutic relationship and routinely included the patient's symptoms and functioning. Supportive therapy and use of rapport building techniques were routinely utilized. Evidence-based clinical interventions, such as cognitive behavior therapy, were utilized during several contacts, and the patient was responsive to these interventions. Apart from a life skills group offered by a PC, the primary group treatment modality was recreationally based.

**Findings**

The treatment provided to this EOP patient was inadequate.

Although the patient remained stable and engaged, the strengths in PC documentation and care and overall quality of psychiatric care were outweighed by multiple deficits in care. Deficits included the lack of treatment goals with collaborative evidence-based interventions, along with the long delay between psychiatric contacts. This delay was of particular concern given the patient's documented symptoms of hallucinations and passive suicidal ideation. The patient's suicidal ideation was not appropriately assessed or communicated to the patient's assigned PC for targeted treatment and monitoring. The lack of provider communication and collaboration extended to documented hallucinations. Individualized clinical group programming was needed.

**Patient H**

This 29-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was transferred to EOP care at CSP/Corcoran on September 24, 2024 from ICF level of care, where he had been treated for grave disability. He was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed a monthly Haldol injection and Remeron under a PC 2602 order for involuntary treatment. At the time of the review, he was housed on 3B.

Five-day follow-up encounters were completed as required. However, the underlying reason for the patient's psychiatric decompensation that resulted in inpatient care was not clearly addressed. The initial psychiatric assessment was appropriate. In contrast, the initial PC assessment provided an overview of some psychosocial factors but inappropriately directed the reader to review the record for other relevant factors including self-harm history and substance use history. The only information regarding the ICF admission was copied from a prior MHCB placement; this information indicated that the patient decompensated due to medication non-adherence and required an ICF referral. ICF documentation regarding the patient's treatment progress and response, useful for relapse prevention and treatment planning, was not included. A case formulation was not completed.

Initial and routine IDTT meetings were attended by the patient and treatment providers. During the initial IDTT meeting, the patient did not meet higher level of care indicators. The treatment

plan section of the document was not updated and included goals that were met at ICF. During the routine IDTT meeting, the patient met higher level of care referral due to a pattern of high treatment refusals. The non-referral rationale was reasonable, and EOP treatment modifications were appropriate. Documentation for the rationale for continued EOP care needed improvement. It was documented that he was appropriate for EOP LOC for the structure and regular contact with mental health but a clear indication for the reason the structure was needed was not.

Except for a 69-day gap between November 15, 2024 and January 23, 2025, psychiatric contacts occurred every month with the assigned psychiatrist. Documentation indicated that the patient remained stable, that auditory hallucinations and depression subsided, and that functioning was appropriate. During several psychiatric contacts, the patient indicated that he did not want to be subject to the PC 2602 order for involuntary treatment; the psychiatric response was appropriately educational.

PC documentation between December 2024 and February 2025 was generally timely and consistently occurred with the assigned clinician. Patient attendance for confidential contacts was variable. The patient's mental status was routinely monitored and was assessed as stable. Most documentation was consistent with a wellness check. A review of the appointments report indicated that duration of PC contacts between December 2024 and January 2025 was less than seven minutes.

Group treatment was offered by recreational therapists. Of note, there was some misrepresentation in the record regarding group treatment. First, there were several incidents between September 25, 2024 and October 8, 2024, when the patient was at CSP/Corcoran but group notes from ICF were included in the chart. While the patient was documented as a 'no show' for most group sessions, on October 4, 2024, the patient was noted to have attended the group even though he had not been at ICF for several weeks. Further, it was unclear who facilitated these groups as there was conflicting information regarding a clinician and rehab therapist for two of the notes.

**Findings**

The treatment provided to this EOP patient was inadequate.

Although the patient remained stable and engaged, treatment was deficient. The initial PC assessment and documentation from the initial IDTT meeting did not include sufficient clinical information to direct treatment planning. While the quality of psychiatric documentation was clinically appropriate, there was a significant delay between contacts. This delay was particularly noteworthy given the patient's recent ICF discharge and resistance to psychiatric medication. Meaningful therapeutic PC contacts did not occur. Five-day follow-up encounters were not individualized to the patient's treatment needs. Individualized clinical group programming was needed.

**Patient I**

This 49-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to the facility in June 2023 and received

EOP care on 3B during the review period. He was diagnosed with schizophrenia and prescribed Risperdal, Cogentin, and Zoloft. His healthcare record was randomly selected to assess adequacy of care.

Assigned providers attended the three routine IDTT meetings during the monitoring period, one of which was conducted in absentia. A summary of the patient's treatment, clinical presentation and functioning was included in IDTT documentation, although more detail was needed for continuity of care. The patient did not meet higher level of care indicators. Documentation described the patient as stable with consideration for a discharge to 3CMS in the future. The decision for continued EOP level of care lacked an individualized, patient-specific rationale.

Psychiatric encounters were not timely. Specifically, there were no encounters during August 2024, December 2024, or January 2025. These gaps in psychiatric care were of concern given the patient's intermittent medication adherence and major mental illness. One appointment did not occur as the internet connection was not functioning and the patient was re-scheduled as planned the following week. Of note, it was not clearly documented that this provider was a telepsychiatrist. Two of four completed psychiatric encounters were not provided by the assigned psychiatrist. Documentation included relevant clinical information for continuity of care, including symptoms, functioning, and medication adjustments. The patient's delusions and hallucinations improved with an increase in antipsychotic medication. Most reviewed PC contacts occurred with the assigned clinician and were timely. The assigned PC's progress notes reflected a positive therapeutic alliance and meaningful treatment. Group treatment was solely provided by recreational therapists.

**Findings**

The treatment provided to this EOP patient was inadequate.

The strengths in PC care were outweighed by treatment inadequacies, including multiple delays in psychiatric care, lack of continuity in psychiatric care, and lack of documented treatment planning. These deficits were particularly concerning because the patient was symptomatic and diagnosed with a serious mental illness. It was unclear how group treatment was individualized to the patient's needs.

**Patient J**

This 63-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to the facility in April 2023 and received EOP care on 3B during the review period. He was diagnosed with schizoaffective disorder and prescribed Latuda and Remeron.

Routine IDTT meetings were attended by the patient and assigned providers. IDTT documentation provided a summary of the patient's clinical presentation, treatment engagement, and functioning, but would have been improved with greater specificity. The patient did not meet higher level of care indicators. Treatment planning was updated appropriately and targeted ADLs and emotional

regulation. However, the treatment plan lacked collaborative treatment interventions including group treatment.

Psychiatric encounters were not timely. The patient did not have a contact in either August 2024 or December 2024. Two of five contacts were not with the assigned psychiatrist. One scheduled appointment did not occur as the internet connection was not functioning, and the patient was re-scheduled as planned the following week. Overall, quality of psychiatric documentation was relevant and appropriate, with clear descriptions of the patient's clinical presentation. Most PC contacts between November 2024 through February 2025 occurred with the assigned clinician through telemental health. PC progress notes routinely documented the patient's clinical presentation. These notes indicated that the PC was attentive to the patient's treatment needs and utilized various clinical interventions. The patient received group treatment with recreational therapists.

**Findings**

The treatment provided to this EOP patient was adequate with need for improvement.

The overall strengths in quality of provider care outweighed the psychiatric delays. PC interventions were individualized to the patient's needs. Treatment planning documentation would have been improved with increased specificity in the clinical summary. Individualized clinical group programming was needed.

**Patient K**

This 39-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to the facility on December 30, 2024 and received EOP care on 3B during the monitoring period. He was diagnosed with schizoaffective disorder, bipolar type. He was prescribed Zyprexa, Lexapro, and propranolol.

The initial PC assessment was insufficient and outdated. Specifically, documentation copied from the reception center noted that the patient was referred to MHCB care for suicidal ideation with a plan. However, the outcome was not included. Additional copied documentation indicated that the patient's level of care was changed to EOP in November 2024 without explanation for the change. Further, documentation was discrepant regarding psychotic symptoms. Consequently, documentation did not sufficiently convey the patient's treatment needs at the time admission to CSP/Corcoran.

The initial IDTT meeting was attended by assigned providers and the patient. The clinical summary, copied from the primary clinician initial assessment, did not provide updated documentation regarding the patient's current treatment needs. Treatment planning was not completed. A safety plan was not considered despite the recent suicidal ideation. The patient did not meet higher level of care indicators. Rationale for EOP level of care was not documented.

The initial psychiatric assessment was not completed until after the initial IDTT meeting. Most of the assessment was copied from another unknown provider and timeframe. The psychiatrist noted

the patient's ongoing auditory hallucinations were "prominent" and concerns regarding psychiatric medication, as well as a plan to increase the medication over time. The patient was seen for a follow-up psychiatric encounter a little over a month later. He presented as slightly less symptomatic, but hallucinations were still documented as "prominent." The psychiatrist documented concerns regarding increasing already high doses of psychotropic medication along with a plan to consider augmentation. However, no changes were made to medications, and the patient was not scheduled for more frequent psychiatric contacts to enable closer monitoring.

PC encounters occurred with the assigned PC every week following admission to CSP/Corcoran. The patient consistently reported depression, anxiety, poor sleep that improved over time, and bothersome hallucinations that were repeatedly documented as derogatory and yelling or screaming. The clinician routinely discussed various interventions and skills to assist the patient in managing his symptoms, and the patient was receptive to these interventions. The patient was provided with recreational therapy groups.

**Findings**

The treatment provided to this EOP patient was inadequate.

The combination of a delayed initial psychiatric assessment and inadequate initial PC assessment negatively impacted treatment planning for this first term patient with a serious mental illness. Psychiatric care was insufficient, as the plan to delay changes to psychiatric medications prolonged the patient's bothersome auditory hallucinations and prolonged the patient's suffering. Despite failure to identify treatment goals and interventions during the initial IDTT meeting, routine PC care was individualized to the patient's treatment needs. However, there was a lack of communication from the PC to the psychiatrist regarding the patient's distressing hallucinations. Individualized clinical group programming was needed.

This patient was interviewed during the Special Master's site visit and there were no acute issues that required higher level of care evaluation. Institutional leadership and regional staff were aware of the patient.

**Patient L**

This 53-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to the facility in October 2023 and receiving EOP care on 3B during the review period. Psychiatric diagnoses provided to the patient during the review period were inconsistent and included unspecified anxiety disorder as well as bipolar I disorder. He was prescribed Effexor, Vistaril, and Geodon.

The patient and assigned providers attended the three routine IDTT meetings held during the review period. A summary of the patient's treatment needs between IDTT meetings was included. The treatment plan section of the document was blank. However, PC areas of focus were documented in the patient's verbalized treatment goals section of IDTT documentation. Targeted areas were not measurable, and collaborative interventions were not included. A plan to increase contacts while the patient was on C status was documented, but completion of these additional

contacts was not located. The patient did not meet higher level of care indicators. Rationale for EOP level of care was variable but showed signs of improvement. Documentation indicated a plan to change the patient's diagnosis to bipolar I without clear rationale; the change was not documented in the official place of record in EHRS.

Routine psychiatric encounters did not occur in November 2024 and December 2024. Psychiatric contacts occurred with the assigned provider apart from contacts in September 2024 and February 2025. Documentation included appropriate information regarding the patient's symptoms, functioning, and medication response. Medication changes with rationale were made to address the patient's auditory hallucinations.

Reviewed primary clinician documentation between late October 2024 and February 2025 indicated that contacts consistently occurred with the assigned clinician. During a joint PC-psychiatrist encounter, the psychiatrist noted the patient's skin picking and assessed the behavior as due to underlying anxiety. Concerningly, the PC did not provide targeted interventions for this anxiety-driven behavior, although the patient's dermatological condition improved with antibiotics. PC progress notes otherwise conveyed an appropriate summary of the patient's symptoms and functioning and reflected meaningful therapeutic contacts. The patient regularly received individualized treatment interventions that were frequently evidence-based. Recreational therapy was the primary group treatment modality.

**Findings**

The treatment provided to this EOP patient was adequate with need for improvement.

The delays in psychiatric care were outweighed by the multiple strengths in care for this stable patient. Strengths include quality of psychiatric care and routine use of clinical interventions by the primary clinician. Diagnostic clarification with rationale and individualized clinical group programming were needed.

**Patient M**

This 57-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to CSP/Corcoran in 2018 and received EOP care on 3B during the review period. He was provided diagnoses of unspecified adjustment disorder, antisocial personality disorder, and major depressive disorder. He was prescribed Trileptal and Vistaril.

The patient was discharged to EOP care after an MHCB placement between August 7, 2024 and August 15, 2024. MHCB care was initiated after he stated that he was suicidal with a plan to cut his wrist. Prior to MHCB placement, the patient had not been in the MHSDS since 2020, when he received 3CMS care. Once in EOP care at CSP/Corcoran, five-day follow-up encounters were completed as required and the patient's risk of harm was monitored. However, underlying precipitants to the crisis were not addressed. The initial PC assessment referenced the MHCB placement and included relevant psychosocial and mental health information, but there was no documentation regarding what precipitated the patient's suicidal ideation.

Initial and routine IDTT meetings were attended by assigned providers and the patient. The patient's stated goals were to increase distress tolerance and improve mood stability. However, targeted treatment areas were not in clear alignment with the patient's requests. One goal targeted impulse control, had a short-term objective of no MHCB admissions in 90 days, and an intervention of using DBT to manage poor impulse control. Another goal targeted anxiety, the intervention focused on assessment of the patient's anxiety. There was some indication that the MHCB placement was precipitated by anxiety and poor impulse control, but clear language to support this was not located in documentation. A goal that targeted self-harm was not developed. There was minimal change to treatment goals during the routine IDTT. The patient did not meet higher level of care indicators.

An initial psychiatric assessment was not completed. There was a gap in routine psychiatric encounters for the 69 days between November 16, 2024 and January 24, 2025. Routine psychiatric progress notes indicated assessment of symptoms, functioning, and medication response, along with use of supportive therapy. During the monitoring period, the patient did not receive timely PC contacts, although contacts occurred with the assigned tele-clinician. Reviewed contacts between December 2024 and March 6, 2025, were patient-centered and supportive, with the use of reflective and active listening. However, evidence-based treatment interventions to assist the patient in accomplishing treatment goals were not documented. Group treatment was provided by recreational therapists.

**Findings**

The treatment provided to this EOP patient was inadequate.

Five-day follow-up encounters did not address underlying precipitants for the patient's MHCB admission. Although the patient was recently discharged from a higher level of care for suicidal ideation, suicidal ideation was not targeted in treatment planning. The patient's stated treatment goals were also not integrated into the treatment plan. While the initial and routine psychiatric contacts were not timely, psychiatric care was individualized to the patient's treatment needs. Although not timely, the patient was monitored and supported by the primary clinician, but targeted clinical interventions to address behavior change were not utilized. Diagnostic clarification with rationale and individualized clinical group programming were needed.

**Patient N**

This 57-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He had been at CSP/Corcoran since 2017 and received EOP care on 3B during the review period. He was provided a diagnosis of schizophrenia and was prescribed Vistaril for anxiety. During the review period, the patient had multiple medical interventions that required outside medical care. These included a skin graft and surgery to repair circulation to both legs.

Psychiatric encounters with two different providers were not timely. There were gaps in psychiatric contacts between September 18, 2024 and November 1, 2024 and between November

15, 2024 and February 5, 2025. The patient was consistently described as having grandiose, ego-syntonic delusions. Psychiatric staff discussed psychiatric medications with the patient, and a petition for a PC 2602 order for involuntary treatment was considered but determined to not be appropriate. Custody staff was not consulted regarding the patient's functioning. During the February 2025 psychiatric encounter, the patient requested medication for anxiety and sleep, and Vistaril was prescribed. His medical needs were assessed as improving. PC encounters were not timely during the months of September 2024 and October 2024. Most PC contacts throughout the monitoring period occurred at cell front due to the patient's refusals. Throughout the review period, the patient remained delusional, either speaking of his celebrity girlfriend or his belief that he was President of the United States. He was not distressed by his symptoms and was able to manage his environment and ADLs.

On November 13, 2024, a supervisor attended the patient's individual PC encounter to assess the patient's progress and assess for higher level of care. It was documented that the patient did not appear to follow medical recommendations, and the plan was to consult with medical regarding the patient's condition and treatment adherence. There was no indication that the psychiatrist was aware of concerns with treatment adherence during a psychiatric contact a few days later. Within a week, during an IDTT meeting with assigned providers, he was referred to ICF care. This ICF referral was initiated because an open foot wound had worsened as a result of the patient compulsively spitting on the wound; the patient spat on the wound because he believed his saliva had special healing powers from God. These behaviors were not noted in provider documentation part from an August 27, 2024 PC progress note, in which the PC documented that the patient was not adherent with medical care. Medical needs from the patient's foot wound and additional wounds had required outside hospital treatment four times in a two-month period. During this timeframe, he continued to refuse recommended treatment including outside medical care for a potentially life-threatening infection. He subsequently required surgery to repair vasculature in his legs. The patient's lack of insight into his medical needs was assessed to be a direct result of his grandiosity and delusions. Of note, the behaviors that warranted the referral were not routinely assessed during subsequent PC contacts, and the patient was not seen by psychiatry. On December 20, 2024, PC documentation indicated that the referral was rescinded and that, although the patient remained delusional, the increased risk of harm had subsided. It was noted that the patient's wound had healed and that his engagement with medical care had improved. There was no documentation of consultation with the psychiatrist or the supervisor.

Treatment planning was insufficient. The designated treatment plan section of the document was blank, while a goal to target hallucinations was documented in the clinical summary section of IDTT documentation. It was unclear why hallucinations were identified as a treatment target, as hallucinations were not consistently noted in provider documentation. Prior to the ICF referral, the patient's stability and ability to function was based on ADLs and lack of bothersome symptoms. However, the impact of his symptoms on medical functioning was not timely considered in the treatment planning process. Additionally, consultation with custody staff was not completed to fully assess the patient's functioning and safety on the unit. Treatment interventions such as reality testing were reasonable but not utilized.

Of note, in September 2024 and November 2024, he was placed on a 1:1 suicide watch in RHU after returning from outside hospitalizations for medical care. These suicide watches were initiated

after hours. There was no documentation explaining the rationale for the suicide watches, and the patient was discharged from suicide watches based solely on his self-report.

Group treatment was recreational in nature.

**Findings**

The treatment provided to this EOP patient was inadequate.

This patient had complex and chronic medical needs along with chronic delusions and limited mental health engagement. He received inadequate care due to lack of multidisciplinary collaboration and timely provider contacts. There was a persistent lack of coordination and communication for this patient's care. Specifically, regular communication was needed between mental health providers and medical staff, between the PC and psychiatrist, and between mental health providers and custody staff. Prior to the ICF referral, there was a prolonged lack of provider documentation regarding the impact of the patient's symptoms on his medical care; the absence of such documentation raised concerns that providers had limited awareness of the patient's poor functioning until it endangered his health. The ICF recission appeared to be made solely by the primary clinician. Twice the patient was placed on suicide watch after outside hospital trips with unclear rationale. The discontinuation of suicide watches without clear understanding of what prompted them was an area of concern. Lastly, while secondary to the patient's primary treatment needs, individualized group treatment was not provided.

This patient was interviewed by the Special Master's team during the site visit and determined to not need a higher level of care review.

**Patient O**

This 70-year-old patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was admitted to CSP/Corcoran in 2023 and received EOP care during the review period. He was diagnosed with bipolar disorder and delusional disorder, persecutory type. He was not prescribed psychiatric medication. He had a history of DSH admissions and a lengthy outside hospital admission between February 2024 and March 2024 for multiple medical procedures. Upon his return from this hospitalization, he attributed his ailments to a custody assault that had been the driving force for his delusions. At the time of the review, the patient resided in 3A.

Psychiatric care was inadequate due to lack of timely contacts, lack of continuity, and poor quality of care. No psychiatric encounters occurred for the 67 days between November 9, 2024 and January 15, 2025. Four different psychiatrists attempted to provide treatment during the review period. The patient had a long history of delusions regarding custody staff and believed that they had poisoned his food and seriously assaulted him. These delusions persisted during the review period. During a November 9, 2024 psychiatric encounter, he was pre-occupied with a unit officer whom he reported sexually assaulted him. The next psychiatric contact occurred on January 15, 2025. During this encounter, an initial psychiatric assessment was completed, apparently due to a housing change because of a PREA complaint. It was unclear if this PREA concern involved the

same custody officer with whom the patient was pre-occupied in November 2024 or someone completely different. During psychiatric encounters, the patient indicated that he did not want psychiatric medication. However, clear discussion about medication and consideration of a PC 2602 petition for involuntary treatment was not documented. There was also no documentation that psychiatric staff consulted with custody staff regarding the patient's functioning.

Between November 2024 and through February 2025, routine PC encounters occurred with the same PC at cell front due to refusals for all but one contact. Documentation was limited, in part due to the patient's lack of engagement. On occasion, the clinician acknowledged the inability to complete a full assessment of the patient. However, there were multiple incidents in which the patient was observed self-dialoging. Across contacts, documentation regarding consultation with custody staff was variable.

In January 2025, the patient's mental illness significantly impacted his functioning. On January 5, 2025, a psychiatric technician documented that the patient was angry, aggressive, pacing, incoherent, confused, and forgetful. The following day, the patient was seen for an urgent consult due to hostility, agitation, and self-dialoguing. The mental health consult documented medical staff's report that the patient was decompensating, appeared confused, and showed signs of dementia. A supervisor consult indicated that the patient did not currently meet MCHB admission criteria. That same day the patient received an RVR for threatening great bodily injury or death. The mental health RVR assessment determined a nexus between the patient's mental health symptoms and the alleged behavior. Subsequent clinical documentation indicated that the patient continued to voice delusions regarding an assault by custody and a belief that personal items were stolen.

IDTT documentation between August 2024 and January 2025 consistently indicated the presence of delusions but noted that he was managing ADLs and did not meet higher level of care criteria. Treatment modifications to address chronic treatment refusals were largely unchanged, focused primarily on improving therapeutic rapport, and were ineffective.

**Findings**

The treatment provided to this EOP patient was inadequate.

Despite a pattern of worsening psychotic symptoms between August 2024 and January 2025 that led to an RVR, along with ongoing documentation that the patient could not be fully assessed to refusing encounters, the patient was not appropriately considered for a higher level of care referral until there was a crisis in his housing unit. Treatment modification in the interim was insufficient. Factors contributing to the patient's insufficient care included a lack of continuity of psychiatric providers, insufficient attempts to engage the patient in a discussion regarding psychiatric medication, and a delay in care at a time when more frequent psychiatric encounters were appropriate. PC documentation was insufficient. Treatment team members failed to consult adequately with custody staff and did not weigh the risk to custody staff in the face of persistent fixed delusions. Lastly, individualized clinical group programming was needed.

**Patient P**

This 26-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was diagnosed with unspecified mood disorder upon admission to MHCB, but at discharge his diagnoses were listed as opioid and synthetic cannabinoid use disorders. He was not prescribed any psychotropic medication. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included chronic lower back pain and left knee pain. Within CDCR, the patient had not previously received any mental health care. At CSP/Corcoran, he was admitted to MHCB care from January 23, 2025 through January 31, 2025 for danger to self and suicidal ideation. He had threatened to kill himself in the context of fearing being killed by security threat group members, whose prohibition of spice use he had violated.

The initial psychiatric assessment was timely and minimally adequate but completed by an alternate for the assigned psychiatrist. The initial IDTT meeting was timely, attended by the patient and required staff, including the assigned psychiatrist, who had not previously met the patient. Confusingly, the alternate for the assigned psychiatrist, who completed the initial psychiatric assessment, was not listed as attending the IDTT meeting but nevertheless completed the master treatment plan psychiatry review. The team found that the patient did not meet criteria for a higher level of care. The case formulation was not updated, the patient's strengths and verbalized treatment goals were not documented, no treatment plan was developed, and the rationale for MHCB care and discharge criteria were not documented. The initial primary clinician assessment was completed following the initial IDTT meeting. It provided no documentation of predisposing, perpetuating, precipitating, or protective factors, and it did not provide diagnostic impressions. The case formulation consisted of statements the patient made rather than a clinical formulation, and it was not adequate to guide treatment. The patient was followed daily by one of two primary clinicians; about half of these encounters were confidential, and the other half occurred at cell front. Progress note documentation reflected ongoing monitoring but no provision of planned or evidence-based interventions. One of three psychiatrists saw the patient for the initial assessment, one individual encounter, and IDTT meetings. Psychiatric care consisted of assessment and monitoring. The patient refused a recreational therapy assessment but accepted recreational therapy activities. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in discharge to 3CMS care. No safety plan was reviewed during this meeting, and the case formulation was not updated. The patient's strengths, verbalized treatment goals, and treatment plan continued to be blank. Beyond completion of a custody investigation that found the patient's safety concerns unsubstantiated, it was not clear what had changed in the patient's clinical presentation by the time of discharge. The discharge suicide risk evaluation was adequate and found the patient at low risk. The accompanying safety plan failed to address the patient's recent mortality fears and environmental safety concerns and as a result was inadequate to meet his treatment needs. The psychiatric discharge summary was timely but did not provide a rationale for the change in diagnoses or a sufficiently detailed description of the course of treatment.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment, case formulation, initial and follow-up IDTT meeting documentation, and psychiatric discharge summary were all deficient and provided limited insight into the patient's clinical presentation. Continuity of care across psychiatric providers was impaired. No treatment plan was developed, and no treatment beyond assessment and monitoring was documented outside of recreational therapy activities. The safety plan essentially denied that the patient was suicidal and did not provide adequate preventative interventions. Rationale for diagnostic changes was not documented, and the patient's treatment needs were inadequately explored.

**Patient Q**

This 42-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was diagnosed with schizoaffective disorder, bipolar type, and post-traumatic stress disorder. He was prescribed and adherent with aripiprazole, lamotrigine, mirtazapine, propranolol, and duloxetine. Hydroxyzine was prescribed PRN for anxiety, and he used this medication once during MHCB care. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included opioid use disorder and a history of a substance-induced seizure. Within CDCR, the patient had previously received only 3CMS care. At CSP/Corcoran, he was admitted to MHCB care from January 23, 2025 through January 31, 2025 for significant impairment due to mental illness, after becoming nonadherent with antipsychotic medication and using unprescribed bupropion and methamphetamine. Upon admission, he was disorganized, paranoid, severely delusional, and reporting coprophagia. He was discharged to EOP care on January 30, 2025 but remained in MHCB care for one more day.

The initial psychiatric assessment was timely and adequate but completed by an alternate to the assigned psychiatrist. Aripiprazole was initiated and the dose increased systematically. The initial IDTT meeting was timely and attended by the patient and required staff, including the assigned psychiatrist, who had not previously met with the patient. Surprisingly given the severity of his symptoms, the patient was not found to meet criteria for a higher level of care. The case formulation was inadequate and did not address psychosis. The patient's strengths and verbalized treatment goals were not documented. The treatment plan was pulled forward without modification from prior plans developed in 3CMS care. The plan was inappropriate for crisis care, included two goals that were not measurable, and did not address psychotic symptoms other than auditory hallucinations. Discharge criteria were not documented. Confusingly, the alternate for the assigned psychiatrist completed the master treatment plan psychiatry review despite not being listed as attending the initial IDTT meeting. The initial primary clinician assessment was completed after the initial IDTT meeting. It did not include any documentation of the predisposing, perpetuating, precipitating, and protective factors. The case formulation was not updated and inadequate to guide treatment; it did not address psychotic symptoms. The assigned clinician followed the patient daily. These encounters were consistently confidential, and the interventions provided were consistent with the patient's needs and treatment plan. Outside of the initial psychiatric assessment and IDTT meetings, a psychiatrist saw the patient only once for an individual encounter. Psychiatric care appeared otherwise appropriate. A recreational therapy assessment and provision of recreational therapy activities were adequately documented. The

follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in discharge to EOP care. Documentation of the patient's strengths, verbalized treatment goals, and treatment plan was updated, and a new goal for EOP care was added to address delusional thinking that his food was poisoned, along with food refusal. The patient remained psychotic but was deemed sufficiently improved to be able to function safely in EOP care. The discharge suicide risk evaluation was adequate and found the patient at low risk. The psychiatric discharge summary was timely but provided only a generalized description of the course of treatment, with minimal detail.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment, case formulation, initial IDTT documentation, and treatment plan were deficient. In a patient with severe psychosis and active titration of antipsychotic medication, the frequency of psychiatric follow-up encounters provided to the patient was likely inadequate. Continuity of care across psychiatric provider was impaired. However, the major challenge in this patient's care was the plan to discharge the patient to EOP care when the patient remained psychotic and continued to voice concerns that his food was being poisoned. While his symptoms improved, they did not improve sufficiently to warrant discharge to a lower level of care, and the failure to find the patient sufficiently impaired by his mental illness to need a higher level of care was surprising. As it turned out, he spent less than one month in EOP care before requiring readmission to MHCB care and then to acute care. During the current MHCB treatment, individual treatment provided by the primary clinician represented a strength.

**Patient R**

This 29-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was diagnosed with unspecified schizophrenia and adjustment disorder with mixed anxiety and depressed mood. He was prescribed mirtazapine, olanzapine, and oxcarbazepine but was nonadherent with all three medications. Hydroxyzine and an additional dose of olanzapine were prescribed PRN for anxiety and psychosis, and the patient used both PRN medications once or twice a day. Through the ISUDT, he was prescribed buprenorphine-naloxone; he was nonadherent with this medication. One episode of self-injurious behavior was listed in the health record. Medical conditions included opioid use disorder, obesity, and a history of hepatitis C. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At CSP/Corcoran, he was admitted to MHCB care from January 23, 2025 through January 31, 2025 for suicidal ideation in the context of increasingly severe auditory hallucinations and anxiety about his safety.

The initial psychiatric evaluation was timely but so terse it provided little clinical detail and no explanation or supporting evidence for the diagnosis of unspecified bipolar disorder. This diagnosis was subsequently changed to unspecified schizophrenia and other psychotic disorder. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated or adequate to guide treatment; it did not address psychotic symptoms. The patient's strengths and

verbalized treatment goals were not documented. The treatment plan was pulled forward from one developed a month earlier and was inappropriate for MHCB care; the plan indicated that the patient's two treatment goals had already been met. Discharge criteria were not established. The initial primary clinician assessment was completed after the initial IDTT meeting. It inaccurately indicated that the patient had no history of suicidal or self-injurious behaviors. It did not include any documentation of the predisposing, perpetuating, precipitating, and protective factors. The case formulation was not updated. The patient was followed daily by one of two primary clinicians or one of three psychiatrists. Primary clinician encounters were confidential and supportive but did not document provision of the interventions listed in the treatment plan. The quality of psychiatric progress notes varied widely by provider, but medication management appeared appropriate. A recreational therapy assessment and provision of recreational therapy activities were adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. The case formulation and treatment plan were not updated, and the patient's strengths and verbalized treatment goals remained undocumented. A discharge plan was not developed. The suicide risk evaluation found the patient at low risk but provided only limited justification for this risk level. The accompanying safety plan was collaborative and included useful recommendations, but was internally redundant, providing the same answers across the warning signs and protective factors sections of the document. The psychiatric discharge summary was timely but terse, using telegraphic and abbreviated wording, and provided only minimal patient-specific information.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial assessments, IDTT documentation, case formulation, treatment plan, discharge suicide risk evaluation and safety plan, and psychiatric discharge summary were deficient. There was no evidence that the nonpharmacological interventions listed in the treatment plan were delivered or that the plan was used to guide treatment. While psychiatric care appeared appropriate, reasons for multiple diagnoses and changes among diagnoses were inadequately documented. The use of highly abbreviated and telegraphic wording in psychiatric documentation inhibited rather than facilitated an understanding of the patient's treatment needs.

**Patient S**

This 30-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was diagnosed with post-traumatic stress disorder, unspecified mood disorder, and adjustment disorder. He was not prescribed any psychotropic medication. Two suicide attempts were listed in the health record. Medical conditions included right knee and right elbow pain. Within CDCR, the patient had previously received 3CMS and MHCB care. At CSP/Corcoran, he was admitted to MHCB care from January 23, 2025 through January 31, 2025 for danger to self and suicidal ideation, after reporting a plan to hang himself in the context of fearing retaliation from custody. He was discharged to 3CMS care on January 30, 2025 but remained in MHCB care for one more day.

The initial psychiatric assessment was timely, adequate, and completed by a non-assigned psychiatrist. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned primary clinician. The assigned psychiatrist had not previously evaluated the patient. The patient was not found to meet criteria for a higher level of care. The case formulation was generic, focused on substance use and "deviant" behavior, and did not address current symptoms or treatment needs. The patient's strengths, verbalized treatment goals, treatment plan, and discharge criteria were not documented. The initial primary clinician assessment was completed after the initial IDTT meeting. The assessment was cursory and did not include a complete mental status exam, documentation regarding the predisposing, perpetuating, precipitating, or protective factors, and did not update the case formulation, which was inadequate. The patient was followed daily by one of three primary clinicians, and a total of three psychiatrists met with him to complete the initial psychiatric assessment or attend an IDTT meeting. Primary clinician progress notes were brief and consistent with wellness checks; one progress note indicated that the contact occurred at cell front due to staffing limitations, while the rest did not indicate whether the encounter was confidential or at cell front. A recreational therapy assessment and provision of recreational therapy activities were adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to 3CMS care. IDTT documentation indicated that the patient voiced suicidal intent with the goal of being removed from WSP, where he had conflicts with custody officers, and that the patient had no significant mental health symptoms. However, MHCB prevention planning was not completed, and the case formulation was not updated. The patient's strengths, verbalized treatment goals, and treatment plan remained undocumented. The suicide risk evaluation was adequate and found the patient at low acute risk and moderate chronic risk. The accompanying safety plan engaged the patient in only one portion of its development and included identical language in several areas of the form; it was clinically superficial and unlikely to assist the patient. The psychiatric discharge summary was timely but cursory, and it provided little to no information regarding the patient's care, diagnostic considerations, or treatment needs.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment, case formulation, IDTT documentation, safety plan, and psychiatric discharge plan were deficient, and no treatment plan was developed. Continuity of care across psychiatric providers was impaired. Justification for various psychiatric diagnoses was unclear, and at discharge it was unclear what the psychiatric diagnosis was. As documented, the patient received neither psychopharmacological nor psychotherapeutic interventions.

**Patient T**

This 35-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Corcoran. He was diagnosed with bipolar I disorder, manic, severe with mood-congruent psychotic features. He was prescribed and adherent with divalproex sodium, hydroxyzine, and olanzapine. Benztropine was prescribed PRN for muscle spasms, and he used this medication on three occasions during MHCB care. One episode of self-injurious behavior was listed in the health record. Medical conditions included a traumatic brain injury,

bilateral knee pain, and apical periodontitis. Within CDCR, the patient had previously received 3CMS, MHCB, EOP, and acute care. At CSP/Corcoran, he was admitted to MHCB care from January 23, 2025 through January 30, 2025 for danger to others, after exhibiting unpredictable mood swings, threatening staff, and showing signs of psychosis.

The initial psychiatric assessment was timely but limited, and included little history, no suicide risk documentation, and no psychiatric diagnostic impressions. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned primary clinician. The patient was not found to meet criteria for a higher level of care. The case formulation was pulled forward, failed to address symptoms of serious mental illness, and was inadequate to guide treatment. The patient's strengths and verbalized treatment goals were not documented. The treatment plan was pulled forward from one developed earlier in the month, did not address mood symptoms, and did not include a measurable short-term goal. The interventions it identified, including motivational interviewing and cognitive restructuring, were not subsequently provided during MHCB care. The initial primary clinician assessment was cursory and completed after the initial IDTT meeting. The case formulation was pulled forward, generic, and inadequate to guide treatment; it did not address mood or psychotic symptoms. One of two psychiatrists and one of four primary clinicians followed the patient. Most primary clinician encounters occurred at the cell front and were consistent with wellness checks. One of these encounters noted that custody staff did not want to remove the patient from his cell because 90 minutes were required to get him back to the cell from the shower; as documented in the progress note, custody staff reported that it appeared as if the patient was "rebooting" every few minutes. During these encounters, the patient exhibited staring and apparent thought blocking or thought disorganization. The single individual psychiatric encounter provided during MHCB care was confidential and well-documented; the patient's medications were adjusted to address continued mood instability. The recreational therapy assessment and provision of recreational therapy activities were adequately documented.

The follow-up IDTT meeting was timely but held in absentia due to the patient's refusal. Apart from a new alternate for the assigned clinician, required staff attended and determined that the patient was ready for discharge to EOP care. The case formulation, treatment plan, and patient strengths and verbalized treatment goals were not updated. The reason for the patient's refusal to attend the meeting was not documented. The discharge suicide risk evaluation was timely but cursory and found the patient at low risk based on consideration of a limited number of factors. Confusingly, although the patient was not admitted for suicidal ideation and did not report any during MHCB care, a safety plan was completed. It was developed without the patient's involvement and provided only formulaic recommendations that were not tied to any clinical signs or symptoms exhibited during the current course of care. The psychiatric discharge summary was timely, brief, and did not include details regarding the patient's course of treatment.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment, IDTT documentation, case formulation, treatment plan, safety plan, and psychiatric discharge summary were deficient. It did not appear that the treatment

plan was used to guide treatment, and the provision of nonpharmacological interventions beyond recreational therapy was not evident. As documented, the patient exhibited significant psychotic symptoms. Although the patient's symptoms improved, it is not clear why a higher level of care for continued stabilization was not considered. His symptoms were not adequately explored or documented. The potential role of the patient's prior traumatic brain injury or injuries was not explored, and it was unclear whether psychiatric providers were informed of the patient's continual "rebooting" during the 90 minutes he required to return to his cell from the shower.

**Patient U**

This 39-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Corcoran. The patient was provided diagnoses of unspecified mood disorder and schizophrenia spectrum disorder with psychotic disorder, although elsewhere in his healthcare record diagnoses of antisocial personality disorder, major depressive disorder, and unspecified anxiety disorder were noted. He was prescribed and adherent with olanzapine and bupropion under a PC 2602 order for involuntary treatment due to danger to self and others. Hydroxyzine was prescribed PRN for anxiety; he rarely used this medication during the review period. He was placed in the EOP RHU in May 2024 and remained in the RHU through February 3, 2025, when he was transferred to another facility.

The patient routinely attended individual contacts with providers but chronically refused groups. As a result of his programming refusals, daily contacts, akin to brief wellness checks, were initiated in late September 2024 and continued through the end of the review period. Psychiatric documentation included rationale for medication changes. PC documentation provided an overview of the patient's current functioning. Treatment interventions included psychoeducation and the provision of in-cell activities, which were not integrated into treatment. Of note, much of provider documentation was not sufficiently updated across contacts.

Throughout reviewed dates the patient was seen for multiple codes for chest pain. Early on, he attributed the chest pain to anxiety. However, treatment interventions were not utilized to address the anxiety, and medical staff were not included in IDTT meetings. The patient was also seen for four SREs after making a suicidal statement that he recanted upon assessment. These incidents were precipitated by poor distress tolerance. He was generally assessed as low acute risk and moderate chronic risk. Clinical rationale for these determinations varied by provider. With the exception of one psychiatric encounter, the patient's recurrent chest pain, anxiety, and suicidal statements were not addressed during routine contacts.

Two routine IDTT meetings occurred during the review period. These meetings were timely and attended by required staff but held in absentia due to the patient's refusals to attend. IDTT documentation was deficient. The clinical summary section had not been updated since at least March 2024 and did not include a summary of his mental health needs, treatment engagement, or overall functioning between IDTT meetings. Consequently, the multiple medical codes for chest pains and multiple SREs were not readily available in IDTT documentation. Similarly, treatment planning from November 2023 was continued. Treatment goals were to reduce the patient's self-reported anxiety and depression to a five or lower on a subjective units of distress scale ranging from zero to ten. In advance of the December 31, 2024, IDTT meeting, the patient repeatedly rated his depression and anxiety as a four during PC encounters. Despite this evidence that the patient

had met his goals for treatment, treatment goals were not updated or reformulated. Interventions included encouraging medication adherence and providing education on coping skills. The patient's pattern of treatment refusals, poor distress tolerance, and grief were not addressed in the treatment plan. The patient met criteria for a higher level of care review due to chronic refusals. Non-referral rationale in the September 2024 IDTT documentation supported his claim that he did not like groups or some group members. Further inquiry would have been useful. Despite continued group refusals and daily contacts, a higher level of care review was not completed during the December 2024 IDTT meeting.

IDTT documentation indicated a plan to transfer the patient to 3CMS care. On the day of his December 2024 IDTT meeting, he was also seen for a SRE after making a suicidal statement. During the assessment he recanted suicidal ideation but reported that his depression was worse and that he did not want to move to 3CMS care. It was unclear from the timestamp if the SRE occurred before or after the IDTT meeting. Transfer to 3CMS was discussed during subsequent PC contacts in January 2025, with the PC noting that 3CMS appeared to be an appropriate level of care.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

In addition to psychiatric medication, this patient needed evidence-based clinical interventions and individualized, updated treatment planning to assist with distress tolerance, lack of group attendance, grief, anxiety, and depression. The patient's ongoing lack of distress tolerance and numerous emergency assessments by medical and mental health staff did not support readiness to transfer to 3CMS. Integration of in-cell activities and crisis calls into routine care was needed. Areas in need of improvement included need for updated provider documentation, coordinated multidisciplinary care, and diagnostic clarification.

**Patient V**

This 34-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Corcoran. The patient was placed in the RHU following an RVR for aggravated battery on a non-prisoner on December 27, 2024. His healthcare record was reviewed through the site visit in mid-March, 2025. Within CDCR, he had been treated at all levels of care. He was provided diagnoses of antisocial and borderline personality disorders and major depressive disorder with psychotic features. He was prescribed aripiprazole, divalproex sodium, valproic acid, and desvenlafaxine. He was partially adherent with aripiprazole and desvenlafaxine and nonadherent with both forms of Depakote. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder.

The initial psychiatric and PC assessments were timely and adequate; the psychiatric assessment occurred at cell front due to the patient's refusal. Both assessments included useful clinical documentation regarding current and historical functioning. The PC assessments included a comprehensive summary of the patient's recent and historical mental health functioning and an adequate case formulation. The patient had an extensive history of self-harm, including foreign body ingestion with six MHCB referrals/admissions in the past six months.

The initial IDTT meeting was timely and attended by assigned providers but not the patient, who refused. Non-referral rationale to a higher level of care for multiple MHCB admissions was reasonable, and multidisciplinary treatment modifications included evidence-based, individualized interventions including dialectical behavior treatment. The treatment goal targeted self-harm with dialectical behavior therapy. Although established over a month prior to the RHU placement, this goal remained clinically appropriate at the time of the IDTT meeting. A goal for anxiety, disclosed during the PC initial assessment, was not developed. Rationale for continued EOP care was individualized.

The patient's variable group attendance resulted in daily contacts, and during these contacts the patient presented as stable. Documentation of routine PC encounters were consistent with wellness checks and occurred at cell front due to the patient's refusals. However, when the patient disclosed distress, the contact was individualized to the patient's needs. The clinician documented a primary treatment barrier as the patient's readiness for change and lack of insight. Psychiatric documentation was thorough. Rationale for medication decisions was adequately documented. When atypical symptoms such as continuous auditory hallucinations were reported, the psychiatrist addressed the discrepancy with the patient and appropriately documented observations that were inconsistent with the patient's self-report, including observations that the patient did not appear to be responding to internal stimuli. Medication nonadherence was addressed, although not in a timely manner.

The patient was seen for multiple SREs for suicidal statements between mid-February 2025 and mid-March 2025. There were three MHCB recissions. He consistently recanted and attributed the suicidal statement to poor distress tolerance or a maladaptive attempt to meet his needs. He was consistently assessed as low risk with variable clinical justification. Five-day follow-ups and a safety plan were initiated after some crisis incidents. These incidents were rarely addressed during routine care. On March 10, 2025, he reported that he ingested 20 tablets of Tylenol for pain management. No bottle of Tylenol was found in his cell, and lab tests did not support his claim. He was assessed as low risk, and five-day follow-ups were continued. As with previous crises, this incident was not addressed during the subsequent PC assessment.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The pattern of stating and recanting suicidal statements, along with an escalation in the form of a reported suicide attempt, indicated that the patient was suffering and posed an increased risk of harm to himself. There was a need for evidence-based treatment interventions to address this risk, but no changes to treatment planning or routine care were made. Each risk assessment was completed in isolation, with little consideration of the pattern of poor distress tolerance and little integration into routine care. Initial treatment planning needed improvement, treatment refusals were not appropriately addressed, and psychiatric follow-up for medication nonadherence was not timely. The patient was a good candidate for the Personality Disorders program.

**Patient W**

This 32-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Corcoran. After reporting safety concerns, the patient was placed in the RHU on January 28, 2025 where he remained through the site visit in mid-March 2025. He was provided diagnoses of major depression in remission, PTSD, and unspecified anxiety disorder. He was prescribed and adherent with aripiprazole, fluoxetine, and olanzapine. Hydroxyzine was prescribed PRN for insomnia, and he used this medication frequently. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder.

The initial psychiatric and PC assessments were timely and included current treatment needs with minimal historical information. The case formulation was generic, focused on criminal behavior rather than psychiatric symptoms, and inadequate to guide treatment. The initial IDTT meeting was timely and attended by assigned providers and the patient. The patient met criteria for a higher level of care review due to multiple MHCB admissions. Non-referral rationale was documented poorly. The documentation summarized a recent risk assessment in which the patient recanted suicidal ideation and one of three MHCB admissions, instead of summarizing precipitating events for the three MHCB admissions. Treatment modifications included evidence-based interventions to assist with distress tolerance. Treatment goals, carried forward from December 9, 2024, remained relevant and targeted poor coping, suicidal ideation, and auditory hallucinations. Interventions included dialectical behavior treatment, motivational interviewing, and reality testing, but not psychiatric care. The patient's symptoms of depression and nightmares, which were identified during provider initial assessments, were not addressed in the treatment plan. The rationale for continued EOP care was not documented.

The one required routine psychiatric contact occurred with a covering psychiatrist. The patient's primary language was Spanish. For reasons that were unclear, instead of using the language line for interpretive services, an officer was used. Rationale for medication changes was documented. PC encounters were timely, and PC documentation included collateral sources. The patient was assessed as stable and appropriately monitored, but clinical interventions were not utilized during contacts for elevated depression and anger. Homework on anger management and dialectical behavior skills was provided although not integrated into routine contacts.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

While the patient was appropriately monitored by the PC, the PC did not integrate therapeutic worksheets into routine contacts. Nor were clinical interventions utilized during treatment to assist the patient in managing symptoms. The use of a correctional officer for a routine psychiatric contact without first considering the language line was inappropriate. Treatment planning did not adequately target the patient's full range of symptoms and treatment needs, and non-referral rationale did not appropriately synthesize the factors that warranted the higher level of care review.

**Patient X**

This 33-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Corcoran. He was placed in the RHU on January 4, 2025 following MHCB discharge and remained in the RHU until February 28, 2025. The brief MHCB placement

was precipitated by aggressive behavior with custody staff. The patient was provided diagnoses of antisocial personality disorder and opioid use disorder, although diagnoses of major depressive disorder, schizoaffective disorder, and unspecified depressive disorder were noted elsewhere in the healthcare record and not reconciled during the period reviewed. He was prescribed aripiprazole, clonidine, hydroxyzine, and sertraline and was adherent with aripiprazole, clonidine, and hydroxyzine. He was nonadherent with sertraline, and this medication was discontinued as a result. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder.

Five-day follow-ups were completed as required. The initial psychiatric assessment was timely, confidential, and adequate. It included a useful summary of the patient's current clinical presentation, recent functioning, and psychosocial history. A medication adjustment was made to target irritability and mood lability, assessed as due to antisocial personality disorder. The initial PC assessment was timely, completed through telehealth, and inadequate. The presenting problem/chief complaint and history of present illness sections of the assessment were left blank, and most information was copied from previous providers. No case formulation was developed. Instead, a brief mental status and summary of the patient's statements was documented in its place. Documented information did not provide an updated or sufficient summary of the patient's current treatment needs.

The initial IDTT meeting occurred late, 18 days after the patient's arrival in the RHU. The patient, assigned PC, assigned psychiatrist, and senior psychologist supervisor attended, but no correctional counselor was documented as attending. The patient did not meet criteria for a higher level of care review. The case formulation remained unchanged and inadequate, and treatment goals from February 14, 2024 were not updated or aligned with the patient's current treatment needs.

Routine psychiatric encounters were timely and adequately documented. Psychiatric progress notes included medication response, side effects, and current functioning. PC encounters occurred through telehealth. For reasons that were unclear, the patient had a change in assigned PC in February 2025. Routine PC documentation indicated discussion of the patient's current stressors and techniques to manage symptoms; however, progress notes did not address his core treatment needs of poor distress tolerance. Beginning in late January 2025, the patient was seen for daily contacts although rationale was not clearly documented. Most daily contacts consisted of brief check-ins at cell front. The patient experienced several significant instances of poor distress tolerance and maladaptive behaviors. On one occasion, he made a suicidal statement which he recanted. He was assessed as low risk; however, the clinical rationale for this determination was not documented. A follow-up individual contact occurred two days later, and he presented as stable and used the time to vent about multiple stressors. On two other occasions, he initiated hunger strikes which he terminated shortly after initiation.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The multiple deficits in PC care outweighed the strengths in psychiatric documentation. The PC failed to complete an appropriate initial assessment which negatively impacted individualized treatment planning. PC contacts did not appropriately address needed distress tolerance skills to

assist the patient in managing his emotional dysregulation and low frustration tolerance; this deficit in care resulted in maladaptive behaviors and unnecessary, ongoing suffering. Clinical rationale for the risk assessment was not documented. The patient had a pattern of group treatment refusals that were not appropriately addressed, and a change in the assigned PC occurred without appropriate clinical termination. Diagnostic clarification with clinical rationale was needed.

**Patient Y**

This 33-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Corcoran. The patient was placed in the RHU following a six-month ICF hospitalization precipitated by suicidal ideation and paranoid delusions. He was provided with diagnoses of antisocial personality disorder, bipolar I disorder, and intermittent explosive disorder. He was prescribed and adherent with long-acting intramuscular fluphenazine, oral haloperidol, hydroxyzine, and lithium under a PC 2602 order for involuntary treatment due to danger to self and others. Benztropine and hydroxyzine were prescribed PRN for extrapyramidal symptoms and insomnia, respectively; the patient used benztropine twice and hydroxyzine intermittently while in EOP RHU care. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He received EOP RHU care at CSP/Corcoran from December 10, 2024, to February 27, 2025.

Five-day follow-ups were completed as required. The initial psychiatric assessment was timely, thorough, and included appropriate clinical information for continuity of care but was not completed by the assigned provider. The initial PC assessment was timely. Most information was copied from previous encounters but did not provide a concise or useful summary of his mental health or psychosocial history. The assessment indicated that the patient's mental health concerns were elevated depression and moderate auditory hallucinations. The case formulation was partially adequate but did not address depression or auditory hallucinations. The initial IDTT meeting was timely, held in absentia due to the patient's refusal, and attended by required staff, apart from a second alternate for the assigned psychiatrist. This alternate had not previously evaluated the patient. The treatment plan was pulled forward without modification from one developed for MHCB care in April 2024 that targeted suicidal ideation and substance use rather than the patient's current symptomatology. The treatment plan did not include psychiatric care and was inadequate to guide EOP RHU treatment, and discharge criteria/rationale for retention in EOP care were not documented.

The patient was seen by six psychiatrists during his stay in EOP RHU. Routine psychiatric documentation included the patient's current mental status and functioning as well as rationale for medication adjustments. Additionally, when the patient's requests for medications were assessed as not clinically appropriate, the rationale for this determination was documented. Routine PC documentation indicated discussion of the patient's current stressors and individualized discussion of suggestions to manage symptoms. These encounters were consistently provided by the assigned PC. Daily clinical contacts were initiated due to the patient's poor group attendance. Documentation was indicative of a wellness check and conducted at cell front.

**Findings**

The treatment provided to this EOP RHU patient was adequate, with need for improvement.

Care for this patient care with a serious mental illness was adequate with need for improvement. Despite the inadequate PC initial assessment, inadequate IDTT documentation, and inadequate treatment planning, routine provider care was timely, individualized to the patient's treatment needs, and adequately documented. Consistency of the assigned PC was a strength, while consistency among psychiatrists needed improvement. Additionally, while the patient's pattern of refusals prompted daily clinical contacts, his lack of group treatment engagement was not addressed.

**Patient** Z

This 38-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood and opioid use disorder. Symptoms included anger, anxiety, depressed mood, and a reported history of auditory hallucinations and multiple suicide attempts. He was prescribed olanzapine and venlafaxine and was partially adherent with the former and consistently adherent with the latter. Hydroxyzine was prescribed PRN for insomnia, and he used this medication intermittently. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, the patient had previously received only 3CMS care. At CSP/Corcoran, he was placed in 3CMS RHU care on September 14, 2024, for a battery with a deadly weapon and destruction of state property. He remained 3CMS RHU care throughout the review period.

Initial PC and psychiatric assessments were timely, confidential, and adequate. The initial IDTT meeting was timely and attended by the patient and required staff. However, IDTT documentation was deficient. The case formulation was generic and did not integrate clinical information. Treatment goals were vague and lacked detail, measurable objectives, or documented interventions. Discharge criteria and planning were omitted. The routine IDTT meeting was timely but failed to provide a meaningful update; information was pulled forward from previous evaluations. While the plan was adjusted to include measurable goals for anger and anxiety, interventions were identified only for anger and not for anxiety; no short-term goals were included for anxiety. Discharge criteria were generic and not individualized.

Routine psychiatric contacts were timely. The psychiatrist demonstrated sound clinical judgment by adjusting medications in response to the patient's reported anxiety and insomnia, and by addressing non-adherence with olanzapine. The diagnostic formulation was updated to reflect the resolution of substance-induced psychotic symptoms. The patient frequently refused confidential appointments, resulting in multiple wellness checks at cell front. PC encounters were not timely and instead consistently occurred every two weeks. Clinical quality was variable. Some PC notes documented substantive therapeutic work, including exploration of childhood trauma and challenging negative thoughts in a confidential setting, while others reflected wellness checks at cell front and lacked a clear connection to treatment plan goals. Although the patient was enrolled in a weekly 90-minute process group, he attended only seven of sixteen due to institutional cancellations and patient refusals.

**Findings**

The treatment provided to this 3CMS RHU patient was inadequate.

Although the initial assessments and psychiatric contacts were timely, the PC contacts were not, and most PC encounters did not reflect evidence-based treatment. IDTT documentation was deficient, with critical sections left blank. He did not receive individualized case formulations and treatment goals and therapeutic interventions with either missing or poorly documented. Although the subsequent IDTT contained some measurable goals and intervention the clinical summary, case formulation and discharge planning were generic. Psychiatric care appeared appropriate.

**Patient AA**

This 48-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of major depressive disorder, recurrent, mild, antisocial personality disorder, and opioid use disorder, mild. He was prescribed and adherent with fluoxetine and melatonin. Through the ISUDT, the patient was also prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, the patient had previously received 3CMS, EOP, MHCB, and acute care. He transferred to CSP/Corcoran on February 8, 2024, and was placed in 3CMS RHU care from July 2, 2024, through October 25, 2024.

A quarterly IDTT meeting was not held during the period reviewed, and the initial IDTT meeting, held prior to the review period, lacked measurable goals and did not support tracking treatment progress or continuity of care. Due to staffing shortages, routine PC encounters occurred approximately twice monthly. Contacts were held both at cell front and in confidential settings, and progress notes reflected symptom monitoring, supportive listening, psychoeducation, and provision of in-cell therapeutic materials. Some cognitive-behavioral interventions, such as scripting for anxiety and sleep, were provided, but PC documentation lacked specificity tied to measurable treatment plan goals. After receiving an RVR for possession of a deadly weapon, the patient reported auditory hallucinations telling him to make weapons. The PC attempted to coordinate care with the psychiatrist in response to this report. Psychiatric encounters were timely, confidential, collaborative, addressed patient-reported sleep difficulties, adjusted medication, and encouraged adherence and participation in programming. However, there was no documented response to auditory hallucinations described in PC notes or evidence of direct coordination with the PC regarding these symptoms. Required 90-minute therapeutic groups were not offered consistently each week, and the patient complained about not being pulled for groups and institutional cancellations. Although the PC attempted to communicate with the recreational therapist, there was no documentation that barriers to the patient's access to treatment were resolved.

On August 22, 2024, the patient received an RVR for possession of deadly weapon. The ensuing mental health assessment found no nexus between the alleged behavior and mental health symptoms, but the patient's report of command auditory hallucinations was not addressed.

**Findings**

The treatment provided to this 3CMS RHU patient was inadequate.

A routine IDTT meeting was required but not held during the period reviewed. PC encounters were not timely, lacked specific therapeutic interventions, and did not assess the patient's response to interventions. Psychiatric documentation failed to include collateral information regarding patient's auditory hallucinations and recent RVR. Group programming was not offered with sufficient frequency, and barriers to treatment were not resolved. The mental health RVR assessment was inadequately documented.

**Patient BB**

This 46-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of unspecified anxiety disorder and amphetamine-type substance use disorder, severe. He had a history of substance-induced auditory hallucinations, mood fluctuations, and violence while under the influence of illicit substances. Medical conditions included advanced cirrhosis of the liver. He was not prescribed psychotropic medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, he had previously received only 3CMS and MHCB care. He transferred to CSP/Corcoran on October 2, 2024 and received 3CMS RHU care from October 2, 2024, through January 23, 2025.

The initial PC assessment was timely but occurred at cell front due to the patient's refusal. The assessment was incomplete and inadequate, with no assessment of violence risk, suicidal behavior history, or mental status. Most content was pulled forward from prior evaluations. Language included as the case formulation did not provide any formulation of the patient's current clinical presentation. The patient denied experiencing any mental health concerns and requested to be removed from 3CMS. The initial psychiatric assessment was attempted three times. Two of these attempts were timely; the third attempt occurred after the initial IDTT meeting. On all three occasions, the patient refused, and follow-up wellness checks at the cell front were provided by telehealth. An initial psychiatric assessment was not completed.

The initial IDTT meeting was timely, held in absentia due to the patient's refusal, and attended by required staff. The clinical summary indicated the patient's request to be removed from 3CMS and outlined a plan to assess him over the next 90 days for discharge. IDTT documentation was deficient; the case formulation was not updated, and neither the patient's strengths nor his verbalized treatment goals were documented. The treatment plan lacked measurable goals and was not aligned with the patient's verbalized treatment goal. Rationale for continued 3CMS care and discharge criteria were adequately documented. A routine IDTT meeting was timely and attended by the required staff but not the patient, who refused. IDTT documentation noted that the patient was being transferred to another facility as his RHU term had been suspended. IDTT documentation was otherwise unchanged, and the treatment plan was not updated. There was no evidence of individualized discharge planning.

Weekly routine PC encounters were not provided consistently. The PC saw the patient weekly in October 2024, once in November 2024, twice in December 2024, and once in January 2025. All contacts occurred at cell front due to the patient's refusals. The patient consistently denied mental health concerns and was assessed as stable. PC progress notes did not address barriers to the patient's treatment participation or attempts to adapt interventions in response to the patient's

disengagement. The patient was offered weekly 90-minute recreational therapy groups but did not attend. On the final day of 3CMS RHU care at CSP/Corcoran, the patient was offered a timely routine psychiatric encounter but refused, and a wellness check at cell front was attempted by telepsychiatry. However, by that time the patient was being escorted out of his cell for transport to another facility.

**Findings**

The treatment provided to this 3CMS RHU patient was inadequate.

No initial psychiatric assessment was completed, and the initial PC assessment was deficient. The case formulation and treatment plan were inadequate to guide treatment. The PC did not provide individual treatment or contacts each week, and the patient's treatment disengagement was never adequately assessed or addressed. The patient did not receive meaningful, evidence-based interventions.

**Patient CC**

This 27-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of stimulant-induced psychotic disorder, adjustment disorder with mixed anxiety and depressed mood, antisocial personality disorder, methamphetamine use disorder, and opioid use disorder. Primary symptoms and problem behaviors included insomnia, anger, hostility, irritability, paranoia, and a history of violence. He was initially prescribed, and was adherent with, hydroxyzine and olanzapine. Mirtazapine and melatonin were prescribed PRN for insomnia, and the patient used both medications intermittently. All psychotropic medications except PRN melatonin were eventually discontinued during the review period. Within CDCR, he had previously received 3CMS and MHCB care. He transferred to CSP/Corcoran on July 25, 2024, and received 3CMS RHU care from that date through the end of the review period. His RHU placement was precipitated by an RVR for battery on a peace officer. The patient was primarily Spanish speaking.

The initial PC assessment was completed prior to the review period. The initial IDTT meeting was late, 27 days after the patient's arrival in the RHU, and was held in absentia due to the patient's refusal. Required staff attended. IDTT documentation was deficient, with portions pulled forward verbatim from prior records. The case formulation was generic and failed to integrate key clinical data or address the patient's significant language barrier. Treatment plan goals lacked baseline measures and included meaningless metrics, such as reducing violent behavior to a "default level of '4' on a scale of 1-10." The plan omitted specific interventions, and neither discharge criteria nor a rationale for retention were documented. The routine IDTT meeting was timely but again held in absentia due to the patient's refusal; IDTT documentation showed no meaningful review, continued the same treatment plan, and provided clinically insufficient rationale for retention in 3CMS care. Although the psychiatrist made several attempts to conduct an initial evaluation, the patient refused these efforts, and the initial psychiatric evaluation was not completed until a week after the initial IDTT meeting. Content was minimally adequate but included limited mental health history and showed no awareness that the patient had required an emergent mental health consult

several hours earlier due to suicidal ideation. This CIT consult was adequately documented and had resulted in clearing the patient to return to housing.

Following the initial psychiatric assessment, routine psychiatric encounters were offered timely, but the patient refused many of these, and the patient was seen at cell front as a result. Whether in a confidential setting or at cell front, psychiatric encounters occurred through telehealth, with a Spanish interpreter present. Psychiatric documentation was adequate and included rationale for medication changes. The patient was not offered weekly PC encounters, and progress notes reflected a plan to follow up with the patient every seven to 14 days. The clinical quality of the PC encounters that did take place was poor. These contacts were exclusively brief, non-confidential wellness checks at cell front, and they often were characterized by the patient's refusal to engage. The notes lacked therapeutic substance, showed no connection to treatment plan goals, and documented the patient's persistent non-engagement in treatment rather than any clinical intervention or adjustment of treatment approach to address the patient's lack of participation. The patient was offered a 90-minute process group weekly, but attended only one group session during the 24-week review period, due to refusals and institutional cancellations. Three mental health RVR assessments were completed during the review period, all for RVRs alleging batteries on peace officers. In each case, the evaluator found no nexus between the alleged behavior and mental health symptoms. The rationale for this determination was poorly documented.

**Findings**

The treatment provided to this 3CMS RHU patient was inadequate.

The initial IDTT meeting and initial psychiatric assessment were late. The treatment team failed to provide a clinically meaningful, individualized treatment plan. The treatment plan lacked specificity, measurable goals, and appropriate intervention; it did not take into account or address the patient’s significant language barrier, increase in RVRs, and lack of treatment participation. PC encounters did not meet minimum Program Guide requirements for frequency, and they failed to include therapeutic interventions or address the patient’s treatment refusal. The use of mirtazapine solely as a PRN medication was concerning and requires review.

**Patient DD**

This 35-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of PTSD and cannabis use disorder, moderate, in sustained remission. Symptoms included anxiety, poor sleep, poor appetite, flashbacks, increased alertness, irritability, nightmares, and a history of substance use and violence. He was not prescribed psychotropic medications. Medication conditions included a seizure disorder. Within CDCR, the patient had previously received only 3CMS care. He transferred to CSP/Corcoran on August 15, 2024, for court-related proceedings, and remained in 3CMS RHU care from that date until his release on October 22, 2024.

The initial PC assessment was timely, thorough, and adequately documented the rationale for 3CMS care. The psychiatrist made a timely attempt to complete the initial psychiatric assessment, but the patient was away at court, and the assessment could not be completed until after the

patient's return. Unfortunately, the psychiatric assessment was completed two days after the initial IDTT meeting and was not available to inform treatment planning. Content was adequate; the psychiatrist documented the patient's symptoms and educated him about therapy and medication options, but the patient declined medications and agreed to therapy. No subsequent routine psychiatric contacts occurred during the review period. The initial IDTT meeting was delayed due to the patient's court schedule and held in absentia due to the patient's refusal. Aside from an alternate for the assigned PC, required staff attended. IDTT documentation was deficient. The case formulation was generic. The treatment plan included a broad goal to reduce anxiety but lacked specific interventions. No structured or evidence-informed interventions were identified. Although the patient's level of care was adequately justified, discharge planning was not included.

Weekly routine PC encounters were not consistently offered, with contacts occurring up to two weeks between contacts. Encounters occurred both in confidential settings and at the cell front. Content of PC notes was primarily supportive; progress notes recorded the patient's reports of mood, sleep, appetite, and coping strategies such as watching movies and reading. The patient's subjective experience was explored, but there was no documentation of specific intervention utilized and limited connection to treatment plan objectives. PC progress noted reflected awareness that the patient would soon be released to the community, but the PC did not document efforts to support this transition. The patient was offered a weekly 90-minute group and attended about half of the group sessions. A mental health pre-release planning assessment was not completed until three days prior to the patient's release.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Initial psychiatric contact and IDTT meeting were both delayed, and the initial psychiatric assessment was not available to inform treatment planning. IDTT documentation was deficient, and the treatment plan lacked evidence-informed interventions. PC contacts did not occur with sufficient frequency and did not address the patient's target symptoms. Documentation reflected primarily supportive listening rather than structured therapeutic interventions tied to treatment objectives. Pre-release planning occurred very close to release, and the PC did not engage the patient in preparing for release. The patient did not receive meaningful treatment for anxiety or other PTSD symptoms.

**Patient EE**

This 34-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of bipolar II disorder, unspecified personality disorder, opioid use disorder, severe, and methamphetamine use disorder. He was prescribed atomoxetine and was partially adherent with this medication. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, he had previously received only 3CMS care. He transferred to CSP/Corcoran on December 19, 2024, when he was placed in 3CMS RHU care. He remained in 3CMS RHU care through the end of the review period.

The initial psychiatric assessment was attempted timely, but the patient refused and was unavailable for a wellness check at cell front. The rescheduled initial assessment remained timely and was completed through telepsychiatry in a confidential setting; content was adequate. The initial PC assessment was late, incomplete, and inadequate. The patient's history of suicidal and self-injurious behaviors and mental status exam were not documented. The case formulation focused on criminal behavior rather than mental health symptoms. The initial IDTT meeting was late, occurring on the 20th day of 3CMS RHU care. The patient and required staff attended. The clinical summary was comprehensive, but the case formulation remained generic, focused on criminal behavior, and inadequate for guiding treatment. The treatment plan appropriately identified depression and social isolation as treatment targets, but treatment goals were not measurable, and no interventions were identified. The rationale for retention in 3CMS care and discharge criteria were adequately documented.

Individual PC encounters were not consistently provided on a weekly basis. PC encounters were offered about every other week, with some sessions occurring confidentially and others at cell front due to staff shortages. Contacts were supportive and resembled wellness checks. The connection between PC contacts and treatment plan goals was present but lacked specificity, with few measurable outcomes or therapeutic interventions documented. The patient was offered and attended 90-minute recreational therapy groups about once a week.

**Findings**

The treatment provided to this 3CMS RHU patient was inadequate.

The initial PC assessment was late, incomplete, and inadequate. The initial IDTT meeting was also late. Neither the case formulation nor the treatment plan were adequate to guide treatment. No measurable treatment goals or specific treatment interventions were identified. PC contacts did not meet the required weekly frequency, and documentation lacked evidence of structured, evidence-based interventions.

**Patient FF**

This 29-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder, unspecified anxiety disorder, and opioid use disorder. He was prescribed and adherent with olanzapine. An additional dose of olanzapine was prescribed PRN for agitation, and he used this dose on three occasions. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, the patient had previously received only 3CMS and MHCB care. He transferred to CSP/Corcoran on March 7, 2023, and received 3CMS RHU care from September 28, 2024, through January 22, 2025.

The initial PC assessment was timely but completed at cell front due to the patient's refusal. The assessment was incomplete and inadequate. The presenting problem, history of illness, risk of violence, history of suicidal/self-injurious behaviors were left blank, and the mental status exam was only partially completed. No case formulation was developed. The initial IDTT meeting was

timely and attended by the patient and required staff. The case formulation was not updated and remained inadequate. No treatment plan was developed, and no discharge criteria or rationale for 3CMS care were documented. The routine IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned PC. The clinical summary was cursory, and the case formulation was not updated. A treatment plan was developed and identified depression and anxiety at treatment targets. Interventions were generic, without defined therapeutic modalities. The psychiatrist timely attempted to complete the initial psychiatric assessment, but the patient refused and was seen briefly at cell front. The initial psychiatric assessment was completed 48 days after the patient's arrival and only after the initial IDTT meeting had occurred. The assessment was confidential and completed by telepsychiatry. Content was minimally adequate, and olanzapine was initiated.

During 3CMS RHU care, the patient was provided with a timely routine psychiatric encounter but refused a confidential setting; he was seen at cell front through telepsychiatry for a wellness check. Olanzapine was continued unchanged, and the psychiatrist documented a plan to reschedule the patient within seven days. The patient was transferred before this appointment came due. Weekly routine PC encounters were not provided consistently. Most contacts were refused by the patient and conducted at cell front. PC documentation included limited assessment of mental status and risk, encouragement of out-of-cell activities, and reminders to contact mental health if needed. There was minimal evidence of structured interventions or linkage to treatment plan goals. Barriers to participation were not explored, and the treatment plan was not adjusted to address ongoing refusal of care. The patient was offered a weekly 90-minute recreational therapy group but did not attend. A mental health assessment for an RVR alleging possession of a deadly weapon was adequate and found a nexus between mental health symptoms and the alleged behavior.

**Findings**

The treatment provided to this 3CMS RHU patient was inadequate.

The initial PC assessment was incomplete and inadequate. The initial psychiatric assessment was substantially delayed and unavailable to inform treatment planning during the initial IDTT meeting. No case formulation was developed, and the treatment plan was not developed until the routine IDTT meeting, 109 days after the patient's arrival. Even when completed, identified interventions were generic and not patient-specific. Barriers to treatment engagement were inadequately assessed and addressed. PC contacts were infrequent and lacked therapeutic substance, with no evidence of adaptation to address barriers to participation.

**Patient GG**

This 52-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of generalized anxiety disorder, delusional disorder, schizophrenia, and opioid use disorder. Symptoms and problem behaviors included paranoid and persecutory ideation, delusions of reference, auditory hallucinations, anxiety, angry outbursts, poor insight, history of suicide attempts, and violence. He was prescribed and adherent with oxcarbazepine. Hydroxyzine was prescribed PRN for insomnia, and he used this medication intermittently. Through the ISUDT, he was prescribed buprenorphine-naloxone

for opioid use disorder. Within CDCR, he had previously received 3CMS, EOP, and MHCB care. He most recently entered 3CMS RHU care at CSP/Corcoran RHU on October 3, 2024, where he remained through the end of the review period. During recent months, the patient had accrued RVRs for battery on a peace officer, battery, unauthorized possession of medication, and threatening staff. On October 2, 2024, he received an RVR for attempted murder, prompting a return to RHU placement at CSP/Corcoran. He was serving a sentence of life without parole.

The initial psychiatric assessment was timely, confidential, and completed by telehealth. The psychiatrist documented delusional content, offered antipsychotic medication, and recorded the patient's refusals. The patient agreed to increase the oxcarbazepine to address anger and irritability, and to start PRN hydroxyzine, and the psychiatrist noted the patient did not meet criteria for involuntary treatment. The initial PC assessment was timely but limited due to the patient's refusal of a confidential setting. Although the assessing PC noted the case formulation was "deeply mired in speculation," the case formulation was adequate and included reasonable hypotheses that were useful for guiding treatment.

Initial and routine IDTT meetings were timely, held in absentia due to the patient's refusals, and attended by required staff. Due to multiple RVR assessments, the patient met criteria for a higher level of care review during the initial IDTT meeting. Rationale for retention in 3CMS care and treatment modifications were appropriately documented. Patient strengths were inadequately documented, and the patient's verbalized treatment goals were not documented; in their place, the team's goals for the patient were documented. The treatment plan addressed anger and threatening behavior, hallucinations, delusions, and thoughts of harming others. It included measurable short-term and long-term goals but lacked baseline measurements of the patient's symptoms. Status updates on these targets were provided, but interventions were supportive and psychoeducational and did not include psychiatric care. During the routine IDTT meeting, the patient was not found to meet any criteria for a higher level of care despite ongoing psychotic symptoms. The team maintained the same treatment plan but noted that the patient was continuing to experience hallucinations, delusions, and anger, and that the patient was ambivalent about transferring to EOP care.

Psychiatric encounters were offered timely; the patient refused three of four attempted encounters, and brief wellness checks were provided at cell front through telehealth on these occasions. The patient participated in one confidential psychiatric encounter during the period reviewed; this contact also occurred through telepsychiatry. Documentation was adequate and included the patient's ongoing refusal of antipsychotic medication and the psychiatrist's assessment that the patient did not meet criteria for involuntary treatment. PC encounters were not offered with adequate frequency during the period reviewed, despite documentation of increasing paranoia, delusions, bizarre behavior, and homicidal ideation. The patient refused confidential settings, and most encounters occurred at cell front. Interventions were largely supportive, and PC contacts focused on symptom monitoring. There was no evidence of consistent, structured, evidence-informed approaches. The PC eventually identified the need for a higher level of care and recommended EOP care, but the patient nevertheless remained in 3CMS care. A 90-minute group focused on rational behavior and decisions was offered inconsistently during the period reviewed; the patient typically attended this group when it was offered.

**Findings**

The treatment of this 3CMS RHU patient was inadequate.

While the initial psychiatric assessment, initial PC assessment, psychiatric encounters, and IDTT meetings were timely, weekly PC contacts were not provided consistently throughout the period reviewed. These contacts occurred in nonconfidential settings due to patient refusals, and the reasons for the patient's refusals were inadequately explored and addressed. The IDTT process lacked measurable baseline data and did not provide specific, evidence-informed interventions for persistent psychotic symptoms and violence risk. While the original determination to retain the patient in 3CMS care was justified in the initial IDTT meeting, it became clear that 3CMS care was insufficient to meet the patient's treatment needs, and the PC reversed direction by recommending EOP care. Despite this recommendation, the patient continued to be retained in 3CMS care. The rationale for this determination in the routine IDTT meeting, despite ongoing psychosis, violence, and accumulating RVRs, was not clearly justified. The patient did not receive the treatment he needed.

**Patient HH**

This 24-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of adjustment disorder with anxiety and opioid, marijuana, and stimulant use disorders. Symptoms included anger, frustration, anxiety, possible delusions, and substance use. Medical conditions included a seizure disorder. The patient was not prescribed psychotropic medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, he had previously received only 3CMS care. He transferred to CSP/Corcoran on May 20, 2024, and was not enrolled in MHSDS services at that time. He was placed in RHU care on August 22, 2024, following an RVR for threatening great bodily injury or death, and on the same date was enrolled in 3CMS care. He remained in 3CMS RHU care until November 18, 2024, when he transferred to another facility.

An initial IDTT meeting was held on the same day that the patient was placed in RHU for purposes of determining an appropriate level of mental health care. The patient and most required staff attended; however, no assigned or alternate PC or psychiatrist was documented as attending. The patient was not found to meet criteria for a higher level of care review. The case formulation was pulled forward without modification from one developed in 2023 but adequately addressed the patient's symptoms and substance use. The treatment plan identified generalized anxiety and depression as target symptoms. Short-term and long-term goals were not measurable, and no interventions were identified. As a result of the IDTT meeting, the patient was appropriately placed in 3CMS care. The rationale for this decision was poorly documented.

The initial 3CMS RHU psychiatric assessment was completed the following day. The assessment was confidential, thorough, and completed by telepsychiatry. The psychiatrist documented the patient's refusal of psychotropic medications and scheduled follow-up in 12 weeks. The initial PC assessment occurred six days later and was confidential and minimally adequate. The initial IDTT meeting was late, occurring 20 days after placement in 3CMS RHU care. The patient and required staff attended. The case formulation, patient's strengths, and patient's verbalized treatment goals

were not updated, but the treatment plan was appropriately revised and identified both measurable long-term goals and CBT interventions addressing anxiety, depression, and anger.

Although the patient was not prescribed psychotropic medications, the assigned telepsychiatrist followed the patient timely. The encounter was confidential and adequately documented. Weekly confidential PC encounters were provided as required, and progress note content indicated provision of clinically appropriate therapeutic interventions consistent with the treatment plan. These included CBT-based anger management workbooks and assertive communication training, and the patient's treatment progress was adequately tracked. The patient was consistently offered a 90-minute weekly group on rational behaviors and decisions, which he consistently attended. He expressed satisfaction with programming and reported benefits from learning anger management and coping skills.

**Findings**

The treatment provided to this patient was adequate.

Although the preliminary IDTT meeting on the day of arrival was not adequate for detailed treatment planning purposes, it was effective in promptly identifying the patient's general need for mental health treatment and placement in 3CMS care. Ensuing initial PC and psychiatric assessments were confidential and adequate. The initial IDTT meeting, although delayed, appropriately identified the patient's specific treatment needs, and the treatment plan was adequate. Routine psychiatric and PC encounters were timely and consistent with active treatment of the patient's identified symptoms, and the patient's symptoms improved.

**Patient II**

This 66-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSP/Corcoran. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, unspecified bipolar and related disorder, methamphetamine use disorder, and opioid use disorder, moderate. Primary symptoms included chronic depression, anxiety, and reported stress related to institutional transfers. He also suffered from chronic back pain and used a walker. He was prescribed and adherent with mirtazapine. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, the patient had previously received 3CMS and EOP care. He transferred to CSP/Corcoran in 2022 and received 3CMS RHU care from August 6, 2024, following an RVR for battery with a deadly weapon, through October 24, 2024.

The initial psychiatric assessment was timely, completed through telepsychiatry, and minimally adequate but truncated due to the patient's refusal to participate in the full evaluation. The patient reported insomnia and depression and requested and received an increase in mirtazapine. The initial PC assessment was timely and completed by record review due to the patient's refusal to participate. Following a suspected overdose and referral to MHCB care, a SRE was completed on August 18, 2024. The patient also refused to participate in this evaluation but denied suicidality or overdosing. Instead, he stated that he had fallen and was unable to get up. The SRE found the patient at low risk, rescinded the MHCB referral, and was minimally adequate. The safety plan

was not useful and did not address the patient's treatment needs. Five-day follow-ups were continued for seven days, during which the patient consistently denied overdosing and denied thoughts to want to harm himself or others. The initial IDTT meeting was late, held in absentia due to the patient's refusal, and attended by required staff. IDTT documentation noted the patient's complaints of severe back pain and mobility issues, which were being addressed by medical staff. The case formulation was inadequate and did not address the role of pain or mobility challenges in the patient's behavior and symptoms. The treatment plan focused on the patient's depression and anxiety. It included measurable short- and long-term goals but lacked specific interventions and baseline measures. The patient's suspected overdose, substance use, and lack of treatment participation were not addressed. The rationale for retaining the patient in 3CMS care and discharge criteria were inadequately documented.

Routine psychiatric encounters were timely. All psychiatric contacts occurred through telepsychiatry at cell front due to the patient's refusals. The psychiatrist documented medication management and symptom monitoring, and the patient reported improvement in mood and denied side effects. Although the psychiatrist attempted to reschedule confidential appointments and documented communication of the refusals to the treatment team, treatment plan documentation did not reflect adjustment to address barriers to patient's participation. Weekly PC encounters were not provided consistently during the patient's RHU stay. All PC contacts occurred at cell front due to patient refusals and/or mobility limitations. The PC documented persistent pain, depressive and anxiety symptoms, and barriers to participation; however, interventions were limited to supportive listening and encouragement to attend psychiatry and medical appointments. The October 2024 contacts noted improvement in mood, with the patient expressing willingness to meet in a confidential setting in future sessions. Despite this, PC documentation lacked evidence of structured therapeutic interventions tied to treatment plan goals to track patient's progress and treatment effectiveness. The patient was offered weekly groups, including 90 minutes of the rational behavior and decision-making group, but refused all except for one vaccine group, which he attended only to decline vaccination. His access to programming was limited by refusals and mobility issues, and there is no documentation of efforts to address these barriers or offer alternative treatment. A mental health assessment for the RVR alleging battery with a deadly weapon was cursory and found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The treatment provided to this 3CMS RHU patient was inadequate.

The initial IDTT meeting and routine psychiatric and PC encounters were not provided timely. The safety plan, case formulation, treatment plan, and IDTT documentation were inadequate. Substance use concerns were not addressed in the treatment plan, despite the diagnoses, history, and a suspected overdose during the review period. There was little evidence of structured therapeutic interventions or modification of the treatment plan to address treatment barriers and engage the patient in treatment.

**APPENDIX B-10**
**California State Prison/Los Angeles County (CSP/LAC)**
**September 1, 2024 – February 28, 2025**

**Patient A**

This 59-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided during his placement in the CSP/LAC RHU. The patient was provided with a diagnosis of depressive disorder and was prescribed bupropion and Trileptal to address mood swings and depression. He was placed in the RHU on January 16, 2025 for safety concerns.

He had been managed at the 3CMS level of care since his arrival to CDCR and additionally had a history of three EOP placements and three MHCB admissions.

The initial psychiatric assessment occurred on January 28, 2025, at cell front after the patient declined to come to a confidential setting. The psychiatrist addressed current functioning and suicide risk, and discussed the patient's request for medication changes, agreeing to discontinue Remeron and start Trileptal. The assessment was adequate and included an appropriate record review.

The PC conducted an initial assessment on January 29, 2025, at cell front, citing a critical staff shortage as the reason for the non-confidential contact. The assessment was limited and largely based on historical information as a result. A suicide risk evaluation was completed during the same encounter and secondary to being clinically indicated although the clinical indication was unclear given the lack of mental health concerns noted in the initial assessment. The patient's risk was determined to be low.

A master treatment plan was entered later than required on February 5, 2025, with documentation indicating participation by all required staff. The plan contained conflicting information regarding the patient's presence at the IDTT meeting, stating both that he was present and that he was seen at cell front due to modified programming. Suicide risk and higher level of care considerations were discussed. While IPOCs were listed, the plan did not include specific mental health goals or interventions. There was no treatment plan. The patient's stated treatment goal was to lower his security level points. Notably, the PC who was present at the meeting was not the individual who completed the initial assessment.

There were no routine PC contacts held for the remainder of the monitoring period, despite a requirement for weekly contacts. There were no group therapy sessions documented.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The record reflected an absence of routine PC clinical contacts and group therapy documentation, along with a lack of specific mental health goals and interventions in the treatment plan. Additionally, there was conflicting documentation regarding IDTT attendance. These

deficiencies indicated non-compliance with CDCR mental health documentation standards for 3CMS patients in RHU.

**Patient B**

This 29-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CSP/LAC RHU. The patient was diagnosed with unspecified depressive disorder and prescribed Remeron for depression and anxiety. The patient was admitted to the MHSDS shortly after his placement in CDCR. He reported no mental health treatment history in the community but had taken an antidepressant while in jail.

He was placed in RHU on September 23, 2024, following an RVR for possession of a deadly weapon. On that same date, the patient was involved in an altercation and made a suicidal statement to an officer. He later denied suicidal intent and was assessed by the on-call psychiatrist, who cleared him to return to housing. On September 27, 2024, the patient submitted a healthcare request asking to be placed back on his medications. He participated in a coping group on September 30, 2024.

A SRASHE was completed on October 1, 2024 following the decision to rescind the MHCB referral made on September 23, 2024. This assessment was significantly delayed. His risk was assessed as low with the patient stating his suicidal threats were due to frustration over his property. A safety plan was completed with the patient to assist with future crises and was marginally adequate. Later that day, the patient reported suicidal ideation and was placed on suicide watch but refused to be moved. Notably, there was no clinical documentation related to the decision to place him on suicide watch. An assessment was completed in response to a controlled use of force, as the patient was refusing to relinquish his handcuffs after placement on suicide watch. The following morning, he was assessed and cleared to return to the RHU. Five-day follow-up contacts were completed at cell front secondary to patient refusal and modified programming. Documentation of these contacts was adequate.

An initial psychiatric assessment was completed at cell front on October 2, 2024, due to the patient's refusal to attend the clinic. The psychiatrist performed a comprehensive evaluation and initiated Remeron after discussion with the patient. An initial PC assessment was completed on October 3, 2024 at cell front after the patient refused to meet in a confidential setting. The assessment was limited due to the patient's lack of cooperation, but a review of the patient's history was documented.

A master treatment plan was completed on October 8, 2024, with participation by required staff and the patient. The patient did not articulate treatment goals, and the treatment team documented that additional time was needed to assess problems and goals. As a result, there was no treatment plan documented. The psychiatrist documented that the patient was receiving mirtazapine to address depression and anxiety and it was unclear why these problems were not addressed in the treatment plan. There was no rationale for the patient's level of care nor discharge criteria documented.

The PC documented that a routine contact was completed during the IDTT meeting, which was not appropriate. Documentation included a mental status examination but evidenced no assessment of the patient's needs or treatment interventions being offered. No routine PC or psychiatric contacts were documented with the patient for the remainder of his stay in the RHU, over the following five weeks.

The patient was offered recreational therapy groups focused on coping skills five times during the seven weeks he was in the RHU.

**Findings**

The treatment provided to this patient was inadequate.

While initial assessments and treatment planning were completed, there was a significant lapse in required weekly primary clinician contacts and weekly groups were not offered. Additionally, the patient was not seen monthly by the psychiatrist despite being started on medications upon placement in the RHU. The treatment plan was absent, and the team deferred identification of problems and goals despite psychiatry treating the patient for symptoms of depression and anxiety. Although the patient attended a few recreation therapy groups, there was no evidence of a comprehensive or coordinated approach to his care during his time in RHU.

**Patient C**

This 36-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided during his placement in the RHU at CSP/LAC. He was provided with diagnoses of adjustment disorder and antisocial personality disorder and was prescribed sertraline for depression and anxiety. He was non-adherent. The patient had a reported history of suicide attempts, though he denied them, and stated he had experienced symptoms of depression since 2016.

The patient was placed in RHU on February 10, 2025, due to safety concerns. A timely initial PC assessment was completed on February 19, 2025 and included a comprehensive therapeutic evaluation, discussion of the patient's concerns, and review of coping skills. The psychiatrist completed an initial assessment at cell front on February 25, 2025, as the patient declined a confidential setting. The assessment was later than required by the Program Guide. The psychiatrist performed a thorough evaluation, ordered laboratory tests, and continued the patient's medications.

A master treatment plan was not completed during the monitoring period, despite being required.

The primary clinician saw the patient at cell front weekly for wellness checks secondary to modified program. There was no evidence that treatment was provided to the patient. The psychiatrist offered a routine contact to the patient, but the patient refused. The patient was noncompliant with his medications and the laboratory testing required, so the medications were tapered and stopped. A recreation therapist delivered a wellness packet to the patient at his cell,

but there was only documentation of one group session being offered to the patient on February 27, 2025.

**Findings**

The treatment provided to this patient was inadequate.

The initial psychiatric assessment was completed later than required. The frequency of primary clinician contacts was short of required standards. There was no IDTT meeting held despite one being required during the monitoring period. There was also no evidence of weekly group therapy being offered, making the interventions insufficient to address the patient's clinical needs at the 3CMS level of care.

**Patient D**

This 30-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided during his RHU placement at CSP/LAC. He was provided with diagnoses of bipolar disorder, borderline personality disorder, generalized anxiety disorder, and opioid use disorder. Remeron and Trileptal were prescribed to address mood and anxiety symptoms. He had a history of bipolar disorder and ADHD since childhood, with prior involuntary psychiatric hospitalizations before incarceration.

The patient was placed in the RHU on January 12, 2025. On January 15, 2025, the patient reported suicidal ideation in response to not having a radio or a tablet. A SRASHE was completed and was adequate, determining the patient to be at low risk for suicide after the patient denied reporting suicidal thoughts and presenting as stable but frustrated. The clinician appropriately completed a safety plan with the patient to assist with mitigating further crises. The following day he punched a wall and was again assessed for suicide risk. His risk level was noted to be unchanged with clear rationale.

The psychiatrist completed an initial assessment within 10 days of RHU placement at cell front due to the patient's refusal. The assessment included an adequate record review and was comprehensive. The psychiatrist concurred with most of the diagnoses on record but identified antisocial personality disorder rather than borderline personality disorder being a possible diagnosis.

After not being seen by a PC since placement in the RHU, the patient submitted a healthcare request from on January 24, 2025 asking to see a therapist. An initial PC assessment was completed on January 28, 2025, later than required by the Program Guide. The assessment was completed at cell front without rationale documented for the non-confidential contact. The assessment was adequate despite the non-confidential setting. Only one PC contact was documented in February, on the 19th, and this was in response to a healthcare request submitted by the patient who reported an increase in depressive symptoms. The contact was completed at cell front due to staffing shortages resulting in the patient submitting another healthcare request with profanity and angry content the following day. The patient was not seen in response to this request. There were no routine PC contacts documented.

There was no IDTT meeting held during the reporting period, despite the patient having been in the RHU for over six weeks.

Group therapy was inconsistently offered, with approximately one session per month. The patient attended half of the sessions offered, which focused on recreation therapy topics such as current events and mood management. He was also provided with in-cell packets by the recreational therapist.

**Findings**

The treatment provided to this 3CMS patient in the RHU was inadequate.

The record reflected a delayed initial PC assessment, the absence of regular clinical contacts, inconsistent group therapy offerings, lack of adequate response to healthcare requests, and a lack of documented timely treatment planning. These deficiencies indicate significant risk to the patient’s mental health and lack of appropriate care for a patient housed in a restricted setting.

**Patient E**

This 40-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided in the RHU at CSP/LAC. He was provided with diagnoses of anxiety disorder, bipolar disorder, PTSD, and opioid use disorder. He was not prescribed any psychotropic medication. The patient was first incarcerated in CDCR in 2013 and has had four MHCB admissions and several transfers between 3CMS and EOP levels of care. Prior to incarceration, he served in the Marines and was on active duty in Afghanistan. He had a significant history of suicide attempts and violence.

The patient was placed in RHU on January 20, 2025. The psychiatrist completed an initial assessment within five days of the patient’s placement in the RHU at the cell front, noting that the patient refused to come out for the evaluation. The psychiatrist thoroughly assessed the patient and agreed to continue monitoring his progress without medication. Level of care considerations were documented but inadequately explained, as the patient requested multiple times to be released from the MHSDS and reasons for keeping him in care were not documented. The PC met with the patient at the cell front, due to staffing shortage, on January 29, 2025, for an initial assessment. The assessment reviewed current functioning, suicide risk, and treatment goals progress.

A master treatment plan was completed on February 5, 2025. All required staff were present at the IDTT meeting, with an alternate PC in attendance. The treatment plan stated both that the patient attended the meeting and that he was seen at the cell front due to staff shortage, which limited the information gathered from him. He reported a desire to be discharged from mental health services since he was not taking medication. Identified problems and goals were related to depression and mania and were appropriately documented. The rationale for retaining the patient included current stressors and a pending investigation. Rationale noted, inconsistent with the prior statement about the patient wanting to be removed from the MHSDS, that the patient agreed with retention at the 3CMS level of care.

The patient wrote several mental health care requests to staff, asking that he be removed from 3CMS services so that he could be cleared for fire camp. On February 20, 2025, a psychologist responded and met with the patient at his cell front. The psychologist assessed the patient's mental status and deferred to the IDTT about the patient's level of care.

The patient was not offered any routine PC or psychiatry contacts for the remainder of his stay in the RHU, through March 7, 2025. There was one group therapy session documented, which the patient did not attend. He was provided with in-cell packets by the recreational therapist on two occasions.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The record reflected irregular and insufficient clinical contacts, inadequate group therapy offerings, and a lack of clear rationale for retaining the patient in the MHSDS. In addition, the patient made multiple requests to be released from mental health care, while no symptoms or mental health concerns were commented on in the record.

**Patient F**

This 52-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided at CSP/LAC RHU. He was provided with diagnoses of major depressive disorder and antisocial personality disorder and was prescribed Vistaril and Remeron to address depression and anxiety. The patient had four MHCB admissions within the past three months, each related to incidents in which he threatened suicide and then quickly retracted his intent to self-harm.

The patient was placed in RHU on January 28, 2025, due to safety concerns related to having an enemy on the yard. The patient reported suicidal ideation soon after placement and was placed in alternate housing on January 29, 2025 and again on February 3, 2025. The psychiatrist conducted an initial assessment for RHU placement on February 3, 2025, at the cell front while the patient was on suicide watch. The patient refused to come out for the visit and did not wish to engage with the psychiatrist. The psychiatrist reviewed the record and continued the current medication regimen, noting that the patient was adherent and psychiatrically stable. Documentation reflected that the patient remained in alternate housing and was referred to the MHCB twice, but never transferred, with the referral being rescinded twice prior to returning to RHU status on February 5, 2025.

The PC completed an initial assessment at the cell front on February 6, 2025, eight days after RHU placement. The non-confidential contact was due to a critical staff shortage. The patient refused to talk, and the PC gathered information from the record, unit staff, and observation. Five-day follow-up contacts were completed in light of the MHCB rescissions. The contacts were adequate and reflected review of the patient's safety plan. The patient was again placed in alternative housing on February 11, 2025. That MHCB referral was rescinded with appropriate assessments completed. A safety plan was not completed; however, noting the patient's refusal to engage in

safety planning. There was no rationale for failing to incorporate previous information and documenting clinical recommendations in a safety plan.

An IDTT meeting was held on February 12, 2025, with all required staff present. The patient refused to attend. The only identified problem in the treatment plan was irritability, with a goal to improve decision-making and reduce irritability. The intervention was vague. There was no mention of the psychiatrist's documentation of providing medication for anxiety and depression. The patient's recent MHCB referrals warranted review for the need for a higher level of care and rationale for not referring the patient was adequate as were the treatment enhancements proposed. Unfortunately, no safety plan was discussed.

The patient submitted several mental health care requests each week, expressing a desire to talk with someone, reporting intrusive thoughts, and stating that his medication was not helping. He made multiple suicidal threats and was placed on and off suicide watch several times. Staff responded to these emergencies and documented interventions. There were no documented routine PC contacts, yet the patient's frequent placements in alternative housing made scheduling difficult. Similarly, the patient was not offered any groups.

**Findings**

The treatment provided to this patient was inadequate.

Treatment planning was inadequate, providing only one problem area loosely connected to his diagnosis and should have addressed his frequent suicidal threats and thoughts. There was no evidence of interventions being provided or safety planning to assist the patient in managing his distress. On a positive note, staff were responsive to his self-harm and suicidal thoughts.

**Patient G**

This 40-year-old transgender female 3CMS patient's healthcare record was reviewed to assess the quality of care provided during her placement in the RHU at CSP/LAC. The patient was provided with diagnoses of adjustment disorder, antisocial personality disorder, and alcohol use disorder. Although offered psychotropic medication, she declined to accept. The patient had a significant mental health history, including more than five suicide attempts and multiple admissions to the MHCB.

The patient was placed in the RHU following an RVR for battery on an officer on January 27, 2025. Of note, the patient was placed in alternate housing nearly daily upon arrival in the RHU. On February 8, 2025, the patient was admitted to the MHCB for suicidal ideation and after swallowing a razor. She was discharged from the MHCB on February 13, 2025, with staff reporting that her mood had stabilized and that there were no behavioral incidents during her placement.

An initial mental health assessment was completed by the psychiatrist at the cell front on February 3, 2025, as the patient refused to exit her cell. The assessment included review of behavior,

confirmation of diagnoses, and evaluation of suicide risk. The patient again declined medication, and the psychiatrist agreed not to prescribe.

While the patient was not seen for an initial PC assessment during the monitoring period, she was assessed almost daily for suicide risk, seen for five-day follow-up contacts, or seen in response to requests or referrals. Additionally, several RVR mental health assessments were completed with the patient during this time. No 3CMS RHU IDTT was held with the patient as she did not remain at the 3CMS level of care within the RHU for more than four consecutive days during the monitoring period. Clinicians consistently attempted to engage the patient in safety planning, but the patient refused to participate. PCs varied in the quality of the recommendations provided in the safety plan to assist the patient in remaining safe.

During the reporting period, only one group session was offered while the patient was housed in the RHU. This session was facilitated by a recreation therapist, and the patient attended and participated appropriately.

Notably, clinicians did not consistently document the patient's preferred pronouns. Additionally, a multitude of PCs interacted with and assessed this patient during the monitoring period. At least eight different PCs completed suicide risk evaluations over the course of 30 days.

**Findings**

The treatment provided to this complex patient was adequate given the challenges associated with her unstable behavior.

The team responded to the patient's threats and behaviors appropriately, attempted to engage in safety planning, and monitored her for safety. The team appropriately admitted her to the MHCB when warranted and conducted five-day follow-ups upon her return to the RHU. Improvements with regard to continuity of care were needed; however, given the patient's primary personality disorder.

**Patient H**

This 59-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of schizoaffective disorder, psychoactive substance use disorder, and antisocial personality disorder. He was prescribed buspirone and venlafaxine but was medication nonadherent. Hydroxyzine was prescribed as needed for anxiety, and the patient used this medication occasionally. Seven suicide attempts between 1990 and 2015 were listed in the health record. Within CDCR, the patient previously received 3CMS, EOP, EOP Mod, MHCB, and ICF services. Medical conditions included dyslipidemia, hypertension, iron deficiency anemia, and several skin conditions. He arrived at CSP/LAC in EOP on July 23, 2024, clinically transferred from EOP to 3CMS care on January 29, 2025, and physically transferred to 3CMS housing on February 14, 2025.

During the January 29, 2025 EOP IDTT meeting, the patient complained about the lack of available programming and requested placement in 3CMS care with the goal of obtaining transfer to another facility. The treatment team documented that the patient had remained stable with no cognitive or functional impairments despite declining to participate in EOP programming and remaining nonadherent with medications. Documented evidence regarding patient's functioning was weak, as the patient received only limited contacts in the EOP level of care. The most recent EOP PC contact with the patient occurred 64 days prior to the IDTT meeting and was limited to a brief wellness check; two subsequent checks on the patient's status consisted exclusively of collateral contacts with custody and did involve direct contact with the patient. The patient did not attend EOP caseload groups. The most recent confidential psychiatric encounter occurred 97 days prior to the IDTT meeting. During the IDTT meeting, buspirone and venlafaxine were discontinued, diagnoses of schizoaffective disorder and bipolar I disorder were discontinued, and the team agreed to transfer the patient to 3CMS care.

Once in CSP/LAC 3CMS care, no initial psychiatric assessment or initial IDTT meeting was completed. As of April 8, 2025, both events were still pending. The initial PC assessment occurred by telemental health 62 days after the patient was enrolled in 3CMS care. The assessment was confidential and otherwise adequate.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Care during the EOP-3CMS transition was deficient. Based on EOP IDTT documentation, the transfer from EOP to 3CMS care appeared to be clinically appropriate, and the rationales for the change in level of care, discontinuation of psychotropic medications, and change in diagnoses were documented; however, evidence supporting these rationales was largely absent due to deficient EOP care. Once the patient was placed in 3CMS care, the delay in physically transferring the patient from EOP housing to 3CMS housing for 16 days was problematic and contributed to delayed and deficient mental health care. The 3CMS admission assessments and treatment planning were either significantly delayed or missing. Particularly because a diagnosis of serious mental illness was removed and psychotropic medication stopped when the patient was placed in 3CMS care. The failure to provide a psychiatric assessment or PC treatment encounter in the 62 days following placement was problematic.

**Patient I**

This 37-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with a diagnosis of adjustment disorder with depressed mood, prescribed mirtazapine and olanzapine, and was adherent with these medications. Three incidents of self-injurious behavior during 2024 were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, and EOP services. Medical conditions included hypertension, constipation, and abdominal bloating. He arrived at CSP/LAC in EOP care on February 7, 2024 and transferred from EOP to 3CMS care on September 4, 2024. He remained in EOP housing on 3CMS status throughout the review period.

The EOP IDTT meeting in which the decision to place the patient in 3CMS care occurred late, did not include a case formulation or treatment plan, indicated that the patient did not suffer from depressive symptoms and instead reported depression to influence his housing and level of care, emphasized negative patient behaviors, and noted that the patient's diagnosis was inconsistent with the need for EOP care. IDTT documentation did not address the patient's need for suicide watch or the patient's report of depression, grief, and auditory hallucinations in the week prior to the IDTT meeting.

Once placed in 3CMS care, the patient was not seen for an initial psychiatric assessment for one month and was not seen for an initial PC assessment for nearly seven months. The initial psychiatric assessment included a diagnosis of major depressive disorder with psychotic features and documented a plan for the patient to be seen in 14 days. Instead, the next psychiatric encounter occurred 96 days later. The initial PC assessment did not provide a case formulation or adequate assessment of treatment needs. Instead, it focused on providing stress management and relaxation skills. No PC treatment was provided in 3CMS care between September 4, 2024 and March 28, 2025. A 3CMS IDTT meeting was not held, and no treatment plan was developed. Mental health assessments for RVRs in December 2024 and February 2025 found no nexus between the alleged behavior and mental illness despite noting paranoia and auditory hallucinations.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Care during and following the EOP-3CMS transition was deficient. The failure to transfer the patient from EOP housing to 3CMS housing for over 30 weeks following clinical transfer was highly problematic and contributed to delayed and deficient 3CMS mental health care. Given that he accrued additional RVRs, required suicide watch, and requested help for serious symptoms, the clinical appropriateness of the EOP transfer to 3CMS care was unclear. Once in 3CMS care, care was inadequate. Initial psychiatric and PC assessments were significantly delayed, did not address the patient's paranoia and history of reporting auditory hallucinations, and provided an inadequate basis for treatment. There was no case formulation, no IDTT meeting, and no master treatment plan. Psychiatric follow-up did not occur in accordance with the planned timeframe. The patient's depression, possible psychosis, and negative patient behaviors were inadequately explored and conceptualized.

**Patient J**

This 45-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of depressive disorder, methamphetamine use disorder, and psychotic disorder. He was initially prescribed escitalopram and trazodone but was nonadherent with these medications. Both medications were discontinued early during the period reviewed. Hydroxyzine was prescribed as needed for anxiety and he used this medication occasionally while it was ordered as direct observation treatment. Four episodes of self-injurious behavior between 1995 and 2018 were listed in the health record. Within CDCR, the patient received 3CMS, MHCB,

EOP, EOP Mod, ICF, and APP services. Medical conditions included lower extremity paresthesia, methamphetamine use disorder, and a history of hepatitis C. Following discharge from inpatient care for serious impairment due to mental illness, he arrived at CSP/LAC in EOP care on March 4, 2024. He was clinically transitioned from EOP to 3CMS care on September 18, 2024, and physically transferred to RHU 3CMS housing on October 29, 2024. He remained in RHU 3CMS care until December 4, 2024, when he was briefly placed on MHCB status. He returned to RHU 3CMS care on December 6, 2024 and was discharged to the community from the RHU on January 15, 2025.

The September 18, 2024 EOP IDTT meeting in which the decision to place the patient in 3CMS care occurred three months late. The patient did not attend this meeting due to custody modified programming. A master treatment plan was not developed. IDTT documentation made clear that the patient was being referred to 3CMS care because he was not engaging in EOP treatment, despite treatment refusal being a criterion for consideration of a higher level of care. Subsequent documentation was insufficient to determine how or when the patient was informed of the change in his level of care. Shortly after the EOP IDTT meeting, the patient became nonadherent with psychotropic medications, and they were discontinued without the patient being seen. The initial 3CMS psychiatric assessment was not completed until 50 days after the patient was enrolled in 3CMS RHU care and did not clarify the patient's diagnoses. Apart from noting the patient's report of ongoing derogatory auditory hallucinations, the assessment contained minimal current information. An initial PC assessment was not completed until 55 days after the patient started 3CMS care and did not update the clinical summary or case formulation. A 3CMS IDTT meeting was not held.

On December 1, 2024, while in 3CMS RHU care, the patient submitted a health care services request to see mental health urgently and stated that he was unable to manage his stress. No response to this request was documented. On December 4, 2024, he reported suicidal ideation to custody. The CIT was contacted but did not respond. The patient then cut his left wrist with a staple while under observation by custody. He required five stitches. He was placed on suicide watch by the on-call psychiatrist and referred to MHCB care. A suicide risk evaluation at a holding cell in the Facility D gym mistakenly concluded that the patient had not engaged in recent self-injurious behavior, assessed the patient's suicide risk as low, and rescinded the MHCB referral. A safety plan was developed without the patient and was inadequate. He was returned to the RHU, where five-day follow-ups occurred at the cell front. The patient submitted at least two subsequent requests to see mental health. One cell-front encounter was offered nine days after the first request and two days after the second. The patient was informed that the encounter needed to occur at cell front due to lack of staff, and he declined to engage because the encounter was not confidential. The initial PC assessment following rescission of the MHCB referral was late, not confidential, incorrectly indicated that the patient had been free of self-injurious behavior, and did not update the case formulation. The initial psychiatric assessment was also late but confidential; it did not clarify the patient's diagnoses. The patient received no confidential individual treatment from a primary therapist after placement in RHU 3CMS care.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient did not receive the required services in either EOP or 3CMS levels of care. Because there was no EOP treatment plan and limited confidential EOP individual treatment, it was unclear whether the patient met any treatment goals at the time he was transferred to 3CMS care. Reasons for his treatment disengagement were not adequately explored, and the rationale for moving the patient to a lower level of care was actually a criterion for considering a higher level of care. Assessments in 3CMS care were late, and PC assessments incorrectly concluded that the patient had no history of self-injurious behavior. Psychiatric diagnoses were never discussed or resolved, the patient's treatment needs were inadequately assessed, and the transfer from EOP to 3CMS care lacked unambiguous evidence of clinical appropriateness. Mental health responses to patient requests for services were delayed and inadequate. The delay in physically transferring the patient from EOP housing to 3CMS housing for 41 days following clinical transfer was problematic and contributed to delayed and deficient mental health care.

**Patient K**

This 50-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of unspecified depressive disorder, borderline personality disorder, antisocial personality disorder, childhood sexual abuse, and cocaine use disorder. He was prescribed oxcarbazepine but was nonadherent with this medication, and it was discontinued. Hydroxyzine was prescribed as needed for insomnia; he rarely used this medication. One suicide attempt and several self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, EOP, ICF, and APP services. Medical conditions included obesity, gastroesophageal reflux disease, steatosis of liver, degenerative disc disease, hyperlipidemia, low back pain, kidney cyst, and phencyclidine use disorder. He arrived at CSP/LAC in EOP care on July 23, 2024, clinically transitioned from EOP to 3CMS on September 18, 2024, and physically transitioned to RHU 3CMS housing on March 5, 2025.

Due to custody modified programming, the patient did not attend the September 18, 2024 EOP IDTT meeting at which time it was determined to place him in 3CMS care. The EOP treatment plan did not address mental illness symptoms outside of substance use and was not updated to reflect the patient's treatment progress. EOP IDTT documentation inaccurately asserted that the patient was medication adherent and attending mental health treatment, even though he was nonadherent with oxcarbazepine and attending less than 50 percent of his offered EOP programming at the time. Individual psychiatric and PC contacts in EOP occurred exclusively at the cell front.

Once transitioned to the 3CMS level of care, the initial psychiatric assessment was timely but not confidential or thorough; the rationale for prescribing oxcarbazepine was not documented. The initial PC assessment was not completed until 163 days after the patient was transferred to the 3CMS level of care, and the assessment did not reflect awareness of the patient's history of inpatient care and suicidal/self-injurious behavior. A 3CMS IDTT meeting was not held until after the review period, on March 26, 2025, 189 days after the patient's treatment level was changed to 3CMS care. The 3CMS treatment plan was taken from the one developed during EOP care without modification or updating, and did not address the emotional reactivity and impulsivity discussed

in his case formulation. During the period the patient remained in EOP housing on 3CMS care, he was seen timely by psychiatry but received no confidential individual treatment from a PC. He was seen twice for urgent referrals due to bizarre and withdrawn behavior; both mental health consultations occurred at the cell front and did not yield adequate assessments of the patient's mental status and treatment needs. The patient attended EOP recreational therapy groups selectively during this time.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The determination to transfer the patient from EOP to 3CMS care was based on inaccurate conclusions that the patient was medication adherent and engaged in treatment. Reasons for the patient's treatment disengagement and medication nonadherence in EOP were inadequately explored. EOP treatment was inadequate, the rationale for transitioning the patient to 3CMS care was contradicted by the health record, and the patient did poorly in 3CMS care, as evidenced by two urgent referrals for bizarre and withdrawn behaviors. The delay in physically transferring the patient from EOP housing to 3CMS housing for 24 weeks following clinical transfer was highly problematic and contributed to delayed and deficient mental health care. Both the 3CMS initial PC assessment and initial IDTT meeting were significantly delayed. The 3CMS master treatment plan inadequately addressed the patient's needs, and the transfer to 3CMS care appeared questionable.

**Patient L**

This 66-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of major depressive disorder, recurrent, moderate, and traumatic brain injury. He was not prescribed psychotropic medication. Two overdoses, one of which was determined to be a suicide attempt, were noted in the health record. Within CDCR, the patient previously received 3CMS, MHCB, EOP, and APP services. Medical conditions included prediabetes, dyslipidemia, gastroesophageal reflux disease, mild persistent asthma, history of abnormal MRI of head, left cataract extraction, nuclear sclerosis, and occlusion of central retinal vein in left eye. He was enrolled in the developmental disability program with a code of DD1. He arrived at CSP/LAC in EOP care on August 8, 2024, clinically transitioned from EOP to 3CMS care on October 2, 2014, and physically transitioned to RHU 3CMS housing on February 5, 2025.

During the two months of EOP care the patient received at CSP/LAC, there was no documentation of individual PC contacts and limited group treatment. He attended two caseload groups and two of five offered recreational therapy groups. The psychiatrist saw the patient once, and during this encounter the patient advocated for placement in 3CMS care. In the October 2, 2024 EOP IDTT meeting in which the treatment team decided to place him in 3CMS care, the patient was described as easily provoked and difficult to engage in a therapeutic alliance, but also as euthymic and effectively using coping skills. His treatment plan identified anger and emotional regulation as treatment targets, identification of anger triggers and of emotions as interventions, and the patient's

response to treatment as "in progress." It was not clear that EOP treatment goals were met as of this IDTT meeting.

Once enrolled in 3CMS care but remaining in EOP housing, the patient was offered one recreational therapy group, no PC contacts, and one psychiatric contact. He was involved in an altercation with a peer that resulted in transfer to RHU. The initial 3CMS PC assessment did not occur for 132 days, after the patient was placed in RHU. It was not confidential due to staffing shortages, did not include an adequate psychosocial history, and did not address suicidal risk. The initial psychiatric assessment did not occur for 140 days and was not confidential due to the patient's refusal of a confidential setting. The patient was noted to be irritable and showing poor judgment by refusing medication for hypertension. The initial IDTT meeting did not occur until March 4, 2025, 153 days after the patient was transitioned to 3CMS care and almost four weeks after the patient was placed in RHU 3CMS care. The RHU 3CMS master treatment plan was not modified or updated from the October 2, 2024 EOP treatment plan, which in turn was adopted whole cloth from an April 2024 treatment plan developed for 3CMS care at another facility.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient did not receive required services in either EOP or 3CMS levels of care. Evidence supporting the EOP treatment team's decision to accede to the patient's request to be placed in 3CMS care was limited, and it was not clear the patient had achieved EOP treatment goals. The delay in physically transferring the patient from EOP housing to 3CMS housing for 18 weeks following clinical transfer was highly problematic and contributed to delayed and deficient 3CMS mental health care. The initial 3CMS psychiatric and PC assessments and the initial 3CMS IDTT meeting were all late, cursory, and failed to identify the patient's treatment needs in a comprehensive or adequate manner.

**Patient M**

This 28-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of adjustment disorder, substance-induced psychotic disorder, multiple substance use disorders and, on a rule out basis, PTSD. He was not prescribed psychotropic medications for most of the period reviewed. Beginning in early February 2025, he was prescribed oxcarbazepine and prazosin and was adherent with these medications. One episode of headbanging was listed in the health record. Within CDCR, the patient previously received MHCB and EOP services. No medical conditions were indicated in the health record. He arrived at CSP/LAC in RHU EOP care on August 1, 2024, transferred to mainline EOP care on October 11, 2024, clinically transitioned from EOP to 3CMS on October 21, 2024, and physically transitioned to 3CMS care on November 11, 2024. He remained in mainline 3CMS care until January 30, 2025, when he was moved to RHU 3CMS care. He remained in RHU 3CMS care until February 10, 2025, when he was admitted to MHCB care and transferred to another facility.

In the October 21, 2024 mainline EOP IDTT meeting in which it was decided to move the patient to 3CMS care, the team noted that the patient had four MHCB referrals in the last six months and was attending less than 50 percent of offered treatment. Because all four MHCB referrals had been triggered by substance-induced symptoms and the patient had remained abstinent in EOP care, the team determined that it was not necessary to refer him to a higher level of care. The patient's treatment disengagement was not addressed, but the team concluded that the patient had reached maximum benefit of EOP treatment and no longer exhibited symptoms requiring EOP care. However, the treatment plan was not updated to indicate the patient's response to treatment. At the time the patient was transitioned from EOP to 3CMS care, he had been in mainline EOP care for only 10 days, and no initial PC assessment had been completed.

During the three weeks the patient was enrolled in 3CMS care but remained in EOP housing, he had no contact with the PC or psychiatrist and was not offered groups. During the 80 days between November 11, 2024 and January 30, 2025, when he was enrolled in 3CMS care and placed in 3CMS housing, he had no contact with the PC or psychiatrist. An initial 3CMS psychiatric assessment was finally completed 107 days after the patient was enrolled in 3CMS care and 86 days after the patient was transferred to 3CMS housing; the assessment occurred only after the patient was placed in RHU 3CMS care. Similarly, the initial 3CMS PC assessment was only completed 112 days after the patient was enrolled in 3CMS care and 91 days after the patient was transferred to 3CMS housing. This assessment also occurred only after the patient was placed in RHU 3CMS care, and it took place on the final day of the patient's stay at CSP/LAC. No 3CMS IDTT meeting was held, and on or about February 10, 2025, while in RHU 3CMS care, the patient attempted to hang himself. He was found to be at high risk for suicide and referred to MHCB care.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient was transferred from EOP to 3CMS despite meeting two criteria for consideration of a higher level of care and receiving only minimal care in the RHU and mainline EOP. At the time he was moved from EOP to 3CMS care, the patient had been in mainline EOP care for only 10 days, and an initial PC assessment had not been completed. The delay in physically transferring the patient from EOP housing to 3CMS housing for three weeks following clinical transfer was problematic and contributed to delayed and deficient mental health care. However, challenges in completing timely assessments were not entirely attributable to delayed housing movement. From October 21, 2024 until early February, 2025, no 3CMS initial psychiatric or initial PC assessment was completed, and a treatment plan was never developed for the patient's 3CMS care at CSP/LAC. The patient received no meaningful treatment in 3CMS care, became suicidal, and was admitted to a crisis bed.

**Patient N**

This 43-year-old non-binary 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of antisocial personality disorder and unspecified schizophrenia spectrum and other psychotic disorder. They were not prescribed any psychotropic

medications. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, EOP, and EOP Mod services. Medical conditions included being overweight, hypertension, hypertriglyceridemia, and gastroesophageal reflux disease. They arrived at CSP/LAC in EOP Mod care on February 7, 2024, transitioned to full EOP care on May 22, 2024, clinically transitioned from EOP to 3CMS care on October 10, 2024, and physically transitioned to 3CMS care on February 11, 2025. They remained in mainline 3CMS care through the site visit.

Documentation for the October 10, 2024 EOP IDTT meeting in which the treatment team determined to move the patient to 3CMS care noted that the patient was attending less than 50 percent of offered treatment. IDTT documentation indicated that the patient's treatment disengagement was not the result of mental illness, and that the patient reported no symptoms congruent with any mental illness. However, the case formulation retained for this meeting indicated that the patient exhibited sexual preoccupation driven by psychotic symptoms. An EOP master treatment plan was not developed, and it was unclear what the patient's EOP treatment goals were or whether they had achieved them. After being enrolled in 3CMS care, the patient did not receive any PC contacts for 127 days, when a one-paragraph, inadequate PC report was completed based on record review. The patient did not attend any groups while still in EOP housing. The initial psychiatric assessment for 3CMS care did not occur until February 18, 2025, 131 days after the patient was enrolled in 3CMS care and 137 days after his most recent psychiatric encounter. Both the psychiatric assessment and the prior psychiatric encounter were brief, limited, and occurred at cell front. As of April 8, 2025, an initial 3CMS IDTT meeting had not been held.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient did not receive required services at either the EOP or the 3CMS level of care. The decision to move the patient from EOP to 3CMS care was not adequately justified, given contemporaneous documentation of psychotic symptoms and a schizophrenia spectrum diagnosis. The delay in physically transferring the patient from EOP housing to 3CMS housing for four months following clinical transfer was highly problematic and contributed to delayed and deficient mental health care. In addition, the PC documentation was far from an adequate initial assessment. No master treatment plan was present for either EOP or 3CMS care. No meaningful 3CMS treatment was provided outside of a brief psychiatric assessment.

**Patient O**

This 30-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of unspecified anxiety disorder and unspecified depressive disorder. He was prescribed buspirone, levetiracetam, olanzapine, and sertraline. He was adherent with these medications in EOP care, but in 3CMS care he was only partially adherent with sertraline and levetiracetam and nonadherent with buspirone and olanzapine. Additional doses of olanzapine were prescribed as needed for psychosis, and the patient used this medication intermittently in 3CMS care. Through the ISUDT, he was prescribed buprenorphine-naloxone for

opioid use disorder and was adherent with this medication. One episode of self-injurious behavior was listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, EOP, and APP services. Medical conditions included latent syphilis, opioid use disorder, hepatitis C, and a history of lumbar spine surgery. He was discharged from acute care to RHU EOP care at CSP/LAC on October 1, 2024. He clinically transitioned from mainline EOP to 3CMS care on December 3, 2024, but remained in EOP housing on 3CMS status until February 18, 2025, when he was discharged from CDCR custody.

Documentation for the December 3, 2024 EOP IDTT meeting at which the treatment team determined to step the patient down from EOP to 3CMS care accurately indicated that the patient was medication adherent in EOP care. IDTT documentation also noted that the patient was stable, with no significant functional impairment or signs of mental health decompensation, and that the patient no longer needed EOP care. Psychiatric assessments prior to the IDTT meeting provided robust evidence in support of this conclusion, including adequate assessment of the nature of the patient's reports of auditory and visual hallucinations. However, the IDTT documentation did not address the patient's high rate of refusing groups, which was over 50 percent during November 2024, or indicate whether the patient had achieved EOP treatment goals.

Once enrolled in 3CMS care, the patient received a timely, confidential, and adequate psychiatric assessment through telepsychiatry. No initial 3CMS PC assessment or IDTT meeting was completed. In 3CMS care, he was seen for a timely psychiatric follow-up. In that encounter, the psychiatrist indicated that the patient needed to be seen again in 30 days, yet this subsequent appointment did not occur. The patient was seen twice by mental health clinicians, once for an urgent consult and once for an RVR mental health assessment. Both encounters concluded that the patient was stable and not influenced by self-reported psychotic symptoms.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The decision to move the patient from EOP to 3CMS care was adequately supported by prior psychiatric assessments but did not adequately address the patient's recent disengagement with treatment groups or progress towards the specified treatment goal. Once in 3CMS care, treatment was not adequate. The delay in physically transferring the patient from EOP housing to 3CMS housing for 11 weeks following clinical transfer was problematic and contributed to delayed and deficient mental health care. The patient was never placed in 3CMS housing prior to his release from CDCR custody. In addition, there was no initial PC assessment and no IDTT meeting or treatment plan. No scheduled PC encounter occurred during 3CMS care. For unknown reasons, a planned follow-up psychiatric appointment did not occur. The patient's medication adherence declined and was not adequately addressed.

**Patient P**

This 28-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of unspecified mood disorder with depression and anxiety

and unspecified disruptive, impulse-control, and conduct disorder. He was prescribed citalopram and olanzapine and was partially adherent with the former and consistently adherent with the latter. Trazadone was prescribed as needed for insomnia, and he used this medication frequently until early January, 2025. Within CDCR, the patient previously received 3CMS, MHCB, EOP, and EOP Mod services. Medical conditions included chronic back pain, prediabetes, microcytosis, and lactose intolerance. He arrived at CSP/LAC in EOP care on October 6, 2023, clinically transitioned from EOP to 3CMS care on October 29, 2024, and physically transitioned to mainline 3CMS housing on December 3, 2024. On December 18, 2024, after being placed on MHCB status for a day, he was moved to RHU 3CMS housing, where he remained through the end of the review period.

Six days prior to the EOP IDTT meeting in which it was decided to move the patient to 3CMS care, the patient requested transfer to 3CMS care. IDTT documentation indicated that the patient was stable, free from signs of distress, displayed functioning appropriate for a lower level of care, and had met his EOP treatment goals. However, because no master treatment plan for EOP care was developed, measurable EOP treatment goals were not identified. After the patient was enrolled in 3CMS care, he accrued two RVRs for fighting while still in EOP housing. During the month he remained in EOP housing on 3CMS status, he received an initial psychiatric assessment and attended several EOP recreational therapy groups. The psychiatric assessment was timely but brief and did not indicate whether the encounter was confidential. A second initial psychiatric assessment was completed when the patient was placed in RHU 3CMS housing; the assessment was brief but confidential and adequate. An initial PC assessment was not completed until 55 days after the patient was made 3CMS and 20 days after the patient was placed in RHU 3CMS housing. The case formulation focused on negative behaviors rather than treatment needs and did not incorporate the patient's documented trauma history. The initial 3CMS IDTT meeting did not occur until 71 days after the patient was enrolled in 3CMS care, 36 days after the patient was moved to 3CMS housing, and 21 days after the patient was transferred to RHU 3CMS care. An alternate PC attended the meeting by telemental health. The patient advocated for a return to EOP care, while the treatment team determined to maintain the patient in 3CMS care but did not document the rationale for this decision. The treatment plan addressed only depression as a treatment target and inadequately addressed the patient's behaviors and possible psychotic symptoms.

On December 18, 2024, the patient reported suicidal ideation in the context of gang-related enemy concerns. He was placed on suicide watch and referred to MHCB care. The suicide risk evaluation found him at low risk for suicide, and he was moved to the RHU. A suicide risk evaluation the following day also found him at low risk and resulted in a rescission of the MHCB referral. Confusingly, the second evaluation also indicated that the patient posed an immediate risk to himself, suffered from severe mental illness, and was suitable for EOP care. The accompanying safety plan was inadequate. Five-day follow-ups occurred at cell front and were adequate except for failure to improve the safety plan. During December 2024 and January 2025, the patient repeatedly requested a return to EOP care. He reported suicidal ideation on three occasions, and in each instance was found to be at low risk. In mid-February 2025, a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder was added by the psychiatrist in response to the patient's ongoing reports of auditory and visual hallucinations. In late February 2025, the patient reported overdosing on three occasions and was sent to a community hospital on two of

these occasions. In both cases, suicide risk assessments upon his return to CSP/LAC found him at low risk. However, the patient was placed on suicide watch following the last episode and then required admission to MHCB care on March 3, 2025.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Evidence that the patient had met EOP treatment goals at the time he was placed in 3CMS care was scant, and there was no EOP treatment plan to confirm his treatment goals. The delay in physically transferring the patient from EOP housing to 3CMS housing for more than a month following clinical transfer was problematic and contributed to delayed and deficient mental health care. Psychiatric assessments and care were timely, but the remainder of the patient's 3CMS care was not. In 3CMS care, the patient experienced intensified stress and deterioration in his behavior and mental status. He advocated for a return to EOP care, required multiple suicide risk evaluations and two outside hospital trips, and was transferred to a crisis bed. The 3CMS care provided did not adequately address his treatment needs.

**Patient Q**

This 37-year-old male 3CMS patient's healthcare record was selected for review to assess the quality of mental health care across the transition between EOP and 3CMS care at CSP/LAC. The patient was provided with diagnoses of antisocial personality disorder and major depressive disorder, mild. He was prescribed lithium and mirtazapine but was nonadherent with both, and they were discontinued at the end of the period reviewed. Hydroxyzine was prescribed as needed for anxiety and the patient used it only once. One suicide attempt by hanging in 2013 was listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, EOP, and APP services. Medical conditions included gastroesophageal reflex disease, dyslipidemia, benign prostatic hyperplasia, chronic sinusitis, pityriasis simplex, history of positive tuberculosis screening, and history of helicobacter pylori infection. He arrived at CSP/LAC in EOP care on July 3, 2023 and was clinically transitioned from EOP to 3CMS care on October 31, 2024. He remained in EOP housing on mainline 3CMS care until transferred to another facility on December 23, 2024.

During the October 31, 2024 EOP IDTT meeting in which the treatment team determined to move the patient to 3CMS care, the team documented that the patient was declining to participate in more than half of the offered treatment. The patient attributed his poor attendance rate to frequent cancellations of groups; however, several caseload groups were offered and the patient declined all of them. In the IDTT meeting, he was discontinued from the SRMP. The clinical summary was thorough, but the case formulation was inadequate and there was no master treatment plan. It was therefore unclear whether the patient had achieved EOP treatment goals and why the patient was documented as having reached maximum benefit from EOP care despite his treatment disengagement. During the 53 days he was in 3CMS care, the patient received a timely initial psychiatric assessment. The encounter occurred at cell front because the patient refused a confidential setting, and the assessment was adequate. The patient did not receive an initial 3CMS

PC assessment, or initial 3CMS IDTT meeting. Aside from the single cell-front psychiatric assessment, the patient received no other mental health contacts while in 3CMS care.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

In EOP, the patient attended scant treatment, and individual encounters were almost always at cell front; these encounters provided insufficient clinical evidence to make an appropriate determination that a lower level of care was indicated. The patient's EOP treatment goals were not documented, and he was placed in a lower level of care despite meeting a criterion for consideration of a higher level of care. The delay in physically transferring the patient from EOP housing to 3CMS housing for 53 days following clinical transfer was problematic and contributed to delayed and deficient mental health care. Once in 3CMS care, he became nonadherent with medications. Neither his medication nonadherence in 3CMS nor his treatment disengagement in EOP were adequately addressed. He did not receive a 3CMS PC assessment, IDTT meeting, or meaningful treatment outside of one cell-front psychiatric assessment.

**Patient R**

This 34-year-old male EOP patient's healthcare record was reviewed to assess the quality of mental health care at CSP/LAC. The patient was provided with diagnoses of delusional disorder; amphetamine-type substance use disorder, moderate; and major neurocognitive disorder due to traumatic brain injury, without behavioral disturbance. The patient was court-ordered to take prescribed medications under PC 2602 due to the risk of harm to himself and others. Prescribed medications included quetiapine and paliperidone, and he was noted to be adherent to the medications. Additionally, olanzapine was prescribed for use on an as-needed basis if the patient were to refuse the paliperidone.

The patient began serving his first CDCR term on August 16, 2016, entering MHSDS on October 5, 2016, at the 3CMS level of care. The patient has since received treatment at all levels of care, including in both outpatient and inpatient settings. Healthcare records indicate the patient had a history of nine prior incidences of self-harm, including lacerations, head banging, and asphyxiation, all with no intent towards ending his life.

The patient transferred to CSP/LAC EOP on June 12, 2024. During the review period, routine PC contacts were not conducted in a timely manner per Program Guide requirements. For example, no PC contacts were documented in September 2024. The PC contacts that occurred were brief, conducted by an unlicensed psychologist, at cell front, and resembled wellness checks. PC documentation lacked essential treatment interventions, as well as the patient's response to treatment. PC contacts often occurred at cell front due to custody modified programming. The patient expressed frustration on October 1, 2024, about the limited access to individual therapeutic contacts with his PC. Although the patient was assigned to biweekly EOP caseload groups, he could not attend sessions on January 23, February 20, and February 28, 2025, due to reported critical staff shortages.

Routine psychiatric contacts were also not timely, per Program Guide requirement as the patient did not meet with a psychiatrist in September or October 2024. Additionally, the patient was seen by three psychiatrists during the review period, raising concerns about continuity of care. During the December 6, 2024 psychiatric contact, the patient denied any depression or anxiety. Still, he indicated that his primary stressor was being at the facility for approximately five to six months, during which he was unable engage in mental health treatment and start college due to modified programming. The patient submitted healthcare requests and was seen by psychiatry on February 4, 2025, to discuss his PC 2602 order and his feelings of sluggishness and weight gain. On February 19, 2025, the patient missed his scheduled psychiatric appointment; however, psychiatry met with him in a non-confidential environment, where the patient requested a decrease in Seroquel, and his medications were subsequently adjusted.

An unlicensed psychologist conducted an initial assessment on January 6, 2025 with minimal updates, relying heavily on historical data, and sections were carried forward, noting that sections were unable to be completed due to the patient's past traumatic brain injury (TBI). An IDTT meeting was convened seven months after the previous IDTT on January 23, 2025. While the patient’s assigned psychiatrist and patient were absent from the treatment team meeting, the patient’s assigned PC, an alternate psychiatrist, and a CCI attended. Aside from noting the patient’s upcoming PC 2602 hearing in March 2025 and adherence to psychiatric medications, the clinical summary was vague, and updated information regarding the patient’s progress along established treatment objectives since the last IDTT was lacking. Documentation did not provide meaningful updates regarding the patient’s progress or lack thereof. Additionally, diagnostic clarification was needed, given questions raised during the June 2024 IDTT meeting regarding the patient not meeting symptom criteria for delusional disorder. While general treatment plan goals were established to address the patient’s depression and paranoid ideation, there were no baseline measurements or details regarding psychiatric care as an intervention. Furthermore, the discharge criteria and rationale for retaining patients at the current level of care were left blank, resulting in unclear discharge criteria for the patients.

During the review period, the patient was not offered the requisite number of structured therapeutic activities per Program Guide requirements, and attended, on average, less than two hours each week.

**Findings**

The treatment provided to this patient at CSP/LASC was inadequate.

While at CSP/LAC, the patient’s access to care and treatment were not commensurate with his EOP level of care. Deficiencies were noted in timely IDTT meetings, PC contacts, routine psychiatric contacts, and the minimum number of structured therapeutic activities offered, indicating significant deviations from the Program Guide requirements. Furthermore, the treatment plan was incomplete, missing essential clinical updates, diagnostic rationale, justification for the current care level, and clear discharge criteria for transitioning to a lower level of care. While the plan aimed to address the patient’s paranoid ideation and depression, it lacked necessary baseline measures. Moreover, individual PC contacts were neither timely nor conducted in a confidential environment, raising serious concerns about the patient’s privacy and the quality

of mental health contacts. PC documentation failed to address the patient's progress along established treatment goals, nor did it reflect meaningful therapeutic contacts with interventions utilized and patient's response to therapeutic interventions. These deficiencies contributed to inadequate treatment planning and continuity of care.

**Patient S**

This 34-year-old male EOP patient's healthcare record was reviewed to assess the quality of mental health care at CSP/LAC. The patient was provided with diagnoses of trichotillomania, obsessive-compulsive disorder (OCD), generalized anxiety disorder, antisocial personality disorder, other (or unknown) substance-induced depressive disorder with moderate or severe use disorder, and opioid abuse. Prescribed medications included escitalopram, hydroxyzine, prazosin, propranolol. He was fully adherent to propranolol but partially adherent to the other medicines during the review period. The patient was also enrolled in MAT for substance use and was prescribed buprenorphine-naloxone.

The patient served his first CDCR term in the general population beginning on February 24, 2010, until he was paroled on October 11, 2016. The patient re-entered CDCR on April 8, 2019, and was transferred to CSP/LAC on June 26, 2019, at the EOP level of care, where he has since remained.

During the review period, the treatment team convened on August 28, 2024, and did not meet again until January 22, 2025, which was significantly delayed according to Program Guide requirements. Although both meetings included necessary staff members, the January meeting took place in absentia due to the patient's refusal and was held to discuss the patient's closed custody status following an increase in behavioral concerns. Overall, IDTT meetings highlighted the patient's symptomatology related to his diagnoses of OCD and trichotillomania but lacked documentation of symptoms that supported the patient's additional diagnoses. The patient's expressed goals included reducing his anxiety while increasing his social interactions; however, the treatment plan was vague, setting broad objectives to target the patient's anxiety and ritualistic behaviors without establishing specific, measurable goals or therapeutic interventions to address these objectives. The treatment plan noted that the patient experienced recent increases in altercations, hair pulling, and substance use. The patient's behavioral concerns were attributed to external stressors and a lack of programming, rather than mental health deterioration. Nonetheless, no changes were made to the treatment plan, neglecting necessary modifications to address the patient's worsening behaviors and substance abuse. The discharge plan, while noting that the patient was usually a positive programmer, also stated that the patient was struggling with coping with his mother's illness and the lack of mental health programming offered due to modified programming and did not include specific discharge criteria.

During the review period, routine PC contacts were inconsistent and conducted mostly cell front due to modified programming. In September 2024, the patient was seen only twice, once at cell front and once in an EOP caseload group, but did not meet again with his assigned PC until December 19, 2024, when he was again seen cell front due to modified mental health programming. The patient at the time was noted to be facing challenges associated with his mother being ill, issues with his cellmate, and an increase in substance use, all contributing to psychosocial

stress and negatively impacting the patient's mental health as demonstrated by his increase in hair pulling and stopped talking to his family as a result.

Although enrolled in EOP caseload groups, the patient attended only one session in September 2024 and either did not show up or the EOP groups were canceled due to modified programming. Despite treatment strategies aimed at identifying coping skills and emotional processing, the inconsistency in PC contacts and monitoring of the patient's treatment objectives with measurable goals significantly undermined these efforts and the ability to determine the treatment effectiveness.

Routine psychiatric contacts occurred timely within the Program Guide requirements; however, aside from September 9, 2024, all other psychiatric contacts occurred at cell front, after the patient did not show for scheduled appointments. The patient exhibited varying levels of compliance with medication over several contacts from September 6, 2024, to February 6, 2025, with notable issues such as the discontinuation of prazosin due to noncompliance and worsening trichotillomania reported by the patient's PC. Despite these challenges, the patient consistently denied side effects, wanted to continue medications at the same doses, and felt that the medicines were effective. Although psychiatric contacts appeared adequate, psychiatric progress note documentation was overly inclusive and included each psychiatric notes dating back to 2020, which complicated the readability of progress notes.

During the review period, the patient received RVRs on December 5th and December 6th for fighting; however, mental health was not deemed to be a nexus between mental health symptoms and RVR behaviors. In addition, the patient was not offered the minimum ten hours of structured therapeutic activities, as required by the Program Guide and attended, on average, less than four hours of structured treatment per week during the review period and was noted to work as a plumber.

**Findings**

The treatment provided to this patient at CSP/LAC was inadequate.

During the review period, the patient was not provided timely IDTT meetings and meaningful therapeutic contacts, nor was he offered the minimum required number of structured therapeutic activities per week, as mandated by the Program Guide. Instead, the patient was frequently seen at cell front due to modified programming. The significant delays and lack of mental health treatment obstructed the patient's access to care and continuity of that care. Additionally, the treatment plan was inadequate, lacking measurable goals or therapeutic interventions, no meaningful way to determine treatment plan effectiveness, and did not establish clear discharge criteria. Moreover, despite the patient's worsening behavioral symptoms during the review period, which were attributed to stressors and limited programming, the treatment approach was not modified or adapted to the patient's changing behavioral needs.

**Patient T**

This 65-year-old male patient's EOP healthcare record was reviewed to assess the quality of mental health care at the CSP/LAC. The patient was provided with a diagnosis of schizophrenia, and his symptoms included persecutory and somatic delusions, paranoid ideation, isolative behavior, and poor self-care. The patient had a PC 2602 order in place due to grave disability and the patient was prescribed and adherent to medications including long-acting injectable risperidone and hydroxyzine as needed for anxiety.

The patient's history included the patient being incompetent to stand trial and being psychiatrically hospitalized at Patton State Hospital for three years. Once competent, the patient was sentenced to his first CDCR prison term on June 8, 2011, to serve a sentence of life with the possibility of parole. The patient then entered MHSDS in 2012 at the EOP level of care and since received treatment at all levels of care, including both outpatient and inpatient services. The patient's last inpatient psychiatric admission occurred from August 29, 2023 to October 16, 2023, secondary to serious impairment due to mental illness. The patient was transferred to CSP/LAC at the EOP level of care following discharge from the inpatient setting.

During the review period, routine PC contacts were held at cell front, due to critical staff shortages. The PC documentation also reflected that assessments were limited due to the nonconfidential nature of the contacts. Consequently, PC individual therapeutic contacts resembled brief check-ins with the patient, who often denied experiencing any mental health concerns, despite observations to the contrary. By November 1, 2024, the patient, although denying any mental health concerns, exhibited delusional thought processes and was noted to demonstrate minimal reality testing. Although the PC checked with the patient regularly and noted an increase in psychotic symptoms during the review period, overall, the PC's progress notes lacked documentation of therapeutic interventions and/or documentation of the patient's response to interventions. No IDTT meeting was scheduled to address the patient's increased symptoms or to adapt the treatment plan to patient's needs. By January 10, 2025, the patient's delusions were noted to worsen as the patient appeared to be in more distress. Despite this, the plan remained to monitor the patient for any decompensation that might require a higher level of care without any changes to his treatment.

Routine psychiatric contacts did not occur in a timely manner, occurring only twice, once by an alternate psychiatrist on December 19, 2024, and again by the patient's assigned psychiatrist on February 14, 2025. All psychiatric interactions occurred at cell front, following the patient's refusal. Although noted to be medication adherent, the patient was described as dismissive, with paranoid delusions, and expressing dislike for his PC clinician. On December 12, 2024, a psychiatrist attempted to meet with the patient for an assessment to renew the patient's PC 2602. The patient refused the appointment and justification for the PC 2602 renewal was based on the patient's refusal of two evaluations, low treatment engagement, the need for a long-acting injectable psychiatric medications due to non-adherence with oral medications, and consistent documentation of delusional thinking and lack of insight by his psychiatrist and PC.

During the review period, the IDTT did not meet in a timely manner, as required per Program Guide requirements. Instead, the team met for the first time in over eight months on January 30, 2025, for an IDTT update meeting and to determine the patient's single-cell status. The IDTT meeting was held in absentia due to the patient's refusal and without the assigned psychiatrist

present. The clinical summary noted that the patient's medication had recently been lowered without further details. The patient was noted to have met higher level of care consideration for treatment refusal for seven out of the past 13 weeks, experiencing persistent psychotic symptoms affecting adaptive and social functioning and treatment participation. The team determined that the patient did not meet higher level of care criteria, as he managed his ADLs, maintained a clean cell, visited the canteen, had no self-harm history, no RVRs in the past year, and was adherent to his PC 2602 medications. Although the IDTT concluded the patient did not meet higher level of care criteria at the time, the treatment plan modifications to enhance participation were inadequate, only suggesting that PC continue to encourage group treatment participation. The treatment plan instead aimed to address the patient's delusional thinking, focusing on improving their ability to reality test; however, it lacked baseline measures to assess effectiveness and lacked effective interventions. Critical psychiatric interventions, such as medication assessments and adjustments, were omitted.

Subsequently, on February 12, 2025, an urgent referral was made due to the patient's worsening mental status, including increased paranoia, refusal to eat stemming from delusional beliefs, declining hygiene, and escalating agitation with PC 2602 administration. On February 13, 2025, the treatment team reconvened, and the patient was referred to ICF for serious impairment due to mental illness as a result of unremitting psychosis that was interfering with his ability to function and care for himself at the EOP level of care. Although this referral was appropriate, it followed a notable and lengthy clinical decline and required a referral to mental health by custody rather than recognition by his treatment team.

Although the patient was offered group treatment that included stress management, recreational therapy, and a life skills group, the patient did not attend groups. The patient was noted to have attended a 60-minute life skills group on September 6, 2024; however, documentation revealed that the patient did not attend a group, but instead received an in-cell packet during wellness rounding. During the review period, the patient averaged less than two hours of structured therapeutic activities per week.

**Findings**

The treatment provided to this patient was inadequate.

During the review period, the patient did not have access to treatment appropriate to the EOP level of care. Rather the treatment team failed to meet Program Guide requirements for timely PC and psychiatric contacts, and IDTT meetings were delayed. When meetings occurred, they inadequately addressed the patient's treatment refusal and declining condition, lacking clear goals and timely interventions. Mental health contacts were minimal and non-therapeutic due to the patient's refusal to engage and were limited to brief, non-confidential check-ins. Documentation showed minimal therapeutic interaction, with the patient often declining to engage in treatment. Ultimately, the lack of treatment led to decompensation and the need for inpatient placement.

**Patient U**

The 47-year-old male patient's EOP healthcare record was reviewed to assess the quality of mental health care at the LAC. The patient was provided with diagnoses of major depressive disorder, recurrent episode moderate and adult antisocial behavior. The patient was generally adherent to his prescribed fluoxetine.

The patient served multiple CDCR prison terms, last re-entering on July 2, 2010, to serve a 25-year sentence. The patient has since received treatment at 3CMS and EOP levels of care and transferred to CSP/LAC on December 11, 2021.

The patient's IDTT meeting did not convene every 90 days per Program Guide requirements and in fact, the IDTT did not convene at all during the review period, with the last meeting in May 2024.

Additionally, routine PC contacts did not align with EOP level of care requirements. The patient was only offered six EOP caseload groups during the monitoring period, facilitated by three different PCs, with the patient occasionally attending. During the review period, the patient's lack of attendance was documented as either the patient refusing the group, or the groups being canceled due to custody modification programming. Although the PC requested collateral information from custody, there was no follow-up with the patient at cell front when the patient refused EOP caseload groups. Furthermore, individual PC contacts did not occur in a timely manner. The patient was not seen for individual contacts from September 2024 through January 28, 2025, with documentation often noting critical staffing shortages. Notably, on January 28, 2025, the patient stopped a clinician to inquire about his assigned PC. The patient was informed that he was assigned a telemental health clinician; however, upon further consultation with the mental health supervisor, it was discovered that the patient had been incorrectly classified as being at the 3CMS level of care rather than in EOP level of care. The patient was then re-assigned to an EOP PC but was not seen again until February 18, 2025, at cell front. Overall, PC contacts were not timely, and limited due to the occurrence of cell-front, with minimal meaningful treatment interventions being offered to the patient commensurate with his level of care.

Routine psychiatric contacts took place once in September 2024 in a confidential setting, during which the patient denied experiencing any mental health symptoms but expressed frustration over the lack of programming at LAC. The patient was not seen in November 2024, and all other psychiatric contacts took place at cell front and were noted to be limited due to the non-confidential setting. The reason for cell front contact was not always provided. It was noted that the patient either denied symptoms or did not present with any symptoms based on a limited exam, and the patient's psychiatric medications were continued.

In addition to the above contacts, the patient received two RVRs during the review period and was assessed by mental health on January 14, 2025, after receiving an RVR for a deadly weapon and again on February 4, 2025 for refusing a cellmate, neither of which was determined to be directly related to his mental health.

During the review period, the patient was offered EOP caseload groups, stress management, recreational therapy, and leisure groups. He was not provided with the requisite ten hours of structured therapeutic activities per week and attended on average, less than four hours per week during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The patient's access to care was significantly compromised during the review period, as he was offered substantially less treatment than the minimum required for the EOP level of care. In fact, the patient was inadvertently classified to an inappropriate level of care and did not receive services in accordance with the Program Guide requirements. Moreover, the treatment provided was frequently confined to brief interactions at cell front, lacking confidentiality. Concerns regarding continuity of care were also noted, as the patient was assigned to EOP caseload groups facilitated by three different clinicians. Overall, the treatment delivered was inadequate, characterized by limited and brief non-confidential interactions, and did not meet the EOP standards, ultimately negatively impacting the patient's mental health treatment.

**Patient V**

This 38-year-old male patient's EOP healthcare record was reviewed to assess the quality of mental health care at the CSP/LAC. The patient was provided with diagnoses of schizophrenia and antisocial personality disorder. During the review period, the patient was not prescribed psychotropic medications.

The patient had served multiple CDCR prison terms and last entered CDCR on June 28, 2013, to serve a term of life with the possibility of parole. Healthcare records included one incident of patient engaging in self-injurious behavior by head banging in 2014, noting that the patient was transferred to the EOP level of care on August 12, 2014. The patient was also noted to have one MHCB admission from March 10, 2017 until March 22, 2017, due to grave disability as evidenced by dissociation, irritability, irrational thought processes, and functional impairments in his ability to care for himself effectively. The patient has been at the EOP level of care since 2014 and transferred to CSP/LAC EOP on July 20, 2022.

An IDTT meeting was held on September 25, 2024 without the patient present, as he refused to attend. The patient's assigned PC and psychiatrist were also absent, although a CCI, alternate PC, and an alternate psychiatrist were present. The patient was flagged on the sustainable process report for treatment refusals, which the team attributed to the patient's psychotic symptoms that often prevented him from leaving his cell. In addition, it was noted that the patient was not prescribed psychiatric medications, required prompting to complete activities of daily living (ADLs), but became very agitated when prompted. Despite this, the decision was made that the patient did not require a higher level of care based on the team's assessment that the patient was functioning at his baseline, as evidenced by the patient's attendance at meals and the medication line. The treatment team did not consider placing the patient on a modified EOP treatment plan, nor did they enhance the master treatment plan to effectively address the patient's treatment non-

adherence. Rather the treatment plan indicated that the patient was to continue to engage in trash removal from his cell, engage with his PC at cell front, attend dayroom group, advocate for himself, and maintain stability off medications. Interventions were for the PC to continue to prompt the patient for his ADLs and provide psychoeducation at cell front while encouraging an increase of the patient's participation.

Furthermore, the master treatment plan lacked clarity and responsiveness to the patient's needs. The clinical summary section did not provide a clear update on the patient's progress or identify current barriers to treatment engagement since the prior IDTT meeting. In addition, the case formulation was duplicated verbatim from earlier IDTTs, with outdated content that had been carried forward since 2022, lacking the name of the author and date of the information. Furthermore, the treatment plan contained targets for treatment without information regarding patient's progress and/or whether treatment goals were achieved. For example, the treatment plan continued to focus solely on the patient's poor ADLs as the primary problem area, without documenting any measurable progress or changes since its initiation of the treatment target in March 2024. The plan failed to incorporate the patient's ongoing psychotic symptoms, including agitation when prompted for ADLs, and chronic treatment refusal as formal treatment targets, despite clinical significance. Overall treatment approach remained the same and did not evolve across treatment team meetings to address patient treatment needs which were not responding to previous interventions.

While the patient was not prescribed medications during the review period, psychiatric contacts were offered monthly except for November 2024. All contacts were conducted at cell-front due to the patient either refusing confidential contacts or modified programming. Similarly, PC clinical contacts were infrequent and did not occur timely per Program Guide requirements. Rather, the contacts were limited to mostly brief check-ins with minimum documentation of meaningful contacts, therapeutic interventions utilized, and patient's progress toward measurable treatment goals.

Additional programming gaps further exacerbated the situation, as several scheduled EOP groups were canceled due to modified programming as a result of critical staffing shortages. In addition, if the patient were to miss groups, there was no alternative interventions offered such as follow-up contacts at cell front. The patient also was not offered the required structured therapeutic activities during the review period and attended fewer than one hour of activities a week.

Additionally, during the monitoring period, the patient was also assessed for three RVRs on September 11, 2024, for refusing to accept assigned housing/delaying a peace officer; November 28, 2024, for resisting staff; and January 25, 2025, for delaying a peace officer in the performance of duties.

**Findings**

The treatment provided to this patient was inadequate.

The patient did not receive mental health treatment commensurate with the EOP level of care, including a lack of timely IDTT meetings and infrequent clinical contacts. The treatment plan

remained static and failed to adapt to the patient's chronic treatment refusals, persistent psychotic symptoms, agitation during ADLs, or escalating disciplinary issues evidenced by RVRs. These gaps in care, exacerbated by staffing shortages that limited structured treatment offerings, resulted in insufficient mental health treatment that did not meet the patient's needs, despite reports of the patient functioning at baseline.

**Patient W**

This 80-year-old male patient's EOP healthcare record was reviewed to assess the quality of mental health care at CSP/LAC. The patient was provided with diagnoses of dementia; alcohol abuse disorder, moderate; and anxiety due to another medical condition. Historically, the patient struggled with alcoholism, which was noted to be contributing to his memory impairments and the onset of Korsakoff's Syndrome. Prescribed medications included escitalopram to which he was adherent. The patient was also deemed to meet eligibility for a DD1 designation and noted to have a potential diagnosis of prostate cancer.

The patient first entered the CDCR on July 27, 1965, and the MHSDS on February 18, 2015. He has since received treatment at the 3CMS and EOP levels of care. The patient transferred to CSP/LAC on December 12, 2013, and was first placed in the EOP level of care in 2020 due to noticeable cognitive and memory deficits. The patient had no history of self-injurious behaviors or suicide attempts.

During the review period, IDTT meetings occurred on October 8, 2024, and again on January 28, 2025, which exceeded Program Guide timeframes. During the October 2024 IDTT meeting, all treatment team participants were present, except for the patient's assigned psychiatrist with an alternate psychiatrist attending instead. The clinical summary of the treatment plan acknowledged that the patient had a history of emotional regulation challenges and misinterpretation of social interactions, linking these issues to his ongoing struggles with alcoholism and memory impairments from Korsakoff's Syndrome. The treatment plan objectives targeted the development of the patient's coping mechanisms to manage dementia-related distress; however, the plan lacked measurable goals to address the patient's anxiety, as well as specific discharge criteria and rationale for retaining the patient at the current level of care.

Similarly, during the January 2025 IDTT meeting, all providers and the patient attended, and the team noted the patient's regular engagement in mental health programming. While he exhibited memory difficulties and confabulation related to his dementia, he was also noted to remain easily redirectable. The treatment team also noted that the patient was experiencing significant anxiety/mood dysregulation, which the team linked to a recent potential prostate cancer diagnosis. In addition, the patient reportedly became distressed when he was notified that there was a potential custody reduction to Level III. In response, the team determined that maintaining his current EOP level of care was clinically warranted due to his dementia and the destabilizing effect of change, assuring him they would revisit the placement later. Despite this justification, the treatment plan had a significant gap. While its objectives targeted coping skills for general, dementia-related distress, the plan was not updated with measurable goals to address the patient's acute anxiety and mood dysregulation stemming from his potential cancer diagnosis. Furthermore, the documentation lacked specific discharge criteria for the patient.

Routine PC contacts occurred only twice during the review period with an unlicensed psychologist. Although the patient attended EOP caseload groups, he only participated four times in these groups throughout the six-month review period. The patient also underwent a Montreal Cognitive Assessment (MoCA) evaluation on February 6, 2025.

Routine psychiatric contacts were untimely per Program Guide requirements. The patient was not seen in September 2024, but between October 2024 and February 2025, the patient had refused appointments and there was a subsequent session that was terminated after the patient became agitated and accused the psychiatrist of conspiracy. Following a period of relative stability after a tele-psychiatry appointment in December 2024, the patient missed two more appointments in January and February 2025, once stating he had forgotten. During his first in-person psychiatric visit on February 27, 2025, the patient was noted to display confusion about his medications and became highly agitated when the psychiatrist could not prescribe Donepezil, a dementia medication prescribed by the patient's medical care physician, leading to the session ending early.

Although the patient was scheduled for NLTGs related to alcohol use, the patient did not attend. He was, however, reportedly working as an ADA worker. Overall, the patient was offered less than the 10-hour minimum required for structured therapeutic activities and attended, on average, approximately five hours of structured therapeutic activities per week during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The patient was not seen timely during the review period, per Program Guide requirements. In addition, mental health contacts were inconsistent and often conducted in non-confidential settings and/or disrupted due to custody modified programming. Clinically, the treatment plan was inadequate, lacking measurable goals to address the patient's documented anxiety and irritability and failing to incorporate strategies for managing his distress related to dementia, memory impairment, and a potential cancer diagnosis. Compounding these issues, the patient received insufficient therapeutic programming, falling well below the required minimum hours.

**Patient X**

This 31-year-old male patient's EOP healthcare record was reviewed to assess the quality of care at the CSP/LAC. The patient was provided with diagnoses of major depressive disorder, single episode, moderate; antisocial personality disorder; borderline personality disorder; and cannabis use disorder, moderate. Prescribed medication included olanzapine and oxcarbazepine to which the patient was noted to be only partially adherent. During the review period the patient also participated in medicated assisted treatment (MAT) and was enrolled in cognitive behavioral substance use program facilitated by licensed clinical social worker.

The patient has served multiple CDCR prison terms and re-entered CDCR on July 6, 2018. He received mental health treatment at the 3CMS and EOP levels of care and had a history of a suicide

attempt on February 14, 2021, via hanging, which resulted in a referral to MHCB. The patient transferred to CSP/LAC EOP on March 16, 2023.

Although the IDTT was convened on May 13, 2024, the treatment team did not meet again until eight months later, significantly delayed per Program Guide requirements. When the team convened in November 2024, IDTT meeting attendees included the patient, the assigned psychiatrist, an alternate PC, and CCI. The treatment plan included the patient's diagnoses and provided an update on the patient's medication non-adherence, desire to discontinue olanzapine, and the fact that the patient was working and attending college courses. It also noted that the patient had reportedly remained sober for two months. The treatment plan omitted the patient's symptomatology. Additionally, despite the patient's depression diagnosis, reports of patient's depressive symptoms documented during the May 2024 IDTT meeting, and a mental health referral in September 2024 following a family loss with depressive symptoms noted, the patient's depression was not a focus in the treatment plan nor was the patient's lack of participation in treatment addressed. The case formulation included documentation from a previous clinician noting the patient's struggle with managing emotions and impulsivity, which affected his overall functioning; however, the treatment plan did not focus the patient's emotional dysregulation or impulsivity. Instead, it targeted anxiety and substance use and included short-term goals but lacked long-term ones. The treatment plan failed to justify the patient's retention at the EOP level of care and lacked specific discharge criteria for the patient. It is also worth noting that the treatment team did not reconvene for the quarterly IDTT in February 2025.

Routine psychiatric contacts did not occur timely, and the psychiatrist did not meet with the patient in September or October 2024. In fact, the psychiatrist did not meet with the patient until November 4, 2024. At that time, it was noted that the patient had stopped taking the prescribed olanzapine two months prior due to experiencing headaches but was using his prescribed Vistaril for sleep as needed. The patient expressed a desire to consolidate his medication to a single noon dose of Trileptal, acknowledging the need for some medication despite attempts to achieve a clean slate since becoming sober. On December 4, 2024, the patient was seen cell front due to being non-compliant with Trileptal and requested its discontinuation. Despite this, the patient was not seen again until February 12, 2025, after being off the medication for two months. During this appointment, the patient expressed concerns about racing thoughts and requested to restart the medication, indicating that he was attending groups. On February 27, 2025, during a follow-up appointment in a confidential setting, the patient again reported not taking Trileptal due to his work as a barber and requested to change his medication schedule to evenings.

Routine PC contacts did not occur as required during the review period. The only time the assigned PC saw the patient was for a follow-up SRE on September 10, 2024, and during an urgent referral/assessment on September 24, 2024, after the patient reported experiencing unresolved grief from the loss of a family member. During the September 24, 2024, confidential interview, the patient shared feelings of grief and reported feeling depressed, including low energy, loss, emptiness, sadness, guilt, and crying. The clinician and the patient discussed various coping strategies such as breathwork, writing, listening to music, positive self-talk, exercise, and mindfulness techniques. Following the interview, the staff concluded that the patient was stable, and the plan was for the patient to continue with EOP caseload group and be monitored monthly with psychiatry. Nevertheless, the patient typically did not show up for the EOP caseload group,

only attending twice, once in January 2025 and partially on February 4, 2025. Yet follow-up regarding the patient's non-attendance in the EOP group did not occur.

In addition, the patient was offered an average of approximately nine hours of structured therapeutic activities per week but attended on average approximately five hours a week. The patient was also noted to be attending Cognitive Behavioral Therapy (CBT) for substance use group that was held bi-weekly and completed this on November 18, 2024, while also working as a barber.

**Findings**

The treatment provided to this patient was inadequate.

Although the patient's treatment plan focused on anxiety and substance use, it failed to address the patient's depressive symptoms/grief related to stressors in his life, emotional dysregulation, impulsivity, and treatment nonadherence. The patient demonstrated poor medication adherence, frequently discontinuing and restarting prescriptions without adequate clinical follow-up. The team provided irregular and delayed clinical contacts and held interdisciplinary meetings outside of recommended timelines, which prevented sufficient monitoring and effective treatment planning.

**Patient Y**

This 35-year-old male patient's EOP healthcare record was reviewed to assess the quality of mental health care at CSP/LAC. The patient was provided with diagnoses of antisocial personality disorder, amphetamine-type substance use disorder, severe intermittent explosive disorder, PTSD, cannabis use disorder, and severe attention-deficit/hyperactivity disorder, with predominantly hyperactive/impulsive presentations. Prescribed medications included atomoxetine, escitalopram, and hydroxyzine, as needed. The patient was not adherent to his psychiatric medications during the review period.

The patient served multiple CDCR prison terms beginning in 2009 and re-entered CDCR on December 8, 2017, to serve a 41-year minimum sentence. The patient first entered MHSDS at the 3CMS level of care in August 2022 and subsequently EOP on June 21, 2023, after experiencing depression with no improvements from medication and intermittent suicidal ideation. The patient had since been retained in EOP due to ongoing symptoms of depression, anxiety, anger, and substance abuse. On April 4, 2024, the patient transferred to the CSP/LAC's EOP. He was also noted to be in the substance use medication-assisted substance use program and was prescribed buprenorphine-naloxone.

The treatment team convened on October 14, 2024, nearly six months after the last treatment team meeting, and did not convene again during the review period. All required participants except the patient were present at the IDTT meeting. At the time, the patient was noted to be adherent with psychotropic medications, but inconsistent with MAT and medical medications. The patient participation was noted to be flagged on the sustainable process report for refusing treatment, which was attributed to his depressive symptoms and mistrust of others. Adequate justification

for maintaining him at the current level of care was provided, along with interventions to be utilized. While the treatment plan specifically targeted the patient's depression and substance abuse with some measurable goals identified, and focused on the patient's treatment participation, there were notable omissions. Specifically, baseline measures and specific discharge criteria for the patient to move to a lower level of care were omitted. Additionally, the treatment team failed to convene for the quarterly IDTT meeting in January 2025.

Routine PC contacts did not occur weekly per Program Guide requirements. Although EOP caseload groups were scheduled approximately once a month, the patient attended EOP group but was not seen for individual PC contacts during the review period. Although the patient did not participate in any meaningful PC contacts, the PC did document consulting with custody on November 14, 2024, with no concerns noted.

Similarly, routine psychiatric contacts did not occur as required by the Program Guide. Instead, the patient had only met with the assigned psychiatrist once, on September 14, 2024, for a confidential psychiatric session during which he expressed symptoms of depression. Documentation indicated that the patient recently lost his mother due to a drunk driver, had other stressors, was non-adherent to prescribed medications over the previous month, and was demonstrating social withdrawal. The patient agreed to an increased dosage of escitalopram to address his depressive symptoms and agreed to restart his other medications. Despite this medication adjustment, the patient was not seen again until December 8, 2024, due to missing the scheduled psychiatric contact on October 17, 2024, and because of custody-modified programming. The psychiatrists observed that the patient's adherence to the medication regimen fluctuated but noted it to be poor by December 2024. In addition, routine psychiatric contacts on January 7, 2025, and February 5, 2025, occurred at cell front, in a non-confidential setting after the patient did not show up for his scheduled appointment. During the January 2025 contact, the patient reported that he was not doing well due to family issues. He also indicated that he was experiencing sleep changes, isolating, and having auditory hallucinations, which were reportedly manageable. The patient was again noted to be nonadherent with his psychiatric medications, because he reportedly did not feel like being around people so he would not leave to get his medications. The patient reported he would start taking his medications again. By February 5, 2025, the patient was noted to only show minimal improvement in medication adherence, so patient's Lexapro was decreased, given the reported risk of side effects when taking titrated sporadic doses.

On October 9, 2024, the patient received an RVR for the destruction of state property valued at less than $400. Subsequently, on December 13, 2024, the patient received another RVR for possession of a controlled substance and tested positive for methamphetamine, morphine, and codeine which was assessed on January 3, 2025, by mental health. Lastly, the patient received an additional assessment for another RVR received on January 23, 2025, regarding the possession of a deadly weapon.

During the review period, the patient was offered less than the required ten hours of structured therapeutic activities per week, averaging approximately five hours per week during the review period. The patient generally attended less than one hour, on average, of structured activities per week during the reporting period. Despite the patient's reported symptoms, an increase in RVRs,

medication non-adherence, and the lack of treatment participation by the patient, the treatment team did not convene for an IDTT meeting, consider placing the patient at a higher level of care or on EOP modified programming, nor provide the Program Guide required treatment to effectively monitor and provide treatment interventions for the patient.

**Findings**

The treatment provided to this patient at CSP/LAC was inadequate.

Routine primary care and psychiatric contacts, IDTT meetings, and structured therapeutic activities significantly deviated from Program Guide requirements. Although the treatment plan targeted the patient's depression and substance abuse with some measurable goals, it lacked baseline measures and specific discharge criteria for transitioning to a lower level of care. Furthermore, the patient was primarily seen cell-front, with contacts resembling wellness check-ins rather than contacts with clinical therapeutic interventions. Moreover, custody-modified programming further limited the patient's access to treatment and overall care.

**Patient Z**

This 36-year-old male patient's EOP healthcare record was reviewed to assess the quality of mental health care at the LAC. The patient was provided with diagnoses of other specified schizophrenia spectrum and other psychotic disorder and antisocial personality disorder. Healthcare records also indicated the patient carried a diagnosis of other (or unknown) substance use disorder, severe, and was noted to have a history of opioid abuse. Prescribed medications included olanzapine, fluoxetine, and chlorpromazine. The patient was partially adherent to his prescribed medication. The patient was enrolled in a substance use program and was prescribed buprenorphine-naloxone. Medically, the patient had a history of gout and hyperlipidemia and required wound care dressing to be changed during the review period.

The patient served multiple CDCR prison terms and re-entered CDCR on July 14, 2016, and has since received mental health treatment at the 3CMS, EOP, and MHCB levels of care. The patient transferred from the MHCB level of care to the CSP/LAC EOP level of care on March 16, 2022.

During the review period, one treatment team meeting was convened on September 5, 2024 and was attended by all required participants. The patient was noted to meet higher care criteria due to three weeks of treatment refusal, but this was considered a potential error, as the patient had been observed attending some groups. The patient was also noted to have received three RVRs, two for fighting and one for refusing school, but was reported to be now attending courses. He was also noted to have relapsed in his substance use in the past 90 days yet was seeking support through MAT, justifying patient's current level of care.

During the treatment team meeting the patient reported hearing voices consistently from the time he was a child. He also reported that his medication was only effective for a few hours and then wore off. He reported an increase in symptoms and medications were discussed. The clinical summary was comprehensive and useful. Although the patient's verbalized goals included achieving sobriety, reducing depressive symptoms, and developing healthy coping skills, the

treatment plan lacked specific treatment targets with measurable goals for these issues, focusing solely on substance use without establishing baselines or measurable goals to monitor treatment effectiveness. Moreover, therapeutic interventions were limited to psychoeducation. Although the patient was noted to be enrolled in educational classes, interventions that included specific groups or psychiatric interventions were also lacking as well as specific discharge criteria.

The patient was enrolled in EOP caseload groups offered on average once a month, with additional groups not occurring due to custody-modified programming. Despite being offered these groups, the patient did not show up to any of the PC's EOP caseload groups and follow-up cell front did not occur. Additionally, individual PC contacts did not occur during the review period. The PC would instead typically follow up with custody when the patient was to miss a group, with no significant issues or bizarre behaviors reported.

Routine psychiatric contacts only occurred twice during the review period, once on November 19, 2024, and again on February 14, 2025, which was not in keeping with Program Guide requirements. One of the contacts were held in a confidential setting, while the other was a cell front after the patient did not show up for his scheduled contact. The patient was noted to be attending groups and denied having any issues. The patient's medication was continued; however, the patient was not monitored per Program Guide requirements.

During the review period, the patient received an RVR for fighting on October 1, 2024. The patient was enrolled in NLTGs that were offered multiple times a week related to substance use, smoking cessation, management, mental health, wellness, life skills, and expressive therapies; however, the patient was offered on average a little over seven hours of structured therapeutic activities per week, and attended, on average, less than three hours per week.

**Findings**

The treatment provided to this patient at CSP/LAC was inadequate.

The patient did not have access to appropriate treatment for his level of care at CSP/LAC. The treatment plan was inadequate, as it did not establish treatment targets tailored to the patient's individualized needs. Additionally, there were no baseline measures or measurable goals documented to monitor the patient's progress effectively. Routine PC and psychiatric contacts, as well as IDTT meetings and structured therapeutic activities, deviated from the Program Guide's treatment requirements. Despite increases in RVRs, potential treatment refusal, and recent substance use, individual PC or psychiatric contacts did not occur according to requirements. Instead, these contacts often took place at the cell front, resembling brief check-ins without documented therapeutic interventions or the patient's response to treatment interventions.

**Patient AA**

The 34-year-old male patient's EOP healthcare record was reviewed to assess the quality of mental health care at CSP/LAC. The patient was provided with diagnoses of schizophrenia and opioid abuse. Prescribed medications included olanzapine with fair adherence. He was also a participant in the substance use program and prescribed buprenorphine-naloxone.

The patient entered CDCR on December 12, 2012, and received treatment in the EOP, MHCB, ICF, and acute levels of care. The patient was last hospitalized at Atascadero State Hospital from February 3, 2023 to May 10, 2023, after which the patient was transferred to CSP/LAC on May 10, 2023.

A treatment team meeting held in absentia on September 23, 2024, due to custody modified programming. Although the patient's assigned PC and psychiatrist attended, the CCI was not present. The clinical summary provided minimum updates that indicated that the patient was noted to be at baseline functioning, compliant with treatment and medication, and attending group sessions regularly. However, the clinical summary was contradictory, noting the patient's continued psychotic symptoms while also stating he demonstrated no overt symptoms or functional impairments. Overall, the treatment plan was vague, lacking specific targets, measurable goals, therapeutic interventions, or clear discharge criteria, with the only stated objective being to work on coping skills. Additionally, the only intervention included was for the PC to assess the patient for decompensation and distress at the EOP LOC with a goal of transferring to the 3CMS level of care. Most significantly, a suspected overdose on September 4, 2024, which required Narcan and hospitalization, was not documented, and substance use was also not included as a treatment target. Moreover, following this meeting, the treatment team did not convene again during the review period.

During the review period, an unlicensed psychologist conducted routine PC contacts but failed to meet the Program Guide requirements. In addition, aside from the two EOP caseload groups that patient attended, the patient was largely seen at cell-front for non-confidential contacts, which resembled brief check-ins rather than meaningful contacts focused on specific treatment targets. Reasons for non-confidential contacts included the fact that confidential space was unavailable. Other PC documentation did not clearly state whether the patient was seen in a confidential setting, but indicated that the patient's cell was clean, which suggested the patient was seen at cell front. All the PC contact notes in November and December were identical. Additionally, most of the documentation was limited to a mental status exam with the only intervention noted as the PC to encourage the patient to engage in self-care and for the patient to notify staff if his symptoms worsened.

Routine psychiatric contacts were not timely per the Program Guide, occurring only four times during the review period. On September 4, 2024, routine psychiatric contacts indicated that the patient was seen briefly, at cell front, due to missing a scheduled appointment and the patient reported not being called for the appointment. Notably, he had been found unconscious the prior day and received four doses of Narcan before being sent to the hospital. Upon assessment, the patient displayed a disorganized thought process and agreed to switch medications from aripiprazole to olanzapine. By November 25, 2024, although the patient still exhibited a disorganized thought process, interactions were noted to be more relaxed, and the patient was noted to have good medication adherence with no reported side effects. By February 24, 2025, the patient was described as fairly compliant with his psychiatric medications.

On average, the patient was offered 9.5 hours of structured therapeutic activities, most of which he attended. He was enrolled in groups such as EOP caseload groups, process, leisure activities,

recreational, and social skills group. In addition, on February 25, 2025, the patient was scheduled for an ISUDT and would be offered six cognitive behavioral treatment sessions per policy.

**Findings**

The treatment provided to this patient at CSP/LAC was inadequate.

Treatment was not provided according to Program Guide requirements. Additionally, treatment planning was deficient in identifying treatment targets with measurable goals to monitor treatment intervention effectiveness. Rather, the patient was primarily seen at cell and contacts resembled wellness check-ins rather than documenting treatment intervention and patient responses. In addition, custody-modified programming appeared to have significantly impacted the patient's access to treatment and overall care.

**Patient BB**

This 64-year-old transgender female MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/LAC. She was provided with a diagnosis of schizoaffective disorder, bipolar type. She was not prescribed any psychotropic medication. Two episodes of self-injurious behavior were listed in the health record at the time of MHCB admission, and additional episodes were noted in the initial PC assessment. Medical conditions included chronic hepatitis C with advanced cirrhosis, lumbar spondylosis with chronic back pain, difficulty chewing, cocaine use disorder in remission, and a history of latent tuberculosis and traumatic brain injury with loss of consciousness. Within CDCR, the patient had previously received all levels of mental health care. Between 2015 and early 2023, she received involuntary treatment under PC 2602 orders for grave disability and danger to self and others. At CSP/LAC, she was admitted to MHCB care from October 19, 2024 through October 28, 2024 for significant impairment due to mental illness and danger to others, after becoming disruptive, paranoid, delusional, responding to internal stimuli, and using feces to write messages on the cell wall. She was not receiving gender affirming hormone therapy but advocated for gender reassignment surgery during MHCB care.

The initial psychiatric assessment was timely but brief and did not include current diagnostic impressions or a brief suicide risk evaluation; the patient was not found to exhibit signs or symptoms of psychosis. The initial PC assessment was timely and largely adequate, although the case formulation did not give adequate attention to the disorganized and psychotic symptoms documented in the mental status exam, or to the stress the patient reported arising from negative attention she received because of her transgender identity. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. Due to multiple MHCB admissions/referrals in the prior six months, the patient was found to meet criteria for consideration of a higher level of care. The rationale for retaining her in MHCB care was adequately documented. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan was inadequate. It carried forward from plans developed months earlier, failed to identify psychotic symptoms as treatment targets, and included short-term goals with timeframes that were too long for MHCB care. Interventions listed in the plan focused on DBT and group therapy.

The assigned PC or one of three psychiatrists followed the patient daily. Neither discipline documented whether these encounters were confidential except on one occasion. PC encounters were brief and did not reflect the provision of interventions required by the treatment plan. The patient declined to engage with psychiatrists, and most of these encounters were limited in scope and duration. The sole encounter documented as confidential was accompanied by diagnoses of adjustment disorder and antisocial and borderline traits. There was no documentation of diagnostic reconciliation efforts. Provision of in-cell recreational therapy activities was adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge her to EOP care. The rationale for discharge, other than the conclusion that the patient had reached baseline functioning, was not documented. Signs and symptoms of sleeplessness, paranoia, bizarre thinking, and impaired functioning continued to be noted. The case formulation, patient strengths, verbalized treatment goals, and treatment plan were not updated. The discharge suicide risk evaluation did not adequately address the patient's safety concerns as a transgender woman; it found the patient at low risk. The accompanying safety plan was collaborative and included some useful interventions, but it did not adequately address the patient's safety concerns as a transgender woman and was unlikely to be successful given the patient's ongoing paranoia and psychosis. The psychiatric discharge summary was timely but brief. It provided only a cursory description of the patient's MHCB treatment, used both male and female pronouns to refer to the patient, and did not address psychotic symptomatology documented during the patient's treatment.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The initial psychiatric assessment was cursory and incomplete. The case formulation, IDTT documentation, and treatment plan were all deficient and failed to address the complexity and severity of the patient's clinical presentation. Most PC and psychiatric encounters appeared to be brief and nonconfidential, although documentation did not consistently make clear where these encounters occurred. Although there was adequate documentation that the patient did not meet criteria for petitioning for involuntary treatment, there was inadequate documentation of the rationale for discharging the patient to EOP care. Using a subjective judgment that the patient's symptoms and functioning were at baseline did not reflect evidence-based decision-making and fell below the standard of care, and it was unclear what MHCB discharge criteria the patient had met. Given the patient's ongoing symptomatology, greater consideration of ICF care should have been undertaken. The suicide risk evaluation, safety plan, and psychiatric discharge summary did not adequately reflect the severity of the patient's symptoms or the complexity of her treatment needs.

**Patient CC**

This 34-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/LAC. He was provided with diagnoses of schizoaffective disorder, bipolar type, and antisocial personality disorder. He was prescribed and largely adherent with haloperidol decanoate, mirtazapine, and valproic acid. Hydroxyzine was

prescribed as needed for anxiety, and he used this medication daily for the last four days of MHCB care. Through the ISUDT, he was prescribed, and adherent with, buprenorphine-naloxone for opioid use disorder. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included mild intermittent asthma, leukocytopenia, and opioid use disorder. Within CDCR, the patient had previously received all levels of mental health care. At CSP/LAC, he was admitted to MHCB care from November 15, 2024 through November 22, 2024 for danger to self, in response to escalating and reckless substance use and multiple overdoses requiring medical rescue. He was discharged to EOP care on November 21, 2024 but remained in MHCB care for an additional day.

The initial psychiatric assessment was timely but nonconfidential, brief, and only minimally adequate. It was completed by a non-assigned psychiatrist, contained little detail regarding the patient's psychiatric history, and did not adequate exploration of the patient's recent substance use. The initial PC assessment was timely and adequate, although it relied extensively on prior documentation. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was identified as a high treatment refuser but retained in MHCB care with adequate documentation of the rationale for doing so. The case formulation, which was carried forward without modification, was largely adequate but did not address reasons the patient's substance use had recently escalated and become reckless in severity. The patient's strengths and verbalized treatment goals were minimally documented. The treatment plan was carried forward without modification from one developed seven months earlier, focused on personal hygiene, and was not relevant to the patient's current clinical presentation or to MHCB care. It did not address symptoms of mental illness or substance use.

One of two PCs and one of two psychiatrists followed the patient daily. Encounters were brief and primarily occurred at the cell front. The PC did not document the provision of interventions, and no changes were made to the patient medications. Recreational therapy activities were adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. Rationale for MHCB discharge was poorly documented, and the case formulation, patient's strengths, verbalized treatment goals, and treatment plan were not updated. The discharge suicide risk evaluation was adequate and found the patient at low current risk but subject to increased suicide risk when using substances. The safety plan was collaborative and useful. The psychiatric discharge summary was timely but overly brief.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The patient was referred to MHCB due to recklessness in substance use and multiple overdoses, leading to significant concern that he was a danger to himself. Although MHCB providers asked the patient about the nature of his overdoses, documentation did not indicate that this issue was adequately assessed or that motivational interviewing or other evidence-based interventions were used. The case formulation and treatment plan did not address the patient's escalation in substance use or how it might be interacting with symptoms of his mental illness. There was no evidence that the MHCB team contacted addiction medicine providers for consultation, despite the patient's

ongoing treatment with buprenorphine-naloxone. The patient was discharged to EOP with no changes in treatment, and his underlying risks were poorly explored and inadequately addressed. He did not receive the treatment he needed.

**Patient DD**

This 30-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/LAC. He was provided with a diagnosis of adjustment disorder with disturbance of mood. He was prescribed fluoxetine and olanzapine and was partially adherent with fluoxetine and consistently adherent with olanzapine. Intramuscular diphenhydramine, hydroxyzine, and additional doses of olanzapine were ordered PRN for agitation and anxiety. He used PRN hydroxyzine and/or olanzapine daily during MHCB care. However, he was suspected of cheeking medications. He received one injection of diphenhydramine before it was discontinued due to a reaction of nausea. Through the ISUDT, he was prescribed, and adherent with, buprenorphine-naloxone for opioid use disorder. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included opioid use disorder. Within CDCR, the patient had previously received 3CMS and MHCB care. At CSP/LAC, he was admitted as a MHCB-to-MHCB transfer from October 31, 2024 through November 8, 2024 for suicidal ideation. His MHCB admission at CSP/LAC was immediately preceded by a two-day MHCB stay in SATF, during which he engaged in property destruction within two MHCB cells, rendering them unusable, and cut himself superficially. He had engaged in a riot in October 2024, received an RVR for battery with a deadly weapon, and acknowledged safety concerns.

The initial psychiatric assessment was timely and brief but adequate. The initial PC assessment was timely and mostly adequate. It was heavily reliant on prior documentation and did not update the case formulation, which was underdeveloped and inadequate to guide current treatment. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. MHCB prevention planning was not completed despite documentation that the patient was seeking MHCB and EOP care to avoid safety concerns. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan was pulled forward without modification from one developed in MHCB care at another facility on October 29, 2024. This plan was appropriate to his MCHB treatment needs and nearly adequate, but it failed to include psychiatric care as a necessary intervention.

The patient remained angry and agitated during the first half of his MHCB stay, and on November 3, 2024 broke a MHCB cell window. The assigned clinician and one of four psychiatrists saw the patient daily. These encounters occurred at cell front due to the patient's agitation. Medications were adjusted to address the patient's agitation and suspected cheeking, and attempts were made to provide support for developing prosocial coping skills. Progress notes indicated that the patient was likely manufacturing psychotic symptoms to affect a housing change. The patient's mood and behavior improved following the November 3, 2024 window-breaking incident. The follow-up IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The treatment team determined to discharge the patient to 3CMS care. MHCB prevention planning was not completed, the case formulation and treatment plan were not updated, and the patient's strengths and verbalized treatment goals remained

undocumented. The patient's participation in the IDTT meeting, including his advocacy for EOP care and objection to the treatment team's discharge plan, was adequately documented. The rationale for discharging him to 3CMS rather than EOP care was adequately documented, but discharge planning was inadequate. The discharge suicide risk evaluation was adequate and found the patient at low current risk. The safety plan was collaborative, attempted to address the patient's use of suicidal threats to affect housing changes, and offered useful recommendations. The psychiatric discharge summary was timely and adequate, and it provided a nuanced opinion regarding the patient's elevated long-term suicide risk.

**Findings**

The treatment provided to this MHCB patient was adequate.

The patient received timely and adequate assessments and care. Both psychiatric and PC interventions appeared clinically indicated and appropriate to the patient's needs. While the treatment plan was not completely adequate because it did not include psychiatric interventions, it was appropriate to the patient's other treatment needs. The patient's mood and behavior improved, and the discharge to 3CMS care was appropriate. The biggest areas requiring improvement were the case formulation and discharge planning, both of which needed to address the patient's behavioral risks and characterological difficulties in greater depth.

**Patient EE**

This 30-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/LAC. He was provided with a diagnosis of unspecified schizophrenia spectrum or other psychotic disorder. He was prescribed olanzapine and was adherent with this medication except on one occasion. Hydroxyzine and an additional dose of olanzapine were prescribed as needed for anxiety and psychosis; he used hydroxyzine each evening except once and did not use PRN olanzapine at all. Through the ISUDT, he was prescribed, and adherent with, buprenorphine-naloxone for opioid use disorder. Four episodes of self-injurious behavior were listed in the health record. Medical conditions included tumor of head of rib, uveitis of left eye, extrapyramidal signs, opioid use disorder, and history of hepatitis C. Within CDCR, the patient had previously received all levels of mental health care. At CSP/LAC, he was admitted to MHCB care from October 25, 2024 through November 4, 2024 for significant impairment due to mental illness and danger to others, after becoming paranoid, delusional, disorganized, incoherent, isolated, agitated, and aggressive.

The initial psychiatric assessment was timely and adequate. The initial PC assessment was timely and adequate except for the case formulation. The case formulation provided a thorough framework for understanding the patient's interpersonal relations and substance use, but it was not updated to address the psychotic symptoms for which the patient was admitted and was therefore inadequate to guide treatment. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The patient was not found to meet criteria for a higher level of care because a sustainable process report was not generated, yet, as indicated in the follow-up IDTT meeting, the patient had been refusing over 50 percent of

group treatment. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. No treatment plan was developed.

The assigned clinician and/or one of four psychiatrists followed the patient daily. These interactions were supportive and brief, but they were documented well enough to track the patient's gradual improvement. Several progress notes did not indicate whether the encounter was confidential or at the cell front. One progress note indicated that the patient was seen at cell front due to lack of confidential treatment space. Provision of recreational therapy activities was adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. The patient was judged to be functioning at baseline, with continuing hallucinations, delusions, and disorganized thoughts. The patient's participation in this meeting was inadequately documented. The case formulation was not updated, and the patient's strengths, verbalized treatment goals, and treatment plan remained undocumented. The discharge suicide risk evaluation was timely, adequate, and found the patient at low risk. A safety plan was developed even though the patient was not admitted to MHCB care for danger to self and had not voiced suicidal ideation during his MHCB care. The PC attempted to collaborate with the patient in developing the safety plan, but the task made the patient defensive. Useful observations, interventions, and recommendations were documented, but the patient was unlikely to benefit from the plan because he adamantly denied suicidal ideation and did not see the safety plan as relevant. The psychiatric discharge summary was timely and brief but adequate.

**Findings**

The treatment provided to this MHCB patient was inadequate.

Although psychiatric care appeared to be appropriate and resulted in significant clinical improvement in the patient's symptoms, overall MHCB care was not adequate. Missing from the patient's care was careful treatment and discharge planning, current and adequate case formulation, and helpful nonpharmacological treatment beyond recreational therapy activities. The subjective judgment that the patient was functioning at baseline was not equivalent to a finding that the patient had met objective treatment goals, and no treatment goals were established for this patient. Development of a safety plan when no suicidality was present may have been countertherapeutic.

**FF**

This 34-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/LAC. He was provided with diagnoses of adjustment disorder with disturbance of mood and opioid use disorder. He was prescribed, and adherent with, buspirone. Hydroxyzine was prescribed as needed for anxiety, and the patient used this medication once or twice a day throughout MHCB care. Through the ISUDT, he was prescribed, and adherent with, buprenorphine-naloxone for opioid use disorder. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included hypokalemia, hypomagnesemia, peripheral neuropathy secondary to chemotherapy, recurrent hepatitis C, stimulant and opioid use disorders, a history of successfully treated T-cell lymphoblastic lymphoma, and a history of cosmetic plastic surgery.

Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. He was subject to involuntary treatment under a PC 2602 order for danger to others from 2017 to 2018. At CSP/LAC, he was admitted to MHCB care from September 30, 2024 through October 10, 2024 for danger to self and others, after voicing both homicidal and suicidal ideation in the context of family estrangement and despair at his ability to remain incarcerated. Once in MHCB care, he was discharged to EOP care on October 8, 2024, but remained in MHCB care for two more days.

The initial PC assessment was timely but provided minimal current information and relied heavily on prior documentation. It described the patient in negative terms as a "complainer rejecting help presentation" [sic] and did not update the predisposing, perpetuating, precipitating, or protective factors or the case formulation. The case formulation was underdeveloped and characterized the patient's personality but not the current crisis, symptoms, and distress that prompted the MHCB admission. It also did not address interpersonal alienation the patient was thought to be experiencing as an Iraqi. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The patient met criteria for consideration of a higher level of care due to multiple MHCB referrals/admissions and high frequency of treatment refusal. It was determined not to refer the patient because the treatment team felt the patient's difficulties were driven by dysfunctional personality traits and substance use, and that his MHCB admission was driven by a desire to avoid having a cellmate. The case formulation was unchanged and addressed neither the patient's reported distress nor the treatment team's hypotheses regarding the current MHCB admission. The patient's strengths and verbalized treatment goals were not documented. The treatment plan was pulled forward from one created 11 months earlier, identified anger as the treatment target, but offered no interventions beyond monitoring. The short-term goal was inapplicable to MHCB care, and the treatment plan could not be used to guide MHCB care.

The assigned PC and one of three psychiatrists followed the patient daily. Progress notes did not indicate whether these encounters were confidential. PC interventions were appropriate to the patient's needs. Medications were adjusted to address the patient's symptoms, and the patient's anger, anxiety, dysphoria, and thinking improved. Recreational therapy activities were documented adequately. The follow-up IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The treatment team documented a provisional diagnosis of borderline personality disorder and determined to discharge the patient to EOP care. The case formulation was not updated with the treatment team's findings. The treatment plan remained unchanged, and the patient's strengths and verbalized treatment goals remained undocumented. However, recommendations for treatment in EOP were well articulated. The discharge suicide risk evaluation was adequate and clinically useful and found the patient at low risk. The safety plan was collaborative and included clinically appropriate recommendations. The psychiatric discharge summary was brief but adequate.

**Findings**

The treatment provided to this MHCB patient was adequate.

Despite a deficient case formulation and treatment plan, the care provided to this MHCB patient evidenced planning, therapeutic attunement, and effectiveness. Both psychiatric and PC interventions were appropriate to the patient's treatment needs. The patient's mood and flexibility in thinking improved significantly. The discharge suicide risk assessment, safety plan, and recommendations for EOP care well done. The discharge to EOP rather than 3CMS care was clinically appropriate, although it is likely the patient will require treatment specifically focused on his personality disorder. Major areas requiring improvement included avoiding use of pejorative and judgmental language, expanding documentation explaining the provision diagnosis of borderline personality disorder, and completing IDTT documentation more thoroughly.

**Patient GG**

This 47-year-old male patient's MHCB healthcare record was reviewed to assess the adequacy of mental health care at CSP/LAC. The patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood; opioid use disorder, moderate; antisocial personality disorder; and a rule-out of schizoaffective disorder. The patient was prescribed fluoxetine, olanzapine, venlafaxine, and buprenorphine-naloxone, with documented medication adherence.

The patient entered CDCR in 1999 and first received MHSDS care at the MHCB level of care in March 2019. He received treatment at 3CMS, EOP, and MHCB levels of care. He transferred to the CSP/LAC MHCB on October 8, 2024, and was discharged to the EOP level of care on October 17, 2024.

His MHCB admission was prompted by suicidal ideation and significant impairment due to mental illness, presenting with nervousness, an intense demeanor, paranoid ideation, and self-harm. Although he denied safety concerns, his behavior and an anonymous ISU report suggested acute risk for suicide. He also had recent positive tests for amphetamines and fentanyl.

Initial PC and psychiatric assessments were completed within 24 hours, with documentation of mental status, denial of suicidal ideation, safety concerns, and substance use. He was placed on safety precautions, provided a provisional diagnosis, and an initial plan to adjust medications. IDTT meetings were held on October 10 and 17, 2024, with required members and the patient present. The treatment plan provided diagnoses and identified broad objectives such as increasing insight, addressing treatment adherence, and managing symptoms. The treatment plan included interventions but lacked specific measurable goals and did not specify discharge criteria.

Psychiatric contacts were timely, occurring at least twice weekly, with documentation that included medication adjustments, ongoing management, and risk assessments. The psychiatrist responded to patient-reported symptoms and clinical decisions were justified based on the patient's presentation and safety needs. PC contacts were mostly confidential, except for two cell-front contacts due to space limitations and patient refusal. Contacts addressed safety, medication compliance, and treatment participation, with interventions including motivational interviewing, psychoeducation, and coordination with custody. Clinical contacts were brief but included ongoing risk assessment and care coordination, though documentation was inconsistent in documenting the specific interventions utilized. An SRE was completed on October 17, 2024,

indicating low self-harm risk at discharge and the patient was discharged to EOP level of care with five-day follow-ups.

**Findings**

The treatment provided to this patient was adequate.

Although the treatment plan lacked specific measurable goals and discharge criteria, PC and psychiatry provided timely assessments, suicide risk evaluations, clinical contacts, and IDTT meetings were in keeping with Program Guide requirements. In addition, the psychiatrist documented medication adjustments and responded to patient's clinical needs. The team documented efforts to engage the patient and maintained appropriate monitoring and safety precautions throughout the admission. Discharge planning and aftercare were initiated, supporting continuity of care and documentation reflected adequate clinical judgment.

**Patient HH**

This 42-year-old male patient's MHCB healthcare record was reviewed to assess the quality of care at CSP/LAC. The patient was provided with diagnoses of unspecified cannabis use disorder, unspecified anxiety disorder, and opioid abuse. The patient was not prescribed psychiatric medications but was prescribed buprenorphine naloxone to manage his opioid abuse.

The patient first entered CDCR in 2007 and re-entered most recently in August 2023. He was placed in MHSDS at the 3CMS level of care on May 8, 2024, and has received treatment at the 3CMS, EOP, and MHCB levels of care. The patient was admitted to CSP/LAC MHCB from January 13 through January 23, 2025, for danger to self and significant impairment due to mental illness, following a suspected intentional overdose.

Initial PC and psychiatric assessments occurred timely and documented the patient's denial of an intentional overdose. The initial IDTT meeting was timely, with the psychiatrist, psychologist, nursing, and custody staff present. The patient's participation was documented in confidential office settings. Initial IDTT documentation provided the referral and psychosocial information, and patient's current presentation, but did not include a formal diagnosis. The documented treatment plan targeted substance use and anxiety with long term measurable goals; however, the short-term goals were vague. The plan was carried forward from November 2024, without progress updates towards treatment targets. Initial IDTT documentation noted that the patient did not meet higher level of care needs. The IDTT meeting at discharge included the appropriate disciplines as well as the patient. Documentation provided a current mental status and noted the patient would be discharged to 3CMS LOC with five-day follow-ups.

Psychiatric contacts were timely, confidential, and occurred daily. The psychiatrist conducted thorough mental status exams, reviewed labs, and consistently assessed suicide risk. The patient was offered psychotropics but declined. The psychiatrist provided education on risks and benefits of medications and focused on nonpharmacological interventions such as psychoeducation about substance use, cognitive distortions, coping strategies, and engagement treatment.

PC contacts included a thorough review of the patient's psychiatric, medical, and substance use history. PC contacts were confidential and addressed the patient's presenting problems, including substance abuse, mood symptoms, and psychosocial stressors. The PC reviewed collateral information, coordinated with medical and custody staff, and completed suicide risk assessments timely. The patient was noted as presenting as future-oriented and actively involved in treatment.

**Findings**

The treatment provided to this patient was adequate.

PC and psychiatry provided timely initial evaluations, daily clinical contacts, ongoing monitoring, and suicide risk assessments. Therapeutic contacts included psychoeducation, cognitive behavioral strategies, supportive therapy, and adequate aftercare planning at discharge. There could have been improvements to treatment planning documentation.

**Patient II**

This 34-year-old male patient's MHCB healthcare record was reviewed to assess the adequacy of mental health care at CSP/LAC. The patient was provided with a diagnosis of adjustment disorder with depressed mood. His symptoms included depressed mood, anxiety, and recent suicidal ideation related to stressors around an upcoming appeal hearing, and in consideration of transferring to SNY status. No psychotropic medications were prescribed.

The patient first entered CDCR on November 19, 2010, and remained in general population until November 29, 2024, when he entered the MHSDS for the first time at the MHCB level of care. He was admitted to the MHCB level of care from November 29, 2024, through December 6, 2024, due to danger to self after expressing suicidal ideation with intent. The patient has not received services at any other level of care.

An initial psychiatric assessment occurred on November 30, 2024, and initial PC assessment on December 2, 2024, with daily follow-up by both psychiatry and the PC.

The initial IDTT meeting was held within the required 72 hours, with an alternate PC, alternate psychiatrist, CCI, nurse, senior supervising psychologist, and the patient present. The treatment plan included a clinical summary that noted the rationale for the patient's admission. He had no history of psychiatric diagnoses or suicidal ideation or attempts, but was noted to have presented uncharacteristically, with plans to cut his wrists "and end it all." The clinical summary did not provide a working diagnosis, and the treatment plan failed to include treatment objectives with measurable goals and interventions or clear discharge criteria, rather, these sections were left blank. A second IDTT meeting was held on December 6, 2024, with an alternate psychiatrist, alternate PC, CCI, nurse, and patient present. The team reviewed the patient's clinical status and determined his suicide risk was low. The patient reported that his suicidal statements were intended to obtain time off the yard and reevaluate his life goals, including consideration of SNY status. The patient was determined not to meet criteria for enrollment in the MHSDS, and the

patient agreed with the discharge plan to general population, which included education about the SNY transition process and encouragement to seek further mental health support as needed.

Routine psychiatric contacts were timely. The psychiatrist discussed medication options, assessed suicide risk, and documented the patient's refusal of psychotropic medications. Routine PC contacts occurred timely in confidential settings. The therapeutic content focused on the patient's adjustment to possible SNY status, anxiety, and coping with life changes. Interventions included psychoeducation, support, and encouragement. While the contacts documented the patient's concerns, the connection to specific treatment plan goals and measurable objectives was lacking, and specific interventions utilized were not always clearly documented. Suicide risk assessments were completed upon admission and prior to discharge, with evaluations indicating low risk at discharge.

**Findings**

The treatment provided to this patient was inadequate.

Although assessments, daily contacts, and IDTT meetings were conducted timely, there were a number of elements lacking. These included a working diagnosis, comprehensive and individualized treatment plan, measurable goals and targeted interventions, and incomplete documentation potentially compromising continuity of care and the ability to effectively monitor the patient’s progress. Furthermore, the failure to establish clear discharge criteria and consistently document therapeutic interventions utilized deviated from Program Guide requirements.

**Patient JJ**

This 34-year-old male patient's MHCB healthcare record was reviewed to assess the adequacy of mental health care at CSP/LAC. The patient was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder and his symptoms included auditory hallucinations and history of suicidal ideation. The patient was adherent to his prescribed olanzapine.

The patient entered CDCR in December 2017 and was placed in the MHSDS in April 2022, at the 3CMS level of care. He received treatment at the 3CMS, EOP, and MHCB levels of care, with one prior MHCB admission occurring in May 2023. The patient last re-entered CDCR on May 22, 2024, to serve a three-year prison term and was admitted to CSP/LAC MHCB on November 25, 2024. He remained in the MHCB through December 3, 2024.

The IDTT was convened within the required 72 hours of admission, with an alternate PC, alternate psychiatrist, senior supervising psychologist, nurse, and CCI present. Patient participation was documented, and the patient denied experiencing suicidal ideation at that time. IDTT documentation did not include the patient’s updated diagnosis or revised treatment targets. The treatment plan carried forward goals from October 2024, focusing on auditory hallucinations and medication adherence, with short-term goals that lacked measurable objectives. Long-term goals included developing coping skills, and interventions such as CBT techniques and medication adherence support were noted. Medication details were present, but discharge criteria were not

clearly established or documented in the initial or updated plans. The IDTT was convened again on December 3, 2024, prior to discharge, with the required members present and patient participation documented, but the treatment plan was not updated and continued to lack specificity.

The initial PC assessment, IDTT meetings, and SREs were completed timely, with documentation of both confidential and cell-front interactions. Psychiatry contacts were timely with daily clinical contacts documented. Contacts included both confidential and cell-front interactions per patient preference. Clinical documentation included mental status exams, suicide risk assessments, and updates on symptoms and medication response. Although there were no medication changes, medication management was consistent, with documentation of the patient's adherence and lack of reported side effects. The psychiatrist's discharge note indicated that the patient was seen in a confidential setting, understood and agreed with the discharge plan, and denied current symptoms. His mood and auditory hallucinations gradually improved and stabilized, and he was discharged to the EOP level of care in stable condition.

**Findings**

The treatment provided to this patient was inadequate.

Although timely assessments, daily psychiatry contacts, and consistent medication management were documented, there were notable deficiencies including the absence of a comprehensive and individualized treatment plan, with measurable goals and clear discharge criteria. In addition, clinical documentation of the clinical interventions utilized to target the patient's needs were lacking.

**Patient KK**

This 33-year-old male patient's MHCB healthcare record was reviewed to assess the adequacy of mental health care at CSP/LAC. The patient was provided with diagnoses of bipolar I disorder, current or most recent episode manic with psychotic features, and schizophrenia. His symptoms included bizarre behavior, poor hygiene, confusion, malodor, and suspected medication nonadherence. Prescribed medications included olanzapine, haloperidol, buspirone and benztropine. Notably, during the admission, quetiapine was discontinued, and olanzapine was initiated to improve efficacy and ensure compliance under his PC 2602 order.

The patient entered CDCR for the second time on February 15, 2023. He received treatment at the EOP, MHCB, Acute, and ICF levels of care. He was admitted to the MHCB from November 25, through December 3, 2024, due to significant impairment due to mental illness. The pre-admission screen thoroughly documented the presenting problems, including psychosis, severe neglect of his hygiene, and concerns that he was spitting out his medication, justifying the need for inpatient stabilization.

Initial psychiatric and PC assessments, as well as a suicide risk evaluation, were completed timely. The initial PC assessment was limited by the patient's refusal to engage. IDTT meetings were held timely on November 26, 2024 and December 3, 2024, with the PC, alternate psychiatrist, senior psychologist supervisor, registered nurse, and CCI present. At the initial IDTT meeting, the patient

minimally participated when seen at bedside and the team appropriately decided to retain him in the MHCB for further assessment and stabilization. The treatment plan included targeted objectives with measurable goals and therapeutic interventions of psychiatric medications to address the objectives, which were the same goals carried forward from patient's previous MHCB admission in June 2024. The discharge IDTT meeting was conducted at cell-front, during which the patient participated, demonstrated insight into the reason for his admission, and agreed with the discharge plan. The team provided a clear and clinically sound rationale for not referring to a higher level of care, noting that despite his psychosis and treatment refusal, his adaptive functioning remained sufficient for management at the EOP level of care. Interventions were appropriate, focusing on medication management, psychoeducation, and developing coping skills, however criteria for discharge were not clearly documented.

Psychiatric treatment was timely and responsive. Daily contacts were documented by the treating psychiatrist, though the patient's engagement fluctuated from complete refusal to brief, cooperative interactions. A key clinical decision was made to discontinue Seroquel due to a lack of efficacy and start olanzapine, directly addressing both his psychosis and the suspected compliance issues. This medication adjustment appeared effective, as the patient's condition improved and stabilized over the course of the admission. Mental status exams and suicide risk assessments were consistently documented, justifying clinical decisions and confirming a low acute risk of self-harm throughout the stay.

**Findings**

The treatment provided to this patient was adequate.

The record demonstrated timely and appropriate assessments, consistent daily psychiatric contacts, and a responsive approach to medication management. IDTT meetings were timely, including treatment objectives with measurable goals, and adequate therapeutic interventions. The rationale for the patient's level of care was clearly documented. While clinical contacts were limited by patient refusal, psychiatry provided daily monitoring and medication management with timely documentation and justified clinical decisions.

**APPENDIX B-11**
**California State Prison/Sacramento (CSP/Sac)**
**Reporting Period: September 1, 2024 – February 28, 2025**

**Patient A**

This 25-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility C and diagnosed with major depressive disorder, recurrent, mild. He was prescribed mirtazapine on an as-needed basis for anxiety, and he used this medication nightly or almost nightly during the review period. One episode of self-injurious behavior was listed in the health record. Within CDCR, the patient previously received 3CMS and one day of MHCB services. Medical conditions included opioid use disorder, hammer toes, and a history of a stab wound. He was placed in mainline 3CMS care at CSP/Sac on December 20, 2023, and remained at this level of care in CSP/Sac throughout the review period.

During the review period, a primary clinician only once saw the patient. This encounter occurred at the cell front because the patient refused a confidential setting, was a brief wellness check, and was the first primary clinician encounter in 205 days. A primary clinician did not see him again until he was moved to RHU 3CMS care in early April, 2025. The assigned psychiatrist saw the patient timely but briefly for two follow-up appointments during the review period. One of these encounters occurred at the cell front due to the patient's refusal of a confidential setting; the mirtazapine dosage was increased at the patient's request. Primary clinician and psychiatric progress notes contained only very minimal content. The annual IDTT meeting was due on February 7, 2025 and had not been completed when the patient was moved to RHU.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the patient was seen timely by psychiatry, these encounters were brief and minimally documented. He was not seen timely or adequately by his primary clinician. Meaningful treatment beyond psychotropic medication was not provided. An annual IDTT meeting was not held, the patient's treatment plan was not updated, and the interventions required by the existing treatment plan were not provided.

**Patient B**

This 56-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility A and diagnosed with major depressive disorder, recurrent, in partial remission. He was not prescribed any psychotropic medications. Two suicide attempts, both in 2011, were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, EOP, and ICF services. Medical conditions included back pain, hypertension, and hypothyroidism. He was placed in mainline 3CMS care at CSP/Sac on June 19, 2023, and remained at this level of care in CSP/Sac throughout the review period.

The annual IDTT meeting occurred prior to the review period; the treatment plan developed at that time required the provision of CBT interventions to assist the patient in identifying triggers and automatic thoughts contributing to depression. Primary clinicians saw the patient timely but briefly on three occasions; two of these encounters occurred at the patient's job site and one occurred at the cell front following the murder of one of the patient's peers. None of the encounters were confidential, and none included the provision of CBT interventions required by the treatment plan. In December 2024 and January 2025, the patient was offered two-hour recreational therapy groups on five occasions. Later in January 2025, when the facility operated on a custody modified program, the patient received two cell-front contacts from recreational therapists, who provided him with in-cell recreational and mental health packets. One of these cell-front encounters was documented as a one-hour therapeutic/group contact.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient did not receive meaningful treatment or interventions required by his treatment plan. Primary clinician encounters were not confidential or indicative of anything more than wellness checks. The rationale for retaining the patient on 3CMS care was unclear from available documentation, as he last took psychotropic medications on June 4, 2024. Recording a cell-front recreational therapy round as a one-hour contact was problematic.

**Patient C**

This 35-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility C and diagnosed with unspecified anxiety disorder and major depressive disorder, recurrent, mild. On a PRN basis, he was prescribed citalopram and diphenhydramine for anxiety and insomnia, respectively. He used diphenhydramine regularly and citalopram intermittently. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was partially adherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. No medical conditions were listed in his record. He was placed in mainline 3CMS care at CSP/Sac on June 15, 2022, and remained at this level of care in CSP/Sac throughout the review period.

During the review period, the primary clinician attempted to see the patient once. This encounter occurred at the cell front because the patient refused a confidential setting. During the encounter, the patient was sleeping with headphones on and did not wake up. The encounter was not timely, as the most recent primary clinician encounter occurred 131 days earlier. As of April 11, 2025, no primary clinician contacts had been documented for 171 days. The patient received timely and confidential follow-up appointments with the assigned psychiatrist. These contacts were brief, and the corresponding progress notes were minimal in content and nearly identical across encounter. The most recent IDTT meeting was held in July 2023, and as of April 11, 2025 the annual IDTT meeting was overdue by more than 270 days. No treatment plan was available to guide treatment during the review period.

**Findings**

The care provided to this 3CMS patient was inadequate.

As of April 11, 2025, no IDTT meeting had been held for 21 months, and no treatment plan had been developed. Only one attempted primary clinician encounter was documented during the review period, and in that attempt the patient remained asleep. Aside from psychotropic medications, the patient did not receive meaningful treatment. Psychiatric follow-up encounters, although timely, were very brief, with minimal documentation. The rationale for prescribing citalopram on a PRN rather than scheduled basis was unclear.

**Patient D**

This 42-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility B and diagnosed with unspecified insomnia disorder. He was prescribed melatonin and mirtazapine and was adherent with these medications. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. Medical conditions included obesity, gastroesophageal reflux disease, ulcerative colitis, obstructive sleep apnea, asthma, history of hepatitis B and C, and opioid and amphetamine-type substance use disorders. He was placed in mainline 3CMS care at CSP/Sac on August 19, 2024, and remained at this level of care in CSP/Sac throughout the review period.

Both the initial primary clinician and the initial psychiatric assessment were completed during the review period. Both were late and neither indicated whether the encounter was confidential. The primary clinician assessment did not include a case formulation; content was otherwise adequate. An accompanying suicide risk evaluation found the patient at low risk. The initial psychiatric assessment was cursory, generic, and included new diagnoses without discussion of existing diagnoses. The initial IDTT meeting was not held until 93 days after the patient's placement in mainline 3CMS care. It did not result in the development of a treatment plan and was not accompanied by a master treatment plan psychiatry review. During the review period, only one attempt by a primary clinician to see the patient was documented. The patient refused the appointment, which was overdue, and an attempt to conduct a wellness check at the cell front was unsuccessful because the patient was in school. Psychiatric follow-up encounters during the review period were timely but documented in generic, nearly identical language; one of these encounters occurred at the cell front due to the patient's preference. A pre-release planning assessment was completed timely and adequately.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial psychiatric and primary clinician assessments and the initial IDTT meeting were not timely. There was no case formulation or treatment plan to guide 3CMS care, and various psychiatric diagnoses were not reconciled. Documentation was formulaic, with little patient-

specific information. Aside from psychotropic medications, the patient did not receive meaningful treatment.

**Patient E**

This 73-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility B and diagnosed with unspecified depressive disorder. He was prescribed sertraline and adherent with this medication. Hydroxyzine was prescribed on a PRN basis for insomnia, but he did not use this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, and EOP services. Medical conditions included a history of myocardial infarction, aneurysm of ascending aorta, hypertension, Takotsubo cardiomyopathy, dyslipidemia, choroidal malignant melanoma status post-radiation, radiation retinopathy, fracture of eighth thoracic vertebra, and right hip pain. He was placed in mainline 3CMS care at CSP/Sac on June 25, 2024, and he remained at this level of care in CSP/Sac throughout the review period.

The initial IDTT meeting occurred a month prior to the review period, and the treatment plan developed at that time required weekly or biweekly primary clinician encounters to identify the patient's strengths. The case formulation indicated that the patient would benefit from interventions challenging his negative thoughts and building coping and symptom management skills.

No scheduled primary clinician encounters occurred during the review period. Instead, he was seen only once in response to a health care request. During this encounter, the patient reported that his anxiety and depression were increasing, that he was concerned he would have a second heart attack, and that he was unhappy with medical care at CSP/Sac. The clinician assessed the patient's symptoms as moderate and offered to provide more frequent encounters. The patient declined and remained focused on obtaining a transfer to another facility where he felt cardiac care would be better. Two psychiatrists saw the patient for a total of two encounters during the review period. The first encounter was late and occurred at the cell front due to the patient's refusal of a confidential setting; the second encounter was confidential. The patient declined additional psychotropic medication. Documentation for both encounters was adequate.

**Findings**

The care provided to this 3CMS patient was inadequate.

During the review period, the interventions required by the treatment plan were not provided, and the patient did not receive any regularly scheduled primary clinician encounters. The potential relationship between the patient's medical condition and his symptoms of anxiety and depression was inadequately explored. Beyond psychiatric care, the patient did not receive meaningful mental health treatment. Psychiatric care appeared adequate, although continuity of psychiatric providers was a challenge.

**Patient F**

This 37-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility B and diagnosed with unspecified mood disorder and unspecified hallucinogen-related disorder. He was prescribed escitalopram and olanzapine and was adherent with these medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. Medical conditions included HIV+ status, recurrent syphilis, neuropathic pain, chronic kidney disease, prediabetes, and opioid use disorder. He was placed in mainline 3CMS care at CSP/Sac on April 24, 2024, and he remained at this level of care in CSP/Sac throughout the review period.

The initial IDTT meeting occurred prior to the review period, and IDTT documentation included a plan to develop a case formulation. The treatment plan developed at that time required the provision of CBT to support the development of coping skills to address anxiety. Two attempts to see the patient were documented by the primary clinician during the review period. The first attempt occurred late and was unsuccessful because the patient was also scheduled for a dental appointment at the same time. Prior to this attempt, the most recent primary clinician encounter had occurred 211 days earlier. The second primary clinician encounter was timely, confidential, conducted by telemental health, and focused on the completion of an evaluation for placement in a male community reentry program. The assigned psychiatrist saw the patient twice during the review period. The first encounter occurred almost a month late and, for reasons not documented, at the cell front. The second encounter was timely but occurred in a nonconfidential setting. Psychiatric documentation was generic, nearly identical across encounters, and included new diagnoses without discussion.

**Findings**

The care provided to this 3CMS patient was inadequate.

Psychiatric and primary clinician encounters were not provided timely in two instances, resulting in long gaps between visits. The interventions required by the treatment plan were not provided, and the development of a case formulation was not pursued. The patient did not receive meaningful treatment of his anxiety and depression outside of psychotropic medications. The nature of the patient's auditory hallucinations, one of the symptoms for which he was receiving olanzapine, was inadequately explored, and the patient's diagnoses remained unclear and unreconciled.

**Patient G**

This 50-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility A and diagnosed with major depressive disorder, recurrent, mild, and unspecified trauma- and stressor-related disorder. He was prescribed melatonin and was nonadherent with this medication. Melatonin was made PRN early during the review period, and hydroxyzine was also prescribed PRN for insomnia. The patient

made increasing use of both medications as the review period progressed. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, and EOP services. Medical conditions included obesity, benign prostatic hypertrophy with nocturia, gastroesophageal reflux disease, allergic rhinitis, low back pain, elevated blood pressure without a diagnosis of hypertension, and pulmonary coccidioidomycosis. He was placed in mainline 3CMS care at CSP/Sac on June 10, 2021, and remained at this level of care in CSP/Sac throughout the review period.

The annual IDTT meeting occurred prior to the review period, and the treatment plan developed at that time required the provision of supportive therapy and motivational interviewing to assist the patient in identifying his treatment goals; the patient's attendance of confidential treatment sessions with the primary clinician was established as his treatment goal. Documentation for the IDTT meeting also included a plan to update the case formulation. The patient was followed timely and appropriately by his assigned primary clinician. These encounters were confidential, occurred about every two weeks, and were consistent with the treatment plan until the patient's grandmother passed away. Treatment interventions then began to focus on grief and loss, but the treatment plan was not modified to address this new challenge and new interventions. Multiple cell-front wellness checks were provided following the murder of the patient's friend, a peer in Facility A. The wellness checks were adequately documented and reflected diligent care. The patient was appropriately referred to mental health for evaluation after he gave a large set of books to the prison library and appeared depressed. The evaluation in response to this referral was clinically sound, and an accompanying suicide risk evaluation found the patient at low risk.

A psychiatrist saw the patient only once during the review period. This encounter was over 40 days late, occurred in the dayroom due to lack of available custody officers, and appeared to be brief; progress note documentation was minimal. A follow-up psychiatric appointment was late by more than three weeks and occurred in early April, 2025. Again, progress note documentation was minimal. In December 2024 and January 2025, he was offered a total of four two-hour recreational groups and seen once by a recreational therapist at the cell front for the provision of an in-cell therapeutic packet; this cell-front round was documented as an hour-long contact.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient received inadequate psychiatric care. The identification of the patient's treatment goals was not documented clearly in primary clinician notes despite early work in this area. The patient's treatment plan and case formulation were not updated when clinically indicated. The inability to provide confidential psychiatric and primary encounters due to staffing shortages on two occasions was problematic. However, primary clinician follow-up and particularly ongoing monitoring following the murder of another incarcerated person were frequent and demonstrated clear concern for the patient's welfare and mental health. The treatment and support provided by primary clinicians and recreational therapy groups represented significant strengths in this case, but the recording of a cell-front round as an hour-long contact was problematic.

**Patient H**

This 29-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility C and diagnosed with unspecified bipolar and related disorder. He was prescribed buspirone, mirtazapine, and olanzapine and was nonadherent with these medications. Buspirone, hydroxyzine, mirtazapine, and olanzapine were also prescribed on a PRN basis for anxiety and agitation. During the review period he did not use PRN olanzapine, used PRN buspirone and mirtazapine once each, and used PRN hydroxyzine rarely. One suicide attempt by hanging in 2019 was listed in the health record. Within CDCR, the patient had previously received 3CMS services, with no higher levels of care. Medical conditions included asthma, scrotal mass, low back pain, and latent syphilis. He was placed in mainline 3CMS care at CSP/Sac on October 23, 2024, and remained at this level of care in CSP/Sac through the end of the review period.

The initial psychiatric assessment was timely, confidential, but minimal, and introduced a new psychiatric diagnosis without adequate discussion. The initial primary clinician assessment was not completed until 48 days after the patient's placement in mainline 3CMS care. The patient declined to participate in this assessment, and most sections of the assessment, including the suicide and self-harm summary and mental status exam, were left blank. A plan to develop a case formulation was documented. The predisposing, perpetuating, precipitating, and protective factors were not updated and remained minimal and poorly formulated. No initial IDTT meeting was held, and no treatment plan was developed for the patient's mainline 3CMS care. He refused the single psychiatric encounter offered during the review period; the accompanying progress note inaccurately indicated that the patient was medication adherent, indicated that the patient denied suicidal and homicidal ideation, auditory and visual hallucinations, paranoia, or delusions during the interview. The note included boilerplate language documenting discussion with and education of the patient, whereas the encounter was refused. As of April 11, 2025, the patient has not been seen by a primary clinician since his placement in mainline 3CMS care.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial psychiatric assessment was minimal and introduced a diagnosis of major depressive disorder without explanation. The initial primary clinician assessment was late and incomplete. No IDTT meeting was held, no treatment plan was developed, no case formulation was developed, and no primary clinician encounters occurred. The single psychiatric appointment was refused and documented in an internally inconsistent manner. The patient's nonadherence with medications was inadequately addressed. The patient did not receive meaningful treatment.

**Patient I**

This 25-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility C and diagnosed with adjustment disorder with mixed anxiety and depressed mood, antisocial personality disorder, other hallucinogen use disorder, severe, and cannabis use disorder, severe. He was briefly prescribed

mirtazapine but refused all doses, and this medication was changed from scheduled to PRN status during the first week of his 3CMS care. He made intermittent use of the medication during the review period, and the PRN order was subsequently discontinued. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. No medical conditions were listed in the health record. He was placed in mainline 3CMS care at CSP/Sac on September 24, 2024, and he remained at this level of care in CSP/Sac through the end of the review period.

The initial psychiatric assessment was timely but too limited to be adequate. It was conducted at the cell front due to lack of custody escort officers, inaccurately indicated that the patient was medication adherent, and introduced a new psychiatric diagnosis without discussion. The initial primary clinician assessment was timely but incomplete. The patient's mental health treatment and suicide and self-harm histories were left blank, and a case formulation was not developed. No IDTT meeting occurred, and no treatment plan was developed following the patient's arrival in mainline 3CMS care. Psychiatric follow-up was confidential but late, with sparse documentation. The primary clinician follow-up encounter also occurred late and was conducted by telemental health; it consisted of a brief mental status exam, identification of current coping skills, provision of a composition notebook and coping skills psychoeducational book, and encouragement.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial psychiatric and primary clinician assessments were deficient and incomplete. Psychiatric evaluation of the patient's medication adherence was inaccurate. No IDTT meeting was held, and there was no current case formulation or treatment plan to guide 3CMS care. Follow-up appointments occurred late, and the patient's various diagnoses remained unreconciled.

**Patient J**

This 36-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was housed in Facility B and diagnosed with unspecified anxiety disorder, posttraumatic stress disorder, major depressive disorder, recurrent, mild, and unspecified depressive disorder. He was prescribed mirtazapine on a PRN basis for insomnia and used this medication regularly. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. Opioid use disorder was the only medical condition listed. He was placed in mainline 3CMS care at CSP/Sac on November 22, 2023, and remained at this level of care in CSP/Sac throughout the review period.

The IDTT meeting occurred prior to the review period but did not result in the development of a treatment plan. As of April 11, 2025, the annual IDTT meeting was over a month late and had not occurred. During the review period, the patient was offered three primary clinician appointments through telemental health. He missed the first encounter, which was scheduled three weeks late. A non-confidential wellness check through telemental health was completed, and the patient's

appointment was rescheduled. He was seen by telemental health five days later, and the third appointment occurred only a few days late. Both completed encounters were confidential but brief, and they consisted of a brief mental status exam and wellness check. Provision of interventions was not documented. The assigned psychiatrist saw the patient twice during the review period. The first encounter was over six weeks late, while the second occurred a month early. Both encounters occurred at the cell front due to the patient's refusal and were brief. Documentation was generic, nearly identical across encounters, and included documentation of extensive patient education that was not relevant to the patient's care and unlikely to have been provided during the cell-front visit. New psychiatric diagnoses were introduced without discussion, and these remained unreconciled with those listed in the health record.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was no treatment plan available to guide 3CMS care, and the annual IDTT meeting was overdue. Mental health encounters were brief and not consistently timely. The existing case formulation noted an extensive history of trauma in a Palestinian refugee camp that contributed significantly to the patient's clinical presentation; treatment based on this formulation was not provided. Primary clinician and psychiatric follow-up appointments were brief, and the primary clinician did not provide interventions beyond wellness checks and brief mental status exams. Psychiatric documentation was inadequate and included inaccurate information regarding education provided to the patient.

**Patient K**

This 50-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with unspecified depressive disorder, unspecified schizophrenia spectrum and other psychotic disorder, cocaine use disorder, severe, and antisocial personality disorder. He was prescribed chlorpromazine, fluoxetine, hydroxyzine, mirtazapine, and oxcarbazepine, and was adherent with all medications except chlorpromazine, which he accepted about 84% of the time. Melatonin was prescribed PRN for insomnia, and the patient used this medication nightly. Two suicidal episodes, one in 1986 and one in 1996, were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. Medical conditions included obesity, lumbar spondylosis, osteoarthritis of the right knee, solitary lung nodule, and intermittent asthma. He was hearing impaired and used hearing aids. He was placed in RHU 3CMS care at CSP/Sac on December 18, 2024, and he remained there through the end of the review period.

The initial primary clinician assessment was timely but did not indicate whether the interview was confidential. The assessment included an incomplete mental status exam and did not update the case formulation. The initial psychiatric assessment was timely, confidential, and adequate. An RVR mental health assessment found no contribution of mental illness to the alleged behavior that resulted in RHU placement. The initial IDTT meeting was held 22 days after arrival and attended by the patient and required staff. The patient was not found to meet any criteria for consideration of a higher level of care. A treatment plan developed prior to the patient's arrival in the RHU was

adopted without modification or updates regarding treatment progress. It contained measurable goals with no baseline measurement and did not address psychiatric care or psychotic symptoms. Specific CBT interventions were listed to address the patient's depression and anxiety. The patient was offered individual sessions with his primary clinician about once every two weeks. The first of these occurred 19 days after the patient's arrival but was confidential and consistent with the treatment plan. The patient refused out-of-cell confidential sessions thereafter, and the encounters were brief wellness checks. Progress notes were largely duplicative, with nearly identical mental status descriptions. The patient was offered a two-hour group monthly and participated in two of the three offered.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The initial primary clinician assessment did not address the patient's recent behavior or current placement in RHU in the case formulation and did not include a complete mental status exam. The patient's unspecified diagnoses were not clarified, and the patient's partial adherence with antipsychotic medication was not addressed. The patient did not receive weekly primary clinician contacts or weekly structured group therapeutic activities. The patient's refusal of confidential encounters with his primary clinician was not explored. His treatment plan was not updated and the IDTT meeting was not timely.

**Patient L**

This 27-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood and other or unknown substance-induced psychotic disorder. He was prescribed mirtazapine and olanzapine and adherent with these medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and became adherent with this medication during the review period. Medical conditions included HIV+ status, opioid use disorder, mild intermittent asthma, dyslipidemia, cyst of epididymis, and varicocele. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. He was placed in RHU 3CMS care at CSP/Sac on November 19, 2024, and remained there through the end of the review period.

The initial psychiatric assessment occurred at the cell front because late scheduling resulted in no ducat being issued. The assessment was timely but brief, and it did not reflect awareness that the patient may have recently been captured on video camera in the act of stabbing or slashing a peer's throat. The initial primary clinician assessment was timely and adequate, apart from generic case formulation that was not updated, individualized, or helpful in specifying interventions. The initial IDTT meeting occurred late and was attended by required staff and the patient. The patient was not found to meet criteria for a higher level of care. The treatment plan addressed sleep disturbance and depression, but not the patient's psychiatric care or reported auditory hallucinations. The subsequent quarterly IDTT meeting occurred late and did not result in meaningful documentation of the patient's treatment progress. The assigned psychiatrist followed him timely, confidentially,

and adequately, and increased the dosage of olanzapine to address the patient's continuing reports of harassing auditory hallucinations. The assigned primary clinician saw the patient once every two weeks during the period reviewed. Only the first encounter was confidential, and all remaining encounters occurred at the cell front, with the primary clinician documenting that the patient refused confidential settings in each case. Progress notes were largely duplicative, with nearly identical mental status descriptions. The patient received structured therapeutic group activity for two hours once every two to four weeks.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The case formulation was generic, and the treatment plan addressed only some of the patient's reported symptoms; neither document provided an adequate framework for guiding the care that was needed or provided. IDTT meetings were not timely. While psychiatric care was responsive to reported symptoms, the nature of the patient's auditory hallucinations, including the hypothesized source of these hallucinations, was not adequately explored or addressed. All but one primary clinician encounter was a cell-front wellness check. Provision of sleep hygiene, emotion regulation, and thought replacement skills, as required by the treatment plan, was not documented. The patient did not receive weekly primary clinician contacts or weekly structured group therapeutic activities. Reasons why the patient declined confidential primary clinician encounters were not adequately explored or addressed.

**Patient M**

This 28-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with unspecified depressive disorder. On a PRN basis, he was prescribed divalproex sodium, hydroxyzine, and mirtazapine for agitation, anxiety, and insomnia, respectively. He used all three medications, often all on the same day, throughout the monitoring period, with a variable pattern of use. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS and one night of MHCB services following spice ingestion. Medical conditions included a meniscus tear in the left knee and a history of a drug overdose in 2021. He was placed in RHU 3CMS care at CSP/Sac on November 29, 2024 and remained there through the end of the review period.

The initial psychiatric assessment was timely but cursory and occurred at the cell front because the patient refused a confidential setting. The assessment indicated that anxiety was the primary problem and provided no discussion of the rationale for prescribing a mood stabilizer on a PRN basis. The initial primary clinician assessment was late, incomplete, and not adequate. The assessment interview was not confidential, and the case formulation addressed criminal behavior rather than psychiatric symptoms; the case formulation was not updated. The initial IDTT meeting occurred late but was attended by the patient and required staff. The patient was not found to meet criteria for consideration of a higher level of care. The treatment plan identified depression and anxiety as treatment targets but lacked measurable goals or specific interventions. CBT was listed generically as the only intervention, and the patient's need for three PRN medications was not

addressed. A subsequently quarterly IDTT had not occurred as of April 11, 2025. Immediately following the review period, the assigned psychiatrist provided a timely and confidential follow-up appointment and converted all PRN medications to scheduled medications to improve adherence and effectiveness. The primary clinician saw the patient once every two to four weeks. Half of these encounters occurred at the cell front, and one progress note indicated that the patient was seen at the cell front because he did not request a confidential setting. There was no evidence that CBT was provided. Therapeutic groups were offered monthly for two hours.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The initial psychiatric and primary clinician assessments, case formulation, and treatment plan were deficient and insufficient to guide 3CMS care. Both the primary clinician assessment and the IDTT meeting were late. A quarterly IDTT meeting was overdue by more than a month as of April 11, 2025. Use of a mood stabilizer on a PRN basis fell outside the standard of practice. The patient did not receive weekly individual or group treatment. The primary clinician's reliance on the patient not requesting a confidential setting for an encounter was clinically inappropriate. Individual primary clinician encounters did not reflect the provision of meaningful treatment.

**Patient N**

This 56-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with adjustment disorder with mixed emotional features and antisocial personality disorder. During the latter third of the review period, he was prescribed fluoxetine as a keep on person medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. Medical conditions included intermittent asthma, hypertension, arthralgia of knee, congenital pes planus, and ametropia. He was placed in RHU 3CMS care at CSP/Sac on September 19, 2024, and remained there through the end of the review period. He used a cane and orthotic shoes.

The initial psychiatric and primary clinician assessments were timely and confidential. The initial psychiatric assessment was cursory but noted that the patient was unwilling to accept psychotropic medications or EOP care. A diagnosis of unspecified personality disorder was made. The primary clinician assessment included two mental status exams, and information regarding the patient's mood, affect, attitude, insight, and judgment was contradictory across the exams. Diagnoses of adjustment disorder with mixed emotional features and antisocial personality disorder were made. The case formulation was not updated. The initial IDTT meeting occurred timely and was attended by the patient and required staff. The patient was not found to meet criteria for consideration of a higher level of care. The treatment plan was clinically appropriate and included measurable goals and specific interventions. The rationale for retaining the patient in 3CMS care was adequately documented. No quarterly IDTT meetings were held during the review period. A mental health assessment for an RVR of battery with a deadly weapon identified a nexus between the patient's mental health and the alleged behavior but indicated that the patient was unlikely to decompensate if retained in RHU.

During the review period, the primary clinician followed the patient once every 14 to 21 days. The encounters were confidential except when the patient refused. The patient was consistently described as frustrated, irritability, and loquacious in his complaints about perceived mistreatment, a self-reported writing disability and need for accommodations, and his mind operating "like a beehive" with "a million thoughts." The primary clinician described the patient's complaints about CDCR's allegedly fraudulent behavior and mistreatment as delusional. A psychology intern and supervisor completed a battery of psychological tests with the patient; results and recommendations were not documented in the EHRS. After more than two months in the RHU, the patient began to be offered two-hour recreational groups. These were offered once a month except in December 2024, when he was offered two groups on the same day. He did not attend any group offered. In mid-January, 2025, the psychiatrist saw the patient for an unplanned encounter on the yard. During this encounter, the patient exhibited extreme and obsessive self-doubt and agreed to a low dose of fluoxetine for anxiety; he was not found to exhibit signs of psychosis.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The case formulation was not updated, and mental health diagnoses were not reconciled. Despite a clinically appropriate treatment plan, planned treatment was not delivered. After the initial IDTT and before April 11, 2025, two quarterly IDTT meetings were required but none occurred. The patient remained perseverative, hyperverbal, difficult to redirect, irritable, and prone to infer hostile intentions throughout the review period. The intense nature of the patient's presentation was described as delusional, extreme, and obsessive, but symptoms and behaviors were not adequately assessed or appreciated as potential symptoms. The patient did not receive evidence-based treatment beyond a starting dose of fluoxetine, and his treatment needs were not met.

**Patient O**

This 36-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with unspecified bipolar and related disorder, opioid use disorder, moderate, and antisocial personality disorder. Through a 2602 order for involuntary medication due to grave disability and danger to others, he was prescribed haloperidol decanoate, mirtazapine, and olanzapine. He was adherent with these medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Two episodes of self-injurious behavior, in the form of swallowing foreign objects, were listed in the health record. Within CDCR, the patient previously received 3CMS, MHCB, EOP, and APP services. Medical conditions included chronic kidney disease, intermittent asthma, a history of neutropenia, and a history of knee surgery. He was placed in RHU 3CMS care at CSP/Sac on May 16, 2024, and remained in RHU 3CMS care throughout the review period. He had a custody classification score of 999 points.

The first quarterly IDTT meeting during the review period occurred over a month late. It was attended by the assigned primary clinician, a substitute for the assigned psychiatrist, the assigned

correctional counselor, and a senior psychologist supervisor. IDTT documentation indicated both that the patient attended and was cooperative with the treatment team, and that the patient declined to attend. Treatment goals were documented as anger management, impulse control, and medication adherence, but these were not reflected in the treatment plan, which addressed only violence and not symptoms of serious mental illness or need for involuntary treatment The treatment plan indicated that the patient had met the treatment goal of being free of violent behaviors for 90 days, but no new treatment goals were formulated to guide treatment. A subsequent quarterly IDTT meeting did not occur for 154 days, after the current review period, and the treatment plan remained unmodified and inapplicable as a treatment guide. The patient was started on involuntary medication during the review period and followed timely and adequately by the psychiatrist. The patient showed a partial but not yet adequate response to medication, and the dose of haloperidol decanoate was increased. The patient was offered individual encounters with his primary clinician once every two weeks, and additional consults were provided after the patient returned from court appearances. Almost all contacts were at the cell front due to the patient's refusal of confidential setting, but in one of the few confidential encounters the patient voiced grandiose delusions. He was offered two-hour recreational therapy groups once a month but attended none. A mental health assessment for an RVR alleging threatening great bodily injury or death found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The initial IDTT meeting was late, contained internally contradictory information about the patient's attendance, and did not produce a treatment plan that adequately addressed the patient's psychotic symptoms and need for involuntary treatment. A quarterly IDTT meeting was more than two months late and did not improve the treatment plan. While the treating psychiatrist followed the patient adequately, the patient did not receive weekly individual primary clinician contacts or weekly RHU 3CMS groups. Apart from psychotropic medication, the patient did not receive evidence-based care for psychotic symptoms, and his psychiatric diagnosis remained unspecified and unclear. Minimum program guideline requirements were not met, and the patient's disengagement with treatment was not adequately explored or addressed.

**Patient P**

This 22-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with an unspecified anxiety disorder. He was prescribed hydroxyzine and mirtazapine but was adherent only with mirtazapine. Hydroxyzine, mirtazapine, and melatonin were also prescribed PRN for anxiety and insomnia. He used PRN hydroxyzine and melatonin intermittently and PRN mirtazapine regularly until this medication was ordered as scheduled. Despite the addition of scheduled mirtazapine to the patient's medications, PRN mirtazapine continued to be ordered and was subsequently renewed. Medical conditions included mild persistent asthma, seizure disorder, eczema, and back pain. No suicide attempts or self-injurious behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. He was placed in RHU

3CMS care at CSP/Sac on September 12, 2024, and remained there through the end of the review period.

The initial primary clinician assessment was timely but relied exclusively on record review because the patient declined to participate and decided to sleep instead. This did not stop a mental status exam from being completed, and the patient was found to be alert, fully oriented, interactive, attentive, and free from disturbances in mood, affect, thought, or perception. The patient's judgment was determined to be fair; no rating of the patient's insight was offered. An updated and adequate case formulation was not developed. The initial psychiatric assessment was also timely but was limited and occurred at the cell front due to the patient's refusal of a confidential setting. The initial IDTT meeting was timely and attended by required staff but not the patient, who refused. He was not found to meet any criteria for consideration of a higher level of care. The case formulation was not updated, and the treatment plan continued treatment goals developed four to nine months earlier. These goals focused on anxiety and insomnia as problems and were accompanied by no interventions in one case and only one vague intervention – medications – in the other. No quarterly IDTT meetings occurred. The patient was followed timely by psychiatry, but encounters were brief and occurred at the cell front due to the patient's refusals. Primary clinician encounters occurred every two weeks in non-confidential settings, in part due to staff shortages. In one instance, the primary clinician documented that the encounter occurred at the cell front because the patient did not request a confidential contact. There were no primary clinician encounters between January 29, 2025 and February 27, 2025. The patient was offered three two-hour recreational meetings during the review period, spaced one month apart. He did not attend. A mental health assessment for an RVR alleging battery causing serious injury found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

Although both were timely, neither the initial primary clinician nor the initial psychiatric assessment provided sufficient clinical information to provide treatment guidance. The only IDTT meeting during the review period was held in absentia, and as of April 11, 2025, two quarterly IDTT meetings should have been held but were not. Psychiatric care was timely but minimal and did not address the patient's disengagement. The rationale for continuing to prescribe mirtazapine on a PRN basis after a scheduled dose had been ordered was not documented. The patient received no confidential individual and group treatment, never had a case formulation adequately developed, and remained disengaged from treatment. Reliance on the patient not asking for a confidential encounter as the reason for a cell-front contact was clinically inappropriate.

**Patient Q**

This 23-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood. He was prescribed hydroxyzine, mirtazapine, and quetiapine PRN for insomnia and agitation, and he used these medications regularly. Abnormal thyroid hormone tests were noted as a medical condition. No suicide attempts or self-injurious

behaviors were listed in the health record. Within CDCR, the patient previously received 3CMS services, with no higher levels of care. He was placed in RHU 3CMS care at CSP/Sac on January 29, 2025, and remained there until March 5, 2025.

The initial primary clinician assessment was timely and provided an adequate clinical summary but an inadequate case formulation. During the assessment, the patient reported using illicit substances and overusing prescribed medications to treat emotional pain. The initial psychiatric assessment occurred timely but was brief and cursory. It occurred at the cell front due to the patient's preference. The patient reported auditory hallucinations secondary to methamphetamine use and requested an increase in the PRN order for quetiapine. The psychiatrist determined not to raise the quetiapine dose but continued it to assist with methamphetamine withdrawal. The initial IDTT meeting occurred timely and was attended by required staff but not the patient, who declined to attend. The patient was not found to meet any criteria for consideration of a higher level of care. The treatment plan appropriately continued two prior goals addressing depression and anxiety, added a third addressing medication overuse and substance use, and was appropriate. The rationale for retaining the patient in 3CMS care was not documented. Following the IDTT meeting, the primary clinician saw the patient once every two weeks. One of these contacts was a wellness check at the cell front, and neither contact documented interventions required by the treatment plan. He was not offered any mental health groups. A mental health assessment for an RVR alleging possession of a deadly weapon found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The initial psychiatric assessment was cursory and did not address the patient's self-reported overuse of prescribed medications. Neither the initial psychiatric nor the initial primary clinician assessment provided an adequate exploration of the patient's substance use history and its potential relationships with anxiety and depressive symptoms. When the patient was placed in RHU, he had been diagnosed with an adjustment disorder for over a year, and the duration of this adjustment disorder was inadequately investigated. The patient did not receive the required minimum individual and group treatment while in RHU 3CMS care. The interventions the patient did receive were not consistent with the treatment plan.

**Patient R**

This 26-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with persistent depressive disorder and generalized anxiety disorder. He was prescribed was prescribed duloxetine and mirtazapine and was nonadherent with these medications. Medical conditions included a seizure disorder and a history of arthroscopic rotator cuff surgery. Two episodes of self-injurious behaviors, both in 2022, were listed in the health record. Within CDCR, the patient previously received 3CMS and MHCB services, with no higher levels of care. He was placed in RHU 3CMS care at CSP/Sac on November 7, 2024 and remained there until March 17, 2025, when he was transferred to another facility.

The patient reported grief and suicidal ideation on November 7 and 8, 2025. Two suicide risk evaluations determined that the patient was at moderate and then low risk; both evaluations concluded that he did not require a higher level of care to maintain safety. The accompanying safety plan was inadequate. The initial primary clinician assessment was timely but included a generic and inadequate case formulation. The case formulation was not updated and did not address the patient's symptoms, reports of suicidal ideation, or placement in RHU. The initial psychiatric assessment was also timely and included careful observations and a rationale for retaining the patient in RHU 3CMS care despite elevation in suicide risk. Duloxetine was initiated to assist the patient with grief and depression. The initial IDTT meeting occurred timely and was attended by the patient, the assigned primary clinician, an alternate for the assigned psychiatrist, a senior psychologist supervisor, and the assigned correctional counselor. The patient was not found to meet criteria for a higher level of care, but the treatment team determined that the patient would be seen weekly while he was adjusting to duloxetine, and during these encounters continue to assess the patient's need for a higher level of care. The treatment plan added a new goal addressing depression to an existing goal addressing anxiety; CBT and DBT, but not psychiatric care, were documented as interventions. A quarterly IDTT meeting was not held despite 123 days passing after the initial IDTT meeting, while the patient remained in RHU 3CMS care.

The psychiatrist provided timely follow-up encounters during the patient's RHU stay. Both encounters were brief and occurred at the cell front due to the patient's preference, and duloxetine was discontinued at the patient's request. During both encounters, the psychiatrist provided a new diagnosis of major depressive disorder but did not document the rationale for this diagnosis. Despite a treatment plan that called for weekly contacts, the primary clinician often saw the patient less frequently during the review period. When the patient accepted a confidential encounter, the primary clinician's progress notes documented interventions that were consistent with the treatment plan. However, the patient frequently refused, and contacts consisted of wellness checks in these instances. The primary clinician continued to document diagnoses of persistent depressive disorder and generalized anxiety disorder. The patient was offered either one or two two-hour recreational therapy groups once every two weeks, and he attended these.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The safety plan developed in response to the patient's suicidal ideation was inadequate, and the patient's suicide risk may have been under-appreciated, given that he was retained in RHU 3CMS care despite separate findings by the psychiatrist and primary clinician that the patient was at moderate risk. The patient was suffering from significant depression, as evidenced in psychiatric documentation. However, the diagnosis of major depressive disorder made by the psychiatrist was not reconciled with diagnoses made by the primary clinician. The patient's medication nonadherence was inadequately explored. He did not receive a quarterly IDTT meeting, did not consistently receive the weekly contacts required in the treatment plan, and did not receive the minimum individual and group treatment required by the program guide.

**Patient S**

This 51-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with opioid use disorder, severe, generalized anxiety disorder, and antisocial personality disorder. He was prescribed aripiprazole and was nonadherent with this medication. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Medical conditions included genital herpes simplex, eczema, cobalamin deficiency, and unintended weight loss. One episode of self-asphyxiation was listed in the health record. Within CDCR, the patient previously received 3CMS and MHCB services. He was placed in RHU 3CMS care at CSP/Sac on August 21, 2024, and remained there through the end of the monitoring period.

The initial IDTT meeting occurred late, soon after the monitoring period commenced, and was not preceded by an initial psychiatric assessment. The meeting was attended by required staff except for the assigned psychiatrist. An alternative for this psychiatrist attended, and the patient declined to attend. The patient was not found to meet criteria for consideration of a higher level of care, and the team determined to maintain the patient in 3CMS care to address symptoms of anxiety, depression, and anger. No treatment plan was developed, and there was no case formulation. A quarterly IDTT meeting was not held until March 13, 2025, 189 days after the initial IDTT meeting. This meeting was also held in absentia due to the patient's refusal, and although required staff attended it, no case formulation or treatment plan were developed. The patient was retained in 3CMS care to reduce symptoms of anxiety and depression. The initial psychiatric assessment was not completed for 97 days after the patient's placement in RHU and 82 days after the initial IDTT meeting. The assessment was cursory and occurred at the cell front due to the patient's refusal of a confidential setting. Diagnoses were not addressed and the rationale for aripiprazole for anxiety symptoms was not documented.

Psychiatric follow-up occurred timely but was limited due to the patient's refusal of a confidential setting. The patient's nonadherence with aripiprazole was discussed and an agreement to continue the medication with the patient's re-commitment to take it as prescribed. Psychiatric diagnoses and the rationale for aripiprazole continued to be unaddressed. The primary clinician saw the patient individually once every two weeks during the review period except during the 35 days between December 13, ,2024 and January 17, 2025, when no individual encounters occurred. All primary clinician encounters occurred at the cell front due to the patient's refusals of confidential settings, and they constituted brief wellness checks. Beginning in January 2025, the patient was offered one two-hour recreational group about once a month; he attended none of them.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

There was no case formulation or treatment plan to guide 3CMS care. Symptoms, diagnoses, and the rationale for prescribing an antipsychotic medication were inadequately documented. The initial psychiatric assessment was substantially delayed, and the initial IDTT meeting occurred without the benefit of a current psychiatric assessment. The quarterly IDTT meeting occurred quite late and did not result in specification of the patient's treatment. The patient did not receive the minimum individual and group treatment required by the program guide, and primary clinician

contacts consisted exclusively of wellness checks. The patient's refusals of confidential settings for these encounters were not adequately explored or addressed.

**Patient T**

This 39-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with insomnia, although no mental health problems were listed in the health record. He was prescribed PRN melatonin for insomnia and used this medication intermittently. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included obesity, hypertension, dyslipidemia, atypical chest pain, mitral valve prolapse with bradycardia, urticaria, and a history of a fractured foot. Within CDCR, the patient had not previously received MHSDS services. He had been incarcerated for more than 16 years before being placed in the MHSDS. He was placed in RHU at CSP/Sac on January 7, 2025, and began receiving mental health services on January 16, 2025, after requesting medication to assist his sleep. He received RHU 3CMS care from January 16, 2025 through the end of the monitoring period.

The post-placement mental health screening for non-MHSDS individuals occurred timely and adequately. A brief mental health free text note indicated that the patient attended an IDTT meeting on January 16, 2025 and the treatment team agreed to place the patient into the MHSDS at 3CMS level of care. A master treatment plan psychiatry review was completed on the same date, documenting the initiation of 3CMS care but failing to provide a rationale beyond targeting mood and insomnia symptoms. The review indicated that the patient was improving and was not receiving any psychotropic medication. The psychiatrist entered an order for PRN melatonin later that day. No other documentation for this IDTT meeting was developed, and there was no documentation that a mental health orientation brochure was provided. The initial primary clinician assessment was timely but cursory. It provided only a minimal psychosocial history, no case formulation, and no treatment recommendations. The initial psychiatric assessment was late, minimal, and consistent with a brief contact note rather than an assessment. The encounter occurred on the yard at the patient's preference, and the patient requested melatonin be stopped because it was ineffective. The initial IDTT meeting did not occur until after the review period, on March 20, 2025, 63 days after the patient began to receive 3CMS services, and was mislabeled a quarterly rather than an initial IDTT meeting. Although required staff attended, the patient declined to attend, and no case formulation or treatment plan were developed. The primary clinician saw the patient about once every two weeks and documented the provision of sleep hygiene skills and the patient's response to them. Three of five encounters occurred at the cell front due to an institutional lockdown or the patient's refusals, and these contacts were consistent with wellness checks. The patient was not offered any other structured therapeutic groups.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

There was no documentation that the newly enrolled patient received mental health orientation brochure. The initial psychiatric and primary clinician assessments were inadequate. There was no case formulation or treatment plan to guide 3CMS care, and the nature of the patient's insomnia

was inadequately explored. The initial IDTT meeting was late and did not result in a treatment plan. Although meaningful interventions in the form of melatonin and sleep hygiene training were provided, the patient did not receive weekly individual or group therapeutic activities, and the patient's response to interventions was not followed adequately. Reasons why the patient refused to attend his IDTT meeting and individual primary clinician sessions were not adequately explored or addressed.

**Patient U**

This 46-year-old, maximum custody, non-binary, MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. They were diagnosed with major depressive disorder, recurrent, with psychotic features, and antisocial personality disorder. They were prescribed venlafaxine and partially adherent with this medication. Hydroxyzine and mirtazapine were prescribed PRN for anxiety and insomnia; he used both medications frequently. Three suicide attempts, one overdose with unknown intent, and one instance of self-injurious behavior were listed in the health record. Medical conditions included paroxysmal atrial flutter, sickle cell trait, gastroesophageal disease, migraines, hyperlipidemia, leukopenia, eczema, and hepatitis B. Within CDCR, the patient had previously received all levels of mental health care. They were admitted to MHCB care on February 7, 2025 for suicidal ideation and acute distress in the context of safety and housing concerns and a family death. They were referred to ICF care on February 18, 2025 but remained in MHCB housing on ICF status from February 18, 2025 through February 27, 2025. The patient returned to MHCB status in MHCB housing from February 27, 2025 through March 4, 2025 and was then discharged to RHU EOP.

The pre-admission mental health consult, accompanying suicide risk evaluation, and initial psychiatric assessment were timely and adequate. No initial primary clinician assessment was completed. The initial IDTT meeting was timely, attended by the patient and required staff, and documented the rationale for retaining the patient in MHCB care despite meeting criteria for consideration of a higher level of care. Although IDTT documentation indicated that the patient may have sought MHCB care for safety reasons, the MHCB prevention planning indicated that this was not the case. No case formulation was developed. No patient strengths were documented. An old EOP treatment plan was adopted without modification or updating. The plan did not address suicidal ideation and was not appropriate for MHCB care. Weekly IDTT meetings occurred timely and were consistently attended by required staff but not the patient, who declined to attend. The rationale for an ICF referral was adequately documented, although the MHCB team noted that the patient did not present with significant mental health concerns and instead appeared to be seeking a higher level of care to transfer out of CSP/Sac. The case formulation continued to be missing, and the treatment plan was not updated. On February 26, 2025, the PIP referral was rejected, and the MHCB team rescinded the referral. Throughout their MHCB care, the patient was seen daily by a psychiatrist or primary clinician, but most encounters were brief. Most primary clinician encounters occurred at the cell front, and four psychiatrists shared the patient's care. Progress notes contained much material that was copied from other notes or assessments and did not consistently indicate whether the encounter was confidential. Provision of skills-building or other interventions outside of medication was not documented. After a late recreational therapy intake assessment, recreational therapy was provided on only one occasion. The discharge suicide risk evaluation found the patient at moderate risk. The accompanying safety plan did not address

the patient's pattern of reporting suicidal ideation and engaging in self-harm to affect changes in the environment, and the plan was insufficient to meet the patient's treatment and safety needs. The patient was discharged to EOP care essentially unimproved, and the psychiatric discharge summary, while timely, failed to provide a synthesis of the patient's clinical presentation or treatment needs.

**Findings**

The care provided to this MHCB patient was inadequate.

No case formulation was developed, and the treatment plan was not updated or appropriate for crisis care. Although the patient's medication nonadherence was adequately addressed, much of the MHCB care consisted of monitoring and waiting rather than provision of interventions. Most primary clinician encounters were not confidential, and continuity of psychiatric care was a challenge. Progress notes contained only sparse current information. While rescission of the ICF referral may have been clinically appropriate, the rationale for this rescission was poorly documented and appeared to be driven by the PIP rejection rather than clinical reformulation of the patient's treatment needs. The patient's hypothesized use of suicidal statements and self-injurious behaviors to affect changes in the environment was not adequately addressed. The patient remained at elevated risk for problem behaviors at discharge, the safety plan was inadequate, and it was not clear that the patient benefitted from the protracted MHCB stay.

**Patient V**

This 43-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with unspecified anxiety disorder and opioid use disorder. He was prescribed bupropion and duloxetine and was adherent with the former and partially adherent with the latter. Olanzapine was prescribed PRN for anxiety, and he used this medication on five of nine days while in MHCB care. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Six suicide attempts and three episodes of self-injurious behavior were listed in the health record. Medical conditions included mild intermittent asthma, a history of drug overdose, and a lipoma located on his scalp. Within CDCR, the patient had previously received all levels of mental health care. He was admitted to MHCB care on February 25, 2025 for suicidal ideation and discharged to RHU EOP care on March 6, 2025.

The pre-admission consult and accompanying suicide risk evaluation were adequate and resulted in clinically appropriate findings of elevated risk and a MHCB referral, despite the clinician's confrontational approach to challenging the patient's report of symptoms and suicidality. The initial psychiatric assessment was timely and well done. However, in response to the patient's reports of auditory hallucinations telling him to hurt himself, the psychiatrist ordered olanzapine PRN up to three times a day for anxiety, without any accompanying scheduled antipsychotic medication or discussion of the patient's diagnoses. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by required staff except the assigned primary clinician, for whom an alternate clinician attended. The patient declined to attend and was not found to meet criteria for a higher level of care. No case formulation, patient strengths, or

verbalized goals were documented. The treatment plan was adopted without modification from one developed in June 2024. It did not address suicidal ideation and was not appropriate for crisis bed care. Although other documentation made clear that the team suspected that the patient reported suicidal ideation and symptoms to avoid a return to RHU, MHCB prevention planning was not documented. Three psychiatrists and two primary clinicians offered the patient daily encounters, but these were brief and often refused. Progress notes did not consistently indicate whether the encounter was confidential. Non-pharmacological interventions were not documented. No recreational therapy was offered following the recreational therapy intake assessment. The discharge suicide risk evaluation found the patient at moderate risk but appropriate for discharge to RHU EOP care. The accompanying safety plan was adequate. The discharge IDTT meeting was attended by required staff but not the patient and failed to provide any case formulation or an updated treatment plan. The psychiatric discharge summary was timely, but rather than summarize the course of care, the psychiatrist copied and pasted sections of progress notes into the discharge summary.

**Findings**

The care provided to this MHCB patient was inadequate.

MHCB care lacked a case formulation and a current and clinically appropriate treatment plan. The initial psychiatric assessment was a strength. However, the nature of the patient's self-reported command auditory hallucinations was poorly investigated, and the treatment team's conclusion that the patient was reporting suicidal ideation and symptoms to avoid a return to RHU was insufficiently supported with evidence. Despite this, the primary clinician's conclusion that the patient's sense of being a burden to others and hopelessness represented a strength in the patient's care. Meaningful and evidence-based interventions outside of psychiatric care were not documented, and use of PRN olanzapine for anxiety was off-label. Most primary clinician encounters were not confidential, and continuity of psychiatric care was a challenge. Reasons for the patient's refusals of confidential encounters and IDTT meetings were not adequately explored or addressed. There were no attempts to discuss and specify the patient's diagnoses. The discharge safety plan was useful.

**Patient W**

This 29-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with posttraumatic stress disorder, unspecified depressive disorder, narcissistic personality disorder, and antisocial personality disorder. He was prescribed haloperidol and oxcarbazepine but was nonadherent with both medications. Intramuscular haloperidol, lorazepam, and diphenhydramine were prescribed PRN for agitation but were not used. Hydroxyzine and mirtazapine were prescribed PRN for agitation and anxiety; the patient used mirtazapine once but did not use hydroxyzine. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder but was nonadherent with this medication. Three episodes of self-injurious behaviors and one suicide attempt were listed in the health record at the time of his MHCB placement. Medical conditions included unintended weight loss, feigning symptoms, and opioid use disorder. Within CDCR, the patient had previously received all levels of mental health care except ICF care. He was admitted to MHCB care on

January 11, 2025 for suicidal ideation and ingestion of a razor blade, and he was transferred to acute care on January 27, 2025.

The emergent mental health consult and suicide risk evaluation that led to the patient's MHCB placement were adequate. The initial psychiatric assessment was timely and unusually thorough. However, malingering was noted as an ongoing problem without explanation, and the patient's report of being transgender was noted without discussion. No initial primary clinician or recreational therapy assessment were completed. The initial IDTT meeting was timely and attended by required staff but not the patient. Documentation indicated both that the patient refused to attend and that the IDTT meeting was held in absentia due to the patient's volatility. The patient met criteria for consideration of a higher level of care due to multiple RVRs and high rates of treatment refusal. He was retained in MHCB care for observation and stabilization. No case formulation, patient strengths, or verbalized treatment goals were documented. A minimally adequate treatment plan was developed. Later that day, the patient took an overdose of buprenorphine-naloxone in view of nursing staff. A follow-up suicide risk reassessment failed to explore the nature of the patient's behavior, did not involve contact with the patient, and stated that the evaluation was completed to "satisfy some policy/procedure within CDCR" but was not clinically indicated. Psychotropic medications were changed to liquid formulation to prevent hoarding. However, nursing staff continued to be concerned that the patient was hoarding medications, and three days later the patient was placed on enhanced direct observation treatment, which required him to exit his cell to receive medication.

One of four psychiatrists and/or one of three primary clinicians followed the patient daily. He refused most of these encounters and remained agitated, angry, and uncooperative with treatment. Two of the progress notes – one from a psychiatrist and one from a primary clinician – were thorough and reflected careful clinical thinking; the remaining progress notes were brief and limited. The patient's transgender identity was not discussed and instead was noted as a patient complaint. The weekly IDTT meeting was timely and again held in absentia due to the patient's refusal. Required staff attended and determined that the patient was unable to function adequately due to his mental illness. The patient was referred to acute care. The case formulation, patient strengths, and verbalized treatment goals remained undocumented. The patient engaged with his primary clinician for the first time after the IDTT and continued to be agitated, anger, pressured, grandiose, and manic or hypomanic. The psychiatric discharge summary was developed at the time the patient was referred to acute care, six days prior to physical transfer, and was not updated to include the course of treatment for the final six days of the MHCB stay. The discharge summary did not synthesize the course of treatment or the patient's needs and instead relied upon pasting in multiple fragments of prior progress notes. The summary noted that the team was petitioning for a non-emergent PC 2602 order but did not elaborate. A total of six mental health assessments for RVRs were completed during the MHCB stay; three found no nexus and three found a nexus between the patient's mental health symptoms and the alleged behavior, and these discrepancies went unresolved.

**Findings**

The care provided to this MHCB patient was inadequate.

There was no case formulation. The suicide risk reassessment completed after the patient took an overdose of buprenorphine-naloxone in view of MHCB nursing staff was dismissive, unprofessional, and woefully inadequate. The nature of the patient's agitation, suicidal ideation, pressured speech, escalation in assaultive behaviors, resistance to treatment, and anger was inadequately explored and addressed. Findings that the patient was potentially manic or hypomanic were not reconciled with psychiatric diagnoses. The notation of the patient's transgender identity as a "complaint," without discussion, was inadequate and potentially dismissive. Safety interventions, including the provision of psychotropic medications in liquid form and the requirement for enhanced direct observation treatment, were clinically appropriate, as was the referral to acute care and the petition for involuntary treatment. However, the patient did not receive adequate assessment or treatment while in MHCB care. The psychiatric discharge summary was weak and out of date when the patient was transported to inpatient care.

**Patient X**

This 30-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with posttraumatic stress disorder and borderline and antisocial personality disorders. He was prescribed bupropion, olanzapine, and prazosin and was adherent with olanzapine and prazosin and partially adherent with bupropion. Diphenhydramine, an additional dose of olanzapine, and chlorpromazine were ordered PRN for agitation, and one or more of these medications was used on four occasions during the MHCB stay. Multiple suicide attempts and self-injurious behaviors were listed in the health record. Medical conditions included a history of hepatitis C. Within CDCR, the patient had previously received all levels of mental health care. He was admitted to MHCB care at CSP/Sac on November 22, 2024 immediately following discharge from a 452-day stay at CHCF-PIP; MHCB placement was due to self-injurious behavior and suicidal ideation. He was referred to acute care on December 2, 2024 and transferred to acute care at CMF on December 4, 2024.

On the day he was transferred from CHCF-PIP to CSP/Sac, the patient cut himself in multiple locations on the upper extremities, and he arrived at CSP/Sac bandaged, tearful, and reporting suicidal ideation. The mental health consult and suicide risk evaluation upon arrival were adequate and found the patient at high risk. The patient was appropriately placed in MHCB care. The initial psychiatric assessment was timely but minimal. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff apart from the absence of a correctional counselor. The patient was not found to meet criteria for a higher level of care. Although IDTT documentation noted that the patient continued to report depressed mood and suicidal ideation, no case formulation, patient strengths, or patient verbalized treatment goals were documented. The treatment team suspected the patient engaged in self-injury to influence housing but did not complete MHCB prevention planning. The treatment plan identified depressed mood as the treatment target, did not address suicidal ideation, and did not identify any interventions; the plan was adopted without modification from the treatment plan developed during ICF care and was not appropriate for crisis bed care. One of five psychiatrists and/or one of two primary clinicians followed the patient daily. These encounters were brief, occasionally refused, and most occurred at the cell front. Progress notes did not consistently indicate whether the encounter was confidential. Primary clinician progress notes included appropriate crisis assessments but not treatment interventions. After the recreational therapy

assessment was completed, no recreational therapy encounters were documented. The dosage of bupropion was increased to address depressive symptoms, and olanzapine was changed to a rapid dissolving formulation, but the patient continued to engage in self-injurious behaviors. The weekly IDTT meeting was timely, attended by the patient and required staff, and resulted in a finding that the patient was unable to function adequately, a referral to acute care, and a recommendation for single celling. A thorough and thoughtful clinical summary documented the treatment team's reasoning. However, no case formulation, patient strengths, or verbalized treatment goals were documented, and the treatment plan was not updated. The referral suicide risk evaluation was adequate and found the patient at continued high risk. The psychiatric discharge summary did not synthesize the patient's course of care or treatment needs and instead relied upon copied and pasted sections of progress notes.

**Findings**

The care provided to this MHCB patient was inadequate.

No case formulation was developed, and the treatment plan was incomplete, inadequate, and inappropriate for MHCB care. The treatment team's hypothesis that the patient engaged in self-injury for secondary gains was inadequately documented and explored. Beyond medication adjustments, there was little evidence of evidence-based crisis interventions being provided. Continuity of psychiatric care was challenging, and the psychiatric discharge summary was weak. The referral to acute care was clinically appropriate, and a clinical summary in the weekly IDTT documentation was a significant strength.

**Patient Y**

This 45-year-old transgender MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with major depressive disorder, recurrent, mild, unspecified anxiety disorder, unspecified mood disorder, gender dysphoria, and borderline personality disorder. He was prescribed chlorpromazine, clonidine, mirtazapine, oxcarbazepine, and risperidone and was adherent with all but oxcarbazepine, which was discontinued. Chlorpromazine was ordered PRN for insomnia before it was converted to a scheduled medication, and the patient used these PRN doses on four occasions. Buspirone was ordered PRN for anxiety, but the patient never used it. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Nine suicide attempts and two episodes of self-injury were listed in the health record. Medical conditions included memory impairment, chronic back pain, gender dysphoria, dyslipidemia, opioid use disorder, nummular eczema, and asymmetrical hearing loss. Within CDCR, the patient had previously received all levels of mental health care. He was admitted to MHCB care on December 24, 2024 for suicidal ideation, foreign body ingestion, and an overdose. He was transferred to CMF-PIP on January 7, 2025.

The mental health consult and suicide risk evaluation that led to MHCP placement concluded that the patient engaged in self-injurious behavior with the goal of obtaining a PIP admission; nevertheless, the patient was found to be at moderate acute risk and high chronic risk for suicide, and he was placed in MHCB care. The initial psychiatric assessment was timely but cursory and

found the patient to be suffering from anxiety and psychosis. A single dose of lorazepam was ordered and administered. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. No case formulation, patient strengths, or patient verbalized treatment goals were documented. The treatment plan was copied without modification from one developed during a prior MHCB stay, did not address psychiatric care or the patient's reported command auditory hallucinations, and did not include safety planning as an intervention despite documentation that a safety plan would be developed. The patient was followed daily by one of four psychiatrists and/or one of two primary clinicians. All contacts were brief and most appeared to have occurred at the cell front; progress notes did not consistently indicate whether the encounter was confidential. The patient's dose of mirtazapine was increased to address depressive symptoms. Psychiatric progress notes indicated that staff were relying on the patient contracting for safety. Primary clinician progress notes did not document the provision of evidence-based crisis interventions. After the recreational therapy assessment, only one brief recreational therapy encounter was documented. This contact occurred at the cell front when the patient declined to accept an offered book.

The weekly IDTT meeting was timely and attended by the patient and required staff except for the assigned correctional counselor, for whom an alternate was substituted. Attempts to engage the patient in safety planning were documented as unsuccessful, and the patient was found unable to function adequately and was referred to acute care with a recommendation that he be housed in an unlocked dorm. Again, no case formulation, patient strengths, or verbalized treatment goals were documented. The treatment plan was not updated. The suicide risk evaluation required for the acute referral found the patient at high risk. This evaluation, the accompanying mental health consult, and the IDTT documentation contained identical language summarizing the course of care. The psychiatric discharge summary was developed on January 2, 2025, when the patient was referred for but not transferred to acute care. It was not updated to reflect MHCB care over the next five days, did not include any summary of the treatment course or the patient's treatment needs, and relied on copied and pasted sections of progress notes as if these were sufficient.

**Findings**

The care provided to this MHCB patient was inadequate.

No case formulation was developed, and the treatment plan was inadequate and not used to guide treatment. The initial psychiatric assessment was limited and did not adequately address psychiatric diagnoses. The patient's transgender identity received no apparent consideration in MHCB assessments or treatment considerations, beyond a simple notation of its existence. Progress notes reflected only brief contacts with the patient, with no interventions outside of psychiatric care. Reliance on safety contracting fell below the standard of care. The psychiatric discharge summary was substandard and not current at the time the patient was transferred to acute care.

**Patient Z**

This 30-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with major depressive disorder, antisocial personality disorder, and opioid and methamphetamine use disorders. He was prescribed escitalopram, olanzapine, and valproic acid, but was nonadherent with these medications despite a PC 2602 order for involuntary medication due to grave disability and danger to self and others. Hydroxyzine was ordered PRN for anxiety, and intramuscular olanzapine was ordered as a back-up for refusal of oral medications. Medical conditions included a history of gunshot wound to the bladder, self-reported neurogenic bladder, chronic urinary bladder pain, urinary retention, and lower urinary tract symptoms, gastroesophageal reflux disease, gastritis, ingestion of foreign body, hepatitis C, and opioid and methamphetamine use disorders. He used a catheter and had an extensive history of inserting and ingesting foreign bodies that required outside hospital care. Within CDCR, the patient had previously received all levels of mental health care.

He was admitted to MHCB care on February 24, 2025 for suicidal ideation and recent insertion and ingestion of foreign bodies. The pre-admission screening was adequate. A suicide risk evaluation completed the day prior to admission found the patient at moderate risk for suicide and moderate to high risk for self-injury and recommended MHCB admission. Other documentation indicated that the patient was admitted to MHCB by telepsychiatry with scant information. After MHCB admission, the patient was sent to an outside hospital overnight on February 24, 2025 for urinary retention. He returned to MHCB care between February 25, 2025 and March 1, 2025. On February 26, 2025, he swallowed a piece of metal prior to the initial psychiatric assessment and IDTT meeting but was not sent to an outside hospital. The initial psychiatric assessment was timely, confidential, and adequate. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff. He was found to meet criteria for consideration of a higher level of care due to multiple MHCB referrals. The patient's level of care and retention in MHCB care were adequately addressed. Although other documentation made clear that the team suspected that the patient reported suicidal ideation and symptoms to affect housing placement, MHCB prevention planning was not documented. No case formulation, patient strengths, or patient verbalized treatment goals were documented. The treatment plan was adopted with modification from one developed in December 2024; the new treatment goal addressed depression but did not add new interventions, and the treatment plan did not address the patient's need for involuntary treatment. When not receiving medical care at the outside hospital, a psychiatrist or primary clinician saw the patient daily. Five psychiatrists, including two on-call psychiatrists, participated in the patient's MHCB care. Progress notes did not consistently indicate whether the encounter was confidential. Progress notes indicated that the patient's observational status and issue were advanced based on safety contracting, including on March 1, 2025.

Later on March 1, 2025, he inserted foreign bodies. He was sent to an outside hospital from March 1, 2025 through March 6, 2025 for surgical removal of foreign bodies from his rectum and bladder. He was administratively discharged from MHCB care on March 4, 2025 and readmitted to MHCB from the outside hospital on March 6, 2025. Within hours of his return to MHCB on suicide precautions, the patient ingested another foreign body but remained in MHCB care. The ensuing re-admission psychiatric assessment was timely and adequate, although the patient refused to participate. The IDTT meeting on March 7, 2025 was timely and attended by required staff but not the patient, who refused, and resulted in the team referring the patient to acute care. An

accompanying suicide risk evaluation found the patient at high risk. He was recommended for a multi-person cell with the rationale that cellmates may function as deterrents to penile and rectal insertion of foreign bodies. The psychiatric discharge summary was also developed on March 7, 2025, offered diagnoses of anxiety, factitious disorder, and opioid use disorder, and adequately addressed the patient's risks but not the patient's treatment needs. Before the patient could be transferred to PIP care, he was sent to an outside hospital on March 8, 2025 through March 14, 2025 for urinary retention and a foreign body in the urethra. He was again administratively discharged from MHCB care on March 10, 2025. Within two hours of his return to MHCB care on March 14, 2025, he was sent back to the outside hospital for urethral obstruction. He remained at the outside hospital until March 17, 2025, returned to MHCB care on suicide watch, and received a third initial psychiatric assessment, which was adequate. The patient was followed daily by psychiatry or a primary clinician and transferred to CMF-PIP for acute care on March 19, 2025.

**Findings**

The care provided to this MHCB patient was inadequate.

MHCB care lacked a case formulation, and a current and clinically appropriate treatment plan. The nature, frequency, and severity of the patient's recurrent self-injurious behaviors were inadequately explored and documented. Reliance on safety contracting fell below the standard of care, was misleading, and resulted in a false determination of safety. Continuity of psychiatric care was weak. The patient's diagnoses and reasons for refusing confidential encounters and IDTT meeting were not adequately explored or addressed.

**Patient AA**

This 38-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with unspecified anxiety disorder, unspecified schizophrenia spectrum and other psychotic disorder, and antisocial personality disorder. He was prescribed PRN hydroxyzine and olanzapine for anxiety, insomnia, and auditory hallucinations. He used hydroxyzine on four of seven days in MHCB care but did not use olanzapine. Prior to the MHCB admission, one episode of self-injurious behavior in 2022 was listed in the health record. Medical conditions included diabetes and mixed hyperlipidemia. He was hearing impaired and used hearing aids. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP levels of care. He was admitted to MHCB care on February 25, 2025 for suicidal ideation and a public display of hanging in a therapeutic treatment module that required a use of force. He was discharged to mainline EOP care on March 3, 2025.

The mental health consult and suicide risk evaluation that led to the patient's MHCB admission were adequate. The initial psychiatric assessment was timely, documented the patient's agitation, anger, and disruptive behaviors, but did not adequately address the patient's diagnoses or current risk for suicide. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff. It was noted that the patient had been attending less than 50% of the EOP groups offered, but the patient reported that he had never been scheduled for EOP groups. On this basis, the treatment team determined to retain the patient in MHCB rather than refer him to a higher level of care. Neither a case formulation nor patient

strengths were documented. The treatment plan was adopted without modification from one developed for EOP care, did not address suicidal ideation, and was not appropriate for crisis bed care. Psychiatrists and primary clinicians followed the patient daily, but these encounters were brief and more consistent with monitoring and wellness checks than treatment. Progress notes did not consistently indicate whether the encounter was confidential. The patient was refused all medication for diabetes. Provision of evidence-based nonpharmacological interventions was not documented. After the recreational therapy initial assessment, no recreational therapy encounters were documented. The follow-up IDTT was timely, attended by the patient and required staff, and resulted in discharge to EOP care. Discussion of risk and protective factors relevant to the discharge decision was adequate, but IDTT documentation continued to lack an adequate treatment plan, any case formulation, and any patient strengths. The discharge suicide risk evaluation found the patient at moderate risk but with adequate mitigating and protective factors. The accompanying safety plan was adequate. The psychiatric discharge summary was timely but did not illuminate the nature of the patient's problem behaviors, address the patient's psychiatric diagnoses, or provide helpful assistance for purposes of continuity of care. Rather than summarizing the course of treatment, the psychiatrist copied and pasted sections from daily progress notes into the discharge summary.

**Findings**

The care provided to this MHCB patient was inadequate.

MHCB care lacked a case formulation and a current and clinically appropriate treatment plan. Patient strengths were not documented. Assessment of the patient's treatment needs was cursory, and the nature of the patient's anger, agitation, auditory hallucinations, potential suicidality, protest behaviors, conflicting self-reports, and refusal of diabetes medications was not adequately investigated or documented. Nonpharmacological evidence-based interventions were not documented. The patient's psychiatric diagnosis and the nature of the patient's distress that led to the MHCB admission remained unclear.

**Patient BB**

This 40-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood, attention deficit-hyperactivity disorder, antisocial personality disorder, and alcohol and amphetamine-type substance use disorders. He was prescribed atomoxetine, buspirone, olanzapine, oxcarbazepine, and trazodone and was adherent with these medications except olanzapine. In response to nonadherence, olanzapine was changed from a scheduled to a PRN medication for psychosis, but the patient did not use it. Hydroxyzine was also prescribed PRN for anxiety, and the patient used this medication daily. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Multiple episodes of self-injury and one suicide attempt were listed in the health record. Medical conditions included history of irritable bowel syndrome, chronic constipation, history of hepatitis C, lower urinary tract symptoms, and cannabis and opioid use disorders. Within CDCR, the patient had previously received all levels of care except ICF. He was admitted from

EOP to MHCB care on February 21, 2025 for suicidal ideation and discharged to mainline EOP care on February 28, 2025.

The mental health consult and suicide risk evaluation that led to the patient's MHCB admission were completed in a nonconfidential setting but adequately documented the patient's risks and need for MHCB care. The initial psychiatric assessment was timely but limited, and did not adequately discuss the nature of the patient's incoherent speech or flight of ideas and did not provide an updated diagnosis. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care, but it appears a sustainability report was not reviewed, as the team subsequently learned that the patient had not attended 50% of the EOP treatment that was offered. No case formulation, patient strengths, or patient verbalized goals were documented. The treatment plan incorporated treatment goals and interventions developed prior to the MHCB admission, included a new and clinically appropriate goal addressing suicidal ideation, but did not address psychiatric care. The rationale for retaining the patient in MHCB care was not documented. Psychiatrists and primary clinicians followed the patient daily. In psychiatric follow-up encounters, a diagnosis of bipolar disorder was offered without discussion. In one primary clinician encounter but not others, a diagnosis of major depressive disorder was offered without discussion. Progress notes did not consistently indicate whether the encounter was confidential. After the recreational therapy initial assessment, no recreational therapy encounters were documented. Apart from psychiatric care, no evidence-based treatment was documented. The weekly IDTT was timely and attended by the patient and required staff, documented the patient's high rate of treatment refusal in EOP care, and resulted in the patient's discharge from MHCB. No case formulation was provided, and the treatment plan was not updated to reflect the attainment of MHCB care treatment goals. IDTT documentation was internally redundant and cursory in terms of case conceptualization. No suicide risk evaluation was completed upon discharge, but a minimally adequate safety plan was developed. The psychiatric discharge summary was timely but failed to provide a useful case conceptualization or adequate discussion of the patient's treatment progress. Rather than summarizing the course of treatment, the psychiatrist copied and pasted sections from daily progress notes.

**Findings**

The care provided to this MHCB patient was inadequate.

No case formulation was developed. The nature of the patient's mental health needs was not clear from the health record, and new diagnoses of major depressive disorder and bipolar disorder were not discussed or reconciled. Apart from psychiatric care, little meaningful treatment could be discerned from the record. The decision to change olanzapine from a scheduled to a PRN medication based on the patient's refusal of the medication was problematic. A suicide risk evaluation was not completed upon discharge.

**Patient CC**

This 50-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with schizoaffective disorder,

bipolar type, borderline personality disorder, antisocial personality disorder, and amphetamine-type or other substance-induced psychotic disorder. He was prescribed fluoxetine, olanzapine, and valproic acid under a PC 2602 order for involuntary treatment due to danger to self and others, and he was adherent with these medications. Intramuscular olanzapine was ordered as a PRN backup in the event of medication refusal, but this medication did not need to be used during MHCB care. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Multiple suicide attempts and self-injurious behaviors, primarily wrist-cutting, were listed in the health record. Medical conditions included memory impairment, gastroesophageal reflux disease, being overweight, hypothyroidism, abnormal liver, hypertension, and opioid use disorder. Within CDCR, the patient had previously received all levels of mental health care. He was admitted to MHCB care on February 21, 2025 for suicidal ideation, referred to ICF care on March 3, 2025, and physically transferred to ICF care on March 13, 2025.

The mental health consult and suicide risk evaluation that led to the MHCB placement were adequate and found the patient at high risk. An initial psychiatric assessment was timely but minimal in content and more consistent with a progress note than an assessment. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff except the assigned correctional counselor, for whom a substitute attended. The patient was not found to meet criteria for a higher level of care. No case formulation, patient strengths, or patient verbalized treatment goals were documented. A clinically appropriate treatment goal and interventions were provided in the treatment plan, but the plan also included three goals developed almost eight weeks earlier, and these goals were not updated to be made relevant and appropriate for crisis bed care. The rationale for retaining the patient in MHCB care was inadequately documented. The patient was seen daily by one of four psychiatrists and/or one of three primary clinicians. These encounters were brief, and at least some occurred at the cell front. Progress notes did not consistently indicate whether the encounter was confidential. The dose of fluoxetine was increased to address significant depressive symptoms. Nonpharmacological interventions required by the treatment plan were not documented. Two brief recreational therapy contacts, one of them at the cell front, were documented. Weekly IDTT meetings were timely and consistently attended by the patient and required staff except the assigned correctional counselor, for whom an alternate attended. On March 3, 2025, the team determined that the patient unable to function adequately in MHCB care because of mental illness and referred him to ICF care. A suicide risk evaluation at the time of referral to ICF found him at moderate risk. Of note, identical language was used in this evaluation, the associated mental health consult, and the IDTT documentation. No case formulation, patient strengths, or patient verbalized treatment goals were documented in the weekly IDTT meetings, and the treatment plan was not updated. The patient remained free of self-injury while in MHCB care but reported that he was unable to manage safely in an outpatient setting, in part due to the lack of programming available at CSP/Sac. The psychiatric discharge summary was developed on March 3, 2025 and not updated to reflect the course of treatment over the next ten days of MHCB care.

**Findings**

The care provided to this MHCB patient was inadequate.

No case formulation was developed, and the treatment plan was a mixture of goals and interventions that were not relevant to crisis bed care along with a goal and interventions that were relevant. The initial psychiatric assessment was limited. Apart from psychotropic medications, the interventions called for by the treatment plan were not documented. The increase in antidepressant medication and ICF referral were clinically appropriate responses to the patient's severe depression, but there was little evidence of behavioral activation or recreational therapy to complement these interventions. The psychiatric discharge summary was developed ten days prior to the patient's actual transfer to ICF, and it did not provide a coherent summary of the course of treatment or the patient's treatment needs.

**Patient DD**

This 34-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Sac. He was diagnosed with schizoaffective disorder, bipolar type. Under a PC 2602 order for involuntary treatment due to danger to others, he was prescribed aripiprazole and venlafaxine and adherent with both. Intramuscular diphenhydramine and haloperidol were ordered as a backup for refusal of oral medications but were not used during MHCB care. Two suicide attempts and four episodes of self-injurious behavior were listed in the health record. Medical conditions included asthma, extrapyramidal disease, eczema, low back pain, and opioid use disorder. Within CDCR, the patient had previously received all levels of mental health care. He was admitted to MHCB care on October 2, 2024 for delusional thinking, referred to ICF care on October 10, 2024, and transferred to CHCF-PIP for ICF care on October 17, 2024.

The mental health consult that led to MHCB placement found the patient delusional, resistant to taking medication, talking to himself, and at risk in general population housing. The initial psychiatric assessment was timely, confidential, and adequate. No initial primary clinician assessment was completed. The initial IDTT meeting was timely and attended by the patient and required staff. Based on multiple RVRs, the patient was found to meet criteria for consideration of a higher level of care. He was retained in MHCB care for stabilization, and IDTT documentation indicated the patient was poorly oriented, psychotic, and manic. The clinical summary provided adequate detail to support MHCB placement, but no case formulation, patient strengths, or verbalized treatment goals were documented. A partially adequate treatment plan was developed, but it called for the provision of DBT skills training, an intervention that was unrealistic to provide given the severity of the patient's symptoms. Confusingly, in advance of the first weekly IDTT meeting and in anticipation of discharging the patient to EOP care, a suicide risk evaluation was completed. The evaluation found the patient at moderate risk for suicide but sufficiently stable to be considered for discharge to EOP care. The conclusion regarding the patient's stability and suitability for EOP care was reversed the following day.

Weekly IDTT meetings were timely and attended by the patient and required staff, except on one occasion when an alternate for the assigned correctional counselor attended. In the first weekly IDTT meeting, conducted one day after the suicide risk evaluation, documentation addressing the need for a higher level of care indicated that the patient had stabilized and reached maximum benefit in MHCB care. This language was prepared in advance of the IDTT meeting and contradicted in the IDTT meeting itself. The patient was found to need a higher level of care and

was referred to ICF care in single cell housing due to danger to others and significant impairment due to mental illness. In both weekly IDTT meetings, the case formulation, patient strengths, and verbalized treatment goals remained undocumented, and the treatment plan was not updated. The mental health consult required for ICF referral was adequate.

The patient was followed daily by one of four psychiatrists and/or one of three primary clinicians. Most encounters occurred at the cell front. Although the patient received several medication adjustments including an increase in antipsychotic medication, psychiatric documentation and continuity of care were problematic. An extensive "subjective/HPI" section of an October 3, 2024 psychiatric progress note was copied and pasted into the same section of an October 10, 2024 note without alteration, raising concern that the patient statements documented in the October 10, 2024 were accurate. The October 10, 2024 note also indicated that a small dose of venlafaxine would be started at the patient's request; in reality, venlafaxine was already initiated. These errors were particularly concerning because the October 10, 2024 note was saved as the psychiatric discharge summary, although no summary of treatment or treatment needs was offered. An October 13, 2024 psychiatric progress note indicated that the patient did not need a higher level of care, three days after the rest of the treatment team had referred the patient to ICF care. Primary clinician progress notes included adequate assessment of the patient's symptoms and mental status, but they did not reflect the provision of treatment interventions. Recent illicit substance use and ejection from a security threat group were suspected to contribute to symptoms. The assigned primary clinician repeatedly documented that the patient was permitted to attend yard but also, as reasons the patient was not allowed to go to yard, that the patient was decompensated and homicidal. Elsewhere, homicidal ideation was consistently documented as absent. Out-of-cell and cell-front recreational therapy encounters were documented on seven occasions. Two mental health assessments were completed during the patient's MHCB stay. The first, for an RVR alleging that the patient threatened great bodily injury or death was inadequate. It found no nexus between the patient's symptoms and the alleged behavior but provided no supportive evidence beyond asserting the absence of evidence. The second, for an RVR alleging battery on a peace officer, found a nexus and concluded that an exacerbation of the patient's psychotic and mood symptoms contributed to the alleged behavior.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient was appropriately referred to a higher level of care and received medication adjustments to address his ongoing symptoms, MHCB treatment was poorly coordinated and did not meet his needs. There was no case formulation developed, and the treatment plan included unrealistic interventions given the severity of the patient's impairment; these interventions were not, in fact, delivered. Several documents raised concerns about clinical accuracy or veracity, including a suicide risk evaluation that found the patient sufficiently stable to be discharged to EOP care, a psychiatric progress note that included subjective information which was word-for-word identical to the information provided in a progress note one week earlier, primary clinician progress notes that indicated the patient was homicidal, and a mental health RVR assessment that relied exclusively on a one-sentence opinion that there was no evidence to support a nexus between the patient's serious mental illness and alleged behavior. The psychiatric discharge summary was

inadequate and out of date at the time the patient was transferred to CHCF-PIP. Hypotheses that substance use and gang estrangement contributed to the patient's decompensation were inadequately explored and addressed.

**Patient EE**

This 36-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. He was admitted to the EOP RHU on February 23, 2025. He had a history of depression, mood swings, psychosis, and danger to self and others. He had multiple MHCB admissions and an ICF admission with discharge in October 2024, less than six months prior to the RHU admission. Discrepant diagnoses were provided during the review period, with diagnoses of antisocial personality disorder, major depressive disorder, and substance use disorders noted in the IDTT documentation, and a chronic mood and thought disorder noted in the psychiatric assessment. He was prescribed Remeron and Zyprexa. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder.

The initial PC and psychiatric assessments were not completed in advance of the initial IDTT meeting. The patient refused to attend the initial IDTT meeting, and it was conducted in absentia and attended by assigned treatment providers. Clinical documentation of the patient's treatment needs to assist with treatment planning had not been updated since the patient's MHCB admission in September 2024. Treatment goals were not updated since November 2024. The patient met criteria for a HLOC consideration due to three RVRs in the past six months and poor treatment participation. The patient reported he had received the RVRs because he was overly focused on helping others; IDTT documentation attributed the RVRs to the patient's poor boundaries and significant involvement in prison politics. The patient attributed his low treatment attendance to depression and low motivation. The HLOC nonreferral rationale did not consider his self-report and indicated that he did not show signs of decompensation and used his coping skills. The PC attributed the treatment refusals due to prison politics and illicit substance use. The basis of the PC's attributions was unclear because, in addition to insufficient data, the PC had not assessed the patient. Treatment modifications were not integrated into treatment planning or utilized during subsequent routine PC encounters.

The initial psychiatric assessment was completed at the cell front due to custody modified programming almost a week after the initial IDTT meeting. Clinical presentation including current symptoms, medication adherance, history of substance use, and mental health history were assessed. Medication non-adherance was not appropriately addressed by the psychiatrist, and no changes to the medication regimen were made.

During a four-day period between March 4, 2025 and March 8, 2025, the patient was seen for three SREs due to making suicidal statements. Two SREs a occurred on the same day. Each time, the patient was assessed as low risk. During the first evaluation, he reported that he impulsively made the statement following a misunderstanding. During the two subsequent SREs, he recanted and indicated that the suicidal statement was made to impact his environment.

Four of five required PC contacts prior to transfer to another institution occurred at the cell front. During the first of these, on March 14, 20205, the patient indicated that he wanted to be discharged

to 3CMS care; as documented, the PC's response was internally inconsistent. The March 14, 2025 progress note indicated that the PC agreed that the patient did not require EOP care and would commence paperwork for 3CMS discharge, but also indicated that the patient would continue to benefit from EOP care until his release on June 10, 2025. The patient reported that he struggled with grief and substance use and was uncertain how to change. No treatment interventions were documented in the PC's progress notes. Consultation with custody staff was unremarkable. The PC's documentation indicated a lack of awareness that the patient was prescribed Zyprexa, and it was unclear if the PC was aware of recent SREs, as they were not addressed. There was no documentation indicating that groups were offered to the patient.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The patient did not receive timely provider initial assessments to direct individualized and collaborative treatment planning. IDTT documentation did not provide a comprehensive assessment of the patient's current treatment needs, and hypotheses were made without sufficient data. As a result of the lack of updated clinical information, documentation was insufficient for continuity of care. The psychiatrist did not appropriately addressed the patient's medication non-adherence. PC contact documentation did not reflect a full understanding of the patient's treatment needs and was not sufficiently individualized. The PC's documentation indicated that she was initiating a change in the patient's level of care to 3CMS, without IDTT and psychiatric input, was inappropriate. Group treatment was not offered. Diagnostic clarification with clinical rationale was needed.

**Patient FF**

This 55-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. He was admitted to the EOP RHU on December 21, 2024 after receiving an RVR for battery on a peace officer. He was provided diagnoses of antisocial and borderline personality disorders, major depressive disorder, and unspecified anxiety and depressive disorders. He was prescribed Remeron, Vistaril, and Lamictal.

The initial psychiatric assessment included limited information regarding the patient's treatment needs but briefly addressed current symptoms, functioning, and psychiatric history. The initial PC assessment was not updated, as information was copied from February 2022 and February 2024. A summary of treatment engagement and treatment progress since February 2024 was not included. Initial and routine IDTT meetings were attended by assigned providers. The clinical summary remained outdated during both IDTT meetings. The patient did not meet HLOC indicators. Treatment goals were not updated from those established in February 2024.

Routine psychiatric contacts between January 2025 and March 2025 were timely. Three different psychiatrists saw the patient. Quality of documentation varied by provider and ranged from thoughtful and thorough assessment of symptoms and functioning to a brief wellness check. Overall, routine PC contacts between January 2025 and March 2025 were timely. Five PCs provided individual treatment to the patient during this time. Most PC progress notes reflected

wellness checks that occurred at the cell front; the patient was seen at the cell front due to custody modified programming, patient refusals, and clinician preference. During the few confidential contacts, the PCs utilized therapeutic interventions. However, despite the patient's ongoing frustration and poor distress tolerance, during most PC encounters there was no indication that clinical interventions not utilized. On January 21, 2025, the patient stated that he thought about suicide daily. The PC documented an effort to investigate the patient's suicidal thinking, but the patient did not elaborate, and further assessment was not completed. The patient made suicidal statements on February 12, 2025 and March 8, 2025, and he was assessed as at low risk following completion of risk assessments. It was not clear that treating PCs were aware of these incidents, as they were not addressed during contacts. Recreational therapy groups were offered once a week.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Provider continuity was lacking. Initial assessments and treatment planning were not sufficiently updated to target the patient's multiple treatment needs, including ineffective coping, poor distress tolerance, and impulsivity. Relatedly, clinical interventions for these symptoms were rarely utilized by the PCs. The PCs also failed to address risk assessments during routine contacts. Group treatment, an important out-of-cell opportunity, was not sufficiently offered. Diagnostic clarification with clinical rationale was needed.

**Patient GG**

This 33-old EOP patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. He was admitted to the EOP RHU on December 22, 2024. The patient had spent most of his incarceration since 2016 in either the RHU or MHCB care; his history included approximately 38 MHCB admissions and 14 self-harm incidents, all with minor or no injury. He was provided diagnoses of antisocial personality disorder and unspecified depressive disorder. He was prescribed Remeron.

Documentation indicated that since admission to ML EOP at CSP/Sac, the patient had remained out of MHCB and RHU for about two months until the current RHU placement. His behavior declined once placed in EOP RHU. Between December 22, 2024 and March 20, 2025, he received four RVRs, including two for delaying a peace officer in the performance of duties, one for aggravated battery on a non-inmate by means of gassing, and one for battery on a peace officer. He also required nine SREs during this time. Most SREs were completed in response to suicidal statements that he recanted upon assessment.

The initial psychiatric assessment was not timely but provided relevant historical information. At the time of the assessment, the patient presented as stable. The patient's variable Remeron adherence was reviewed, and the patient agreed to take it more consistently. The initial PC assessment was timely and included relevant psychosocial information. The assessment noted that patient had no suicide history but an extensive self-harm history. However, the patient's current clinical presentation, including symptoms and functioning during the two months the patient was

able to function in mainline EOP care, were not documented. Additionally, current treatment needs were not clearly specified.

The initial IDTT meeting was attended by assigned providers but held in absentia due to the patient's refusal. The patient's extensive MHCB history met criteria for a HLOC consideration. However, neither the nonreferral rationale nor treatment modifications were documented. Treatment plan goals that targeted distress tolerance, substance use, and depression with appropriate interventions remained unchanged from those developed in August 2024 and October 2024. There was no documentation that the treatment team discussed a risk assessment due to a self-reported overdose that occurred the day of RHU placement.

Routine psychiatric contacts during January 2025 and February 2025 were conducted at the cell front due to the patient not arriving for his scheduled appointment. Documentation indicated the psychiatrist assessed the patient's symptoms, functioning, medication adherence, and medication side effects. Overall, the patient was assessed as stable, but there was no documentation to indicate the psychiatrist's awareness of the many SREs.

Most routine PC encounters between December 2024 and March 2025 occurred at the cell front due to refusals. The patient was minimally engaged and stated early on that he would not be attending treatment. Attempts to engage the patient were not clearly documented. In response to the patient's lack of engagement, the PC initiated a discussion regarding a change in level of care to 3CMS. While the patient was initially resistant, over time he became agreeable to this plan. On February 27, 2025, the PC documented that the patient would likely continue "falsely reporting SI for secondary gain," but that the patient did not want to receive EOP care. Consultation with custody was unremarkable. Although PC documentation indicated that the process for discharging the patient to 3CMS had been completed, the patient remained in EOP care as of March 28, 2024. Group treatment, an important out-of-cell opportunity, was not sufficiently offered. No groups were offered during January 2025 and February 2025.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Poor distress tolerance was not appropriately addressed in initial assessments or routine primary clinician contacts. The patient could not manage EOP RHU as evidenced by the multiple SREs and RVRs that quickly accrued following the patient's placement in EOP RHU care. Despite evidence of this pattern, the treatment team failed to intervene appropriately. Treatment planning was generic and not sufficiently updated. HLOC indicators were not addressed. Provider continuity was poor. There was a lack of provider collaboration in the context of multiple SREs, as well as a failure by providers to problem-solve and address the patient's distress. The discussion of transfer to 3CMS was premature. The treatment team failed to engage the patient in individualized treatment for ongoing impulsivity, aggressive behavior, and poor distress tolerance. Given his chronically poor distress tolerance, the patient is a good candidate for the personality disorders program.

**Patient HH**

This 41-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. He was admitted to CSP/Sac on February 4, 2025 and placed in EOP RHU care two days later for safety concerns. The PC provided diagnoses of unspecified bipolar disorder, unspecified anxiety disorder, and antisocial personality disorder. He was prescribed Depakene under a PC 2602 order for involuntary treatment due to danger to self and others.

The initial PC assessment was not completed. The initial psychiatric assessment focused on the patient's current functioning and was more consistent with a routine contact than a comprehensive initial assessment to assist with treatment planning. The initial IDTT meeting was attended by assigned providers. The clinical summary section did not provide an updated summary of pertinent clinical factors, case formulation, or a comprehensive summary of the patient's current treatment needs. The patient's multiple MHCB admissions in the past six months met criteria for a HLOC consideration. The HLOC nonreferral rationale was reasonable, but treatment modifications failed to clearly address safety concerns, a contributing factor in recent MHCB admissions. Treatment goals, although they were established in January 2025 in advance of the patient's RHU placement, were in alignment with the patient's treatment needs. They addressed lack of emotional regulation and mood instability. However, the treatment plan indicated that the mood instability goal had already been met. Interventions were collaborative and included medication management, CBT, and dialectical behavior treatment.

During EOP RHU care, risk assessment referrals were often initiated due to non-mental health issues, including safety issues, property concerns, and housing requests. None of the evaluations were confidential due to the patient's refusals. He was consistently assessed as low current risk with no further follow-up. During one evaluation, the full SRE was conducted; on the remaining nine a reassessment of risk was conducted. Reassessment documentation did not consistently include mental status examinations or changes in dynamic and personal risk factors. In some cases, documentation of suicide attempt history was inconsistent with the full SRE that was completed.

The single routine psychiatric contact that occurred prior to this case review addressed the patient's current symptoms and functioning at the cell front. The patient was not visible to the psychiatrist during this encounter, as the patient refused to remove paper that covered his cell window. Despite the psychiatrist's inability to assess the patient appropriately, the psychiatrist did not consult with custody staff or the PC. There was no documentation indicating that the psychiatrist was aware of ten recently completed SREs. Routine PC contacts were timely and occurred with the same clinician. After the first contact, the patient consistently declined confidential contacts and was seen at the cell front. The PC consistently consulted with custody regarding the patient's functioning and utilized clinical interventions during contacts. During PC encounters through March 5, 2025, there was variable follow-up on the ten SREs that were completed. Between the time of admission and March 5, 2025, the patient was not offered any groups.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The initial PC assessment was not completed, and the initial psychiatric assessment was insufficient and negatively impacted IDTT documentation. The patient was not appropriately assessed during the single required psychiatric contact that occurred prior to March 5, 2025. Risk assessments were not completed in accordance with documentation requirements and were not consistently addressed during routine provider contacts. Multidisciplinary collaboration was needed to fully address this patient's safety concerns. Group treatment, an important out-of-cell opportunity, was not offered.

**Patient II**

This 24-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. He was placed in EOP RHU on December 20, 2024. He was diagnosed with schizophrenia and cocaine and alcohol use disorders. He was prescribed Zyprexa as needed.

The patient refused to answer questions during the pre-placement screen, including a question regarding suicidal ideation and was appropriately referred to mental health as an emergent consult. For reasons that were unclear, the clinician documented that a risk assessment was not necessary. The patient recanted suicidal ideation and reported that he feared for his safety. After placement in RHU, an initial psychiatric assessment was not located. The initial PC assessment included useful clinical information based on a previous RHU placement but failed to describe the patient's clinical presentation since that placement. The PC also failed to consider his treatment needs in the context of multiple RHU admissions in seven months. Clinical documentation indicated that the patient had difficulty communicating thoughts and emotions along with limited insight into his mental illness. He had a history of depression and negative symptoms, received outpatient and inpatient psychiatric treatment in the community, and had a family history of mental illness. There had been no MHCB admissions since shortly after the patient's CDCR arrival in 2021.

The attendance of assigned providers at initial and routine IDTT meetings was unclear. The clinical summary was not sufficiently updated with the patient's current treatment needs to guide treatment planning. The patient met criteria for two HLOC indicators, including more than three RVRs in three months and poor treatment attendance. The nonreferral rationale was overly reliant on mental health RVR assessments and lack of mental health as a contributing factor to the infraction, appropriate ADLs, and self-advocacy. The documented rationale failed to consider the patient's pattern of poor functioning. Further, poor treatment attendance was attributed to his lack of insight and mental health symptoms, challenges that would suggest a need for a HLOC. The sole treatment goal established during the initial IDTT meeting targeted substance use; this goal was unchanged from one developed in February 2024, almost a year prior to the current EOP RHU admission.

In the subsequent routine IDTT meeting, a plan to target poor distress tolerance through dialectical behavior therapy skill practice was appropriately identified. However, the rationale for a short-term goal to manage daily command auditory hallucinations was unclear, as routine provider documentation indicated the absence of psychosis. Nevertheless, IDTT documentation noted that the patient was experiencing auditory hallucinations, presented with limited concentration, and

denied any mental health issues. Despite an apparent increase in symptoms and decline in functioning, the patient was not referred to a HLOC. Nonreferral rationale was insufficient, and treatment modifications failed to include psychiatric provider interventions.

The patient was seen by two different psychiatrists for routine psychiatric encounters between December 30, 2024 and March 12, 2025. These occurred at the cell front due to a refusal and custody modified program. During the first encounter, the patient reported that he felt depressed with low energy, and he was prescribed fluoxetine. Fluoxetine was discontinued during the second encounter due to medication non-adherence. An alternative medication was not discussed despite the psychiatrist assessing the patient chronic depression and thought disorder. Relatedly, the patient's limited use of the prescribed PRN antipsychotic medication was not adequately addressed. PC encounters were generally timely but occurred with multiple PCs. Contacts occurred at the cell front due to patient refusals or modified programming. Most documentation reflected wellness checks and lacked clinical interventions. The reason for refusals was not assessed and underlying poor distress tolerance that precipitated multiple risk assessments were not addressed. Dialectical behavior skills were not utilized as required by the treatment plan. Consultation with custody staff was regularly documented. The patient was offered a total of seven EOP RHU groups between January 6, 2025 and March 4, 2025. Groups were offered by recreational therapists, psychiatric technicians, or a nurse. As of March 26, 2025, there was no documentation to indicate that the patient was offered any mental health groups since March 4, 2025.

The patient underwent fifteen SRE assessments between January 2, 2025 and March 30, 2025. Each was completed as a reassessment. The most recent full SRE was completed in September 2024 and thus fell outside the timeframe allotted by CDCR policy. Reassessments did not clearly address changes in dynamic and personal correctional risk factors as required. Each SRE was initiated after the patient made a suicidal statement, only to recant it and attribute the statement to an institutional stressor such as canteen, television access, or feeling bullied by custody staff. It was unclear if the patient's allegations of being bullied were referred for investigation. The patient was consistently assessed as at low risk. His coping skills were minimally reviewed. Mental health RVR assessments consistently found that the patient's mental health symptoms did not contribute to the alleged violent behaviors. Assessments failed to consider how the patient's chronic poor distress tolerance and low frustration tolerance may have contributed to his behavior.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

This patient presented with severe and persistent mental illness, poor distress tolerance, and emotional dysregulation at the time of RHU placement. Despite this presentation, a risk assessment was not completed. His symptoms persisted during the RHU stay, and the patient warranted a HLOC. An initial psychiatric assessment was not completed. The initial PC assessment was insufficient to guide treatment planning. The treatment plan itself did not fully target the patient's treatment needs, and there were discrepancies in IDTT and progress note documentation. Provider contacts consistently occurred at the cell front, and a result the patient's symptoms and functioning were never appropriately assessed. Routine primary clinician contacts

failed to address the patient's ongoing poor distress tolerance and emotional dysregulation. These symptoms continued to adversely affect the patient's functioning, as evidenced by multiple SREs and violent RVRs in short period of time. Mental health RVR assessments failed to adequately consider the relationship between his symptoms and his behavior. There were multiple failures regarding risk assessment, including the failure to complete a full risk assessment at the time of admission to RHU. Policy was not followed regarding use of the abbreviated risk assessment. Group treatment was well below the required structured treatment hours for EOP RHU patients. Lastly, the use of an antipsychotic solely as PRN medication warranted review and diagnostic clarification with rationale was needed.

**Patient JJ**

This 31-year-old transgender patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. She had been in the EOP RHU since June 2024. She was placed in RHU for safety reasons shortly after admission to CSP/Sac from the reception center after she was the victim of a battery. She was provided diagnoses of unspecified depressive disorder, PTSD, gender dysphoria, and opioid use disorder. She was prescribed Buspar and Lexapro.

Reviewed IDTT documentation from December 2024 and March 2025 indicated that assigned providers attended these IDTT meetings. The patient's IDTT meeting attendance was variable. For reasons that were unclear, IDTT documentation indicated that she did not warrant a HLOC review despite a chronic pattern of treatment refusals. There was no documented input from psychiatry or custody staff in the IDTT documentation, and this omission was noteworthy given the patient's persistent safety concerns. The treatment plan goal to reduce depression was unchanged from one formulated in June 2024. CBT and dialectical behavior therapy were identified as interventions in the treatment plan but not used during reviewed PC encounters. A second goal, to remain RVR free for 90 days and discharge from RHU, was not consistent with the patient's attempts to remain in RHU. Documentation indicated a pattern of engaging in behavior to receive a RVR to avoid being released from the RHU. Safety concerns regarding her offenses and transgender status were noted, but interventions to address safety needs were not documented. Despite prolonged treatment refusals and new-onset anxiety in the severe range, no goal was developed to target these treatment needs.

Psychiatric encounters during the monitoring period were not timely and occurred at the cell front, primarily due to refusals. Symptoms, functioning, and side effects were consistently assessed. Medication non-adherence was not addressed, and consideration of a medication adjustment was not documented. Relatedly, there was no documentation that the psychiatrist was aware of the patient's ongoing reports of elevated anxiety during PC contacts.

Between mid-December 2024 and March 2025, PC contacts consistently monitored the patient's clinical presentation and functioning. All PC encounters occurred at the cell front, primarily due to refusals. The reasons for the patient's refusal were not assessed or targeted during treatment. Her depression remained stable or decreased until the PC initiated a discussion to change her level of care to 3CMS, when the patient's depression increased. A new onset of severe anxiety was documented in late February 2025. The patient continued to report severe anxiety during

subsequent weekly contacts, and at times the PC attributed this anxiety to safety concerns. Despite this change in symptoms, the PC failed to appropriately address the patient's anxiety. Instead, the PC initiated a discussion regarding a level of care change to 3CMS. The patient's statements that she would engage in self-harm to remain in EOP and her request for a new PC were inappropriately assessed as evidence that the patient was not benefitting from EOP. During the review period, two risk assessments were completed, one of which was addressed by the PC. The patient had not been offered group treatment since admission to EOP RHU in June 2024.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

At the time of this review, the patient had been in RHU for close to a year. Her mental health needs were intertwined with safety concerns, and neither her treatment needs nor her safety concerns were appropriately addressed during cell front contacts. Documented safety concerns that prevented her from attending confidential treatment interfered with appropriate assessment of her treatment needs and functioning, and encounters at the cell front did not permit appropriate treatment. Safety concerns also resulted in the patient engaging in behavior that harmed others and additional RVRs led to continued RHU placement. During this time the patient's depression and anxiety increased, in part due to safety concerns. The patient's behaviors were inappropriately interpreted as evidence that the patient was not benefiting from EOP care. It was unclear how her chronic pattern of treatment refusals did not flag on the HLOC indicator. The patient did not receive timely psychiatric contacts and medication non-adherance was not addressed. There was a lack of provider collaboration.

**Patient KK**

This 31-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. His level of care was changed to EOP while in the 3CMS RHU on January 10, 2025. He was diagnosed with antisocial personality disorder, unspecified depressive disorder, and major depressive disorder. He was prescribed Effexor, Vistaril, and Zyprexa.

Initial psychiatric and PC assessments occurred at the cell front due to the patient's refusal and were not clinically useful for treatment planning. The psychiatric assessment was consistent with documentation for a routine encounter and lacked sufficient clinical history. The initial PC assessment was overly brief and outdated, with only limited psychosocial information that was copied from May 2024. Suicide and self-harm information within the document was discrepant, and some sections of the mental status exam were incomplete.

A shortened version of the Master Treatment Plan was used during the initial IDTT meeting. The patient was identified as meeting criteria for HLOC consideration due to low treatment participation. However, nonreferral rationale and treatment modifications were not documented. The patient stated that his treatment needed to focus on sobriety and anxiety secondary to safety concerns. Treatment goals with interventions were not developed. Subsequent IDTT meetings were attended by assigned providers. The patient was identified for a HLOC review in February

2025. Treatment modifications and nonreferral for poor treatment attendance were reasonable, but PCs did not use treatment modifications during subsequent encounters. Despite no change in the patient's treatment participation, he was not identified for a HLOC consideration during the April IDTT meeting. The sole treatment goal targeted anger, with RVRs as the outcome measure. Identified interventions of cognitive behavior therapy and dialectical behavior therapy were appropriate but not utilized during routine contacts.

The same psychiatrist provided routine psychiatric encounters during the review period. These contacts occurred at the cell front due to the patient's refusals. Documentation indicated assessment of symptoms, ADLs, and medication side effects. Buspar was initiated in March 2025 to target anxiety. During the April 2025 contact, the psychiatrist was unable to assess the patient visually because the patient's door was covered with paper. The patient indicated he was doing fine and did not want to participate in the meeting. Consultation with the PC regarding the psychiatrist's inability to assess the patient was not documented. The PC saw the patient later the same day, and during this encounter the patient disclosed that he was feeling depressed. This information was not communicated to the psychiatrist. Across psychiatric contacts, there were no concerns from custody consultation. Routine PC encounters were timely and occurred at the cell front due to patient refusals. Reason for refusals were variably addressed. The patient was seen by three different PC between February 2025 and April 2025. The rationale for a PC change was not documented. Treatment interventions were limited to supportive treatment and exchange of workbooks. The patient's stated treatment needs, documented in the first IDTT meeting, were not addressed during PC encounters. PCs did not follow up on multiple risk assessments.

The patient was seen four times for SREs between January 30, 2025 and April 10, 2025. Twice, an abbreviated reassessment was completed despite the absence of a full SRE completed in the 30 days prior to the reassessment. Documentation did not clearly address changes in dynamic and personal correctional risk factors as required. The patient variously attributed his suicidal statements to impulsivity, poor distress tolerance, and bad news such as his grandmother's death, father's death, or a recent cancer diagnosis. He was assessed as low risk. Clinical interventions were rarely offered during these contacts. Between January 22, 2025 and February 5, 2025, the patient was offered three recreational groups.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Initial provider assessments lacked sufficient clinical information to assist with individualized treatment planning. Initial treatment planning was not completed. Subsequent treatment planning was not updated to target the patient's treatment needs, and there was a lack of provider collaboration regarding the patient's treatment needs. Given his chronic refusals, the patient was not appropriately evaluated throughout the course of treatment. Providers also did not follow up on numerous crisis incidents and risk assessments. Risk assessments were not completed in accordance with policy. PC continuity was poor. Treatment interventions to assist the patient in managing distress and target a pattern of ineffective coping were not provided.

**Patient LL**

This 50-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. He was admitted to the EOP RHU on April 16, 2025. He was diagnosed with schizophrenia and prescribed a long-acting formulation of paliperidone under a PC 2602 order for involuntary treatment due to grave disability.

An abbreviated initial PC assessment provided a clinically relevant summary of the patient's long history of mental illness and current mental status. The assessment occurred at the cell front due to the patient's refusal. The patient ignored the PC's attempts to engage with him, and the patient presented as odd and malodorous, although his cell was clean. The initial psychiatric assessment occurred after the initial IDTT meeting. It also occurred at the cell front because the patient refused his appointment. The patient was minimally engaged and presented with negative symptoms but was not malodorous. Assigned providers attended the initial IDTT meeting, which was completed in absentia due to the patient's refusal. A December 2024 treatment goal addressing treatment disengagement was continued and remained appropriate. The treatment plan also carried forward a second goal from December 2024 that addressed medication adherence for the patient's seizure disorder. This goal had been met through a PC 2604 court order. There was no documentation that the team considered providing either modified EOP programming or regular contact between the PC and the psychiatric technician to closely monitor the patient's ADLs. Attention to the patient's personal hygiene and functioning was an area of concern not only as a clinical indicator but because the patient was pending possible transfer to another institution. The patient met criteria for a HLOC referral due to his low treatment attendance. Nonreferral rationale documentation attributed programming refusals to the patient's anger at mental health and opined that the patient may be at baseline. These conclusions were not supported by a comprehensive record review. Had a record review been completed, providers would have seen that the patient's long-term ML EOP psychiatrist had recently considered an ICF referral for this patient.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The patient was not appropriately considered for a HLOC despite impaired functioning due to serious mental illness. IDTT discussion did not include relevant, documented clinical information to assist the treatment team. The team did not document discussion of appropriate clinical modifications, such as consideration of modified EOP and close monitoring through regular communication with the psychiatric technician. This was an area of concern for continuity of care. It was unclear why the team delayed initiation of modified EOP.

**Patient MM**

This 54-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. During the prior ten years, the patient had not been in the MHSDS; he was referred to 3CMS care in February 2025 due to a decline in functioning. He was placed in 3CMS RHU on April 2, 2025. His care was elevated from 3CMS to EOP RHU on April 10, 2025 based on a history of psychosis and concerns regarding his disheveled appearance. The patient was not provided a diagnosis and was not prescribed psychotropic medication.

The initial PC assessment was not completed. Documentation from a PC encounter at the cell front contact in advance of the initial IDTT meeting described the patient as stable with no signs of acute distress or decompensation. The patient did not attend the initial psychiatric assessment and was assessed at the cell front. He was minimally engaged and assessed as having a chronic mood disorder. Historical information available in the healthcare record was not included in the initial psychiatric assessment. The initial IDTT meeting was attended by assigned treatment providers but held in absentia due to the patient's refusal. IDTT documentation included relevant history, current concerns regarding the patient's poor hygiene, and suspected dementia or cognitive decline. The team discussion focussed on the possibility of cognitive decline with a DDP referral. There was no consideration of the impact that the patient's psychosis could have on his mental status. A goal from March 19, 2025 for anxiety was continued, and a goal to address treatment refusals was added. These goals were measurable, and interventions were appropriate. The patient did not meet criteria for any HLOC indicators and was continued at EOP level of care. However, the rationale for retaining the patient in EOP care was not updated and remained identical to the rationale that had been developed when the patient was in 3CMS care.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The initial psychiatric initial assessment did not include relevant clinical history. While the PC did not assess the patient in accordance with Program Guide requirements, the PC succinctly documented the patient's clinical presentation in IDTT documentation. However, the PC who led the IDTT meeting discussion excluded the patient's full history, including the patient's history of psychosis. As a result, the team did not have all relevant clinical information, and discussion focused on cognitive decline with a plan to refer the patient for a DDP evaluation. The plan to refer him to DDP was appropriately documented for continuity of care given this patient's likely transfer to a mainline yard. However, the role of psychiatric illness on the patient's functioning was inadequately assessed and addressed. A goal for diagnostic clarification was needed.

**Patient NN**

This 27-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment provided at CSP/Sac. The patient was discharged to EOP RHU care on February 6, 2025, after his seventh MHCB referral in six months for suicidal ideation. Three of the seven MHCB referrals had resulted in MHCB admissions, and the patient also had a recent APP admission. According to the initial EOP RHU IDTT documentation, he was diagnosed with unspecified anxiety and depressive disorders, ASPD, opioid use disorder, and other substance-induced anxiety. He was prescribed Wellbutrin and Effexor and was in the MAT program.

Five-day follow-ups were timely and included a review of the safety plan during one of the five follow-ups. An initial PC assessment was not completed, and the initial psychiatric assessment was completed at the cell front due to the patient's refusal. Documentation of the psychiatric assessment was comparable to that of a brief routine contact. The patient requested a medication increase for anxiety. When his symptoms were queried, the patient remained focused on reporting

his history of suicide attempts. He prematurely ended the interview, and the psychiatrist's note did not make clear whether medications were adjusted.

The initial IDTT meeting was completed in absentia but attended by assigned providers. The clinical summary did not sufficiently summarize or conceptualize relevant clinical factors, including the recent course in treatment. Treatment plan goals targeted self-harm and depression; these goals were objective, measurable, and included evidence-based treatment interventions. However, additional goals documented in the clinical summary were not added to the treatment plan. These goals were appropriate for the patient's care; they included reducing RVRs, improving distress tolerance, and increasing treatment adherence and collaboration with the psychiatrist. HLOC nonreferral rationale included a description of recent MHCB admissions but did not sufficiently explain the reason for nonreferral. Treatment modifications were evidence-based and appropriate. The patient was continued at the EOP level of care although the rationale was not individualized. The patient was seen for two SREs in advance of the initial IDTT meeting. Neither the results of the SREs nor the safety plan were discussed during the IDTT meeting or included in IDTT documentation.

During the observed routine IDTT meeting, the PC discussed the patient's disorganization and observations that he was responding to internal stimuli. The PC attributed these signs to psychosis and opined that the patient needed a medication change or consideration for a PC 2602 petition for involuntary treatment. In contrast, the psychiatrist believed the patient's clinical presentation was due to substance use. The discrepant assessments remained unresolved during the observed IDTT meeting, with no plan for resolution. Documentation indicated that a provisional diagnosis of depression with psychotic features was added. However, a clear rationale for this diagnosis was not documented. As of the review date, May 15, 2025, the patient had not been offered any groups.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The patient's risk of harm to self, multiple inpatient admissions, and HLOC nonreferral rationale were not appropriately considered by the treatment team. The lack of comprehensive initial assessments by either provider contributed to a lack of diagnostic clarification. The patient's diagnoses remained unresolved, with no plan for resolution discussed during the routine IDTT meeting. The patient's continued reports of suicidal ideation and recent risk assessments were not discussed during the routine IDTT meeting or integrated into IDTT documentation. Relatedly, safety planning was discussed during the IDTT meeting or addressed during each five-day follow-up or IDTT meeting. Group treatment has not been offered in accordance with Program Guide requirements.

**APPENDIX B-12**
**California State Prison/Solano (CSP/Solano)**
**Reporting Period: July 1, 2024 – December 31, 2024**

**Patient A**

This 30-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. He was provided diagnoses of complex PTSD and dysthymic disorder; although the latter diagnosis was not listed in the mental health problems section of the healthcare record, and the former diagnosis was listed without specifying that the disorder was complex. He was not prescribed psychotropic medication. He was included in the ISUDT, and he was prescribed buprenorphine-naloxone for opioid use disorder and was intermittently nonadherent with that medication. Urine toxicology screens in 2024 were consistently positive for cannabis, amphetamine, methamphetamine, fentanyl, and/or other non-prescribed opiates. The patient arrived at CSP/Solano on December 27, 2022.

The patient had a history of substance use, anxiety, childhood trauma including exposure to violence, prolonged sexual abuse, paternal incarceration, and maternal abandonment. He had a history of a gunshot wound. No suicide attempts or self-injurious behaviors were documented in the healthcare record. Within the CDCR, the patient had exclusively received mental health services at the 3CMS level of care. He was previously treated with diphenhydramine and hydroxyzine PRN for insomnia and anxiety. He was serving a sentence of life with the possibility of parole.

The 2024 annual IDTT meeting occurred timely on February 8, 2024 which was attended by the required staff but not the patient, as he refused to leave his cell. Patient strengths were not documented, and no treatment plan was formulated. The patient was noted to be refusing treatment and appointments, and treatment was described as focusing on building rapport to establish a therapeutic relationship.

During 2024, the patient did not see a psychiatrist. Five appointments with the primary clinician were documented; the patient refused all but one. The primary clinician's CSP/Solano confidential encounter in 2024 focused on encouraging the patient to return to education classes, as the patient had stopped attending. The patient declined to participate in an RVR mental health assessment in July 2024. The RVR for sexual disorderly conduct alleged that the patient had encouraged a visitor to rub his genitals, and the assessment concluded that mental illness did not contribute to the alleged behavior. On September 27, 2024, the wellness check at the cell front that followed the patient's refusal of the appointment described the patient as dysphoric but denying thoughts of self-harm or suicide. No mental health groups were documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was no treatment plan to guide the patient's mental health treatment, and he received no mental health services in 2024 that addressed his symptoms of anxiety, dysphoria, and

posttraumatic stress. The patient's resistance to treatment, reasons for refusing psychotropic medications, and ongoing substance use were not adequately addressed.

**Patient B**

This 42-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided diagnoses of PTSD and opioid use disorder, moderate. Treating psychiatrists indicated an additional diagnosis of major depressive disorder in their progress notes, but that diagnosis was not listed in the mental health problems section of the healthcare record. The patient was prescribed divalproex sodium and mirtazapine for mood stabilization, agitation, depression, and insomnia. He was adherent with those medications 86 percent of the time. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. The patient was placed at CSP/Solano on November 21, 2022 at the 3CMS level of care.

The patient had a history of adolescent fighting, juvenile detention, and substance use, as well as repeated emotional trauma related to his mother. No suicide attempts or self-injurious behaviors were documented in the healthcare record. Within the CDCR, the patient received mental health services at the 3CMS, EOP, and MHCB levels of care; he was placed in the MHCB on one occasion in 2014 due to suicidal ideation.

An annual IDTT meeting in November 2023 indicated that mental health staff would begin to address the patient's trauma-related symptoms "once we are adequately staffed;" no treatment plan was developed in that meeting. In 2024, the annual clinical summary and care formulation was completed timely. The 2024 annual IDTT meeting occurred on December 12, 2024 that was attended by the patient, assigned primary clinician, and an alternate for the assigned psychiatrist. Again, no treatment plan was developed at that meeting. He tested positive for cannabis, fentanyl, and/or other non-prescribed opiates on eight occasions during 2024. His medical conditions included onychomycosis, hemorrhoids, and constipation.

During 2024, the patient was first seen by a psychiatrist on May 31, 2024; the most recent prior psychiatric contact occurred seven months earlier in October 2023. Following the May 31, 2024 encounter, the patient refused a psychiatric appointment in September and was next seen on December 10, 2024. The September 2024 psychiatric progress note indicated that informed consent for psychotropic medications was not documented; that was obtained on October 17, 2024. Psychiatric documentation did not indicate whether the two encounters in 2024 occurred in a confidential setting, and there was no documentation that the patient's suboptimal adherence with medications or frequent use of illicit substances was addressed. No adjustments to the patient's medications or dosages occurred.

Apart from the IDTT meeting in December 2024, the patient was seen by primary clinicians on three occasions during 2024. Two of those encounters occurred in a confidential setting; one occurred at the cell front. None of the encounters addressed the patient's mood or posttraumatic symptoms. During the review period, the patient was offered between one and four recreation therapy groups monthly and with approximately 65 percent attendance.

**Findings**

The care provided to this 3CMS patient was inadequate.

No treatment plan was developed to guide the patient's mental health treatment. Follow-up by both psychiatry and primary clinicians was deficient, characterized by long gaps between encounters and was insufficient to meet the patient's treatment needs. Aside from psychotropic medications, the patient's mood and posttraumatic stress symptoms were not addressed. Psychotropic medications were provided for many months without obtaining informed consent, although corrected once recognized. The patient's recurrent substance use and suboptimal medication adherence were not adequately addressed.

**Patient C**

This 43-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. He was provided a diagnosis of adjustment disorder, with mixed anxiety and depressed mood. He was not prescribed psychotropic medication and was not included in the ISUDT. The single urine toxicology screen completed in 2024 was negative for illicit substances. His medical conditions included chronic low back and left hip pain. The patient was received at the WSP reception center from a county jail on May 8, 2024, and transferred to CSP/Solano at the 3CMS level of care on June 27, 2024.

The patient had a history of childhood depression but no prior mental health treatment. No suicide attempts or self-injurious behaviors were documented in the healthcare record; although WSP reception records indicated that the patient attempted suicide by overdose at age 12 when he was not hospitalized. Within CDCR, the patient exclusively received mental health services at the 3CMS level of care. He was serving his first CDCR term with a sentence of life with the possibility of parole.

The initial IDTT meeting occurred on July 18, 2024 and was attended by the patient and alternates for the assigned primary clinician and psychiatrist. The patient was noted to be experiencing stress related to incarceration and exhibited paranoia that contributed to his instant offense. The patient declined treatment with psychotropic medications. The treatment plan identified anxiety, hopelessness, helplessness, worthlessness, and sadness as treatment targets. The plan included measurable short-term objectives, but long-term goals were not measurable. Cognitive restructuring and mindfulness were identified as interventions.

Apart from the July 18, 2024 IDTT meeting, the patient was seen only once by a psychiatrist, when the initial psychiatric evaluation was completed on October 10, 2024. No symptoms were identified in the psychiatric evaluation, but the patient's adjustment disorder diagnosis was continued with a plan to return for psychiatric follow-up on a PRN basis. No primary clinician assessment or update was documented.

Following the July 18, 2024 IDTT meeting, the patient was seen twice by primary clinicians at approximately 90-day intervals. Different clinicians saw the patient on those occasions, and the

provision of interventions was not documented by either clinician. No mental health groups were documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial IDTT meeting occurred one week late and was not attended by either the assigned psychiatrist or the assigned primary clinician. No initial primary clinician assessment or update was completed. The patient received only three mental health encounters following his transfer to the 3CMS level of care. None of those encounters provided evidence of the provision of cognitive restructuring or mindfulness training, and only one of the encounters documented that it occurred in a confidential setting. Given that treatment targeted anxiety, hopelessness, helplessness, worthlessness, and sadness, with a childhood history of depression and suicide attempt, chronic pain, and the patient was serving a long sentence and his first prison term; closer monitoring and an updated suicide risk evaluation were clinically indicated but were not provided.

**Patient D**

This 63-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided a diagnosis of generalized anxiety disorder. He was not prescribed psychotropic medication and was not included in the ISUDT. His medical conditions included seizure disorder, leukopenia, neutropenia, lumbar spondylosis, right shoulder pain, carpal tunnel syndrome, Dupuytren's contractures of hand joints with surgery on both hands, visual impairment, senile hyperkeratosis, and history of colon polyp. The patient was placed at CSP/Solano on March 21, 2022.

The patient had a history of anxiety and depression. From ages 12 to 35, he had alcohol, cannabis, and cocaine use but no history of mental health treatment prior to incarceration. No suicide attempts or self-injurious behaviors were documented in the healthcare record. Within the CDCR, the patient exclusively received mental health services at the 3CMS level of care. He declined treatment with psychotropic medications. He was serving an indeterminate life sentence.

The 2024 annual clinical summary and case formulation and IDTT meeting were completed timely in April 2024, but no treatment plan was developed at that meeting. Persistent anxiety with the potential for worsening was noted at that time, but there was no documentation regarding how that concern would be addressed beyond retaining the patient at the 3CMS level of care.

Aside from the April 2024 IDTT meeting, the patient was not seen by a psychiatrist during 2024. He was seen by primary clinicians at least once every 90 days throughout 2024; the documentation of those encounters was adequate but reflected supportive care without the identification of specific treatment targets or the provision of treatment interventions. No mental health groups were provided.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was no treatment plan to guide the patient's mental health treatment. The reasons for the patient's refusal of psychotropic medications, despite persistent and potentially worsening anxiety along with intermittent sleep problems, were not adequately investigated and addressed. Although the patient was seen timely by primary clinicians, the encounters lacked focus and instead provided generalized support. The provision of anxiety management interventions and tools was not documented.

**Patient E**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided diagnoses of PTSD and major depressive disorder, recurrent, mild. He was not prescribed psychotropic medication and was not included in the ISUDT. His medical conditions included mild intermittent asthma and an epidermal burn of hand. A history of uncomplicated bereavement was also noted. The patient was placed at CSP/Solano on February 28, 2024 at the 3CMS level of care.

The patient had a history of interpersonal trauma and loss beginning in childhood, as well as sexual abuse and mental health care beginning at age six. Two suicide attempts and one instance of self-injury were documented in the healthcare record; those events occurred in 2011 or earlier. He was reportedly hospitalized twice as a child for suicide attempts. He had juvenile detention involvement, substance use, special education, and school expulsions beginning in early adolescence. Within the CDCR, he received mental health services at the 3CMS and MHCB levels of care; he was placed in the MHCB on one occasion in 2018. He was previously prescribed hydroxyzine, mirtazapine, and sertraline.

An initial primary clinician assessment occurred timely and included a plan to focus treatment on increasing the patient's awareness of how he self-sabotaged. The initial IDTT meeting occurred on April 11, 2024 that was attended by the patient, assigned primary clinician, and alternate for the assigned psychiatrist. IDTT documentation indicated that no safety plan was required. Patient strengths, verbalized treatment goals, and a treatment plan were not documented. Anxiety was identified as the treatment target; although, nightmares, night terrors, hypervigilance, psychomotor agitation, avoidance, and dissociative symptoms were also documented.

Apart from the April 11, 2024 IDTT meeting, the patient was seen once by a psychiatrist during the remainder of the year. That encounter occurred on August 30, 2024, six months after the patient's arrival; the encounter was documented as an initial psychiatric evaluation. A diagnosis of adjustment disorder with depressed mood was added without explanation. The patient declined treatment with psychotropic medications, and a plan to follow up as needed was documented.

The patient was offered timely appointments with the primary clinician but declined to attend two of the three appointments. The third occurred in a confidential setting and focused on bereavement, loss, and alienation from peers; the patient was reportedly very tearful during that encounter. Although the primary clinician offered support and a clinically appropriate intervention for managing painful emotions; no assessment of the patient's acute suicide risk was documented.

The progress note indicated that the patient was assessed with high chronic risk for suicide in 2019. No other mental health interventions were documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

No treatment plan was documented to guide the patient's care, and the initial psychiatric assessment was excessively delayed given the patient's history. Reasons for the patient's medication refusal were inadequately explored or documented. The patient had only one confidential encounter with the primary clinician; and in that encounter, the patient was dysphoric and crying. Given that the patient was assessed with high chronic suicide risk and was diagnosed with both PTSD and major depressive disorder; an updated suicide risk evaluation, a safety plan, closer monitoring, and more frequent treatment sessions were clinically indicated but were not provided.

**Patient F**

This 55-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided a diagnosis of generalized anxiety disorder. He was not prescribed psychotropic medication and not included in the ISUDT. His medical conditions included obesity, hyperlipidemia, hypertension, asthma, bilateral hand cellulitis, benign prostatic hyperplasia, right shoulder pain, and polyp of colon with family history of colon cancer. The patient was placed at CSP/Solano on October 25, 2023.

The patient had a history of childhood trauma and chaotic upbringing. Apart from a history of family counseling at age 16 when a younger brother was removed from the home, the patient denied any history of mental health care or treatment with psychotropic medications. Psychiatric progress notes from 2018 indicated current treatment with hydroxyzine and a history of treatment with buspirone and sertraline. No suicide attempts or self-injurious behaviors were documented in the healthcare record. Within the CDCR, the patient exclusively received mental health services at the 3CMS level of care. He was serving an indeterminate life sentence.

The 2024 annual clinical summary and case formulation update was completed timely and indicated that the patient would benefit from insight-oriented psychotherapy. The 2024 IDTT meeting occurred timely and was attended by the patient, assigned clinician, and an alternate for the assigned psychiatrist. Without explanation, the IDTT documentation indicated that the patient was provided a diagnosis of unspecified anxiety disorder rather than generalized anxiety disorder. Although anxiety was identified as the treatment target; no treatment plan was developed, and the patient's strengths and verbalized treatment goals were not documented.

The patient was most recently seen by psychiatry in 2018, and he did not see a psychiatrist in 2024 apart from the IDTT meeting. He was provided with timely primary clinician contacts throughout the second half of 2024, including monthly contacts from October to December 2024. Progress notes reflected supportive treatment in a confidential setting and addressed symptoms of anxiety,

but those encounters were provided by three different clinicians during that period. No mental health groups were documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was no treatment plan documented to guide the patient's mental health treatment, and the three primary clinicians who saw him during the review period documented different approaches to treatment interventions. Those encounters were frequent, confidential, and responsive to the patient; but there was little evidence of planned treatment or provision of the interventions that were identified in the annual clinical summary. The patient's treatment progress was not measured or systematically reviewed. The patient's diagnoses were documented both as generalized anxiety disorder and unspecified anxiety disorder without explanation or reconciliation.

**Patient G**

This 56-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided a diagnosis of unspecified anxiety disorder. Although he was not prescribed psychotropic medication by a psychiatric provider, he was prescribed nortriptyline for neuropathic pain by his medical provider, and he was medication adherent. During the review period, the patient underwent left shoulder surgery for left shoulder acromioclavicular dislocation. He was provided diagnoses of cannabis, methamphetamine, and opioid use disorders but was no longer included in the ISUDT. No toxicology screens were documented in 2024. The patient was placed at CSP/Solano on January 23, 2023.

Little mental health or social history was available in the patient's recent healthcare records. He had a history of periodic depression and anxiety. One suicide attempt by overdose in 1993 was documented in the healthcare record. Within the CDCR, the patient received mental health services at the 3CMS and MHCB levels of care; the MHCB treatment most recently occurred in 2011. He was previously prescribed mirtazapine and buspirone in 2017, but no psychiatric providers prescribed psychotropic medications after December 2017. He originally was serving a sentence of life without the possibility of parole; and in 2024, the patient had already served over 31 years. He was recently resentenced and was now eligible for parole.

His medical conditions included prediabetes, hypertensive disorder, lumbago with sciatic, chronic low back pain, hemobilia, internal hemorrhoids, rectal hemorrhage, mild intermittent asthma, and allergic rhinitis. A history of fractures was noted, and he used a permanent wrist support brace.

In 2024, an annual clinical summary and case formulation was not completed other than what was documented in the IDTT meeting. The 2024 annual IDTT meeting occurred timely and was attended by the required staff. The patient did not attend due to a custody issue in the facility. The clinical summary and case formulation consisted of identical paragraphs and provided no information regarding the patient's treatment or response to treatment. Although anxiety continued to be identified as the treatment target, no treatment plan was developed.

Apart from the annual IDTT meeting, the patient did not see a psychiatrist in 2024. He was last seen by a psychiatrist in July 2022, when he was at another facility.

During the second half of 2024, the primary clinician met with the patient on two occasions. The first encounter in July occurred at the cell front, because the patient was in medical isolation after testing positive for COVID-19. The second encounter occurred 98 days later in a confidential setting. During that session, the patient asked to be removed from the MHSDS but acknowledged mild nervousness. It was agreed to consider removal from the MHSDS at the upcoming IDTT meeting. The progress note did not reflect the provision of any treatment interventions. No other mental health services were documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

No treatment plan was present to guide the patient's mental health treatment. Little to no treatment was provided, and the patient's treatment progress and anxiety symptoms were not thoroughly assessed. The diagnosis of unspecified anxiety disorder was continued without resolution, and the rationale for retention of the patient at the 3CMS level of care was unclear.

**Patient H**

This 30-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided diagnoses of generalized anxiety disorder; major depressive disorder, recurrent, moderate; unspecified schizophrenia spectrum and other psychotic disorder; opioid use disorder in sustained remission; cannabis use disorder; and PTSD. He was prescribed hydroxyzine PRN for anxiety, and he utilized that medication approximately once monthly during the review period. He was not included in the ISUDT, and no toxicology screens were documented in 2024. His medical conditions included obesity, sleep apnea, mild intermittent asthma, degenerative joint disease of the knee, and anal fistula. The patient was most recently placed at CSP/Solano on March 28, 2024.

The patient had a history of mental health treatment including psychiatric hospitalization since age eight, exposure to violence, physical abuse, and paternal incarceration during childhood; he was kidnapped at age 12, was the victim of head traumas and multiple gunshot wounds in his teens, and had the onset of substance use and juvenile detention in adolescence. One suicide attempt and three episodes of self-injury were documented in the healthcare record; the most recent occurred in 2014. Within the CDCR, the patient received mental health services at the 3CMS, EOP (including EOP modified programming), and MHCB levels of care; he was last placed in the MHCB in 2014. He was prescribed quetiapine in 2017 and 2018, but no psychotropic medications other than hydroxyzine were prescribed thereafter. The patient stopped quetiapine due to weight gain. Prior trials of chlorpromazine, fluoxetine, haloperidol, methylphenidate, mirtazapine, olanzapine, and oxcarbazepine were also documented.

The clinical intake assessment occurred timely and was adequate. The 2024 annual IDTT meeting occurred timely and was attended by the patient, the assigned primary clinician, and an alternate

for the assigned psychiatrist. The clinical summary indicated that the patient's major depression was in partial remission, but he continued to experience nightmares, flashbacks, and auditory hallucinations. He declined treatment with psychotropic medications other than hydroxyzine. In the treatment plan, anxiety and posttraumatic stress were identified as the treatment targets. The short-term objective was measurable, while the long-term goal was not. Provision of CBT, DBT, and recreational therapy groups for skill building were identified as interventions. The rationale for retention of the patient at the 3CMS level of care was clearly documented.

After his return to CSP/Solano in March 2024, the patient was seen by psychiatrists timely throughout 2024, and a psychiatric assessment was completed. The psychiatric documentation was minimally adequate; it did not indicate whether the encounter occurred in a confidential setting. No medication changes were made. The primary clinician saw the patient an average of once monthly during the second half of 2024 when the PC documented the provision of appropriate cognitive interventions, consistently documented the patient's response to treatment, and noted the presence of a collaborative therapeutic relationship. Those progress notes failed to indicate whether the encounters occurred in confidential settings. Two and a half months after the treatment plan indicated that recreational therapy groups should be provided; the patient began to receive mental health groups. On average, groups were offered two to three times monthly, and the patient consistently attended and participated with high levels of engagement.

**Findings**

The care provided to this 3CMS patient was adequate.

Although the treatment plan could have been improved to include a more measurable long-term goal and psychiatric care, it was completed timely and was otherwise appropriate to the patient's treatment needs. The interventions directed by the treatment plan were provided. The patient was followed regularly and adequately by both psychiatry and the primary clinician, and the primary clinician's notes reflected active treatment and detailed assessment of the patient's status and response to treatment. Therapeutic collaboration was evident. It appeared that psychiatric and primary clinician encounters were confidential, but progress notes could have been improved by making that information explicit. The delay in providing mental health groups was a concern, but the eventual provision of those groups was a positive development. A potential concern was the absence of an updated suicide risk assessment. Given a determination of high chronic suicide risk documented on May 11, 2021, and the persistence of mild to moderate depression and anxiety during the review period; reassessment of suicide risk may have been clinically indicated.

**Patient I**

This 51-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided diagnoses of unspecified anxiety disorder; PTSD; major depressive disorder, recurrent, unspecified; and depressive disorder. He was prescribed prazosin for nightmares and an exaggerated startle response; he was medication adherent. Hydroxyzine was prescribed PRN for anxiety and posttraumatic restlessness, and he utilized that medication nearly daily. His medical conditions included alpha thalassemia,

microcytosis, neutropenia, diabetes, overweight, dyslipidemia, and allergic rhinitis. The patient was placed at CSP/Solano on December 15, 2021.

The patient had a history of substance use starting in childhood, adolescent juvenile detention, exposure to street violence, and a gunshot wound resulting in PTSD symptoms. No suicide attempts or self-injurious behaviors were documented in the healthcare record. Within the CDCR, the patient had exclusively received mental health services at the 3CMS level of care. By 2024, he had served 30 years of a life sentence but had received news that his sentence would be reconsidered and that he might become eligible for release with time served. He also anticipated a parole hearing.

No treatment plan was developed during the December 2023 IDTT meeting when anxiety was identified as the treatment target. In 2024, the clinical summary and case formulation update was completed timely, but the case formulation was inadequate. The 2024 IDTT meeting occurred timely and was attended by the assigned primary clinician and an alternate for the assigned psychiatrist. The patient did not attend. The patient's strengths and verbalized treatment goals were documented, but no treatment plan was developed.

During 2024, the patient was seen timely for psychiatric follow-up appointments by three different psychiatrists. One of those encounters occurred at the cell front after the patient refused the appointment; documentation for the remaining appointments did not indicate whether the encounters occurred in a confidential setting. Psychiatric progress note content was minimal, and often copied and pasted from the prior note. The patient's nearly constant use of PRN hydroxyzine twice daily and the symptoms that the patient was attempting to address with hydroxyzine were not addressed during the review period. The diagnoses of major depressive disorder with the most recent episode unspecified, and depressive disorder were not reconciled or resolved.

During 2024, the patient was also seen timely for primary clinician follow-up appointments by two different clinicians. One progress note from those encounters did not indicate whether the patient was seen in a confidential setting; the remainder of the encounters were confidential. Progress note content indicated that case management was provided regarding education, programming and parole; however, there was not documentation of the provision of treatment. In December 2023, the primary clinician documented an intention to initiate individual treatment "despite the severe staff shortage;" however, that did not occur. No other mental health services were documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was no treatment plan available to guide the patient's mental health treatment, and the case formulation was little more than a statement that the patient would remain at the 3CMS level of care. The psychiatric documentation was scant, was copied and pasted, and did not address diagnostic reconciliation and specification. An alternative to the patient's nearly continuous use of PRN hydroxyzine was not prescribed until after the review period when paroxetine was added in early January, 2025. The provision of individual treatment which the primary clinician

determined was clinically indicated did not occur, and there was no documentation regarding why that clinically indicated treatment was not provided.

**Patient J**

This 52-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at CSP/Solano. The patient was provided a diagnosis of unspecified depressive disorder. He was prescribed hydroxyzine PRN for anxiety, and the medication was utilized most evenings. The patient was not included in the ISUDT, and no toxicology screens were documented in 2024. His medical conditions included obesity, obstructive sleep apnea, peripheral edema, onychomycosis, a history of pityriasis versicolor, respiratory disease, and tubular adenoma. The patient was placed at CSP/Solano on October 19, 2023.

The patient had no history of mental health treatment prior to incarceration and was previously provided diagnoses of adjustment disorder with anxiety, antisocial personality disorder, depressive disorder not otherwise specified, and a variety of substance use disorders including cannabis and cocaine use disorders. In 2024, the patient reported that he was abstinent from substance use for ten years. No suicide attempts or self-injurious behaviors were documented in the healthcare record. Within CDCR, the patient exclusively received mental health services at the 3CMS level of care. He was previously prescribed sertraline.

In 2024, the clinical summary and case formulation update was completed timely. However, the clinical summary was copied and pasted from the previous year except for a single sentence stating that the patient was stable during the last year. The case formulation was limited to a single sentence and was inadequate to guide individualized treatment. The 2024 IDTT meeting occurred timely and was attended by assigned staff; however, the patient refused to attend. Depressed mood was identified as the treatment target, but no treatment plan was formulated.

During 2024, three different psychiatrists saw the patient outside of the IDTT meeting. No psychiatric encounters occurred during the 180 days between October 31, 2023 and April 28, 2024. During the April 2024 encounter, the psychiatrist attempted unsuccessfully to persuade the patient to accept scheduled psychotropic medication rather than PRN hydroxyzine. The psychiatrist also noted that no informed consent for hydroxyzine was on file and obtained consent during that session. Of the three psychiatric encounters occurring in 2024, only the April 2024 encounter was accompanied by thorough documentation and an indication that the session was confidential. Documentation for the two psychiatric encounters occurring in the review period was minimal, and the content was copied and pasted unchanged from prior notes. No effort to specify the patient's diagnosis was documented.

The patient received timely follow-up encounters with the primary clinician during 2024. The documentation did not indicate whether the sessions occurred in confidential settings and did not reflect the provision of treatment. It appeared that the encounters were brief and supportive, but were more consistent with monitoring than treatment. No other mental health services were documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

The case formulation was inadequate, and there was no treatment plan to guide the patient's mental health care. The patient was not seen by a psychiatrist for 180 days prior to the review period, and during that time there was apparently no informed consent for the prescribed medication. The diagnosis of unspecified depressive disorder was not resolved or specified, and the psychiatric documentation during the review period was deficient. Primary clinician contacts, although timely and collaborative, did not reflect the provision of any treatment. Potential cognitive contributions to the patient's depression were not identified or addressed.

**Patient K**

This 45-year-old patient's healthcare record was randomly selected to assess adequacy of care at the MHCB level of care in close proximity to the site visit. The patient was provided with diagnoses which varied across providers and the diagnoses on record. They included antisocial personality disorder, borderline personality disorder, major depressive disorder and bipolar disorder. He was prescribed Abilify. The patient was admitted to the MHCB on December 27, 2024.

Provider initial assessments indicated the patient was referred to the MHCB for suicidal ideation and a plan to cut himself. His distress was precipitated by difficulty managing a dorm environment, in part due to reported pressure to use drugs. Psychiatric documentation included succinct but relevant historical information. The PC initial assessment included copied historical documentation that appeared to be from two different providers. The first was from 2021 and required an updated; the second did not include source, thus relevance was unable to be determined.

The initial IDTT meeting was attended by a covering psychiatrist and the assigned clinician. The patient did not meet higher level of care indicators. Treatment planning targeted suicidal ideation and agitation. A short-term goal of no suicidal ideation and a vague long-term goal was initiated. Interventions included medication, daily mental health contacts, psychoeducation, and distress tolerance. Rationale for continued MHCB treatment was insufficient. Of note, documentation indicating that mental health staff could not identify a reason to recommend not using cuffs was an area of concern.

Daily contacts, which occurred primarily with psychiatric providers, did not occur on a daily basis as required by the Program Guide. Rationale for psychiatric medication changes was not clear. Over the course of treatment, the patient was seen by four different providers whose documentation varied and ranged from insufficient to clinically useful. The patient's suicidal ideation subsided the day after admission and by December 31, 2024, he reported that he was not depressed.

Guidance was not provided to the patient to complete safety planning. For example, the patient stated that being quiet was a warning sign. When asked to identify additional warning signs he was unable to do so. Instead of providing suggestions, documentation indicated that the patient's PC could work on this with the patient. Documentation indicated that he could benefit from

brainstorming additional coping skills which was another lost opportunity to assist the patient in managing future crises.

On January 2, 2024, the discharge IDTT meeting was attended by a covering PC and the assigned psychiatrist. Documentation indicated that the patient was looking forward to returning to the EOP at the sending institution. Rationale for discharge indicated an absence of suicidal ideation and ability to care for himself. It was assessed that he had stabilized and could function at the EOP level of care. The discharge summary was insufficient for continuity of care. He was appropriately assessed as low risk at the time of discharge. Of note, the discharge risk assessment included discrepant documentation regarding suicide history from what was found in other clinical documentation. He was discharged to EOP level of care with five-day follow-ups on January 5, 2025.

**Findings**

While this patient's care improved with placement in the MHCB, overall, his treatment was inadequate.

The patient's crisis was precipitated by an inability to manage institutional stressors. There was no documentation that he received necessary clinical interventions to assist him in managing his distress and preventing future crises despite a return to the institution where the crisis occurred. Further, safety planning was inadequate. Daily contacts did not occur as required. Diagnostic clarification with clinical rationale was needed. Lastly, the use of cuffs for a patient that was not clearly documented as a maximum custody patient was an area of great concern.

**Patient L**

This 42-year-old patient's healthcare record was selected to assess adequacy of care at the MHCB level of care in close proximity to the site visit. The patient was provided with diagnoses of adjustment disorder, anxiety disorder, bipolar I and II disorder, and substance induced psychotic disorder. These diagnoses were copied into provider documentation and were not updated to reflect the diagnosis provided by the psychiatrist of major depressive disorder. He was prescribed Zoloft, Remeron, Abilify and Vistaril as needed. The patient was admitted to the MHCB on December 12, 2024 for suicidal ideation with a plan.

The psychiatric initial assessment included relevant clinical information. While the PC initial assessment included a useful summary of the reason for MHCB placement; clinical history, copied from a previous clinician, did not include original source such as level of care or date to determine clinical relevance. In addition, inconsistent information regarding suicide history and substance use was documented.

Initial assessment documentation which attributed his distress to a possible cancer diagnosis and feeling tired of prison life conflicted with initial IDTT documentation which attributed the MHCB admission to medication non-adherence, increased disruptive behavior, and inability to manage dorm life. Subsequent IDTT documentation focused on safety concerns. The patient had two MHCB admissions and two recissions in the previous six months. MHCB admissions were

attributed to safety concerns, but non-referral documentation lacked specificity to support this assessment. Treatment modifications were reasonable but not sufficiently documented.
Assigned providers completed initial assessments and attended initial and routine IDTT meetings. Treatment goals developed in May 2024 that targeted anger and depression were not updated during IDTT meetings and therefore, the treatment plan did not address the patient's current treatment needs within the MHCB. Clinical information was not sufficiently updated in routine IDTT documentation to reflect responses to offered treatment or changes in mental status.

The patient was seen by five different providers for daily contacts, yet these contacts did not occur as required by the Program Guide. Clinical documentation was generally descriptive of the patient's mental status and the majority of psychiatric documentation included rationale for medication changes. During the one PC contact evidence-based interventions were offered for anxiety.

Documentation indicated that the patient's mental status improved each day in the MHCB. Shortly after admission, on the same day that safety concerns were disclosed and reported to custody, he denied suicidal ideation. However, during an IDTT meeting several days later when discharge was proposed, his symptoms reportedly worsened. During a follow-up psychiatric contact, he was unwilling to answer any questions about suicidal ideation and reported increased anxiety and depression. He reiterated that he had safety concerns due to a drug debt and would hurt himself or someone else for protection. With education from custody staff and support from psychiatric staff, he stabilized and reported improved mood.

On December 23, 2024, the discharge IDTT meeting was attended by covering providers. Reasons for non-referral indicated that he had not stabilized but was agreeable to discharge to EOP with a plan to work on safety concerns at his prior institution. Treatment modifications included medication management, addressing safety concerns, developing a recovery program, and reviewing the need for an ICF referral in the future. The discharge summary was useful for continuity of care. Similar to IDTT documentation, a plan to discuss an ICF referral if unable to manage dorm life was documented. During the discharge risk assessment, he was assessed as moderate risk, yet the rationale for this determination needed improvement. Individualized safety planning was completed on the day of discharge.

Of note, the patient's Remeron was not available on December 21, 2024 which was addressed by the psychiatrist.

**Findings**

This patient's treatment was inadequate overall, despite strengths in isolated areas of care including the psychiatric initial assessment, daily provider documentation, and individualized treatment planning.

The PC initial assessment and routine IDTT documentation was not sufficiently updated. Individualized treatment goals to target the depression and suicidal ideation that precipitated the MHCB admission were not developed or appropriately targeted during routine care. Daily contacts did not occur as required by the Program Guide and there was a disruption in continuity of care.

There was a lack of clear explanation regarding the change in precipitating factors for the patient's distress. The patient did not receive sufficient treatment to manage his pattern of MHCB referrals and admissions. Clarification of diagnosis with clinical rationale was needed. Discharge documentation that he had not stabilized was not consistent with daily documentation. Further, the plan for the sending institution to consider an ICF referral for distress stemming from underlying safety concerns and management of dorm life was inappropriate.

**Patient M**

This 32-year-old patient's healthcare record was from the MHCB roster to assess adequacy of care in close proximity to the site visit. The patient was provided with a diagnosis of unspecified depressive disorder. He was prescribed lorazepam, an anti-anxiety medication.

The patient was admitted to the MHCB on December 26, 2024. He presented as depressed and reported suicidal ideation without a plan. Of note, the patient had attempted to escape the day prior to the MHCB referral. Provider initial assessments included relevant clinical information and described the patient as guarded, depressed, and minimally responsive. The initial IDTT meeting was attended by the assigned PC, although a different clinician completed the initial assessment. The assigned psychiatrist completed the initial assessment, but a covering provider attended the initial IDTT meeting. Provider continuity concerns continued across daily contacts.

During the initial IDTT meeting, the patient answered questions with non-verbal responses, a further decrease in his limited engagement during initial assessments. Treatment goals targeted grief, depression, and suicidal ideation. Interventions included medication management, psychoeducation, cognitive-behavioral therapy, and skills training. IDTT documentation indicated new onset of an unexplained inability to walk and required wheelchair to attend his initial IDTT meeting. There was no further documentation of this impairment, including no consultation with medical staff. Clinical rationale for continued MHCB placement was insufficient. There was conflicting information in initial IDTT documentation regarding his reported ability to return to his sending institution. Documentation indicated that the patient would continue to be restrained by cuffs during movement due to unpredictability.

The patient's initial limited verbal engagement transitioned to mutism shortly after admission. He was observed sitting in the same position for hours at a time and staring at the wall. Ativan was initiated as a short-term intervention to target suspected catatonia. Initial IDTT documentation indicated a plan to taper the Ativan but an order was not located in the record. Instead, after a few days, the Ativan was continued for seven days without reference to the prior plan to taper the medication.

The patient maintained behavioral control during his MHCB placement until January 4, 2025 when he refused to leave the therapeutic cubicle after an EKG for chest pain was completed. During the daily contact with the psychiatrist the following day, he was minimally engaged and assessed as responding to internal stimuli at least once. Documentation indicated variable food intake with appropriate liquid intake. Psychiatric documentation questioned if his behavior could be attributed to a diagnosis of unspecified personality disorder.

That same evening, he complained of abdominal pain and demanded to go to the hospital. He held the food port hostage and threw food around and outside his cell. He threatened to harm himself and bang his head until he died. The psychiatrist ordered emergency Zyprexa and Ativan. His agitation subsided and he fell asleep.

An IDTT meeting was held on January 6, 2025 and he agreed to a referral to acute level of care for severe mood dysregulation and internal preoccupation. Discharge diagnoses were substance induced psychotic disorder, catatonia, depressive disorder, and substance use disorder.
While awaiting transfer, his clinical presentation changed. The day after the acute referral, he was assessed as more talkative. On that same day, he stated he would be suicidal if not transferred to the emergency room for continuous chest and abdominal pain. His observation level was increased to 1:1. Later that same day, he reported that he swallowed a razor blade which was not confirmed with imaging. Nursing documentation indicated that he said he was faking in order to get out of the MHCB. In contrast, PC documentation indicated that he appeared paranoid and made a joke about visual hallucinations.

The patient was discharged to acute level of care on January 9, 2025.

**Findings**

This complex patient's treatment was inadequate.

Other than psychiatric medication, evidence-based clinical interventions were not utilized. There was a lack of continuity of care for this patient whose wide range of clinical presentations from catatonic to poor behavioral control warranted assessment, diagnostic clarification, and intervention by consistent providers. Further, consultation with medical staff was needed. There was inconsistent determination of the need for Ativan and there was no follow-up regarding the sudden unexplained need for the wheelchair. Psychiatric documentation of character traits was not properly addressed by the treatment team and the drastic change in his clinical presentation warranted review of the acute care referral. Lastly, the use of cuffs for a patient that was not clearly documented as a maximum custody patient was an area of great concern.

**Patient N**

This 35-year-old patient's healthcare record was randomly selected to assess adequacy of care at the MHCB level of care in close proximity to the site visit. The patient was provided with diagnoses of anxiety and polysubstance dependence in the record, which conflicted with a psychiatric provider's diagnosis of unspecified mood disorder and a rule-out of substance induced unspecified psychotic disorder. The patient was prescribed Zoloft, Abilify and melatonin.

The patient was admitted to the MHCB on December 28, 2024, for anxiety, command auditory hallucinations, and suicidal ideation with a plan. The initial psychiatric assessment was comprehensive. Documentation indicated that the patient's suicidal statement was made, at least in part, to affect a housing change. Specifically, following an RVR for drug paraphernalia, as part of C status, he would be required to move from a dorm to two-person cell housing. During the assessment the patient requested EOP level of care to facilitate dorm housing. The PC's initial

assessment documented the reason for MHCB placement and noted substance use but lacked the context provided by the psychiatric assessment. Mental health history was copied from 2021 despite recent clinical documentation.

The patient and assigned treatment providers attended the initial IDTT meeting. The clinical summary was useful. Documentation indicated that the patient tried to manage his distress when he learned of the housing change; however, his distress worsened, and he experienced suicidal ideation. The patient's short-term and long-term goals were written in partial phrases with numbers listed as benchmarks; however, there was no baseline assessment of his anxiety to assess change or if the goal was realistic. Treatment interventions included medication management, daily mental health contacts for monitoring, psychoeducation, and distress tolerance and communication skills. Other than medication management, the patient did not receive any additional targeted clinical treatment interventions. He did not meet higher level of care criteria. Rationale for continued MHCB placement lacked sufficient detail.

The patient received twice weekly psychiatric contacts but did not receive daily clinical contacts as required by the Program Guide. Provider continuity was poor as the patient was seen by multiple different providers for daily contacts, initial assessments, and IDTT meetings. Documentation quality varied by provider and ranged from insufficient to appropriate. Psychiatric documentation did not consistently include medication response or side effects. There was regular documentation of observation frequency and permitted property; however, clinical rationale was not provided.

The patient was discharged from the MHCB on January 7, 2025. The discharge IDTT meeting was attended by the patient, the assigned psychiatrist, and a covering PC. IDTT documentation had not been updated to reflect his course of treatment, rationale for discharge, discharge plan, or level of care. The discharge SRE was more useful and indicated that he was discharged to EOP level of care with five-day follow-ups. He was assessed as low risk with appropriate clinical rationale.

The discharge summary was limited as it was based on minimal available clinical documentation from multiple providers during the MHCB stay. A daily summary of his clinical presentation was documented but a summary of treatment progress and case conceptualization to aid his new providers with treatment planning was lacking.

**Findings**

This patient's treatment was inadequate.

In addition to failing to meet Program Guide requirements, treatment quality was compromised. While insufficient documentation in the PC initial assessment was improved in initial IDTT documentation, treatment planning and rationale for MHCB placement was insufficient. Relatedly, treatment interventions included psychotropic medication, observation, and monitoring but targeted clinical interventions to address the patient's treatment needs were not utilized. Discharge IDTT documentation was not sufficiently updated and was not useful for continuity of

care. Similarly, the discharge summary did not include relevant clinical information for continuity of care. Diagnostic clarification with clinical rationale was needed.

**Patient O**

This 34-year-old patient's healthcare record was selected from the MHCB roster to focus on adequacy of care in close proximity to the site visit. The patient was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. At the time of discharge, he was prescribed Zyprexa, Buspar and Depakote. He was treated at the MHCB facility between December 28, 2024 and January 8, 2025 due to psychiatric decompensation. Symptoms included poor ADL's, bizarre behavior, confusion, tangential thoughts, and response to internal stimuli.

The patient's psychotic symptoms prevented him from participating in the initial psychiatric assessment which was completed by a covering psychiatrist. Documentation copied from recent provider contact included this patient's long history of mental illness and extensive inpatient treatment history. He was assessed as manic and psychotic. Psychiatric medications and a toxicology screen were ordered. Of note, toxicology results were not obtained as the patient refused the test. The PC initial assessment was not updated sufficiently and included copied documentation from 2021. Documentation indicated that on the day prior to the MHCB referral, he refused a toxicology screen. It was opined that his mental illness was exacerbated by drug use. Rationale for this conclusion was not clearly documented.

Assigned providers and the patient attended the initial IDTT meeting. Treatment planning was unclear. Specifically, in the designated treatment plan section, auditory hallucinations, agitation and disorganization were targeted with goals which included partial phrases and benchmark numbers without specifics. Interventions included psychiatric medication, daily mental health monitoring, and psychoeducation. The patient did not meet higher level of care criteria. Rationale to continue MHCB level of care lacked sufficient detail.

The patient was seen by seven different providers including five psychiatrists and two PCs during his admission. This included initial assessments, daily contacts, and during the IDTT meetings. The patient received twice weekly psychiatric contacts but did not receive daily clinical contacts as required by the Program Guide. When contacts did occur, quality was variable and ranged from insufficient to generally useful. Observation frequency and permitted property were included in clinical documentation; however, clinical rationale was not provided. Psychiatric documentation did not consistently include medication response or side effects, nor was rationale for adjustments routinely clear. Clinical interventions were not offered by clinicians.

Based on limited clinical documentation, the patient's symptoms stabilized and improved over the course of the MHCB admission. During his January 8, 2025 IDTT meeting, he was discharged to the EOP level of care at his sending institution per his multiple requests throughout his stay. Of note, the discharge IDTT meeting was not attended by assigned providers including a clinician who had only seen him for one contact; and the Chief Psychiatrist who had not previously evaluated him. The patient did not meet higher level of care criteria. Discharge rationale, while brief, was appropriate. The PC discharge summary did not offer much in the way of continuity of care, in part due to limited documentation during his MHCB stay.

Of concern, there was documentation that he was in cuffs, despite lack of clear rationale for this level of security restraints.

**Findings**

This patient's treatment was inadequate.

The patient recompensated with psychiatric medication. Despite an early hypothesis that substance use agitated his underlying mental illness, clear documentation as to the final assessment was not documented. Regardless of the lack of clear treatment planning documentation, other than medication management and daily monitoring and assessments, the patient did not receive necessary skills to assist him in identifying, managing, or preventing a future decompensation. In addition to insufficient quality of care, the patient did not receive required daily contacts. When provided daily contacts were offered, they were completed by multiple providers which was disruptive to continuity of care. Lastly, the use of cuffs for a patient that was not clearly documented as a maximum custody patient was an area of great concern.

**Patient P**

This 59-nine-year-old male patient's healthcare record was randomly selected from the census to assess adequacy of care at the 3CMS level of care. He was provided with a diagnosis of adjustment disorder with depressed mood. He was not prescribed psychiatric medication.

In November 2024, the patient sought mental health services after more than 15 years without MHSDS participation. Presenting symptoms included depression, variable appetite, anger, and aggressive thoughts which he was having difficulty managing. He was isolating himself to prevent himself from acting on aggressive thoughts. He was recently sober, having discontinued methamphetamine use within the past year. The patient declined offered antidepressant medication during the initial psychiatric assessment. The initial psychiatric assessment was completed following the patient's initial IDTT but was otherwise adequate.

A partially drafted IDTT form, which was not formally entered into the record, indicated that an IDTT meeting was held on November 27, 2024 with required staff present. That document indicated that the initial IDTT meeting was completed in absentia; however, this appeared to be an error. Regardless, as of January 2025, IDTT documentation remained incomplete, including the lack of established treatment goals.

During the review period, the patient had two PC contacts with his assigned PC. The first contact occurred after the initial IDTT meeting to clarify a potentially suicidal statement, that was made during IDTT meeting. Documentation was indicative of a therapeutic contact with utilization of interventions to assist him in managing his distress; however a clinically indicated suicide risk assessment was not completed. The patient was seen a month later and his mood and functioning improved, in part due to a change in situational stressors and family support. Documentation noted that the patient was appropriately assessed; however, treatment interventions were not utilized.

**Findings**

The treatment provided to this patient was inadequate.

There was insufficient clinical documentation to support a diagnosis of adjustment disorder with depressed mood. The initial psychiatric assessment was delayed and treatment planning was incomplete. Given the potentially suicidal statement and lack of a risk assessment since 2017, completion of a SRASHE was clinically indicated. Use of treatment interventions during timely PC contacts was variable.

**Patient Q**

This 23-three-year-old male patient's healthcare record was randomly selected from the census to assess adequacy of care at the 3CMS level of care. The patient was provided with a diagnosis of unspecified anxiety disorder. He was prescribed Remeron as needed for anxiety. He was transferred to CSP/Solano on March 20, 2024.

The patient was seen for two psychiatric contacts during the review period with his assigned psychiatrist. While the patient should have been seen in August 2024, he was seen in October 2024 and documentation was sparse. Specifically, it was documented the Remeron, previously prescribed as needed for anxiety was changed because it was no longer effective and the patient was provided with melatonin The melatonin was prescribed as needed for sleep without further assessment of the patient's original problem of anxiety; assessment of sleep quality/duration; or assessment as to why the patient wanted the melatonin. Documentation from a timely November contact was similarly brief.

The patient had three PC contacts between August 2024 and January 2025. There was no indication in the August documentation that the assigned clinician would be changing; nor did the new clinician document discussion of the change in clinicians. Regardless, the patient reported improved anxiety and functioning which he attributed to a Life Skills course and support from 3CMS level of care. Only one of the three contacts was suggestive of a meaningful therapeutic contact and targeted his anxiety, his sole treatment goal established during his initial IDTT meeting. The remainder were indicative of wellness checks.

**Findings**

This patient's treatment was inadequate.

Clinical rationale for his diagnosis was needed. Psychiatric care was delayed and clinical documentation was insufficient. PC documentation lacked discussion of a clinician change and evidence of therapeutic interventions being provided was variable.

**Patient R**

This 46-year-old male patient's healthcare record was randomly selected to assess adequacy of care at the 3CMS level of care. Diagnoses provided by the PC of bipolar disorder and persistent

depressive disorder conflicted with IDTT documentation which indicated that diagnostic clarification was needed. He was not prescribed psychiatric medication. He had been at the facility since November 2023.

The patient and assigned providers attended his annual IDTT meeting in November 2024. Treatment planning documentation was inadequate. The clinical summary section had not been updated since his initial assessment. There was no summary of the patient's functioning, mental status, or progress toward treatment goals over the previous year. The sole treatment goal was a need for diagnostic clarification which was initiated in 2023 and remained in progress.

Between August 2024 and February 2025, the patient had four PC contacts and was seen more often than required. The patient had a clinician change in October 2024 without explanation from the preceding or newly assigned clinician. Documentation generally consisted of status updates with little focus on the patient's mental health needs. To that end, there were limited clinical interventions offered to this patient.

**Findings**

This stable patient's treatment was inadequate.

Treatment planning was not sufficiently updated. While PC contacts occurred more frequently than required, the content was not representative of meaningful therapeutic contacts. Rationale for and clarification of the patient's diagnosis was needed.

**Patient S**

This 43-year-old patient's healthcare record was randomly selected from the census to assess adequacy of care at the 3CMS level of care. The patient was provided with diagnoses of unspecified anxiety and unspecified depressive disorder. He was not prescribed psychiatric medication. He had been housed at CSP/Solano since 2010.

PC contacts occurred more frequently than required by the Program Guide between August and December 2024; however, continuity of care was poor. Specifically, two of the four contacts were held with three different clinicians when his long-time PC was out on medical leave. While contacts did not clearly target anxiety and depression, treatment goals established during his February 2024 annual IDTT meeting, documentation was representative of a meaningful therapeutic contact in which self-understanding and growth were addressed. However, on December 24, 2024, he was seen in the TTA for chest pain. He reported increased familial stress and was referred to mental health. During the follow-up mental health contact, he reported that he was feeling better and there was no further discussion of precipitants, ways to manage symptoms or the relationship between thoughts and behaviors to better manage any future incidents.

**Findings**

This stable, treatment-engaged patient's treatment was adequate with room for improvement.

Overall, PC contacts were representative of meaningful therapeutic contacts. However, there was a missed opportunity during a routine consult to better assist the patient in managing acute anxiety.

**Patient T**

This 38-year-old patient's healthcare record was randomly selected from the census to assess adequacy of care at the 3CMS level of care. He was provided with diagnoses of PTSD and unspecified depressive disorder. He was not prescribed psychiatric medication at the time of the review. He had been at the facility since November 2023.

The patient's assigned providers held the annual IDTT meeting in absentia in November 2024. Documentation indicated a pattern of treatment non-adherence since the previous IDTT meeting. However, a treatment goal to address the ongoing poor treatment engagement or address need for 3CMS level of care was not developed. Instead, the sole goal was to reduce depression with cognitive-behavioral therapy.

During the review period, there were delays in psychiatric contacts. The patient was due for a contact in August which did not occur until October 2024. Documentation was brief and other than a mental status exam, documentation relayed a medication time change at the patient's request to improve Remeron medication adherence. An assessment of the patient's symptoms, functioning or continued need for the medication was not completed. The patient refused a subsequent contact in November 2024 to address ongoing medication non-adherence. Further, he refused a cell front interaction and refused to sign an overdue medication consent. He was informed that medications could not be continued without a signed consent and indicated understanding. The Remeron was discontinued on that date but the rationale was not clearly indicated in the medication order.

In August, the patient was seen in response to a mental health request submitted to help him with distress for family issues. Documentation conveyed a therapeutic interaction and the patient reported positive benefit; however, this treatment engagement was an anomaly and the patient refused two of three subsequent PC routine contacts. When he did attend a routine appointment in November 2024, documentation indicated a discussion of his overall functioning but did not address his poor treatment engagement.

**Findings**

This patient's treatment was inadequate.

Psychiatric documentation needed clinical rationale regarding discontinuation of medication. The treatment team failed to address the patient's poor treatment attendance and level of care.

**Patient U**

This 31-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was diagnosed with schizoaffective disorder, unspecified type. Under a PC 2602 order for involuntary treatment due to grave disability, he was prescribed and adherent with long-acting injectable aripiprazole, divalproex sodium, olanzapine,

and valproic acid. Benztropine and diphenhydramine were prescribed PRN for extrapyramidal symptoms and agitation, respectively; he used diphenhydramine once and did not use benztropine at all. An intramuscular dose of olanzapine was ordered as a back-up for refusal of oral medications but was not needed. At the time of MHCB admission, one suicide attempt and two episodes of self-injurious behavior were listed in the health record. Medical conditions included obesity, hypothyroidism, gastroesophageal reflux disease, astigmatism, benign ethnic neutropenia, and a history of brain disorder. Within CDCR, the patient had previously received all levels of mental health care and been subject to multiple PC 2602 orders. At CSP/Solano, he was admitted to MHCB care from September 2, 2024 through September 12, 2024 for danger to self and others and significant impairment due to mental illness. He had reported homicidal, suicidal, and delusional ideation. He was referred to acute care on September 9, 2025, but remained in MHCB care for three more days.

The initial primary clinician and psychiatric assessments were timely. The initial psychiatric assessment was adequate; the primary clinician assessment was limited and relied heavily on pulling forward prior documentation. The case formulation was generic, not updated, and did not address the patient's current suicidal ideation, psychotic symptoms, lack of insight, or inferred negative impression management. The initial IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned psychiatrist. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation remained deficient, and patient strengths, verbalized treatment goals, and rationale for retention in MHCB were minimally or poorly documented. The treatment plan carried forward two treatment goals that had been developed months earlier in EOP care and were inappropriate for MHCB care. It added one treatment goal focused on elimination of suicidal ideation, without identifying measurable goals. The patient was followed daily by the assigned primary clinician or one of three psychiatrists. Progress notes were adequate and appropriate for crisis care, although psychiatric progress notes did not consistently indicate whether the encounter was confidential. Recreational therapy interventions were adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff apart from an alternate for the assigned psychiatrist, and resulted in a determination to refer the patient to acute care with a recommendation for single-cell placement. IDTT documentation was updated in a cursory manner, with no changes to the case formulation or treatment plan. An accompanying suicide risk evaluation and mental health consult were adequate; the patient was found to be at moderate suicide risk. The MHPC discharge summary was timely but cursory and did not adequately summarize the course of treatment.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely and clinically appropriate care. Although he initially impressed evaluating providers as feigning or exaggerating symptoms through rehearsed behavior, his symptoms were carefully monitored and his referral to acute care after one week in MHCB care was clinically appropriate. Some psychiatric progress notes were excellent and included rationale for treatment decisions. The case formulation, IDTT documentation, including the treatment plan, and discharge summary represented areas in which significant improvements are needed.

**Patient V**

This 42-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was in CDCR custody as a safekeeper because his behavior was too disruptive to be managed in county jail. He was diagnosed with schizoaffective disorder, bipolar type, antisocial and borderline personality disorders along with alcohol, amphetamine-type, cannabis, cocaine, hallucinogen, and opioid use disorders. He was prescribed buspirone and nonadherent with this medication. On the day prior to his discharge, lorazepam was initiated, and he was adherent with this medication. An additional dose of buspirone along with melatonin were also ordered as PRN medications at that time, and he used both medications intermittently. At the time of MHCB admission, one episode of head-banging was listed in the health record. Medical conditions included a history of hepatitis C, gastroesophageal reflux disease, and unspecified substance use disorder. Within CDCR, the patient had previously received all levels of mental health care. At CSP/Solano, he was admitted to MHCB care from December 11, 2024 through December 24, 2024 for danger to self and others, after reporting suicidal ideation and auditory hallucinations telling him to escape. He was referred to acute care on December 13, 2024, but remained in MHCB care for 11 additional days.

The initial primary clinician and psychiatric assessments were timely and adequate, apart from the case formulation, which was not updated, rudimentary, and failed to address recommended treatment. An initial recreational therapy assessment was timely and adequate. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist, who had not seen the patient prior to the IDTT meeting. The patient was agitated, aggressive, and found to meet criteria for consideration of a higher level of care. The treatment team determined to discuss transfer to a higher level of care with the patient once he was less agitated. Documentation of the patient's strengths, verbalized treatment goals, and retention in MHCB care was poor. The treatment plan included two goals that had been developed prior to the current MHCB admission, both of which required the provision of DBT skills training. A third MHCB goal was generic and targeted the patient's assessed dangerousness rather than psychiatric symptoms. However, the treatment team evidently determined to refer the patient to acute care, as a mental health consult for this referral was prepared later in the day. The first follow-up IDTT meeting was held one day later and attended by the patient and required staff, apart from an alternate for the primary clinician. The meeting resulted in a formal referral for acute care with a recommendation of single-cell placement. The rationale for the referral was adequately documented, but the remainder of IDTT documentation was not updated. A discharge suicide risk evaluation was well documented and resulted in a finding of moderate risk. The MHPC discharge summary was developed on December 14, 2024, and not updated with information related to the patient's continued MHCB care for the next ten days. A second follow-up IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned clinician. IDTT documentation inaccurately indicated that the patient did not meet criteria for a higher level of care. The case formulation, treatment plan, patient strengths, and patient verbalized treatment goals were not updated, and the IDTT discussion was not documented. A *Vitek* hearing was held on December 19, 2024 and upheld the acute care admission. The following day, the patient smashed a radio, swallowed a piece of metal, and was sent to a community emergency department. On December 22, 2024, the patient assaulted nursing staff with an unknown liquid. Apart from the time the patient spent in the community emergency room, the patient was followed

daily by one of three primary clinicians and/or one of five psychiatrists. Contacts occurred at the cell front due to the patient's behavioral impulsivity, hostility, and volatility. Progress notes were adequate and often astute. Recreational therapy interventions were also at the cell front and adequately documented.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient received timely assessments, IDTT meetings, and individual follow-up encounters, he did not receive adequate assessment, treatment planning, or interventions. Diagnostic evaluation was weak, and the nature of the patient's agitation and volatility was inadequately explored and addressed. It is unclear why emergency medication was not considered in responding the patient's enraged behaviors, particularly given the patient's documented dangerousness and its apparent association with serious mental illness. The use of three clinicians and five psychiatrists undermined the team's ability to develop therapeutic rapport and trust with the patient. Treatment planning was not patient-specific or adequate to guide the patient's MHCB care, and the patient's capacity to accept or refuse psychotropic medication was inadequately evaluated. Several psychiatric and primary clinician progress notes contained careful observations regarding the patient's mental illness, and these, along with the referral to acute care, represented significant strengths in the patient's care. Unfortunately, the discharge summary was prepared long before the patient left MHCB care and did not summarize these observations, a weakness that undermined continuity of care.

**Patient W**

This 46-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was diagnosed with adjustment disorder with depressive and anxious mood, antisocial personality disorder, and opioid use disorder. He was not prescribed any psychotropic medication. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and adherent with this medication except once. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions at the time of MHCB admission included traumatic brain injury with two brain surgeries, posttraumatic headache and seizures, hypertension, opioid use disorder, and a history of successfully treated hepatitis C. Within CDCR, the patient had not previously received mental health care except for one day on MHCB status at another institution, immediately prior to his CSP/Solano MHCB admission. At CSP/Solano, he was admitted to MHCB care from August 7, 2024 through August 16, 2024 for danger to self after voicing intense suicidal ideation in the context of safety concerns and a recent institutional transfer. He was discharged to EOP care on August 15, 2024, but remained in MHCB care one more day.

The initial primary clinician and psychiatric assessments were timely, and the psychiatric assessment was adequate. The primary clinician assessment did not result in a diagnosis, and the case formulation was rudimentary and did not address suicidal ideation or safety concerns. An initial recreational therapy assessment was timely and adequate. The initial IDTT meeting was timely and attended by the patient, alternates for both the assigned clinician and the assigned

psychiatrist, and other required staff. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation remained unchanged and deficient, and documentation of the patient's strengths and verbalized treatment goals was rudimentary. No treatment plan was developed. The patient was followed daily by one of two primary clinicians and/or one of five psychiatrists. Progress notes were adequate. Recreational therapy interventions were also adequately documented. The patient received an RVR for indecent exposure on August 13, 2024. The mental health indecent exposure screen was timely and adequate; his personality disorder and TBI were thought to be contributory, and he was not found to meet criteria for exhibitionism. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. A treatment plan was formulated with a retroactive date of August 9, 2024 and a generic goal addressing suicidal ideation that was not readily measurable. A discharge suicide risk evaluation was adequate and found the patient at low acute risk and moderate chronic risk, with rationale for these determinations appropriately documented. The accompanying safety plan was collaborative and useful. The MHPC discharge summary was adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received adequate assessment and supportive treatment that was clinically appropriate given his treatment needs. Services were provided timely, and most were adequately documented. The discharge to EOP care was clinically indicated under the medical necessity criterion, given the patient's severe suicidal ideation prior to admission, limited distress tolerance skills, proneness to impulsivity secondary to his head trauma and personality disorder, and openness to treatment. Psychiatric care and prescribing restraint appeared clinically appropriate. Treatment planning and case formulation documentation were areas in need of improvement, but the patient nevertheless received the care that he needed.

**Patient X**

This 45-year-old, maximum custody, MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was diagnosed with bipolar I disorder, most recent episode depressed, with psychotic features, posttraumatic stress disorder, and antisocial personality disorder with narcissistic and borderline features. Under a PC 2602 order for involuntary treatment due to danger to self, he was prescribed and adherent with carbamazepine and prazosin. He also received a one-time intramuscular injection of diphenhydramine and olanzapine for acute agitation after allegedly assaulting an officer. Intramuscular olanzapine was prescribed as a back-up for refusal of oral medications but was never needed. Hydroxyzine was prescribed PRN for agitation, and the patient used this medication twice. At the time of admission, over 60 episodes of self-injurious behavior were noted in the health record, primarily instances of inserting or ingesting foreign objects. Medical conditions included osteoarthritis and recurrent dislocation of left shoulder, gastrointestinal disease, and multiple foreign body ingestions/insertions. Within CDCR, the patient had previously received all levels of mental health care. At CSP/Solano, he was admitted to MHCB care from July 11, 2024 through July 23, 2024 for danger to self, after engaging in increasingly serious self-injury. Once

in MHCB care, he was referred to acute care on July 16, 2024 but remained in MHCB care for seven more days.

The initial primary clinician and psychiatric assessments were timely and adequate, despite occurring at the cell front due to the patient's refusal to participate in confidential settings. They listed multiple psychiatric diagnoses without clear resolution CSP/Solano. The case formulation was generic and did not address the current behavioral crisis or self-injurious behaviors. The initial IDTT meeting was timely but occurred at the cell front because the patient declined to leave his cell. The IDTT meeting was attended by required staff aside from alternates for the assigned primary clinician and the assigned psychiatrist. The patient was found to meet criteria for consideration of a higher level of care due to multiple MHCB admissions and multiple RVR mental health assessments, but the treatment team determined to retain the patient in MHCB for evaluation of appropriate care level. Patient strengths and verbalized treatment goals were poorly documented. The treatment plan carried forward three goals that had been developed months earlier and were not appropriate for MHCB care, but the plan added one addressing self-injurious behavior that was appropriate for MHCB care. The patient was followed daily by one of two primary clinicians and/or one of six psychiatrists. Progress notes indicated all contacts occurred at the cell front, either due to repeated power outages or due to the patient's repeated assaults of staff. The patient refused adjustments to his medications and was repeatedly documented as irritable, impulsive, and affectively dysregulated. An initial recreational therapy assessment was started but not completed. The patient was not offered recreational therapy interventions due to safety concerns. The patient engaged in several instances of assaulting staff with fluids, and a gas shield was placed around his door. The follow-up IDTT meeting was held early and, due to a power outage, at the cell front. The patient and required staff attended, apart from an alternate for the assigned psychiatrist. The patient met four criteria for a higher level of care and was referred to acute care with single cell housing. Documentation of patient strengths and verbalized treatment goals remained poor, and the treatment plan was not updated. The mental health consult completed in connection with the referral to acute care was adequate. A discharge suicide risk evaluation was adequate and found the patient at high risk. The primary clinician discharge summary was only minimally adequate, as it provided little guidance regarding best strategies for managing the patient's chronic self-injurious behaviors.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient was seen daily and timely and appropriately referred to a higher level of care, efforts were not undertaken to understand the precipitants and reinforcers for the patient's recurrent self-injurious behavior. His scheduled psychotropic medications appeared to be ineffective or inadequately effective, as evidenced by the patient's aggressiveness and irritability. Continuity of care across psychiatric provider was poor, and efforts to collaborate with the patient appeared limited. Given the patient's well-known history, ongoing danger to self and others, and active PC 2602 order, more active efforts at enhancing and modifying treatment were clinically indicated but not undertaken.

**Patient Y**

This 46-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder. He was nonadherent with valproic acid, and this medication was discontinued. He was adherent with mirtazapine for several days before it was discontinued. After an emergency PC 2602 order for involuntary treatment due to danger to self and others was granted, he was prescribed and adherent with aripiprazole and olanzapine. Diphenhydramine and an additional dose of olanzapine were prescribed PRN for agitation, and he accepted both medications intermittently. An intramuscular injection of olanzapine was prescribed as a backup for refusal of oral medications but did not need to be used. Five episodes of self-injurious behavior were listed in the health record. Through the ISUDT, he was prescribed buprenorphine-naloxone and partially adherent with this medication. Medical conditions included mixed hyperlipidemia, right inguinal hernia, hypertension, vitamin D deficiency, and opioid use disorder. Within CDCR, the patient had previously received all levels of mental health care as well as involuntary treatment. At CSP/Solano, he was admitted to MHCB care from September 2, 2024 through September 16, 2024 for danger to self, after becoming nonadherent with psychotropic medications, voicing suicidal ideation, and overdosing on fentanyl on August 30, 2024; eight doses of naloxone were required to revive him. He was referred to acute care on September 10, 2024, but remained in MHCB care for six more days.

The initial primary clinician was timely and largely adequate. The case formulation was pulled forward, generic, and not updated; it did not address suicidal ideation, psychotic symptoms, or the need for involuntary treatment. The initial psychiatric assessment was completed several hours after the initial IDTT but was otherwise adequate. Both assessments found the patient to be suffering from paranoia and psychotic symptoms. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was found to meet criteria for consideration of a higher level of care but retained in MHCB for additional observation and treatment, with a plan to initiate an emergency PC 2602 petition and refer to acute care if symptoms did not improve. The patient's verbalized treatment goals were not documented. The treatment plan pulled forward an undated goal that was not appropriate for MHCB care and included a new goal that was not measurable or realistic. The patient was followed daily by the assigned primary clinicians and/or one of three psychiatrists. Progress notes were adequate and occasionally demonstrated skillful collaboration with the patient, but they did not consistently indicate whether the encounter was confidential. An emergency PC 2602 order for involuntary treatment was obtained in the first week of MHCB care, after which the patient's medication adherence and mental status improved. Recreational therapy interventions were adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a referral to acute care with a recommendation of single cell housing. Updates to the IDTT documentation were cursory, and the treatment plan and case formulation remained unchanged and deficient. The accompanying mental health consult and suicide risk evaluation were adequate; the patient was found at moderate to high risk of suicide. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely and clinically appropriate care. His symptoms were adequately monitored, and the pursuit of an emergency PC 2602 petition was timely and clinically appropriate. The referral to acute care was clinically indicated, and documentation was sufficient to support continuity of care following transfer from MHCB. Psychiatric treatment was skillful. Case formulation, treatment planning, and other IDTT documentation needed significant improvement, but the patient's overall care met his treatment needs.

**Patient Z**

This 39-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was diagnosed with unspecified bipolar disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, rule out paranoid personality traits, and rule out methamphetamine-induced psychotic disorder. He was prescribed aripiprazole and olanzapine and was adherent with both. Hydroxyzine was prescribed PRN for anxiety, and he used this medication twice. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone. Six suicide attempts were listed in the health record. Medical conditions at the time of MHCB care included latent tuberculosis, arthralgia of temporomandibular joint, prolonged QT interval, opioid use disorder, and history of cholecystectomy. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At CSP/Solano, he was readmitted to MHCB care from November 5, 2024 through November 14, 2024 for danger to self, after reporting worsening psychotic and mood symptoms and suicidal ideation with a plan to cut himself. The patient had been in MHCB care at CSP/Solano from October 25, 2024 through October 30, 2024.

The initial primary clinician assessment was timely but relied heavily on prior documentation and failed to provide a diagnosis. The case formulation was pulled forward without modification and did not address suicidal ideation or symptoms of serious mental illness. The initial IDTT meeting was timely and attended by the patient, alternates for both the assigned primary clinician and the assigned psychiatrist, and other required staff. The patient was found to meet criteria for consideration of a higher level of care due to multiple MHCB referrals/admissions, but the team elected to retain the patient in MHCB care for observation and stabilization. The case formulation remained inadequate, and documentation of the patient's strengths, verbalized treatment goals, and rationale for retention in MHCB care was poor. The treatment plan brought forward one goal that was developed two months earlier and that was not appropriate for MHCB care. A second goal was added to address suicidal ideation; this goal was not measurable. The treatment team was silent on symptoms of mood disturbance and psychosis. The initial psychiatric assessment was completed several hours after the initial IDTT meeting but was otherwise adequate. Except on November 13, 2024, when the patient was not seen by either a primary clinician or a psychiatrist, the patient was followed daily by the assigned primary clinician and/or one of two psychiatrists. Most contacts occurred at the cell front due to the patient's refusals of confidential settings. Progress note documentation was adequate but highly redundant, and psychiatric notes did not always indicate whether the encounter was confidential. The assigned psychiatrist documented a plan to initiate long-acting injectable antipsychotic medication once the patient's treatment for latent tuberculosis was completed, but she later ordered this medication prior to the patient's tuberculosis treatment being completed. Fortunately, the psychiatrist caught this error the same day and rescinded the order before the patient received the medication. Recreational therapy was

regularly offered, but the patient declined to participate. The follow-up IDTT meeting was one day late, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. IDTT documentation of the patient's readiness for discharge was cursory, but the treatment plan was updated to indicate that the patient had not experienced suicidal ideation while in MHCB care. A discharge suicide risk evaluation found the patient at low risk but appeared to underestimate suicide risk in the context of the patient's history, ongoing symptoms, and social impairment. The accompanying safety plan was collaborative, thoughtful, and useful. The primary clinician discharge summary was timely but provided only a cursory summary of MHCB care and the patient's mental status at the time of discharge.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient's depressive symptoms improved during MHCB care, documentation indicated that he remained paranoid, psychotic, and concerned about his safety at discharge. The case formulation and treatment plan were inadequate to guide his care. Psychiatric care appeared appropriate and self-corrected an error in prescribing that could have otherwise resulted in adverse medication interaction. However, the patient's underlying psychosis remained active, and his discharge to EOP care was likely premature. Given the patient's recent history of requiring multiple MHCB admissions and appearing unable to program at the EOP level of care, consideration of an ICF referral with a plan to stabilize him on long-acting injectable antipsychotic medication should have been considered but was not. Documentation regarding the rationale for not referring the patient to a higher level of care was deficient.

**Patient AA**

This 30-year-old nonbinary (he/him/his) MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was diagnosed with unspecified anxiety disorder, unspecified depressive disorder, and insomnia. He was prescribed aripiprazole, melatonin, and mirtazapine and was partially adherent with aripiprazole and melatonin and nonadherent with mirtazapine. An additional dose of melatonin was prescribed PRN, but the patient did not use any PRN doses. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions at the time of MHCB admission included HIV infection, migraine, gender dysphoria, cocaine use disorder, severe, in sustained remission, and a history of fractured mandible and successfully treated hepatitis C. Within CDCR, the patient had previously received 3CMS care. At CSP/Solano, he was admitted to MHCB care from October 1, 2024 through October 12, 2024 for danger to self, after reporting suicidal ideation with a plan to hang himself in the context of heavy illicit substance use, a drug debt, and recent loss of his brother to a fentanyl overdose. He was on C status at the time of admission. He was discharged to EOP care on October 10, 2024 but remained in MHCB for two more days.

The initial primary clinician and psychiatric assessments were timely and adequate. Both were thorough and well-documented, but the case formulation was not updated and did not address suicidal ideation, the need for MHCB care, bereavement, or the patient's nonbinary identity. The initial IDTT meeting was timely and attended by required staff, apart from an alternate for the

assigned psychiatrist. The patient was not found to meet criteria for consideration of a higher level of care. Documentation for MHCB prevention planning was cursory, the case formulation remained inadequate, and the patient's verbalized treatment goals were poorly documented. The treatment plan appropriately addressed the patient's suicidal ideation but did not include measurable short- or long-term goals. It required the provision of distress tolerance skills that were not subsequently documented. The patient was followed daily by one of three psychiatrists. Psychiatric progress notes were thorough and collaborative. Recreational therapy interventions were offered on most days. The primary clinician saw the patient during IDTT meetings and for a discharge suicide risk evaluation but did not provide individual counseling sessions. The follow-up IDTT meeting was timely and attended by the patient and required staff. While the treatment plan was updated to indicate achievement of the short-term goal, remaining IDTT documentation was cursory, and there was no documentation of any discussion in the IDTT meeting. A discharge suicide risk evaluation was adequate and found the patient at low risk. The accompanying safety plan was collaborative, detailed, and useful. The MHPC discharge summary was timely but inaccurately indicated that the patient was medication adherent; the summary was otherwise adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation was not updated or appropriate for the patient's current treatment. It addressed treatment needs present in 3CMS care but not in the current MHCB admission and did not consider the patient's C status, nonbinary identity, suicidal ideation, or grief. The treatment plan was also deficient in failing to provide measurable goals. It identified distress tolerance skills as interventions, and these were not provided. Although the patient improved with the addition of aripiprazole, insufficient attention was paid to the patient's nonadherence with medication after the first week of treatment. Assessments, psychiatric care, provision of recreational therapy, and discharge to EOP rather than 3CMS care represented strengths in the patient's care. However, overall planning, monitoring, and intervention were insufficient to address the patient's complex treatment needs.

**Patient BB**

This 31-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was diagnosed with schizoaffective disorder, depressive type. He was prescribed olanzapine and sertraline and was adherent with both. Through the ISUDT, he was prescribed buprenorphine-naloxone and adherent with this medication. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included hyperlipidemia, hypertension, anemia, inactive tuberculosis, and alcohol, methamphetamine, and opioid use disorders. Within CDCR, the patient had previously received all levels of mental health care. At CSP/Solano, he was admitted to MHCB care from August 18, 2024 through August 27, 2024 for significant impairment due to mental illness, after exhibiting confusion, poor hygiene, difficulty following directions, treatment nonadherence, and unpredictable hostility. Prior to arrival in MHCB care, the treatment team at

the sending facility had referred the patient to ICF care. He was discharged from MHCB to ICF care on August 26, 2024, but remained in MHCB care for one more day.

The initial primary clinician and psychiatric assessments were timely and mostly adequate, but the case formulation was pulled forward without modification, cursory, and inadequate to guide treatment. The initial IDTT meeting was timely and attended by alternates for both the assigned clinician and the assigned psychiatrist, along with other required staff. The patient was found to meet criteria for consideration of a higher level of care, and the MHCB team agreed with the existing ICF referral made by the sending institution's treatment team. The case formulation was not updated and remained inadequate. The patient's strengths and verbalized treatment goals were poorly documented, and the treatment plan failed to include measurable treatment goals. The patient was followed daily by one of three primary clinicians and/or one of five psychiatrists. Most encounters occurred at the cell front due to the patient's refusals, and the patient was minimally verbal and avoidant of eye contact during all interactions. Progress note documentation was generally adequate. Psychiatric care appeared appropriate, with adequate consideration given to the patient's lack of decision-making capacity and the possibility that a PC 2602 petition was needed. Attempts to provide recreational therapy were adequately documented; the patient consistently refused these interventions. The follow-up IDTT meeting was timely and again attended by alternates for both the assigned clinician and the assigned psychiatrist, along with other required staff. The team discharged the patient to ICF care and adequately documented the patient's symptoms of self-neglect, social withdrawal, alogia, and grave disability. However, most IDTT documentation, including the case formulation, patient strengths, and the treatment plan, was not updated, and the patient's verbalized treatment goals were not documented. The patient was recommended for an unlocked dorm. A discharge suicide risk evaluation was adequate and found the patient at low acute risk and moderate chronic risk. The MHPC discharge summary was minimally adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely and clinically appropriate evaluations and treatment. Although treatment planning documentation was poor, the interventions the patient was offered were appropriate to his treatment needs. He was restarted on antipsychotic and antidepressant medication, and daily documentation of the patient's negative schizophrenic symptoms was adequate. Psychiatric documentation regarding the patient's decision-making capacity was a strength. Case formulation and treatment planning documentation were weaknesses.

**Patient CC**

This 33-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. He was serving two consecutive sentences of life without parole. He was diagnosed with other substance-induced psychotic disorder, with moderate or severe substance use. He received emergent intramuscular injections of lorazepam and olanzapine during the first two full days of MHCB care due to acute agitation and psychosis. He was subsequently prescribed and adherent with oral olanzapine. Chlorpromazine was prescribed

PRN for agitation, and the patient used this medication on five occasions; it was also prescribed on a one-time basis for agitation, and the patient accepted it on this occasion. Oral and injectable diphenhydramine were prescribed PRN for agitation and extrapyramidal symptoms, respectively; he received one injection of this medication and used the oral preparation frequently. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included sickle cell disease with retinopathy and a new vitreous hemorrhage, chronic pain, polysubstance [sic] use disorder, and history of auto-infarction of spleen. Within CDCR, the patient had previously received 3CMS care. At CSP/Solano, he was admitted to MHCB care from December 21, 2024 through January 3, 2025 for danger to others and significant impairment due to mental illness, after exhibiting signs of acute substance intoxication and severe psychosis and reporting homicidal ideation. He was referred to acute care on December 31, 2024, but remained in MHCB care for three more days.

The initial primary clinician and psychiatric assessments were timely and adequate, apart from the case formulation. The case formulation was pulled forward, and current content was rudimentary and insufficient to guide treatment. The initial IDTT meeting was timely but occurred at the cell front due to the patient's agitated behavior. The patient and required staff, apart from an alternate for the assigned primary clinician, participated. Surprisingly, given the patient's acute disorganization, the patient was not found to meet criteria for consideration of a higher level of care. Documentation of the patient's strengths and verbalized treatment goals was adequate in the context of the patient's symptoms. The treatment plan appropriately targeted psychotic symptoms. However, the plan used medication adherence rather than symptom improvement as a short-term treatment goal and did not identify a measurable long-term goal. The case formulation was not updated and remained inadequate. The patient was followed daily by one of two primary clinicians or one of four psychiatrists. Most encounters occurred at the cell front due to the patient's behavioral instability. Progress note documentation was largely adequate, but several notes did not indicate whether the encounters were confidential. Psychiatric care appeared appropriate, and there was adequate consideration regarding the possible need for an emergency PC 2602 petition. Provision of recreational therapy interventions were adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, but again occurred at the cell front. It resulted in a decision to refer the patient to acute care, with a recommendation for single-cell placement. This time, the patient was found to meet two criteria for consideration of a higher level of care. The mental health consult and suicide risk evaluation accompanying the acute care referral were adequate; the patient was found at low risk. The MHPC discharge summary was adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely and clinically appropriate assessments and crisis interventions. Psychiatric care appeared appropriate, including the use of emergent injectable medication on two occasions. The need for a PC 2602 petition for involuntary treatment was adequately considered, and the referral to acute care was clinically indicated. The patient's symptoms improved but required further inpatient care due to their severity. Case formulation, treatment planning, and documentation of encounters as non-confidential/confidential were areas in need of improvement. Nevertheless, the patient's crisis care needs were met.

**Patient DD**

This 39-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSP/Solano. During his MHCB stay, he was variously diagnosed with schizophrenia, schizoaffective disorder, unspecified schizophrenia and other psychotic spectrum disorder, unspecified depressive disorder with psychosis, persistent depressive disorder, and alcohol, opioid, and stimulant use disorders. He was prescribed aripiprazole, bupropion, escitalopram, and olanzapine, and he was adherent with these medications. Hydroxyzine was prescribed PRN for anxiety, but he did not use this medication. No suicide attempts or episodes of self-injurious behavior were listed in the health record at the time of his MHCB admission. Medical conditions included hypertension, diabetes mellitus, gastroesophageal reflux disease, Bell's palsy, steatosis of liver, obesity, and hyperlipidemia. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At CSP/Solano, he was admitted to MHCB care from November 29, 2024 through December 10, 2024 for danger to self after reporting suicidal ideation and command auditory hallucinations telling him to harm himself.

The initial primary clinician and psychiatric assessments were timely. Neither included documentation of diagnostic impressions, and the psychiatric assessment mistakenly indicated that the patient had cut himself prior to admission. The primary clinician assessment relied extensively on material pulled forward from prior documents, including the case formulation, which was pulled forward without modification and did not address depression, auditory hallucinations, or suicidal ideation. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. Documentation of the patient's strengths and the rationale for retaining the patient in MHCB care was cursory. The treatment plan appropriately addressed the patient's suicidal ideation and command auditory hallucinations but did not include a measurable treatment goal or patient-specific interventions. The patient was not found to meet criteria for consideration of a higher level of care. The patient was followed daily by the assigned primary clinician and/or one of four psychiatrists. Progress noted did not consistently indicate whether the encounters were confidential but were otherwise adequate. The aripiprazole dose was lowered due to concern of possible akathisia, and olanzapine was added to address persistent auditory hallucinations. Recreational therapy interventions were adequately documented. The follow-up IDTT meeting was one day late, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. The case formulation and documentation of the patient's strengths were unchanged; the treatment plan was updated to indicate that the patient had not experienced suicidal ideation or command auditory hallucinations to hurt himself while in MHCB care. A discharge suicide risk evaluation was adequate and provided thoughtful justification of a finding that the patient was at low risk. The accompanying safety plan was collaborative and helpful. The MHPC discharge summary was timely and mostly adequate, but it incorrectly indicated that the patient was adherent with mirtazapine.

**Findings**

The care provided to this MHCB patient was adequate.

The central difficulty in this patient's care was the lack of diagnostic clarity and resolution CSP/Solano of multiple diagnoses, with attendant challenges in formulating evidence-based treatment goals and a useful case formulation. While resolution CSP/Solano of diagnostic impressions may have required more time than the patient spent in MHCB care, there was little documentation of the rationale for different diagnostic considerations and of effort to resolve CSP/Solano these considerations. Additionally, there were important inaccuracies in documenting the patient's behavior prior to admission and in the discharge summary's account of what medications were prescribed. Nevertheless, the patient received timely and clinically appropriate crisis care. With close reading, documentation was sufficient to follow the course of treatment, and the patient's symptoms and side effects improved. For all the ambiguity of the patient's diagnoses, medication management appeared appropriate, and the discharge to EOP care met the patient's treatment needs. The suicide risk assessment and safety plan were well done.

**APPENDIX B-13**
**California Substance Abuse Treatment Facility (CSATF)**
**Review Period: October 1, 2024 -March 31, 2025**

**Patient A**

This 30-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSATF. The patient was provided diagnoses of amphetamine-type substance intoxication, with perceptual disturbances and moderate or severe use disorder, unspecified schizophrenia spectrum or other psychotic disorder, and opioid use disorder. Symptoms included auditory and visual hallucinations, delusions, circumstantial thought, paucity of speech, paranoia, decrease in appetite and poor ADLs. He was prescribed and adherent with olanzapine. Additional doses of olanzapine were prescribed PRN for psychosis, and the patient used these doses frequently. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, he had previously received 3CMS and MHCB care. After receiving an RVR for battery on a peace officer, he transferred to CSATF RHU. He received 3CMS RHU care from January 15, 2025, to April 7, 2025.

The initial PC assessment was timely but limited. Most information was pulled forward from previous assessments, which were not comprehensive. To this information, the current PC added only that the patient was focused on obtaining personal property and denied mental health symptoms. The initial psychiatric assessment was not completed until after the initial IDTT meeting but was otherwise adequate. The psychiatrist documented the rationale for changing the olanzapine dosage and a plan to follow up with the patient in seven to 14 days.

The initial IDTT meeting was timely and attended by the patient and required staff. The patient did not meet higher level of care criteria. The case formulation and treatment plan were inadequate to guide treatment. Most of the case formulation was generic rather than patient-specific, and the portion of the case formulation that was specific to the patient was insufficiently elaborated to be helpful. The treatment plan was carried forward from one developed at another institution and did not include measurable goals or address psychiatric care, which was critical to this patient's treatment. The plan failed to address the patient's diagnosed substance use disorders, which were noted to contribute to patient's psychosis, and it did not address the behaviors leading to RHU placement.

Despite the plan in the initial psychiatric assessment for the patient's response to medication change to be reviewed in seven to 14 days for medication, there were no further psychiatric contacts while the patient remained in CSATF RHU. The assigned PC documented weekly cell-front offers for confidential sessions, which the patient consistently refused. The PC did not document any attempts to implement interventions, explore the patient's treatment disengagement, or modify the treatment plan. The patient was not offered the requisite 90 minutes of group each week while housed in the RHU, as there were two weeks in which groups were not offered. He attended only three of seven offered stress management groups while he was in the RHU.

**Findings**

The treatment provided during this review period was **inadequate.**

The initial PC assessment was inadequately updated, and neither the case formulation nor the treatment plan were adequate to guide treatment. The initial psychiatric assessment occurred only after the initial IDTT meeting was completed. After the psychiatrist adjusted the patient's medications and documented a plan to follow up with the patient in seven to 14 days, no psychiatrist did not see the patient again, and the patient's response to the medication changes was inadequately monitored. The patient's resistance to confidential individual treatment was inadequately assessed and addressed. The patient's access to care was hindered by the lack of groups offered weekly while the patient was placed in RHU.

**Patient B**

This 44-year-old patient's 3CMS health care record was reviewed to assess the quality of mental health care at CSATF. The patient was provided with diagnoses of adjustment disorder with mixed disturbance of emotions and conduct, borderline personality disorder, and gender dysphoria in adolescents and adults. He was prescribed and partially adherent with olanzapine. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder, and through medical services, he was prescribed gabapentin for neuropathic pain. The patient had previously identified as transgender, but during the period reviewed identified as male; through medical services he received testosterone. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. He was placed in 3CMS RHU at CSATF from February 12, 2025, through May 8, 2025.

The initial PC assessment was timely but limited, with little treatment history included. However, the case formulation was adequate. An initial psychiatric assessment was not completed. The initial IDTT meeting was timely and attended by the patient and required staff. IDTT documentation was incomplete, with the clinical summary, clinical formulation, patient's verbalized goals, and discharge planning sections left blank. The treatment plan targeted anxiety and auditory hallucinations, provided measurable short-term goals, poorly formulated long-term goals, and specific interventions.

During the patient's 3CMS RHU care, two psychiatrists attempted to see the patient confidentially on a total of four occasions. In each case, the patient refused to leave his cell. Follow-up wellness checks were conducted for the first three appointments but could not be provided for the fourth because there was no laptop or tablet available for the telepsychiatrist to conduct a visit at the cell front. In response to the patient's third refusal, the psychiatrist documented a plan to email the patient's PC and the RHU supervisor to schedule an IDTT meeting. The ensuing IDTT meeting occurred 12 days later and was attended by required staff but not the patient, who refused. IDTT documentation remained inadequate, and there was no documentation of what was discussed, other than a decision to retain the patient in 3CMS. The PC attempted to provide weekly encounters, but the patient often refused. In the two instances in which progress notes indicated a completed encounter, they did not indicate whether the encounter was confidential. All four contacts in March 2025 were identical, copy-pasted notes

documenting cell-front refusals without clinical effort to engage the patient and discover barriers to patient's participation. While the PC documented provided general support, it was not until April 16, 2025, after the review period, that specific interventions were documented. PC progress notes did not reflect patient's progress along treatment plan goals. The patient's access to structured therapeutic activities was limited as he was not offered a 90-minute group during four weeks of his 3CMS RHU care.

**Findings**

The treatment provided to this patient was inadequate.

An initial psychiatric assessment was not completed, and the initial PC assessment was limited. IDTT documentation was inadequate, and the adequate case formulation included in the PC assessment was not included in treatment planning documentation. The patient's inconsistent medication adherence and resistance to mental health encounters were not adequately assessed or addressed. Group therapeutic activities were not provided in accordance with the Program Guide requirements. Most psychiatric and PC progress notes were cursory and contained material copied from one note to the next.

**Patient C**

This 34-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSATF. The patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood and opioid use disorder. Symptoms included stress, depressed mood, anxiety, difficulty sleeping, and overthinking. The patient was interested in receiving psychotropic medication for anxiety and depression, and venlafaxine was initiated on April 16, 2025, after the patient completed hepatitis C medication. He was adherent with this medication. He first entered CDCR on March 19, 2010, and was placed in the MHSDS at the 3CMS level of care shortly thereafter. Within CDCR, he had previously received 3CMS and MHCB care, but at the time he transferred to CSATF on June 10, 2024, he was no longer receiving mental health services. The patient was placed in the RHU on February 18, 2025, while in general population, and reenrolled in 3CMS care on March 11, 2025. He remained in 3CMS RHU at CSATF from March 11, 2025 through April 24, 2025, when he transferred to another facility.

While housed in the CSATF RHU for enemy concerns and for conspiring to manufacture a deadly weapon, the patient reported increase in symptoms of depression and anxiety. The patient was seen timely for a routine mental health consult on March 4, 2025, in response to a healthcare services request. The patient was found appropriate to continue in general population level of care. A second routine mental health consult occurred timely on March 11, 2025 in response to a second healthcare services request. An unlicensed social worker completed both consults and the initial PC assessment, which was timely and adequate. The PC increased the patient's level of care to the 3CMS and adequately justified the increase. The initial psychiatric assessment was timely and adequate, documenting awareness that the patient was receiving direct-acting antiviral medication for hepatitis C and documenting that the patient's liver function would be reviewed prior to potentially initiating any psychotropic medication.

The initial IDTT was timely and attended by the patient and required staff. While the case formulation was adequate, the clinical summary lacked detail regarding specific symptoms and functional impairments. The treatment plan was inadequate. The treatment plan goal was not clearly defined and provided no objective way to monitor patient progress. The discharge plan and criteria were not documented, but the rationale for 3CMS care was adequately documented. The assigned PC offered routine PC encounters timely while the patient remained in 3CMS RHU at CSATF. The patient refused some of these encounters, and wellness checks were provided at the cell front in these cases. All other routine PC encounters were confidential, supportive, and documented discussing basic relaxation skills. However, the PC did not document provision of cognitive reframing, which was prescribed in the treatment plan. A telepsychiatrist saw the patient on April 14, 2025 and initiated venlafaxine; documentation reflected adequate assessment and appropriate education and treatment. The patient was offered the minimum required 90 minutes of group therapy weekly and engaged in coping skills group each week during the review period.

**Findings**

The treatment provided to this patient was adequate.

The initial psychiatric and PC assessments were adequate, mental health contacts were timely, and the patient was provided access to the requisite 90 minutes of groups therapy each week. Areas for improvement included IDTT documentation and treatment planning, as well as documenting the provision of interventions required in the treatment plan.

**Patient D**

This 56-year-old patient's healthcare record was reviewed to assess the quality of mental health care at CSATF. The patient was provided diagnoses of generalized anxiety disorder, adjustment disorder with depressed mood, amphetamine-type substance use disorder, moderate, in early remission, and opioid use disorder. His symptoms included mild depression, anxiety, low appetite, and low energy. He was prescribed and adherent with mirtazapine.

The patient first entered CDCR on March 19, 1997, and had served multiple terms. He began serving his third term on April 12, 2024, and was first placed in MHSDS at the 3CMS level of care on May 1, 2024. The patient has a history of placement in general population and the 3CMS level of care. In January 2025, the patient received an RVR for battery on an inmate causing serious injury. He was then transferred from CIM to CSATF's RHU on March 6, 2025. He received 3CMS RHU services between March 6, 2025 and April 15, 2025, before being transferred to COR.

While at CSATF's RHU, the patient was seen timely for an initial psychiatric assessment via telehealth. During the psychiatric assessment, the patient described mild to moderate anxiety and depressive symptoms, which he attributed to the RHU placement. The psychiatrist offered to increase the mirtazapine dosage to target anxiety, but the patient preferred to utilize his coping skills first before increasing medications. An initial PC assessment was not completed.

The initial IDTT meeting was six days late but attended by the patient and all required staff. Most IDTT documentation was left blank, with no data included in the clinical summary, case formulation, or discharge plan. The treatment plan targeted the patient's anxiety and depression and included a measurable short-term goal, but it omitted any baseline measurement against which progress could be measured. In addition, the treatment plan only included a generalized intervention of cognitive behavioral therapy. During the review period, routine PC contacts were timely and offered as confidential sessions. The patient refused confidential setting during two of the three encounters. PC progress notes reflected brief check-ins with the patient, and the mental status section of these notes contained mostly cut and copied material. The PC provided active listening and support and was responsive to patient's requests for books, information, and psychoeducational handouts. However, progress notes did not reflect the provision of therapeutic interventions or the patient's response to the interventions. Barriers to patient's treatment engagement were not explored or included in the patient's treatment plan despite patient's lack of participation. Although he was enrolled in groups such as coping skills and stress management, he only attended one group during the period reviewed.

**Findings**

The treatment provided to this patient was inadequate.

Although the initial psychiatric assessment and weekly PC contacts were completed timely, and patient was offered weekly group therapy, an initial PC assessment was not completed. In addition, the master treatment plan was incomplete and lacked substantive information, limiting its use in guiding treatment and supporting continuity of care. Planned and evidence-based therapeutic interventions, along with the patient's response to them, were not documented. The patient's persistent lack of engagement and behavior leading to RHU were not adequately explored or addressed.

**Patient E**

This 38-year-old transgender patient's healthcare record was reviewed to assess the quality of mental health treatment at CSATF. The patient was provided with diagnoses of unspecified anxiety disorder, major depressive disorder, recurrent episode, moderate, and gender dysphoria in adolescents and adults. Symptoms included frustration, agitation, insomnia, low energy, and reports of intense depression and anxiety. She was prescribed and adherent with hydroxyzine for anxiety. An additional dose of hydroxyzine was prescribed PRN for insomnia, and she used PRN doses six times during the period reviewed. The patient entered CDCR on April 3, 2015, to serve her first term of life with the possibility of parole. She was placed in MHSDS on October 26, 2023, at the MHCB level of care, and transferred to 3CMS care on November 3, 2023. She had remained in 3CMS care since then. The patient transferred from CIM to CSATF RHU on October 10, 2024, where she was placed in the RHU for an RVR of battery causing serious injury. She received 3CMS RHU services between October 10, 2024 and January 30, 2025.

The initial PC and psychiatric assessment were timely and adequate; the psychiatric assessment was conducted through telehealth. The initial and routine IDTT meetings were also timely. Required staff attended the initial IDTT meeting, which was held in absentia due to the patient's refusal. The patient attended the second IDTT meeting, and all required staff except a senior

psychologist supervisor or designee participated in this meeting. Initially, the treatment plan targeted the patient's anxiety, bereavement, and depression. The plan included both measurable and vague, unmeasurable treatment goals. During the follow-up IDTT in January 2025, the treatment team appropriately added anger management as an additional treatment goal.

During 3CMS RHU care, the patient was provided with two routine psychiatric encounters; both occurred during December 2024. The psychiatrist worked collaboratively with the patient, adjusted the hydroxyzine dosage, and initiated a trial of sertraline in response to persistent symptoms. Sertraline was discontinued shortly after initiation, after the patient reported side effects and was nonadherent. The PC was an unlicensed social worker who met with the patient weekly for individual therapy. The PC was responsive to patient's mental health needs. After initial crisis intervention focused on the patient's acute grief, the PC began providing anger management interventions at the patient's request. Subsequent weekly PC progress notes documented evidence-based therapeutic interventions. The patient was routinely offered a 90-minute weekly stress management group except during three weeks of her RHU stay. She attended most of these groups but refused on two occasions .

**Findings**

The treatment provided to this patient was adequate.

IDTT meetings and psychiatric and PC contacts were timely. Although treatment planning goals could improve, the individual therapy provided by the PC was adequate and demonstrated evidence-based interventions to target patient's anger as outlined in the patient's treatment plan. Psychiatric contacts were comprehensive, collaborative, and responsive to patient.

**Patient F**

This 38-year-old patient's 3CMS health care record was reviewed to assess the quality of mental health care at CSATF. The patient was provided with diagnoses of major depressive disorder, recurrent, mild, PTSD, and unspecified anxiety disorder. Symptoms included depression, stress related to medical issues, and insomnia. He was prescribed mirtazapine which, due to the patient's nonadherence, was changed from scheduled to PRN during the review period. Within CDCR, the patient had previously received 3CMS care, and he remained in 3CMS care at CSATF throughout the review period. He transferred to CSATF on July 3, 2024.

During the review period, two psychiatrists each provided one psychiatric contact with the patient; these encounters were timely and responsive, and the second encounter was completed by a telepsychiatrist. The patient reported anxiety and depression during both encounters. The initial PC assessment was significantly delayed and did not occur until December 11, 2024, five months after the patient arrived. No individual PC encounters were provided during the review period or until June 24, 2025. The initial IDTT meeting did not occur until December 17, 2024. It was held in absentia due to the patient's refusal and was attended by an alternate for the assigned PC, the assigned psychiatrist, and a CCI. The clinical summary and clinical formulation were adequate and provided a clinical update identifying appropriate therapeutic interventions. The treatment plan targeted the patient's depression and included a measurable long-term goal with clinically appropriate interventions. At the time of the IDTT meeting, mirtazapine was changed from

scheduled to PRN in response to documented nonadherence. The PRN dose was then doubled during the second psychiatric encounter, on January 27, 2025. The patient used these doses on most evenings. As of the end of October, 2025, a psychiatrist had not seen the patient since the January 27, 2025 encounter. During the review period, the patient expressed frustration regarding his inability to access additional groups that he believed would be beneficial for his upcoming parole board hearing.

**Findings**

The treatment provided to this patient was inadequate.

The patient did not receive the treatment he needed. Both the initial PC assessment and the initial IDTT meeting were completed months after they were due, and the PC did not provide any individual treatment encounters. Following the patient's arrival at CSATF on 3CMS care, nearly a year passed before an individual PC encounter was offered, and this occurred long after the review period ended. While psychiatric care was timely and responsive during the review period, timely psychiatric care did not continue after the review period. As of October 31, 2025, the patient had not been seen by a psychiatrist for 277 days. The use of mirtazapine solely as a PRN medication requires review.

**Patient G**

This 51-year-old 3CMS health care record was reviewed to assess the quality of mental health care at CSATF. The patient was provided a diagnosis of unspecified anxiety disorder. Symptoms included anxiety, catastrophizing, and stress related to his legal case. During the review period, buspirone was briefly prescribed but discontinued due to nonadherence. Hydroxyzine was prescribed PRN for anxiety, but the patient used it on only two occasions during the review period. Within the CDCR, the patient previously received 3CMS care. While receiving 3CMS care, he transferred to CSATF on July 15, 2024.

Both the initial psychiatric and the initial PC assessment were substantially delayed. The initial psychiatric assessment did not occur until October 9, 2024, nearly three months after patient arrived, and the initial PC assessment did not occur until December 20, 2024, five months after the patient's arrival. The initial psychiatric assessment was cursory, conveyed almost no psychiatric history, and more consistent with a progress note than with an assessment. The initial PC assessment was adequate. The initial IDTT meeting was also substantially delayed and did not occur until after the review period, on April 1, 2025.

During the review period, routine psychiatric contacts were timely and was responsive to the patient's concerns and medication requests. Two psychiatrists each provided one encounter; neither documented whether the encounter was confidential, and the second encounter was provided by telepsychiatry. When the patient reported nonadherence with hydroxyzine due to drowsiness the psychiatrist adjusted the patient's medication to include buspirone instead. However, when the patient expressed concerns about heart palpitations with buspirone and requested to return hydroxyzine, buspirone was discontinued and PRN hydroxyzine was re-prescribed. Psychiatric documentation was comprehensive, and the psychiatrist provided psychoeducation regarding the medications. However, after the second psychiatric encounter on

January 6, 2025, no additional psychiatric encounters were provided through October 31, 2025. No individual PC encounters were provided during the review period, and the first such encounter did not occur until July 8, 2025, long after the review period ended and nearly one year after the patient's arrival.

**Findings**

The treatment provided to this patient was inadequate.

The initial psychiatric and PC assessments and the initial IDTT meeting were substantially delayed, and for much of the review period there was no structured assessments or treatment planning to guide 3CMS care. The initial psychiatric assessment was cursory. No individual PC encounters were provided. While psychiatric care was timely and responsive during the review period, timely psychiatric care did not continue after the review period. As of October 31, 2025, the patient had not been seen by a psychiatrist for 297 days. The patient's treatment needs were inadequately monitored.

**Patient H**

This 35-year-old patient's 3CMS health care record was reviewed to assess the quality of mental health care at CSATF. The patient was provided with diagnoses of chronic PTSD, grief reaction, and opioid use disorder. His symptoms included depression, auditory hallucinations, and suicidal ideation. He was prescribed and partially adherent with aripiprazole, mirtazapine, and sertraline. Through the ISUDT, he was buprenorphine-naloxone for opioid use disorder.

The patient entered the MHSDS in November 2023 and transferred to CSATF on July 9, 2024, at the 3CMS level of care. While an initial psychiatric contact occurred timely in July 2024, the initial PC assessment was not completed until March 3, 2025, eight months after the patient's arrival. The initial IDTT meeting was also delayed by eight months and occurred on March 25, 2025. The patient and required staff attended. Most IDTT documentation was simply copied and carried forward from a May 2024 IDTT meeting at another facility. IDTT documentation inaccurately indicated the patient was housed in RHU and failed to address the patient's current clinical needs, which included depression, auditory hallucinations, medication nonadherence. Instead, the treatment plan included an IPOC for depressed mood without specific measurable goals, baseline measures, or evidence-based interventions. Discharge criteria and justification for retaining the patient in 3CMS care were not documented.

There were no routine PC encounter during the review period. Routine psychiatric contacts were also not timely. There was a nearly eight-month-long delay from the initial psychiatric contact in July 2024 until the next psychiatric encounter in April 2025. These delays were concerning given the nature of the patient's symptoms and frequent medication refusals.

**Findings**

The treatment provided to this patient was inadequate.

The patient did not receive the treatment that he required or that was required by the Program Guide for 3CMS care. The initial IDTT meeting was delayed by eight months, IDTT information contained outdated and inaccurate information, and the treatment plan was inadequate to guide treatment. The patient did not receive either psychiatric or PC encounters during the review period, and the patient's treatment needs, including frequent medication nonadherence, were not addressed.

**Patient I**

This 53-year-old transgender patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSATF. The patient was provided diagnoses of unspecified depressive disorder, gender dysphoria, major depressive disorder, recurrent episode, moderate, and gender identity disorder of adulthood. She was prescribed and adherent with duloxetine, which was originally initiated by medical services for pain secondary to severe osteoarthritis of the left hip and then was continued by psychiatry for depression. Early in the review period at the patient's request, mirtazapine was converted from a scheduled to a PRN medication for dysphoria, anxiety, and restlessness, and she used this PRN medication on four occasions during the review period; she was only partially adherent with mirtazapine while it was prescribed as a scheduled medication. Through medical services, she was prescribed duloxetine for pain and gender affirming hormone treatment. The patient entered CDCR on June 4, 2003, and was placed in the MHSDS at the 3CMS level of care on June 20, 2003. She was either in general population or 3CMS care throughout multiple prison terms. She last entered CDCR on February 16, 2024, at the 3CMS level of care and was transferred from NKSP to CSATF on April 15, 2024.

The first psychiatric contact during the review period occurred on October 8, 2024, by a covering psychiatrist via telepsychiatry. The patient requested lowering the mirtazapine dosage and changing the medication from scheduled to PRN, and the psychiatrist adjusted the medication order accordingly. She was next seen by psychiatry on March 13, 2025, 156 days after the October 8, 2024 encounter. During this encounter, the psychiatrist provided a comprehensive review of the patient's history, and appropriate psychoeducation regarding medications. PC encounters were also significantly delayed and provided by four PCs. The first routine PC contact during the review period occurred on November 7, 2024, over six months after the next most recent PC encounter, on April 26, 2024. It was unclear if the November 7, 2024 encounter was confidential. The accompanying progress note documented the patient's current presentation and mental status, but not the provision of clinical interventions. Following the November encounter, the patient was next seen 117 days later, on March 4, 2025, for a routine PC contact. Documentation was generic and lacked evidence that specific therapeutic interventions were provided or that the encounter was tied to a treatment plan objective. On March 8, 2025, the patient was seen for an urgent consult after custody observed her talking to herself, screaming in her cell, refusing her medications, and exhibiting behaviors and concerns about vulnerability. During this PC consult, the patient denied symptoms and requested removal from mental health services. The PC agreed to refer the patient for a discharge IDTT meeting. Routine PC consults occurred on March 12, 2025 and March 28, 2025 to follow up on the March 8, 2025 urgent referral. The three consults were each provided by a different PC; each found the

patient behaviorally stable, although the final consult documented an assessment of moderate to severe depression.

**Findings**

The treatment provided to this patient was inadequate.

Psychiatric care was not timely, and the conversion of mirtazapine from a scheduled to a PRN medication was concerning and requires reassessment. PC encounters were significantly delayed and inconsistent. PC progress notes did not reflect the provision of specific interventions tied to the treatment plan or the patient's response to interventions. The patient became more unstable and symptomatic over time, and she did not receive the treatment she needed.

**Patient J**

This 26-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care at CSATF. The patient was provided with diagnoses of unspecified mood disorder, PTSD, and methamphetamine and opioid use disorders. He had no history of self-injurious behavior or suicide attempts. During the review period, he was not prescribed psychotropic medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. The patient first entered CDCR on August 27, 2020, and was placed in MHSDS at the 3CMS level of care on March 16, 2021. He served multiple terms in CDCR, and began serving his third term on September 25, 2023, at the 3CMS level of care. The patient transferred to CSATF on June 24, 2024 and remained in 3CMS care throughout the review period.

On August 19, 2024, the patient submitted a request to meet with mental health due to hearing things because he was not sleeping and requested to be seen for medications to assist with sleep. Despite this request, the patient was not seen by a mental health provider until December 2024, nearly five months after his arrival in June 2024. On December 2, 2024, the patient submitted another request to be seen by mental health because he was under stress and having thoughts about his cellmate. In response to his request, the patient was seen on December 3, 2025, for an urgent referral. The PC provided support and reviewed coping skills with the patient, and the patient requested an increase in PC contact. The PC also noted follow-up with custody staff to pursue a plan to change the patient's housing.

On December 5, 2024, an initial PC assessment was conducted, primarily by chart review, with most information pulled forward from prior assessments. The initial assessment included a brief cell-front interaction with the patient after the patient refused to meet in a confidential setting. Aside from the mental health consult and initial PC assessment, no other PC encounters were provided during the review period.

The initial IDTT meeting occurred on December 5, 2024, with the assigned PC and psychiatrist present along with a CCI. Documentation noted that due to the patient's refusal and modified programming, the IDTT meeting was held in absentia. The clinical summary and case formulation were carried forward from 2023. The case formulation referenced a delusional disorder that was not one of the patient's current diagnoses. Clinical information about the recent mental health consult and the request for increased PC contact was omitted. IDTT

documentation was incomplete and inadequate. The patient's strengths, verbalized goals, measurable objectives, and evidence-based therapeutic interventions were not documented. The discharge criteria/plan and rationale for retaining the patient 3CMS care were vague and inadequately documented. An initial psychiatric assessment was not completed until January 20, 2025, over a month after the patient's initial IDTT meeting, five months after the patient requested medications to address auditory hallucinations and insomnia, and seven months after his arrival at CSATF. No other psychiatric encounters were provided during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The patient did not receive the treatment he needed. There was a significant five-month delay before any clinical contact occurred, despite the patient's initial request to meet with mental health services in August 2024. During this time, he had insufficient access to care, his treatment needs were not timely assessed or addressed, and there was poor continuity of care. The patient was only seen after submitting a second urgent request in December 2024. The initial IDTT meeting was substantially delayed, and IDTT documentation and the treatment plan were inadequate. The lack of psychiatric encounters for a patient reporting auditory hallucinations was a significant concern.

**Patient K**

This 39-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with diagnoses of PTSD, unspecified anxiety disorder, adjustment disorders with anxiety, and amphetamine-type substance (or other stimulant)-induced psychotic disorder with moderate or severe use. He was mostly adherent to his prescribed oxcarbazepine. He was also prescribed hydroxyzine as a PRN and suboxone for his substance use disorder.

This patient was incarcerated for the second time within CDCR in March 2016. During a previous incarceration from 2006 to 2007, he had a brief placement at the 3CMS level of care, but otherwise did not receive services within the MHSDS. He was placed at the 3CMS level of care soon after his arrival in 2016 and remained at that level of care through 2023 when he was elevated to the EOP level of care after two MHCB placements within one month. Since then, he has been placed at the MHCB level of care five times and there was a brief attempt to place him at the 3CMS level of care in August 2024 while he was in the RHU, but he was soon returned to the EOP level of care. He was transferred to CSATF on December 30, 2024 at the EOP level of care.

On January 6, 2025, a psychologist saw the patient for a routine consult, although the reason for the consult was not clear. Given subsequent documentation in the record, it appeared that this primary clinician used the consult note template to document routine clinical contacts with the patient. The psychologist documented that the patient was anxious and agitated and completed a partial mental status examination. It was documented that the patient would attend an IDTT on January 9, 2025 and the patient was informed about which recreational therapy track he would attend. The patient began attending groups that same day. An initial IDTT meeting was held on January 9, 2025 despite no initial primary clinician or psychiatric assessments having been

completed. The required staff and patient were in attendance along with a psychologist supervisor and a psychiatric technician. The patient flagged for a need to consider a higher level of care after being admitted to the MHCB four times in the previous six months. The rationale for retaining him at the EOP level of care was adequate yet the enhancements for treatment were vague and generic. The enhancements made mention of the patient's treatment goals, yet the goals on the formal treatment plan were not updated since September and were not in keeping with the enhancements outlined. The clinical summary and case formulation were adequate, as were the documented patient strengths and verbalized treatment goals yet it was unclear if these latter two sections were updated or taken from his recent MHCB placement given the content. There were no discharge criteria documented. A suicide risk evaluation was also completed on January 9, 2025 as the patient had been recently discharged from the MHCB. The patient was assessed to be at low current risk for suicide with adequate justification.

An initial psychiatric assessment was completed on January 28, 2025, outside of required timeframes and well after the initial IDTT meeting. The assessment was adequately documented. Unfortunately, the patient was not seen again by a psychiatrist during the monitoring period.

The patient was seen by his primary clinician for individual and group contacts which mostly reflected adequate treatment in keeping with the patient's treatment goals; however, some of the individual contacts were status checks more than therapeutic interactions. There was good continuity across contacts and the content was in keeping with the treatment plan.

**Findings**

Treatment of this patient was adequate but not without concerns. There was no initial primary clinician assessment, the initial psychiatric assessment was late, and there were no routine psychiatric contacts. The treatment provided to the patient was in keeping with his needs and the treatment plan, and there was demonstrated continuity across primary clinician contacts.

**Patient L**

This 34-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with a diagnosis of schizoaffective disorder, bipolar type. He was mostly adherent to his prescribed mirtazapine, partially adherent to his prescribed buspirone, and non-adherent to his prescribed aripiprazole, hydroxyzine, and prazosin. This patient was incarcerated for the fourth time within CDCR in June 2022 and was immediately placed at the 3CMS level of care. During his previous period of incarceration from March 2021 through December 2021 the patient received services at the 3CMS level of care. Prior to that, he had not been placed within the MHSDS. In August 2024, while at CSATF in the RHU, the patient was elevated to the EOP level of care. He transferred from CSATF to an EOP RHU on November 4, 2024.

A routine IDTT meeting was held on October 9, 2024. An alternate primary clinician was present; however, other required staff were in attendance. The patient was not present at the meeting secondary to security issues in the RHU. The treatment plan noted that the patient was being held in a non-EOP RHU since August 7, 2024 and was awaiting transfer. The treatment plan included

relevant and updated goals along with evidence-based interventions. Of concern was the fact that the patient was non-adherent to his medications and notices were documented in the record, yet this fact was not mentioned in the IDTT documentation nor in the psychiatrist's review of the patient's medications for the IDTT meeting.

There were two contacts with the telepsychiatrist during the monitoring period. The patient's non-adherence was documented and addressed by discontinuing the patient's antipsychotic medication despite ongoing auditory hallucinations. The patient requested not to be on "heat meds" yet there was no evidence that options were reviewed. The diagnoses documented by the psychiatrist were not in keeping with the diagnosis of record and were listed as major depressive disorder and anxiety. The patient reported an increase in hallucinations following the discontinuation of the antipsychotic medication yet there was no documentation of other medication options being discussed. The patient reported that he laid down to cope with the voices. The patient was seen weekly by his primary clinician and the contacts reflected adequate interventions in keeping with the patient's treatment plan. The patient was offered one hour of group weekly and did not attend.

**Findings**

Treatment of this patient was marginally adequate. Psychiatric care was inadequate. The patient was not present for his IDTT meeting secondary to environmental issues and the meeting was not rescheduled so the patient could attend. Further, diagnostic clarification was needed as the psychiatrist's diagnostic formulation was not in keeping with the diagnosis of record.

**Patient M**

This 61-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with a diagnosis of schizoaffective disorder, bipolar type. The patient was fully adherent to his prescribed olanzapine and oxcarbazepine.

This individual has been incarcerated multiple times within CDCR since 1986. He first received services within the MHSDS in October 2000 at the 3CMS level of care during a prior period of incarceration. He fluctuated between the 3CMS level of care and not receiving mental health services through February 2004 when he was first placed at the MHCB level of care and was discharged to the EOP level of care in April 2004. He continued to receive services at the 3CMS, EOP, and MHCB levels of care through his most recent release in 2012. He was incarcerated for the current term in September 2019 and was placed at the EOP level of care upon arrival. After a brief placement at the 3CMS level of care resulted in an MHCB placement after 51 days, he was returned to the EOP level of care in December 2019. Other than an MHCB placement in October 2020, he remained at the EOP level of care and transferred to CSATF in April 2024.

A routine IDTT meeting was held on October 10, 2024 with required staff present; however, an alternate psychiatrist was covering the meeting. The patient did not attend the meeting as he "was out to medical" and it was not documented why the meeting was not rescheduled. The clinical summary did not include any clinical updates since his prior IDTT meeting. The patient's treatment plan was internally inconsistent as the goals and interventions were disconnected. For

example, one of the patient's problems was listed as depression. The long-term goal was to utilize journaling as a means of self-expression at least once a day for the next 90 days, yet the short-term goal was to engage in physical activity and the intervention was to identify ways to prevent delusional beliefs from impacting his daily functioning and social interactions. The section for a discharge plan and criteria for retaining the patient at the EOP level of care was filled with language copied from the treatment goals with explanation. Routine IDTT meetings were held in December and March with alternate psychiatrists but other required staff present. The patient was not in attendance at either meeting but the rationale for his absence was not documented. Clinical updates were lacking and included no information about the patient's symptoms or functioning. The treatment plan was not updated and there was no discussion of the patient's progress toward treatment goals. Much of the content was unchanged.

Routine primary clinician contacts were conducted individually as well as in caseload groups. The patient was not consistently offered confidential individual sessions in keeping with requirements. Some of the contacts were offered in non-confidential settings due to reasons other than patient refusal and groups were offered on consecutive weeks on multiple occasions. The content of documentation was largely generic and unchanged from contact to contact. Group documentation included no individualized content. Overall, there was little evidence that the patient's needs were being addressed through the delivery of evidence-based interventions in keeping with his needs or with the goals outlined in the treatment plan. Routine telepsychiatric contacts were held at least monthly and evidenced adequate interventions which addressed the patient's needs. Groups were offered in keeping with requirements.

**Findings**

Treatment of this patient was inadequate due to the lack of an internally consistent treatment plan, failure to provide meaningful therapeutic interventions, and no routine review of patient progress or ongoing needs. Additionally, the patient was not present for his IDTT meetings without adequate explanation and many primary clinician contacts were non-confidential secondary to reasons other than patient refusal.

**Patient N**

This 44-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. The patient was provided with diagnoses of schizoaffective disorder, depressive type and polysubstance dependence. He was fully adherent to his prescribed ziprasidone.

This individual was incarcerated numerous times since 2002 and consistently received services within the MHSDS at the 3CMS, EOP, and MHCB levels of care. He was most recently incarcerated in February 2023 and was primarily treated at the EOP level of care with brief placements at the 3CMS level of care and two MHCB placements. He most recently returned to the EOP level of care in September 2024 after spending just over two months at the 3CMS level of care. He transferred to CSATF on October 3, 2024.

Initial primary clinician and psychiatrist assessments were completed timely and prior to the initial IDTT meeting. The primary clinician assessment was inadequate and included information pulled forward from previous assessments without clear indication of what was relevant for the patent's current treatment. It also included inaccurate information noting that the patient arrived from the reception center and made no reference to the patient's recent increase in level of care. The psychiatric assessment also included previously documented information but did contain updates on the patient's current symptoms and need for medications.

There were two IDTT meetings held with the patient during the monitoring period. His initial IDTT was held on October 16, 2024 and was timely. Required staff and the patient were in attendance. The clinical summary inaccurately noted that the meeting was a routine 90-day IDTT yet discussed the fact that the patient was adjusting to the setting and was yet to be enrolled in groups. The patient was noted as experiencing hallucinations and depression without specifics other than the symptoms were "stable" and described the patient as receiving support from group programming despite not yet being enrolled in groups. The treatment goals were carried forward from when the patient was at the 3CMS level of care and included reference to an IPOC that was not documented. The goals were objective and measurable but the interventions were vague. There were no patient strengths or verbalized goals documented. A routine IDTT meeting was held timely in January 2025 and included required staff and the patient. The clinical summary noted that the patient's psychotic symptoms continued to impair his functioning without specifics as to how. The patient was noted as finding groups helpful, again without specifics. The case formulation, pulled forward from September 2024, noted that the patient had substance abuse issues, gender identity issues, and history of poor coping without further details. The treatment plan was unchanged without any reference to patient progress toward goals.

The patient was not seen as required by his primary clinician. He was seen for individual contacts less than once per month and was not offered caseload groups weekly. Documentation was not individualized and included copied content for most individual sessions. Caseload group documentation noted that the patients were shown videos and included no individualized content about the patient. Between November 8, 2024 and December 20, 2024 and again between December 20, 2024 and January 21, 2025, there was no evidence that the patient was seen by a primary clinician. Psychiatric contacts were not held monthly during the reporting period. The patient was not seen in November 2024 nor in January 2025 by a psychiatrist. Medication adjustments were made during nearly every contact and the psychiatrist did not evidence review of the patient's record as there were references to weekly primary clinician contacts that were not being offered to the patient.

**Findings**

Treatment of this patient was inadequate. He was not offered treatment as required by the Program Guide and there was little evidence of treatment being provided to address his needs or the goals of the treatment plan. There was no assessment of the patient's treatment progress other than the psychiatrist attempting to address his reported symptoms with medication changes.

**Patient O**

This 39-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with diagnoses of schizoaffective disorder, bipolar type and chronic PTSD. The patient was partially adherent to his prescribed cariprazine. This individual was incarcerated for the first time within CDCR in October 2021 and was placed at the 3CMS level of care while in the reception center. He was admitted to the MHCB in December 2021 and discharged to the EOP level of care where he has remained, other than seven subsequent referrals to and/or placements at the MHCB level of care. He was most recently discharged from the MHCB and was placed at the EOP level of care at CSATF on September 16, 2024.

There were two IDTTs held with the patient while he was incarcerated at CSATF during the reporting period. The first, which should have been an initial IDTT meeting following his discharge from MHCB was held on October 2, 2024, was noted as a routine IDTT meeting, made no reference to the patient's recent MHCB stay, and included no updated information within the clinical summary. The treatment goals were carried forward from a prior treatment plan from February 2024 with no reference to patient progress or lack thereof. The December IDTT had an incomplete clinical summary that included information regarding clinical contacts in August and medication adherence from July. The summary made mention of symptoms not discussed previously and yet the treatment plan remained unchanged and did not address those symptoms. Both meetings included required staff and the patient. Neither included rationale for continuation at the EOP level of care or discharge criteria. Of note, the OnDemand system indicated that the patient was made EOP Mod from December 19, 2024 through February 6, 2025 when he transferred to another institution, yet there was no mention of this change in the IDTT documentation from December 18, 2024.

There were no routine primary clinician contacts documented during the monitoring period. There were no routine psychiatric contacts in October or November 2024. There was an initial psychiatric assessment completed on December 23, 2024. Prior to that, the patient had not been seen by a psychiatrist since his return from the MHCB in mid-September 2024. The assessment was basic but adequate. The psychiatrist noted that the patient was transferred to the 3CMS yard and was referred to be seen after acting bizarrely yet no referral was documented in the record and the patient had been seen by the IDTT only five days prior. The psychiatrist noted that the patient was placed at the EOP Mod level of care.

The patient submitted requests for mental health on December 27, 2024, January 4, 2025 and again on January 7, 2025. The patient noted that he was not being seen for routine contacts and not receiving any groups as he was not housed in the EOP program. He also reported concerns about taking medications while in a 3CMS yard with evidence of non-adherence. A primary clinician saw the patient on January 8, 2025 in response to these requests and provided the patient with some interventions to address his anxiety and tearfulness at not being seen by any clinicians or receiving any groups. The patient was referred to his assigned psychiatrist and primary clinician. The patient was seen by his assigned primary clinician on January 8, 2025 and documentation evidenced the use of interventions the addressed the patient's immediate needs. A psychiatrist saw the patient on January 9, 2025 regarding medication non-adherence and noted that the patient needed reminders to take his medications yet did not document any means by which the patient would be reminded. The patient continued to be non-adherent to his medications and was seen on

January 16, 2025 by his assigned telepsychiatrist and the patient reported that his placement in non-EOP housing was negatively impacting his mental health as well as his ability to take medications as prescribed. The psychiatrist encouraged the patient to take his medications and attend weekly primary clinician contacts, despite the fact that contacts were not being offered.

There were three staff referrals and another patient request for mental health services submitted regarding the patient's needs over the following weeks, which went unanswered prior to the patient's transfer to another facility on February 6, 2025.

**Findings**

Treatment of this patient was grossly inadequate. He was not provided with routine clinical contacts with his primary clinician or psychiatrist for most of the reporting period and no groups were offered to the patient after he was moved off of EOP housing in December 2024. The patient's mental health and medication adherence declined during this period, and yet no clinical interventions were provided. The patient transferred to another facility in February 2025.

**Patient P**

This 28-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. The patient was provided with diagnoses of major depressive disorder, recurrent episode, with psychotic features and PTSD. He was mostly adherent to his prescribed aripiprazole and buspirone and non-adherent to his prescribed atomoxetine and citalopram. He was also prescribed hydroxyzine and propranolol as needed.

This patient was incarcerated within CDCR for the first time in January 2015, was released on parole in 2021, and returned to CDCR on April 4, 2024. He began receiving mental health services at the 3CMS level of care in March 2015 and after an MHCB admission in August 2018, was discharged to the EOP level of care. Upon returning to incarceration in April 2024, he was placed at the EOP level of care and was transferred to CSATF on September 6, 2024.

During the reporting period, there were two routine IDTT meetings held, one in December 2024 and one in March 2025. Both were timely. The patient was not present for either meeting but documentation indicated that the patient did not refuse. The patient was noted as being "out to medical" and "at canteen" during the meetings. Covering psychiatrists were present for both meetings. Neither treatment plan included information about the patient's progress toward treatment goals or barriers to achieving goals. The December documentation was internally inconsistent, including a number of disjointed statements about the patient's treatment needs and planned interventions. The March documentation was more internally consistent, including updated information about targeting the patient's anger and anxiety with adequate interventions. Neither provided clear justification for the patient's placement at the EOP level of care other than noting that the patient wanted to be a peer support specialist and "needs the help of EOP to make it happen."

The patient was seen monthly by a telepsychiatrist and these sessions were adequate and addressed the patient's identified needs. Of note, the psychiatrist's documentation included templated language about the appointment addressing medication nonadherence regardless of the patient's level of adherence resulting in inaccurate documentation. Primary clinician contacts were inadequate. The patient was not seen weekly and most contacts were held in a group setting with limited documentation of clinical interventions being provided in accordance with the patient's treatment needs. There was one individual session with the patient documented between October 2024 and mid-February 2025. There was evidence of caseload groups being offered to the patient most weeks, however, the documentation of these sessions was templated and included no individualized documentation. Of serious concern was documentation by the patient's primary clinician noting that "chakra medication, yoga, and aura cleansing" were formal cognitive behavioral therapy techniques being used in group sessions. Additionally, during one individual contact, the patient requested support with release planning and the primary clinician documented referring the patient to his peers for help with release planning.

On February 12, 2025, the patient was issued an RVR for assault on a peer. The patient reported receiving bad news, experiencing auditory hallucinations telling him to hurt others, and looking for his primary clinician prior to the incident. He was also seen by his psychiatrist and primary clinician earlier that day. The psychiatrist noted medication non-adherence and chronic auditory hallucinations and the primary clinician noted increased anxiety, nightmares, and a parole denial. Despite these factors, the clinician completing the assessment noted that mental health factors did not play a role in the infraction. It is unclear how this decision was made.

The patient was routinely offered a number of recreational therapy groups weekly and attended most.

**Findings**

Treatment of this patient was inadequate. The patient was not seen as required by his primary clinician and there were little to no primary clinician interventions provided to the patient. There were serious concerns about documented interventions by the primary clinician lacking any evidence base. Group documentation lacked individualization. Psychiatric interventions were mostly adequate but templated language made tracking patient adherence a challenge. Treatment planning was inadequate and did not include the patient in the process. There were also concerns about the adequacy of the mental health assessment following an RVR as well as the response to the patient's request for release planning support being referred to his peers.

**Patient Q**

This 56-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with a diagnosis of major depressive disorder, recurrent episode, moderate. He was moderately adherent to his prescribe aripiprazole and mirtazapine. The patient was noted as being DD1 status and having a number of chronic medical conditions.

This individual was incarcerated multiple times, beginning in 1997. He was first treated within the MHSDS in April 2006 at the 3CMS level of care during a prior period of incarceration. Between 2006 and his release in 2016, he received care at the 3CMS, EOP and MHCB levels of care as well as experiencing a period of over five years (September 2010 through January 2016) when he was not receiving services within the MHSDS. Upon his return for his current period of incarceration in October 2024, he was placed at the 3CMS level of care and was elevated to the EOP level of care while at CSATF in March 2025. At that time, he was placed on EOP Mod status.

The patient was seen for an IDTT meeting on March 11, 2025 while at the 3CMS level of care. Documentation noted that the patient was experiencing increased distress and wanted to be elevated to the EOP level of care. Despite this, no higher level of care indicators were endorsed. His adaptive support needs were documented. The patient had one documented treatment goal, addressing anxiety, despite the narrative noting tearfulness, irritability, depression, and avolition. Rationale for increasing his level of care was adequate.

The patient was seen two days after the IDTT by his assigned psychiatrist who documented "covering" for the assigned psychiatrist, which was confusing. The documentation was difficult to track as historical information was interspersed with current information. Despite acknowledging the patient's increased level of care, the psychiatrist documented a plan to follow up with the patient in 10 to 12 weeks rather than the required 30 days. A full initial psychiatric assessment was not completed as required.

An initial primary clinician assessment was completed timely. Documentation noted that the patient was placed at the EOP Mod level of care. There was contradictory information regarding the patient's housing, making it difficult to discern whether the patient was housed within the EOP program. Much of the documentation was copied psychiatric progress notes and did not represent a full initial assessment. The patient was seen for a routine primary clinician contact the following week but documentation evidenced a status check and no clinical interventions. Despite an initial IDTT being due prior to the reporting period, one was not completed.

**Findings**

Treatment of this patient was not adequate. He was elevated to the EOP level of care but was not seen for an initial psychiatric assessment or initial IDTT within required timeframes. His initial primary clinician assessment was completed timely but was inadequate to support treatment planning.

**Patient R**

This 53-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was fully adherent to his prescribed mirtazapine and olanzapine. He was also prescribed hydroxyzine as a PRN. This individual was incarcerated for the fourth time within CDCR on October 18, 2024. During prior periods of incarceration, he was primarily treated at the 3CMS level of care, but after an MHCB admission in December of 2019, he was discharged to the EOP level of care and remained there

until his release in March 2020. He was transferred to CSATF at the EOP level of care on December 30, 2024.

An initial primary clinician assessment was conducted timely on January 8, 2025. It was mostly adequate and indicated that the patient's auditory hallucinations would be primarily treated with medications. There was no initial psychiatric assessment completed prior to the initial IDTT which was held timely on January 8, 2025. The patient and required members of the treatment team were present. The higher level of care indicator noted that the patient was not attending at least half of his offered treatment. The narrative explaining his lack of attendance appeared to be carried forward from a previous treatment plan as it referenced the patient forgetting to attend groups but attending individual sessions with his primary clinician and caseload groups, yet the patient had not been offered any individual sessions or groups since his arrival at CSATF. The rationale for not referring him to a higher level of care was that his needs were met at the EOP level of care without further explanation. The interventions listed to support increased attendance were adequate and reasonable. The clinical summary described that the patient was experiencing anxiety, depression, mood dysregulation, and impulsivity, yet none of these had been mentioned in the initial primary clinician assessment conducted earlier that same day. It also noted that the patient denied hallucinations, yet this was the primary symptom identified during the initial assessment. There were no patient strengths or verbalized goals documented and there was no formal treatment plan listing goals or interventions.

An initial psychiatric assessment was completed the day after the IDTT meeting. The documentation was internally inconsistent noting that the patient reported experiencing auditory hallucinations and paranoia but listing elsewhere that he denied the same. The psychiatrist included a diagnosis of schizophrenia without clarification.

Other than recreational therapy groups being offered to the patient, which he refused to attend, there was no evidence of further clinical contacts with the patient's primary clinician until March 11, 2025, over two months since the previous contact. The patient appeared to be experiencing psychotic symptoms but no interventions were documented. There was no mention of the patient's level of participation in groups or lack thereof. Similarly, there was no psychiatric routine contact until March 25, 2025, more than two months after the last contact. The contact was adequate.

A routine IDTT was held on March 26, 2025 and noted that the patient continued to not engage in treatment and presented with negative symptoms of psychosis. The only intervention provided to support increased engagement was medications and providing the patient with a list of groups. The primary clinician noted that discussions would be held with the recreational therapists to see if they could help prompt the patient. The patient was noted to be presenting with avolition, asociality, cognitive impairment, and poor sleep but was noted to being going to meals as was "well-nourished" and had adequate activities of daily living. He was not being referred to a higher level of care as his mental health needs were being met, although it was not clear how. The clinical summary was largely unchanged from the initial treatment plan with symptoms not discussed elsewhere being listed as barriers for the patient (i.e., anxiety, depression, mood dysregulation, impulsivity). There was no treatment plan.

**Findings**

Treatment of this patient was inadequate. Treatment planning was inadequate and documentation of the patient's needs on the treatment plan were inconsistent with other documentation about the patient. There was one routine primary clinician contact and one routine psychiatric contact in a three-month period, with no evidence of any interventions being provided to the patient other than recreational therapy groups. There also appeared to be a need for diagnostic clarification.

**Patient S**

This 48-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with diagnoses of PTSD and schizoaffective disorder, depressive type. The patient was adherent to his prescribed aripiprazole, levetiracetam, prazosin, and sertraline. He was also prescribed olanzapine as needed.

This individual was incarcerated within CDCR on numerous occasions beginning in 1996. Other than a brief placement at the 3CMS level of care in 1998, he was not placed within the MHSDS until 2006 when he returned to the 3CMS level of care. He was primarily treated at the 3CMS level of care through subsequent periods of incarceration until April 2015 when he was removed from the MHSDS. Upon his return to CDCR for his most recent period of incarceration in March 2022, he was not placed within the MHSDS until June 2022 while in restricted housing. Since then, he experienced MHCB placements and an admission to the Acute level of care from November 2022 through April 2023. He was discharged to the EOP level of care at that time, and other than three MHCB admissions, has remained at the EOP level of care. On August 26, 2024, the patient was transferred to CSATF.

The patient was not seen as required by his primary clinician. There were two individual sessions offered in a two-month period, both completed at cell-front due to patient refusal. The documentation for these sessions was remarkably similar and was likely copied from previous notes. There were two caseload groups offered during the same time period, neither of which included individualized documentation about the patient. The patient was seen for monthly psychiatric contacts. The documentation was adequate and noted findings that contradicted what was documented by the primary clinician. Specifically, both notes by the primary clinician noted that the patient reported no appetite, while the psychiatrist noted that the patient reported an adequate appetite, eating three meals and two to three snacks per day. These discrepancies were not acknowledged or addressed.

On October 29, 2024, the patient was seen for three mental health assessments regarding RVRs for fighting nearly three weeks prior, misuse of food ten days prior, and refusing to accept housing three days earlier. There were no mental health factors identified as contributing to the behaviors and the assessment appeared adequate although it relied strongly on patient interview as there was little clinical documentation to review during the time period when the RVRs occurred.

On November 27, 2024 the patient was seen for a routine IDTT meeting. The patient flagged for receiving three RVRs within the past 90 days as well as not attending at least half of offered programming. IDTT documentation noted that the patient was functioning well, including eating

and sleeping fine, with no challenges in completing his activities of daily living. Documentation noted that mental health factors did not impact his behavior related to the RVRs and the patient reported that he did find groups helpful so did not attend. The treatment team decided to lower the patient's level of care to 3CMS. Of note, the last contact the patient had with his primary clinician prior to the IDTT meeting was November 4, 2024 and there was no mention of any of these factors nor discussion of changing his level of care. Documentation indicated that the patient wanted to move to a lower level of care. There were no relevant treatment goals listed on the treatment plan, so the patient's ability to achieve treatment goals prior to discharge from EOP could not be assessed.

**Findings**

Treatment of this patient was not adequate. He was not seen as required by his primary clinician and there was no evidence that the documentation provided by the primary clinician was current or reflected findings at the time of the contact given that the documentation conflicted with other documentation in the record, including documentation by the same primary clinician following the patient's IDTT meeting. Psychiatric contacts appeared adequate. While the patient's move to the 3CMS level of care may have been clinically acceptable, the documentation regarding the rationale for the change was not.

**Patient T**

This 48-year-old male patient's healthcare record was randomly selected to review the quality of care provided to patients at the EOP level of care at CSATF. He was provided with diagnoses of PTSD; schizoaffective disorder, depressive type; and methamphetamine dependence. He was adherent to his medication regimen which included prazosin, olanzapine, mirtazapine, fluoxetine, and benztropine.

This patient has experienced multiple periods of incarceration within CDCR beginning in 1997. He was first treated within the MHSDS in July 2011. During his current period of incarceration, which began in June 2021, he was not placed within the MHSDS until February 2023 when he was admitted to the MHCB, transferred to the Acute level of care, and then placed at the ICF level of care at the Coalinga State Hospital (CSH) in June 2023. He was discharged from CSH to the EOP level of care at CSATF in February 2024.

Two routine IDTTs were held during the reporting period, one in December 2024 and the other in March 2025. Both were timely. Required staff were present but the patient did not attend either meeting. He refused to attend the meeting in December secondary to symptoms of anxiety and in March documentation noted that he had a group scheduled at the same time. While the patient received an RVR in October, the December IDTT meeting failed to note this. There was a single measurable treatment goal listed to address anxiety and it included a list of modalities and vague interventions, with no mention of psychotropic medications or groups. Very little IDTT documentation was updated.

The patient was not seen as required by his primary clinician. There were a total of four individual contacts documented during the six-month reporting period and caseload groups, while offered up

to three times per month, were not consistent. The patient was seen by a primary clinician only once during the month of November and once during the month of January, both times in caseload groups that did not include individualized documentation regarding the patient. Individual contacts were adequately documented and evidenced some use of clinical interventions, often targeting the patient's expressed needs of the day rather than in a systematic manner to address identified treatment goals. Psychiatric contacts did not occur monthly as required, as there were no psychiatric contacts in the month of November nor the month of February. Documentation of psychiatric contacts was adequate.

There was evidence that the patient was offered recreational therapy and NLTGs during the reporting period, which he occasionally attended. He was not consistently offered ten hours structured treatment, however.

**Findings**

Treatment of this patient was inadequate. He was not seen as required by his primary clinician nor his psychiatrist. There was limited evidence of interventions being provided to the patient in keeping with the treatment plan. Additionally, the treatment plan included vague interventions and did not address patient progress or barriers to treatment progress. The IDTT failed to acknowledge the patient receiving an RVR related to drug use, which was problematic given his history of substance use.

**Patient U**

This 33-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was diagnosed with bipolar II disorder, antisocial personality disorder, and methamphetamine and opioid use disorders. He was prescribed and adherent with scheduled olanzapine, but this medication was discontinued on the second day of MHCB care. Melatonin, additional doses of olanzapine, and trazodone were prescribed PRN for insomnia and agitation, and he used each of these medications daily except once, when he used only melatonin and trazodone. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder; he was nonadherent with this medication. Three suicide attempts and one episode of self-injurious behavior were listed in the health record. Medical conditions included persistent asthma, obstructive sleep apnea, hypertension, nephrolithiasis, unintended weight loss, opioid and methamphetamine use disorders, right big toe fracture, a history of hepatitis C, and a history of closed fracture of first metacarpal, right hand. He used a BiPAP machine. Within CDCR, the patient had previously received all levels of mental health care. At CSATF, he was admitted to MHCB care from March 6, 2025 through March 14, 2025 for danger to self and others, after becoming highly agitated and threatening harm to others and himself following a cell search. He was clinically discharged from MHCB care on March 13, 2025 but remained in MHCB for one more day.

The initial primary clinician and psychiatric assessments were timely. The primary clinician assessment was cursory, provided no mental health history or mental status examination, and did not result in diagnostic impressions or a case formulation. It was unclear whether the assessment was confidential. The psychiatric assessment was confidential, occurred by telehealth, and

minimally adequate. However, the psychiatrist discontinued scheduled olanzapine and initiated PRN olanzapine despite noting the patient's lack of psychosis. The initial IDTT meeting occurred on the fourth day of MHCB care and was attended by the patient and required staff disciplines. No primary clinician was assigned to the patient at the time of the IDTT meeting, and an alternate for the assigned psychiatrist attended. The patient met criteria for a higher level of care due to multiple mental health RVR evaluations and treatment refusals in EOP care; the treatment team determined to retain him in MHCB care and provided adequate justification for this decision. The case formulation was speculative, generic, and inadequate, but the patient's strengths and verbalized treatment goal were adequately documented. The treatment plan was pulled forward without modification from one developed more than seven months earlier. It focused solely on anger, was not appropriate for MHCB care, did not address suicidal ideation, and did not include psychiatric care. The patient was followed by one of four primary clinicians and one of four psychiatrists but was not seen by either discipline on March 9, 2025. Most individual encounters occurred at the cell front. The follow-up IDTT meeting was timely and attended by the patient and required disciplines, but it again involved non-assigned staff. Documentation indicated that no primary clinician had yet been assigned to the patient, and both a different primary clinician and a different alternate for the assigned psychiatrist attended. The team determined to discharge the patient to EOP care and provided adequate justification for this decision. The treatment plan was not updated. The discharge suicide risk evaluation was adequate and found the patient's current risk to be low but his chronic risk to be high. The accompanying safety plan was collaborative and useful. The MHPC discharge summary was incomplete and inadequate, providing no description of the course of treatment or the patient's response to planned interventions, and providing only a cursory discharge plan. On the final day of MHCB care, escitalopram was initiated following a psychiatric contact at the cell front; rationale for the medication was not documented.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment, case formulation, treatment plan, and discharge summary were inadequate. The initial IDTT meeting was late. The interventions required by the treatment plan were not delivered, and the interventions delivered were not included in the treatment plan. Apart from IDTT meetings, most care occurred at the cell front. Continuity of care within primary clinicians and within psychiatrists was poor; across both disciplines, a total of eight different providers saw the patient during his nine-day stay. He was not seen by any providers on March 9, 2025. Use of olanzapine solely as a PRN medication fell outside the standards of care, and provision of nonpharmacological self-regulation skill training was not documented. Clinically, the patient did not receive the care he needed. Administratively, failure to assign a primary clinician to the patient requires investigation.

**Patient V**

This 33-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was diagnosed with bipolar II disorder, attention deficit-hyperactivity disorder, and antisocial personality disorder. He was prescribed and adherent

with oxcarbazepine. Hydroxyzine was prescribed PRN for anxiety; he used this medication twice on the final day of MHCB care but not otherwise. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. One episode of self-injurious behavior was listed in the health record. Medical conditions included mild intermittent asthma, chronic back and neck pain following trauma, inguinal hernia, and methamphetamine and opioid use disorders. Within CDCR, the patient had previously received all levels of mental health care except acute. At CSATF, he was admitted to MHCB care from November 27, 2024 through December 5, 2024 for danger to others, after voicing both suicidal and homicidal ideation and experiencing mood instability with depression in the context of ongoing spice use and a use of force incident. He was serving life without parole.

The initial psychiatric assessment was timely but cursory; it provided no psychiatric history or diagnostic impressions. The initial primary clinician assessment was timely and confidential but incomplete and inadequate. The mental status examination failed to document any determination regarding delusions or perceptual disturbances; no clinical summary was developed; and the case formulation was not updated and remained generic, incomplete, and unhelpful in guiding treatment. The initial IDTT meeting was late, occurring on the sixth day of MHCB care, and was attended by the patient, alternates for the assigned primary clinician and assigned psychiatrist, and a correctional counselor. The patient met criteria for a higher level of care due to multiple MHCB referrals/admissions and multiple mental health RVR assessments. The treatment team determined to retain the patient in MHCB care and provided adequate rationale for this decision. The case formulation was updated but remained underdeveloped. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan pulled forward three goals that were developed six to nine months earlier, did not update these goals, and did not address suicidal or homicidal ideation. Documented short-term goals were poorly operationalized for crisis bed care, and psychiatric care was not addressed. One of four primary clinicians and/or one of three psychiatrists followed the patient daily. Most encounters were brief and occurred at the cell front or in a nonconfidential setting. Nonpharmacological interventions required by the treatment team were not documented as provided, but oxcarbazepine was increased with apparent benefit in mood stability. The follow-up IDTT meeting was timely and attended by the patient, different alternates for the assigned primary clinician and assigned psychiatrist, and a correctional counselor. This meeting resulted in a decision to discharge the patient to EOP care. The clinical summary was adequately updated. The case formulation was rewritten but generic and of limited value in guiding treatment. The treatment plan was not updated. The discharge suicide risk evaluation adequately assessed the patient's current risk as low. The accompanying safety plan was adequate. The MHPC discharge summary was minimally adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician and psychiatric assessments were incomplete and inadequate. Various versions of the case formulation were insufficient to guide treatment, and the treatment plan itself was inadequate to guide crisis bed treatment. The initial IDTT meeting was not timely. Continuity of care within primary clinician and psychiatry disciplines was poor, and across both disciplines the patient was seen by seven providers during his nine-day MHCB stay. Most encounters

occurred at the cell front and were brief and consistent with wellness checks rather than treatment. There was no documentation that structured psychotherapeutic interventions were provided to address suicidal and homicidal ideation, mood instability, or behavioral impulsivity.

**Patient W**

This 37-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. Although psychiatric diagnoses remained poorly documented throughout MHCB care, one progress note indicated the patient was diagnosed with borderline personality disorder, unspecified mood disorder, and amphetamine use disorder. He was prescribed and adherent with a single dose of venlafaxine during MHCB care. Venlafaxine was then replaced with desvenlafaxine, and he was adherent with this medication. Two suicide attempts and one episode of self-injurious behavior were listed in the health record. Medical conditions included hammer toe, metatarsalgia, contracture of bilateral Achilles tendons, overweight, unspecified tachycardia, and opioid use disorder. Within CDCR, the patient had previously received 3CMS and EOP care. At CSATF, he was admitted to MHCB care from February 3, 2025 through February 14, 2025 for danger to self and suicidal ideation, after learning from his wife that she no longer wanted to remain in their marriage. He was discharged to EOP care on February 11, 2025 but remained in MHCB care for three more days.

The initial psychiatric assessment was timely but did not indicate whether it was confidential and did not include current diagnostic impressions. The initial IDTT meeting was timely and attended by the patient, the assigned psychiatrist, and alternate for the assigned primary clinician; no correctional counselor was documented as attending. The patient was not found to meet criteria for a higher level of care. The patient's strengths and verbalized treatment goals were not documented, and the treatment plan was deficient. It did not include measurable short- or long-term goals and did not identify specific or evidence-based interventions beyond offering a therapeutic relationship and medication education. Rationale for retaining the patient in MHCB care was poorly documented. The initial primary clinician assessment was completed following the initial IDTT meeting. Although the clinical summary was adequate, most elements of the mental status examination were left blank, current diagnostic impressions were not provided, and the case formulation was not updated and failed to address suicidal ideation or the recent rupture of the patient's marriage. One of four primary clinicians and/or one of four psychiatrists followed the patient daily. Most of these contacts were confidential, and one of the psychiatrists used telehealth equipment to meet with the patient. Progress notes from both disciplines consistently listed "mental disorder, acute episode" rather than a specific diagnosis in the assessment section of the notes. As noted, the patient agreed to start an antidepressant he had not previously tried. There was little documentation of non-pharmacological interventions. The follow-up IDTT meeting was timely and attended by the patient, a correctional counselor, and alternates for the assigned primary clinician and assigned psychiatrist. The team determined to discharge the patient to EOP care and provided adequate justification for this decision. The case formulation, patient's strengths, patient's verbalized treatment goals, and treatment plan were not updated and remained deficient or missing. The discharge suicide risk evaluation found the patient's current and chronic risks to be low, but it may have underweighted historic factors that would have raised the patient's chronic risk to moderate. The accompanying safety plan was collaborative, thoughtful, and adequate. The MHPC discharge summary was cursory. While it provided a plan for treatment in

MHCB and a discharge mental status examination, it did not include a narrative summary of the patient's treatment course or treatment response, and the discharge plan was neither specific nor substantive.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial psychiatric assessment did not include current diagnostic impressions, and the patient's psychiatric diagnoses were never fully clarified during MHCB care. The initial primary clinician assessment was deficient in content and completed only after the initial IDTT meeting. The case formulation, treatment plan, IDTT documentation, and discharge summary were inadequate. Assigned staff were missing from the IDTT meetings, and no correctional counselor was present during the initial IDTT meeting. Continuity of care within primary clinicians and psychiatrists was poor; across both disciplines, a total of eight providers saw the patient during the 12-day MHCB stay. Discharge planning was cursory, although the safety plan represented a strength in the patient's care.

**Patient X**

This 33-year-old transgender (she/her/hers) MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. She was diagnosed with borderline and antisocial personality disorders. She was prescribed and adherent with olanzapine and risperidone. Hydroxyzine, mirtazapine, and an additional dose of olanzapine were prescribed PRN for anxiety, insomnia, and psychosis, respectively. The patient used all three PRN medications frequently during MHCB care. Through the ISUDT, she was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. Nine episodes of self-injurious behavior were listed in the health record. Medical conditions included prediabetes, asthma, chest wall pain, multiple premature ventricular complexes, and a history of hepatitis C. She was not receiving gender affirming hormone treatment. Within CDCR, the patient had previously received all levels of mental health care. At CSATF, she was admitted to MHCB care from January 27, 2025 through February 7, 2025 for danger to self and suicidal ideation, after cutting her forearm and reported suicidal ideation and command auditory hallucinations telling her to kill herself. This episode was preceded by an incident in which three peers entered the patient's cell and struck her in the face and torso. The patient was discharged from MHCB to EOP care on February 6, 2025 but remained in MHCB care for one more day.

The initial psychiatric assessment was timely. It occurred at the cell front but was otherwise adequate. The initial primary clinician assessment was timely and largely adequate. The mental status examination failed to address the patient's insight, judgment, and estimated intelligence, and the case formulation failed to address suicidal ideation and self-injury. However, a thorough mental health history was provided, including a past diagnosis of schizoaffective disorder, bipolar type. The initial IDTT meeting was timely and attended by the patient, alternates for the assigned primary clinician and assigned psychiatrist, and a correctional counselor. The patient met criteria for a higher level of care due to multiple mental health RVR assessments. The treatment team retained the patient in MHCB care but did not document a clear rationale for doing so. The

patient's strengths and verbalized treatment goals were adequately documented, apart from use of non-preferred pronouns. The treatment plan was brought forward without modification and consisted of two treatment goals that had been developed three to four months earlier. One of these goals, for the patient to report only passive suicidal ideation for three days, was clinically inappropriate, because passive as well as active suicidal ideation can precede suicidal behavior. The treatment plan did not address auditory hallucinations, paranoia, interpersonal conflict, guilt about her index crime, or psychiatric care, despite each of these elements being present in the MHCB record.

One of four primary clinicians and/or one of three psychiatrists followed the patient. The patient was not seen by either discipline on February 1, 2025. Most encounters were confidential through February 2, 2025; thereafter, most encounters occurred at the cell front due to the patient's refusals. Progress notes documented an inconsistent clinical presentation, ranging from goal-oriented and linear thinking and organized behavior to severe depression, auditory hallucinations, word salad, bizarre behavior with elevated mood, and suicidality in the form of tying pieces of a cloth to the bed. The patient's olanzapine dose was increased to address her inconsistent signs and symptoms, and her prognosis was noted to be poor. Clarity about the patient's diagnosis and presentation was not adequately documented. The follow-up IDTT meeting occurred two days late and was held in absentia due to the patient's refusal. It was attended by different alternates for the assigned primary clinician and assigned psychiatrist, as well as a correctional counselor. During this meeting the treatment team determined to discharge the patient to EOP care; in response, the patient indicated that she wanted ICF care and was suicidal. IDDT documentation included justification of the MHCB discharge but overlooked the signs and symptoms of serious distress and mental illness that were documented during the MHCB stay. Although conducted at the cell front, the discharge suicide risk evaluation was adequate and found the patient at moderate acute and chronic risk. The safety plan was not collaborative but included useful clinical impressions and recommendations. The MHPC discharge summary was inadequate. It did not include a narrative description of the course of treatment or the patient's response to treatment, did not include MHCB prevention planning despite evidence the patient sought MHCB care to obtain an ICF admission, and did not include a substantive or specific discharge plan. A mental health assessment for a January 25, 2025 RVR alleging fighting found no nexus between mental health symptoms and the alleged behavior. It was unclear whether this assessment was adequate, as the assessment made no mention of the paranoia the patient was experiencing at the time of the alleged behavior, despite this symptom being noted in subsequent MHCB documentation.

**Findings**

The care provided to this MHCB patient was inadequate.

The case formulation and treatment plan were inadequate and, with little exception, were not used to guide treatment. A treatment goal of voicing "only" passive suicidal ideation not clinically appropriate. Only one primary clinician progress note documented provision of the interventions required in the treatment plan, and most interventions that were provided were not included in the treatment plan. The nature of the patient's inconsistent clinical presentation and reported psychotic symptoms was not adequately investigated or documented. Neither the rationale for retaining the patient in MHCB care rather than referring to a higher level of care nor the rationale for discharging

the patient to EOP care were adequately documented. The patient's diagnosis was inadequately assessed and documented. Continuity of care within primary clinicians and psychiatrists was poor; across both disciplines, a total of seven providers saw the patient during the 12-day MHCB stay. The patient was not seen by either discipline on February 1, 2025. Use of mirtazapine exclusively as a PRN medication fell outside standards of care. The discharge summary and discharge planning were inadequate, particularly considering the patient's poor prognosis and moderate suicide risk.

**Patient Y**

This 31-year-old nonbinary MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was diagnosed with posttraumatic stress disorder, unspecified depressive disorder, and sleep-wake schedule disorder, advanced phase type. He was prescribed and adherent with hydroxyzine, oxcarbazepine, and sertraline. Melatonin was prescribed PRN for insomnia, and he used this medication on four consecutive nights during MHCB care. One suicide attempt and one episode of self-injurious behavior were listed in the health record at the time of MHCB admission. Medical conditions included mild persistent asthma, chronic kidney disease, postprandial hypoglycemia, excoriated rash, diarrhea, and post-surgical correction of bilateral hammer toe. He used back and knee braces and was in a wheelchair prior to MHCB admission. He was also noted to be nonbinary and "gender identity finding." Within CDCR, the patient had previously received all levels of mental health care except ICF. At CSATF, he was admitted to MHCB care from March 11, 2025 through March 20, 2025 for danger to self, after reporting escalating suicidal ideation in the context of his 17-year-old son's death and funeral, his inability to contact family members due to custody-modified programming, and illicit drug use one day prior to admission. He was discharged to 3CMS care.

The initial psychiatric and primary clinician assessments were timely but nonconfidential, occurring at the cell front due to custody reports that the patient was combative. Both assessments provided a minimally adequate review of symptoms, mental status, and history, but neither resulted in current diagnostic impressions. The case formulation was truncated and inadequate to guide treatment. The initial IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned primary clinician. The patient was not found to meet criteria for a higher level of care. IDTT documentation did not include a case formulation, patient strengths, or the patient's verbalized treatment goal. The treatment plan was pulled forward without modification and consisted of two goals developed 11 months prior at another facility. These goals addressed cognitive distortions and poor distress tolerance. The plan did not address suicidal ideation, grief, or depression, used timeframes that were inappropriate for MHCB care, and erroneously indicated that the patient had experienced "significant improvement" rather than a suicidal crisis. The assessment of significant improvement was brought forward from an IDTT in October 2024 at another facility. One of four primary clinicians and/or one of three psychiatrists followed the patient daily during MHCB care except on March 16, 2025, when neither discipline saw the patient. For the first five days of MHCB care, most encounters were confidential; thereafter, most encounters occurred at the cell front. Primary clinician progress notes did not document provision of any of the evidence-based interventions listed in the treatment plan and were consistent with wellness checks. Three days prior to MHCB discharge, sertraline was discontinued at the patient's request. The follow-up IDTT meeting was timely and attended by the

patient, alternates for both the assigned primary clinician and the assigned psychiatrist, and a correctional counselor. IDTT documentation included a generic case formulation and limited documentation of the patient's strengths and treatment goals, but the treatment plan was not updated. The discharge plan was not patient-specific. The MHPC discharge summary was timely and partially adequate but did not include a specific description of the patient's response to treatment or a patient-specific discharge plan. The discharge suicide evaluation indicated that the patient was feeling trapped, hopeless, helpless, angry, depressed, and agitated or anxious, with mood changes, traumatic grief, and a history of family suicide, and found the patient's dynamic suicide risk to be moderate. Nevertheless, the patient's current suicide risk was assessed as low. The safety plan was not developed with the patient and provided only limited patient-specific recommendations; as documented, it was a plan to develop a safety plan rather than a document that included specific steps for the restoration and preservation of safety.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient's psychiatric diagnoses were poorly documented and inadequately investigated. The case formulation and the treatment plan were inadequate and not used to guide treatment. Consistency of primary clinicians and psychiatrists was poor, with four primary clinicians and three psychiatrists providing treatment during the ten-day MHCB stay. Neither a primary clinician nor a psychiatrist saw the patient on March 16, 2025. Prior to discharge, the patient discontinued his antidepressant medication, declined to speak with the treatment team at the time of discharge, and was noted to have multiple dynamic risk factors for suicide. The suicide risk evaluation underestimated risk based on findings included in the evaluation. Although the treatment team documented a remission of symptoms and a decision to discharge the patient to 3CMS care, documentation was inconsistent with the discharge suicide risk evaluation, the rationale for 3CMS care was poorly documented. Neither the safety plan nor the discharge plan were adequate for the patient's treatment needs.

**Patient Z**

This 39-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was initially diagnosed with unspecified schizophrenia and other psychotic disorder, with a rule out of substance-induced psychotic disorder; later in MHCB care, the diagnosis of substance-induced psychotic disorder was confirmed. Following admission, the on-call psychiatrist prescribed a one-time dose of intramuscular olanzapine and diphenhydramine for acute agitation. The patient objected, custody determined not to use force, and the injection was not given. One additional PRN dose of intramuscular diphenhydramine was prescribed for extrapyramidal symptoms, and oral olanzapine was prescribed PRN for agitation; the patient used neither. Through medical services, he was prescribed nortriptyline for chronic pain but was nonadherent with this medication. One episode of self-injurious behavior was listed in the health record at the time of MHCB admission. Medical conditions included keratoconus and chronic pain related to scoliosis. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At CSATF, he was admitted to MHCB care from October 6, 2024 through October 17, 2024. His MHCB admission at CSATF was

preceded by a MHCB admission at KVSP from October 2, 2024 to October 6, 2024, after biting his wrist, endorsing suicidal ideation, and reporting paranoid delusions that staff and incarcerated individuals were conspiring to kill him. The KVSP MHCB admission was preceded by the patient allegedly murdering his friend and cellmate on September 19, 2024. On October 5, 2025, he broke the KVSP MHCB cell door's glass window, leading to his transfer to CSATF MHCB care. He was clinically discharged from CSATF MHCB care on October 15, 2025, but remained in MHCB care for two more days.

The initial psychiatric assessment was timely but cursory and did not include diagnostic impressions. The initial primary clinician assessment was timely but incomplete, with multiple sections of the assessment left blank, including suicide and violence risk/histories and the mental status examination. The case formulation was generic but partially useful. The clinical summary was adequate and included diagnostic impressions. The initial IDTT meeting was timely and attended by the patient and required disciplines. At the time of the meeting, no primary clinician had been assigned to the patient; an alternate to the assigned psychiatrist attended. Despite the severity of the patient's symptoms, he was not found to meet criteria for a higher level of care. The patient's strengths were adequately documented, but no verbalized treatment goal was documented. The treatment plan was only partially adequate. It identified suicidal ideation but not psychotic symptoms, paranoia, or agitation, and it did not address psychiatric care. Both short- and long-term goals were appropriate for MHCB treatment of suicidal ideation. One of four primary clinicians and/or one of three psychiatrists followed the patient daily except on October 15, 2024, when neither discipline saw the patient. Most primary clinician encounters occurred at the cell front and were brief; no progress notes indicated the provision of therapeutic interventions. Psychiatric encounters were confidential except when the patient refused the encounter; documentation was adequate. A urine toxicology screen was positive for cannabis and amphetamine. The follow-up IDTT meeting was timely and attended by the patient and the same staff who attended the initial IDTT meeting; documentation indicated that a primary clinician still had not been assigned to the patient. The patient met criteria for a higher level of care because the length of his MHCB stay exceeded ten days. However, the treatment team noted that the patient's symptoms had improved and provided adequate justification for not referring the patient to a higher level of care. Instead, the team determined to discharge the patient to EOP care and provided an adequate rationale for this decision. The updated clinical summary was adequate, but the patient's verbalized treatment goals and treatment plan were not updated. The discharge suicide risk evaluation was adequate and found the patient at low risk. The safety plan was collaborative and adequate apart from failing to address the patient's instrumental use of self-injury to force a housing change. The MHPC discharge summary was timely but inadequate. It did not provide narrative descriptions of the patient's course of treatment or the patient's responses to interventions, and it did not provide patient-specific discharge planning.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician and psychiatric assessments were missing key elements, and the case formulation and treatment plan were only partially adequate. Consistency of primary clinicians and psychiatrists was poor, with four primary clinicians and three psychiatrists providing care

during the patient's 12-day stay in CSATF MHCB care. Neither a primary clinician nor a psychiatrist saw the patient on October 15, 2024. Interventions identified in the treatment plan were not documented as provided. Custody staff overrode a psychiatric order for intramuscular medication, and the medication was not administered. Use of olanzapine solely as a PRN medication fell outside the standards of care. The discharge summary was inadequate. Reasons why a primary clinician was not assigned to the patient require investigation.

**Patient AA**

This 36-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was diagnosed with schizoaffective disorder, depressive type, and antisocial personality disorder. He was prescribed benztropine, chlorpromazine, fluoxetine, mirtazapine, and risperidone; he was partially adherent with all medications except mirtazapine, which he consistently accepted. One additional dose of chlorpromazine with diphenhydramine was prescribed on a one-time basis for agitation, and later PRN chlorpromazine was added for agitation; the patient accepted both the one-time and the PRN chlorpromazine. Additionally, two intramuscular injections of olanzapine and two intramuscular injections of diphenhydramine, haloperidol, and lorazepam were administered for agitated psychosis. Additional doses of chlorpromazine were ordered PRN for agitation, and the patient used these doses. Five suicide attempts and three episodes of self-injurious behavior were listed in the health record at the time of admission. Medical conditions included asthma, heartburn, partial amputation of left fifth finger following a gunshot wound, and chronic pain of neck, back, foot, and chest wall, with possible bullet fragments in left upper chest. Within CDCR, the patient had previously received all levels of mental health care and was previously subject to a PC 2602 order for involuntary treatment due to danger to self; in May 2023, the treating psychiatrist determined to not seek a renewal of the PC 2602 order, and this order expired in mid-July 2023. At CSATF, the patient was admitted to MHCB care from January 22, 2025 through February 6, 2025 for danger to self, after reporting a plan to harm or kill himself by cutting. He was referred to and agreed to acute care on January 30, 2025 but remained in MHCB care for another week.

The initial primary clinician assessment was timely, confidential, and adequate apart from a generic case formulation that did not address the patient's current symptomatology. The initial psychiatric evaluation was conducted by telehealth in a confidential setting and was adequate. The initial IDTT meeting was timely but erroneously identified as a weekly follow-up IDTT meeting. It was attended by the patient, alternates for the assigned primary clinician and assigned psychiatrist, and a correctional counselor. The patient was found to not meet criteria for a higher level of care, despite multiple MHCB referrals/admissions and multiple mental health RVR evaluations. The case formulation was not updated, and the patient's strengths were minimally documented. The treatment plan identified poor distress tolerance and impulsivity, but not suicidal ideation or psychosis, as treatment targets. The treatment goals were pulled forward without modification from those developed in MHCB care at another facility two weeks earlier and did not include psychiatric care as an intervention. One of four primary clinicians and/or one of four psychiatrists followed the patient daily. The patient's mental status did not improve, and most encounters occurred at the cell front due to the patient's assaultive or agitated behavior. Two primary clinician encounters documented care in attempting to establish rapport and therapeutic engagement, but most primary clinician progress notes did not demonstrate that interventions were

provided. Psychiatric progress notes were largely adequate. Scheduled medications were changed in collaboration with the patient, including the replacement of chlorpromazine with risperidone and the initiation and subsequent discontinuation of fluoxetine because it was too activating. As noted, the patient also received several one-time doses of antipsychotic medication due to episodes of agitation and psychosis. He had several incidents of self-injury, gassing staff, holding cuffs, and exhibiting himself, and required five-point restraints on February 3, 2025.

The two follow-up IDTT meetings were timely. The first follow-up meeting included the patient, the assigned psychiatrist, an alternate for the assigned primary clinician, and a correctional counselor; the second follow-up meeting included the same staff members but was held in absentia due to the patient's refusal. At the first follow-up meeting, the treatment team correctly found that the patient met the multiple MHCB admission criterion for a higher level of care and determined to refer the patient to acute care with a recommendation of single-cell placement. However, the treatment team did not recognize that the patient also met the higher level of care criterion for multiple RVR assessments or because he was unable to function adequately in MHCB care. The clinical summary, case formulation, and treatment plan were not updated at this meeting. The suicide risk evaluation accompanying the referral to acute care was adequate and found the patient at moderate risk. The safety plan was not developed with the patient and provided recommendations that were generic rather than patient-specific or useful to the patient. At the second follow-up IDTT meeting, the treatment team again erroneously documented that the patient did not meet any criteria for a higher level of care. However, the clinical summary was updated and accurately documented the patient's decompensation and referral to acute care. The treatment plan was again not updated. The MHPC discharge summary was timely but did not include narrative descriptions of the course of treatment or the patient's response to interventions. Recommendations for treatment in acute care were adequately documented under course of treatment, but the discharge plan itself was generic and unhelpful.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient received timely initial assessments, timely IDTT meetings, and daily primary clinician and psychiatric contacts, MHCB was far from optimal and did not meet the patient's needs. The treatment team was slow and inconsistent in recognizing that the patient met at least two criteria for a higher level of care, and IDTT documentation never included acknowledgment that the patient met criteria for higher level of care because he was unable to function adequately, had refractory psychiatric symptoms with major impairment in functioning, and had not responded to treatment sufficiently in the last six months. Although the patient's referral to acute care was appropriate and fell within minimum timeframes required by the program guide, the referral and subsequent admission were unnecessarily delayed, and during this time the patient required multiple intramuscular injections as well as five-point restraints due to psychotic agitation. The treatment plan was inadequate because it did not address high acuity elements of the patient's clinical presentation, including psychotic decompensation and suicidal ideation. The number of primary clinicians and psychiatrists involved in the patient's MHCB care was excessive and did not contribute to building therapeutic trust or maintaining continuity of care. The discharge

summary was poorly documented and of little value in conveying the course of the patient's MHCB stay.

**Patient BB**

This 35-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was diagnosed with unspecified anxiety disorder. He was not prescribed any scheduled psychotropic medications. Hydroxyzine was prescribed PRN for insomnia, and he used this medication on eight occasions. No suicide attempts or episodes of self-injurious behavior were listed in the health record at the time of MHCB admission. Medical conditions included a history of mild renal insufficiency and back pain. Within CDCR, the patient had not previously received mental health care. At CSATF, he was admitted to MHCB care from October 30, 2024 through November 15, 2024 for suicidal ideation in the context of ongoing safety concerns, bereavement with the death of a family member, and illicit substance use.

The initial primary clinician assessment was timely but did not include diagnostic impressions or a clinical summary. The case formulation was minimally adequate. The initial psychiatric assessment was conducted by telehealth in a confidential setting and mostly adequate, but it did not result in diagnostic impressions. The initial IDTT meeting was timely and attended by a patient, the assigned psychiatrist, a primary clinician, and a correctional counselor; IDTT documentation indicated that no primary clinician had been assigned to the patient. The patient was not found to meet criteria for a higher level of care, and IDTT documentation was adequate apart from failure to develop a treatment plan. It was noted that the patient's safety concerns constituted a barrier to discharge and had been reported to custody for investigation. One of five primary clinicians and/or one of three psychiatrists followed the patient daily; one of the psychiatrists used telehealth for these encounters, but about half of the primary clinician and psychiatric encounters occurred at the cell front, some because of custody-modified programming. Regardless of location, encounters were consistent with wellness checks and monitoring the patient's mental status. Nonpharmacological interventions were not documented, and none of the progress notes included diagnostic impressions until the final day of MHCB care, when a primary clinician offered the diagnosis of unspecified anxiety disorder. The first follow-up IDTT meeting was timely and attended by the same individuals who attended the initial IDTT meeting. The patient's response to MHCB care was adequately documented, but no other elements of the IDTT documentation were changed; safety concerns continued to be unresolved at the time of this meeting. The second follow-up IDTT meeting was two days late and attended by the same individuals who attended prior IDTT meetings, except for the primary clinician, who was different. The patient was noted to be on the sustainable process list for a MHCB overstay because of an ongoing custody investigation into the patient's safety concerns. At the time of this meeting, custody had determined that the patient's safety concerns were unsubstantiated, and the treatment team determined to discharge the patient to 3CMS care. IDTT documentation provided adequate recommendations for follow-up care in 3CMS. However, the case formulation was not updated to be consistent with these recommendations, and the patient continued to have no treatment plan. The discharge suicide risk evaluation was adequate and found the patient at low risk. The safety plan was collaborative, adequate, and useful. The MHPC discharge summary was timely but used boilerplate language that was not specific to the patient when describing the course of treatment.

The summary's discharge plan was also generic and did not include the recommendations that were well-articulated in the final IDTT meeting.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient's psychiatric diagnoses, or lack thereof, were not adequately explored or documented, and the patient's lengthy MHCB stay constituted a two-week wait for a custody investigation to be concluded, with only minimal treatment provided. No treatment plan was developed to guide MHCB care, and primary clinicians did not address bereavement or substance use adequately. As documented, the patient's resistance to scheduled psychotropic medication and verbal psychotherapy was inadequately explored. Consistency of primary clinicians and psychiatrists was poor, as a total of eight providers saw the patient during his stay. Although the need to develop distress tolerance, coping, emotion regulation, self-care, and decision-making skills along with increased insight into triggers and warning signs were appropriately, they were not identified until the final IDTT meeting and development of the safety plan at the end of MHCB care. These treatment targets were apparent at the commencement of MHCB care but not translated into active treatment efforts, and the patient's treatment needs were not met while he was in MHCB care.

**Patient CC**

This 50-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was diagnosed with unspecified psychotic disorder, substance use disorder, and antisocial personality disorder. He was prescribed escitalopram and was partially adherent with this medication. Diphenhydramine and hydroxyzine were prescribed PRN for anxiety and insomnia. He used diphenhydramine frequently but did not use hydroxyzine, which was discontinued as a result. Through medical services, he was prescribed amitriptyline for chronic pain but was nonadherent with this medication. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included obesity, hypertension, hyperlipidemia, persistent asthma, obstructive sleep apnea, degenerative joint disease of the knees with chronic pain, gastroesophageal reflux disease, and opioid use disorder. He used a wheelchair and a CPAP machine. Within CDCR, the patient had previously received all levels of mental health care except ICF. At CSATF, he was admitted to MHCB care from January 15, 2025 through January 28, 2025 for danger to self and suicidal ideation, after reporting suicidal ideation with a plan to hang himself in the context of RHU housing, illicit substance use, safety concerns, and news about his mother's declining health. He was discharged on January 23, 2025 but remained in MHCB care for five more days.

The initial psychiatric assessment was timely, confidential, adequate, and occurred using telehealth. The initial primary clinician assessment was timely and mostly adequate but did not offer diagnostic impressions. The initial IDTT meeting was timely and attended by the patient, an alternate for the assigned psychiatrist, a non-assigned primary clinician, and a correctional counselor; IDTT documentation indicated that no primary clinician had been assigned to the patient. The patient was not found to meet criteria for a higher level of care. The patient's case

formulation, strengths, and verbalized treatment goals were adequately documented, but no treatment plan was formulated, and the rationale for MHCB care was poorly documented. One of six primary clinicians and/or one of three psychiatrists followed the patient daily. Most encounters occurred at the cell front, and regardless of location, primary clinician encounters were consistent with wellness checks and at most brief supportive therapy; primary clinicians did not document provision of structured and specific interventions. Psychiatric progress notes indicated that the patient was free from signs of psychosis despite the patient's reports that he saw and heard elves. One careful progress note from the senior supervising psychologist indicated that the patient's thought processes were organized except when discussing safety concerns and exhibiting paranoia, when the patient's thought pattern became looser and less linear. During the MHCB stay, the patient learned that his younger sister had died of complications from bariatric surgery. The follow-up IDTT meeting was timely and attended by the same individuals who participated in the initial IDTT meeting; IDTT documentation indicated that a primary clinician still had not been assigned to the patient. During this meeting, the patient was informed that custody had determined that his safety concerns were unsubstantiated and that the treatment team was discharging him to EOP care. The patient became agitated and left the meeting. IDTT documentation noted that the patient continued to exhibit depression, anxiety, agitation, and paranoia but was not suicidal. The discharge suicide risk evaluation was timely, confidential, and adequate; the patient was found to be at moderate risk. The patient did not participate in developing the safety plan, but clinical impressions and recommendations were helpful. The MHPC discharge summary was timely but inadequate. It summarized recommended treatment but not the course of treatment or the patient's response to treatment outside of his behavior during the follow-up IDTT meeting. The discharge plan was generic and not helpful.

**Findings**

The care provided to this MHCB patient was inadequate.

No treatment plan was formulated to guide MHCB care, and progress notes for primary clinician encounters lacked any evidence of coherent and consistent provision of planned interventions. The patient's diagnoses were poorly investigated and documented, and psychiatric and primary clinician progress notes included conflicting accounts regarding the presence or absence of psychotic symptoms. The patient's anticipated grief regarding his mother and current grief regarding his sister were not addressed. Most importantly, the nature of the patient's paranoia was not adequately assessed or treated. He received no pharmacological or psychotherapeutic interventions targeting paranoia. Consistency of treatment providers, especially primary clinicians, was poor and unlikely to foster trust. Reasons why a primary clinician was not assigned to the patient deserve investigation.

**Patient DD**

This 34-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at CSATF. He was not provided with a diagnosis during his MCHB care. He was prescribed and adherent with olanzapine. An additional dose of olanzapine was ordered PRN for psychosis, but he did not use any PRN doses. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included lower back

pain, and he used back braces. Within CDCR, the patient had previously received only one day of MHCB care. At CSATF, he was admitted to MHCB care from February 13, 2025 through February 20, 2025 for significant impairment due to mental illness, after presenting with illogical, incoherent, pressured, tangential, and delusional thinking and exhibiting odd mannerisms and hand gestures that were unrelated to his verbal communications. He was discharged to 3CMS care on February 18, 2025 but remained in MHCB care for two more days.

The initial primary clinician and psychiatric assessments were timely but occurred at the cell front due to the patient's bizarre behaviors. Neither assessment offered diagnostic impressions, but both noted that it was possible the patient was intoxicated on illicit substances. Apart from lack of diagnostic impressions, both assessments were adequate given the limited historical information available at the time. The initial IDTT meeting was late, occurring on the sixth day of MHCB care. The patient, an unassigned primary clinician, an alternate for the assigned psychiatrist, and a correctional counselor attended. The patient was not found to meet criteria for a higher level of care. The patient's participation in the IDTT meeting, recent clinical history, case formulation, patient strengths, the patient's verbalized treatment goal, and rationale for MHCB care were adequately documented. However, no treatment plan was developed. One of four primary clinicians and/or one of two psychiatrists followed the patient daily. Most encounters occurred at the cell front due to the patient's bizarre behavior or lack of available confidential space. Two psychiatric encounters occurred by telehealth and were confidential. Progress notes for both disciplines confirmed that the patient's symptoms and response to medication were closely monitored, but primary clinicians did not document the provision of interventions. On the final day of MHCB care, a psychiatrist started the patient on escitalopram to address underlying anxiety and depression. The follow-up IDTT meeting was timely and attended by the patient, a different non-assigned primary clinician, the same alternate for the assigned psychiatrist, and a correctional counselor. The IDTT documentation indicated that a primary clinician still had not been assigned to the patient. The treatment team noted that the patient's symptoms had improved significantly and determined to discharge him to 3CMS care. No treatment plan was developed during this meeting. The discharge suicide risk evaluation was adequate and found the patient at low risk. The safety plan was collaborative and thoughtful but did not address substance use. The MHPC discharge summary was timely and provided a nearly adequate summary of the course of treatment. However, it failed to note the initiation of an antidepressant medication. Additionally, the patient's response to treatment interventions was not documented, and the discharge plan was generic and not helpful.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient was not provided with a psychiatric diagnosis during MHCB care, and no treatment plan was developed. Whether through natural withdrawal, response to olanzapine, or a combination of the two, the patient's substance-induced symptoms improved markedly, and the discharge to 3CMS care was appropriate. However, the symptoms underlying the patient's substance use received little treatment until the final day of MHCB care. The discharge plan was inadequate. Reasons why a primary clinician was not assigned to the patient deserve investigation.

**APPENDIX B-14**
**California Treatment Facility (CTF)**
**Reporting Period: July 1, 2024 – December 31, 2024**

**Patient A**

This 56-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with attention-deficit/hyperactivity disorder, combined type, and adjustment disorder with mixed anxiety and depressed mood. He was prescribed buspirone and was adherent with this medication about 84 percent of the time when it was prescribed as a scheduled medication. The psychiatrist also prescribed clonidine for anxiety and insomnia but discontinued it due to nonadherence. In December 2024, the buspirone order was changed from scheduled daily to as-needed for anxiety, and hydroxyzine was added on an as-needed basis for insomnia. Medical conditions included obesity, hyperlipidemia, hypertension, degenerative joint disease of left knee, irritable bowel syndrome with diarrhea, and a history of lower urinary tract infection. He was issued a knee brace.

The patient had a history of childhood attention-deficit/hyperactivity disorder with pharmacological treatment, dyslexia, paternal incarceration, domestic violence, and alcohol and cannabis use. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He was serving a sentence of life with parole. In December 2024, he learned that he would be resentenced in January 2025 with the conviction for murder dropped, allowing him to be released with time served.

The patient was placed in mainline 3CMS care at CTF on March 29, 2022, after the loss of his grandmother; this is the first time he began participating in the MHSDS. During 2024, the annual clinical assessment and IDTT meeting were completed prior to the review period. During the review period, the psychiatrist saw the patient on average once every six weeks. Documentation was adequate but did not indicate whether the encounters occurred in confidential settings and occasionally included content that was copied and pasted from a prior psychiatric note. Medication adjustments were made in response to the patient's symptoms and side effects, with clear documentation of rationale. The patient was also followed regularly and timely by the primary clinician, who regularly assessed the patient's symptoms, provided skills training and active interventions, and followed the treatment plan. Like the psychiatrist, the primary clinician failed to indicate whether the clinical encounters occurred in confidential settings.

**Findings**

The care provided to this 3CMS patient was adequate.

Psychiatric and primary clinician follow-up appointments were timely, clinically appropriate, and adequately documented. The patient's symptoms were regularly assessed and addressed, and the patient responded well. Documentation evidenced active collaboration between mental health providers and the patient, and between the primary clinician and the psychiatrist. Improvement is needed in documenting whether encounters occur in confidential settings.

**Patient B**

This 49-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with posttraumatic stress disorder. He was prescribed melatonin on an as-needed basis for insomnia. Because this medication was ordered as keep on person, the patient's use of melatonin was not indicated in medication administration records. Medical conditions included cardiomyopathy, mixed hyperlipidemia, and lower back pain.

The patient had a history of falling from a balcony and shattering his teeth as a child, childhood sexual abuse, interpersonal betrayal when he learned that his father's identity had been kept from him, involuntary psychiatric treatment at age 20, alleged sexual victimization in federal prison during his early 20's, racialized trauma, and loss of his son's mother to murder. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He was serving a sentence of life with parole and also had a federal detainer; by 2024, he had been incarcerated for 24 years.

The patient was placed in mainline 3CMS care at CTF on May 3, 2022. During 2024, the annual primary clinician assessment and annual IDTT meeting occurred prior to the review period. During the review period, the patient received timely follow-up appointments with the assigned psychiatrist. Psychiatric documentation did not indicate whether encounters occurred in confidential settings and included minimal new information; and most content was copied and pasted from a prior note. However, the patient's symptoms and progress were adequately monitored and documented. The primary clinician saw the patient for three encounters during the review period and documented careful assessment of the patient's symptoms and functioning along with provision of CBT and DBT skills training, and cognitive restructuring. In mid-December 2024, the primary clinician encouraged the patient to attend a mental health group. Primary clinician progress notes did not indicate whether these encounters occurred in a confidential setting, and the notes contained much content that was copied and pasted from a prior note. However, active treatment and therapeutic collaboration were evident.

**Findings**

The care provided to this 3CMS patient was adequate.

Evidence-based interventions were provided and consistent with the treatment plan. The patient received regular and timely follow-up encounters from both the psychiatrist and the primary clinician. Ongoing assessment of the patient's symptoms and response to treatment, active provision of therapeutic interventions, and collaboration were evident. Documentation needed improvement through the reduction of copied content and the inclusion of documentation regarding the confidentiality of the encounter.

**Patient C**

This 39-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with persistent depressive disorder and major depressive disorder, recurrent, moderate. He was prescribed fluoxetine for depression and was adherent about 86 percent of the time. He was also prescribed melatonin to assist with sleep, first on an as-needed basis and then on a nightly basis, and he was consistently adherent with this medication. Medical conditions included degeneration of lumbar intervertebral disc, lateral epicondylitis of left humerus, seasonal allergies, and a history of allergic conjunctivitis. He was issued a left ankle brace.

The patient had a history of childhood poverty, paternal incarceration, sexual abuse, juvenile detention, early substance use, and exposure to violence. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He was serving an indeterminate life sentence.

The patient was placed in mainline 3CMS care at CTF on April 13, 2021. During 2024, the annual primary clinician assessment and annual IDTT meeting occurred prior to the review period. The patient was followed regularly and timely by the psychiatrist during the review period. Psychiatric progress notes were characterized by considerable content that was copied and pasted from a prior note, with identical wording in mental status exams. The notes did not indicate whether the encounter occurred in a confidential setting. No medication changes were made. The patient was seen regularly and timely by the primary clinician. Like the psychiatric progress notes, the primary clinician progress notes did not indicate whether the encounter occurred in a confidential setting and also contained considerable content that was copied and pasted from a prior note, again including identical or near-identical wording in mental status exams. The patient's progress towards his long-term treatment goal was not measured, and some interventions that the primary clinician documented as provided, such as reviewing CBT techniques to address dysfunctional thought and behavior patterns, were not accompanied by examples or any evidence that the patient was engaging in dysfunctional thinking or behavior. Most progress note content was more consistent with case management than treatment.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient's treatment needs were not adequately met. Although both the psychiatrist and the primary clinician followed him regularly, the patient continued to exhibit symptoms of a persistent depressive disorder that, according to the case formulation, was thought to have its roots in childhood trauma. This disorder required consistent and frequent therapy that was not provided. The mental health encounters documented during the review period were frequently more consistent with monitoring and case management than with treatment, and the patient's progress towards reducing the intensity, frequency, and duration of mood symptoms was not assessed. The extent of material, including mental status exams, which was copied from one progress note to the next was concerning.

**Patient D**

This 58-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with adjustment disorder with depressed mood and major depressive disorder, single episode. Although he was not prescribed any psychotropic medications through psychiatry, he received duloxetine from the medical provider for chronic foot pain. He was consistently adherent with this medication. Medical conditions included prediabetes, hypertension, hyperlipidemia, chronic low back pain, vitamin D deficiency, chronic foot pain, and a history of a rotator cuff tear.

The patient had a history of childhood depression, childhood and adolescent exposure to violence, behavioral problems, paternal substance use, physical abuse, and alcohol, cannabis, cocaine, and PCP use beginning at age 13 and continuing while incarcerated until 2016. He had been shot at but not wounded. He had no history of mental health treatment or psychiatric hospitalization in the community. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services with no higher levels of care. He was serving an indeterminate life sentence, and by 2024 had been incarcerated for 35 years.

The patient was placed in mainline 3CMS care at CTF on September 10, 2018. During the review period, the annual primary clinician assessment occurred timely, but the clinical summary was copied word for word from the 2023 assessment and made no reference to the duloxetine the patient was receiving from a medical provider. The 2024 case formulation indicated that dysfunctional thinking and attachment issues would be addressed through CBT techniques and the therapeutic relationship. A pre-IDTT psychiatric assessment was adequate but did not indicate whether the encounter occurred in a confidential setting. The psychiatrist documented that the patient was receiving duloxetine and that the patient declined other psychotropic medications. A plan to see the patient upon request for services was noted.

The annual IDTT meeting occurred timely and was attended by the patient and assigned primary clinician. Documentation indicated that no assigned psychiatrist had been identified, and no psychiatrist attended the meeting. The patient met no criteria for consideration of a higher level of care. IDTT documentation did not reflect the patient receiving duloxetine from a medical provider and instead indicated that the patient was doing well without medication. The treatment plan identified depression as the treatment target, formulated a measurable long-term goal, and indicated that CBT would be used to address dysfunctional thinking and behavior. No rationale for retaining the patient at the 3CMS level of care and no criteria for discharging the patient from MHSDS were documented. Neither a baseline measurement nor any subsequent measurement of the patient's depression was obtained for purposes of assessing progress towards the treatment goal.

During the review period, the patient received only one routine primary clinician encounter. The encounter occurred on December 11, 2024; the most recent prior individual treatment session occurred 182 days earlier, on June 12, 2024. During the December 2024 encounter, the patient's progress towards his treatment goal was not measured, but the mental status exam indicated no

symptoms of depression. Interventions appeared to be supportive in nature, although the primary clinician documented provision of CBT without indicating any specifics.

**Findings**

The care provided to this 3CMS patient was inadequate.

A baseline measurement of the patient's depression, described as persistent, was not obtained, and the annual clinical summary provided by the primary clinician was copied without modification from the 2023 clinical summary. A psychiatrist did not attend the annual IDTT. The formulation of the treatment goal and the patient's progress towards meeting that goal was not supported by an assessment of the intensity of depression, and the type and intensity of services the patient required were unclear from the record. The patient was provided with little mental health treatment but may have benefitted from the antidepressant he was taking for pain. Reasons for retaining the patient in 3CMS care were not documented.

**Patient E**

This 55-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with generalized anxiety disorder, attention-deficit/hyperactivity disorder, combined type, panic disorder without agoraphobia, and major depressive disorder, recurrent, in remission. Bereavement was later added as a diagnosis during the review period, although the mental health problems section of the health record was not updated with this diagnosis. He was prescribed escitalopram and melatonin; both medications were ordered as keep on person. Hydroxyzine was prescribed on an as-needed basis for insomnia; he used this medication on only three occasions during the review period. Medical conditions included benign paroxysmal positional vertigo, hyperlipidemia, carpal tunnel syndrome, pterygium, cholelithiasis, and perianal warts.

The patient had a history of significant trauma. He was a child living in a war zone in Vietnam during the war, spent two years in refugee camps, was physically abused by his father, grew up in poverty, and was exposed to maternal depression. He became depressed during adolescence, and two suicide attempts, both in 1987, were listed in the health record. He was psychiatrically hospitalized following one of the attempts. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. During 2024, he experienced the unexpected death of his best friend/former girlfriend.

The patient was placed in mainline 3CMS care at CTF on April 22, 2015. During the review period, the annual primary clinician assessment occurred timely and was adequate, although it did not summarize the patient's response to treatment over the last year. Passive suicidal ideation was noted and an accompanying SRASHE found the patient's chronic suicide risk to be moderate, but acute suicide risk low due to protective factors and future orientation. The annual IDTT meeting occurred timely and was attended by the patient and required staff. The patient did not meet any criteria for consideration of a higher level of care. The treatment plan identified depression as the treatment target but failed to formulate a long-term goal that was measurable. CBT interventions provided by the primary clinician were identified as the treatment intervention; psychiatric care

was not addressed. No criteria for discharge from MHSDS or rationale for retaining the patient in 3CMS care were documented.

The patient was followed timely by the psychiatrist during the review period, and medications were adjusted in response to his symptoms. Psychiatric progress notes were adequate but failed to indicate whether the encounters occurred in confidential settings. The primary clinician saw the patient timely and on average once a month during the review period. Primary clinician encounters were clinically appropriate, documented active provision of interventions, and helped support the patient through bereavement. The patient consistently denied suicidal and self-injurious thoughts when meeting with the psychiatrist and primary clinician.

**Findings**

The care provided to this 3CMS patient was adequate.

Although the treatment plan failed to establish a measurable long-term goal and neither the rationale for 3CMS care nor criteria for discontinuation of mental health care were documented, the patient was appropriately retained in 3CMS and received clinically appropriate care that was sufficient to meet his treatment needs. Medications were adjusted and primary clinician sessions made more frequent to respond to the patient's evolving treatment needs. The patient responded well, with increased participation in programming, education, and exercise. Suicidal ideation was assessed during each contact, and the passive suicidal ideation voiced early in the review period disappeared. Documenting whether the encounter occurred in a confidential setting needed improvement.

**Patient F**

This 41-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with persistent depressive disorder and prescribed paroxetine for anxiety, insomnia, and depression. The psychiatrist diagnosed major depressive disorder, but the mental health problems section of the health record was not updated. This medication was ordered as keep on person. Hydroxyzine was ordered on an as-needed basis for anxiety, but he did not use this medication during the review period. Medical conditions included obesity, diabetes, hypertension, hyperlipidemia, spinal arthritis, asthma, and spasmodic rhinorrhea.

The patient had a history of childhood-onset depression and physical abuse, exposure to domestic violence, two suicide attempts in early adolescence, juvenile detention, school suspensions for fighting, and outpatient mental health care from ages eight to 14. Two suicide attempts, both in 1997, were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services with no higher levels of care. He was previously treated with oxcarbazepine and prazosin. He was serving an indeterminate life sentence and by 2024 had been incarcerated for 21 years.

The patient was placed in mainline 3CMS care at CTF on November 1, 2022. During the review period, the annual primary clinician assessment was completed timely and adequately. The annual

IDTT meeting occurred timely and was attended by required staff but not the patient, who arrived an hour early for the meeting and then needed to return to work. The patient did not meet any criteria for a higher level of care. The treatment plan documented for the 2024 IDTT meeting was identical to the one developed in November 2022 and identified depression as the treatment target. The long-term treatment goal was to maintain depression at a 3 out of 10 for 90 days, but no baseline measurement was provided, and only one subsequent measurement of his subjective depression was obtained. The only intervention identified was CBT skills to address dysfunctional thoughts and patterns; there was no mention of psychiatric care. No criteria for discharge from MHSDS or rationale for retaining the patient in 3CMS care were documented.

The assigned psychiatrist provided timely follow-up appointments during the review period. Documentation was minimal, did not indicate whether the encounters occurred in confidential settings, and used identical wording for mental status exams across contacts. The patient was described as euthymic, even when he rated his depression a '9' out of '10' following the death of a family member. The patient was also followed regularly by the primary clinician in the early portion of the review period. However, he was not seen for individual treatment after September 19, 2024 apart from completion of the annual assessment. Primary clinician progress notes did not indicate whether the encounters were confidential, did not include measurement of the patient's subjective depression, and were supportive but more consistent with extended wellness checks than treatment. The patient's mood was consistently documented as good, with "euthymic affect."

**Findings**

The care provided to this 3CMS patient was inadequate.

The measurable long-term goal contained in the treatment plan was assessed only once during the review period, and clinical documentation was contradictory regarding the intensity of the patient's subjective distress regarding his depression. Progress notes consistently described the patient as euthymic, suggesting that the treatment goal had been achieved and that the treatment plan needed to be updated; the plan had not been changed in the prior two years. Provision of CBT skills was poorly documented in progress notes and did not appear to have occurred. Identical wording across mental health status exams was problematic. There was no reconciliation of the patient's psychiatric diagnoses. While the patient appeared to be doing well, the framework for and documentation of treatment was deficient.

**Patient G**

This 45-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with schizoaffective disorder, bipolar type. He was prescribed haloperidol, divalproex sodium, and benztropine and was adherent with these medications. Medical conditions included obesity, diabetes, hypertension, hyperlipidemia, atypical chest pain, prolonged QT interval, and lichenoid allergic contact dermatitis.

The patient had a lengthy history of psychiatric treatment for symptoms of psychosis and mania. He had used cannabis, alcohol, and ecstasy from an early age, but reported abstinence from illicit

substances since 2021. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services with no higher levels of care. He was previously treated with hydroxyzine, mirtazapine, and olanzapine, but had no history of involuntary treatment under PC 2602. He was serving an indeterminate life sentence.

The patient was placed in mainline 3CMS care at CTF on July 14, 2021. In 2024 the annual primary clinician assessment and annual IDTT meeting occurred prior to the review period. The patient was followed regularly and timely by the psychiatrist during the review period. Psychiatric progress notes contained minimal new information, with most content copied from prior notes; wording was identical across multiple mental health status exams; and the notes did not indicate whether the encounter occurred in a confidential setting. Nevertheless, psychiatric symptoms and the patient's responses to medications were adequately monitored. The documented history and symptoms were consistent with the psychiatric diagnosis. The primary clinician saw the patient timely during the review period in confidential settings. These encounters were primarily supportive and relatively brief. Documentation was adequate.

**Findings**

The care provided to this 3CMS patient was adequate.

The patient's symptoms and treatment needs were adequately addressed and monitored, interventions consistent with the treatment plan were provided, and the patient received regular follow-up encounters. The patient improved, as evidenced by engagement in new behaviors, new programming, and new education, along with the ongoing absence of interfering symptoms or signs of irritability. Treatment was adequate; documentation required improvement.

**Patient H**

This 57-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with unspecified depressive disorder, persistent depressive disorder, and antisocial personality disorder, although the latter two diagnoses were not updated in the mental health problems section of the health record. He was prescribed melatonin and sertraline as keep on person medications. Hydroxyzine was prescribed on an as-needed basis for anxiety, and he used this medication frequently. Medical conditions included chronic kidney disease, elevated low density lipoprotein cholesterol, sciatica, and hearing loss with tinnitus and use of hearing aids, vertigo, muscle pain, and a history of adverse reaction to a statin medication and hepatitis C. A diagnosis of attention-deficit/hyperactivity disorder, predominantly inattentive type, was also listed under medical problems.

The patient had a history of emotional and physical abuse in childhood, exposure to violence, and substance use. He had no history of mental health care prior to incarceration. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services with no higher levels of care. He was serving an indeterminate life sentence and by 2024 had been incarcerated for 33 years.

The patient was placed in mainline 3CMS care at CTF on October 26, 2023. During the review period, the annual primary clinician assessment was completed timely and adequately. The annual IDTT meeting occurred timely and was attended by the patient and required staff. The patient did not meet any criteria for consideration of a higher level of care. The treatment plan was appropriately updated to address current levels of depression and insomnia with new interventions, but psychiatric care was not referenced. Long-term goals were measurable, and a rationale for retaining the patient at the 3CMS level of care was clearly documented.

The assigned psychiatrist followed the patient timely during the review period. The patient's symptoms were adequately assessed and documented. Psychiatric progress notes consistently indicated a diagnosis of recurrent major depression rather than unspecified depressive disorder. There was no documentation as to whether the encounters occurred in confidential settings. The primary clinician also followed the patient regularly during the early portion of the review period, but did not provide a treatment session after September 18, 2024, instead seeing the patient for an annual assessment. Primary clinician encounters were confidential. Documentation reflected appropriate monitoring of the patient's functioning and symptoms, provision of cognitive-behavioral interventions, and therapeutic collaboration.

**Findings**

The care provided to this 3CMS patient was adequate.

The treatment plan was updated, detailed, and clinically appropriate for the patient's treatment needs, apart from failing to include psychiatric care as an intervention. The patient received timely and effective care from the psychiatrist and primary clinician, and interventions identified in the treatment plan were provided. Therapeutic collaboration was evident in progress notes, and the patient remained stable during the review period. Documentation was adequate.

**Patient I**

This 46-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with unspecified anxiety disorder and major depressive disorder, recurrent, mild, noted to be in partial remission during the review period. A diagnosis of unspecified anxiety disorder was also documented but not included in the mental health problems section of the health record. The patient was prescribed melatonin as a keep on person medication. Hydroxyzine was prescribed on an as-needed basis, but he did not use this medication during the review period, and it was discontinued. Medical conditions included lumbar spondylosis, severe cervical stenosis with pain, irritable bowel syndrome with incontinence, constipation, irreducible umbilical hernia with right inguinal pain, history of gastroesophageal reflux disease, benign prostatic hyperplasia, chronic right foot pain due to prior injuries, with surgery to this foot, radiculopathy of left arm and hand, vitamin D deficiency, and polyneuropathy due to drugs.

The patient had a history of childhood exposure to domestic violence, physical abuse, poverty, and starting in adolescence, alcohol, cannabis, and codeine use. As a child, he witnessed two suicide attempts by his mother. He had no history of juvenile detention and, apart from going to a crisis

center on one occasion, no history of mental health care prior to incarceration. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had received 3CMS and EOP services, with EOP care provided in 2017 and 2018. He was serving an indeterminate life sentence.

The patient was placed in mainline 3CMS care at CTF on August 17, 2019. During the review period, the annual primary clinician assessment occurred timely and was thorough. The annual IDTT occurred timely and was attended by the patient and required staff. The patient did not meet any criteria for consideration of a higher level of care. The patient's strengths were well-documented. The treatment plan identified anxiety and insomnia as treatment targets, formulated measurable short-term objectives and long-term goals, and identified rational emotive behavior therapy and sleep hygiene skills as interventions to address symptoms. Although the plan did not reference psychiatric care, it indicated a plan to reduce the patient's use of melatonin over the next year and consider a step-down from 3CMS care in a year.

The assigned psychiatrist followed the patient timely during the review period, adequately monitored the patient's symptoms, and discontinued hydroxyzine due to the patient's improvement in anxiety and his request to discontinue this medication. Documentation was adequate, although content of mental status exams was nearly identical across encounters and the psychiatrist failed to indicate whether the encounters occurred in confidential settings. The primary clinician provided the patient with timely and confidential individual encounters, and progress notes documented the provision of evidence-based interventions consistent with the treatment plan. These notes were thorough.

**Findings**

The care provided to this 3CMS patient was adequate.

Although not referencing psychiatric care, the treatment plan was otherwise adequate and clinically appropriate. The psychiatrist and primary clinician provided timely and effective treatment throughout the review period, and the patient received the interventions identified in the treatment plan. The patient remained stable and engaged in treatment, therapeutic collaboration was apparent, and the patient's anxiety improved to the extent that hydroxyzine could be discontinued. However, specification of the patient's anxiety disorder diagnosis was not provided.

**Patient J**

This 31-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at CTF. He was diagnosed with attention-deficit/hyperactivity disorder, predominantly hyperactive/impulsive presentation, unspecified anxiety disorder, and unspecified trauma and stressor-related disorder. He was prescribed aripiprazole but was nonadherent with this medication, and it was discontinued at the patient's request early in the review period. Medical conditions included recurrent nose bleeds, hypertrophy of nasal turbinates, and elevated blood pressure without a diagnosis of hypertension. Opioid use was listed under medical problems.

The patient had a history of special education, childhood trauma, exposure to violence and a dead body, paternal incarceration, maternal death from sickle cell disease, early criminal behavior, and early-onset substance use that included alcohol, cannabis, cocaine, methamphetamine, and opioids. He was psychiatrically hospitalized on multiple occasions in the community and given diagnoses of schizophrenia, schizoaffective disorder, substance-induced psychosis, and posttraumatic stress disorder. The health record included contradictory information regarding the patient's suicide attempt history, with either one or two attempts in 2020. Additional contradictory information suggested that there may have been other suicide attempts. The patient reportedly experienced substance-induced psychosis at the time, which contributed to the attempt(s). Within the CDCR, the patient had exclusively received 3CMS services with no higher levels of care, and was previously treated with sertraline.

The patient was placed in mainline 3CMS care at CTF on August 28, 2023. During the review period, the annual primary clinician assessment was timely and adequate. An accompanying SRASHE found the patient at low acute risk but moderate chronic risk for suicide. The IDTT meeting occurred timely and was attended by the patient and required staff. The patient did not meet any criteria for consideration of a higher level of care. The patient's strengths and verbalized treatment goal were well documented. The treatment plan identified social anxiety as the treatment target but did not formulate a measurable long-term goal. "Exploration" of history that fostered social anxiety and of ways to manage future situations were identified as treatment interventions. At the patient's initiative, a plan to consider step-down from 3CMS care in six months was documented.

The assigned psychiatrist followed the patient timely during the review period. Progress notes included diagnoses of bipolar disorder with psychotic features, marijuana use disorder, methamphetamine use disorder, and opioid use disorder, but these diagnoses were not updated in the mental health problems section of the health record. Progress notes showed evidence of therapeutic collaboration and appropriate monitoring of the patient's functioning and symptoms, but they failed to indicate whether the encounters were confidential. The wording of mental health status exams was nearly identical across sessions. Evidence for the bipolar diagnosis was unclear. With the annual primary clinician assessment included, the patient received timely contacts from the primary clinician, who documented that the patient had been prescribed aripiprazole for substance-induced psychosis, provided the patient with a skills training workbook for anger management, and engaged in cognitive reframing to assist with anxiety and frustration. Primary clinician encounters were confidential and adequately documented.

**Findings**

The care provided to this 3CMS patient was adequate.

Although various diagnostic discrepancies were not resolved during the review period, the patient received treatment that was clinically appropriate, timely, and adequate to address his diminishing symptoms. The patient remained stable after antipsychotic medication was discontinued, and non-pharmacological interventions were effective and collaborative. Documentation needed to be improved in the areas of developing measurable long-term treatment goals, conducting less generic, less identical psychiatric mental status exams, and confirming that encounters were

confidential. It would have been helpful to document the rationale for the patient's unspecified trauma disorder and bipolar disorder diagnoses, or to discontinue these diagnoses. Evidence for these disorders was unclear, and the patient did not receive treatment directly addressing them.

**Patient K**

This 53-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF on March 3, 2023. He was provided diagnoses of unspecified anxiety disorder, unspecified bipolar and related disorder in partial remission, and unspecified other or unknown substance-related disorder in remission. The patient was previously prescribed psychotropic medications that were discontinued during fall of 2023 due to stabilization and at the patient's request.

During the monitoring period, the patient was seen for three contacts by various PCs. The patient was also seen on February 21, 2025 by one of the PCs for a brief check-in. Assessments and progress notes by the PCs indicated that the patient remained fixated on the appeal in his criminal case, despite the appeal reportedly having been denied in October 2023. The patient had a child sexual offense and likely experienced anxiety related to his commitment offense. The PC contact documentation repeated significant amounts of prior information. One PC described the patient as hypomanic; however, other than his fixation on his legal case and occasional hyperverbal incidents, no support for that determination was documented.

The patient was referred for an RVR mental health assessment related to a possible indecent exposure incident that was determined not to be due to mental health illness.

As the patient was not prescribed psychotropic medications, he was not consistently seen by a psychiatrist; however, he was seen on December 11, 2024 for an initial psychiatric assessment due to housing moves and brief placement in the RHU. The psychiatric documentation indicated that the patient remained stable, denied symptoms, and demonstrated no need for psychotropic medication treatment.

Treatment planning was delayed by more than nine months, and the plan only included IPOCs for hypomania. The documentation of treatment planning was inadequate and internally inconsistent. The treatment team documented that the patient had improvement with decreased hypomania, but no baseline was established to evaluate treatment progress, and the hypomania was never clinically described or explained. The treatment plan contained inadequate interventions, such as encouraging the patient to improve functioning without providing empirical support. Mood swings were noted as unresolved, but the patient was described as stable. While the treatment plan indicated that CBT would be used for mood swings, the specific CBT techniques and their expected impact were not discussed. The lack of specificity in treatment planning did not allow for implementation of the plan.

No mental health treatment groups were offered to the patient, and it did not appear that group therapy was available.

**Findings**

The treatment provided to this patient was inadequate.

Although the documentation suggested that the patient was stable, the documentation did not indicate that the patient was adequately assessed. The patient was seen for several brief PC check-ins with two different PCs and only one contact with a psychiatrist. Most of the documentation consisted primarily of prior information with little new clinically relevant information available.

The treatment plan was delayed by almost one year and was clearly inadequate. Additionally, the treatment plan documentation was internally inconsistent, which did not allow for a clear clinical perception of the patient. Although it appeared that the patient had stabilized despite the lack of treatment, the treatment team did not document discussion of discharge from the MHSDS. The patient would have benefitted from a comprehensive evaluation and an updated treatment plan that adequately addressed the required level of care.

**Patient L**

This 62-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF in 2014 and had received mental health services at the 3CMS level of care since at least 2017. He was provided a diagnosis of major depressive disorder, recurrent, mild. The patient was prescribed Prozac.

This was reportedly the patient's first incarceration, and he was serving a sentence of 42 years to life.

There was documentation of annual IDTT meetings. The most recent meeting occurred on September 9, 2024 when alternate PC and psychiatrist were present as well as a correctional counselor. The treatment plan included a significant amount of past information that did not appear relevant. No information regarding the patient's progress was documented. The treatment plan indicated that the patient was asymptomatic and stable. The treatment plan was inadequate as there were no targets for treatment, no updates on progress, no evidence-based interventions, and no actual treatment provided. Additionally, there was no consideration for group therapy by the treatment team, and the IDTT did not define the frequency of contacts that was clinically indicated.

The patient was seen twice for psychiatric contacts during the review period. He was seen timely for the first contact, but he was seen more than three weeks late for the second encounter. The psychiatrist noted that the patient was stable on Prozac.

The patient was seen three times during the review period by two different PCs. The patient was last seen on December 4, 2024. All clinical contacts appeared brief and clinically superficial.

**Findings**

The treatment provided to this patient was inadequate.

The patient was not seen timely for substantive clinical encounters. Both psychiatric and PC documentation suggested that the contacts were brief check-ins that did not include the provision of actual therapeutic interventions. The treatment plan documentation did not provide a plan for treatment and failed to critically assess the patient's symptomatology and functional level. The patient required an updated assessment to evaluate his psychiatric symptoms, functional level, and the appropriate level of care to facilitate the development of an appropriate treatment plan.

**Patient M**

This 54-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF on August 2023. He was provided a diagnosis of depressive disorder, unspecified. He was prescribed Cymbalta; however, the patient reported during mid-October 2024 that he stopped taking the medication, and the medication was discontinued.

The patient was seen on September 17, 2024 and December 28, 2024 during the review period by the same psychiatrist in a confidential setting. Both contacts did not occur timely; the first was overdue, as the patient had left the psychiatric appointment that was not rescheduled timely.

The patient was seen on three occasions by a PC, and those contacts occurred in confidential settings unless the patient refused. While conducting a cell front contact in July 2024, the PC noted that a custody officer was present. The patient was seen every 90 days unless he submitted a health services request when he was seen more frequently. The contacts appeared brief, and the documentation provided little clinically relevant information. On September 11, 2024, the patient was seen due to a self-referral, because he was experiencing stress related to his release from prison and was concerned about recent RVRs. The last PC contact occurred on November 14, 2024. The patient was seen for pre-release planning assessment, but he did not receive any pre-release treatment groups or targeted pre-release services.

A current treatment plan was developed; however, the plan was minimal in content and did not clarify the patient's current symptomatology, treatment needs, and functional abilities. The treatment plan also did not document whether the patient was at the appropriate level of care or a plan for future treatment. There was no description of the patient's current symptoms or functional level to assist in identification of treatment needs and applicable interventions.

**Findings**

The treatment provided to this patient was inadequate.

Despite receiving minimal and untimely clinical contacts, the patient was able to maintain at the 3CMS level of care; however, there was a paucity of clinical information documented. There was a lack of documentation that the psychiatrist attempted to educate the patient regarding the necessity of medication adherence or that there was discussion with the patient to ensure that he made an informed decision to discontinue his medications and to monitor his stability. The treatment team also failed to document whether group therapy was considered or offered to the patient.

**Patient N**

This 41-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF in May 2022. He was provided diagnoses of unspecified anxiety disorder; unspecified depressive disorder; insomnia; cannabis use disorder; cocaine use disorder; sedative, hypnotic, or anxiolytic use disorder, severe in sustained remission; opioid use disorder; social anxiety disorder; and neuralgia. He received gunshot wounds prior to incarceration that contributed to chronic pain. He was prescribed Remeron while housed in the

RHU and had not previously been prescribed psychotropic medication. The patient also received medication assisted treatment for his opioid use disorder.

The patient was placed in the CTF RHU on September 12, 2024, and he was endorsed to a 3CMS RHU on September 30, 2024.

As the patient had not been prescribed psychotropic medication, he was not seen by psychiatry until an initial assessment was completed following placement in RHU on September 17, 2024. The psychiatric documentation included some clinical history. The patient was not seen again by the psychiatrist during the review period.

The patient was also seen by the PC on September 17, 2024, when the initial assessment was completed. That assessment contained large portions of outdated information without appropriate updates. The patient was seen for three of four required PC contacts. He was seen cell front on September 26, 2024 by his PC after refusing a confidential contact. He refused a confidential PC contact again on October 2, 2024 and was seen cell front when he also refused in-cell materials. The patient reported that he did not want to continue psychotropic medication treatment, as he stated that he only requested the medication for insomnia.

The initial RHU IDTT meeting occurred on September 18, 2024; an alternate psychiatrist was present with the assigned PC, patient, and CCI. Although the master treatment plan noted that the treatment team reviewed the safety plan with the patient; no safety plan was developed. The treatment plan also contained outdated information that required updating. The only identified problem or treatment target was to abstain from heroin. There were no interventions documented in the treatment plan.

**Findings**

The treatment provided to this patient was inadequate.

Although the patient was determined to require mental health services at the 3CMS level of care, the clinical documentation in the initial assessments, ongoing progress notes, and treatment planning failed to provide the rationale for continuation in the MHSDS. Upon his arrival to the RHU, the patient was anxious and was unable to sleep. The documentation indicated that the clinical contacts were brief and superficial in content. Treatment planning was inadequate.

**Patient O**

This 35-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF in July 2023. He was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, PTSD, opioid use disorder, methamphetamine use disorder, cannabis use disorder, and alcohol use disorder. He was prescribed BuSpar and melatonin with sporadic adherence.

The patient had received mental health services at the 3CMS level of care since April 2023. He was placed into the CTF RHU on October 11, 2024, and was endorsed to a 3CMS RHU on October 23, 2024. Prior to October 9. 2024, the patient had not been seen by a PC in five months. It was unclear what precipitated the RHU placement, but the patient was seen in a holding area there by

a PC on October 12, 2024. He was not seen in a confidential setting due to an inadequate number of escort staff.

While in the RHU, the patient was seen by two different PCs. On October 14, 2024, the patient refused a confidential contact and was seen cell front. The contact noted that the patient reported that his father had recently died. The documentation did not indicate a plan for providing ongoing support and monitoring during a difficult time that included the loss of his father, RHU placement, and imminent release from prison. The clinical documentation throughout the CTF RHU stay included significant amounts of cut and pasted information that was not relevant to the patient's current status or treatment plan. The patient did not want to transfer to another RHU. He was very concerned about his scheduled release and worried about his safety in another RHU. Due to concerns regarding his upcoming prison release, the patient requested removal from the MHSDS so that he would not have to transfer to another facility for placement in a 3CMS RHU.

The 3CMS general population IDTT meeting occurred on July 18, 2024; both assigned providers were present with a correctional counselor. The treatment plan was vague, not appropriately individualized, and was inadequate for implementation. Anxiety was the problem area identified; however, there was insufficient operationalization to focus specific treatment techniques to symptoms. The treatment team did identify a treatment goal of learning three coping skills, but it was unclear how that would occur, or how it would impact the patient's anxiety symptoms. There were no interventions listed that would improve patient outcome or reduce symptomatology.

The RHU IDTT meeting occurred on October 23, 2024, and the treatment plan was not adequately updated. The assigned PC, an alternate psychiatrist, and correctional counselor were present with the patient. The RHU treatment plan was not individualized to the patient, setting, or to the patient's treatment needs. The problem areas of depression and anxiety were not operationalized to allow for objective measurement and documentation of improvement. A significant amount of information was pulled forward from prior records that should have been briefly summarized for those relevant areas. Instead, the treatment team copied the same inadequate portion of the prior treatment plan regarding anxiety. The short-term goals were not easily measured or connected to specific measurable treatment improvement.

**Findings**

The treatment provided to this patient was inadequate.

While housed in general population as a 3CMS patient, the patient was provided with an inadequate treatment plan, no real interventions were provided, and he was not regularly seen by mental health staff. A quarterly PC contact occurred two months late and he was finally seen after RHU placement. The RHU treatment plan carried forward most of the 3CMS general population treatment plan despite its inadequacy and lack of applicability to the patient's multiple stressors at that time. There was insufficient documentation to evaluate whether the patient received mental health services at the appropriate level of care which should have been adequately assessed and documented.

**Patient P**

This 62-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF in April 2015. The patient was provided diagnoses of alcohol use disorder; synthetic cannabis use disorder; and dysthymic disorder, persistent and severe. The patient also had diabetes.

The documentation indicated that the patient was referred to the MHCB monthly during October, November, and December 2024; however, the referrals were rescinded for each incident. Those incidents occurred after the patient was found unconscious or with altered mental status. An ISUDT social worker attempted to interview the patient on October 18, 2024, but he refused.

The patient was first discovered unconscious on October 28, 2024. He was provided with four doses of Narcan and taken to an outside emergency room. Upon his return to CTF, he was placed in alternative housing. The mental health provider assessed the patient with low suicide risk and returned him to housing, noting that mental health staff would continue with the existing treatment plan.

During a November 27, 2024 ISUDT assessment, the patient denied a history of overdoses and opioid use. He stated that he smoked marijuana prior to the October 2024 episode and drank manufactured alcohol prior to the November 2024 incident. The patient declined placement in the ISUDT treatment as he denied that the incidents were not overdoses.

On November 30, 2024, the patient was again discovered unconscious. He received three doses of Narcan before responding and then refused ambulance transport and medical care. The patient was again referred to mental health for a suicide risk assessment which assessed the patient with low suicide risk, and he was returned to his housing. Five-day follow-up contacts occurred; however, the contacts typically occurred in a nonconfidential setting, and the documentation indicated that there was no focus on identifying precipitants and developing a plan to remain safe.

The patient was referred again to the ISUDT as he increasingly exhibited altered levels of consciousness. There was not, however, documentation of collaboration between medical, mental health, and ISUDT staff to develop an interdisciplinary treatment plan or to update the existing treatment plan to address the patient's treatment resistance and to prevent continued drug use and overdose.

The patient had another incident of altered consciousness on December 29, 2024 that required treatment with Narcan. The patient again denied illicit substance use.

The master treatment plan was not updated since April 18, 2024. Although not overdue, the significant clinical incidents of altered level of consciousness were clinically significant and should have resulted in an updated treatment plan. This treatment plan was inadequate, focused on depressed mood without providing progress over time, and included no actual interventions. The patient was not assessed regarding the need for group treatment, and the focus of individual contacts was not detailed.

The IDTT did not convene despite the third suspected overdose by the patient; those multiple overdose incidents should have resulted assessment of the need for treatment at a higher level of care as well as diagnostic clarification. The healthcare record documentation did not indicate whether medical causes were considered as the cause for the patient's altered consciousness. The

patient was ultimately placed in the ISUDT, but the mental health treatment plan was not updated despite the patient's additional services.

**Findings**

The treatment provided to this patient was inadequate.

The patient was not seen consistently by the PC; he was only seen for suicide risk assessments after multiple suspected overdoses. The IDTT failed to refer the patient for medical care to rule out possible medical causes of his altered mental status, such as his diabetes. The treatment plan failed to adequately address the patient's functional impairment and deterioration and the underlying precipitants for self-injury by overdose. The treatment team did not implement a plan to more closely monitor the patient and to better integrate care between medical, ISUDT, and mental health staff.

**Patient Q**

This 38-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF on July 29, 2024 from WSP. He was provided diagnoses of unspecified anxiety disorder, methamphetamine use disorder, opioid use disorder, and substance use disorder. He received medication assisted treatment. The patient was initially prescribed prazosin and Remeron; however, the medications were discontinued at the patient's request on October 29, 2024.

The initial IDTT meeting on August 15, 2024 occurred approximately three days late. The treatment plan was vague and incomplete, and it maintained outdated interventions from the reception center that were not appropriately updated for the patient's new setting. The treatment plan also did not provide a clinical rationale for diagnoses beyond the patient continuing to report that he was experiencing anxiety.

The PC completed an adequate initial evaluation on August 2, 2024. The diagnosis of anxiety was maintained; no current symptoms were documented, and the mental status exam was reportedly within normal limits with no evidence of delusional or psychotic thought processes. The same PC saw the patient on three occasions during the review period. The documentation of those contacts included large portions of cut and pasted information from the most recent psychiatric contact, making it very difficult to identify what if any current information was provided.

The patient was seen by the psychiatrist consistently at 60 to 90 day intervals. Psychotropic medications were discontinued at his request on October 29, 2024. At the time of psychiatric follow up appointment on December 19, 2024, the documentation indicated that the patient was stable and functioning well without psychotropic medications.

**Findings**

The treatment provided to this patient was minimally adequate.

This was the patient's first prison term, and he was placed at the 3CMS level of care at the reception center due to self-reported anxiety and insomnia. Upon his transfer to CTF, the patient's care did

not consistently meet Program Guide requirements. For example, he was not always seen timely by the treatment team. The treatment plan was not appropriately individualized, failed to support the patient's diagnosis, and included no actual interventions. The patient, however, was seen regularly by his assigned PC and psychiatrist. It appeared that the patient may have experienced increased anxiety and stress due to his initial incarceration. Despite minimal medication management and supportive clinical contacts, the patient stabilized and was able to function adequately at the 3CMS level of care. The patient would benefit from an updated assessment and treatment plan that focused on providing needed services and reviewing the appropriateness of his level of care.

**Patient R**

This 62-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. The patient arrived at CTF in November 2016. He was provided diagnoses of unspecified depressive disorder, in remission, and substance use disorder in complete sustained remission. The patient was not prescribed psychotropic medication.

The most recent IDTT meeting occurred timely on September 12, 2024; the assigned PC and an alternate psychiatrist were present. As the patient was not prescribed psychotropic medications, he was not assigned a treating psychiatrist. The patient was seen by a psychiatrist prior to the IDTT meeting when he reportedly was doing well off psychotropic medications with no symptoms of depression or anxiety. No treatment plan was developed by the IDTT. IPOCs for depression and anxiety were continued, which was contrary to the information referenced in the treatment plan that established that the patient no longer experienced those symptoms. Despite the patient's lengthy stability, his level of care was not reviewed at the IDTT meeting, and clinical considerations for group therapy were also not addressed.

The patient was seen four times by his assigned PC in a confidential setting, but the documentation indicated that the contacts were brief and superficial. Significant amounts of information were cut and pasted or brought forward from prior documentation. There was little updated information. It appeared that those clinical contacts were brief check-ins with no clinical interventions provided. This suggested that the patient may have been appropriate for consideration of a decrease in level of care, particularly considering the lack of an actual treatment plan.

**Findings**

The treatment provided to this patient was minimally adequate.

The patient appeared to have improved, but the IDTT did not provide a relevant treatment plan to address the patient's improved status. The treatment plan should have identified additional needs for the patient with interventions to address those needs, or the IDTT should have considered discharging the patient to a lower level of care given his functional level and lack of reported symptoms. Despite the lack of a relevant treatment plan, the patient was seen timely by his assigned PC and annually by a psychiatrist. He likely would have been appropriate for a reduction in his level of care.

**Patient S**

This 41-year-old 3CMS patient's healthcare record was reviewed to assess the mental health treatment provided at CTF. This patient arrived at CTF on March 24, 2021 from NKSP. The patient was provided a diagnosis of panic disorder; he was prescribed Zoloft.

The patient was seen by the same psychiatrist in a confidential setting on three occasions during the review period. At the September 2024 contact, the patient was prescribed an antidepressant medication in response to his reported symptoms. The patient was seen by the psychiatrist the following month when he was reportedly stable on his medications. At the December 2024 psychiatric contact, the patient reported that he had stopped taking Zoloft and requested removal from the MHSDS. The patient's reasons for this request were not documented, but his medication was discontinued at that time.

The annual assessment was updated on January 31, 2025 prior to the updated IDTT meeting. Although the IDTT meeting did not occur timely, the assessments were updated annually. The most recent assessment noted that the patient was placed at the 3CMS level of care due to medical necessity; however, healthcare record documentation did not confirm that statement, and that information was not documented in prior treatment plans. The PC noted that the patient's mental status had improved; he appeared sufficiently stable, and he requested removal from the MHSDS.

The documentation indicated a significant lapse in care for this patient. The treatment plan was not updated annually; instead, the plan was completed one year late on February 4, 2025. At that IDTT meeting, an alternate PC and psychiatrist attended with the patient and a CCI. The treatment team concluded that the patient's anxiety had improved; however, adequate documentation was not provided to support that clinical opinion. At that time, the patient was removed from the MHSDS.

**Findings**

The treatment provided to this patient was inadequate.

Despite the inadequacy of treatment, the patient appeared to improve. Although high functioning with minimal symptoms, his symptoms increased to the extent that antidepressant medication was resumed in September 2024. The documentation indicated that the patient's inclusion in the MHSDS at the 3CMS level of care was not due to medical necessity, and he had not been stable off medications for six months or more; for those reasons, the appropriateness of his MHSDS removal was concerning. The treatment plan was overdue by one year, and during that time the patient only received minimal medication management and brief supportive therapy. The patient appeared to improve or maintain stability despite inadequate treatment.

**APPENDIX B-15**
**Central California Women's Facility (CCWF)**
**Review Period: September 1, 2024 – February 28, 2025**

**Patient A**

This 47 or 62-year-old[1] female patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and cannabis use disorder, severe. She was fully adherent to her prescribed psychotropic medications which included haloperidol, mirtazapine, risperidone, and benztropine. Her case was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the 3CMS level of care. This patient was received within CDCR for the first time on November 12, 2024.

The patient arrived with her jail healthcare records and there was evidence that the medications she was receiving at the jail were continued upon arrival within CDCR. Beyond a list of medications and recent laboratory results, there was no information regarding her psychiatric history or mental health needs included with the jail records. An initial health screening was completed on the day of her arrival. All required screening questions were documented including information taken from the patient's records when she denied mental health needs. A mental health screening was completed by a licensed psychologist on the day of the patient's arrival. The narrative documented the patient's age as 62 years old, noting that the patient reported the date of birth on her records was incorrect. The screening was positive and the patient was seen for a full primary clinician initial assessment timely on November 19, 2024. The assessment relied almost entirely on information gathered by the nurse and psychologist who completed the initial screenings. Other than a mental status examination, there was no documented clinical assessment. The clinical summary, predisposing factors, perpetuating factors, precipitating factors, protective factors, and case formulation sections were all left blank. The patient was provided with the above-listed diagnoses without rationale or symptoms to support the criteria. The assessment was not adequate and no initial treatment plan was formulated. The patient was placed at the 3CMS level of care without rationale to support the placement.

The patient was seen for an initial psychiatric assessment on November 24, 2024 with a telepsychiatrist. The assessment was mostly adequate, with diagnoses of depressive disorder, unspecified; psychosis, unspecified; and substance dependence documented without rationale. The psychiatrist included the patient's age of record, not her self-reported age.

The patient was seen for a routine primary clinician contact on December 2, 2024 during which the patient reported anxiety. The primary clinician noted that coping skills were "explored" but there was no evidence of clinical interventions being provided.

The patient was transferred to CIW on January 28, 2025, within required timeframes.

---

[1] Her date of birth on record indicates she is 47 years old, yet the patient reported that date was incorrect and she was actually 62 years old.

**Findings**

Mental health services provided to this patient were inadequate. Despite the fact that the patient was seen more often than required, the initial primary clinician assessment was incomplete, there was no initial treatment plan, no rationale for diagnoses provided, and disparate diagnoses provided by the primary clinician and psychiatrist. When the patient was seen for a clinical contact, no evidence of therapeutic interventions was documented.

**Patient B**

This 49-year-old female patient was provided with diagnoses of bipolar I disorder, current or most recent episode depressed, unspecified; borderline personality disorder; posttraumatic stress disorder; and amphetamine-type substance use disorder, severe. She was fully adherent to her prescribed trazodone. Her case was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the 3CMS level of care. This patient was received within CDCR for the first time on October 23, 2024.

The patient arrived with limited healthcare records from the jail yet her psychotropic medications were appropriately continued upon arrival. Her initial health screening was completed on the day of her arrival and included completion of the mental health screening questions. An adequate mental health screening was completed on October 25, 2024 in keeping with requirements. The patient's screening was positive and she was seen for a primary clinician initial assessment timely, on October 30, 2024. The assessment was not adequate as it included the same text copied and pasted into multiple sections of the assessment. The presenting problem, history of present illness, clinical summary and case formulation all included the same language, much of which was taken from the mental health screening. The patient was provided with the above-listed diagnoses without rationale or support for the criteria. There was no initial treatment plan and no rationale provided for the patient's placement at the 3CMS level of care.

An initial psychiatric assessment was completed on November 8, 2024 with much of the content being copied from the initial primary clinician assessment. The psychiatrist provided the patient with diagnoses of borderline personality disorder, posttraumatic stress disorder, and amphetamine-type substance use disorder but did not include the previously provided bipolar diagnosis. No rationale for diagnostic impressions was documented. The psychiatrist told the patient that the prescribed trazodone would be discontinued in 90 days as it was not on the formulary and the patient refused to take any other medication.

The patient was seen for a routine primary clinician contact on December 11, 2024. The patient reported having symptoms triggered by a fight in her room and the primary clinician documented appropriate interventions in response. No initial treatment plan was documented other than "routine" follow up with the primary clinician. There was evidence in the record that NLTGs were offered to the patient a few times in the following weeks and the patient typically attended. It was unclear when the patient was transferred to mainline 3CMS, but the next contact with a primary clinician occurred on February 3, 2025 in mainline, indicating that she was transferred within required timeframes.

**Findings**

The mental health services provided to this patient while in the reception center were inadequate secondary to inadequate initial assessments, the absence of an initial treatment plan, poor diagnostic formulation, and the lack of rationale for her placement at the 3CMS level of care. On the positive side, clinically relevant interventions were provided by her primary clinician and NLTGs were offered during her time in the RC.

**Patient C**

This 24-year-old female patient was provided diagnoses of unspecified anxiety disorder; alcohol use disorder, severe; amphetamine-type substance use disorder, severe; and opioid use disorder, severe. She was not prescribed psychotropic medications. Her case was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the 3CMS level of care. This patient had one prior period of incarceration within CDCR for thirty days in 2020 and did not receive mental health services during that time. She was incarceration again on October 15, 2024.

The patient arrived at CCWF with her jail records which did not include evidence of mental health treatment or psychotropic medications. An initial health screening was completed on the day of arrival and was adequate, including documented responses to all mental health questions. The patient reported a history of treatment for depression and anxiety as well as suicide attempts with the last one occurring two years prior. A mental health screening was completed the same day and was adequate, indicating positive findings and the need for further assessment.

An initial primary clinician assessment was completed on October 25, 2024 and was inadequate. Most sections included the same information copied and pasted into the form and a number of sections were left blank or minimally completed. The above-listed diagnoses were provided without rationale and there was no initial treatment plan created. No rationale was documented for the patient's placement at the 3CMS level of care and there was no suicide risk assessment completed despite the patient's history of suicide attempts and the presence of identifiable risk factors. An initial psychiatric assessment was completed on October 29, 2024 with most of the content being copied from the initial primary clinician assessment. The psychiatrist prescribed mirtazapine and sertraline with targeted symptoms documented and a plan for routine follow up with the psychiatrist and a primary clinician, approximating an initial treatment plan.

The patient was seen for a routine consult on October 29, 2024, the origin of which was not clear. The patient reported having an anxiety attack and appropriate interventions were provided however the plan for follow-up was vague. The patient was seen again on November 4, 2024 for a routine contact and other than an updated mental status examination, the documentation was copied from the patient's initial assessment and there was no evidence of treatment interventions being provided and no mention of the patient's anxiety attack less than a week prior. The patient was seen by the psychiatrist on November 25, 2024 secondary to non-adherence with her prescribed sertraline, which was discontinued at the patient's request. On December 3, 2024, a referral was placed by a correctional officer noting that the patient wanted to talk with mental health secondary to problems at home. The patient was seen the next day and denied the need to

be seen, stating that her issues had been resolved, but instead asked for paper from the clinician. Other than a mental status examination, there was no indication of a clinical interaction. The patient was offered a few NLTGs prior to her transfer on December 27, 2024.

**Findings**

Mental health services provided to this patient were not adequate. The initial assessments were inadequate and there was no evidence of an adequate suicide risk evaluation being completed despite clinical indications. The psychiatrist documented an initial treatment plan, which was a positive finding.

**Patient D**

This 34-year-old female patient was provided with diagnoses of amphetamine-type substance (or other stimulant)-induced bipolar and related disorder, with moderate or severe use disorder and posttraumatic stress disorder. Her case was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the 3CMS level of care. This patient was received within CDCR for the first time on September 12, 2024.

The patient arrived with her jail records indicating an active prescription for quetiapine which was continued upon her arrival. An initial health screening was completed on the day of her arrival with responses to all mental health questions documented. A mental health screening was completed the same day and was adequate, indicating a positive screen and the need for a full assessment. An initial primary clinician assessment was completed timely on September 18, 2024 and included content taken from previous documentation with little to no evidence of an assessment being completed beyond a mental status examination. A number of sections were left blank. Both above-listed diagnoses were noted to be provisional and based on the patient's previous diagnoses and current self-report that bipolar symptoms were evident only when the patient was using substances. No rationale was provided for the patient's placement at the 3CMS level of care and there was no initial treatment plan documented. An initial psychiatric assessment was completed on September 23, 2024 and was minimally adequate with much of the information being copied from previous assessments. The patient reported that the medication was not effective and it was discontinued as a result. The psychiatrist provided diagnoses of unspecified anxiety disorder and amphetamine-type substance use disorder without rationale or discussion of the diagnoses provided by the psychologist who completed the initial primary clinician assessment. The psychiatrist prescribed mirtazapine and a PRN for hydroxyzine to address the patient's anxiety and lack of sleep. The initial treatment plan was minimally adequate.

A routine primary clinician contact occurred on September 24, 2024 with no evidence of clinical interventions being provided to address the patient's reported anxiety. Diagnoses remained unchanged and the psychiatrist's assessment was not recognized in the documentation. The patient submitted a healthcare request to have all her medications stopped on November 14, 2024 and again on November 19, 2024. The psychiatrist saw the patient on November 19, 2024 and her medications were discontinued secondary to refusal and her desire to stop taking them. The patient requested to be removed from the MHSDS and the psychiatrist documented that removal

would be considered. The patient submitted another request on November 22, 2024, asking to be removed from the MHSDS. She was seen on November 26, 2024 in response to that request and after gathering collateral information from the custody staff on the patient's unit, the psychologist removed the patient from the MHSDS. There was no mention of her recent medication changes or opinion of the psychiatrist.

**Findings**

Mental health services provided to this patient were inadequate. While the decision to remove the patient from the MHSDS appeared to meet her needs, the decision should have been documented as an IDTT decision. Further, improvement were needed with regard to initial assessments and diagnostic clarification.

**Patient E**

This 20-year-old transgender male patient's record was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the 3CMS level of care. This patient was provided with diagnoses of unspecified depressive disorder and cannabis use disorder, moderate, in early remission. He was adherent to his prescribed aripiprazole, fluoxetine, and hydroxyzine. This patient was incarcerated for the first time within CDCR on January 30, 2025.

The patient arrived to CDCR with records from the jail indicating prescriptions for aripiprazole, diphenhydramine, fluoxetine, melatonin, and a PRN of trazodone. These medications were continued; and both the trazodone and diphenhydramine were ordered to be crushed and floated. An initial health screening was completed on the day of arrival and responses to all mental health questions were documented. A mental health screening was completed timely on February 3, 2025 by an unlicensed psychologist with no evidence of review by a licensed psychologist or supervisor. The screening was positive. The same unlicensed psychologist completed the initial primary clinician assessment on February 10, 2025 and while timely, there was no evidence of supervisory review of the documentation. The assessment was adequate and included rationale for the patient's diagnosis and placement at the 3CMS level of care. There was no initial treatment plan. The patient was seen for an initial psychiatric assessment on February 20, 2025, nearly three weeks after arrival within CDCR. A non-adherence report was also addressed during this contact. The patient reported experiencing hallucinations, which had been denied during previous assessments. The psychiatrist did not note this discrepancy of the patient's self-reported symptoms. Given the reported symptoms, the psychiatrist provided differential diagnoses of schizophrenia spectrum vs. substance induced psychosis, mood disorder, anxiety disorder, insomnia, and substance use disorder. The psychiatrist included a brief initial treatment plan.

The patient was offered NLTGs while in the RC.

**Findings**

Mental health services provided to this patient while in the RC were adequate.

**Patient F**

This 29-year-old patient's record was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the EOP level of care. The diagnosis of record was generalized anxiety disorder which was dated from May 2022 when the patient was on parole and not incarcerated within CDCR. The patient was not prescribed medications. This patient was incarcerated within CDCR for the first time in June 2018. She was placed at the MHCB level of care in Jun 2019 and discharged to the 3CMS level of care for only four days before returning to the MHCB. On July 17, 2019, she was discharged to the EOP level of care. She had two additional MHCB stays, returning each time to the EOP level of care until her release in January 2020. She returned to CDCR for her current period of incarceration on October 14, 2024.

The records received from the county jail indicated that this patient was provided with diagnoses of bipolar disorder, current episode manic, severe, with psychotic features; cannabis dependence, uncomplicated; and other stimulant dependence, uncomplicated. There were no active psychotropic medications listed in her jail records. An initial health screening was completed on the day of her arrival into CDCR and was adequate, included documented responses to all mental health questions. The screening included a list of the patient's diagnoses provided during her previous incarceration which included bipolar I disorder, current or most recent episode depressed, in full remission and unspecified schizophrenia spectrum and other psychotic disorder, both of which were provided to the patient in June 2019. A mental health screening was completed the day after her arrival which was adequate. The findings were positive.

An initial primary clinician assessment was completed on October 17, 2024 by an unlicensed psychologist with no evidence of supervisory review. The patient denied all current mental health symptoms and attributed her previous psychiatric issues to drug use. The assessment included a review of the patient's history including her placements at higher levels of care and her most recent level of care within CDCR at EOP. The patient expressed a desire for substance use treatment. The assessment included a clear mental status and no documented symptoms. The patient's level of care was listed as "per IDTT" yet an EOP functional evaluation was completed and noted that the patient was placed at the EOP level of care. The patient's previous diagnoses from 2019 were retained without explanation. An initial treatment plan was created and was vague and minimally adequate. An initial psychiatric assessment was completed the following day and was adequate. The psychiatrist provided diagnoses of "unspecified psychosis/BAD", and amphetamine use disorder without rationale but seeming based on the patient's psychiatric history. As the patient was not interested in taking medications, none were prescribed.

An initial IDTT was held on October 22, 2024 with required staff and the patient present. The content was adequate and the rationale for her placement at the EOP level of care was to "further evaluate her treatment needs." Appropriate measurable goals were documented along with adequate interventions. The discharge criteria appeared generic as they included medication compliance as required for discharge, yet the patient was not prescribed medications. She was seen for routine weekly primary clinician contacts on October 22 and 30, 2024; however, there

was no mention of the patient's treatment goals or evidence of treatment interventions being provided. There was no evidence that groups were provided to this patient while she was housed in the RC; however, a recreational therapist provided in-cell activities to the patient on November 1, 2024. The patient transferred to a mainline EOP unit for services on November 6, 2024.

**Findings**

Treatment of this patient was adequate; however, she was not provided with the required number of structured therapeutic activities required for EOP patients in the RC.

**Patient G**

This 31-year-old patient's record was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the EOP level of care. The patient was provided with diagnoses of major depressive disorder, recurrent episode, moderate; posttraumatic stress disorder; borderline personality disorder; amphetamine-type substance use disorder, severe; and alcohol use disorder, moderate, in early remission. Of note, all of these diagnoses were provided during previous periods of incarceration dating back to 2018-2020. The patient was fully adherent to her prescribed mirtazapine, olanzapine, sertraline, and benztropine, but only moderately adherent to her prescribed trazodone.

This patient was incarcerated within CDCR on two previous occasions. The first incarceration lasted from February 2015 through July 2016. During that time, the patient was treated at the 3CMS, EOP, and MHCB levels of care. Upon her return to CDCR in July 2017, she received treatment at all levels of care including 3CMS, EOP, MHCB, ICF, and Acute. In December 2021, she was admitted to Patton State Hospital (PSH) and remained there for over a year. Following her discharge from PSH, she continued to experience changes in her level of care including EOP, MHCB, ICF, and Acute placements. She was released from CDCR on April 3, 2024 while receiving services at the EOP level of care. The patient was most recently incarcerated on September 12, 2024.

Records were received from the patient's stay in county jail indicating a prescription for trazodone which was continued upon arrival. Records also included a number of x-ray results secondary to the patient swallowing foreign objects, including in the week prior to her transfer to CDCR. An initial health screening was completed on the day of the patient's arrival. The nurse noted the patient's recent foreign body ingestion and documented responses to all mental health questions. The patient reported recent suicidal ideation as well as a suicide attempt in the previous 12 months. An urgent referral to mental health was generated. The patient was seen later that same day for the consult and an initial mental health screening. Of note, the consult indicated that that patient was placed at the EOP level of care, yet it was unclear who made the placement or what the rationale was. The screening was positive for mental health needs. Later that same day, the patient was seen in the TTA where she again mentioned swallowing the foreign object prior to her transfer and reported experiencing auditory hallucinations. The on-call psychiatrist placed the patient on 1:1 suicide watch despite the patient's denying suicidal

thoughts or plans. There was no documentation from the psychiatrist providing rationale for this decision.

The patient was seen the following morning and a SRE was completed. The evaluation was adequate and provided clear justification for the current risk rating of low and the decision to rescind the referral to MHCB. The patient was returned to her previous housing with an adequate plan and referral for five-day follow-up contacts. Unfortunately, no safety plan was initiated despite a clinical indication for a plan given the patient's recent and distant history of engaging in self-injurious behavior for secondary gain. The following day, the patient was seen for the first five-day follow-up and was cleared from custody checks with no concerns noted. Later that same day, a pre-screening for placement in the RHU was documented with no indication for a need for referral to mental health. There was no documentation as to why the patient was being placed in the RHU but later documentation indicated it was for battery on a staff member. Later that night, the patient was seen by nursing in response to an emergent request by custody staff who reported that they could not see the patient inside a TTM and the patient was not responding verbally to the officers. The patient was noted to have both hands cuffed behind her back in the TTM. The patient refused assessment by the responding nurse but reported anxiety and auditory hallucinations. Another emergency call was initiated and the patient reported the need for antidepressant medication. An on-call telepsychiatrist was unable to evaluate the patient due to a lack of equipment and/or lack of a telepresenter. The psychiatrist noted that the patient was denying suicidal ideation but inaccurately documented that the patient's most recent SRASHE indicated high chronic and high acute risk for suicide. The patient was referred to the MHCB and placed on 1:1 observation. The patient reported chest pain and then reported swallowing a toothbrush, stating that she could not remain in a smock overnight and wanted to be transferred. When the patient was seen for a five-day follow-up the following morning, she was placed at the MHCB level of care. An updated SRE was completed, assessing the patient to be at moderate risk for suicide with adequate rationale. An initial primary clinician assessment was also completed at that time, indicating that the reason for completion was for the level change from EOP to MHCB. Other than a description of the patient's presenting problem (which was copied into the section for the case formulation) and a history taken from previous documentation, most of the assessment was blank.

The patient was transferred to another facility on September 15, 2024.

**Findings**

Treatment of this patient was inadequate. While the patient was seen for initial screenings as required, responses to the patient's emergent requests were inadequate. On-call psychiatrists did not assess the patient and used inaccurate information to make clinical decisions. Further, the psychologist who completed the patient's initial SRE did not engage in safety planning, which could have assisted the patient in avoiding the next crisis and alerted other staff to the patient's use of self-harm to influence her environment, although, as the psychiatrist failed to review the most recent SRE, that information would not have been used if it had been documented. The patient was not provided with updated diagnoses and there was no indication as to how or why the patient was placed at the EOP level of care upon her arrival.

**Patient H**

This 27-year-old patient's record was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the EOP level of care. She was provided with a diagnosis of severe recurrent major depression with psychotic features. She was fully adherent to her prescribed aripiprazole. This patient was incarcerated within CDCR for the first time on December 26, 2024.

The patient arrived from county jail with records with no psychotropic medications prescribed. An initial health screening was conducted on the day of her arrival and responses to all mental health questions were documented. Given the patient's responses, an urgent referral to mental health was generated. Despite this urgent referral requiring follow-up within 24 hours, the patient was not seen until January 7, 2025. The contact was for a mental health screening, which also occurred later than required by the Program Guide. The content of the screening was adequate, acknowledged the patient's upcoming release date, and indicated a diagnostic hypothesis along with a positive findings for the screening. A timely initial primary clinician assessment was completed on January 9, 2025 yet was completed by a telepsychologist who documented that the patient's hygiene could not be assessed due to the virtual nature of the contact. The assessment was comprehensive but failed to include a diagnosis or initial treatment plan. Additionally, the recommendation was for the patient to be placed at the 3CMS level of care without rationale.

An initial psychiatric assessment was scheduled for January 15, 2025 but the patient refused, reporting to the psychiatrist that she was feeling ill. The psychiatrist noted that the patient should be rescheduled in one week. Within 20 minutes of that contact, an urgent referral was placed by a correctional officer noting that the patient was hostile, aggressive, had poor attention, exhibiting bizarre behavior, poor appetite, unpredictable behavior, had bad hygiene, and was not appropriately caring for herself. Concerns about the patient were also reported during the morning huddle which resulted in a psychologist reaching out to the psychiatrist for more information. The psychiatrist reported that the patient needed to be seen by someone "today" and that the psychiatrist believed the patient required placement in the EOP program. It is unclear why the psychiatrist did not document the need for urgent follow up or any of these concerns in the original note.

The patient was seen for the urgent consult by a psychologist who noted the patient had many scabs on her face and hands but otherwise had adequate grooming. Of note, the initial assessment completed during the same interaction with the patient noted that the patient was unkempt. She appeared depressed and there were reports from staff and peers about her lack of cleanliness and failure to take her insulin as prescribed. The psychologist referred the patient to the EOP level of care and completed an initial assessment to enact that change. The psychologist provided a diagnosis and an initial treatment plan. The patient was relocated to mainline EOP that same day.

**Findings**

Treatment of this patient was inadequate. Initial mental health screening was not timely, there were a few significant inconsistencies noted in the documentation by both a psychiatrist and psychologist, and the initial primary clinician assessment completed in January failed to include a diagnosis or initial treatment plan. Further, the decision to place the patient at the 3CMS level of care was not adequately justified.

**Patient I**

This 25-year-old patient's record was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the EOP level of care. She was provided with diagnoses of schizoaffective disorder, bipolar type and alcohol use disorder, severe. She was fully adherent to her prescribed olanzapine, partially adherent to propranolol. This patient was incarcerated within CDCR for the first time on October 23, 2024.

The patient arrived to CDCR with her jail records which did not evidence prescriptions for psychotropic medications, yet there were diagnoses of mood disorder, psychotic disorder, substance related disorder, and anxiety disorder in her records. An initial health screening was completed on the day of her arrival and responses to all mental health questions were recorded yet the patient denied any mental health history and the nurse did not acknowledge the presence of psychiatric diagnoses in the patient's jail records. The patient was seen for a mental health screening by an unlicensed psychologist on October 29, 2024. Documentation was not co-signed by a licensed supervisor. During the mental health screening, the patient provided information that differed from what was documented by nursing staff. The patient reported a history of suicide attempts, involuntary inpatient hospitalization, and psychiatric symptoms. The clinician evidenced review of the jail records and the screening was positive for mental health needs.

On October 30, 2024, the patient refused her initial health and physical and the physician questioned whether the patient needed to be placed at the EOP level of care. A referral was placed to mental health staff on November 4, 2024 by a correctional officer who noted that that patient was having a hard time adjusting to the RC. An initial primary clinician assessment was completed that same day. The patient was noted to have poor hygiene and presented with disorganized thinking and speech and unusual movements. She appeared to be responding to internal stimuli and the psychologist noted that staff and peers on her unit described her as behaving oddly. The assessment was a challenge to complete given the patient's inability to engage, so most of the content was reliant on records, observations, and input from collateral sources. The psychologist provided the above-listed diagnoses and indicated that the patient should be placed at the EOP level of care; however, no initial treatment plan was documented. The patient was relocated to the EOP housing unit later that day.

**Findings**

Treatment of this patient was adequate; however, there was no initial treatment plan developed following the initial mental health assessment.

**Patient J**

This 38-year-old patient's record was selected at random for review of patients who arrived at the reception center at CCWF during the monitoring period and placed at the EOP level of care. She was provided with a diagnosis of schizophreniform disorder and was fully adherent to her prescribed mirtazapine. This patient was incarcerated within CDCR for the first time on December 18, 2024.

The patient arrived to CDCR with her jail records indicating an active prescription for mirtazapine as well as melatonin. Both medications were continued. She was seen for an initial health screening on the day of her arrival. The patient denied mental health concerns and any mental health history and the nurse did not document evidence of mental health treatment from the jail records other than noting the presence of psychotropic medication prescriptions. On December 20, 2024 that patient submitted two healthcare requests, one to speak with mental health about stress and anxiety, and the other asking for an increase in medications to manage the same symptoms. She submitted another request for an increase in medications on December 21, 2024 and another on December 23, 2024 asking to speak to a psychiatrist about medications. A mental health screening was completed by an unlicensed psychologist on December 24, 2024 and documentation was not co-signed by a licensed supervisor. The screening was positive for mental health needs but made no mention of the patient's healthcare requests. There was no evidence in the record that these healthcare requests were resolved. On December 26, 2024, a correctional officer submitted a referral to mental health as the patient "has too many issues and bothers others too much." The urgency of the referral was not indicated but the correctional officer asked that someone see the patient "instantly."

An unlicensed social worker met with the patient for an initial primary clinician assessment and in response to the urgent referral on December 26, 2024. The documentation was not co-signed by a licensed supervisor. There was no mention of the patient's healthcare requests, dating back over five days. The assessment revealed that the patient's speech was pressured and paranoid in content. Collateral information and the patient's self-report noted that the patient had to have her housing changed multiple times due to conflict with others secondary to her beliefs and behavior. The assessment was adequate and included a diagnosis, initial treatment plan, and rationale for placing the patient at the EOP level of care. The patient was transferred to the mainline EOP unit the same day.

**Findings**

Treatment of this patient was adequate. Two concerns were noted. The first was the lack of co-signatures on the documentation of unlicensed clinicians and the second was the failure to respond to the patient's healthcare requests.

**Patient K**

This 42-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the 3CMS level of care at CCWF. There was no diagnosis provided to this patient and she was not prescribed any medications. This patient was incarcerated for the first time within CDCR in 2007 and did not receive mental health services. She was released on parole in July 2010 and returned to CDCR on October 9, 2024.

She was placed at the 3CMS level of care while in the RHU at CCWF on October 15, 2024. Surprisingly, during her RHU pre-placement screening, the patient was noted as being at the 3CMS level of care. A review of her initial health screening revealed that she was prescribed melatonin by psychiatry while at the county jail and the medication was continued upon reception. The patient was seen cell-front for an RHU screening by a psychiatric technician and denied any mental health concerns. On October 15, 2024 the patient was seen for a reception mental health screening at cell-front secondary to refusal. The psychologist noted that the patient's placement in RHU was secondary to having been maximum security status during her previous incarceration. The patient screened positive for mental health needs. An initial primary clinician assessment was completed cell-front during the same contact. The assessment was adequate given the limited information provided by the patient. The patient reported that she had no mental health concerns and wanted to have her melatonin discontinued and asked to be removed from the MHSDS.

On October 17, 2024, the patient was removed from RHU.

**Findings**

The treatment of this patient while in the RHU was adequate.

**Patient L**

This 25-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the 3CMS level of care at CCWF. She was provided with diagnoses of unspecified depressive disorder; unspecified anxiety disorder; alcohol use disorder, moderate, and cannabis use disorder, severe. The patient was fully adherent to her prescribe venlafaxine and partially adherent to her prescribed oxcarbazepine and hydroxyzine.

This patient was incarcerated for the first and only time within CDCR on September 12, 2024. She was placed at the 3CMS level of care while in the RC and was moved to the RHU on November 16, 2024. The RHU pre-placement assessment was completed and the patient was urgently referred to mental health. An on-call psychiatrist placed the patient on 1:1 watch and made a referral to the MHCB. She had engaged in self-injury by burning her neck and reported suicidal ideation to the nurse. The psychiatrist did not evaluate the patient. The patient was seen for a SRE at cell front secondary to "institutional challenges" which "prevented inmate movement" despite the patient wishing to be seen in a confidential setting. The SRE included information that was inconsistent with documentation in the record indicating that the clinician did not adequately review the patient's record. Specifically, the SRE did not accurately note the patient's self-injurious behavior and relied solely on her self-report denying suicidal ideation. The patient was assessed to be at low risk for suicide, which appeared to be an underestimation given the number of risk factors identified. The narrative noted a short "safety plan" which included increasing the patient's distress tolerance, developing coping skills, and "navigating" housing in RHU. No formal safety plan was developed noting that it was not clinically indicated which was contradictory given what was written in the narrative. The patient was placed on five-day follow-ups and the MHCB referral was rescinded.

All of the five-day follow-up contacts were held in non-confidential locations and all noted that the patient's safety plan was reviewed, despite the absence of a formal safety plan. An initial mental health assessment was completed in a non-confidential location on November 18, 2024. Other than a short paragraph describing the patient's current disciplinary status and vaguely referring to her mental health needs being placed in both the presenting problems and clinical summary sections, much of the initial assessment was left blank. There was no clinical assessment of her mental health needs and no indication that a mental status examination was completed. There was also text copied from the patient's initial assessment completed in RC in the clinical summary and case formulation sections. The assessment was inadequate. An initial psychiatric assessment was completed the following day in a confidential setting via telepsychiatry. The assessment was adequate and included evidence of medication adjustments in keeping with the patient's needs and documented interventions to address the patient's distress.

An initial IDTT meeting was held on November 20, 2024 with required staff and the patient present. The psychiatrist was not assigned to the patient but was the psychiatrist who completed the initial assessment. Documentation indicated that the patient's safety plan was reviewed during the meeting, yet the document was blank as no safety plan had been created with this patient. The clinical summary was copied, unchanged, from the initial assessment without any input from other IDTT members and the sections on patient strengths and patient's stated goals were blank. There was one goal created to address anxiety without any baseline being provided and inadequate interventions. The rationale for remaining at the 3CMS level of care was documented.

The primary clinician saw the patient for two individual contacts, both were non-confidential secondary to reasons other than patient refusal. Despite evidence of distress, there was no indication that clinical interventions were provided to the patient. The patient was offered a 90-minute group on December 5, 2024 but was noted as "No show" without further documentation. The patient did attend a group on December 12, 2024. On December 16, 2024 a referral from medical staff was sent to mental health as the patient reported feeling anxious and nervous. The patient declined to meet with her primary clinician in response to the referral. The patient was seen for a routine psychiatric contact on December 17, 2024 during which she reported feeling depressed and tired all the time and discussed her recent anxiety attack. The psychiatrist made medication adjustments and provided supportive psychotherapy.

**Findings**

Despite quality psychiatric contacts and the provision of required groups, treatment of this patient was inadequate. The patient's five-day follow-up contacts were not in keeping with expectations, her SRE underestimated her suicide risk, her initial primary clinician assessment was inadequate, and subsequent primary clinician contacts lacked evidence of clinical interventions. Most contacts offered by the primary clinician were non-confidential despite the patient's willingness to meet privately. The psychiatrist was able to provide confidential contacts.

**Patient M**

This 42-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the 3CMS level of care at CCWF. She was provided with diagnoses of PTSD, adjustment disorder with anxiety, unspecified mood disorder, alcohol use disorder severe and opioid use disorder severe. Of note, there was documentation of a diagnosis of bipolar disorder in progress notes and community hospital documentation. She was fully adherent to her prescribed olanzapine, oxcarbazepine, and sertraline. This patient was incarcerated for the first and only time within CDCR in November 2023 and was placed at the 3CMS level of care while in the RC. While at the 3CMS level of care, she had six rescinded referrals to MHCB prior to being placed within the RHU on September 17, 2024.

On September 16, 2024, the patient reported ingesting hand sanitizer in what she reported to be a suicide attempt. She was sent to a community hospital for assessment but refused to be seen and assaulted an officer who was transporting her to the hospital. Upon return to CCWF, she was placed on 1:1 status in alternative housing. Her ethanol level was documented as 246 (significantly elevated). The patient was seen at cell-front the following morning after refusing to be seen in a confidential space. The patient denied suicidal ideation and the primary clinician documented "informal IDTT determined Bx to be neither SIB or SA" without further explanation as to who was consulted or what was discussed to make this determination. A shortened suicide risk assessment was completed and noted that a full assessment was not clinically indicated. The patient's suicide risk was assessed to be low and she was noted to be having problems adjusting to housing and noted that her recent referrals to higher levels of care were secondary to substance use or "attempting to escape interpersonal stressors." Despite this statement, no safety plan was created with the patient to address her behavior which was determined to be motivated by secondary gain. Five-day follow-up contacts were completed over the next five days. The first contact noted that while in mainline, the patient's primary clinician documented that the patient was to be considered for elevation to the EOP level of care during her next IDTT meeting. All five-day follow-up contacts were completed cell-front secondary to patient refusal and no concerns were noted.

An initial psychiatric assessment was completed via telepsychiatry on September 20, 2024. The assessment was adequate and noted that the patient was at overall moderate risk for suicide which was mitigated by her lack of current intent, compliance with medications, and access to mental health staff. The psychiatrist noted diagnostic clarification was needed to discern between a mood disorder and a substance-induced mood disorder. The psychiatrist also documented an anxiety disorder and substance use disorder. The assessment was adequate. An initial primary clinician assessment was completed the same day. The presenting problem was pulled forward from November 2023 with no reference to the patient's recent dangerous behavior. The clinical summary was brief and noted that the patient would remain at the 3CMS level of care in order to be observed by the RHU clinical team to determine her needs. The majority of the content was pulled forward from previous assessments but was mostly adequate.

An initial IDTT was held timely with required staff and the patient present, although the patient's assigned primary clinician was not in attendance. The patient was flagged for a necessary review to determine if a higher level of care was indicated given the high number of MHCB referrals in

the previous six months. The rationale for retaining her at the 3CMS level of care and treatment modifications were adequate. The patient's substance use was noted as the primary concern and appropriate treatment goals were documented with adequate interventions.

The patient was seen for routine telepsychiatry and primary clinician contacts. While the patient attended telepsychiatry appointments, group contacts, substance use treatment contacts, and medical appointments, she was consistently documented as refusing contacts with her assigned primary clinician. When she did not refuse contacts, the primary clinician documented seeing the patient during yard time. There was no evidence that the treatment goals were addressed or that the treatment interventions outlined on the patient's treatment plan were implemented at any point during her stay in the RHU. The patient was offered 90-minute groups during the month of October and was released from the RHU on October 31, 2024.

**Findings**

Treatment of this patient was inadequate. The patient had multiple crisis episodes in the months leading up to her placement in RHU indicating that a higher level of care might be indicated and her previous primary clinician noted that EOP placement should be considered. Despite this, the RHU treatment team decided to keep her at the 3CMS level of care with treatment modifications to address her substance use and interpersonal skills. There was no evidence that these modifications were put into place and the patient released from RHU only to immediately require crisis intervention. Documentation indicated that the patient refused primary clinician contacts. On the positive side, the patient was seen as required and offered 90-minute groups weekly.

**Patient N**

This 41-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the 3CMS level of care at CCWF. She was provided with diagnoses of delusional disorder, PTSD, major depressive disorder, and generalized anxiety disorder. She was fully adherent to her prescribed venlafaxine and partially adherent to aripiprazole and buspirone.

This patient was incarcerated for the first and only time within CDCR in August 2022 and was placed at the 3CMS level of care while in the RC. She was admitted to the MHCB on May 3, 2023 and discharged to the EOP level of care later that month. She returned to the 3CMS level of care on September 20, 2023, was readmitted to MHCB within two weeks, was discharged to the 3CMS level of care for one day and was again re-admitted to the MHCB. She was discharged to the EOP level of care on October 19, 2023. Her level of care was reduced to 3CMS on November 1, 2023 and she was placed within the RHU at CCWF on July 28, 2024.

During the review period, the patient was offered weekly sessions with her primary clinician but reportedly refused all contacts and was seen cell front. There was no evidence of treatment interventions being provided, even when the primary clinician noted increased anxiety. The telepsychiatrist saw the patient for one contact during the review period and the patient reported significant symptoms including night terrors, paranoia, sleep disturbance, anxiety, and depression. The patient's medication concerns were appropriately addressed.

The patient was not offered weekly groups as required.

**Findings**

Treatment of this patient was inadequate. Other than responsive psychiatric contacts, the patient was not provided with treatment necessary to address her mental health needs.

**Patient O**

This 35-year-old transgender male patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the 3CMS level of care at CCWF. He was provided with diagnoses of schizoaffective disorder, bipolar type and PTSD. He was fully adherent to his prescribed buspirone, lithium, and duloxetine and partially adherent to his prescribed risperidone. He was also prescribed hydroxyzine, benztropine, and clonidine as PRNs.

This patient was incarcerated for the first time within CDCR on July 1, 2021. He was not treated within the MHSDS until February 24, 2023 when he was placed at the 3CMS level of care. He was admitted to the MHCB and eventually to the Acute and then ICF levels of care from June 11, 2024 through August 13, 2024 when he was discharged to the EOP level of care. He returned to the MHCB level of care in September 2024 and was discharged to the EOP level of care and placed in the RHU on October 7, 2024. On December 10, 2024 while still in the RHU, his level of care was reduced to 3CMS. He transferred to CCWF on December 17, 2024.

Upon arrival at CCWF, an RHU pre-placement screening was completed and incorrectly documented that the patient was not enrolled in MHSDS. Fortunately, the initial health screening completed upon his arrival generated an urgent referral after the patient reported a suicide attempt four months prior. The patient was seen by a licensed psychologist on the day of his arrival. The patient reported placement in RHU for safety reasons and was assessed to have no acute needs. A timely initial primary clinician assessment was completed at cell-front on December 23, 2024 with no rationale provided for the non-confidential assessment. Most of the assessment form was left blank, with the same text being placed in the presenting problems and clinical summary sections. This single copied paragraph indicated that the patient had not received any RVRs since October and was placed in RHU secondary to enemy concerns. He was noted to not have any behavior problems and was medication compliant. There was no indication that a clinical assessment of his mental health needs or mental status examination were conducted. The patient's history and case formulation were copied unchanged from a prior assessment. A timely initial psychiatric assessment was conducted via telepsychiatry on December 24, 2024. Medication non-adherence was also noted as being addressed during this contact. The assessment was adequate and medication adjustments were made to address side effects and patient's reported symptoms.

An initial IDTT meeting was held timely on December 24, 2024. Required staff were present but the patient refused to attend. The fact that the patient had received over three RVRs in the previous 90 days was acknowledged. The discussion of these events as well as the patient's

current functioning was comprehensive and supported the decision to retain the patient at the 3CMS level of care. Treatment modifications were appropriate to the patient's needs and were incorporated into the patient's treatment plan which included measurable goals and appropriate interventions. A safety plan was included in the treatment plan but was documented as having not been reviewed during the meeting.

According to OnDemand, the patient was moved to mainline housing on December 26, 2024.

**Findings**

Mental health services provided to this patient were inadequate. An inadequate initial primary clinician assessment and inaccurate RHU pre-placement screening contributed to this assessed inadequacy. The treatment plan was adequate; however, there was no chance to assess its implementation because the patient returned to mainline housing.

**Patient P**

This 35-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the EOP level of care at CCWF. She was provided with diagnoses of schizoaffective disorder, borderline personality disorder, and methamphetamine abuse. The patient was fully adherent to her prescribed sertraline, risperidone, lithium, and fluphenazine, was partially adherent to propranolol and benztropine, and often refused her prescribed mirtazapine. The patient was noted to be receiving antipsychotic medications under a PC 2602 order secondary to being a danger to herself.

This patient was incarcerated within CDCR since February 2013. She received mental health services at all levels of care (i.e., 3CMS, EOP, MHCB, Acute, ICF) as well as spending nearly a year at Patton State Hospital (PSH) from October 2020 through September 2021. She was discharged from MHCB to the EOP RHU on August 25, 2024.

During the RHU pre-placement screening, the patient reported a belief that others would be harmed if she did not kill herself and was emergently referred to be seen by mental health. The patient was placed in an alternative housing cell on continuous observation at 1537 hours on August 25, 2024. Documentation noted that she was removed from this status at 0824 hours on August 26, 2024. The monitoring form only included documentation of observations from 1800 hours on August 25, 2024 through 0105 on August 26, 2024. It was unclear why there were no observations for the first two-and-a-half hours or for the last seven hours. There was no evidence in the medical record that observations were recorded.

The patient was seen for a suicide risk assessment on August 26, 2024 and the content was marginally adequate. The justification for a low acute risk rating was less than adequate; however, the safety plan was adequate. There was no acknowledgement of the patient's involuntary medication order secondary to danger to herself. The patient was placed in the RHU secondary to safety concerns and was noted to have a bruised eye. The patient was seen for five-day follow-up contacts, all of which were completed at cell front reportedly because the patient refused to be seen out of cell. They were adequately documented.

An initial primary clinician assessment was conducted on August 27, 2024. The presenting problem section included reasons for the patient's RHU placement and a brief description of the patient's crime, interpersonal conflicts, substance use, motivations, medication adherence and one diagnosis. There was no mention of her PC 2602 order. Most other sections of the document were left blank, including the mental status examination, EOP functional assessment, suicide and self-harm summary, and clinical summary. Only the case formulation was completed, and that was copied from a previous assessment. An initial psychiatric assessment was completed the following day and was adequate.

An initial IDTT was held timely on September 4, 2024. The required staff were present, other than a covering psychiatrist who was not the individual who completed the initial assessment. The patient refused to attend. The patient's safety plan was reviewed. The patient's treatment goals were reasonable and measurable with adequate interventions listed. The rationale for retaining the patient at the EOP level of care was adequate. The patient declined a subsequent individual primary clinician contact.

The patient was offered an adequate number of groups each week but refused to attend. She returned to mainline EOP on September 12, 2024.

**Findings**

Given her brief stay in the RHU, treatment of this patient was adequate. However, there were concerns related to inadequate documentation of monitoring the patient while in alternative housing and a marginally adequate initial primary clinician assessment.

**Patient Q**

This 27-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the EOP level of care at CCWF. She was provided with diagnoses of PTSD and schizophrenia. While in the RHU, the patient was fully adherent to fluoxetine and partially adherent to olanzapine.

This patient was incarcerated for the first and only time within CDCR on May 30, 2024 and was placed at the 3CMS level of care while in the RC. She was admitted to the MHCB on September 21, 2024 and was discharged to the EOP level of care on October 1, 2024. She was placed in the EOP RHU on November 8, 2024 and remained there for less than one week.

Upon arrival, she was seen for an RHU pre-placement screening which noted no acute concerns. An initial primary clinician assessment was completed timely but most of the sections were not completed. The presenting problem section included a brief statement about the patient's lack of distress from her hallucinations. There was no mental status examination completed. The clinical summary was entirely copied from a previous assessment completed in October 2024 other than noting the patient was placed in RHU due to safety concerns related to drug debts. The case formulation was unchanged, which was concerning as it included an assessment of the patient's acute risk for suicide to be high with no actions being taken to address this risk. An

initial psychiatric assessment was completed the following day. It was challenging to discern what content was current and what had been taken from prior assessments so the comprehensive content was unclear in its current relevance.

An initial IDTT meeting was held on November 13, 2024 with an alternate primary clinician, but other required staff. The patient was present. The IDTT documentation did not acknowledge the patient's EOP placement with regard to assessing treatment participation but the safety plan was noted as having been reviewed. The decision to retain the patient at the EOP level of care was adequate and noted functional impairments related to hallucinations, anxiety, and paranoia. The majority of information and the treatment plan were pulled forward for the patient's prior treatment plan and not updated to address her current environment.

The patient was returned to mainline EOP the following day.

**Findings**

Mental health services provided to this patient were not adequate. Despite the timely completion of necessary assessments and the treatment plan, the content of these documents was inadequate and not updated following the patient's placement in restricted setting of the RHU. Of concern was the carrying forward of an assessment of high acute risk for suicide which was not addressed.

**Patient R**

This 32-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the EOP level of care at CCWF. She was provided with diagnoses of bipolar I disorder, current or most recent episode depressed, moderate; borderline personality disorder; antisocial personality disorder; and PTSD. She was fully adherent to her prescribed divalproex sodium and olanzapine.

This patient experienced one prior period of incarceration from April 2012 through December 2018. During that time, she was treated at all levels of care (3CMS, EOP, MHCB, ICF, Acute). Most of her inpatient stays were relatively brief (approximately one month) and she was primarily treated at the EOP level of care with multiple placements in the MHCB. She was incarcerated most recently on January 16, 2025 and was immediately placed at the EOP level of care. She was placed in the EOP RHU on January 30, 2025.

An initial psychiatric assessment was completed the following day. The psychiatric noted that the patient cut another incarcerated individual with a razor. The patient refused to be seen outside of her cell but had been seen for an initial psychiatric assessment four days earlier and much of the information was included from that assessment. The assessment was adequate given the limitations of a cell front contact. An initial primary clinician assessment was completed cell front secondary to patient refusal on February 4, 2025. The patient refused to engage and a chart review was completed resulting in an adequate assessment. An initial IDTT was held on February 5, 2025 with required staff and the patient present; however, an alternate psychiatrist attended. The documentation was adequate and included measurable and reasonable treatment

goals. The interventions were generic and did not reflect evidence-based interventions which could support the patient in achieving her goals.

Over the following two weeks, the patient refused all primary clinician contacts, groups, and her RVR mental health assessment. She did attend one hour of group on February 24, 2025. Later that day, she was seen cell front by her primary clinician for a high-refuser contact. The patient denied environmental or security procedures impacted her decision not to attend clinical appointments and groups. She reported enjoying the group she attended and planned to attend the following day. She did not attend and when seen by her primary clinician, she reported being tired and not wanting to attend a group that was "all day." The patient refused individual primary clinician and psychiatric contacts but did attend a group session for four hours on February 27, 2025. She continued to be seen daily by her primary clinician to encourage group participation.

**Findings**

Treatment of this patient was adequate.

**Patient J**

This 22-year-old female patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the EOP level of care at CCWF. She was provided with a diagnosis of schizoaffective disorder, bipolar type and was fully adherent to her prescribed lithium and olanzapine. She was also prescribed haloperidol, hydroxyzine, and benztropine as PRNs. This patient was incarcerated within CDCR for the first time in July 2023 and was placed at the 3CMS level of care while in the RC. In November 2023, she was placed at the MHCB level of care and discharged to the EOP level of care. Other than a brief stay in the MHCB on April 2024, she has been maintained at the EOP level of care throughout her incarceration. On August 18, 2024 she was moved to the RHU. She returned to mainline EOP for a single day in December but struck a correctional officer in the face three times, unprovoked, and returned to the RHU.

The patient was out to court from September 4, 2024 through October 1, 2024. During that time, recreational therapists continued to document that the patient was offered groups and on September 6, 2024, a psychiatric technician documented that the patient attended a one-hour group with a recreational therapist.

A routine IDTT meeting was held timely in October 2024, an initial was held in December 2024, and a routine meeting was held in February 2025. The patient's assigned psychiatrist was not present for any of the meetings, but instead an alternate psychiatrist was present. The patient's assigned primary clinician was not present for the meeting in December. All other required staff were present and the patient attended the meetings in December and February. In October, the treatment plan included a single treatment goal, which was to remain free from RVRs and dangerousness toward others for 30 days, which the patient achieved as of her that meeting, but the goal was not updated or revised. There was a short-term goal to achieve full medication compliance, which the patient had not met. In December, the only change to the treatment plan

was a long-term goal of no violence or RVRs for 90 days once release from RHU yet other than medications, it was not clear how staff were going to support the patient's achievement of that goal. Rationale for retaining the patient at the EOP level of care was adequate. Documentation at the February meeting was minimally updated.

During the reporting period, all but one of the patient's routine primary clinician contacts were completed at cell front secondary to patient refusal. None of the documentation evidenced the use of clinical interventions. While the patient's medication adherence, as listed on the treatment plan, was routinely reviewed, there were no interventions provided to address the patient's needs. Psychiatric contacts were held monthly with all but one contact being held in a confidential setting. These contacts appeared adequate. The patient routinely attended groups with some refusals which she reported were due to the length of the group sessions and being cuffed throughout the sessions.

In late October, 2024, it was noted that the patient was due to be paroled and would be sent to Patton State Hospital, yet three days prior to her parole date, it was determined that she had received more time.

**Findings**

Treatment of this patient was inadequate. The patient had a history violence and impulsivity resulting in confinement in prison and then within the RHU and yet there was no evidence that the patient was being provided with treatment beyond medications to address her needs.

**Patient T**

This 38-year-old patient's record was randomly selected to assess the quality of mental health care provided within the RHU to patients at the EOP level of care at CCWF. The patient's record reflected the use of both male and female pronouns and it was never explicitly stated with which gender the patient identified. As male pronouns appeared more pervasive, those are being used here. The patient was provided with a diagnosis of schizophrenia. He was not consistently adherent to his prescribed medication regimen which included fluphenazine and olanzapine.

This patient was incarcerated during one prior period from August 2008 through May 2014. He was maintained at the EOP level of care during all but the final four months of his incarceration when he was placed at the 3CMS level of care. He arrived CDCR for his current period of incarceration in June 2024 and immediately placed at the 3CMS level of care. He was elevated to the EOP level of care on October 22, 2024 and placed in the RHU on January 29, 2025.

The patient refused to engage in the RHU pre-placement screening and was urgently referred to be seen by mental health. The patient was seen later that same day for a suicide risk reassessment instead of a full suicide risk evaluation, as he had been assessed to be low risk just over two weeks prior. He was seen in a TTM after being assaultive toward another incarcerated individual and attempted to spit on a correctional officer. The patient denied suicidality and reported being frustrated. He was assessed to be at low risk for suicide and agreed to be transferred to the RHU.

An initial psychiatric assessment was completed cell front on January 31, 2025 and was adequate; however, the rationale for the cell front assessment was not documented. The psychiatrist was familiar with the patient from having seen him previously. Medications were adjusted to address the patient's increase in irritability. A cell front initial primary clinician assessment was completed timely and noted that the patient did not want to meet confidentially. The content was adequate given the non-confidential nature of the interaction.

An initial IDTT meeting was held on February 5, 2025. An alternate psychiatrist attended, but all other required staff were present. The patient did not attend, but documentation did not indicate why the patient was not present. Treatment goals and interventions were pulled forward from previous plans and not updated to reflect the patient's current placement in the RHU and for two of the goals, the treatment interventions still referenced 3CMS services. The goals and interventions were appropriate for a mainline setting but unclear how they would be implemented in the RHU. The rationale for retaining the patient at the EOP level of care was recent violence and bizarre behavior, although the documentation indicated a suspicion that these were due to substance use. Yet, the results of a recent toxicology screening indicated the presence of non-prescribed buprenorphine only, which does not typically result in violence. Of note, the patient had submitted a healthcare request for a pregnancy test on January 31, 2025 which was negative, yet this fact was not mentioned during the IDTT meeting. Upon examination, the patient reported that he was feeling something moving in his stomach yet denied intercourse with a man.

Despite documentation that the patient had been acting in a bizarre fashion prior to placement in the RHU and reported concerns about pregnancy which were not likely, the RVR mental health assessment did not find any impact of mental health symptoms on the patient's behavior and appeared to rely solely on the patient's behavior during the interview and reports from the RHU primary clinician. No contact was made with the individuals treating the patient at the time of the RVR. This assessment was inadequate.

The patient refused most group sessions and began being seen daily as a high refuser on February 24, 2025. The patient refused to speak for two days and then reported frustration with the five-month sentence in the RHU as a reason for refusing to talk. The patient began attending groups on February 27, 2025. The patient refused out of cell contacts with his primary clinician and psychiatrist and all primary clinician contacts reflected superficial interactions without any evidence of clinical interventions. Psychiatric contacts were adequate given the non-confidential nature of the interactions.

**Findings**

Treatment of this patient was inadequate due mostly to the fact that the patient was not properly assessed for psychiatric symptoms evidenced by thoughts of being pregnant and reportedly bizarre behavior not clearly due to substance use. The treatment plan was not updated to reflect the patient's RHU placement and there was no evidence of interventions being provided beyond medication and recreational therapy groups.

**Patient U**

This 30-year-old transgender male patient was provided with a diagnoses of adjustment disorder with mixed anxiety and depressed mood. He was moderately adherent to his prescribed fluoxetine and fully adherent to his prescribed hydroxyzine. His case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This patient was incarcerated for the first and only time within CDCR in September 2022. He was placed at the 3CMS level of care while in the reception center on September 15, 2022 but was discharged from the MHSDS on October 25, 2022. He returned to the 3CMS level of care on August 22, 2023 and remained there until he was admitted to the MHCB on January 31, 2025 from the RHU.

Documentation indicated that the patient was experiencing difficulty adjusting to the RHU environment and made threatening statements toward custody staff after being denied access to the telephone. He was evaluated by an MHPC who noted that the patient was tearful and expressing hopelessness. A SRASHE was completed and noted moderate risk for suicide with adequate rationale. At the time of admission to the MHCB, he was not prescribed any psychotropic medications other than a PRN for hydroxyzine. An initial psychiatric assessment was completed the following day and was adequate.

An initial IDTT was held timely on February 3, 2025 and was attended by an MHPC and MHMD who had not met with the patient previously. A correctional counselor, nurse, recreational therapist, additional psychologist, and the patient were present as well. Documentation was adequate and included measurable and reasonable treatment goals along with appropriate interventions. While the goals were measurable, no baseline rating were provided as benchmarks for progress.

There was documentation of daily clinical contacts by an MHPC, psychiatrist, or both. Individual daily contacts were not held in confidential settings but were routinely held at "bedside." There was evidence of daily contacts with a recreational therapist out of the patient's cell. Clinical contacts did not reflect use of the interventions described on the treatment plan, but the patient was offered an antidepressant medication which he agreed to take. A discharge IDTT was held with required staff and the patient present on February 7, 2025. The content was adequate and reflected appropriately that the patient's treatment goals had been met. The discharge SRASHE and discharge summary were adequate and included appropriate rationale for risk decisions and plan to discharge.

Of note, documentation did not consistently reflect the use of the patient's preferred gender pronouns.

**Findings**

Treatment of this patient was adequate. Of concern, daily clinical contacts were not held in confidential settings and did not reflect use of the interventions outlined in the treatment plan. There was no rationale provided for the lack of confidentiality or failure to provide the planned

interventions. Otherwise, assessments were adequate and the decision to discharge appeared appropriate.

**Patient V**

This 49-year-old female patient was provided with a diagnosis of schizoaffective disorder, bipolar type. She was moderately adherent to her prescribed olanzapine. Her case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period. This patient was incarcerated within CDCR for the first time on November 6, 2024 and was placed into the MHCB on November 13, 2024.

When the patient was seen for her initial mental health screening, she refused to answer any questions and presented as psychotic. She was paranoid, tangential, and displayed bizarre behavior. She denied any psychiatric history when seen by the nurse for her initial health screening a week prior. The unlicensed psychologist who completed the screening and subsequent mental health assessment, SRASHE, and inpatient referral documented consulting with a supervisor about the case. The patient was placed at the MHCB level of care for significant impairment due to mental illness and was provided with a diagnosis of unspecified schizophrenia spectrum disorder.

The patient was seen the following day for an initial IDTT meeting without having been seen for an initial assessment prior to the meeting. The psychiatrist documented that the initial assessment was completed during the IDTT meeting. The initial assessment documentation noted the patient to be acutely manic making it difficult to complete an interview. The patient denied the need for medications, but the psychiatrist determined that medications were necessary to stabilize the patient and noted that a PC 2602 may be pursued if the patient refused medications. IDTT documentation was adequate with measurable and reasonable goals being documented; however, baseline assessments were not provided as a means to gauge treatment progress. Planned interventions were adequate to address the goals. The patient was provided with a provisional diagnosis of schizoaffective disorder, bipolar type, during the meeting and was noted to be manic in her presentation. Initial clothing and privileges were commensurate with the patient’s identified risks.

The following day, November 15, 2024, nurses documented that the patient was receiving medications under a PC 2602 order, yet there was no evidence that a petition had been filed in the patient’s record. The psychiatrist had ordered oral olanzapine along with an injection as a back up in case the patient refused her medications, yet there was no evidence of any PC 2602 order or paperwork in the record. Subsequent documentation by psychiatrists noted clear communication to the patient that an injection would be used if the patient refused medications. A covering psychiatrist who saw the patient on November 16, 2024 noted that the patient’s medications were under a PC 2602 order. This series of documentation evidenced poor communication among team members and/or poor documentation in that there was no documentation indicating that the patient met criteria to receive emergency involuntary medication or criteria to file a petition for a PC 2602. Additionally, there was documentation that nursing chart checks were completed every 24 hours and no mention of these discrepancies were noted. Even if the psychiatrist had determined that the patient was in need of emergency

involuntary treatment, the order for such is limited to 72 hours and this patient had an order for involuntary medication by injection through December 2, 2024 with notation that the patient could not refuse oral medications. Of note, there was no evidence that the patient received an involuntary injection, yet nursing staff were authorized to force medication on this patient for a period of 20 days, even after she was discharged from the MHCB. This is seriously concerning.

The patient was seen daily by the "team" at her bedside, not in a confidential setting yet documentation noted that these contacts were confidential. She was receptive to taking olanzapine over time and stabilized. The patient initially refused daily recreational therapy contacts but began attending groups outside of her cell and made phone calls. The patient was seen on November 22, 2024 for a discharge the IDTT meeting. Required staff and the patient were present. The decision to discharge the patient to the EOP level of care was made with appropriate rationale. Discharge documentation noted both that the patient was not under a PC 2602 order but that injectable medications were ordered as a back-up should the patient refuse her oral medications.

**Findings**

Overall, treatment of this patient was determined to be inadequate. While the patient received medications to stabilize the symptoms of her mental illness which appeared to meet her needs, there were serious concerns with communication and medication orders related to involuntary administration of medications. Further, clinical contact were not offered in confidential settings.

**Patient W**

This 30-year-old female patient was provided with diagnoses of bipolar II disorder, borderline personality disorder, and PTSD. She was fully adherent to her prescribed psychotropic medications which included buspirone, amitriptyline, mirtazapine, olanzapine, and oxcarbazepine. Her case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This patient has been incarcerated within CDCR since May 2016. She was placed at the 3CMS level of care in June 2016. She experienced multiple MHCB admissions, EOP placements, and inpatient admissions to both the Acute and ICF levels of care throughout her incarceration. Her most recent inpatient placement was to the Acute level of care in September 2022. She transitioned to the ICF level of care after one week and was discharged to the EOP level of care after 32 days on October 25, 2022. She returned to the MHCB on two more occasions from the EOP level of care through April 2023, when she was transitioned to the 3CMS level of care. She was admitted to the MHCB on two occasions and was discharged to the EOP level of care in October, 2023. She remained at the EOP level of care through September 2024 when she transferred to 3CMS level of care. She was admitted to the MHCB from the 3CMS level of care on February 3, 2025 after cutting to her forearm.

The patient was seen for an initial psychiatric assessment on February 4, 2025 which noted additional diagnoses of stimulant use disorder and opioid use disorder beyond what was listed above. Documentation indicated that the assessment took place at "bedside along with rest of

treatment team" however, the members of the team were not specified. The content of the assessment was adequate and appropriate rationale was listed for the patient's clothing and privilege allowances. A timely IDTT meeting was held the following day with required staff and the patient in attendance. A safety plan dated October 20, 2023 was noted as having been reviewed in the meeting. The content was out of date and not updated during the meeting. A treatment plan with adequate, measurable, and reasonable goals and interventions was created; however, baseline ratings were not provided to assist in assessment of progress.

The patient was seen "bedside" daily by the treatment team for clinical contacts. Most of these contacts were documented by a psychiatrist who focused on medication interventions. There was evidence of a confidential 1:1 contact with a psychologist on February 6, 2025. The content reflected a supportive interaction but limited evidence of interventions being provided.

The patient was offered out-of-cell recreational activities on weekdays.

On February 13, 2025 a discharge SRASHE was completed with the patient. An updated safety plan was created in collaboration with the patient and appeared adequate. Risk ratings and rationale were also adequate. A discharge IDTT was held that same day with required staff and the patient in attendance. Rationale for the discharge and return to the 3CMS level of care was adequate. Unfortunately, neither IDTT documentation nor the discharge summary reflected the use of interventions outlined on the treatment plan other than medications.

**Findings**

Treatment of this patient was minimally adequate. Daily clinical contacts were not confidential and reflected medication interventions without evidence of therapeutic interventions to support a decrease in self-injury. The patient's safety plan was adequate to address her needs upon discharge. The treatment plan lacked baseline ratings.

**Patient X**

This 32-year-old female patient was provided with diagnoses of schizoaffective disorder, bipolar type; cannabis use disorder, severe; and amphetamine-type substance use disorder, severe. She was partially adherent to her prescribed psychotropic medications which included benztropine, olanzapine, and ziprasidone. Her case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This patient was incarcerated for the first and only time within CDCR on August 14, 2024. She was placed at the 3CMS level of care while at the reception center and was admitted to the MHCB level of care on November 15, 2024. She was discharged to the EOP level of care on November 25, 2024 but returned to the MHCB level of care the following day. Documentation indicated that the patient reported suicidal ideation to the correctional officers on the EOP unit but then denied those statements when seen by an MHPC. The MHPC referred the patient to the psychiatrist as she was tangential and provocative and was not taking her medications as prescribed. When she was seen later that same day by an MHPC for an initial assessment, the MHPC noted that the patient appeared to be severely impaired by her mental illness and referred

the patient back to the MHCB. Despite this referral pending, a psychiatrist saw the patient in response to the earlier referral and made no reference to the patient's need for an MHCB placement but instead scheduled the patient for a routine initial assessment for EOP.

The patient was transferred to the MHCB after being assessed by nursing staff to be tachycardic but refused to be evaluated further. An initial IDTT meeting was held on November 27, 2025 without an initial evaluation being completed prior to the meeting; however, the staff were familiar with the patient given her discharge two days prior and the psychiatrist completed an initial assessment during the meeting. The treatment team noted suspicions that the patient was exaggerating her symptoms and attempting to present herself as more psychotic than she may actually have been. Despite these suspicions, the team created a treatment plan with measurable and reasonable goals and interventions to address her reported symptoms.

The patient was seen daily in her cell by the treatment team. She continued to make bizarre statements and engaged in provocative behavior. The psychiatrist documented uncertainty about how much of her presentation was volitional and noted that the patient likely needed a referral to a higher level of care. Recreational therapy groups were offered on weekdays and the patient was noted to be intrusive with her peers and acted inappropriately in that setting. The IDTT met on December 5, 2024 and referred the patient to the ICF level of care with adequate rationale. The team continued to see the patient daily and conducted a weekly IDTT meeting on December 22, 2024 while awaiting a determination about inpatient placement. The patient transferred to ICF on December 19, 2024.

**Findings**

Treatment of this patient was adequate; however, daily clinical contacts were not confidential. Additionally, interventions appeared limited to medications and unstructured recreational therapy groups. The psychoeducational interventions listed on the treatment plan were not provided.

**Patient Y**

This 29-year-old female patient was provided with diagnoses of PTSD; major depressive disorder, recurrent episode, moderate; and amphetamine-type substance use disorder, severe. She was fully adherent to her prescribed aripiprazole and mirtazapine. Her case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This patient was incarcerated within CDCR for the second time on July 21, 2021. During her previous period of incarceration, from October 2018 through October 2019, she was placed at the 3CMS level of care with one three-day admission to the MHCB. Upon reincarceration, she was immediately placed at the 3CMS level of care and was discharged from the MHSDS in October 2024 for just over two months before being admitted to the MHCB level of care on December 6, 2024. The admission was prompted by the patient's report of command auditory hallucinations and thoughts to harm herself and others. The patient made vague threats and noted that she just wanted time to be alone.

An initial psychiatric evaluation was completed timely. The patient was not prescribed psychotropic medications so the psychiatrist prescribed medications and ordered monitoring and privileges commensurate with the patient's risk level. The patient denied thoughts of suicide or harming others when speaking with the psychiatrist.

The patient was seen by the treatment team in an IDTT meeting on December 9, 2024; however, the psychiatrist present at the meeting had not assessed the patient prior to the meeting. The clinical summary included an incorrect age for the patient and noted that it was her first incarceration within CDCR, when records indicated it was the second period of incarceration. A treatment plan with reasonable and measurable goals and interventions was documented. The patient was seen daily by the treatment team at bedside, not in a confidential setting, with no evidence of treatment interventions beyond medications. The patient was offered daily recreational therapy but refused most days. On December 13, 2024 a discharge SRASHE and IDTT meeting were completed; however, no safety plan was created as required. She was discharged to the 3CMS level of care.

**Findings**

Treatment of this patient was inadequate. The only treatment offered to the patient were psychotropic medications and unstructured recreational therapy groups. There was no evidence of the coping skills, therapeutic interventions, and education outlined in the treatment plan being provided to the patient. Additionally, despite being admitted to MHCB secondary to suicidal ideation, there was no safety plan completed prior to discharge.

**Patient Z**

This 41-year-old female patient was provided with diagnoses of PTSD and adjustment disorder with mixed anxiety and depressed mood. She was moderately adherent to her prescribed duloxetine. She was also prescribed hydroxyzine as needed. Her case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This female patient was incarcerated for the first and only time within CDCR on August 23, 2023. She was placed at the 3CMS level of care while in the reception center. She was referred, but not admitted, to the MHCB level of care on three occasions between that date and December 16, 2024 when she was admitted to the MHCB at CCWF.

The patient was admitted following statements of a plan to kill herself secondary to housing concerns. The patient refused other housing options offered to her and was admitted to MHCB after being assessed to be at high risk for acting on her thoughts of suicide given her history. The patient refused to engage in safety planning. The patient's initial psychiatric assessment was completed during the initial IDTT meeting. The patient's treatment plan included a goal but was vague in regard to the treatment interventions which would be used to support the goal, listing only "CBT" and nothing further.

The patient was seen "bedside" by the treatment team daily with no evidence of treatment interventions being offered or provided. The patient attended a few recreational therapy groups

during which she opened up to the recreational therapist about her thoughts and feelings. The recreational therapist noted that the patient would be referred to an MHPC for an individual session but there was no evidence that this occurred. Additionally, the patient was noted as asking for individual treatment during a bedside encounter, but again, there was no evidence of an individual contact occurring. Further, the patient was overhead discussing suicidal thoughts and behaviors over the phone, yet no referral was made or suicide risk assessment completed following this observation.

An updated SRASHE and safety plan were completed prior to discharge. The safety plan was minimally adequate and lacked specific details regarding interventions and actions that could be taken to reduce suicide risk. Further, the patient discussed using MHCB as a means to secure a change in housing without evidence of interventions being recommended to reduce the occurrence of such behavior. A discharge IDTT was held with limited evidence of treatment progress beyond the patient denying current suicidal ideation.

**Findings**

Treatment of this patient was inadequate. The patient was not provided with any treatment interventions, other than medications, which she did not consistently take as prescribed despite her request for individual sessions and her apparent willingness to discuss her thoughts and feelings with a recreational therapist. The safety plan created prior to discharge was inadequate.

**Patient AA**

This 50-year-old female patient was provided with diagnoses of schizoaffective disorder, depressive type; unspecified personality disorder; alcohol use disorder, moderate; and amphetamine-type substance use disorder, severe. She was mostly adherent to her prescribed psychotropic medications which included aripiprazole, benztropine, buspirone, fluoxetine, mirtazapine, olanzapine, and oxcarbazepine. Her case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This patient has been incarcerated within CDCR since September 2004. She was primarily treated at the 3CMS level of care, with two admissions and one referral to MHCB through February 2018. She was briefly placed at the EOP level of care on February 6, 2018 before being admitted to the MHCB on February 26, 2018 and then to the ICF level of care on March 29, 2018. She was discharged to the EOP level of care on June 28, 2018 and transitioned between EOP and 3CMS levels of care with four referrals/admissions to MHCB through January 2024. She was briefly elevated to the Acute level of care while in the MHCB on January 29, 2024 but returned to the MHCB level of care four days later and discharged to the EOP level of care on February 5, 2024. She vacillated between EOP, 3CMS, and MHCB levels of care through September 26, 2024 when she was admitted to the MHCB from the 3CMS level of care while in the RHU at CCWF.

Documentation indicated that the patient was being monitored on five-day follow-ups when she returned to the MHCB. She was admitted to MHCB due to danger to herself and others, yet documentation was not clear regarding what precipitated the admission, as the SRASHE noted

her suicide risk to be low with the only identified current risk factor being suicidal ideation reported with no plan or intent. The patient reported that she was not taking her medications as prescribed and wanted to be placed at the EOP level of care.

The initial psychiatric assessment was completed during the patient's initial IDTT meeting on September 27, 2024. The psychiatric assessment included documentation taken from previous assessments and the current content was a challenge to decipher. The patient was noted as being confrontational and resistant during the IDTT meeting, which was terminated early as a result. The initial IDTT document indicated that the number of MHCB referrals made over the previous six months and the number of RVRs received recently warranted review for the need for a higher level of care. The rationale for not referring the patient to a higher level of care was mostly adequate and the proposed treatment to improve the patient's functioning was appropriate. The treatment plan was consistent with these recommendations and included reasonable and measurable goals with adequate interventions.

The patient was seen for daily clinical contacts at her bedside by the treatment team. While the psychiatrist documented that these contacts were confidential, the patient expressed reservations about discussing certain topics in front of a group of individuals which included a custody officer. There was evidence of a single individual therapy session with an MHPC held at the patient's request, but formal treatment interventions were not documented. The patient inconsistently reported symptoms and suicidal ideation, which staff interpreted as the patient's attempt to secure a higher level of care upon discharge. Recreational therapy contacts were mostly held at cell front as the patient was on 1:1 status during most of her stay in MHCB.

A discharge SRASHE and safety plan were completed on December 2, 2024. The SRASHE was moderately adequate; however, the safety plan was not adequate and included copied text noting only that the patient was not "truly" suicidal and was engaging in "impression management." Fortunately, there was a recommendation on how to support the patient in coping with her current situation rather than using threats of suicide to obtain changes in housing once discharged. The discharge IDTT documentation was adequate as was the discharge summary.

**Findings**

Treatment of this patient was not adequate. Other than medications, there was no evidence of treatment interventions being provided to the patient to assist with the goals outlined in the treatment plan. Further, daily clinical contacts were not confidential and the one confidential contact held with the patient lacked documented clinical interventions.

**Patient BB**

This 36-year-old female patient was provided with diagnoses of other specified personality disorder, drug-induced mood disorder, and methamphetamine dependence. She was fully adherent to her prescribed aripiprazole. Her case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This patient was incarcerated within CDCR for the third time on February 27, 2024. There is no evidence that she received mental health services during her first period of incarceration from October 2015 through April 2016. During her second period of incarceration, she was treated at the 3CMS level of care. Upon her most recent reincarceration, she was placed at the 3CMS level of care. She was admitted to the MHCB at CCWF on September 15, 2024 after reporting hearing voices telling her to kill herself. She reported recently learning that her father passed away and reported feeling unsafe in her current housing location.

An initial psychiatric assessment was completed timely and was adequate. An initial IDTT was held timely with required staff and the patient present. Documentation noted that the patient's symptoms were unlikely to be related to psychosis, but more likely related to mood disturbance and characterological traits. Little attention was paid to the potential impact of grief given that the patient reported her father recently died. Treatment goals were reasonable, although lacking baseline ratings, and interventions were adequate. Despite the psychiatrist documenting that the patient was believed to be embellishing symptoms, an antipsychotic was prescribed. Daily contacts were mostly held "bedside" with the entire treatment team present. Interventions were not provided during these contacts and documentation was mostly unchanged from day to day. There was a single individual MHPC contact which evidenced no treatment interventions being provided. The patient participated in unstructured recreational therapy groups when offered. The recreational therapist noted that the patient was observed crying during a phone contact but no follow-up was documented regarding this.

The discharge SRASHE and safety plan were mostly adequate, although the safety plan was generic. A discharge IDTT meeting was held on September 24, 2024 and was adequate. The discharge plan lacked specific recommendations.

**Findings**

Treatment of this patient was not adequate. The patient reported auditory hallucinations, which were suspected to be "embellished" yet was started on an antipsychotic medication. She also reported suicidal ideation and the recent death of her father, and despite being seen crying during a phone conversation, received no treatment interventions to address her loss or reports of suicidal ideation. Instead, the treatment team focused on her reported safety concerns and discharged her with a generic plan.

**Patient CC**

This 28-year-old transgender male patient was provided with diagnoses of gender dysphoria and antisocial personality disorder. He was fully adherent to his prescribed mirtazapine. His case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period. This patient was incarcerated within CDCR for the second time on November 12, 2024. During his prior period of incarceration, from February 2018 through June 2019, he was treated at the 3CMS level of care. Upon reincarceration, he was placed at the 3CMS level of care and was admitted to the MHCB level of care at CCWF on December 11, 2024 and making threats to harm himself and others with weapons he placed inside his body.

An initial psychiatric assessment was completed the following day at cell front after the patient refused a confidential contact. The contact was completed in conjunction with the initial IDTT. The patient denied being suicidal or making suicidal statements but reported being frustrated with an officer leading to anger, agitation, and threats the previous day. Both the initial assessment and the IDTT meeting were not confidential. The treatment plan was reasonable and measurable with adequate interventions listed.

Daily clinical contacts were documented on all but one day, December 13, 2024. The contacts were completed "bedside" and were not confidential. The content reflected status of the patient but lacked any discussion of interventions beyond the effects of medication. The patient was offered recreational therapy groups on weekdays and typically attended but kept to himself.

The discharged SRASHE and safety plan were adequate. Documentation from the discharge IDTT meeting indicated that the patient had met his treatment goals and was ready for discharged to the 3CMS level of care with adequate recommendations for follow-up.

**Findings**

Treatment of this patient was inadequate. The patient was not seen for any confidential contacts other than at the time of discharge. Daily clinical contacts did not occur on one day and there was no evidence of treatment interventions being provided beyond medications and unstructured recreational therapy groups.

**Patient DD**

This 27-year-old transgender male patient was provided with diagnoses of gender dysphoria, unspecified mood disorder, PTSD, unspecified attention-deficit hyperactivity disorder, unspecified bipolar and related disorder, and unspecified trauma- and stressor-related disorder. He was not prescribed psychotropic medications. His case was selected at random for review of patients who were admitted to the MHCB at CCWF during the monitoring period.

This patient was incarcerated within CDCR for the second time on June 29, 2023. During his previous period of incarceration beginning in August 2017, he spent nearly ten months not enrolled in MHSDS, with a brief placement in the MHCB in June 2018. He was treated at the 3CMS level of care through his release in June 2022. Upon arrival within CDCR for his current period of incarceration, he was placed at the 3CMS level of care briefly but was removed from the MHSDS on July 17, 2023. He was admitted to the MHCB from the RHU on October 23, 2024 after reporting suicidal ideation and presenting as tearful, angry, and agitated.

An initial psychiatric assessment was completed the following day at the patient's bedside, non-confidentially, with the entire treatment team present. The content of the assessment was adequate; however, the patient denied ongoing symptoms or the need for medication. A confidential contact with a psychologist was offered to the patient but he refused. The initial IDTT was held timely with required staff and the patient present. Documentation was adequate yet the treatment plan addressed suicidal ideation, which the patient denied as well as self-harm

of which the patient had no history while incarcerated. The plan included female pronouns. The listed interventions were mostly adequate.

Daily contacts with the patient were held at cell front and evidenced no interventions. The patient was also seen cell front by the recreational therapist. A discharge SRASHE was completed and appeared adequate, determining a low risk level with adequate justification. The safety plan was created collaboratively with the patient and was adequate. The discharge IDTT was held with the patient and required staff present. The content was adequate and reflected that the patient's treatment goals had been met. The discharge summary was superficial.

**Findings**

Treatment of this patient was inadequate. There was no evidence that treatment interventions were offered or provided to the patient, and other than one instance at the time of admission, the patient was not seen in a confidential setting for any treatment intervention during his stay in the MHCB.

**Patient EE**

This 20-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient began her first prison term on May 31, 2024, and entered the MHSDS at the 3CMS level of care on June 7, 2024. She transferred from the reception center to mainline housing on September 5, 2024 and remained in 3CMS care thereafter. The patient was provided diagnoses of adjustment disorder with anxiety and opioid use disorder. Her symptoms included sleep disturbance, restlessness, and excessive worry. She was prescribed mirtazapine for sleep and anxiety. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder.

The initial PC and psychiatric assessments were not completed prior to the initial IDTT meeting. The initial IDTT meeting was late, with the assigned PC, an unlicensed social worker, an alternate psychiatrist, the patient, and a CCI present. The clinical summary provided limited information and instead focused exclusively on the patient's concerns about losing day room privileges and being transferred to Facility A. The treatment plan target was vague and focused on the patient's adjustment and stress management. The treatment plan failed to include specific measurable goals focused on patient's symptoms related to her diagnosis, such as sleep, anxiety, or substance use. Baseline measures of the patient's symptoms, specific CBT and other interventions, such as psychiatric medications, education, groups, or employment, were absent. Discharge criteria and rationale for treatment retention were not documented.

The assigned psychiatrist did not see the patient during the review period. Instead, the patient was seen by two alternate psychiatrists, which impacted continuity of care. Aside from the IDTT meeting, the patient only met with an alternate psychiatrist once during the review period. During this encounter, the patient reported that her medication was having some effect but that she continued to wake up early in the morning. In response, the psychiatrist increased mirtazapine. During the five months of the review period following this encounter, there was no psychiatric follow-up to monitor the patient's symptoms and response to the medication increase. Routine PC contacts were also not timely during the review period. The unlicensed social

worker first met with the patient during the initial IDTT in October 2024. The PC attempted to see the patient again on January 8, 2025, but the patient refused, and there was no follow-up at the cell front. The next contact occurred 105 days later, on April 23, 2025. This encounter was cut short, with the patient voicing a desire to finish her laundry and get ready for yard. As a result of the infrequency and inconsistency of PC contacts, no meaningful therapeutic contacts or treatment interventions were provided during the review period. The patient had limited access to structured therapeutic activities, given institution cancellations.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

IDTT meetings, psychiatric contacts, and PC contacts were not timely. The continuity of care was compromised due to the patient not being seen by her assigned psychiatrist during the review period. There was no psychiatric follow-up after a medication adjustment. In addition, the treatment plan was deficient. It lacked specific measurable goals with baseline measures to monitor the patient's progress, failed to document specific interventions, and did not provide a clinical justification for retaining the patient in 3CMS care or establish clear discharge criteria. PC encounters did not result in the provision of meaningful therapeutic interventions.

**Patient FF**

This 49-year-old 3CMS's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided with diagnoses of unspecified depressive and unspecified anxiety disorders. She was prescribed sertraline as a KOP medication and reported to be adherent with this medication. The patient had bilateral hearing loss, wore hearing aids, and required sign language interpreter. On March 4, 2014, the patient began serving her first CDCR prison term of life without parole. She had been maintained in 3CMS care since her admission to the MHSDS on March 12, 2014, and she remained in 3CMS care throughout the review period. The patient was housed in the honor dorm and did not have any RVRs during the review period.

During the review period, routine psychiatric contacts were not timely. The psychiatrist attempted to meet with the patient on November 13, 2024, but the patient refused. A follow-up contact at the cell front was not provided. The patient next met with a psychiatrist on March 20, 2025, nearly eight months after the next most recent completed psychiatric contact. An alternate to the assigned psychiatrist provided the March 20, 2025 encounter. Routine PC contacts were provided by an unlicensed social worker, timely, supportive, and confidential. The patient discussed managing roommate conflicts and reported medication adherence. Her medication was noted to be helpful in treating her depression. However, aside from the PC discussing coping skills and providing coloring pages, documentation of specific therapeutic interventions and the patient's response to interventions was absent. Specific monitoring of treatment progress, which was required by the treatment plan, did not occur. PC notes indicated that patient was participating in the Equine program, and on average, the patient attended two hours of structured treatment activities each week during the review period.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Although one psychiatric appointment was scheduled, the patient was not seen by any psychiatrist during the review period, and a nearly eight-month long gap between psychiatric encounters occurred between July 2024 and March 2025. PC contacts were timely and confidential, but the PC documentation failed to provide specific therapeutic interventions or track the patient's progress towards established treatment goals. Although the patient remained stable, the treatment provided was inadequate.

**Patient GG**

This 72-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided a diagnosis of major depressive disorder, recurrent. She was prescribed and adherent with aripiprazole for mood stabilization and psychosis and sertraline for depression and anxiety. Hydroxyzine was prescribed PRN for anxiety. Her symptoms included depression, anxiety, and auditory hallucinations, and she had a history of two suicide attempts. Within the CDCR, she had previously received 3CMS, EOP, and MHCB care. During the review period, she received 3CMS care. Medical issues included hyperlipidemia, incontinence, type II diabetes, chronic pain due to chronic arthritis with severe osteoarthritis of the knees, hypertension, and obstructive sleep apnea. She was wheelchair dependent and serving life without parole.

In early September 2024, the patient submitted two healthcare requests to see mental health. The first request stated that she was doing well and taking her medications, but having difficulty with medical issues; the second request, a week later, indicated that she wanted to speak to her PC because she needed help. Nine days after the second request, the assigned PC attempted to meet with the patient. The patient refused, and a follow-up contact at the cell front was not conducted. Two days later, medical staff in the TTA submitted a referral for a SRE after the patient made two superficial cuts on her wrists. When evaluated, the patient was assessed as at low risk, and a safety plan was developed. She was placed in the skilled nursing facility from September 20, 2024, through October 8, 2024 for assistance with ADLs and as a result of the self-injury.

Fifteen days after the patient returned to mainline 3CMS care from the skilled nursing facility, an initial PC assessment was attempted. The patient refused to participate, and a record review was completed. An initial psychiatric initial assessment was not completed. The initial IDTT meeting occurred 16 days after the patient's return to mainline 3CMS care. Required participants attended. IDTT documentation was deficient. Most of the clinical summary was pulled forward verbatim from an earlier summary without including the date or author of the information. Documentation regarding the patient's auditory hallucinations was internally contradictory. The case formulation, patient's verbalized treatment goals and strengths, and treatment targets were carried forward from an earlier IDTT meeting. The plan targeted self-injury and depression but contained only one measurable goal and no baseline measures. IDTT documentation failed to include discharge criteria or rationale for 3CMS care.

During the limited time the patient remained in mainline 3CMS care, one routine psychiatric encounter was provided. The psychiatric progress note included a detailed mental status examination, a clear plan for medication management, and a plan to follow up with the patient in 60 days. As described below, the patient was returned to the skilled nursing facility before another psychiatric encounter was due. A follow-up SRE was conducted adequately on December 5, 2024, and the patient was deemed to be at low risk. On December 19, 2024, the patient was assessed for TCU placement. She was noted to have early, moderate dementia with memory impairment. She was also noted to need verbal cues to complete ADLs, to have experienced some falls, to need assistance to ambulate, and to suffer from incontinence that required nursing care. The patient transferred to the skilled nursing facility on December 20, 2024, where she remained for the rest of the review period.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The treatment provided to this patient was not commensurate with her needs. An initial psychiatric assessment was not completed. The PC failed to provide meaningful therapeutic contact and did not follow up with the patient despite two healthcare requests and a subsequent refusal. A follow-up contact did not occur at the cell front as required, and the patient engaged in self-injurious behavior two days later. The assigned PC did not see the patient except during the IDTT meeting. In addition, the treatment planning process was deficient. IDTT documentation was largely pulled forward from an earlier IDTT meeting, did not contain measurable goals for each treatment, baseline measurements, discharge criteria, or rational for retaining the patient in 3CMS care. Aside from a thorough and adequate psychiatric encounter, the patient lacked therapeutic treatment while in mainline 3CMS care.

**Patient HH**

This 42-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided a diagnosis of major depressive disorder, recurrent, moderate. She had a history of depressed mood and three suicide attempts. She was prescribed citalopram as a KOP medication for depression and anxiety. Venlafaxine and lamotrigine were prescribed PRN for depression and anxiety. Within the CDCR, she had previously received 3CMS care, and she received 3CMS care throughout the review period. She was serving her first sentence of 50 years to life.

Routine psychiatric contacts were not timely during the review period. She was seen only once, 141 days after the next most recent psychiatric encounter. The December 5, 2024 encounter was conducted by telepsychiatry in a confidential setting. The patient reported that medications were helpful and rated her depression low, but also reported experiencing suicidal ideation on her bad days. She denied intent or plan, reported coping skills were helpful, and was deemed a low acute risk. Citalopram was continued, and lamotrigine and venlafaxine were changed from scheduled to PRN medications to accommodate the patient's preference. The psychiatrist educated the patient on taking medications daily for efficacy despite ordering them as PRN. PC contacts were limited. The patient was scheduled to be seen on October 30, 2024 but refused the contact. No follow-up occurred at the cell-front, but the PC noted that if the patient refused the next

scheduled appointment, then follow-up would occur in the yard. The patient was not seen until February 3, 2025, nearly eight months after the last PC contact in July 2024. The encounter was confidential, and the PC introduced herself as the patient's new PC. The progress noted provided no detail regarding patient's progress toward treatment goals, therapeutic interventions utilized, or patient's response to treatment interventions.

During the review period, the patient's annual IDTT meeting was due in early February 2025 but did not take place until March 13, 2025, more than one month late. The treatment plan targeted reducing the patient's depression.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient was not seen timely for the annual IDTT meeting, psychiatric contacts, or PC contacts. The decision to order lamotrigine and venlafaxine as PRN was concerning. The PC did not follow up with the patient after the patient refused contact. The single PC encounter that occurred during the review period provided no information regarding the patient's progress towards treatment goals, interventions utilized, or patient's response to interventions.

**Patient II**

This 31-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. She was provided with diagnoses of PTSD and adjustment disorder. Symptoms included mild depression, anxiety, feelings of guilt, difficulty sleeping, and frequent nightmares. The patient had no documented history of suicidal behaviors. She was prescribed and adherent with fluoxetine for depression and anxiety. Mirtazapine was prescribed PRN for anxiety. The patient entered CDCR on December 6, 2016, and began receiving 3CMS level of care later that month. She remained in 3CMS level of care thereafter, except for a brief stay in MHCB care in 2018.

The patient refused the only routine psychiatric encounter offered during the review period, on October 9, 2024. This appointment occurred five months after the next most recent encounter, which the patient had also refused. After the October 9, 2024 appointment, no further psychiatric encounters were provided during the review period.

Routine PC encounters were sporadic, and the patient often refused these contacts. On October 9, 2024, the patient requested to be seen by mental health; her assigned PC saw her in a confidential setting six days later. As documented, this encounter was consistent with a wellness check. There was no documentation regarding the patient's progress toward treatment goals, provision of interventions outlined in the treatment plan, or the patient's response to interventions. Three days later, the patient submitted another request to speak with mental health because she was hearing voices. When seen for this request, the patient reported that she had already met with mental health and had not requested to be seen again. On January 14, 2025, the patient refused a scheduled PC appointment; no follow-up at the cell front was conducted. mental health assessment for an RVR alleging possession of alcohol was conducted on January 29, 2025. No nexus between the patient's mental health symptoms and the alleged behaviors was found. The assessment recommended that the assigned PC follow up with the patient during

routine encounters to discuss the patient's behaviors, improve distress tolerance and emotion regulation, and develop behavior modification strategies to decrease the likelihood of additional RVRs. Despite this recommendation, the patient was not seen again until March 13, 2025, in response to suicidal statements.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Psychiatric encounters were not timely, and there were no successfully completed psychiatric encounters during the review period. PC encounters occurred sporadically and were often prompted by the patient's requests. PC contacts lacked evidence that treatment interventions were provided or that the patient's response to these interventions and overall treatment progress were monitored. The patient's disengagement from treatment was not adequately assessed or addressed. Recommendations from the mental health RVR assessment were not followed, and the patient's treatment plan was not updated to address treatment challenges evident in the RVR.

**Patient JJ**

This 66-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder. Symptoms included command auditory hallucinations, paranoid ideation, depressed mood, anxiety, nightmares, and flashbacks. She reported a history of two suicide attempts in her early 20's and 30's. Within the CDCR, she had previously received 3CMS care except for one day of MHCB care. She was noted to be unable to read and had low cognitive functioning. She was prescribed and adherent with mirtazapine. Melatonin was prescribed on a PRN basis for insomnia. Through medical services, she was prescribed gabapentin and nortriptyline for pain and diabetic neuropathy. Medical conditions included heart failure with reduced ejection fraction, cardiomyopathy, coronary artery disease, hypertension, asthma-chronic obstructive pulmonary disease overlap syndrome, sleep apnea, type 2 diabetes mellitus, chronic pain, chronic kidney disease, and a history of cocaine use disorder. She had an automatic implantable cardiac defibrillator and used hearing aids. She was housed in the Transitional Care Unit (TCU) and received 3CMS care during the review period.

No IDTT meeting occurred during the review period. The most recent annual IDTT meeting had occurred nearly four years earlier, on March 2, 2021. The next annual IDTT meeting occurred after the review period, on July 17, 2025. During the review period, the patient was without a current, comprehensive, and multidisciplinary treatment plan, with measurable goals linked to treatment targets, and interventions to guide the patient's treatment.

On October 22, 2025, the patient submitted a request for medication to help her sleep, and she specifically requested hydroxyzine. The first and only completed psychiatric encounter of the review period occurred two days later in response to the patient's request. The psychiatrist discussed the potential risks associated with the patient's request given her medical conditions, and the patient agreed to mirtazapine titration and a trial of melatonin. The psychiatrist educated the patient that the medications may not be able to overcome her pain. The psychiatrist attempted to meet with the patient again on December 24, 2024, after the patient received news

of her brother's passing. However, the patient was in medical quarantine at the time and could not be seen. The psychiatrist noted that the patient was medication adherent. On December 26, 2024, medical quarantine was discontinued. Despite becoming available to be seen, a psychiatrist did not see the patient again during the review period.

Routine PC contacts were not timely, and it was unclear if the patient was seen in confidential settings for these encounters. Despite including boilerplate language indicating that thoughts, feelings, ADLs, and skills were reviewed, PC progress notes were consistent with wellness checks rather than individual treatment. For example, on September 3, 2024, the patient reported that she was doing well but stated she still "plays with her green men," who keep her busy. No exploratory or explanatory documentation regarding this remark was provided. On November 11, 2024, that patient again denied having any concerns but reported that she had been hit in the face with tray two weeks earlier and was then housed alone. The PC progress note provided no additional clinical information regarding this episode. The patient was found stable on both encounters. The patient's responses to interventions were not documented. An attempt was made to see the patient on December 18, 2024, when the patient was in medical quarantine. The PC note indicated that the patient would be seen in three weeks or sooner if needed. The patient was not seen again until March 13, 2025, almost three months later. During the review period, the patient attended an average of five hours of structure treatment activities each week, including nursing-led treatment groups focused on substance use, physical health, and life skills.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The absence of an IDTT meeting in nearly four years was a significant departure from Program Guide requirements and failed to meet the patient's treatment needs. There was no treatment plan available to guide treatment and no multidisciplinary discussion regarding the patient's underlying diagnosis and symptoms. Psychiatric treatment was not timely, and PC encounters lacked evidence that clinically appropriate interventions were provided to address the patient's treatment needs. PC progress notes did not document the patient's response to any interventions that may have been provided. Apart from a single psychiatric encounter, the impact of the patient's complex and chronic medical conditions on her mental health was inadequately addressed.

**Patient KK**

This 54-year-old patient's health care record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided with diagnoses of PTSD, antisocial personality disorder, psychotic disorder due to another medical condition, with hallucinations, and other (or unknown) substance-induced psychotic disorder, with mild use disorder, opioid use disorder, severe, alcohol use disorder, severe, amphetamine or other stimulant intoxication without perceptual disturbances, without use disorder, and misuse of prescription only drugs. A recent diagnosis of bipolar I disorder was also noted. She was not prescribed any psychotropic medication. Through the ISUDT, she was prescribed included buprenorphine-naloxone for opioid use disorder. With the CDCR, she had previously received 3CMS and MHCB care, and she received 3CMS care during the review period.

The annual IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned psychiatrist. The clinical summary provided limited information on the patient's treatment progress and instead carried forward prior IDTT history that had indicated a need for diagnostic clarification. The patient's strengths, verbalized treatment goals, treatment plan, and discharge plan/reason for retention were not completed. Instead, IDTT documentation referenced a 2023 IPOC for treatment nonadherence, with a goal of attending all scheduled groups for three months.

The assigned PC provided two routine encounters during the review period. These encounters were timely and confidential, but PC progress note content was consistent with brief wellness check-ins rather than therapeutic sessions. Documentation included only generic interventions and global assessment of the patient's mood, risk, and daily functioning, without detailing specifics. Progress notes did not include patient's progress towards treatment goals or the patient's response to interventions. On February 14, 2025, the PC documented that the patient was stable and would be removed from the mental health caseload within two weeks. The progress note offered no further justification or rationale for this decision.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Although the patient remained stable and was seen timely for the annual IDTT meeting and PC contacts, documentation of mental health services did not reflect adequate treatment. The patient's treatment plan lacked updated treatment targets, measurable goals, and interventions. The rationale for retaining the patient in 3CMS care, specific discharge criteria, and subsequently the rationale for discharging the patient from 3CMS care were not documented. The PC's February 2025 plan to discharge the patient from the MHSDS in two weeks, without input from the psychiatrist or other IDTT members, was inappropriate. The patient was provided multiple psychiatric diagnoses that were not clarified or reconciled, and psychiatric reassessment would have been helpful in this regard.

**Patient LL**

This 30-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided with diagnoses of PTSD, ADHD, unspecified depressive disorder, and methamphetamine and opioid use disorders. She was prescribed and adherent with topiramate for mood symptoms. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder. Within the CDCR, she had previously received only 3CMS care, and she received 3CMS care throughout the review period.

On September 5, 2024, a non-assigned psychiatrist completed a master treatment plan psychiatry review which indicated that an IDTT meeting was held in absentia and that the treatment team recommended continued 3CMS care. However, there was no other documentation of this IDTT meeting in the health record. The most recent IDTT meeting and most recent treatment plan were dated August 10, 2023. According to the master treatment plan psychiatric review, treatment goals were to decrease the patient's depression and anxiety and monitor mood stability. As of late October 2025, the treatment plan had not been updated since August 10, 2023.

During the review period, routine psychiatry contacts were not timely. The first psychiatric encounter was scheduled for December 4, 2024, 113 days after the next most recent encounter. The patient refused this appointment and subsequently refused the follow-up appointment scheduled for January 28, 2025. Wellness checks at the cell front did not occur following either refused appointment. The psychiatrist documented the patient's adherence with topiramate and on January 28, 2025 documented a plan for the patient to be seen within 30 days or sooner. There was no psychiatric follow-up until March 25, 2025.

A routine PC contact occurred on September 27, 2024, and the patient reported managing her symptoms and expressed interest in participating in the community re-entry program. The PC assessed the patient's functioning and documented broad therapeutic interventions such as exploring thoughts, feelings, and coping skills, the PC did not document specific the interventions used, the patient's response to interventions, or the patient's progress toward treatment goals. No other PC encounters were documented during the review period, and the patient was not scheduled to be seen again until May 1, 2025, long after the review period ended and more than seven months after the September 27, 2024 encounter. Notably, an ISUDT progress note in October 2024 indicated the patient had used methamphetamines due to boredom.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

During the review period, the annual IDTT meeting was substantially overdue, and psychiatric encounters were neither timely nor adequate. A current treatment plan to guide 3CMS care was lacking. Follow-up encounters at the cell front did not occur as required in response to refused psychiatric appointments. The single completed mental health encounter, with a PC, was supportive but did not reflect the provision of planned, specific, evidence-based interventions or the patient's response to these interventions. The patient was not provided with the treatment she needed.

**Patient MM**

This 61-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. She was provided diagnoses of PTSD and methamphetamine use disorder, in institutional remission. She was not prescribed any psychotropic medications. The patient had a history of extensive trauma. She was a victim of a fire in 1965 in which she lost her mother and grandmother, was in a coma for eight weeks, and underwent multiple surgeries. She suffered severe sexual abuse by family members, was sold for sex, and was a victim of domestic violence. Her symptoms included flashbacks, hypervigilance, anxiety, feelings of guilt, and depressed mood, along with one suicide attempt in 2001. She had undergone multiple state psychiatric hospitalizations, including at Patton State Hospital from 1992 to 1997 and Napa State Hospital from 2000 to 2005. The patient was also a participant in the conditional release program from 1993 to 2010 and had been found not guilty by reason of insanity. Medical conditions included a genetic blood clotting disorder that resulted in two strokes, hypertension, chronic obstructive pulmonary disorder, hyperlipidemia, diabetes, and a history of anaphylaxis. The patient also reported having an inoperable cyst on her brain. She entered CDCR on

March 1, 2023and was placed in 3CMS care on March 9, 2023. She had remained in 3CMS care since then.

During the review period, the patient was seen by psychiatry once, on January 10, 2025. On that date she was seen by a telepsychiatrist in a confidential setting. The patient reported programming and working towards her GED. She denied having depression and reported low anxiety that was manageable as well as flashbacks related to her trauma when under stress. The patient elected to continue managing her symptoms without psychotropic medications. She informed the psychiatrist that her heart had 20% narrowing due to long COVID and that she was completing a 30-day treatment for an infectious disease. Routine PC contacts occurred timely during the review period. It was unclear whether the contacts were confidential. The contacts appeared supportive but were more consistent with wellness checks than individual therapeutic treatment. The patient reported programming and discussed roommate and medical issues. She denied experiencing mental health symptoms or stressors. No interventions or patient responses to interventions were documented. The only plan documented involved continuing to meet for PC contacts and submitting a health services request form if needed. The patient attended GED classes and participated in some nursing-led treatment groups for chronic pain management and substance use. However, some groups were canceled by the institution due to low staffing shortages or other institutional functions.

Required participants attended the patient's annual IDTT meeting. The clinical summary was not updated. The treatment plan focused on the patient maintaining sobriety. The discharge summary and justification for maintaining the patient in 3CMS care incorrectly indicated that the patient was taking psychotropic medications.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Given the patient's lengthy, complex psychiatric history, which includes an NGRI finding and multiple state hospital admissions, the patient did not receive adequate psychiatric monitoring. Despite not being prescribed psychotropic medications, more frequent psychiatric monitoring was clinically indicated, particularly while the patient was managing complex medical issues. Notably, the patient was relatively stable, and PC contacts were timely and appeared to be supportive. Nevertheless, PC progress notes failed to specify whether the contacts were confidential or whether any specific therapeutic interventions utilized. The notes did not link the patient's response to treatment goals. Furthermore, there were multiple cancellations of programming that impacted patient's access to care, and IDTT documentation contained incorrect information.

**Patient NN**

This 66-year-old patient's health care record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided diagnoses of unspecified depressive disorder, ADHD, and, on a rule out basis, PTSD, along with alcohol, opioid, and stimulant use disorders. Symptoms included depressed and anxious mood, difficulty focusing, and nightmares. The patient was prescribed and generally adherent with duloxetine as a KOP medication., buspirone,

and atomoxetine. Hydroxyzine was prescribed PRN for anxiety. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder. Within the CDCR, the patient had previously received only 3CMS care, and she received 3CMS care throughout the review period.

The annual IDTT meeting occurred prior to the review period and resulted in a treatment plan that lacked any interventions and included treatment goals that were not measurable. During the review period, routine psychiatric treatment was not timely, and progress notes failed to document whether the contacts were confidential. Although atomoxetine was initiated on July 25, 2024, and duloxetine was lowered, there was no documented psychiatric follow-up until nearly five months later, on December 10, 2024. While the patient endorsed moderate depression and lower anxiety, she continued to have difficulty with attention, and her atomoxetine was increased. This was the only psychiatric encounter during the review period. The assigned PC provided four routine PC encounters during the review period. These were confidential and delivered through telehealth. PC progress notes were detailed, and encounters were supportive, with ongoing assessment of the patient's general mood symptoms. However, progress notes failed to describe specific therapeutic interventions linked to the patient's treatment plan targets or to document the patient's response to those interventions.

**Findings**

The treatment provided to this patient was inadequate.

The psychiatric treatment was not timely and instead was marked by a five-month delay in follow-up after medication changes. While PC encounters were timely, supportive, and exceeded minimum Program Guide requirements in frequency, there was no evidence that the PC used planned, evidence-based interventions or that the patient's response to these interventions was tracked. Treatment provided during the review period was not guided by a structured, measurable treatment plan.

**Patient OO**

This 36-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided diagnoses of schizoaffective disorder, bipolar type, and alcohol, amphetamine, and cannabis use disorders. Through a PC 2602 order for involuntary treatment, she was prescribed olanzapine, haloperidol, hydroxyzine, and benztropine. She had previously received EOP, MHCB, and ICF care within the CDCR. Her most recent ICF admission occurred between May 20, 2024 and August 28, 2024 for danger to others and psychosis. During ICF care, the PC 2602 order for involuntary treatment was obtained. After initiation of the PC 2602 order, the patient had no major mental health symptoms, fully participated in ICF programming, and agreed to return to CCWF. She entered EOP care at CCWF on August 28, 2024.

The initial psychiatric assessment was timely, comprehensive, and well documented, including thorough clinical and medication histories. The patient indicated she was not interested in the MAT program and denied recent substance use. The initial PC assessment was also timely and well documented. The assessment included an updated and thorough clinical summary and noted contact with the patient's MHCB PC for continuity of care purposes. Three IDTT

meetings occurred during the review period. Each was timely and attended by the patient. A covering psychiatrist attended one IDTT meeting, and different CCIs were present for each IDTT meeting. With these exceptions, required staff attended each meeting. Treatment planning was adequate and addressed medication adherence, reducing paranoia and delusions, and reducing aggressive/assaultive behaviors. Treatment goals were measurable, and interventions were appropriate. Level of care and discharge criteria were brief and generalized, but the patient's clinical improvement over the course of the IDTT meetings was adequately documented.

Psychiatry contacts were offered approximately every six weeks during the review period in a confidential setting. Each contact was well documented with updated assessments and mental status. The patient consistently denied any significant symptoms, remained consistently medication adherent, and showed improved insight. The patient attended individual PC contacts and PC caseload groups on alternating weeks throughout the review period. Some progress notes lacked detail or did not directly reference the treatment plan and appeared more akin to a wellness check than a comprehensive note. However, the PC included clinical interventions such as reality testing and social skills development in other progress notes and consistently noted the patient's mental stability and improved insight. Near the end of the review period, the patient reported that she no longer had any problems with peers or interpersonal relationships. The patient she was offered several recreational therapy groups focused on leisure topics, such as walking, movies, reading, art, and gym. The patient attended these groups consistently throughout most of the review period.

**Findings**

The care and treatment provided to this EOP patient were adequate.

The patient remained stable, gained insight, and attended almost all assigned programming and treatment during the review period. Psychiatry contacts were not timely, but they were offered consistently. The medication regimen largely eliminated the patient's psychotic symptoms. PC care was adequate, and although some progress notes lacked detail, the noted interventions aligned with the treatment plan. The patient's reality testing, interpersonal skills, and optimism improved significantly.

**Patient PP**

This 46-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided diagnoses of unspecified depressive disorder, methamphetamine use disorder, moderate, schizoaffective disorder, bipolar type, and substance-induced mood disorder. She was prescribed fluoxetine, buspirone, hydroxyzine, risperidone, propranolol, and melatonin. The patient had four psychiatric hospitalizations in the community and had received only EOP care within the CDCR. She arrived at CCWF from county jail on February 7, 2024 and was placed at the EOP level of care upon arrival.

Two routine IDTT meetings occurred during the review period. The meetings were appropriately staffed although a covering psychiatrist attended one IDTT and a covering PC attended the other. The patient attended both IDTTs. The treatment team noted both that the patient attended all

scheduled routine contacts and most groups, and that she rarely engaged meaningfully with her clinicians and was resistant to implementing new coping skills for panic attacks and anxiety. Treatment planning was adequate, with appropriate goals and interventions, and was updated when additional problem areas were identified. Discharge criteria and treatment retention rationale were brief but appropriate for the patient.

Psychiatry contacts were offered approximately every four to six weeks in a confidential setting. The patient refused a confidential setting on two occasions, and the encounter occurred in the housing unit dayroom. The psychiatrist noted the patient's panic symptoms and adjusted medications. The patient responded well to the medication change, reported a decrease in panic episodes, and denied medication side effects. PC contacts were offered through alternating weekly individual contacts and PC caseload groups. Individual PC encounters were confidential. Progress notes indicated that PC interventions aligned with the treatment plan and included coping skills to address panic symptoms and anxiety. The PC adjusted the interventions appropriately and the patient eventually began to implement the skills she learned in treatment. She remained afraid of attending groups, but her attendance increased slightly as interventions became more effective. Continuity of care was adequate when the patient's PC changed in December 2024, and the new PC continued the interventions in the treatment plan. The PC and program supervisor met with the patient to provide additional support in January 2025 when her ADLs and treatment adherence declined as she was grieving a family loss. The patient was offered recreational groups including yard, reading, and coping skills. Her attendance was poor but improved slightly as the review period progressed. Overall, the patient's insight, treatment engagement, and clinical presentation improved during the review period.

**Findings**

The care and treatment provided to this EOP patient were adequate.

Treatment planning was adequate. The patient received timely individual PC contacts and caseload groups. She attended PC contacts consistently and her engagement in treatment improved over the review period. Continuity of care was adequate when the patient's PC was changed, and the PC and supervisor provided additional support when the patient's presentation declined. Psychiatry contacts were often delayed by one to several weeks, but the patient's medications were effective and significantly reduced the patient's symptoms. Although not always timely, psychiatric care was adequate when it was provided. She was offered appropriate recreational therapy groups. Despite a period of grief, the patient's clinical presentation improved.

**Patient QQ**

This 57-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided diagnoses of bipolar I disorder, most recent episode manic, and polysubstance use disorder. Her symptoms included chronic auditory hallucinations. She was prescribed and adherent with olanzapine. Hydroxyzine and additional doses of olanzapine were prescribed PRN for anxiety and agitation, respectively. Within the CDCR, she had previously received 3CMS, EOP, and MHCB care. The patient arrived at CCWF

for her first prison term in November 2024. She was admitted to MHCB care between December 17, 2024 and December 27, 2024, for danger to others and significant impairment due to mental illness. Medical conditions included hepatitis C.

Following discharge to EOP care at CCWF on December 27, 2024, the patient received timely and well documented five-day follow-up contacts. The initial psychiatric and PC assessments were timely and adequate. The patient's initial IDTT meeting was timely and attended by the patient, assigned clinicians, a CCI, and two senior psychology supervisors. Treatment planning was adequate. Short- and long-term goals were measurable and clinically appropriate. Interventions included medication adherence, psychoeducation, grounding skills, and reality testing. There were no flagged HLOC indicators, and the rationale for retaining the patient in EOP care was adequately documented.

The patient received one routine psychiatry contact during the review period. The contact was timely, confidential, and adequately documented. PC contacts were provided in a confidential setting through alternating weekly individual contacts and PC caseload groups. During the individual contact on February 10, 2025, the PC documented that the patient had settled into the milieu and was generally medication adherent. Progress notes included references to the treatment plan and interventions. The patient was offered daily recreational therapy groups focused on leisure activities that included walking groups, gym, art, and creative writing. The patient's recreational therapy group attendance steadily improved as she adjusted to prison and the EOP program requirements. However, it did not appear that the patient was offered an introduction to EOP group.

**Findings**

The treatment provided to this patient were adequate.

Clinical contacts were timely and confidential, including initial assessments prior to the initial IDTT. Treatment planning was adequate for the patient's needs, and the treatment team appropriately focused on medication adherence to reduce her manic and psychotic symptoms. The PC established good rapport, and the patient's insight and medication adherence improved. By the end of the review period the patient was attending most groups, had a job as an ADA worker, and was noted to be programming well.

**Patient RR**

This 40-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. She arrived at CCWF from county jail on February 1, 2023 and was immediately placed in EOP care. The patient's diagnoses included schizoaffective disorder, bipolar type, amphetamine-type substance-induced psychotic disorder, with moderate or severe use disorder, generalized anxiety disorder, alcohol use disorder, and cannabis use disorder. She was prescribed and generally adherent with aripiprazole, atomoxetine, buspirone, divalproex sodium, lithium, melatonin, and ziprasidone. Benztropine and hydroxyzine were prescribed PRN for extrapyramidal symptoms and anxiety. Through the ISUDT, she was prescribed

buprenorphine-naloxone. She had previously received MHCB and EOP care. Medical conditions included hepatitis C infection.

Three routine IDTT meetings occurred during the review period. The IDTT meetings were timely and attended by the patient's assigned clinicians and CCI. A senior psychologist supervisor attended one of the IDTT meetings, and the patient attended one of three IDTTs. The psychiatrist attended through telepsychiatry. The patient was described as overtly anxious, manic, irritable, and prone to interpersonal conflicts and verbal aggression. Treatment planning was inadequate. The treatment plan, including clinical summary, was not updated from the previous IDTT meeting, and treatment goals were not measurable or individualized. There were no treatment progress updates, level of care retention rationale, or discharge criteria in the IDTT documentation. The treatment plan remained unchanged during each IDTT meeting, despite persistent interference from symptoms in her functioning.

The patient received one to two telepsychiatry contacts each month. Ziprasidone, hydroxyzine, and aripiprazole doses were increased during the review period in response to persistent symptoms, which included paranoid and grandiose delusions, auditory hallucinations criticizing others, and anxiety. Psychiatric care was timely, responsive, and collaborative. PC contacts were provided weekly in either PC caseload group or individual encounters, but it was unclear in several progress notes whether individual encounters were confidential. PC progress notes were otherwise well documented, and the PC and patient had good rapport. Despite the absence of an adequate treatment plan, PC encounters reflected planned and clinically appropriate care. Most session content included working on the patient's interpersonal skills, coping skills, insight development, and reality testing. The patient was offered recreational therapy groups focused on leisure activities; her attendance was poor for these groups but adequate for the PC caseload group. The patient received two pre-release contacts prior to her anticipated parole date. Pre-release notes were well documented and indicated she was connected with appropriate mental health and medical programs and resources in the community.

Less than 30 days prior to her anticipated parole date, the patient received an RVR alleging that the patient was attempting trying to bring substances into the facility. The patient's agitation and anger increased significantly. In response, the PC provided additional supportive therapy, redirected the patient effectively, and made the appropriate psychiatry referral. The patient's sentence was extended for 90 days pending investigation. The patient maintained her innocence and was later found not guilty of the RVR.

**Findings**

The treatment provided to this patient were adequate.

Despite an inadequate treatment plan and IDTT documentation, overall treatment provided to this patient was clinically appropriate. Although she demonstrated persistent interpersonal difficulties and mild to moderate psychotic symptoms throughout the review period, the patient received well documented clinical contacts that included appropriate interventions. The PC developed strong rapport with the patient and frequently documented clinically appropriate interventions that should have been documented in the treatment plan. The psychiatrist adjusted

medications in response to symptoms, and the patient's insight and medication adherence improved. She received timely pre-release contacts in anticipation of parole.

**Patient SS**

This 36-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient transferred to CCWF EOP care on July 2, 2024 from CIW EOP. She was provided diagnoses of schizoaffective disorder, bipolar type, and unspecified schizophrenia spectrum or other psychotic disorder. Symptoms included paranoid delusions, auditory hallucinations, and mood symptoms related to beliefs that her boyfriend put a chip in her head to monitor her and was colluding with some staff and other patients to harm her. Through a PC 2602 order for involuntary medication due to danger to others, she was prescribed and adherent with olanzapine, fluphenazine, long-acting paliperidone, benztropine, and thiothixene. Additional doses of olanzapine and fluphenazine were prescribed PRN for medication refusal, psychosis, and agitation. During the review period, she did not require back-up involuntary medications and used PRN olanzapine for agitation only rarely. She had previously received all levels of mental health care. Medical conditions included seizure disorder, asthma, carcinoma in situ of uterine cervix with stenosis, and chronic back pain.

Two routine IDTT meetings occurred during the review period. The patient, assigned clinicians, two senior psychologist supervisors, and a CCI attended both meetings. The treatment plan was updated appropriately at each IDTT meeting. Treatment planning was adequate and included appropriate goals, interventions, and progress updates. The rationale for EOP care and discharge criteria were adequately documented. During the second routine IDTT meeting, it was noted that the patient's presentation and treatment participation had improved. Although she remained paranoid and delusional, her symptoms had become more manageable, she did not act on these symptoms, and she was working as a voluntary porter on her housing unit.

The patient received confidential psychiatry contacts every four to six weeks. Psychiatric progress notes were comprehensive and clinically appropriate. There were no medication changes during the review period. The patient was offered weekly PC contacts through individual contacts and PC caseload groups. The PC provided follow-up wellness checks when the patient did not attend the caseload group. Progress notes were adequate and therapeutic rapport improved significantly over the review period. The PC provided psychoeducation, coping skills, conflict resolution skills, and supportive therapy interventions. These interventions were consistent with the treatment plan, and the patient's program adherence improved in response to the PC's interventions. In addition to the caseload group, the patient was offered a weekly clinical coping skills group, and daily recreational therapy groups focused on art, leisure, walking, and reading. Her group attendance improved significantly over the review period as her reactivity decreased and she was better able to tolerate psychotic symptoms.

**Findings**

The treatment provided to this EOP patient was adequate.

Excepting minor delays in psychiatric appointments, clinical contacts and IDTT meetings were timely and well documented. The patient remained medication adherent, and no medication changes were required during the review period. The PC met with the patient weekly and worked consistently to establish rapport and a therapeutic relationship despite the patient's delusions and paranoia towards staff and other patients. The PC implemented the interventions required in the treatment plan. Group assignments were appropriate and included a core clinical group. The patient's attendance, symptoms, and overall clinical presentation improved in response to treatment.

**Patient TT**

This 41-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. The patient was provided diagnoses of schizoaffective disorder and opioid use disorder, severe, in early remission. Symptoms included auditory and visual hallucinations contributing to profound fear and uncontrollable crying, severe paranoia, fixed delusions, overwhelming grief and guilt, and severe depression and nutritional neglect. She was prescribed and adherent with Abilify, Buspar, Lithium, Effexor, Latuda, Vistaril, prazosin, and Cogentin. She arrived at CCWF EOP on August 31, 2023 from Patton State Hospital. Within CDCR, she had received EOP, MHCB, and ICF care, and she had five hospitalizations in the community secondary to auditory hallucinations and danger to self. Significant medical conditions included seizure disorder. The patient's commitment offense was relevant in that she murdered her daughter while psychotic and delusional, and she continued to experience grief and depression around that event.

Two update IDTT meetings and two routine IDTT meetings occurred during the review period. All four meetings were attended by required staff and the patient, apart from a covering psychiatrist attending one of the routine IDTT meetings. During an update IDTT meeting on September 10, 2024, treatment planning was adequate and appropriately focused on addressing nutrition, ADLs, sleep hygiene, and reality testing some of her delusions. However, interventions were limited to vague references to CBT. By her routine IDTT meeting on December 3, 2024, the patient was actively participating in therapy with her PC to process the guilt and grief. She had achieved notable progress on all treatment goals. She no longer had severe crying spells, had a marked decrease in frequency of delusional thoughts, significant improvements in emotional regulation, consistently brighter affect, and improved ADLs. The patient's symptoms and irritability increased in December 2024, and her medications were adjusted at an update IDTT meeting on December 17, 2024. Her symptoms did not respond to the medication change, and she was appropriately referred to ICF care during an update IDTT meeting on January 7, 2025. During this meeting, the patient reported persistent and distressing grandiose delusions, paranoia, and made delusional accusations against the EOP program supervisor. The treatment team appropriately added treatment goals and interventions targeting paranoia and agitation pending acceptance of the ICF referral. A HLOC indicator was flagged for inpatient referral due to serious impairment in functioning due to major mental disorder and chronic psychiatric symptoms. The treatment plan was updated and provided appropriate enhanced treatment interventions and housing recommendations. The patient remained at CCWF until she transferred to ICF on February 13, 2025.

The patient received confidential psychiatry contacts every four to six weeks during the review period. The progress notes were comprehensive and included updated mental status exams, assessments, observations, and treatment rationale at each contact. In September 2024, prazosin was initiated for the nightmares, and in October 2024, Latuda was initiated for increased paranoia. Medications remained unchanged thereafter until the patient was transferred to ICF. Confidential PC contacts were provided weekly. Interventions were appropriate, consistent with the treatment plan, and focused on processing guilt and grief, developing reality testing skills, challenging delusions, and developing self-compassion. The PC documented the effectiveness of these interventions, including the patient's improved insight. Confusingly, neither psychiatric nor PC progress notes documented the patient's decompensation that resulted in the ICF referral. Unless the patient decompensated over the course of days rather than weeks, the change in presentation should have been documented in the progress notes. The patient was assigned six to eight recreational therapy groups each week and demonstrated generally adequate attendance and good participation noted when she attended. Group topics were limited to leisure activities that lacked clinical focus or skills training. A core clinical group focused on coping skills or grief may have benefitted this patient.

**Findings**

The treatment provided to this EOP patient was adequate.

The patient received timely clinical contacts and adequate support for continuity of care, including special IDTT meetings during periods when her symptoms and/or presentation changed significantly. The treatment team made an appropriate referral to ICF care when the patient's symptoms became so severe that she was no longer able to engage with the treatment team. The PC provided confidential individual treatment on a weekly basis and documented appropriate therapeutic interventions that aligned with the treatment plan. Psychiatry care was adequate and included medication adjustments in response to symptom changes and collaboration on a complicated polypharmacy regimen. The recreational therapy groups offered were appropriate, but an additional clinical group focused on coping skills or grief processing may have been helpful.

**Patient UU**

This 46-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health mental health treatment at CCWF. The patient arrived at CCWF EOP from ICF care on October 11, 2019. During the review period, she was provided a diagnosis of schizophrenia. Primary symptoms included grandiose and paranoid delusions, paranoia, and anxiety. She was prescribed and adherent with Buspar, Haldol, Effexor, Cogentin, and melatonin. Within CDCR she had previously received all levels of care except acute care.

Two routine IDTTs meetings occurred during the review period. These meetings were timely and attended by the patient, her assigned clinicians, two senior psychologist supervisors, and a CCI. During the November 2024 IDTT meeting, treatment planning was adequate, and problem areas focused on improving insight and addressing her delusions to reduce their impact on her functioning. Interventions appropriately focused on reality testing, medication adherence, and

psychoeducation. Treatment goals were objective and measurable. However, IDTT documentation did not provide a rationale for EOP care or discharge criteria. During the IDTT meeting in February 2025, the treatment team noted that the patient was refusing confidential PC encounters and opined the patient may have been taking nonprescribed medications or illicit substances. The team added treatment adherence as a problem area and encouraged the patient to participate in confidential PC encounters.

The patient received confidential psychiatry contacts every four to six weeks during the review period. Progress notes were comprehensive and reflected appropriate symptom and medication monitoring. PC contacts were offered weekly through alternating PC caseload groups and individual encounters. The PC appropriately documented the patient's symptoms, behavior, and responses to interventions. The PC documented appropriate interventions that aligned with the treatment plan and addressed the patient's reluctance to participate in out-of-cell contacts. The patient was assigned 10 hours per week of recreational therapy groups. Group attendance was inconsistent but improved near the end of the review period. Recreational therapy groups focused on leisure topics that provided little clinical skill development.

**Findings**

The treatment provided to this EOP patient was adequate.

IDTT meetings and clinical contacts were timely and well documented. IDTT meetings were well staffed, and treatment planning was individualized to address the patient's symptoms. Treatment goals and interventions were adequate and were updated appropriately to reflect the patient's evolving treatment needs and functioning. Psychiatry contacts were adequately documented and reflected active collaboration with the patient on prescribed medications. Confidential PC contacts were offered weekly and were followed by wellness checks at the cell front when the patient declined the office visit. There were no flagged HLOC indicators or disruptions in continuity of care.

**Patient VV**

This 59-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. Her diagnoses included schizoaffective disorder, bipolar type, extrapyramidal syndrome, and unspecified affective disorder. Primary symptoms included paranoia, delusions, auditory hallucinations, aggression, mood swings, depression, anxiety, poor insight, and impaired judgment. She was prescribed and adherent with fluphenazine and lithium. Hydroxyzine was prescribed PRN for insomnia., but she did not use this medication during the review period. She arrived at CCWF EOP from Patton State Hospital on July 31, 2023 and had previously received 3CMS, EOP, and ICF care. Medical conditions included hyperlipidemia, hypothyroidism, hypertension, severe obesity, and urinary incontinence.

Two routine IDTT meetings occurred during the review period. The patient, her assigned clinicians, and a CCI attended both IDTT meetings, and one IDTT meeting was also attended by two senior psychologist supervisors. During October 2024 IDTT meeting, treatment planning was appropriate and focused on reducing the impact of the patient's delusions. Treatment goals

were measurable, and interventions were clinically appropriate. Documentation of the rationale for EOP care and discharge criteria were appropriate and individualized. During the routine IDTT in December 2024, the patient was assigned a new PC and was receptive. Her overall treatment plan remained appropriate and was not changed.

The patient was offered confidential psychiatry contacts every four to eight weeks. Although not timely, contacts were well documented. There were no medication changes, and the patient did not make any requests to be seen between contacts. Progress notes indicated the patient remained stable but psychotic, with ongoing delusions about her brother being kidnapped and auditory hallucinations about a specific person trying to kill her through demonic forces. She reported that these symptoms were not distressing. The patient received weekly PC treatment through confidential individual sessions or PC caseload groups. PC progress notes were well written, and the PC documented provision of interventions required by the treatment plan, including psychoeducation, reality testing, meditation, and journaling. After the patient's assigned PC was changed in December 2024, the patient received several individual PC contacts to establish rapport before resuming PC caseload groups. This step improved continuity of care. The patient was offered between four and ten hours of recreational therapy groups each week. She attended all offered groups and was described as highly engaged. Group topics were primarily leisure groups and lacked clinical focus. However, during IDTT meetings the patient reported benefiting from these groups.

**Findings**

The care and treatment provided to this EOP patient were adequate.

PC contacts and IDTT meetings were timely throughout the review period. Although not timely, psychiatric encounters reflected appropriate care, and there were no disruptions in continuity of care. Treatment planning was individualized for the patient's symptoms and clinical needs. It included measurable treatment goals and appropriate interventions. Discharge and retention criteria were appropriate. PC encounters included well documented interventions that aligned with the treatment plan. Continuity of care was achieved when the assigned PC changed midway through the review period, and the newly assigned PC established rapport effectively. The patient was consistently medication and program adherent and appeared to benefit significantly from treatment.

**Patient WW**

This 46-year-old patient's healthcare record was reviewed to assess the quality of mental health treatment at CCWF. Her diagnoses included major depressive disorder, recurrent, moderate, delusional disorder, other specified schizophrenia spectrum or other psychotic disorder, antisocial personality disorder, opioid use disorder, severe, and unspecified anxiety. Symptoms included a history of psychosis in the context of methamphetamine use, auditory hallucinations, paranoia, and fixed delusions about an infection in her head. She was prescribed fluphenazine, venlafaxine, propranolol, melatonin, and benztropine. She was placed in CCWF EOP after discharge from acute care on November 8, 2023. Within the CDCR, she had previously received 3CMS, EOP, MHCB, and PIP care. Medical conditions included hyperlipidemia and neuropathy.

Two routine IDTT meetings and one special IDTT meeting were held during the review period. The IDTT meetings were well staffed and at minimum included the patient, her assigned clinicians, a senior psychologist supervisor, and CCI. Additional participants who attended at least one IDTT meeting included an additional senior psychologist supervisor, an additional psychiatrist, a recreational therapist, and an occupational therapist. Both the PC and the psychiatrist were onsite for each IDTT meeting. During the routine IDTT meeting in October 2024, the patient was appropriately retained in EOP care despite requesting discharge to 3CMS care, after she acknowledged partial medication adherence, an increase in depression and sleep, and illicit substance use to cope with depression. The treatment plan, rationale for EOP care, and discharge criteria were adequately documented, and a plan to hold a special follow-up IDTT meeting in 30 days was developed. At the 30-day update IDTT meeting in November 2024, the patient's group attendance and medication adherence were noted to have improved, but her attendance of individual treatment was inconsistent. The patient reported that she wanted to work on coping skills, and the treatment team added coping skills training to the treatment plan. At the routine IDTT meeting in February 2025, the patient was medication adherent and attended groups but still did not attend individual treatment offered by the PC. The patient was again appropriately retained in EOP care due to concerns about insight and the need to explore a transition to a lower level of care. Level of care rationale and discharge criteria were updated appropriately at each IDTT.

The patient was offered confidential psychiatry contacts every four to six weeks during the review period, but she was not offered a routine psychiatry encounter during November 2024. Psychiatric progress notes were comprehensive and indicated the patient achieved consistent medication adherence as the review period progressed. At several contacts, the patient denied psychotic symptoms and asked to stop Prolixin, but the psychiatrist provided psychoeducation, and the patient remained on the medication. Near the end of the review period, the psychiatrist documented that the patient's insight was fair and her condition was generally stable.
The patient was offered weekly PC contacts through individual contacts or PC caseload groups. Contacts were provided in a confidential setting except when the patient declined; follow-up wellness checks at the cell front were provided in these cases. PC contacts were well-documented, including reference to the treatment plan and specification of interventions. The PC provided the interventions prescribed in the treatment plan. The patient's attendance of individual PC encounters improved over the review period. The PC appropriately noted the patient's engagement, completion of homework assignments, and improvements in skill development. The patient was offered daily recreational therapy groups throughout most of the review period consisting of leisure and yard groups. A random check of progress notes indicated the patient's recreational therapy group attendance was poor, in contrast to IDTT documentation that indicated consistent attendance.

**Findings**

The treatment provided to this EOP patient was adequate.

The patient received timely IDTTs that were well staffed, collaborative, and incorporated the patient's stated treatment goals into the treatment plan. The goals and interventions provided by

the treatment team were appropriate and individualized for the patient. Overall PC care was adequate. PC contacts were offered weekly and the patient's engagement and participation in individual treatment improved significantly over the review period. The PC provided the interventions prescribed by the treatment plan. The patient responded well to therapy and appeared to benefit significantly from the PC's persistent efforts towards engagement and rapport-building. Apart from a gap in November 2024, the patient received timely, confidential, and appropriate psychiatric care. The treatment team responded well to the patient's repeated requests for a lower level of care, and the team collaborated with the patient to develop clinically appropriate treatment plans and discharge criteria.

**APPENDIX B-16**
**Folsom State Prison (FSP)**
**Review Period: August 1, 2024 – January 31, 2025**

**Patient A**

This 49-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. He was provided diagnoses of major depressive disorder, recurrent, mild with anxious distress, polysubstance dependence, and anxiety. He was prescribed and adherent with escitalopram, hydroxyzine, and prazosin to address anxiety, insomnia, and nightmares. He entered the MHSDS at the 3CMS level of care on November 19, 2010 and remained in 3CMS care since then, with no HLOC referrals or placements. Medical conditions included hypertension, hyperlipidemia, diabetes, and asthma. The patient arrived at the FSP 3CMS program in early January 2023 and remained in 3CMS care at FSP throughout the review period. He was housed in Facility A.

During the review period, a timely annual IDTT meeting occurred on December 18, 2024. The assigned clinicians, program supervisor, chief psychiatrist, and CC I attended the IDTT meeting. The patient did not attend due to custody modified programming. The treatment team noted the patient recently reported primary symptoms of anhedonia, depressed mood, sleep disturbance, low energy, irritability, and excessive worry. IDTT documentation included an updated and comprehensive clinical summary. The treatment plan included individualized treatment goals and interventions including mood stabilization and management, grief processing, and increased communication skills. Interventions included referrals to appropriate groups and medication adherence. The treatment plan also included IPOCs to address depressed mood and anxiety with objective and measurable goals. Documentation of discharge criteria was adequate.

The patient received three routine psychiatry contacts during the review period. The encounters were provided in person in a confidential setting. At each contact, the patient was noted as stable and he denied any significant symptoms or distress. His mental health symptoms were well controlled with his medications and the patient denied significant anxiety, depression, or nightmares. The patient was medication adherent, and he denied any side effects. These encounters were adequately documented. The patient was offered three routine PC encounters during the review period. The contacts were offered in a confidential setting, but the patient declined full sessions for two of three contacts and requested a "check-in" so he could participate in other programming. At each contact the patient was noted as stable and he denied any significant symptoms or distress. His treatment goals and IPOCs were appropriately included in the progress notes, and the PC noted the patient had not yet met his treatment goals. The patient was not offered any groups during the review period, but the record indicated he was on the waitlist for several clinical and recreation therapy groups.

**Findings**

The treatment provided to this 3CMS patient was adequate.

The annual IDTT meeting was timely and well attended. The treatment plan included specific, measurable, and individualized goals to address the patient's depression and anxious symptoms. He received timely routine psychiatry contacts and was medication adherent. His symptoms were well controlled by the medications. PC contacts were timely and well documented, and the PC appropriately updated the patient's treatment progress and IPOCs at each contact. It appeared that group waitlist times were long, as the patient was on several group waitlists throughout the review period.

**Patient B**

This 42-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. The patient arrived at FSP in 3CMS care on January 11, 2023. During the review period, he was provided diagnoses of adjustment disorder with depression and anxiety and opioid use disorder. The adjustment disorder diagnosis had been the patient's primary diagnosis for the past several years, far exceeding diagnostic time requirements for the disorder. He had not been prescribed psychotropic medications since 2019. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. His level of care history was limited to 3CMS, with no HLOC referrals or placements, and he remained in 3CMS care at FSP throughout the review period. He was housed in Facility A.

The annual IDTT meeting occurred on August 6, 2024. The patient, assigned clinicians, and a CC I attended the meeting. The patient denied any acute mental health symptoms and rated his anxiety and depression "0/10." He identified several treatment goals, including maintaining stable mood and little to no symptoms, completing DRP classes, and enrolling in college classes later that Fall. He also asked to be placed on the waitlists for several mental health groups. The treatment plan included an IPOC for anxiety; the IPOC indicated that the patient had met all treatment goals except being discharged to general population. His primary treatment goal was to maintain stability until his next IDTT meeting. The interventions and discharge criteria were clinically appropriate. The patient was retained at 3CMS to continue quarterly PC contacts and to allow the him to participate in groups when they became available.

The patient received three confidential routine PC contacts during the review period. The patient and PC had good rapport, and the PC noted he and the patient discussed symptom management, relapse prevention, and healthy coping skills. The progress notes were well documented and updated appropriately at each encounter. IPOC indicators and progress towards treatment goals were also updated appropriately. The patient remained stable, despite increases in stressors such as a court hearing and two isolated opioid relapses. The PC provided appropriate support and therapy, and the patient did not require any referrals. The patient was not offered groups during the review period, but the annual IDTT documentation indicated he was on the waitlist for several mental health groups.

**Findings**

The treatment provided to this 3CMS patient was adequate.

The annual IDTT meeting was a timely and well-staffed. The patient's treatment goals and interventions were appropriate for his needs and had proven effective in maintaining his stability since his last IDTT meeting. Level of care retention rationale and discharge criteria were appropriate. He was stable for several years without psychiatric medication. PC contacts were well documented. The interventions aligned with the patient's treatment plan and met his clinical needs.

**Patient C**

This 28-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. He arrived at FSP on May 17, 2021. His diagnoses during the review period were adjustment disorder with mixed anxiety and depressed mood and cannabis use disorder, mild. He was not prescribed psychotropic medication during the review period or for several years prior to the review period. He was placed at 3CMS level of care at reception and did not have a history of any HLOC referrals or placements. The patient did not suffer from any pertinent medical conditions. He remained in 3CMS care at FSP throughout the review period. He was housed in Facility A.

The annual IDTT meeting occurred on October 2, 2024 and was attended by the patient, assigned clinicians, CC I, and program supervisor. The treatment team noted that the patient wanted to remain in 3CMS care to continue developing stress management skills, and that he benefited from groups and individual counseling. The PC noted that the patient was highly motivated to participate in as many mental health groups as possible and was receptive to the skills and strategies taught in the groups. The treatment plan included IPOCs for depressed mood and anxiety. Both IPOCs included appropriate interventions and progress indicators that were updated appropriately at each PC contact. Treatment goals were thorough and individualized and included short-term goals, long term goals, and interventions. Discharge criteria were absent, but the rationale for retaining the patient in 3CMS care was adequately documented.

The assigned PC provided four routine PC contacts during the review period. These encounters were confidential. Most session content focused on the patient's efforts to remain sober and developing stress management and coping skills. The patient repeatedly denied any acute symptoms or distress and was consistently optimistic in his recovery. The PC contacts were well documented and included references to the treatment plan goals. IPOC progress indicators were updated at each contact. The patient was offered a weekly dialectical behavior group facilitated by a LCSW. The group topic was appropriate for the patient's treatment needs, and the patient's attendance was adequate. He was noted as an active participant.

**Findings**

The treatment provided to this 3CMS patient was adequate.

The annual IDTT meeting was timely and well-staffed. The patient's treatment plan was individualized and included specific interventions and treatment goals. The rationale for retaining the patient in 3CMS care was appropriate. He was stable without psychiatric medications, received timely and well-documented individual PC treatment, and participated in dialectical behavior

treatment groups. The patient remained stable and appeared to benefit from treatment throughout the review period.

**Patient D**

This 30-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. He arrived at FSP on July 30, 2024 and was released from prison on January 6, 2025. His diagnoses during the review period were adjustment disorder with anxiety and unspecified bipolar and related disorder. He was prescribed buspirone, mirtazapine, and olanzapine and adherent with these medications. As described below, these medications were adjusted several times prior to his release. He was placed at 3CMS LOC in reception and had remained at 3CMS since then, with no HLOC referrals or placements. He did not have any pertinent or chronic medical conditions. He continued to receive 3CMS treatment throughout the time he remained at FSP.

The patient received a timely initial psychiatry assessment. He was prescribed Zyprexa, Remeron, and Buspar on arrival and reported the medications were helpful. He denied anxiety, depression, and hallucinations and rated his mood "8/10" with "10" being highest. The psychiatrist continued the medications unchanged. The initial PC assessment was timely and comprehensive, and it informed subsequent treatment planning. The PC noted the patient's upcoming release date in January 2025 as well as the patient's statements that his treatment program was helpful and he did not want any changes. The clinical summary and case formulation were updated appropriately.

The initial IDTT meeting was timely and attended by the patient, assigned clinicians, and a CC I. The patient's primary symptoms were depressed mood and anxiety. The patient reported that he wanted to remain in 3CMS for counseling resources and education on coping skills and stress management techniques. The treatment plan included specific interventions including daily mindfulness exercises and dialectical behavior treatment-based distress tolerance techniques. An IPOC for anxiety contained several specific and appropriate progress indicators and interventions to inform treatment. Discharge planning was included and noted that resources on housing and other community resources would be provided as the patient's release date approached.

The patient received three psychiatry encounters during the review period. At his first routine contact on October 23, 2024, the patient and psychiatrist agreed to discontinue buspirone because it was originally prescribed as a PRN medication; the patient had not been requesting it. His other medications were continued unchanged until the next routine contact on November 7, 2024. On November 7, 2024, the patient reported increased anxiety as his parole date approached, and he requested to restart buspirone. The psychiatrist restarted buspirone as a scheduled rather than PRN medication, discontinued olanzapine because there was no clear benefit, and continued mirtazapine. At his final psychiatry contact on December 5, 2024, the patient reported his medications were effective and asked about parole medications. Psychiatric encounters were well documented, and it appeared medications were adjusted appropriately in response to the patient's clinical needs. The patient received one routine PC contact during the review period on November 4, 2024. The PC noted the patient was stable and was preparing for his upcoming parole. His mental status was unremarkable, and the PC and patient discussed transition and parole plans. The contact was well documented.

**Findings**

The treatment provided to this 3CMS patient was adequate.

The patient received timely clinical contacts, and his initial IDTT and treatment plan were appropriate for his needs. The patient spent most of his time at FSP preparing for parole and coping with anxiety related to that process. He collaborated with his psychiatrist for several medication adjustments to properly address his symptoms. Psychiatric care was well documented and responsive to the patient's needs. He received one routine PC contact that was well documented and included appropriate support and discussions. The patient remained stable throughout his time at FSP and paroled successfully in January 2025.

**Patient E**

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. He entered prison for his second term on May 24, 2024 and arrived at FSP on September 5, 2024. His EPRD was April 14, 2026. He was provided a diagnosis of schizoaffective disorder, depressive type, and he was prescribed and adherent with aripiprazole, buspirone, fluoxetine, hydroxyzine, mirtazapine, and duloxetine. Primary symptoms were paranoid ideation, intense anxiety, and chronic depressed mood. His level of care history was limited to 3CMS with no HLOC referrals or placements. He did not have any chronic or pertinent medical concerns. He remained in 3CMS care at FSP throughout the review period. He was housed in Facility A.

The initial PC assessment was timely and confidential. The patient reported a history of depression and significant anxiety, but during the assessment he said his anxiety was generally well controlled with medications; he reported a stable mood with minimal to mild anxiety but frequent depression. The patient and PC planned to focus on improving the patient's self-esteem, increasing his insight into his triggers, and developing effective coping skills for depression and anxiety. The initial psychiatry assessment was timely, collaborative, and adequate. The patient reported frequent depressive symptoms, including persistently sad and depressed mood and episodic hopelessness, paranoid ideation, and episodes of intense anxiety. The patient also reported good sleep and appetite. The psychiatrist documented the patient's mental health history and mental status, updated the patient's medication dosages, and added aripiprazole to target paranoid ideation.

The initial IDTT meeting was timely and attended by the patient, his assigned clinicians, and a CC I. IDTT clinical summary referenced the treatment goals provided in the initial PC assessment and focused on improving the patient's self-esteem, increasing insight into triggers, and developing effective coping skills for his depression and anxiety. Unfortunately, these goals were not reflected or identified in the treatment planning or IPOC sections of IDTT documentation. No measurable progress indicators were provided. Discharge and level of care retention criteria were documented in generalized language. Overall, IDTT documentation was inadequate, as it did not provide measurable and objective treatment goals or progress indicators.

The patient received three psychiatry follow-up contacts during the review period. All three encounters were confidential. He endorsed ongoing depression, anxiety, and paranoia at each

contact and asked the psychiatrist to adjust his medications. His medications were adjusted several times, with aripiprazole discontinued at the patient's request in mid-November 2024. By the end of the review period he was prescribed buspirone, duloxetine, hydroxyzine, and mirtazapine and remained psychiatrically stable. Psychiatric progress notes were comprehensive and documented the rationale and discussion with patient at each medication adjustment. The patient received one routine PC contact on December 14, 2024. The encounter was confidential. He reported "pervasive" episodes of depression but denied significant anxiety. He reported his primary coping skills were staying occupied during the day with yard, playing games, and listening to mindfulness materials on his tablet. The PC noted he and the patient reviewed self-esteem enhancement strategies. The progress note included IPOCs for anxiety and depressed mood and objective measures to assess treatment progress. The contact was well documented and adequate for the patient's needs.

**Findings**

The treatment provided to this patient was adequate.

Despite inadequate treatment planning during the initial IDTT meeting, the patient received the treatment he needed. The patient received timely and thorough initial clinical assessments, and the initial IDTT meeting was a timely and well-staffed IDTT. The clinical summary was adequate and included relevant clinical data and generalized treatment goals. Unfortunately, the treatment plan was not adequate. Psychiatry and PC encounters were confidential and adequate. Psychiatry contacts were thoroughly documented, and the patient and psychiatrist actively collaborated on the patient's medication regimen to maximize efficacy and reduce his symptoms. The PC progress note reflected active and appropriate treatment as well as monitoring of the patient's treatment progress. The patient appeared to benefit from his treatment and remained relatively stable as his medications were adjusted.

**Patient F**

This 24-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. The patient arrived at FSP on October 28, 2024. This was the patient's first incarceration, and he had an EPRD of February 19, 2025. He was provided a diagnosis of adjustment disorder with anxious and depressed mood. He was prescribed and adherent with mirtazapine. Through the ISDUT, he was prescribed buprenorphine-naloxone for opioid use disorder. His level of care history was limited to 3CMS, and he did not have any chronic or significant medical concerns. He was housed at the minimal support facility and received 3CMS care throughout the time he was incarcerated at FSP.

The initial PC assessment was timely and confidential. He endorsed significant depressive and anxious symptoms and sleep disturbance and said Remeron helped reduce his symptoms and aid his sleep. He also reported methamphetamine dependence and concerns about limited job skills, homelessness, and his upcoming release. The PC noted the prerelease coordinator would be working with the patient. The assessment was adequate and informed treatment planning. The initial psychiatric assessment was confidential and adequate with respect to content. However, it was completed late, occurring one day after the initial IDTT meeting. The psychiatrist noted the

patient endorsed sleep disturbance, anxiety, and depressed mood and requested an increase in his Remeron. He denied any side effects and was medication adherent. The psychiatrist agreed to the increase and scheduled follow-up for 30 days. The initial IDTT was timely and attended by the patient, assigned clinicians, and a CC I. The treatment plan included individualized, objective, and measurable treatment goals; however, the goals were incorrectly placed in the "discharge/reason for retention" section of IDTT documentation. Interventions were specific and individualized, and discharge criteria were appropriate. Despite being poorly organized, the overall treatment plan was adequate and specific to the patient.

The patient received one follow-up psychiatry contact during the review period, 34 days after the initial psychiatric assessment. The psychiatrist noted the patient was stable but requested to increase mirtazapine because he felt it had gradually become less helpful for his anxiety and insomnia. The psychiatrist provided psychoeducation and agreed to the mirtazapine increase. The psychiatrist noted the patient had a job in the kitchen, but he was not involved in any other programming or organized activities. The patient received one routine PC contact during the review period. The encounter was confidential and adequately documented. The patient reported minimal anxiety and unimpaired sleep and appetite. His mental status was within normal limits, and he reported no significant concerns or complaints. The PC provided supportive therapy and psychoeducation on coping skills. An IPOC for depressed mood was included in the progress note and included several specific interventions and progress indicators that were updated during the encounter.

The patient received four prerelease planning contacts with the prerelease coordinator. The contacts were initiated approximately one month prior to the patient's scheduled release and were well documented. At the final contact on January 31, 2025, the patient told the coordinator that he felt his prerelease plans had been addressed and he declined further contacts or services.

**Findings**

The treatment provided to this 3CMS patient was adequate.

Although his stay at FSP was brief, the patient received an adequate treatment plan that addressed his symptoms, short-term goals, and focused on preparing for his upcoming release. His initial clinical assessments provided adequate data and informed treatment. However, the initial psychiatry assessment was completed late, one day after the initial IDTT meeting. The patient's clinical contacts were confidential and well documented. The patient's medications were adjusted collaboratively, and the PC worked with him to improve his coping skills. He received prerelease contacts and felt prepared for release at his final clinical contact.

**Patient G**

This 39-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at FSP. The patient arrived at FSP on September 7, 2021. He was provided diagnoses of major depressive disorder, recurrent episode, moderate, and cannabis use disorder, severe. Hydroxyzine was prescribed PRN for insomnia, but the patient did not use it during the review period. He was level II and housed in the general population at FSP. Within CDCR, he

had received only 3CMS care, and he remained in 3CMS care at FSP throughout the review period. He was housed in Facility A.

The annual IDTT meeting was timely and attended by the patient, the assigned PC and psychiatrist, and a CC I. The patient rated his depression and anxiety as "extremely high" on psychological screening measures; these ratings were noted as higher than those he provided during his last annual IDTT meeting. The clinical summary noted the patient's feelings of worthlessness, low self-esteem, and tendency to ruminate. The treatment team noted the patient attended group consistently, was an active participant, and had completed a second round of CBT groups and achieved 100% attendance. The treatment plan included objective and measurable short- and long-term goals with interventions including CBT, groups, and relaxation techniques. The plan noted that the patient had not yet met his treatment goals. The discharge plan/criteria appeared pulled forward as it indicated the patient was in RHU when he was not.

The patient was offered three timely routine psychiatry contacts during the review period. He attended two of three contacts and declined the third because he was at canteen. The psychiatrist noted the patient presented as stable and reported no acute distress or difficulties although he was struggling with feelings of guilt. His acute risk for self-harm was low, and his mental status was within normal limits at both contacts. The patient asked to continue the PRN order for hydroxyzine during both encounters, despite not using it. The patient was offered weekly to biweekly PC contacts throughout the review period. The contacts were confidential and ranged in length from 4 minutes to approximately one hour. Each contact progress note was updated appropriately and included the patient's subjective report and mental status. The patient was euthymic and used the PC encounters to process current stressors and work on coping skills. PC progress notes were consistent with the treatment plan and referred to the treatment goals and interventions appropriately. The patient was offered CBT groups during the review period and completed CBT groups on September 10, 2024 with 100% attendance. He began virtual reality therapy with the recreational therapist on November 6, 2024 and had three additional sessions during the review period. The recreational therapist noted that the patient reported feeling more relaxed and asked to continue virtual reality sessions whenever available.

**Findings**

The treatment provided to this 3CMS patient was adequate.

The patient received timely and well documented treatment. His treatment plan was individualized and included the patient's stated goals, objective and measurable clinical goals and interventions, and progress updates. The overall IDTT was adequate despite lacking discharge criteria. Psychiatric encounters were timely and well documented. PC contacts were frequent, confidential, aligned with the treatment plan, and well documented. The patient participated in both CBT groups and virtual reality therapy.

**Patient H**

This 30-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. The patient arrived at FSP on June 8, 2023. He was provided a diagnosis of

adjustment disorder, unspecified. He was not prescribed psychiatric medications. Primary symptoms included anxiety and depressed mood. He did not have any history of suicidal or self-injurious behavior. Within CDCR, he had only received 3CMS care, and he remained in 3CMS care at FSP throughout the review period. He was housed in Facility A.

The annual IDTT meeting was timely and attended by the patient, assigned clinicians, a CC I, and the remainder of the FSP mental health team. The treatment plan included an IPOC for anxiety that included specific and measurable treatment goals and interventions. The progress indicators had been updated at each PC encounter since the last IDTT meeting. The treatment plan included short-term objectives, measurable long-term goals, and patient-specific interventions. Discharge criteria were appropriate and included prerelease resources as the patient neared his parole date.

The patient received three routine PC contacts during the review period. The encounters were confidential but, at the patient's request, kept brief. The patient consistently denied any acute distress or mental health symptoms. The PC documented provision of supportive counseling and psychoeducation regarding coping skills and stress management techniques. PC progress notes included appropriately updated IPOC progress indicators, and the interventions aligned with the treatment plan.

**Findings**

The treatment provided to this 3CMS patient was adequate.

The patient received timely clinical contacts including his annual IDTT meeting and routine PC contacts. He remained stable throughout the review period, and the treatment team noted he continued to benefit from supportive counseling contacts and access to clinicians should the need arise. IDTT documentation was adequate, and the treatment plan was individualized with objective and measurable goals. PC progress notes were adequately documented and included updated treatment progress indicators and provision of the interventions required by the treatment plan.

**Patient I**

This 33-year-old 3CMS patient's healthcare record was reviewed to assess the quality of care of FSP. The patient arrived at FSP on July 13, 2023. He was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, PTSD, and opioid use disorder, severe. He was prescribed fluoxetine and mirtazapine, and adherent with fluoxetine but not with mirtazapine. Early in the review period, mirtazapine was converted from a scheduled to a PRN medication, and the patient used it almost every evening. Hydroxyzine was prescribed PRN for anxiety, but the patient used this medication only once during the review period. Through the ISUDT, he was prescribed buprenorphine-naloxone. The patient's level of care history was limited to 3CMS. He did not have any chronic or significant medical concerns. He was housed in Facility A and remained in 3CMS care throughout the review period.

The annual IDTT meeting was timely and attended by the patient, alternates for the assigned PC and assigned psychiatrist, and a CC I. IDTT documentation included IPOCs for anxiety and

depressed mood; the covering PC noted that the patient had achieved his treatment goals for both. No ongoing treatment plan was formulated, and no updated interventions or support strategies were identified. The clinical summary was not updated. The IDTT meeting was inadequate and lacked any treatment planning.

The patient received three routine psychiatry contacts during the review period. All three encounters were confidential. The psychiatrist noted the patient's severe opioid use disorder, repeated medication nonadherence, and history of urine toxicology screens that were positive for cannabis and fentanyl in addition to prescribed buprenorphine-naloxone. The psychiatrist prescribed fluoxetine and mirtazapine. This medication combination appeared to be effective, as the patient's adherence improved and anxiety and depression reduced. Four PC encounters were provided during the review period; each was confidential and were well documented. PC progress notes included updated treatment progress indicators, the patient's subjective report and mental status, and the plan moving forward. The PC and patient frequently discussed the patient's struggles with medication adherence and sobriety. The PC provided psychoeducation and collaborated with the patient to develop a relapse prevention plan. The PC noted that despite substance abuse and medication adherence difficulties, the patient remained stable and did not demonstrate or report any acute symptoms or decompensation. The patient was not offered groups during the review period.

During the review period, the patient received an RVR alleging possession of a controlled substance. The mental health RVR assessment was adequate and found no nexus between mental health symptoms and the alleged behavior. On the same day that the RVR was issued, the patient submitted a PREA complaint because he was placed in a holding cell, allegedly naked and in full view of other incarcerated individuals, while custody staff searched his cell. The mental health consult and accompanying SRE resulting from the patient's PREA complaint were timely and adequate; the patient was found at low risk.

**Findings**

The treatment provided to this 3CMS patient was adequate.

Despite the inadequate IDTT meeting and treatment planning, the patient was provided with adequate treatment. He responded well to the clinical interventions provided by the PC and psychiatrist, and the patient's overall stability increased. Medication adherence improved and use of illicit substances decreased. The PC had good rapport with the patient and provided supportive therapy, psychoeducation, and collaborative work to develop a relapse prevention plan. Mental health assessment following a PREA allegation was timely and adequate. The patient remained stable, his symptoms improved in response to treatment, and he had met his treatment goals at the end of the review period.

**Patient J**

This 29-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care at FSP. The patient arrived at FSP on July 16, 2024. He was provided diagnoses of unspecified mood/thought disorder, substance-induced chronic mood and psychotic disorder, and

opioid and amphetamine use disorders. He was prescribed mirtazapine and olanzapine and was partially adherent with both. He denied any side effects or problems with his medications. Buspirone was discontinued on the first day of the review period. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. The patient was housed in the minimal support facility during his time at FSP.

The initial PC assessment was timely and adequate; it was completed two days prior to the start of the review period. The initial IDTT meeting was timely and held on the first day of the review period. As noted, buspirone was also discontinued on this date; there was no contemporaneous documentation of the rationale for this discontinuation. The IDTT meeting was attended by the patient, assigned PC and psychiatrist, and a CC I. IDTT documentation included an IPOC for depressed mood but lacked any specific objectives, long-term goals, or interventions. The treatment plan section of IDTT documentation was left blank. Discharge criteria were appropriate and included the use of objective assessment measures to determine symptom severity and progress. The comments section also contained clinical interventions including identifying triggers, developing coping skills, utilizing goal-setting, and other CBT strategies. IDTT documentation and the treatment plan were inadequate because they lacked specific and individualized interventions and were poorly organized.

The initial psychiatry assessment was late, occurring one week after the initial IDTT meeting, but confidential. Content was adequate to support continuity and coherence of care. The psychiatrist noted that the patient described prescribed mirtazapine and olanzapine as "remarkably helpful." The patient denied significant symptoms or distress, and his mental status was within normal limits with good mood and congruent affect. The psychiatrist assessed the patient's chronic risk of self-injurious behavior as high and acute risk was "low." Following the delayed initial psychiatric assessment, the psychiatrist attempted to see the patient 20 days later in response to the patient's health services request for an explanation regarding the discontinuation of buspirone. The patient declined the contact. The first psychiatric encounter did not occur until 111 days later. During this encounter, the psychiatrist documented that he had discontinued the patient's olanzapine and mirtazapine several days earlier due to the patient's nonadherence. The patient reported that he was nonadherent because the medications made him go to sleep earlier than he wanted, and he asked to take the medications on a PRN basis. The psychiatrist agreed to change both medications to PRN. Following this encounter, the psychiatrist saw the patient monthly through the end of the review period. The psychiatrist last saw the patient on January 14, 2025; during this encounter, the psychiatrist documented that the patient was intoxicated on an unknown substance. Until this date, the patient only used PRN medications rarely, but following the January 2025 psychiatric encounter, he began using both PRN medications nightly. No follow-up of the patient's substance use was documented by any IDTT member.

The assigned PC provided two confidential individual encounters during the review period. The encounters were well documented and included updated mental status and subjective reports. As documented, interventions were limited to education and supportive counseling. Substance use was not addressed. The patient received a timely pre-release planning contact with the prerelease coordinator on December 30, 2024. He reported he had housing arranged, did not have any concerns about community resources, and felt his prerelease needs had been met. He paroled on February 10, 2025.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Psychiatric assessment was delayed until after the initial IDTT meeting, and there was a subsequent gap in timely psychiatric care. Treatment planning was disorganized and did not identify specific, individualized treatment goals or treatment interventions. There was no contemporaneous documentation of the rationale for discontinuing buspirone. After being discontinued due to nonadherence, mirtazapine and olanzapine were both reinitiated as PRN medications at the patient's request. Use of antidepressant and antipsychotic medication solely on a PRN basis requires review. Both psychiatric and PC encounters were supportive, and the monthly psychiatric encounters provided after medications were converted to PRN status demonstrated concern for and appropriate monitoring of the patient's symptoms and functioning. However, the PC documented the provision of only vague interventions in the form of education and support. The patient's diagnoses remained unreconciled and unclear during the review period.

# APPENDIX B-17
# High Desert State Prison (HDSP)
# Reporting Period: November 1, 2024 – April 30, 2025

**Patient A**

This 27-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with adjustment disorder with depressed mood. He was not prescribed any psychotropic medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder, and he was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in his health record. Within CDCR, the patient previously received 3CMS and MHCB services. Medical conditions included opioid use disorder and recurrent hepatitis C. He received RHU 3CMS care at HDSP for 52 days from October 14, 2024 to December 5, 2025, when he was transferred to another facility.

The initial primary clinician assessment was not completed until 38 days following the patient's placement in RHU 3CMS. The patient refused this encounter, which was offered by telehealth; the assessment was completed based on record review, necessarily lacked a mental status exam, and failed to note the patient's history of treatment with mirtazapine, the patient's trauma history, which included seeing his older brother shot to death when the patient was seven years old, or the patient's methamphetamine use disorder. An initial psychiatric assessment was not completed, and the patient was not seen by a psychiatrist at any time during RHU 3CMS care. No IDTT meetings were held. Only one primary clinician encounter was documented. This encounter was attempted by telehealth 51 days after the patient was placed in RHU 3CMS care and was refused. Notably, the progress note indicated that a HDSP directive permitted the medical assistant to collect patient refusal forms but not to transport the telemental health provider to the patient's cell front. A weekly 90-minute recreational therapy group was offered during five of the patient's seven weeks of RHU 3CMS care; the patient attended no sessions.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The primary clinician assessment was late and failed to capture key elements of the patient's psychosocial and psychiatric history. No psychiatric assessment and no IDTT meetings were completed. The patient was not offered weekly primary clinician encounters and, on two occasions, was not offered the required weekly RHU 3CMS group. The telemental health provider's inability to conduct a wellness check following the patient's refusal of a confidential encounter was particularly concerning both because this was the only individual encounter offered during the 52 days of 3CSM RHU care and because a HDSP directive was in place that prevented the completion of a follow-up wellness check.

**Patient B**

This 64-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with unspecified depressive

disorder, posttraumatic stress disorder, and adjustment disorder. He was prescribed melatonin, sertraline, and duloxetine and was adherent with melatonin and duloxetine; sertraline was prescribed as a keep-on-person medication. Through medical services, he was prescribed amitriptyline for low back pain, and he was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in his health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included male genital disorder, diabetes, hypertension, hyperlipidemia, peripheral venous insufficiency, history of gastroesophageal disease, chronic obstructive sleep apnea, spinal stenosis of the lumbar region, and arthritis of the knee. He received RHU 3CMS care at HDSP from February 27, 2025 through the time of this review, in early June, 2025.

The initial primary clinician assessment was completed by telehealth. It was timely but not adequate, as it failed to document any exploration of posttraumatic stress disorder or adjustment disorder symptoms and did not address or reconcile these diagnoses. The initial psychiatric assessment was completed late and at the cell front due to the patient's refusal of a confidential setting. This assessment was limited but resulted in a diagnosis of a depressive disorder. The initial IDTT meeting occurred 41 days after the patient's placement in RHU 3CMS. The patient and required staff attended, and the patient was not found to meet any criteria for consideration of a higher level of care. The case formulation was not updated, did not address factors that could improve the patient's symptoms or functioning, and did not reflect the patient's placement in RHU. No treatment plan was developed. It was determined to retain the patient in 3CMS care for symptom monitoring. The primary clinician assigned to the patient changed once during the period reviewed; the patient was seen once every 12 to 15 days during this time. Both clinicians used telehealth equipment, but documentation was not always clear as to whether the encounter was confidential. Interventions included provision of chapters from a posttraumatic stress disorder workbook and cognitive restructuring. The second primary clinician to follow the patient indicated in each progress note that the treatment plan outlined in the IDTT meeting would continue to be followed. The patient was offered 90-minute recreational therapy groups almost weekly during the period reviewed. However, the provision of an in-cell worksheet was documented as a 90-minute group on April 2, 2025, and group topic content recycled quickly.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The patient did not receive weekly individual primary clinician contacts. The initial psychiatric assessment and IDTT meeting were both late. The case formulation was not updated, no treatment plan was developed, and the patient's various psychiatric diagnoses were not reconciled. Although interventions provided during these contacts appeared to be evidence-based and clinically appropriate, they were not guided by a treatment plan. Repeated statements in progress notes that the treatment plan outlined in the IDTT meeting would continue to be followed were performative and inaccurate. Provision of evidence-based interventions during individual encounters and of 90-minute groups represented relative strengths. However, documentation that the patient participated in a 90-minute group to receive an in-cell worksheet was problematic.

**Patient C**

This 31-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with major depressive disorder, single episode, unspecified. He was prescribed escitalopram and was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in his health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included obesity, vitamin D deficiency, and acute rental impairment. He received RHU 3CMS care at HDSP for 31 days from February 8, 2025 to March 11, 2025, when he was transferred to another facility.

A clinical summary and case formulation update rather than a full initial primary clinician assessment were completed. The update was timely but did not indicate if the patient was interviewed or, if so, whether the interview was confidential. It did not address the patient's safety concerns or RHU placement and was completed by a non-assigned clinician. The initial IDTT meeting occurred late but was attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. The patient's strengths, content of his participation in the IDTT meeting, and rationale for the patient's level of care were not documented. No treatment plan was developed. The initial psychiatric assessment was completed several hours after the treatment plan, through telehealth. The assessment was limited and did not update the patient's diagnosis, but it resulted in re-initiation of escitalopram at the patient's request. One individual primary clinician encounter was provided. Due to EHRS malfunctioning, the progress note for this encounter was entered by a senior psychologist on behalf of the assigned clinician. The progress note was brief, did not indicate whether the encounter was confidential, and did not record provision of interventions. The patient was offered one 90-minute recreational therapy group during his RHU 3CMS stay; he did not attend.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

A full initial primary clinician assessment was not completed, and the limited update did not address the patient's safety concerns or RHU placement. The initial IDTT meeting occurred late and without the benefit of a psychiatric assessment; the initial psychiatric assessment was also late and limited. No treatment plan was developed to guide care. The patient's diagnosis was inadequately addressed and was not updated or specified. The patient was not provided with only one weekly individual primary clinician and one weekly 90-minute group during the month-long RHU 3CMS stay. Apart from escitalopram, the patient did not receive evidence-based care.

**Patient D**

This 30-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with an adjustment disorder with mixed anxiety and depression. He was prescribed mirtazapine PRN for anxiety and used this medication almost every evening while in RHU 3CMS. No suicide attempts or self-injurious behaviors were listed in his health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included dyspepsia. He received RHU 3CMS care at HDSP for 64 days from January 8, 2025 to March 13, 2025. He was serving life without parole.

A clinical summary and case formulation update rather than a full initial primary clinician assessment were completed. The update was timely but did not indicate if the patient was interviewed or, if so, whether the interview was confidential. A non-assigned clinician completed it. The initial IDTT meeting occurred 42 days after the patient was placed in RHU 3CMS. It was attended by the patient and required staff. The patient was not found to meet any criteria for a higher level of care. The case formulation did not address the patient's placement in RHU and did not identify symptoms or behavior requiring treatment. The patient's verbalized treatment goals were not documented, and the treatment plan was not updated from one developed more than seven months prior; it listed only generic interventions such as "medications" and "groups." The initial psychiatric assessment was completed several hours after the treatment plan, through telehealth. The assessment was limited, did not update the patient's diagnosis, and did not address why mirtazapine was ordered as PRN rather than as a scheduled medication. The psychiatrist noted the patient's complaint that he was not being seen on a weekly basis. A mental health assessment for a January 6, 2025 RVR alleging battery causing serious injury found no nexus between mental health symptoms and the alleged behavior. The assigned primary clinician attempted to see the patient for individual treatment on three occasions, or about once every 25 days, during the 64-day stay in RHU 3CMS; at least one of these encounters was attempted by telehealth. The patient refused all three sessions. The patient was offered weekly 90-minute recreational therapy groups and attended three of the nine group sessions offered.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

A full initial primary clinician assessment was not completed, and it was unclear whether the patient was interviewed for the limited update assessment. Both the initial IDTT meeting and the initial psychiatric assessment were late and deficient. The case formulation did not identify target symptoms, and the treatment plan was not updated and did not identify specific interventions. The IDTT meeting occurred without the benefit of a psychiatric assessment, and even when the psychiatric assessment was completed, the patient's diagnoses was inadequately addressed. The use of an antidepressant medication as a PRN was clinically inappropriate and was not justified. The patient did not receive required individual interventions on a weekly basis, and the combination of the patient's disengagement from the primary clinician and desire for more frequent primary clinician contacts was inadequately explored and addressed.

**Patient E**

This 27-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with unspecified anxiety disorder and cannabis use disorder, severe. He was prescribed mirtazapine PRN for insomnia. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He was partially adherent with this medication but required one dose of naloxone during his RHU 3CMS stay despite adherence at that time. No suicide attempts or self-injurious behaviors were listed in his health record, although assessments indicated a suicide attempt by hanging at the age of 13 while in juvenile detention. Within CDCR, the patient previously received only 3CMS services.

Medical conditions included laryngopharyngeal reflux, vitamin D deficiency, bradycardia, incomplete right bundle branch block, heart failure with reduced ejection fraction, and opioid and methamphetamine use disorders. He received RHU 3CMS care at HDSP for 24 days from April 22, 2025 to May 16, 2025.

A clinical summary and case formulation update was completed timely, but it was unclear whether the patient was interviewed for this update and, if so, whether the interview was confidential. A non-assigned primary clinician completed the update. The assigned primary clinician then completed a full initial assessment through telehealth. This assessment was timely, confidential, and adequate. The initial psychiatric assessment was late, limited, and completed by telehealth; documentation did not clarify whether the assessment was confidential, and the assessment did not clarify the patient's diagnosis. No IDTT meeting was held. A mental health assessment for an April 21, 2025 RVR alleging battery causing serious injury found no nexus between mental health symptoms and the alleged behavior. The patient was seen for one individual primary clinician encounter during his RHU 3CMS stay. This encounter occurred by telehealth, was confidential, and included documentation of evidenced-based care. However, it also indicated that treatment would continue to be provided in accordance with the treatment plan developed by the IDTT, even though no current plan was present. The patient was offered weekly 90-minute recreational therapy groups and attended all offered sessions.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

Although there were significant strengths in this patient's care, the overall care was inadequate. While both an abbreviated clinical summary and formulation update and an adequate and full initial primary clinician assessment were completed timely, there was no documentation to indicate that the update and assessment were used to guide treatment. No IDTT meeting occurred, and no treatment plan was developed. The initial psychiatric assessment was limited and did not address the patient's diagnosis. The use of an antidepressant medication as a PRN was clinically inappropriate and was not justified. The patient did not receive weekly individual contacts with the primary clinician. Strengths included the provision of weekly recreational therapy groups, the quality of the initial primary clinician assessment, and the quality of the primary clinician's single individual encounter with the patient.

**Patient F**

This 34-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with schizoaffective disorder, bipolar type, and opioid use disorder. He was prescribed hydroxyzine PRN for anxiety and used this medication on five occasions during his RHU 3CMS stay. Through the ISUDT, he was prescribed buprenorphine extended-release injections for opioid use disorder. Two suicide attempts, both in February 2021, were listed in his health record. Within CDCR, the patient previously received all levels of mental health services. He had a history of involuntary treatment under PC 2602 for danger to others; the most recent PC 2602 order expired on November 2, 2023. Medical conditions included a seizure disorder, diabetes, hyperlipidemia, chronic neck pain, and

history of hepatitis C. He used a helmet due to his seizure disorder. He received RHU 3CMS care at HDSP for 21 days from March 18, 2025 to April 8, 2025, when he was released to mainline 3CMS care.

No primary clinician assessment or update were completed. An initial psychiatric assessment by telehealth was completed 20 days after the patient was placed in RHU 3CMS. During that assessment, the patient reported that he was falsely imprisoned, that he has always been treated unfairly because he is Black and Asian, and that psychotropic medications had poisoned him and given him diabetes. His thought content was assessed as positive for psychosis and paranoia, his thought processes were assessed as disorganized, his affect was restricted, and his mood was anxious. The patient reported sleeping three to four hours a night, and the psychiatrist concluded that the patient was hypomanic with rapid speech. Despite the patient's known history and active symptomatology, suicide risk was judged low. No IDTT meeting occurred, and no individual primary clinician encounters were offered. Only one 90-minute recreational therapy group was offered; the patient did not attend.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The patient was not seen by any primary clinician during his 3CMS stay, and no IDTT meeting was held. The psychiatric assessment was late and failed to address findings of disorganization, paranoia, and psychosis beyond noting that the patient was refusing antipsychotic medication. Despite the patient's current symptoms, history of two suicide attempts, and prior involuntary treatment, no additional treatment interventions were ordered. A full suicide risk evaluation was clinically indicated but not conducted. The brief suicide risk evaluation included in the psychiatric assessment appeared to rely on the patient's denial of suicidal ideation as the sole indicator. Such reliance was not clinically appropriate given the patient's serious mental illness and history. Apart from a single group, the patient was not offered weekly individual or group interventions. The long delay following RHU placement before the patient was seen by anyone from mental health, as well as the lack of ongoing treatment in RHU 3CMS, were particularly concerning considering the patient's history and presentation. It should be noted that the patient required MHCB placement about two weeks after being released from RHU 3CMS.

**Patient G**

This 44-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with schizophrenia. On a PRN basis, he was prescribed melatonin, mirtazapine, and olanzapine for anxiety and insomnia; he used all three medications almost daily. No scheduled psychotropic medications were prescribed. Through medical services, he was prescribed amitriptyline for pain. No suicide attempts or self-injurious behaviors were listed in his health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included cervical spondylosis and stenosis, mixed hyperlipidemia, overweight, vitamin D deficiency, posttraumatic headache and fractures of multiple ribs and left orbital floor. He received RHU 3CMS care at HDSP for 91 days from January 6, 2025 to April 7, 2025, and was then transferred to CSP-LAC.

An IDTT meeting for indecent exposure occurred nine days after the patient was placed in RHU 3CMS; it was attended by the patient and required staff. The patient was not found to meet any criteria for consideration of a higher level of care. His participation in the IDTT meeting was adequately documented, but the case formulation was not updated or relevant to the patient's current presentation, and no treatment plan was developed. Justification for the patient's level of care was inadequately documented. Neither the initial psychiatric assessment nor the initial primary clinician assessment were completed prior to this first IDTT meeting. The initial psychiatric assessment occurred by telehealth 14 days after the patient's placement in RHU 3CMS. It was brief, limited, resulted in an increase in the patient's PRN dose of olanzapine, and provided a diagnosis of "history of schizophrenia" without further discussion. The initial primary clinician assessment occurred 22 days after the patient's placement in RHU 3CMS. It was conducted by telehealth, relied on a prior case formulation, and did not clarify the patient's diagnoses. The initial IDTT meeting occurred 37 days after the patient's placement in RHU 3CMS and was attended by the patient and required staff. Again, the patient was not found to meet criteria for consideration of a higher level of care. The case formulation was not updated, and a treatment plan was not formulated. Rationale for retaining the patient in 3CMS care was adequately documented. The patient was offered individual primary clinician appointments once every two weeks. He refused all but one encounter, and the rest involved wellness checks at the cell front. Almost all encounters were offered by telehealth. Following the single confidential primary clinician encounter he permitted, a referral to psychiatry was made due to the patient's ongoing complaints of insomnia, anxiety, and racing thoughts. The assigned psychiatrist saw the patient within two days, via telehealth, and increased the patient's PRN doses of melatonin and olanzapine. Weekly 90-minute groups were not offered. A mental health assessment for a December 23, 2024 RVR alleging indecent exposure without prior convictions found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

Both the initial primary clinician and psychiatric assessments were late, limited, and inadequate with respect to clarifying the nature of the patient's symptoms or the patient's diagnosis. The initial IDTT meeting was also late. The case formulation was not updated or fully relevant to the patient's current clinical presentation, and no treatment plan was developed. The patient was not offered weekly RHU 3CMS groups as required and offered individual primary clinician encounters only every other week. The use of antidepressant and antipsychotic medications solely as PRN fell outside the standard of care. Reasons for the patient's refusals of offered individual encounters were not adequately addressed, and as a result most care provided took the form of wellness checks rather than evidence-based treatment.

**Patient H**

This 33-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with major depressive disorder, recurrent, mild. He was prescribed mirtazapine PRN for anxiety and used this medication daily.

Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in his health record. Within CDCR, the patient previously received 3CMS and MHCB services. Medical conditions included asthma and opioid use disorder. He received RHU 3CMS care at HDSP for 64 days from January 8, 2025 to March 13, 2025.

The initial psychiatric and primary clinician assessments were not completed until 33 days and 37 days, respectively, after the patient's placement in RHU 3CMS care. The patient refused the initial psychiatric assessment, and a follow-up attempt to see him at the cell front was unsuccessful because the patient was attending yard. The psychiatric assessment was incomplete, inadequate, and included documentation that the patient denied medication side effects, depression, anxiety, suicidal ideation, homicidal ideation, mania, or psychosis, even though the patient was not interviewed. The initial primary clinician assessment occurred at the cell front due to the patient's refusal of a confidential setting; the assessment was cursory. Four days later, another primary clinician completed a clinical summary and case formulation and brief records review, with little added information. The initial IDTT meeting occurred 42 days after the patient was placed in RHU 3CMS care and was held in absentia due to the patient's refusal to attend; required staff attended. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation was inadequate and did not reflect the patient's RHU placement. No verbalized treatment goals were documented, and no treatment plan was developed. The patient was offered one individual primary clinician encounter during his 64 days of RHU 3CMS care. This encounter occurred by telehealth and was a brief wellness check at the cell front due to the patient's refusal of a confidential setting. Five 90-minute recreational therapy groups were offered during the patient's nine-week RHU stay; he attended four of these. A mental health assessment for a January 6, 2025 RVR alleging battery causing serious injury found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The initial psychiatric and primary clinician assessments and the initial IDTT meeting were all delayed and inadequate. The case formulation was perfunctory and did not address the patient's RHU placement or depressive symptoms adequately. No treatment plan was developed. The patient did not receive the minimum required individual and group encounters, and the patient's refusal of confidential individual treatment was inadequately assessed and addressed. Use of an antidepressant medication solely as a PRN fell below the standard of care.

**Patient I**

This 30-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with unspecified depressive disorder. He was not prescribed any psychotropic medication. Through the ISUDT, he was prescribed buprenorphine-naloxone and was adherent with this medication. One episode of non-suicidal self-injurious behavior was listed in his health record. Within CDCR, the patient previously received 3CMS and MHCB services. Medical conditions included functional asplenia,

migraine, and methamphetamine and opioid use disorders. He received RHU 3CMS care at HDSP for 53 days from November 19, 2024 to January 11, 2025.

A primary clinician clinical summary and case formulation were completed 24 days after the patient's placement in RHU 3CMS care; a full primary clinician assessment was not completed until 30 days after the patient's placement and did not reconcile the patient's diagnosis with observed symptoms. An accompanying suicide risk reevaluation found the patient at low risk. It quoted the patient's assertions that he was an FBI informant and was being tortured by custody staff; the revaluation did not adequately explore these statements but concluded that they were delusional in nature. The relationship between the patient's delusional statements and suicide risk was inadequately addressed, and there was no documentation that psychiatry was alerted to the patient's possible psychotic thinking. The patient was not seen by any psychiatrist during his RHU 3CMS care at HDSP, and no IDTT meeting was held. Following the initial assessments, only one primary clinician encounter was documented; this occurred by telehealth and at the cell front due to the patient's refusal of a confidential setting; the encounter was a brief wellness check. The patient was offered four 90-minute recreational therapy groups during his more than seven-week stay in RHU 3CMS care; he attended none of these sessions.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The patient's initial primary clinician assessment was significantly delayed and did not adequately explore possible psychotic thinking or its potential role in suicidal risk. Despite the possible presence of delusional thinking, the patient was not seen by a psychiatrist at any time during his RHU 3CMS stay, and no IDTT meeting was held. He did not receive individual or group encounters on a weekly basis, and the patient's refusal of treatment was inadequately addressed.

**Patient J**

This 30-year-old RHU 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with unspecified attention-deficit/hyperactivity disorder, bipolar I disorder, most recent episode depressed, mild, and antisocial personality disorder. He was prescribed aripiprazole and was adherent with this second medication. Buspirone, hydroxyzine, and oxcarbazepine were prescribed PRN for anxiety and insomnia, and he used all three medications almost daily. Through a medical provider, he was prescribed duloxetine for pain and was partially adherent with this medication. Through the ISUDT, he was prescribed acamprosate for alcohol use disorder. Four episodes of suicidal or self-injurious behavior were listed without detail in his health record. Within CDCR, the patient previously received only 3CMS services. Medical conditions included dyslipidemia, allergic rhinitis, xeroderma, dry eyes, shoulder and back pain, bone spur of left foot, and a history of spinal surgery. He used a cane, knee brace, and orthotic shoes to ambulate. He received RHU 3CMS care at HDSP for 78 days from February 27, 2025 to May 16, 2025.

Following placement in RHU 3CMS care at HDSP, the patient was first seen by a mental health provider eight days later for a consult generated because the patient refused to answer mental

health questions on the RHU intake screening. During this encounter, the patient reported that he had swallowed heroin upon arrival on February 27, 2025, in an apparent suicide attempt, but woke up without complications. A suicide risk evaluation was not completed. The initial psychiatric assessment occurred by telehealth 18 days following the patient's placement; content was minimally adequate, included a diagnosis of bipolar disorder, and resulted in an increase in the aripiprazole dose and the initiation of hydroxyzine PRN for anxiety and irritability. Three days later, the patient was seen by a primary clinician for an urgent consult after the patient presented as tearful and upset in ICC because he had been cut off from communicating with his family while in RHU. Although the patient denied suicidal ideation and showed improved affect, a suicide risk evaluation was likely indicated but not completed. An initial primary clinician assessment was not completed until 36 days after placement in RHU 3CMS care. The assessment was almost adequate. The patient reported a pattern of minimizing suicidal ideation and symptoms to clinical staff to avoid placement in a higher level of care, suggesting the need for a more thorough suicide risk evaluation; one was not completed at that time. A full suicide risk evaluation was finally completed the following day and found the patient at low acute and high chronic suicide risk. The initial IDTT meeting was not held until 48 days after the patient's placement in RHU 3CMS care. The patient and required staff attended. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation was partially adequate but did not address current symptoms, suicide risk, or factors that could improve the patient's functioning. The patient's strengths and verbalized treatment goals were adequately documented, but no treatment plan was developed. During his 11-week period of RHU 3CMS care, the patient was seen on four occasions for routine primary clinician assessments; none of the encounters included documentation regarding the confidentiality of the contact, and all were supportive in nature. The psychiatrist saw him timely by telehealth, with adequate documentation. The patient was offered eight 90-minute recreational therapy groups and attended five of these.

**Findings**

The care provided to this RHU 3CMS patient was inadequate.

The initial primary clinician and psychiatric assessments were both late, which was particularly concerning given the patient's report that he had swallowed heroin with the expectation of death on the first day of his RHU 3CMS stay. This report was not adequately explored. A suicide risk evaluation was not completed for 37 days despite evidence the patient was distressed, depressed, and had a history of at least four suicidal spectrum episodes. A finding of chronic high suicide risk was not adequately addressed in treatment. The initial IDTT meeting was more than a month late and did not result in the development of a treatment plan. The case formulation was not adequate to guide treatment, and the patient did not receive the minimum required individual or group encounters. The use of a mood stabilizer as a PRN medication fell outside the standard of care. Strengths included the quality of the primary clinician's individual encounters when they occurred.

**Patient K**

This 52-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with an adjustment disorder with depressed mood. He was not prescribed psychotropic medication. One suicide attempt,

immediately prior to MHCB admission, was listed in the health record. Medical conditions included a self-inflicted laceration, right knee pain, and history of latent tuberculosis. Within CDCR, the patient had not previously received mental health care. At HDSP, he was admitted to MHCB care from April 7, 2025 through April 16, 2025 for danger to self, after lacerating his right antecubital area with a razor and reporting suicidal intent. He required ten sutures in the community emergency department prior to his MHCB admission. He was discharged to EOP care at SATF on April 14, 2025 but remained in MHCB care for two more days.

The initial primary clinician assessment was timely but brief, erred in stating that the patient was 46 years old, did not provide diagnostic impressions, and did not result in a coherent case formulation. The initial psychiatric assessment, completed by telehealth, was timely but cursory. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The patient was not found to meet criteria for a higher level of care. An underdeveloped case formulation, in the form of a one-sentence hypothesis regarding the nature of the patient's suicidal ideation, was documented; it was not sufficient to guide treatment. Patient strengths and verbalized treatment goals were minimally documented, and no treatment plan was developed. The rationale for MHCB care and MHCB discharge criteria were adequately documented. A recreational therapy assessment completed the day after the IDTT meeting was adequate in content but was not available to the treatment team at the time of the initial IDTT. One of two psychiatrists or the assigned primary clinician followed the patient; the psychiatrists saw the patient through telehealth. The patient was seen daily by a clinician or psychiatrist except on Saturday, April 12 and Sunday, April 13, 2024, when neither discipline saw the patient. As documented, encounters were brief but adequate to assess the patient's improving mood and behavioral stability. The follow-up IDTT meeting occurred timely, was attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. The patient was not found to meet any criteria for a higher level of care. The case formulation was not updated, and the treatment plan continued to be lacking. The discharge suicide risk evaluation found the patient at high suicide risk based on his recent attempt. The accompanying safety plan was underdeveloped but included some clinically useful elements. The MHPC discharge summary was timely but cursory in describing the patient's treatment course and in specifying a discharge plan.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment and case formulation were cursory and inadequate to guide treatment. No treatment plan was developed, and the patient did not receive any individual encounters from a clinician or psychiatrist during the weekend. As documented, there was inadequate exploration of the patient's mood, thinking, and motivation for attempting suicide. There was no documentation of the rationale for the diagnosis of adjustment disorder rather than a major depressive disorder, and no documentation as to why psychotropic medications were not needed. The discharge to EOP care appeared appropriate, but there was inadequate discharge planning considering the patient's recent significant suicide attempt and high risk at discharge.

**Patient L**

This 32-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with schizoaffective disorder, bipolar type, antisocial personality disorder, and opioid and stimulant use disorders. He was prescribed haloperidol decanoate, oxcarbazepine, and trazodone and was adherent with haloperidol but not the other two medications. Olanzapine and diphenhydramine were prescribed PRN for agitation and extrapyramidal symptoms, respectively, and the patient used both medications frequently. Through the ISUDT, he was prescribed buprenorphine-naloxone; he was partially adherent with this medication. Two suicide attempts and six episodes of self-injurious behavior were listed in the health record. Medical conditions included subclinical hypothyroidism, vitamin D deficiency, alcohol, opioid, and stimulant use disorders. Within CDCR, the patient had previously received all levels of care except 3CMS care. He was subject to a PC 2602 order for involuntary treatment due to danger to others at the time of his MHCB admission, and he had a history of multiple PC 2602 orders for grave disability and/or danger to self or others. At HDSP, he was admitted to MHCB care from February 28, 2025 through March 12, 2025 for danger to self and others, after assaulting an officer and attempting to bite and scratch himself. He reported suicidal ideation and intense command auditory hallucinations directing him to assault others, and he later acknowledged using methamphetamine and heroin the day prior to admission. Once in MHCB care, was referred to acute care on March 10, 2025 but remained in MHCB care for two more days.

The initial primary clinician assessment was timely but brief and did not result in clear diagnostic impressions or a case formulation. An accompanying suicide risk evaluation found the patient at low risk. A safety plan previously developed in CHCF-PIP was adopted without modification and quoted the patient as if it were current. The initial IDTT meeting was timely and attended by the patient and required staff, although it was noted that a psychiatrist had not been assigned to the patient at the time of the meeting. The patient was not found to meet criteria for a higher level of care. The case formulation consisted of a single sentence stating that psychotic symptoms interfered with the patient's ability to make rational decisions; the formulation was underdeveloped, generic, and inadequate to guide specific treatment. Documentation of the patient's strengths and verbalized treatment goals was cursory. The treatment plan was pulled forward from one developed several months earlier in an acute care setting, identified violence, treatment nonadherence, and substance use but not suicidal ideation or auditory hallucinations as treatment targets, established short-term goals that were not appropriate for MHCB care, and was inadequate to guide MHCB treatment. The initial psychiatric assessment was completed by telehealth only after the IDTT meeting but was otherwise adequate.

The assigned primary clinician and/or one of three psychiatrists followed the patient. He was seen daily except on March 1, 2, ,8, and 9, 2025, when neither a psychiatrist nor a clinician provided individual care. Progress notes were minimally adequate, psychotropic medications were adjusted in response to the patient's ongoing symptoms, and the assigned clinician documented provision of cognitive restructuring. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a referral to acute care with a recommendation for unlocked dorm housing. The case formulation and treatment plan were not updated, but the patient's clinical presentation and rationale for the acute care referral were adequately documented. The accompanying mental health consult and suicide risk evaluation were adequate; the patient was found to be at moderate risk. The MHPC discharge summary was timely but cursory, and it did

not provide an adequate description of the patient's course of treatment or an adequate discharge plan.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment failed to provide current diagnostic impressions and a case formulation, and the initial psychiatric assessment occurred only after the initial IDTT meeting had been held. Both the treatment plan and a safety plan from another location were brought forward without modification as if they were current, and the treatment plan was not appropriate for crisis care. The patient was not seen by a psychiatrist or clinician during four of the 12 days of MHCB care. The discharge summary was cursory and inadequate to sustain continuity of care. While diagnostic clarity might not have been achieved during the MHCB stay, greater documentation of diagnostic considerations was needed. Pharmacological treatment and the referral to acute care were strengths in this patient's treatment, but his overall MHCB care was not adequate to meet his needs.

**Patient M**

This 40-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with unspecified psychotic disorder. He was prescribed mirtazapine and olanzapine and was nonadherent with both. Hydroxyzine and melatonin were prescribed PRN for insomnia, but he used neither medication. Through the ISUDT, he was prescribed buprenorphine-naloxone but was nonadherent with this medication as well. One episode of self-injurious behavior was listed in the health record. Medical conditions included hypertension and gastroesophageal reflux disease. Within CDCR, the patient had previously received 3CMS, EOP, MHCB, and acute care. At HDSP, he was admitted to MHCB care from March 21, 2025 through April 3, 2025 for grave disability due to lack of self-care associated with psychotic symptoms. He was referred to acute care on March 26, 2025 but remained in MHCB care for an additional seven days.

The initial psychiatric assessment was timely and largely adequate. It was completed by telehealth at the cell front due to the patient's disorganized and resistant behavior and resulted in medication changes and consideration of petitioning for involuntary treatment. The initial primary clinician assessment was timely but cursory and did not result in a case formulation. Both assessments included a recitation of prior psychiatric diagnoses, but neither provided current diagnostic impressions. The initial IDTT meeting was timely but held in absentia due to the patient's refusal; required staff attended. The patient was not found to meet criteria for a higher level of care. The case formulation consisted of a single sentence hypothesizing that the patient's psychotic symptoms were the result of either schizophrenia or substance use; the formulation was not patient-specific and was insufficient to guide treatment. Patient strengths and verbalized treatment goals were inadequately documented, and a treatment plan from December 2024 was brought forward without modification. It identified depression and anxiety, but not self-neglect or psychosis, as treatment targets. It included non-measurable goals that were not consistent with the patient's current needs and identified cognitive-behavioral interventions, but not psychiatric care, as needed.

In contrast, the patient's clinical presentation, need for MHCB care, and likely need for involuntary treatment in a PIP were adequately documented. Two days following the initial IDTT meeting, a follow-up IDTT meeting was held, again in absentia, with required staff attending. At this meeting, the patient was found in need of a higher level of care and referred to acute care with a recommendation of single cell placement. The case formulation, treatment plan, and documentation of the patient's strengths and verbalized treatment goals were not updated. The patient's clinical presentation and rationale for the acute care referral were adequately described in the IDTT documentation and accompanying mental health consult. The suicide risk evaluation completed in association with the acute care referral was adequate and found the patient at low risk.

One of two psychiatrists and the assigned clinician followed the patient. All encounters occurred at the cell front due to the patient's refusal to leave his cell, and all encounters were characterized by patient resistance to being interviewed along with signs and symptoms of psychosis and self-neglect. He remained naked most of the time, laughed inappropriately, did not attend to personal hygiene or cell cleanliness, and exhibited a poverty of speech. He was observed muttering to himself. It was not clear how much food the patient was consuming, as he had spread food across his cell floor and walls. The assigned psychiatrist indicated that he was pursuing a PC 2602 petition, but in fact another psychiatrist initiated the petition only once the patient was admitted to PIP. The patient was not seen by either a clinician or a psychiatrist on March 21, 22, 29, 30, or 31, 2025 – five days out of a total of 14 days in MHCB care. Sometime between March 27, 2025 and April 1, 2025, a *Vitek* hearing was held and apparently decided in favor of inpatient admission, although this was not documented. The patient refused a recreational therapy assessment and all offered recreational therapy activities. A second follow-up IDTT meeting was timely and attended by the patient and required staff. The content of the meeting and the patient's contributions to the discussion were not documented, and the case formulation, treatment plan, and documentation of the patient's strengths and verbalized treatment goals were not updated. It was noted that the patient presented with severe impairment in social functioning because of his psychotic symptoms; he remained appropriate for acute care. The MHPC discharge summary was timely but cursory except for admission details, which were thoroughly documented. It did not address the need to pursue involuntary treatment and was inadequate to support continuity of care.

**Findings**

The care provided to this MHCB patient was inadequate.

The major challenges in this patient's care involved deficient case formulation, inappropriate and inadequate treatment planning, and, most importantly, lack of daily clinician or psychiatry contacts for more than one-third of the patient's MHCB stay. The patient's psychotic symptoms rendered him unable to participate meaningfully in verbal treatment, but daily contacts remained clinically indicated and necessary to monitor the patient's symptoms and behaviors. Consideration of a PC 2602 petition along with referral to acute care were both clinically indicated and appropriately pursued, but other treatment efforts were largely absent.

**Patient N**

This 45-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with schizoaffective disorder, unspecified type. On the first day of MHCB care, before the medications were prescribed as scheduled, he was prescribed mirtazapine and olanzapine as PRN medications for insomnia and psychosis. He used these medications once before the PRN orders were discontinued and the medications were ordered to be scheduled. Thereafter, he was adherent with scheduled doses of mirtazapine and olanzapine. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included seborrheic dermatitis, gastroesophageal reflux disease, hyperlipidemia, tremor in left hand, right knee pain, and loss of 21 percent of his weight since November 2024. Within CDCR, the patient had previously received only 3CMS care. At HDSP, he was admitted to MHCB care from April 8, 2025 through April 17, 2025 for significant impairment due to mental illness, after exhibiting agitation and psychotic symptoms. He was discharged to EOP care on April 16, 2025 but remained in MHCB care for one more day.

The initial primary clinician and psychiatric assessments were timely but cursory. The primary clinician assessment did not provide diagnostic impressions or a case formulation. The psychiatric assessment was conducted by telehealth, identified symptoms of mania and psychosis but did not provide diagnostic impressions, and resulted in changing medications from PRN to scheduled. The patient refused an initial recreational therapy assessment. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. The patient was not found to meet criteria for a higher level of care. The case formulation was inadequate and consisted of a one-sentence hypothesis stating that the patient's psychosis was likely due to schizophrenia, schizoaffective disorder, or drug use. The patient's strengths and verbalized treatment goals were minimally documented, while the rationale for MHCB care was adequately documented. No treatment plan was developed. Except on April 12 and 13, 2025, when neither a psychiatrist nor a primary clinician saw the patient, the patient was followed daily by one of two psychiatrists or the assigned primary clinician. Progress notes were cursory. All psychiatric care was provided through telehealth. The patient's olanzapine dosage was increased, and his symptoms improved. No recreational therapy activities were documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. The patient continued to not meet criteria for a higher level of care. The case formulation, patient strengths, and patient verbalized treatment goals were not updated, and the treatment plan continued to be blank. The accompanying MHPC discharge plan was timely but cursory and inadequate to support continuity of care. The discharge suicide risk evaluation was minimally adequate and found the patient at low risk. The patient's pending parole date was considered a protective factor.

**Findings**

The care provided to this MHCB patient was inadequate.

Initial assessments were cursory and did not provide diagnostic impressions. The patient did not receive an adequate case formulation, treatment plan, or discharge summary. He was not seen by a psychiatrist or primary clinician over the weekend of April 12 and 13, 2025. Psychiatric care appeared appropriate, although on the first day of MHCB care, the initial PRN doses of an antipsychotic and antidepressant, without accompanying scheduled doses, fell outside the

standards of care. Fortunately, this was promptly corrected. Inadequate mental health attention was provided to the patient's upcoming release and weight loss and their potential relationships to the exacerbation of psychotic symptoms.

**Patient O**

This 58-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at HDSP. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood, trauma- and other stressor-related disorder, unspecified, and alcohol use disorder, severe. He was prescribed and adherent with mirtazapine. Olanzapine was prescribed PRN for psychosis, but the patient did not use this medication. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included asthma, hyperlipidemia, prediabetes, spondylolisthesis with low back pain, unintended weight loss, history of left ankle fracture, and umbilical hernia with surgical repair. Within CDCR, the patient had previously received only 3CMS care. At HDSP, he was admitted to MHCB care from January 15, 2025 through January 29, 2025 for danger to self, after presenting with symptoms of depression, anxiety, panic, and suicidal ideation. He was discharged to EOP care on January 27, 2025 but remained in MHCB for two more days.

The initial primary clinician and psychiatric assessments were timely. The psychiatric assessment was adequate. The primary clinician assessment was cursory, did not include a mental status examination, and did not update the predisposing, perpetuating, precipitating, and protective factors or the case formulation, which referred to the patient as housed in reception center. Although this assessment was inadequate, an accompanying safety plan was developed in a collaborative manner and resulted in identification of useful interventions. The patient refused a recreational therapy assessment. The initial IDTT meeting was late, occurring on the sixth day of MHCB care. The patient and required staff, apart from an alternate for the assigned psychiatrist, attended. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated, the patient's strengths were inadequately documented, the patient's verbalized treatment goals were not documented, and no treatment plan was developed. The rationale for MHCB care was adequately documented. The assigned primary clinician and one of five psychiatrists followed the patient. However, he was not seen by any psychiatrist or clinician on January 18, 29, 20, 25, or 26, 2025. Psychiatric progress notes varied by psychiatrist and ranged from cursory to thorough. Primary clinician progress notes were cursory. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. IDTT documentation noted that the patient had remained in MHCB for more than ten days due to staffing challenges in the MHCB, as the assigned psychiatrist had been away from the institution. The case formulation and patient strengths were not updated. There was no treatment plan and no documentation regarding the patient's verbalized treatment goals. The MHPC discharge summary was timely but cursory and provided no patient-specific information regarding the course of treatment. The discharge suicide risk evaluation was adequate and found the patient at low risk. The accompanying safety plan contained useful guidance but was inadequately updated from the safety plan developed earlier in the MHCB stay.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment and case formulation were inadequate. There was no treatment plan. As indicated in IDTT documentation, the patient's longer MHCB stay was due to staffing issues rather than clinical need. The patient was not seen by any clinician or psychiatrist during five of the 14 days in which he received MHCB care, and continuity of psychiatric provider was poor. Additional attention to clarifying the nature of the patient's symptoms and psychiatric diagnoses was needed. Prescription of a PRN antipsychotic medication, without an accompanying order for scheduled antipsychotic medication, fell outside the standard of care. Strengths in this patient's treatment included the early development of a safety plan and a discharge to EOP care.

**Patient P**

This 33-year-old MHCB patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of major depressive disorder, recurrent, moderate; generalized anxiety disorder; and opioid use disorder, severe. The patient was prescribed Trileptal, Suboxone, and clonidine.

The patient was initially placed in the MHCB from November 25, 2024 to December 9, 2024. The second admission began on December 10, 2024, with discharge to the acute inpatient level of care on December 18, 2024.

The patient was placed in the HDSP RHU on November 24, 2024. At that time, he reported suicidal ideation with intent to cut himself due to anxiety regarding recent disciplinary violations that were referred for possible prosecution by the district attorney.

The patient was referred and admitted to the HDSP MHCB on November 25, 2024, after experiencing somatic symptoms of chest pain due to anxiety. A comprehensive nursing assessment was completed at intake. The history and physical examination and initial PC assessment were completed the same day and were comprehensive. The PC noted that the patient also had a history of amphetamine-type use disorder, severe, in a controlled environment. The patient was seen by the MHCB telepsychiatrist one day late on November 27, 2024. During that session, the telepsychiatrist discontinued Trileptal and began Abilify at bedtime while maintaining the other medications.

The initial MHCB IDTT meeting occurred on November 27, 2024. The assigned PC, telepsychiatrist, nursing, and a CCI attended the meeting. The IDTT noted that the patient met the criterion for higher level of care referral consideration due to three or more rule violation mental health assessments completed during the last three months; however, he was not referred to a higher level of care. The clinical rationale for nonreferral noted that the RVRs were not due to his mental illness but did not address the patient's continued report of suicidality. The treatment modifications were not individualized and were simply copied and pasted, as they were identical to other MHCB patients whose treatment plans were reviewed. The treatment plan did not adequately address the patient's anxiety and suicidality; instead, the plan focused on the identification of problematic thoughts without any evidence-based interventions. The targets of

treatment were not objective and behaviorally based, and the treatment goals were a mix of subjective and objective outcomes.

No treatment interventions beyond medication management could be utilized, because the patient was rarely seen by his treatment providers in the MHCB; the patient was not seen by his PC or telepsychiatrist on November 28, November 30, December 1, December 7, and December 8, 2024 while housed in the MHCB. He was seen by a different PC on November 29, 2024. The patient was seen by a covering telepsychiatrist on December 2 and December 6, 2024. At that time, Abilify was discontinued, and Zyprexa was initiated with other medications remaining unchanged. When seen by the assigned PC on December 3, 2024; the patient reported that the medication seemed to be helping, but he remained very anxious about returning to the yard.

An IDTT meeting occurred on December 4, 2024 that included the assigned treatment providers and required disciplines. The treatment plan and higher level of care form were not updated, despite the patient remaining in the MHCB and meeting two criteria for higher level of care referral consideration. No clinical rationale was provided for maintaining the patient in the MHCB; although, clinicians previously reported extended patient stays due to the inability to conduct IDTT meetings due to staffing shortages. The patient was again not referred to a higher level of care. The rationale for nonreferral and treatment modifications were not changed and were inadequate, as they did not reflect the patient's ongoing suicidality. The IDTT documentation indicated that the patient was stable, and there was conflicting information regarding whether the patient would be discharged.

The actual discharge IDTT meeting occurred on December 9, 2024, and a suicide risk assessment was completed that day. The PC documented that the patient appeared to be engaging in impression management to influence housing. The higher level of care form remained inadequate and blamed the patient's MHCB overstay on his unwillingness to demonstrate progress, which would seem to have suggested that inpatient referral was indicated. No changes were made to the treatment plan. During the MHCB stay, the patient's suicidality and anxiety were not appropriately addressed, and it appeared that the lack of interventions was attributed to the patient's behavior being solely volitional without any recognition of the patient's psychiatric symptoms. The treatment team also failed to establish an adequate safety plan with the patient.

The patient was discharged to the RHU from the MHCB. On the first day of five-day follow-up contacts, the patient continued to report suicidal ideation with a plan to hang himself. He was readmitted to the MHCB. This second MHCB placement was again characterized by poor continuity of care, as the patient was seen by different telepsychiatrists, and he had no contact with a mental health provider on December 14 and December 15, 2024.

During the initial IDTT meeting for the second MHCB placement, the assigned PC and psychiatrist were not present. The higher level of care form was not fully updated, but it did note that the patient might require referral to a higher level of care without adequately explaining the decision to delay referral. The clinical rationale for nonreferral was inadequate as were the treatment modifications. The treatment plan was not updated or implemented. The patient was, however, referred for acute inpatient treatment at the next routine IDTT meeting due to reported failure to improve with MHCB treatment that was minimally provided according to the documentation. At the time of the

acute care referral, the patient was prescribed Suboxone, Thorazine, Vistaril, clonidine, and Wellbutrin.

**Findings**

The treatment provided to this patient was inadequate.

Of the 14 days that the patient was housed in the MHCB, he was not seen by a mental health provider on at least five of those days. The patient's suicidality was perceived by at least one mental health provider as impression management for secondary gain, specifically for a housing change. The risk factor of safety concerns and the impact on his mental status and suicidality were not clinically addressed. The observed symptoms were not adequately addressed through therapeutic interventions beyond medication treatment. There appeared to be disagreement among the IDTT regarding the patient's degree of impairment; as some documented the observable signs and self-report of intense anxiety by the patient and persistent suicidality, while other staff suggested that the patient was stable. The patient was discharged without any clear rationale or documentation that he had improved. Unsurprisingly, he was readmitted to the MHCB in less than 24 hours.

The patient was ultimately referred for acute inpatient treatment during the second MHCB placement; however, that referral appeared delayed, as the patient met the criteria for referral during the initial MHCB placement. The premature MHCB discharge and delay in referral for inpatient treatment unnecessarily delayed the patient's access to needed treatment.

**Patient Q**

This 27-year-old MHCB patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of amphetamine-type substance use disorder, severe; opioid substance use disorder, severe; trichotillomania; and unspecified anxiety disorder. The patient had multiple chronic health conditions including hepatitis C, herniated nucleus pulposus, chronic lumbar back pain, multiple nasal/septal problems, and loss of vision in his left eye. The patient was prescribed Vistaril for anxiety and was also prescribed Suboxone for opioid use disorder as well as Cymbalta for chronic pain.

The patient previously received mental health services at the EOP level of care. He was admitted to the MHCB after a suicide attempt on April 14, 2025, when the patient covered his cell door and was found hanging. Custody staff entered the cell, and medical staff responded. He was admitted to the MHCB on that date.

There was contradictory information in the healthcare record regarding the incident. Nursing documentation at the time of the incident noted that custody reported that the patient was observed hanging, initial vital signs of 94 percent oxygenation, a Glasgow score of 11, disorientation, and that CPR was initiated. Additional nursing notes documented that multiple chest compressions were applied to the unresponsive patient. When transported to the TTA, the patient was observed with his eyes open, but he remained nonverbal. The HDSP SPRFIT coordinator documented the incident as a suicide attempt. The physician who completed the history and physical examination on April 15, 2025 described the incident as a suicidal gesture and stated that custody staff found

the patient sitting on the floor, and he was not suspended in the air with the noose tied to his bed. The patient minimized the incident and refused a physical for the history and physical examination.

The initial suicide risk assessment was completed by a telehealth provider in the TTA, and that documentation also noted that the patient minimized the suicide attempt. The patient did not want to be admitted to the MHCB and felt that it was humiliating to wear a suicide resistant gown and watched continuously. This assessment noted that the patient had self-injurious behavior earlier that month prior to the attempt.

The initial PC intake assessment was completed on April 15, 2025, and it was minimally adequate, as it appeared to be primarily based upon a healthcare record review and most of the information was copied and pasted from prior assessments. The initial psychiatric assessment included relevant historical information and significant current stressors. The patient had an active legal case and significant safety concerns. The patient disclosed that he was assaulted three times in the yard at HDSP and was unable to safely program there.

The patient was seen for the initial IDTT meeting on April 16, 2025, and the assigned providers and required staff were present. The safety plan was adequate but did not specifically address the patient's safety concerns and reported victimization. It did not appear that the IDTT adequately considered referral to a higher level of care, and the treatment plan was inadequate for the severity of the patient's suicide attempt. An IPOC to address danger to self was initiated, but the targets of treatment and treatment goals failed to incorporate objective, behaviorally based measures beyond remaining without RVRs and suicidal ideation. While the interventions were reasonable, they were never implemented based on the documentation.

The patient was not seen by a clinician on April 19 and April 20, 2025. He was seen by different psychiatrists with impaired continuity of care, and he was not seen timely. A psychiatrist recommended treatment with a mood stabilizing medication; however, the patient refused to take the medication.

An IDTT meeting occurred on April 21, 2025. The IDTT referred the patient for inpatient treatment at the intermediate level of care due to ongoing suicidality, as custody found a note written by the patient stating that he wanted to be dead but was too frightened to kill himself. The patient was also found in possession of excessive blankets and multiple plastic bags that could possibly be utilized in a suicide attempt.

**Findings**

The treatment provided to this patient was inadequate.

This patient did not receive adequate treatment at the MHCB; however, he was eventually referred for intermediate inpatient treatment. There were significant problems with the continuity of care in the MHCB due to different providers and untimely clinical contacts. The patient minimized the severity of his attempt, but the treatment plan did not address that significant risk factor. While psychotropic medication was indicated; the patient refused, and treatment refusal was also not addressed in treatment planning.

**Patient R**

This 30-year-old MHCB patient's healthcare record was reviewed to assess the treatment provided at HDSP. He was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, anxiety, and opioid use disorder. He was prescribed Vistaril and Remeron and had previously received mental health services at the 3CMS level of care.

The patient had four recent HDSP MHCB placements. The most recent MHCB placement occurred from January 29, 2025 to February 9, 2025. Review of prior MHCB documentation revealed poor treatment planning that included problems/focus of treatment, treatment goals, and interventions that were not completed. The patient had ongoing anxiety related to significant safety concerns, but the treatment plans did not address his anxiety and suicidality. The third MHCB placement resulted in discharge on January 29, 2025, with a note that the patient's safety concerns were addressed; however, the patient reported that he was not interviewed regarding his safety concerns while he was housed in the MHCB. An emergency referral was submitted to mental health within a few hours of his discharge to A yard which was a yard he had stated that he could not return to. The patient placed a noose around his neck in his cell that was removed prior to injury. He was readmitted to the MHCB and discharged on February 5, 2025 to the EOP level of care.

The initial assessments were all completed timely and were adequate. The initial IDTT meeting did not occur timely; it was conducted two days late on February 3, 2025. The patient continued to report significant safety concerns and a willingness to harm himself or others if he was returned to A yard. The PC noted that custody had completed two investigations and could not substantiate the patient's concerns, and the PC made efforts to convince custody not to return the patient to A yard with no success.

The required disciplines were present at the initial IDTT meeting. No significant changes were made to the new treatment plan from prior ineffective plans. The higher level of care review did not address the patient's anxiety and willingness to harm himself due to his safety concerns. Instead, the rationale for nonreferral to a higher level of care was that inpatient treatment was not designed to address safety concerns. The patient's safety concerns, if unable to be validated, should have been further explored to determine whether psychiatric symptoms influenced his perception of threat, and if additional treatment addressing suicidality, anxiety, and coping were indicated. The treatment team maintained an IPOC for danger to self that was inadequate and merely repeated what was ineffective during the patient's three prior MHCB placements.

The discharge IDTT meeting occurred timely on February 5, 2025, and all required disciplines except nursing were in attendance. The higher level of care form required some modification. It indicated that the patient was not referred to a higher level of care, but that was inaccurate. While the patient was not referred to inpatient treatment, his level of care was increased from 3CMS to EOP at discharge. The treatment modifications were acceptable, but they did not address the increased level of care. The patient was physically discharged two days later to an EOP at another facility with sensitive needs yards.

**Findings**

The treatment provided to this patient was inadequate.

The patient had significant safety concerns that precipitated his suicidality and extreme anxiety. Those safety concerns were reportedly not validated in two separate investigations, but the patient continued to be returned to the same yard which resulted in repeated MHCB admissions. The MHCB treatment team did not adequately assess and treat the patient's suicidality, anxiety, and the relationship of his safety concerns to his psychiatric symptoms. Referral to a higher level of care was not appropriately considered by the IDTT; instead, the treatment team based the rationale for nonreferral on the patient only needing his safety concerns addressed and that inpatient treatment was not designed to do so. While inpatient treatment was not a remedy for safety concerns solely, the patient repeatedly exhibited significant anxiety that interfered with his ability to function at his current level of care. As his anxiety increased, he became increasingly suicidal to avoid harm. No treatment interventions were identified to address those concerns, and the clinical contacts were primarily brief check-ins rather than meaningful interactions with clinical interventions implemented.

The patient was ultimately referred to a higher level of care in the EOP after the fourth MHCB placement; however, the increase in level of care should have occurred sooner.

The patient's psychiatric needs were only addressed by medication management; however, other therapeutic interventions were clinically indicated. The patient was not seen on two days during his seven-day MHCB placement by any mental health provider, and on at least one occasion he was seen by a different telepsychiatrist. The MHCB documentation did not indicate that actual therapeutic interventions were implemented.

**Patient S**

This 21-year-old MHCB patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood, and he was prescribed Remeron. The patient previously received mental health services at the 3CMS level of care and was housed in the RHU.

The patient was admitted to the MHCB on February 24, 2025 due to suicidal ideation with a plan to hang himself or to jump from an upper tier. He was discharged on March 5, 2025. Prior to the MHCB placement, the patient was housed in the RHU after informing custody staff of contraband on the yard and requesting protective custody. He reported anxiety due to that action and related safety concerns.

The initial assessments were all completed timely and were generally adequate. The safety plan completed with the patient, however, was limited and was inadequate. The initial IDTT meeting occurred timely, but the safety plan and treatment plan were inadequate to address the patient's ongoing anxiety and suicidality.

The routine IDTT meeting conducted on March 3, 2025 was noted as a discharge IDTT meeting in some documentation; however, it did not appear to be an actual discharge IDTT meeting. All

required disciplines were present except a covering telepsychiatrist. The treatment plan was not appropriately updated or individualized despite the ineffectiveness of the prior treatment plan.

A discharge IDTT meeting occurred on March 5, 2025 that included all required disciplines and the assigned treatment providers. The higher level of care nonreferral justification was inadequate, stating only that inpatient treatment was not intended to address poor behavioral decision-making unrelated to serious mental illness; additionally, the patient's safety concerns were not addressed. While the treatment plan and modifications were inadequate due in part to the lack of individualization and relevant treatment goals and interventions, the safety plan was further developed and was adequate.

During the MHCB placement, the patient was not seen individually in a confidential setting by a mental health provider on March 1, March 2, and March 3, 2025; he was only seen in the IDTT meeting on March 3, 2025. The patient was seen by different telepsychiatrists which resulted in impaired continuity of care. There were no interventions documented in the healthcare record beyond medication management. The patient's Remeron was increased soon after arrival in response to his reported symptoms.

**Findings**

The treatment provided to this patient was inadequate.

There were challenges in continuity of care, as the patient was seen by different psychiatric providers even though establishing rapport with the patient was the primary treatment focus identified. The patient was not seen by a mental health provider for three days of a nine-day MHCB placement. Given the nature of the patient's crisis and reported suicidality and anxiety, intensive brief behavioral interventions were indicated but were not provided.
Medication management was appropriate and beneficial. The treatment plan, however, was otherwise not individualized and consisted of the identical goals and strategies noted in the documentation of every reviewed MHCB patient admitted due to danger to self.

**Patient T**

This 32-year-old MHCB patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of adjustment disorder with depressed mood, unspecified mood disorder, and methamphetamine use disorder. At the time of MHCB admission, the patient was only prescribed Vistaril, as he had requested discontinuation of other psychotropic medications. Those medications were tapered and discontinued prior to the MHCB admission.

The patient was admitted to the MHCB from the 3CMS level of care on April 24, 2025 due to superficial cuts to his arm and neck after using a paperclip to harm himself. At the time of the self-injury, the patient told nursing staff that he did not want to live, and the injuries were classified as a suicide attempt. The suicide risk assessment noted that while the patient had superficial cuts to his neck, he had deeper cuts on his left wrist. The SPRFIT coordinator and the MHCB PC, however, determined that the incident was not a suicide attempt despite the patient requiring sutures for his wrist without providing a clinical rationale for changing the classification of the

incident. The second responder documented superficial scratches with no active bleeding; however, the attending physician documented the use of Dermabond to cuts that were described as gaping.

The initial nursing, PC, and psychiatric assessments were completed timely as well as the history and physical examination. The initial PC assessment was clinically inadequate due to a lack of updated relevant information. The patient refused a confidential session with the telepsychiatrist, and he was seen cell front. He was described as guarded and did not want to discuss what led to the MHCB placement, possibly due to the lack of confidentiality. The patient reported psychotropic medication treatment in the community and approximately four community psychiatric hospitalizations. Current stressors included serving his first prison term with a life sentence and worry that his custody classification points were nearing Level IV which would negatively impact his housing alternatives. There was documentation from prior providers that the patient had a history of auditory hallucinations; however, a psychotic disorder was not considered as a diagnosis or as a provisional diagnosis.

MHCB nursing notes documented that the patient was not sleeping, was agitated with response to internal stimuli, and he engaged in odd behaviors including standing in awkward fixed positions for extended periods of time with prolonged staring.

The initial IDTT meeting occurred late on April 28, 2025 and included the assigned providers and required disciplines. The IDTT noted that the patient did not meet the criteria for higher level of care consideration. The treatment plan was not individualized and included generic statements regarding building rapport through empathy and medication management. The treatment plan included an IPOC, but there were no clear targets of treatment or treatment goals, and the interventions were inadequate to address the patient's diagnostic issues and significant psychiatric symptoms.

The subsequent discharge IDTT meeting occurred two days after the initial IDTT meeting; the assigned providers and required disciplines were present. The case formulation was vague and brief, and it did not adequately provide an adequate assessment of the patient's complex clinical picture and ongoing stressors or psychotic symptoms, including those documented by nursing. The treatment plan was not updated and remained inadequate. The IDTT did recognize that the patient required a higher level of care and discharged the patient to the EOP. He was physically discharged on May 2, 2025.

Documentation in the healthcare record indicated that the patient was repeatedly observed responding to internal stimuli, although he denied auditory hallucinations. While in the exercise yard, the patient was observed masturbating. This behavior was thought by the MHCB PC to be due to his psychosis, and mental illness was later determined to have directly contributed to the behavior in the RVR mental health assessment. A subsequent suicide risk assessment also noted that the patient was responding to internal stimuli, exhibiting delusional thinking, and had poor insight and judgment regarding his mental illness.

Despite the presence of obvious and significant psychotic symptoms, the IDTT did not update the treatment plan, assessment, or diagnoses accordingly. The patient was not seen individually by any

mental health provider on April 26, April 27, and April 28, 2025, and he was not seen by a psychiatrist at least every three days. The psychiatrist recommended treatment with a mood stabilizing medication on May 1, 2025; however, the patient refused the medication.

After discharge from the MHCB, the patient was described with active psychotic symptoms during the five-day follow-up contacts. He had not showered since discharge from the MHCB, he had not been observed eating for at least four days; and he was unkempt with poor eye contact and very limited speech. He was described as nonresponsive to mental health staff and custody, and he was again referred to the MHCB due to grave disability.

The patient was admitted to an MHCB at another institution where he was provided diagnoses of unspecified mood disorder, unspecified psychotic disorder, and possible catatonia. The patient remained with severe psychosis, and he was ultimately referred for acute inpatient care. Of concern was the severity of the patient's symptoms that were present and not addressed during the HDSP MHCB placement.

**Findings**

The treatment provided to this patient was inadequate.

The patient was not seen consistently in the MHCB for assessment and treatment considering his clinical acuity and need. While the patient typically refused confidential contacts, no behavioral interventions or other therapeutic techniques were implemented to encourage his participation in treatment and to allow for comprehensive evaluation and therapeutic interventions. Although the treatment team documented significant objective evidence of psychosis, they failed to update the diagnoses and treatment plan accordingly. The patient repeatedly refused psychotropic medication treatment; however, the treatment team did not document any interventions implemented to address that treatment refusal. Consequently, the patient's care was primarily removal from the yard and isolation within the MHCB with occasional brief nonconfidential clinical contacts.

The patient's lack of improvement and need for a higher level of care were not addressed, and the patient discharged to another facility where providers quickly recognized that he was acutely psychotic and gravely disabled. The behaviors described in documentation from that facility were behaviors that the patient exhibited at the HDSP MHCB which strongly suggested that the patient should have been referred to a higher level of care while in the HDSP MHCB. The failure to do so unnecessarily delayed the patient's access to appropriate and needed mental health treatment.

**Patient U**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed Vistaril and BuSpar. The patient utilized hearing aids.

The patient transferred to HDSP on March 26, 2024; he had been receiving mental health services at the 3CMS level of care since February 3, 2023.

The most recent master treatment plan was dated August 7, 2024, and the required staff and the patient attended the IDTT meeting. IPOC goals were developed for the patient's primary problems and goals rather than in the treatment plan section, but the goals addressed the relevant issues presented by the patient. The patient's own goals for treatment were not recorded.

The psychiatrist met with the patient twice in a confidential setting during the review period by telehealth; the PC was present during the sessions. The frequency of visits and medication monitoring were appropriate.

The PC met with the patient on three occasions during the review period when CBT and supportive therapy were utilized, and the patient was provided self-help articles. The documentation of those contacts, however, appeared to be copied from prior documentation and contained little unique current information.

The patient received an RVR on February 4, 2025 for possession of alcohol. The RVR mental health assessment indicated that mental illness did not play a role in the patient's behavior.

**Findings**

The treatment provided to this patient was minimally adequate.

While there were concerns with the inadequate PC and IDTT documentation, the patient received appropriate medication monitoring and frequent contacts from the providers and was able to maintain stability.

**Patient V**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of major depressive disorder, opioid use disorder, and alcohol use disorder. The patient was prescribed Remeron for depression and insomnia. He had multiple physical health conditions including neuropathy, diabetes, chronic constipation, and insomnia.

The patient arrived at HDSP on August 2, 2023. An IDTT meeting occurred on October 8, 2024. The required staff and the patient were present at the meeting. The IDTT noted that the patient did not to meet the criteria for consideration of referral to a higher level of care. The treatment plan included an IPOC for depressed mood, but goals and interventions to address depression were not documented.

On March 1, 2025, the patient was observed with an altered mental status, and he reported smoking spice. Narcan was administered; subsequently, the patient was able to respond to interview questions and was returned to housing. A suicide risk evaluation assessed the patient with low chronic and acute suicide risk.

The psychiatrist provided contacts with the patient by telehealth and monitored the patient's response to programming and medication treatment; however, the patient was not seen timely. The patient was not seen from November 1, 2024, to April 30, 2025. The patient reported that he was doing fine but not sleeping well.

The PC did not note whether contacts occurred remotely or in person; routine PC contacts occurred on October 8, 2024 and July 25, 2025. The PC documented what appeared to be templated intervention wording in the notes.

**Findings**

The treatment provided to this patient was inadequate.

Although the patient remained stable regarding depressive symptoms, he was not provided with psychiatric or PC visits at the required frequencies, and the PC notes contained little unique information and failed to document the provision of actual interventions.

**Patient W**

This 35-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of major depressive disorder and cannabis disorder. He was prescribed Remeron and Vistaril. His physical health conditions included constipation and gastroesophageal reflux disease.

The patient arrived at HDSP on February 26, 2025. Multiple behavioral problems were documented, and the patient received his most recent RVR for battery on another incarcerated person.

The most recent treatment plan was from the previous facility PBSP and was dated January 8, 2025. The psychiatrist saw the patient by telehealth at HDSP on April 17, 2025, nearly two months after transfer to HDSP. The psychiatrist reviewed the patient's history and current functioning and continued psychotropic medications unchanged.

The PC did not conduct an initial assessment until April 17, 2025, 49 days following the patient's transfer. The assessment included a thorough review of behavior, history, and formulation but did not specify any interventions or recommendations for treatment except maintaining the current level of care.

**Findings**

The treatment provided to this patient was inadequate.

Psychiatric and primary clinician contacts did not occur timely, and treatment planning required update.

**Patient X**

This 40-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of depressive disorder, and he was prescribed Remeron.

The patient arrived at HDSP on March 20, 2019 for his sixth CDCR term. During October 2024, the patient requested resumption of medication for depression and insomnia. His physical health concerns including hip pain, kidney disease, asthma, and prediabetes.

An IDTT meeting occurred on October 9, 2024 that included the required staff and the patient. While the IPOC section was completed and identified depressed mood as a problem area, there were no treatment goals or objectives documented. Higher level of care referral criteria were appropriately reviewed.

The psychiatrist met with the patient by telehealth upon arrival in October 2024, and again on January 23, 2025 and April 23, 2025 to review his response to treatment. The psychiatrist did not note whether the visit occurred in a confidential setting during the January 2025 visit but did document that the patient refused an office visit at the April 2025 session. The patient's history and current status were appropriately reviewed, and the medication was continued as the patient reported improved sleep and mood. According to the documentation, the psychiatrist and the PC met with the patient together.

The PC met with the patient on January 23, 2025 and April 23, 2025 and included an assessment and mental status examination, but the plan section of the documentation reported the use of CBT with a note that appeared identical to previous notes in this patient's and other patients' healthcare records. The clinician provided packets for self-work. There was no documentation of the clinician having separate visits from those that occurred with the psychiatrist.

**Findings**

The treatment provided to this patient was inadequate.

Notably, the patient responded well to medication treatment and remained stable, but the care was largely unguided by an adequate treatment plan. Additionally, the PC documentation was generic and not individualized, and the PC only met with the patient in joint sessions with the psychiatrist.

**Patient Y**

This 55-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of anxiety disorder. He was not prescribed psychotropic medication. Additionally, he had physical health diagnoses of hepatitis C, gastroesophageal reflux disease, hypertension, hyperlipidemia, chronic kidney disease, and hypothyroidism.

The patient arrived at HDSP on August 26, 2024 from CSP/Sac. He had an EPRD of May 4, 2025.

The patient intermittently received treatment at the 3CMS and EOP levels of care with one MHCB placement in 2013. An IDTT meeting occurred on October 16, 2024 that included all required staff and the patient. The IDTT appropriately considered higher level of care factors and suicide risk. Anxiety and pre-release planning were identified as problem areas, but only the pre-release section included goals and objectives listed. The patient requested continuation at the 3CMS level of care due to his potential upcoming parole.

The psychiatrist saw the patient by telehealth at the same time as the IDTT meeting prior to the review period on October 16, 2024 when the psychiatrist noted that the patient was medication nonadherent and recommended continuation at the 3CMS level of care for stability. The psychiatrist did not meet with the patient during the review period.

The PC met with the patient on January 8, 2025 and April 9, 2025, but did not document whether the visits occurred in a confidential setting or if they occurred by telehealth. The patient denied mental health symptoms. The clinician documented the content of the patient's comments and mental status; however, the interventions were generic and were not individualized.

**Findings**

The treatment provided to this patient was inadequate.

While the IPOC section of the master treatment plan included anxiety; no goals or objectives were documented, and pre-release planning was the only issue identified with specified objectives. The lack of individualized treatment planning and reliance on generic intervention language were concerning. It was unclear why the patient remained in the MHSDS, as he denied and displayed no mental health symptoms.

**Patient Z**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of depressive disorder, PTSD, and opioid use disorder. He was prescribed Thorazine, Prazosin, and Zoloft. Pertinent physical health conditions included asthma and prediabetes.

The patient arrived at the institution on March 26, 2024. He had received treatment at the 3CMS level of care since December 29, 2021.

The master treatment plan was completed at an IDTT meeting on August 7, 2024 that was attended by all required staff and the patient. The IDTT appropriately assessed the patient for consideration of higher level of care referral and suicide risk. The IPOCs contained individualized goals, objectives, and interventions for depressed mood, but the treatment plan section itself was not completed.

Psychiatric contacts occurred by telehealth with the primary clinician, and the patient's symptoms and medication continuity were appropriately documented The modality and confidentiality of those visits were noted. Subsequent scheduled contacts and a cell front visit on April 24, 2025 were documented, as the patient refused to leave his cell and denied difficulties. No RVRs, suicide risk assessments, unusual incidents, self-harm events, or significant housing moves were documented during the review period.

Treatment planning was partly individualized, but goals were not documented in the main treatment plan.

**Findings**

The treatment provided to this patient was adequate.

The patient was seen for adequate medication management, psychiatric and PC contacts. The documentation of individualized treatment planning required improvement.

**Patient AA**

This 40-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of bipolar II disorder, major depressive disorder, recurrent with psychotic features, and Tourette's syndrome. Additional physical health diagnoses included chronic allergic rhinitis, chronic pain involving the shoulder, neck, knee, and elbow, prediabetes, and sleep apnea.

The patient arrived at HDSP on August 26, 2024, and he had received mental health services at the 3CMS level of care since 2017.

An IDTT meeting occurred on October 2, 2024 that included the required staff and the patient. The treatment plan identified depressed mood as the target for intervention, and relevant goals, objectives, and interventions were documented. The higher level of care referral criteria were reviewed appropriately.

The psychiatrist and PC each documented an appointment on March 20, 2025 which the patient refused to attend, and the patient informed the escort officer that he was doing well; his medication regimen was continued unchanged. The PC noted intent to utilize CBT, but the documentation appeared generic, as a December 10, 2024 note containing the exact wording as the March 20, 2025 entry. Although it was documented that the patient was offered a confidential visit, he was not seen face-to-face during the review period. No incidents, RVRs, suicide risk assessments, unusual incidents, or pertinent housing moves were documented during the review period.

**Findings**

The treatment provided to this patient was inadequate.

Despite appropriate diagnosis and treatment planning, the treatment was compromised by the lack of face-to-face clinical contacts during the review period. The documentation of clinical contacts included generic interventions that were not individualized.

**Patient BB**

This 61-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of depressive disorder. He was not prescribed psychotropic medication. The patient had several physical health conditions.

An IDTT meeting occurred on July 31, 2024 that included the PC and psychiatrist, but the patient declined to attend. The higher level of care referral criteria and suicide risk were reviewed appropriately, and treatment plan goals, objectives, and interventions addressing depression were documented.

The most recent psychiatric contact occurred on June 27, 2024 when the patient appeared to be doing well.

The PC met with the patient twice during the review period; he was seen at cell front on December 13, 2024 for a routine visit after the patient refused to attend a confidential session, and he was seen on April 30, 2025 in response to the patient's request. At the April 2025 visit, the patient expressed frustration about being away from family, limited program access, concerns about his memory, and school difficulties. The clinician referred the patient for a psychological assessment to evaluate possible cognitive difficulties. No RVRs, suicide risk assessments, unusual incidents, self-harm events, or housing moves were documented during the review period.

**Findings**

The treatment provided to this patient was adequate.

Mental health contacts occurred at the appropriate frequency, and the patient's symptoms were closely monitored.

**Patient CC**

This 38-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of major depressive disorder and PTSD. He was not prescribed psychotropic medication.

The patient transferred to HDSP on November 21, 2023. An IDTT meeting occurred on December 11, 2024 that included the required staff, but the patient declined to attend. The patient had previously communicated interest in addressing depression and irritability, and the plan included goals, objectives, and interventions relevant to depressed mood. The higher level of care referral criteria and suicide risk were reviewed appropriately. The psychiatrist documented the patient's request to discontinue mental health treatment, but that information was not corroborated in the treatment plan or in the PC documentation.

The psychiatrist did not meet with the patient during the review period, but based upon a healthcare record review, it was noted that Remeron was previously prescribed. The primary clinician met with the patient twice at cell front due to the patient's refusal to leave his cell for confidential sessions. Although the patient had requested mental health contact; he subsequently stated that his issues were resolved.

**Findings**

The treatment provided to this patient was adequate.

The patient was monitored at the required frequency and maintained stability with supportive care.

**Patient DD**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of major depressive disorder. He was not

prescribed psychotropic medication. The patient also had hepatitis A, asthma, and a ganglion cyst on his wrist.

The patient arrived at HDSP on February 11, 2020. An IDTT meeting on January 8, 2025 included the required staff, but the patient declined to attend. Higher level of care indicators and suicide risk were reviewed. While IPOCs were developed to address depressed mood; the goals and objectives were not completed.

The psychiatrist reviewed the patient's healthcare record during the IDTT meeting and noted that the patient did not take psychotropic medication; however, the psychiatrist did not meet with the patient during the review period.

The PC documented two contacts with the patient; both occurred at the cell front, as the patient declined to attend a confidential session. The clinician observed the patient's mental status, quality of interaction, and the state of his cell and clothing; however, little unique information was documented in the progress notes, and templated generic language was utilized.

**Findings**

The treatment provided to this patient was minimally adequate.

The patient's status was appropriately monitored, and he was offered opportunities for treatment sessions; however, there was concern regarding the incompleteness of the treatment plan, and the patient was not seen outside his cell during the review period. The use of templated language in documentation indicated a lack of individualized care.

**Patient EE**

This 61-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of schizophrenia and antisocial personality disorder. He was prescribed Zyprexa, BuSpar, and fluphenazine, and he received his psychotropic medications by a PC 2602 order due to grave disability. Pertinent medical concerns included chronic kidney disease, hypertension, hypothyroidism, and anemia.

The patient previously received mental health services at the EOP, MHCB, acute, and intermediate levels of care. He arrived to HDSP at the EOP level of care on March 28, 2024. A 30-day modified treatment IDTT meeting occurred on December 3, 2024; a covering PC, the assigned telepsychiatrist, and a CCI attended. It was unclear whether the patient attended; the treatment plan indicated that he refused, but the clinical summary stated otherwise. The treatment team reported the patient's history of grandiose and bizarre delusions, inability to manage ADLs, and his isolative and unpredictably aggressive behaviors. The IDTT noted partial response to medication treatment with improvement in the patient's positive symptoms, self-care, and reduction in aggressive behavior. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. There was an IPOC for delusions, but there were no specific treatment goals, interventions, or response to treatment provided; and the discharge criteria were severely inadequate.

The patient, assigned clinicians, and a CCI attended the routine IDTT meeting on March 4, 2025. The clinical summary was pulled forward unchanged from the previous treatment plan. The PC added problem areas of anxiety and delusions, but the goals and interventions were generic and vague. The discharge criteria/reason for retention section included much of the actual treatment plan and indicated that the patient was medication adherent, and he attended his three scheduled groups weekly. The overall quality of the IDTT documentation at this meeting was improved compared to the December 3, 2024 IDTT documentation; however, treatment planning remained inadequate due to the lack of specific, individualized, measurable, and objective treatment goals and interventions.

The psychiatric care was provided by telepsychiatry; the patient was not seen for timely routine contacts which was concerning due to the patient's PC 2602 status, lack of insight, and ongoing residual psychotic symptoms. The patient was not seen for routine psychiatric contact or check-in between October 16 and December 19, 2024 or between December 20, 2024 and February 19, 2025. The progress notes were comprehensive, were updated appropriately, and they provided the clinical rationale for medication adjustments; however, the frequency of routine contacts was severely problematic and resulted in delays in assessments and medication adjustments that might have addressed the patient's ongoing residual psychotic and extrapyramidal symptoms.

Routine PC contact occurred sporadically and did not occur timely between November 1, 2024 and January 23, 2025; but those sessions occurred in a confidential setting. The documentation of those contacts were brief and lacked treatment interventions, but the patient denied acute symptoms and was generally stable. Confidential PC contacts occurred weekly after a new telemental health PC was assigned on January 23, 2025, and the progress notes provided detailed descriptions of the session content and the patient's functioning. The PC noted residual psychotic symptoms and bizarre, delusional thinking, but those symptoms did not have a significant impact on the patient's functioning or mood. The patient appeared to benefit from the support and attended all scheduled appointments, but the progress notes did not consistently reference any specific treatment goals or interventions.

The patient was offered two to five hours of EOP groups weekly during the review period.
The topics included coping and current events, and most of groups were facilitated by recreation therapists. The HDSP CEO facilitated a weekly process group that reportedly focused on current events and addressed questions from the EOP participants. PC progress notes between November 27, 2024 and January 23, 2025 indicated that the patient met the higher level of care criterion for treatment refusals; however, his recreation therapy group attendance improved significantly after January 21, 2025, and he attended nearly all groups for the remainder of the review period.

**Findings**

The treatment provided to this patient was inadequate.

The treatment plan was inadequate due to poor documentation and did not provide individualized, objective, and measurable treatment goals or specific interventions to address the patient's residual psychotic symptoms and persistent delusions. The psychiatric care was also inadequate. There were two distinct periods where the patient was not seen for psychiatric contact for 60 days or

longer despite the active PC 2602 order, ongoing symptoms, and moderate to persistent severe medication side effects. PC contact timeliness improved during the review period, and the telemental health PC appeared to establish good therapeutic alliance with the patient, but the progress notes did not consistently or specifically reference treatment goals or interventions to improve the patient's level of functioning and eventual discharge to a lower level of care.

**Patient FF**

This 48-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of major depressive disorder, recurrent episode, moderate; adjustment disorder with disturbance of conduct; antisocial personality disorder; borderline personality disorder; and opioid use disorder, severe. He was prescribed Zyprexa, Abilify, Remeron, Vistaril PRN, and Suboxone. Pertinent medical conditions included obesity and hepatitis C. He was prescribed Wegovy for obesity.

The patient arrived at HDSP on April 20, 2024 from the KVSP EOP. The patient previously received mental health services at the 3CMS, EOP, MHCB, acute, and intermediate levels of care.

A routine IDTT meeting occurred on November 19, 2024 that included a covering PC, the assigned telepsychiatrist, and a CCI. The clinical summary noted that the patient was provided diagnoses of antisocial personality disorder, borderline personality disorder, bipolar disorder, substance abuse, depression, and anxiety. He reportedly presented with mild to moderate impairment in social functioning due to anxiety and irritability that improved with exercise. The treatment plan included an IPOC for irritability that indicated one of four goals were not met. A problem area of suicidal ideation remained from the most recent MHCB placement on March 1, 2024, and the goals and interventions were also inadequate and not updated. No discharge criteria or level of care rationale were documented. At routine psychiatric contacts on October 22, 2024 and December 5, 2024, the patient reported auditory and visual hallucinations, but those symptoms were not identified or discussed during the IDTT meeting.

The patient was placed in the RHU on February 21, 2025 due to safety concerns and increased paranoia after he was assaulted the prior weekend. An initial RHU EOP IDTT meeting occurred on March 12, 2025; the psychiatrist noted that the patient was medication nonadherent, but there were no other significant concerns. The treatment goals and interventions were not updated and remained inadequate, but the treatment plan indicated that the patient would be retained in the EOP for 90 days to address ongoing anxiety and racing thoughts.

The patient's level of care was reduced to 3CMS at the mainline initial EOP IDTT meeting on April 15, 2025 upon return from the RHU. The IDTT indicated that the patient had met his treatment goals; however, it was unclear which treatment goals were met, as none were documented to address his anxiety, racing thoughts, and hallucinations, and he remained medication nonadherent. The discharge from the EOP was particularly concerning; a MH5 Emergency Mental Health request was submitted later that same day indicated that the patient reported suicidal ideation; however, there was no documentation that a clinician responded to that request.

Routine psychiatric contacts occurred monthly by a telepsychiatrist in a confidential setting. The progress notes were comprehensive and included the rationale for medication changes and noted the patient's ongoing medication nonadherence with Zyprexa due to side effects. Zyprexa and Remeron were changed to PRN at the patient's request on October 22, 2024, and Abilify was added on December 5, 2024 to better address psychosis. The patient reported nausea due to Abilify on January 16, 2025, and the dosage was lowered. The patient was not seen for another routine EOP psychiatric contact before his level of care was decreased to 3CMS on April 15, 2025.

The patient was not seen for a routine PC contact during November 2024. The patient was seen for a routine contact on December 4, 2024 weight loss medications and mobility issues due to obesity were discussed. The PC indicated that the patient was stable, but the progress note was brief and vaguely referenced cognitive restructuring as an intervention. A telemental health provider was reassigned as the PC during January 2025. After the change, PC contacts occurred biweekly, and the quality of documentation improved significantly. The notes referenced specific interventions, and the patient showed a positive response to the individual contacts.

The patient was offered three to five group sessions weekly while in the mainline EOP. The groups were facilitated by recreation therapists and the HDSP CEO, and the topics included coping, leisure, and a process group. The group topics were appropriate, but the patient's attendance was inconsistent but improved during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The treatment planning was inadequate and consistently lacked several key elements including current and individualized treatment goals, specific level of care rationale, and discharge criteria; additionally, there was no discussion of treatment interventions to address the patient's chronic and ongoing psychosis. Further, discharge to the 3CMS level of care immediately after his release from the RHU was questionable and occurred with very little clinical justification provided. Although routine psychiatric contacts were adequate, the psychiatrist failed to document the patient's psychotic symptoms in the IDTT meeting or in treatment planning. Additionally, the patient remained with medication nonadherence that was not adequately addressed. PC contacts were adequate with significant improvement after the PC reassignment.

**Patient GG**

This 53-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of delusional disorder, opioid use disorder, unspecified anxiety disorder, and unspecified schizophrenia and other psychotic disorder. He was prescribed Prozac, Zyprexa, Vistaril and Suboxone. Pertinent medical concerns included chronic hepatitis C and hypertension.

The patient arrived at HDSP EOP on or about March 29, 2024. He previously received mental health services at the EOP and MHCB levels of care.

The patient was admitted to the MHCB from June 7 to June 12, 2024 and from June 26 to July 16, 2024 due to suicidal ideation regarding his transfer to HDSP where he was far from family support. The initial EOP IDTT meeting was severely delayed and did not occur until October 1, 2024 when the patient, assigned clinicians, and a CCI were in attendance. The patient reported difficulty adjusting to HDSP and that he would prefer a location closer to family. His primary symptoms were auditory hallucinations, paranoia, and agitation, and he had no history of suicide attempts or self-injurious behavior in CDCR. The treatment plan problem areas and goals were all carried forward from previous MHCB placements and were not updated to reflect the patient's EOP level of care and more recent clinical presentation. The interventions were also carried forward verbatim from previous MHCB placements and were inadequate and inappropriate. The discharge criteria and level of care rationale were unclear and inadequate.

The next 30-day modified treatment IDTT meeting occurred on February 25, 2025. The assigned clinicians and a CCI participated, but the patient refused to attend. The IDTT documentation was very disorganized, and pertinent information was placed in the wrong sections and often was not dated correctly to indicate when it was updated. The treatment plan section remained unchanged and inadequate, and discharge criteria were completely absent. The treatment planning was severely inadequate.

Routine psychiatric contacts occurred sporadically during the review period. The contacts were provided in a confidential setting by telepsychiatry on November 1, 2024, January 23, 2025, and March 26, 2025. The progress notes were adequate and included appropriate updates and rationale for medication changes. The patient reported chronic auditory hallucinations and depression and stated that his medications were very helpful in managing his symptoms. He was prescribed Cogentin on January 23, 2025 to address medication side effects. His medications otherwise remained unchanged, and his auditory hallucinations and depression continued to improve. There were significant lapses between psychiatric contacts which resulted in delays in medication adjustments to address medication side effects.

The patient was not seen for routine individual PC contact between October 10, 2024 and February 26, 2025. The February 26, 2025, PC documentation indicated that the patient was managing well with the support of therapy and medication; however, the patient had not been seen for a therapy session in more than four months. The PC contact was very poorly documented. At a March 20, 2025, PC contact, the patient remained stable, but the documentation remained inadequate with significant portions of information carried forward or copied and pasted inappropriately.

The patient was offered between one and three recreation therapy groups weekly during the review period. The group topics were coping and current events, and his attendance was adequate.

The patient was placed in the MHCB from April 1 to April 14, 2024, and the patient was seen by the CIT on April 16, 2025 after reporting suicidal ideation and safety concerns. He was subsequently readmitted to the MHCB on April 16, 2024 with eventual admission to the CHCF-PIP for intermediate care on May 14, 2025.

**Findings**

The treatment provided to this patient was inadequate.

Clinical contacts and treatment planning were severely inadequate due to lack of timeliness and poor documentation. The treatment plans were carried forward from prior MHCB admissions and included goals and interventions that were inappropriate for the EOP setting and/or did not reflect the patient's current functioning. The psychiatric contacts did not occur timely which likely delayed a medication change to address longstanding medication side effects. PC contacts rarely occurred and were very poorly documented.

**Patient HH**

This 37-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided a diagnosis of major depressive disorder, recurrent episode, in partial remission with anxious distress. He was prescribed Abilify and Remeron PRN.

The patient previously received mental health services at the 3CMS, EOP, and MHCB levels of care. He originally arrived at HDSP on April 30, 2024 at the 3CMS level of care but was immediately sent to the CSP/Sac MHCB where he was treated from April 30 to May 9, 2024 and discharged back to the HDSP EOP.

The initial EOP IDTT meeting occurred on July 30, 2024, but a subsequent quarterly IDTT meeting did not occur until January 28, 2025. This was particularly concerning because a PC progress note on December 26, 2024 by a covering PC indicated that the patient had refused two consecutive PC contacts with three consecutive days of Abilify nonadherence. The PC concluded that an IDTT meeting would be beneficial, but a meeting did not occur for over 30 days.

The IDTT meeting included the patient, assigned clinicians, and a CCI; the PC and psychiatrist participated remotely. An IPOC for anxiety was not updated since June 10, 2024. A problem area of depression was documented that included limited but appropriate and measurable treatment goals and adequate interventions. The psychiatrist reported that the patient had 80 percent medication adherence and attended 60 percent of the three groups he was assigned weekly. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The patient reported overall improvement in mood and denied any concerns. The discharge criteria were adequate.

The patient, assigned clinicians, and a CCII participated in the quarterly IDTT meeting on April 15, 2025. The IDTT noted that the patient was working to reduce depression and had not met any of his treatment goals. The psychiatrist reported that the patient had 93 percent medication adherence, but he typically refused to attend individual psychiatric contacts. The level of care rationale and discharge criteria were individualized and appropriate. Although the quarterly IDTT meeting did not occur timely, the treatment planning was adequate.

The patient was not seen for a routine psychiatric contact during November and December 2024. He refused a scheduled contact for medication nonadherence on January 8, 2025, and the progress note indicated that a cell front telepsychiatry check-in was offered. The patient participated in a confidential telepsychiatry contact on February 19, 2025 when he reported fair mood and benefit

from treatment with Abilify. The progress note was adequate and indicated that the patient was 75 percent adherent with Abilify, rarely requested Remeron PRN, and he declined medication changes. The patient refused another medication nonadherence contact and was seen for a cell front telepsychiatry check-in on March 20, 2025. He remained stable, but the appointment was not rescheduled appropriately; the documentation indicated that the patient was not seen for individual psychiatric contact until June 23, 2025.

Routine PC contacts occurred in a confidential setting by telemental health every two weeks during the first half of the review period and increased to weekly after February 14, 2025. The patient frequently refused to attend a confidential session and often reported that he was not ducated or informed of his appointments. The PC did not offer cell front contacts and instead noted any custody concerns and sent the telepresenter to obtain signed refusal forms. The progress notes were adequate and provided detailed updates of the patient's clinical functioning and mental status. The patient remained stable during the review period and reportedly enjoyed his work as an ADA worker. He was ambivalent about attending scheduled PC sessions, but he had good rapport with his PC and appeared to benefit when he attended.

The patient was offered only two to three recreation therapy groups weekly. The group topics of coping and leisure activities were appropriate, but the frequency and variety of group topics were inadequate. The patient's attendance was adequate and improved during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The patient was not seen for routine psychiatric contact for two months despite treatment with Abilify and Remeron and medication nonadherence. He often refused confidential psychiatric contacts, and they were not rescheduled appropriately which resulted in long delays between medication assessments. Group offerings were severely limited in frequency and topics. The long delay between the initial IDTT and subsequent quarterly IDTT meetings was also problematic, although overall treatment planning was adequate.

**Patient II**

This 52-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of paranoid personality disorder; bipolar I disorder, current or most recent episode depressed, unspecified; mood disorder; opioid use disorder; and unspecified schizophrenia spectrum or other psychotic disorder. He was prescribed Zyprexa, Cogentin, Suboxone, Prolixin, Remeron, prazosin, and melatonin.

The patient previously received mental health services at the 3CMS, EOP, MHCB, and intermediate levels of care. He arrived at HDSP on March 11, 2024 after discharge from the CMF-PIP acute care. The patient, assigned clinicians, and a CCI attended a quarterly IDTT meeting on November 12, 2024. The patient reported increased depression, and his treatment goal was to improve coping skills. An IPOC for anxiety included appropriate treatment goals and progress updates since the last treatment plan. Depression and auditory hallucinations impacting group

attendance were initiated as problem areas, and brief but measurable goals and adequate clinical interventions were included. The patient's group attendance was 70 percent for two mental health and three ISUDT groups weekly, and he was medication adherent. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The discharge criteria and level of care rationale were adequate.

The same participants attended the quarterly IDTT meeting on February 4, 2025. The patient's group attendance was below 50 percent for the two groups offered weekly. The PC noted the patient's medication nonadherence and increased paranoia that resulted in not leaving his cell. His medications were recently increased, and the patient reported improvement in his symptoms and denied side effects. The level of care rationale and discharge criteria were updated appropriately and remained adequate.

The patient was seen for a routine telepsychiatry contact in a confidential setting with a covering telepsychiatrist on November 1, 2024. He denied depression but reported increased anxiety. He also reported auditory hallucinations but said they were not bothersome, and he denied significant mood instability. The progress note was detailed but failed to include clonidine in the medication summary, although it was on the active medication list. The telepsychiatrist noted medication adherence and denial of medication side effects, and the medications were continued unchanged.

The patient was not seen for another routine psychiatric contact until January 23, 2025, when he first met with his assigned telepsychiatrist. He reported increased agitation and requested an increase in Prolixin, but the psychiatrist noted that the patient's risk of side effects would increase significantly. The psychiatrist also noted concerns about possible medication diversion and was awaiting the results of laboratory studies to assess medication adherence.

The patient refused his next scheduled psychiatric visit on February 26, 2025 and was seen on March 4, 2025. At that contact, he told the psychiatrist he attempted suicide the prior Saturday by hanging from the light fixture in his cell, but the sheet broke. The patient was single-celled, and he reported that there were no witnesses. He reported severe depression, suicidal ideation, paranoia, and command and derogatory auditory hallucinations during the previous several weeks and acknowledged carrying a knife due to the paranoia. He also reported that he did not want to disappoint his PC, so he pretended to be doing better than he was. He also acknowledged cheeking his medications. The telepsychiatrist remained in the telepsychiatry session with the patient while consulting with the PC, and they admitted the patient to the HDSP MHCB on March 5, 2025.

The patient was seen for one or two confidential telemental health PC contacts monthly until admitted to the MHCB. Although the contacts did not occur timely, the progress notes were detailed and included the patient's subjective report, response to interventions, and updated mental status. The patient occasionally refused to be seen in a confidential setting and was seen cell front or in the EOP housing unit dayroom. He reported that he was chronically depressed, anxious, and paranoid with chronic auditory hallucinations. His symptoms increased during the winter holidays, and the PC noted discussion of passive suicidal ideation of joining his mother who died in 2022 without a plan. A suicide risk assessment should have been completed due to the patient's increased symptoms and continued suicidal ideation.

The patient was offered two recreation therapy groups weekly. The topics were current events and coping which were appropriate, but the group frequency was severely inadequate. The patient's group attendance was inconsistent, as his paranoia increased significantly during periods of medication nonadherence.

**Findings**

The treatment provided to this patient was inadequate.

Although treatment planning were adequate, severe failures in psychiatric care impacted treatment and significantly increased the patient's risk of harm. Although the patient was prescribed multiple psychotropic medications, he was not seen for a routine psychiatric contact or medication management for over 80 days. This was further concerning, as the patient had questionable medication adherence. The routine psychiatric contact on January 23, 2025 was the telepsychiatrist's first time meeting with the patient. Continuity of care was inadequate, as there were noted concerns about medication effectiveness; however, the next contact did not occur for over 30 days. The psychiatric care was severely inadequate, and the lack of timely routine contacts and medication monitoring significantly increased the patient's risk and probably contributed to his decompensation.

The patient was ultimately admitted to the HDSP MHCB after he self-reported a failed suicide attempt, admitted to cheeking medications, and acknowledged minimizing his symptoms.

**Patient JJ**

This 42-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of schizoaffective disorder, bipolar type; alcohol use disorder, severe; and amphetamine-type substance use disorder, in full remission. He was not prescribed psychotropic medication until February 5, 2025, when Haldol PRN was initiated.

The patient previously received mental health services at the 3CMS, EOP, MHCB, and intermediate levels of care. His EPRD was in May 2025. He arrived at HDSP on June 26, 2024 from CMC.

The patient, assigned telepsychiatrist, a covering telemental health PC, and a CCI participated in a quarterly IDTT meeting on January 14, 2025; the prior initial IDTT meeting occurred on September 24, 2024. The clinical summary was not updated since the initial treatment plan, and most clinical updates and treatment planning was included in the discharge criteria and level of care rationale section. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The patient regularly attended his groups. The IDTT documented the goals developed with the patient that included pre-release planning due to his upcoming release date. Depression and pre-release were identified as problem areas in the treatment plan, and appropriate and individualized goals and interventions were included. The level of care rationale was adequate.

An updated IDTT meeting occurred on April 15, 2025 that included the patient, assigned clinicians, and the CCI; the assigned PC was onsite. An IPOC for mania was initiated on April 14, 2025 that indicated all goals were met. The discharge section noted that the patient presented with recent manic or hypomanic symptoms including racing thoughts, rapid speech, and excessive energy and was prescribed Haldol PRN. The summary concluded that the patient's symptoms were causing mild impairment in social functioning, but he did not require a higher level of care and would likely parole before leaving the EOP.

The psychiatric contacts occurred by telepsychiatry in a confidential setting. The patient was not prescribed psychotropic medication until February 4, 2025, when he requested Haldol PRN due to increased anxiety, agitation, and feeling overwhelmed as his parole date approached. He denied psychotic symptoms, and his mental status was otherwise unremarkable. Haldol was increased at a follow-up contact on March 5, 2025, after the patient reported ongoing agitation and anxiety. The psychiatrist also noted referrals for the patient to meet with the pre-release coordinator and the recreation therapist coordinator to increase his groups. The patient denied significant symptoms and was optimistic about parole at the routine telepsychiatry contact on April 16, 2025.

PC contacts occurred in-person in a confidential setting, but there were instances in which several weeks lapsed between contacts. Much of the progress note content was carried forward at each contact but included sufficient updates to report the patient's functioning and referrals as indicated. The notes lacked specific interventions or references to the treatment plan. The patient reported increased anxiety and agitation as his parole date approached, but he remained optimistic and reported that he had housing and planned to work as a barber. He eventually paroled in August 2025.

The patient was offered four to five recreation therapy groups weekly. The group topics were appropriate and included social skills/communication, coping, current events, recreation therapy, and a process group with the CEO. The group topics were appropriate, and the patient's attendance and participation were adequate.

**Findings**

The treatment provided to this patient was adequate.

Treatment planning was individualized, measurable, and addressed the patient's pertinent clinical needs. The patient was appropriately retained at EOP level of care to receive support as he approached parole. Pre-release contacts occurred timely, and the patient received the appropriate social services. PC contacts did not occur timely, and the quality of the PC documentation was deficient; however, the patient remained stable, and referrals were made as indicated. Group assignments were adequate, and his attendance and participation were consistent.

**Patient KK**

This 46-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of major depressive disorder, recurrent episode,

with psychotic features; generalized anxiety disorder; and depressive disorder. He was prescribed Zyprexa, BuSpar, Vistaril PRN, and Trileptal.

The patient previously received mental health services at the 3CMS, EOP, MHCB, acute, and intermediate levels of care. He had no history of suicide attempts but a significant history of self-injurious behavior without intent by cutting, ingestion, and insertion.

The patient arrived at HDSP on May 25, 2024 from KVSP with an EPRD of October 2025. A quarterly IDTT meeting occurred on November 19, 2024. The patient, a CCI, a covering PC, and a covering telepsychiatrist participated in the meeting. The patient reported recent anxiety due to his upcoming parole that improved significantly since his arrival. The treatment was focused on reducing anxiety and preparing the patient for parole. The patient was incarcerated since age 17. The treatment plan problem areas, treatment goals, and interventions were not updated since May 20, 2024 during the last MHCB placement and were inadequate for the current goals and functioning. The IDTT indicated that the patient did not meet the criteria for consideration of referral to a higher level of care. The discharge criteria and level of care rationale were not documented.

A quarterly IDTT meeting occurred on March 25, 2025; the patient assigned telepsychiatrist, a covering telemental health PC, and a CCI attended. The IDTT meeting was more than 30 days overdue, and the covering PC had never met the patient. Much of the treatment plan was carried forward unchanged including treatment goals and interventions from the MHCB, and it remained inadequate. The level of care rationale indicated that the patient was retained in the EOP to reduce depression and increase coping skills, but the patient's primary symptoms and concerns were anxiety related, and no specific goals and interventions were developed to address those symptoms. The recreation therapist noted that the patient attended one NLTG group weekly.

Confidential telepsychiatry contacts did not occur consistently, and there were periods when the patient did not see a psychiatrist for over 45 days despite consistent medication nonadherence. The contacts were well documented and included appropriately updated assessments and mental status observations. The psychiatrist worked with the patient to taper Zyprexa at his request, and it was eventually replaced with Abilify on January 28, 2025. The patient reported ongoing anxiety related to upcoming parole, and the psychiatrist made appropriate referrals for pre-release assessments and contacts.

The patient was not seen for routine PC contact in November 2025, and routine contacts occurred every one to three weeks during the remainder of the review period. The contacts occurred in a confidential setting, but the patient occasionally refused and was seen at cell front. He generally remained stable but reported ongoing anxiety related to his upcoming parole and frustration when he could not attend groups due to custody modified programming. The progress notes included updated mental status observations and a very brief assessment of the patient's functioning, but references to specific treatment goals and interventions were not documented.

The patient's frustration and agitation increased in response to the lockdowns, and emergency referrals with CIT response due to suicidal ideation occurred on March 27, March 28, April 1, and April 10, 2025. The PC consult progress notes indicated that the patient denied suicidal ideation

at each assessment and reported that he needed a higher level of care to program and receive treatment before parole. A suicide risk assessment was completed with each incident, and the patient was not referred to a higher level of care.

The patient was offered two to three recreation therapy groups weekly, a pre-release group facilitated by a LCSW, and one NLTG. Recreation therapy group topics were appropriate and included coping, current events, and life skills. The patient's group attendance improved, but there were several weeks when groups were not offered due to custody modified programming.

**Findings**

The treatment provided to this patient was inadequate.

The quarterly IDTT meetings did not occur timely, and treatment planning was severely inadequate. The treatment goals and interventions were carried forward unchanged from the MHCB and could not adequately address the patient's current presentation and symptoms. The discharge and level of care rationale were not provided in one treatment plan and incorrectly described the patient's primary symptoms and treatment focus in the other treatment plan. The psychiatric care was inadequate, as there were periods when the patient was not seen for routine contact for over 45 days despite medication efficacy concerns and nonadherence. PC contacts were scheduled inconsistently, lacked treatment interventions, and were poorly documented.

**Patient LL**

This 32-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and opioid use disorder. He was prescribed melatonin PRN.

The patient previously received mental health services at the 3CMS, EOP, and MHCB levels of care. He arrived at HDSP from the CSP/Sac EOP on June 4, 2024.

A quarterly IDTT meeting did not occur until February 4, 2025; the patient, assigned clinicians, and a CCI attended. The patient reported that his primary treatment goals were to address PTSD symptoms, delusions, insomnia, racing thoughts, and hallucinations. The treatment team initiated goals and clinically appropriate interventions to address insomnia, hallucinations, and delusions. The psychiatrist provided psychoeducation regarding antipsychotic medication treatment, but the patient continued to decline medication treatment. The recreation therapist reported that the patient's group attendance was 100 percent, and he always completed assigned homework. The level of care retention rationale was individualized and appropriate.

The same participants attended the next quarterly IDTT meeting on April 29, 2025. The previous treatment goals remained adequate and were noted as ongoing. Additional goals were initiated to address anxiety and included measurable goals and specific CBT interventions. The discharge criteria and level of care retention rationale were updated appropriately and were adequate.

The psychiatric care was provided by telepsychiatry. Routine psychiatric contacts did not occur consistently, and the patient was not seen for psychiatric contact in February 2025 or April 2025. He was prescribed melatonin PRN for insomnia and requested the medication frequently, but he repeatedly declined antipsychotic medication treatment to address chronic hallucinations and delusions. Psychiatric progress notes were comprehensive and were updated appropriately, and the psychiatrist often provided psychoeducation about antipsychotic medications. The psychiatrist noted that the patient was scheduled for a medical consult due to concerns about dementia and memory loss.

Routine PC contacts occurred approximately every 14 to 30 days. The PC progress notes were overly brief and were generally inadequate for the routine contacts provided until January 16, 2025, when a new PC was assigned. After the change, routine contact timeliness remained problematic, but the quality of documentation improved significantly and included references to the treatment goals and specific interventions. The PC and patient worked on anger management and coping skills, and the patient demonstrated positive response to treatment. He also reported dementia and memory loss concerns during the PC sessions.

The patient was offered four recreation therapy groups weekly. The group topics were appropriate and included life skills, coping, and a process group with the prison CEO. The patient's attendance was consistent, and he was noted as an active participant.

**Findings**

The treatment provided to this patient was inadequate.

The routine PC contacts were untimely with poor provision of care documented, but improvements in quality of care occurred during the review period. The treatment planning was adequate and included individualized and measurable goals and interventions to address the patient's primary symptoms, but those goals and interventions were not initiated until the second half of the review period. The psychiatric care was inadequate, as a scheduled contact did not occur for more than 30 days on two separate occasions. PC contacts and progress notes were initially poor but improved significantly when the patient was reassigned to a telemental health PC, but the contacts remained untimely and were offered only one to two times monthly.

**Patient MM**

This 34-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of antisocial personality disorder and schizophrenia. He was prescribed Zyprexa with medication adherence, as the patient received his psychotropic medications by a PC 2602 order due to grave disability.

The patient had received mental health services at the EOP level of care since 2016. He arrived at HDSP on March 7, 2024 from SVSP.

A quarterly IDTT meeting occurred on December 17, 2024; the patient, a covering PC, the assigned telepsychiatrist, and a CCI attended. The clinical summary noted that the patient

demonstrated poor reality testing and treatment nonadherence. The reported focus of treatment was overly vague, and the primary goal was to learn three coping skills. An IPOC for impulsive behaviors was initiated on March 18, 2024 that was never updated. No problem areas, goals, interventions, level of care rationale, or discharge criteria were documented in the treatment plan.

On March 25, 2025, a different covering PC, the assigned telepsychiatrist, CCI, and the patient participated in a quarterly IDTT meeting. The clinical summary was carried forward from the previous treatment plan, and no treatment goals or interventions were documented. The level of care rationale was updated appropriately and noted that the patient asked to be removed from the MHSDS. The psychiatrist reported that the patient refused to attend most scheduled visits, and the recreation therapist, RN, and CCI denied any concerns.

The psychiatric care was severely inadequate, and the patient did not participate in any confidential contacts during the review period; he remained, however, medication adherent. The progress notes were inadequate and did not provide the patient's diagnoses, medications, mental status, or clinical history. The psychiatrist continued the prescribed medications unchanged despite the patient's refusals to attend office visits or to allow laboratory testing. The most recent confidential psychiatric contact occurred on October 15, 2024; the patient refused to attend the remaining scheduled contacts during the review period. It was very concerning that the patient's medications were continued unchanged for over six months without obtaining laboratory testing or individual contact.

The PC care was extremely problematic during the review period, as the patient was not seen for a routine PC contact in November 2024. He was seen for routine PC contact on December 4, December 11, and December 19, 2024 but was not seen another contact until March 24, 2025. Routine contacts occurred weekly in April 2025. The progress notes were brief, and most of the content was repeated for each contact. The patient reportedly remained stable, but there were no references to specific treatment goals or interventions.

The patient was offered only two recreation therapy groups weekly, and his attendance was adequate. The group topics were coping and life skills which appeared appropriate for the patient.

**Findings**

The treatment provided to this patient was grossly inadequate.

The patient was not provided an adequate treatment plan inclusive of specific treatment goals and interventions. The assigned PC did not participate in the quarterly IDTT meetings during the review period. Despite an active PC 2602 order and treatment with Zyprexa, the psychiatrist never saw the patient for a confidential session or obtained clinically indicated laboratory studies during the review period. Therapeutic interventions to address treatment nonadherence were not documented or implemented. PC contacts did not occur timely and included inadequate clinical documentation and lacked the provision of substantive clinical interventions. The patient was provided only two groups weekly during the review period which was inadequate.

**Patient NN**

This 44-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at HDSP. The patient was provided diagnoses of antisocial personality disorder, borderline personality disorder, exhibitionistic disorder, PTSD, and opioid use disorder. His primary symptoms included mood instability and dysregulation, and he had an extensive history of self-injurious behavior without intent without a history of suicide attempts. He was prescribed Wellbutrin, Vistaril, Zyprexa, and Tramadol.

The patient previously received mental health services at the 3CMS, EOP, MHCB, acute, and intermediate levels of care; the patient was most recently hospitalized for intermediate care during March 2024. He arrived at HDSP on May 2, 2024 from CHCF.

A quarterly IDTT meeting at HDSP occurred on January 28, 2025; the patient, assigned clinicians, and a CCI were in attendance, and the psychiatrist participated by telepsychiatry. The clinical summary included a very brief update about the patient's symptoms and current medications, but the treatment goals and interventions were carried forward from the CHCF-PIP treatment plans, and an IPOC for DBT was not updated since December 24, 2024. There were no level of care rationale or discharge criteria provided. No subsequent EOP IDTT meetings were documented during the review period.

The patient was admitted to the HDSP MHCB on February 25, 2025, after he reported suicidal ideation and command auditory hallucinations telling him to harm himself.

The psychiatric care was provided by telepsychiatry, and routine contacts occurred in a confidential setting. The routine contacts included appropriate updates to the patient's clinical presentation, response to medication, and mental status; however, the contacts occurred sporadically, and the patient was not seen for psychiatric contact between December 11, 2024 and February 11, 2025. At a routine contact on February 11, 2025, the patient reported benefit from medication treatment, but he requested a change in the timing of Zyprexa. He was not seen for another routine psychiatric contact before he was admitted to the MHCB two weeks later.

The patient was not seen by a PC between September 4, 2024 and December 16, 2024. A PC consult routine progress note on December 16, 2024 indicated that the PC provided assessments for PTSD and depression resulting in ratings for mild depression and no PTSD. The remainder of the progress note was the patient's entire CDCR mental health history copied and pasted from elsewhere in the healthcare record. No treatment goals or clinical interventions were documented.

The patient was again not seen for routine PC contact between December 19, 2024 and January 29, 2025. He was seen for a routine consultation to assess his response after a court hearing on January 10, 2025. The patient reported recently increased auditory hallucinations and depression, and the PC reported that DBT skills interventions were provided. DBT skills training continued at a confidential routine contact on February 3, 2025, and the patient appeared to respond well to the interventions, but he was not seen for another PC contact before he was admitted to the MHCB.

The patient was offered three recreation therapy groups weekly during the review period except during custody modified programming. The group topics were life skills, current events, and

recreation therapy that were appropriate for the patient. The group frequency was, however, inadequate. The patient frequently attended groups with moderate to high participation.

**Findings**

The treatment provided to this patient was inadequate.

Treatment planning was severely delayed and poorly documented. Most of the treatment plan including treatment goals and interventions that were carried forward from the recent intermediate hospitalization in March 2024. There was no updated treatment planning to address the patient's current presentation and symptoms, and level of care rationale and discharge criteria were not documented at all. Routine clinical contacts were inadequate and did not occur consistently. Neither the telepsychiatrist nor the PC saw the patient for routine contact or check-in between early December 2024 and early February 2025; subsequently, the patient was admitted to the MHCB on February 25, 2025 due to danger to self.

**APPENDIX B-18**
**Kern Valley State Prison (KVSP)**
**Reporting Period: November 1, 2024 to April 30, 2025**

**Patient A**

This 43-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with a diagnosis of unspecified depressive disorder. He was fully adherent to his prescribed citalopram. This patient was incarcerated for the third time within CDCR in March 2005. During his two prior periods of incarceration, he was not enrolled in the MHSDS. Within four days of his current period of incarceration, he was placed in restricted housing and began receiving services at the 3CMS level of care the same day. He remained at the 3CMS level of care through May 11, 2023 when he was elevated to the EOP level of care. He was transferred to KVSP on November 7, 2024. Prior to his transfer, he had been placed on modified EOP programming (EOPMod).

The patient was seen for a timely initial PC assessment. The assessment documented that the patient was experiencing symptoms of posttraumatic stress disorder (PTSD) yet later in the document it noted that the patient was currently diagnosed with unspecified depressive disorder and opioid use disorder. Much of the assessment's contents was copied from prior assessments with little updated information. There was no initial psychiatric assessment completed prior to the patient's initial IDTT meeting which was held timely on November 20, 2024. Required staff and the patient were present at the meeting. There were no patient strengths or patient identified goals documented, yet an IPOC was initiated to address depressed mood without any further details. The treatment plan, which had been created prior to the patient's arrival at KVSP was continued. The short-term goal was measurable but no baseline was provided and the long-term goal was vague and the interventions were generic. There was no mention of input from IDTT members or the fact that the patient was EOPMod status. There was no rationale for retaining the patient at the EOP level of care and there were no discharge criteria.

The patient was seen for an initial psychiatric assessment on December 3, 2024. The contact was held at cell front after the patient refused a confidential contact. In addition to the initial assessment, the contact also addressed the fact that the patient had missed three doses of medications the previous week but otherwise had been adherent. The assessment was superficial and made no mention of the two healthcare requests the patient submitted prior to the contact. The psychiatrist documented that the patient was seeking bupropion.

The patient submitted numerous healthcare requests and two grievances related to his mental health care during the monitoring period. Not all of the healthcare requests were addressed. Additionally, the content of some of the requests was bizarre and a psychiatric technician made a referral to the psychiatrist that the patient appeared to be responding to internal stimuli and was at risk for violence from other incarcerated individuals, yet these concerns were not acknowledged or addressed by the patient's primary clinician or psychiatrist. The patient was engaged in a fight with another incarcerated person that same week. The mental health assessment for the RVR

found no evidence that the patient's mental health played a role in the RVR despite the preceding events.

The responses to grievances submitted by the patient were not adequate. Both grievances noted that the patient did not feel he was receiving adequate treatment to address his PTSD symptoms among other concerns. The response documentation indicated that there was evidence in the healthcare record that after the initial IDTT meeting the patient "received several subsequent mental health interventions…to discuss treatment goals and mental health concerns listed in grievance." It is unclear what documentation the reviewer was referring to, as the patient was not being seen routinely by his PC and none of the documentation referenced the symptoms of PTSD or provided evidence of treatment for the same. All groups offered to the patient were recreational in nature or were nursing-led treatment groups focused on physical health and wellness. The only interventions addressing the patient's symptoms were medication adjustments made by the psychiatrist.

On February 12, 2025, the patient was seen for a routine IDTT meeting with required staff and the patient present. Documentation noted that the patient was not participating in at least 50 percent of offered treatment. The patient reported that he would try to attend more consistently, which was accepted by the IDTT as sufficient to maintain him at the EOP level of care. The documentation referenced a continuation of weekly primary clinician contacts to encourage group attendance despite the fact that the patient was not being seen weekly. The clinical summary was not updated to include any information about the patient's RVRs, grievances, healthcare requests, or changes in symptoms or functioning since the previous IDTT meeting. There was no mention of the rule out diagnoses being considered by the psychiatrist. The treatment plan was not updated and there were no discharge criteria. The patient was seen for another routine IDTT meeting on March 26, 2025 with his assigned PC, an alternate psychiatrist, and a correctional counselor present. The only update appeared to be the addition of recent RVRs to the clinical summary and the fact that the patient was no longer attending less than half of the treatment offered.

During the review period, the patient was not seen for routine PC contacts on a weekly basis. The patient was typically seen every two weeks; however, there were periods of three to four weeks between contacts. In total, the patient was seen for ten individual contacts during the 26-week reporting period. One contact was held at cell-front secondary to modified program. None of the contacts evidenced the use of evidence-based treatment interventions to address the patient's mental health needs. There was no mention of the patient's RVRs, grievances, or review of the patient's progress or lack thereof in the EOP program. The patient was seen by his assigned psychiatrist in December and January, but not again until May 2025.

There was evidence that the patient intermittently attended groups offered by recreational therapists and nursing staff; however, documentation was generic and offered little insight into the patient's level of functioning or response to the group content.

**Findings**

The treatment of this patient was inadequate.

The patient was not seen as required by his PC or psychiatrist. The patient was on EOPMod status and not offered at least ten hours of structured treatment per week, yet there was no indication of how many hours of program he was targeted to attend. The patient's healthcare requests and grievances were not adequately addressed and there was no evidence that the patient was provided with the treatment outlined in his treatment plan. Further, the patient made numerous requests for treatment of his PTSD symptoms, yet there was no evidence that his reported symptoms were assessed or addressed and the patient's diagnoses remained unclear throughout the reporting period.

**Patient B**

This 49-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with diagnoses of major depressive disorder, recurrent, severe and antisocial personality disorder. The patient was mostly adherent to his prescribed sertraline, partially adhered to his prescribed aripiprazole and mirtazapine, and was not taking his prescribed hydroxyzine. This patient was incarcerated within CDCR on multiple occasions beginning in 1998. He first received mental health services during his current period of incarceration which began in June 2012. He was placed at the 3CMS level of care in August 2012, was placed in the MHCB level of care in November 2012, was discharged to the 3CMS level of care twelve days later and was elevated to the EOP level of care in June 2013. He returned to the 3CMS level of care in August of 2017, had four MHCB admissions, and was elevated to the EOP level of care in February 2021. He was referred but not admitted to MHCB on seventeen occasions prior to being transferred to KVSP on September 23, 2024.

During the reporting period, one routine IDTT meeting was held on February 26, 2025 with required staff and the patient in attendance. This meeting was held over one month later than required. During the meeting, a treatment goal addressing anger was included which had been carried forward from April 2024. The patient was not attending at least half of the treatment offered secondary to recent surgery. The clinical summary noted an additional diagnosis of opioid use disorder. While the narrative described that the patient wanted to work on anxiety and planning for his upcoming release in May 2025, the treatment plan addressing anger was unchanged.

The patient was seen every two weeks, rather than weekly, by his assigned primary telemental health clinician. The contacts reflected adequate provision of mental health interventions to address the patient's reported anxiety. The documentation did not reflect a review of the patient's progress toward his treatment goal or engagement in EOP programming. The patient was not seen monthly by psychiatry but was instead seen only three times in six months, with no visits in December, January, or February. When the patient was seen, documentation was adequate.

The patient was released in early June 2025, and the record reflected adequate pre-release planning.

**Findings**

The treatment of this patient was adequate.

Despite the patient not being seen as required by the Program Guide, treatment addressed his needs. Improvements in treatment planning and frequency of visits with both his primary clinician and psychiatrist were needed.

**Patient C**

This 26-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with diagnoses of PTSD and adjustment disorder with mixed anxiety and depressed mood. The patient was nonadherent to his prescribed sertraline, which was ultimately discontinued.

This patient was incarcerated within CDCR for the first and only time on August 20, 2021. He was placed at the 3CMS level of care in October 2021. He was referred but not admitted to the MHCB level of care on four occasions prior to being elevated to the EOP level of care in March 2023. He was referred but not admitted to the MHCB level of care on four more occasions and was reduced to the 3CMS level of care for less than three weeks prior to his transfer to KVSP on March 10, 2025 at the EOP level of care.

Upon arrival at KVSP, a psychiatrist noted that the patient had not been taking his prescribed medication, so discontinued the medication without ever meeting the patient. There was no initial psychiatric assessment documented prior to the patient's initial IDTT meeting. An initial PC assessment was conducted timely but held at cell front as the patient refused to meet confidentially. The assessment was largely based on historical documentation as a result. The documentation included an adequate plan for engaging with the patient and providing services. An initial IDTT meeting was held timely and included required staff. The patient refused to attend per custody staff's report. Treatment goals addressing depression, anxiety, and substance use were adequate but interventions were somewhat vague. There was documentation indicating that the patient did not need a higher level of care but the rationale for retaining him at the EOP level of care was not clear.

On March 24, 2025 the patient reported swallowing a number of pills and was placed in alternate housing. The following morning, the patient was uncooperative with the clinician who attempted to complete a suicide risk evaluation. The clinician documented that the patient was informed that failure to engage in the assessment would result in being discharged back to EOP housing. The patient "agreed to be cleared" and did not engage. He was noted to be disheveled and irritable. His risk was determined as low based on a review of records which indicated that the patient frequently reported suicidal ideation in response to not getting immediate responses from staff. The patient was placed on five-day follow-ups and was seen for follow-ups over the next eight days. It was unclear why the contacts continued for that length of time. The patient denied suicidal ideation and was seen for five of the contacts by his assigned PC who reviewed the safety plan with the patient and provided in-cell treatment materials. All contacts were completed cell-front

as the patient refused to be seen in a confidential setting. There was no clear documentation of why the patient reported taking pills; however, there was evidence that the patient received an RVR for battery on that date.

Another initial IDTT was held on April 2, 2025 with required staff and the patient present; however the psychiatrist was not assigned to the patient. There was no documentation related to the patient's claim of engaging in self-injury and the treatment plan was not modified in any way. The patient requested to be placed back on medication. The patient was seen by a psychiatrist for the first time on April 3, 2025. The contact was attempted at cell front due to lock down and the patient refused to engage but agreed to restart sertraline. The psychiatrist documented that the patient was not visible during the cell front encounter.

The patient was offered two individual encounters with his PC in April and attended one of them. The contact was clinically adequate and reviewed the patient's lack of treatment participation and receipt of two RVRs in the previous month. The patient was nonadherent to his prescribed medications, which were discontinued without a clinical contact with a psychiatrist.

**Findings**

The treatment of this patient was inadequate.

While there were clear challenges in engaging with this patient given his frequent refusals, there was no evidence that his plan of treatment was modified to address his disengagement, nor his use of reported self-harm for secondary gain. He was not offered individual or group treatment in keeping with requirements. Additionally, all medication changes were made without the psychiatrist seeing the patient. On two occasions, no contact was attempted and on the third occasion, the contact was cell front and the patient was not visible to the psychiatrist.

**Patient D**

This 37-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with diagnoses of other specified bipolar and related disorder, dream anxiety disorder, antisocial personality disorder, and borderline personality disorder. During the reporting period, he was initially prescribed prazosin and was nonadherent, so it was discontinued. He was prescribed hydroxyzine and gabapentin as needed which he chose to take frequently. He was also prescribed buprenorphine-naloxone for a substance use disorder.

This patient was incarcerated on three prior occasions beginning in November 2009. He was treated at all levels of care, including the Acute and ICF levels of care. His last inpatient discharge was in March 2022, when he was placed at the EOP level of care. Since then, he has had a number of MHCB admissions but has been discharged to the EOP level of care each time. He transferred to KVSP on June 30, 2022.

A routine IDTT meeting was held on November 20, 2024 with required staff and the patient present. The clinical summary included no information about the patient's current status, treatment

needs, progress toward goals, or barriers to treatment. It was a summary of the patient's criminal and psychosocial history only. IDTT documentation noted that the patient experienced three or more MHCB admission in the previous six months and was not attending at least half of the treatment offered. Both of these factors required the IDTT to review the patient for the need for a higher level of care. The rationale for not referring the patient to a higher level of care was adequate. The proposed enhancements to treatment were adequate on their face; however, it was not clear that they were reasonable given the patient's limited engagement in treatment and staffing shortages impacting the ability to provide weekly treatment sessions with the PC as documented. The treatment plan was adequate with appropriate goals and vague interventions but had not been updated in some time. None of the goals were adjusted to reflect the enhancements documented elsewhere.

The patient was not consistently offered PC contacts. For most of the reporting period he was offered sessions two times per month, but for three weeks in December, contacts were offered weekly, and only one contact was offered in January and in March. The patient refused to attend all contacts and was seen at cell front. PC contacts did not evidence the use of the interventions or treatment enhancements outlined in the treatment plan. The patient was offered a routine psychiatric contact for the first time during the reporting period on March 6, 2025 which he refused. There was a progress noted entered on November 20, 2024 which included the following text only, "Prazosin – pt is taking it intermittently, - asked pt if 1- he could talk (sic) it regularly, or 2- stop the medication – pt stated he didn't care, so DC.ed the prazosin" which did not reflect an adequate clinical contact.

On December 4, 2024, the patient declared a hunger strike but did not provide a reason. He was offered two routine PC contacts but refused. Nursing staff completed daily checks. The hunger strike ended on December 14, 2024 and the patient reported that it had been due to the fact that his sink was leaking.

On January 13, 2025 a suicide risk evaluation was completed by the patient's assigned PC noting that it was clinically indicated without further explanation. The document was blank and included no information about the patient's previous or current risk of suicide. RVR mental health assessments were completed on a number of occasions during the reporting period and most were adequate despite the fact that the documentation in the patient's record was limited by his refusal to engage in treatment. The assessments determined that mental health was not a factor in any of the rule violations. The clinician completing the assessments was not always able to consult with the patient's PC; however, which was a concern given the lack of documentation in the patient's record.

On March 17, 2025, the patient reported experiencing suicidal ideation and refused to leave his cell. A suicide risk re-evaluation, not a complete suicide risk evaluation, was completed at cell-front despite the fact that a full suicide risk evaluation had not been completed in the previous 30 days. It was unclear from nursing documentation whether the patient was moved to an alternative housing cell or was placed under observation in his EOP cell. The following morning, the patient was seen for a full suicide risk evaluation as it was noted that his MHCB referral was being rescinded. Other than a recent RVR, the patient had no dynamic risk factors documented and sufficient protective factors to warrant a low-risk rating. He was placed on five-day follow-ups

and an adequate safety plan was completed despite the patient's refusal to engage in the process. Later that day, the patient engaged in superficial self-injury and while he was seen by a clinician, no suicide risk re-evaluation was completed. Also, the five-day follow-up contact completed the following day made no mention of the self-injury. Further, on March 19, 2025 the patient was found lying on the floor, unresponsive next to a pool of "thick yellow emesis" and was given naloxone as he appeared to have overdosed. This was not acknowledged during the five-day follow-up the next day. On the final day of the five-day follow-ups, the patient was noted as appearing intoxicated and no action was taken by the clinician who completed the contact other than to document that five-day follow-up were being discontinued. Of note, two of the five-day follow-up contacts were documented as having been held in a confidential setting with the patient's PC yet there was no evidence that the clinician attempted to engage the patient in therapeutic interactions despite a clear opportunity to do so. This was notable as the patient had not agreed to meet with the clinician in a confidential setting at any other point during the reporting period. It was also possible that the documentation of a confidential setting was inaccurate.

Also on March 19, 2024, a routine IDTT meeting was held later than required by the Program Guide. Required staff and the patient were documented as being present. The patient's lack of participation in treatment was noted and it was documented that the patient would be discharged to a lower level of care during his next IDTT meeting without any mention of the patient's recent suicidal ideation, hunger strike, or substance use. Further, the clinical summary and treatment plan were not updated in any way to acknowledge or reflect recent events. The treatment plan was wholly inadequate.

The patient was not offered another PC contact until April 2, 2025 and there was no evidence that the above-described incidents were discussed. The patient overdosed two additional times in the following weeks and again reported suicidal ideation on April 16, 2025 after being seen for a telemental health consult contact during which he denied any mental health concerns at cell front secondary to custody factors. A suicide risk re-evaluation was completed at cell-front during which the patient showed recent superficial cutting on his arm and reported a death in the family. He was assessed as being low risk for suicide and using self-injury to influence his environment. The patient was not seen again until April 25, 2025 when he was referred to mental health staff as he was visible in distress. The patient was noted as being assigned to a telehealth clinician and could not be seen by that individual as the medical assistant had gone home for the day. A covering PC saw the patient. Appropriate interventions were provided and the patient was returned to his cell. A full suicide risk evaluation was completed and was adequate. A referral was made to the psychiatrist who saw the patient on April 29, 2025 at cell front secondary to a lock down. Documentation of the contact was adequate and the patient denied wanting any changes to medications. Also, a PC saw the patient in response to a consultation and offered adequate support but failed to evidence adequate review of the record as there was little continuity of care.

**Findings**

The treatment of this patient was inadequate.

There was inadequate treatment planning, failure to provide adequate care for his mental health needs, and poor continuity of care. The process for assessing his suicide risk was not in keeping with clinical standards.

**Patient E**

This 29-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with diagnoses of schizoaffective disorder, bipolar type; antisocial personality disorder; malingering; cannabis use disorder, severe; and alcohol use disorder, severe. The patient was fully adherent to his prescribed paliperidone and melatonin, but not adherent to his prescribed venlafaxine. The patient was receiving medications under a PC 2602 order which was initiated in 2020 and renewed annually. In July 2024, the renewal was granted secondary to grave disability and danger to others. He was also prescribed buprenorphine-naloxone.

This individual was incarcerated for the second time within CDCR on April 10, 2018. He had been treated at all levels of care. His was most recently admitted to the ICF level of care on April 11, 2024. He was discharged to the EOP level of care and transferred to KVSP on November 12, 2024.

A CCAT was held to discuss the patient's transfer on November 12, 2024. The patient's course of treatment while an inpatient as well as his ongoing needs were discussed. It was noted that the patient was not in agreement with his discharge to the EOP level of care. On November 13, 2024 there was a note indicating that it was the second day of the five-day follow-ups. There was no day-one contact documented. Despite the fact that a safety plan was developed with the patient prior to his discharge from the inpatient setting, the safety plan section of the five-day follow-up documentation was blank. The clinician documented that the contents of the blank safety plan were reviewed with the patient; however. Subsequent contacts did not indicate reviewing the safety plan with the patient. Five-day follow-up documentation inaccurately noted that the patient had been discharged from the MHCB following an admission for depression and suicidal ideation. In fact, the patient had been admitted to the inpatient setting for serious impairment due to mental illness as evidenced by a decline in his ability to care for himself, auditory hallucinations, withdrawal from others, paranoia, low mood, and suicidal ideation within the context of recent substance use. None of the five-day contacts, which were provided for six days, mentioned the patient's recent inpatient stay. A suicide risk re-evaluation was completed on November 13, 2024 and incorrectly noted that the patient was discharged from MHCB. The evaluation noted that the patient's risk had not changed since prior to his discharge and he was assessed as being at low risk of suicide.

A clinician-to-clinician contact was completed on November 14, 2024 via email and the content was adequate. An initial PC assessment was completed timely and was adequate, including a review of his inpatient stay and continuing mental health needs. There was no initial psychiatric assessment completed prior to his initial IDTT meeting on November 20, 2024. Required staff and the patient were present for the meeting. Unfortunately, the patient's safety plan was blank and the documentation indicated that one was not needed, despite his recent discharge from an inpatient setting and evidence of the patient engaging in self-harm to avoid discharge. Further, the

patient was not enrolled in the suicide risk management program (SRMP) despite meeting criteria including discharge from an inpatient setting where the admission was related to suicidal ideation. The treatment plan was adequate and addressed the needs identified in the initial assessment. An initial psychiatric assessment was completed the following day. The patient complained of side effects from the haloperidol he was prescribed and the psychiatrist began tapering off haloperidol and started paliperidone.

The patient was treated for a suspected drug overdose on December 23, 2024. He was seen by his PC at cell front in response to a referral regarding drug use on December 31, 2024. There was no rationale provided for the non-confidential contact. The patient overdosed again on January 7, 2025 and was taken to a community hospital as he had fallen and hit his head. The patient was seen by his PC for a routine contact during which a suicide risk evaluation was completed in light of the two overdoses. The clinician concluded that the patient's risk level was low although his chronic risk remained high with adequate rationale.

Despite numerous reports of medication nonadherence, a recent medication change, an involuntary medication order, and the requirement for a psychiatrist to see EOP patients monthly, the patient was not seen for a routine psychiatric appointment in December or January. On February 25, 2025, the patient refused his offered contact and was seen at cell front. He was observed to possibly be intoxicated.

Routine PC contacts were offered every two weeks and were routinely refused resulting in cell front contacts during which planned interventions could not be provided.

In March, a routine IDTT meeting was held later than required with necessary staff present. The patient did not attend and documentation indicated that the patient attended only six percent of what was offered. The patient's perceived stability when seen at his cell door, attention to his activities of daily living, and socializing with his peers was provided as evidence that he did not need a higher level of care. Interventions to support improved attendance were adequate and his treatment plan was updated to address the same. There was no treatment goal to address his drug use. The patient attended a few groups in the week following the IDTT meeting but then stopped.

Three days later, the patient again overdosed and was taken to a community hospital secondary to his loss of consciousness. He overdosed again on April 2, 2025 and April 6, 2025. He refused contacts with his PC and substance use providers for the remainder of the reporting period. He was nonadherent to his medications that were not court-ordered. A psychiatrist documented that a PC 2602 renewal interview was completed on April 29, 2025 but there were no routine psychiatric contacts completed with the patient for the remainder of the reporting period.

**Findings**

The treatment of this patient was not adequate.

The patient was difficult to engage due to frequent refusals, yet the patient was not offered even the minimal amount of treatment required by his placement in the EOP program. Despite frequent drug use, there was no evidence of coordination with substance use providers to address the

patient's treatment needs. Treatment planning was mostly adequate but failed to address the patient's substance use. Psychiatric contacts did not meet the needs of this patient who was under a PC 2602 order, nonadherent to any medications not court-ordered, and actively using substances. Five-day follow-up documentation included inaccurate information that was carried forward into other documents.

**Patient F**

This 33-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with diagnoses of schizophrenia and unspecified anxiety disorder. He was fully adherent to his prescribed paliperidone, olanzapine, lithium, and benztropine. He had an active PC 2602 order.

This patient was incarcerated within CDCR for the first time on November 15, 2022. He was placed at the 3CMS level of care in January 2023, was referred to MHCB on three occasions, and was discharged from the MHCB level of care to the EOP level of care in September 2023. He was readmitted to the MHCB level of care after less than one month and was transferred to the Acute level of care in October 2023. He transitioned to the ICF level of care in January 2024 and was discharged to the EOP level of care at KVSP on July 10, 2024.

There were two routine IDTT meetings held with the patient during the monitoring period. One in November and one in March. Neither were held within the required timeframes. Both meetings included required staff and the patient was present in December but the March documentation included contradictory information about whether or not the patient attended. The patient's assigned primary clinician and psychiatrist changed from November to March. In November, it was documented that the patient was not attending at least half of the treatment offered. The reasons were related to symptoms of depression, auditory hallucinations, and lack of sleep. The rationale for not referring the patient to a higher level of care was that he appeared to be at baseline without clarification of what that meant, was attending to his ADLs, and had a clear mental status during his last contact with his primary clinician. The enhancements to better engage the patient in treatment were marginally adequate. The patient was noted as being enrolled in the SRMP and reported no suicidal ideation in the previous 90 days. There were no patient strengths, no patient verbalized goals, and no treatment plan documented. The patient's group participation did not improve in March the patient reported it was due to custody staff not letting him out of his cell and it was noted that the patient had no overall functional deficits. The patient was no longer noted as being in the SRMP and no rationale for this change was documented. Otherwise, there was no information about patient's treatment goals or treatment progress and no treatment plan.

The patient was typically seen every two weeks by his primary clinician although no contacts were documented between December 17, 2024 and January 13, 2025. None of the contacts included the provision of any treatment interventions but instead appeared to be status checks with the patient. Psychiatric contacts were not provided monthly, but instead there were only two contacts with a psychiatrist during the six-month monitoring period, one of which was in response to a referral. Documentation was marginally adequate. The patient was not offered ten hours of structured treatment weekly.

**Findings**

The treatment of this patient was inadequate.

He was not offered treatment in keeping with requirements of an EOP. There was no treatment plan for the patient and while the patient was not engaging in group treatment, there were no documented efforts to increase his attendance and no evidence of continuity of care with regard to follow up on plans to improve treatment participation. The patient was removed from the SRMP without clinical documentation or adequate assessment of his ongoing suicide risk.

**Patient G**

This 27-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, and substance use disorder. The patient was not prescribed psychotropic medications other than hydroxyzine as needed. This patient was incarcerated within CDCR for the first time in June 2018 and was not enrolled in the MHSDS until October 2021 when he was placed at the 3CMS level of care for one day before being admitted to the MHCB level of care. He was discharged to the EOP level of care where he remained for 68 days before being reduced to the 3CMS level of care in January 2022. He was elevated to the EOP level of care in March 2022 and was transferred to KVSP in September 2023. He returned after being out to court for an extended period of time on December 11, 2024. It was documented that he received two additional years on his sentence, so he was seen for an urgent consult with a primary clinician the following day. There was no evidence of acute distress in response to the change in sentencing.

An initial PC assessment was completed timely. No presenting problem was documented, his mental status was clear, and there were no functional deficits noted. The assessment included diagnoses of major depressive disorder, antisocial personality disorder, and unspecified schizophrenia with no justification. The patient reported depressive symptoms and a history of substance use. There was no initial psychiatric assessment completed prior to his initial IDTT meeting which was held later than required with the patient and required staff in attendance. There was no formal treatment plan but the patient reported he wanted to reduce his level of depression. There were no planned interventions documented, no rationale for placement at the EOP level of care, and no discharge criteria. A routine IDTT meeting was held in March with required staff and the patient present. The patient was flagged for the need to be assessed for a higher level of care secondary to treatment refusal. There was no rationale provided for the patient missing groups but it was documented that it was not due to mental health reasons. The plan was to use motivational interviewing to increase attendance. There was no mention of the patient's progress toward his identified goal of reducing his depression.

Routine telemental health contacts were provided every two to three weeks, most were held in confidential setting unless the patient refused. There was one contact held cell front secondary to a lockdown. The contacts were documented as check-ins and evidenced no clinical interventions being provided to the patient to address his mental health needs. Further, there was no reference

to his group attendance or the use of motivational interviewing to address the same as outlined in the treatment plan. There were no psychiatric contacts with the patient during the reporting period.

**Findings**

The treatment of this patient was inadequate.

There was no treatment plan, no evidence of clinical interventions being provided by his PC, and no evidence of psychiatric contacts during the reporting period, including no initial psychiatric assessment. The patient was not engaged in treatment, yet efforts to improve his attendance were not documented.

**Patient H**

This 37-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with a diagnosis of schizoaffective disorder, bipolar type. He was fully adherent to his prescribed buspirone, paliperidone, and benztropine and partially adherent to his prescribed haloperidol. He was also prescribed haloperidol as needed.

This individual was incarcerated for the third time within CDCR in June 2023. During his first period of incarceration from March 2010 through October 2013, he was not enrolled in the MHSDS. Upon reincarceration for the second time in December 2017, he was placed at the 3CMS level of care while at the reception center and received services at that level of care until his release in January 2019. Upon arrival at the reception center for his current term, he was immediately placed at the 3CMS level of care and was elevated to the EOP level of care on June 30, 2023. He was transferred to KVSP in April 2024.

The patient was typically seen by his PC every two weeks; however, there were no individual or group contacts between February 5, 2025 and March 5, 2025. The content of documentation by the PC was largely unchanged across visits and evidenced no use of interventions nor reference to the patient's treatment goals, other than having the patient provided numerical ratings for his hallucinations and anger.

The patient was not seen for any routine psychiatric contacts during the reporting period. He was only seen in April 2025, on two occasions, in response to referrals. The first was related to an increase in visual hallucinations and a request for medication change. When assessed, the patient reported engaging in violence against his cellmate the day prior and asked for assistance in obtaining a single cell. The psychiatrist explained that cell placements were determined by custody. Medication adjustments were made. The second consult, which occurred ten days later, was related to hallucinations interfering with the patient's ability to work in the kitchen. Medication adjustments were made.

The patient was seen for a single IDTT meeting during the reporting period which was not conducted timely as the prior meeting was seven months before. Required staff were at the meeting but the patient refused to attend. There were no higher level of care indicators noted.

Treatment goals addressing hallucinations and depressed mood were documented and appeared appropriate. The interventions were adequate; however, there was no mention of the patient's progress toward the goals which had been established over a year prior.

**Findings**

The treatment of this patient was inadequate.

Primary clinician, psychiatry, group contacts and IDTT meetings were not held in accordance with the Program Guide. There was no evidence that the patient was provided treatment in keeping with his treatment plan and no continuity of care related to following up with the patient on reported increases in symptoms and acts of violence toward others.

**Patient I**

This 41-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with a diagnosis of unspecified anxiety disorder. He was not prescribed psychotropic medications other than hydroxyzine as needed. This individual was incarcerated within CDCR for the third time in June 2015. During his first period of incarceration, he received mental health services at the 3CMS level of care for approximately 90 days. Upon arrival within CDCR for his current term, he was placed at the 3CMS level of care while at the reception center for 14 days, before being removed from the MHSDS. He received services at the 3CMS level of care again from March 2017 through August 2018 before being removed from the MHSDS. After referral to the MHCB level of care in December 2023, the patient was placed at the 3CMS level of care and remained there through September 2024 when he was admitted to the MHCB level of care. He was discharged to the EOP level of care and placed at KVSP on October 4, 2024.

One IDTT meeting was held during the reporting period. It was not timely. Required staff and the patient were present. The clinical summary included a description of the patient's history without mentioning his current functioning, treatment progress, barriers to treatment, or treatment targets. The treatment plan was unchanged from his MHCB admission in September 2024. The patient met the long-term goal of not being readmitted to MHCB for 90 days. There was no rationale for the patient's placement at the EOP level of care and no discharge criteria.

An initial psychiatric assessment was completed after the patient's initial IDTT meeting and not in keeping with required timeframes. The psychiatrist, who was not assigned to the patient, noted diagnoses of major depressive disorder, recurrent and unspecified anxiety disorder by history. The assessment was completed at cell front without documented rationale. The patient was prescribed sertraline at the time and was mostly non-adherent but the psychiatrist continued the medications without rationale or sufficiently addressing the nonadherence. On November 26, 2024, the patient's psychiatrist documented that sertraline was discontinued because the patient was not taking it regularly. There was no evidence of a meeting with the patient at that time. The patient was seen only once for a routine contact during the reporting period. The patient was seen as cell front because the psychiatrist "had meetings so unable to see in office." Documentation was superficial and did not address the medication discontinuation.

The patient was typically seen every two weeks for an individual session with his PC. The patient occasionally refused to be seen in confidential setting. The primary clinician noted that the patient was often irritable and resistant to treatment interventions, yet there was no evidence that alternative methods of engagement were utilized. Over time, the documentation became generic and reflected status check-ins rather than active treatment sessions. The patient experienced what appeared to be a panic attack in April 2025, yet this was not addressed during the subsequent primary clinician contact. Further, the patient's irritability was impacting his ability to tolerate medical appointments, yet this issue was not addressed in treatment. The patient received two RVRs during the reporting period for refusing to accept a cellmate and this issue was not explored during sessions. The RVR mental health assessment were adequate given that the patient refused to engage in the process; however, the patient's growing irritability and its impact on functioning were not addressed in treatment.

Two suicide risk evaluations were completed during the reporting period. The first was completed on December 31, 2024 and was noted to be clinically indicated without further explanation. There were no dynamic risk factors identified other than a recent RVR. There was no documentation on or near this date which indicated a trigger for the risk assessment. Similarly, a suicide risk assessment was completed on March 27, 2025 and indicated that it was triggered by an MHCB rescission, yet there was no collateral documentation of any event related to an MHCB referral. There were no dynamic risk factors identified and the patient's risk was assessed to be low.

**Findings**

The treatment of this patient was inadequate.

There was no active treatment plan for this patient and no clear indication of what was being targeted in treatment or what interventions were being employed. Psychiatric contacts did not occur as required and medication was discontinued without a face-to-face contact with the patient. PC contacts did not address the patient's growing irritability which was likely a symptom of his mental health conditions of depression and anxiety and was negatively impacting his functioning as evidenced by receipt of RVRs, a panic attack, and decreased engagement in treatment.

**Patient J**

This 33-year-old male patient's healthcare record was randomly selected and reviewed to assess the quality of care provided within the EOP at KVSP during the monitoring period. The patient was provided with diagnoses of antisocial personality disorder, adjustment disorder with mixed anxiety and depressed mood, opioid use disorder, severe, and substance abuse. He was not prescribed psychotropic medications but was prescribed buprenorphine-naloxone to which he was marginally adherent.

This individual was re-incarcerated within CDCR in May 2011. During his previous period of incarceration, the patient did not receive services within the MHSDS. Upon his reincarceration, he was not enrolled within MHSDS until he was admitted to the MHCB level of care in February 2016. He received treatment at the 3CMS and MHCB levels of care until February 29, 2024, when

he was discharged from MHCB to the EOP level of care. Other than two rescinded referrals to MHCB, he has been retained at the EOP level of care since that time. He transferred to KVSP on December 9, 2024.

An initial PC assessment was completed timely yet was blank except for a clinical summary. The assessment was completed at cell front because the patient was unable to attend the appointment due to custody constraints. There was no attempt to conduct a thorough assessment at a later date. There was no initial psychiatric assessment completed prior to the initial IDTT meeting held on December 18, 2024. Required staff were in attendance but the patient was not. There was conflicting information documented as to why he did not attend, both refusal and custody constraints were noted. There was no treatment plan other than noting that the patient wanted to work on anger, depression, and coping with stress without goals or interventions being identified. There was no rationale for the patient's placement at the EOP level of care and no discharge criteria. The routine IDTT meeting held in March 2025 was timely and noted that the patient was not attending at least 50 percent of the treatment offered. The patient was also noted to be refusing individual sessions. The patient's high refusal rate was suspected to be due to substance use with the interventions being listed as psychoeducation and relapse prevention skills. It was unclear how these interventions were to be provided given the patient's refusal to meet with the primary clinician. There was still no treatment plan, no rationale for EOP placement, and no discharge criteria.

There was no evidence of PC contacts being offered to the patient in December 2024. Otherwise, the patient was offered sessions every two weeks and the documentation of those sessions was nearly the same content. It included a superficial description of the patient and a generic plan for follow up without any evidence of interventions being attempted.

The patient was offered four psychiatric appointments, over four consecutive weeks from December 26, 2024 through January 23, 2025, when an initial psychiatric assessment was attempted. The patient refused the first three contacts and was unable to attend the fourth due to a facility lock-down. The patient was not cooperative with cell-front contacts so documentation was minimal. The patient was not offered psychiatric sessions at any other time during the reporting period.

**Findings**

While treatment with this patient was a challenge given his high refusal rate, the overall treatment provided to him was inadequate as it evidenced less than the minimally required sessions being offered.

Additionally, when the patient was seen, there was little to no documented evidence of attempts to engage the patient. Further, there was little evidence to support the patient's need for treatment at the EOP level of care, yet there was no consideration of a level of care change. Finally, there was mention in the treatment plan of the patient's substance use interfering with his treatment, yet no documented attempts to collaborate with substance use staff to assist the patient.

**Patient K**

This 48-year-old male patient's 3CMS health care record was reviewed to assess the adequacy of mental health care at the KVSP RHU. The patient was provided with diagnoses of major depressive disorder and opioid abuse. His symptoms included depression, sleep disturbance, anxiety, and a history of multiple suicide attempts and self-injurious behaviors. The patient was adherent with his prescribed mirtazapine.

The patient first entered CDCR on January 30, 1997, and served multiple CDCR prison terms. He last entered CDCR on September 8, 2011. He was initially placed in the MHSDS at the 3CMS level of care in June 2007 and subsequently received treatment at the 3CMS, EOP, and MHCB levels of care. He had a history of serious RVRs, with the most recent dated February 3, 2025, for possession of a deadly weapon.

The patient transferred to KVSP on February 7, 2025 and was placed in the RHU for safety due to enemy concerns. Earlier that day, the patient tied a noose around his neck, but no injuries occurred nor medical attention required. An SRE was completed prior to transfer and another was completed at KVSP. Although the patient did not disclose the reasoning for his attempt, the clinician opined that it was potentially an attempt to block his transfer to KVSP. The patient's acute risk for suicide was deemed to be low as the patient recanted suicidal statements and his chronic risk was deemed moderate due to his history. The patient remained in RHU through April 26, 2025, with a brief transfer to alternative housing for one-to-one suicide watch after reporting suicidal ideation on April 26, 2025. The MHCB referral was rescinded, and the patient returned to RHU.

While in the KVSP RHU, the initial PC assessment occurred timely in a confidential setting via telehealth and was thorough. The initial psychiatric assessment occurred following the IDTT and twenty days after the patient's arrival, exceeding the requirement for initial psychiatric assessments in RHU.

The initial IDTT meeting was not timely. All required participants were present including the assigned PC, psychiatrist, correctional counselor, licensed psychiatric technician, and the patient. The safety plan was carried forward from February 7, 2025. The treatment plan included specific and measurable objectives. Interventions were adequate. Although the treatment plan noted the patient's use of self-harm gestures for secondary gain, the plan did not include this specifically as a target for treatment planning.

Routine PC contacts were mostly conducted cell-front due to the patient's consistent refusal of confidential sessions. The contacts were brief and resembled wellness checks with encouragement of the patient to participate in confidential sessions. The therapeutic content was limited, with little evidence of interventions being implemented as outlined in the treatment plan. There was also no increase in monitoring nor modification of treatments, given the patient's continued treatment refusal. The patient was not seen by psychiatry for any routine contacts for during the monitoring period. The only psychiatric documentation was entered on April 26, 2025, in response to patient's report of suicidal ideation. This was a phone consult and was not face-to-face; after the patient refused a direct evaluation. Orders were placed for one-to-one observation and the patient was transported to alternate housing overnight. A SRE was completed the following day.

According to the assessment, the patient reported suicidal ideation without a specific known trigger other than feeling unsafe and then refused to be evaluated by the psychiatrist. At the time of the evaluation, the patient denied suicidal ideation and agreed to practice healthy coping skills and to work with his treatment team. His suicide risk level was deemed to be low, and the patient was recommended to return to RHU with five-day follow-ups.

The patient was not offered the requisite 90 minutes of confidential, structured group therapeutic activity weekly as required by the Program Guide. Structured therapy was limited to weekly cell-front contacts with the recreation therapist, who provided in-cell activity packets focused on coping skills, stress management, and cognitive training. The patient generally accepted these packets and was observed to be stable, but there was no documentation of patient refusal to attend groups or institutional cancellations.

**Findings**

The treatment provided to this patient was inadequate.

Although the PC initial assessment and routine contacts were timely, the initial psychiatric contact and IDTT meeting did not occur within ten days of patient's arrival, which was not in keeping with RHU requirements. While the treatment plan included specific goals and interventions to address depression, baseline measures were omitted, and patient's suicidal ideation/gestures were not specifically targeted in the treatment plan. In addition, therapeutic interventions were limited to cell-front contacts and in-cell activity packets and there was no modification of treatment to address the patient's refusal of confidential contacts. The patient was not offered the mandated 90 minutes of confidential, structured group therapy weekly hindering the patient's access to care.

**Patient L**

This 44-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at the KVSP RHU. The patient was provided with diagnoses of PTSD and opioid abuse, moderate. The patient's history was notable for chronic mood symptoms, opioid use, and multiple suicide attempts. The patient was initially prescribed venlafaxine but was non-adherent and it was discontinued. Duloxetine was added, with documentation of patient's partial adherence. The patient was prescribed buprenorphine-naloxone for opioid use disorder.

The patient first entered CDCR on June 9, 2004, and was placed in the MHSDS on September 7, 2004. He last entered CDCR on September 25, 2018, to serve a sentence of life with the possibility of parole. He received treatment at all levels of care including 3CMS, EOP, MHCB, ICF, and Acute. He transferred to KVSP on June 3, 2024, and was placed in RHU from December 9, 2024 through April 2, 2025, due to safety concerns.

An initial PC assessment and the initial IDTT meeting was convened timely. An updated IDTT occurred as required. All required participants attended, although the patient refused both meetings. The clinical summary and case formulation were adequate but omitted the patient's symptoms to justify diagnoses. The treatment plan targeted reduction of depression but lacked baseline measures and a measurable long-term goal. Interventions were generic. The plan did not

address medication nonadherence or target the patient's lack of engagement in treatment beyond continued rapport building and psychoeducation.

Psychiatric contacts did not meet Program Guide requirements for timeliness, as the initial psychiatric assessment occurred after the IDTT meeting and not within the patient's first ten days of placement in the RHU. A subsequent psychiatric contact was two months later in response to medication nonadherence. The psychiatrist provided a thorough assessment, responded to patient-reported side effects, and adjusted medication, by discontinuing venlafaxine and prescribing duloxetine.

Routine PC contacts occurred weekly, primarily occurring at cell front due to the patient's continued refusals of confidential sessions. The PC attempted to build rapport and provided psychoeducation, but there was little evidence of implementation of interventions as outlined in the treatment plan. The patient's refusal to participate was consistently documented, but there was no attempt to increase monitoring, address underlying barriers to engagement, or to adapt the treatment plan accordingly.

The patient was not offered the requisite 90 minutes of confidential, structured group therapeutic activity weekly as required by Program Guide. Instead, structured therapy was limited to weekly cell-front contacts with the recreation therapist, who offered one-hour in-cell activity packets focused on coping skills, stress management, and cognitive skills, however the patient frequently refused the packets.

**Findings**

The treatment provided to this patient in the KVSP RHU was inadequate.

Although PC contacts and the initial IDTT meeting were timely, the psychiatric initial assessment did not meet the ten-day requirement for initial assessment. The treatment plan provided measurable short-term goals but lacked baseline measures. Interventions were generic and the treatment plan failed to address the patient's lack of treatment participation. Weekly PC contacts were provided cell front but were limited and did not include interventions that were outlined in the patient's treatment plan. Additionally, the patient did not receive the required 90 minutes of confidential, structured group therapy weekly, hindering the patient's access to care.

**Patient M**

This 40-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental healthcare at the KVSP RHU. The patient was provided with a diagnosis of major depressive disorder with psychotic features. His symptoms included depressed mood, anxiety, insomnia, racing thoughts, command auditory hallucinations and visual hallucinations, past suicide attempts, and he was noted to have a history of treatment noncompliance. Prescribed medications included venlafaxine, divalproex sodium, and lurasidone, to which the patient was adherent.

The patient entered CDCR on September 30, 2004, and began serving his second term, on April 15, 2010. He was placed in the MHSDS in 2008 at the 3CMS level and has also received treatment at the EOP and MHCB levels of care, with his last MHCB admission occurring in January 2023. He was treated at the 3CMS level of care since that time. He transferred to KVSP in May 2023 and was placed in RHU twice for safety reasons: from December 27, 2024 to January 25, 2025, and again from February 7, 2025 to March 7, 2025, for safety concerns. Both placements were reviewed.

Initial PC assessments were timely and were held in confidential settings. Only one of the initial psychiatric assessments was conducted in a confidential setting and both initial psychiatric assessments were untimely exceeding the ten-day requirement.

The IDTT meeting for his first RHU placement was held timely with all required staff present; however, the patient refused to attend. The treatment plan did not document specific signs and symptoms supporting the diagnosis, and although the team justified continued 3CMS placement to address symptoms of anxiety, the plan addressed only depression. The short-term goal was measurable but the long-term goal lacked measurable criteria and did not address patient's reported anxiety or psychosis. Interventions were vague and generic. An IDTT meeting did not occur during the patient's second admission to the RHU which was not in keeping with the ten-day requirement.

PC contacts occurred at least weekly, mostly cell-front because the patient often refused confidential settings. These resembled brief wellness checks with the patient usually refusing in-cell activities offered by the PC. On February 19, 2025, he met with the PC confidentially, reported symptoms, and asked for higher level of care. PC responded by requesting a psychiatric consult and gave the patient workbooks for in-cell activities, which he agreed to use. Later contacts remained cell-front due to his refusal of meeting in a confidential setting. The PC continued to offer education and coping materials, but progress was limited by the patient's lack of engagement, and an increase in monitoring of patient was not implemented despite patient's reported symptoms and continued lack of treatment participation.

Psychiatric treatment included regular contacts with the psychiatric nurse practitioner (PNP), but some were cell-front. Reasoning for cell front contacts included the lack of treatment space and the patient's refusals. During the routine contacts the psychiatric provider reviewed the patient's history, symptoms, and medication adherence, and continued his medications. On February 20, 2025, the patient was seen in response to the PC referral. The patient reported feeling paranoid and having difficulty coping and thought he may need a higher level of care. The PNP targeted the patient's hallucinations, insomnia, and depression by providing psychoeducation, continuing the patient's prescribed medications, and encouraging treatment participation. There was no evidence of discussion among IDTT members to assess the patient's request for a level of care change.

The patient was offered group activities weekly, consistent with policy requirements for 90 minutes of confidential, structured group therapeutic activity. He did not attend any groups. The patient agreed to use workbooks for in-cell therapy, but no follow-up was documented.

**Findings**

Overall, the quality of treatment for this patient was inadequate.

The initial IDTT meeting and weekly PC contacts were timely, and the patient was provided regular clinical contacts by both the PC and psychiatric nurse practitioner, including timely initial PC assessments in confidential settings. The IDTT during the patient's second admission did not occur timely and both initial psychiatric assessments were untimely. The treatment plan did not address patient's symptoms justifying diagnosis and did not address the full scope of the patient's symptoms. Treatment interventions were generic and not tailored to the patient's psychotic symptoms or anxiety. The PC and psychiatric contacts were often non-confidential, due to patient's refusal, limiting the utilization of effective therapeutic interventions and there was limited documentation of efforts to address barriers to patient's treatment participation, other than encouragement and psychoeducation. The clinical response to the patient's request for higher care was limited, with no evidence of increased monitoring or discussion among the IDTT. Although the patient was offered the requisite 90 minutes of group each week, he did not participate and follow-ups to in-cell interventions were absent.

**Patient N**

This 51-year-old male patient's 3CMS health care record was reviewed to assess the adequacy of mental health care at KVSP. The patient was provided with a diagnosis of post-traumatic stress disorder and his symptoms included mild depression, anxiety, poor sleep, and hypervigilance. No psychotropic medications were prescribed during the review period.

The patient entered the CDCR on April 7, 1998, to serve a term of life with the possibility of parole. He was placed in the MHSDS at the 3CMS level of care in July 2022. He remained at this level of care and was housed at KVSP from November 12, 2024 through January 2025.

The initial PC assessment occurred timely on November 19, 2024, cell front, as the patient refused to attend. While the IDTT meeting was convened in a timely manner on November 27, 2024, with the assigned PC, psychiatrist, CCI and psychiatric technician present, the patient refused to attend. The treatment plan goal to lower depressed mood was specific, but there was no baseline measure and the long-term goal was vague. Furthermore, the planned intervention was not specific and was internally inconsistent given the plan to provide monthly skills yet meet with the patient every 90 days.

The initial psychiatric assessment occurred on January 8, 2025, nearly two months after the patient's transfer to KVSP, which exceeded Program Guide requirement. This single contact was conducted in a non-confidential setting due to custody modified programming. During the assessment, the psychiatrist offered medications; however, the patient declined.

A routine PC contact occurred on December 2, 2024, which was conducted at cell front after the patient declined to meet in a confidential setting. The progress noted a focus on rapport building and psychoeducation to encourage treatment participation; however, there were no implemented

interventions tied to the patient's treatment plan goals. Despite this, the patient was noted to be stable.

**Findings**

The treatment provided to this patient was adequate.

Although initial psychiatric evaluation was not timely and one clinical contact occurred in non-confidential setting due to custody modified programming, the patient remained stable throughout the review period, with no evidence of worsening symptoms or acute psychiatric need. The treatment team made reasonable efforts to engage the patient, respect his preferences, and provide supportive interventions despite his limited participation. While improvements to the treatment plan to include specific interventions and measurable long-term goals are recommended, the patient was monitored during his time at KVSP, his condition did not deteriorate, and he was offered appropriate treatment, including medication, which he declined.

**Patient O**

This 50-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental health care at KVSP. The patient was provided with diagnoses of unspecified mood disorder, antisocial personality disorder, and multiple substance use disorders in sustained remission, with target symptoms including depression, anxiety, insomnia, and mood instability. The patient was intermittently adherent to his prescribed oxcarbazepine.

The patient entered CDCR on December 1, 1997 and was first placed in the MHSDS on May 26, 2009. He received treatment at the 3CMS, EOP, and MHCB levels of care. The patient transferred to KVSP at the 3CMS level of care on May 29, 2020, where he has remained since.

The last documented IDTT meeting was convened on November 22, 2022, which was over two years prior to this review, exceeding the Program Guide's annual treatment review requirement. This resulted in the patient not having an updated individualized treatment plan with treatment objectives to guide patient’s treatment and to ensure continuity of care.

Routine psychiatric treatment contacts failed to meet the 90-day follow-up requirement for the 3CMS level of care despite the patient being prescribed psychiatric medications. Routine PC contacts did not occur for over seven months. There was no ongoing treatment and no monitoring of the patient's clinical status and mental health needs.

**Findings**

The treatment provided to this patient was inadequate.

The IDTT did not convene for over two years, resulting in the absence of an updated, individualized treatment plan with relevant objectives and measurable goals to guide the patient’s care. While psychiatric contacts occurred, they were not timely and there were no PC contacts for

more than seven months, representing a clear denial of access to care and leaving the patient without ongoing therapeutic intervention or monitoring of progress toward treatment goals.

**Patient P**

This 64-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental healthcare at KVSP. The patient was provided with diagnoses of mild depression and antisocial personality disorder. The patient was mostly adherent to his prescribed fluoxetine.

The patient served multiple prison terms, first entering CDCR on August 3, 1982, and beginning his most recent term of life with the possibility of parole on June 9, 2000. He was first placed in the MHSDS on October 7, 2004, at the MHCB level of care. He has since received treatment at the 3CMS, MHCB, EOP, and ICF levels of care. He transferred to KVSP on February 14, 2017, at the 3CMS level of care.

The IDTT meeting was convened on February 27, 2025, which was over two years since the last IDTT meeting was held. This delay failed to meet the annual Program Guide requirement for 3CMS level of care. Additionally, the meeting was attended by an alternate PC and was held in absentia because the patient refused. Although the clinical summary provided some information about the patient’s symptoms, diagnosis, and mental health history, the case formulation was generic. Although IDTT documentation contained IPOCs for depression initiated in 2019 and there were notes in the clinical formulation suggesting interventions such as CBT and DBT, there were no objectives, goals, or interventions included in the treatment plan and the rationale for retaining patient at the 3CMS level of care was generic.

Routine psychiatric contacts were not timely. The delay in appointments resulted in the patient’s medication expiring between contacts. In addition, the psychiatric progress note dated April 22, 2025, noted conflicting information such as the patient refused his medications and denied side effects, but later in the plan section noted that patient was compliant with his medication.

PC contacts were more than 90 days apart. Both contacts with the patient were brief, nonconfidential, and cell front. Only one cell front contact was due to the patient’s refusal. The other was due to custody modified programming. The brief contacts resembled wellness checks and were limited.

**Findings**

The treatment provided to this patient was inadequate.

The annual IDTT meeting and routine psychiatric and PC contacts were not timely. IDTT documentation was generic and contained no individualized goals or interventions. Routine PC contacts were limited to non-therapeutic cell front checks, with one contact due to an institutional program modification. Furthermore, the lapse in the patient’s medication renewal further contributed to the inadequacy of the patient’s care.

**Patient Q**

This 47-year-old male patient's 3CMS health care record was reviewed to assess the adequacy of mental health care at KVSP. The patient was provided with diagnoses of unspecified schizophrenia spectrum or other psychotic disorder and antisocial personality disorder. The patient was not prescribed psychotropic medications during the review period.

The patient first entered CDCR on January 16, 2001. He received treatment at multiple levels of care, including 3CMS, EOP, MHCB, and ICF. He transferred to KVSP on October 25, 2023 at the 3CMS level of care.

The IDTT did not convene timely and had not met in over twenty months since the initial IDTT that occurred on December 7, 2023, exceeding the Program Guide annual requirement for 3CMS level of care. This resulted in a treatment plan that was not updated leaving the treatment team without a plan to guide any clinical interventions, coordinate treatment, and ensure continuity of care.

Psychiatric treatment was not provided. Despite the patient's transfer to KVSP on October 25, 2023, there were no psychiatric contacts since August 25, 2022, a significant failure to meet Program Guide requirements including the initial psychiatric assessment and subsequent routine contacts for patients at the 3CMS level of care. Although the patient was not prescribed medication, this lack of psychiatric oversight is particularly concerning given the patient's diagnosis and history of multiple involuntary medication orders for dangerousness and grave disability.

PC contacts did not occur timely, with the single contact during the review period occurring on January 22, 2025, nearly four months after the previous contact. The contact was a brief and non-confidential after the patient refused a confidential contact. The documented progress note plan was generic and appeared copied, as it was identical to the September 2024 plan.

**Findings**

The treatment provided to this patient was inadequate

The IDTT meeting was untimely and the patient was left without an updated treatment plan to guide treatment. The patient had not been seen by a psychiatrist for over two years and the single PC contact held during the monitoring period was not in keeping with the Program Guide requirements. The absence of psychiatric oversight and meaningful treatment planning for a patient with a history of grave disability and dangerousness was a significant concern.

**Patient R**

This 50-year-old male patient's 3CMS health care record was reviewed to assess the adequacy of mental health care at KVSP. The patient was provided with diagnoses of major depressive disorder single episode, moderate and adjustment disorder with depressed mood. The patient was not prescribed psychotropic medications.

The patient first entered CDCR on May 31, 2001, and was placed in general population until he entered MHSDS on June 1, 2023, at the 3CMS level of care. He had no changes in his level of care. He was placed at KVSP from May 22, 2024 through February 13, 2025.

There were no initial psychiatric or PC assessments nor IDTT meetings held at KVSP since the patient's arrival in May 2024, resulting in no treatment plan to guide patient's treatment and to ensure continuity of care.

Routine psychiatric treatment was not provided. Although there was one PC contact on January 16, 2025, the contact occurred in a non-confidential setting, cell-front, nearly six months since the patient was last seen by a PC. This exceeded Program Guide requirements for 3CMS level of care patients. Although the contact was brief and the patient reported doing being stable. the PC was unable to fully assess the patient due to the limited contact.

**Findings**

The treatment provided to this patient was inadequate.

Since the patient's transfer to KVSP, the patient did not receive an initial psychiatric or PC assessment, nor did an IDTT meeting occur. Additionally, psychiatric contacts were not held during the patient's time at KVSP, and there was a nearly six-month lapse before the patient was first seen by a PC. The one subsequent PC contact was brief, non-therapeutic, and conducted in a non-confidential setting, which was limited. The patient's access to care as well as ensuring continuity of care was inadequate.

**Patient S**

This 43-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental healthcare at the KVSP RHU. The patient was provided diagnoses of adjustment disorder with depressed mood, opioid abuse, and amphetamine abuse. He was hearing impaired and provided with a vest and hearing aids. The patient was not prescribed psychotropic medication. He was prescribed buprenorphine-naloxone for substance use.

The patient was serving his first CDCR term of life with the possibility of parole, entering on CDCR March 2, 2005. Other than a rescinded MHCB referral in 2015, the patient was not enrolled in the MHSDS until August 12, 2022 when he was placed at the 3CMS level of care. He transferred to KVSP on January 23, 2025, and was placed in the RHU from January 23, 2025 to May 12, 2025, pending investigation into enemy concerns. He had a history of serious RVRs and substance abuse, with documentation noting decompensation in restricted housing.

The initial PC contact occurred timely; however, it was limited due to patient's refusal to meet in a confidential setting. The assessment included information carried forward from November 2024 but was otherwise adequate. The initial psychiatric assessment was conducted beyond the ten-day requirement, but occurred before the IDTT, at cell front due to patient refusal. The psychiatrist documented that the patient denied symptoms, acute distress, was not taking psychotropic medication, and did not endorse symptoms. The patient was encouraged to work with the

treatment team and was informed of the process for stepping down from 3CMS. There was no other psychiatric contact during the patient's RHU placement.

The initial IDTT meeting did not convene timely. All disciplines were present; however, the patient refused to attend. The patient also refused to attend the routine IDTT meeting on May 7, 2025. The treatment plan objectives focused on anxiety and depression, with measurable goals. The listed interventions were not adequate. In the subsequent IDTT, depression was removed as a target without any documented rationale or update on progress or barriers to patient's lack of participation in treatment. The patient received an RVR on February 10, 2025, for possession of controlled substance in an institution, yet this was not addressed or mentioned in patient's treatment plan.

Routine PC contacts occurred weekly, via telehealth, at cell front due to the patient's refusal of confidential settings. The contacts resembled brief wellness checks as the patient regularly denied mental health concerns, suicidal or homicidal ideation, and was noted to appear stable. Interventions were limited to encouragement to attend confidential contacts, monitoring, and education on accessing mental health services due to patient's refusal to attend, with the exact language copied into each note without evidence of structured interventions linked to treatment plan goals and patient's response to interventions. The documentation did not reflect any attempt to engage the patient in evidence-informed therapy beyond encouragement, nor did it address barriers to patient's participation nor provide progress toward patient's goals.

The patient was not offered the requisite 90-minute, confidential, weekly structured group therapeutic group per Program Guide requirements. Rather, the recreational therapist met weekly at cell front with the patient for a brief check in and offered a one hour in-cell activity packet focused on such topics as: coping skills, emotional regulation, physical health and wellness, relaxation techniques, and cognitive techniques with the patient often accepting the materials provided; however, there was no documentation of follow-up that the patient completed any of the packets.

**Findings**

The treatment of this patient was inadequate.

The initial psychiatric assessment and the IDTT were not timely. The patient's lack of participation was not explored or targeted in treatment. The patient was not offered the required weekly structured group therapy, instead was offered in-cell activities, with no further follow-up documented. Treatment planning contained some measurable goals, yet there was no documentation of progress or rationale for changes in targets and the patient's RVR for possession of controlled substance was not addressed in the treatment plan.

**Patient T**

This 41-year-old male patient's 3CMS healthcare record was reviewed to assess the adequacy of mental healthcare at the KVSP RHU. The patient was provided with diagnoses of bipolar II and insomnia disorder. Prescribed medications included clonidine for mood swings and sleep

disturbances, with mirtazapine and hydroxyzine available as needed. The patient was adherent to his prescribed medications.

The patient first entered CDCR on April 25, 2005, and last entered CDCR on June 19, 2017, to serve a term of life without the possibility of parole. The patient transferred to KVSP on February 19, 2021, and was placed in MHSDS on March 17, 2021, at the 3CMS level of care. He remained at KVSP through January 30, 2025.

During the review period the patient was placed in the KVSP RHU from October 8, 2024 to November 21, 2024, for battery with a deadly weapon and again from November 27, 2024, to January 29, 2025, for attempted murder, following six days on 3CMS mainline. The patient had a history of serious RVRs including RVRs for fighting, battery on a prisoner, conspiring to commit murder, battery with a deadly weapon, possession of dangerous contraband, destruction of property valued less than $400, and attempted murder.

The initial psychiatric assessment did not occur within ten days of the patient's placement in RHU on October 8, 2024, instead it occurred over a month later, at cell front, due to the patient's refusal, limiting the assessment. The subsequent psychiatric initial assessment also occurred later than required. Although the psychiatrist attempted confidential contacts with the patient, the patient refused, resulting in cell-front contacts. The psychiatrist reviewed prior assessments, medication history, and collateral information and noted the patient denied experiencing any symptoms. Medication management was addressed, with reminders and encouragement for medication adherence. There were no other psychiatric contacts during the patient's RHU placement. PC initial assessments were timely and adequate.

The initial IDTT meetings were convened timely, with all participants present; however the patient refused to attend. The clinical summary was thorough, documenting the patient's legal history, recent RVRs, and mental health presentation. Treatment targets developed in October 2024, included anxiety and depression, with measurable short-term goals and long-term goals. Baseline measures were; however, not included and the patient's progress toward treatment targets were not included in documentation from the next IDTT meeting.

PC contacts occurred on a weekly basis, which was in keeping with Program Guide requirements; however, all contacts were conducted cell-front due to patient refusal to meeting in a confidential setting. While the treatment plan targeted goals for reducing anxiety and depression, there was no documented assessment of progress toward these goals, and interventions were not implemented as planned. Rather, the patient consistently denied experiencing any acute symptoms, and PC interventions were supportive, focusing on rapport-building, utilizing coping skill, ongoing psychoeducation, providing in-cell activities, and encouragement of participation in structured programming. The patient's engagement in structured therapeutic activities was also limited. Although weekly groups were offered, the patient attended only two groups during his RHU placement, however the potential barriers and patient's lack of participation in treatment were not fully explored.

**Findings**

The treatment of this patient was adequate.

Although the initial psychiatric assessments were delayed, all PC assessments, IDTT meetings, and weekly PC contacts were timely. The IDTT process included thorough documentation of clinical history, diagnosis, and measurable goals, despite the patient's refusal to participate. Although the treatment plan did not include baseline measures, patient's progress toward goals, or fully address barriers to patient's participation, attempts to engage the patient and provided supportive interventions, encouragement, psychoeducation, and medication management were provided and the patient was noted to be stable. In addition, structured therapeutic activities were consistently offered, despite the patient's limited participation.

**Patient U**

This 47-year-old male patient's healthcare record was randomly selected to assess adequacy of treatment at the MHCB level of care at KVSP. He was not provided with any diagnosis of record but was prescribed Zyprexa and Remeron.

This patient was treated at the MHCB level of care between April 30, 2025 and May 7, 2025. He was referred to the MHCB from the reception center due to agitation, refusal to cooperate, and suicidal statements, precipitated by dissatisfaction with dorm housing. Throughout his stay there were various psychiatric diagnoses including unspecified schizophrenia, acute psychosis with suicidal ideation, and at the time of discharge, depression. Initial assessments documented current symptoms but included limited psychosocial history. At the time of admission, the psychiatrist initiated Zyprexa and Remeron for various symptoms including intermittent auditory and visual hallucinations, depression, anxiety, hopelessness, helplessness, and poor sleep, representing a decline from a month prior when the patient denied any mental health symptoms. Psychiatric assessment documentation was inconsistent regarding psychotic symptoms and presence of suicidal and homicidal ideation. PC assessment documentation indicated that reports of auditory and visual hallucinations were previously assessed as reported in the service of secondary gain. He was observed to be responding to internal stimuli and a diagnosis of delusional disorder was considered.

Neither the psychiatrist nor the PC in attendance at the initial IDTT meeting had completed the patient's initial assessments and findings from assessment documentation were not appropriately considered in treatment planning. Specifically, initial IDTT documentation conceptualized his treatment needs as poor impulse control and distress tolerance, consistent with referral documentation. Additionally, documentation of prior mental health history was inconsistent with initial assessment documentation which included one hospitalization and documentation of current paranoia. The one treatment goal, which was measurable and objective, targeted distress tolerance with appropriate evidence-based interventions, was consistent with referral rationale but not his assessed treatment needs. He did not meet criteria for a higher level of care review.

With one exception, when the patient was seen by a psychologist, daily contacts occurred with three different psychiatric providers. The patient was not seen by his assigned primary clinician, a supervising psychiatric social worker, during his stay. Lack of provider continuity was also evident in admission and discharge IDTT meetings. The one daily contact with a psychologist

was meaningful and individualized. Across daily contacts the patient consistently denied suicidal ideation. Psychotropic medication was adjusted to address ongoing assessment of paranoia which had subsided at the time of discharge.

Across the MHCB admission, the patient's symptoms and mental status stabilized. In advance of the discharge IDTT meeting, he indicated a readiness to return to his sending institution with improved ability to manage his housing. The patient was assessed as low risk on the discharge risk assessment with appropriate clinical rationale and an appropriate safety plan was developed. Clinical rationale to discharge and return the patient to 3CMS was appropriate. The discharge summary provided relevant information of the patient's course of treatment to the 3CMS treatment team.

**Findings**

This patient's treatment was inadequate.

The discrepant conceptualizations of this patient in initial assessments and daily psychiatric contacts compared to IDTT documentation was an area of concern and reflective of lack of provider collaboration and the lack of provider continuity. Further, prior mental health records were not sought but were clinically indicated. Treatment planning narrowly targeted the patient's treatment needs. Clinical interventions with the patient to assist him in managing his symptoms and distress around housing, the precipitant that resulted in his psychiatric crisis, were limited and not utilized as clinically indicated. Diagnostic clarification with clinical rationale was needed.

**Patient V**

This 35-year-old male patient's healthcare record was randomly selected to assess adequacy of treatment at the MHCB level of care at KVSP. The patient was provided with diagnoses of narcissistic personality disorder, schizoaffective disorder, and schizophrenia. He was prescribed Abilify, Cogentin, Buspar, Vistaril, Depakote and Zoloft.

This patient was treated at the MHCB between April 28, 2025 and May 7, 2025 after making a suicidal statement with a plan to hang himself. He had no history of suicide attempts or self-harm. After acute and ICF admissions between August and December 2024, he was discharged to the EOP level of care. Documentation indicated multiple alternative housing and CIT interventions following his inpatient discharge. Of note, he was not flagged for a higher level of care review.

PC and psychiatric initial assessments included relevant historical and current clinical information. At the time of admission, the patient presented as acutely psychotic, which slowly improved with initiation of, and adjustments to, antipsychotic medication. Suicidal ideation decreased upon admission and subsided after several days. Daily contacts with providers were individualized to the patient's current treatment needs.

Initial IDTT documentation conceptualized his presenting problem as low frustration tolerance, based primarily on the initial PC assessment which excluded the psychiatric assessment of manic/depressive and psychotic symptoms. Treatment goals which targeted low frustration

tolerance, hallucinations, and serious impairment due to mental illness developed when he was in EOP were not updated or individualized to his current treatment needs or reason for referral.

The patient was seen by five different providers, including three psychiatrists and two primary clinicians, for daily contacts, initial assessments and in IDTT meetings. Covering providers were in attendance during the initial and discharge IDTT meetings. There was no contact with the assigned primary clinician during his MHCB stay. He only had one routine contact with his assigned psychiatric provider.

The patient was appropriately discharged to mainline EOP with five-day follow-ups by the IDTT after he sufficiently stabilized. The patient was assessed as low risk on the discharge risk assessment; clinical rationale was clear and thorough. Similarly, the safety plan was comprehensive and individualized. A comprehensive discharge summary was completed to assist with discharge planning and relapse prevention.

**Findings**

This patient's treatment was adequate with need for improvement.

The patient received treatment in accordance with his treatment needs, despite outdated treatment planning. IDTT collaboration and continuity of care needed improvement. Diagnostic clarification with clinical rationale was needed. In terms of relapse prevention, it would have been beneficial had IDTT members discussed factors that contributed to and assisted with resolution of suicidal ideation during daily contacts.

**Patient W**

This 32-year-old male patient's healthcare record was randomly selected to assess adequacy of treatment at the MHCB level of care at KVSP. The patient was provided with diagnoses of antisocial personality disorder, major depressive disorder, and schizoaffective disorder. He was prescribed Zyprexa, Remeron and Vistaril.

The patient was admitted to the MHCB level of care on April 25, 2025 precipitated by psychiatric decompensation including distressing psychotic symptoms and the potential for violence. The patient reported auditory hallucinations to harm others and was pre-occupied with a threat from the Mexican mafia. In addition to possessing a weapon, he planned to make more weapons. Relatedly, he had been involved in a physical altercation and a use of force prior to the MHCB referral. It was unclear if the Mexican mafia fears were reality based.

The initial psychiatric assessment included relevant clinical information; however, instead of a summary of recent clinical functioning, clinical documentation from several recent contacts was copied into the document which was challenging to review. During the psychiatric assessment, the day after admission, the patient denied psychotic symptoms and thoughts of harming others. He was assessed as a moderate risk to others, possibly due to his mental illness.

The initial PC assessment was comprehensive and included relevant current and historical information. The patient reported intermittent auditory hallucinations and ongoing paranoid delusions to the clinician. He reported that the FBI was aware that he was being followed by the Mexican mafia. Recent substance use and life in a Level IV institution were considered contributing factors to his paranoid thinking. The patient minimized aggressive behavior that occurred prior to the MHCB admission. From the outset, he requested to return to the EOP level of care and attributed the MHCB admission to a misunderstanding with the referring clinician. Consultation with the referring clinician or collateral sources was not sought.

Treatment planning needed improvement. For reasons that were unclear, treatment goals, developed in EOP that targeted anxiety and depression were continued despite IDTT documentation that the patient denied anxiety and depression. Measurable and objective goals established in the MHCB, which targeted aggression and poor distress tolerance, were reasonable. Interventions were reasonable although not utilized during the MHCB admission. Despite conceptualization that substance use contributed to his psychosis, there were no goals for substance use or psychosis.

Provider continuity needed improvement. The patient was seen by three different psychiatric providers for initial and daily contacts. Initial and discharge IDTT meetings were attended by covering providers. It was unclear if the daily psychiatric contact on the day of the IDTT meeting occurred during or separately from IDTT meeting. There was no daily contact on April 27, 2025.

The patient's symptoms improved and were less bothersome without changes to psychotropic medication. The patient, who had requested discharge shortly after admission, agreed with discharge to mainline EOP on April 30, 2025. Discharge IDTT documentation attributed his precipitating symptoms of paranoia as reality-based for a Level IV institution and substance use. He was appropriately assessed as low risk on the risk assessment with thoughtful and thorough clinical justification. An individualized safety plan was developed. The discharge summary included a useful summary of the patient's course of treatment for treatment planning.

**Findings**

This patient's treatment was inadequate.

Daily contacts did not occur as required by the Program Guide. Treatment planning did not fully target his treatment needs including danger to others, psychosis, and substance use. There was a lack of provider continuity and collaboration. Other than psychotropic medication, he did not receive evidence-based clinical interventions to address his treatment needs. His mental illness was not sufficiently considered as a contributing factor to his clinical presentation. Additionally, given the patient's continued report that he was mistakenly admitted to the MHCB, consideration of behavior and use of force prior to MHCB admission, administration of a toxicology screen and determination of the reality-based nature of his ideation were needed to assist with diagnostic clarification.

**Patient X**

This 30-year-old male patient's healthcare record was randomly selected to assess adequacy of treatment at the MHCB level of care at KVSP. The patient was provided with diagnoses of antisocial personality disorder and substance use disorders including alcohol, amphetamine-type, opioid, and sedatives. Psychiatric diagnosis at the time of discharge was substance-induced psychosis. He was prescribed Remeron.

On March 28, 2025, the patient was admitted to the MHCB from the RHU after a self-inflicted forearm wound that required staples as well as lacerations to his abdomen and back. By all accounts, he presented as intoxicated. Chemical agents were utilized to subdue him. With the exception of noting one inpatient hospitalization, the initial PC assessment excluded psychosocial and psychiatric history. During initial assessments, the patient presented as disorganized, agitated, paranoid, and confused. He had not been sleeping and was disruptive on the unit. A toxicology screen and other lab work were ordered which he refused. A treatment goal to report no suicidal ideation three days prior to discharge was inappropriate. Evidence-based interventions were documented although not utilized. For reasons that were unclear a previous goal of depression was continued but there was no goal for the patient's disorganized, confused, and agitated behavior.

At the time of admission, he was prescribed Remeron. During the initial psychiatric assessment, he consented to, but refused to take, Zyprexa. The next day, the psychiatrist ordered an emergency involuntary dose of Haldol and Ativan for danger to self and grave disability as his mental status was unchanged. On March 30, 2025, after a period of non-adherence the Remeron was discontinued although there was no accompanying clinical documentation to support rationale or discussion with the patient. Following two after-hours consultations for medication on two different nights, the Remeron was prescribed regularly.

While there was residual paranoia, the patient's mental status, thoughts of self-harm, and functioning improved after administration of emergency psychiatric medication and continued to improve across daily contacts. As his mental status improved, he reported increased depression and anxiety and had a return of disturbed sleep. PC treatment interventions were not offered, and psychiatric medication was not discussed to address real or imagined safety concerns or mood symptoms.

There was a lack of provider continuity. The patient was seen by three different psychiatrists and three different PCs for initial and daily contacts. Initial and discharge IDTT meetings were attended by covering providers. There were no contacts with the assigned primary clinician.

Once sufficiently stabilized, consistent with his request, he was discharged to the EOP level of care in the RHU. At the time of discharge, he was assessed as moderate risk with five-day follow-ups. A reasonable safety plan was developed despite the patient's lack of participation. The discharge summary, completed a week after the patient's discharge, was not individualized to the patient's course of treatment.

**Findings**

This patient's treatment was inadequate.

The strength in this patient's care was the implementation of the emergency PC 2602 for acute psychosis; however, after the crisis subsided, sufficient care was not provided for residual paranoia and mood symptoms. Treatment planning was outdated, not individualized to the patient's clinical needs, and a goal of no suicidal ideation was inappropriate. The discontinuation of the Remeron without discussion with the patient was also inappropriate. The moderate risk assessment warranted discussion of his ability to safely manage his discharge to RHU, a high a high-risk environment.

**Patient Y**

This 31-year-old male patient's healthcare record was randomly selected to assess adequacy of treatment at the MHCB level of care at KVSP. The patient was provided with diagnoses of adjustment disorder, adjustment disorder with mixed anxiety and depressed mood, antisocial personality disorder, and schizoaffective disorder, depressed type. He was prescribed intramuscular Haldol under PC 2602 and Depakote.

This patient had an extensive history of mental illness and was treated at all levels of care within CDCR. He was being treated at the 3CMS level of care until the current MHCB admission on April 26, 2025 due to auditory hallucinations which impaired his ability to care for himself and program appropriately. Although outside the scope of this review, it is worth noting that documentation indicated that his February Haldol injection was not given, despite a PC 2602 in place.

Initial assessments were appropriate and included relevant information for treatment planning, although more information regarding recent functioning and updated mental health treatment would have been useful in the psychiatric assessment. Treatment planning targeted self-care. Interventions included medication compliance and additional goals to increase insight and manage distress were documented as well.

The patient requested discharge throughout his admission. Documentation in advance of the discharge IDTT meeting indicated improved symptoms and functioning. Medication changes were made in advance of his discharge to target mood symptoms. He did not meet criteria for a higher level of care review. He was assessed as low risk of harm to himself at the time of the discharge, which was appropriate based on documentation review, however clinical rationale needed improvement. He was appropriately discharged to EOP level of care on April 30, 2025. The discharge summary included useful information for the EOP treatment team.

Continuity of psychiatric care needed improvement. The patient was seen by three different psychiatrists for initial and daily contacts. It was unclear whether the daily contact on the day of the initial IDTT meeting occurred during or separately from meeting. Initial and discharge IDTT meetings were attended by covering providers.

**Findings**

This patient's treatment was adequate.

He was discharged after a brief MHCB stay once he demonstrated a period of stability. His discharge plan to the EOP level of care allowed for improved monitoring and support than his previous 3CMS placement. Treatment planning and risk assessment documentation needed improvement. Diagnostic clarification with clear rationale was needed.

**APPENDIX B-19**
**Mule Creek State Prison (MCSP)**
**Reporting Period: July 1, 2024 to December 31, 2024**

**Patient A**

This 27-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with a diagnosis of schizoaffective disorder, depressive type. He was moderately adherent to his prescribed mirtazapine and was fully adherent to his prescribed aripiprazole. This patient was incarcerated within CDCR for the second time in August, 2019. He was placed at the 3CMS level of care at reception and was elevated to the EOP level of care in October 2019. His first inpatient placement was in November 2019 at the MHCB and then Acute levels of care. Since then, the patient has been placed at the EOP level of care with one 18-month stay at the ICF level of care from April 2021 to October 2022 and nine MHCB placements with the most recent occurring in May 2024. He has been treated at the EOP or EOPMod level of care at MCSP since September 19, 2024.

The patient was seen for an initial psychiatric assessment with a telepsychiatrist on September 23, 2024. The assessment was adequate. The patient's first contact with his primary clinician was documented in a progress note rather than an initial assessment form. The content was oddly worded, with the primary clinician describing what "would be" done during the session rather than what was done. Other than a mental status examination, the content of the note included no clinical information about the patient or the patient's history. This document was inadequate as an initial primary clinician assessment. A SRE was completed at the same time as the initial primary clinician encounter and rated the patient's suicide risk as low with adequate justification.

The patient's initial IDTT was held on October 3, 2024, which was within required timeframes yet was held after the patient's ICC, rather than before as required by the Program Guide and without an initial primary clinician assessment having been completed. The required staff and the patient were present for the meeting. The psychiatrist was a telepsychiatrist and the attendance documentation made no mention of a medical assistant being present. Documentation indicated that the patient was not attending at least 50 percent of structured treatment offered to him. Documentation indicated that the patient's failure to attend programming was secondary to paranoid ideation and delusions, yet the patient's level of functioning did not warrant a higher level of care. Treatment strategies to assist the patient with his thoughts and increase his group attendance were documented adequately. The clinical summary was minimally adequate. The treatment plan included one goal to address the patient's distress tolerance which was initiated in June of 2024 without being updated and there was no mention of the goal to increase the patient's group participation or the interventions listed earlier in the document. There was no rationale for the patient's retention at the EOP level of care and no discharge plan. In EOP functional evaluation section, the section about the patient's ability to work in heat included the statement, "defer to MHMD" which was confusing as the telepsychiatrist was documented as being present at the meeting. Another IDTT meeting was held on October 31, 2024 at which time the patient was placed on EOPMod status given his failure to attend any groups. The narrative included steps to assist the patient in attending more groups and indicated that he would be scheduled for five yard groups only as the patient requested not to be scheduled for indoor groups. The frequency of

primary clinician contacts was documented as monthly, which was below Program Guide requirements, as was his next IDTT which was scheduled to be held in six months. The treatment plan section was unchanged and did not include any of the goals or interventions mentioned elsewhere in the document.

The primary clinician saw the patient monthly and the contacts evidenced interventions and a review of the patient's progress toward treatment attendance but were not in keeping with the frequency required by the Program Guide. Telepsychiatry contacts occurred monthly and were adequate. The patient attended some yard groups during the month of November.

The patient was seen for a crisis assessment on November 2, 2024 after threatening an officer. The assessment was adequate and revealed no elevated suicide risk. The patient requested emergency medical attention frequently during November secondary to chest pain and feeling like he was struggling to breathe. There was no mention of these episodes by the primary clinician or psychiatrist.

On December 10, 2024, the patient was placed in the RHU for battery.

**Findings**

Treatment of this patient was inadequate. There was no adequate primary clinician assessment. The initial IDTT was minimally adequate and treatment goals recorded in the patient's treatment plan were outdated and did not reflect the plan of care for the patient documented elsewhere. The patient's assigned clinician and psychiatrist failed to acknowledge urgent mental health and medical contacts that were occurring. While primary clinician contacts evidenced treatment that met the patient's needs, the frequency did not meet requirements. Groups were provided in accordance with the patient's modified program and telepsychiatry contacts were adequate.

**Patient B**

This 37-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with a diagnosis of major depressive disorder, recurrent episode, mild and was mostly adherent to his prescribed fluoxetine. He was also prescribed hydroxyzine as a PRN. This patient was incarcerated for the first time within CDCR in May 2019 and was immediately placed at the MHCB at the time of reception. Since then, he was primarily treated at the EOP level of care with placement at the 3CMS level of care from July 2020 through May 2021. He was placed at the MHCB level of care in May 2021 and discharged to the EOP level of care at MCSP on May 26, 2021.

Routine IDTT meetings were held on September 25, 2024 and December 18. 2024. Required staff and the patient present were present at the September meeting; however the psychiatrist was not assigned to the patient and there was no evidence of the psychiatrist having met with the patient in the previous three months. At the December meeting, the patient was unable to attend due to "institutional medical lockdown." IDTT documentation included no treatment plan, no goals, and no interventions. His group participation was reviewed in September with regard to attendance but not the impact on his mental health needs. There was no mention of treatment participation at

the December meeting. The patient's functioning, treatment progress, behavior, and symptoms were not documented. Patient strengths and goals were documented but not updated. The decision to retain the patient at the EOP level of care included no rationale for that decision. The were no discharge criteria listed. Further, the December IDTT meeting failed to note the patient's reported increase in depression and decrease in motivation and pleasure which he was discussing in individual sessions with his primary clinician.

The patient was seen every two weeks by his primary clinician and with a few exceptions in the month during which the patient discussed increased symptoms and interventions were provided, documentation was generic and did not include anything beyond a description of the patient's current status. Of concern was the fact that the patient's increased depressive symptoms appeared to occur following a medication change yet this issue was never acknowledged by the primary clinician (there was no mention of the medication change) and the patient was not referred to a psychiatrist. Further, the change in depressive symptoms was not noted by the psychiatrist, indicating a failure to review the patient's record adequately. Further, while the patient was seen monthly by a psychiatrist, he was seen by at least five different psychiatrists which may have contributed to the problem noted above regarding the failure to note the impact of a medication change.

The patient had a job and was offered an adequate number of groups each week, although he did not routinely attend more than two-thirds of the offered groups, all of which were facilitated by recreational therapists. It was unclear how these groups addressed the patient's mental health needs and documentation by recreational therapists was lacking beyond the fact that the patient attended and participated in any given group.

**Findings**

Treatment of this patient was not adequate. Treatment planning was absent and the IDTT process failed to note changes in the patient's symptoms and behavior despite the patient reporting an increase in symptoms following a medication change. Primary clinician contacts did not occur as required and were mostly generic status notes with copied content from session to session. Psychiatric contacts were adequate but superficial and included contact with a number of different psychiatrists during the reporting period. Group treatment was adequate in quantity but not quality and documentation of group was lacking.

**Patient C**

This 33-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with diagnoses of posttraumatic stress disorder; bipolar I disorder, current or most recent episode manic, with psychotic features; and schizophrenia. The patient was fully adherent to his medical regimen which included clozapine, lamotrigine, lithium, mirtazapine, prazosin, venlafaxine, and benztropine. This patient arrived in CDCR in May 2019 and was placed at the EOP level of care. He transferred to MCSP on October 15, 2020.

There were two routine IDTT meetings held during the reporting period. In July 2024, required staff and the patient were present. Documentation acknowledged that the patient was not participating in at least half of the structured treatment offered to him. The patient reported that he only fails to attend outdoor groups because he was on heat medications. The IDTT acknowledged that half of the patient's groups were outdoors, but rather than address this fact, interventions to increase the patient's attendance were planned. It was unclear how this would be effective as even if the patient attended all indoor groups, his attendance would never exceed 50 percent. The clinical summary and case formulation were not updated since 2019. The patient's verbalized goal to get out of prison as soon as possible was documented as were strengths which had not been updated in some time. There was no treatment plan, no goals, no interventions, no rationale for his level of care, and no discharge criteria documented. The November IDTT was later than required and included required staff and the patient. While participation in treatment was reviewed, there was no mention of treatment progress, symptoms, behaviors, or patient functioning. Again, the patient was noted as not attending at least 50 percent of his groups and interventions were documented, yet there was no mention of the fact that none of the previously documented planned interventions had been provided nor was there any change in the patient's participation level. The clinical summary evidenced minimal updates but the case formulation from 2019 remained unchanged. There was no treatment plan, no goals, nor clinical interventions documented. There was no rationale for EOP placement nor were discharge criteria documented.

The patient was seen five times during the reporting period by his primary clinician. None of the contacts evidenced clinical interventions or a review of the patient's symptoms or mental health needs. Instead, notes documented the patient's current status and plan to follow up with him in a month. The patient was noted as attending college courses. Psychiatric contacts with the patient's assigned telepsychiatrist were held monthly and were adequate.

The patient was offered at least ten hours of group weekly but rarely attended.

**Findings**

Treatment of this patient was inadequate to meet the needs of the EOP level of care. There was no treatment plan and IDTT documentation was wholly inadequate. Primary clinician contacts evidenced no treatment interventions and served only as status check-ins with the patient. Groups were offered in sufficient quantity but all were recreational in nature and documentation did not reveal how these groups were meeting the patient's mental health needs. Psychiatric contacts were adequate. It was unclear whether this patient met criteria for placement at the EOP level of care.

**Patient D**

This 58-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with diagnoses of schizoaffective disorder, depressive type and major depressive disorder, recurrent episode, moderate. He was mostly adherent to his prescribe buspirone and divalproex sodium and was moderately adherent to his prescribed aripiprazole and venlafaxine. He was also prescribed buprenorphine-naloxone to address his opioid use disorder. This patient was incarcerated for the second time in February 2016. He was soon placed at the 3CMS level of care through December

2022 when he was placed at the MHCB level of care. He was discharged to the EOP level of care at MCSP on January 20, 2023.

The patient had one IDTT meeting during the reporting period, on November 14, 2024. This routine meeting was later than required as his prior IDTT meeting had been held in May 2024. Required staff and the patient were present; however, the psychiatrist was not assigned to the patient. IDTT documentation noted that the patient was not attending at least 50 percent of the structured treatment offered. The patient reported that it was due to chronic pain and interventions to address chronic pain were planned. The patient was also referred to his primary care physician for pain medication. The clinical summary was updated but made no reference to the patient's symptoms or functioning, nor mention of his progress in treatment. The case formulation was adequate but not recently updated. Discharge criteria were included in the case formulation although they appeared to reference removal from MHSDS rather than transitioning to a lower level of care. Patient strengths and goals were listed. The treatment plan included a single measurable goal without specifics or a baseline. The interventions were adequate but did not include specifics as to what would be the focus of treatment and made no mention of medications or group interventions. There was no rationale for retaining the patient at the EOP level of care.

The patient was seen monthly for primary clinician contacts; however, no contact occurred in December 2024. None of the documentation reflected the use of the interventions outlined in the treatment plan and while group participation was tracked, there was no discussion of patient progress in treatment or how groups affected his mental health. Psychiatric contacts were also held monthly, although the contact in August 2024 occurred six weeks after the July contact. Psychiatric contacts noted that the patient was experiencing passive suicidal ideation along with thoughts of cutting his wrists in July, yet no SRE or safety plan was completed and this issue was not addressed further by the psychiatrist or primary clinician. The psychiatrist also documented that the patient's buspirone "ran out" for approximately a week before being renewed.

The patient was offered adequate hours of structured treatment; however, all groups were facilitated by recreational therapists and there was no indication of how the groups aligned with the patient's treatment plan. While the patient often refused groups, when he did attend, documentation was generic and made no reference to the patient's functioning or presentation during the groups.

**Findings**

Treatment of this patient was inadequate. His IDTT meetings did not occur as required and the content of documentation was lacking. Additionally, the patient's reports of passive suicide ideation were not appropriately addressed. Medications were allowed to expire and were not available to the patient for almost a week and it was unclear how group treatment was applicable to the patient's needs.

**Patient E**

This 31-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with a diagnosis of major

depressive disorder, recurrent episode, with psychotic features. He was prescribed mirtazapine, olanzapine, and sertraline with moderate to low adherence. This patient was incarcerated in January 2016 and was not placed within the MHSDS until May 2016 when he was admitted to the MHCB level of care. He was discharged to the 3CMS level of care and then removed from the MHSDS in August 2019. He was placed in the MHCB in October 2023 and discharged to the EOP level of care in November 2023. He transferred to MCSP on November 8, 2023.

There was one IDTT meeting held with the patient during the reporting period on July 11, 2024. Of note, there was no subsequent IDTT meeting with the patient through the date of this review (February 16, 2025), a significant departure from requirements. The IDTT meeting was noted as occurring to address the patient's "C status" and included required staff and the patient. Documentation noted that the patient was not attending at least 50 percent of offered treatment. The patient reported not attending groups because they were not useful, yet the primary clinician believed that the patient was avoiding interpersonal interactions for fear of conflict with peers. A plan to use appropriate interventions during individual treatment sessions was documented. The IDTT also noted that the patient was experiencing increased anxiety secondary to loss of his tablet due to C status and the IDTT recommended that access to his tablet be restored. The patient's strengths were listed; however, the verbalized patient goal only included the word "anxiety." There was no treatment plan, no treatment goals, and no interventions listed beyond what was included in the discussion of increasing group attendance. There was no rationale for retaining the patient at the EOP level of care and no discharge criteria.

While monthly psychiatric contacts were documented, the content of the documentation was sparse including little updated information beyond a brief description of the patient's self-reported functioning and a mental status examination. Notes early in the reporting period also include large sections copied from week to week. The patient was offered primary clinician contacts every four to five weeks and occasionally refused to attend so was seen at cell front. Contacts were offered by three different primary clinicians and documentation did not reflect interventions or refer to the patient's treatment needs. The patient received an RVR for fighting in November, yet there was no acknowledgement of this in primary clinician documentation.

While the patient was offered a sufficient number of weekly groups, all sessions were facilitated by recreational therapists and did not reference the patient's functioning or how the groups impacted the patients' mental health or support his progress in treatment.

**Findings**

Treatment of this patient was inadequate. There was no evidence that treatment interventions were provided to the patient beyond medication and recreational therapy. There was no review of the patient's progress in treatment as no IDTT was held for over seven months and primary clinician contacts were not held as required. There was also no evidence that the patient's nonadherence was appropriately addressed by his psychiatrist.

**Patient F**

This 73-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with a diagnosis of schizophrenia and prescribed haloperidol and levetiracetam to which he was adherent. This patient was incarcerated within CDCR on seven previous occasions beginning in 1988 with one brief placement at the 3CMS level of care in 1999. Otherwise, the patient was not enrolled in the MHSDS until his current incarceration. He was placed at the 3CMS level of care in April 2002. Since then, he was treated at the 3CMS, EOP, MHCB, and Acute levels of care. His most recent MHCB placement occurred in June 2023 and he was discharged to the 3CMS level of care. He was elevated to the EOP level of care on July 12, 2023 while at MCSP.

This patient's only IDTT meeting held during the reporting period was on September 18, 2024. Prior to this meeting, the patient was last seen by the IDTT in February 2024. Required staff and the patient were present for the meeting. Documentation indicated that the patient had not been attending at least 50 percent of offered treatment secondary to paranoid ideation and resulting anxiety. The patient also reported having difficulty following what goes on in groups and that the content was not helpful to him. The documentation included appropriate interventions to be provided by the primary clinician to assist the patient with reality testing and anxiety management. Documentation indicated that a referral to a higher level of care was not warranted but no clear rationale was provided. The clinical summary and case formulation were not appropriately updated. There was no treatment plan, no patient strengths, and no patient goals documented. There were appropriate discharge criteria included.

Primary clinician contacts were held with three different primary clinicians during the reporting period with sessions offered every two to four weeks. There was no evidence that the interventions outlined in the treatment plan were provided to the patient. Further, primary clinicians did not review the patient's participation in groups beyond asking the patient if he was attending groups. The patient reported that he was, but in reality, he was not. When the patient did attend groups, documentation was generic and did not reflect support of the patient's mental health needs. All groups were facilitated by recreational therapists.

Psychiatric contacts were offered at least monthly, and while the patient was seen by three different providers, continuity of care was retained. Sessions with the psychiatrist focused monthly on the patient's poor sleep and anxiety.

**Findings**

Treatment of this patient was not adequate. The lack of IDTT meetings impacted the ability of the treatment team to adequate address the patient's needs and assess his overall functioning. There were discrepancies between the patient's self-report and his behavior with regard to group attendance, and while the IDTT focused on paranoid ideation, there was no evidence of this during clinical sessions. Further, medications were provided to help the patient with sleep and yet this was not identified as a primary need in the treatment plan.

**Patient G**

This 35-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with diagnoses of schizoaffective disorder, bipolar type; amphetamine-induced psychotic disorder with moderate or severe use; and alcohol use disorder, mild. He was not prescribed psychotropic medications but was receiving buprenorphine-naloxone for his substance use disorder and had a PRN order for mirtazapine. This patient was received into CDCR in December 2018 and was placed at the 3CMS level of care. He was admitted to the MHCB in April 2019 and discharged to the EOP level of care. He had two more admissions to MHCB, one in two days after discharge in April 2019 and another in January of 2020. Since that time, he has remained at the EOP level of care and was transferred to MCSP in February 2020.

There were two IDTT meetings held with the patient during the reporting period, one in September 2024 and one in December 2024. Prior to the September meeting, there had not been an IDTT meeting since November 2023. Both meetings were attended by required staff and the patient. IDTT documentation made no mention of the patient's mental health needs, symptoms, functional deficits, treatment goals, or interventions. While the documentation noted that the patient was attending groups and individual sessions, there was no reference to what treatment was addressing or why the patient needed to be at the EOP level of care. Additionally, there was inconsistent information in the documentation noting that the patient was not prescribed medications but then stating that the patient was encouraged to remain compliant with prescribed psychotropic medications.

While primary clinician contacts were held every two to four weeks, there was no reference to the patient's symptoms or mental health needs in any documentation. Notes reflected a brief description of the patient's current status along with a mental status examination which reflected no abnormalities. There was no reference to group treatment or patient participation in the same. Sessions frequently referenced the patient's sobriety and engagement in healthy activities and family relationships. There was no clear indication of a need for mental health treatment. Additionally, progress notes referred to the patient remaining adherent to his medications, despite not being prescribed any psychotropic medications.

Similarly, while psychiatric appointments were held monthly there was no reference to any symptoms or mental health conditions being treated. Almost every note included a header that the session was a routine follow-up and a medication non-adherence follow-up, yet later in every note there was evidence that the only medication prescribed was a PRN which the patient rarely used. The psychiatrist documented a diagnosis of methamphetamine use disorder with a recent relapse in every note during the reporting period despite documenting elsewhere that the patient remained sober. The patient's diagnosis of record was not recognized by the psychiatrist.

The patient attended most recreational groups offered, although documentation did not include any reference to the patient's involvement in the groups or how the groups met his treatment needs.

**Findings**

The quality of treatment provided to this patient was a challenge to assess yet determined to be inadequate. It was unclear what the patient's treatment needs were or why he was receiving mental

health services at the EOP level of care. Looking purely at the requirements for EOP, the patient did not receive adequate treatment planning or primary clinician contacts and all groups were recreational in nature. Further, documentation by both the primary clinician and the psychiatrist contained internal inconsistencies which reflected formulaic documentation rather than notes specific to the patient.

**Patient H**

This 58-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with a diagnosis of schizoaffective disorder, depressive type. He was fully adherent to his prescribed mirtazapine, olanzapine, and venlafaxine. This patient has been incarcerated within CDCR four times beginning in 1985. He did not receive services within the MHSDS during any previous period of incarceration. He was most recently received within CDCR in October 1997 and was first placed within MHSDS in July 2009 when he was admitted to the MHCB. Since that time, he was treated at all levels of care (i.e., 3CMS, EOP, MHCB, APP, and ICF). His last and only PIP placement occurred from October 2016 through August 2017 when he was discharged to the EOP level of care. Since then he has had two MHCB placements and a brief period of placement at the 3CMS level of care in 2021 but has been primarily treated at the EOP level of care. His most recent discharge from MHCB was in December 2021 and he transferred to MCSP in January 2022.

There was no IDTT documentation in the record during the reporting period. The last IDTT meeting held with this patient occurred in June 2023. That document was reviewed to assist in understanding the patient's treatment needs. Documentation indicated that the patient experienced auditory hallucinations and moderate depressive symptoms. The clinical summary included a description of how dialectical behavioral therapy (DBT) would be used to help the patient manage distress. Discharge criteria was listed and was adequate. The patient did not attend the meeting.

Primary clinician contacts were held with the patient five times during the reporting period at interval of four to eight weeks. Documentation indicated that a translator was used to communicate with the patient as his primary language was Spanish during sessions through September 2024. After this, the patient was not seen again until November and there was no mention of a translator being used to facilitate that session with a new primary clinician. Documentation of contacts from July through September noted the use of clinical interventions to assist the patient with depression, anxiety, and parole board preparation. The primary clinician noted that a previous denial by the parole board resulted in suicidal ideation and that the patient had ongoing passive suicidal ideation. His parole board hearing was set for December 2024. Despite this, the contact with the patient in November was held in a non-confidential setting due to patient refusal and documentation was generic without mention of previously identified concerns or the patient's upcoming parole hearing. The patient was not seen for a primary clinician contact in December, despite his parole board hearing and identified risk associated with a denial. Subsequent contacts were reviewed and the patient reported experiencing increased symptoms but no suicidal ideation.

Psychiatric contacts were documented at least monthly and were provided via telepsychiatry with a translator present. Documentation was adequate and reflected interventions and medication adjustments to address the patient's auditory hallucinations and increased depressive symptoms.

Sessions appeared adequate to meet the patient's needs but the parole board hearing was not mentioned.

While the patient was offered recreational therapy groups and routinely attended, there was no evidence that an interpreter was available despite documentation by the recreational therapists noting that the patient's ability to communicate in English was limited. Documentation of groups was not comprehensive so it was difficult to determine what, if anything, the patient received from group participation.

**Findings**

Overall, treatment of this patient was inadequate. There was no IDTT held with this patient in over 18 months. Primary clinician contacts did not occur as required and while sessions in the early part of the reporting period evidenced clinical interventions and the use of an interpreter, subsequent contacts were lacking any evidence of engagement with the patient. Additionally, there was no evidence of follow-up with the patient following his parole board hearing despite identified risks for suicidal ideation given the patient's history. Groups were recreational in nature and conducted in English without use of interpreter services. Psychiatric contacts were adequate.

**Patient I**

This 56-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with diagnoses of schizophrenia and antisocial personality disorder. The patient had an active PC 2602 order and was fully adherent to his prescribed buspirone, clozapine, and mirtazapine. The patient had a PC 2602 order in effect since at least 2017 secondary to danger to himself and others which was renewed in August 2024. This patient was received within CDCR for the second time in 1996. He did not receive services within MHSDS during his previous incarceration but was placed at the 3CMS level of care in June 1996 and has received services since then. He has primarily been treated at the EOP level of care with three MHCB admissions (in 2013, 2020, 2022) and two inpatient stays, one at Atascadero State Hospital (ASH) from February 2015 through March 2017 and at the ICF level of care within CDCR from August 2022 through October 2023 when he was discharged to the EOP level of care at MCSP.

There was one IDTT meeting held during the reporting period, on October 31, 2024. The previous meeting had been held seven months prior. Required staff were in attendance but the patient refused to attend. It was documented that the patient was not attending at least 50 percent of treatment offered and was placed in EOPMod programming with an expectation of attending two groups per week and monthly individual contacts (despite EOP requirements of weekly primary clinician contacts). The patient's cognitive impairments were noted as the likely reason for his inability to attend groups and interventions to support participation were adequately planned. The clinical summary adequately addressed the patient's treatment progress to date and noted that he had met previous treatment goals but failed to identify current treatment goals or clinical interventions beyond encouraging group participation. It was unclear what symptoms the patient was experiencing. He was referred for a DDP evaluation to assess for cognitive deficits. Rationale for retaining the patient at the EOP level of care was adequate.

The patient was seen by the crisis intervention team on August 31, 2024 after reporting suicidal ideation to custody officers. The precipitant appeared to be conflict with his cellmate. The patient was angry and demanding to go to an inpatient setting. An SRE was completed adequately and the patient was returned to his housing. There was no mention of this incident in subsequent primary clinician or psychiatric documentation nor was it addressed during the IDTT meeting.

The patient refused to attend monthly primary clinician and psychiatric contacts. Primary clinician contacts were held cell front with no evidence of interventions being provided to the patient. The patient's group attendance was being monitored, however. Psychiatric contacts were also held cell front and evidenced medication monitoring, yet in November, the patient's clozapine expired and needed to be renewed by an on-call psychiatrist.

Recreational therapy groups were offered to the patient and he rarely attended.

**Findings**

Treatment of this patient was adequate, but minimally so. He did not have IDTT meetings or primary clinician contacts in keeping with requirements, but the frequency appeared to meet the needs of the patient who was stable but disengaged from and resistant to treatment. He was appropriately placed at the EOPMod level of care which appeared to assist in increasing his group participation, albeit minimally.

**Patient J**

This 39-year-old patient's healthcare record was randomly selected to assess the quality of treatment provided at the EOP level of care at MCSP. He was provided with diagnoses of posttraumatic stress disorder and major depressive disorder, recurrent episodes with psychotic features. He was also noted as being DDP1 status with prompts required for hygiene, cell cleaning, and laundry exchange as well as the need for simple instructions. He was fully adherent to his prescribed clozapine, sertraline, and hydroxyzine. This patient was incarcerated for the first and only time within CDCR in October 2016 and was placed at the 3CMS level of care. He was admitted to the MHCB within six days of reception, discharged to the 3CMS level of care for five days, was elevated to the EOP level of care, and was readmitted to the MHCB within eight days. He was admitted to the ICF level of care in February 2017, discharged to the EOP level of care in May 2019, then returned to the ICF level of care in August 2019 where he remained hospitalized at ASH through July 2021. He was placed at the EOP level of care until being readmitted to ASH in April 2023 and discharged to the EOP level of care at MCSP on October 19. 2023.

His only IDTT meeting during the reporting period was held on September 25, 2024 with the prior meeting having been held in April 2024. Required staff and the patient were present. Documentation indicated that the patient was not attending at least 50 percent of offered treatment secondary to depression and anxiety. Appropriate interventions were planned to address his participation in treatment. His adaptive support needs were acknowledged. The patient's upcoming release from prison was noted but there were no goals or interventions identified to assist the patient with release. His treatment plan included one goal, to address his depression, yet

baseline assessment of his depression was not provided. Interventions were vague and did not include medications or group treatment. There was no rationale provided for retaining the patient in the EOP level of care.

Monthly psychiatric contacts were adequate and evidenced review of functioning, symptoms, medication efficacy and discussion regarding the patient's upcoming release. The patient was offered primary clinician contacts every two to four weeks with a telesocial worker. Documentation evidenced the use of interventions to address the patient's needs as well as discussion regarding his upcoming release. There was no mention of group participation or depression ratings despite both being identified in the patient's treatment plan as targets for treatment. There was evidence that formal pre-release planning was initiated with the patient in December 2024 with a release date in March 2025. The patient was offered recreational therapy groups but rarely attended.

**Findings**

Despite the frequency of IDTT meetings and primary clinician contacts not meeting EOP requirements, treatment of this patient was adequate. There was evidence of treatment interventions to address his needs as well as support for his upcoming release. The patient was stable and appeared to benefit from the treatment offered.

**Patient K**

This 32-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care provided at MCSP. The patient had been at MCSP since 2021 and housed in Facility A. The patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, depressive disorder, and unspecified anxiety disorder. He was not prescribed psychiatric medication during the review period.

The patient had one scheduled PC contact during the review period, on October 30, 2024. Documentation indicated that the patient refused the contact. Consult with custody indicated no "obvious" signs of decompensation but direct clinician observation of the patient was not completed. The patient was not scheduled to be seen again until January 2025.

The patient did not have an IDTT meeting during the review period and was past due for an annual IDTT meeting. The previous annual IDTT meeting occurred in October 2023. His next IDTT meeting occurred in April 2025, well after the review period and 18 months after the 2023 IDTT meeting.

**Findings**

The treatment provided to this 3CMS was inadequate.

The patient did not receive care in accordance with Program Guide requirements. There was no direct assessment of the patient's functioning. The delay in his annual IDTT resulted in outdated

treatment planning and a lack of clinical documentation regarding this patient's symptoms, functioning, and treatment progress.

**Patient L**

This 57-year-old transgender patient's 3CMS healthcare record was reviewed to assess the quality of mental health care provided at MCSP. She had been at MCSP since 2015 and was housed in Facility A. He was provided with diagnoses of antisocial personality disorder, ADHD, gender dysphoria, and other specified depressive disorder. She was prescribed Depakote and Vistaril.

The patient did not have an annual IDTT meeting during the review period and was past due for an annual IDTT meeting. The previous annual IDTT meeting occurred in April 2023, and the next IDTT meeting occurred in February 2025, 22 months later.

The patient was assessed as stable during the two required telepsychiatric contacts during the review period. One contact was conducted at cell front due to a refusal to attend a confidential contact. There was documentation that the patient was encouraged to attend the contact, and education was provided. Rationale for the refusal was not located. Assessment of side effects, symptoms, and functioning was documented for the confidential telepsychiatry contact.

Two PCs provided timely encounters during the review period. One of three contacts was conducted at cell front due to custodial cell searches. According to documentation of the patient's functioning and level of distress, she presented as stable.

**Findings**

The treatment provided to this 3CMS was inadequate.

While psychiatric documentation was appropriate, this patient's care was inadequate given the lack of multidisciplinary treatment planning to coordinate and appropriately address treatment needs. While primary clinician documentation assessed the patient's functioning, documentation was not representative of a meaningful therapeutic contact. Diagnostic clarification with clinical rationale was needed.

**Patient M**

This 42-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care provided at MCSP. He was admitted to MCSP on July 19, 2024 and was housed on Facility A. He was provided diagnoses of ADHD and mood disorder. He was prescribed Strattera, lithium, and Vistaril, as needed. His healthcare record was randomly selected to assess adequacy of care.

The initial psychiatric assessment was reasonable but late. The initial PC assessment was late, copied from previous providers, and insufficiently updated to include a summary of his recent mental health symptoms, functioning, or treatment engagement since 2012. There were discrepancies regarding self-injurious behavior, and copied documentation incorrectly indicated

that the patient was in the RHU. The initial IDTT meeting occurred a month after his arrival. For reasons that were not clinically supported, the sole treatment goal targeting anger was continued from a March 2024 treatment plan.

The patient refused routine psychiatric contacts in October, November, and December 2024. He was seen at the cell front for follow-up, although only one psychiatric contact included documentation of a brief clinical assessment. Scheduled medications were discontinued due to non-adherence in early December, 2024, without a face-to-face assessment. He refused a confidential contact despite requesting to resume psychiatric medication.

The patient attended one tele-mental health PC contact in September 2024. The patient's symptoms and functioning were assessed. He presented as stable. There was no clinical documentation that he was scheduled for another PC encounter during the review period.

**Findings**

The treatment provided to this 3CMS was inadequate.

There were delays in provider initial assessments, routine PC contacts and the initial IDTT. The PC initial assessment was outdated, and treatment planning was not supported by provider clinical documentation. While psychiatric contacts were appropriately scheduled, the patient was not appropriately assessed. Medication discontinuation without an assessment was an area of concern.

**Patient N**

This 38-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care provided at MCSP. He had been at MCSP since 2023 and was housed on Facility B. The patient was provided a diagnosis was major depressive disorder. He was prescribed Cymbalta, Abilify, and Buspar.

In October 2024, he was discharged from EOP to 3CMS care. There was no initial PC assessment prior to or following the initial IDTT meeting. The initial psychiatric assessment was brief. While some relevant clinical information was included, mental health history was insufficient.

The initial IDTT meeting was held in absentia due to a custody lockdown for flu vaccinations. It was unclear whether the assigned psychiatrist was in attendance. Most of the clinical summary was copied from the EOP discharge IDTT meeting and lacked an updated assessment of the patient's current treatment needs. Treatment goals were not developed. There was no documented psychiatric input despite the patient's only contact since arrival to 3CMS with the psychiatrist.

Routine provider contacts were not required during review period, and none were scheduled.

**Findings**

The treatment provided to this 3CMS was inadequate.

Care for this patient who was recently discharged from a higher level of care was inadequate. An initial PC assessment to guide treatment planning was not completed. IDTT documentation lacked a sufficient clinical summary, treatment planning, and multidisciplinary input.

**Patient O**

This 51-year-old patient's 3CMS healthcare record was reviewed to assess the quality of mental health care provided at MCSP. He had been at MCSP since 2019 and was housed on Facility B. He was diagnosed with unspecified mood disorder and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Trileptal and Remeron.

Treatment goals from the patient's April 2024 annual IDTT meeting targeted a reduction in psychosis, with solution-focused therapy as the identified intervention.

The patient was provided with one routine PC contact before his RHU placement in November 2024. While documentation indicated an appropriate assessment of his symptoms and functioning, there was no documented utilization of any treatment interventions. An initial psychiatric assessment following discharge from RHU was not completed. Instead, a routine psychiatric contact was completed; documentation was limited but conveyed that he was stable. The PC initial assessment upon return to ML 3CMS from the RHU was insufficient. It lacked a comprehensive assessment of the patient's current treatment needs and relevant historical information. These deficits negatively impacted IDTT documentation. The IDTT meeting following transfer from RHU to mainline 3CMS was late.

Routine psychiatric documentation while the patient received ML 3CMS care varied by provider and ranged from appropriate to insufficient. The patient presented as stable in July 2024. However, several months later in October 2024, his mental status declined, and he reported auditory hallucinations. He was agreeable to the addition of Trileptal to the Remeron he was prescribed PRN.

**Findings**

The treatment provided to this 3CMS was inadequate.

Routine psychiatric care was variable. The lack of appropriate provider initial assessments and IDTT following his release from RHU and return to ML 3CMS was not in accordance with Program Guide requirements. Additionally, he did not receive clinical interventions during PC routine contacts or solution-focused therapy as indicated in his treatment plan.

**Patient P**

This 39-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at MCSP. He was diagnosed with schizoaffective disorder, bipolar type, and antisocial and borderline personality disorders. He was prescribed and adherent with clozapine, mirtazapine, risperidone, and venlafaxine. Hydroxyzine was prescribed PRN for anxiety, and he used this medication on four occasions during MHCB care. Four suicide attempts

and two episodes of self-injurious behavior were listed in the health record. Medical conditions included sialorrhea, hyperlipidemia, diabetes mellitus, hypertension, and diarrhea. He had a tattoo of "5150," the code for emergency psychiatric commitment, on his forehead. Within CDCR, the patient had previously received all levels of mental health care. At MCSP, he was admitted to MHCB care from January 6, 2025 through January 14, 2025 after reporting suicidal ideation in the context of his wife's death two days prior to admission.

The initial primary clinician assessment was timely but relied upon prior assessments for the presenting problem, history of present illness, and case formulation. These sections of the assessment were not updated, and the prior case formulation was incomplete and only partially relevant to the patient's current clinical presentation. The initial psychiatric assessment was timely and adequate and noted that the patient had safety concerns in prisons due to previous gang involvement. The veracity of the patient's report of his wife's death was questioned due to lack of signs of bereavement. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was found to meet criteria for consideration of a higher level of care due to high treatment refusal in EOP care, but the rationale for retaining the patient in MHCB care was adequately documented. The case formulation was updated but remained inadequate to guide treatment; it did not reflect the recent loss of his wife. A treatment plan developed in EOP care was brought forward without modification and incommensurate with the patient's current treatment needs. The plan identified depression, distress/anxiety, and auditory hallucinations as treatment targets, but not suicidal ideation, bereavement, or treatment refusals. Short-term objectives were either missing or not measurable, and psychiatric care was not included. The patient was followed daily by the assigned clinician or one of three psychiatrists. All but one of these encounters occurred at the cell front, due to the patient's preference and later due to the patient being placed on medical isolation for norovirus. Encounters were brief and supportive in nature; the provision of CBT interventions and distress tolerance skills training required by the treatment plan was not documented. Recreational therapy contacts were adequately documented. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in discharge to EOP care. The rationale for discharge and recommendations to address treatment refusals in EOP were adequately documented. However, the case formulation and treatment plan were not updated. The discharge suicide risk evaluation, which found the patient's risk to be low, failed to reflect the safety concerns the patient reported upon admission to MHCB and did not appear to give sufficient weight to multiple prior suicide attempts. A psychiatric progress note the day prior had appropriately indicated that the patient's chronic suicide risk was moderate. However, the accompanying safety plan was collaborative and useful. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment, case formulation, and treatment plan were poorly documented, inadequate to guide treatment, and were not used to guide treatment. The patient's report of bereavement was suspected to be false without alternate hypotheses being documented or pursued. While psychiatric care appeared appropriate, provision of nonpharmacological interventions other than recreational therapy was not documented. It was unclear why the patient

began denying suicidal ideation; this area of concern was inadequately probed and treated. The discharge suicide risk evaluation underestimated long-term suicide risk. Strengths in this patient's MHCB care included the timeliness of assessments, IDTT meetings, and daily follow-up encounters, the development of recommendations for increasing participation in mental health programming, and psychiatric care.

**Patient Q**

This 62-year-old, primarily Spanish speaking, MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at MCSP. He was diagnosed with delusional disorder, adult antisocial behavior, and unspecified depressive disorder. Under a PC 2602 order for involuntary medication due to grave disability, he was prescribed and adherent with benztropine, buspirone, hydroxyzine, and olanzapine. Although not given in MHCB care because it was not due, he was also prescribed and adherent with haloperidol decanoate. An additional dose of benztropine was ordered PRN for extrapyramidal symptoms, and he used this dose once during MHCB care. Additional doses of haloperidol and olanzapine were ordered PRN for psychosis and agitation, but he did not use these PRNs during MHCB care. Two suicide attempts were listed in the health record. Medical conditions included Raynaud's disease, hypertension, hyperlipidemia, chronic ankle pain, and history of meningioma with seizures and surgical excision. Within CDCR, the patient had previously received all levels of mental health care. At MCSP, he was admitted to MHCB care from January 7, 2025 through January 14, 2024 for significant impairment due to mental illness, after becoming agitated and reporting that he was not eating because he was seeing spiders and worms in his food. He was discharged to EOP care on January 13, 2025 but remained in MHCB care for one more day.

The initial primary clinician assessment was timely but relied upon prior assessments for the presenting problem, history of present illness, and case formulation. These sections of the assessment were not updated, and the prior case formulation was generic and not helpful for guiding treatment. The initial psychiatric assessment was timely and adequate. Both assessments used a Spanish interpreter. The initial IDTT meeting was timely, attended by the patient, a Spanish interpreter and required staff, and found the patient met consideration for a higher level of care due to high frequency of treatment refusals. The rationale for retaining the patient in MHCB care and recommendations to address treatment refusals were adequately documented. The case formulation was not updated. The patient's strengths and verbalized treatment goals were minimally documented, and no treatment plan was developed. The patient was followed daily by the assigned primary clinician or one of three psychiatrists. Most encounters occurred at the cell front without an interpreter; these encounters were brief and focused on symptoms and medication management. Nonpharmacological interventions were not documented, and the patient refused all offered recreational therapy activities. The follow-up IDTT meeting was timely, attended by the patient and required staff apart from an alternate for the assigned psychiatrist, and resulted in discharge to EOP care. Although it was strongly suspected that the patient was seeking admission to DSH, the MHCB prevention planning section of the IDTT documentation indicated that the patient did not seek MHCB admission for a specific purpose. The case formulation was not updated and the treatment plan continued to be absent. The discharge suicide risk evaluation was overly simplified, completed without a confidential interview, and likely underestimated the patient's risk when it found suicide risk to be low. The psychiatric discharge summary was timely

and adequate; it found the patient's chronic suicide risk to be moderate. At the time of discharge to EOP care, the patient continued to report visual hallucinations, advocate for DSH admission, request quetiapine, and indicate that he would resume refusing groups and food once returned to EOP care.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment was cursory, the case formulation was generic and not helpful in guiding treatment, and no treatment plan was developed. Although both the assigned clinician and the assigned psychiatrist strongly suspected the patient was unreliable, engaged in negative impression management, and was seeking DSH admission, the motivations behind this presentation were not adequately explored or addressed. The patient's clinical presentation at the time of discharge appeared unchanged from his status upon admission.

**Patient R**

This 42-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at MCSP. He was diagnosed with persistent depressive disorder and antisocial personality disorder. He was prescribed clozapine and adherent with this medication except on the final two days of MHCB care. Hydroxyzine was prescribed PRN for insomnia, and he used this medication nightly during MHCB care. Five suicide attempts and three episodes of self-injurious behavior were listed in the health record at the time of his MHCB admission. Medical conditions included dyslipidemia and a history of coccidioidomycosis. Within CDCR, the patient had previously received all levels of mental health care. At MCSP, he was admitted to MHCB care from January 8, 2025 through January 16, 2025 after reporting suicidal ideation and threatening self-harm in the context of fearing sexual assault upon his return to MCSP from an inpatient PIP stay. He was discharged to EOP care on January 14, 2025 but remained in MHCB care for two more days.

The initial primary clinician assessment was timely and adequate apart from a lack of diagnostic impressions and a generic case formulation that was pulled forward without modification and did not address suicidal ideation. The initial psychiatric assessment was timely and adequate. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated, and the patient's strengths and verbalized treatment plans were minimally documented. A treatment plan developed in acute care in July 2024 was brought forward without alteration. It failed to address mood instability, for which clozapine was prescribed, or anxiety and insomnia, for which hydroxyzine was prescribed, and it provided a long-term goal that was inappropriate for MHCB care. The assigned clinician or one of three psychiatrists followed the patient daily. Medications were adjusted to address symptoms, and follow-up for nonadherence with clozapine was timely and adequate. There was no evidence that nonpharmacological interventions were provided beyond encouraging the patient to use his coping skills. The patient refused all offered recreational therapy activities. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care despite the patient continuing

to report suicidal ideation and intent with a plan, and despite the treatment plan including a short-term goal of eliminating suicidal ideation. The treatment team determined that the patient was engaged in negative impression management and exaggerating his suicidal ideation with the goal of gaining readmission to PIP. The case formulation was not updated to reflect this determination, and the treatment plan was not adjusted to reflect an accurate or feasible short-term objective. The discharge suicide risk evaluation was adequate and found the patient at moderate risk. The accompanying safety plan reflected a collaborative attempt to work with the patient but did not result in interventions that adequately addressed what was documented as "inauthentic" suicidal ideation. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

Despite timely assessments, IDTT meetings, and individual encounters, the patient's treatment lacked coherence and was not guided by a clear case formulation or appropriate treatment plan. The treatment team determined that the patient was falsely reporting depression and suicidal ideation for purposes of avoiding general population EOP housing, but the team did not adequately explore the patient's discomfort with this housing or adjustments and interventions that could be used to facilitate the patient's adjustment to EOP. The rationale for using clozapine in a patient with persistent depressive disorder and putatively feigned suicidality was inadequately documented, as there was no evidence of mood instability. Reasons for living were not explored adequately. The patient was discharged to EOP care unchanged, with continued threats of suicidal behavior.

**Patient S**

This 45-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at MCSP. He was diagnosed with unspecified schizophrenia and other psychotic disorder, unspecified depressive disorder, alcohol and stimulant use disorders, antisocial and borderline personality disorders, and mild cognitive impairment. Under a PC 2602 order for involuntary medication due to grave disability and danger to self, he was prescribed aripiprazole and escitalopram. He was adherent with the former but not with the latter. Although not given in MHCB care because it was not due, he was also prescribed haloperidol decanoate, and he had been nonadherent with this medication prior to MHCB admission. Benztropine and intramuscular haloperidol were prescribed PRN for extrapyramidal symptoms and refusal of oral medications, but the patient did not use the medications during MHCB care. Through the ISUDT, he was prescribed buprenorphine-naloxone but refused this medication on the single attempt to administer it. Three suicide attempts and eight episodes of self-injurious behavior were listed in the health record, while a primary clinician assessment indicated a history of over 20 suicide attempts. Medical conditions included congenital hemivertebra with chronic musculoskeletal pain, osteoarthritis of left knee, opioid use disorder, history of hepatitis C, and deep ulcers and dehydration as described below. Within CDCR, the patient had previously received all levels of mental health care. At MCSP, he was admitted to MHCB care from January 8, 2025 through January 14, 2025 for grave disability, after deterioration in personal hygiene and cell cleanliness in RHU EOP. Upon arrival in MHCB care, he was found to be emaciated and dehydrated. A large,

deep, and infected decubitus ulcer was discovered in the thoracic region of his back, along with other ulcers or wounds in the lower spine, perineal area, and right heel. These were described as highly malodorous and emitting a "rotting smell."

The initial primary clinician and psychiatric assessments were timely but completed at the cell front due to the patient presenting as frail, weak, and malodorous. The initial psychiatric assessment was thorough and provided a clear history, including an episode of catatonia in October 2024 and more recent refusal to engage with mental health staff in RHU EOP. The assessment concluded that the patient's current medical crisis was adversely affecting the patient's mental health. The primary clinician assessment was cursory, relied extensively on prior documentation, and did not update the case formulation. The case formulation was generic, inadequate, and did not address symptoms of serious mental illness, the need for involuntary treatment, or the patient's proneness to become gravely disabled. The initial IDTT meeting was held timely but in absentia due to the patient's compromised physical condition and malodorous presentation. He met criteria for a higher level of mental health care due to seven MHCB admissions in the last six months, but IDTT documentation was inconsistent in documenting this. IDTT documentation was also inconsistent in the use of male and female pronouns when referring to the patient. The case formulation was not updated and remained focused on historical criminal behavior and substance use rather than the patient's current clinical presentation. A treatment plan from September 2024 was brought forward without modification and was neither realistic nor relevant to the patient's current presentation. It did not address grave disability or the need for psychiatric care, including involuntary treatment.

Shortly after the initial assessments and while the initial IDTT meeting was occurring, the patient was transferred to the community emergency room for medical care of his ulcers. He was admitted and remained hospitalized in the community until January 14, 2025. There he was treated for ulcers and anemia. Upon return to the CDCR the patient was admitted to MHCB and CTC care at CMF. The MCSP MHCB psychiatric discharge summary and an accompanying primary clinician progress note were timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the amount of time the patient spent in MHCB was quite limited, the initial primary clinician assessment case formulation, and treatment plan were all deficient. These elements of care were inconsistent with the patient's treatment needs and failed to reflect the severity of his mental incapacity. However, psychiatric care appeared appropriate, with an adequate initial assessment and discharge summary. The case raises significant concerns about the care the patient was receiving in RHU EOP, prior to MHCB admission, as the patient's medical condition and mental health status were significantly deteriorated by the time the patient was admitted to MHCB care.

**Patient T**

This 34-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at MCSP. He was diagnosed with schizoaffective disorder, depressive type, opioid use disorder, borderline intellectual functioning, and antisocial and borderline personality disorders. He was prescribed divalproex sodium, hydroxyzine, mirtazapine, olanzapine, risperidone, and sertraline. Except for mirtazapine, he was nonadherent with these medications. PRN doses of buspirone, hydroxyzine, mirtazapine, and olanzapine were prescribed for anxiety, insomnia, and agitation. He used PRN hydroxyzine and olanzapine on several occasions, but not PRN mirtazapine. He accepted a one-time intramuscular injection of olanzapine and diphenhydramine on the second day of MHCB care for psychotic agitation. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. One suicide attempt was listed in the health record at the time of MHCB admission, and additional episodes of self-injury and overdoses were noted in the initial primary clinician assessment. Medical conditions included diabetes, opioid use disorder, mixed hyperlipidemia, and a history of hepatitis C. Within CDCR, the patient had previously received all levels of mental health care. At MCSP, he was admitted to MHCB care from September 26, 2024 through October 9, 2024 for suicidal ideation and danger to others, after requiring outside hospital care for an overdose with methamphetamine and ecstasy. Once in MHCB care, he was referred to acute care on October 4, 2024 but remained in MHCB care for five more days.

Upon arrival in MHCB care, the patient swallowed a ring and required overnight evaluation in a community emergency room; he was returned to MHCB care the next morning. The initial primary clinician assessment was timely but cursory. It relied heavily on prior documentation, did not include a mental status exam, carried forward without alteration a generic case formulation that did not address suicidal ideation or substance use, and did not provide current diagnostic impressions. The initial psychiatric assessment was timely and adequate. The initial IDTT meeting was timely but completed in absentia due to the patient's refusal. Required staff attended and did not find the patient to meet criteria for a higher level of care. The case formulation was not updated, and the patient's strengths and verbalized treatment goals were not documented. A treatment plan developed for acute care in January 2024 was pulled forward without modification. It was inapplicable to MHCB care, focusing on attendance in group programming over the next 30 to 60 days, and identified the patient's problem as major depressive disorder. No interventions were listed in the plan. The assigned clinician or one of two psychiatrists followed the patient daily. Most of these encounters were confidential, and documentation was adequate. Significant efforts were made to encourage medication adherence, and medications were adjusted as part of these efforts and in response to the patient's symptoms. The patient was successfully placed on a long-acting antipsychotic injection. He remained depressed, psychotic, hopeless, and easily agitated, and the treatment team's cautious approach was clinically appropriate. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a referral to acute care, with a recommendation for unlocked dorm housing. The patient's participation in the meeting was adequately documented, but the case formulation, patient strengths, patient's verbalized treatment goals, and treatment plan were not updated. The mental health consult and suicide risk evaluation completed in connection with the acute referral were adequate and appropriately concluded that the patient was at high risk for suicide. A follow-up suicide risk reassessment completed on the final day of MHCB care was also adequate and continued to find the patient at high risk. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was adequate.

There were significant challenges in documentation. The initial primary clinician assessment, case formulation, and treatment plan were inadequate to guide care; the case formulation and treatment plan were inapplicable and irrelevant to MHCB care. Nevertheless, psychiatric care appeared to be appropriate, and the primary clinician provided supportive treatment that was appropriate to the patient's condition and capabilities. Care was timely, and the referral to acute care was clinically appropriate. The patient received the care he needed, despite the absence of coherent treatment planning and case formulation.

**Patient U**

This 53-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. He was provided diagnoses of schizoaffective disorder, depressive type, and PTSD. He was prescribed and adherent with clozapine and fluoxetine. Benztropine and hydroxyzine were prescribed PRN for extrapyramidal symptoms and anxiety, respectively; the patient used hydroxyzine rarely and did not use benztropine. Within CDCR, the patient had previously received all levels of mental health care. Three suicide attempts were listed in the health records. Pertinent medical conditions included a history of seizures, asthma, and liver enzyme abnormality. He initially arrived at MCSP EOP on November 2, 2023 and was placed in the RHU on December 19, 2024 after a PREA allegation was made against him. He returned to mainline EOP on January 24, 2025.

The initial PC assessment was timely, and most of the assessment was completed appropriately. The patient's mental status was unremarkable; the EOP functional evaluation was appropriate, and the assessment noted the patient's lifelong history of auditory, paranoid ideation, and traumatic stress. The initial psychiatric assessment was timely, adequate, and indicated that the patient had been prescribed clozapine for the past seven years and that it was helpful with the patient's auditory hallucinations. The initial IDTT meeting was timely and attended by the patient and required staff. There were no positive HLOC indicators. The treatment team initiated an IPOC for anxiety, but there were no treatment goals or interventions provided. Level of care rationale and discharge criteria were also absent. IDTT documentation and the treatment plan were grossly inadequate and did not prescribe any specific or substantive treatment.

The patient received one routine psychiatry encounter during his 36-day RHU stay. The contact was timely, confidential, and adequately documented. The patient reported occasional auditory hallucinations that were "like mumbles." He denied any side effects from his medications, and they were continued unchanged. PC contacts were provided weekly, but the patient declined a confidential setting on each occasion, and he was seen at the cell front. The patient reported ongoing anxiety related to the PREA charges. The PC suggested he use his tablet and read to pass the time and made vague references to CBT and dialectical behavior treatment techniques but did not identify how they were applied to help manage the patient's symptoms. It appeared that distraction was the primary intervention provided to this patient. The patient was offered five to six groups each week. Recreational therapists facilitated the groups, and the topics were

appropriate for the patient. The patient attended almost all scheduled groups and was described as an active participant.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Although the initial clinical assessments appeared adequate to inform treatment planning, the initial IDTT meeting was inadequate. The patient was never provided an adequate treatment plan. He endorsed chronic, heightened anxiety related to the PREA allegations throughout his RHU stay and was never offered specific treatment goals or interventions to address this symptom or reduce his overall distress.

**Patient V**

This 65-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. The patient was provided a diagnosis of schizoaffective disorder, bipolar type, and was prescribed Risperdal Consta, Depakene, and Cogentin under a PC 2602 order for involuntary treatment due to grave disability. With CDCR, he had previously received EOP, MHCB, and ICF care. Medical conditions included atrial fibrillation, stage 3 kidney disease, hyperlipidemia, cranial cyst, and obesity. Following discharge from ICF care, he was placed in the MCSP EOP RHU on November 26, 2024, where he remained until transferred to another facility on February 3, 2025.

Upon arrival in MCSP EOP RHU care, the patient received timely five-day follow-ups for the first five days. He was reportedly stable, denied suicidal ideation, and maintained good ADLs at each contact. During the evening of the fifth day, he was discovered in his cell with altered mental status and was transferred to an outside hospital for assessment. He was found to have overdosed on non-prescribed Suboxone. The patient returned to MCSP RHU on December 2, 2024 and was placed in the MHCB for one night for observation. He then received seven daily follow-up contacts from December 3 to December 9, 2024. He was described as stable and cooperative and denied suicidal ideation.

The initial PC assessment was timely but incomplete and inadequate. It was provided at the cell front after the patient declined a confidential setting. Key sections of the assessment, including the mental status examination, clinical summary, and case formulation, were either left blank or were carried forward from previous records. The assessment failed to comment on the patient's current clinical functioning or provide actionable insights to inform treatment planning. The initial psychiatry assessment was timely but clinically limited. It occurred at the cell front because the patient refused to attend; the psychiatrist reported the patient appeared sleepy and unable to answer questions due to the residual effects of the suboxone overdose. The psychiatrist continued the patient's PC 2602 medications and scheduled a 30-day follow-up. The patient's initial IDTT meeting was timely and attended by the patient and required staff. There was one positive HLOC indicator for three or more RVRs in the previous three months. The treatment team provided adequate rationale for the nonreferral to a HLOC. Although the ICF discharge plan had recommended EOP Mod status until the patient was able to consistently demonstrate appropriate behaviors during groups and in social settings, the EOP treatment team did not place the patient

on modified status. The clinical summary and case formulation were carried forward from prior records, and the case formulation was generic. The treatment plan did not provide updated treatment goals, interventions, or discharge rationale. The same attendees participated in the patient's routine IDTT meeting, which was timely. There were no positive HLOC indicators identified during this meeting. The clinical summary and treatment plan were not updated and remained inadequate. There was no evidence that any individualized treatment goals or interventions were ever identified or provided for this patient.

Confidential routine psychiatry encounters were provided approximately every two weeks. Three psychiatrists provided a total of four contacts , undermining consistency of care. Psychiatric progress notes were adequate, and the patient remained medication adherent and denied adverse side effects. Although the patient remained stable in December 2024, during a psychiatric encounter on January 15, 2025, he exhibited labile mood, irritability, disorganization, confusion, and mild cognitive deficiency. Routine PC contacts were offered weekly throughout the review period. The patient refused confidential settings; in addition, on occasion custody shortages precluded individual patient escorts. As a result, the patient was seen at the cell front. PC progress notes were inadequate and rarely included references to clinical interventions or structured treatment approaches. PC contacts functioned as wellness checks rather than therapeutic sessions, and there was no evidence the PC was aware of the psychiatrist's findings of cognitive disorganization and impairment. The patient was offered between two and five recreational therapy groups each week; group topics were appropriate for the patient. The patient rarely remained for the duration of the group sessions and had limited engagement, raising concerns about his cognitive endurance and attention span. During periods of modified programming, recreational therapists provided in-cell therapeutic packets and activities.

The patient received a DDP evaluation on January 17, 2025 due to concerns about cognitive impairment and possible dementia. The evaluation confirmed the presence of mild cognitive impairment, which further reinforced concerns about the contradictory PC mental status documentation.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Treatment was inadequate despite the timeliness of clinical contacts and the patient's overall mental stability. The initial PC assessment was incomplete and inadequate. Treatment planning failed to provide substantive or individualized treatment goals or interventions. The treatment team ignored the discharge recommendations from the PIP and did not discuss EOP Mod status or consider the patient's interpersonal difficulties that resulted in frequent RVRs. PC progress notes were inadequate and did not include clinical interventions or treatment strategies. However, it should be noted as strengths that PC contacts, psychiatry contacts, and recreational therapy groups were scheduled appropriately and offered in confidential settings, and that a DDP evaluation was completed timely.

**Patient W**

This 52-year-old transgender EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. She was provided diagnoses of schizoaffective disorder, manic type, opioid use disorder, severe, in sustained remission, amphetamine-type substance use disorder, moderate, and antisocial personality disorder. She was prescribed and adherent with buspirone, mirtazapine, olanzapine, oxcarbazepine, and venlafaxine. Hydroxyzine was prescribed PRN for anxiety, and she used this medication almost every evening. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder; through medical services, she was prescribed gender affirming hormone treatment. Within CDCR, she had previously received all levels of mental health care. Pertinent medical conditions included hyperlipidemia, hypertension, and obesity. The patient was placed in the MCSP EOP RHU on December 18, 2024 due to a PREA investigation, and she remained there until transferred to another facility on February 12, 2025.

The initial PC assessment was provided on the day of arrival; it was conducted at the cell front because of modified programming due to a Norovirus outbreak in the facility. Despite lack of confidentiality, the assessment, including the case formulation, was adequate. The initial psychiatric assessment was timely but completed at the cell front after the patient refused a confidential setting. The psychiatrist noted that the patient was cooperative, denied mental health symptoms, and denied medication side effects. Her mental status was within normal limits, and medications were continued unchanged. The initial psychiatry assessment was adequate and documented appropriately. The initial IDTT meeting was timely and attended by the patient and required staff. There were no positive HLOC indicators. The patient's stated treatment goal was to improve distress tolerance. An IPOC for depressed mood was listed, but there were no specific symptoms/problems, long-term goals, short-term objectives, or clinical interventions provided in the treatment plan. Discharge criteria and level of care rationale were vague and inadequate. Treatment planning did not provide clinical guidance or direction to support the patient.

The patient received one scheduled routine psychiatry encounter, which occurred at the cell front due to her refusal. She denied any significant mental health symptoms and reported the medications were effective. The psychiatrist noted her mental status was within normal limits, and medications were continued unchanged. Routine PC encounters were offered weekly throughout the patient's RHU term. She declined confidential settings at each contact but actively participated in contacts at the cell front and consistently denied acute symptoms or distress. The quality of PC progress notes was poor; they consistently lacked specific clinical interventions or rationale for the patient's refusals to participate in programming. The patient received daily high-refuser contacts beginning on January 13, 2025. The high-refuser notes were vague, formulaic, and perfunctory, and did not appear to provide any clinical value. The patient was offered several clinically appropriate recreational therapy groups but did not attend any.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Treatment planning documentation was inadequate and failed to provide support for the patient's mental health and recovery. The quality of clinical documentation was generally deficient, and PC progress notes lacked specific details and observations. The treatment team did not attempt

any additional strategies or coordination despite the patient's ongoing refusals to participate in any out-of-cell EOP programming throughout her time in RHU.

**Patient X**

This 30-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. He was provided diagnoses of bipolar I disorder, current episode manic with psychotic features, ADHD, primarily inattentive type, and antisocial personality disorder. He was prescribed and adherent with oxcarbazepine. Hydroxyzine was prescribed PRN for insomnia, but he used this medication only once. The patient received mental health services at the EOP, MHCB, Acute, and ICF levels of care. He was placed in the MCSP EOP RHU on December 3, 2024, and remained there through January 16, 2025, when he returned to mainline EOP.

The initial psychiatric assessment was timely, provided at the cell front after the patient refused a confidential setting, and adequate. Medication was continued unchanged. The initial PC assessment was timely, provided by telehealth, comprehensive, and well documented, apart from a generic case formulation. The clinical summary was updated appropriately, and the EOP functional evaluation indicated no significant impairments. The initial IDTT meeting was timely and attended by required staff but not the patient, who was absent due to custody modified programming. There were no positive HLOC indicators. No patient strengths or verbalized treatment goals were provided. IDTT documentation included outdated IPOCs for depressed mood and delusions that were initiated in November 2023 and had not been updated since then. The treatment plan identified depression and group attendance as treatment targets. Short- and long-term goals were measurable, and clinical interventions were specific and appropriate to the patient's needs, although they omitted psychiatric care. Discharge criteria and LOC rationale were not individualized.

The patient received one routine psychiatry encounter, 35 days following the initial assessment. The contact was confidential and well documented, and medications were continued unchanged. The telemental health psychologist offered weekly encounters throughout the patient's EOP RHU care. The patient repeatedly refused confidential settings and was seen at the cell front for all but one routine weekly contact. The patient participated in one confidential contact with a covering PC because he had worked with the PC in the past. The PC noted the patient expressed some delusional thought content but was otherwise stable. Continuity of care was adequate, and the telemental health PC established functional rapport with the patient. The patient was offered several clinically appropriate recreational therapy groups, but he did not attend any. He was added to the treatment high-refuser list shortly after his RHU placement and was provided daily high-refuser contacts. The high-refuser contact progress notes were minimal, perfunctory, and did not provide useful or additional clinical information to address the patient's refusals.

**Findings**

The treatment provided to this EOP RHU patient was adequate.

The patient was offered timely and well-documented clinical contacts while in EOP RHU care, including initial assessments and routine contacts. Overall treatment planning was adequate for

the patient's needs, although some elements of IDTT documentation required improvement. Therapeutic rapport was established despite his repeated refusals to leave his cell and he engaged appropriately with his PC during contacts at the cell front. He was appropriately added to the treatment high-refuser list and received daily contacts, although those contacts were poorly documented. Psychiatry care was adequate. Psychotropic medications were effective and were not changed while he was in RHU. He remained clinically stable throughout his RHU stay and did not experience decompensation or acute distress.

**Patient Y**

This 52-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. He was provided diagnoses of unspecified schizophrenia spectrum or other psychotic disorder, unspecified depressive disorder, social anxiety disorder, severe, and amphetamine-type substance use disorder, moderate/severe, stimulant-induced psychotic disorder, amphetamine type, cannabis use disorder, moderate. He was prescribed and partially adherent with bupropion and buspirone. Through medical services, he was prescribed gabapentin for lumbago; through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, the patient had previously received the 3CMS, EOP, and MHCB care. At MCSP, he received EOP RHU care from January 2, 2025 to February 13, 2025, when he returned to mainline EOP care.

The initial psychiatric assessment was timely and partially adequate. It was provided at the cell front due to the patient's refusal. The assessing psychiatrist noted that the patient had a previously toxicology screen that was positive only for prescribed buprenorphine-naloxone but failed to recognize other positive toxicology findings during the last year. Medications were continued unchanged. The initial PC assessment was also timely, but it was unclear whether it was confidential. Unfortunately, the assessment lacked several key components, including the presenting problem, history of the patient's mental illness, and an adequate clinical summary. The initial IDTT meeting was timely, attended by the patient and required staff, but poorly organized and poorly documented. The treatment plan included an inadequate safety plan and indicated the patient was in the SRMP, but it was unclear whether the plan was current or carried forward from a previous treatment plan. No patient strengths were documented. The patient's sole verbalized treatment goal was pulled forward and no longer appropriate. The treatment plan was pulled forward unchanged from the most recent MHCB admission in July 2024, and it failed to reflect the patient's current RHU placement and clinical needs. No discharge criteria or level of care rationale were provided.

A non-assigned psychiatric provided the sole routine psychiatry contact required during the patient's EOP RHU care. The encounter was timely but occurred at the cell front due to the patient's refusal. The psychiatrist noted that the patient had several positive urine toxicology screens for opiates and cannabis in 2024 and that CDCR policy prohibited prescribing bupropion to patients with positive substance use screenings within the previous two years. The psychiatrist explained the policy to the patient and initiated a bupropion taper. Remaining medications were continued unchanged. The patient was offered weekly routine PC contacts throughout his stay in RHU. He refused confidential settings on each occasion and was seen at the cell front. The assigned PC maintained consistent efforts to engage with the patient; however, progress notes lacked any references to specific clinical interventions or treatment goals. PC encounters were

consistent with wellness checks rather than therapeutic encounters, and were inadequate due to lack of clinical interventions and inconsistent documentation. The patient was offered several recreational therapy groups that were appropriate for his needs, but he refused all offered groups. He was added to the treatment high-refuser list on January 27, 2025 and received daily PC contacts. The high-refuser contact progress notes contained no meaningful or helpful clinical information or observations.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The initial PC assessment, IDTT documentation, and treatment plan were poorly documented and inadequate to guide treatment. The initial PC assessment was incomplete and missing several key sections. The initial psychiatric assessment failed to recognize implication of the patient's recent substance use for the ongoing prescribing of bupropion. The patient was never provided an adequate treatment plan, and most IDTT documentation was carried forward from previous records. The patient did not leave his cell to participate in programming, and there was no indication of efforts to encourage program participation or treatment adherence. Diagnostic clarification with rationale was needed.

**Patient Z**

This 32-year-old transgender EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. She was provided diagnoses of unspecified schizophrenia spectrum disorder and antisocial personality disorder. She was not prescribed scheduled psychotropic medications. Chlorpromazine was prescribed solely as a PRN for agitation, and she used this medication once or twice a day. Medical conditions included HIV infection. She was not prescribed gender affirming hormone treatment. Within CDCR, she had previously received 3CMS, EOP, and MHCB care. At MCSP, she was placed in EOP RHU care on November 15, 2024 following a MHCB discharge. She remained in EOP RHU care through the end of the review period.

Five-day follow-up encounters were provided as required for the first five days of EOP RHU care. An initial PC assessment was timely but inadequate. The assessment was conducted at the cell front because custody refused to remove the patient from her cell due to recent violent and unpredictable behavior. Most of the assessment, including the clinical summary and case formulation, was carried forward with minimal or no updates to reflect the patient's EOP status or RHU placement. The initial psychiatric assessment was also timely and completed at the cell front; unlike the PC assessment, the psychiatric was adequately documented. The initial IDTT meeting was timely and attended by the patient and required staff. The patient met criteria for a HLOC review; the rationale for retention in EOP care and treatment modifications were adequately documented. The case formulation was not updated and remained generic and inadequate to guide specific treatment. Patient strengths and verbalized treatment goals were not documented. An IPOC for delusions was initiated, but there was no rationale provided and there was no mention of delusions in the initial clinical assessments. The treatment plan was pulled forward without modification from one developed during MHCB care, did not include a long-term treatment goal, identified only vague and generalized interventions, and was inadequate. Discharge criteria were

not documented. The routine IDTT meeting was timely and attended by required staff; it was held in absentia due to the patient's refusal. There were no positive HLOC indicators at this IDTT meeting. The clinical summary, treatment plan, and other elements of the IDTT documentation were carried forward unchanged from the initial IDTT meeting and remained inadequate. It was unclear why the treatment team did not discuss EOP Mod status for this patient since she had refused out of cell clinical contacts and groups since her arrival.

The patient was offered routine psychiatric encounters in confidential settings approximately every 30 days; she repeatedly declined confidential settings and was seen at the cell front. Psychiatric progress notes were adequate. On January 16, 2025, chlorpromazine was prescribed PRN to address multiple symptoms; the patient would not agree to scheduled chlorpromazine. At her next routine contact, she reported the medication was helpful and denied any adverse side effects or issues with the medication. Most weekly routine PC contacts were provided at cell front due to the patient's ongoing refusals to attend in a confidential setting. PC progress notes were vague, did not include references to clinical interventions, and were akin to wellness checks rather than treatment sessions. During several contacts, the patient expressed confusion about the rationale for EOP placement and indicated a preference for 3CMS care. The patient was offered several clinically appropriate recreational groups but exhibited extremely poor attendance. She was placed on the treatment high-refuser list on December 2, 2024 and received daily PC contacts. The high-refuser contact notes lacked detail but indicated the patient remained stable and attended to her ADLs appropriately.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Most clinical documentation was moderately to severely inadequate. The PC initial assessment and the treatment plan were inadequate and did not provide current clinical information sufficient to guide the patient's recovery and treatment. Treatment plan goals and interventions were carried forward from a recent MHCB admission and were not appropriate for EOP care or the patient's functioning. She was added to the treatment high-refuser list only two weeks after arrival, but EOP Mod status was not discussed in the subsequent IDTT meeting. Although she remained psychiatrically stable, there was no substantive treatment offered to address the patient's well documented distress tolerance and coping skills deficiencies that frequently impacted her functioning. The use of PRN chlorpromazine as the sole psychotropic medication was concerning and required review.

**Patient AA**

This 48-year-old transgender EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. She was provided diagnoses of unspecified depressive disorder and antisocial personality disorder. She was prescribed and partially adherent with fluoxetine. Hydroxyzine was prescribed PRN for anxiety, and she used this medication regularly during most of her EOP RHU stay. Through medical services, she was prescribed gender affirming hormone treatment. The patient's only additional medical condition was chronic hepatitis C infection. Within CDCR, she had previously received 3CMS, EOP, and MHCB care.

At MCSP, she was placed in EOP RHU care on November 5, 2024 and remained there through February 27, 2025.

The initial PC assessment was timely but incomplete and inadequate. It was provided at the cell front due to custody modified programming. Key elements of the assessment were missing, including the presenting problem, mental health history, and mental status. The remainder of the assessment was carried forward from previous entries and did not include recent information about the patient's functioning. The initial psychiatric assessment was timely. The patient refused a confidential setting and then refused to engage at the cell front. Given the patient's lack of cooperation, the assessment was adequate.

Three timely IDTT meetings occurred during the patient's EOP RHU care. The patient and most required staff attended the initial IDTT meeting, although no program supervisor or designee was present. The patient met criteria for a HLOC review due to three or more RVRs over the past three months. The rationale for retaining the patient in EOP care along with treatment modifications were adequately documented. The patient's self-reported treatment goal was to learn how to manage auditory hallucinations more effectively, but the treatment plan focused solely on anxiety as a treatment target. Treatment plan goals were inconsistent with the patient's stated goals and clinical diagnoses. Discharge criteria were not documented. The patient and most required staff attended the first routine IDTT meeting; an alternate for the assigned psychiatrist attended. IDTT documentation noted the patient had maintained excellent programming, stable mood, and absence of mental health difficulties since she was placed in RHU. Treatment goals and interventions remained unchanged. The second routine IDTT meeting was held in absentia due to the patient's refusal but attended by required staff. The treatment team noted that the patient was engaged in programming, had learned to express frustrations appropriately, and was awaiting release from RHU. The treatment plan remained unchanged, and there was no indication of her response to treatment or the effectiveness of the prescribed interventions.

Routine psychiatry contacts were offered in a confidential setting once every 30 to 45 days. The contacts were well documented. The patient denied adverse medication side effects and was medication adherent except for a brief period in early February 2025. At a routine contact on February 10, 2025, the psychiatrist noted the patient had refused fluoxetine for several days without explanation. The psychiatrist provided psychoeducation on the importance of medication adherence, and the patient said she would start taking it again. Weekly routine PC contacts were offered in confidential settings throughout the patient's stay in RHU. She frequently refused the confidential setting and received wellness checks at the cell front; during these encounters, the patient remained engaged with her PC. PC progress notes were brief, vague, and inadequate. They lacked clinical interventions or strategies to help the patient improve coping and distress tolerance skills. The patient was offered several clinically appropriate recreational therapy groups and had almost perfect group attendance until February 2025. At that time, she learned of a pending transfer and stopped attending groups. She was added to the treatment high-refuser list on February 10, 2025, but her sudden change in programming attendance was not addressed in the routine PC progress notes. This was particularly concerning because the patient had reported increased anxiety, stress, and frustration due to her upcoming transfer to a different facility when she was released from RHU.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Although psychiatric care and contacts were adequate and responsive to the patient's clinical needs, PC care, IDTT documentation, and treatment planning were deficient. The initial PC assessment, subsequent IDTT documentation, and treatment plans lacked updated clinical information about the patient's functioning. Excessive amounts of clinical data were carried forward inappropriately. There were notable discrepancies between the patient's diagnoses, reported and observed symptoms, treatment goals, and prescribed interventions. The treatment plan was not updated at each IDTT meeting to reflect changes in the patient's functioning. Her drastic decline in program adherence and increased distress in February 2025 were not adequately addressed in the IDTT meeting or PC contacts prior to her transfer.

**Patient BB**

This 48-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. He was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, unspecified schizophrenia, other specified depressive disorder, and opioid use disorder. He was prescribed and adherent with mirtazapine and paliperidone. Hydroxyzine and an additional dose of paliperidone were prescribed PRN for anxiety and auditory hallucinations; he used hydroxyzine frequently and PRN paliperidone rarely. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. Medical conditions included hypertension and a seizure disorder. He arrived at MCSP on December 18, 2024 from the CMC MHCB and was subsequently placed in the EOP RHU care on December 30, 2024. He remained in EOP RHU care through the end of the review period.

The initial PC assessment was timely, provided at the cell front due to the patient's refusal, and minimally adequate, given the patient's lack of participation and engagement. The patient woke up briefly to acknowledge the PC's presence and deny mental health symptoms, but otherwise he did not participate in the assessment. The initial psychiatric assessment was timely, confidential, and adequate. The initial IDTT meeting was timely and attended by the patient and required staff apart from an alternate for the assigned psychiatrist. The patient met one positive HLOC indicator for multiple MHCB referrals; rationale for retaining the patient in EOP care and treatment modifications were adequately documented. He was placed in the SRMP due to frequent MHCB admissions secondary to suicidal ideation or self-injurious behavior. An IPOC for impulsive behavior was initiated, and the treatment plan maintained a previous treatment goal to address his depression, poor sleep, and suicidal ideation using CBT techniques. Treatment planning was adequate at this IDTT meeting. The routine IDTT meeting was timely and attended by the patient and required staff. IDTT documentation appropriately noted that the patient was medication adherent, consistently demonstrated positive mood and affect, had no acute mental health crises or MHCB referrals since he was placed in RHU, and had adjusted well. However, the team failed to address the patient's refusals to leave his cell for programming activities or his treatment high-refuser status. No additional goals or strategies were provided to encourage better participation. Treatment planning was inadequate at this IDTT meeting.

The patient was offered one routine psychiatry encounter during the review period. It was timely and offered in a confidential setting, but the patient refused and was not in his cell when the psychiatrist attempted a follow-up at the cell front. The psychiatrist noted he was medication adherent and his single cell was clean and well organized. The medications were continued unchanged. Routine PC contacts were offered weekly and provided at the cell front because of repeated refusals. PC progress notes were brief, vague, and did not include any references to clinical interventions or treatment goals. The PC noted that the patient did not leave his cell for any programming activities. The patient was offered several clinically appropriate recreational groups but attended none. He was added to the treatment high-refuser list on January 27, 2025 and received daily high-refuser contacts, but these contacts were poorly documented with the same progress note carried forward. There was no documentation that the PC attempted to address the treatment refusals in any meaningful or therapeutic manner. PC care did not incorporate the treatment goals or interventions into routine contacts.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

Although psychiatric care was adequate and the patient appeared to respond well to psychotropic medications, poor treatment planning along with poor PC interventions and documentation deficiencies ultimately resulted in a finding of inadequate treatment. Although the initial treatment plan appeared appropriate for the patient's needs, he refused to leave his cell for clinical contacts and programming, and he was quickly added to the high-refuser list. No specific strategies or interventions were initiated to address treatment non-adherence aside from daily high-refuser contacts. These were poorly documented and clinically ineffective. Routine PC contacts, while timely and consistent, were akin to wellness checks and did not make any references to the clinical interventions prescribed in the treatment plan.

**Patient CC**

This 32-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. He was provided diagnoses of depression, PTSD, other or unknown substance-induced psychotic disorder, borderline and antisocial personality disorders, and alcohol, cannabis, amphetamine, and other hallucinogen use disorders, each of which was severe and in early remission. He was prescribed and adherent with buspirone, mirtazapine and oxcarbazepine. Buspirone and oxcarbazepine were originally prescribed PRN for anxiety, and he used both medications regularly before orders was converted from PRN to scheduled medications after three weeks of EOP RHU care. Fluoxetine was also prescribed PRN for anxiety at the time the patient was placed in EOP RHU. The PRN fluoxetine order was discontinued within one day of arrival, with a notation that prescribing fluoxetine as PRN medication was clinically inappropriate and the patient was not using it. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He did not have any pertinent or chronic medical conditions. With CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At MCSP, he was placed in EOP RHU care on November 24, 2024 and remained there until February 10, 2025, when he transferred to another facility.

The initial psychiatric assessment was timely, well documented, and adequate despite the patient's refusal of a confidential setting. The psychiatrist appropriately noted that there were no clinical indications for fluoxetine, buspirone, and oxcarbazepine to be prescribed PRN. As noted, fluoxetine was discontinued, and buspirone and oxcarbazepine were subsequently converted from PRN to scheduled medications. The initial PC assessment was timely, provided by telemental health, and adequate apart from an overly generalized case formulation focused more on criminal behavior than mental health symptoms. The clinical summary was updated appropriately and included the patient's clinical, psychosocial, legal and institutional histories. The initial IDTT meeting was timely and attended by the patient and required staff. The PC participated via telemental health. There were no positive HLOC indicators and the patient was not a participant in the SRMP. The clinical summary was carried forward from the PC initial assessment and remained appropriate. The treatment plan and discharge criteria were appropriately individualized and adequately documented.

Two routine IDTT meetings occurred while the patient was in EOP RHU care; both were timely and attended by the patient and required staff. During the first, the treatment team appropriately addressed a self-injurious incident, when the patient swallowed a battery and a coaxial cable and set his mattress on fire. He required transport to an outside hospital for surgical removal of the battery and had several mild burns on his hands. He was added to the SRMP, with specific CBT and dialectical behavior treatment interventions to address the patient's poor distress tolerance and self-injurious behavior. Unfortunately, these interventions were not incorporated into the treatment plan, and his treatment goals were not updated. No discharge criteria or retention rationale were provided. During the second routine IDTT meeting, the patient was no longer in the SRMP and had experienced no further incidents of self-injury or acute distress. However, he was participating in less than half of scheduled treatment and had been added to the treatment high-refuser list. The patient reported he did not attend groups because he found them boring; the PC opined that his high refusal rate was related to poor distress tolerance when bored. Treatment goals remained unchanged, but the patient's progress and response to treatment were updated appropriately. The treatment team appropriately retained the patient in EOP care as he continued to improve his coping skills and distress tolerance.

Routine psychiatry encounters were timely, well documented, and provided appropriate updates to the patient's clinical functioning and mental status. Although the patient was offered a confidential setting at each contact, the patient often refused, and most psychiatry contacts were provided at the cell front. Routine PC encounters were offered timely through telemental health in a confidential setting. The patient utilized the confidential setting on several occasions but generally refused and received contacts at the cell front. The patient consistently engaged and participated in these contacts. PC encounters contacts were well documented, indicated strong therapeutic rapport, included specific clinical interventions prescribed by the treatment plan, and noted the patient's positive responses to these interventions. However, the effectiveness of the interventions was limited by the cell-front nature of the contacts. The patient was offered several clinically appropriate recreational therapy groups but did not attend.

**Findings**

The treatment provided to this EOP RHU patient was adequate.

The patient received timely and well documented clinical assessments and routine contacts that incorporated the treatment goals and interventions prescribed in the treatment plans. He had good rapport with his providers and he engaged with them appropriately despite frequently refusing a confidential setting. IDTT documentation and treatment planning were adequate, despite deficiencies in one IDTT meeting. The patient's symptoms and presentation improved in response to the clinical interventions and medication adherence. He was appropriately added to the treatment high-refuser list when his group attendance declined.

**Patient DD**

This 74-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided in the RHU at MCSP. He was provided a diagnosis of major depressive disorder, recurrent, severe. He was prescribed and adherent with paroxetine. Medical conditions included hypertension, hypothyroidism, liver cirrhosis, osteopenia, and thyroid nodules. With CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At MCSP, he was placed in EOP RHU care on December 23, 2024 and remained there until he transferred to another facility on February 11, 2025.

The initial PC assessment was timely but inadequate. It occurred at the cell front after he refused a confidential setting. The assessment was incomplete, and most the document was blank aside from information that was automatically pulled forward from prior records. The case formulation was not updated, cursory, and inadequate to guide treatment. The assessment did not document the patient's functioning or symptoms and did not provide helpful information to inform treatment planning. The initial psychiatric assessment was also timely and occurred at the cell front due to the patient's refusal, but unlike the PC assessment, was well documented, adequate, and provided the patient's clinical history and updated mental status.

The patient's initial IDTT was timely and attended by the patient and required staff attended, apart from an alternate for the assigned psychiatrist. The patient met criteria for a HLOC review due to low treatment participation. The patient reported that he did not feel safe leaving his cell and was not interested in the group topics offered. The PC opined the refusals were likely due to a combination of anxiety and depressive symptoms, which was consistent with his diagnosis. Retention rationale and treatment modifications were adequately documented. The case formulation was not updated and remained inadequate. The treatment team initiated IPOCs for depressed mood and anxiety but included no interventions or treatment goals; the treatment plan itself was left blank. Discharge criteria were also absent. He was transferred to another facility before a routine IDTT meeting was due.

The patient received one routine psychiatry encounter. This contact was timely but limited because the patient refused a confidential setting. The patient did not get out of bed when prompted and did not engage in conversation but provided a thumbs up and went back to sleep. He did not appear to be in acute distress, his cell was clean, and he was medication adherent. The psychiatrist continued his medications unchanged. The patient was offered routine PC contacts in a confidential setting every seven to ten days. He refused confidential settings, and all routine contacts were provided at the cell front. The patient often declined to speak with PCs aside from reporting that he was stable and did not need anything. He was offered several clinically appropriate recreational therapy groups but did not attend any. He began receiving daily high-

refuser contacts on January 13, 2025. Each daily high-refuser contact note was carried forward from the previous note, and none of these notes included individualized strategies or interventions to encourage treatment participation.

**Findings**

The treatment provided to this EOP RHU patient was inadequate.

The initial PC assessment was inadequate, poorly documented, and did not provide substantive clinical data or information that would inform treatment planning. The initial IDTT meeting did not produce an adequate treatment plan. Clinically appropriate, individualized treatment goals and interventions were not developed to manage the patient's depressive symptoms and improve his functioning. Although he was added to the treatment high-refuser list, there were no interventions or treatment goals to improve treatment participation or address his reluctance to engage with his providers.

**APPENDIX B-20**
**North Kern State Prison (NKSP)**
**Reporting Period: December 1, 2024 – May 31, 2025**

**Patient A**

This 37-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility A and diagnosed with an adjustment disorder with mixed anxiety and depressed mood. He was briefly prescribed hydroxyzine and was adherent with this medication until it was discontinued. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included obesity, neutropenia, gastroesophageal reflux disease, and mild persistent asthma. Within CDCR, the patient was first placed in 3CMS care on January 15, 2025 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on January 27, 2025 and remained there through the end of the review period.

The initial PC assessment was completed late, 22 days after the patient arrived in 3CMS care at NKSP. Apart from the case formulation, content was adequate. The initial psychiatric assessment was also late, completed through telehealth 25 days after the patient's arrival, but also adequate in content. Neither the PC nor the psychiatrist who completed these assessments were assigned to the patient. Between the patient's arrival at NKSP and the initial psychiatric assessment, the order for hydroxyzine was permitted to expire without documentation or patient contact. The initial IDTT meeting was late, held 29 days after the patient was transferred to mainline 3CMS care at NKSP. Alternates for the assigned PC and assigned psychiatrist, along with a correctional counselor who may or may not have been assigned to the patient, attended; the patient refused to attend. He was not found to meet criteria for consideration of a higher level of care. The case formulation was underdeveloped and generic. A treatment plan from another facility was adopted without modification and included the provision of group therapy, which was not available to 3CMS patients at NKSP at any time during the review period. However, patient verbalized treatment goals and rationale for retention in 3CMS care were adequately documented. During the review period, the patient was seen once for an individual PC encounter. This encounter was confidential but provided by an alternate to the assigned clinician, and there was no documentation of interventions required by the treatment plan. Although the initial psychiatric assessment indicated a plan for psychiatry to see the patient in 90 days, as of July 22, 2025, no psychiatric encounters had been documented since the February 21, 2025 assessment.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial assessments and IDTT meetings were late, completed by non-assigned staff, and did not result in adequate case conceptualization or treatment planning. Medication prescribed for anxiety was permitted to expire without explanation or concurrent evaluation of the patient. The treatment plan was adopted from another facility without any modification and included interventions that were not available at NKSP. Following the IDTT meeting, there was no

documentation of evidence-based interventions, and planned psychiatric follow-up was not provided. Meaningful treatment of the patient's adjustment disorder was not evident.

**Patient B**

This 45-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility M and diagnosed with posttraumatic stress disorder, unspecified depressive disorder, and several substance use disorders. He was prescribed escitalopram, hydroxyzine, mirtazapine, and olanzapine, and was adherent with escitalopram and mirtazapine but not hydroxyzine or olanzapine, which were discontinued as a result. Although no suicide attempts or self-injurious behaviors were listed in the health record, assessments noted a history of six prior suicide attempts by self-strangulation. Medical conditions included prediabetes, hyperlipidemia, a seizure disorder, and a spinal injury from military trauma that required surgical intervention. Within CDCR, the patient was first placed in 3CMS care on October 4, 2024 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on December 11, 2024 and remained there through the end of the review period.

The initial PC and psychiatric assessments were both completed late, 49 days after the patient arrived in 3CMS care at NKSP, and neither assessment indicated whether it was confidential. The PC assessment failed to provide a case formulation or working diagnosis and described the patient as an "other male" without explanation. The initial psychiatric assessment was adequate in content and indicated that a psychiatric follow-up would occur within four weeks. The initial IDTT meeting occurred 50 days after arrival and was attended by the patient, assigned psychiatrist, an alternate for the PC, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for consideration of a higher level of care. The type of IDTT meeting, patient strengths, verbalized treatment goals, and 3CMS retention rationale were poorly documented or not documented, and no treatment plan was developed. After the initial psychiatric assessment, the next psychiatric encounter occurred not four weeks but more than two months later. This encounter occurred by telehealth, was confidential apart from the telepresenter, and was documented adequately. Primary clinician follow-ups were timely and confidential but not provided by the same clinicians. Provision of evidence-based care was documented in one but not the other of these encounters. The patient was also evaluated and found eligible for placement in the male community reentry program.

**Findings**

The care provided to this 3CMS patient was inadequate.

Initial assessments and the initial IDTT meeting were delayed, and neither a case formulation nor a treatment plan were developed. The direction and goals of treatment were unclear. Continuity of PC care was poor, and psychiatric follow-up did not occur at the planned interval. Tardiness aside, psychiatric care and documentation appeared adequate. However, there was little evidence of non-pharmacological treatment of the patient's posttraumatic and depressive symptoms.

**Patient C**

This 59-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility A and diagnosed with an unspecified mood disorder and alcohol and cocaine use disorders, in a controlled environment. For about a month, he was prescribed olanzapine on a PRN basis for agitation, but he never took this medication, and no other psychotropic medications were prescribed. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included hypertension benign prostatic hyperplasia, alcohol and cocaine use disorders, back pain, rear of right rotator cuff and right meniscus, and prediabetes. Within CDCR, the patient was first placed in 3CMS care on November 5, 2024 at NKSP, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on January 17, 2025 and remained there through the end of the review period.

A PC clinical summary and case formulation update was completed late, 26 days after patient placement in mainline 3CMS care, by a non-assigned PC. While it referred to the patient's history of diagnoses, it did not provide an updated working diagnosis and included only a vague and generic case formulation. No initial psychiatric assessment was documented, but a psychiatric progress note was developed several hours after the initial IDTT meeting was held and resulted in a change of diagnoses and discontinuation of the PRN olanzapine. The initial IDTT meeting occurred 32 days after the patient's placement and was attended by the patient and alternates for the assigned PC and assigned psychiatrist; no correctional counselor was documented as present. The patient was not found to meet criteria for consideration of a higher level of care. Patient strengths, verbalized treatment goals, and 3CMS retention criteria were poorly documented, and no treatment plan was formulated. An alternate psychiatrist followed the patient quarterly and referred the patient to individual and group psychotherapy. An alternate for the assigned PC followed the patient timely and confidentially during the review period, but the documentation failed to include meaningful treatment beyond mental status examination. Although the patient reported that he sometimes experienced auditory hallucinations and rated his depression as a 7 on a 0 to 10 scale, the clinician concluded that the patient was not in psychological distress.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial assessments and IDTT meeting occurred late and did not result in a meaningful case formulation. No correctional counselor attended the IDTT meeting. No treatment plan was developed, and the direction and goals of treatment were not specified. Neither the assigned PC nor the assigned psychiatrist saw the patient during the review period. While the psychiatrist concluded that that the patient's refusal of psychotropic medications was reasonable, individual and group therapy were recommended but not provided. It was unclear whether any therapeutic rapport was established or how the patient's symptoms were being treated.

**Patient D**

This 48-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility A and diagnosed with unspecified schizophrenia and psychotic disorder. He was not prescribed any psychotropic medications. No suicide attempts, self-injurious behaviors, or medical conditions were listed in the health record. Within CDCR, the patient was first placed in 3CMS care on January 15, 2025 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on January 22, 2025 and remained there through the end of the review period.

A clinical summary and case formulation update were completed late, 27 days after the patient's arrival, by a non-assigned PC. Due to the patient's reluctance to participate, results were sparse, although a history of incoherent and delusional speech was noted in the record. A case formulation was not developed. The initial psychiatric assessment was also late, completed 30 days after the patient's arrival, by a non-assigned psychiatrist. The assessment was completed by telehealth, confidential apart from the telepresenter, and adequate. The initial IDTT meeting occurred in absentia 34 days after the patient's placement. Alternates for the assigned PC and assigned psychiatrist, and a correctional counselor who may or may not have been assigned to the patient, attended. The patient was not found to meet criteria for consideration of a higher level of care. Patient strengths, verbalized treatment goals, and 3CMS discharge criteria were minimally documented. The treatment plan identified delusional thinking as the target symptom and individual therapy as the sole intervention. The plan was copied over from one developed at another facility, without modification, and there was no clear explanation in the IDTT documentation why the patient was considered delusional. Although the initial psychiatric assessment indicated that the patient should be reevaluated by psychiatry within 30 days, a psychiatrist did not see the patient for more than four months, after the monitoring period ended. A non-assigned PC saw the patient timely and confidentially. Both the psychiatric and the PC follow-up encounters documented possible but not definite symptoms of thought disorder, and the patient was considered to be functioning well without medication.

**Findings**

The care provided to this 3CMS patient was inadequate.

In addition to the significant delays in completing the initial assessments and IDTT meeting, psychiatric follow-up encounters did not take place as planned and clinically indicated. The patient, who was documented as desiring to avoid mental health services due to prison politics, was not adequately assessed for an underlying psychotic or mood disturbance, and the contrast between the patient's ongoing denial of symptoms and prior documentation of delusional thinking was not resolved. Appropriately, the patient was retained in 3CMS care for further evaluation and monitoring, but that evaluation and monitoring was too infrequent and too limited to identify the patient's treatment needs. Neither the assigned PC nor the assigned psychiatrist saw the patient during the review period,

**Patient E**

This 26-year-old, Spanish speaking, 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility M and had been previously diagnosed with an adjustment disorder in a reception center; his diagnosis while in mainline 3CMS care at NKSP was not documented. He was not prescribed any psychotropic medications. No suicide attempts, self-injurious behaviors, or medical conditions were listed in the health record. Within CDCR, the patient was first placed in 3CMS care on October 20, 2024 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on December 12, 2024 and officially remained in 3CMS care until April 22, 2025. He was then returned to general population status at NKSP, where he remained through the end of the review period.

The initial PC assessment was completed late, 48 days after the patient arrived in mainline 3CMS care. The assessment noted that the patient had been placed in 3CMS care due to a history of receiving melatonin in county jail for insomnia. The patient refused to participate in the assessment, and the clinician noted that the information in the assessment was limited and needed to be reviewed and updated. An updated case formulation and working diagnosis were not developed. No initial psychiatric assessment was completed. The initial IDTT meeting was held late, 50 days after the patient's arrival, and held in absentia due to the patient's refusal. The meeting was attended by the assigned psychiatrist – who had not previously met the patient – an alternate for the assigned PC, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for consideration of a higher level of care. Patient strengths were minimally documented, but no verbalized treatment goals and no treatment plan were developed. The treatment team agreed to remove the patient from MHSDS. Although OnDemand data indicated that the patient was not removed from 3CMS care until April 22, 2025, no further mental health encounters occurred following the January 30, 2025 IDTT meeting.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial PC assessment and IDTT meeting were significantly delayed, and no psychiatric assessment was completed despite a history of receiving melatonin in county jail. The nature of the patient's history of insomnia and refusal of mental health services within the CDCR were not adequately assessed, and the patient was discontinued from 3CMS care after refusing to participate in his PC assessment and in his IDTT meeting. The psychiatrist had no contact with the patient prior to the patient's removal from MHSDS, and the PC's assessment was limited in scope, depth, and detail. After a provisional diagnosis of adjustment disorder was made, more thorough observation and assessment were needed prior to discontinuation of services, particularly in a patient serving his first state sentence. Formal discontinuation of MHSDS services did not take place for nearly three months following the IDTT meeting at which it was determined that the patient did not require mental health services.

**Patient F**

This 29-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility M and diagnosed with unspecified depressive disorder. He was not prescribed any psychotropic medications. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included hepatitis C and methamphetamine use disorder. Within CDCR, the patient was first placed in 3CMS care on October 10, 2024 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on December 11, 2024 and remained there through the end of the review period.

The initial PC assessment was completed late, 47 days after the patient's arrival in mainline 3CMS care. Recent treatment with fluphenazine was noted, and provisional diagnoses of unspecified depressive disorder and methamphetamine use disorder were offered. The case formulation was generic and underdeveloped. The initial IDTT meeting was also held late, 50 days after the patient's arrival and prior to completion of a psychiatric assessment, and the patient refused to attend. The assigned PC and assigned psychiatrist participated in the meeting, but no correctional counselor was documented as attending. The patient was not found to meet criteria for consideration of a higher level of care. Patient strengths were not documented, and no treatment plan was developed. A non-assigned psychiatrist completed the initial psychiatric assessment the day following the IDTT meeting; the psychiatric assessment relied extensively on information pulled from earlier assessments and concluded that the patient had an unclear psychiatric history, presented without a chief complaint, and should be followed by psychiatry in 90 days. A non-assigned PC attempted to see the patient for a timely follow-up, but the patient refused at the office door, explaining that he was being released too soon to start therapy. A psychiatric appointment was not offered until 139 days after the assessing psychiatrist indicated that the patient should be seen within 90 days; the patient also refused this encounter.

**Findings**

The care provided to this 3CMS patient was inadequate.

Initial assessments and the IDTT meeting were delayed, and the initial psychiatric assessment occurred after the initial IDTT meeting. No correctional counselor participated in this meeting. The case formulation was inadequate to guide treatment, and no treatment plan was developed. The nature of the patient's unspecified depression, historical indications for his prior use of antipsychotic medication, and the patient's reluctance to participate in mental health services were inadequately explored. The patient was not followed by psychiatry as planned.

**Patient G**

This 30-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility M and diagnosed with an unspecified anxiety disorder. He was prescribed mirtazapine but was nonadherent with this medication, and it was discontinued as a result. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and generally adherent with this medication. One

episode of non-suicidal self-injurious behavior was listed in the health record; it occurred while he received mainline 3CMS care at NKSP and involved a suspected drug overdose. Medical conditions included a history of hepatitis C. Within CDCR, the patient was first placed in 3CMS care on September 26, 2024 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on December 6, 2024 and remained in 3CMS care through the end of the review period except for one day on MHCB status following a suspected drug overdose.

After arriving in mainline 3CMS care at NKSP, no mental health encounters occurred for more than one month, until the patient was placed in alternative housing on MHCB status following a suspected drug overdose and emergency room evaluation on January 11, 2025. The patient denied substance use and reported that he had suffered a seizure. The following day, the MCHB referral was rescinded. An accompanying suicide risk evaluation found the patient at low risk. The ensuing safety plan was inadequate and consisted of three sentences that were repeated in different sections of the plan. Five-day follow-ups occurred as required, but documentation was nearly identical across several of these notes. The initial PC assessment was completed late, 47 days after the patient arrived in mainline EOP care and 11 days following the suspected drug overdose. The patient refused to participate in this assessment, and content was limited. The mental status examination was incomplete, and an updated case formulation was not developed. The initial IDTT meeting was also late, occurring 48 days after the patient's placement in mainline 3CMS care and without the benefit of an initial psychiatric assessment. It was held in absentia due to the patient's refusal, and attended by the assigned psychiatrist, an alternate for the assigned PC, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation was not updated and did not address anxiety. No treatment plan was developed. The patient was retained in 3CMS care. The initial psychiatric assessment was completed by a non-assigned telepsychiatrist 36 days after the initial IDTT and 84 days after the patient's arrival in mainline 3CMS care. The assessment was confidential apart from the telepresenter and resulted in diagnoses of adjustment disorder with mixed anxiety and depression, and polysubstance use [sic]. Mirtazapine was discontinued at the patient's request, and the psychiatrist documented a plan for the patient to be seen again in 30 days. Instead, the patient was next seen by another non-assigned telepsychiatrist 84 days later. The psychiatric progress note for this encounter included much language that was copied directly from the initial assessment, including identical assessments and plans. Following the IDTT meeting, the patient was seen by a non-assigned PC twice during the review period, once for a follow-up suicide risk evaluation and once for a routine 90-day encounter. The follow-up suicide risk evaluation found the patient at low risk and not in need of a safety plan; the progress note for the routine encounter did not indicate whether the encounter was confidential and was consistent with a wellness check, with no indication that active interventions were provided.

**Findings**

The care provided to this 3CMS patient was inadequate.

After placement in mainline 3CMS care at NKSP, the patient was not seen by mental health staff for more than one month, and even then, was seen only because of a suspected overdose followed by placement in alternate housing on MHCB status. Because the patient denied any substance use

or overdose, the nature of the overdose and whether he was also denying actual suicidal intent remained unclear. Although a suicide risk evaluation was completed timely following the incident, this evaluation did not have the benefit of current initial primary care and psychiatric assessments, and the finding of low risk was based largely on the patient's denial of suicidality. The safety plan was entirely inadequate, and based on the language it contained, it appeared the clinician completing it did not feel a safety plan was needed. The initial assessments and initial IDTT meeting were completed late and more than ten days after the suspected overdose; the psychiatric assessment was completed after the initial IDTT meeting. No treatment plan or updated case formulation were developed, and treatment goals were unclear. The patient's substance use and disengagement with mental health treatment were inadequately assessed, and the patient was not seen by his assigned PC or assigned psychiatrist during the review period. The plan for follow-up psychiatric care 30 days following the initial psychiatric assessment was not completed.

**Patient H**

This 30-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility M and diagnosed with unspecified anxiety disorder and opioid use disorder. He was prescribed hydroxyzine and mirtazapine and adherent with these medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and adherent with this medication most of the time. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included opioid use disorder and a history of a gunshot wound to the left leg. Within CDCR, the patient was first placed in 3CMS care on October 10, 2024 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on December 11, 2025 and remained there through the end of the review period.

The initial PC assessment was completed late, 50 days after the patient's arrival in mainline 3CMS care, by the assigned clinician. Apart from an underdeveloped, single-sentence, case formulation, the assessment content was adequate. The initial psychiatric assessment was completed late, 56 days after the patient's arrival, by the assigned psychiatrist. It did not indicate whether the encounter was confidential and was minimal but adequate; it included a plan for the patient to be seen in four weeks. The initial IDTT meeting was also completed late, 57 days after the patient's arrival, and in absentia due to the patient's refusal. The assigned psychiatrist, assigned PC, and a correctional counselor who may or may not have been assigned attended. The patient was not found to meet criteria for consideration of a higher level of care. Patient strengths were not documented, and his verbalized treatment goals and criteria for retention in 3CMS care were minimally documented. No treatment plan was developed. Following the initial psychiatric assessment, the patient was next seen not four weeks but rather 12 weeks later by a covering telepsychiatrist; the appointment was confidential apart from the telepresenter, and the psychiatric progress note was adequate. An alternate PC offered a routine follow-up encounter 97 days after the initial PC assessment. The patient refused the encounter, and only a brief progress note was entered.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial assessments and IDTT meeting were delayed and did not result in an adequate case formulation or any treatment plan. Goals of 3CMS care were not specified. The patient was not seen timely for the planned psychiatric follow-up, and the PC follow-up was late and provided by a non-assigned clinician. Apart from psychotropic medication, the patient did not receive meaningful interventions for his anxiety disorder.

**Patient I**

This 23-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility A and diagnosed with unspecified depressive disorder, adjustment disorder with anxiety mood, cannabis and opioid use disorders in a controlled environment, and bereavement. He was prescribed mirtazapine but was nonadherent with this medication, which was discontinued as a result. Hydroxyzine was ordered on a PRN basis, but the patient used this medication infrequently, and it was also discontinued as a result. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder, and he was partially adherent with this medication. One episode of non-suicidal self-injurious behavior was listed in the health record; it involved a suspected drug overdose with naloxone rescue and occurred during the review period while the patient was receiving mainline 3CMS care at NKSP. Medical conditions included opioid use disorder and a history of an appendectomy. Within CDCR, the patient was first placed in 3CMS care in 2023 at another facility, and he had no prior history of CDCR mental health services. He was transferred to mainline 3CMS care at NKSP on January 3, 2025 and remained there through the end of the review period, except for a single day on RHU status due to being the victim of a battery.

A non-assigned psychiatrist completed the initial psychiatric assessment late, 18 days after the patient's placement in mainline 3CMS care. The assessment was brief but adequate, although it did not indicate whether the encounter was confidential. PRN hydroxyzine was discontinued, and mirtazapine was initiated on an off-label basis to treat anxiety; the psychiatrist documented a plan to have the patient seen again in four weeks. The initial PC assessment was completed by a non-assigned clinician 19 days after the patient's placement in mainline 3CMS care. Assessment content was cursory but documented unremitting depression and acute anxiety. The patient's mood and anxiety symptoms as well as his interpersonal challenges were inadequately explored. The case formulation consisted of a single sentence describing the patient as displaying maladaptive behavior that might keep him in prison. The initial IDTT meeting was held late, 25 days after the patient's placement in mainline 3CMS care, and in absentia due to the patient's refusal. Alternates for the assigned PC and assigned psychiatrist attended, along with a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for a higher level of care. Patient strengths, verbalized treatment goals, and 3CMS retention rationale were minimally documented, and no treatment plan was developed. Three days later, the patient was found non-responsive in his cell. Naloxone was administered, he regained consciousness, began actively vomiting, and was sent out by ambulance to the emergency room. There he declined treatment and signed himself out against medical advice. Upon return to the facility, an

emergent psychiatric consultation was completed over the telephone with no face-to-face contact, and the patient was permitted to return to regular housing with a routine PC consult ordered. A non-assigned clinician completed the consultation less than two days later and provided adequate documentation of the encounter and the patient's condition. A plan for supportive therapy to continue in two weeks was documented. The following day, the patient was placed in RHU due to being a victim of a battery; he was removed from RHU status after one day. The patient was next seen in mainline 3CMS care four weeks after the routine mental health consult; this encounter was non-confidential and conducted by a non-assigned clinician. A second PC encounter occurred two weeks later, in a confidential setting. Neither encounter documented the provision of evidence-based interventions, and in the second encounter the patient reported that he did not want mental health care. He was seen once by a non-assigned telepsychiatrist for a follow-up appointment. This encounter occurred 95 days rather than four weeks after the initial psychiatric assessment and resulted in discontinuation of mirtazapine at the patient's request. The psychiatric progress note relied heavily on prior documentation and provided little current or new information.

**Findings**

The care provided to this 3CMS patient was inadequate.

Initial assessments and the IDTT meeting occurred late and did not result in a clear case formulation. No treatment plan was developed. The patient's reports of unremitting depression and acute anxiety were inadequately explored. Follow-up encounters did not occur as planned for either psychiatry or the PC; instead, much longer periods of time lapsed before the patient was seen. While these intervals between care appointments met minimum program guide requirements, they were much longer than clinically indicated as assessed by the treating professionals. Primary clinician encounters did not reflect provision of evidence-based care, and the patient did not see the assigned PC or the assigned psychiatrist at any time during the review period. In the context of high anxiety and unremitting depression, the suspected drug overdose required additional mental health investigation, and a full suicide risk evaluation should have been considered.

**Patient J**

This 31-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at NKSP. He was housed in Facility A and diagnosed with an unspecified adjustment disorder and cannabis use disorder, severe. He was not prescribed any psychotropic medications. Two episodes of self-injurious behavior, both in December 2024 while in the reception center at NKSP, and both involving suspected drug overdose, were listed in the health record. He was briefly placed in MHCB status following the first overdose; this was his only MHCB placement. A history of being stabbed six times in 2017 and shot once in 2022, with no subsequent medical conditions, was documented. Within CDCR, the patient was first placed in 3CMS care in 2021 during an earlier incarceration, and, apart from his December 2024 MHCB placement, he was either in 3CMS care or general population status while in the CDCR. During his current sentence, he was placed in 3CMS care on December 2, 2024, while in the reception center, and he transferred to mainline 3CMS care at NKSP on January 10, 2025. He remained in

3CMS care only until February 4, 2025, when he was discontinued from mental health services. He was released from custody on April 15, 2025.

A non-assigned clinician completed the initial PC assessment 18 days after the patient's placement in mainline 3CMS care. The patient declined to participate, and the assessment was limited and based on record reviews. An updated case formulation was not developed, and the prior case formulation that was pulled forward was not specific to the patient or adequate to identify specific mental health problems. Prior diagnoses of an unspecified adjustment disorder and cannabis use disorder, severe, were pulled forward, and it was recommended that the patient remain in 3CMS care. No initial psychiatric assessment was completed. The initial IDTT meeting was held late, 25 days after the patient's placement in mainline 3CMS care. The patient, alternates for the assigned psychiatrist and assigned PC, and a correctional counselor who may or may not have been assigned to the patient attended. The patient was not found to meet criteria for consideration of a higher level of care. It was determined to discharge the patient from 3CMS care to general population status, and no treatment plan was developed. Although the rationale for MHSDS discontinuation was documented, consideration of the patient's recent drug overdoses and their potential implications for his mental health and safety was not documented. A subsequent suicide risk evaluation, completed by a non-assigned clinician as a 90-day follow-up for the patient's December 2024 MHCB placement, found the patient at low risk. The accompanying safety plan was minimally adequate, but by that time the patient had been discontinued from mental health services. The patient was not seen by his assigned psychiatrist or assigned PC while in mainline 3CMS care.

**Findings**

The care provided to this 3CMS patient was inadequate.

Initial assessments were either late or missing, and the IDTT meeting was also held late. The patient was discontinued from mental health services after refusing to participate in an initial PC assessment, not being offered an initial psychiatric assessment, and engaging in illicit substance use resulting in two overdoses, one of which required MHCB care. At the time of MHSDS discharge, the patient had been in 3CMS care for less than two months. The patient's potential treatment needs were not adequately assessed considering this history. Although the clinician who completed the initial assessment and IDTT documentation recommended that the patient be retained in 3CMS care, the team nevertheless acceded to the patient's request to be discharged. They did so without adequate consideration of the risks involved. However, completion of the 90-day suicide risk evaluation after the patient had been discharged from MHSDS care as a strength in this patient's care.

**Patient K**

This 32-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of the treatment provided at NKSP. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood and bipolar disorder. He was prescribed Vraylar.

The patient was admitted to the MHCB from the reception center due to suicidal ideation with a plan to hang himself; he was housed in the MHCB from March 8, 2025 to March 17, 2025.

The initial provider assessments included relevant clinical information to assist with treatment planning for this patient with a history of depression and several suicide attempts. Original documentation of psychosocial and mental health history was included. The psychiatric documentation noted the patient's elevated anxiety, depression, and suicidal ideation that was triggered by fears that he would be murdered by peers for drug debt; therefore, he preferred taking his own life. The MHCB sergeant was made aware of the patient's safety concerns. While he denied current suicidal ideation to the psychiatrist, suicidal ideation was not clearly assessed by the primary clinician.

The patient and covering providers attended the IDTT meeting. Despite a narrow clinical summary that solely focused on the patient's current clinical presentation; treatment goals appropriately targeted suicidal ideation, depression, and anxiety. The treatment goals were objective and measurable with evidence-based interventions that included CBT and dialectical behavior therapy; however, those interventions were not utilized during daily contacts. The treatment provided during daily clinician contacts was individualized and therapeutic with variable use of interventions.

The patient's mood, sleep, appetite, and stress management improved. After sufficient stabilization, he was discharged to the EOP level of care for continued treatment to address anxiety, depression, and distress tolerance. The status of his safety concerns was not documented in the healthcare record; and for reasons that were unclear, safety concerns were not included in the safety plan.

The patient was assessed with low suicide risk at the time of the MHCB discharge. The clinical justification was individualized and thorough with a heavy emphasis on protective factors. The safety plan was reasonable. The discharge summary provided a useful summary of treatment needs; however, the course of treatment was not documented.

**Findings**

The treatment provided to this patient was adequate.

The patient stabilized and improved with the change in environment, medication management, and therapeutic engagement. Treatment planning would have been improved with a goal for substance use and documentation regarding the outcome of the patient's safety concerns. The suicide risk assessment rationale documentation would have been improved with integration of risk factors. Diagnostic clarification with clinical rationale was also needed.

**Patient L**

This 36-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of the treatment provided at NKSP. The patient was provided diagnoses of ADHD, generalized anxiety disorder, and unspecified mood disorder. He was prescribed Depakene, Remeron, BuSpar, and Vistaril.

The patient arrived at CDCR on April 30, 2025, and was admitted to the MHCB from the 3CMS level of care on May 31, 2025 due to suicidal ideation, head banging, and anxiety.

The initial provider assessments included sufficient current and historical clinical information to assist in treatment planning. The providers considered the impact of illicit substances on the patient's clinical presentation while also considering a differential diagnosis of a mood disorder; however, a toxicology screen was not ordered to assist in diagnostic clarification.

The IDTT meetings were attended by the patient, the assigned psychiatrist, and a covering clinician. The IDTT determined that the patient did not meet the criteria for higher level of care consideration. The sole treatment goal targeted anxiety. Appropriate clinical interventions were established and were utilized during PC contacts. No treatment goals were documented for the identified symptoms of suicidal ideation and depression.

The patient's suicidal ideation continued for the first few days of MHCB placement and then remitted. His elevated anxiety and restlessness improved, coping skills were reviewed, and medication adjustments occurred. As the patient's symptoms improved, he requested discharge which occurred after stabilization. The patient was assessed with low suicide risk, and a reasonable justification was provided. The safety plan was reasonable and would have been improved with further assessment of the patient's warning signs for self-harm. The patient was discharged to the 3CMS level of care.

**Findings**

The treatment provided to this patient was adequate.

The patient was appropriately assessed and monitored during the MHCB stay. With treatment his symptoms improved, and he stabilized. A toxicology screen at the time of MHCB admission would have been helpful for diagnostic clarification, and treatment planning needed improvement.

**Patient M**

This 54-year-old transgender MHCB patient's healthcare record was reviewed to assess the adequacy of the treatment provided at NKSP. The patient was provided a diagnosis of unspecified mood disorder. She was prescribed BuSpar. The patient was classified as DD1.

The patient was treated in the MHCB between April 14, 2025 and April 23, 2025. She was admitted to the MHCB from the EOP after multiple days of agitated behavior and poor reality testing. She was assessed as a danger to others with a serious impairment due to a mental illness. That behavior persisted during the first few days in the MHCB. She denied mental health symptoms, denied the need for MHCB treatment, and presented with loud, hyperverbal speech and agitation. The psychiatrist documented consideration of evaluation for paranoia and tardive dyskinesia, but no further assessment was documented. The patient made several PREA allegations, expressed enemy concerns, and attributed the MCHB placement to peers' drug use. Those concerns were conveyed to custody, but the outcome was not documented.

The initial provider assessments included the patient's current clinical presentation and reason for referral; however, historical information to assist in case conceptualization and treatment planning was not documented.

The patient, assigned psychiatrist, and a covering PC attended the initial IDTT meeting. The IDTT documentation erroneously indicated that the patient did not meet the criteria for higher level of care referral consideration; however, the patient had three recent MHCB placements as well as an increase in level of care from 3CMS. The case formulation was not aligned with the patient's clinical presentation. A treatment goal from one month prior that targeted substance abuse was continued despite no clear indication that substance use contributed to her current clinical presentation. A goal from the prior MHCB placement that targeted hostility and aggression was continued. Newly established goals targeted homicidal ideation.

The patient's acute symptoms improved and resolved. She was discharged to EOP at the sending institution where she consistently stated that she could not return to without preparation. Four days after the MHCB discharge, the patient was readmitted to a different MHCB and was subsequently transferred to acute and then intermediate care where she currently remained at the time of review in November 2025.

**Findings**

The treatment provided to this patient was inadequate.

The treatment team failed to conduct a comprehensive assessment including healthcare record review and consultation with prior providers to assess the origin of the patient's symptoms and functioning that led to multiple MHCB placements. There was, instead, an overreliance on the patient's self-report and denial of symptoms. At the time of MHCB admission, her clinical presentation warranted further assessment to determine whether her symptoms were due to substance use or psychiatric decompensation; however, that assessment was not completed. The patient was not adequately prepared in the MHCB with the tools and strategies needed for discharge to the sending institution.

**Patient N**

This 64-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of the treatment provided at NKSP. The patient was provided diagnoses of adjustment disorders with mixed anxiety and depressed mood, adult antisocial behavior, delusional disorder, and memory impairment. He was not prescribed psychotropic medication.

The patient was treated at the MHCB from March 26, 2025 to April 2, 2025, and he was admitted due to suicidal ideation. At the time of the referral, he presented with cognitive deficits, poor insight, and paranoia.

The initial provider assessments documented the patient's current clinical presentation as disorganized with tangentiality, loose associations, and possible psychosis. Standard historical information was documented; however, neither provider summarized the patient's four MHCB placements that occurred in the preceding six weeks. That was particularly noteworthy, as the patient had not received inpatient treatment since an intermediate care discharge in 2020. The patient declined psychotropic medication treatment, and the psychiatric documentation noted consideration of a PC 2602 order, but no further psychiatric follow-up was documented.

The assigned providers and the patient attended the initial IDTT meeting. The IDTT noted that the patient met the criterion for a higher level of care consideration due to multiple MHCB admissions. The nonreferral rationale and treatment modifications were not sufficiently individualized. The clinical summary focused on the patient's clinical presentation during the meeting and opined that the patient was not psychotic but rather that his primary diagnosis was of a severe personality disorder. That opinion was discrepant with the reason for MHCB referral, the patient's recent clinical presentation, and psychiatric documentation from the same day that provided diagnoses of unspecified mood disorder, anxiety, antisocial personality disorder, and consideration of bipolar and psychotic disorders. The patient was retained in the MHCB for monitoring and assessment with a recommendation for early discharge due to his belief that he did not have a mental illness and was not suicidal. Previous treatment goals for suicidal ideation and treatment nonadherence were continued.

The patient declined most mental health daily contacts and was uncooperative with staff attempts at engagement. Relatedly, during his MHCB stay, there was also documentation of refusals of showers, recreational therapy, vital signs, and nursing mental health assessments.

The provider daily contact documentation was variable. Of concern, on March 29, 2025, no collateral or objective observations of the patient's functioning were documented. On the following day, the documentation described him as off topic, disorganized, and delusional with poor hygiene. In response to the patient's ongoing request for higher level of care placement, the clinician encouraged engagement during daily contacts which the patient appeared to understand; however, he continued to refuse engagement at subsequent contacts.

Despite a lack of engagement or sufficient assessment of his mental status, the patient was discharged to the EOP level of care. He was assessed with low suicide risk at the time of discharge. The discharge suicide risk assessment documented that the patient stated that he was suicidal to facilitate transfer to CHCF; however, the documentation also stated that the patient denied suicidal ideation. The day after the MHCB discharge, the patient was admitted to a different MHCB with subsequent ICF placement.

**Findings**

The treatment provided to this patient was inadequate.

The patient's multiple MHCB admissions following a five-year period of stability were not adequately considered for case conceptualization or his treatment needs. Diagnoses of delusional disorder and memory impairment were not sufficiently considered by the treatment providers. The patient was discharged to a lower level of care without sufficient clinical assessment or consideration that his lack of engagement was possibly due to mental illness.

**Patient O**

This 51-year-old MHCB patient's healthcare record was reviewed to assess the adequacy of the treatment provided at NKSP. The patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Zyprexa and Vistaril prn.

The patient was admitted to the MHCB on February 21, 2025 due to significant severe mental illness. At the time of referral, the patient was disoriented and unable to attend to his ADLs. It was determined that the patient had a manic episode with psychotic features.

The initial provider assessments included the reason for referral, current clinical presentation, and appropriate historical information. It was opined that medication nonadherence contributed to the patient's psychiatric decompensation. A medication change occurred to address psychosis and mood lability with variable adherence.

The initial IDTT documentation included the reasons for referral and the patient's current clinical presentation. The patient denied all psychiatric symptoms and was described during the initial IDTT meeting as rambling and incoherent which was indicative of psychotic thought processes; however, that conclusion was not clearly documented. Multi-disciplinary treatment goals targeted medication nonadherence and insight. Treatment interventions were evidence-based and included CBT and motivational interviewing; however, those interventions were not utilized during daily contacts. The IDTT indicated that the patient did not meet the criteria for higher level of care consideration.

The daily contact documentation indicated that the patient's mental status steadily improved with clearer and more linear thinking, and he did not appear to be responding to internal stimuli. Except for one primary clinician contact, therapeutic interventions were rarely documented.

At the time of the discharge suicide risk assessment, the patient was assessed with low suicide risk, and an appropriate clinical rationale was provided. After the patient stabilized, he was appropriately discharged to the EOP level of care on March 3, 2025.

**Findings**

The treatment provided to this patient was adequate.

The patient was appropriately monitored by providers. Medication nonadherence was timely addressed, and medication adjustments resulted in adherence. His psychosis remitted, and he was able to return to a lower level of care. The patient's care would have been improved with the use of PC interventions for relapse prevention.

**APPENDIX B-21**
**Pelican Bay State Prison (PBSP)**
**Reporting Period: October 1, 2024 to March 31, 2025**

**Patient A**

This 22-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU.

The patient transferred to PBSP on March 25, 2025 and was placed in the RHU on April 10, 2025. He was provided diagnoses of adjustment disorder and opioid use disorder; additionally, he had medical conditions that included dental, foot, and lower back pain, as well as a seizure disorder. He was prescribed Remeron and Effexor.

The patient was housed in the RHU due to safety concerns and had no significant history of mental health treatment at other levels of care. He reported depressive symptoms and requested removal from the MHSDS, citing discomfort with being labeled as intellectually disabled.

An IDTT meeting occurred on April 23, 2025. The PC, psychiatrist, and patient were present; however, not all required staff attended. Anger was the only problem area documented in the problem section of the master treatment plan, although the patient requested treatment for both anger and depression. The treatment team discussed and determined that the patient should remain at the 3CMS level of care.

The psychiatrist conducted an initial assessment in the RHU on April 14, 2025 when the patient's safety, mental health, and physical health concerns were addressed. The session was provided by telepsychiatry and occurred in a confidential setting. Despite the patient's inconsistent feedback regarding medication effectiveness; the psychiatrist continued Remeron and Effexor due to ongoing irritability and sleep difficulties. Additional psychiatric contacts occurred timely.

A social worker saw the patient on April 16, 2025 after reports of depression; the documentation indicated that coping skills were discussed. The PC completed an initial assessment on April 21, 2025. At that time, the patient denied depressive symptoms but acknowledged issues with anger, violence, and impulse control. Weekly PC contacts were not consistently provided thereafter.

The patient was offered weekly group therapy beginning in May 2025 which he attended with appropriate participation. The group note did not provide detail regarding the group process and only mentioned the group topic.

**Findings**

The treatment provided to this patient was minimally adequate.

Although clinical contacts in the RHU occurred less frequently than required; those contacts appeared to address the patient's needs, and his care was managed appropriately.

**Patient B**

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU.

The patient was placed in the RHU on March 3, 2025. He was provided a diagnosis of major depressive disorder. He was prescribed Remeron, Lexapro, melatonin, and naloxone. Documented medical conditions included plantar fasciitis and eczema.

An IDTT meeting occurred on March 12, 2025 that included the PC and psychiatrist; no other staff were documented in attendance. The IDTT assessed the patient's need for safety planning and appropriateness for the 3CMS level of care. The treatment plan addressed depression, and the only stated goal was for the patient to receive his property.

The psychiatrist completed an initial assessment by telepsychiatry for the RHU placement on March 7, 2025. The assessment was thorough and incorporated the patient's input. The psychiatrist continued the current medication regimen, but it was not recorded whether the contact occurred in a confidential setting.

The initial RHU PC assessment was completed on March 10, 2025 in a confidential setting. The patient reported ongoing depression and insomnia but noted some benefit from medication treatment. The clinician explored the patient's concerns and feelings and assessed his suicide risk and mental status. The assigned PC visited the patient weekly and provided appropriate therapeutic interventions included homework assignments.

The patient was offered weekly group therapy that focused on symptom management, he attended just over half of the groups with appropriate participation.

Suicide risk assessments were completed on April 14, 2025 and May 7, 2025, and the patient was assessed with moderate risk due to recent expression of suicidal thoughts; he denied active suicidality and attributed his statements to feeling disrespected by staff. The patient received RVRs for possession of a deadly weapon on March 15, 2025 and April 22, 2025; the RVR mental health assessment determined that the behavior was not due to mental illness.

**Findings**

The treatment provided to this patient was adequate.

The patient received timely assessments, appropriate medication management, consistent confidential psychiatric and primary clinician contacts, and access to group therapy. His suicide risk was monitored, and treatment planning addressed relevant clinical issues.

**Patient B**

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU.

The patient was placed in the RHU at PBSP on November 4, 2025. He was provided diagnoses of schizophrenia and bipolar disorder. The patient was prescribed olanzapine and mirtazapine. He was also prescribed famotidine for gastroesophageal reflux disease.

This was the patient's second prison term, and he received mental health services at the 3CMS level of care during both terms. He reported experiencing auditory hallucinations since age 15.

An IDTT meeting occurred on April 23, 2025; the meeting included all required staff, and the documentation indicated review of the patient's suicide risk and recent functioning in the RHU. Identified problems included anxiety, depression, and suicidal thoughts; the goals and objectives provided were relevant to those problem areas.

The psychiatrist provided an initial assessment by telepsychiatry on November 13, 2024 when the patient's medications were increased at his request due to anxiety and mood instability. The patient was seen by the psychiatrist for follow up timely who was appropriately responsive to the patient's needs and requests.

The PC provided weekly contacts to the patient in a confidential setting; the patient occasionally declined to leave his cell and was seen at cell front. The patient engaged appropriately with the clinician and often denied any change in his symptoms. He occasionally acknowledged feelings of sadness about separation from his family with anxiety and rumination. The PC provided appropriate therapeutic interventions.

The patient was offered group therapy for stress management weekly until March 2025 when the frequency decreased to monthly without explanation. The quality and facilitation of group therapy were not described in detail. The patient attended approximately half of the offered groups.

The patient was referred to the MHCB on April 8, 2025 due to suicidal ideation and auditory hallucinations. He was discharged to the 3CMS level of care on April 14, 2025; it was noted that the patient discussed with the clinician and psychiatrist that he felt suicidal when released to the yard and was threatened.

**Findings**

The treatment provided to this patient was adequate.

The patient received timely assessments, regular confidential contacts with the primary clinician and psychiatrist, and appropriate medication management. The patient was referred to a higher level of care when indicated and was returned to the 3CMS level of care when clinically appropriate. Group therapy was offered, although the reduction in frequency was not explained.

**Patient D**

This 45-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU.

The patient was placed in the RHU on May 6, 2025. The patient was provided diagnoses of bipolar disorder, type II and opioid use disorder. He was prescribed BuSpar, Depakote, and hydroxyzine

pamoate. He was also provided a diagnosis of ADHD at age 14, but he did not receive mental health treatment for that diagnosis prior to incarceration.

The patient reported suicide attempts in 2006 and 2014, and he received mental health services in the CDCR at the 3CMS level of care since 2011.

An IDTT meeting occurred on May 14, 2025; the psychiatrist, PC, social worker, counselor, psychologist, and the patient attended. The IDTT reviewed the patient's recent behavior and history; however, no specific treatment issues or goals were documented. The patient's level of care was reviewed, and it was determined that he was at the appropriate level of care.

The psychiatrist met with the patient by telepsychiatry at the required monthly frequency during the reporting period when symptom management and medication issues were addressed. The visits occurred in a confidential setting. In March 2025, the psychiatric provider added medication to address the patient's anxiety and continued his mood stabilization treatment.

The PC provided an initial assessment on May 13, 2025 when the patient's mental status, current concerns, and functioning were addressed. The patient did not have acute complaints and was focused on his upcoming release date later that year. The clinician did not document whether the visit occurred in a confidential setting, or whether it was conducted in person or by telehealth. PC visits continued weekly as required.

Group therapy for stress management was offered within the first few days of the patient's RHU placement and then weekly; the patient attended and participated appropriately.

A suicide risk assessment was completed on May 7, 2025 upon RHU placement, and the patient was assessed with low risk.

**Findings**

The treatment provided to this patient was adequate.

Although there were concerns that the IDTT did not document treatment goals or interventions, and the primary clinician also omitted required documentation regarding the confidentiality and modality of the session; those omissions did not compromise the overall quality of the patient's care.

**Patient E**

This 54-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU.

The patient was placed in the RHU on December 31, 2024 after receiving an RVR for battery on a peace officer. He was provided diagnoses of opioid use disorder, unspecified bipolar disorder, and unspecified depressive disorder. He was prescribed Abilify, Vistaril, Trileptal, and Paxil to address psychosis, anxiety, mood stability, and depression. The patient also had pertinent medical conditions that included foot and leg pain resulting from past gunshot wounds.

The patient had been incarcerated in CDCR six times and had received treatment for depression and mood instability at the 3CMS level of care during each term.

An IDTT meeting occurred on April 2, 2025 that included the PC, psychiatrist, correctional counselor, social worker, social work supervisor, and the patient. The patient's history and current functioning were reviewed, and the patient stated that his personal goal was to focus on himself. No goals were documented in the treatment plan, making the course of treatment and objectives for progress unclear. Higher level of care indicators were reviewed at the IDTT meeting, and the IDTT determined that the patient was receiving mental health services at the appropriate level of care.

The psychiatrist provided an initial assessment upon the patient's placement in the RHU on January 7, 2025, within a week of placement. The visit was provided by telepsychiatry in a confidential setting. The patient reported increasing depression and anxiety since receiving the RVR and RHU placement, and the psychiatrist increased the dosages of Vistaril and Paxil to address those symptoms.

The PC documented weekly sessions with the patient; although, the location and confidentiality of the visits were often not recorded, nor was it always clear if the sessions occurred in person or by telehealth. Occasionally, the notes indicated that the patient declined to leave his cell and was seen at cell front. The clinician discussed the patient's current functioning, mental status, and feelings, and reviewed aftercare plans related to his upcoming release from prison.

The patient was offered weekly group therapy for stress management which he often attended and appropriately participated.

On May 12, 2025, the patient received a suicide risk assessment after voicing suicidal ideation related to the possibility of release to the mainline yard. Upon evaluation, he explained his concerns, and the clinician reviewed safety options with the patient and assessed the patient with low suicide risk.

**Findings**

The treatment provided to this patient was adequate.

The patient received timely psychiatric assessment and medication management, regular contact with his primary clinician, and access to group therapy. Higher level of care indicators were reviewed which supported continued placement at the 3CMS level of care. However, the absence of documented treatment goals in the treatment plan limited clarity regarding the objectives for progress.

**Patient F**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU.

The patient arrived at PBSP on April 22, 2025, and he began receiving treatment at the 3CMS level of care on March 17, 2025 while at the reception center. The patient was provided a diagnosis of adjustment disorder, unspecified. He was not prescribed psychotropic medication.

An IDTT meeting occurred on April 30, 2025, eight days after the patient's RHU placement. The meeting was attended by the PC, psychiatrist, supervising social worker, correctional counselor, social worker, psychiatric technician, and the patient. Higher level of care indicators were reviewed, and it was determined that the patient did not require referral to a higher level of care. The patient's suicide risk was reviewed, and he verbalized a desire to work on his depression. The treatment plan, however, did not document any treatment goals or objectives.

The psychiatrist provided a confidential initial assessment by telepsychiatry on April 26, 2025, within four days of the patient's arrival. The patient's primary concern was transfer away from his family, and he declined treatment with psychotropic medication. This was the only required psychiatric contact during the review period.

The PC provided weekly contacts during the patient's RHU placement in a confidential setting. The patient denied mental health symptoms, and the sessions focused on healthy habits and coping skills.

Group cognitive behavioral therapy was offered to the patient weekly, but he did not attend. When this was discussed, the patient explained that he had developed a habit of reading and studying late into the night and often overslept at scheduled group times. The clinician encouraged the patient to be mindful of his sleep and to participate in available therapeutic activities.

There were no RVRs or self-harm incidents during the review period.

**Findings**

The treatment provided to this patient was adequate.

The patient received timely assessments and consistent clinical contact, and higher level of care indicators were appropriately reviewed. The lack of documented treatment goals and group participation limited the therapeutic engagement, but the patient's needs and risk factors were appropriately addressed.

**Patient G**

This 25-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU. The patient was provided diagnoses of major depressive disorder and unspecified psychotic disorder. He was prescribed Remeron.

The patient was placed in the MHSDS during November 2024 due to a history of suicide risk and depression.

The patient transferred from the PBSP RHU to the MHCB on April 26, 2025 after being observed during rounds hitting the wall and his own face. He was discharged back to the RHU on May 7, 2025.

An IDTT meeting occurred on May 14, 2025, and the psychiatrist, PC, and CCII were present with the patient at the meeting. The patient stated that he wanted to work on depression and to learn coping skills; those goals were reflected as the problems and objectives in the treatment plan. The IDTT documented review of indicators to consider regarding referral to a higher level of care; the treatment team and the patient determined that 3CMS was the appropriate level of care.

The psychiatrist provided an initial assessment by telepsychiatry for RHU placement on May 12, 2025, . The patient's symptoms and status were reviewed; he reported a stable mood but endorsed occasional nightmares and auditory hallucinations of voices telling him that he was no good and an orphan. The psychiatrist maintained the existing dose of antidepressant medication and offered treatment with an antipsychotic medication; however, the patient declined. Psychiatric contacts by telepsychiatry occurred at the required frequency were conducted confidentially and addressed medication management and continuity of care.

The PC assessed the patient within two days of RHU placement and met with him weekly thereafter in person in a confidential setting. The patient did not report significant ongoing or new mental health related symptoms and was focused on leaving the RHU. Primary clinician contacts occurred onsite in confidential settings at the required frequency.

Group therapy was offered weekly for symptom management while the patient was housed in the RHU. The group notes documented attendance but did not describe the patient's participation or the quality of group. The facilitator of group therapy was not documented.

A suicide risk assessment was completed on May 5, 2025 which assessed suicide risk as low. The patient acknowledged non-suicidal self-injury by hitting his head on a wall when frustrated. No RVRs, additional risk assessments, or other unusual incidents were documented other than the initial self-harm incident and subsequent MHCB placement.

**Findings**

The treatment provided to this patient was adequate.

The patient received timely assessments and treatment planning with appropriate IDTT attendance and documentation of treatment goals. The required therapy was provided at the appropriate intervals.

**Patient H**

This 60-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU. The patient was provided diagnoses of unspecified depressive disorder and antisocial personality disorder. In addition, the patient had multiple chronic medical conditions including asthma, gastroesophageal reflux disease, and a history of colon surgery.

The patient was placed in the RHU on March 28, 2025, after arriving at PBSP in October 2024. He had a significant and longstanding mental health history with treatment since 1993 at the 3CMS and EOP levels of care as well as nine MHCB placements.

The patient presented with depressed mood upon arrival for which he was assessed and prescribed Lexapro by the psychiatrist. The patient reported that he was previously treated with Vistaril for depression, but that medication was ineffective. In November 2024, Lexapro was initiated at PBSP; however, by April 2025, the medication was changed to Celexa by the psychiatrist due to concerns about intolerable side effects when the patient was seen for a confidential telepsychiatry session. Throughout his placement in the RHU, the patient frequently requested transfer to a higher level of care due to depression; however, multiple clinical assessments by the IDTT consistently indicated that he was appropriately placed at the 3CMS level of care.

On April 9, 2025, an IDTT meeting occurred that included the psychiatrist, PC, CCII, psychiatric technician, and social worker in attendance. The patient declined to participate in the IDTT but subsequently informed his clinician that he wanted to focus on better managing his stress and depression. The treatment plan developed at that time appropriately identified depression as the primary clinical issue and outlined specific objectives and interventions. The treatment team also reviewed the patient's level of care and determined that he did not require referral to a higher level of care.

The patient was seen for an initial assessment ten days after RHU placement; subsequent follow-up contacts with mental health staff occurred at least every two weeks. He was always offered confidential sessions, but occasionally he declined stating that he was "good" and did not require additional support. Most contacts occurred with the assigned PC; although, a single additional session with an unlicensed social worker occurred. Throughout the review period, the patient did not report or exhibit any acute behavioral disturbances or significant worsening of his mental health.

Three CBT groups were offered by an unlicensed social worker during the reviewed six weeks; the patient attended when groups were conducted, and he had appropriate engagement during those sessions.

A suicide risk assessment was completed upon RHU placement, and the patient was assessed with low risk for suicide.

**Findings**

The treatment provided to this patient was adequate.

The psychiatrist provided appropriate medication management, regular clinical assessment, and follow-up. The provision of group therapy, however, was insufficient and was not provided weekly as required.

**Patient I**

This 25-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU.

The patient arrived at PBSP on December 17, 2024, and was placed in the RHU on March 12, 2025. The patient was not provided with a mental health diagnosis by a psychiatrist; however, he arrived from a county jail with a prescription for Remeron and notation of a previous diagnosis of

adjustment disorder. Upon arrival at the CDCR reception center, the patient stated that he did not want mental health services and declined to continue Remeron. He was placed in the MHSDS due to his history of medication treatment and mental health symptoms. At the time of reception, the patient received a substance use disorder assessment that included the first mention of adjustment disorder as well as a diagnosis of opioid dependence. The substance use disorder diagnosis was not mentioned further in the mental health documentation; however, the patient was prescribed buprenorphine for his opioid dependence.

A initial RHU IDTT meeting occurred on March 19, 2025, the patient refused to attend the meeting that included the assigned PC, supervising social worker, and correctional counselor. The documented treatment goal was for the patient to challenge his own thoughts and to adjust to the institution. The patient continued to stated that he did not want to participate in treatment, especially if it did not provide sentence credits; the IDTT decided to retain the patient at the 3CMS level of care due to his history of psychotropic medication treatment.

The psychiatrist provided confidential sessions by telepsychiatry. The initial psychiatric contact occurred on March 17, 2025, and it included a comprehensive mental status assessment as well as assessment of current functioning and behavior. The patient was described as upset and reluctant to engage and tended to focus on others when asked about his own involvement in conflicts.

The PC visited the patient weekly at his cell, as the patient regularly declined to come to confidential appointments. The interactions were brief and primarily involved the patient asking about transfers to another institution or denying mental health symptoms and treatment needs. One documented refusal noted the patient's dissatisfaction with how the officer approached him for his appointment, reporting that he was told that he would not be allowed to leave his cell after being perceived as taking too long to leave.

Cognitive behavioral therapy groups were offered weekly, but the patient did not attend any groups. There was a notable lack of documentation of concerted efforts to increase the patient's engagement in treatment.

**Findings**

The treatment provided to this patient was adequate.

The providers offered regular opportunities for psychiatric and clinical intervention, medication review, and group therapies; and they documented the patient's consistent refusal to participate and preference to avoid mental health services. No acute issues or missed clinical needs were identified during the period reviewed; however, documentation of efforts in increasing treatment engagement should have occurred.

**Patient J**

This 46-year-old 3CMS patient's healthcare record was reviewed to assess the adequacy of treatment provided at the PBSP RHU. The patient arrived at PBSP on April 3, 2025 and was placed in the RHU on April 17, 2025. The patient was provided diagnoses of unspecified schizophrenia, alcohol use disorder, antisocial personality disorder, generalized anxiety disorder, and opioid use disorder. He was prescribed Abilify and Remeron for auditory hallucinations, mood, and sleep

difficulty. Pertinent medical conditions included bilateral hearing deficit, catathrenia, deformity of the left hip joint with hip pain, morbid obesity, and status post medial meniscus repair.

The patient had been incarcerated in CDCR since 2007 for his third prison term. He received mental health services at the 3CMS level of care during most of his sentence, and he had one MHCB referral on April 10, 2025.

The patient recently discharged from the MHCB after placement due to suicidal ideation with a plan to hang himself. He received RVRs on April 17, 2025 for possession of a deadly weapon and battery on an officer that resulted in the RHU placement. The RVR assessment indicated that the patient's mental health symptoms may have contributed to his behavior.

An IDTT meeting occurred on April 23, 2025 that was attended by the assigned PC and psychiatrist, supervising social worker, correctional counselor, psychiatric technician, and the patient. The patient stated that his goal was to get help with auditory hallucinations and yelling in his sleep. Treatment plan goals addressed anxiety and safety planning, improvement in symptoms, and discontinuation of MHCB referrals. The IDTT decided to retain the patient at the 3CMS level of care, and an appropriate rationale was provided for that decision.

The psychiatrist met with the patient in a confidential setting by telepsychiatry on April 21, 2025. The patient reported significant worsening of symptoms with ongoing auditory hallucinations, anger, frustration, paranoia, and difficulty thinking clearly. His medications were reviewed, and the psychiatrist began treatment with Abilify and Remeron and provided psychoeducation regarding medication management, coping skills, sleep, and exercise.

The PC met in person weekly with the patient in a confidential setting where concerns were discussed. The PC documented that there was good rapport with the patient but did not describe further interventions or treatment planning.

A social worker offered five group sessions that focused on symptom management at least weekly; the patient was noted as absent for all but one group between April 25, 2025 and May 13, 2025. The documentation included only attendance and group content without commentary regarding group participation.

**Findings**

The treatment provided to this patient was adequate.

Psychiatric and PC visits were provided timely, and relevant concerns were addressed during those sessions. The IDTT reviewed the patient's clinical status appropriately and determined that the patient was receiving mental health services at the appropriate level of care.

**Patient K**

This 27-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at PBSP. He was diagnosed with unspecified depressive disorder, antisocial personality disorder, and methamphetamine and opioid use disorders. He was prescribed hydroxyzine and oxcarbazepine and partially adherent with these medications. Through the

ISUDT, he was prescribed and adherent with buprenorphine-naloxone. One suicide attempt and three episodes of self-injurious behavior were listed in the health record. Medical conditions included opioid and stimulant use disorders and hepatitis C. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At PBSP, he was admitted to EOP care from October 19, 2024 through December 6, 2024.

Upon arrival in PBSP EOP care, five-day follow-ups occurred as required and were adequately documented. The initial primary clinician assessment was timely and adequate apart from an incomplete case formulation. The case formulation did not address the patient's depressive symptoms. Although all subsequent contacts provided by this clinician occurred by telehealth, there was no indication whether the initial assessment was in person or by telehealth. The initial psychiatric assessment was attempted by telehealth in a timely manner, but the patient refused. The assessment was a combination of a wellness check and record review, and content was minimally adequate. The initial IDTT meeting was timely but held in absentia due to the patient's refusal to participate; required staff attended. The patient was not found to meet criteria for a higher level of care. The patient's strengths, verbalized treatment goals, and rationale for EOP care were adequately documented, but both the case formulation and the treatment plan were only partially adequate. The case formulation continued to remain silent regarding depressive and mood symptoms. The treatment plan included measurable goals with clinically appropriate interventions, but it did not address psychiatric care. After the initial psychiatric assessment, the patient was not seen by psychiatry during the remainder of his EOP care. The assigned primary clinician saw the patient weekly by telehealth. Progress notes included minimal content. They indicated that the patient remained focused on custody-related issues, and the provision of cognitive-behavioral interventions required by the treatment plan was not documented. The patient was offered mental health groups regularly and attended slightly more than half of them. He tested positive for unprescribed gabapentin and methamphetamine, and there was no documentation indicating that his psychiatrist and clinician were aware of this. His EOP ended abruptly following a December 6, 2024 incident in which the patient was assaulted in his cell by a peer. The patient refused a nursing assessment and RHU screening, and he became tearful, fearful, and increasingly agitated. He was referred to MHCB care due to danger to self and others. The accompanying mental health consult and suicide risk evaluation were adequate, and the patient was found to be at moderate risk for suicide.

**Findings**

The care provided to this EOP patient was inadequate.

While including thoughtful elements, the case formulation and treatment plan were incomplete and could not be used to guide the patient's EOP treatment. During the patient's 48 days in EOP care, he was seen only once by psychiatry. This encounter occurred by telehealth at the cell front and amounted to a wellness check. Primary clinician encounters were insufficiently documented to indicate provision of the evidence-based interventions required by the treatment plan. The patient's frequent refusals of mental health programming and continued use of illicit substances were not addressed in mental health encounters. He did not receive the treatment he needed.

**Patient L**

This 33-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at PBSP. He was diagnosed with unspecified bipolar disorder and related disorder and antisocial personality disorder. He was prescribed lamotrigine, mirtazapine, and olanzapine; he was partially adherent with mirtazapine but nonadherent with lamotrigine and olanzapine, which were discontinued in the first two months of EOP care. Later, mirtazapine was converted from a scheduled to a PRN medication. Seven episodes of self-injurious behavior, most involving hanging or asphyxiation, were listed in the health record. Medical conditions included dyspepsia. Within CDCR, the patient had previously received 3CMS, EOP, MHCB, and ICF care. At PBSP, he was admitted to EOP care from September 9, 2024 through March 23, 2025, when he was released to parole.

The assigned psychiatrist saw the patient through telehealth at least once during four of the six months in the review period. However, no psychiatrist saw the patient during the 77 days between December 12, 2024 and February 27, 2025, or in March 2025. At the patient's request, psychotropic medications were either discontinued or changed from scheduled to PRN administration. Psychiatric documentation was adequate to track the patient's symptoms and response to medication changes, and the patient remained stable. However, the unspecified bipolar disorder diagnosis remained unresolved. The patient was seen weekly by a primary clinician throughout EOP care; the assigned clinician saw the patient exclusively through telehealth, while back-up clinicians saw the patient in person when the assigned clinician was away from the institution. Progress notes included scant information. While the notes reflected general support for the patient's pending release to parole, there was no evidence that the distress tolerance skills training required in the treatment plan was provided. The patient's growing excitement about his upcoming release was repeatedly noted. The patient was offered extensive mental health programming while in EOP care; his attendance was initially excellent but waned as he approached his release date. The treatment team did not address this pattern. Two follow-up IDTT meetings occurred during the review period. Both were timely and attended by required staff. The patient attended the first but not the second follow-up IDTT meeting. Reasons for the patient's refusal of the second meeting were not identified. The clinical summary, case formulation, and treatment plan were updated in each IDTT meeting, and these updates provided adequate documentation of the patient's treatment response. The patient was removed from the SRMP during the first follow-up IDTT, and documentation of the rationale for this removal was adequate. A suicide risk evaluation completed in anticipation of SRMP removal was adequate and found the patient at low risk. A mental health pre-release planning assessment was timely and adequate.

**Findings**

The care provided to this EOP patient was inadequate.

Although this patient's care had several strengths and the patient appeared to improve with time, deficiencies in this care rendered his overall treatment inadequate. The patient did not receive consistent monthly psychiatric monitoring following discontinuation of three scheduled psychotropic medications. In a patient with a history of multiple self-injurious episodes and a diagnosis of an unspecified bipolar disorder, closer monitoring was clinically indicated. The patient's psychiatric diagnoses were not specified during EOP care. It was not clear whether the primary clinician was providing the evidence-based skills training that was required in the treatment plan, and most primary clinician notes read like brief wellness checks. The patient's

symptoms improved, but his behavior – at least in terms of program participation – did not. It is just as likely that his symptom improvement was driven by external factors, including his documented excitement in anticipating release to parole, as it is that symptom improvement was driven by treatment. Strengths in this patient's care included consistent primary clinician contacts, timely and adequate IDTT documentation, and adequate release planning.

**Patient M**

This 35-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at PBSP. He was diagnosed with major depressive disorder, recurrent, severe with psychotic features, generalized anxiety disorder, and antisocial personality disorder. He was prescribed fluoxetine and hydroxyzine and was adherent with the former and partially adherent with the latter. One suicide attempt was listed in the health record. Medical conditions included de Quervain's tenosynovitis of right wrist, band keratopathy, proliferative vitreoretinopathy, retinal detachment, and blindness in the left eye. Within CDCR, the patient had previously received all levels of mental health care. At PBSP, he was admitted to EOP care from October 29, 2024 through the end of the review period.

The initial psychiatric assessment, conducted by telehealth, was timely and adequate. The initial primary clinician assessment was timely but included an incomplete mental status examination. The case formulation was adequate. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for consideration of a higher level of care. The patient's strengths, verbalized treatment goals, and rationale for EOP care were adequately documented. However, the rationale for EOP care indicated that the patient suffered from posttraumatic stress disorder due to losing sight in his left eye after being assaulted in prison; the diagnosis of posttraumatic stress disorder was not documented elsewhere. The treatment plan was pulled forward without modification from one developed by another treatment team, and it included only generic interventions. The patient was followed monthly by one of two psychiatrists until the end of February, 2025; he was not seen by psychiatry in March 2025. Psychiatric care was provided exclusively through telehealth, and progress notes were adequate. The patient was followed weekly by one of three primary clinicians. Several of these encounters were at the cell front due to custody modified programming, but primary clinicians did not consistently indicate whether the encounters were confidential. One of the three clinicians used telehealth to provide these encounters. Regardless of whether the encounter was at cell front in or a confidential treatment space, progress notes reflected observations, brief mental status exams, and supportive interventions. With occasional exceptions, documentation of cognitive-behavioral interventions, which were called for generically in the treatment plan, was lacking in most notes. The patient attended most of the mental health groups he was offered, but there were periods when mental health groups were not offered due to custody modified programming. The follow-up IDTT was timely and attended by the patient and required staff. Again, the patient was not found to meet criteria for consideration of a higher level of care. Except for a minor update in the clinical summary, none of IDTT documentation was updated in this meeting. As a result, the treatment plan continued to reflect the status of the patient's progress and treatment response as they were documented on October 9, 2024, before the patient was placed in EOP care. There was no documentation regarding the rationale for continuing EOP care. Mental health evaluations for RVRs alleging batteries on prisoners were adequate and found a nexus between the patient's mental health symptoms and the alleged behaviors.

**Findings**

The care provided to this EOP patient was inadequate.

The treatment plan included only generic interventions and did not appear to be used to guide treatment. Although the patient was seen timely for primary clinician and psychiatric encounters during much of the review period, he was not seen by psychiatry between February 27, 2025 and April 8, 2025. As documented, the patient's persistent refusal to increase the dosage of his medications or otherwise change them, and his inconsistent adherence with hydroxyzine were inadequately explored and addressed. Additionally, many of his primary clinician encounters occurred at the cell front and/or were brief and consistent with wellness checks. Planned and systematic psychotherapeutic interventions were not documented. Documentation also did not clarify whether the patient was making progress towards his treatment goals or learning new mental health skills. Although it was documented as a rationale for providing EOP care, the potential posttraumatic stress disorder noted in connection with being assaulted and losing sight in his left eye was never clarified or addressed in treatment. The patient continued to report moderate symptoms of depression and anxiety at the end of the review period.

**Patient N**

This 41-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at PBSP. During the review period, he was variously diagnosed with schizophrenia, unspecified schizophrenia spectrum and other psychotic disorder, unspecified personality disorder, rule out unspecified tic disorder, and alcohol, cocaine, and methamphetamine use disorders. He was not prescribed psychotropic medication by psychiatry. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Through medical services, he was prescribed amitriptyline for hand pain, but the patient was nonadherent with this medication. Medical conditions included claw hand with pain, a diaphragm injury and lacerations to the spleen and liver, along with hepatitis C. Within CDCR, the patient had previously received 3CMS, EOP, and ICF care. At PBSP, he was admitted to EOP care from October 1, 2024 through the end of the review period.

The initial primary clinician assessment was timely but completed without a patient interview, due to his refusal. Information from prior records was brought forward, but there was no clarity about the patient's current mental illness and treatment needs. The case formulation was generic, vague, and did not identify specific symptoms or treatment needs. The initial psychiatric assessment, conducted by telehealth, was timely and adequate. It was conducted at the cell front due to the patient's refusal. Notably, the psychiatrist scheduled the patient to be seen again in two weeks because the assessment occurred at cell front, and this appointment was scheduled accordingly. Unfortunately, the patient again refused to come to the psychiatric appointment. The initial IDTT meeting was timely but held in absentia due to the patient's refusal; required staff attended. The patient was found to be positive for high treatment refusal; the rationale for retaining the patient in EOP care was adequately documented. Patient strengths and verbalized treatment goals were not documented. The treatment plan was brought forward without modification from one developed three months earlier at another institution. It identified delusions, hallucinations, depression, and substance use as treatment targets, none of which were in evidence in the initial

assessments, and it continued to reflect the patient's treatment response as making "good, reasonable progress" despite the patient's refusal to engage in treatment.

Outside of the initial psychiatric assessment and IDTT meetings, the patient was seen by psychiatry only once during the review period. This encounter occurred at the cell front due to the patient's refusal. There were no individual psychiatric encounters during the 179 days between October 24, 2024 and April 21, 2025. The patient was followed weekly by one of four primary clinicians throughout the review period. Despite the regularity of these primary clinician encounters, almost all of them occurred at the cell front or in other nonconfidential settings, either due to the patient's refusals or due to custody modified programming. Although documented thoroughly, these encounters were consistent with wellness checks. The patient was offered multiple mental health groups but consistently refused all of them, stating that he had no mental illness. A follow-up IDTT meeting occurred timely and was attended by the patient and required staff, apart from an alternate for the assigned psychiatrist. He continued to be positive for high treatment refusal, and it was noted without explanation that the patient suffered from "flocculating" delusional thinking and poor insight into the presence of mental illness. A plan to retain the patient in EOP care and address his treatment refusal was adequately documented. Regrettably, the case formulation, patient strengths, patient verbalized treatment goals, and treatment plan were not updated, and the treatment plan continued to indicate inaccurately that the patient was making good treatment progress. The patient incurred two RVRs during the review period, one alleging fighting and the other alleging refusal of assigned housing. Mental health assessments for these RVRs found no nexus between mental health symptoms and the alleged behaviors. However, a third RVR assessment, for alleged fighting in 2023, found such a nexus and provided an adequate rationale. All three assessments were adequate.

**Findings**

The care provided to this EOP patient was inadequate.

The three-month old treatment plan adopted from another facility for use in the PBSP EOP IDTT meetings was not clinically appropriate or factually accurate. It was inconsistent with the patient's presentation as documented in initial assessments and other progress notes; it also indicated that the patient was making good treatment progress when the patient was refusing all mental health treatment and denying the presence of mental illness. The patient's diagnoses and history of requiring ICF care for grave disability were inadequately explored or clarified, and for most of the review period the patient was not followed as required by psychiatry. While the primary clinician documented that the patient had diminished insight and "flocculating" delusional content, the nature, content, and frequency of the patient's delusions was not documented. Beyond close monitoring, the patient did not receive meaningful treatment.

**Patient O**

This 35-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at PBSP. He was diagnosed with unspecified depressive disorder, anxiety [sic], and antisocial personality disorder. He was prescribed mirtazapine and was nonadherent with this medication. Hydroxyzine was prescribed PRN for anxiety, and he used this medication frequently during the review period. Four suicide attempts were listed in the health

record. Medical conditions included gastroesophageal reflux disease and chronic neutropenia. Within CDCR, the patient had previously received all levels of mental health care. At PBSP, he was admitted to EOP care from October 31, 2024 through the end of the review period.

Upon the patient's arrival in EOP care, five-day follow-up encounters occurred as required and were adequately documented. Four encounters were nonconfidential, and lack of custody escort was cited as the reason for two of the nonconfidential contacts. The initial psychiatric assessment, conducted by telehealth, was timely and adequate. The initial primary clinician assessment was timely but relied heavily on prior documentation, failed to update historical information, and included a superficial clinical summary and generic case formulation that did not identify or address any mental health symptoms requiring EOP care. The initial IDTT meeting was timely and attended by required staff but held in absentia due to the patient's refusal. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation was not updated, and the treatment plan was pulled forward without modification from one developed in MHCB care, when the patient was reporting suicidal ideation. Short- and long-term goals were not measurable or appropriate to the patient's current treatment needs, as he was no longer experiencing suicidal ideation. The rationale for EOP care was not documented.

One of two psychiatrists provided monthly follow-up encounters during the review period until the end of January, 2025, when he was seen at the cell front due to security concerns in the yard. All psychiatric encounters occurred by telehealth. On January 30, 2025, an attempt to address the patient's increasing nonadherence with mirtazapine was made by changing the administration time. However, there was no timely follow-up monitoring to determine whether this adjustment resulted in improved adherence, and the progress note also erroneously referred to continuing sertraline, which was not prescribed to the patient. The patient was not seen by psychiatry for the 61 days between January 30, 2025 and April 1, 2025. One of four primary clinicians followed the patient weekly throughout the review period. Documentation of these contacts was consistent with monitoring the patient's mental status and treatment adherence, and very few therapeutic interventions were documented. In February, 2025, the patient reported that because he was the victim of a previously reported sexual assault while imprisoned in 2010, he was refusing a cellmate. The suicide risk evaluation completed in response to his renewed PREA report was timely and adequate. The patient was offered multiple treatment groups and attended most of them. The follow-up IDTT meeting was timely and attended by the patient and required staff. Although the clinical summary indicated that the current treatment goal was to reduce anxiety and depression from moderate to low levels, this goal was not reflected in the treatment plan, which was not modified and remained inconsistent with the patient's treatment needs. The rationale for EOP level of care was not documented. Adequate mental health assessments for two RVRs were completed. The first RVR alleged willful resistance of a peace officer; the second, alleged refusal of assigned housing. No nexus between mental health symptoms and the alleged behaviors was found for the first RVR, but such a nexus was found for the second RVR, with adequate justification.

**Findings**

The care provided to this EOP patient was inadequate.

The initial primary clinician assessment was deficient, the treatment plan was not measurable, updated, or consistent with the patient's current treatment needs, and the rationale for EOP care was not documented. No psychiatric appointments were offered during the final two months of the review period, and the patient's medication nonadherence was inadequately monitored. The patient was diagnosed with "anxiety" without clarification, and there were no efforts to specify his diagnoses. Primary clinician encounters were consistent with wellness checks rather than treatment, and they included very little evidence that evidence-based interventions were provided. The clinical implications and link between the patient's traumatization as the victim of sexual assault in 2010 and his current avoidance and resistive behaviors, documented in a mental health RVR assessment, were not pursued in treatment.

**Patient P**

This 40-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided diagnoses of major depressive disorder, recurrent, with psychotic features; PTSD; antisocial personality disorder; opioid use disorder, severe; and several additional substance use disorders that were in sustained remission. He was classified as DD1. He was prescribed Wellbutrin, Haldol, Vistaril, and Suboxone during the review period.

The patient had a history of receiving mental health services at the 3CMS, EOP, MHCB, acute and intermediate levels of care. The patient had a history of three serious suicide attempts while in CDCR as well as a history of self-injurious behavior including cutting and ingesting razors.

The patient arrived at PBSP on November 18, 2024 from CMC. The initial psychiatric assessment was provided by telepsychiatry on November 20, 2024; the assessment noted a history of major depression, substance abuse, and multiple suicide attempts. The patient denied significant distress or symptoms and reported that his medications were effective.

The initial PC assessment occurred on November 26, 2024. The PC reported that the patient transferred from the CMC RHU due to safety and victimization concerns after he was attacked on the yard. The assessment included a clinical history and an adequate safety plan. The PC noted the patient's partial insight and fair judgment. The clinical summary and case formulation were carried forward from the most recent CMC RHU treatment plan on November 13, 2024.

The initial IDTT meeting occurred on November 27, 2024. The patient and required participants attended the meeting, except for the covering psychiatrist. The treatment plan was carried forward unchanged from the previous plan which remained appropriate for the patient's clinical needs. The identified problem areas were depression, anxiety, auditory hallucinations, and grief with appropriate goals and specific interventions including CBT and grief counseling. The IDTT noted that the patient did not meet the criteria for consideration of referral to a higher level of care. The level of care retention and discharge criteria were vague and inadequate. The EOP functional evaluation was completed appropriately; no restrictions were indicated, and the evaluation documented supportive accommodations for educational and vocational settings.

A routine IDTT meeting occurred on February 26, 202; the patient and required participants including the assigned clinicians attended the meeting. The treatment plan goals and interventions remained unchanged, but the patient was identified on the sustainable process report due to

participation in fewer than five hours weekly of scheduled treatment. His attendance was 44 percent during the prior 12 weeks, and he reported paranoia and anxiety around other patients as the reason for his group attendance refusals. The PC reported that he attended his individual contacts and actively participated in exposure therapy. The IDTT noted that the patient was not placed on EOP modified programming, as his group attendance had significantly improved in recent weeks. The patient was generally described as stable with fair insight and judgment.

The psychiatric care was provided by telepsychiatry in a confidential setting. The first routine psychiatric contact did not occur until January 9, 2025, approximately six weeks after the initial psychiatric assessment. The patient reported increased depression, anxiety, and paranoia; he reported that he was assaulted by another patient when he went to group that morning. He denied psychotic symptoms and asked that Wellbutrin and Haldol be continued unchanged. The patient was seen for the subsequent psychiatric contact on February 5, 2025, when he reported severe anxiety, depression, and paranoia and moderate auditory hallucinations. He denied any medication side effects and requested an increase in his Haldol dosage. The patient was seen on February 11, 2025 due to medication nonadherence; the patient reported auditory hallucinations and paranoia that prevented him from leaving his cell for medication pass. The psychiatrist noted the provision of counseling and psychoeducation, and the patient agreed to medication adherence. At a routine psychiatric contact on March 4, 2025, the patient reported panic attacks and requested Vistaril PRN. The psychiatrist documented the provision of specific CBT techniques and discontinued Haldol ordered PRN, as the patient had never requested the PRN medication and prescribed scheduled Vistaril.

Routine PC contacts occurred weekly in a confidential setting; although, the patient frequently refused and was seen cell front. Several routine PC contacts occurred at cell front due to custody modified programming. The documentation of PC contacts was well written and included the interventions outlined in the treatment plan. The patient frequently reported anxiety and paranoia regarding group attendance, and the PC discussed exposure and desensitization concepts to encourage better attendance. The patient remained severely paranoid, anxious, and depressed; he continued to report auditory hallucinations and to refuse groups and individual contacts despite the PC interventions. The PC made the appropriate psychiatric referral when the patient reported panic attacks in early March 2025 and documented several discussions with custody about the patient’s DD1 status and safety concerns.

Although PC care was consistent and included appropriate interventions, the patient’s treatment attendance was only 27 percent in March 2025. The patient was assigned two core clinical and recreation therapy groups. The clinical groups were facilitated by an LCSW and psychologist, and the topics included life skills and symptom management. Recreation therapy groups consisted of leisure activities such as games and movies. The group assignments were appropriate, and the patient appeared to benefit from the few instances when he attended.

**Findings**

The treatment provided to this patient was adequate.

The treatment plan was appropriate, and it addressed the patient's symptoms and clinical needs. Although there was a delay between the initial psychiatric assessment and the first routine contact; subsequent psychiatric contacts occurred timely, and the documentation indicated collaboration in medication management and the development of coping skills. PC contacts were offered weekly, and cell front check-ins were frequently required due to patient refusal, but the PC documented appropriate interventions and support to assist the patient in symptom management and to improve his treatment adherence and group attendance. Group topics were appropriate, and the patient reported benefit when he attended.

**Patient Q**

This 51-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. He was provided diagnoses of delusional disorder, unspecified anxiety disorder, and antisocial personality disorder. He was not prescribed psychotropic medications during the review period. Pertinent medical conditions included obstructive sleep apnea and hypertension.

The patient arrived at PBSP on April 26, 2024 from the MCSP RHU. He had received mental health services at the 3CMS, EOP, MHCB, and intermediate levels of care.

Routine IDTT meetings occurred on October 30, 2024 and January 22, 2025. The patient, assigned clinicians, and the CC I attended both meetings. The treatment team noted that the patient was nearly 100 percent treatment adherent and was highly active in groups and individual contacts. The IDTT noted that the patient did not meet the criteria for consideration of referral to a higher level of care. The patient reported moderate depression and anxiety and said that groups were very effective in managing his mood and maintaining stability. The treatment planning was adequate and targeted depression and anger with appropriate goals, specific clinical interventions, and progress updates. Discharge criteria and level of care rationale were not provided.

The patient was not prescribed psychotropic medication during the review period; he was however seen for a confidential telepsychiatry contact on February 4, 2025. His mental status was described as normal, and the patient declined psychotropic medication treatment. The patient stated that he was interested in attending all treatment, and his goals were to improve his coping skills and to remain stable. The psychiatrist provided specific CBT interventions that focused on distress tolerance and coping skills.

PC contacts were offered weekly during the review period, but the setting was not always confidential due to modified programming or scheduling conflicts with groups. The PC contacts were well documented, timely, and clinically appropriate interventions were provided in response to the patient's concerns or symptoms. The interventions aligned with the treatment plan. Continuity of care was adequate.

The patient was offered clinical and recreation therapy groups which he attended with almost 100 percent adherence; he also attended NLTG groups. Clinical groups were facilitated by a psychologist and a LCSW, and the topics included life skills and symptom management. The recreation therapy groups consisted of leisure activities. The group offerings were adequate, and the patient reported significant benefit.

**Findings**

The treatment provided to this patient was adequate.

The patient was seen timely for well documented clinical contacts, and the treatment plan was appropriate for his goals. Treatment planning was adequate and included appropriate goals and interventions. The PC was responsive to the patient's needs and provided interventions that aligned with the treatment plan. Group offerings were appropriate and included two core clinical groups.

**Patient R**

This 26-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided diagnoses of adjustment disorder, with depressed mood, and PTSD. During the review period he was prescribed Depakote, Remeron, BuSpar and Vistaril PRN. He had also had a seizure disorder and was prescribed Trileptal.

The patient received mental health services at the 3CMS, EOP, and MHCB levels of care. He arrived at PBSP on December 30, 2024.

The initial clinical assessments occurred timely and were well documented. The telepsychiatrist collaborated with the patient in medication management; the patient was reportedly medication adherent with normal mental status and no suicidal ideation. The initial PC assessment on January 6, 2025 was provided by an unlicensed social worker who was not the assigned PC. The assessment was generally adequate and completed appropriately except for the documentation of a diagnosis of schizophrenia spectrum or other psychotic disorder, which was not present elsewhere in the healthcare record.

The initial IDTT meeting occurred on January 8, 2025; the patient, assigned clinicians, and CC II were in attendance, and the psychiatrist participated by telepsychiatry. The clinical summary and case formulation were updated appropriately. Treatment planning was adequate and included appropriate goals and CBT interventions to target the patient's depressed mood. The IDTT noted that the patient met the higher level of care criterion for three or more MHCB referrals initiated in the last six months. The IDTT provided adequate rationale for nonreferral, as each MHCB admissions occurred after the patient reported conditional suicidal ideation after learning that he would be transferred to an institution away from his family. The IDTT documented specific interventions to improve distress tolerance and problem-solving skills to reduce the need for MHCB admission when overwhelmed. The level of care justification and discharge criteria were adequate.

Routine psychiatric contacts were offered in January and February 2025, but no routine contact was offered in March 2025. The psychiatric care was inadequate due to the lack of follow-up and monitoring, as the patient was not offered a psychiatric contact for over two months between February 18, 2025 and April 21, 2025.

Routine PC contacts were offered weekly in a confidential setting. The patient had consistent attendance and engagement in his individual PC sessions. He often presented with frustration regarding his PBSP placement, and the PC worked with him to improve distress tolerance and coping skills. Although the patient often engaged in negative and aggressive behavior toward custody and while in the housing unit, the PC noted that he functioned appropriately in mental health groups and during individual contacts. The PC also opined that his presentation was better attributed to behavior disturbance and low frustration tolerance than mental illness. The treatment provided during the sessions generally aligned with the treatment plan, but the provision of CBT and DBT interventions were not always clearly documented.

The patient was offered an introduction to EOP and recreation therapy groups. He attended one of three introduction to EOP group sessions. The recreation therapy groups consisted of leisure activities. His attendance at recreation therapy groups was initially inconsistent but improved significantly by the end of the review period. In March 2025, the patient attended 91 percent of scheduled treatment compared with 66 percent attendance in February 2025.

**Findings**

The treatment provided to this patient was adequate.

The patient was seen timely for well documented clinical contacts except for psychiatric contacts that did not occur in March 2025. Treatment planning was adequate for the patient's needs, and the treatment goals appropriately targeted the patient's depressed mood and low frustration tolerance. He was seen consistently by the PC when a strong therapeutic alliance was developed, and interventions were provided that aligned with the treatment plan. Medication adjustments occurred appropriately in response to side effects and nonadherence. Group offerings were appropriate, and the patient's attendance and participation improved.

**Patient S**

This 36-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. He was provided diagnoses of schizoaffective disorder, bipolar type; opioid use disorder; and synthetic cannabinoid abuse. He was prescribed Prozac, Haldol, Cogentin, Zyprexa and Vistaril PRN, and Suboxone.

The patient arrived at PBSP on April 10, 2024 from CSP/Sac. He had previously received mental health services at the 3CMS, EOP, MHCB, and acute levels of care.

The patient, assigned clinicians, and a CC II attended the routine IDTT meeting on October 23, 2024. The treatment plan was adequate with identified problems/treatment targets that included substance use, psychosis, treatment adherence, and pre-release planning. Appropriate goals and specific clinical interventions and techniques were provided for each problem, and the response to treatment was updated. The IDTT noted that the patient met the higher level of care criterion for participation in fewer than five hours of treatment weekly; the patient refused nearly all offered treatment in the prior quarter. The patient reported that he avoided leaving his cell to prevent conflicts with peers, but the IDTT speculated that he was using substances and avoiding staff. He

was noted as stable and maintained at the EOP level of care. The discharge and level of care rationale were adequate.

The next IDTT meeting occurred on December 18, 2024 due to ongoing group treatment refusals. The patient did not attend, but the required and assigned staff were present. The IDTT indicated that the patient continued to refuse groups but attended most individual PC contacts. He continued to report fear of conflicts as the reason for group refusals. The IDTT placed the patient on EOP modified programming so that he could focus on the groups he found most beneficial while the PC taught him anger management and conflict resolution skills. His primary treatment goals remained unchanged and appropriate.

The patient, assigned providers, and other required staff attended an IDTT meeting on January 15, 2025. At that meeting, the treatment team noted no change in the patient's group attendance, and he maintained that he refused groups to avoid trouble, as he was scheduled for parole two weeks later. The treatment team appropriately adjusted the treatment plan to focus on individual PC sessions and parole-related activities. The patient was described as stable, medication adherent, and focused on securing treatment services post-release.

The psychiatric care was severely inadequate, as the patient was not seen for routine psychiatric contact between October 1, 2024 and his parole on February 2, 2025. A psychiatric technician progress note on October 6, 2024 indicated that the patient's Haldol, which was provided by a PC 2602 order, was not renewed and had expired on October 5, 2024. The psychiatric technician stated that they emailed the psychiatrist and asked the TTA RN to obtain a bridge order from the on-call psychiatrist. There was no documentation in the healthcare record that the medication was renewed by the on-call or assigned telepsychiatrist. A psychiatric progress note on December 26, 2024 by a covering psychiatrist simply stated "patient refused labs."

PC contacts were offered weekly by telemental health. The patient frequently refused his scheduled PC individual contacts and was often seen cell front or in the rotunda of his housing unit. The progress notes were adequate and included updated mental status, clinical observations, and interventions that were consistent with the treatment plan. The PC made appropriate referrals to assist in prerelease planning. The session content primarily focused on parole preparation and improving coping skills. The patient's mood was often euthymic, and he remained generally stable without any significant distress. He occasionally reported auditory hallucinations describing them as annoying but not overly bothersome. It appeared that treatment termination was appropriately performed with the PC.

The patient was offered clinical and recreation therapy groups. Clinical groups were offered weekly, and the topics were symptom management and life skills. The clinical groups were facilitated by a psychologist, LCSW, and an unlicensed social worker. The recreation therapy groups were leisure focused and were offered several days weekly. The groups were appropriate for the patient.

The patient paroled from PBSP on February 2, 2025.

**Findings**

The treatment provided to this patient was inadequate.

Although treatment planning and PC care were adequate and appeared to meet the patient's needs; the overall care was inadequate due to severe lapses in psychiatric continuity of care and routine contacts. The patient was not seen for routine psychiatric contact between October 1, 2024 and his parole date of February 2, 2025. This was particularly concerning as the patient received his antipsychotic medication by a PC 2602 order; the appropriate monitoring and medication management did not occur. There was no documentation that the psychiatric technician request for a medication refill was addressed; additionally, a severely inadequate psychiatric progress note indicated the patient had refused laboratory studies, and there was no subsequent follow-up.

**Patient T**

This 36-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. He was provided a diagnosis of schizoaffective disorder and was prescribed Haldol, Vistaril, and melatonin. The patient received mental health services at the 3CMS, EOP (including EOP modified programming), MHCB, and intermediate levels of care. Pertinent medical concerns included asthma and hypertension.

The patient arrived at PBSP on November 23, 2024 from the CHCF PIP intermediate care unit. The patient's mental health symptoms were directly related to his index offense with command auditory hallucinations and delusional thinking.

The patient was admitted to the CHCF intermediate care unit on October 20, 2023 due to suicidal ideation and for initiation of treatment with clozapine. He was provided timely five-day follow-up contacts after his arrival at PBSP. The contacts were appropriately documented and included an adequate safety plan. The patient denied suicidal ideation or distress at each contact and appeared future oriented.

The initial mental health assessments occurred timely and were documented appropriately. The initial psychiatric assessment occurred on November 26, 2024. The assessment was comprehensive and included thorough clinical and psychosocial histories. The patient reported that clozapine caused side effects, and he agreed to continue his medication regimen of Haldol, Vistaril, and melatonin. At the initial PC assessment on December 3, 2024, the PC provided a provisional diagnosis of depersonalization (dissociative) disorder that had not been documented elsewhere in the healthcare record. The patient reported that no medications had been effective in significantly decreasing or eliminating the auditory hallucinations, and he had almost constant passive suicidal ideation and intermittent active suicidal ideation.

The initial IDTT meeting occurred on December 4, 2024; the patient and required participants were in attendance. The PC and psychiatrist participated by telemental health and telepsychiatry. The treatment planning was inadequate. Problem areas of depression and auditory hallucinations were documented; however, the patient denied depressive symptoms. Short term objectives were vague and generalized, and no long-term goals or clinical interventions were provided. The level of care rationale and discharge criteria were inadequate. The IDTT did not indicate whether the

patient met the criterion for consideration of higher level of care referral, and the EOP functional evaluation was not completed.

The routine IDTT meeting on February 26, 2025 also included the necessary participants and the patient. The treatment plan continued to lack meaningful treatment goals and did not provide any clinical interventions to address mental health symptoms. No level of care rationale or discharge criteria were provided. The PC noted the patient's low group attendance and that he was more likely to participate in individual contacts due to his index offense, but no indicators for higher level of care consideration were identified.

Psychiatric contacts occurred monthly in a confidential setting by telepsychiatry. The progress notes were adequate and were appropriately updated at each routine contact. The patient consistently reported auditory hallucinations but denied suicidal ideation during the review period. The telepsychiatrist frequently discussed increasing Haldol or treatment with a different antipsychotic medication to address the constant auditory hallucinations, but the patient declined significant medication adjustments. The only medication adjustment during the review period occurred on March 3, 2025, when Prozac was initiated to address increased depression.

PC contacts occurred weekly in a confidential setting by telemental health. The session content indicated that the patient remained generally stable despite ongoing auditory hallucinations until he reported increased depressive symptoms in February 2025. The PC responded appropriately and provided clinical interventions that were beneficial that included CBT techniques, reality testing, and logo therapy. The patient's treatment adherence improved significantly during the review period, and he had 99 percent attendance in March 2025.

The patient was assigned to the introduction to EOP and recreation therapy groups. He did not attend any of the offered introduction to EOP group sessions. The recreation therapy groups were offered several days per week and consisted of leisure and social activities. The group assignments were appropriate.

**Findings**

The treatment provided to this patient was adequate.

The overall care and treatment were adequate, despite the lack of adequate treatment planning. Five-day follow-up contacts occurred timely and were adequately documented. The IDTT meetings occurred timely and included the necessary participants; however, long-term treatment goals and interventions were not provided to address the patient's mental health symptoms. Routine clinical contacts were provided consistently, and the patient developed good rapport with his clinicians. The psychiatrist consistently discussed medication options to address auditory hallucinations, but the patient was resistant to medication changes. The PC provided specific and clinically appropriate interventions that should have been included in the actual treatment plan; as the patient responded very well, and his treatment adherence improved significantly.

**Patient U**

This 51-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. He was provided diagnoses of major depressive disorder, recurrent, with psychotic features; PTSD; and severe opioid use disorder. He was not prescribed psychotropic medication during the review period but was prescribed Depakote and Vistaril until September 2024 when he refused all medications and asked that they be discontinued at a psychiatric contact on September 26, 2024. Pertinent medical concerns included neutropenia, thrombocytopenia, and hyperlipidemia.

The patient arrived at PBSP on January 26, 2024 from SVSP. The patient had received mental health services at the 3CMS, EOP (including EOP modified programming), and MHCB levels of care.

Three IDTT meetings occurred during the review period. The patient and required staff, including the assigned clinicians attended each meeting, and the PC and psychiatrist participated by telemental health and telepsychiatry. At the routine IDTT meeting on December 18, 2024, the PC reported that the patient had abruptly stopped attending mental health groups one month prior without substantive justification, but he continued attending NLTGs. The patient requested placement at the 3CMS level of care at the IDTT meeting, and the PC noted that he had made the request previously. The treatment team decided to place the patient on EOP modified programming that was limited to NLTGs and individual contacts. The treatment plan previously focused on depressed mood/irritability as the sole problem area, and the IDTT added treatment participation as a problem area and provided appropriate goals and clinical interventions. The level of care rationale and discharge criteria were appropriate and indicated that they would convene an update IDTT in 30 days to determine whether the patient would discharge to the 3CMS level of care if he was successful in EOP modified programming.

At the update IDTT meeting on January 15, 2025, the patient continued to advocate for the 3CMS level of care, but the PC told him that the treatment team did not plan to make the level of care change at that time. The patient had only partially met his treatment goals, and the goals were not changed. The discharge plan indicated that the patient was stable, participated in individual contacts, and would be brought back to the IDTT in one week to complete discharge to the 3CMS level of care. It was unclear why the patient was retained for an additional seven days.

At the discharge IDTT meeting on January 22, 2025, the IDTT discussed the patient's mood symptoms of irritability that might impact his social interactions. The patient reported that he understood their concerns, but he did not foresee any barriers or issues functioning at the 3CMS level of care. The patient was subsequently placed at the 3CMS level of care.

The patient's psychotropic medications were discontinued at a routine psychiatric contact on September 26, 2024 after frequent refusals; the patient reported that he felt better without the medications. He was seen for a routine psychiatric contact on December 10, 2024 when he reported that he was able to make significant progress after medications were discontinued. The patient further elaborated that he would have a parole board hearing the next year, and the medications caused sedation and interfered with his ability to prepare for the hearing. He continued to decline psychotropic medication treatment, and the psychiatrist noted stability. The patient was not seen for subsequent psychiatric contact before his level of care was lowered to 3CMS.

The patient was seen for weekly routine PC contacts by telemental health. He initially refused his scheduled confidential individual contacts and participated in cell front or housing unit check-ins, but his individual contact attendance increased significantly in December 2024, and he refused only one individual contacts between December 1, 2024 and 3CMS placement. The PC frequently documented the presence of euthymic mood, but the patient consistently perseverated on various perceived injustices related to the institution, CDCR policies, and medical issues such as foot and finger pain. The PC provided active listening interventions but did not challenge his thoughts or behaviors, as he was very difficult to redirect. Signed refusals were obtained for the nonconfidential contacts.

The patient was assigned recreation therapy groups focused on leisure activities. He refused to attend nearly all assigned groups after November 18, 2024 and was placed on EOP modified programming at the December 18, 2024 IDTT meeting in anticipation of discharge to the 3CMS level of care. He attended two recreation therapy groups in the week prior to discharge. The patient reportedly described the groups as boring when he was asked why he refused to attend the groups.

**Findings**

The treatment provided to this patient was adequate.

The treatment plan included measurable and individualized goals to address the patient's depressive symptoms and treatment nonadherence. The treatment team was cautious in their assessment of the patient's symptoms prior to reducing his level of care to 3CMS and appropriately placed him on EOP modified programming to monitor his response to fewer group assignments. The patient was not prescribed psychotropic medication during the review period, but he was seen twice for routine psychiatric contacts and remained psychiatrically stable with no significant increase in symptoms or decline in functioning. PC contacts were offered weekly when supportive therapy was provided.

**Patient V**

This 37-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. He was provided diagnoses of major depressive disorder, recurrent, with psychotic features; opioid use disorder; and amphetamine-type substance (or other stimulant) induced psychotic disorder with mild use. The patient was prescribed Lithium, Paxil, Thorazine and Vistaril PRN. His medical history was remarkable for hepatitis C.

The patient arrived at PBSP on October 26, 2024 from the CMF-PIP acute unit. He previously received mental health services at the 3CMS, EOP, MHCB, and acute levels of care, and the patient had a history of multiple suicide attempts and incidents of self-injurious behavior. The recent acute care admission occurred after a suicide attempt with intent to die involving laceration and foreign body ingestion.

Five-day follow-up contacts were adequately provided by PCs when the patient arrived at PBSP. The patient denied active suicidal ideation at each contact and presented with stability and no distress. His only concern was boredom as he awaited his property; he participated in yard and dayroom to remain active.

The initial psychiatric assessment by telepsychiatry was completed on October 29, 2024; the assessment was comprehensive and well documented. The patient reported moderate depression, anxiety, and command auditory hallucinations telling him to harm himself; but he stated that he was able to control his behavior, and the auditory hallucinations were improving in response to medication treatment. The psychiatrist noted three suicide attempts in CDCR that resulted in minor injury; the patient stated that he had intent to die with the attempts, but he denied current active suicidal ideation or plan.

The patient refused to participate in the initial PC assessment on November 5, 2024, and most of information was pulled forward from the previous IDTT documentation. The EOP functional evaluation was not completed. The assessment included clinical and psychosocial histories and was useful in informing treatment despite the patient's refusal to participate.

The initial IDTT meeting on November 6, 2024 was attended by the assigned clinicians and other required participants, but the patient refused to attend. The psychiatrist attended by telepsychiatry, and the PC was onsite. The treatment planning was inadequate. The problems and treatment goals were pulled forward from the acute care treatment plan that indicated that all the goals were met. The level of care rationale and discharge criteria were generalized and indicated that the patient was functioning well without support from EOP clinicians, as he had refused most contacts and the initial PC assessment. The IDTT documentation indicated that the patient would continue to be monitored and provided cell front contacts.

The patient and required participants attended an update IDTT meeting on January 28, 2025. The treatment team noted the patient's parole date of April 20, 2025. The patient reported improvement in auditory hallucinations and depressive symptoms after the psychiatrist increased Thorazine, and he denied suicidal ideation. Although he verbalized treatment goals of reducing anxiety and depressive symptoms by CBT techniques; those goals and interventions were not included in the treatment plan that remained unchanged from the initial IDTT meeting. The IDTT did not identify criterion for consideration of referral to a higher level of care, and level of care rationale and discharge criteria were not documented. The treatment planning was inadequate and failed to provide substantive treatment goals or interventions to support the patient as he prepared for release from prison in the upcoming months.

The patient was seen for timely routine telepsychiatry contacts in a confidential setting. There was documentation of active collaboration with the psychiatrist regarding medication management. The patient denied side effects, and his medication adherence improved during the review period. Although he consistently reported moderate to severe anxiety, depression, and command auditory hallucinations; he did not demonstrate serious impairment in activities, and he reported normal sleep and appetite.

PC contacts occurred weekly and occasionally were provided in a nonconfidential setting due to modified programming or external weather incidents. The patient participated in each individual session and remained generally stable. The PC progress notes were generally adequate, were updated appropriately, and included some appropriate treatment interventions intended to help the patient remain stable and to prepare for parole. The patient responded very well to the PC interventions and encouragement, and his treatment attendance at the end of March 2025 was 99 percent.

The patient was offered recreation therapy leisure groups as well as introduction to EOP and life skills groups. He attended almost all offered groups until his parole. Group topics were appropriate, and the patient told his providers that the groups were helpful in maintaining stability as he approached his parole date.

**Findings**

The treatment provided to this patient was adequate.

The overall care and treatment were adequate despite inadequate treatment planning. The patient was seen timely for well documented clinical contacts from the telepsychiatrist and PC, and he responded well to treatment. His medications were adjusted in response to his symptoms, and the patient denied medication side effects. The PC met with the patient weekly and provided supportive therapy and positive reinforcement as his parole date approached. Group offerings were appropriate with good treatment adherence.

**Patient W**

This 47-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided a diagnosis of schizophrenia, paranoid type. He received his psychotropic medications by a PC 2602 order and was prescribed Zyprexa, Invega Sustenna, and Depakote; Haldol and Zyprexa injections were ordered upon medication refusal.

The patient arrived at PBSP on July 3, 2024 after inpatient treatment at the CMF-PIP acute unit where he was hospitalized from February 14 to July 17, 2024. The patient had received mental health services at the 3CMS, EOP, MHCB, and acute levels of care. Pertinent medical concerns included dyslipidemia and obesity,

A quarterly IDTT meeting occurred on October 9, 2024; the patient, assigned clinicians, and other required participants were in attendance. The PC and telepsychiatrist participated remotely. The treatment team noted that the patient was medication adherent and stable since his last IDTT meeting, and he generally denied symptoms and the need for mental health treatment. Treatment planning was appropriate, and problem areas included medication adherence, stress management, lack of insight into mental illness and medication treatment, and desire for treatment at a lower level of care. Each problem had individualized and measurable goals and specific clinical interventions. Progress and response to treatment were updated appropriately. The IDTT noted that the patient met the criterion for consideration of higher level of care referral for lack of treatment participation, as he had refused all of groups for the past 11 weeks. The treatment team

provided adequate rationale for nonreferral and explained that the patient attended individual therapy regularly and was at his baseline, but his paranoid ideation likely played a significant role in his avoidance of group settings.

The next quarterly IDTT meeting occurred on December 26, 2024, when the patient requested downgrade to the 3CMS level of care. The required participants except for a covering telepsychiatrist attended the meeting. The IDTT noted the patient's ongoing stability, and he had met all his treatment goals except treatment participation; they agreed to convene a final discharge IDTT meeting within the next 30 days if the patient remained stable.

The next IDTT meeting did not occur until February 26, 2025, and the patient did not attend; the assigned clinicians and required staff were present at the meeting. The PC noted that the patient was consistently stable and high functioning but could deteriorate rapidly if not medication adherent. He refused 93 percent of offered treatment in the previous 30 days and said he received no benefit from groups or social interactions. The treatment plan provided specific interventions including gradual exposure and grounding techniques to encourage group attendance. The patient was retained at the EOP level of care to continue working on insight development and to ensure his readiness for the 3CMS level of care.

The psychiatric care during the review period was severely inadequate. The patient was only seen for two confidential telepsychiatry contacts during the review period despite treatment with antipsychotic and mood stabilizing medications and an active PC 2602 order. The most recent telepsychiatry contact prior to the review period occurred on September 12, 2024, when the patient was noted to be medication adherent and stable with very poor insight. He was not seen again by the telepsychiatrist until December 19, 2024 for renewal of the PC 2602 order. The patient remained with poor insight and could not answer questions related to his diagnosis, symptoms, or medications. He remained medication adherent, denied side effects, and was psychiatrically stable on the medications, and the PC 2602 was renewed. A routine psychiatric contact occurred on February 3, 2025 when the patient reported no complaints or distress and remained medication adherent.

Routine PC contacts occurred weekly during the review period by telemental health in a confidential setting except on rare occasions when cell front check-ins were conducted due to custody modified programming. The patient attended almost all the offered individual contacts sessions and had very good rapport with his telemental health PC. His mood was consistently described as euthymic, and he never reported or demonstrated any distress or increase in symptoms. The progress notes were updated appropriately at each contact, and the PC provided insight building interventions and positive reinforcement of the patient's attendance and participation in individual sessions. On March 31, 2025, the PC described the patient as odd but consistently stable and well-functioning with medication adherence due to the PC 2602 order, although he lacked insight and denied mental illness.

The patient did not attend groups during the review period. He was offered recreation therapy groups and a clinical stress management group, which would have been appropriate had he attended.

**Findings**

The treatment provided to this patient was inadequate.

The psychiatric care was severely inadequate, particularly given the PC 2602 order and treatment with antipsychotic and mood stabilizing medications. The PC 2602 renewal assessment and one routine contact were the only two telepsychiatry contacts that occurred during the review period. Although the patient remained generally stable, the prolonged time between contacts and lack of monitoring represented severe deficiencies in psychiatric care.

**Patient X**

This 67-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at PBSP. He was provided diagnoses of unspecified depressive disorder, opioid use disorder, and methamphetamine use disorder. He was prescribed BuSpar, Zyprexa, Remeron, and Suboxone.

The patient arrived at PBSP on April 19, 2024 from the NKSP MHCB. He previously received mental health services at the 3CMS, EOP, and MHCB levels of care.

A quarterly IDTT meeting occurred on October 16, 2024. The patient refused to attend, but assigned clinicians participated by telehealth. The treatment plan was inadequate and included contradicting treatment goals and interventions that were limited to exploring the etiology of depressive symptoms, teaching coping skills, and goal setting. The level of care rationale and discharge criteria were brief but appropriate. The IDTT noted that the patient met the criterion for consideration of higher level of care referral for frequent treatment refusals; he was identified as a high refuser for 12 of the previous 13 weeks. The IDTT noted that the patient had increased depression and anxiety due to the poor health of his only remaining family member in the community, and he was recently advised to waive his upcoming BPH hearing for one to two years due to an RVR for fighting the previous year. It was noted that the patient would address those issues during individual PC contacts and would be considered for a higher level of care at the next IDTT meeting if his group attendance did not improve.

The patient refused to attend the next IDTT meeting on January 8, 2025 that included the necessary participants except for a covering PC. The clinical summary was not updated, and the patient continued to meet the criterion for consideration of referral to a higher level of care due to treatment refusals. Treatment goals and interventions were not updated despite the clear lack of effectiveness or clinical response from the patient.

A sustainable process review IDTT meeting occurred on February 26, 2025; the patient and required participants were in attendance. The patient reported severe hopelessness and amotivation due to his BPH delay, and the IDTT provided support and encouragement and volunteered to provide him with additional materials to help prepare for the next hearing. The patient was receptive, committed to seeking additional support if the amotivation continued to impact his treatment participation, and agreed that a higher level of care would be appropriate if his symptoms did not improve. They also identified the patient's cellmate as a strong protective factor. The treatment team provided adequate rationale for nonreferral to a higher level of care.

Adequate treatment goals and interventions were not developed or updated to address the patient's ongoing distress and depressive symptoms.

The psychiatric care was severely inadequate. The patient was seen for a routine psychiatric contact on February 18, 2025 by telepsychiatry. The contact occurred in a confidential setting, and the patient reported severe depression and anxiety. He was not fully medication adherent and routinely missed his noon BuSpar due to excessive sleep, and the medication timing was changed. There was no documented discussion of adjusting the patient's antidepressant medication in response to increased symptoms that impacted his treatment adherence. A routine telepsychiatry contact was attempted on March 20, 202, but the patient refused the office visit and did not participate in the cell front check-in.

The patient was seen for weekly PC contacts by telemental health during the review period. Most contacts occurred in a confidential setting unless modified custody programming mandated cell front contacts. The progress notes were well written and were updated appropriately at most contacts. The patient's attendance at scheduled individual contacts vacillated, but his refusal rate increased as his depressive symptoms increased. He was often apologetic for missing his individual contacts, but the progress notes did not include any substantive clinical interventions to address his symptoms or his declining participation. The PC noted that despite his symptoms and treatment nonadherence, the patient was mentally stable and maintained his ADLs without assistance or prompting. Overall PC contacts occurred timely but were clinically inadequate and did not provide sufficient interventions to address the patient's increased depression.

The patient was offered approximately six hours per week of recreation therapy groups that were leisure focused and included games and social activities. The patient was a treatment high refuser, but his group attendance increased slightly when scheduled in the afternoon. Group topics were appropriate, but a symptom management clinical group might have been beneficial.

**Findings**

The treatment provided to this patient was inadequate.

Treatment planning was inadequate for the patient's needs. His depressive symptoms increased significantly after he received bad news about his upcoming BPH hearing, and his individual contacts and group attendance sharply declined. The treatment team did not develop additional treatment goals or specific interventions to target his hopelessness and amotivation. Psychiatric care was severely inadequate and infrequent, as the patient was seen for only two routine telepsychiatry contacts despite being prescribed antipsychotic and mood stabilizing medications and his noted decline in overall functioning. PC contacts were offered weekly, and a therapeutic alliance was established; however, the PC progress notes did not include substantive clinical interventions to address the patient's increased symptoms and treatment nonadherence.

**Patient Y**

This 32-year-old male patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, unspecified schizophrenia and other psychotic disorder, other or

unspecified stimulant disorder, posttraumatic stress disorder (PTSD), insomnia disorder, opioid use disorder, and cannabis use disorder. He was fully adherent to his prescribed mirtazapine and risperidone. He was also prescribed hydroxyzine as needed and buprenorphine-naloxone for his substance use disorder. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This individual was incarcerated within CDCR on two occasions. His first period of incarceration lasted from December 2018 through May 2021 and he was not enrolled in the MHSDS during that time. Upon returning for his current period of incarceration on November 27, 2023, he was not enrolled in the MHSDS until September 2024 when he was placed at the 3CMS level of care. He experienced seven referrals or placements at the MHCB level of care through January 2025, being returned to the 3CMS level of care each time. He was most recently admitted to the MHCB level of care at PBSP on January 9, 2025 after making suicidal statements.

The initial MHPC assessment was completed on January 9, 2025 and documented that the patient was stable and ready for discharge; however, the patient would have to wait for his IDTT the following day and would likely not be discharged until after the weekend. The assessment was completed at cell front, without rationale for the nonconfidential contact. The disposition decision was based primarily on the patient's self-report and as such, only marginally adequate. The patient was seen the following day for an initial IDTT. Required staff were present; however the psychologist who completed the initial assessment was not present at the meeting. Documentation indicated that the patient needed to be considered for a higher level of care given the number of MHCB referrals and admissions in the previous six months. There was no rationale documented for the decision not to refer the patient to a higher level of care. The treatment modification listed were appropriate to address the patient's needs but were not applicable to the MHCB setting. Additionally, a safety plan was documented but included text taken from a progress note written prior to the patient's admission and included the same copied text in a number of sections throughout the safety plan. The treatment plan included reasonable and measurable goals along with appropriate interventions; however, the goals were written in October 2024 and noted that they had been met. The IDTT decided to discharge the patient to the 3CMS level of care despite no treatment being offered to the patient and no rationale other than the patient's self-report.

Daily contacts with the patient were completed at cell front by MHPCs due to "modified programming." The patient was never assessed by a psychiatrist other than during the IDTT. The patient was discharged on January 13, 2025 to the 3CMS level of care.

**Findings**

Treatment of this patient was inadequate. Documentation relied almost entirely on patient self-report and prior entries in the record. The safety plan and treatment plan were inadequate. Documentation focused on statements made by the patient that were untrue, rather than assessing what was actually happening that precipitated the crisis.

**Patient Z**

This 23-year-old male patient was provided with a diagnosis of schizoaffective disorder, depressive type. He was fully adherent to his prescribed olanzapine. His case was selected at

random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This individual was incarcerated for the first time within CDCR on August 31, 2022. He entered the MHSDS at the 3CMS level of care on May 15, 2024. He was admitted to the MHCB level of care in August 2024 and was discharged to the 3CMS level of care but elevated to the EOP level of care on October 10, 2024. He experienced two additional MHCB placements in October 2024 and was discharged to the EOP level of care both times. He was admitted to the MHCB level of care at PBSP on January 13, 2025 after reporting suicidal ideation and staff finding manufactured nooses in his cell.

An initial psychiatric assessment was completed on the day of his admission by a telepsychiatrist and was limited in scope, not representative of a comprehensive assessment. An MHPC initial assessment was also completed on the day of admission and was adequate. Later that same day, an initial IDTT was held with required staff present; however the psychologist who completed the initial assessment was not at the meeting. Documentation indicated that the patient needed to be considered for a higher level of care secondary to the frequency of MHCB referrals over the previous six months. Rationale for not making the referral was marginally adequate and referred only to the patient's current mental status and not his long-term needs. Enhancements in treatment to support the patient in the current level of care were adequate. The treatment plan was not updated since August 2024 and contained goals that were not applicable to his current needs.

Attempts were made to see the patient daily, but he refused all contacts. He was taking his prescribed olanzapine as ordered. A safety plan was created without participation from the patient on January 17, 2025 and it was adequate. An IDTT was held with required staff and the patient in attendance on January 17, 2025 and the decision was made to discharge the patient to the EOP level of care with a recommendation for modified programming. There was evidence of multidisciplinary input; however, the treatment plan remained unchanged. The patient attended confidential contacts with MHPCs over the following two days with evidence of attempts to utilize clinical interventions to assist the patient.

**Findings**

Treatment of the patient was adequate. The initial psychiatric assessment was superficial and limited in scope.

**Patient AA**

This 37-year-old male patient was provided with diagnoses of unspecified depressive disorder and adjustment disorder with mixed anxiety and depressed mood. He was fully adherent to his prescribed escitalopram and partially adherent to mirtazapine. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This individual was first incarcerated within CDCR briefly from December 2013 through February 2014 and was not enrolled in the MHSDS. He was reincarcerated for his current term on March 15, 2022. His first time receiving services within the MHSDS was when he was admitted to the MHCB level of care on March 26, 2024. He was discharged to the 3CMS level of care, was admitted to the MHCB level of care at PBSP from October 30, 2024 through November 5, 2024 only to be readmitted on November 7, 2024.

The patient had been reporting suicidal ideation since his discharge from MHCB on November 5, 2024. He reported that he did not feel safe in his housing unit and would continue to report suicidal ideation until he received a housing change. He also reported severe back pain during this time. He was admitted to alternative housing after hours and assessed as being at moderate risk for suicide secondary to his suicidal statements with a plan to hang himself. An initial psychiatric assessment was completed at the time of admission via telepsychiatry. The content was superficial and limited in scope, lacking any historical information. The patient was restarted on an antidepressant medication. An MHPC initial assessment was documented on the same day and the information appeared to be pulled in its entirety from previous documentation and not updated. An initial IDTT meeting was held with required staff present on November 8, 2024. The patient refused to attend. The treatment plan included measurable and reasonable goals with appropriate interventions.

The patient refused nearly all daily contacts and consistently reported on-going suicidal ideation. A safety plan was created without patient input on November 14, 2024. A discharge IDTT with required staff in attendance was held on November 15, 2024 noting that the patient has received "maximum benefit" from his stay in MHCB. His disengagement and use of suicidal statements to affect housing were noted. The IDTT documented that the patient's safety concerns were investigated and unfounded. A discharge SRASHE was completed on November 17, 2024. It included the previously created safety plan and noted that his risk for suicide was moderate and unchanged since his admission. The patient was to be discharged the following day and seen for five-day follow-up contacts.

**Findings**

Treatment of this patient was adequate given his refusal to engage in treatment and his desire to change housing with suicidal statements. Initial assessments needed improvement.

**Patient BB**

This 28-year-old male patient was provided with diagnoses of unspecified schizophrenia and other psychotic disorder, borderline personality disorder, antisocial personality disorder, and persistent depressive disorder. He was fully adherent to his prescribed olanzapine. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period.

This individual was serving his third period of incarceration within CDCR. During his two prior terms, he was treated at the 3CMS level of care. During his current period of incarceration, which began on January 9, 2023 he was initially placed at the 3CMS level of care but was admitted to the MHCB level of care in February 2023. He was discharged to the EOP level of care and experienced a number of MHCB admissions and inpatient placements at the ICF and Acute levels of care through January 2024. Since being discharged to the EOP level of care on January 18, 2024 he was admitted to the MHCB level of care two additional times and also had an eight-day placement at the 3CMS level of care prior to one of the admissions. He transferred to PBSP at the

EOP level of care on December 12, 2024 and was admitted to the MHCB on December 25, 2024 after reporting suicidal ideation. The patient was being treated under a PC 2602 order.

The initial psychiatric assessment was completed via telepsychiatry while the patient was in alternative housing. The telepsychiatrist noted that the internet connection failed prior to the completion of the assessment. The content was limited in scope to a status assessment with limited historical information and no case formulation. An initial MHPC assessment was completed the following day and noted that the patient was not interviewed due to "modified program." The assessment was based solely on chart review and was limited by the lack of interaction with the patient. Psychiatric technician documentation on December 26, 2024 noted that the patient expressed concern that he would die soon, either by overdose or by being killed by officers. This encounter did not appear to be recognized by the MHPC who documented the following day that the patient's "crisis behavior has quickly resolved" and he would be considered for discharge during his IDTT.

An initial/discharge IDTT was held with required staff present, although the psychiatrist present at the meeting had not met the patient previously. The patient was in attendance but noted to be argumentative and used profanity against the staff, so he was asked to leave the meeting which continued in his absence. The team decided that the patient was ready for discharge to the EOP level of care in the RHU setting with the rationale being that his behavior was driven by personality characteristics and not severe mental illness. It was not clear how this distinction impacted the patient's risk for harm to himself and suicidal thoughts which precipitated his admission. There was no mention of treatment goals or treatment progress. A safety plan was created on the same day in collaboration with the patient and appeared adequate. When the patient was seen the following day by a senior psychologist specialist who had not seen him previously, the psychologist documented that the patient was displaying "obvious hypomania" and the patient's symptoms, presentation, and danger to himself needed to be monitored. The psychologist completed a SRASHE and noted the patient to be at moderate risk for harming himself, but "treatable" in an outpatient setting. The psychologist noted that the patient was looking forward to receiving a copy of his safety plan, which was provided to him later that day.

Of note, the banner bar in the patient's healthcare record noted preferred female pronouns, yet all documentation in the record used male pronouns.

**Findings**

Treatment of this patient was not adequate. Initial assessments were inadequate. There was no treatment plan created for the patient and the decision to discharge him was made prior to his initial IDTT meeting. There were discrepancies in documentation that were not resolved regarding the patient's suicidal thoughts and symptom presentation. The safety plan was adequate; however.

**Patient CC**

This 44-year-old male patient was provided with diagnoses of bipolar disorder, unspecified anxiety disorder, and unspecified bipolar and related disorder. He was mostly adherent to his prescribed

aripiprazole and bupropion and nonadherent to hydroxyzine. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period.

This individual was incarcerated within CDCR on five occasions. During his first term, which lasted from November 2004 through January 2009, he was treated at the 3CMS and EOP levels of care. Upon reincarceration in July 2009, he was placed the 3CMS level of care but was eventually admitted to the MHCB, discharged to the EOP level of care and then admitted to Atascadero State Hospital in December 2009 where he remained until his release in June 2012. Upon returning to CDCR from June 2014 through February 2015, he was treated at the EOP level of care. During his term between April 2022 and August 2023, he was treated at the EOP and 3CMS level of care and had one MHCB admission in December 2022. He was incarcerated for his current term on March 13, 2024 and placed at the 3CMS level of care. He was admitted to the MHCB level of care at PBSP on November 12, 2024 after reporting suicidal ideation.

An initial MHPC assessment was completed on November 13, 2024 despite the patient's refusal to engage in the assessment. The content was based solely on record review and was limited as a result. Similarly, the SRASHE was completed solely based on record review and noted the patient's risk to be high given that he could not be assessed. An initial IDTT meeting was held the same day with required staff and the patient in attendance. The telepsychiatrist had attempted to meet the patient prior to the meeting, but the patient did not respond to requests to be seen when approached at cell front. The patient reported safety concerns and noted that he stated he was suicidal because he did not believe that custody staff were taking his safety concerns seriously. Appropriate goals and treatment interventions were documented.

The following day, the patient reported during an MHPC contact that this bupropion was being discontinued because it was nonformulary. The patient reported that he tried to see the telepsychiatrist the day prior but the screen kept freezing. There was no documentation of this failed attempt at a telepsychiatry appointment in the healthcare record. The MHPC noted that the patient did not want to engage in safety planning, as he was not suicidal and believed that safety planning did not address his needs. The MHPC created an adequate safety plan despite this and noted that an investigation was initiated by custody staff regarding the patient's safety concerns. Of concern, the MHPC documented that the patient stated he was never really suicidal, but if he were, "I would just hang myself and snap my neck." Subsequent daily contacts were offered to the patient, although he occasionally refused. When he saw the psychiatrist on November 18, 2024, the patient expressed a desire to remain on bupropion, but the psychiatrist documented that there was no clinical indication for the medication, suspected misuse, and was continuing the taper to discontinue it.

A discharge IDTT meeting was held on November 20, 2024 with required staff and the patient in attendance. Documentation indicated that one, but not both of his treatment goals had been met. The patient reported increased anxiety and depression secondary to the discontinuation of his bupropion and noted that he would return to MHCB if he was returned to his previous housing unit. The rationale for discharge was adequate. A discharge SRASHE was completed adequately. It noted the changing nature of his suicide risk based on environmental factors and incorporated his previously completed safety plan. He was provided with a copy of his safety plan prior to discharge.

**Findings**

Treatment of this patient was adequate given the patient's resistance to engaging in treatment other than his desired medications. This made the delivery of interventions to assist him a challenge.

**Patient DD**

This 25-year-old male patient was provided with diagnoses of unspecified depressive disorder and adult antisocial behavior. He was fully adherent to his prescribed mirtazapine, olanzapine and hydroxyzine and non-adherent to his aripiprazole. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This patient was incarcerated within CDCR on February 22, 2023 and placed at the 3CMS level of care while at the reception center. He was elevated to the EOP level of care in August 2023 and was admitted to the MHCB level of care in October 2023. He was discharged to the EOP level of care in November 2023 and was reduced to the 3CMS level of care in August 2024. He was admitted to the MHCB level of care at PBSP on February 12, 2025.

The patient arrived to PBSP on February 12, 2025 and reported to custody staff that he heard voices telling him to kill himself. He noted an intent and plan and placed in alternative housing. The following morning he was seen via telepsychiatry for an initial assessment. The patient reported being suicidal secondary to his transfer to PBSP and his movement from EOP to the 3CMS level of care. The psychiatrist documented that the patient's olanzapine would be discontinued secondary to neutropenia being diagnosed in December 2024. Aripiprazole was added to address his reported depression and auditory hallucinations. An MHPC initial assessment and SRASHE were completed timely. Both were adequate and the SRASHE included an appropriate safety plan created in collaboration with the patient.

An initial IDTT meeting was held with required staff and the patient in attendance. A goal was created to address the patient's anxiety with reasonable interventions. The patient's variable medication adherence was noted as was his inconsistency in reporting his history. During a daily contact on February 14, 2025 the patient was seen at cell front secondary to "modified programming" and reported being suicidal. The MHPC documented that the patient was adherent to medications he was not prescribed indicating either an error in documentation or inadequate record review. The following day he was seen for a confidential MHPC contact which included evidence of clinical interventions. The patient continued to express suicidal ideation and intent. Later that day, the patient complained of chest pain and then later engaged in a suicide attempt by hanging which was documented as "fake" by nursing staff as he had activated his call button prior to tying a torn towel around his neck. Upon returning from the community hospital, the patient was noted to be cheerful, laughing, and talking with his peer in the next room. He was seen the following day in a confidential setting by a psychologist to review his behavior and discuss behavioral alternatives. The following day, the patient tied a sheet around his neck in front of a nursing staff member and later complained of chest pain when staff refused to move him to another cell. Later, he attempted to tie the safety smock around his neck after complaining about being cold and wanting to speak to the sergeant about changing his cell. Neither incident resulted in

injury. He later reported chest pain and the need to have a bowel movement but reported his toilet was broken.

The following day, he was seen by a telepsychiatrist who noted that the patient reported his medications were not working and would not "contract for safety." The psychiatrist made medication dose changes and continued the patient on 1:1 monitoring with safety issue. Later that day, the patient reported chest pain and then a PREA incident. The patient claimed an officer engaged in sexual behavior toward him and the patient asked to be transferred to another prison. A SRASHE was completed adequately by an unlicensed clinician and noted the patient to be at high risk. Despite this assessment, a psychologist decreased the patient's status to 11-minute monitoring and partial issue. Over the next few days, the patient reported a number of physical health concerns but did not engage in self-harm. The psychiatrist who initially discontinued his olanzapine at admission secondary to neutropenia, restarted it as the patient reported that aripiprazole was not effective. The psychiatrist made no mention of the previous rationale for discontinuation and no recent laboratory results were noted.

A discharge IDTT was held on February 21, 2025 with required staff in attendance. The patient's recent number of RVRs, including two he received while in the MHCB, triggered the need to review him for a higher level of care. The justification for not referring him was a lack of nexus between his behavior and a psychiatric condition. Instead, the team determined that discharge to the 3CMS level of care was indicated. The patient continued to advocate for placement at the EOP level of care secondary to the groups available but was told that he would be discharged to the RHU program which also included groups. The treatment plan did not note that the patient's goals had been met. A safety plan was drafted without input from the patient. It was adequate and a copy was provided to the patient. A discharge SRASHE was completed on February 23, 2024 and was adequate. The patient was discharged on February 24. 2025.

**Findings**

Treatment of this patient was inadequate. Medication changes were made immediately upon his admission secondary to laboratory results, yet the medication was restarted without discussion of the unchanged results. The patient engaged in a number of self-harm incidents and yet there were no treatment goals created to address this behavior nor interventions attempted to address this behavior.

**Patient EE**

This 44-year-old male patient was provided with diagnoses of generalized anxiety disorder, unspecified schizophrenia and other psychotic disorder, borderline personality disorder, major depressive disorder, opioid-induced anxiety disorder, alcohol use disorder, amphetamine-type substance use disorder, and antisocial personality disorder. He was fully adherent to his prescribed duloxetine and melatonin, and only partially adhere to olanzapine. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This patient has been incarcerated within CDCR since June 2009. He has been enrolled in the MHSDS since November 2009 and has received services at all levels of care including 3CMS, EOP, MHCB, ICF, and Acute, as well as having three periods of time outside of the MHSDS from

November 2016 through May 2017, from May 2019 through October 2019, and from June 2021 through October 2021. He was admitted to the MHCB at PBSP from the EOP level of care on October 9, 2024.

According to the record, the patient was discharged from the MHCB level of care on October 9, 2024 at another facility and arrived at PBSP later than same day. The patient had been referred to the Acute level of care but not accepted. Upon arrival, the patient reported he had no reason to live secondary to his discharge from MHCB and transfer to PBSP. He reported active suicidal ideation and planned to hang himself. He also reported thoughts of killing others. He was admitted to the MHCB and seen for a psychiatric assessment with a telepsychiatrist the following morning, which was mostly adequate although the document was internally inconsistent noting a plan to make changes to medications at the request of the patient followed by a statement that the patient wanted to continue on his current medications. The patient refused to engage in an MHPC initial assessment and SRASHE. Both were adequate despite being largely based on record review.

An initial IDTT meeting, with required staff in attendance, was held on October 11, 2024. The documentation included inconsistent information about whether the patient was present but it appeared that he did not attend. The frequency of MHCB referrals and RVRs required that the patient be assessed for a higher level of care. The IDTT provided adequate rationale for not referring the patient to a higher level of care and provided reasonable plans for treatment modifications to address the patient's needs during the MHCB stay. The treatment plan was minimal in content and did not include the treatment modification listed earlier in the document. The patient was seen for daily clinical contacts, some at cell front secondary to modified programming and some in confidential settings. Contacts included the provision of some clinical interventions. The patient reported improvement in mood and was amenable to a plan to be discharged to the CTC to address his limited mobility. A safety plan was developed with the patient's input was documented. A discharge IDTT and SRASHE were completed on October 16, 2024. The patient's identified treatment goals were partially met and the IDTT noted that the remaining goals could be targeted at the EOP level of care. The SRASHE was adequate.

**Findings**

Treatment of this patient was adequate despite some inconsistencies in documentation.

**Patient FF**

This 29-year-old male patient was provided with a diagnosis of unspecified bipolar and related disorder, adjustment disorder with anxiety, and misuse of medication. He was fully adherent to his prescribed aripiprazole, mirtazapine, and trazodone. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This patient was incarcerated within CDCR on two occasions. During his first term, from March 2016 through October 2017, he received mental health services at the 3CMS level of care for the first two weeks of his incarceration before being removed from the MHSDS. Upon reincarceration in September 2024, he was placed at the 3CMS level of care for less than a month before being removed from the MHSDS in October 2024. He returned to the 3CMS level of care in December 2024 and was admitted to the MHCB level of care at PBSP on January 8, 2025.

The patient was transferred to PBSP on January 7, 2025 and took an overdose of fluoxetine and B vitamins on January 8, 2025 resulting in a transfer to the emergency room at a community hospital where he was observed for six hours and returned to prison. The patient reported that the overdose was a suicide attempt in response to being transferred to PBSP. A cell search found 18 additional pills in the patient's property. The patient also submitted a healthcare request form on January 8, 2025 reporting the overdose and suicidal thoughts. The patient was admitted to the MHCB level of care.

He was seen for an initial MHPC assessment and SRASHE on January 9, 2025. Both were adequate. The SRASHE found the patient to be at moderate risk for suicide with adequate justification. An initial psychiatric assessment was completed by a telepsychiatrist on the same date. The content was based solely on the patient's self-report with no evidence that the psychiatrist reviewed the patient's record. The patient provided information that was inconsistent with previously documented information. An initial IDTT meeting was held on January 10, 2025 with required staff and the patient in attendance; however, the psychiatrist in attendance had not met the patient previously. The meeting also served as a discharge IDTT. The treatment plan included reasonable and measurable goals and interventions targeting outpatient services rather than crisis intervention. The patient's safety plan was reviewed during the meeting and he was provided with a copy. The patient was to be discharged to the RHU at the 3CMS level of care.

**Findings**

Treatment of this patient was adequate; however, the initial psychiatric assessment relied entirely on the patient's self-report and did not constitute an adequate assessment.

**Patient GG**

This 33-year-old male patient was provided with diagnoses of unspecified depressive disorder and antisocial personality disorder. He was partially adherent to his prescribed aripiprazole and nonadherent to mirtazapine. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This patient has been incarcerated within CDCR since November 2012. During his incarceration, he has received services at all levels of care including 3CMS, EOP, EOPMod, MHCB, ICF and Acute. His most recent inpatient hospitalization was at the Acute level of care from January 19, 2023 through March 30, 2023. He was admitted to the MHCB at PBSP from the 3CMS level of care on March 30, 2025 after having been referred to or admitted to the MHCB level of care on six occasions in the month of March 2025. Documentation indicated that the patient claimed suicidal ideation daily since March 15, 2025 but refused medical attention and refused to engage in mental health treatment.

He was most recently discharged from the MHCB level of care to the 3CMS level of care on March 29, 2025 while at another facility and transferred to PBSP. After hours on March 29, 2025, the patient reported suicidal ideation and was placed in alternative housing. He was assessed in the morning to be at moderate to high risk for suicide and admitted to the MHCB. An initial MHPC assessment was completed along with a SRASHE. The initial assessment was brief and limited. It did not provide a foundation for the patient's treatment. The SRASHE was basic but adequate.

An initial psychiatric assessment was completed via telepsychiatry on the morning of April 1, 2025. The patient provided information which differed from what was provided to the MHPC, but the discrepancies were not noted by the psychiatrist. Specifically, the patient was not eating and reported to the MHPC that he feared the correctional officers were poisoning his food while he reported to the psychiatrist that he was not eating due to missing his wife who recently left him. The psychiatric assessment was based primarily on the patient's self-report and was minimally adequate. An initial IDTT was held later that day with required staff and the patient in attendance; however, the MHPCs present at the meeting had not met the patient previously. Given the numerous referrals to MHCB over the previous six months, a review of the patient's need for a higher level of care was documented. The rationale for not referring him to a higher level of care and the proposed enhanced interventions were adequate. Documentation reflected multidisciplinary input and the treatment goal was reasonable, measurable, and included adequate interventions. A safety plan was documented on April 1, 2025 but did not appear to have been created in collaboration with the patient.

The patient was seen for daily contacts by either an MHPC or psychiatrist. Six different MHPCs and three psychiatrists saw the patient and there was evidence of poor continuity of care as a result. Issues being addressed by an MHPC were not followed up on despite documentation indicating follow-up was needed. Psychiatry also evidenced a lack of continuity in decisions about medications. The patient was noted as growing increasingly irritable and frustrated with changes in clinicians and became less cooperative with treatment and medication adherence. The patient threatened self-injury on April 6, 2025. On April 7, 2025, a discharge IDTT meeting was held with required staff present, yet the MHPC at the meeting had not met the patient previously. The rationale for discharging the patient was his lack of engagement in treatment and his "overall stability." While IDTT documentation noted that the patient had adequate hygiene, other documentation noted that the patient had not showered since his admission. The patient's safety plan was reviewed with him during the meeting and he was provided with a copy, despite not providing input into the plan. The patient did not achieve his treatment goal but was discharged to the 3CMS level of care as he had reached "maximum benefit" from the admission.

**Findings**

Treatment of this patient was not adequate. While individual MHPC contacts occasionally evidenced the use of treatment interventions to address the patient's needs, there was no continuity across MHPCs, resulting in an overall lack of treatment. Similarly, psychiatric interventions lacked continuity and appeared to rely on patient self-report rather than documentation and input from other clinicians. Rationale for discharge was inconsistent with the patient's presentation.

**Patient HH**

This 41-year-old male patient was provided with a diagnosis of bipolar I disorder, current or most recent episode depressed, moderate. He was fully adherent to his prescribed sertraline and moderately adherent to mirtazapine. His case was selected at random for review of patients who were admitted to the MHCB at PBSP during the monitoring period. This individual was incarcerated within CDCR on six occasions beginning in October 2007. He did not receive services within the MHSDS during his first two terms. During his third term, which began in July

2014, he was enrolled at the 3CMS level of care from January 2016 through his release to community supervision in August 2017. Upon reincarceration from July 2018 through September 2021, he was primarily treated at the 3CMS level of care, although he was removed from the MHSDS for a brief time from August through December 2018. His current term of incarceration began on January 11, 2024. He was immediately placed at the 3CMS level of care at the reception center. He was transferred to PBSP on March 27, 2024 and was admitted to the MHCB on November 5, 2024 after reporting thoughts of hurting himself or others due to the receipt of bad news.

An initial MHPC assessment was completed at the time of admission and was adequate. It revealed that the patient was at higher risk of violence toward others than himself. The assessment was adequate. An initial psychiatric assessment was completed by a telepsychiatrist and was adequate. The assessment was consistent with that completed by the MHPC. An initial IDTT was held on November 6, 2024 with required staff and the patient in attendance. Reasonable and measurable treatment goals were documented along with appropriate interventions for the MHCB setting. Daily clinical contacts were offered but the patient refused to attend any until November 9, 2024. During that contact he was angry and hostile and treatment was limited due to his level of agitation. He refused a clinical contact the following day and did not participate in safety planning. He did participate in a clinical session on November 11, 2024 but remained irritable and angry, ending the session early. The MHPC noted that the patient was not taking responsibility for his behavior and noted a plan to discharge the patient. This was not in keeping with the initial assessments for the patient which noted that his other-focused irritability was the target of treatment, along with thoughts of hurting himself. The following day, the patient reported safety concerns which were relayed to custody staff.

A discharge IDTT was held with required staff and the patient in attendance on November 13, 2024. The team assessed the patient's continued suicidal and homicidal ideation to be related to safety concerns and documented that the patient would continue to verbalize these thoughts in order to avoid discharge. Clinically, the team assessed the patient to be in need of services at the 3CMS level of care. Multidisciplinary input was documented along with the patient's desire not to be discharged to population. Documentation indicated some movement toward treatment goals. A discharge SRASHE was completed and was adequate. The patient was provided with a copy of his safety plan prior to discharge. Of note, the patient was readmitted to the MHCB the following day.

**Findings**

Treatment of this patient was not adequate. Initially, it appeared that the treatment team was working with the patient to lessen his symptoms and promote stability, yet over time, the patient's irritability was no longer seen as a treatment target and the decision was to discharge him despite a continuation of the symptoms and behaviors that precipitated the admission. Medication adjustments were still being made at the time of discharge.

**Patient II**

This 36-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided a diagnosis of schizophrenia and was prescribed Risperdal and Vistaril. His medical history was significant for liver fibrosis and obesity.

The patient arrived at PBSP on January 30, 2024 and had received mental health services at the 3CMS level of care since his reception to CDCR in 2023. He had no history of higher level of care referrals.

An IDTT meeting occurred on March 13, 2025, which included all required participants and the patient. The problem identified for treatment was irritability, and the plan included appropriate goals, objectives, and interventions. The patient stated that he preferred to program and not engage with others when group treatment was discussed. Required reviews of criterion for consideration of higher level of care referral and assessment of suicide risk were documented as completed.

The psychiatrist conducted three sessions by telepsychiatry with the patient during the review period. During the January 17, 2025 session, the psychiatrist addressed the patient's refusal of Risperdal and agreed to discontinue the medication following the discussion. The patient explained that he no longer wanted to attend the medication line and did not perceive therapeutic benefit from the medication. The provider documented that the patient continued to report auditory hallucinations but otherwise presented with normal behavior and affect. Ongoing monitoring was continued without psychotropic medication treatment.

The PC conducted timely telehealth contacts. The patient was often difficult to engage but attended sessions reliably, and the clinician documented adequate assessment of his mental status and adjustment. Treatment planning and other documentation reflected awareness of the patient's chronic symptoms and functional baseline.

**Findings**

The treatment provided to this patient was adequate.

The psychiatrist and PC met with the patient timely, and both appropriately assessed and monitored his mental and emotional status. The patient remained stable and adequately functioned at the 3CMS level of care. Treatment decisions such as discontinuation of antipsychotic medication with continued monitoring were clinically justified and appropriately documented.

**Patient JJ**

This 51-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided diagnoses of adjustment disorder and depression and was prescribed Zyprexa, Remeron, and Prozac. Physical health conditions included anemia, diabetes, hyperlipidemia, and obesity.

The patient arrived at PBSP on April 3, 2024. An IDTT meeting occurred on November 7, 2024 that included the required participants and the patient. The master treatment plan documented relevant goals, objectives, and interventions addressing depression. Higher level of care indicators

and suicide risk were appropriately reviewed, and the documentation included clear rationale supporting continuation at the 3CMS level of care.

The psychiatrist met with the patient by telepsychiatry in a confidential office on December 20, 2024 and February 20, 2025. The documentation reflected collaboration between the psychiatrist and patient regarding symptoms, medication management, and coping strategies. The patient expressed satisfaction with progress and agreed to minor medication adjustments to maintain stability.

The primary clinician met with the patient by telehealth in a confidential setting on October 31, 2024 and March 17, 2025; the sessions did not occur timely. Progress notes described ongoing assessment of mood, coping, and medication adherence; the patient was reportedly stable, cooperative, and in no acute psychiatric distress.

**Findings**
The treatment provided to this patient was adequate.

The patient was seen consistently by the psychiatrist with active collaboration regarding medication management, and individualized treatment planning was provided to address depression. Although primary clinician contacts occurred outside the required 90-day interval, the documentation reflected clinically appropriate assessments and interventions.

**Patient KK**

This 28-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided a diagnosis of depressive disorder. Although he was prescribed Zoloft, he had not taken the medication for several months.

The patient arrived at PBSP on July 9, 2024. An IDTT meeting occurred on January 7, 2025, nearly six months after the patient's transfer to the institution. The meeting was attended by the required participants and the patient. Although the master treatment plan document addressed higher level of care indicators, the patient's history, and suicide risk; the treatment plan portion itself was not completed. The clinician identified a diagnosis of generalized anxiety disorder; however, that diagnosis did not align with the psychiatric diagnosis of depressive disorder.

Psychiatric contact by telepsychiatry occurred in a confidential setting 30 days after the patient's PBSP arrival. The psychiatric contact did not occur timely, and only one visit occurred during the review period. The patient requested discontinuation of psychotropic medication and denied current mental health symptoms; however, the psychiatrist did not document medication discontinuation, despite three months of nonadherence.

The PC met with the patient on three occasions. The contacts occurred timely and documented symptoms of panic, stress, anxiety, and depression without linking those concerns to the individualized treatment plan or addressing whether such symptom reports indicated the need for referral or intensified treatment.

**Findings**

The treatment provided to this patient was inadequate.

Despite some areas of compliance, several critical deficiencies were present including the absence of an individualized treatment plan, lack of documented coordination between provider diagnoses, insufficient documentation or follow-up regarding medication discontinuation, delayed IDTT meeting, and insufficient clinical response to patient reported symptom changes.

**Patient LL**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP.

The patient was provided diagnoses of schizoaffective disorder, depressive type; major depressive disorder, recurrent; anxiety disorder; and opioid use disorder. He was prescribed Effexor and buprenorphine. Pertinent physical health conditions included hyperlipidemia, obesity, and migraine headaches.

The patient had a history of multiple referrals to higher levels of care, and he previously received mental health services at the EOP, acute, and MHCB levels of care. The patient was Spanish-speaking and required the use of a telephonic translator for communication.

The patient arrived at PBSP on February 13, 2023. An IDTT meeting occurred on November 14, 2024 that included the required participants and the patient in attendance. The treatment team reviewed the patient's appropriateness to continue 3CMS care and evaluated his suicide risk indicators. Although the master treatment plan included relevant treatment goals, objectives, and interventions related to depression, the diagnoses of schizoaffective disorder and anxiety were not addressed in the plan.

The psychiatrist met with the patient timely when the patient's functioning and symptoms were monitored. The psychiatrist continued treatment with Effexor without changes. The documentation reflected appropriate psychiatric assessment and intervention.

The PC met twice with the patient by telehealth during the review period on October 18, 2024 and March 4, 2025. The clinician noted difficulty hearing the translator during the October session which limited communication. The patient denied current mental health symptoms at both visits. The documentation of those encounters, however, did not reflect any therapeutic interventions or efforts to align care with the treatment plan beyond mental status evaluation and supportive listening.

**Findings**

The treatment provided to this patient was adequate.

The patient was seen timely by providers; however, the treatment plan did not address all identified issues.

**Patient MM**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed Remeron for depression.

The patient arrived at PBSP on March 19, 2024. An IDTT meeting occurred on July 18, 2024, three months after the patient's arrival when the required participants and the patient attended. The goals and interventions in the treatment plan were relevant to the patient's diagnosis and symptoms. The treatment plan appropriately included higher level of care indicators and suicide risk monitoring. The patient reported that he did not believe that he needed mental health services but was agreeable to continuing psychotropic medication treatment and acknowledged experiencing anxiety and racing thoughts. The treatment team appropriately recommended continuation at the 3CMS level of care.

The psychiatrist and PC met with the patient for the first time 45 days and 34 days after his transfer, respectively, which exceeded the 14-day requirement for initial contacts. Subsequent visits occurred timely. The psychiatrist appropriately assessed the patient's symptoms and progress and continued the current medication. One of the two visits with the PC was a joint session with the psychiatrist, resulting in the patient not receiving the required number of separate sessions. The clinician provided supportive therapy and documented mental status assessments; although, the progress notes did not clearly link therapeutic interventions to the treatment plan goals.

**Findings**

The treatment provided to this patient was minimally adequate.

There was concern due to the lack of timely initial psychiatric and PC assessments, the occurrence of combined rather than separate sessions, and the absence of clear correlation between the treatment plan goals and clinical documentation.

**Patient NN**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP.

The patient was provided diagnoses of depressive disorder, cannabis use disorder, and opioid use disorder. He was prescribed Remeron to address mood and insomnia difficulties.

The patient arrived at PBSP on April 24, 2024. An IDTT meeting occurred on February 6, 2025, approximately two months after the initial assessments were completed. The meeting was attended by the required participants and the patient. The treatment plan included relevant goals, measurable objectives, and interventions. Although the documentation did not clarify the reason for the delay in the meeting, the plan met required elements once completed.

A psychiatric evaluation was conducted by telepsychiatry on December 13, 2024 in a confidential setting. The patient reported sleep difficulties and anxiety and stated that Remeron was previously effective. The psychiatrist completed an adequate assessment, restarted Remeron, and provided

psychoeducation and supportive intervention. The patient was seen again after the PC referred the patient to the psychiatrist due to anxiety and insomnia.

PC contacts occurred timely on December 13, 2024 and March 14, 2025. Supportive counseling was provided, and the patient was determined appropriate to continue at the 3CMS level of care.

**Findings**

The treatment provided to this patient was adequate.

The PC contacts occurred timely with documentation of the provision of relevant therapeutic interventions. Psychiatric evaluation and medication management were appropriate, and the clinical documentation supported the diagnosis and treatment decisions. Treatment planning, while delayed, was comprehensive and included measurable objectives and appropriate interventions. The patient's ongoing stability was adequately monitored through supportive counseling and medication management.

**Patient OO**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided a diagnosis of major depressive disorder, single episode, severe. The patient was prescribed Zoloft, Remeron, and Vistaril. Relevant physical health diagnoses included hypertension, back pain, and prediabetes.

The patient had an extensive history of mental health treatment that included two MHCB placements within the past 18 months. The patient arrived at PBSP on December 11, 2024. An IDTT meeting occurred on January 30, 2025, nearly two months after transfer to PBSP. The necessary participants were in attendance; however, the patient did not attend due to modified program status related to custody issues. The treatment plan identified distress, poor emotional regulation, and symptoms of depression as targets but did not include complete written goals and objectives. The higher level of care indicators were addressed, but the safety plan section of the treatment plan was inconsistent; it both stated that a safety plan was not required and then included a previous safety plan completed in December 2024.

The psychiatrist provided a confidential initial assessment by telepsychiatry on January 7, 2025, twenty-six days after PBSP arrival. At that assessment, Remeron was added based on the patient's presentation and assessment. The psychiatrist also addressed the patient's history of medication nonadherence, provided psychoeducation, and scheduled the patient to be seen for follow-up. The patient was seen for follow-up on February 18, 2025, when the psychiatrist discontinued Zoloft and Remeron at the patient's request.

The assigned clinician assessed the patient within seven days of transfer to PBSP. The PC met with the patient on two other occasions when a suicide risk evaluation that was not documented from the prior institution was completed. Supportive counseling and monitoring were provided, and the patient maintained stability during the review period.

**Findings**

The treatment provided to this patient was minimally adequate.

While the patient was provided with an appropriate diagnosis, medication management, and regular contacts by both the psychiatrist and primary clinician; treatment planning was incomplete and not individualized. The initial IDTT meeting was significantly delayed.

**Patient PP**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided diagnoses of adjustment disorder with depressed mood and opioid use disorder. He was prescribed Remeron, and he also received MAT for opioid use disorder.

The patient arrived at PBSP on April 16, 2024. An IDTT meeting occurred on November 12, 2024, five months after transfer; the meeting included the patient and all required participants. The treatment plan focused on individualized goals targeting depressive symptom management including medication management and therapeutic engagement.

Psychiatric contacts occurred timely and were provided by telepsychiatry in a confidential setting; the encounters addressed medication adherence and symptom evaluation. The PC conducted timely confidential telehealth contacts that focused on treatment goals, mood assessment, medication adherence, and use of effective coping strategies. Continued clinical support was documented.

**Findings**

The treatment provided to this patient was adequate.

The psychiatric and PC contacts occurred timely and were appropriately documented, and treatment planning was individualized and goal oriented.

**Patient QQ**

This 31-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was provided diagnoses of adjustment disorder and opioid use disorder. He was not prescribed psychotropic medication. Physical health conditions included obesity and lower back pain, and the patient received MAT for opioid use disorder.

The patient arrived at PBSP on May 15, 2024. An IDTT meeting occurred on November 24, 2024, more than six months after the patient's PBSP arrival; the meeting included the necessary participants. The treatment plan was incomplete and lacked goals, objectives, and interventions. Higher level of care and suicide indicators were reviewed, but the decision to retain the patient at the 3CMS level of care occurred without written rationale or explanation documented.

The patient was seen by the telepsychiatrist in a confidential setting for one contact during the review period after referral from the PC due to the patient's reported sleep difficulty. The psychiatrist provided assessment, psychoeducation, and prescribed Vistaril in March 2025.

The PC met with the patient timely and made referrals to the psychiatrist when clinically indicated. The clinician did not note whether telemental health was utilized nor document regarding use of a confidential space.

**Findings**

The treatment provided to this patient was inadequate.

Treatment planning was inadequate without goals, objectives, or documented interventions. The psychiatrist failed to complete required follow-up after initiating medication treatment.

**Patient RR**

This 46-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PBSP. The patient was not provided with a complete diagnosis; "psychiatric disorder" was listed in the psychiatric notes and treatment plan. The patient was prescribed Prozac, Remeron, and Zyprexa to address depression, auditory hallucinations, anxiety, and sleep difficulty.

The patient arrived at PBSP on June 11, 2024. The initial psychiatric contact occurred 28 days after transfer to PBSP; and the initial PC visit occurred on October 2, 2024, 113 days after transfer to PBSP.

An IDTT meeting occurred on December 19, 2024 which was delayed. All required participants and the patient were in attendance. The treatment plan included relevant and measurable goals and objectives related to depression but did not address the patient's auditory hallucinations, despite the patient having reported hearing voices for many years and expressing a desire to work toward improvement in that area.

The patient was seen consistently for psychiatric contacts by telepsychiatry that included discussion regarding symptom control, benefit and tolerability of medications, and assessment of functional status. Medication management was appropriate with no side effects or safety concerns noted. The psychiatrist completed thorough mental status and suicide risk assessments, coordinated physical health care needs, and ensured continuity of care with scheduled follow-up and supportive education.

The patient was seen for two routine individual PC contacts during the review period that occurred four months apart by two different clinicians. Both visits addressed mood, risk factors, coping skills, and medication adherence. Clinical assessments and follow-up planning were consistently provided.

**Findings**

The treatment provided to this patient was inadequate.

There were significant delays in initial psychiatric and primary clinician contacts after the patient arrived at PBSP. The IDTT meeting did not occur timely, and the treatment plan did not include interventions for persistent auditory hallucinations despite recent patient reports. Although

medication management and routine contacts were performed appropriately; continuity of care and individualization of care were lacking, and diagnostic clarification was needed.

**APPENDIX B-22**
**Pleasant Valley State Prison (PVSP)**
**Reporting Period: December 1, 2024 to May 31, 2025**

**Patient A**

This 38-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with diagnoses of schizophrenia, unspecified schizophrenia spectrum and other psychotic disorder, and amphetamine-type substance use disorder, mild, in early remission. This patient was adherent to his prescribed mirtazapine and hydroxyzine. He was also prescribed buprenorphine-naloxone to address his substance use disorder.

This patient entered CDCR for the sixth time on February 10, 2025. When he was first incarcerated in 2008 and re-incarcerated for parole violations through 2010, he was not enrolled in the MHSDS. During a period of incarceration beginning in October 2019, he was placed at the 3CMS level of care while at the reception center and continued to receive that level of services through his release in July 2020. Upon being reincarcerated in January 2022, he was enrolled in the 3CMS and was placed at the MHCB level of care in May 2022. Upon discharge, he was placed at the EOP level of care through his release in June 2022. He was placed at the EOP level of care upon arrival for his current period of incarceration and transferred to PVSP on April 8, 2025.

Upon arrival at PVSP, a referral to mental health was submitted by the nurse who completed the transfer screening, noting that the patient reported prior suicide attempts and appeared distressed. There was no urgency level indicated on the referral. The patient was seen in response to that referral on April 14, 2025. An initial primary clinician assessment and suicide risk evaluation were also completed on the same date. All were adequately documented, and the patient's discrepant diagnoses of schizophrenia and unspecified schizophrenia spectrum and other psychotic disorder were noted but not resolved. The patient was assessed as being at low risk for suicide with adequate rationale. The patient was seen for an initial psychiatric assessment on April 11, 2025. The psychiatrist provided diagnoses of schizophrenia and opioid use disorder; however, the outdated multiaxial diagnoses list was also documented indicated at list of diagnoses being considered, including schizophrenia vs. schizoaffective disorder, depressive type and a rule-out for other specified obsessive-compulsive and related disorder without explanation. A diagnosis for stimulant use disorder was also listed and the psychiatrist noted that a "cluster B" personality disorder was "probable" without rationale. The psychiatrist noted the patient's suicide risk to be low "acutely" but elevated chronically due to the patient's history. The assessment was adequate overall.

An initial IDTT meeting was held on April 15, 2025 with required staff in attendance, but the patient refused to attend. Documentation was adequate and included reasonable and measurable goals with evidence-based interventions listed.

The patient submitted a healthcare request to speak to the psychiatrist about his medications which were causing negative side effects. He was seen by a psychiatrist in response to that request on April 21, 2025 and his needs were adequately addressed. Diagnostic options were not resolved.

The patient submitted another request for a medication change on May 11, 2025. The patient documented that he did not want to be prescribed "heat meds" as he wanted to get a job and did not want his yard time restricted. The patient saw the psychiatrist on May 23, 2025 and the psychiatrist discontinued the patient's antipsychotic medication along with his buspirone as the patient requested.

The patient was seen for weekly contacts by a primary clinician; however, four different clinicians saw the patient over a period of six weeks. Initially, the patient's primary clinician provided interventions in keeping with the treatment plan but when a new clinician was assigned in early May, the documentation did not reflect interventions in keeping with the treatment plan. Additionally, primary clinician group documentation did not include individualized notes about the patient's response to the group content or any mental status information. The clinician was not licensed and there was no evidence of co-signatures by a supervisor.

An initial recreational therapy assessment was completed on April 24, 2025 and was noted to have been done because the patient was admitted to the MHCB level of care, but this was not the case. Otherwise, the content was adequate. Groups were offered by recreational therapists four days per week for two hours each session during the monitoring period. There were a few occasions when the patient was offered two 120 minutes groups during the same week. He routinely attended yet the documentation was not individualized. Beginning on May 16, 2025, there was evidence that the patient was enrolled in NLTGs which he attended.

**Findings**

Treatment of this patient was mostly adequate. The patient was initially provided with therapeutic interventions in keeping with the treatment plan, but primary clinician documentation became more generic after a change in clinicians. Continuity of care was also compromised by different clinicians seeing the patient and not building on previous contacts. Diagnostic clarification was needed, and group documentation did not evidence individualization. Psychiatric contacts were adequate other than the use of an outdated diagnostic system.

**Patient B**

This 49-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with a diagnosis of schizophrenia. He was fully adherent to his prescribed fluoxetine, haloperidol, olanzapine, and valproic acid. This patient was incarcerated within CDCR for the first time on October 17, 2024. He was placed at the 3CMS level of care while at the reception center, was elevated to the EOP level of care two days later and transferred to PVSP on December 30, 2024.

An initial psychiatric assessment was scheduled on January 8, 2025 but the patient refused to attend, so the psychiatrist visited the patient's cell. The assessment was limited based on the patient's refusal to attend the session yet the psychiatrist did not appear to conduct a comprehensive record review. Overall, the assessment was not adequate. An initial primary clinician assessment was completed on January 9, 2025 and while it included a brief history, there was no assessment or case formulation documented to assist in understanding the patient's current

functioning or presentation. There was no discussion of the patient's symptoms, presenting problems, or mental health needs to be addressed. The assessment was not adequate and was also not co-signed despite being completed by an unlicensed clinician. An initial recreational therapy assessment was completed on January 8, 2025 and was adequate.

An initial IDTT meeting was held on January 14, 2025 with required staff present. The primary clinician was noted as being assigned to the patient but was not the individual who completed the initial assessment. The patient was present for the meeting. The inadequate clinical summary and case formulation were pulled unchanged from the primary clinician initial assessment. There was evidence that the patient's strengths and goals for treatment were discussed during the meeting. The treatment plan was blank, but the goals provided by the patient were measurable, yet no baseline information was provided. There was no rationale for the patient's placement at the EOP level of care and no discharge criteria were documented. A routine IDTT was held timely on April 4, 2025 with required staff and the patient present. Documentation revealed that the patient was not attending at least 50 percent of offered treatment hours. The team reviewed his participation and found it related to his mental health symptoms as well as a lack of interest in recreational groups. Appropriate interventions were listed to assist the patient in attending more treatment groups. The treatment plan was adequately updated with appropriate goals and interventions.

The patient was seen by the psychiatrist on January 22, 2025 after refusing his haloperidol injection. The patient was seen cell-front without rationale and reported that he did not refuse the injection and planned to take it when offered. The psychiatrist ordered it to be administered that day and the patient accepted. On February 23, 2025, the patient submitted a healthcare request noting that his valproic acid was stopped and needed to be renewed. A review of the orders revealed that the order expired on February 21, 2025. A psychiatrist saw the patient at cell front and reordered the medications on February 27, 2025 yet the medication did not restart until March 4, 2025.

Toward the end of February, the patient was placed on isolation status due to having lice. This prohibited him from attending groups and individual sessions, but he was seen at cell front by his primary clinician. Nursing conducted rounds during this time as well.

The patient was offered weekly contacts with his primary clinician, alternating between caseload groups and individual sessions. He mostly attended sessions with his primary clinician. Documentation was adequate and reflected the use of interventions outlined in the treatment plan including enhancements to assist with attending more groups. Psychiatric contacts were offered at least monthly and while the patient refused most contacts, the psychiatrist saw the patient at cell front and attempted to meet his needs.

The patient was offered NLTGs and recreational therapy groups routinely during the reporting period and attended most sessions. Documentation was not individualized.

**Findings**

Treatment of this patient was adequate. Improvements in individualized documentation for groups would have been beneficial in understanding the patient's treatment progress, or lack thereof, over

time. Additionally, there was a concern that a medication was allowed to expire and resulted in the patient missing this medication for nearly one week.

**Patient C**

This 33-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with diagnoses of unspecified depressive disorder and unspecified schizophrenia spectrum and other psychotic disorder. The patient was adherent to his prescribed buspirone and venlafaxine but did not consistently take his olanzapine as prescribed. This patient was incarcerated within CDCR for the first time on September 18, 2024. He was initially placed at the 3CMS level of care but was elevated to the EOP level of care while still at the reception center. He transferred to PVSP on October 28, 2024.

Two routine IDTT meetings were held during the monitoring period, one in February and one in May 2025. Both meetings were timely. The patient attended the meeting in February but neither his assigned psychiatrist nor his assigned primary clinician were in attendance. Covering staff were present. The patient needed to be considered for a higher level of care given his failure to attend at least half of the offered programming. The IDTT documentation noted that he was not being referred to a higher level of care secondary to an onset of new symptoms including anxiety and panic attacks. The documentation noted he had not been stabilized on medications and this was to be his primary goal. Goal development was deferred to the patient's primary clinician and not completed during the meeting. Additionally, the clinical summary was not updated and included no information about the patient's progress or functioning over the previous 90 days. The treatment plan was not updated. The May 2025 IDTT meeting documentation was never completed. The patient and his assigned clinician and psychiatrist were noted to be present alone with a correctional counselor. The patient was noted as still not attending at least half of his offered programming, but the section related to considerations for a higher level of care remained blank. The treatment planning section was unchanged.

The patient was seen by his primary clinician weekly, alternating individual and group sessions. During the individual sessions, the primary clinician provided services in keeping with the treatment plan; however, the issue of anxiety was not addressed. Instead, the clinician focused on the patient's depressive symptoms, lack of medication adherence, and auditory hallucinations which were the focus of treatment on the treatment plan. The topics for group sessions were general and not specific to the patient's identified needs; however, documentation was individualized.

Psychiatric contacts were completed at least monthly with the psychiatrist providing a diagnosis of schizoaffective disorder, depressive type with a rule-out for PTSD. There were noted to be frequent medication changes in response to the patient's discussion of ongoing symptoms. In March 2025 the patient's antidepressant and antipsychotic medications were discontinued without the patient being seen and the patient refused the next appointment with the psychiatrist. Within two weeks, the patient reported wanting to restart medications secondary to a resurgence of auditory hallucinations and depressed mood. The medications were restarted. Of note, there was

no mention of the treatment of anxiety or panic attacks noted in the IDTT documentation from February.

Groups were routinely offered to the patient by recreational therapists as well as nursing staff, yet he rarely attended.

**Findings**

Treatment of this patient was adequate despite poor treatment planning documentation. The use of a covering primary clinician in February and an incomplete plan in May resulted in the treatment plan not addressing the patient's needs. Fortunately, the patient's primary clinician and psychiatrist worked to address his reported symptoms and while the patient attended most caseload groups, he rarely attended other programming. There was a need for diagnostic clarification.

**Patient D**

This 34-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and unspecified alcohol-related disorder. The record also included a diagnosis of schizophrenia, and the treatment team included opioid use disorder during treatment planning. He was not prescribed any psychotropic medications but was prescribed buprenorphine-naloxone for his substance use disorder. This patient was incarcerated within CDCR for the first and only time on June 26, 2024. He was placed at the EOP level of care on July 7, 2024 and was admitted to the MHCB on the same day. He was discharged to the EOP level of care and transferred to PVSP on August 29, 2024.

There were three routine IDTT meetings held during the reporting period. One in December, one in February, and one in April. Required staff were in attendance at all meetings and the patient attended the meetings in December and February, but not in April. All three meetings noted that the patient was not participating in at least half of the treatment offered. Appropriate interventions were documented along with rationale for not referring the patient to a higher level of care. The December treatment plan documentation was disjointed, discussing anxiety and panic symptoms as targets but entering a treatment goal to address hallucinations. Subsequent treatment planning was much clearer and more focused, directed to address the patient's paranoia, anxiety, anger, and frustration tolerance along with his group attendance. Treatment progress toward group attendance was tracked and discussed.

The patient was offered weekly contacts with his primary clinician, typically alternating between individual and group sessions. The patient intermittently attended individual sessions but refused most caseload groups. The contacts make generalized reference to evidence-based interventions without a clear description of how they were being used to address the patient's needs and identified treatment goals. Toward the end of the monitoring period, the assigned primary clinician was changed and the patient refused to attend individual sessions.

Psychiatric contacts were not offered monthly. There were no psychiatric contacts offered to the patient between November 25, 2024 and February 27, 2025. This was especially concerning as

the patient's medications were discontinued completely during the November visit. The patient refused all offered contacts, denying the need for medications. Psychiatrists noted that the patient was irritable and unwilling to discuss symptoms or medication options.

During the monitoring period, there was evidence that the patient was offered recreational therapy groups and NLTGs multiple times per week. The patient consistently refused to attend.

**Findings**

Treatment of this patient was inadequate. He was not offered psychiatric contacts as required. The patient's mental health needs were marginally addressed by his primary clinician, but the patient started refusing sessions toward the end of the monitoring period. The patient was not engaged in groups and interventions to increase participation were either absent or ineffective. Diagnostic clarification was needed.

**Patient E**

This 55-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with adjustment disorder with mixed anxiety and depressed mood, alcohol dependence, and bipolar affective disorder, current episode depression. He was fully adherent to his prescribed aripiprazole, buspirone, mirtazapine, and hydroxyzine. He was also prescribed buprenorphine-naloxone for his substance use disorder.

This patient has been incarcerated within CDCR numerous times since July 1996. He was first placed within the MHSDS during his third period of incarceration in February 2007. During subsequent periods of incarceration from November 2008 through April 2010, August 2010 through January 2011, April 2011 through October 2011, December 2017 through November 2018, and November 2019 through September 2022, he remained at the 3CMS level of care with a brief removal from MHSDS for less than three months in late 2010 and placement at the MHCB level of care for two days in January 2018. Upon arrival for his current period of incarceration on August 7, 2024 he was placed at the 3CMS level of care but elevated to the EOP level of care the same day. He transferred to PVSP on September 23, 2024.

There were two routine IDTT meetings held during the monitoring period, one in February and one in April. The February meeting was not timely, as the patient's initial IDTT had been held in October 2024. IDTT documentation noted that the patient was diagnosed with bipolar I disorder which was not in keeping with the diagnoses of record or the diagnosis provided by the psychiatrist. The meetings included required staff and while the patient was present for the meeting in February, he refused to attend the meeting in April. The treatment plan was adequately updated in February to include two new treatment goals addressing the patient's anxiety and auditory hallucinations. Unfortunately, there were no updates to the April treatment plan to indicate patient progress toward goals, ongoing barriers, or current functioning.

There was no psychiatric contact held with the patient in December. Subsequently, monthly contacts were offered to the patient. The psychiatrist's diagnostic formulation differed from the

diagnoses of records and included schizoaffective disorder, bipolar type and severe opioid use disorder. Contacts were documented adequately and included review of the medication efficacy and the patient's ongoing symptoms. Primary clinician contacts were offered weekly, alternating between individual and group sessions. Documentation from these contacts included a description of the patient's level of interaction and mental status. At times, there was mention of interventions being provided, but they were primarily in the form of discussing the patient's coping skills rather than the use of evidence-based interventions to address mental health symptoms. There was no evidence that the goals and interventions in the treatment plan were being addressed during sessions with the primary clinician.

Recreational therapy and NLTGs were routinely offered to the patient throughout the monitoring period.

**Findings**

Treatment of this patient was not adequate. The patient's diagnostic profile was unclear. While the patient's treatment plan updated in February was adequate, it was not timely, and subsequent updates did not reflect information about the patient's functioning or progress toward treatment goals. Primary clinician contacts were offered routinely but did not consistently address the treatment targets outlined in the treatment plan. Psychiatric contacts were mostly adequate but not held as required.

**Patient F**

This 36-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with a diagnosis of unspecified bipolar and related disorder. The patient was not prescribed psychotropic medication. This patient was incarcerated within CDCR for the third time on May 22, 2024. Upon his arrival, he was placed at the 3CMS level of care, admitted to the MHCB level of care on May 31, 2024, and discharged to the EOP level of care on June 13, 2024. During his two previous periods of incarceration, he was treated at the 3CMS level of care or was placed in general population without being enrolled in MHSDS. This patient transferred to PVSP at the EOP level of care on August 8, 2024.

Two routine IDTT meetings were held during the monitoring period, one in February and one in May. Both were timely. The February meeting included a covering primary clinician, but other required staff and the patient were present. At the May meeting, the patient refused to attend but required staff were present. The documentation from both meetings included comprehensive treatment plans with adequate goals and interventions but provided no updates as to the patient's progress toward treatment goals, barriers to achieving goals, or level of functioning. Much of the documentation was carried forward from prior meetings. Additionally, the patient agreed to attempt a trial of medication in March, yet this was not mentioned in documentation by the IDTT.

Primary clinician contacts were held most weeks, although the patient was not consistently offered an individual contact every two weeks during the monitoring period. When the patient was seen for individual sessions, the content included status check-ins with the primary clinician offering

validation and supportive listening as the primary interventions. There was mention of motivational interviewing and "psychoeducation" about cognitive behavioral therapy, but no evidence that treatment modalities were used with the patient to address his treatment needs in keeping with the treatment plan. The primary clinician also documented the patient's frustration with the lack of clinical interventions being offered to him in treatment.

The patient was not seen monthly for psychiatric sessions. There was no evidence of a psychiatrist providing services between December 10, 2024 and February 27, 2025. The patient refused most contacts but in March, agreed to a trial of medications. The patient did not find the medication helpful, so stopped taking it and it was ultimately discontinued. Given the patient's limited willingness to engage with a psychiatrist, the documentation was adequate.

There was evidence of the patient being offered recreational therapy and NLTGs weekly.

**Findings**

Treatment of this patient was inadequate. The patient reported a number of symptoms and ongoing distress, yet there was limited evidence of interventions being provided to the patient to address his needs. Most of the sessions with the patient's primary clinician were "supportive" and did not include the use of evidence-based interventions to address the patient's grief, depression, and mood lability. The groups that were offered to the patient were occasionally related to his identified needs but were mostly nonspecific to his needs.

**Patient G**

This 33-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with diagnoses of major depressive disorder, recurrent, severe; unspecified anxiety disorder; and adjustment disorder with mixed anxiety and depressed mood. The patient was not prescribed psychotropic medications.

This patient was incarcerated within CDCR for the first time in August 2010 and was not enrolled in the MHSDS through his release in July 2011. Upon reincarceration in February 2023, he was not enrolled initially in the MHSDS but was admitted to the MHCB in May 2023 and discharged to the 3CMS level of care where he remained until release in January 2024. He was admitted to CDCR for his current period of incarceration on January 30, 2025 and initially placed at the 3CMS level of care. After one rescinded referral to MHCB in March 2025 and an MHCB admission in April 2025, he was discharged to the EOP level of care and transferred to PVSP on April 11, 2025.

Upon arrival at PVSP, the patient was seen for five-day follow ups. A clinician met with the patient daily and documented reviewing his safety plan with him. Follow up contacts were adequate; however, none of the clinicians reviewed the reason for the patient's placement at the MHCB level of care. A suicide risk evaluation was completed with the patient on April 12, 2025 and was adequate. On April 14, 2025, the patient submitted a healthcare request asking to have his psychotropic medications stopped. He was offered an initial psychiatric assessment on April 16, 2025, but refused, stating that he did not need medications or need to see the psychiatrist. The psychiatrist also documented that the patient was not taking his prescribed medications. The

psychiatrist continued the patient's medications with a plan to see the patient again in one month. On April 17, 2025, the patient was urgently referred for a mental health assessment after being the alleged victim of a sexual harassment. He had been placed in the RHU for his safety. The clinician who assessed the patient noted that alleged sexual harassment had triggered the patient's prior MHCB placement and completed an adequate suicide risk evaluation at cell front as the patient refused a confidential session. The patient's suicide risk was assessed to be low with adequate rationale. The patient similarly refused to engage in a confidential initial primary clinician assessment, which was adequate and based on record review. The patient refused another attempt to complete an initial psychiatric assessment on April 21, 2025.

An initial IDTT was held while the patient was in the RHU on April 23, 2025. Required staff and the patient were in attendance. The patient was noted as continuing to refuse to take medications, so they were discontinued. Despite the patient's denial of mental health needs, goals for addressing the patient's depression and danger to himself were initiated with appropriate interventions. The patient was moved to mainline EOP over the next two days. The patient refused initial primary clinician and psychiatric assessments. On May 2, 2025, an initial IDTT meeting was held with required staff present, although an alternate psychiatrist was present. The patient refused to attend. While documentation was mostly adequate, the treatment goals and interventions were not updated and still referenced the patient's placement in the RHU. The patient was noted to have a release date in October, 2025 yet pre-release planning was not documented on his treatment plan.

The patient initially refused individual sessions with his primary clinician and psychiatrist but attended once he was informed of milestone credits. He denied the need for treatment and did not engage in sessions but attended. He refused all offered groups. Toward the end of the monitoring period, he was transferred to a telepsychologist and refused to remain in the session.

**Findings**

Treatment of this patient was not adequate. Treatment was not targeted to address his needs, which included possible delusional ideation and a refusal to engage with mental health staff. Improvements in treatment planning were necessary.

**Patient H**

This 46-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with a diagnosis of schizoaffective disorder, depressive type. He was adherent to his medication regimen which included divalproex sodium, fluoxetine, olanzapine, and hydroxyzine. This patient was received into CDCR for the first and only time on November 13, 2024. He was placed at the 3CMS level of care the following day and was elevated to the EOP level of care while at the reception center on December 11, 2024. He transferred to PVSP on December 30, 2024.

He was seen for a timely primary clinician assessment on January 3, 2025 which was comprehensive. An initial psychiatric assessment was completed on January 8, 2025. It was superficial and the contents did not reflect a comprehensive assessment but rather appeared to be a routine clinical contact. An initial IDTT was held with the patient's assigned primary clinician

but a covering psychiatrist who had not met the patient previously on January 10, 2025. A correctional counselor and a medical assistant were also present, along with the patient. There were no strengths or verbalized goals from the patient documented. The treatment plan was blank and there was no rationale for retaining the patient at the EOP level of care. A routine IDTT was held timely in April 2025. The patient triggered review for the need for a higher level of care given his lack of participation in treatment. The rationale for retaining him at the EOP level of care and the enhanced interventions proposed were minimally adequate. The clinical summary was copied text from the rationale for non-referral. There was still no treatment plan, yet in the rationale for retention section, there was reference to increasing his participation in treatment by 12 percent.

While primary clinician telehealth contacts were offered weekly, the content was generic and included a list of interventions provided to the patient which were largely the same from week to week without any indication of the patient's response to these interventions or progress toward treatment goals. For example, documentation indicated that group participation was reviewed, but not information about his level of participation, which was minimal, was documented. Monthly psychiatric contacts were adequate.

There was evidence of recreational therapy and NLTGs being offered to the patient, but he did not attend. There was evidence of pre-release planning as the patient was due to be released in July 2025 yet there was minimal evidence of interventions provided to the patient to assist with the transition.

**Findings**

Treatment of this patient was not adequate. There was no evidence that the patient was provided with the treatment needed to address his symptoms of psychosis and paranoia other than medications. He had no treatment plan and no evidence of interventions being provided to assist the patient in being more active in his treatment or preparing him for release.

**Patient I**

This 43-year-old male patient's record was randomly selected for review of services provided to individuals at the EOP level of care at PVSP. This patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and other substance-induced psychotic disorder without substance use disorder. The patient was not adherent to his prescribed medications during the monitoring period, including aripiprazole, divalproex sodium, and olanzapine. He was prescribed hydroxyzine as a PRN. This patient was received into CDCR for the first time on December 12, 2024. He was not initially enrolled in MHSDS but was admitted to the MHCB level of care on January 3, 2025. He was discharged to the EOP level of care, returned to the MHCB level of care on February 10, 2025 and discharged to the EOP level of care at PVSP on February 21, 2025.

Five-day follow-up contacts were completed with the patient upon his arrival at PVSP. All session were conducted in a confidential manner and included review of the patient's safety plan with the exception of day two, when the patient refused a confidential contact. An initial psychiatric

assessment was completed timely. The assessment was inadequate in that it clearly used a template and a number of necessary elements were omitted including a plan for follow-up. Additionally, the psychiatrist discontinued the patient's antipsychotic medication despite the fact that his recent admission to MHCB was secondary to psychosis and there was no evidence that the psychiatrist reviewed the documentation from that admission. The patient denied any psychotic symptoms. An initial primary clinician assessment was conducted timely and was adequate. The patient denied any psychiatric symptoms other than anxiety. An adequate recreational therapy assessment was also completed prior to the patient's initial IDTT meeting. An initial IDTT meeting was held timely on March 7, 2025. Other than a covering psychiatrist, required staff were present along with an additional social worker and the patient. The patient reported that his psychotic episode was related to inhaling disinfectant. The treatment plan included an adequate goal to address anxiety and continued a goal related to sleep and behavioral disturbance secondary to psychosis that was initiated at MHCB and appeared to have been met prior to discharge. It was not clear why this goal was continued.

The patient was seen weekly for individual confidential sessions with his primary clinician who was an unlicensed clinician through April, when individual sessions were reduced to every other week with caseload groups in between. There was no evidence that interventions were provided to that patient to assist with his mental health needs. During individual contacts, the patient stated that he was not yet enrolled in recreational therapy groups, yet there were multiple notes in the record weekly from recreational therapists noting that the patient was not showing up for groups. This fact was not acknowledged by the primary clinician. On March 29, 2025, the patient presented with psychotic symptoms during session. The patient submitted a healthcare request to see the psychiatrist on March 30, 2025. Also, a referral was placed by a correctional officer after the patient was observed exhibiting bizarre behavior and making bizarre statements. The clinician who assessed the patient noted the patient was delusional, tangential, and grandiose with pressured speech and made a referral to the patient's assigned primary clinician for follow up. A psychiatrist other than the patient's assigned psychiatrist, saw him on April 3, 2025 in response to the healthcare request. The psychiatrist started an antipsychotic on that date but also appeared to incorrectly note the patient's current medications, including that the patient was prescribed olanzapine, which he was not. On April 16, 2025, this psychiatrist discontinued the patient's aripiprazole and hydroxyzine and decreased his dose of divalproex sodium secondary to the patient not taking the medications without seeing the patient. Of note, the primary clinician had made note of the patient struggling to get his medications as he had lost his identification card. Surprisingly, the patient reported to his clinician on April 19, 2025 that he found his identification card and was feeling better with his new medications. The primary clinician did not appear aware that most of the patient's medications were discontinued three days earlier. When seen for a routine psychiatric contact on April 30, 2025, the patient's assigned psychiatrist incorrectly documented the patient's current medications including mirtazapine, prazosin, and olanzapine. The psychiatrist continued the patient's divalproex sodium but did not restart an antipsychotic medication. The primary clinician documented that there were reports of the patient responding to internal stimuli and was aggressive on the housing unit, without evidence of interventions or action being taken.

For the remainder of the monitoring period, the patient continued to refuse groups and medications. There was no evidence that his lack of group attendance was acknowledged or addressed by his

primary clinician. Despite a number of non-adherence notices, no psychiatric contact was scheduled with the patient prior to his routine IDTT meeting on May 23, 2025. During that meeting, required staff were present, but the patient was not. The patient's refusal to attend group programming triggered the need for review of whether the patient needed a higher level of care. The rationale for not referring the patient to a higher level of care was minimally adequate yet the interventions proposed (i.e., person-centered therapy interventions of congruence and unconditional positive regard) were wholly inadequate to address his lack of participation in groups which were noted as being secondary to his symptoms of psychosis, aggression, and delusional thinking. The IDTT noted a diagnosis of schizoaffective disorder, bipolar type without rationale or explanation. The patient's treatment goals were not updated and there was no reference to any progress made toward previously identified goals.

**Findings**

Treatment of this patient was inadequate. The patient's mental health needs were not addressed and there was poor continuity of care. There was inaccurate documentation by both psychiatrists and the patient's primary clinician, limited evidence that the patient's treatment providers were reviewing the patient's record, and no evidence of follow-up on previously identified needs.

**Patient J**

This 35-year-old male patient's record was selected for review of services provided to individuals at the EOP level of care at PVSP after plaintiffs raised concerns about his level of care. This patient was provided with diagnoses of schizoaffective disorder, depressive type; persistent depressive disorder; and cannabis use disorder, mild, in sustained remission. He was intermittently adherent to his prescribed aripiprazole, oxcarbazepine, and sertraline.

This patient was incarcerated within CDCR for the first time in July 2022. He was placed at the MHCB level of care upon arrival and subsequently transferred to the acute inpatient setting less than two weeks after his arrival. He remained at the Acute level of care for nearly a year, discharging to the EOP level of care in June 2023. He transferred to PVSP on September 26, 2024.

Routine IDTTs were held with the patient in January and April 2025. Both were timely. The meeting in January included required staff but the patient refused to attend because he was not feeling well. The IDTT noted that the patient was not attending at least half of the treatment offered to him. The reasons provided by the patient were anxiety in large groups, not wanting to leave the unit to attend group, and the fact that groups were two-hours in length. The psychiatrist also noted that the patient was not medication adherent and attributed the non-adherence to the patient's recent illness. The rationale for not referring the patient to a higher level of care was not clear, as it referred to symptoms of low mood and auditory hallucinations not contributing to the patient's treatment refusals but made no mention of the patient's anxiety. The interventions documented to support the patient's treatment attendance were inadequate in addressing the identified causes, but instead noted education, prompting and monitoring as steps to be taken to increase his attendance. The treatment plan made no mention of anxiety or treatment participation as formal goals. The April meeting included the patient and staff. The patient was noted as still not attending at least half of the treatment offered, but some improvements were made. The patient

reported the same reasons for low attendance. The rationale for not referring the patient to a higher level of care was clearer and more appropriate with the planned interventions better targeting his situational anxiety. The plan was to modify the patient's program to at least three groups weekly for at least 30 minutes, yet he was not placed on EOPMod status. His treatment plan was appropriately updated. In neither meeting was there an updated clinical summary regarding the patient's progress toward identified goals or other functional deficits.

The patient's primary clinician offered weekly sessions to the patient, alternating between caseload groups and individual confidential sessions during most of the reporting period. In December, three caseload groups and only one individual session was offered. The patient only occasionally attended caseload groups. Individual sessions appeared to address the patient's identified needs with evidence of appropriate interventions and tracking of patient group attendance. The psychiatrist met with the patient at least monthly, and those contacts addressed the patient's needs.

**Findings**

Treatment of this patient was generally adequate. Improvements in treatment planning were needed, but otherwise, the patient appeared to be treated adequately at the appropriate level of care.

**Patient K**

This 56-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at PVSP. He was housed in Facility D and diagnosed with unspecified schizophrenia, stimulant use disorder, stimulant-induced psychotic disorder, and alcohol use disorder. He was prescribed escitalopram, mirtazapine, and risperidone. According to medication administration records, he was adherent with escitalopram and risperidone and partially adherent with mirtazapine. According to the patient's self-report, he cheeked escitalopram and risperidone, and these medications were discontinued in mid-February 2025 at the patient's request. Mirtazapine was also discontinued in mid-March 2025 due to medication nonadherence, with no contemporaneous psychiatric documentation. No suicide attempts or episodes of self-injurious behavior were listed in the health record, but an extensive family history of suicide was documented. Medical conditions included hyperlipidemia and phimosis, with circumcision performed during the review period. Within CDCR, the patient had previously received only 3CMS level of care. At PVSP, he was admitted to 3CMS care from December 10, 2024 through the end of the review period.

The initial psychiatric assessment was timely, minimally adequate, and completed by telehealth. The initial primary clinician assessment was timely but cursory. It did not result in diagnostic impressions or an adequate case formulation, and it did not describe the patient's symptoms in specific detail. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. The case formulation remained generic and insufficient to guide treatment. The patient's strengths and verbalized treatment goals were not documented. The treatment plan was inadequate. It focused exclusively on sleep disturbance, did not address mood and psychotic symptoms, did not include psychiatric care as an intervention, and did not formulate measurable short-term or long-term goals. The patient was

followed timely every 90 days by one of two psychiatrists and by a primary clinician. One psychiatrist used telehealth and documented that the encounters were confidential; the other psychiatrist did not indicate whether the encounter was confidential or in person. Psychiatric progress notes were otherwise adequate. The primary clinician provided timely individual follow-up appointments, but only one of the two progress notes indicated that the encounter was confidential and occurred by telehealth; the other progress note was silent on these elements. No interventions were documented, despite relaxation and sleep hygiene skills being required by the treatment plan. A mental health pre-release planning assessment was timely and adequate.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial primary clinician assessment, case formulation, treatment plan, and documentation of the patient's strengths and verbalized treatment goals were deficient. Interventions required by the treatment plan were not provided by the primary clinician. The nature of the patient's mood and psychotic symptoms remained unclear, as did the patient's psychiatric diagnoses. Mirtazapine was discontinued without contemporaneous psychiatric documentation. Although the patient received 3CMS services in a timely manner, they were insufficient to meet or clarify his treatment needs.

**Patient L**

This 34-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at PVSP. He was housed in Facility M and diagnosed with major depressive disorder, in remission, unspecified anxiety disorder, attention-deficit/hyperactivity disorder, and alcohol and stimulant use disorders. He was not prescribed any psychotropic medication. No suicide attempts or episodes of self-injurious behavior were listed in the health record, although assessments indicated that the patient reported one suicide attempt by overdose. Medical conditions included hypothyroidism, dyslipidemia, and vitamin D deficiency. Within CDCR, the patient had previously received only 3CMS level of care. At PVSP, he was admitted to 3CMS care from December 3, 2024 through the end of the review period.

Both the initial primary clinician and the initial psychiatric assessment were timely, confidential, adequate, and completed by telehealth. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care, and the rationale for maintaining the patient in 3CMS care while taking no psychotropic medications was adequately documented. Documentation of the patient's participation, strengths, and verbalized treatment goal was also adequate, but no treatment plan was developed. A primary clinician followed the patient timely every 90 days. These encounters were confidential. The first addressed the patient's anxiety and rumination using cognitive-behavioral interventions, while the second was abbreviated because the patient needed to have blood drawn at the medical clinic. A mental health pre-release planning assessment was timely and adequate.

**Findings**

The care provided to this 3CMS patient was adequate.

The patient was timely and adequately assessed upon arrival at PVSP, and a primary clinician provided confidential encounters at required intervals. These encounters were sufficient to monitor the patient's symptoms and functioning, and in the single session that was not cut short by the patient's medical needs, clinically appropriate interventions were documented. The patient remained stable on no psychotropic medications, and an adequate pre-release planning assessment was completed. The major deficit in care involved the lack of a treatment plan, but planned treatment was provided and adequate to meet the patient's needs.

**Patient M**

This 34-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at PVSP. He was housed in Facility C and diagnosed with schizophrenia. He was prescribed, but nonadherent with, olanzapine. Although progress notes indicated that olanzapine was court ordered, it was discontinued during the initial psychiatric assessment. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included anemia, gastroesophageal reflux disorder with vomiting, chronic diarrhea, and coccidioidomycosis. Within CDCR, the patient had previously received 3CMS and MHCB care. At PVSP, he was admitted to 3CMS care from December 6, 2024 through the end of the review period.

The initial primary clinician assessment was timely but cursory. It failed to include an adequate mental status examination, any assessment of the patient's risk for violence or suicide, a case formulation, or any current diagnostic impressions. The initial psychiatric assessment was timely and adequate but did not indicate whether the assessment was confidential. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. IDTT documentation was minimal and did not include a case formulation. The treatment plan identified depression as the treatment target but failed to formulate measurable short-term and long-term goals; the primary intervention identified was monitoring the patient's symptoms, functioning, and clinical needs. The assigned clinician followed the patient at least every 90 days. Progress notes were cursory, did not indicate whether the encounters were confidential, included extensive language that was identical from one encounter to the next, and did not identify provision of any evidence-based interventions. After the initial assessment, the assigned psychiatrist saw the patient twice during the review period. The first of these encounters was late, occurring 119 days following the psychiatric assessment. Although the plan documented in this encounter was to re-ducat the patient in 90 days, the patient was seen for his second psychiatric encounter in less than 30 days. Reasons for the more rapid return to clinic were not indicated. Both psychiatric progress notes were cursory, failed to indicate whether the encounter was confidential, and inaccurately stated that the possible side effects of prescribed medications were discussed, as no medications were prescribed. The psychiatrist found the patient stable and free from psychotic symptoms on no medications. In February 2025, a follow-up IDTTT meeting was held in response to a letter from a judge who recommended additional mental health care and programming. The patient and required staff attended. IDTT documentation remained cursory, and the only modification was a note indicating that the treatment team found the current level of care to be appropriate for the patient. The case formulation continued to be missing, and the treatment plan was not updated.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial primary clinician assessment was deficient, and no case formulation was documented in the patient's record. IDTT documentation was also deficient, and the treatment plan was not adequate to guide the patient's treatment. Although the treatment team conducted a follow-up IDTT meeting as clinically indicated to address concerns expressed by a judge regarding the adequacy of the patient's care, the IDTT documentation failed to provide an adequate rationale for retaining the patient in 3CMS care despite this letter of concern. Primary clinician progress notes were cursory and did not include evidence that planned and structured interventions were provided. The patient was not seen by a psychiatrist for the 119 days between December 17, 2024 and April 15, 2025. Inadequate attention was given to the patient's symptoms, diagnosis, or potential impact that his medical conditions might be having on his mood. Documentation provided little clarity as to whether the patient suffered from schizophrenia and, if so, what his treatment needs were. The patient received monitoring but little else.

**Patient N**

This 34-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at PVSP. He was housed in Facility D and diagnosed with unspecified schizophrenia and alcohol and stimulant use disorders. He was prescribed hydroxyzine, mirtazapine, and olanzapine; he was partially adherent with hydroxyzine and consistently adherent with mirtazapine and olanzapine. Scheduled hydroxyzine was discontinued, and PRN hydroxyzine was added, but the patient used a PRN dose only once. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included latent tuberculosis, chronic back pain, and epigastric pain. Within CDCR, the patient had previously received only 3CMS level of care. At PVSP, he was admitted to 3CMS care from December 3, 2024 through the end of the review period.

Both the initial primary clinician assessment and the initial psychiatric assessment were timely, confidential, adequate, and completed by telehealth. The initial IDTT meeting was timely but completed in absentia due to the patient's refusal; required staff attended. The patient was not found to meet criteria for a higher level of care, but the rationale for maintaining him in 3CMS care was not adequately documented, considering initial assessment findings that he was delusional, paranoid, pressured, thought disordered, and difficult to follow. The assigned psychiatrist followed the patient at least every 90 days through telehealth. These encounters were confidential and adequately documented. Appropriately, the psychiatrist saw the patient within 30 days of initiating olanzapine for psychotic symptoms. The olanzapine dose was increased, and the patient was appropriately persuaded to remain on this medication while psychosis continued to be observable. When the patient persisted in requesting olanzapine discontinuation, it was discontinued, while the frequency of psychiatric appointments was increased. The assigned primary clinician also provided the patient with confidential encounters at least every 90 days through telehealth. However, no interventions were documented, and these encounters were largely supportive in nature. Brief suicide reassessments, completed in January and April 2025

because the patient had previously been in MHCB care, were adequate and found the patient at low risk.

**Findings**

The care provided to this 3CMS patient was inadequate.

The major challenges to adequate care in this patient's treatment were the lack of treatment planning, failure to clarify the patient's diagnoses over time, and lack of meaningful treatment outside of psychopharmacological care. Psychiatric care appeared appropriate, and the patient improved over time. However, given a diagnosis of chronic mental illness characterized by psychosis, adequate diagnostic work-up and treatment planning was essential to ensure continuity and safety of care.

**Patient O**

This 46-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at PVSP. He was housed in Facility D and diagnosed with anxiety disorder due to another medical condition. He was prescribed fluoxetine, hydroxyzine, and mirtazapine, and was partially adherent with fluoxetine and consistently adherent with hydroxyzine and mirtazapine. Additional doses of hydroxyzine were prescribed PRN for anxiety, but he used a PRN dose only once, and the PRN order was discontinued early in the review period. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included asthma, dyslipidemia, cannabis use disorder, in remission, and a history of fracture of the mandible. Within CDCR, the patient had previously received only 3CMS level of care. At PVSP, he was admitted to 3CMS care from December 5, 2024 through the end of the review period.

The initial psychiatric assessment was timely, confidential, conducted by telehealth, and adequate apart from a failure to provide a rationale for the diagnoses or identification of the medical condition hypothesized to give rise to anxiety. The initial primary clinician assessment was timely but cursory. It was overly reliant on past documentation, did not provide a clear description of current symptoms, did not provide current diagnostic impressions, and resulted in a poorly conceptualized, generic case formulation. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. The patient's strengths and verbalized treatment goals were not documented. The treatment plan identified depression and anxiety as treatment targets but did not provide measurable short-term or long-term goals or patient-specific interventions, and it did not include psychiatric care as an intervention. The rationale for 3CMS care was adequately documented. In late January and early February 2025, the patient submitted a series of three healthcare requests, asking for anti-anxiety medication. One day after the third healthcare request was received, the assigned psychiatrist saw the patient in a confidential setting through telehealth and increased the patient's medications to address complaints of extreme anxiety. Thereafter, the assigned psychiatrist provided individual encounters through telehealth at least every 90 days. The patient refused two consecutive psychiatric appointments, and the psychiatrist discontinued the patient's psychotropic medications in response to these appointment refusals. The assigned primary clinician also provided individual

encounters every 90 days through telehealth, and progress notes indicated provision of clinically appropriate, evidence-based cognitive-behavioral interventions to support self-regulation and decrease anxiety. Two weeks after his medications were discontinued by the psychiatrist, the patient learned from the primary clinician that the medications were discontinued due to refusals of psychiatric appointments.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial primary clinician assessment, case formulation, treatment plan, and other IDTT documentation elements were inadequate. The patient's psychiatric diagnosis and the nature of the medical condition that gave rise to symptoms of anxiety remained unclear and poorly documented throughout the review period. Discontinuation of psychotropic medications, with which the patient was adherent, solely in response to refusal of psychiatric appointments and without communication to the patient, fell outside the standards of care. Individual interventions provided by the primary clinician represented a strength in this patient's care, but these encounters were too infrequent to meet the patient's treatment needs, especially in the context of medication discontinuation the patient did not expect or understand.

**Patient P**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was not prescribed psychotropic medication and declined interest in taking medications.

The patient had a history of anxiety and cannabis use and had not received mental health treatment prior to incarceration. His medical concerns included hypertension, obesity, psoriasis, and asthma.

The patient was placed at the 3CMS level of care in 2019 and arrived at PVSP on February 10, 2020. IDTT meetings occurred annually, and the most recent master treatment plan was dated January 9, 2025. The meeting was attended by all required staff, and treatment goals were documented to address anxiety and depression. The plan included appropriate interventions and a report on the patient's progress during the prior year. An appropriate rationale that the patient would continue working on symptom management was provided for continuation at the 3CMS level of care.

The initial psychiatric assessment occurred on April 18, 2023 in a confidential setting; additionally, psychiatric updates were also provided to the master treatment plan. The notes did not indicate whether services were provided in person or by telepsychiatry. The patient declined treatment with psychotropic medications and expressed a preference to work on his issues through counseling and physical exercise.

The PC provided telehealth visits in a confidential office setting with additional visits when requested. The patient expressed concerns about his relationships and anxiety symptoms and received support and interventions as appropriate.

**Findings**
The treatment provided to this patient was adequate.

The IDTT provided timely and relevant mental health interventions appropriate for the patient's level of care and consistent with his treatment needs.

**Patient Q**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided a diagnosis of bipolar I disorder, depressed type. He was prescribed Remeron. The patient had pertinent medical conditions including gout, hyperlipidemia, prediabetes, obesity, and chronic right elbow pain.

The patient arrived at PVSP on September 23, 2024. He had a history of treatment for substance use prior to incarceration and had no MHCB placements in the CDCR. A master treatment plan was documented on October 24, 2024. A goal to address depression and anxiety was included with relevant interventions, and the level of care determination was to maintain the patient at the 3CMS level of care. The PC, psychiatrist, and the patient attended the IDTT meeting, but the correctional counselor was not present. The IDTT determined that the patient was functioning adequately with support at the 3CMS level of care, and he was continued at that level of care.

The psychiatrist provided an initial assessment at the time of the patient's transfer to PVSP and additionally evaluated the patient on January 17, 2025. On April 9, 2025, the patient requested a psychiatric visit but refused to attend the appointment. All psychiatrist contacts occurred by telepsychiatry and were completed in a confidential setting. The psychiatrist discontinued Remeron on April 23, 2025, as the patient refused to see the psychiatrist; Prozac was discontinued on February 11, 2025 due to nonadherence.

The PC provided mental health contacts on January 14, 2025 and April 4, 2025 by telehealth in a confidential office. The PC offered appropriate supportive counseling. The patient was responsive to the visits; however, his interactions with the PC were minimal, and he avoided discussing issues beyond superficial topics and avoided the development of significant treatment goals.

**Findings**

The treatment provided to this patient was adequate.

The patient received appropriate mental health services at the 3CMS level of care with consistent psychiatric and primary clinician contacts. While the patient demonstrated nonadherence with treatment appointments and medications, the treatment team appropriately adjusted the treatment approach and provided necessary monitoring.

**Patient R**

This 40-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided diagnoses of ADHD, opioid use disorder, and stimulant use disorder. He was previously prescribed Strattera, but he stopped taking the medication near the beginning of the report period and was prescribed Vistaril on February 25, 2025.

The patient was placed at the 3CMS level of care in 2022, and he had no higher level of care placements or significant mental health-related events since that time.

An IDTT meeting occurred on April 10, 2025 that included the PC, psychiatrist, correctional counselor, and the patient. The treatment plan identified depression as the primary problem to address in treatment, and the plan included appropriate goals and interventions. The patient's expressed goals were to address his substance use, sexual identity, and to reduce his feelings of depression. The IDTT determined that the patient should remain at the 3CMS level of care to address his symptoms of depression.

The psychiatrist met with the patient by telepsychiatry on three dates. A session was scheduled on May 30, 2025, however, the patient declined to attend. The psychiatrist was responsive to the patient's requests and provided psychoeducation regarding medication treatment.

The PC met with the patient by telehealth in a confidential office setting. Four contacts were provided by the PC during the review period that focused on listening to the patient's concerns. The PC encouraged the patient to attend appointments and take prescribed medications.

**Findings**
The treatment provided to this patient was adequate.

The clinician addressed psychosocial concerns while the psychiatrist demonstrated clinical responsiveness by continuing effective medications given the patient's stable presentation.

**Patient S**

This 53-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided a diagnosis of major depressive disorder. He was prescribed Prozac. Pertinent medical conditions included hypertension, hyperlipidemia, obesity, chronic low back pain, prediabetes, and chronic hepatitis C.

The patient’s mental health treatment history included mental health services at the 3CMS and MHCB levels of care. A master treatment plan was documented on December 4, 2024, and the IDTT meeting included the psychiatrist, PC, correctional counselor, and the patient. The treatment plan included goals to address anxiety and depressive symptoms that would be addressed by CBT interventions. It was documented that the patient should remain at the 3CMS level of care to assist with his anxiety and mood; however, progress and discharge planning were not documented.

The psychiatrist met with the patient three times by telepsychiatry during the review period and conducted thorough assessments in a confidential setting. Prozac was increased with reported improvement in depressive and anxiety symptoms. The psychiatrist appropriately addressed the patient’s substance abuse history in sustained remission and provided psychoeducation about medication adherence.

The patient was timely seen for three telehealth contacts by the PC over five months. On February 20, 2025, the PC met with the patient in a nonconfidential setting in the dayroom, as the patient declined his scheduled appointment. The PC contacts focused on symptom monitoring and rapport building, but the therapeutic interventions were limited to basic cognitive behavioral techniques

for anxiety. Implementation of treatment planning was poor with no evidence of structured interventions or follow-through regarding the patient's identified goals for anxiety management and requests for medication adjustments. Continuity of care was disrupted by the death of the PC and multiple provider changes.

**Findings**

The treatment provided to this patient was adequate.
The psychiatrist provided appropriate medication management and consistent, confidential and clinically relevant contacts that maintained the patient's stability. Although the PC maintained the required frequency of contacts, continuity of clinician care was disrupted, and treatment planning and implementation were lacking.

**Patient T**

This 20-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided a diagnosis of PTSD. He was prescribed Remeron, Celexa, Prazosin, and Strattera.

The patient arrived at PVSP on December 4, 2024. An initial IDTT meeting occurred on December 10, 2024, and the master treatment plan documented the attendance of the PC, psychiatrist, correctional counselor, and the patient. The plan identified the patient's depression as the problem, listed "engage" as the objective, and described a long-term goal for the patient to report reduction in his depression. The patient's stated goal was to have his medication increased.

The psychiatrist provided an initial assessment on December 10, 2024 when Celexa and Prazosin were continued, and Remeron was prescribed for sleep disturbance. The patient did not take Remeron consistently, and the medication was discontinued; however, the patient again requested the medication on May 6, 2025, due to continued insomnia. The psychiatrist also prescribed Strattera to address ADHD symptoms. The psychiatrist did not document whether contacts occurred in a confidential setting or if they occurred in person or by telehealth.

The PC saw the patient for three in person mental health visits during the review period. The documentation described routine clinical contact, review of the healthcare record, consultation with housing staff, and assessment of the patient's demeanor and symptoms. Clinical records documented the patient's diagnosis, ongoing medication adjustments, current program involvement, and decisions regarding referral and treatment. Appropriate referral to psychiatry occurred when the patient's symptoms changed, and there was clear documentation of ongoing follow-up plans at each visit.

**Findings**

The treatment provided to this patient was adequate.

The patient was seen for timely and appropriate PC and psychiatric evaluation with consistent follow-up contacts that exceeded the minimum requirements. The documentation indicated adequate assessment, treatment planning, and follow-up.

**Patient U**

This 32-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided diagnoses of adjustment disorder, major depressive disorder, PTSD, opioid use disorder, and amphetamine use disorder. He discontinued psychotropic medications while in a county jail in January 2025 and was not prescribed medications at CDCR during the review period.

The patient arrived at PVSP on April 4, 2025. An IDTT meeting occurred on April 15, 2025. The master treatment plan documented attendance of the PC, psychiatrist, the correctional counselor, and the patient. The patient reported that he wanted to be removed from the MHSDS and described his condition as fine. The treatment plan identified depression and substance abuse as target problems with relevant goals and objectives listed. Higher level of care referral criteria were reviewed, and it was documented that monitoring of the patient's adaptation and functioning would occur before considering discontinuation of mental health treatment.

The psychiatrist provided an initial contact on April 15, 2025, which was the same day as the IDTT meeting. The psychiatrist documented a thorough assessment and review of the patient's history. The documentation was unclear whether the contact occurred in person or by telehealth. The psychiatrist agreed to monitor the patient without medication treatment.

An initial PC assessment occurred on April 10, 2025. The assessment documented the patient's history and current status, but did not include interventions other than planning for the upcoming IDTT meeting. The documentation was unclear whether the contact occurred in person or by telehealth.

**Findings**
The treatment provided to this patient was adequate.

Psychiatric and PC contacts were completed at the required frequency, and appropriate monitoring of symptoms was documented. Treatment goals addressed relevant clinical needs, higher level of care criteria were reviewed, and suicide risk was assessed appropriately.

**Patient V**

This 45-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided a diagnosis of psychotic disorder, not otherwise specified. The most recent psychotropic medication prescribed was Remeron; the patient took the medication until June 2024, when he declined further medication treatment.

The patient had a history of head injury from a car accident requiring surgeries. He did not report current physical health concerns but continued to exhibit delusional thinking that a computer was implanted in his brain allowing telepathic communication with others.

The patient arrived at PVSP on August 7, 2024. No IDTT meeting occurred during the review period. The most recent IDTT meeting occurred timely on August 20, 2024; an alternate PC, the psychiatrist, and the patient attended the meeting. The identified clinical problem was observation for potential higher level of care referral, and goals were identified to improve treatment engagement and adherence with mental health contacts. An IPOC addressing depressed mood was also documented, although no prior clinical evidence of depression was presented.

The psychiatrist provided one contact during the review period on March 25, 2025. It was not documented whether the contact occurred by telepsychiatry or in person. The note contained several cut-and-paste portions from earlier documentation that included a discussion of possible side effects of psychotropic medications; however, the patient was not prescribed psychotropic medication. The psychiatrist documented that the patient did not meet the criteria for a PC 2602 involuntary medication order.

The PC met with the patient on December 18, 2024, February 20, 2025, and April 25, 2025. The patient was consistently described as cooperative and pleasant. He continued to reference delusional thinking of a brain implant but reported improved well-being following a recent housing change. The patient declined psychotropic medication treatment and presented with no acute psychiatric needs or significant clinical decompensation.

There was no documentation of RVRs, suicide risk assessments, self-harm evaluations, or unusual incidents during the review period.

**Findings**

The treatment provided to this patient was adequate.

Treatment contacts reflected consistent monitoring with reasonable and clinically appropriate assessment and planning. While improvement in psychiatric documentation was indicated, those deficiencies did not compromise the adequacy of treatment provided.

**Patient W**

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the treatment provided at PVSP. The patient was provided a diagnosis of adjustment disorder with anxiety. He was prescribed Remeron and BuSpar.

The patient arrived at PVSP on January 29, 2025 and had previously received mental health services at the MHCB and 3CMS levels of care. In December 2024, the patient was placed in an MHCB due to a report of suicidality; following discharge, he acknowledged that his suicidal threat was intended to accomplish a yard change.

The initial psychiatric assessment was completed on February 3, 2025. The assessment was comprehensive and included a mental status examination. The psychiatrist described the patient as psychiatrically stable with resolved anxiety after his housing move. The existing medication regimen was appropriately continued, and laboratory monitoring was reviewed. The psychiatrist assessed the patient with low suicide risk and scheduled timely follow-up within 90 days.

An IDTT meeting occurred on February 5, 2025 that included the PC, psychiatrist, correctional counselor, and the patient. The patient declined to provide input on treatment goals and reported no mental health concerns. The psychiatrist and PC attended the meeting in person. The treatment plan addressed anger and substance use and recommended ongoing treatment at the 3CMS level care with continued therapy, groups, and psychotropic medication treatment. Treatment planning involved appropriate identification of problems, and the plan recommended continued monitoring and support, although the patient provided minimal engagement and input.

The patient received an RVR for battery causing serious injury on December 31, 2024. The RVR mental health assessment determined that the RVR behavior did not result from mental illness. The patient was subsequently moved to the RHU.

While housed in the RHU, the PC provided consistent weekly monitoring that primarily occurred at cell front due to frequent refusals. Each encounter addressed the patient's mental status, substance use psychoeducation, and coping strategies for emotional reactivity and aggression. Anger management interventions and positive psychology approaches were used to address property and tablet-related distress. Collateral information from housing staff was solicited and reviewed.

Group therapy was offered by the recreational therapist during the patient's RHU placement, but the patient stopped attending groups in March 2025. The patient's nonattendance was not addressed by the assigned clinician in individual sessions.

**Findings**

The treatment provided to this patient was adequate.

The patient received consistent assessment and monitoring with appropriate psychiatric management and follow-up after his RVR and transfer to the RHU. The treatment interventions addressed relevant problems, and continuity of care was maintained.

**APPENDIX B-23**
**Richard. J. Donovan Correctional Facility (RJD)**
**Reporting Period: June 1, 2024 – November 30, 2024**

**Patient A**

This 69-year-old male patient's healthcare record was reviewed to assess the quality of care provided at RJD's EOP program. The patient was provided with diagnoses of schizoaffective disorder, depressive type; PTSD; opioid use disorder; severe cocaine use disorder, severe; and cannabis use disorder, severe. The patient was prescribed psychiatric medications, including Zyprexa and Abilify for mood and psychosis; Zoloft for depression; and Cogentin for side effects. Healthcare records reflected the patient was adherent to his psychiatric medications. The patient was designated DD1. Healthcare records also noted medical conditions of hyperlipidemia, liver fibrosis, malignant supraglottic tumor, glaucoma, and benign essential hypertension.

The patient served multiple prison terms beginning in 1986, entering the MHSDS at the MHCB level of care on September 16, 2013. The patient's most recent term began on February 22, 2023, with an expected release date of January 10, 2028. During the patient's multiple prison terms, the patient received treatment at various levels of care, including 3CMS, EOP, and MHCB.

The patient's history included inpatient psychiatric hospitalization in the community, as well as incidents of violence, self-injurious behavior, and multiple suicide attempts by hanging, wrist-cutting, and overdose. The last documented suicide attempt occurred on February 1, 2017, by overdose; however, healthcare records also indicated the patient attempted to throw himself down the stairs in 2022. The patient's most recent MHCB admission took place from September 29, 2017 to October 9, 2017, prompted by feelings of depression and suicidality while at the reception center.

On April 12, 2023, the patient was transferred to RJD's EOP. During the review period, three IDTT meetings were conducted. Required participants attended each treatment team meeting, including the patient. The assigned PC's first encounter with the patient; however, was during the initial IDTT meeting on June 5, 2024. The treatment plan case summaries and case formulations were minimally updated during each IDTT meeting, primarily carrying forward information from the 2023 without including progress or the patient's status since the previous treatment team meeting. The treatment plan omitted the patient's diagnoses and symptoms. IPOCs for depressed mood, auditory hallucinations, and substance use were carried forward from 2023. Although the treatment plan targeted anxiety and depression, the plan was vague and lacked specific, individualized, measurable goals to track the patient's progress and the effectiveness of treatment interventions implemented.

The treatment plan did, however, include appropriate interventions to address the patient's anxiety and depression but not the disciplines responsible for providing the interventions. The plan did not document the patient's progress toward the targeted symptoms but rather stated that the patient was attending his programming and looking forward to going home. Additionally, despite the patient's concerns of interrupted sleep and nightmares related to past reported trauma which were being addressed during individual sessions, the treatment plan did not specifically address these

concerns. Additionally, the treatment plan omitted discharge planning criteria and the justification for retaining the patient at the current level of care.

Routine PC contacts generally occurred timely and included both individual and EOP group contacts. Although, at times, the assigned PC would meet with the patient twice in each week for both individual and group contacts, the PC only met once with the patient each week from June 24, 2024 through July 26, 2024. Routine PC contacts were not identified as confidential; however, the PC appeared to have built a good rapport with the patient as the patient consistently attended the programming both individually and in groups with the assigned PC. Although the content of the contacts documented was generally appropriate with adequate interventions, the implementation of the treatment plan and progress towards treatment plan goals were not consistently documented, nor was the patient's response to treatment interventions included.

Routine psychiatry contacts were timely and, at times, occurred more than once a month during the review period for either a follow-up on a referral or for initial medication non-adherence with Prazosin prescribed for nightmares. The contacts were noted to be confidential and addressed the patient's concerns, per documentation.

On average, the patient attended the requisite number of structured treatment activities each week, and was offered more than the minimum required hours. In addition to attending his EOP caseload group with his assigned PC, the patient also attended relevant groups related to CBT techniques, substance abuse, and mindfulness techniques, as well as NLTGs and recreational therapy groups.

**Findings**

The treatment provided to this patient was adequate.

Although both the interdisciplinary treatment plans and individual contacts with the assigned PC included documentation issues, namely, the lack of identified specific, measurable goals to address the patient's symptoms; discharge criteria; and documentation of the patient's progress toward goals to assess treatment effectiveness and determine necessary modifications or lower level of care criteria; assigned providers met with the patient often, at times exceeding Program Guide minimum requirements. In addition, documentation indicated appropriate interventions addressed the patient's concerns, and continuity of care was maintained during the review period. Notably, during this period, the patient was adherent to psychiatric medications, attended structured treatment activities, and remained relatively stable.

**Patient B**

This 46-year-old male patient's healthcare record was reviewed to assess the quality of care provided at RJD's EOP program. The patient was provided with diagnoses of major depressive disorder, recurrent episode severe; opioid use disorder, severe, in early remission; and amphetamine-type substance use disorder severe. The patient's history included suicide attempts by overdose, hanging, and swallowing a razor and self-injurious behavior by head banging. The patient was not prescribed psychiatric medication; however, was noted to participate in the

substance use program and was prescribed buprenorphine-naloxone. His medical concerns included colitis gravis, for which he was prescribed mesalamine.

The patient served multiple prison terms commencing March 17, 2003, entering MHSDS at the 3CMS level of care on July 26, 2005. The patient has since received treatment at various levels of care, including 3CMS, EOP, EOPMod, MHCB, and ICF. The patient's recent term began on April 25, 2019, with his last MHCB admission occurring from December 10 to December 20, 2021, due to suicidal ideation with a plan. The patient transferred to RJD on June 8, 2022, and was noted to have a release date of January 30, 2025.

During the review period, IDTT meetings occurred timely in June and September 2024. The June 2024 IDTT was documented as a referral for the MCRP. All required participants were present, as well as the patient. In addition, a recreational therapist, social worker, and correctional officer were also in attendance. The treatment plan's clinical summary was primarily carried forward from an earlier plan and did not provide meaningful updates regarding the patient's progress in treatment; however, the patient's symptoms, progress, and barriers to treatment were discussed in further detail under other sections of the treatment plan. The patient was noted to be motivated for MCRP and agreed to attend substance use classes. Although adequate interventions were included, the treatment plan goals were vague, and baseline measures for patient goals were not provided. There were appropriate discharge criteria included.

On September 16, 2024, a quarterly IDTT meeting was convened timely in a confidential setting. While the assigned PC, psychiatrist, and CC I attended, the patient refused. The clinical summary provided minimal updates, largely unchanged. An update on the patient's progress was provided in both the discharge criteria and the patient's strengths sections of the treatment plan. The treatment plan continued to lack measurable goals and did not reflect the patient's progress toward specific treatment objectives. The treatment plan addressed the patient's recent RVR and the patient's role in the kitchen was noted to serve as a protective factor. The treatment plan continued to focus on depression and substance use, yet the goals remained vague and were not adjusted to reflect on-going substance use. In addition, although the patient was noted to report anxiety due to his upcoming releases, the treatment plan did not specifically target the patient's anxiety or discharge planning. Discussions on specific patient groups and job assignments were not included as interventions for patient treatment.

Routine PC contacts alternated between caseload group and individual sessions. While initial substance use and MCRP assessments were conducted in confidential settings, most follow-up PC contacts occurred cell front due to the patient's refusal. Notably, the healthcare records indicated that there were only two assigned PC contacts in July due to staffing shortages. The patient was often described as not in distress and having a clean cell, and it was noted that the patient continued to work in the kitchen despite substance use being a barrier to the patient's treatment.

Given the patient's refusal, meaningful PC therapeutic contact with the utilization of treatment interventions aimed at treatment targets was not consistently achieved. Despite the patient's lack of attendance in caseload groups, the patient was not seen for follow up until the next week. In addition, the patient's progress toward treatment target goals was not consistently documented in individual PC contacts. During PC contacts, while appropriate interventions were included, they

were repeated in each note, and the follow-up and plan disposition documentation was overly inclusive and repeated across PC documentation without clarification of which specific intervention was utilized. Sometime in October the patient was reassigned a new PC.

Routine psychiatry appointments occurred timely, although the patient often refused, and contacts occurred in non-confidential settings as a result. The patient was not prescribed psychiatric medications and was noted not to be in distress. The patient's assigned psychiatrist assessed the patient as having major depressive disorder versus substance-induced mood disorder, although further diagnostic clarification was not sought. Psychiatry contacts did not occur monthly, yet the patient's current symptoms were assessed, and the assigned psychiatrist provided treatment options to the patient.

During the review period, the patient was seen twice for an RVR assessment including possession of contraband on July 30, 2024 that was not deemed related to the patient's mental health issues and on October 8, 2024, for possession of alcohol, but was assessed to possibly due to mental illness due to the patient's difficulty abstaining from substance use which was being targeted in treatment. According to healthcare records, the patient's RVRs were subsequently reduced to warnings.

Pre-release planning dated November 4, 2024, was included with a plan for patient to attend transitional housing when paroled in January 2025. The 60-day discharge summary dated November 18, 2024, was noted to coordinate the patient's placement, MAT, medical benefits, and community resources**.**

Patient-assigned groups were not included in the patient's treatment plans. However, healthcare records indicated that the patient was enrolled in the assigned PC caseload groups, anger management groups, NLTGs, recreation groups, and yard. Additionally, the patient was enrolled in a clinical pre-release group and reported attending substance use groups, although healthcare records noted that patient only attended some groups and yards. The patient also worked in the kitchen and, according to healthcare records, was offered the required number of structured treatment activities per week according to the Program Guide. The patient attended just over half of offered structured treatment per week during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The treatment plan was ineffective and required modification and updating to include measurable goals to determine the patient's progress. While substance use was recognized as an obstacle, no further treatment adjustments were implemented, nor was the additional mood symptom of anxiety incorporated into the patient's treatment plan, despite the patient indicating he was anxious due to upcoming release. Additionally, due to staffing shortages, the patient did not receive timely care during the review period, and based on the patient's consistent refusals, the patient was often seen in non-confidential settings. Although the patient underwent two RVR assessments in this timeframe, the treatment plan remained unchanged despite the noted lack of insight regarding substance use, poor attendance to therapeutic individual and group sessions, and the absence of a

relapse prevention strategy. Given the patient's treatment refusals, meaningful therapeutic contact with the utilization of treatment interventions aimed at treatment targets was not consistently achieved.

**Patient C**

This 37-year-old male patient's healthcare record was reviewed to assess the quality of care provided at RJD's EOP program. The patient was provided with a diagnosis of schizophrenia characterized by delusional beliefs, auditory hallucinations, paranoia, catatonia, poverty of speech, poor motivation, and poor insight. The patient's history included suicidal ideation, self-injurious behavior, suicide attempts, violence, and homicidal ideation. The patient was prescribed Clozapine under a PC 2602 order.

The patient was serving his first term of life with the possibility of parole for attempted murder, 2nd degree assault with a deadly weapon, and aggravated mayhem. Healthcare records indicated the patient had an involuntary medication order in effect since 2010 due to danger to others and grave disability. In addition, the patient had a history of four prior psychiatric admissions due to incompetence to stand trial. The patient's term began on July 6, 2009, and the patient received treatment at all levels of care including a DSH admission due to homicidal ideation towards cellmate. The most recent MHCB placement was from March 14 to March 24, 2020, secondary to suicidal ideation related to transferring to RJD. The patient subsequently transferred to RJD and was placed on EOPMod status on August 3, 2020.

During the review period, monthly IDTT meetings were held with all but two being timely. All required participants attended each meeting except for the September and November sessions, which had an alternate psychiatrist and an alternate PC present, respectively. The patient, along with a CC I, was present at all meetings, and a supervising psychologist attended nearly all sessions, missing only one. The June and July IDTT meetings were categorized as quarterly meetings led by a different assigned PC than the later monthly meetings, which were designated as 30-day EOPMod treatment team meetings.

The treatment plans established in June and July aimed to address the patient's delusional thinking and psychosis with CBT with the goal of reducing the patient's self-reported distress levels; however, key baseline measures were missing. The treatment goals were deemed insufficient, especially given the patient's denial of symptoms. Additionally, there was a goal to improve the patient's attendance in group therapy to two sessions per week to address the patient's negative symptoms of schizophrenia, yet baseline measurements were again lacking. Subsequent monthly IDTT documentation did not discuss patient progress toward goals, changed the focus of treatment without justification, and did not integrate the patient's desire to work on parole planning. The patient's lack of participation in programming warranted review for a higher level of care beginning in September 2024. Initial rationale for not referring the patient to a higher level of care and treatment modifications were adequate and appeared effective; however, in November, documentation failed to provide any treatment modifications and the clinical summary did not contain updates regarding the patient's progress since the last IDTT meeting. There was also no discharge criteria or plans for transitioning the patient to a lower level of care.

Routine PC contacts occurred biweekly, with alternating EOP groups assigned; however, the patient did not attend caseload groups. Besides monthly IDTT meetings, no additional contacts were offered, even though the patient followed a modified treatment plan. When contacts were held, the patient usually met with the assigned PC in a private setting. PC documentation did not reflect the patient's progress toward treatment goals. Although not reflected in IDTT notes, PC documentation indicated that the patient participated in GED classes. The patient rarely engaged in clinical group treatment or recreational groups.

Routine psychiatry appointments occurred monthly and were conducted in a confidential setting with the patient's assigned psychiatrist, who noted the patient's current presentation and adjusted medications. The psychiatrist at times met with the patient twice within a calendar month, and in November, a psychiatry appointment occurred via telehealth with a covering psychiatrist but was noted to be confidential. Monthly routine psychiatric documentation assessed patient symptoms, medication response, rationale for use, and documented patient education.

The patient was offered caseload groups and recreation groups but did not attend. Given that the patient was designated as EOP Modified, the patient was offered less than ten hours of structured treatment per week with the patient attending only 2.73 hours on average each week during the review period.

**Findings**

The treatment provided to this patient was inadequate.

The treatment plan was insufficient as it lacked a meaningful summary of patient progress or changes in functioning since prior IDTT meetings and treatment objectives were removed without rationale. Although the IDTT met monthly, increased individual and psychiatry contacts did not occur, despite the patient's EOP-modified status. Overall, the documentation inadequately addressed the patient's progress along measurable goals and modifications were needed.

**Patient D**

This 44-year-old male patient's healthcare record was reviewed to assess the quality of care provided at the RJD EOP level of care. The patient was provided with a diagnosis of schizophrenia and was noted to have a history of traumatic brain injury. The patient had an active PC 2602 for involuntary medications for paliperidone injection due to grave disability, which was renewed timely through November 18, 2025. The patient was also included in the DDP with the designation of DD2.

Although the patient's term began on April 3, 2002, the patient did not enter MHSDS until May 15, 2014 at the 3CMS level of care. The patient was transferred to the EOP level of care shortly thereafter on June 18, 2014, and has since received treatment at all levels of care, including 3CMS, EOP, EOPMod, MHCB, ICF, and Acute levels of care. The patient was transferred to RJD on April 27, 2023, at the EOP level of care and was designated as EOPMod status on June 15, 2023,

after being housed at the MHCB level of care from June 13, 2023, to June 15, 2023, due to reported suicidal ideation.

According to healthcare records, the patient's symptoms included self-injurious behaviors, mutism, delusions, paranoia, auditory hallucinations, nonsensical speech, catatonia, and cognitive limitations. Although the patient had no known suicide attempts, the patient had 19 higher level of care referrals and a history of assaultive and aggressive behaviors. The patient also has a history of cannabis and cocaine use but was reported to be in remission. According to healthcare records, the patient was noted to have a traumatic head injury in 2018 and anoxic/toxic metabolic encephalopathy likely related to an unknown substance/drug ingestion on November 17, 2022.

While on EOP-modified programming, the patient was scheduled monthly for IDTTs; however, refused to attend. A pre-doctoral psychology intern was listed as the assigned PC at the IDTT meetings held in June and July. Although a licensed psychologist was not present during the June IDTT, the patient's assigned psychiatrist and a CC I were in attendance. The patient's assigned psychiatrist was also not present for three out of the six IDTT meetings. A correctional officer was also present during the November 2024 IDTT meeting.

During the June IDTT meeting, the patient required review for the need for a higher level of care due to his lack of treatment participation. The patient's current level of care was adequately justified, with a plan to see the patient weekly for PC appointments and to continue reminding the patient about the program. The treatment plan carried forward IPOCs targeting hallucinations, the patient's limited insight into mental health issues, and delusional thinking that were initiated in December 2023. The goals of the treatment plan were vague, lacking measurable benchmarks to assess the patient's progress While the interventions were suitable, the treatment plan did not evolve across IDTT meetings, continuing to document the patient's lack of insight and denial of mental health issues without modifications, with the only noted progress being the patient's ongoing filing of grievances concerning his PC 2602 status.

The patient was seen by a pre-doctoral psychology intern for a SRASHE on June 18, 2024, as one of four 90-day required follow-ups. The SRASHE adequately assessed the patient's chronic and acute risk of harm to be low.

Routine PC contacts were initially scheduled weekly; however, sometime in August, the patient was reassigned a new PC and PC contacts were scheduled biweekly with alternating EOP caseload groups. The patient refused the majority of confidential contacts and was often seen cell front. In addition, although assigned to EOP caseload groups, recreation groups, and symptom and psychosis management groups, the patient attended few groups and, when asked, requested to be removed from the psychosis management group.

Routine psychiatry contacts occurred monthly, although often in a non-confidential setting due to patient refusal. There were multiple psychiatrists covering patient care and IDTT meetings during the review period. Each noted that the patient's fixed delusional beliefs and lack of insight into his mental illness, not wanting to take prescribed court-ordered medication but following through with the injections. Notably, the patient was seen by three different PCs and multiple psychiatrists during the review period, affecting the patient's continuity of care.

**Findings**

The treatment provided to this patient was inadequate.

The patient was on modified EOP programming status, and although scheduled for monthly IDTT meetings and initially weekly PC contacts, due to changes in staffing, the patient was seen by multiple providers during the review period, and PC contacts decreased to biweekly without further rationale. The treatment team meetings were also held in absentia and included minimum updates. The treatment plan lacked specific, measurable goals and baseline measures to track the patient's progress for assessing improvement or adjusting the plan accordingly. Given the patient's lack of insight and participation in programming, no alternative strategies were documented despite the lack of treatment plan effectiveness.

**Patient E**

This 49-year-old non-binary patient's healthcare record was reviewed to assess the quality of care provided at RJD's EOP program. According to previous IDTT documentation from 2023, the patient preferred to be acknowledged with female pronouns and identified as transgender/non-binary. The patient was provided with diagnoses of unspecified bipolar and related disorder, gender dysphoria in adolescents and adults, and PTSD. The patient was prescribed divalproex sodium, lithium, trazodone, and olanzapine to address mood along with propranolol and buspirone to target anxiety. The patient was adherent to buspirone but only partially adherent to other psychiatric medications. Medically, the patient was provided with diagnoses of seizure disorder, T-cell large granular lymphocytic leukemia, migraine, thalassemia, essential hypertension, and stomach issues.

This was the patient's first prison term of life with parole, which began on August 21, 2008. Less than a month later, on September 5, 2008, the patient entered MHSDS at the 3CMS level of care and has since received treatment at various levels of care, including 3CMS, EOP, EOPMod, and MHCB. The patient transferred to RJD at the EOP level of care in April 2023.

The patient's symptoms included anxiety, paranoia, depression, and auditory hallucinations that were demeaning and encouraged her to harm herself. The patient had a history of engaging in self-injurious behavior and five suicide attempts in the past. The patient also had a history of substance use, beginning at a young age. Healthcare records also indicated that the patient experienced traumatic events including childhood physical and sexual abuse as well as more recent traumatic events.

During the review period, a routine IDTT meeting convened on September 18, 2024, five weeks later than required. The assigned PC was not in attendance. However, an alternate PC was present, along with a supervising psychologist, the assigned psychiatrist, and a correctional counselor. The treatment team meeting appeared collaborative, documenting the patient's diagnosis, symptoms, treatment progress, goals, and an adequate rationale for the level of care.
The patient was noted to be hostile, irritable, and verbally aggressive, stating that she had not been seen by her assigned PC in eight weeks. Record review confirmed that the patient was offered

sessions by a covering PC on three occasions during that period but no session were offered by the assigned PC. The patient was informed of staffing challenges and that she would be transferred to a new clinician and the patient was receptive to this change. Custody staff contributed meaningfully to the discussion. The treatment plan included an IPOC for depression; however, both the short- and long-term goals were inadequate. The short-term goal aimed to challenge negative cognitions worsening the depression during therapy, while the long-term goal sought to keep the patient free of depression for nine months but lacked measurable goals to gauge the patient's progress.

In July, the patient experienced an increase in depressive symptoms and feelings of hopelessness. Concerns about her medical issues and reported fentanyl use led to the patient being placed on a high-risk list, which was not reflected in the treatment plan. The patient also verbalized the goal to address grief and environmental stressors, but the treatment plan did not incorporate specific, measurable goals for managing these issues. Despite the inclusion of evidence-based interventions, the plan failed to acknowledge the patient's specific group, psychiatric medications, and jobs, which limited the treatment plan's effectiveness. Nevertheless, the justification for retaining the patient at the current level of care was adequately provided.

Routine PC appointments were not timely. Although the patient met monthly in July with the assigned PC, staffing shortages impacted the patient's weekly treatment needs. The patient was not seen for PC contacts in November and met with four different PC during the review period, which affected the patient's continuity of care. Although motivational interviewing occurred at times during PC contacts, known obstacles to patient participation were not directly addressed to improve the patient's attendance during the review period.

Routine psychiatry appointments were timely. On August 22, 2024, a covering psychiatrist noted the patient's irritation with the lack of mental health contacts as well as concerns about poor sleep. Additionally, the patient was noted to be partially non-adherent to her psychiatric medications. On November 20, 2024, the psychiatric assessment indicated a diagnosis of bipolar I disorder, with considerations for a mood disorder due to head trauma and PTSD with a history of gender dysphoria. These were not in keeping with the diagnoses on record.

The patient participated in anger management, caseload, recreational therapy, and a specialty group for anxiety and depression. The patient was working in the kitchen as well as an IAC representative. Despite being offered adequate hours of structured treatment, the patient attended only an average of 5.79 sessions per week.

**Findings**

The treatment provided to this patient was inadequate.

The patient experienced delays in IDTT meetings, which were essential for improving care and diagnostics. The treatment plan failed to specifically address the patient's concerns, which contributed to ongoing symptoms. Documentation of the patient's measurable goals proved insufficient, hindering the ability to assess treatment effectiveness adequately. Staffing shortages

exacerbated delays in the patient's individual PC contacts, negatively affecting the continuity of care. This situation impacted patient progress tracking and overall treatment effectiveness.

**Patient F**

This 49-year-old male patient's healthcare record was reviewed to assess the quality of care provided at RJD's EOP. The patient was provided with a diagnosis of schizophrenia. Due to the patient's refusal, the patient was not prescribed psychiatric during the review period. The patient first entered CDCR on September 23, 1997, and was serving his first term. The patient entered MHSDS at the 3CMS level of care on October 8, 1998, and since received treatment at the 3CMS, EOP, and MHCB level of care.

Healthcare records documented the patient's symptoms, which included a history of auditory hallucinations, poor impulse control, and lack of insight. Additionally, the patient was noted to have paranoia, a pattern of withdrawing, isolating, and remaining in his cell, attributed to the patient's negative symptoms of schizophrenia. The patient was also noted to have one suicide attempt in 2001, as well as admitted to gambling issues that were noted to have likely exacerbated the patient's paranoia and potential safety risks.

The patient was transferred to RJD EOP on April 20, 2018. There were no IDTT meetings held between April 19, 2023 and October 1, 2024. Nearly fifteen months delayed, an IDTT meeting convened on October 2024 with the patient's assigned PC, assigned psychiatrist, and CC I present. The patient did not attend and was noted to have left after waiting for the IDTT meeting to begin. The clinical summary was adequate and noted the patient to have shown improvement despite not being on medication, which was attributed to the patient's reduced gambling activity and increased participation in programming without further details. The treatment plan included IPOCs that were pulled forward to address negative symptoms and treatment non-adherence which remained unchanged since 2022. The treatment plan targeted the patient's negative symptoms with the goal of the patient participating in the group three times per month and five times over six months. Yet, the patient's strengths were noted to include the patient's willingness to participate in individual and group treatment without indicating current baseline measures of how often the patient was currently attending groups. Appropriate interventions of motivational interviewing and positive reinforcement were included. However, the patient's verbalized goals of wanting to work on communication skills and gambling addictions were not targeted specifically. Discharge plan criteria and reason for retention in the current level of care were vague.

Routine individual PC contacts were scheduled to occur in alternating weeks with caseload groups; however, the PC contacts typically only occurred once a month in June and July with caseload groups available more than biweekly. At times, the patient was seen in non-confidential settings due to custody issues, such as the yard being closed or the patient reporting that he did not receive a ducat or the patient's assigned PC was in training. During routine PC contacts, documented information was often repeated, and although the patient's treatment goals were not specifically tracked across treatment contacts to determine the patient's progress, the patient was noted to be attending groups. The assigned PC appeared to have developed a good rapport with the patient and employed appropriate interventions to address the patient's needs.

During the review period, the patient refused psychiatric medications. Routine psychiatry contacts occurred monthly; however, the patient was seen for only two confidential contacts, and the remaining were conducted cell front in non-confidential settings. The patient's symptoms were assessed, and the patient was described as stable and noted not meet the criteria for involuntary medications.

The patient groups included an EOP group with assigned PC that focused on CBT skills. The patient also attended mood and stress management groups and recreational therapy groups. Although the patient was offered the Program Guide structured treatment hours required, the patient attended only 6.82 hours of treatment on average per week.

**Findings**

The treatment of this patient was adequate.

The patient did not receive timely IDTT meetings, hindering the development of an individualized treatment plan with measurable goals to monitor progress. When an IDTT meeting occurred, the patient was absent, and their expressed treatment needs and goals were inadequately incorporated into the care plan. The treatment plan primarily addressed the patient's negative symptoms, aiming to enhance participation in group activities without establishing baseline measures for assessment. Furthermore, despite the patient being scheduled for weekly EOP group sessions, the required alternating PC contacts did not take place consistently during the review period. Nevertheless, the PC appeared to have developed a strong rapport with the patient, who was relatively stable and attending groups focused on CBT and symptom management. Overall, despite the need for treatment plan improvements, the patient's clinical needs appeared to be met during PC contacts and groups through appropriate interventions.

**Patient G**

This 31-year-old male patient's healthcare record was reviewed to assess the overall quality of care at RJD's EOP. The patient was provided with diagnoses of unspecified depressive disorder, unspecified anxiety disorder, opioid abuse, and alcohol use disorder. The patient was prescribed hydroxyzine and melatonin as needed, and psychiatry documented that the patient found the medications useful. The patient was also a participant in the MAT program and prescribed buprenorphine-naloxone to address his substance use problem.

The patient entered CDCR on December 1, 2022, to serve his first term, entering MHSDS on January 15, 2024, at the MHCB level of care. The patient was initially transferred to MHCB after an increase in anxiety due to safety concerns that appeared to have led to the patient becoming SNY-endorsed. The patient was discharged to the EOPMod level of care; however, was readmitted to the MHCB level of care from January 31, 2024, to February 13, 2024, after the patient assaulted his cellmate. The patient was discharged to the EOP level of care and transferred to RJD on March 22, 2024.

Quarterly IDTT meetings convened timely during the monitoring period. During the July 2024 meeting, all required disciplines were present; however, the patient refused to attend. The clinical

summary was meaningful and updated the patient's lack of progress toward treatment goals as well as potential barriers to the patient's treatment. The IDTT was collaborative with input noted from all disciplines. The case formulation was carried forward from April 4, 2024, but remained relevant. While the treatment plan targeted the patient's danger to others and stated that the patient goals also included working on substance use issues, lack of treatment participation, anger management, and emotional regulation, the treatment plan failed to include specific, measurable goals and interventions such as evidence-based treatment modalities, patient-specific groups, and or medication interventions to address these issues. The discharge plan and reason for retention were omitted. Custody collaborated and added that the patient had unusual anger outbursts and RVR for battery on a prisoner on July 17, 2024, which was found to be unrelated to symptoms of mental illness. Custody also noted that the patient attended work when he prefers and attended some yard and recreation but refused EOP groups.

The treatment team also convened on October 9, 2024; however, the meeting was held in absentia. Required staff were in attendance although the PC had changed and an alternate psychiatrist was present. The patient was noted to be attending less than the required minimum number of structure treatment hours requiring a review for the need for a higher level of care. Justification for the current level of care was inadequate. The PC noted plans to consult with the patient's assigned psychiatrist to determine if the patient should be considered for a lower level of care due to a lack of programming, treatment goals, and denial of symptoms with the plan to re-evaluate in 30 days if patient's programming did not increase. The patient's treatment plan remained unchanged but noted that patient had reported recent drug use on September 23, 2024.

Routine PC contacts were offered timely but the patient's attendance was minimal. Although healthcare records noted that the patient was working in the kitchen and attending recreational groups, routine EOP groups and individual contacts were often refused, and the patient was seen in non-confidential settings. While PC attempted to engage the patient and even adjusted meeting times to accommodate the patient's work schedule, the patient's attendance remained limited, impacting the patient's treatment progress. Routine psychiatry contacts occurred in a timely. However, the patient consistently refused to meet with the psychiatrist in a confidential setting.

During the review period, the patient received one RVR on July 25, 2024, the patient was assessed for an RVR for battery on a prisoner but was deemed not likely connected to the patient's mental illness. The patient was notably offered the requisite minimum hours of structured treatment activities per Program Guide requirements. The patient was scheduled for alternating EOP caseload groups with the patient's PC, as well as groups focused on stress management, anger management, health issues, and recreation groups. The patient was also noted to be working in the kitchen. Despite attendance at recreational therapy and work, the patient consistently did not attend clinical groups. Although motivational interviewing occurred at times during PC contacts, known obstacles to patient participation were not directly addressed to improve the patient's attendance during the review period.

**Findings**

The treatment provided to this patient was inadequate.

Although patient PC and psychiatry contacts were offered timely, the patient refused to attend appointments in a confidential setting and declined participation in the majority of structured treatment activities. Despite this, barriers to the patient's participation were not addressed. The treatment plan did not target the patient's specific treatment needs. Despite the treatment plan's apparent ineffectiveness, the patient's ongoing lack of participation in treatment, receipt of an RVR, and reported substance use, a clinically indicated IDTT meeting could have happened sooner to address treatment participation barriers, assess higher level of care considerations based on positive indicators, or modify the treatment plan necessary to address the patient's ongoing concerns with lack of participation in treatment, substance use, and reported additional goals.

**Patient H**

This 35-year-old male patient's healthcare record was reviewed to assess the quality of care at RJD's EOP. The patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorders; major depressive disorder, recurrent episodes; unspecified opioid use disorder, severe; and antisocial personality disorder. The patient was prescribed Invega Sustenna to address psychosis, Cogentin to address side effects, and Haldol as needed for agitation. Due to danger to self and others, a PC 2602 order was in place.

This patient entered CDCR on July 27, 2010, for his first prison term, entering MHSDS at the 3CMS level of care shortly thereafter on August 15, 2010. The patient received treatment at all levels of care, with eight MHCB admissions and the patient's most recent Acute level of care hospitalization occurring from May 16, 2023 to August 30, 2023, for danger to self after an altercation with another patient, resulted in the death of the patient.

The patient's symptoms included auditory hallucinations, paranoia, delusions, negative symptoms, depressed mood, ruminating thoughts, poor sleep, and anxiety. Additionally, the patient's history included self-injurious behaviors and one documented suicide in 2021, involving a laceration that required medical attention. The patient also had a history of substance use and participated in substance use programming, for which he was prescribed buprenorphine-naloxone.

The patient was transferred to RJD on August 28, 2024. During the review period, the IDTT met timely per Program Guide requirements in August and November, 2024. All required participants were present, as was the patient. The clinical summary was carried forward from an initial assessment conducted on September 6, 2023, which was copied verbatim and included historical information that was presented as if it was recent. The clinical summary contained minimal updates, including that the patient being close to baseline with the continued presence of auditory hallucinations that have decreased in frequency and intensity and noted to be minimally distressing. The patient also reportedly requested to reduce and/or change his medication that were given intramuscularly.

Notably, the patient endorsed a desire to manage his anxiety and stress better and agreed with the treatment plan. Although the case formulation was generic, the treatment plan included relevant, targeted problem areas of focus, including depressed mood and ruminating thoughts; however, it did not specifically address patients reported auditory hallucinations and substance use issues. Despite this, measurable short- and long-term goals were established for depression and

rumination and appropriate interventions were documented. Yet, the treatment targets, goals, interventions, and progress remained unchanged since December 2023. Likewise, discussion of the progress toward goals remained unchanged from December 2023. The patient's progress was described as modest but meaningful, noting the patient to be near baseline without further details. Adequate rationale was provided for the patient to remain in EOP; however, it also contained outdated information carried forward from 2023. Psychiatric medications, job assignments, substance use treatment, and specific group assignments outlining the patient's structured treatment activities were not included. Measurable discharge criteria, anticipated length of stay, and barriers to patient discharge were also not documented.

Routine PC contacts alternated between EOP caseload groups; however, they were not consistent with Program Guide requirements. Despite this, the patient had been working with the assigned PC since 2023 who appeared to have developed a good rapport with the patient. Notably, the patient was reported to be at or close to his baseline level of functioning, attending groups, adherent to psychiatric medications, working as a porter, and attending education classes. The PC contacts were adequate, addressing the patient's current symptoms and progress toward targeted behaviors while also documenting the interventions used and the patient's general responses.

Routine psychiatry contacts were held monthly. Although the patient occasionally refused contact and was seen cell front, the majority of the contacts were confidential. The contacts were adequate, as documentation included the patient's concerns, response to prescribed medications, psychiatric history, and current functioning.

On average, the patient was offered the requisite number of structured treatment activities each week. In addition to attending his EOP caseload group with his assigned PC, the patient also attended relevant groups related to stress management, mood management, coping skills, and recreation groups.

**Findings**

The treatment provided to this patient was adequate.

Despite the need for treatment planning improvement, this patient's clinical needs were addressed in individual and group treatment. In addition, therapeutic interventions were applied according to the treatment plan to address the patient's needs. The patient also remained stable throughout the review period and participated in the required structured activities. Based on the available data, the patient's care and treatment were adequate, given the meaningful therapeutic contacts.

**Patient I**

This 35-year-old male patient's healthcare record was reviewed to assess the overall quality of care at RJD's EOP. The patient was provided with diagnoses of major depressive disorder recurrent episode, with psychotic features; non-rapid eye movement, sleep arousal disorders, sleepwalking type; opioid use disorder, severe; and amphetamine-type substance use disorder, moderate. The patient was prescribed buspirone and venlafaxine and was noted to be adherent to his medications.

The patient was also prescribed buprenorphine-naloxone for substance use. The patient served multiple terms, entering CDCR for the first time on October 21, 2011. The patient re-entered CDCR on August 2, 2016, and entered MHSDS shortly thereafter on August 20, 2016, at the 3CMS level of care. The patient has since received treatment at various levels of care, including 3CMS, EOP, and MHCB.

The patient transferred to RJD EOP on August 3, 2023, however, during the review period, IDTT meetings were not held timely according to Program Guide requirements. Rather, the quarterly treatment team convened once on June and again in October 2024, nearly three weeks delayed. During the June IDTT meeting, all required staff members were present along with the patient. Additionally, a senior psychologist and the patient's previously assigned PC were in attendance. Healthcare records noted the patient's assigned PC was an unlicensed social worker under supervision. The treatment plan documentation was identical to that of the previous IDTT meetings having been carried forward from August 2023, omitting meaningful clinical updates such that the patient had received an RVR in May 2024. The treatment plan lacked details pertaining to the patient's progress toward treatment goals since the last treatment team meeting. Additionally, the clinical summary contained inaccuracies, the case formulation was generic, and the patient's preferred learning style section was omitted. Furthermore, the patient's treatment goals had not changed since the IDTT meeting conducted on December 12, 2023. Although the targets for the treatment plan continued to focus on substance use and depression management and included measurable short- and long-term goals with appropriate interventions, progress toward goals featured the same statement across previous IDTT meetings. While some progress was noted, it was described without details. Additionally, while justification for retention at the EOP level of care was adequate, specific criteria for transfer to a lower level of care were vague and only included that the patient would demonstrate a significant reduction in mental health symptoms.

During the October IDTT, all required providers were present; however, the patient was not in attendance due to custody issues. The clinical summary provided appropriate updates detailing the patient's barrier to treatment, namely substance use. The clinical summary noted the patient's substance use resulted in a decline in the patient's physical health but also noted that there was a decrease in the patient's physical wounds related to substance use. The treatment team meeting appeared collaborative, and medical documentation was noted to be reviewed. The patient's treatment plan continued to target the patient's depression management and substance use without specific updates as to the patient's depression. Given the patient's substance use, the assigned psychiatrist was noted to be open to case conferencing to discuss treatment recommendations for the patient and whether he would be better suited for a rehabilitation facility. The discharge plan/rationale for retention in the EOP level of care was adequate, and the patient was recommended for a case conference with a reassessment in 90 days.

Routine PC contacts were timely in keeping with Program Guide requirements. The patient was placed on the high-risk list due to danger to self because of his substance use and was followed weekly in addition to being offered EOP groups; however, the patient often refused EOP groups and individual confidential settings. The assigned PC; however, was consistent in following up with the patient and appeared to have developed a good rapport with the patient. Documentation

revealed the patient's progress toward treatment plan targets was assessed with appropriate interventions utilized during PC contacts.

Routine psychiatry contacts occurred timely; however, only one psychiatry contact out of six was held in a confidential setting due to the patient's refusal. Despite this, during psychiatric contacts, the collateral information was utilized, and the assigned psychiatrist was responsive to the patient's medication needs, such as adjusting the timing of medication and tapering the patient off medication so the patient could participate in treatment to address chronic medical conditions.

During the review period, the patient was scheduled for an EOP group with his assigned PC, which included relevant topics, recreational therapy groups, NLTGs, was enrolled in education classes, and was referred for a clerk position. Overall, the patient was offered structured treatment hours in keeping with Program Guide requirements.

**Findings**

The overall treatment provided to this patient was adequate.

Although the treatment team meeting was delayed, the PC and psychiatry contacts occurred in a timely manner. During the review period, treatment planning documentation improved across IDTTs. Despite the patient refusing individual contacts, the PC and psychiatrist proactively followed up with the patient. The patient was placed on a high-risk list, which increased weekly contacts to ensure closer monitoring due to the patient's substance use and related medical issues. Additionally, the team devised a plan to convene a case conference, recognizing that the patient's substance use posed a primary barrier to treatment. The PC documentation also included updates on the treatment plan targets and utilized appropriate interventions to address the patient's clinical needs.

**Patient J**

This 67-year-old male patient's healthcare record was reviewed to assess the quality of care provided at RJD EOP. The patient was provided with diagnoses of major depressive disorder, recurrent episode, severe; opioid use disorder, moderate, in early remission; amphetamine-type substance use disorder, severe, in early remission; and PTSD. The patient was prescribed duloxetine and mirtazapine and was noted to be medication adherent. The patient's medical conditions included fibrosis of the liver, hepatic fibrosis, system inflammatory response syndrome, kidney lesion, mitral valve prolapse, interstitial lung disease, diabetes mellitus, male urinary stress incontinence, pulmonary fibrosis, dyslipidemia, hypothyroidism, degeneration of the intervertebral disc, obstructive sleep apnea syndrome, astigmatism, history of hepatitis C, diabetic neuropathy and he was noted to be on oxygen.

The patient first entered CDCR on April 2, 2013, and served multiple terms. He re-entered CDCR for the third term on October 4, 2018, and first entered MHDS on June 28, 2021, at the MHCB level of care until July 7, 2021. He was transferred to the 3CMS level of care briefly before transferring to the EOP level of care on July 13, 2021, where he remained. The patient transferred to RJD on November 20, 2023. During the review period, the patient's quarterly IDTT meetings

did not occur timely. An initial IDTT was held on November 1, 2023. However, the following IDTT meeting did not convene again until September 18, 2024, and subsequently, one week later, on September 25, 2024, to review the patient's single cell request. During the September 18, 2024, IDTT meeting, the assigned PC, a CC I, and senior psychologists were present. However, the patient's assigned psychiatrist was not in attendance, but an alternate psychiatrist was present. The patient did not attend.

The clinical summary provided some meaningful background information about the patient's charges, RVRs, level of care, current diagnosis, medication adherence, and the patient's reported treatment goals to continue to reduce depressive symptoms and maintain sobriety; however, patient's diagnostic signs and symptoms were not detailed. The case formulation was carried forward and noted to be relevant. The treatment plan did not contain measurable treatment goals or evidence-based interventions to guide the patient's treatment and provide for continuity across providers and the IDTT. Other than the goal of reducing the patient's self-reported depressive symptoms , continuing to remain sober, and verbalizing hope for the future, specific measures across areas of focus were needed to track the patient's progress as well as specific interventions to utilized to address these areas. In addition, meaningful details regarding the patient's progress along with patient goals were required. However, this section was left blank. In addition, discharge criteria and justification for retention at the current level of care were omitted.

On September 25, 2024, an updated IDTT was held with all required participants present, with the exception of the patient who again refused to attend. The clinical summary only included IDTT was held to review single cell recommendation. It was determined that based on the patient's mental health symptoms, mental health would not be making a recommendation for a single cell. No additional changes were made, noting sections were reviewed and still relevant. The patient's progress was not updated, nor were barriers to treatment identified.

Routine PC contacts generally occurred timely with alternating individual and EOP groups. However, by the end of October patient began refusing PC contacts and EOP groups following the mental health's recommendation regarding the patient's single-cell status. Despite the patient's refusal, the patient assigned PC continued to attempt to meet with the patient cell-front, followed up with the patient, and made efforts to re-engage the patient in treatment and to review the patient's coping skills.

Routine psychiatry contacts occurred timely. On June 24, 2025, an alternate psychiatrist assessed the patient at his cell front due to his refusal to meet in a confidential setting. The patient was noted to be adherent to his medication and denied any significant psychiatric changes or side effects, as well as any suicidal or homicidal ideation, intent, or plan. In August, the patient reportedly stopped his suboxone because he stated he had not used it in two years. Recent toxicology screens were noted to be negative for substance use. The patient's medications were discussed and adjusted to address the patient's reported symptoms, such as insomnia. After the patient was not recommended for single cell status based on current clinical symptoms, when he did meet with the psychiatrist, the patient threatened to kill his future cellmate if he were to be housed with another patient, which the psychiatrist documented as being reported to custody and supervisor. During the review period, the patient's assigned psychiatrist left RJD sometime in October 2024, and four different psychiatrists saw the patient during the review period.

The patient was assessed for an RVR on October 29, 2024, for failure to present for the count. The RVR was assessed to be unrelated to the patient's mental health. The patient was noted to have a history of multiple RVRs.

Although the patient was offered the requisite number, per Program Guide requirements, of structured treatment activities per week, the patient only attended an average of 5.91 hours. He reportedly was working and attended some groups, including an EOP group and mood management and recreational therapy.

**Findings**

The treatment provided to this EOP patient was inadequate.

The patient was not seen timely for quarterly IDTT meetings and the treatment plan lacked individualized measurable goals with appropriate interventions detailing the patient's progress toward goals with clear discharge criteria/or rationale for retaining the patient at the current level of care. Although the PC and psychiatry contacts generally occurred timely and efforts were made to re-engage the patient, the patient often refused, and treatment planning needed further review to assess barriers to the patient's treatment and level of care considerations.

**Patient K**

This 52-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with a diagnosis of major depressive disorder, recurrent, severe without psychotic features. He was prescribed duloxetine and adherent with this medication. Medical conditions included a history of adenocarcinoma of esophagus with recent esophagectomy, leukopenia due to antineoplastic chemotherapy, dysphagia, kidney stones, overweight, benign prostatic hyperplasia with prostate nodule, obstructive sleep apnea, nasal septal perforation, hyperlipidemia, chronic pain, and constipation. He underwent right shoulder arthroscopy surgery in 2023 and had osteomyelitis with a partial hip replacement. He had a do not resuscitate directive, used a walker to ambulate, and had a CPAP machine.

The patient had a history of childhood abuse and neglect but no psychiatric treatment in the community. Three suicide attempts were listed in the health record, dating between 1990 and 1996, and prior assessments indicated a total of six suicide attempts during this time. Within CDCR, the patient had received 3CMS, MHCB, EOP, and EOPMod care. He was treated with venlafaxine for many years, but following surgery for cancer in early September 2024, this medication had to be switched to duloxetine because venlafaxine could not be administered through his food port. As of 2024, he had been incarcerated for 29 years, serving an indeterminate life sentence.

The patient received MHCB care at RJD between December 14, 2024 and December 24, 2024 for suicidal ideation. He had one MHCB admission at another facility during the six months prior to October 28, 2024. The pre-admission screening, suicide risk evaluation, MHCB admission, initial PC assessment, and initial psychiatric assessment were completed timely. The pre-admission

suicide risk evaluation found the patient at high risk with adequately documented rationale. The initial PC assessment was adequate but did not indicate whether the patient was seen in a confidential setting. The accompanying suicide risk evaluation indicated the patient's suicide risk was moderate. The initial psychiatric assessment was through and resulted in an increase in duloxetine, but it did not indicate whether the assessment occurred in a confidential setting.

The initial IDTT meeting occurred timely and was attended by the patient and required staff. IDTT documentation was adequate. The treatment plan continued previously established goals for reducing depression and suicidal ideation, was not updated, and did not include psychiatric care. The patient received daily confidential contacts from PCs or psychiatrists, including four follow-up psychiatric encounters. Psychiatric documentation was adequate, and after the initial increase in duloxetine no further medication changes were made. PC documentation did not demonstrate delivery of clinically appropriate interventions, including those listed in the treatment plan. The patient's participation in recreation therapy activities on the yard was adequately documented, and he was permitted to begin receiving intravenous immunotherapy off site during his MHCB stay.

The weekly IDTT meeting occurred timely and was attended by the patient and required staff, apart from an alternate attending in the place of the assigned psychiatrist. IDTT documentation included discussion of a possible ICF referral and reasons for determining not to make this referral. The treatment plan was not updated. The IDTT discharge meeting was attended by alternates for the assigned PC and psychiatrist, the patient, the assigned correctional counselor, and other MHCB staff. Again, the treatment plan was not updated, but a collaborative safety plan was developed. The accompanying suicide risk evaluation underestimated the patient's risk but documented a rationale for the change in risk level from admission. The MHCB discharge summary was timely but failed to appreciate the extent of the patient's treatment needs.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The MHCB admission and length of stay were clinically appropriate, but the discharge to an EOP level of care was not. During the patient's MHCB care and discharge, the MHCB care team failed to recognize the high risk for future suicidal ideation and at least moderate risk for suicidal behavior in the context of the patient's medical and life circumstances, ongoing depression, and static risk factors. The patient needed to be readmitted to MHCB care at RJD six days following his MHCB discharge, and at that time he had active suicidal ideation and a plan. He was subsequently referred to ICF care. During the MHCB stay reviewed here, care could have been improved if the assigned psychiatrist and assigned PC provided each encounter, yet five psychiatrists and four PCs saw the patient. Adequate appreciation of the patient's treatment needs was not attained, likely as a result. The treatment plan needed improvement and was not updated during the patient's MHCB stay. On the positive side, required elements of MHCB care were provided timely and confidentially, the patient's symptoms appeared to improve with the increase in antidepressant dosage, and no emergency interventions were required.

**Patient L**

This 60-year-old transgender female MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. She was provided with a diagnosis of gender dysphoria in adolescents and adults. Additional diagnoses of schizoaffective disorder, bipolar type, and borderline personality disorder were provided in MHCB documentation but not in the mental health problems section of the health record. She was prescribed benztropine, clonidine, mirtazapine, olanzapine, and sertraline and was adherent with these medications. Hydroxyzine and melatonin were prescribed on an as-needed basis for anxiety and insomnia, respectively, and the patient used both medications frequently. In addition to regularly scheduled olanzapine, PRN doses of olanzapine were prescribed for agitation, and the patient used this medication during the first three days of her MHCB care. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder; toxicology screens adjacent to her MHCB stay were negative for illicit substances. Medical conditions included right bundle branch block, impaired cognition, tardive dyskinesia, hypothyroidism, right inguinal hernia, allergic rhinitis, and opioid use disorder. She received gender-affirming hormones during her MHCB stay. She was assigned a code of DD2 in the developmental disability program, used hearing aids, and used a knee brace and a walker to ambulate.

The patient had a history of childhood sexual abuse, adoption, ejection from the adoptive home due to her gender identity, running away from home, and life-long substance use, including cannabis, cocaine, inhalants, methamphetamine, and opioids. By self-report, she used spice at RJD during the time leading up to her MHCB admission. Multiple suicide attempts and self-injurious behaviors were listed in the health record, dating from 1977 through 2021, along with a family history of suicide. Within the CDCR, the patient received 3CMS, EOP, EOPMod, MHCB, ICF, and APP care. She had a lengthy history of involuntary treatment under PC 2602 orders for danger to self, but renewal of involuntary treatment authorization was denied in 2019 and not re-attempted thereafter. She had been treated with multiple antidepressant and antipsychotic medications. As of 2024, she had been incarcerated for 27 years.

The patient received MHCB care at RJD between September 22, 2024 and October 9, 2024. Her admission was precipitated by several factors. Prior to admission, buprenorphine-naloxone had been discontinued and was recently restarted, but despite this, she had engaged in substance use at RJD. Her attorney informed her that parole was likely to be denied later that year and that she would remain in prison for another three to five years. Her husband told her that he was leaving her, and she had a physical altercation with a peer. She then reported suicidal ideation with a plan. She had no MHCB admissions during the six months prior to September 22, 2024, but had a total of 15 previous MHCB admissions.

The pre-admission screening, suicide risk evaluation, MHCB admission, initial PC assessment, and initial psychiatric assessment were completed timely. The pre-admission suicide risk evaluation found the patient at high acute and high chronic risk for suicide, with multiple risk factors documented. The quality of the PC assessment was marginal; the assessment did not address how the patient's physical impairments and developmental disability impacted her mental health, and it did not document whether the encounter occurred in a confidential setting. The accompanying suicide risk evaluation, completed just hours after the pre-admission suicide risk evaluation, determined that the patient was at moderate risk but did not provide a rationale for how

the patient's high risk at pre-admission had declined. The psychiatric assessment was confidential and adequate.

The initial IDTT meeting occurred timely and was attended by the patient, assigned PC, alternates for the assigned psychiatrist and assigned correctional counselor, and other MHCB staff. IDTT documentation was adequate. The treatment plan identified anger, impulse control, and suicidal ideation as treatment targets. Goals addressing anger and impulse control were continued from the patient's outpatient treatment plan; these were not measurable. A third goal addressing suicidal ideation while in MHCB care was added and easier to measure. The treatment plan did not include psychiatric care. The weekly IDTT meeting occurred three days late and was attended by the patient, the PC, an alternate for the assigned psychiatrist, the assigned counselor, and other MHCB staff. IDTT documentation was adequate and reflected the need for a higher level of care. The patient's lack of treatment progress and an additional treatment goal for depression were added to her treatment plan.

The patient received daily treatment from either a psychiatrist or PC, including psychiatric follow-up encounters at least twice a week. Most contacts occurred in confidential settings, but at least three occurred at the cell front due to lack of confidential treatment space availability. She was seen by three PCs and four psychiatrists during her MHCB stay. PC progress notes reflected active crisis interventions that were appropriate to the patient's needs. Psychiatric encounters resulted in medication changes due to side effects or persistent symptoms, and documentation demonstrated adequate monitoring of the patient's response to treatment. The patient's participation in recreation therapy activities on the yard was adequately documented.

On day 12 of her MHCB stay, the patient was referred to ICF care in multi-person cell housing due to ongoing suicidal ideation, impulses to amputate her genitalia, and her vulnerability to peer pressure and victimization. An accompanying suicide risk evaluation found her at high chronic risk and moderate acute risk for suicide, with well-documented rationale. A discharge IDTT meeting occurred after the patient had been transferred to ICF. It was attended by the PC, alternates for the assigned psychiatrist and assigned correctional counselor, and other MHCB staff. The patient's course of treatment and rationale for ICF admission were documented, but a coherent discharge plan with treatment recommendations was lacking in IDTT documentation and the psychiatric discharge summary.

**Findings**

The treatment provided to this MHCB patient was adequate.

There were several challenges in the provision of timely and adequate care during this MHCB stay, including a weak PC assessment and treatment plan, delayed weekly and discharge IDTT meetings, delayed referral for ICF care, and lack of a coherent discharge plan with specific treatment recommendations. At times, there was inadequate treatment space to permit confidential encounters. Despite these challenges, the overall care met the patient's needs and resulted in a clinically appropriate outcome. Strengths included adequate provision and documentation of clinically appropriate, non-pharmacological interventions, adequate psychiatric care, and an appropriate if delayed referral to a higher level of care.

**Patient M**

This 36-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with diagnoses of borderline and antisocial personality disorders, delusional disorder, and opioid use disorder, moderate. He was prescribed oral and then injectable paliperidone under a November 25, 2024 PC 2602 order due to danger to self and others and was adherent with this medication except once. Olanzapine and later risperidone were prescribed on an as-needed basis for agitation, but the patient did not use these medications; haloperidol was prescribed as an intramuscular back-up for refusal of oral paliperidone and was used when the patient refused the first oral dose of paliperidone. It was not needed thereafter. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Toxicology screens conducted in periods adjacent to his MHCB stay showed adherence with this medication and were negative for illicit substances. Medical conditions included a history of successfully treated hepatitis C, chronic iron deficiency anemia, lung nodule, deep venous thrombosis of right upper extremity, cellulitis of leg, history of sepsis with intravenous antibiotic treatment, fracture of distal phalanx of finger, and foreign body in rectum. He used a back brace, cane, and walker.

The patient had an extensive history of self-injury starting in childhood, multiple foster home and group home placements, and substance use that continued during incarceration. One suicide attempt by hanging and multiple self-injurious behaviors were listed in the health record between 2018 and 2022. Within the CDCR, the patient received 3CMS, EOP, EOPMod, MHCB, ICF, and APP care. He was serving a sentence of life without parole and had been incarcerated for ten years as of 2024.

On November 26, 2024, the patient was admitted to the MHCB level of care due to danger to others while receiving medical treatment in the CTC. He had multiple RVRs but no MHCB admissions during the six months prior to admission. The patient had been admitted to the CTC four days earlier for treatment of deep vein thrombosis following inpatient intravenous antibiotic treatment for sepsis at an outside hospital. His placement into MHCB care in the CTC occurred one day after a PC 2602 petition for involuntary treatment was granted and the patient became violent, breaking cell windows, threatening officers with a sharpened weapon, and assaulting staff. His combined MHCB and CTC care was co-managed by medical and mental health providers and continued for seven days.

The pre-admission screening, MHCB admission, initial PC assessment, and initial psychiatric assessment were completed timely. The patient refused to participate in the PC assessment, which was limited. The assessment found the patient hostile, aggressive, not delusional, but prone to suspicious and paranoid thinking. Although the patient did not cooperate with the initial psychiatric assessment, the assessment was thoughtful and thorough. The initial IDTT meeting occurred timely, but all participating staff were alternates for the patient's assigned staff. IDTT documentation indicated that the patient was present, but his participation was not documented. Consideration of a higher level of care was adequately documented. The treatment plan was not appropriate for MHCB care and continued previously established goals without updating them to reflect the patient's current needs. Psychiatric care was not included in the treatment plan, despite

a court ordered for involuntary treatment. The weekly IDTT meeting occurred timely and was attended by required staff but not the patient, who was in an outside hospital. The treatment plan was not updated. During this seven-day stay, the patient refused medical care but accepted six doses of oral paliperidone, his first injectable dose of long-acting paliperidone, and all doses of buprenorphine-naloxone. Daily attempts to engage the patient were documented by a PC or psychiatrist, including four psychiatric encounters. The patient was angry, dismissive, and refused to engage in most of these encounters; all of them, on the advice of custody, occurred at the cell front.

On December 3, 2024, the patient received his first injection of paliperidone. The patient refused a mental health evaluation for a PREA complaint, which was thought to involve psychotic thinking, as the patient's writing was disorganized, and the patient asserted that staff were torturing him by attacking his genitals and anus with electricity. An accompanying suicide risk evaluation found him to be at low risk for suicide. Later that day, he was admitted to an outside hospital for medical treatment, after injecting feces into multiple sites on his arm using a syringe. A psychiatric discharge summary for the seven days of MHCB care was timely and adequate. The patient remained hospitalized for 13 days, returning to the CTC on December 16, 2024. On that date, he was re-admitted to MHCB care due to danger to self and others, and a suicide risk evaluation found the patient at high risk. He continued to refuse medical and mental health care. The patient was discharged from the CTC but remained in MHCB care. On December 17, 2024, he was referred to acute psychiatric care and received his second dose of long-acting paliperidone. The following day, a PC2604 petition for appointment of a surrogate health care decision-maker was granted.

Following the patient's return from the outside hospital on December 16, 2024, the initial PC assessment was timely but only minimally adequate. An accompanying suicide risk evaluation found the patient at moderate risk. Separately, mental health RVR assessments found that the patient's mental illness contributed to his alleged behaviors of assault with a deadly weapon and destruction of state property. The initial psychiatric assessment was timely and thorough but conducted at the cell front. The initial IDTT meeting was timely and attended by required staff. IDTT documentation indicated that the patient was present, but his participation was not documented. Follow-up and discharge IDTT meetings occurred timely and were attended by required staff except on one occasion, when alternates for the psychiatrist and PC attended; the patient did not attend any of these meetings, and the discharge IDTT meeting occurred after the patient had transferred to CHCF-PIP. The treatment plan was never updated, remained inadequate, and did not include psychiatric interventions or interventions addressing the patient's danger to self. Psychiatrists or PCs documented daily contacts; the patient saw six psychiatrists and three PCs during this time. Due to safety concerns or the patient's refusal to meet in a confidential setting, all contacts occurred at the cell front.

On December 26, 2024, the patient was re-admitted to an outside hospital for removal of a needle and syringe he had inserted into his rectum; he remained hospitalized until December 28, 2024, when he returned to MHCB care. The PC and psychiatric assessments upon the patient's return were timely but inadequate; neither provided an updated or adequate case conceptualization, and the psychiatric assessment described the patient as "very sneaky and manipulative" but did not address diagnoses or the reasons the patient was receiving involuntary medication. A suicide risk evaluation accompanying the PC assessment found the patient to be at moderate acute and low

chronic risk for suicide. He was followed daily by psychiatrists or PCs; all encounters occurred at the cell front. The patient remained in MHCB care until December 31, 2024, when he was admitted to acute care at CHCF-PIP. The psychiatric discharge summary included an adequate summary of recent treatment but no recommendations for the inpatient treatment team.

**Findings**

The treatment provided to this MHCB patient was inadequate.

During the three periods of MHCB care from November 26, 2024 to December 3, 2024, December 17, 2024 to December 26, 2024, and December 28, 2024 to December 31, 2024, there was inadequate conceptualization of the patient's symptoms and behavior. For most treating providers, the patient's violent, self-destructive, and instrumental behaviors overshadowed appreciation of an underlying psychotic disorder. Various diagnostic impressions, ranging from Munchausen syndrome to antisocial personality disorder to delusional disorder and schizophrenia, were not adequately reconciled. The treatment plan was inadequate and never addressed psychotic symptoms or self-harming behaviors. Although the benefit of involuntary antipsychotic treatment was documented, non-pharmacological treatment of suspiciousness, paranoia, delusions, and/or behavioral problems was not provided. Most PC encounters consisted of wellness checks. The patient was not successfully stabilized. Some psychiatric documentation used pejorative and derogatory language to describe the patient.

**Patient N**

This 43-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with diagnoses of schizoaffective disorder, unspecified; amphetamine-type substance use disorder, severe; opioid use disorder, severe, in sustained remission; and alcohol use disorder, moderate. MHCB psychiatric progress notes include a diagnosis of PTSD, but this diagnosis was not included in the mental health problems section of the health record. The patient was prescribed benztropine, perphenazine, sertraline, and lurasidone, but was adherent only with lurasidone. Olanzapine was prescribed on an as-needed basis for agitation, but the patient did not use this medication. Through the ISUDT, buprenorphine-naloxone began to be prescribed during the MHCB stay for opioid use disorder. Toxicology screens conducted during and following his MHCB care were consistent with adherence to this medication but positive for methamphetamine. The patient reported using illicit buprenorphine-naloxone prior to MHCB admission. Medical conditions included obesity, prediabetes, obstructive sleep apnea, hyperlipidemia, gastroesophageal reflux disease, mild intermittent asthma, and chronic pain. He used a cane and walker to ambulate and a CPAP machine to manage sleep apnea.

The patient had a history of severe mental illness with onset in early adolescence, multiple psychiatric hospitalizations, juvenile detention, homelessness, and extensive substance use. Eleven suicide attempts were listed in the health record, dating between 2014 and 2016. Within the CDCR, the patient received EOP, MHCB, and ICF care. He was previously treated with multiple antipsychotics including a long-acting injectable antipsychotic, a mood stabilizer, a stimulant for possible attention-deficit/hyperactivity disorder, and multiple antidepressant

medications, but had no history of involuntary treatment. He was serving a lengthy sentence and as of 2024, he had been incarcerated for six years.

The patient received MHCB care at RJD between August 15, 2024 and August 30, 2024, due to grave disability and danger to others that was triggered by a relapse on methamphetamine following nonadherence with psychotropic medications. He had no MHCB admissions prior to August 15, 2024. The pre-screening assessment, MHCB admission, initial PC assessment, and initial psychiatric assessment were timely. The assessments were adequate, although the psychiatric assessment occurred at the cell front, and the patient refused the PC assessment.

The initial IDTT meeting was timely and attended by the patient, alternates for both the PC and the psychiatrist, a correctional counselor, and other MHCB staff. The case formulation reflected the patient's prior functioning in EOP care, not his current functioning in MHCB care, and no treatment plan was developed. Weekly and discharge IDTT meetings occurred timely and were attended by the patient and MHCB staff, but in none of the three follow-up or discharge IDTT meetings did both the assigned PC and the assigned psychiatrist attend. The case formulation was not updated, and a treatment plan was not developed until the third IDTT meeting, 11 days after MHCB admission. The treatment targets included in the treatment plan were clinically appropriate but did not address the psychotic symptoms and behaviors the patient was exhibiting while in MHCB care. The treatment plan did not include psychiatric care despite targeting medication nonadherence. He was retained for an extended MHCB stay to effect medication changes and achieve medication adherence, and IDTT documentation regarding consideration of higher levels of care, including but not limited to a possible petition for involuntary treatment, was adequate. The treatment plan was appropriately updated in the discharge IDTT meeting.

The patient was seen daily by either a psychiatrist or a PC; two psychiatrists and four PCs provided these encounters. About 38 percent of these encounters occurred at the cell front, either due to the patient's refusal or because confidential treatment space was unavailable. Multiple notes indicated the patient was experiencing withdrawal symptoms from his illicit substance use. The patient's mentation, engagement with treatment staff, and adherence with psychotropic medication improved significantly. Patient participation in recreation therapy activities was adequately documented. A discharge suicide risk evaluation found him at low acute and high chronic risk for suicide. The psychiatric discharge summary was completed by a psychiatrist who had not seen the patient, omitted key elements of the patient's course of treatment, and was inadequate.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The major challenges in adequacy of care included a deficient and delayed treatment plan, an outdated and only partially relevant case conceptualization, and a deficient discharge summary. Psychiatric diagnoses were poorly reconciled, although one psychiatrist documented a clear description of the diagnostic challenges in this case, along with a rationale for designating the patient's schizoaffective disorder as unspecified. Together, these challenges undermined the potential for continuity of care following discharge. Interventions required by the treatment plan were not documented, and most of the PC encounters appeared to be wellness checks or generically

supportive in nature. Psychiatric care and consideration of a possible petition for involuntary treatment were appropriate. The extended MHCB stay was clinically justified to ensure the patient stabilized and was medication adherent following changes in antipsychotic medication. The patient improved after symptoms of intoxication and withdrawal from illicit substances abated. Given evidence that the MHCB admission was triggered by substance use, the patient's placement on buprenorphine-naloxone while receiving MHCB care, the patient's adherence with psychotropic medication, and the patient's improved mentation and problem-solving, discharge to the EOP level of care was clinically appropriate. However, there were no recommendations to support continued stability in EOP care.

**Patient O**

This 40-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with diagnoses of schizoaffective disorder, bipolar type; amphetamine-type substance use disorder, moderate; and tardive dyskinesia. He was prescribed aripiprazole, escitalopram, mirtazapine, and oral and long-acting injectable paliperidone. He was adherent with these medications. Hydroxyzine and olanzapine were prescribed on an as-needed basis for anxiety and agitation, respectively; he consistently made use of these medications. Medical conditions included mild persistent asthma.

The patient had a lengthy history of psychosis, but limited psychosocial information was included in his MHCB records. Six suicide attempts were listed in the health record, dating between 1994 and 2018, and included two episodes of self-immolation. Within the CDCR, the patient received 3CMS, EOP, EOPMod, MHCB, ICF, and APP care, including a 72-day stay at ASH. He had a history of involuntary treatment under PC 2602 due to danger to self which expired in June 2024. He was previously treated with mood stabilizing, antipsychotic, and antidepressant medications. As of 2024, he had been in prison for three years on a 12-year sentence.

The patient received MHCB care at RJD between December 7, 2024 and December 24, 2024, after reporting suicidal ideation with a plan. He had no MHCB admissions during the six months prior, but during this time became progressively nonadherent with psychotropic medication. The pre-screening assessment and MHCB admission were timely. The initial psychiatric assessment was timely and adequate, despite the patient's refusal to engage in the latter. The suicide risk assessment accompanying the pre-screening assessment found the patient at high risk. The initial PC assessment was timely but not adequate. The language in the clinical summary was copied from content in the pre-screening, without alteration. Because different clinicians completed the pre-screening and initial PC assessment, the account of the patient interview copied into the latter assessment could not have accurately reflected the patient interview conducted by the PC, if such an interview occurred. There was no new information contained in the initial PC assessment.

The initial IDTT meeting occurred timely and was attended by the patient, an alternate for the assigned PC, the assigned psychiatrist, a correctional counselor, and other MHCB staff. The case formulation was generic, did not address the patient's severe and persistent mental illness, and did not indicate why the patient was experiencing symptoms or what made them worse. It was copied from an old case formulation and not updated. IDTT documentation recorded the patient's verbalized treatment goal as reducing command auditory hallucinations telling him to hurt others,

and the treatment plan included a treatment goal of reducing auditory hallucinations, along with progress towards that goal that specifically described prior inpatient care. The treatment plan did not address suicidal ideation or mood symptoms, and it did not include psychiatric care. Three follow-up IDTT meetings occurred timely. In only one IDTT meeting did both the assigned PC and the assigned psychiatrist attend. Documentation of considerations for moving the patient to a higher level of care was adequate, and the patient was appropriately referred to inpatient care on the tenth day of the MHCB stay.

The patient was followed by a psychiatrist or PC daily. Most encounters occurred in confidential settings. Overall psychiatric care was appropriate, but because five psychiatrists provided it, it was unlikely that therapeutic relationship was established with the patient. The patient was started on antipsychotic and antidepressant medication and transitioned from oral to long-acting injectable paliperidone; consideration of re-petitioning for authorization to provide involuntary treatment was appropriately documented, but this step was not needed due to the patient's medication adherence. The patient received a total of two doses of long-acting paliperidone while in MHCB care, and his symptoms improved. PC contacts were brief, supportive, and did not reflect the provision of specific interventions other than encouraging medication adherence. Once the determination was made to refer the patient to acute inpatient care, primary care encounters were essentially wellness checks and did not reflect active engagement or collaboration with the patient. The psychiatric discharge summary was inadequate. It consisted of five brief sentences "filed for administrative purposes" by a psychiatrist who did not participate in the patient's MHCB care. Only one of these sentences described the patient's MHCB care, and it did so only in very general terms.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The initial PC assessment was copied from the pre-screening assessment, inadequate for its intended purpose, and inaccurate in presenting the pre-screening patient interview as if it were the initial assessment interview. Initial assessments failed to identify the command auditory hallucinations that became central to the patient's MHCB care. The case formulation was inadequate and did not address the patient's serious mental illness. The treatment plan failed to identify depression and suicidal ideation as treatment targets, despite these symptoms prompting MHCB admission and continuing to be documented during the MHCB stay. PC encounters did not reflect active engagement and collaboration with the patient or provision of much more than general encouragement. The psychiatric discharge summary was deficient. With this exception, psychiatric care was a strength. Despite being delivered by multiple providers, a clinically appropriate plan to transition the patient on to a long-acting injectable antipsychotic medication was successful, and the patient improved. Additionally, the transfer from MHCB to acute inpatient was clinically indicated. However, these strengths were not sufficient to pull the entirety of treatment into adequacy.

**Patient P**

This 30-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with diagnoses of an unknown substance-induced psychotic disorder, with moderate or severe substance use disorder; amphetamine-type substance use disorder, moderate; alcohol use disorder, severe; and anxiety disorder. He was prescribed escitalopram and olanzapine but was nonadherent with these medications. Hydroxyzine was prescribed on as needed for anxiety, and he used this medication on occasion. In addition, he received one intramuscular injection of diphenhydramine, haloperidol, and lorazepam on the first day of MHCB care. Through the ISUDT, he was prescribed buprenorphine-naloxone but was nonadherent with this medication. A toxicology screen several weeks prior to his MHCB admission was positive for non-prescribed opiates. Opioid use disorder and the head trauma and other injuries he experienced at the time of MHCB admission were the only medical conditions noted in his record.

The patient had a history of truancy, school expulsion, homelessness, and extensive substance use. One suicide attempt in 2019 and one episode of self-injurious behavior on the date of MHCB admission were listed in the health record. The suicide attempt involved a heroin overdose with respiratory arrest. Within the CDCR, the patient received 3CMS, EOP, EOPMod, MHCB, and APP care. At the time of his MHCB admission, he had no history of involuntary treatment and had been incarcerated for seven years. He was a maximum custody patient due to battery on a peace officer.

The patient received MHCB care at RJD between August 1, 2024 and August 15, 2024 after becoming nonadherent with buprenorphine-naloxone, engaged in head-banging and sustained a head injury that required sutures, refused medical care, assaulted several custody staff in two encounters, and exhibited mental confusion and unpredictable behaviors. He had four MHCB referrals but no admissions during the six months prior to August 1, 2024. All four referrals were rescinded and were determined to be unrelated to mental illness.

The pre-admission screening was timely and adequate. The accompanying suicide risk evaluation found the patient at high acute risk and moderate chronic risk for suicide, and it included adequate documentation of the rationale for these determinations. The patient refused to participate in this encounter. The MHCB admission was timely. The patient was sent to an outside hospital emergency room for evaluation of his head trauma. He left against medical advice, required five-point restraints and emergency intramuscular medication upon return to RJD, and was sent back to the emergency room. CT scans ruled out fractures and intracranial bleeding; the patient was diagnosed with closed head injury, contusion of face, altered level of consciousness, drug use, and toxic encephalopathy.

The initial PC and psychiatric assessments were timely and adequate. The PC conducted the assessment at the cell front and relied primarily on record review due to the patient's disorientation and confused mental status. The accompanying suicide risk evaluation continued to place the patient at high acute risk and moderate chronic risk for suicide. The psychiatric assessment did not indicate whether it was confidential but was otherwise thorough.

The initial IDTT meeting occurred timely and was attended by the patient, the assigned PC, an alternate for the assigned psychiatrist, a correctional officer, and other MHCB staff. The case

formulation had not been updated to reflect current symptoms and was inadequate. The treatment plan was well-crafted, included clinically appropriate short-term objectives and measurable long-term goals, and listed multidisciplinary interventions that included psychiatric as well as PC care. Weekly IDTT meetings occurred timely and in both cases were attended by the assigned PC, an alternate for the assigned psychiatrist, a correctional officer, and other MHCB staff. The patient attended the first but refused the second weekly IDTT meeting. Neither the case formulation nor the patient's progress towards treatment plan goals were updated. On the seventh day of MHCB care, the patient was referred to acute inpatient care with a recommendation for being housed in a single cell. IDTT updates in the clinical summary were clear.

Psychiatrists and PCs followed the patient daily, including at least two psychiatric encounters each week. The patient refused to leave his cell for most encounters, and they occurred at the cell front. Progress notes for both disciplines demonstrated efforts to engage and collaborate with the patient. Descriptions of the patient's mental status and symptoms were detailed and illuminated the patient's developing clinical picture. Psychiatric progress notes included clear documentation of the rationale for medications, clinical and risk management considerations, and diagnostic uncertainty. New medications were not initiated until the patient was sufficiently oriented and mental status could be more accurately determined. Multiple attempts to obtain a toxicology screen were made, but the patient refused to cooperate. Once the patient began participating in yard on the seventh day of his MHCB stay, his participation in recreation therapy activities on the yard was adequately documented. He was transferred to acute care at CMF-PIP. The psychiatric discharge summary was adequate.

**Findings**

The treatment provided to this MHCB patient was adequate.

The initial assessments, treatment plan, daily follow-up encounters, and the psychiatric discharge summary were at least adequate, and some documentation was excellent. Multidisciplinary efforts to engage the patient in assessment and treatment were well documented, and progress notes included detailed clinical descriptions that demonstrated close attention to the patient's symptoms and treatment needs. Psychiatric care, including emergent interventions, was appropriate and well documented. Interventions listed in the treatment plan were offered to the patient. The patient was timely and appropriately referred to acute inpatient care. Areas for improvement include the case formulation and updating the treatment plan to reflect the patient's response to treatment efforts.

**Patient Q**

This 43-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with a diagnosis of unspecified bipolar and related disorder. He was prescribed diphenhydramine, duloxetine, lamotrigine, lithium, lurasidone, and melatonin and was adherent with these medications. Buspirone and olanzapine were prescribed on an as-needed basis for anxiety and agitation, respectively, and the patient used these medications daily. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Toxicology screens

during MHCB care and adjacent time periods were negative for illicit substances. Medical conditions included chronic foot and ankle pain, chronic back pain, prediabetes, subclinical hyperthyroidism, gastroesophageal reflex disease, and unintended weight loss. A prolonged QTc interval was noted in his record. He used a cane, walker, and knee braces to ambulate.

The patient had a self-reported history of ADHD and bipolar disorder, exposure to violence as a child, with psychiatric hospitalizations dating from age 11, juvenile detention, group home placement, maternal bipolar disorder, ongoing mental health care in the community and county jail, and self-medication through illicit substance use. He reported being sexually assaulted in county jail. A suicide attempt on November 5, 2024 by hanging was listed in the health record; no other self-injurious or suicidal behaviors were noted. He re-entered the CDCR on August 29, 2024 to begin serving a 36-year sentence, his third in CDCR, and since then received 3CMS, MHCB, EOP, and EOPMod care.

The patient received MHCB care at RJD between December 10, 2024 and December 20, 2024, after reporting impulses to harm others because he could not tolerate living with a cellmate. He had one prior MHCB admission at another facility during the six months leading up to December 10, 2024. The pre-admission screening, MHCB admission, initial PC assessment, and initial psychiatric assessment were timely. The PC assessment did not document whether it occurred in a confidential setting and was limited. The case formulation focused on distal factors contributing to criminal behavior rather than the patient's current psychiatric symptoms. The psychiatric assessment was confidential and adequate.

The initial IDTT meeting occurred timely and was attended by the patient, assigned PC, an alternate for the assigned psychiatrist, a correctional counselor, and other MHCB staff. The case formulation was not changed and continued to be inadequate. The treatment plan was copied without modification from a treatment plan recently developed for his EOP care and was not tailored to crisis care or directly focused on the patient's irritability and danger to others. Long-term goals were not measurable. A weekly IDTT meeting was not conducted; the next IDTT meeting occurred on the patient's tenth and final day of MHCB care as a discharge IDTT. The patient, the assigned PC, an alternate for the assigned psychiatrist, a correctional counselor, and other MHCB staff attended. The treatment plan was updated with a new goal relevant to the patient's MHCB admission, with the treatment plan indicating retroactively that the goal was started on the second day of the patient's stay. The treatment plan also indicated that the patient had met this goal; there was no update on the two treatment goals that had been copied from EOP care, and the treatment plan continued to indicate that these were new goals. A partial summary of the patient's care was included but did not reflect psychiatric care. An accompanying suicide risk evaluation rated the patient's suicide risk as low.

The patient was seen daily by psychiatrists or PCs, and most contacts occurred in confidential settings. Psychotropic medication was changed several times to accommodate medical conditions or side effects, and documentation of rationale for these changes was clear. Lithium, which the patient had been taking for years, was discontinued one day prior to MHCB discharge due to concerns that lithium was contributing to elongation of the QTc interval and hypothyroidism. Most PC encounters were supportive in nature and the provision of DBT and CBT skills was documented in two encounters. The patient's participation in recreation therapy activities on the yard was

adequately documented. A mental health RVR assessment found that the patient's alleged delay of a peace officer and housing refusal were unrelated to mental illness. The psychiatric discharge summary was developed four days after the patient left MHCB care.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The initial PC assessment did not discuss the possible role of bipolar mood symptoms in the patient's current irritability and behavior, and it focused on criminal and rule-breaking behavior rather than diagnostic considerations. The case conceptualization did not address psychiatric symptoms or the patient's current clinical presentation. The initial treatment plan was copied without modification from outpatient care and not appropriate for crisis bed treatment. The deficit was corrected, but only at discharge, and only retroactively. Psychiatric care was variable. Several well-reasoned medication changes were made in attempts to stabilize the patient's mood symptoms while addressing chronic pain, a prolonged QTc interval, the risk of inducing mania or hypomania with an antidepressant, and a lithium-induced thyroid response. Discharging the patient from MHCB care one day after a long-standing mood stabilizer was discontinued may have been premature, particularly in the context of the patient's report that he had a long history of using illicit substances for self-medication. Inadequate time monitoring his response to this change was provided in MHCB care. The patient's daily need for PRN olanzapine and buspirone was not addressed. The psychiatric summary was late and did not adequately address diagnostic considerations or ongoing treatment recommendations beyond the discontinuation of lithium.

**Patient R**

This 29-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with a diagnosis of alcohol use disorder, severe. He was prescribed hydroxyzine on an as-needed basis for anxiety and used this medication regularly for the first 17 days of his MHCB stay; he was not prescribed any scheduled psychotropic medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Toxicology screens conducted before and after his MHCB stay were negative for illicit substances. Medical conditions included opioid use disorder, drug-induced constipation, hepatitis C, and weight loss.

The patient had a history of alcohol, cannabis, methamphetamine, opioid, and spice use, with onset of substance use at age 13. No suicide attempts or self-injurious behaviors were listed in the health record. He entered the CDCR on May 9, 2024, and since then had received only MHCB care; during this incarceration, he was not treated with psychotropic medications outside of the MHCB stay.

The patient received MHCB care at RJD between December 13, 2024 and January 6, 2025, after voicing suicidal ideation with a plan to kill himself with a drug overdose. He had no prior MHCB admissions. The pre-admission screening, MHCB admission, initial PC assessment, and psychiatric assessment were timely, and the assessments were confidential and adequate. Although the patient convincingly reported suicidality and depression during the pre-screening assessment,

he denied active suicidal ideation during his subsequent assessments with the psychiatrist and PC. Instead, he reported fleeting suicidal ideation in the context of his sister losing her baby, although with pressing safety concerns due to a drug debt and that he had been instructed by a sergeant to report suicidal ideation because custody did not have time to address the patient's urgent safety concerns. The patient also reported that he hoped to avoid receiving RVRs or the consequences of a recent RVR by gaining admission to MHCB care. Diagnostic impressions included adjustment disorder with depressed mood versus malingering, polysubstance use, and opiate dependence.

The initial IDTT meeting occurred timely and was attended by the patient and required staff. Given the patient's acknowledgment that he sought MHCB admission due to safety concerns and to avoid RVRs, the MHCB prevention planning section of IDTT was inadequate and indicated only that it was unknown whether the patient sought MHCB admission for a specific purpose. Several additional sections of the IDTT documentation required improvement, but the treatment plan was appropriate for MHCB care and addressed the patient's suicidal ideation as an appropriate clinical target. The patient's safety concerns if discharged from the MHCB were reported to custody in a timely manner. Two weekly IDTT meetings were held. These were timely and attended by the patient, alternates for the assigned PC in both instances, an alternate for the assigned psychiatrist in one instance, a correctional counselor, and other MHCB staff. Documentation for the first weekly IDTT meeting used identical language to complete the reasons for non-referral to a higher level of care, the clinical summary, and the discharge plan/reason for retention. The MHCB prevention plan and treatment plan were not updated in either meeting. Documentation described the patient as an "overstay" awaiting outcome of a custody inquiry into the patient's safety concerns.

The patient was followed daily by psychiatrists and PCs; almost all contacts occurred in a confidential setting. The patient remained free of suicidal ideation but reported anxiety and depression. Both psychiatrists and PCs engaged the patient in motivational interviewing techniques to encourage harm reduction from his substance use. Psychiatrists, who provided two-thirds of the daily contact, also provided non-pharmacological interventions for managing anxiety and anger. The patient's history of depressive symptoms was adequately explored, and options beyond suboxone-naloxone for treatment of substance use were also discussed. The patient discontinued using hydroxyzine because he did not want to be placed in outpatient mental health services and instead hoped to be placed in a fire camp. He reported that he was using hydroxyzine to help with sleep due to the noise in the unit. His participation in recreation therapy activities on the yard was adequately documented.

Ultimately, custody determined to place the patient in RHU pending the outcome of their investigation, and an IDTT discharge meeting occurred on the final day of his MHCB stay. The patient and required staff attended, and the treatment plan was updated to reflect that the patient's treatment goal had been met. At the patient's insistence, he was not placed into MHSDS, although it was noted that he could benefit from substance use treatment. A discharge suicide risk assessment found the patient's risk to be low. The psychiatric discharge summary was adequate, and included discharge diagnoses of adjustment disorder, polysubstance dependence, and opioid-induced constipation.

**Findings**

The treatment provided to this MHCB patient was adequate.

The patient was adequately assessed and treated throughout his MHCB stay. Although his MHCB admission was triggered by reports of suicidal ideation, the patient's psychiatric treatment needs were not substantial. He was seen timely and confidentially, and his treatment needs were met. He remained stable and was able to function without significant symptoms or scheduled psychotropic medications.

**Patient S**

This 30-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with diagnoses of major depressive disorder, recurrent, severe with psychotic features and adjustment disorder with mixed anxiety and depressed mood; the latter diagnosis, along with probable chronic PTSD, was used during his MHCB stay. He was prescribed fluoxetine, oxcarbazepine, and trazodone and was adherent with fluoxetine and trazodone but not oxcarbazepine, and oxcarbazepine was discontinued on the second day of his MHCB care. Clonidine and hydroxyzine were prescribed on an as-needed basis for anxiety, and he used these medications frequently during most of his MHCB stay. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. A toxicology screen conducted on the third day of his MHCB stay was positive for non-prescribed opiates. Medical conditions included chronic neck and back pain, myofascial pain syndrome, hypertension, mild persistent asthma, and opioid use disorder. While in prison he suffered multiple stab wounds in 2019.

The patient had a childhood history of sexual abuse, maternal incarceration, group home placement, lengthy juvenile detention, and gang involvement. He reported receiving mental health treatment in the community for depression, anxiety, and grief, prior childhood diagnoses of bipolar disorder, major depressive disorder, and ADHD. Treatment in the community included antipsychotic, antidepressant, mood stabilizing, and stimulant medications. His substance use history included cannabis and heroin, and during his MHCB stay he reported that he was involved with gangs and in drug and contraband trafficking. At the time of his MHCB admission, five suicide attempts were listed in the health record, ranging between 2004 and October 24, 2024. Within the CDCR, the patient had received 3CMS, EOP, EOPMod, MHCB, and APP care; he was previously treated with divalproex sodium and escitalopram. As of 2024, he had been incarcerated for nine years.

The patient received MHCB care at RJD between December 6, 2024 and December 19, 2024, following a suicide attempt by hanging on December 5, 2024 in the EOP RHU. Following clinical discharge, he remained in MHCB care for two additional days until he transferred to EOP care at RJD. He had two MHCB admissions during the six months prior to December 6, 2024; these took place at other institutions and were prompted by suicide attempts by hanging. The most recent episode of MHCB care ended nine days prior to the current MHCB admission.

The pre-screening assessment, suicide risk evaluation, MHCB admission, initial PC assessment, and initial psychiatric assessment were timely. The assessments were adequate and confidential.

An admission suicide risk evaluation rated his suicide risk as moderate. Once admitted to the MHCB patient reported that he was not suicidal, had pretended to hang himself in the context of acute fears for his safety directed at both peers and custody staff, and was seeking to be placed in a higher level of care for the remaining ten months of his sentence. His fears were based on his gang involvement and drug and cellphone trafficking.

The initial IDTT occurred timely and was attended by required staff and the patient. The case formulation did not explicitly address suicidal ideation or behavior. The case formulation was generic and did not address the patient's escalating pattern of suicidal behavior. The treatment plan identified passive suicidal ideation, anger, and poor distress tolerance as treatment targets, did not address the patient's recent suicidal behavior, and was copied without modification or updating from a MHCB treatment plan developed at another facility on November 13, 2024. The interventions listed in the plan were not documented as provided during this MHCB stay.

The patient was followed daily by psychiatrists and PCs. These encounters were confidential, and psychiatric management of the patient's medications was careful and clinically appropriate; medications were initiated and adjusted to address the patient's complaints of depression, anxiety, and sleeplessness. Psychiatrists saw him at least twice a week. PC progress notes included detailed descriptions of the patient and his communications but did not indicate the provision of planned interventions. Neither psychiatrists nor PCs documented a thorough understanding of the patient's suicidal behaviors, and contradictory judgments regarding the nature of these behaviors were not reconciled. The patient's participation in recreation therapy activities on the yard was documented on three occasions.

A weekly IDTT meeting was not held until clinical discharge, eight days after the initial IDTT meeting and two days prior to physical discharge from MHCB. The discharge IDTT meeting was attended by the patient and required staff, and the clinical summary update was thorough and helpful. The treatment plan was not updated to reflect progress towards or achievement of treatment objectives. An adequate and collaborative safety plan was developed. The discharge suicide risk evaluation indicated that the patient was at low risk. The psychiatric discharge summary was timely and detailed. The patient was physically discharged to EOP care at LAC. He was found hanging the next day with loss of consciousness and suffered a seizure when he was revived.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The central challenges in this patient's MHCB care were the absence of a case formulation that adequately addressed the patient's history of suicide spectrum behavior and risk for future suicidal behavior, the absence of a current treatment that addressed suicidal behavior rather than just passive suicidal ideation, and a failure to appreciate that, although the patient sometimes reported he was not suicidal when he placed a rope around his neck, he also reported that this behavior was suicidal in nature. Regardless of the patient's intent, his hanging behavior could have resulted in death. He had two prior hanging incidents in the period leading up to the current MHCB stay, and he hung himself again one day after physical discharge from RJD's MHCB care. He then required

outside hospital care, a fourth MHCB admission, and acute inpatient admission. More intensive examination of his suicidal behaviors, the depth of his safety fears and anxiety, and the role of PTSD in contributing to his suicidal behaviors was needed.

**Patient T**

This 62-year-old male MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at RJD. He was provided with diagnoses of major depression, single episode and an organic psychotic condition, but these diagnoses were not utilized during his MHCB admission. He was not prescribed any psychotropic medications during his MHCB stay. Through the ISUDT, he was prescribed buprenorphine-naloxone and was adherent with this medication. Toxicology screens conducted before and after his MHCB stay were negative for illicit substances. Medical conditions included prediabetes, hyperlipidemia, hypertension, lumbar spondylolisthesis, prurigo nodularis, osteoarthritis of right knee, chronic pain in lower back and knee, and opioid use disorder. He was hearing impaired and used hearing aids as well as knee and back braces to ambulate.

The patient had a self-reported history of anxiety, depression, and waxing and waning auditory hallucinations since the age of 15, and substance use. He reported outpatient but not inpatient psychiatric care in the community. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had received 3CMS and EOP care; he was treated with hydroxyzine, mirtazapine, olanzapine, and sertraline for about six months in 2017. He was serving an indeterminate life sentence and been in prison for nine years at the time he was admitted to MHCB.

The patient received MHCB care at RJD between December 10 and December 21, 2024, after reporting command auditory hallucinations and a suicide plan by hanging. He remained in MHCB for three days following clinical discharge, until he could be transferred to the 3CMS level of care. He had no prior MHCB admissions.

The pre-screening assessment and accompanying suicide risk assessment, MHCB admission, initial PC assessment and accompanying suicide risk assessment, and psychiatric assessment were timely. The PC assessment was adequate but for failure to indicate whether the assessment was confidential and failure to develop an updated, clinically relevant case formulation. The psychiatric assessment was minimally adequate and provided a diagnosis of adjustment disorder with mixed features and rule out diagnoses of depression with psychotic features, delusional disorder, substance-induced anxiety, or mood disorder. The patient declined psychotropic medications and reported that he had a history of auditory hallucinations but had only reported suicidal ideation because he wanted to get off the yard due to safety concerns. His suicide risk was rated high at the time he reported a plan to hang himself during the pre-screening assessment but low once the patient was admitted to MHCB and denied suicidal ideation.

The initial IDTT meeting occurred timely and was attended by the patient, assigned PC, an alternate for the assigned psychiatrist, a correctional counselor, and other MHCB staff. The case formulation was current but did not directly address the patient's reports of suicidal ideation. The treatment plan used measurable and clinically appropriate short-term objectives and long-term

goals but was otherwise impoverished; it indicated that the only intervention to be provided to address suicidal ideation was a review of protective factors.

The patient was followed daily by PCs and psychiatrists, and he received at least two psychiatric encounters a week during his stay. Most encounters appeared to have been confidential, but documentation did not always make this clear. PCs documented discussions with the patient regarding protective factors and reasons to live, and psychiatrists discussed options for pharmacological treatment, which the patient continued to decline. Thoughtful consideration of differential diagnoses was documented. Participation in recreational therapy activities on the yard was documented twice.

The patient remained stable and was clinically discharged to 3CMS care on the eighth day of his stay. The discharge IDTT was attended by the patient, alternates for the assigned psychiatrist and assigned PC, a correctional counselor, and other MHCB staff. The summary of MHCB care was minimally adequate and the treatment plan was updated to indicate that the patient's treatment objective had been resolved. A discharge suicide risk evaluation rated his risk as low, and an adequate safety plan was developed in collaboration with the patient. Following his clinical discharge, he continued to be seen daily by PCs, but progress notes indicated that these encounters were perfunctory and brief.

**Findings**

The treatment provided to this MHCB patient was adequate.

The patient was assessed and seen as required, and he remained free of significant symptoms or the need for psychotropic medications throughout his MHCB stay. Psychiatric providers documented diagnostic and treatment considerations with care, and PCs engaged in positive interventions focused on reasons to live and protective factors. Given his history and presenting complaint of suicidal ideation, he was appropriately returned to MHSDS care upon discharge. The case formulation and treatment plan needed improvement but did not interfere with providing the patient with the care he needed. The poor clinical engagement provided by PCs following clinical discharge was an area of concern.

**Patient U**

This 41-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided at RJD. He was provided diagnoses of unspecified anxiety disorder; depression; opioid use disorder, in remission; and gender dysphoria. The patient identified as transgender but did not have a pronoun preference. He was non-adherent to his prescribed sertraline and Vistaril. The patient received mental health services at the 3CMS level of care and his history was significant for several MHCB admissions. The patient's most recent MHCB admission was in 2011 for self-injurious behavior. He did not have any significant medical conditions.

The patient arrived at RJD on January 5, 2017. He was housed on Facility A during the review period. The patient's annual IDTT meeting occurred on August 15, 2024, and was several months late. The IDTT meeting was attended by the patient's assigned PC and psychiatrist, CC I, and the

3CMS supervisor. The patient did not attend due to yard closure. The PC and psychiatrist participated virtually. The treatment plan did not include short-term treatment objectives, long-term treatment goals, interventions, discharge criteria, or level of care retention criteria. There were no higher level of care indicators flagged and no referrals were required. The IDTT documentation and treatment planning were inadequate.

Psychiatry contacts were provided by a telepsychiatrist. The patient received three psychiatry contacts during the review period which were timely and well-documented. The patient was offered a confidential setting for each contact but refused to attend two of three scheduled appointments. The telepsychiatrist and telepresenter went to the patient's housing unit to perform wellness checks when the patient refused the confidential setting. The patient's medications were discontinued at the patient's request during a psychiatry contact on August 23, 2024 as he had not taken his prescribed medications for over 90 days. The patient reaffirmed this decision at a subsequent psychiatry contact on October 16, 2024. He remained stable with no increase in symptoms.

PC contacts were provided via telemental health. At the start of the review period, the patient had recently completed eight sessions of weekly adjunctive therapy with a practicum student. He received four scheduled PC contacts during the review period. Three contacts were in a confidential setting and one contact was in the housing unit dayroom after the patient refused the confidential setting. PC contacts were well documented and included interventions such as mindfulness techniques, grounding skills, coping skills development, and the patient was placed on the waitlist for DBT. The PC noted the patient was engaged in treatment and managing his mental health symptoms effectively.

The patient was not offered any clinical or recreation therapy groups during the review period.

**Findings**

The treatment provided to this patient was adequate.

The patient received adequate care and treatment despite significant deficiencies in treatment planning and IDTT documentation. The patient received appropriately scheduled PC and psychiatry contacts that were well documented. PC progress notes included appropriate therapeutic interventions to address the patient's clinical needs and his mental health symptoms decreased over the review period. The psychiatrist collaborated with the patient regarding psychiatric medications and when the patient's medications were discontinued the psychiatrist provided appropriate follow-up one month later to ensure the patient remained stable.

**Patient V**

This 60-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care provided at RJD. He was provided diagnoses of unspecified depression and unspecified anxiety disorder and prescribed Vistaril PRN. He received mental health services at the 3CMS, EOP, ICF, and MHCB levels of care while in prison. The patient's medical concerns were significant for benign prostatic hyperplasia.

The patient arrived at RJD on June 13, 2018 and was housed on Facility A during the review period. The patient's annual IDTT meeting was held June 20, 2024, three months overdue. The IDTT meeting was attended by the patient, a covering PC, a CNA, and a CC I. There was no psychiatrist present. Treatment plan documentation was poor. The treatment planning section was blank and all updates were contained within the clinical summary. The recommended treatment goals were generic and not specific to this patient. There were no patient strengths or patient-verbalized goals and no discharge criteria. The IDTT documentation was inadequate.

The patient was offered four appropriately scheduled psychiatry appointments during the review period. He attended the first appointment on June 26, 2024, then declined the next three sessions. In June, the patient reported depression and that he was upset about a recent RVR for indecent exposure. His Vistaril PRN was continued at that appointment but it was later discontinued on November 13, 2024 after he had not taken it for over 90-days.

The patient was offered PC contacts via telehealth. The patient declined a confidential setting throughout the review period and the PC and telepresenter went to the patient's housing unit each time he declined. They made contact with the patient on each occasion and noted he was generally stable. The PC contacts were well documented and the patient's mental status and behavioral observations were updated appropriately. The PC notes indicated the treatment team should consider the patient for discharge in six months due to overall stability and lack of treatment engagement and interest.

The patient was not offered groups during the review period.

There were no unusual incidents during the review period. The patient received an RVR for indecent exposure several months prior to the beginning of the review period.

**Findings**

The treatment provided to this patient was adequate.

The patient received adequate overall care and treatment despite an inadequate annual IDTT meeting. The IDTT meeting was inadequately staffed, documentation was poorly organized, and the treatment planning was generic and lacked specificity. The patient was scheduled appropriately for routine clinical contacts with his assigned telehealth PC and psychiatrist although his participation in treatment was minimal. The psychiatrist discontinued the patient's medications after he had not taken it for over 90-days and had declined all psychiatry contacts offered. The telehealth PC and telepresenter appropriately went to the patient's housing unit to perform wellness checks and he denied symptoms or distress at each contact. The PC appropriately noted the patient would be considered for discharge in six months given his stability and lack of engagement and/or interest in treatment.

**Patient W**

This 28-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. He was provided diagnoses of unspecified depression, unspecified anxiety disorder, and opioid use disorder and was prescribed Vistaril PRN. The patient had only been treated at the 3CMS level of care and had no history of mental health treatment in the community. He had no history of suicidal ideation or attempts. His medical history was significant for dyslipidemia.

He arrived at RJD on April 18, 2024. The patient's initial IDTT meeting at RJD was provided on May 15, 2024. The IDTT was attended by the patient, covering PC and psychiatrist, and a CC I. The patient reported his goal was to learn more about his mental health and symptoms and to reduce his depression and anxiety. The treatment plan included appropriate and measurable long-term goals, short-term objectives, and individualized interventions. Level of care retention criteria was appropriate. The patient's IDTT documentation and treatment planning were adequate and clinically appropriate.

The initial psychiatry assessment was provided on June 3, 2024, after the initial IDTT meeting. The assessment was provided in a confidential setting and the patient reported his prescribed Vistaril was effective. He denied any acute symptoms or distress and reported the mental health program helped with his depression and anxiety. The psychiatrist noted the patient's mental status was within normal limits. The patient declined a confidential setting for his next scheduled contact on July 30, 2024, and was seen in his housing unit day room. The patient's Vistaril was discontinued at that contact at his request and the psychiatrist noted the patient was participating in MAT and prescribed Suboxone.

PC contacts were provided at least monthly via telehealth. The PC progress notes were very well written and were updated appropriately at each contact. The patient reported struggling with heroin use during the review period and relapsed in mid-August. At that point he was not prescribed psychiatric medication and his Suboxone adherence was inconsistent. He also received an RVR for failing to attend his GED classes secondary to using heroin. The patient was appropriately referred for substance use groups, his medication and MAT adherence subsequently improved, and his symptoms decreased. Overall PC care was adequate and the patient received appropriate care for his needs.

The patient participated in substance use groups, but he was not offered clinical or mental health groups.

**Findings**

The treatment provided to this patient was adequate.

The patient received an individualized and collaboratively developed treatment plan at his IDTT meeting. The majority of his clinical contacts were offered timely and were well documented. Psychiatry contacts appeared adequate and appropriate justification was provided for discontinuing the patient's Vistaril and he was participating in MAT to address his heroin addiction. PC contacts were consistent and noted the PC provided the patient with appropriate counseling interventions including packets to work on in his cell. The patient appeared to benefit from the

clinical contacts and support, his treatment and MAT adherence improved, and his depression reduced over the review period.

**Patient X**

This 49-year-old transgender female 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. She was provided with diagnoses of unspecified anxiety disorder, unspecified depressive disorder, and gender dysphoria. The patient was prescribed Vistaril PRN for insomnia and reportedly used the medication frequently. She had a history of treatment at the EOP and 3CMS levels of care. Significant medical conditions were hypertension, asthma, and diabetes.

She arrived at RJD on February 2, 2018. The patient's most recent IDTT meeting was held on April 4, 2024. Her most recent IDTT meeting prior to that was held on September 15, 2021. The patient refused to attend her annual IDTT meeting, but it was attended by the patient's assigned PC and telepsychiatrist, a CC I, the Senior Psychologist Supervisor, and a telepresenter. The patient had reportedly denied any mental health symptoms and the PC noted she demonstrated no significant functional impairments. The treatment plan's objectives, long-term goals, and interventions were appropriate to maintain the patient's stability. There were no flagged higher level of care indicators. Level of care retention criteria was appropriate and she was retained to continue improvement of coping skills to cope with mood symptoms and continue Vistaril PRN.

Psychiatry contacts were offered every 30-60 days via telepsychiatry in a confidential setting. On occasions when the patient did not arrive for her appointment, the telepresenter and telepsychiatrist located the patient in her housing unit and conducted a wellness check. The patient reported no negative side effects from her medication, which she took regularly. Psychiatry progress notes were appropriately updated and care was documented appropriately.

PC contacts were offered by on-site PCs and within appropriate time frames. PC contacts were well documented and noted the PC provided interventions consistent with the treatment plan. The patient's mental status was updated appropriately at each contact and the PC noted the patient remained stable without any significant symptoms or distress. The PC documented appropriate support and interventions as the patient was working on preparing for her resentencing hearing during the review period.

The patient was not offered groups during the review period.

**Findings**

The treatment provided to this patient was adequate.

The patient received a well-attended and documented IDTT meeting which included an individualized treatment plan. She also received timely and well documented PC and psychiatry contacts and the interventions in the patient's progress notes were consistent with the treatment plan. She received appropriate and timely follow-ups when she refused confidential scheduled contacts and the PC and psychiatrist went to the patient's housing unit for wellness checks when

she refused or did not show up for appointments. The patient remained stable and was appropriately retained at 3CMS level of care primarily for medication management and ongoing coping skills development.

**Patient Y**

This 47-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. He was provided with diagnoses of unspecified anxiety disorder, adjustment disorder with mixed anxiety and depressed mood, and a history of PTSD. Primary symptoms were noted as anxiety and nightmares and he was prescribed Vistaril, Paxil, Buspar, and prazosin. The patient had a history of 3CMS level of care with no higher level of care referrals or placements. Significant medical issues included a kidney transplant in 2020 and GERD.

He arrived at CDCR for his first term on September 2, 2022 and was received at RJD on February 2, 2023. The patient had his annual IDTT meeting on August 15, 2024, which was six months delayed. The IDTT meeting was attended by the patient's telepsychiatrist, telehealth PC, CC I, Senior Psychologist Supervisor, LVN, and telepresenter. The patient was reportedly absent due to yard lockdown. The PC noted they did not know the patient well and had met with the patient only once prior to the IDTT meeting and had used the initial PC assessment from February 17, 2023 to inform the treatment planning. Treatment goals and interventions were limited to generically referenced interventions to reduce anxiety. The psychiatrist noted the patient was medication adherent. There was no discharge plan/criteria or retention rationale present in the treatment plan. Overall treatment planning was inadequate because it was not individualized and overly relied upon information in the patient's chart that was well over one year old.

Psychiatry contacts were offered via telepsychiatry approximately every 60 days during the review period. The patient was consistently offered a confidential setting and the telepsychiatrist and telepresenter went to the patient's cell for wellness checks when he did not show for his scheduled appointments. He was prescribed prazosin for nightmares, which was effective in that the patient's nightmares reduced in frequency and he denied any side effects from his medications. The psychiatry contacts were well documented and the patient's mental status was appropriately updated at each contact. Psychiatry contacts were adequate and noted good collaboration with the PC around the patient's care.

The patient received two PC contacts during the review period. One of the contacts was provided over a weekend by a covering PC. The patient's assigned PC was a telesocial worker. Both PC contacts were provided cell front and on both occasions the patient denied any mental health symptoms and his mental status was within normal limits. The patient reportedly declined the PC's offer to reschedule the missed appointment for the following week. The patient was noted as generally stable at both contacts and the contacts were appropriately documented. Overall PC care was adequate for the patient's needs.

The patient was not offered groups during the review period.

**Findings**

The treatment provided to this patient was adequate despite the late annual IDTT meeting and generic treatment planning.

The patient received timely and consistent psychiatry contacts and his prescribed medications were effective to manage his primary symptoms. PC contacts were well documented and the telehealth PC and telepresenter appropriately went to the patient's cell when he failed to show for appointments. The patient remained stable throughout the review period with no reported or observed increases in symptoms or distress.

**Patient Z**

This 64-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. He was provided diagnoses of anxiety disorder and pedophilic disorder, which was based on his history of multiple criminal convictions over the course of eight years for sex offenses involving minors. He did not have a history of mental health treatment in the community and he was not prescribed psychotropic medications during the review period. Significant medical concerns included bilateral cataracts, bilateral Grade 1 hypertensive retinopathy, hearing loss, and hypertension.

The patient arrived at RJD on September 7, 2017. The patient held a job in the PIA and he had not acquired any RVRs since his placement at RJD. The patient's most recent annual IDTT meeting before the review period was on February 22, 2024. The IDTT meeting was well attended and included the patient, his assigned PC, assigned telepsychiatrist, CC I, telepresenter, and Senior Psychologist Supervisor. IDTT documentation noted the patient had several protective factors including close family support, religious involvement, and active engagement in work and leisure activities. The patient reported his primary symptoms were excessive worry, racing thoughts, and restlessness. There was no specific or individualized treatment planning present in the IDTT documentation. There was a one-word description of the patient's problem and a single generic therapeutic intervention was listed. Retention and discharge criteria were appropriate and indicated the treatment team would consider discharge in six months if the patient remained stable. The patient eventually discharged at his next annual IDTT meeting in February 2025.

The patient was not offered any routine psychiatry contacts during the review period because he was not prescribed psychiatric medications and had not been prescribed psychiatric medication since December 2022.

The patient was offered appropriately scheduled PC contacts primarily with an onsite PC and he had one session with a telemental health PC. PC contacts were well documented. The patient consistently denied acute symptoms and the PC noted the patient processed stressful events and received appropriate therapy interventions. The PC progress notes indicated the patient was proactively using his coping skills to reduce distress and anxiety and he received consistent support from the PC. Overall, treatment by the PC was adequate and appropriate for the patient's needs.

The patient was not offered groups during the review period.

The patient received an RVR on October 23, 2024 for behavior which could lead to violence. The patient adamantly denied the RVR allegations and appropriately advocated for himself, including filing a healthcare request when his anxiety increased. The patient's PC responded to that healthcare request within 24 hours.

**Findings**

The treatment offered to this patient was adequate.

The overall care and treatment provided to the patient were adequate despite inadequate IDTT documentation and treatment plan. The IDTT meeting lacked evidence of specific treatment planning including short-term objectives, long-term goals, and any specific interventions. Despite the lack of treatment planning, the PC documented appropriate interventions to meet the patient's needs and he remained stable. The PC also provided a very timely response to the patient's healthcare request. The patient consistently denied acute distress and demonstrated effective coping skills.

**Patient AA**

This 57-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. He was provided diagnoses of anxiety disorder; opioid use disorder, severe, in early remission; and alcohol use disorder, severe, in early remission. He was prescribed clonidine PRN, which he was noted to request almost daily, and Suboxone. The patient had been at the 3CMS level of care since 2014 with no higher level of care placements or referrals. He had a level one security classification and had a job in plant operations for the past seven years. Significant medical concerns were identified as hypertension and hyperlipidemia.

He arrived at RJD on December 24, 2014. The patient's annual IDTT meeting on June 27, 2024 was two months overdue. The IDTT meeting was attended by a covering PC, assigned telepsychiatrist, CC I, and telepresenter. The patient refused to attend. The covering PC did not provide any meaningful treatment plan and left that entire section of the document blank. The covering PC suggested the assigned PC use cognitive restructuring and CBT to reduce stressors, but these suggestions were not patient specific. There was also no retention or discharge criteria. Overall, IDTT documentation was inadequate.

The patient received psychiatry contacts once every 60 to 90 days during the review period. The patient reportedly took his PRN medications daily. The psychiatry progress notes included several positive UTOX screens, including cannabis and gabapentin. The psychiatry progress notes were well documented and indicated the patient did not have any negative side effects from his medications and he remained stable with no acute symptoms.

The patient's assigned PC was a telemental health social worker. He received appropriately scheduled confidential contacts approximately every 90 days. The PC noted the patient remained stable and reported he benefitted from his medications. The patient consistently denied depression and anxiety symptoms, reported good sleep and stable mood, and noted good protective factors. The PC progress notes lacked specific interventions and generally appeared more like wellness

assessments; however, the patient consistently denied any mental health symptoms and his medications were reportedly effective.

The patient was not offered groups during the review period.

**Findings**

The treatment provided to this patient was adequate despite the inadequate annual IDTT documentation and treatment planning.

The PC and psychiatrist provided adequate routine care via well documented and consistently scheduled contacts. The patient's psychiatric medications were effective in controlling his symptoms and he consistently denied any distress. PC contacts were well documented and the PC noted the patient consistently denied any depression or anxiety and he reported his medications were effective with no side effects. The patient maintained his job and was medication and treatment adherent throughout the review period.

**Patient BB**

This 60-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. The patient was provided with diagnoses of amphetamine use disorder, moderate, in sustained remission; unspecified anxiety disorder; unspecified depressive disorder; and pedophilic disorder. His primary symptoms were anxiety and methamphetamine addiction. He was prescribed Vistaril PRN. His level of care history was limited to 3CMS with no higher level of care referrals or placements. Significant medical conditions were dyslipidemia and hypertension.

He arrived at RJD on June 28, 2023. The patient's annual IDTT meeting on September 5, 2024 was approximately one month late. The patient refused to attend, but the IDTT was attended by the patient's assigned PC and psychiatrist, CC I, telepresenter, and Senior Psychologist Supervisor. The treatment planning was grossly inadequate and did not include any meaningful objectives, measurable goals, or progress updates. Retention and discharge criteria were provided but were generic and not patient-specific. The overall IDTT was inadequate.

The patient received two well documented telepsychiatry contacts during the review period. The psychiatry progress notes indicated the patient was working in construction within the facility, was attending AA and NA groups, and had completed an anger management group on his tablet. The psychiatrist noted the patient took his Vistaril PRN often but reported no side effects or requests to change medications.

The patient received three timely scheduled PC contacts but it was unclear whether the contacts were offered in a confidential setting. PC contacts were well documented and the PC noted discussing cognitive restructuring and cognitive reframing techniques with the patient. The patient also told his PC he had completed an anger management group on his tablet and he had enrolled in a domestic violence group on the tablet. There were no referrals required. Overall PC care and PC contacts were adequate and appropriate for the patient's needs.

The patient was not offered any groups during the review period.

**Findings**

The treatment provided to this patient was adequate despite the lack of formal treatment goals and objectives in his treatment plan.

The PC and psychiatrist provided adequate treatment to meet the patient's clinical needs despite the poor treatment plan. The patient remained stable on his prescribed medication and it remained unchanged throughout the review period. The PC met with the patient as scheduled and noted providing CBT in the progress notes. The patient remained stable and received adequate support and treatment from his PC and psychiatrist.

**Patient CC**

This 29-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. He was provided a diagnosis of unspecified depressive disorder and prescribed Remeron and Vistaril PRN. His level of care history was 3CMS with no higher level of care referrals or placements and he did not have any significant medical concerns.

The patient arrived at RJD on August 29, 2018. The patient had an annual IDTT meeting on September 5, 2024. His most recent IDTT meeting prior to that was on December 29, 2022. The IDTT meeting was attended by the patient, his assigned PC and telepsychiatrist, Senior Psychology Supervisor, and telepresenter. There was no CC I present. Treatment planning was adequate and included appropriate short-term objectives, long term goals, and interventions including CBT and psychoeducation on coping skills and relaxation techniques for anxiety and stress. The patient was noted as generally stable and without acute symptoms. Level of care retention and discharge criteria were appropriate and overall treatment planning was adequate.

Psychiatry contacts were provided via telepsychiatry. The patient was initially scheduled at 90-day intervals but contact frequency was increased when he began to refuse confidential appointments. The patient consistently denied acute symptoms and took his medications sporadically. The psychiatrist noted encouraging the patient to work with his PC on coping skills.

PC contacts were offered consistently and the PC went to the patient's housing unit for wellness checks when the patient refused a confidential setting. The PC noted the patient consistently denied any acute symptoms, mental health concerns, or any significant difficulties. He reported he coped by sleeping in his cell. The PC documented difficulty implementing treatment plan interventions due to the patient's lack of engagement and consistent refusals for a confidential setting. The patient was retained at 3CMS due to being prescribed psychiatric medications. The PC documented consulting with the patient's psychiatrist. Overall PC care was adequate and responsive to the patient's needs.

The patient was not offered groups during the review period.

**Findings**

The treatment provided to this patient was adequate.

The patient received an adequate and individualized treatment plan that was appropriate for his clinical needs. The treatment plan included measurable and individualized treatment goals and interventions. PC and psychiatry contacts were scheduled and provided appropriately and both providers collaborated with one another to encourage continuity of care and treatment adherence. The patient was always seen by his assigned providers and they provided wellness checks when he refused his scheduled appointments. Level of care retention was appropriate as the patient was prescribed psychiatric medications, which he took frequently.

**Patient DD**

This 54-year-old male 3CMS patient's healthcare record was reviewed to assess the quality of care at RJD. He was provided diagnoses of unspecified depressive disorder, unspecified anxiety disorder, alcohol use disorder, amphetamine-type substance use disorder, and opioid use disorder. He was prescribed clonidine and Lexapro for his mental health symptoms, Suboxone via the MAT program, and propranolol for liver cirrhosis. Level of care history was limited to 3CMS with no higher level of care referrals or placements. Significant medical conditions were cirrhosis of the liver, type-2 diabetes, Erb's palsy, Hepatitis C, and HIV.

The patient began his current CDCR term on May 16, 2023 and was placed at RJD on July 12, 2023. The patient had a job in the kitchen and no RVRs while in prison. The patient's annual IDTT meeting was timely on October 24, 2024. The patient, his assigned PC and telepsychiatrist, CC I, Senior Psychologist Supervisor, and telepresenter attended. The patient's treatment plan was generic and was not individualized. There were no short-term objectives, measurable long-term goals, or progress indicated in the treatment plan. Level of care retention and discharge criteria were also generic and not individualized. Overall treatment planning at this IDTT meeting was inadequate.

The patient was seen for appropriately scheduled psychiatry contacts and contacts were provided in a confidential setting. The psychiatrist noted the patient was not adherent to his medication for several weeks in May and June because the patient mistakenly thought the medication had been discontinued. The patient resumed taking the medication when he realized the mistake, reported positive benefit from Lexapro and clonidine, and was medication adherent from there forward. The patient's medication dosages were adjusted collaboratively in response to improvements in symptoms. Overall psychiatry care was adequate and the psychiatry contacts were well documented.

PC contacts were provided every 30-90 days during the review period and were always held in a confidential setting. The patient attended all of his scheduled PC contacts. PC progress notes indicated the patient was highly engaged in treatment, work, education, and leisure activities. The PC documented clinically appropriate and consistent support such as counseling the patient on the importance of adhering to diabetes medications and diet. The PC also supported the patient as he was considered for the MCRP and the PC performed the MCRP evaluation. The patient was

eventually approved for the program. The PC progress notes reflected appropriate continuity of care and documentation.

The patient was offered two self-help group sessions during the review period, Book Club and Pride Event, but he did not attend either.

**Findings**

The treatment provided to this patient was adequate despite the inadequate IDTT documentation and treatment plan.

The patient was offered timely routine contacts and follow-ups with his assigned clinicians and contacts were provided in a confidential setting. Psychiatry progress notes indicated good collaboration between the patient and psychiatrist and the patient's medications were effective for his symptoms with little to no side effects. PC contacts were timely and well documented. The PC showed appropriate concern and support for the patient's medical concerns and assisted with the community release program process. The patient remained stable and was medication adherent for the majority of the review period.

**Patient EE**

This 28-year-old male EOP patient's healthcare record was reviewed to assess the quality of care in the RJD EOP RHU. He was provided diagnoses of PTSD, unspecified depressive disorder, and antisocial personality disorder. During the review period the patient was prescribed clonidine, Strattera, Trazodone, Lexapro, and Vistaril PRN. Level of care history included eight MHCB admissions and two ICF admissions. He did not have any significant medical concerns.

He was placed in the EOP RHU on April 21, 2024 for safety concerns/investigation and had an EPRD of November 28, 2024. He was released from RHU and placed on Facility-C EOP yard at his ICC on July 11, 2024. This patient's primary symptom was lifelong severe depression but his history was also significant for manic symptoms and hallucinations when intoxicated. Chronic and acute suicide risk were both assessed to be low on his SRASHE on April 24, 2024. The patient had a routine RHU IDTT meeting on June 19, 2024. He refused to attend the IDTT meeting; however, his assigned clinicians, CC I, the senior psychologist supervisor, and a psych tech were present. There were no flagged higher level of care indicators and the patient did not require any functional accommodations secondary to his mental health symptoms. He was a SRMP participant and the treatment plan included appropriate goals to manage safety. Overall treatment goals aligned with the SRMP goals and included reducing the patient's suicidal ideation, impulsivity, and anger. The goals were measurable and the treatment plan included appropriate interventions but the patient's progress/response had not been updated since January 11, 2024. Level of care retention and discharge criteria were appropriate. Overall treatment planning was adequate for this patient.

The patient received two psychiatry contacts from his assigned onsite psychiatrist. The progress notes were detailed and updated between contacts. At the first contact on June 4, 2024, the patient reported poor sleep, high anxiety, and asked that his Trazadone be increased. The psychiatrist

increased his Strattera and left the remaining medications unchanged. On July 4, 2024 the psychiatrist noted the patient was not taking Strattera consistently but his presentation was otherwise within normal limits and unchanged from the previous contact. Psychiatry contacts were well documented and the patient was stable on his prescribed medications without any significant side effects.

PC contacts were offered weekly in a confidential setting. The patient occasionally declined the confidential setting and engaged cell front. PC progress notes were very detailed and included updates to the patient's presentation, treatment interventions, and response to treatment. The interventions aligned with the patient's treatment plan and included cognitive restructuring, CBT techniques, and coping skills development. The PC used varied and appropriate clinical techniques to encourage treatment adherence and support the patient's recovery. His overall engagement with his PC was adequate and the PC provided appropriate treatment interventions.

The patient was offered between six and eight groups per week while in EOP RHU. Group topics included symptom management, recreation therapy, stress management, and social skills/communication. Recreation therapists and a pre-doctoral psychology intern facilitated groups. The patient attended only two group sessions during the review period.

**Findings**

The treatment provided to this patient was adequate.

The patient received adequate care and treatment in the EOP RHU during the review period. His routine IDTT was timely and attended by appropriate staff. Treatment planning was patient-centered, individualized, and included appropriate interventions that were reflected in the PC progress notes. PC and psychiatry contacts were consistently scheduled, offered in a confidential setting, and well documented. The patient remained stable while in RHU and was offered appropriate treatment interventions and support from his treatment team.

**Patient FF**

This 31-year-old male EOP patient's healthcare record was reviewed to assess the quality of care provided in the EOP RHU at RJD. He was provided diagnoses of opioid use disorder; amphetamine-type substance use disorder; schizoaffective disorder, depressive type; and antisocial personality disorder. His primary symptoms were depression, anxiety, and daily auditory hallucinations and he was prescribed Zyprexa, Abilify, Buspar, and Effexor. MHSDS level of care placements included EOP, 18 MHCB admissions, and inpatient levels of care. Significant medical concerns included history of syphilis and ulcerative colitis.

He was placed in RHU on May 10, 2024 due to enemy/safety concerns after he expressed suicidal ideation upon discharge from the RJD MHCB. The patient did not have a routine IDTT meeting during the review period. His initial RHU IDTT meeting on May 15, 2024 was timely and attended by the patient, his assigned clinicians, program supervisor, CC I, and psych tech. One higher level of care indicator was flagged for three or more MHCB referrals in the last six months, but the patient reported he was feeling safe in RHU, was adherent to treatment and medications, and was

future oriented. The treatment plan focused on reducing hallucinations, depression, and substance abuse. The patient's treatment goals, objectives, and interventions specifically targeted substance abuse and auditory hallucinations. Goals were objective and measurable and included appropriate interventions. Level of care retention justification was appropriate and indicated the persistent and chronic nature of the patient's mental illness necessitated an extended EOP placement. Overall treatment planning was adequate.

The patient received one routine psychiatry contact during the review period. The contact was timely and well documented but was provided at cell front after the patient refused a confidential setting. The progress note indicated the patient and psychiatrist actively discussed medication adjustments and symptoms. The patient was medication adherent and reported adequate sleep, but he rated his depression as moderate and reported auditory hallucinations several times per day. The psychiatrist provided updated diagnoses of major depressive disorder with psychotic features and PTSD. The psychiatry contact was overall adequate and well documented.

The patient received weekly PC contacts while in RHU. PC contacts were well documented and included appropriate updates to the patient's mental status and functioning. The progress notes included the treatment goals, objectives, and interventions provided in the treatment plan. The patient's response to treatment and overall functioning were also updated appropriately and indicated he was functioning adequately with minimal distress. The PC noted the patient used his tablet to complete psychoeducational materials and deep breathing exercises and the PC would continue to assist the patient with reducing distress and improving coping skills to reduce substance abuse.

The patient was offered clinical and recreational therapy groups while in RHU. Group topics were appropriate for the patient and included symptom management, stress management, current events, and yard. On most days, the patient was offered yard group and one recreational therapy or clinical group. His group attendance was extremely poor and he only consistently went to yard group.

**Findings**

The treatment provided to this patient was adequate.

The patient remained stable and treatment adherent during his RHU stay. He was offered timely clinical contacts during his stay in RHU. The IDTT meeting was well staffed and the treatment plan was individualized and appropriate for his needs. Psychiatry care and medication management were collaborative and appropriately targeted the patient's psychosis and depression. PC contacts were timely and well documented and the interventions and goals identified in the progress notes were consistent with the treatment plan. The patient was offered appropriate groups although his attendance was poor.

**Patient GG**

This 43-year-old male EOP patient's healthcare record was reviewed to assess the quality of care at RJD RHU. He was provided diagnoses of antisocial personality disorder, narcissistic personality disorder, adjustment disorder with mixed anxiety and depressed mood, and provisional

diagnoses of major depressive disorder with psychotic features and PTSD. His primary symptoms were auditory hallucinations, agitation, depression, insomnia, and nightmares and he was prescribed Trileptal, Wellbutrin, Abilify, Benadryl, and prazosin. Level of care history included 3CMS, EOP, MHCB, and ICF. There were no significant medical conditions or concerns.

He was placed in RHU on March 11, 2024 from the RJD MHCB level of care and remained in the RHU until July 20, 2024 when he was readmitted to the MHCB level of care. The patient attended one timely RHU routine IDTT meeting during the review period on July 17, 2024. The patient, his assigned clinicians, a psych tech, CC I and Senior. Psychologist Supervisor participated in the IDTT meeting. One higher level of care consideration was flagged because the patient had twelve MHCB referrals initiated in the last six months. Eleven of those referrals were one-day moves to alternative housing which were rescinded and the patient returned to the EOP level of care the following day. The treatment team indicated the patient's behaviors and MHCB referrals were most likely due to custody challenges, a desire to meet his perceived needs, poor distress tolerance, and a lack of coping skills. The PC opined that the patient was likely malingering his mood and psychotic symptoms to affect his housing placement and legal matters. Primary treatment goals were listed in the clinical summary and were to reduce anger, use mental health services appropriately, and work towards a lower level of care. The treatment plan section of the IDTT form was blank and did not provide any problems/symptoms, short-term objectives, long term goals, interventions, or progress. IDTT documentation included a safety plan that was specific and individualized. The patient was not a participant in the SRMP. Discharge and level of care retention criteria were appropriate. Overall, the patient's treatment goals and interventions were appropriate despite the incomplete treatment plan section as the relevant information was present in the clinical summary.

The patient received four psychiatry contacts during the review period. Psychiatry contacts were well documented but it was unclear whether contacts were provided in a confidential setting. The psychiatrist and patient collaborated appropriately on the patient's medication regimen and the psychiatrist documented informed consent and psychoeducation at each medication change. The patient endorsed insomnia and moderate depression but his mental status was generally within normal limits until he was admitted to the MHCB on July 20, 2024. Psychiatry care was adequate.

The patient received weekly PC contacts during the review period. PC contacts were provided in a confidential setting. PC progress notes were thorough and well documented and indicated the patient was generally stable and medication adherent. He consistently demonstrated antisocial and narcissistic personality traits and his anger and hostility increased significantly when he felt his needs were not being met. He perseverated on several perceived grievances at each contact, became hostile and combative when redirection was attempted, and was he not responsive to feedback from the PC. The PC also noted it was unclear whether the patient met criteria for EOP level of care as no symptoms had been reported and his primary diagnoses were personality disorders. The documented interventions were consistent with the treatment plan goals and focused on building rapport and improving coping skills. The patient was referred and admitted to the MHCB on July 20, 2024 when he reported suicidal ideation after the PC told him he did not qualify for single-cell placement given his history of frequent MHCB referrals. PC care was adequate.

The patient was offered clinical and recreational therapy groups while in RHU. Group topics were appropriate and included symptom management, social skills/communication, recreational therapy, and CBT. The patient's attendance was adequate and his participation was often noted as moderate or high.

**Findings**

The treatment provided to this patient was adequate.

The patient was offered timely clinical contacts and an IDTT meeting. The treatment plan was individualized for the patient and despite poor organization, the document included appropriate treatment goals and interventions. The psychiatrist collaborated appropriately with the patient for medication changes and documented informed consent and psychoeducation. PC contacts were very well documented, included interventions from the treatment plan, and indicated the patient's presentation and interactions were beginning to improve before he was admitted to the MHCB. The patient was offered appropriate groups and his attendance and participation were adequate.

**Patient HH**

This 37-year-old male EOP patient's healthcare record was reviewed to assess the quality of care at RJD RHU. He was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder and he was prescribed Abilify, Effexor, Buspar, and Vistaril. He was also prescribed Suboxone as a participant in the MAT program. Primary mental health symptoms included psychosis, delusions, command and demeaning auditory hallucinations, depression, anxiety, paranoia, and nightmares. He received mental health services at the 3CMS, EOP, MHCB, and Acute/ICF levels of care. Medical concerns were hyperlipidemia, hypertension, and obesity. His chronic and acute risk of suicide were low and he was not a participant in the SRMP.

He was placed in RHU on May 19, 2024 for safety concerns. He was subsequently released to RJD A yard on June 30, 2024. The patient had his initial RHU IDTT meeting on May 29, 2024. The patient, his assigned PC and psychiatrist, CC I, Senior. Psychologist Supervisor, and psych tech attended the IDTT meeting. The PC and psychiatrist were onsite. The treatment plan included an IPOC for hallucinations that lacked any measurable goals or interventions. The clinical summary included generalized treatment goals that were appropriate but not individualized for the patient and there were no specific clinical interventions. The patient's safety plan was individualized and included specific treatment goals and interventions that should have been present in the treatment plan section. There were no flagged higher level of care indicators and the EOP functional evaluation was completed appropriately. Level of care rationale and discharge criteria were appropriate. The treatment planning was adequate overall despite the poorly organized documentation.

The patient received one psychiatry contact in RHU during the review period on June 13, 2024. The psychiatrist was onsite and the contact was provided cell front. The contact was well documented and the psychiatrist noted the patient was medication adherent, his auditory hallucinations were significantly reduced, depression was moderate, and his anxiety was manageable. The patient endorsed nightmares twice per week but reported they were manageable

and he declined prazosin. His mental status was within normal limits and the patient reported his symptoms were improving and he did not want to change his medications.

During the review period, the patient received two routine weekly PC contacts in RHU in a confidential setting from his assigned onsite PC. The progress notes were adequate and included updates to the patient's subjective reports, the PC's objective observations, protective factors, coping skills, and the clinical interventions provided in the contact. The interventions aligned with the treatment plan. The patient's presentation improved quickly and significantly between the contacts. On June 14, 2024 he denied depressive symptoms, anxiety, and auditory hallucinations and the PC noted the patient was at his baseline with no significant impairment or distress.

The patient was offered clinical and recreational therapy groups while in RHU. Group topics included stress management, symptom management, social skills/communication, coping, recreational therapy, and yard. Groups were facilitated by a LCSW, a pre-doctoral psychology intern, and recreation therapists. Review of group progress notes indicated his attendance was inconsistent, but he participated appropriately when he attended.

**Findings**

The treatment provided to this patient was adequate.

The patient's IDTT meeting was well staffed yet his treatment plan did not include measurable goals and specific interventions. His safety plan provided better direction with regard to treatment planning. PC and psychiatry progress notes were comprehensive and indicated the patient had good rapport with his clinicians. He participated in confidential individual PC contacts and he was medication adherent. His clinical presentation improved significantly in response to treatment and medication and he was noted as stable when he was transferred from RHU to a mainline EOP yard.

**Patient II**

This 30-year-old male EOP patient's healthcare record was reviewed to assess the quality of care in the RHU at RJD. He was provided diagnoses of schizophrenia and unspecified stimulant-related disorder. He was prescribed Vistaril and Invega Sustenna under a PC 2602 order. His level of care history included 3CMS and EOP with no history of MHCB or inpatient referrals. The patient did not have any significant medical conditions.

He arrived at RJD on June 30, 2023 and was placed in the RJD EOP RHU from May 16, 2024 through June 20, 2024 for possession of a deadly weapon. He received timely initial PC and psychiatry assessments prior to his initial IDTT meeting. The PC assessment was provided in a confidential setting; however, the psychiatry assessment was conducted at cell front after the patient declined the office setting. The patient denied mental health symptoms at both assessments and both clinicians noted his mental status was within normal limits and he was calm and cooperative. He was enrolled in MAT when he arrived at RHU.

His initial RHU EOP IDTT meeting was held on May 22, 2024. The patient refused to attend, but his assigned PC, assigned psychiatrist, the program supervisor, a CC I, and psych tech attended. Appropriate treatment goals were included but were placed in the discharge criteria section. Discharge and retention criteria were appropriate. There was an IPOC for hallucinations, but it had not been updated since 2023. The treatment plan section was blank. The patient was flagged on the treatment high-refuser list and reportedly did not attend treatment because he had no insight into his mental illness and did not know why he was in the MHSDS. He reported he had not heard voices since October 2023 and denied any depression, anxiety, suicidal ideation or homicidal ideation. The psychiatrist opined that the patient's psychosis was so severe that he did not recall when he decompensated, hence his lack of insight. He was adherent to his PC 2602 medications, maintained his ADLs and hygiene, and had not shown any signs of decompensation since his arrival at RHU. The patient's IDTT documentation and treatment planning were adequate.

The patient received one routine psychiatry contact during his stay in RHU. The contact was well documented and timely. The patient denied any mental health symptoms and reported good sleep and appetite. He had taken his last three Invega injections without difficulty and one of seven doses of PRN Vistaril in the previous week. The psychiatrist planned to continue Invega and Vistaril as the patient's symptoms were well controlled. Psychiatry care was adequate.

The patient was offered confidential weekly PC contacts throughout his RHU term. His PC was an unlicensed doctoral psychology intern. The contacts were well documented and the PC noted interventions consistent with the patient's treatment plan and treatment goals. Interventions included motivational interviewing, mindfulness techniques, and packets for the patient to complete in his cell. The patient reported being clean from methamphetamine and heroin throughout his time in RHU. PC care was adequate.

The patient was offered groups throughout his time in RHU. His attendance was inconsistent and generally poor. His group assignments included social skills/communication, coping, symptom management, stress management, and recreational therapy. Groups were facilitated by recreational therapists, psychologists, and predoctoral psychology interns.

**Findings**

The treatment provided to this patient was adequate.

This patient received adequate mental healthcare and treatment throughout his stay on RJD RHU. Clinical contacts were offered timely and in confidential settings. Initial assessments, IDTT meetings, and clinical contacts were timely and generally well documented. The treatment plan was individualized and the patient remained stable and medication adherent throughout his stay. The PC provided interventions consistent with the treatment plan. He was referred to the MAT program when he arrived and abstained from substances throughout his stay.

**Patient JJ**

This 44-year-old male EOP patient's healthcare record was reviewed to assess the quality of care in the RHU at RJD. The patient was provided diagnoses of major depressive disorder, recurrent,

with psychotic features; opioid use disorder; and phencyclidine (PCP) use disorder, severe. He was prescribed Buspar, Geodon, Vistaril, prazosin, and Cogentin. He had a history of depression, manic symptoms, and hallucinations that began at age 21 after he used PCP. Level of care history included EOP and MHCB. His chronic risk for suicide was high and his acute risk was low. Significant medical conditions included Crohn's disease in remission, obesity, glaucoma suspect, and posterior vitreous detachment.

He was placed in the RJD RHU on August 1, 2024 after a MHCB admission on July 22, 2024 following an alleged pill overdose. He was released from RHU on August 8, 2024, but returned on August 12, 2024 for indecent exposure. He was ultimately released from RHU on November 5, 2024. The patient received timely and appropriately documented five-day follow-ups after he arrived at RHU from the MHCB. The five-day follow-ups included an individualized safety plan and the behavioral observations noted the patient remained generally stable and he consistently denied suicidal ideation.

The patient received a timely initial PC assessment at both RHU admissions. The assessments were provided in a confidential setting and were completed appropriately. Different clinicians completed the assessments and both included relevant and current clinical information. The EOP functional evaluations were completed appropriately and indicated he should have restrictions related to being prescribed heat medications, being around sharp objects, and sudden changes in routine. The initial PC assessments were adequate.

The patient received timely initial psychiatry assessments upon both RHU admissions. The psychiatry assessments included contemporaneous updates to the patient's mental status and functioning. He endorsed nearly constant auditory hallucinations and persistent nightmares at both assessments but he declined any increases in medications. The psychiatrist provided diagnoses of substance-induced psychotic disorder and PTSD which were not included elsewhere in his chart. The patient was generally medication adherent and endorsed high levels of depression and low anxiety. The initial psychiatry assessments were adequate.

Timely initial RHU EOP IDTT meetings were held during both placements in the RHU. IDTT meetings were attended by required staff including the program supervisor, but the second IDTT meeting had a covering PC instead of the assigned PC. The patient attended the first IDTT meeting but refused to attend the second and it was held in absentia. Treatment planning was adequate for the patient's symptoms and focused on reducing his depression, suicidal ideation, and impulsivity using DBT interventions and motivational interviewing. He was to receive weekly individual confidential sessions with his PC and groups to improve symptom management and coping skills. Specific discharge criteria was not provided. There were IPOCs for anger, impulsive behavior, and delusions. Treatment planning was adequate for the patient's needs.

Psychiatry contacts were offered in a confidential setting every seven to ten days during the patient's RHU stay. The contacts were well documented despite the patient's general reluctance to engage with his psychiatrist. The psychiatrist noted the patient was generally medication adherent and his presentation remained stable. He denied suicidal ideation at each contact but endorsed high levels of depression, auditory hallucinations, and nightmares. He declined offers to

increase medications to address his reported symptoms. Medications remained unchanged throughout the review period. Overall psychiatry care was adequate.

Routine PC contacts were offered weekly in a confidential setting. The contacts were well documented and the progress notes were updated appropriately with minimal information carried forward. The interventions and IPOCs in the progress notes aligned with the treatment plan. The patient attended his routine contacts in the confidential setting until his primary PC was changed in early October 2024. Subsequent contacts were provided cell front due to patient refusal and he also stopped attending groups. The patient consistently endorsed delusions related to the RHU correctional officers placing incorrect information in his file but his overall presentation remained stable and he denied suicidal ideation. He was provided daily cell front check-ins when he was added to the high refuser list. Overall PC care was adequate.

The patient was offered several clinical and recreational therapy groups during his RHU stay. The groups were facilitated by PCs and recreational therapists and included PC caseload group, symptom management, stress management, social skills/communication, recreation therapy, and yard. The patient's overall group attendance was poor and he was on the high-refuser list during several periods of his RHU stay.

The patient was admitted to alternative housing on September 10, 2024 after he endorsed suicidal ideation, but the MHCB referral was rescinded after he was assessed.

**Findings**

The treatment provided to this patient was adequate.

The patient received adequate care from all mental health disciplines throughout his stay in RHU. His treatment planning was individualized and appropriate for his needs. IPOCs were appropriately included and aligned with the patient's treatment goals. An IPOC for delusions was appropriately added after the patient endorsed paranoid delusional beliefs about the correctional officers on his unit. The psychiatrist responded appropriately to the patient's reported symptoms and recommended increases in medications that he declined. PC contacts were timely and the PC interventions were consistent with the treatment plan. The patient received daily cell front contacts when he was added to the high-refuser list. Group offerings were appropriate although he often refused to attend.

**Hernandez BB0840**

This 31-year-old male EOP patient's healthcare record was reviewed to assess the quality of care provided in the RHU at RJD. He was provided diagnoses of major depressive disorder, recurrent, with psychotic features and unspecified schizophrenia spectrum and other psychotic disorders. He was prescribed Remeron. His history was negative for any suicide attempts but significant for two incidents of superficial self-injurious behavior. His chronic and acute risk of self-harm were low. His MHSDS level of care history included 3CMS, EOP, MHCB, Acute, and ICF.

He was placed in the RHU on May 4, 2024 from mainline EOP at RJD and was reportedly admitted to alternative housing in the RHU in lieu of a MHCB for suicidal ideation and danger to self. He remained in RHU until he was transferred to RJD Facility C on June 12, 2024. Five-day follow-up contacts were timely and well documented. The patient denied any suicidal ideation or intent to harm himself at each follow-up contact.

The patient received a timely initial psychiatry assessment. The psychiatrist noted the patient did not appear to be in acute distress but rated his depression and anxiety as high. He also reported lifelong severe depression and denied manic symptoms or hallucinations. The psychiatrist prescribed Remeron for sleep, depression, and anxiety and noted a preliminary diagnosis of adjustment disorder with depressed and anxious mood. The patient received a timely initial PC assessment although it was completed in absentia because the patient refused to participate. The document was completed appropriately via record review and included critical and relevant clinical information to inform treatment planning.

The initial IDTT meeting was timely and was attended by required staff including a supervising social worker. A covering PC attended instead of the assigned PC and the patient refused to attend. The treatment team noted a long history of EOP treatment and previous treatment goals of eliminating danger toward others and thoughts of harming others. Treatment planning was inadequate and included only one long term goal for the patient to identify two ways to cope with being around others in the correctional setting. That goal was marked as met at the initial IDTT meeting. Discharge and retention criteria were also very limited and generally inadequate. There were no higher level of care indicators flagged and the EOP functional evaluation noted there were no accommodations required. Overall treatment planning for this patient was inadequate due to generalized and nonspecific treatment goals and level of care criteria.

The patient received one routine psychiatry contact while in RHU. The contact was timely and well documented. The psychiatrist noted the patient's depression had reduced slightly since arrival and the patient reported good sleep but high anxiety. He declined an increase in Remeron and denied any other significant symptoms or distress. The patient was offered weekly routine PC contacts throughout his RHU stay but he refused a confidential setting and declined to engage cell front at each contact. The PC documented behavioral observations at each attempt and tried to use a Spanish translator to encourage the patient to participate. The patient remained stable overall and the PC noted he was polite at each encounter in his refusals to speak with her.

The patient was offered clinical and recreational therapy groups while in RHU. Groups were facilitated by PCs and recreational therapists and topics offered to this patient included social skills/communication, stress management, current event, yard, and creative expression. The patient attended the majority of his offered groups and was noted as an active participant.

**Findings**

The treatment provided to this patient in the RHU at RJD was adequate despite an inadequate treatment plan.

The patient was offered a timely IDTT meeting and clinical contacts although he declined to engage with any of his providers except the psychiatrist and attending groups. His treatment plan lacked specificity and adequate discharge criteria, but he remained stable and was medication adherent. The treatment team appropriately made consistent efforts to engage with the patient despite his repeated refusals and provided appropriately documented cell front check-ins in lieu of confidential contacts.

**Patient LL**

This 42-year-old male EOP patient's healthcare record was reviewed to assess the quality of care in the RHU at RJD. He was provided diagnoses of schizophrenia and borderline intellectual functioning and he reported constant auditory and visual hallucinations and chronic anxiety. He was prescribed Risperdal Consta, Abilify, Cogentin, Buspar, propranolol, and Vistaril PRN and was medication adherent. He received mental health treatment at the EOP, MHCB, and ICF levels of care. Significant medical conditions included diabetic nephropathy, hyperlipidemia, and Type 2 diabetes.

He was placed in RHU on August 21, 2024 after he received an RVR for sexually assaulting a staff member when he reportedly tried to touch a psychologist inappropriately. He remained in RHU through the remainder of the review period. He received an initial psychiatry assessment the day after he arrived in the RHU. It was unclear whether it was provided in a confidential setting, but the assessment was comprehensive and well documented. The patient reported auditory hallucination several times per day and mild depression, but he was sleeping well and had good appetite. He was medication adherent and the psychiatrist did not change his medications. An initial PC assessment was provided the same day as the psychiatry assessment. The PC assessment was provided in a confidential setting and the patient presented with depression, anxiety, auditory hallucinations, and visual hallucinations. The assessment was well documented and included the patient's clinical, psychosocial, and legal histories, protective factors, and current mental status.

Two timely RHU EOP IDTT meetings were held during the review period. Both IDTT meetings were attended by his assigned PC, assigned psychiatrist, a CC I, and the program supervisor. The patient attended his initial IDTT meeting but refused to attend the subsequent meeting. The patient's verbalized treatment goals included reducing hallucinations, reducing anxiety symptoms, and maintaining medication adherence and sobriety. The treatment plan goals and interventions focused on reducing his distress from hallucinations using mindfulness and grounding techniques. The goals and interventions were limited and generalized. There were no flagged higher level of care indicators. There was no discharge or level of care retention criteria included in the treatment plan. At the patient's second IDTT meeting, the treatment team noted he had been active in mental health programming, medication adherent, maintaining sobriety, and had been attending various groups and yard. They also noted he was implementing coping skills he learned in treatment. Overall treatment planning and IDTT documentation were inadequate due to generalized treatment goals, lack of specific interventions, and lack of adequate discharge criteria.

The patient received monthly psychiatry contacts during the period reviewed. The psychiatry contacts appeared to be provided in a confidential setting and were well documented. The psychiatrist updated the patient's mental status appropriately and noted his depression and anxiety

symptoms decreased overall and he remained stable. He responded well to increases in medications and he was medication adherent throughout the review period. Overall psychiatry care was adequate.

PC contacts were offered weekly in a confidential setting. Although he attended the majority of individual PC contacts, the patient rarely attended PC caseload group. He was placed on the high refuser list twice and each time received appropriately documented daily high-refuser contacts until his group attendance increased. The patient was provided a PC contact in response to an urgent consult after he received bad news in court, but he reported no distress and did not demonstrate any increase in symptoms. Routine PC contacts were well documented and noted specific interventions including mindfulness, breathing exercises, and self-study packets from the recreational therapists and a PC. The patient remained stable in RHU during the review period. Overall PC contacts were adequate.

The patient was offered clinical and recreational therapy groups while in RHU. His group attendance was inconsistent and he was placed on the high-refuser list twice during the review period. PCs and recreational therapists facilitated the groups. Group topics were appropriate and included stress management, symptom management, social skills/communication, PC caseload group, yard, and leisure activities.

**Findings**

The treatment provided to this patient was adequate.

The care and treatment provided were adequate despite the generalized and incomplete treatment plan documentation. The patient received timely and well documented routine clinical contacts and he was offered appropriate groups. Psychiatry contacts included medication adjustments that helped reduce the patient's psychotic symptoms and he remained medication adherent. PC contacts were well documented and the PC noted appropriate interventions and positive feedback from the patient. Group assignments were appropriate and the patient received daily PC contacts when his group attendance declined. He remained stable and showed overall improvement in his symptoms in response to treatment.

**Patient MM**

This 35-year-old male EOP patient's healthcare record was reviewed to assess the quality of mental health care in the RHU at RJD. He was provided with diagnoses of bipolar I disorder, current or most recent episode unspecified; ADHD; antisocial personality disorder; and narcissistic personality disorder. His primary symptoms were depression, long periods of sustained energy, grandiosity, racing thoughts, pressured speech, paranoia, and auditory hallucinations. He was prescribed Zyprexa, Vistaril, and Remeron for his symptoms. Level of care history included EOP, MHCB, Acute, and ICF. His most recent inpatient admission from November 14, 2023 through July 29, 2024 was due to suicidal ideation and self-injurious behavior after he took 45 pills and cut his arm. Significant medical concerns included kidney disease and cervical spine fusion.

The patient arrived at the RJD RHU on August 1, 2024 following his recent inpatient placement. A SRASHE was completed, and while adequate, lacked an adequate safety plan. He received six daily follow-up contacts after his arrival rather than the required five contacts. The follow-ups were mostly adequately documented although one noted that the safety plan needed to be modified without modifications being made and, on another day, the safety plan was not reviewed with the patient. Although the patient remained generally stable, he endorsed passive suicidal thoughts on two of the days. At each contact he reported he was able to stop the thoughts when he wanted and there was no likelihood he would try to harm himself within the next week. He described his mood as highly anxious and very depressed and expressed concerns about his medications. The follow-up contacts were discontinued appropriately.

The initial PC assessment was provided in a confidential setting the day after the patient was placed in the RHU. His assigned PC was a predoctoral psychology intern but the assessment was provided by a covering PC (LCSW). The assessment was well documented and indicated the patient agreed with his EOP placement and he was engaged in treatment. He rated his anxiety and depression as very high, sleeping only two hours per night, experiencing auditory hallucinations, and poor appetite. The EOP functional evaluation was completed appropriately and the clinical summary was updated. The overall initial PC assessment was adequate.

The initial psychiatry assessment was timely and provided in a confidential setting. The psychiatrist's description of the patient's presentation was consistent with the initial PC assessment and he continued to report poor sleep and depression but his anxiety had reduced and appetite improved. He was medication adherent and agreed to increase Remeron to help with depression and sleep. The initial psychiatry assessment was adequate.

Three RHU EOP IDTT meetings were held during the review period. The IDTT meetings were timely and attended by appropriate staff but the initial IDTT meeting had a covering PC and one IDTT meeting did not include a program supervisor. The patient attended his initial IDTT meeting, was at a medical appointment and missed the second, and he refused to attend the third. Overall treatment planning was inadequate and the treatment plan lacked substantive measurable goals and did not include specific interventions. Generic treatment goals and interventions were mentioned in the SRMP tab, but this information should have been in the treatment planning section. The initial IDTT meeting included the inadequate safety plan. Documentation from two of the IDTT meetings did not include discharge or level of care retention criteria and when criteria were included, they were generalized and inadequate. The clinical summary was carried forward unchanged despite significant events such as the patient's struggle with gender identity and engaging in self-injury. Further, the interventions and safety plan were not updated in light of the patient's self-injury on September 30, 2024. Overall treatment planning was inadequate because the treatment plan was very poorly organized and lacked key elements including specific treatment goals and interventions, specific discharge criteria, and an updated clinical summary. It also failed to review and update the patient's safety plan, which was clinically indicated given his history, on-going reports of suicidal ideation, and self-injurious behavior. There were no higher level of care criteria flagged during the review period despite the patient engaging in behavior that had precipitated his inpatient placement previously.

The patient received psychiatry contacts in a confidential setting approximately every two weeks. Documentation was somewhat updated at each contact yet failed to adequately incorporate

documentation from other clinicians including updated suicide risk assessments and changes in the patient's behavior. The psychiatrist and patient had good rapport and collaborated on the medication regimen. The patient remained medication adherent and it appeared appropriate changes were made to his medications. The patient reported suicidal ideation several times. The patient made a serious suicidal gesture by taking twenty 30mg Remeron tablets and twenty 100mg Vistaril tablets on September 30, 2024 and was sent to an outside hospital where he remained until October 3, 2024. While initially reporting the overdose was a suicide attempt, he reported he was not trying to kill himself upon return to RJD and was trying to get attention for another patient who needed their medication changed. The psychiatrist discontinued his medications when he returned. The patient soon asked to resume medication and Zyprexa was initially restarted, but the psychiatrist replaced Zyprexa with Lamictal after Zyprexa caused excessive sedation. The psychiatrist noted Lithium was not an option due to the patient's kidney disease. Overall psychiatric care was marginally adequate but could have improved with regard to continuity with other members of the IDTT.

The patient was offered routine individual PC contacts every seven to ten days while in RHU. The patient and his assigned PC had very good rapport yet a number of other PCs had contact with the patient during the review period. He was appropriately retained in the SRMP and he received daily cell front high-refuser contacts when he did not attend groups. The patient reported suicidal ideation several times and received timely urgent or emergent consults and follow-up as required. PC contacts evidenced the use of interventions to assist the patient in increasing his coping skills, yet documentation included copied text making it less than clear if these interventions were actually implemented during contacts, many of which were held at cell front due to patient refusal.

A SRE was administered on August 24, 2024 in response to the patient's report of suicidal ideation and indicated moderate chronic and low acute risk which appeared to be an underestimate given the patient's history and recent behavior. The evaluation included inaccuracies, such as noting that the patient was not housed in RHU. The patient frequently used suicidal ideation to express frustration or attempt to get attention to his needs, but he quickly recanted when assessed and he consistently reported he did not want to kill himself. This was the case following the patient's serious overdose on September 30, 2024. A SRASHE was completed with the patient upon his return from the hospital on October 4, 2024. The patient refused to engage in the assessment, so was placed on 1:1 observation and referred to the MHCB level of care. Two hours later, another PC assessed the patient and rescinded the referral, based almost entirely on the patient's self-report that the behavior was impulsive and not a suicide attempt. The PC did not evidence consideration of the premeditation and planning necessary to hoard medications. Another SRASHE was conducted and most previously identified risk factors were no longer endorsed, including his recent self-harm. A safety plan was documented but not individualized for the patient.

The patient was offered clinical and recreational therapy groups during the review period. The groups were facilitated by pre-doctoral psychology interns, LCSWs, clinical psychologists, and recreational therapists. Group topics were appropriate and included symptom management, stress management, recreation therapy, and social skills/communication. The patient's attendance was inconsistent and he was often placed on the high-refuser list, however, review of group progress notes indicated he occasionally attended stress management and symptom management groups.

**Findings**

The treatment provided to this patient was inadequate.

Treatment planning was inadequate and disjointed. Safety planning was inconsistent and there was no evidence that the plan was updated or implemented. A number of significant events including the patient's struggle with gender identity, medication overdose, a hunger strike, and receipt of RVRs were not addressed in treatment planning nor sufficiently in clinical contacts. The patient was offered timely IDTTs and routine clinical contacts including groups. He had good rapport with his providers and clinical contacts were well documented yet the PC notes often contained text copied from session to session and psychiatric documentation did not appear to adequately reflect current record review.

**Patient NN**

This 29-year-old male EOP patient's healthcare record was reviewed to assess the quality of mental health care in the RHU at RJD. He was provided diagnoses of major depressive disorder with psychotic features, opioid use disorder, and uncomplicated bereavement. He previously reported auditory hallucinations, depression, and suicidal thoughts. He was prescribed Abilify, Lexapro, clonidine, melatonin, and Cogentin. Level of care history included 3CMS, EOP and one MHCB admission. The patient's chronic risk of self-harm was moderate and acute risk was low.

He was placed in RJD RHU on September 26, 2024 pending a court hearing and had an EPRD of June 22, 2025. The patient received a timely and well documented initial psychiatry assessment. The psychiatrist noted the patient reported auditory hallucinations one to two times per day, nightmares, high anxiety, and moderate depression. He did not want to take Zyprexa due to gynecomastia risk and was instead prescribed Abilify in addition to clonidine for nightmares, Lexapro for depression, Cogentin and melatonin. The patient refused to participate in the initial PC assessment. The PC indicated that in the record the patient reported he sought treatment for auditory hallucinations, depression, and suicidal thoughts. He endorsed two previous suicide attempts by hanging (2023) and by overdose (2024), but the PC noted several inconsistencies in the record and that the patient was a poor historian. The initial PC and psychiatry assessments were adequate and informed the initial IDTT meeting and treatment planning.

Two IDTT meetings were held for the patient during the review period. Both IDTT meetings were attended by the patient's assigned PC, assigned psychiatrist, the program supervisor, CC I, and a psych tech. The patient attended his initial IDTT meeting but refused his routine IDTT meeting. The initial treatment plan section was blank, lacking any specified goals or interventions. The patient was flagged as a treatment high refuser but the PC noted the patient had moved between several facilities since his last IDTT meeting on July 3, 2024 and prior to then he was programming regularly. To address low treatment adherence, the PC was to meet with the patient weekly, use motivational interviewing, and help the patient develop effective coping skills. This information should have been included in the treatment plan section of the documentation. His judgment and insight were noted as fair and his thought process was logical, coherent, and goal directed. At his second IDTT meeting, the patient was still on the high refuser list and the PC noted his refusals were volitional and not rooted in mental illness. His mental status remained clear and the patient reported he preferred to stay in his cell. Treatment goals at this IDTT meeting were measurable

and appropriate, but there were no planned interventions documented. Discharge and level of care retention criteria were brief and generic. Overall treatment planning was inadequate due to lack of specific goals and interventions, lack of discharge criteria, and poor organization.

The patient was offered psychiatry contacts in a confidential setting approximately every two weeks during the review period although he often refused and was seen cell front. The contacts were well documented and the patient's presentation was updated appropriately on each occasion. The patient consistently reported significantly depressed mood, nightmares, and poor sleep but denied suicidal ideation. In early October 2024, the patient learned that four years could be added to his sentence as part of a plea agreement. The psychiatrist made several medication changes to address the patient's increased symptoms but his depression and sleep disturbances persisted in response to the court stressors. The psychiatrist noted the patient refused to take Abilify as scheduled and it was changed to PRN. Clonidine was discontinued on November 11, 2024 due to the patient's opioid use history. He was adherent to his remaining medications. Overall psychiatry care was adequate and the psychiatrist made appropriate efforts to encourage full medication adherence.

The patient was offered frequent PC contacts in a confidential setting, but he always refused and was seen cell front. He received daily cell front contacts beginning October 21, 2024 through the end of the review period. Although he consistently reported significant depression, he denied suicidal ideation and was willing to engage cell front with his PCs. The contacts were well documented and included updates to the patient's presentation, mental status, and response to interventions. The PC noted good rapport and the patient's willingness to engage cell front but the patient was reluctant to leave his cell for individual sessions, groups, or yard time. Despite his depression, the patient did not demonstrate any decline in functioning or increased safety risk. Overall PC care was adequate as contacts were timely and reflected appropriate interventions and support to address the patient's clinical needs despite his refusals to leave his cell.

The patient was offered clinical and recreational therapy groups while in RHU. Group topics included CBT, symptom management, stress management, social skills/communication, and recreation therapy. Recreational therapists, clinical psychologists, predoctoral psychology interns, and LCSWs facilitated the groups. Group topics were appropriate. The patient did not attend any groups after his court date in early October 2024. He was appropriately placed on the high refuser list and received daily cell front contacts.

**Findings**

The overall treatment provided to this patient was adequate despite the poorly organized IDTT documentation and treatment plan.

The patient received timely and frequent contacts from his PC and psychiatrist that were thoroughly documented and referenced clinically appropriate interventions. Psychiatry contacts noted collaboration between the psychiatrist and patient and the psychiatrist provided appropriate psychoeducation about the patient's medication options. PC contacts also reflected good rapport despite the patient's refusals for confidential contacts. He remained generally stable throughout the review period and contact frequency increased after he received bad news in court.

**APPENDIX B-24**
**Salinas Valley State Prison (SVSP)**
**Reporting Period: June 1, 2024 to November 30, 2024**

**Patient A**

This 51-year-old male patient's health record was randomly selected for review of services provided to patients at the EOP level of care at SVSP. This patient was provided with a diagnosis of bipolar II disorder yet psychiatric progress notes indicated diagnoses of unspecified anxiety disorder and unspecified depressive disorder with no evidence of discussion to reconcile these discrepancies in the record. He was prescribed aripiprazole and sertraline and was fully adherent. He was also prescribed hydroxyzine as needed. This patient was incarcerated within CDCR on 17 prior occasions, beginning in 1994. The patient was not enrolled in the MHSDS during previous periods of incarceration. His current incarceration began on March 10, 2023 and he was placed at the 3CMS level of care on the day of his arrival at the reception center. In May 2023, two weeks after being placed in restricted housing, the patient's level of care was elevated to EOP, designated as modified EOP status (EOPMod). The patient was elevated to the MHCB level of care on October 12, 2023 then transferred to the inpatient setting, at the ICF level of care, on November 16, 2023. He was elevated to the Acute level of care on November 30, 2023 and remained there until being discharged to the EOP level of care at SVSP on March 22, 2024. Upon arrival at SVSP, he was referred to the MHCB level of care on three consecutive days (March 22, 23, and 24, 2024) but had those referrals rescinded within hours. He was ultimately placed at the EOPMod level of care where he remained for the during of the reporting period.

There was no treatment plan located in the patient's record and no indication of any IDTT meeting being held since the patient's arrival at SVSP in March 2024. Even when the search was expanded to the date of this review, January 6, 2025, no IDTT documentation or treatment plan was located in the record. The patient was not seen by a MHPC as required but instead was seen on five occasions for individual sessions during the six-month reporting period. No caseload groups were offered to the patient. Documentation by the MHPC indicated that interventions were provided, but given the lack of a treatment plan, it could not be determined if the interventions were in keeping with treatment goals. There were inconsistencies documented in MHPC notes, specifically, a note indicated the patient had a history of two suicide attempts and later in the same note, reported no history of suicide attempts. Psychiatric contacts were offered monthly as required; however, contacts were changed from an on-site provider to a telepsychiatric provider in November 2024. Of note, one psychiatric contact was noted to be held at cell front secondary to a lockdown.

A 90-day follow-up SRE was completed with the patient on June 24, 2024. It was adequate and provided clear justification for low chronic and acute ratings of suicide risk. Another SRE was initiated but not completed on November 4, 2024. There was no justification documented for risk ratings.

The patient was offered three to four hours of groups each week, facilitated by recreational and rehabilitation therapists and he refused a few groups each week. He was also enrolled in work and education. While it was noted that the patient was in modified EOP programming, the lack of a

treatment plan made it impossible to determine how many hours of treatment the patient was to be provided weekly.

An RVR mental health assessment completed on October 4, 2024 related to a fighting incident. It was determined that mental health symptoms were not a contributing factor in the rule violation. Another RVR mental health assessment completed on October 22, 2024 for possession of contraband concluded no connection between the patient's mental health condition and the rule violation.

**Findings**

Overall, treatment of this patient was inadequate. There was no treatment plan and no evidence that the patient had been seen by the IDTT since his arrival at SVSP's EOP program eight months prior. MHPC contacts and structured therapeutic activities were not in keeping with requirements. There were inconsistencies found in MHPC documentation and an incomplete SRE was located in the record. Psychiatric contacts appeared adequate and occurred as required.

**Patient B**

This 55-year-old male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with diagnoses of antisocial personality disorder, PTSD, and major depressive disorder, recurrent and severe in the record. The psychiatrist documented additional diagnoses of schizophrenia and ADHD yet these were not integrated into the patient's diagnoses on record. He was fully adherent to his medication regimen which included fluoxetine, mirtazapine, and oxcarbazepine. He was also prescribed hydroxyzine as needed. This patient was incarcerated within CDCR for the 10th time on October 31, 2017. Other than brief placements at the 3CMS level of care in 2002 and 2003, the patient did not receive services within the MHSDS during previous periods of incarceration. Most recently, the patient was placed at the 3CMS level of care on November 20, 2017 while still at the reception center. He was elevated to the EOP level of care on July 27, 2021 and transferred to SVSP on March 5, 2024.

An IDTT meeting was held on June 20, 2024 with the patient, the assigned MHPC and assigned telepsychiatrist present at the meeting. There was no correctional counselor present and this was significant as the patient mentioned wanting to discuss issue with the counselor during his most recent MHPC session. Patient's strengths and the patient's verbalized goals were not documented. The patient's diagnoses were listed as antisocial personality disorder and major depressive disorder with no mention of the PTSD diagnosis in the record nor of the diagnoses provided by the psychiatrist. The treatment plan included a single goal to address the patient's depression, which manifests as anger, through the use of homework and MHPC contacts, although no evidence-based interventions were listed and there was no mention of groups or psychiatric interventions. There was no discharge plan or rationale for the patient's level of care. Associated documentation provided by the psychiatrist noted that the patient wanted more "classes" and was medication adherent. The IDTT documentation made no mention of the symptoms targeted by the psychiatrist which included auditory hallucinations and paranoia in addition to low mood. There was no other

IDTT meeting documented in the record through January 2025, despite a requirement for IDTT meetings to be held every 90 days for EOP patients.

The patient was seen only three times by his MHPC during the six-month reporting period. Two of the contacts were held in confidential settings with minimal evidence of interventions being provided. The third contact, held on November 21, 2024 noted that the patient was seen a cell front secondary to refusal but the patient reported he had not refused and wanted to be seen. He was not seen, but instead the MHPC noted he would be seen the following week. The patient was not seen again by an MHPC as of this review on January 6, 2025. There was no evidence that caseload groups were offered to the patient.

The patient's assigned telepsychiatrist saw him monthly with clear documentation that a telepresenter was present. Psychiatric documentation, while adequate, included a number of canned statements that appeared to be copied from session to session, leading to an assumption that topics such as suicidal attempts and drug use were discussed during each session, when other indications within the notes (e.g., that patient refused to engage and left soon after sitting down) indicated that these topics were not discussed.

An RVR mental health assessment was completed on July 31, 2024 for a refusal to accept housing and no mental health nexus was noted. The assessment appeared adequate. An Institutional Classification Committee (ICC) review was held with the patient present on November 12, 2024; however, a supervising social worker, rather than the patient's assigned MHPC was present for the meeting.

The patient was offered approximately six hours of recreational therapy groups weekly, with evidence that clinically relevant groups (e.g., nonviolent communication, substance use, anger management, social skills) facilitated by psychologists were offered on occasion, but the patient rarely attended these groups. Of note, the patient frequently requested to be offered more groups.

**Findings**

The treatment provided to this patient was inadequate.

There was evidence of a single IDTT meeting during the review period which did not include the required participants and failed to evidence multidisciplinary input. The MHPC did not see the patient as required and the patient was not offered structured therapeutic activities in keeping with requirements. Psychiatric contacts were held monthly, but documentation evidenced copied content from month to month making its accuracy questionable. There were discrepancies regarding the patient's diagnoses and targets for treatment which were not addressed.

**Patient C**

This 23-year-old male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with a diagnosis of schizoaffective disorder, bipolar type. He was initially prescribed haloperidol and oxcarbazepine, yet both were discontinued secondary to nonadherence. The patient was not

prescribed any psychotropic medications since November 12, 2024. This patient was received within CDCR for his current period of incarceration on September 28, 2023 for the second time. He his previous period of incarceration, from June 28, 2022 through December 2, 2022 at the ICF level of care at SVSP at which point he was released from custody. Upon return to custody, he was placed immediately at the EOP level of care and transferred to SVSP on August 20, 2024.

Upon arrival at SVSP, the patient was screened by nursing staff and referred routinely to mental health. He was seen by the CIT on August 25, 2024 and an SRE was completed as the patient verbalized suicidal ideation to custody staff. Upon assessment, the patient denied suicidal ideation and reported that he falsely verbalized thought of suicide to address housing problems. The patient again expressed suicidal ideation to staff on August 27, 2024 and was seen by the CIT. The patient recanted his suicidal statements and stated that he was looking to address housing concerns. The psychologist informed the patient that continued false claims of suicidal ideation would result in a write-up for "staff manipulation." During both contacts, nursing staff documented that the patient was nonadherent to his prescribed medications yet the SREs noted medication adherence. Similarly, SREs noted that the patient was compliant with his treatment, yet the record reflected that the patient had refused all offered groups.

On September 12, 2024, the patient was engaged in an altercation with a forehead laceration and nasal bone fracture. He was seen by nursing staff.

The patient was seen for an initial MHPC assessment on September 26, 2024, nearly six weeks after his arrival at SVSP. The patient refused a confidential contact, so was seen at cell front. The assessment was marginally adequate and included a list of diagnoses under consideration, with no rationale or support for any clear diagnostic picture. The MHPC acknowledged the patient's previous inpatient placement, but there was no evidence that records were reviewed. There was also no mention of the CIT activations or altercation that occurred since the patient's arrival at SVSP.

The patient reported suicidal ideation during the evening of October 1, 2024 and was placed in alternative housing. The following day, a SRE was completed and the patient was determined to be at low risk for suicide, having reported no intent, only a desire to be under observation the night prior. He was returned to his cell and placed on five-day follow-ups. A safety plan was completed despite the patient's refusal to engage in the process. The plan was superficial and did not consider the need to address the use of crisis requests for reasons other than mental health needs but instead to affect external changes. Five-day follow-up contacts were completed for four of the next five days, there was no contact on the fourth day. The patient refused to be seen for all but the final day of his five-day follow-up contacts. The safety plan was not reviewed with the patient, even when he was seen in a confidential setting. The patient was not seen again until a CIT contact on October 19, 2024 which inaccurately noted that the patient was adherent to his medications. The patient again reported that he was not suicidal but wanted a change in housing.

The patient was seen for an initial psychiatric assessment on November 12, 2024 nearly three months after his arrival at SVSP. The patient had not been seen due to non-adherence prior to this contact. The psychiatrist documented diagnoses of substance use, substance-induced psychotic disorder, and unspecified depression. The psychiatrist appeared to rely solely on the patient's self-

report with regard to symptom history and concomitant drug use. There was no evidence that the patient's psychiatric history was reviewed or corroborated. The MHPC attempted to see the patient on November 14, 2024 but was not able to as there were "no staff on the unit." The following day, the MHPC saw the patient and noted that the patient was odd, laughing inappropriately, evidenced thought blocking, and appeared to be responding to internal stimuli. He was noted to have poor hygiene.

There was no IDTT held for this patient during the reporting period despite having arrived at SVSP in August 2024. There was an IDTT held on December 19, 2024, which was reviewed, despite being outside of the reporting period. Required staff and the patient were present. IDTT documentation acknowledged that the patient had not participated in any offered group treatment and was decompensating. The team decided to restart the patient's medications prior to referring him to a higher level of care. The clinical summary was not updated despite significant changes to the patient's presentation since the initial MHPC assessment in September 2024. A treatment plan was created for the patient to address his paranoia and decreased functioning. The goals were measurable and reasonable and the interventions were appropriate. Of note, the patient refused his injectable haloperidol which was ordered following the IDTT meeting yet there were no contacts with his MHPC or his psychiatrist since his IDTT meeting (as of January 6, 2025).

**Findings**

The treatment of this patient was wholly inadequate.

He did not have timely assessments nor a timely IDTT meeting. There was no response to the patient's medication nonadherence and the patient was allowed to decompensate with no follow-up. His diagnostic picture was unclear and yet there was no effort to further clarify his presentation. The patient refused all groups and was not offered MHPC nor psychiatric contacts in keeping with expectations.

**Patient D**

This 43-year-old male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder; unspecified anxiety disorder; antisocial personality disorder; cannabis use disorder, severe; and alcohol use disorder, severe. He was prescribed aripiprazole and was moderately adherent. This patient was received by CDCR for his sixth period of incarceration on March 11, 2020. Prior to his current period of incarceration, he was treated at the 3CMS level of care from May 26, 2009 to June 11, 2009 and upon his return to custody on August 4, 2009 through September 28, 2009. The patient was not enrolled in the MHSDS during other periods of incarceration beginning in 2008 and continuing through May 2015. Most recently, the patient was placed at the 3CMS level of care on March 26, 2020 and elevated to the EOP level of care on March 24, 2021. He was placed at the MHCB level of care on November 30, 2023, went out to court on December 4, 2023 and returned to CDCR on March 13, 2024. He was placed at the EOP level of care upon his return and transferred to SVSP on April 5, 2024.

There was no IDTT held with the patient during the reporting period. An IDTT was held on May 30, 2024, just prior. The clinical summary noted that the patient experienced hallucinations, was tangential when speaking, had a number of RVRs for violence, and that his most recent MHCB admission was due to decompensation not self-harm; yet documentation noted that the patient's treatment would focus on substance use, self-harm, and dangerousness to others without any rationale. There were no patient strengths, no patient verbalized goals, and no treatment plan created for the patient. The next time the patient was seen for an IDTT meeting was on December 5, 2024, well outside required timeframes. The IDTT documentation incorrectly noted that the patient had not had more than three RVR mental health assessments in the previous three months. The patient had received at least five RVR mental health assessments since September 2024 and therefore should have been considered for a higher level of care. The clinical summary remained unchanged and included no updated information regarding the patient's functioning, treatment participation, or treatment progress. There was a single treatment goal to address hallucinations which was noted to have been initiated in March, while the patient was in the MHCB, with no baseline information and vague interventions.

During the reporting period, there was a single contact with the patient's MHPC which occurred on August 28, 2024. The content of the documentation contradicted itself in that it noted the patient reported occasional hallucinations and then later noted that the patient reported no hallucinations. There were no interventions documented and no plan for follow-up. No caseload groups were offered to the patient.

Psychiatric contacts were held routinely each month, yet overall, psychiatric documentation was difficult to follow as it contained information that remained unchanged from note to note interspersed with new documentation making it a challenge to understand the patient's presentation at any given time. The patient transferred from one yard to another on July 13, 2024 following a fight. He was seen for an initial psychiatric assessment on July 30, 2024. The content of the assessment was adequate although it relied most on patient self-report. The patient reported a number of symptoms including auditory and tactile hallucinations, anxiety, difficulty concentrating, poor insight, tension, and restlessness but denied desire for medications. The psychiatrist used the outdated multiaxial system for providing diagnoses. The patient submitted a request to see the psychiatrist to discuss medications on September 17, 2024 and was seen at cell front due to lock down on September 25, 2024. Psychiatric documentation made no mention of the healthcare request and indicated that the patient was not interested in medications using language unchanged from the previous progress note. The patient was seen on October 8, 2024 apparently in response to the healthcare request, but the patient reported wanting iron pills and not psychotropic medications. Again, much of the documentation was unchanged from previous notes and was difficult to follow. On October 28, 2024, the patient was seen by the psychiatrist and two progress notes were entered into the record by the psychiatrist which included contradictory information. The latter of the two notes indicated that the patient was prescribed aripiprazole to target psychosis. A follow-up appointment in November could not be completed due to lockdown.

An RVR mental health assessment was completed on June 26, 2024 related to an RVR from May 2023 for fighting. No connection to mental health symptoms was found with adequate rationale. On September 10, 2024 the patient was seen for an RVR mental health assessment related to four RVRs including battery on a prisoner from July 2, 2024, refusing housing on August 3, 2024, and

fighting on August 6 and September 8, 2024. Mental health was not considered to be a contributing factor to the rule infractions with adequate rationale. The patient was again seen for an RVR mental health assessment on October 18, 2024 for fighting with no mental health nexus found. The following day, the patient submitted a healthcare request asking for help filling out a form he did not understand. There was no evidence that the patient was seen in response to this request.

Other than social skills groups facilitated by a psychologist which were offered to the patient in June 2024, all groups offered to the patient during the reporting period were facilitated by recreational and rehabilitation therapist. He was not offered at least ten hours of group each week and did not routinely attend the groups that were offered.

**Findings**

The treatment of this patient was inadequate.

There was no IDTT meeting held during the reporting period despite the requirement for at least two to have been held. There was a single MHPC contact held with the patient over a six-month period, despite the requirement for weekly contacts. Psychiatric contacts were held as required, but documentation was challenging to understand and internally inconsistent. The patient was not seen timely in response to requests and was not offered structured treatment in keeping with requirements.

**Patient E**

This 62-year-old transgender female patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with diagnoses of bipolar I disorder, current or most recent episode depressed, with psychotic features; PTSD; borderline personality disorder; gender dysphoria; and opioid use disorder, severe. She was generally adherent to her prescribed buspirone, mirtazapine, and venlafaxine.

This patient was received within CDCR for her fourth period of incarceration in 1991. She first received services within the MHSDS at the 3CMS level of care for fewer than 90 days in 1996. She returned to the 3CMS level of care in June 1997. Since that time, she has been treated at the 3CMS, EOP, MHCB, ICF and Acute levels of care. Her most recent inpatient stay occurred from October 2022 through March 2023 at the Acute level of care. Since her discharge, she has been treated at the EOP level of care with three rescinded referrals to MHCB. She was transferred to SVSP on September 19, 2024 at the EOP level of care. Prior to the transfer, she was housed in the RHU and was being seen daily secondary to refusing programming.

The patient submitted a healthcare request on September 30, 2024 noting that she was experiencing mental stress. The patient was not seen in response to this request. Nursing staff documented that the patient had refused her prescribed mirtazapine. She was seen for a timely initial psychiatric assessment on October 3, 2024. Diagnoses were provided using the outdated multiaxial system. The content of the documentation was difficult to follow given the combination of old and new entries. Additionally, the psychiatrist included his own previous progress notes written in 2023,

rather than more recent notes written by other psychiatrists as reference obscuring the patient's recent functioning and psychiatric needs. The patient's mirtazapine was increased to address the patient's concerns with the medication being ineffective.

On October 16, 2024 a routine referral was submitted by a nurse as the patient reported that medical procedures which had been denied were affecting her mental health. The patient was not seen in response to this referral. The patient was placed in the RHU on October 29, 2024 and submitted a healthcare request on October 30, 2024 where she noted that she was "getting suicidal" secondary to not having her request for a medical procedure fulfilled. She was seen in response to an urgent referral to mental health later that day and the contact appeared to adequately address the patient's needs; however, the patient's mention of being suicidal was not addressed. Two routine referrals to mental health were submitted on October 31, 2024 by nursing staff secondary to the mental health impact of having medical procedures denied. The patient was not seen in response to these referrals.

Documentation indicated that the patient was seen in an ICC meeting on November 7, 2024 despite not having had any initial assessments or an initial IDTT conducted following her placement in RHU. On November 11, 2024 a SRE was completed cell front while the patient was housed in a "wet cell" and appeared to be in response to the referral from October 31, 2024 when the patient documented that she was suicidal. There was no rationale provided for why the patient was not seen in a confidential setting. The patient's suicide risk was determined to be low with adequate rationale.

An initial psychiatric assessment was completed later than required on November 15, 2024 and was minimally adequate, referring only to the patient's PTSD diagnosis and no other mental health conditions.

There was no initial MHPC assessment nor routine contacts documented in the record for this patient during the reporting period. An initial MHPC was finally completed on December 10, 2024, nearly three months after her arrival at the institution. The content was adequate. There was no IDTT completed with this patient since her arrival at SVSP, including through the date of this review, January 7, 2025.

The patient was not offered group treatment in keeping with requirements.

**Findings**

The treatment of this patient was inadequate. She was not seen for a timely initial MHPC assessment, had no routine MHPC contacts, had no initial IDTT, and was not offered group treatment in keeping with requirements. She was not seen in response to referrals or healthcare requests, and the only contact the patient had with an MHPC was at cell front for an SRE.

**Patient F**

This 65-year-old condemned male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was

provided with diagnoses of antisocial personality disorder, depressive disorder, stimulant abuse, PTSD, opioid use disorder, and panic disorder. He was fully adherent to his prescribed mirtazapine. This patient was incarcerated twice in the past, between May 1978 and June 1981 and again from June 1984 through June 1996 with no evidence that he was enrolled in MHSDS. His present period of incarceration began three days after his release in June 1996. He was first placed within the MHSDS at the MHCB level of care on June 3, 2016 for six days prior to being discharged from MHSDS services. He returned to the MHCB level of care in September 2019 and was discharged to the EOP level of care on October 15, 2019. The patient was admitted to the ICF level of care on November 1, 2019, discharged to the EOP level of care in January 2020 and briefly returned to the MHCB in January 2021 before being discharged to the EOP level of care on January 29, 2021. The patient transferred to SVSP at the EOPMod level of care on May 28, 2024.

The patient did not attend his initial psychiatric assessment scheduled on June 6, 2024 so was seen at cell front. The content was minimal given the nonconfidential nature of the contact; however, there was no evidence that a record review was completed. An initial MHPC assessment was completed later than required on June 17, 2024. The patient refused to attend the appointment so the assessment was completed through record review. The content was adequate given the limitations. An initial IDTT meeting was held later than required on August 15, 2024 with required staff and the patient present. The patient was noted as having attended less than 50 percent of offered treatment and the explanation and intended supports were adequate. The documentation indicated that the patient was refusing groups but attending individual sessions, which was inaccurate, as the patient was consistently refusing psychiatric contacts. There were no patient strengths or verbalized goals documented. There was a single treatment goal, to attend medical appointments, which was initiated in November 2023 and did not appear related to the patient's current needs. There was no discharge plan or rationale for retaining the patient at the EOP level of care.

On September 23, 2024, another initial MHPC assessment was completed with justification being that there were problems with the patient's level of care; however, the content remained largely unchanged. Similarly, another IDTT meeting was held on October 3, 2024 with little to no updated information other than documentation that the patient would be considered for 3CMS level of care at this next IDTT meeting.

The patient was not offered routine MHPC contacts as required and refused to attend the three sessions he was offered. There was no evidence of attempts to provide the interventions listed on the treatment plan to increase the patient's participation. He also refused monthly psychiatric contacts and documentation was adequate.

The patient occasionally attend the recreational groups offered to him, but he was not offered ten hours of weekly structured therapeutic activities.

**Findings**

Treatment was not adequate yet challenging, secondary to the patient refusing most clinical contacts and treatment offered. Improvements could have been made to IDTT documentation and offering a full ten hours of treatment weekly. The patient was not seen for routine MHPC contacts.

**Patient G**

This 62-year-old male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with a diagnosis of disorganized schizophrenia. He was fully adherent to his medication regimen which was prescribed under a PC 2602 order and included paliperidone and benztropine. He was assessed as DD1 status and the most recent assessment indicated the patient's adaptive support needs included offering assistance with reading and writing; using slow and simple language; prompting for cell cleaning, laundry, and wearing clean clothes; and assistance understanding rules and procedures.

This patient has been incarcerated within CDCR since May 1990. He was incarcerated previously from 1982 to 1990 and did not receive mental health services during that period. The patient was first enrolled in the MHSDS at the EOP level of care on December 1, 1997. He has primarily remained at the EOP level of care with placement at the inpatient level of care (i.e., MHCB, ICF) in 2003, 2006, 2007, 2010, 2012 and 2017. He was most recently placed at the ICF level of care from March 23, 2023 through April 10, 2023 and was discharged to the EOP level of care at SVSP on April 10, 2023.

There was no IDTT meeting held during the reporting period. Prior to the reporting period, his last IDTT meeting was held in March 2023 prior to his inpatient placement.

There were only two MHPC contacts held with the patient during the reporting period on August 1, 2024 and October 30, 2024. Both contacts reflected brief interactions and mental status checks. There was no evidence of interventions being provided or documentation of patient progress in treatment. Psychiatric contacts were provided by a telepsychiatrist monthly. Documentation was adequate and supported the need for ongoing involuntary medications. The patient was offered two to three hours of groups weekly and was also noted as having a job. The patient attended most recreational groups but did not attend clinical groups which were offered once per week.

There was an IDTT held on December 5, 2024 which was reviewed for content despite it falling outside the review period. Required staff and the patient were present. The clinical summary was not updated since March 2023 despite his inpatient placement since that time. There were no patient strengths listed nor the patient's verbalized goals. The treatment plan included two goals, one for medication compliance which was noted as having been met with the PC 2602 order and the other for disorganized behavior and poor ADLs which included vague objectives and the intervention of "med compliance." The goal was noted as having both been met and being ongoing.

**Findings**

Treatment of this patient was inadequate.

There was no IDTT held with the patient for nearly 20 months despite having been discharged from an inpatient setting. There was no routine review of his treatment progress or functioning as

he was only seen twice by an MHPC during the reporting period. He was seen by a telepsychiatrist for monthly contacts which were adequate.

**Patient H**

This 30-year-old male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with diagnoses of unspecified depressive disorder, substance-induced depressive disorder with mild use, and opioid use disorder. He was marginally adherent to his prescribed fluoxetine and risperidone. This patient was incarcerated within CDCR for the fourth time in May 2023. During previous periods of incarceration, he was treated at the 3CMS level of care or was not enrolled in the MHSDS. During the current period of incarceration, he was initially placed at the 3CMS level of care, was placed in MHCB in September 2023, discharged to the EOP level of care, returned to the 3CMS level of care in December 2023, was placed in the MHCB level of care in June 2024, and was discharged to the EOP level of care on July 5, 2024 where he has remained since that time. He was transferred to SVSP on September 24, 2024 after returning from court.

An initial psychiatric assessment was completed on October 1, 2024 with a telepsychiatrist. The documentation was adequate; however, diagnoses included unspecified mood disorder, cannabis use disorder, and amphetamine use disorder, not the diagnoses of record. The patient was seen cell front by an MHPC for a "24 hr threat assessment" on October 9, 2024 without further clarification. The patient requested a confidential contact but was unable to be seen due to modified program. Documentation reflected a wellness check. A clinical summary was documented on October 11, 2024 by an MHPC and included information that was inconsistent with other information in the record including an admission to MHCB on September 24, 2024 (which was the day of his arrival at SVSP) and diagnoses of opioid induced psychotic disorder, polysubstance dependence, and major depressive disorder. Another clinical summary was documented on October 16, 2024 with some information corrected but no updated information about the patient's current presentation of level of functioning. It did not appear that the patient was seen for this second assessment.

An initial IDTT was held on October 17, 2024, later than required, with required staff and the patient present. There was no updated information in the clinical summary and no evidence of input from the patient or members of the IDTT other than the MHPC. There were four treatment goals listed, all of which had been developed by other IDTTs at other times. The objectives did not include baseline measurements or were vague but the interventions were appropriate. In the progress section, goals were noted to be met or ongoing, with one goal noted as being met and ongoing. There was no rationale for the patient's EOP placement.

Urgent and emergent referrals were submitted to mental health on November 4th and 5th, respectively, related to the patient expressing depression and suicidal ideation related to RVRs. He was seen on November 5, 2024 and an SRE was completed. The patient was assessed to be ay low risk with adequate justification. He was also seen the following day via telemental health to address the referrals. An RVR mental health assessment adequately documented rationale for not finding that mental health symptoms contributed to the RVR.

The patient was offered one routine MHPC contact between September 24 and November 30, 2024. It was conducted by his assigned telesocial worker. The documentation did not refer to the patient's treatment plan or evidence of the use of any interventions. Psychiatric contacts were held monthly; however, in November, the psychiatrist increased the patient's medications despite ongoing nonadherence to that medication in the prior weeks. One psychiatric contact was held at cell front secondary to lockdown.

The patient was offered and attended one Introduction to EOP group but was offered any further orientation groups. Two to three hours of recreational therapy and clinical groups were offered weekly and the patient mostly attended.

**Findings**

Treatment of this patient was inadequate. Services were not provided in keeping with Program Guide requirements and there was no evidence that the patient received interventions documented in the treatment plan. Diagnostic clarification was needed. The patient's psychiatrist increased the patient's medication despite ongoing nonadherence with the same medication.

**Patient I**

This 51-year-old condemned male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with diagnoses of antisocial personality disorder and borderline personality disorder. He was fully adherent to his prescribed bupropion, topiramate, and paliperidone and moderately adherent to his presented aripiprazole.

This patient was incarcerated on April 12, 1996. He has primarily been treated at the EOP level of care, with brief periods of treatment at the 3CMS level of care. The patient was placed at the MHCB level of care a number of times between 2009 and 2013 and was eventually admitted to the Acute level of care in June 2013. Since then, he has had numerous MHCB, ICF and Acute level of care placements. He was most recently discharged from ICF in December 2022 and had an MHCB stay beginning on August 20, 2023. He was discharged to the EOP level of care on September 1, 2023, and transferred to SVSP on September 3, 2023.

Monthly psychiatric sessions were provided by a telepsychiatrist and were adequate. On two occasions, the patient had to be seen at cell front secondary to lockdown. The patient was seen for two routine MHPC sessions and three other times in response to referrals or patient requests during the reporting period. None of the referral responses were timely. Most MHPC contacts reflected status updates without evidence of interventions being provided. One MHPC note mentioned that the patient was enrolled in the Suicide Risk Management Program (SRMP) yet there was no evidence of the enhanced services that the program was intended to offer. On one occasion, the patient's treatment goals were discussed. He was offered two to three groups weekly, both recreational and core groups.

One routine IDTT was held on November 7, 2024. It was the only IDTT held with the patient in the previous 11 months. Required staff and the patient were present. IDTT documentation

confirmed the patent's enrollment in the SRMP with a number of interventions indicated to address his suicide risk. None of these were evidenced as being implemented during clinical contacts. Documentation included evidence of multidisciplinary input and a review of patient progress. The patient's treatment goal was updated and included adequate interventions.

**Findings**

Treatment of this patient was not adequate. He appeared to be receiving treatment to target his symptoms; however, the frequency was not in keeping with expectations and the documentation could have been more explicit. He was not receiving the treatment outlined in his SRMP which was concerning, as the program was designed to enhance treatment to reduce suicidality with patients at higher chronic risk for suicide. The patient was maintaining stability despite this fact. Additionally, there was an adequate treatment plan and documentation of collaboration in treatment planning.

**Patient J**

This 58-year-old male patient's record was randomly selected for review of the adequacy of treatment provided to patients at the EOP level of care at SVSP. The patient was provided with diagnoses of unspecified depressive disorder, PTSD, and ADHD, combined presentation. He was not consistently adherent to his medication regimen which included atomoxetine, melatonin, prazosin, topiramate, and venlafaxine. This patient was incarcerated eight times since 1993. He was first placed within the MHSDS during a previous period of incarceration in June 2003 at the 3CMS level of care. He received services at the 3CMS, EOP, and MHCB levels of care until his parole in March 2004. Upon his return to CDCR in May 2005, he was placed at the EOP level of care. He has primarily remained at the EOP level of care with brief placements at the 3CMS level of care and removal from MHSDS in 2021 for not quite four months. He has had a number of placements at the MHCB level of care and inpatient stays at both the Acute and ICF levels of care. Most recently, he was discharged from the Acute level of care on September 17, 2024 to the EOP level of care. He was transferred to SVSP on September 23, 2024.

Upon arrival, the patient was seen for the first four days of the required five-day follow-up contacts. No contact was completed on the final day without explanation. The patient was seen at cell front two of the days, once due to security issues and once for an unknown reason. Documentation of contacts was adequate and noted that the patient's safety plan was reviewed daily; however, there was no safety plan documented after the first day. On September 24, 2024, an SRE was completed at cell front without rationale for the nonconfidential nature of the contact. The assessment was marginally adequate and appeared to be overly reliant on the patient's self-report. Despite a good quality safety plan having been developed with the patient prior to his discharge from the inpatient setting, the MHPC indicated that no safety plan was clinically indicated and thus the form was blank and remained so for subsequent contacts with the patient. A clinician-to-clinician contact was documented the following day via email and noted that the sending clinician had nothing to add beyond what was already in the record.

The patient was not seen for individual contacts, initial assessments, or an IDTT meeting in the month of October. During October, he was offered eight recreational therapy groups and attended five of them; averaging less than two hours offered each week.

Nursing sent multiple notifications of medication noncompliance on October 28 and 29, 2024. The patient was seen for an initial psychiatric assessment later than required on November 4, 2024. There was contradictory information within the note about whether the session was confidential or held a cell front secondary to refusal. The psychiatric used the outdated multiaxial system to provide diagnoses which included unspecified schizophrenia spectrum and other psychotic disorder, PTSD, ADHD, bulimia, opioid use disorder, and antisocial personality disorder with little rationale to justify the diagnosis of schizophrenia. The psychiatrist noted that medications would be continued despite the non-adherence "due to extenuating circumstances" which were not explained. Old and new documentation appeared interspersed throughout the note, making it difficult to discern current from past documentation.

An initial MHPC assessment was completed later than required on November 15, 2024. The patient described a number of symptoms that were bizarre and not mentioned to the psychiatrist. The MHPC noted that the patient would be referred back to the psychiatrist for a medication review. Of note, the patient described an intense level of paranoia which the MHPC noted as credible yet was contradicted by the fact that the patient was attending recreational therapy groups during which he was noted to be socializing. Otherwise, the assessment was adequate.

An initial IDTT was held on November 21, 2024, nearly two months after his arrival after being discharged from an inpatient setting. Required staff and the patient were present. IDTT documentation noted that the patient refused more than 50 percent of groups during three out of the previous six weeks. There were a number of planned interventions listed to support increase group participation in lieu of referral to a higher level of care; however, these were not transferred to the patient's treatment plan. There was evidence of multidisciplinary discussion and concurrence as to the patient's diagnoses which included unspecified schizophrenia spectrum and other psychotic disorder, post-traumatic seizures, ADHD, bulimia, opioid use disorder and antisocial personality disorder. It was not clear why these diagnoses were not updated to the patient's record. IDTT documentation noted that the psychiatrist would see the patient to discuss antipsychotic medications. As of this review (January 9, 2025), the patient had not been seen by a psychiatrist to address this issue.

Additionally, the patient was placed in the RHU on November 29, 2024 and had not had any mental health contacts other than daily rounding by psychiatric technicians as of the date of this review.

**Findings**

Treatment of this patient was inadequate.

This patient was not seen as required for the five days following discharge from an inpatient setting and he did not have timely initial assessments or an initial IDTT. There was a single psychiatrist contact on November 4, 2024, but none prior to or after this date. There were no routine MHPC contacts in the record for the entire reporting period and beyond, up to the current date. Referrals

for follow-up were not completed as indicated and there were no contacts with the patient by an MHPC or psychiatrist following placement in the RHU.

**Patient K**

This 36-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with adjustment disorder with depressed mood, amphetamine-type substance use disorder, severe, and antisocial personality disorder, although no diagnoses were listed under the mental health problems section of the EHRS. He was not prescribed any psychotropic medication during the review period. Medical conditions included a history of anemia and recent right shoulder pain.

The patient was serving a life sentence and had a history of anxiety, insomnia, substance use, and gang affiliation. No history of suicide attempts or self-injurious behavior was recorded in his health record. Within the CDCR, the patient had received 3CMS level of care since 2010, with no higher levels of care.

The patient was placed in mainline 3CMS care at SVSP on May 13, 2021. As of January 10, 2025, the most recent IDTT meeting occurred in June 2021. He was last seen by psychiatry in November 2023 during a brief encounter that took place at the cell front. During that encounter, the patient indicated that he was not interested in mental health evaluations or psychotropic medication. He was last prescribed any type of psychotropic medication in 2022 and very early 2023, when hydroxyzine was ordered PRN for insomnia; he last used this medication in November 2022, and the order was discontinued in January 2023. The patient was last seen by a primary clinician in July 2022 at the cell front after refusing a confidential setting. During this encounter, he was assessed as stable and without mental health issues. No mental health groups were documented for the last several years.

**Findings**

The care provided to this 3CMS patient was inadequate.

No mental health interventions of any kind had been provided after November 2023, and no treatment plan had been formulated since June 2021. A diagnosis of adjustment disorder was carried forward as if it was a chronic condition. The patient's treatment needs and rationale for retention at the 3CMS level of care were not documented.

**Patient L**

This 51-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with unspecified depressive disorder, a history of adjustment disorder, and active (daily) opioid use disorder. He was not prescribed any psychotropic medications during the review period. Medical conditions included diabetes, hyperlipidemia, hypertension, obesity, obstructive sleep apnea, prostrate pain, and overactive bladder.

The patient had a history of anxiety, substance use, and sexual abuse. He had a history of childhood mental health care when his parents separated but no history of suicide attempts or self-injurious behavior. Within the CDCR, the patient had received 3CMS care between 2008 and 2013 and continuously since May 2022, with no higher levels of care.

The patient was transferred from CSP/Corcoran to mainline 3CMS care at SVSP on October 22, 2022. As of January 10, 2025, no IDTT meeting documentation and no treatment plan were present in the health record following the patient's transfer to SVSP. He was last seen by a psychiatrist in December 2023, when he was found to be stable, free from psychiatric symptoms, reporting daily use of opioids, and not in need of psychotropic medications. A plan for a 90-day psychiatric follow-up was documented, but no further psychiatric appointments were documented. He was last seen by a primary clinician in April 2023 for a RVR mental health assessment, when the patient received a RVR for possession of a controlled substance. The patient's most recent mental health group occurred in October 2022.

**Findings**

The care provided to this 3CMS patient was inadequate.

No mental health interventions were provided after December 2023, and no IDTT meeting or treatment plan had been documented at SVSP. The patient's unspecified depressive disorder diagnosis was not resolved. The patient's report of current daily opioid use, documented by the psychiatrist in December 2023, was either in error or not subsequently addressed. Treatment needs and rationale for retention at the 3CMS level of care were not documented.

**Patient M**

This 27-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with unspecified depressive disorder and alcohol use disorder, mild. He was prescribed nortriptyline by the primary care physician and was non-adherent with this medication over half the time. Rationale for the antidepressant could not be identified in the health record. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Other medical conditions included a history of right eye trauma with retinal scarring, glaucoma, and right wrist pain.

The patient had a history of substance use, head traumas with and without loss of consciousness, loss of both his mother and brother, and mental health treatment in juvenile detention and county jails. He had no history of suicide attempts or self-injurious behavior. Previous psychotropic medications included fluoxetine, mirtazapine, and trazadone. Within the CDCR had received only 3CMS level of care, and in 2023 was treated with mirtazapine for anxiety and insomnia.

The patient was transferred to SVSP on November 22, 2022 and placed in mainline 3CMS care at SVSP on July 8, 2023. As of January 10, 2025, the most recent IDTT meeting occurred on July 19, 2023 and identified reduction of depression as the primary treatment focus. The most recent psychiatric appointment occurred in January 2024, when the patient declined to attend. The psychiatrist noted that the patient was not prescribed psychotropic medication, presumably

referring exclusively to psychotropic medication ordered by psychiatry. The most recent primary clinician encounter occurred in July 2023, in the context of an institutional classification committee meeting. No mental health groups were documented at any time during his SVSP 3CMS care.

**Findings**

The care provided to this 3CMS patient was inadequate.

No mental health interventions were provided after January 2024, and no IDTT meeting or treatment plan had been documented after July 2023. The patient's unspecified depressive disorder diagnosis was not specified or resolved. Coordination between the medical and psychiatric providers regarding the patient's treatment with nortriptyline was absent. Treatment needs and rationale for retention at the 3CMS level of care were not documented.

**Patient N**

This 44-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with adjustment disorder with depressed mood and antisocial personality disorder, although no diagnoses were listed under the mental health problems section of the EHRS. He was briefly prescribed sertraline for symptoms of anxiety and depression, but was non-adherent with this medication, and it was discontinued in November 2024. Hydroxyzine was prescribed on an as-needed basis for anxiety, and he made frequent use of this medication during the review period. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Toxicology screens were positive for amphetamine and methamphetamine on two occasions in 2024, but also demonstrated adherence with buprenorphine-naloxone. Medical conditions included lower back pain, hip pain and, in June 2024, laceration of the nose with fractured nasal bones. He was diagnosed with cannabis, cocaine, hallucinogen, opioid, and amphetamine-type use disorders, all of them rated as moderate or severe.

The patient had a history of early-onset substance use disorders, gang affiliation, and active use of methamphetamine while at SVSP, as well as an overdose in 2019 that was not considered suicidal in nature. Within the CDCR, he received both 3CMS and EOP levels of care, but since 2017 he had received only 3CMS care. Prior psychotropic medications included buspirone, escitalopram, mirtazapine, and olanzapine; the patient was not adherent with these medications.

The patient was placed in mainline 3CMS care at SVSP on March 4, 2021. As of January 10, 2025, the most recent IDTT meeting occurred on April 8, 2021, 45 months ago, when substance use, depression, and anger were identified as the primary treatment targets. He was followed by his assigned psychiatrist throughout 2024, although the patient failed to attend two of these appointments and was therefore not seen between January 10, 2024 and June 26, 2024. Psychiatric documentation appeared minimally adequate but consistently included boilerplate language that was identical across progress notes. As documented in the assessment section of these progress notes, the patient's diagnosis changed from adjustment disorder with stable mood in June 2024 to antisocial personality disorder in October 2024, without explanation. The reasons for the patient's medication nonadherence were not documented.

Psychiatric progress notes consistently indicated a plan for the patient to continue regular follow-up with the MHPC, but the patient was seen on only two occasions by a primary clinician, in both instances in response to mental health referrals. The first consultation took place in a confidential setting in September 2024 and was triggered by the patient reporting depression after being discontinued from work when he was found with extra cleaner. Documentation was adequate and the patient was referred by the primary clinician to the psychiatrist, who saw the patient promptly. The second consultation was extremely brief because the patient angrily dismissed the primary clinician and refused to be seen; this encounter took place at the cell front. No mental health groups were documented at any time during his SVSP 3CMS care. The patient submitted a health care services request on December 11, 2024, complaining that he was unable to focus in college classes and was experiencing anxiety. As of January 10, 2025, no response to this request was documented in the health record.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient's treatment plan had not been reviewed and updated, and the IDTT had not met, since April 2021. Current treatment needs, treatment goals, and treatment interventions were not documented. The patient's positive urine toxicology results, dismissal from work, medication nonadherence, and complaints of anxiety and being unable to focus in college classes were not adequately explored and addressed. The rationale for changes in psychiatric diagnoses was not documented.

**Patient O**

This 29-year-old SNY 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood, and unspecified depressive disorder. He was prescribed clonidine and hydroxyzine on a PRN basis and made use of the latter on an intermittent basis during the review period; clonidine was discontinued in February 2024 due to lack of use. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He tested positive for cannabis on October 31, 2024, but toxicology screens indicated adherence with buprenorphine-naloxone. Medical conditions included hepatitis C, for which he began receiving active treatment at the end of calendar 2024. He had a history of abnormal weight loss and was diagnosed with opioid and alcohol use disorders.

The patient had a history of juvenile detention and gang affiliation since age 9. He lost his father to gang violence when the patient was four years old. One suicide attempt was listed in his health record, occurring in April 2023 by overdose on fentanyl. He was revived by multiple administrations of Narcan and subsequently reported that he swallowed the fentanyl both to avoid detection by peace officers and because he did not care if he died, as his wife had just told him she was thinking of leaving him. Within the CDCR, the patient had received 3CMS care since November 2023, with two MHCB stays, most recently in April 2023 following his suicide attempt. He was previously treated with mirtazapine but was not adherent with it.

The patient was placed in mainline 3CMS care at SVSP on June 30, 2023. The patient's first IDTT meeting and initial treatment plan at SVSP occurred nearly 15 months later, on September 25, 2024. The meeting was held about a month after the patient was moved to D yard at SVSP. Required staff were in attendance, but the patient declined to attend, and the telehealth clinician who attended and who was assigned to the patient had not yet met the patient. Patient strengths and verbalized treatment goals were not completed, and no treatment plan were developed.

During calendar 2024, the patient was provided appointments by psychiatry on three occasions. The first two of these appointments were completed through telepsychiatry. On December 26, 2024, the patient refused to attend the third telepsychiatry appointment, and as a result a brief cell-front wellness check was completed via telepsychiatry. No psychiatric encounters occurred between May 24, 2024 and December 26, 2024 despite the plan on May 24, 2024 for the patient to return to clinic in 90 days or sooner if needed. During this time the patient continued to be prescribed hydroxyzine on a PRN basis for anxiety. The patient was seen by a primary clinician a total of five times during calendar 2024. Each of these encounters was a brief wellness check at the cell front. In June 2024, the wellness check occurred because the patient had just returned from court, where he learned he could be facing four additional years of incarceration. The patient refused to engage with the telemental health clinician on the last occasion, in October 2024. The most recent mental health group occurred in February 2024.

**Findings**

The care provided to this 3CMS patient was inadequate.

The annual IDTT meeting occurred late, without the patient, and did not result in the formulation of a treatment plan or identification of treatment goals and interventions. There was no documented framework to guide the patient's treatment. Routine follow-up was inadequate. There was a seven-month gap between psychiatric appointments, and no confidential encounters with a primary clinician occurred during calendar 2024. A diagnosis of adjustment disorder was carried forward as if it was a chronic condition. In the context of a nearly fatal fentanyl overdose in 2023, a positive urine toxicology screen, ongoing intermittent use of hydroxyzine for anxiety, and the potential for a longer prison sentence, the patient may have been at increased risk during the review period. Additional mental health monitoring and an updated suicide risk assessment were clinically indicated but not provided.

**Patient P**

This 50-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with adjustment disorder with anxiety and opioid use disorder, although these diagnoses were not listed in the mental health problems section of the health record, and with unspecified substance use disorder, which was listed as a mental health problem. He was prescribed escitalopram for anxiety and was adherent with this medication about 90% of the time. He was prescribed hydroxyzine on an as-needed basis for anxiety and made occasional use of this medication through the review period. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Medical conditions

included dyslipidemia, elevated blood pressure without a diagnosis of hypertension, and a history of a forearm fracture. He was serving life without parole.

The patient had a history of alcohol, cannabis, cocaine, hallucinogen, and opioid use starting at a young age. He continued using illicit substances at SVSP, and urine toxicology screens were positive for cocaine, amphetamine, methamphetamine, and/or non-prescribed opiates on five occasions during 2024. No suicide attempts or self-injurious behaviors were listed in his health record. He had an unintentional overdose on heroin in October 2023 and was sent to an outside hospital but did not require Narcan administration. Within CDCR, he received 3CMS care along with two brief MHCB stays, the most recent of which occurred in October 2023 following his heroin use. He was previously treated with mirtazapine.

The patient was enrolled in 3CMS level of care in June 2022 and most recently placed in mainline 3CMS care at SVSP on October 2, 2023. As of January 10, 2025, no IDTT meeting or treatment plan were documented in his health record. During 2024 he was followed by his assigned psychiatrist at least once every 90 days. One encounter took place at the cell front due to custody issues. The patient's intermittent nonadherence with escitalopram was addressed, and adherence improved over time. Psychiatric documentation frequently included identical content that was copied from a prior note, and psychiatric progress notes consistently indicated a plan for the patient to continue regular follow-up with the MHPC. He was seen only once by a primary clinician during calendar 2024, in the context of an August 12, 2024 institutional classification committee meeting.

**Findings**

The care provided to this 3CMS patient was inadequate.

No IDTT meetings occurred and no treatment plan was developed after the patient was placed in 3CMS care. Although psychiatric care occurred regularly at prescribed intervals and resulted in improved medication adherence, psychiatric documentation was often identical from encounter to encounter. A diagnosis of adjustment disorder was carried forward as if it was a chronic condition. No confidential encounters with a primary clinician occurred during 2024, and no mental health groups were documented at any time during the patient's 3CMS care. The patient's ongoing substance use at SVSP was not addressed by mental health staff.

**Patient Q**

This 32-year-old SNY 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with unspecified depression and antisocial personality disorder. He was prescribed mirtazapine for depression and anxiety and oxcarbazepine for irritability and mood stability. The patient was adherent with mirtazapine 70% of the time and with oxcarbazepine 76% of the time. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Medical conditions included a history of hepatitis C, steatosis of the liver, intermittent asthma co-occurring with allergic rhinitis, and opioid use disorder. A history of gunshot wounds to the abdomen and left forearm was also noted in his record.

The patient had a self-reported history of childhood-onset depression and gang affiliation, juvenile detention, and cannabis, methamphetamine, and opioid use. He continued to use heroin and methamphetamine while at SVSP and tested positive for non-prescribed opiates, amphetamine, and methamphetamine on four occasions during 2024. No history of suicide attempts or self-injurious behavior was listed in his health record, and the most recent MHPC assessment indicated that it was unknown whether the patient had received mental health care in the community. Within the CDCR, the patient had received 3CMS care since 2017, with no higher levels of care.

The patient was most recently placed in mainline 3CMS care at SVSP on November 9, 2023, after release from RHU. An IDTT meeting and treatment plan were not documented for over a year, until December 11, 2024. Prior to that, the most recent IDTT meeting occurred in May 2023, when the patient declined to attend, and treatment goals were not documented. The patient and required staff attended the December 11, 2024 IDTT meeting, and a treatment plan was formulated to increase the patient's distress tolerance. The long-term goal was not measurable, and the intervention, documented as the telemental health clinician using validation strategies to increase the patient's commitment to treatment, was not sufficient to improve distress tolerance. Psychiatric care was not included in the treatment plan. The patient agreed to treatment focused on distress tolerance skills but complained that there was no programming available at SVSP.

Although the patient was prescribed both oxcarbazepine and mirtazapine, he was not seen by a psychiatrist between August 4, 2023 and July 10, 2024. Orders for the medications were renewed during this period, and the dose of oxcarbazepine was lowered due to patient nonadherence, without any patient encounters. After July 10, 2024, psychiatric appointments were offered at least every 90 days. Psychiatric documentation did not consistently indicate whether the encounters were confidential or whether they occurred by telehealth. The patient refused two of these encounters, and cell-front wellness checks were conducted by telehealth as a result. By November 2024, the patient reported increased depression and increased use of illicit substances, and he requested higher doses of his psychotropic medication. The psychiatrist increased both mirtazapine and oxcarbazepine to address the worsening symptoms.

During calendar 2024, the patient was seen by a primary clinician on only two occasions. The first occurred prior to the review period, in May 2024, as a mental health RVR assessment. The clinician concluded that there was no indication that mental illness contributed to the alleged RVR behavior. The second contact occurred in early November, 2024, through telemental health and at the cell front, after the patient declined to attend a scheduled appointment for an initial primary clinician assessment. This encounter was a brief attempt at interviewing the patient for an initial assessment. The patient declined, citing physical illness. The most recent mental health group occurred in October 2023, when the patient declined to attend.

**Findings**

The care provided to this 3CMS patient was inadequate.

For most of the review period, a current treatment plan did not exist. Even after a treatment plan was established, it did not adequately capture the interventions that were provided, and the

intervention documented in the treatment plan had not yet been documented as provided as of January 10, 2024. There was an 18-month gap between the two most recent IDTT meetings. Psychiatric follow-up was also deficient, with an 11-month gap between the August 2023 and July 2024 encounters. Half of the subsequent psychiatric encounters took place at the cell front, and no confidential primary clinician encounters were provided during 2024. The patient's diagnosis of unspecified depressive disorder was not resolved despite worsening symptoms, and the patient's ongoing substance use was not adequately addressed. It appeared that both the assigned psychiatrist and the assigned primary clinician were provided interventions through telehealth.

**Patient R**

This 55-year-old SNY 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was initially diagnosed with unspecified mood disorder and antisocial personality disorder and subsequently diagnosed with major depressive disorder, recurrent, mild. The more recent diagnosis was not included in the mental health problems section of the health record. He was not prescribed any psychotropic medication during the review period. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He tested positive for cannabis on June 20, 2024, but all other toxicology screens in 2024 indicated medication adherence and abstinence from illicit substances. Medical conditions included dyslipidemia, hypertension, psoriasis, knee and foot pain, and opioid use disorder. The patient had a reported childhood history of physical, emotional, and sexual abuse and a prior diagnosis of bipolar I disorder. No history of suicide attempts or self-injury was listed in his health record. Within the CDCR had received 3CMS care with no higher levels of care.

The patient was placed in mainline 3CMS care at SVSP on June 22, 2023. An IDTT meeting was not held for over 13 months, until August 1, 2024, but was attended by the patient and required mental health staff. The most recent prior IDTT meeting occurred on April 12, 2023, when the patient was receiving 3CMS care in another prison. The treatment plan developed on August 1, 2024 focused on reduction of anxiety. One intervention, encouraging the patient to work on improved functioning by using goal setting, was assigned to the telemental health clinician. The need to increase coping and distress tolerance skills was noted as a rationale for retaining the patient in 3CMS care but was not directly addressed in the treatment plan.

During 2024 the patient was seen by a psychiatrist once, on July 17, 2024. The most recent prior psychiatric encounter – and most recent mental health contact of any kind – occurred almost seven months earlier, on December 27, 2023, despite a documented follow-up plan on that date for the psychiatrist to see the patient in 90 days. Much content from the July 17, 2024 psychiatric progress note was copy and paste from the December 27, 2023 psychiatric progress note. The July 2024 note did not indicate whether the encounter was confidential or whether it occurred by telehealth. Except for the August 1, 2024, IDTT meeting, the patient was not seen by a primary clinician at any time throughout 2024. The patient's most recent prior encounter with a primary clinician occurred on June 15, 2023, when the patient was housed in another prison. The most recent mental health group occurred on June 20, 2023, when the patient did not attend.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient received 3CMS care for over a year without an IDTT meeting being held or treatment plan being developed. The treatment plan that was eventually developed did not include adequate interventions to address the target symptom and was not followed. Apart from a single psychiatric encounter and an IDTT meeting, the patient received no mental health services in 2024. The rationale for changing the patient's diagnosis to major depressive disorder and an explanation of how major depressive disorder gave rise to anxiety but not depression were not documented.

**Patient S**

This 25-year-old SNY 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with bipolar II disorder with rapid cycling, amphetamine use disorder, mild, opioid use disorder, moderate, and unspecified obsessive-compulsive and related disorder. A diagnosis of unspecified mood disorder was provided by the psychiatrist but not updated in the mental health problems section of the health record. He was prescribed buspirone and mirtazapine for anxiety, depression, and insomnia, and he was adherent with these medications about 85% of the time. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He tested positive for cannabis and non-prescribed opiates on June 26, 2024, but all other toxicology screens indicated medication adherence and abstinence from illicit substances. Medical conditions included hepatitis C, for which he was receiving active treatment during the review period, chronic right should pain, and vitamin D deficiency.

The patient had no history of mental health treatment prior to incarceration, but he self-reported a life-long history of anxiety and obsessive-compulsive symptoms, with alcohol, cannabis, and heroin use for self-medication of these symptoms. He was previously treated with alprazolam. No history of suicide attempts or self-injurious behavior was listed in the health record, but he required one 12-hour episode of suicide watch in January 2024 after expressing suicidal ideation in the context of safety concerns, resulting in a MHCB stay of less than one day. With this exception, the patient received only 3CMS care in the CDCR.

The patient was originally transferred to SVSP for 3CMS care on December 20, 2022, and most recently placed in mainline 3CMS care at SVSP on January 12, 2024. His initial IDTT meeting occurred ten months later, on October 2, 2024, but was attended by the patient and required mental health staff. Prior to this date, the most recent treatment plan was developed on November 29, 2022, when the patient was receiving 3CMS care in another institution. The October 2, 2024 treatment plan identified anxiety as the treatment target, included a measurable short-term objective and long-term goal, and identified interventions as individual treatment sessions with the MHPC to learn relaxation and distraction skills and follow-up encounters with the psychiatrist to optimize medications.

The assigned psychiatrist saw the patient once every 90 days throughout calendar 2024. Except for failure to document whether the encounter took place in a confidential setting or by telehealth, psychiatric documentation was adequate and included rationales for medication and diagnostic changes. However, the patient's suboptimal medication adherence was not adequately addressed.

The patient was seen once by a primary clinician during the review period, on October 1, 2024. Prior to that date, the most recent primary clinician encounter occurred in April 2024, when the patient twice refused to see a primary clinician for an initial assessment by telemental health, and telehealth wellness checks were performed at the cell front. The October 1, 2024 primary clinician encounter took place by telemental health in a confidential setting. It was conducted in preparation for the IDTT meeting that occurred the following day. The most recent mental health group occurred on January 5, 2024.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient received 3CMS care at SVSP for nearly 22 months before an IDTT meeting was held and a treatment plan developed. Of the interventions identified in the treatment plan, only psychiatric follow-up for optimization of medication was provided. As of January 10, 2025, the diagnosis of unspecified mood disorder had been continued without specification or resolution for over 17 months. Psychiatric documentation did not make clear whether encounters were occurring in a confidential setting or by telehealth. The primary clinician provided no routine treatment.

**Patient T**

This 28-year-old SNY 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with major depressive disorder, recurrent, moderate. He was prescribed escitalopram and mirtazapine and was adherent with these medications about three quarters of the time. Hydroxyzine was prescribed on a PRN basis for insomnia; the patient used this medication on an intermittent basis. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He tested positive for cannabis, amphetamine, methamphetamine, non-prescribed opiates, and/or non-prescribed oxcarbazepine on five occasions during 2024; toxicology screens indicated adherence with buprenorphine-naloxone. Medical conditions included hepatitis C along with methamphetamine and opioid use disorders.

The patient had a history of juvenile detention beginning at the age of eight or nine, group home placement, and special education classes due to behavioral and emotional difficulties. His father was deported when the patient was three years old. The patient fathered his first child when the patient was 13 years old. A 2009 suicide attempt by hanging, when the patient would have been 12 or 13 years old and was in juvenile detention, was documented in his health record. Prior diagnoses included borderline intellectual functioning, schizophrenia, and unspecified psychosis; psychosis was reportedly first diagnosed when the patient was six years old, and he reported an onset of depression at age six. He was previously treated with fluphenazine and olanzapine. Within the CDCR, the patient had received 3CMS and MHCB levels of care.

The patient was most recently placed in mainline 3CMS care at SVSP on March 16, 2023. An initial IDTT meeting occurred on July 11, 2024 and was attended by the patient and required mental health staff. The most recent prior IDTT meeting occurred three and a half years earlier, on December 16, 2020, when the patient was receiving 3CMS care at another facility. The July 11, 2024 treatment plan identified anger as the primary target for treatment, included a measurable

short-term objective and long-term goal, and identified CBT provided by the primary clinician as the sole intervention to decrease anger and increase distress tolerance. Psychiatric care and other symptoms of depression were not included in the treatment plan, despite a case formulation that included depression as one of the central problems.

During calendar 2024, the patient was offered psychiatric encounters about once every 90 days. In June 2024, he was out to court, and he was not seen by psychiatry between February 28 and July 5, 2024. The patient refused three of four psychiatric appointments occurring in the second half of 2024, and wellness checks at the cell front were conducted by telepsychiatry. Escitalopram and mirtazapine were discontinued in mid-September 2024 due to nonadherence and non-attendance of psychiatric appointments, but mirtazapine was restarted in November 2024 at the patient's request. Apart from the wellness checks, psychiatric documentation did not indicate whether the encounter was conducted by telehealth or whether the encounter was confidential. The patient did not see a primary clinician in calendar 2024 outside of the July 11, 2024 IDTT meeting. The most recent mental health group occurred on August 24, 2022; the patient did not attend.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient received 3CMS care at SVSP for nearly 16 months without an IDTT meeting being held or a treatment plan being developed. The treatment plan that was developed did not address the patient's depression or psychiatric care and prescribed CBT interventions that were not provided. The patient's nonadherence with medications and psychiatric appointments and the patient's recurrent substance use were not adequately addressed. Psychiatric documentation did not make clear whether encounters were occurring in a confidential setting or by telehealth. The patient did not receive mental health care from a primary clinician despite the treatment plan making clear that the primary clinician would provide these services.

**Patient U**

This 48-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with schizoaffective disorder, bipolar type. Under a PC 2602 order for involuntary treatment due to grave disability, he was prescribed and adherent with oral haloperidol and benztropine. An intramuscular dose of immediate acting haloperidol, prescribed as a back-up for refusal of oral medication, did not have to be used. Haloperidol decanoate was initiated, and he received one dose of this during MHCB care. Two episodes of head-banging were listed in the health record at the time of MHCB admission, and two suicide attempts were noted in assessments. Medical conditions included a seizure disorder and history of bilateral localized swelling of lower legs. Within CDCR, the patient had previously received all levels of mental health care except acute care. He was first placed on involuntary treatment in 2013. At SVSP, he was admitted to MHCB care from August 27, 2024 through September 27, 2024 for significant impairment due to mental illness, after reporting suicidal ideation in the context of psychotic symptoms. He was discharged to EOP care on September 6, 2024 but remained in MHCB for three more weeks while an EOP bed was found.

The initial psychiatric and primary clinician assessments were timely but cursory. The patient refused to participate in either. The initial IDTT meeting was timely and attended by assigned staff apart from an alternate for the assigned primary clinician. The patient refused to attend and was not found to meet criteria for consideration of a higher level of care. The case formulation was not updated and did not address the patient's current clinical presentation or the need for involuntary treatment. Patient strengths and verbalized goals were documented only minimally, and the treatment plan addressed suicidal ideation but no other symptoms or behaviors. Interventions were listed generically as CBT and unconditional positive regard, and psychiatric care was not addressed. The first follow-up IDTT meeting was timely, attended by the patient and, except for an alternate for the assigned clinician, by required staff. The meeting resulted in a decision to discontinue suicide precautions and discharge the patient to EOP care. The treatment plan was updated to reflect attainment of the short-term goal but continued to be minimal and omit psychiatric care. An accompanying discharge suicide risk evaluation found the patient at low risk. The accompanying safety plan was collaborative, potentially useful, but underdeveloped. Only one additional IDTT follow-up meeting occurred during the three weeks of MHCB care after the patient was clinically discharged. It was held late, attended by required staff but not the patient, and resulted in no changes. Its documented content was perfunctory. Except on September 7, 2024 and September 22, 2024, when there was no documentation that a psychiatrist or clinician saw him, the patient was followed daily by one of two primary clinicians or the assigned psychiatrist. Contacts occurred at the cell front due to the patient's consistent refusals to engage with treatment team members; in most cases, the patient waved the psychiatrist off and spoke minimally with the clinicians. Psychiatric progress notes were cursory and included identical and improbable language in the mental status examinations. For example, each mental status exam quoted the patient as describing his mood as "expansive," even when the patient refused to speak, and each mental status exam indicated that there was evidence of psychomotor agitation despite significant evidence of social withdrawal, emotional flatness, and lack of other symptoms. The patient was described as sleeping most of the time. Numerous efforts to engage the patient in recreational therapy activities were documented as unsuccessful, and all these encounters occurred at the cell front. The psychiatric discharge summary was timely but cursory.

**Findings**

The care provided to this MHCB patient was inadequate.

The three-week wait following the patient's clinical discharge and his physical transfer to EOP care was concerning, particularly because the patient rarely left his MHCB cell and refused verbal interactions and meaningful out-of-cell activities. The patient's social withdrawal and disengagement with nonpharmacological treatment were not explored or addressed. After the first weekly IDTT meeting during which the patient was discharged, only one additional IDTT meeting was held during the following 21 days in which the patient remained in MHCB care. He was not seen by either a primary clinician or a psychiatrist during two days of MHCB care, and most psychiatric contacts were documented in a perfunctory manner. Aside from psychotropic medication and wellness checks, the patient did not receive meaningful treatment.

**Patient V**

This 35-year-old transgender (he/him/his) MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was simultaneously diagnosed with schizoaffective disorder, depressed type, unspecified psychosis not due to a substance or known physiological condition, and amphetamine use disorder. He was prescribed escitalopram and quetiapine and adherent with these medications. At the time of admission, four episodes of self-injurious behavior were listed in the health record. Medical conditions included gender dysphoria, obesity, mild persistent asthma, and opioid use disorder. He was not on gender affirming hormone therapy and had discontinued buprenorphine-naloxone that was formerly prescribed through the ISUDT. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At SVSP, he was admitted to MHCB care from September 2, 2024 through September 13, 2024 for danger to self and significant impairment due to mental illness. Prior to admission and following news of his grandmother's death and heavy use of methamphetamine, the patient had reported suicidal ideation with a plan, smeared feces, and appeared to be responding to internal stimuli. He was discharged to EOP care on September 10, 2024 but remained in MHCB for three additional days.

The initial psychiatric and primary clinician assessments were timely but resulted in divergent diagnostic impressions, with the psychiatrist noting a history of schizoaffective disorder, depressed type, and the psychologist emphasizing the patient's recent methamphetamine use. A PHQ-9 administered by the psychiatrist during the initial assessment showed mild depression. On September 5, 2024, the patient received a one-time intramuscular dose of haloperidol and diphenhydramine for agitation, after smearing feces over himself and his cell window. The initial IDTT meeting was timely but held in absentia due to the patient's refusal. The assigned psychiatrist, an alternate for the assigned primary clinician, the chief psychiatrist, a registered nurse, correctional counselor, and psychiatric technician also attended. The patient was found to meet criteria for consideration of a higher level of care due to having five MHCB referrals/admissions in the last six months. However, the team determined that the patient did not need a higher level of care, and IDTT documentation indicated that the patient's diagnoses were opioid and amphetamine-type use disorders, antisocial personality disorder, and gender dysphoria. MHCB prevention planning was completed but cursory. Because the case formulation focused on psychosis, it was at odds with the rest of the IDTT documentation, which indicated that the patient reported suicidal ideation and threatened self-harm to access a higher level of care. The patient's recent substance use, reports of suicidality, and problem behaviors were not addressed in the case formulation. The treatment plan addressed substance use and poor distress tolerance and included measurable treatment goals and appropriate non-pharmacological interventions, but it did not address psychiatric care or depressive symptoms. The patient was followed daily by one of two primary clinicians and/or the assigned psychiatrist, with most encounters provided by the psychiatrist. Psychiatric progress notes were cursory, did not indicate whether the encounter was confidential, and used identical language across encounters, including but not limited to identical mental status descriptions. He was continued on a low dose of quetiapine even after he demanded it be discontinued when the psychiatrist declined to increase the dose. A low dose of escitalopram was later added. The quality of primary clinician progress notes varied by clinician; the non-assigned clinician provided detailed notes including provision of evidence-based interventions, while the assigned clinician did not. Use of the patient's preferred pronouns was inconsistent. The weekly IDTT follow-up meeting occurred timely, was attended by the patient and required staff,

and resulted in a determination to discharge the patient to EOP care. The treatment plan was updated to note achievement of short-term goals and concerns that the patient may not sustain this progress. A discharge suicide risk evaluation was adequate and found the patient at low risk. The Psychotic Symptom Severity Rating scale completed along with the suicide risk evaluation found only mild psychotic symptoms. The patient refused to collaborate with the development of a safety plan; the resulting plan was clinically useful for future clinicians but not for the patient. The psychiatric discharge summary was timely but cursory.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient's gender identity was not addressed adequately or consistently. The case formulation was not updated or consistent with the treatment team's assessment of the patient's behavioral challenges and treatment needs. The treatment plan was minimally adequate but did not address psychiatric care. The patient's diagnoses were inadequately addressed and went unresolved, and the probable role of a personality disorder was not discussed. Rationale for continuation of low dose quetiapine was not documented or clear. The patient's substance use, desire to stop using, psychiatric symptoms, and behavioral problems combined to illustrate the need for more systematic, integrated, substance use and mental health treatment, including treatment of personality disorders.

**Patient W**

This 34-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with unspecified psychotic disorder and unspecified intellectual disability but was not enrolled in the developmental disability program. He was prescribed aripiprazole, hydroxyzine, and risperidone; he was non-adherent with aripiprazole and partially adherent with hydroxyzine and risperidone. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions at the time of admission included obesity. Within CDCR, the patient had previously received EOP and MHCB care. At SVSP, he was admitted to MHCB care from September 6, 2024 through September 23, 2024 for significant impairment due to mental illness, after exhibiting signs of self-neglect, disorganized behavior, and extremely poor hygiene. He was admitted to acute care on September 13, 2024 but remained in MHCB for ten additional days.

The initial primary clinician assessment was timely and, apart from a weak case formulation, adequate. It resulted in a preliminary diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. The initial IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned clinician. The patient was not found to meet criteria for consideration of a higher level of care, and the treatment team suspected that the patient's symptoms had been substance-induced. The case formulation remained inadequate, and patient strengths, patient verbalized goals, and rationale for retention in MHCB care were poorly documented. The treatment plan did not address psychotic or disorganized symptoms and included short-term objectives that were not appropriate for crisis bed services. Surprisingly, an accompanying Psychotic Symptom Severity Rating scale resulting in a total score of 8, suggesting

only mild psychotic symptoms. In contrast, the patient was cognitively, affectively, and behaviorally disorganized, hallucinating, and smearing feces during this time. The initial psychiatric assessment was completed only after the initial IDTT and only minimally adequate. It resulted in an initial diagnosis of schizoaffective disorder, later changed to unspecified psychotic disorder without explanation. The first and only follow-up IDTT meeting was timely and attended by the patient and required staff. On this occasion, the treatment team found that the patient met five of six criteria for referral to a higher level of care, and he was timely referred to acute care. A petition for involuntary treatment under PC 2602 was submitted simultaneously. The inpatient mental health consult and suicide risk evaluation completed with the acute care referral were adequate, and the patient was found to be at low suicide risk. However, the treatment plan was not updated.

Except for September 22, 2024, when there was no documentation of a primary clinician or psychiatric encounter, the patient was followed daily by one of two primary clinicians and/or the assigned psychiatrist. Most psychiatric progress notes were cursory, failed to indicate whether the encounter was confidential, and provided identical mental status examinations. These mental status exams consistently indicated that absence of hallucinations, internal stimulation, delusions, or grandiosity, even while other disciplines documented auditory hallucinations and paranoid and grandiose delusions. In a September 19, 2024 progress note, the psychiatrist noted both that the patient was responding to internal stimuli and that the patient was not responding to internal stimuli. Clinician encounters were limited to brief cell-front encounters. Recreational therapy encounters also occurred exclusively at the cell front; the patient was asleep and did not engage on each occasion. A second follow-up IDTT meeting was due on or before September 20, 2024, but never took place. Mental health assessments for August 6 and 12, 2024 RVRs alleging battery on a peace officer and refusal of housing were adequate and found a nexus between the patient's mental health symptoms and the alleged behaviors for both RVRs. No discharge summary was developed.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial psychiatric assessment was completed late, and neither the case formulation nor the treatment plan were adequate or appropriate to guide MHCB care. Psychiatric progress notes were cursory and included identical wording for mental status exams that contradicted contemporaneous observations, including observations the psychiatrist made. It was unclear whether psychiatric care was provided in confidential settings. Nonpharmacological interventions occurred at the cell front and were limited to wellness checks. No IDTT meetings were held during the final ten days of MHCB care. The patient was not seen by a psychiatrist or a clinician on the day prior to discharge from MHCB, and no discharge summary was developed. The ten-day delay between clinical discharge and transfer to a PIP suggested inadequate availability of acute care beds. The initial primary clinician assessment, timely referral to acute care, adequate mental health consult for the acute care referral, submission of a PC 2602 petition, and adequate RVR mental health assessments represented significant strengths in this patient's care.

**Patient X**

This 35-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with cannabis-induced psychotic disorder, with moderate or severe use disorder. Later during his MHCB stay, additional diagnoses of major depressive disorder and posttraumatic stress disorder were included in some psychiatric notes but not others. He was prescribed mirtazapine and risperidone and was adherent with the former and partially adherent with the latter. Hydroxyzine was prescribed PRN for insomnia; he used this medication about a third of the time. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder, and he was adherent with this medication. One suicide attempt and one episode of self-injurious behavior were listed in the health record, both occurring prior to the MHCB admission. At the time of admission, medical conditions included opioid use disorder and a history of successfully treated hepatitis C. Within CDCR, the patient had previously received 3CMS and MHCB care. At SVSP, he was admitted to MHCB care from September 19, 2024 to October 18, 2024 for danger to self after lacerating both forearms and voicing suicidal intent. At the time of admission, he reported that he had been using spice, that custody staff were using cameras in his cell to upload videos of his secret actions to websites, and that a microchip was planted in his nose that caused him to hear voices. Although he was discharged to 3CMS care on September 30, 2024, he remained in a crisis bed without physical transfer because a 3CMS bed was not available. His MHCB discharge was then rescinded on October 4, 2024 due to ongoing psychotic symptoms. After further treatment, he was discharged on October 11, 2024, but he remained in MHCB care until October 18, 2024 while a 3CMS bed was identified.

The initial psychiatric and primary clinician assessments were timely when the patient was originally admitted to MHCB as well as when the patient's MHCB discharge was rescinded. These assessments were cursory, and the primary clinician assessment included a generic and underdeveloped case formulation. A BPRS completed by the psychiatrist resulted in a score of 39, indicating marked severity in psychiatric symptoms. The initial IDTT meeting in September was timely and attended by the patient and required staff. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation remained inadequate to guide treatment, and the treatment plan addressed substance use but not suicidal ideation or self-injurious behavior. Although the long-term treatment goal referred to substance-induced psychotic symptoms, no short-term treatment goals were formulated to address these symptoms. The follow-up IDTT meeting was timely, attended by the patient and required staff, included documentation that the patient's psychotic symptoms had diminished significantly, and resulted in a determination to discharge the patient to 3CMS care. The treatment plan was updated to indicate achievement of the short-term goal of remaining free of substance use. An accompanying BPRS score of 23 and Hamilton Depression Rating Scale score of 4 provided additional evidence that the patient's symptoms had improved. Despite the severity of the patient's recent suicidal behavior and the patient flagging on all eight static risk factors, the discharge suicide risk evaluation found his risk to be low. The discharge safety plan was deficient and developed without the patient's input. The psychiatrist discontinued risperidone because the patient insisted that he did not want to be on a heat-alert medication. While waiting for a 3CMS bed, the patient's psychotic symptoms reemerged. Discharge was rescinded and risperidone restarted, and the subsequent initial IDTT in October was timely and attended by the patient and required staff. However, neither the case formulation nor the treatment plan were updated and, as a result, the treatment plan used during

this IDTT meeting indicated that the short-term goal had already been met. The patient was again not found to meet criteria for a higher level of care, and it was determined to retain him in MHCB care for several more days of observation. A PHQ-9 score of 1 and Hamilton Depression Rating Scale score of 7 obtained on the same date as the IDTT meeting suggested mild to no depressive symptoms were present. However, the patient subsequently attempted to use pen fillers to remove a recording and transmitting device in his nose.

Two follow-up MHCB IDTT meetings were held during October 2024. Both were timely and attended by the patient and required staff except for an alternate for the assigned primary clinician during the first follow-up meeting. In the first follow-up meeting, the patient was found to meet criteria for consideration of a higher level of care due to being admitted to MHCB three times in the last six months. IDTT documentation asserted that the patient had only been admitted twice, arguing that the admissions on September 19, 2024 and October 4, 2024 were part of the same admission. The treatment plan was updated to address psychosis with a short-term goal of continuous medication adherence for at least one month. However, because the treatment team also discharged the patient from MHCB during this IDTT meeting, it was evident that this goal was intended to apply to the patient's care in 3CMS, not in MHCB. A PHQ-9 score of 6, obtained on the same day as the discharge IDTT meeting, indicated mild depression. A second discharge suicide risk evaluation found the patient at moderate risk. The accompanying safety plan was again developed without patient input but provided slightly more useful clinical information for future treatment providers. The second follow-up IDTT meeting occurred after the patient was clinically discharged from MHCB and was awaiting a 3CMS bed. In this meeting, the patient was no longer found to meet criteria for consideration of a higher level of care. The treatment plan was updated to note that the short-term goal of medication adherence was "resolved," even though the patient had not been consistently medication adherent for one month.

Except for September 22, 2024, when there was no documentation of a primary clinician or psychiatric encounter, the patient was followed daily from September 21, 2024 through October 18, 2024, by one of two primary clinicians and/or the assigned psychiatrist. Psychiatric progress notes were cursory, failed to indicate whether the encounter was confidential, and used identical language from one encounter to the next, including identical wording for nearly all 15 mental status examinations that were documented. Psychiatric progress notes included inconsistent diagnoses without explanation, but the psychiatrist consistently documented the presence of paranoia and psychotic symptoms. The quality of primary clinician progress notes varied by clinician; the unassigned clinician provided detailed documentation of her provision of evidence-based interventions in a confidential setting; the assigned clinician did not. The unassigned clinician consistently documented psychotic symptoms. The assigned clinician variously documented that the patient was endorsing extreme psychopathology without corresponding symptoms, and that the patient was exhibiting psychotic symptoms. These divergent assessments of the patient were not reconciled. More than half of the primary clinician encounters occurred at the cell front. Recreational therapy encounters also primarily occurred at the cell front. The psychiatric discharge summary was timely but cursory.

**Findings**

The care provided to this MHCB patient was inadequate.

Psychiatric progress notes were cursory, and identical mental status exam language across multiple entries raised accuracy concerns. Although the patient received antipsychotic medication for his symptoms, members of the treatment team underappreciated the severity of the patient's psychotic symptoms and suicide risk. Divergent impressions of the patient's clinical presentation were not reconciled in the health record. The patient was not seen by either a clinician or a psychiatrist on his fourth day of MHCB care. The initial attempt to discharge him to 3CMS care was premature, and the suicide risk evaluation at the time of this attempt underestimated the patient's future risk. Crisis bed treatment planning focused primarily on substance use but not on suicide risk; a short-term goal for psychotic symptoms was not formulated until the fourth IDTT meeting, 22 days into the patient's MHCB stay. Once the patient's discharge was rescinded and he was readmitted to MHCB, the case formulation and treatment plan were not updated, and neither was sufficient to guide treatment. Due both to the patient's symptoms and to difficulties in locating an available 3CMS bed, the patient remained in MHCB care for 29 days, and he continued to exhibit paranoia and psychotic symptoms at discharge. An EOP referral should have been considered but was not. Strengths in this patient's care included the serial use of the BPRS, PHQ-9, and Hamilton Depression Rating Scale to provide measurements of the patient's symptom severity and course.

**Patient Y**

This 31-year-old transgender (she/her/hers) MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. She was diagnosed with major depressive disorder, recurrent, severe with psychotic features. She was prescribed atomoxetine, buspirone, divalproex sodium, mirtazapine, olanzapine, oxcarbazepine, sertraline, and venlafaxine. She was adherent with mirtazapine and olanzapine, partially adherent with sertraline and venlafaxine, and nonadherent with other medications, many of which were discontinued as a result. Hydroxyzine was prescribed PRN for agitation, and she used this medication on four occasions during his MHCB stay. Through the ISUDT, she was prescribed buprenorphine-naloxone, and she was adherent with this medication. Eight suicide attempts and four episodes of self-injurious behavior were listed in the health record at the time of admission. Medical conditions included opioid and methamphetamine use disorders, chronic pancreatitis, abnormal weight loss, active hepatitis C, and status post open reduction and internal fixation of left ankle, with continued pain. Within CDCR, the patient had previously received all levels of mental health care. Involuntary treatment was provided between 2015 and 2021 under PC 2602 orders because of the patient's danger to self. At SVSP, she was admitted to MHCB care from September 28, 2024 through October 10, 2024 for danger to self after reporting depression and suicidal ideation, taking an overdose of what was inconsistently reported to be acetaminophen or oxcarbazepine, and requiring medical management in an outside hospital. Following ten days of MHCB care, she was discharged to EOP care on October 7, 2024 but remained in MHCB for three more days.

The initial psychiatric and primary clinician assessments were timely. The clinician's assessment relied heavily on prior documentation, used the patient's preferred pronouns inconsistently, and did not address the patient's transgender identity or its potential impact on the patient's functioning. The case formulation was generic, not updated, and did not address suicidal behaviors or transgender identity. The psychiatric assessment was cursory and inaccurately documented that, as the patient claimed, the patient had overdosed on acetaminophen; acetaminophen ingestion had

been ruled out at the outside hospital. However, a Hamilton Depression Rating Scale was completed and indicated moderate levels of depression. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation remained inadequate, and patient strengths, patient verbalized goals, and rationale for retention in MHCB care were poorly documented. The treatment plan included two goals that had been developed in another setting and were not appropriate for MHCB care as well as one current goal focused on self-injury that was appropriate for MHCB care and the patient's clinical presentation. The patient was followed daily by one of two primary clinicians or the assigned psychiatrists. During her 13-day MHCB stay, she was sent to the community emergency room on three occasions after swallowing foreign objects and reporting pain. Psychiatric progress notes were cursory, did not indicate whether the encounters were confidential, and used identical language in mental status exams. Outside of the initial assessment and IDTT meetings, the patient received confidential individual treatment from a primary clinician only once. Document of this encounter was adequate and included thoughtful provision of clinically appropriate, evidence-based interventions. Two of three recreational therapy encounters occurred at the cell front. The IDTT follow-up meeting was timely, attended by the patient and required staff, and resulted in discontinuation of suicide precautions and a decision to discharge the patient from MHCB care. IDTT documentation indicated that the patient's symptoms were an expression of antisocial traits. The treatment plan was updated to indicate that the patient had met one of the three short-term goals, but not the other two. A discharge suicide risk evaluation found the patient at low risk, and an accompanying PHQ-9 indicated only mild depression. The patient refused to participate in developing a safety plan, and the resulting safety plan was superficial and of limited value in supporting the patient's safety. One day after the IDTT meeting and completion of these assessments, the patient engaged in her third incident of foreign body ingestion. The psychiatrist documented consideration of rescinding the discharge and making a referral to ICF care if the patient's behavior continued to escalate, but the next day the patient was discharged.

Mental health assessments for September 14 and 26, 2024 RVRs alleging possession of tattoo paraphernalia and possession of a controlled substance were adequate. They found no nexus between the patient's mental health symptoms and possession of the tattoo paraphernalia but a strong nexus between the patient's substance use disorder and possession of a controlled substance. The psychiatric discharge summary was timely but cursory and did not include adequate an adequate account of the patient's swallowing of multiple foreign bodies during MHCB care.

**Findings**

The care provided to this MHCB patient was inadequate.

The precipitating event for MHCB admission was inaccurately described as an acetaminophen overdose despite none being detected in the emergency department. The patient's repeated episodes of swallowing foreign objections while receiving MHCB care were poorly described and insufficiently addressed in the care provided. Her risk for self-injurious behavior and its potential consequences were underappreciated. Both the case formulation and the treatment plan were deficient and not used to guide MHCB care. Discharge/transition planning was deficient. There was no referral for positive behavior support plan development and no consideration of how the

patient's transgender identity have impacted her behavior and symptoms. Use of non-preferred pronouns in documentation of a transgender patient's care was substandard.

**Patient Z**

This 33-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with unspecified anxiety disorder, unspecified anxiety disorder, and opioid and stimulant use disorders. He was not prescribed any scheduled psychotropic medications, but received one-time doses of intramuscular diphenhydramine, haloperidol, and lorazepam on October 29, 2024 and October 31, 2024 for acute agitation. Hydroxyzine was prescribed PRN for anxiety, but the patient did not use this medication. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder, but he was nonadherent with this medication. At the time of MHCB admission, one episode of self-injurious behavior was listed in the health record. Medical conditions included opioid and stimulant use disorders, as well as a black eye and broken nose following an altercation prior to admission. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At SVSP, he was admitted to MHCB care from October 22, 2024 to October 31, 2024 for danger to others after becoming agitated, combative, reporting medical complaints that were not in evidence on five occasions in rapid succession, and asserting that he had cancer and needed to be sent to an outside hospital. His pre-admission behavior was described as disorganized and bizarre. He was discharged to EOP care and RHU on October 29, 2024 but remained in MHCB awaiting a SVSP RHU bed until the end of the month.

The initial psychiatric and primary clinician assessments were timely but cursory. The clinician's assessment did not offer current diagnostic impressions, while the psychiatrist's assessment included a diagnosis of opioid use disorder and noted unspecified anxiety disorder and unspecified bipolar disorder as ongoing problems. The primary clinician assessment included an inadequate case formulation that was developed months earlier. Concurrent medical documentation indicated that the patient was complaining of nausea, vomiting, chest and abdominal pain, and body aches. The patient subsequently reported he was withdrawing from opioids, and urine toxicology screens on October 23 and 24, 2024 were positive for amphetamines and/or methamphetamine. The initial IDTT meeting was timely and attended by the patient and required staff. The patient met criteria for consideration of a higher level of care due to multiple RVR mental health assessments; the rationale for not referring him to a higher level of care was adequately documented. The case formulation, patient strengths, and patient verbalized goals were minimally and inadequately documented. The treatment plan adopted problems, goals, and interventions that were identified in earlier IDTT meetings. Short-term goals were either not specific and measurable or not appropriate for short-term MHCB care. Interventions required by the treatment plan were not delivered during MHCB care. The patient was followed daily by either the assigned primary clinicians or, much more frequently, the assigned psychiatrist. Psychiatric progress notes were cursory, failed to indicate whether the encounter was confidential, and used identical language from one encounter to the next, including identical wording for mental status examinations. Outside of IDTT meetings and the initial assessment, the primary clinician saw the patient only once. This encounter occurred at the cell front due to the patient's refusal of a confidential setting. All recreational therapy contacts occurred at the cell front. No progress notes contemporaneous with the two administrations of emergency intramuscular psychotropic medication were found

from any discipline. The follow-up IDTT meeting was timely, attended by the patient and required staff, and resulted in a decision to discharge the patient to EOP care. It was noted that the patient remained moderately anxious, and the updated treatment plan did not indicate that any of the short-term treatment goals had been met. A discharge suicide risk evaluation was adequate and found the patient at low risk. The psychiatric discharge summary was timely but cursory, silent with respect to both the patient's report of opioid withdrawal and the positive toxicology findings, and inaccurate regarding the date of the first intramuscular medication. It was unclear regarding the patient's psychiatric diagnoses.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial assessments and psychiatric discharge summary were cursory. The patient's diagnoses, nature of his anger and agitation, and potential role of withdrawal from opioids and/or stimulants, were inadequately explored. The case formulation was inadequate. Psychiatric progress notes were also cursory, and individual encounters with the primary clinician and recreational therapist occurred exclusively at the cell front. Outside of the medication administration record, there were no progress notes addressing the circumstances triggering the use of one-time intramuscular psychotropic medication or the patient's response to these medications. Psychiatric progress notes included identical mental status examination descriptions across multiple encounters. The treatment plan was not appropriate for MHCB care and required interventions that were not provided during MHCB care. The patient was returned to EOP care in RHU without achieving any of the short-term goals included in the treatment plan, indicating that the treatment plan was not used to guide MHCB care.

**Patient AA**

This 38-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with schizophrenia and, on a rule out basis, substance-induced psychosis. He was administered an emergency intramuscular injection of benztropine, haloperidol, and lorazepam on the second day of MHCB care and prescribed oral risperidone, but he was consistently nonadherent with oral medication. After an emergency PC 2602 petition was granted one day before MHCB discharge, he was prescribed a low dose of olanzapine with an intramuscular dose of haloperidol as back-up medication for refusal of olanzapine. He accepted olanzapine, and the back-up injection was not used. No suicide attempts or self-injurious behaviors were listed in the health record. At the time of admission, no medical conditions were identified. Within CDCR, the patient had previously received EOP and MHCB levels of care. At SVSP, he was admitted to MHCB care from October 22, 2024 through October 30, 2024 for significant impairment due to mental illness. Immediately prior to admission, he was reported to be confused, incoherent, bizarre, isolative, refusing consideration of psychotropic medication, exhibiting long latency in responding, and not eating, drinking, sleeping, or showering. He returned to EOP care following MHCB discharge.

The initial psychiatric and primary clinician assessments were timely and minimally adequate, given that the patient either refused or was too disorganized to participate in these assessments.

However, the case formulation was inadequate and consisted only of an opinion that the patient's symptoms were unlikely to be the result of substance use. A BPRS and Psychotic Symptom Severity Rating scale completed with these assessments confirmed the presence of severe psychotic symptoms. Following administration of emergency medication on October 23, 2024, the patient's mentation improved, although he continued to lack insight into the presence of symptoms or need for treatment, and he continued to refuse oral antipsychotic medication. A petition for an emergency PC 2602 order for involuntary treatment due to grave disability was submitted two days after admission and granted on the day prior to discharge. The patient was followed daily by the assigned primary clinician or the assigned psychiatrist. Psychiatric progress notes were brief and did not indicate whether the encounters were confidential. Mental status exams were identical across several encounters. On the day prior to discharge, the psychiatrist noted that the patient's MHCB cell was full of trays and that his toilet was unflushed. Primary clinician and recreational therapy interventions occurred exclusively at the cell front. The initial IDTT meeting was not held until the day of discharge. The patient and required staff attended. Despite his initial presentation and the need for emergency involuntary treatment, the patient was not found to meet criteria for a higher level of care. The case formulation, patient strengths, and patient verbalized goals were poorly documented, and documented rationale for discharge to EOP was cursory. The case formulation was not updated to reflect the patient's report that he had used Spice and methamphetamine prior to admission. A treatment plan developed four months prior to the current MHCB admission was adopted and addressed only medication nonadherence rather than the symptoms that gravely disabled the patient upon admission. The short-term goal included in the treatment plan was not a treatment goal but a psychiatric intervention. The treatment plan was updated to indicate that the patient was adherent with medication, a conclusion that was based on only one administration of oral medication. The discharge suicide risk evaluation found the patient to be at low risk, and a Psychotic Symptom Severity Rating scale indicated that the patient's symptoms were mild. The psychiatric discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial IDTT meeting, if it can be termed that, was not held until the day of discharge and functioned as a discharge IDTT meeting. The treatment plan documented at that time was deficient in identifying short-term treatment goals and did not directly address the patient's grave disability. The case formulation was similarly deficient and inadequate to guide treatment. The decision to discharge the patient back to EOP care after only one successful administration of oral antipsychotic medication was premature, and the quality of documentation justifying the decision not to refer the patient to a higher level of care was poor. Strengths in this patient's treatment included rapid provision of emergency medication and pursuit of an emergency PC 2602 order, but overall treatment planning did not adequately address the patient's chronic and severe symptoms and their disabling impact on his functioning.

**Patient BB**

This 33-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with an unspecified mood disorder and

antisocial personality disorder. He was prescribed and adherent with aripiprazole, mirtazapine, and sertraline under an emergency PC 2602 court order for involuntary treatment due to danger to others. The emergency PC 2602 order was issued on November 1, 2024, one day after the patient's MHCB admission. Mirtazapine and oxcarbazepine were prescribed at the patient's request during the final two days of MHCB care, and he was adherent with these medications. Hydroxyzine was also prescribed PRN for anxiety at the patient's request, and he used this medication daily. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder, and he was adherent with this medication. Two suicide attempts and two additional episodes of self-injurious behavior were listed in the health record. Medical conditions included hypertension, opioid use disorder, and a history of successfully treated hepatitis C. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At SVSP, he was admitted to MHCB care from October 31, 2024 through November 8, 2024 for danger to others, after assaulting three custody officers on October 30, 2024 following his mother's death. Upon admission, he reported that officers had placed a microchip in his methamphetamine two years prior, and that because of the microchip he had grown more violent and experienced chest pains and rashes. He accepted a one-time dose of intramuscular haloperidol, diphenhydramine, and lorazepam following admission.

The initial primary clinician assessment was timely and adequate, if heavily reliant on prior assessments. The initial IDTT meeting was timely and attended by the patient, assigned primary clinician, and assigned psychiatrist, a senior psychologist supervisor, a correctional counselor, and a registered nurse. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation was underdeveloped and inadequate to guide treatment. Patient strengths, patient verbalized goals, and rationale for retention in MHCB care were adequately documented. The master treatment plan adequately addressed anger management but did not address mood or psychotic symptoms, bereavement, or the need for involuntary treatment. The initial psychiatric assessment was completed several hours after the initial IDTT meeting. It was cursory, did not address the patient's delusional thinking, did not offer diagnoses that were consistent with the patient's report of auditory hallucinations, and did not document a rationale for involuntary treatment. The patient was followed daily by one of two primary clinicians and/or the assigned psychiatrist. Psychiatric progress notes were cursory, did not consistently indicate whether the encounter was confidential, referred to an October 31, 2024 suicide risk evaluation that was not in the patient's health record, and included the same mental status exam results, word for word, across multiple encounters. The assigned primary clinician's progress notes were thorough, documented the encounters as confidential, and included documentation of non-pharmacological interventions required by the treatment plan. Provision of recreational therapy interventions were adequately documented. The patient tested positive for synthetic cannabinoids on November 4, 2024. The follow-up IDTT meeting was timely and attended by the patient and required staff. It adequately summarized the course of treatment and resulted in a determination to discharge the patient back to DOP care. The treatment plan was updated to document that the patient had met his short-term MHCB treatment goal. A discharge suicide risk evaluation was adequate and resulted in a finding that the patient was at low risk. The psychiatric discharge summary was timely and adequately summarized psychiatric care but not the course of the patient's symptoms or the rationale for involuntary treatment.

**Findings**

The care provided to this MHCB patient was inadequate.

Strengths in this patient's MHCB care included continuity of psychiatric and primary clinician care, clear documentation of both pharmacological and non-pharmacological interventions, and the patient's overall response to interventions. However, the rationale for seeking an emergency PC 2602 order was poorly documented and not self-evident. The case formulation and treatment plan were inadequate and did not address bereavement or psychosis. Psychiatric progress notes were cursory, and serial mental status exams in these notes showed no variation. Psychiatric diagnoses were inadequately explored and documented, and the possibility of a substance-induced mood or psychotic disorder was not addressed despite a positive toxicology finding.

**Patient CC**

This 57-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with schizoaffective disorder, bipolar type. He was prescribed lithium, risperidone, and intramuscular paliperidone and was adherent with these medications. Oral and intramuscular olanzapine were ordered PRN for agitation or refusal of antipsychotic medications, but the patient did not require olanzapine during the MHCB stay. Six episodes of self-injurious behavior were listed in the health record at the time of his MHCB admission. Medical conditions included venous insufficiency of legs with edema and cellulitis, lumbar spondylosis with chronic pain, chronic diarrhea, and obesity. He was mobility impaired and used a walker, orthotic shoes, compression stockings, and, due to a history of repetitive head-banging, a helmet. Within CDCR, the patient had previously received all levels of mental health care except 3CMS services, and he received involuntary treatment under PC 2602 for danger to self and others and grave disability on a continuous basis since at least 2014. At SVSP, he was admitted to MHCB care from November 2, 2024 to November 20, 2024 for danger to self and others. He was referred to acute care on November 13, 2024 but remained in the MHCB at SVSP until November 20, 2024.

The initial psychiatric and primary clinician assessments were timely and adequate, although the case formulation was underdeveloped and not updated. The initial IDTT meeting occurred late, was held in absentia due to the patient's refusal, and was attended by alternates for the assigned primary clinician and assigned psychiatrist. The assigned correctional counselor, a nurse, and a psychiatric technician also attended. Surprisingly, the patient was not found appropriate for a higher level of care. Despite noting the patient's recent history of refusing programming and current mental status and agitated behavior, the IDTT documentation asserted that the patient had not decompensated. The case formulation, patient strengths, patient verbalized goals, and rationale for retention in MHCB care were inadequately documented. The treatment plan addressed self-injurious and aggressive behavior, anger, and medication adherence but not mania and psychosis, which the psychiatrist had identified as target symptoms. The patient was followed daily by one of two primary clinicians and/or the assigned psychiatrist. Psychiatric progress notes were cursory and did not indicate whether encounters were confidential. Primary clinician encounters occurred primarily at the cell front, appeared to be brief, and did not document the provision of therapeutic interventions. Recreational therapy interventions were provided exclusively at the cell front but repeatedly documented that the patient was too agitated to participate in out-of-cell recreational

therapy activities. After the initial IDTT meeting, only one follow-up IDTT meeting occurred. This meeting was timely and attended by the patient and required staff, apart from an alternate for the primary clinician. This time, the treatment team found that the patient met four criteria for consideration of a higher level of care, and the patient was referred to acute care due to ongoing bizarre and psychotic behavior. The treatment plan was not updated. On the same day, the patient was referred to acute care, a non-emergent PC 2602 hearing occurred, and the order for involuntary treatment was extended for another year. A suicide risk evaluation completed on that date was adequate and found the patient at moderate risk. The mental health consultation completed in connection with the patient's referral to acute care was detailed and provided adequate justification for the inpatient admission. No IDTT meet was held between November 13 and November 20, 2025. The psychiatric discharge summary was completed a few hours after the patient was received in acute care but provided a minimally adequate description of the patient's course of treatment.

**Findings**

The care provided to this MHCB patient was inadequate.

Strengths in this patient's treatment include the pursuit of continued involuntary treatment, the eventual decision to refer the patient to acute care, and careful consideration of the patient's suicide risk at the time of the acute care referral. However, the patient's initial IDTT meeting occurred late and failed to document existent triggers for consideration of higher level of care. Although the first follow-up IDTT meeting occurred timely, and second weekly IDTT meeting was required but did not occur prior to discharge. The treatment plan did not adequately address mania or psychosis, and most IDTT documentation was deficient. Most individual encounters occurred at the cell front or were accompanied by documentation that did not indicate whether the encounter was confidential. Except for psychopharmacological treatment, there was no documentation that evidence-based care was provided.

**Patient DD**

This 29-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at SVSP. He was diagnosed with alcohol and opioid use disorders and an unspecified anxiety disorder by the psychiatrist, and with unspecified bipolar disorder, antisocial personality disorder, and substance use disorder by the psychologist. He was prescribed melatonin and adherent with this medication on five of six administrations, but he declined to accept other psychotropic medications. Hydroxyzine was prescribed PRN for anxiety and intramuscular diphenhydramine, haloperidol, and lorazepam were prescribed PRN for agitation, but he did not use any PRN medication during his MHCB care. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and partially adherent with this medication. Five episodes of self-injurious behavior were listed in the health record, and psychiatric notes documented a history of aa hanging attempt and a 2024 opioid overdose. Medical conditions included asthma, opioid use disorder, history of hepatitis C, hyperparathyroidism, and lumbago with sciatica. Within CDCR, the patient had previously received all levels of mental health care except ICF services. He was treated involuntarily under PC 2602 for danger to others

and grave disability from early 2019 through mid-2020. At SVSP, he was admitted to MHCB care from November 12, 2024 to November 18, 2024 for suicidal ideation with a plan and intent.

The initial psychiatric and primary clinician assessments were timely but did not reconcile conflicting diagnoses. Confusingly, the initial psychiatric assessment also indicated that the patient would be placed on q 15-minute and on q 30-minute watch. The primary clinician assessment did not update the case formulation. The initial IDTT meeting was timely but held in absentia due to the patient's refusal to attend. The assigned psychiatrist, an alternate for the assigned primary clinician, a senior psychologist supervisor, correctional counselor, and registered nurse attended. The patient was found to meet criteria for consideration of a higher level of care due having eight MHCB admissions/referrals in the prior six months, along with seven RVR mental health assessments in the prior 90 days. Rationale for retaining the patient in MHCB care was adequately documented. The case formulation and treatment plan were not updated from those developed at another facility, and they did not address the patient's self-reported suicidal ideation or depression, which the psychiatrist identified as target symptoms. The patient was followed daily by one of two primary clinicians and/or the assigned psychiatrist, but the patient refused most primary clinician contacts. On November 15, 2025, orders for the patient's issue were changed from partial to a safety smock after the patient threatened to hang himself with his shirt. The IDTT follow-up meeting was timely and attended by assigned staff, but it was again completed in absentia due to the patient's refusal. IDTT documentation indicated that the patient had somehow reached maximum benefit from MHCB care while simultaneously indicating that short-term treatment goals were not reached because the patient had not attempted to try to reach them. Although the patient continued to meet criteria for consideration of a higher level of care, the treatment team concluded that the patient did not require PIP admission or additional MHCB care. The discharge suicide risk evaluation found the patient at low risk but appeared to minimize risk resulting from the patient's history, personality disorder, and substance use. The patient refused to cooperate with developing a safety plan. The resulting safety plan provided no assistance to the patient or subsequent treatment providers. The psychiatric discharge summary was timely but asserted that the patient had benefitted from multidisciplinary treatment and could be discharged, despite remaining on suicide precautions and in a suicide smock at the time of discharge. The patient required emergency intervention upon his return to the sending institution.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient's anger and agitation were not adequately addressed during the MHCB stay, and the determination that he was at low risk for suicide at discharge was at odds with simultaneous orders for suicide precautions as well as the patient's history and other risk factors. The patient's resistance to treatment and refusal of psychotropic medications were not adequately explored or addressed. The patient's psychiatric diagnoses were not resolved and remained unclear throughout the MHCB stay. Although the assigned psychiatrist asserted that the patient had benefited from MHCB care, there was no documented evidence that he made any treatment progress or that the treatment team had made adequate attempts to understand the patient's suffering and symptoms. The safety plan was not useful or useable.

**APPENDIX B-25**
**San Quentin Rehabilitative Center (SQ)**
**Review Period: September 1, 2024, to February 28, 2025**

**Patient A**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided diagnoses of unspecified depressive disorder, anxiety disorder with panic and social phobia, and substance use disorders. He was prescribed first fluoxetine and then sertraline; both were ordered as KOP medications. Atenolol, atomoxetine, and hydroxyzine were prescribed PRN for restless leg syndrome and anxiety. He used atenolol and atomoxetine daily and hydroxyzine rarely. No suicide attempts or episodes of self-injurious behaviors were listed in the health record. Within CDCR, the patient had previously received only 3CMS care. Medical conditions included hernia of anterior abdominal wall and amphetamine-type substance use disorder, severe, in sustained remission. He arrived at SQ on March 24, 2023 and received 3CMS care from throughout the review period. He was housed in Facility A.

The annual IDTT meeting occurred prior to the review period and did not result in the development of a treatment plan. An annual IDTT meeting occurred timely after the review period, but this meeting also did not result in the development of a treatment plan. The assigned psychiatrist offered six encounters to the patient during the review period, including one in response to the patient's healthcare services request for a change in antidepressant medication due to continuing depression. The patient attended four psychiatric appointments but failed to appear for two. He was rescheduled following missed appointments. Psychiatric documentation was thorough. Medication changes were made in response to the patient's symptoms and side effects, and bipolar disorder was ruled out with adequate documentation of the rationale for this determination. During the review period, the assigned PC offered the patient three individual encounters. The patient failed to appear for the first appointment, and no wellness check was provided. The second and third PC appointments were characterized by active support, provision of pragmatic advice, education, and adequate monitoring of the patient's symptoms, functions, and responses to treatment.

**Findings**

The treatment provided to this 3CMS patient was adequate.

Despite the lack of a treatment plan, interventions provided by the PC and psychiatrist were methodical, collaborative, timely, and responsive to the patient's treatment needs. Frequency of services was appropriate for the patient's care and exceeded minimum Program Guide requirements. The patient responded well to medication adjustments and therapeutic support provided by the PC. Completion of a treatment plan was an area for improvement.

**Patient B**

This 44-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided a diagnosis of major depressive disorder, recurrent, unspecified. He was not prescribed psychotropic medication. One suicide attempt was listed in the health record. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. Medical conditions included right elbow pain and gum ulceration, resulting in difficulty chewing. He arrived at SQ on July 3, 2024 and received 3CMS care from throughout the review period. He was housed in Facility A.

The initial IDTT meeting occurred prior to the review period and did not result in the development of a treatment plan. As a result, there was no treatment plan to guide 3CMS care during the review period. An annual IDTT meeting became overdue and did not occur. During the review period, the first PC encounter was late and occurred 136 days after the next more recent contact. Remaining PC encounters were timely. All encounters were confidential, collaborative, and adequately documented. The patient received adequate and empathic monitoring. However, the provision of evidence-based interventions linked to the patient's treatment plan, and the patient's response to these interventions, were not documented. A post-MHCB discharge SRE was completed timely and adequately in a confidential setting; the patient was found at low risk, with adequate documentation of the rationale for this determination. Beginning in mid-December, 2024, the patient was offered a weekly hour-long recreational therapy group focused on anger management. He consistently attended and participated actively.

**Findings**

The treatment provided to this 3CMS patient was adequate.

Despite lack of a treatment plan and tardiness in holding the first PC encounter, the assigned PC provided warm and supportive treatment and demonstrated good collaboration with the patient. PC monitoring confirmed that the patient was euthymic, stable, and free from significant symptoms. The patient attended ten group sessions focused on anger management and appeared to benefit from them. Improvement in documenting specific interventions tied to a specific treatment plan was needed, but overall care appeared to meet the patient's treatment needs adequately.

**Patient C**

This 46-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided a diagnosis of bipolar disorder, which was subsequently changed to ADHD. He was prescribed and adherent with divalproex sodium and atomoxetine. One suicide attempt was listed in the health record. Within CDCR, the patient had previously received only 3CMS care. Medical conditions included type 2 diabetes, mixed hyperlipidemia, umbilical hernia, upper back pain, and hearing loss. He used hearing aids. He arrived at SQ on July 21, 2022 and received 3CMS care throughout the review period. He was housed in Facility A but placed on RHU status from November 24, 2024 to December 12, 2024 following an altercation with his cellmate.

The initial IDTT meeting occurred prior to the review period and did not result in the development of a treatment plan. As a result, there was no treatment plan to guide 3CMS care during the review period. During the review period, the psychiatrist saw the patient on four occasions, including once in response to a healthcare services request and once in response to a referral from the PC indicating that the patient was experiencing psychotic symptoms. During the first encounter, medication was changed from divalproex sodium to atomoxetine, and the patient's diagnosis was changed from bipolar disorder to ADHD. Psychiatric encounters were timely and adequately documented, although progress notes did not indicate whether encounters were confidential. The patient was assessed as stable, with no psychosis, and the patient declined antipsychotic medications when these were discussed. After atomoxetine was initiated, no further medication changes were made. The assigned PC saw the patient on five occasions, four of which were confidential. In addition, in November 2024the patient was seen for two urgent consults by two different PCs following the patient's altercation with his cellmate and referrals from custody indicating that the patient was bizarre, confused, paranoid, and hallucinating. The consults were adequately documented, and the second consult resulted in a referral to the psychiatrist for possible psychosis and noted that the patient might benefit from a higher level of care. The assigned PC's encounters were confidential, timely, well documented, and demonstrated positive therapeutic rapport. The PC documented using motivational interviewing, but progress notes did not indicate the target for this intervention or the patient's response. In December 2024 and January 2025, the PC documented that the patient was tangential and disorganized in his thinking, but there was no follow-up regarding the November 2024 findings of possible psychosis. Beginning in December 2024, the patient was offered and attended a weekly recreational therapy creative writing group.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Throughout the review period, there was no treatment plan to guide 3CMS care. While the change in diagnosis and medication may have been clinically appropriate, the rationale for the change in diagnosis was not documented. Divergent assessments of the patient's symptoms, including whether the patient was experiencing psychotic symptoms or not, were not adequately addressed or reconciled. Beyond medications and a vague reference to motivational interviewing, there was no evidence that planned, evidence-based interventions were provided. The frequency with which the patient was seen by the psychiatrist and PC was a significant strength, but it was not clear that the patient received the treatment he needed.

**Patient D**

This 52-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided differential diagnoses of schizophrenia versus substance-induced psychotic disorder; these diagnoses were not reconciled during the review period. He was prescribed lamotrigine, melatonin, and olanzapine and was adherent with lamotrigine but not with melatonin or olanzapine. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder, and through medical services, he was prescribed amitriptyline and duloxetine for chronic low back pain. Four suicide attempts were listed in the

health record. Within CDCR, the patient had previously received 3CMS, MHCB, EOP, and acute care. Medical conditions included hyperlipidemia, chronic obstructive pulmonary disease, obstructive sleep apnea, chronic low back pain, pulmonary nodule, hepatitis C, opioid and stimulant use disorders, and a history of malignant neoplasm of testis. He used a CPAP machine and back braces. He arrived at SQ on September 24, 2024 and received 3CMS care from September 24, 2024 through the end of the review period. He was housed in Facility A.

A mental health consult was completed one day after the patient's arrival, based on a positive mental health screening. The consult was adequate, but an initial PC assessment was not completed, and no further PC encounters occurred during the review period. The initial psychiatric assessment was timely and adequate, although it did not indicate whether it was confidential. An initial IDTT meeting was not held. The first IDTT meeting occurred on May 29, 2025, 247 days after the patient's arrival at SQ and long after the review period ended. This was the first IDTT meeting since October 21, 2021. It did not result in the development of a treatment plan. Psychiatric care was timely, appropriate, and well documented. The patient was seen every 30 to 60 days and received adequate monitoring, medication adherence education, encouragement, and collaboration.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

An initial PC assessment was not completed, an initial IDTT meeting was not held, and the patient did not receive required individual PC encounters. No treatment plan was available to guide care during the review period, and an IDTT meeting was finally held long after the review period, no treatment plan was developed. Psychiatric care was a strength, but the lack of multidisciplinary treatment planning and clinical treatment outside of psychiatric contacts rendered overall treatment inadequate.

**Patient E**

This 43-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided diagnoses of unspecified depressive disorder, polysubstance dependence [sic], and a cluster B personality disorder. He was prescribed and adherent with sertraline. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Medical services also prescribed bupropion for methamphetamine cravings, and the patient was adherent with this medication. One suicide attempt was listed in the health record. Within CDCR, the patient had previously received only 3CMS care. Medical conditions included prediabetes, obesity, history of hepatitis C, and opioid and methamphetamine use disorders. He arrived at SQ on June 26, 2024 and received 3CMS care from throughout the review period. He was housed in Badger unit, where C-status incarcerated persons were segregated.

The initial IDTT meeting occurred prior to the review period and did not result in the development of a treatment plan. As a result, there was no treatment plan to guide 3CMS care during the review period. The patient was offered two psychiatric encounters during the review period; both were timely and adequately documented. The psychiatrist appropriately referred the patient to a

dialectical behavioral therapy group based on the patient's treatment needs. The patient refused the second psychiatric encounter, and a wellness check at the cell front was completed. The PC offered three timely encounters during the review period; the patient again refused the second encounter, and a wellness check was attempted 15 days later, but the patient was not found. No evidence-based interventions were documented during PC contacts, and the encounters were not tied to a plan of care with defined treatment objectives. The patient was offered multiple mental health groups, including recreational therapy groups in the yard, a cognitive behavioral intervention group focused on substance use, and a social skills group facilitated by a predoctoral psychology intern. He attended most groups and was an active participant. A mental health evaluation for an RVR alleging possession of a controlled substance was adequate and found no nexus between mental health symptoms and the alleged behavior.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

During the review period, there was no treatment plan available to guide treatment. Psychiatric care was timely, confidential, and adequate, but it was not clear what treatment goals were being pursued, or how they were being pursued, during PC encounters. The reasons for the patient's disengagement from individual sessions was inadequately explored. PC encounters were consistent with supportive care but not with structured treatment. However, the provision of multiple mental health groups was a significant strength in this patient's care.

**Patient F**

This 24-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided diagnoses of unspecified depressive disorder and unspecified anxiety disorder. He was not prescribed psychotropic medications. No suicide attempts or episodes of self-injurious behaviors were listed in the health record. Within CDCR, the patient had previously received only 3CMS care. Medical conditions included prediabetes, patellofemoral syndrome, and history of fracture of metacarpal in right hand. He arrived at SQ on April 10, 2023 and received 3CMS care throughout the review period. He was housed in Facility A.

The annual IDTT meeting occurred prior to the review period and did not result in the development of a treatment plan. An annual IDTT meeting occurred near the end of the review period. This meeting was timely, held in absentia due to the patient's refusal, and attended by the assigned providers; however, no correctional counselor was documented as attending. The patient did not meet criteria for a HLOC review. Neither the clinical summary nor the case formulation were updated, and the case formulation was generic with little patient-specific conceptualization. The patient's verbalized treatment goals, discharge criteria, and rationale for retention in 3CMS care were not documented, and no treatment plan was developed. As a result, there was no treatment plan to guide 3CMS care during the review period.

The assigned PC offered the patient three timely individual encounters during the review period. The first encounter was confidential and well documented; the progress note reflected active

therapeutic work related to trauma, loss, grief, empathy, and emotional vulnerability. The patient appeared for the following two appointments but asked to be excused due to conflicting contemporaneous duties as a prison tour guide and committee member. The PC noted that the patient was euthymic and free from mental health symptoms. A mental health assessment for a September 19, 2024 RVR alleging distribution of a controlled substance was minimally adequate and found no nexus between mental health symptoms and the alleged behavior. The patient's diagnoses were not specified, and there was no documentation that efforts were made to do so.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

There was no treatment plan to guide 3CMS care, and multiple elements of IDTT documentation were deficient. No correctional counselor attended the annual IDTT meeting. The patient's diagnoses remained unspecified, and no documented efforts were made to clarify them. The single completed PC encounter reflected active treatment, but offered in isolation, this session was unlikely to result in reliable treatment progress. Although this encounter provided evidence that the patient would benefit from 3CMS care, the rationale for 3CMS care was not documented, and the encounter represented the only treatment the patient received during the review period.

**Patient G**

This 26-year-old 3CMS transgender patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided diagnoses of unspecified mood disorder, PTSD, and adjustment disorder with anxiety. She was prescribed and adherent with hydroxyzine, lamotrigine, and prazosin. An additional dose of hydroxyzine was prescribed PRN for anxiety, and with few exceptions she used this medication nightly. Through the ISUDT, she was prescribed buprenorphine-naloxone for opioid use disorder. No suicide attempts or episodes of self-injurious behaviors were listed in the health record. Within CDCR, the patient had previously received only 3CMS care. Medical conditions included HIV infection, asthma, left hip pain with a history of left femur fracture, eczema, gender dysphoria in adolescence and adulthood, and stimulant and opioid use disorders. Through medical services, she was prescribed gender affirming hormone treatment. She arrived at SQ on March 26, 2024 and received 3CMS care throughout the review period. She was housed on North block and then in the Badger Unit, where C-status patients were segregated.

The initial IDTT meeting occurred prior to the review period and did not result in the development of a treatment plan. As a result, there was no treatment plan to guide 3CMS during the review period. Following the review period, IDTT meetings were held in April 2025 and August 2025; neither meeting resulted in the development of a treatment plan. The assigned psychiatrist followed the patient timely throughout the review period and adjusted medications collaboratively with the patient. On December 8, 2024, the patient was crying, distraught, and seen by a covering psychiatrist in the TTA. She was prescribed a one-time dose of lorazepam, which resulted in calming, and was placed in medical quarantine due to having the flu. Psychiatric documentation was only partially adequate. Progress notes did not demonstrate sufficient effort to specify the patient's diagnosis and repeatedly indicated that the patient was psychiatrically stable with no

evidence of self-harm or violence. In contrast, other documentation indicated labile and reactive mood, and the patient reported episodes of self-injurious behavior including head banging and superficially scratching her inner thighs to relieve stress.

The assigned PC saw the patient monthly in confidential settings throughout the review period. Progress notes for these encounters did not evidence provision of treatment interventions or awareness that the patient had reported engaging in self-injurious behavior. During the review period, the patient submitted multiple healthcare services requests asking for additional groups, a transfer to a facility where she could receive more group treatment, medication changes, and additional contact with her PC. In these requests, she communicated that she was experiencing significant distress accompanied by a sense of urgency. Responses to these requests were timely, including two urgent consults, but did not result in a reliable increase in emotional or behavioral stability. Mental health evaluations for October 3, 2024 and November 24, 2024 RVRs alleging unauthorized possession of drug paraphernalia were adequate and found no nexus between mental health symptoms and the alleged behaviors. The patient reported that she had engaged in RVRs to lengthen her sentence and obtain C status so that she could be housed near a partner. Beginning in December 2024, the patient was offered and attended recreational therapy groups and placed on the waiting list for clinical groups; recreational therapists also provided in-cell therapeutic activities.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

During and following the review period, there was no treatment plan available to guide treatment. Although psychiatric monitoring and medication management appeared appropriate, the patient's mood lability, distress, need for adequate therapeutic structure, self-reported self-injurious behavior, poor judgment, and rules violations were not adequately addressed by the treatment team. The patient repeatedly submitted mental health requests indicating that she was distressed and in need of more and additional treatment, and she required repeated urgent mental health interventions due to emotional distress. Diagnostic clarification was needed. Except for psychotropic medication, there was little evidence that evidence-based interventions were provided. She did not receive the treatment she needed.

**Patient H**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided diagnoses of adjustment disorder with depressed mood and PTSD. He was prescribed and adherent with mirtazapine and prazosin. Sertraline was prescribed as a KOP medication. Through medical services, he was prescribed lorazepam PRN for seizure disorder and headaches. He used this medication once during the review period. No suicide attempts or episodes of self-injurious behaviors were listed in the health record. Medical conditions included HIV infection, seizure disorder, asthma, lower back and shoulder pain, and opioid use disorder. Within CDCR, the patient had previously received only 3CMS care. He arrived at SQ on May 29, 2024 and received 3CMS care from throughout the

review period. In mid-February, 2025, he was placed on RHU status for a single day. He was housed in the Badger unit and was on C-status.

The initial IDTT meeting occurred prior to the review period and did not result in the development of a treatment plan. An annual IDTT meeting occurred near the end of the review period. It was timely and attended by required staff but not the patient, who refused. The patient did not meet criteria for a HLOC review. Although the IDTT meeting was held in absentia, the clinical summary indicated communication with the patient as if he were attending. The case formulation consisted of a note indicating that the previous case formulation was still relevant, but the case formulation itself was not present; the previous case formulation was a generic exposition on the difficulty of becoming incarcerated. The patient's verbalized treatment goals and discharge criteria were not documented, and no treatment plan was developed. As a result, there was no treatment plan to guide 3CMS care during the review period. The patient failed to attend four appointments with the assigned psychiatrist; a wellness check at the cell front was provided after the fourth appointment. Two days following the wellness check, on February 7, 2025, he was seen for the first and only confidential psychiatric encounter of the review period. Psychiatric documentation was adequate, and no medication changes were made. Four PCs offered the patient a total of five individual encounters during the review period. The patient was not offered any PC encounters during the 121 days between September 10, 2024 and January 9, 2025. The patient failed to appear for two PC appointments; a follow-up wellness check at the cell front occurred for one of the encounters. He was seen for an urgent mental health consult in mid-February 2025 following an altercation; this encounter was adequately documented. Remaining PC progress notes reflect supportive care and were focused on monitoring the patient's mental status and functioning and/or introducing the PC to the patient. Reasons for multiple PCs providing treatment were not documented.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Throughout the review period, there was no treatment plan to guide 3CMS care. Multiple documentation elements for the annual IDTT meeting were deficient. Despite multiple PC appointments, a period of over 120 days went by without the patient being offered a PC appointment. The turnover in PCs resulted in poor continuity, and PC progress notes did not reflect the provision of planned or evidence-based care. Beyond psychotropic medications, there was no evidence that the patient received meaningful treatment.

**Patient I**

This 34-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided a diagnosis of adjustment disorder with anxiety. He was prescribed sertraline as a KOP medication. No suicide attempts or episodes of self-injurious behaviors were listed in the health record. Medical conditions included multiple lipomas and right shoulder pain. Within CDCR, the patient had previously received 3CMS and, from September 11, 2024 through September 21, 2024 MHCB care at CMF. The MHCB admission had been precipitated by significant impairment due to mental illness. Following

MHCB discharge, he returned to SQ on September 21, 2024 and received 3CMS care from September 21, 2024 through the end of the review period. He was housed in Badger unit on C status.

Upon MHCB discharge and return to 3CMS care at SQ, five-day follow-up encounters occurred as required and were adequately documented. Initial PC and psychiatric assessments were not completed. The initial IDTT meeting was two days late and held in absentia for reasons that were not documented. Apart from an alternate for the assigned psychiatrist, required staff attended. The patient did not meet criteria for a HLOC review. The clinical summary was cursory, but the case formulation was partially adequate. The patient's C status and precipitants for the patient's recent decompensation were not adequately addressed. Patient strengths, verbalized treatment goals, discharge criteria, and rationale for retention in 3CMS care were not documented. The treatment plan targeted limited insight for treatment but did not include measurable goals or specific interventions beyond CBT to identify patterns of thought, emotion, and behavior.

Although an initial PC assessment was not completed, an urgent mental health consult and SRE were completed on September 23, 2024 following a positive screening for possible PREA risk. The consult and SRE were adequate, and the patient was found to be stable and at low risk. The psychiatrist made a timely attempt to conduct an initial assessment, but the patient did not appear for three appointments in a row, and the patient was first seen by the psychiatrist at the cell front following his third appointment refusal. This cell-front encounter occurred on January 17, 2024, 118 days after the patient had returned to 3CMS care and two days after the order for sertraline had expired. Sertraline was reordered, and the patient was again seen four days later. Neither the January 17, 2025 nor the January 21, 2025 progress notes represented an initial psychiatric assessment; documentation for the first encounter was consistent with the brief contact at the cell front, and documentation for the second contact was consistent with a routine psychiatric encounter. Following the September 23, 2024 urgent mental health consult, the assigned PC offered three individual encounters during the review period. The patient refused all three appointments, and each time was seen at the cell front. Documentation was consistent with wellness checks, and the provision of CBT interventions was not documented. A second urgent mental health consult occurred on December 21, 2024, after custody staff observed odd behavior. The patient was found to be ruminating about his property and recent RVRs, with "possibly" disorganized thinking and pressured speech. Psychiatric and PC documentation following this incident demonstrated no awareness of this episode.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

Initial assessments were not completed following the patient's return to 3CMS care, and they were therefore not available for the IDTT meeting. Multiple elements of IDTT documentation were cursory, blank, or deficient. The patient's treatment needs were poorly documented. Treatment interventions were not well-defined and did not include psychiatric care. Barriers to the patient participating in scheduled treatment appointments were inadequately explored or addressed.

**Patient J**

This 26-year-old 3CMS patient's healthcare record was reviewed to assess the quality of mental health care provided at SQ. The patient was provided diagnoses of schizoaffective disorder, bipolar type, and adjustment disorder with mixed anxiety and depressed mood. These diagnoses were not clarified during the review period. He was prescribed but nonadherent with escitalopram, and this medication was discontinued as a result. No suicide attempts or episodes of self-injurious behaviors were listed in the health record. Within CDCR, the patient had previously received only 3CMS care. Medical conditions included asthma and chronic eczema. He arrived at SQ on October 22, 2024 and received 3CMS care from October 22, 2024 through the end of the review period. He was housed in Facility A.

The initial PC assessment was timely, thorough, and included an adequate case formulation. The initial psychiatric assessment was timely, partially adequate, and resulted in discontinuation of escitalopram. No diagnostic impressions were offered, although a confusing array of diagnoses was referenced, including PTSD, schizophrenia, schizoaffective disorder, bipolar type, and adjustment disorder with mixed anxiety and depressed mood. The psychiatrist documented a plan to see the patient if needed, but no follow-up appointments occurred. The initial IDTT meeting was two days late, held in absentia due to the patient's refusal, and attended by required staff. The patient did not meet criteria for a HLOC review. The clinical summary and case formulation, populated from the initial PC assessment, were adequate, as was documentation of the patient's strengths and verbalized treatment goals. However, no treatment plan was developed, and no discharge criteria were documented. The assigned PC offered seven individual treatment encounters during the review period, and the patient attended four of these. Attempts were made to complete wellness checks when the patient declined the appointment, but in at least one instance the patient's housing unit was on lockdown and the PC did not make direct contact with the patient. When the PC and patient met confidentially, encounters were focused on supporting prosocial behavior, adjusting to SQ, and prison politics. It was not clear what symptoms or behaviors were being treated.

**Findings**

The treatment provided to this 3CMS patient was inadequate.

The patient's diagnoses were not clarified during the review period, and it remained unclear whether the patient suffered from a serious mental illness. After escitalopram was discontinued during the initial psychiatric assessment, there was no psychiatric follow-up to assess the patient's functioning. No treatment plan was developed, and several elements of IDTT documentation were deficient. While the PC offered frequent individual encounters, the interventions and goals of treatment were poorly documented. It was not clear what the patient was being treated for or how the treatment was intended to work.

**Patient K**

This 55-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was diagnosed with posttraumatic stress disorder and major depressive disorder, recurrent, severe with psychotic features. He was prescribed and adherent

with melatonin, quetiapine, and sertraline. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions during the review period included obesity, chronic obstructive pulmonary disease, gastroesophageal reflux disease, back pain, traumatic neck injury with limited range of motion, history of boxer's fracture, saccular aneurysm at left middle cerebral artery, and opioid use disorder. He used a wheelchair and hearing aids. Within CDCR, the patient had previously received 3CMS and EOP care. At SQ, he was admitted to EOP care from April 17, 2023 through the end of the review period.

During the review period, the patient was followed monthly by one of two psychiatrists. Most psychiatric encounters occurred in a nonconfidential EOP day room due to the patient's preference for this location. Psychiatric documentation was adequate to track the patient's symptoms and response to medicines, and no medication changes were made. A total of five PCs provided weekly individual encounters during 24 of the 27 weeks included in the review period. Most of these encounters were nonconfidential and supportive in nature. While documentation reflected positive therapeutic rapport and collaboration, there was little to no documentation of specific, evidence-based interventions addressing trauma or depressive symptoms. Instead, many of these encounters were wellness checks or focused on case management issues related to the patient's anticipated release from CDCR or to the patient's consistent complaints regarding the prevalence of substance use in the EOP housing unit. Both psychiatric and clinician notes referred to a lack of confidential space in the unit contributing to contacts occurring in the dayroom milieu. Documentation of structured group programming was minimally adequate, but the patient refused more than a third of offered groups. Two IDTT meetings occurred. The first was held in absentia due to the patient's refusal, which was not explained; the patient attended the second meeting. Apart from alternates for the assigned PC, who were present for both IDTT meetings, required staff were in attendance. The patient was not found to meet criteria for a higher level of care on either occasion, and documentation of the patient's strengths and verbalized treatment goals was adequate. However, in the first of these IDTTs, the case formulation was generic and insufficient to guide treatment; the rationale for retaining the patient in EOP care was not documented; and no treatment plan was developed. In the second meeting, documentation of the case formulation and rationale for retention in EOP care was much improved, but the absence of a treatment plan persisted.

**Findings**

The care provided to this EOP patient was inadequate.

There was no treatment plan to guide EOP care, and the lack of a plan was evident in the lack of direction discernable in PC progress notes. There was no evidence that the patient received nonpharmacological, evidence-based interventions for major depressive disorder or posttraumatic stress disorder. There was no evidence of whether the patient's symptoms or functioning were progressing towards an identified goal. The rationale for retaining the patient in EOP care was poorly documented. Most psychiatric and PC care was not confidential, and continuity among PCs was problematic. The limitation in private and confidential treatment space and EOP environmental conditions, which included prevalent use of illicit substances by peers, negatively impacted the patient's treatment to a significant degree. His treatment needs were not met.

**Patient L**

This 55-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was primarily Spanish speaking and diagnosed with major depressive disorder, recurrent, moderate, unspecified anxiety disorder, and posttraumatic stress disorder. He was prescribed escitalopram, gabapentin, melatonin, and mirtazapine and was adherent with each medication except mirtazapine, which was discontinued. Diphenhydramine and propranolol were prescribed PRN for anxiety; he used the former only twice but the latter almost every day during the review period. Three suicide attempts and one episode of self-injurious behavior were listed in the health record. Medical conditions included diabetes, gastroesophageal reflux disease, hypertension, dyslipidemia, chronic tremor, back pain, and allergic rhinitis. Within CDCR, the patient had previously received all levels of mental health care except acute care. At SQ, he was admitted to EOP care from October 17, 2023 through the end of the review period.

The patient was followed at least monthly by one of two psychiatrists, including a timely follow-up for nonadherence with mirtazapine. Psychiatric care appeared appropriate, but psychiatric progress notes contained considerable language that was brought forward from previous encounters and not necessarily current. The psychiatrist used a language line interpreter to communicate; the assigned PC was bilingual and able to communicate without need for an interpreter. Although the assigned PC provided most of the weekly contacts, four additional clinicians provided occasional coverage when the assigned clinician was away. Primary clinician encounters occurred during 26 of the 27 weeks in the review period. Most psychiatric and PC encounters were confidential, although on occasion notes indicate a lack of confidential settings. Primary clinician progress notes consistently documented the provision of evidence-based interventions that were appropriate to the patient's needs, along with the patient's response to them. The patient was offered multiple mental health groups and declined almost all of them. One, related to trauma, he found overwhelming, and he asked to be withdrawn from this group. Three follow-up IDTT meetings occurred during the review period, all in absentia due to the patient's refusal to participate. Required staff attended all three meetings and consistently found that the patient did not meet criteria for consideration of a higher level of care. The case formulation was quite thorough and adequate to guide treatment. Documentation of patient strengths was limited, and there was no documentation of the patient's verbalized treatment goals. The treatment plan targeted anxiety and provided measurable and realistic goals along with specific, evidence-based interventions to achieve those goals, but the plan initially did not address the patient's depressive or trauma-related symptoms. During the second follow-up IDTT, a treatment goal targeting depression was added, along with measurable goals and specific interventions. The treatment plan was updated in the third follow-up meeting to indicate the patient's progress was ongoing for both goals, but no treatment goal related to the patient's documented traumatic history was developed. Adequate documentation of the rationale for retaining the patient in EOP care was present in the second, but not the first or third, IDTT meeting.

**Findings**

The care provided to this EOP patient was adequate.

The patient received timely and clinically appropriate psychiatric and nonpharmacological care, including timely and adequate IDTT meetings. Most treatment was confidential, and documentation was clear about the circumstances when nonconfidential encounters needed to be provided. Most treatment was provided by staff assigned to the patient. At least during individual encounters, the language barrier was adequately overcome, and progress notes consistently documented collaboration and a positive therapeutic rapport. The treatment plan, while initially insufficient, was improved over time, and documentation was sufficient to determine that trauma-focused treatment was contraindicated during the review period. The patient's refusal to attend groups and IDTT meetings was inadequately explored and addressed. Nevertheless, the patient's placement and retention in EOP appeared appropriate, and the care provided met his treatment needs.

**Patient M**

This 57-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was simultaneously diagnosed with major depressive disorder, recurrent, and unspecified mood disorder. He was not prescribed any scheduled psychotropic medication. Hydroxyzine was prescribed PRN for insomnia, but he did not use this medication during the review period. Three suicide attempts were listed in the health record. Medical conditions included hearing loss, hyperlipidemia, diabetes, amnesia, vertigo, and allergic rhinitis. He had impaired mobility and used hearing aids. Within CDCR, the patient had previously received 3CMS and EOP care. At SQ, he was admitted to EOP care from April 4, 2024 through the end of the review period.

The assigned psychiatrist followed the patient monthly, and one of three PCs followed the patient weekly throughout the review period. Psychiatric progress notes were largely adequate, but they did not indicate whether the encounters were confidential. Reasons for continuing the PRN hydroxyzine when the patient was not using it were not documented. The quality of PC encounters varied sharply by clinician, with clinical interventions documented by one clinician but not another; during the second half of the review period, PC encounters were consistent with wellness checks rather than treatment. Most PC progress notes did not indicate whether the encounters were confidential. Differences in diagnostic impressions were not reconciled. As evidenced in the PC notes, the patient's depression and anxiety symptoms worsened over the review period, in part due to his anticipation of release from incarceration. There was no indication the psychiatrist was consulted regarding this development. The patient's attendance of group programming also declined, and reasons for this decline were not adequately addressed. Follow-up IDTT meetings occurred twice during the review period. The patient attended both meetings, and required staff attended the second follow-up meeting. A correctional counselor did not attend the first follow-up IDTT meeting, and this meeting was attended by an alternate for the assigned psychiatrist. The patient was not found to meet criteria for a higher level of care during either meeting. The case formulation failed to address current symptoms and challenges and was not updated during EOP care. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan adequately addressed anxiety and treatment nonadherence but not depressive symptoms, and it was not updated to reflect the patient's response to treatment.

**Findings**

The care provided to this EOP patient was inadequate.

There was no diagnostic reconciliation during the review period, and although the patient received PC treatment focused on trauma during the first half of the review period, he was not diagnosed with a trauma-related disorder. A correctional counselor did not attend one of the two IDTT meetings. Primary clinician encounters during the second half of the review period consisted of wellness checks rather than treatment, and his mood, anxiety, and treatment attendance all declined during this period. The case formulation and treatment plan did not adequately address the patient's depressive symptoms or preparation for release to the community, and there was no evidence of multidisciplinary collaboration to reassess the patient's care needs when his anxiety and depression worsened. The care he received did not meet his treatment needs.

**Patient N**

This 38-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was diagnosed with bipolar disorder, attention-deficit/hyperactivity disorder on a rule out basis, and posttraumatic stress disorder, along with alcohol, methamphetamine, and opioid use disorders. His assigned psychiatrist prescribed guanfacine and oxcarbazepine but was increasingly nonadherent with these medications during the review period. Hydroxyzine was prescribed PRN for insomnia, but the patient did not use this medication during the review period. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. One suicide attempt and two episodes of self-injurious behavior were listed in the health record. Medical conditions included a history of hepatitis C. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At SQ, he was admitted to EOP care from October 19, 2023 through the end of the review period.

During five of the six months in the review period, the assigned psychiatrist provided follow-up encounters to the patient. However, the patient was not seen by psychiatry between October 1, 2024 and December 10, 2024. Most psychiatric care was non-confidential due to the patient's preference for location of the encounters. Appropriate counseling for medication nonadherence and monitoring for illicit substance use was documented, but the pattern of increasing medication nonadherence was inadequately addressed, and diagnostic clarity was not reached. The psychiatrist suspected active methamphetamine use. One of three PCs provided weekly individual care throughout the review period. Progress notes confirmed active, patient-specific interventions focused on vulnerability, self-care, and trauma. However, many of the encounters were nonconfidential, and the direction of treatment was unclear. Additionally, an unlicensed PC inappropriately encouraged the patient to engage in hugging others and made this a short-term goal; the patient reported feeling uncomfortable when hugged by two staff members. There was no evidence that any of the PCs were aware of the psychiatrist's concerns regarding active substance use. The patient attended mental health groups a little over half the time, and reasons for his non-participation were not explored or addressed. During November 2024, only five group sessions were documented. Two follow-up IDTT meetings occurred during the review period; the patient and required staff attended both, and on both occasions, he was found not to meet criteria for a higher level of care. The case formulation, patient strengths, and patient's verbalized

treatment goals were adequately documented. However, no treatment plan was developed, and the rationale for retaining the patient EOP care was inadequately documented.

**Findings**

The care provided to this EOP patient was inadequate.

There was no treatment plan to guide EOP care, and the rationale for EOP care was not documented. Diagnostic reconciliation and clarity were not achieved during the review period, and potential symptoms of bipolar disorder, attention-deficit/hyperactivity disorder and posttraumatic stress disorder were not documented. The increase in the patient's medication nonadherence was not addressed. Medications were continued despite the psychiatrist repeatedly informing the patient that they would be stopped if he did not become more adherent. No psychiatrist saw the patient during November 2024. An unlicensed PC encouraged the patient to engage in hugging behavior and made this a treatment goal, a highly inappropriate intervention in the context of CDCR regulations, the prison environment, and the patient's trauma history. Primary clinicians did not address the patient's suspected methamphetamine use or high level of group treatment refusals. While the patient's treatment needs were adequately documented in the case formulation, the treatment provided appeared rudderless and did not meet these needs.

**Patient O**

This 45-year-old transgender (he/him/his) EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. Psychiatric diagnoses used during the review period included adjustment disorder, with mixed anxiety and depression, gender dysphoria, substance use disorder, schizophrenia, and unspecified psychotic disorder. Despite repeated observations of positive, negative, and disorganized psychotic symptoms, these diagnoses were poorly reconciled during the review period. He was prescribed mirtazapine and paliperidone and was adherent with the former and partially adherent with the latter. Several episodes of self-injurious behaviors were noted in assessments. Medical conditions included gender dysphoria, dyslipidemia, anemia, and a history of gluteal abscess with fistulotomy. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At SQ, he was admitted to EOP care from August 6, 2024 through the end of the review period.

Upon EOP admission, five-day follow-up encounters were provided by three PCs and adequately documented on the first three days. The fourth follow-up encounter included no observations, and the fifth follow-up encounter, during which daily mental health follow-ups were presumably discontinued, included no plan. The psychiatric assessment was timely and adequate, apart from formulating current diagnostic impressions. The psychiatrist concluded that the patient lacked capacity to make decisions regarding transgender care due to psychosis and, in a follow-up encounter one week later, that the patient possessed capacity to make decisions regarding psychotropic medication. A PC 2602 petition for involuntary treatment was appropriately considered, given the patient's psychosis and initial refusal of psychotropic medications. The initial PC assessment was timely but relied heavily on prior documentation, without updating the case formulation or reaching diagnostic clarity. The initial IDTT meeting was timely but held in absentia due to the patient's refusal. The assigned psychiatrist and an alternate for the assigned

PC attended; there was no documentation that a correctional counselor attended. The patient met criteria for higher level of care due to multiple RVRs, but the rationale and plan for retaining the patient in EOP care were adequately documented. The case formulation was not updated, and the treatment plan was inadequate. It was pulled forward without modification from one developed seven months earlier, addressed only lack of insight but not psychotic symptoms or medication nonadherence, failed to include measurable goals, and included CBT as the only intervention, despite the centrality of psychiatric care to the patient's treatment.

The patient was followed at least monthly by the assigned psychiatrist. While progress notes did not consistently indicate whether the encounter was confidential, documentation reflected adequate assessment and monitoring of the patient's symptoms, medication adherence, thinking, and response to treatment. The patient was seen by one of three PCs during 17 of the 21 weeks encompassed by the review period. Most PC encounters were nonconfidential due to the patient's refusal of confidential treatment spaces, and these encounters were consistent with wellness checks; provision of evidence-based interventions was largely absent from clinicians' progress notes. The patient declined to attend most mental health groups, stating at one point that he found them overwhelming. Two follow-up IDTT meetings were held during the review period. In both cases, the patient, assigned psychiatrist, and alternate for the assigned clinician attended, while there was no documentation of a correctional counselor attending either meeting. During both meetings, the patient met criteria consideration of a higher level of care due to multiple RVR assessments and treatment refusals. The rationale for retaining the patient EOP and a plan for addressing his nonattendance in groups were adequately documented. The case formulation was updated appropriately. However, the treatment plan was not modified and continued to be deficient. Three of four mental health evaluations for RVRs for failures to present for count, disobeying an order, and destruction of state property found no nexus between the alleged behavior and the patient's mental health symptoms. The earliest of these evaluations, however, found this nexus during a period in which the patient was not accepting psychotropic medication. The mental health RVR evaluations were adequate.

**Findings**

The care provided to this EOP patient was inadequate.

The treatment plan was rudimentary, vague, failed to include psychiatric care, and was inadequate to guide the multidisciplinary care this patient required. No correctional counselor participated in the three IDTT meetings. Almost all PC encounters appeared to occur in nonconfidential settings, and these encounters appeared brief and consistent with wellness checks rather than treatment. While the patient was encouraged to attend groups, the reasons for his refusals of programming were inadequately explored and addressed. Psychiatric care was careful and psychiatric documentation was adequate. While psychiatric care was essential to meeting the patient's treatment needs, it was not sufficient, and he received little nonpharmacological interventions.

**Patient P**

This 81-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was diagnosed with major depressive disorder, recurrent,

severe. He was prescribed and adherent with escitalopram and mirtazapine. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included osteopenia, seborrheic dermatitis, hypertension, hyperlipidemia, hypothyroidism, anemia, aortic valve stenosis, cardiac murmur, hernia of anterior abdominal wall with chronic gastritis, benign paroxysmal positional vertigo, a history of non-Hodgkin's lymphoma, and chronic low back pain secondary to history of chemotherapy. He used hearing aids. Within CDCR, the patient had previously received only EOP care. At SQ, he was admitted to EOP care from August 24, 2020 through the end of the review period.

One of two assigned psychiatrists provided at least monthly follow-up encounters during the review period. Psychiatric documentation was thorough, and medications were adjusted to treat persistent depressive symptoms. Commendably, the patient was seen by his assigned psychiatrist on four occasions during December 2024 for close monitoring of the patient's response to and potential side effects from a new medication. One of four PCs provided weekly individual treatment throughout the review period. Most encounters were provided by assigned clinicians, who documented confidential sessions and provided therapeutic interventions that were appropriate for the patient's depressive symptoms and stage of life. Primary clinician progress notes were often sparse in content but nevertheless demonstrated principled treatment with detail sufficient to support continuity of care. However, as documented, the patient was offered two few mental health groups during the review period; for example, only two sessions were documented in October 2024, and only three in November 2024. Two follow-up IDTT meetings occurred during the review period. The patient declined to attend the first follow-up IDTT meeting but attended the second; required staff attended both. He was not found to meet criteria for a higher level of care on either occasion. The case formulation and documentation of the patient's strengths, verbalized treatment goals, and rationale for EOP care were all adequate. However, no treatment plan was developed.

**Findings**

The care provided to this EOP patient was adequate.

The patient received timely, confidential, and adequate treatment for his major depressive disorder. Medications were adjusted in response to symptom changes, with positive effect, and psychiatric documentation was adequate. Despite the absence of a treatment plan, individual psychotherapy remained focused appropriately on the patient's depressive symptoms, thought patterns, and behaviors. Although sparse in content, PC progress notes were adequate. The major areas for improvement arose from the absence of a documented treatment plan and the absence or only limited offering of mental health groups during multiple weeks of EOP care. With these important exceptions, the patient received the care he needed and experienced clinical improvement.

**Patient Q**

This 48-year-old, C status, EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was diagnosed with adjustment disorder, posttraumatic stress disorder, unspecified psychotic disorder, and stimulant and opioid use disorders. He was prescribed and adherent with aripiprazole, escitalopram, and hydroxyzine.

Additional doses of hydroxyzine were prescribed PRN for anxiety; he used these doses on three occasions during the relevant period. Through the ISUDT, he was prescribed buprenorphine-naloxone and adherent with this medication. Two suicide attempts were listed in the health record. Medical conditions included gastroesophageal reflux disease and hepatitis C with hepatic fibrosis. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At SQ, he was admitted to EOP care from November 18, 2024 through the end of the review period.

Upon EOP admission, five-day follow-up encounters were provided by three PCs and adequately documented. The initial PC and psychiatric assessments were timely and adequate. The case formulation was updated and adequate for guiding portions of the patient's treatment, but it did not address psychotic symptoms. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. Documentation of the patient's strengths and verbalized treatment goals was adequate, but the rationale for EOP care was not documented. The treatment plan was partially adequate. It included measurable goals and specific interventions but failed to address psychiatric care. The assigned psychiatrist provided a timely follow-up encounter and adjusted the patient's medications in response to reported side effects. The assigned PC provided weekly individual encounters. Progress notes were consistent with wellness checks and unplanned, largely supportive, interventions. It did not reflect provision of the specific interventions required by the treatment plan. Beginning in December 2024, the patient was offered mental health groups, and he attended just over half of these. A mental health evaluation for an RVR alleging a pattern of administrative rule violations found no nexus between mental health symptoms and the alleged violation.

**Findings**

The care provided to this EOP patient was inadequate.

Neither the case formulation nor the treatment plan addressed psychotic symptoms, and the treatment plan did not include psychiatric care. While the psychiatrist noted the possibility that the patient had a substance-induced psychotic disorder, efforts to establish diagnostic clarity were not documented. Nonpharmacological interventions required by the treatment plan were not provided during individual PC encounters, and the patient's refusal of nearly half the offered mental health groups was not investigated or addressed.

**Patient R**

This 72-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was diagnosed with unspecified schizophrenia and other psychotic spectrum disorder and unspecified mood disorder. He was prescribed and adherent with aripiprazole. Three episodes of self-injurious behavior were listed in the health record. Medical conditions included bilateral cataracts, impaired mobility, exposure to scabies, prediabetes, and a history of prostate cancer. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At SQ, he was admitted to EOP care from October 26, 2023 through the end of the review period.

The assigned psychiatrist followed the patient monthly during the review period. Progress notes did not indicate whether these encounters were confidential, but they were otherwise thorough. Responding to treatment team concerns, the psychiatrist evaluated the patient's cognitive functioning with the Montreal Cognitive Assessment and found his functioning slightly below average. Responding to the patient's request, the psychiatrist began a slow titration to discontinuation of aripiprazole, despite clear documentation of the patient's past psychotic symptoms, lack of insight, and grave disability. The assigned PC or, on one occasion, a covering clinician, provided weekly individual encounters throughout the review period except between September 20, 2024 and October 3, 2024, when no encounters occurred. Many PC encounters were nonconfidential and consistent with wellness checks; confidential encounters involved supportive therapy but occasionally documented clinically indicated, evidenced based care. The patient reported that he was concerned about releasing to the community and contemplated suicide by police officer; this statement was documented but inadequately monitored or communicated to the treatment team. The assigned clinician, concerned about potential cognitive decline, referred the patient for neurocognitive testing, and this was completed. Results and treatment recommendations from the assessment were not reflected in the health record. The clinician also addressed the patient's declining hygiene and declining participation in groups. The patient was offered between two and 11 groups each month; he declined to attend most of them. Two follow-up IDTT meetings occurred during the review period. The patient, the assigned PC, and an alternate for the assigned psychiatrist attended the first of these; no correctional counselor was documented as attending. The patient was not found to meet criteria for a higher level of care. The case formulation and patient strengths were adequately documented, but there was no documentation of the patient's verbalized treatment goals or rationale for EOP care. The treatment plan was incomplete, not updated, and did not address the patient's current symptoms and challenges. It included no short- or long-term goals and indicated erroneously that the intervention was a MHCB referral. The second follow-up IDTT was attended by required staff but not the patient; reasons for the patient's nonparticipation were not documented, although it was noted that he had not refused. This time, the patient's verbalized treatment goal and rationale for EOP care were documented, but the treatment plan was unchanged.

**Findings**

The care provided to this EOP patient was inadequate.

The patient's diagnosis was not clarified despite extensive available psychiatric history. The treatment plan was incomplete and deficient; it provided no direction for the patient's care. A correctional counselor was not present in one of the two IDTT meetings. Most of the individual PC encounters were nonconfidential wellness checks. Although there was sufficient concern about the patient's cognitive and daily functioning to pursue neurocognitive functioning, and although the patient had been assessed as lacking insight into his mental illness, the patient's capacity to decline antipsychotic medication was not assessed when the psychiatrist began a slow discontinuation of this medication. The availability of neurocognitive testing was a strength, but results and recommendations from this testing were absent from the health record. The patient was not offered sufficient structured treatment or sufficient assistance in preparation for his eventual release.

**Patient S**

This 47-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was simultaneously diagnosed with persistent depressive disorder, unspecified depressive disorder, unspecified personality disorder, and active stimulant use disorder. He was prescribed escitalopram and partially adherent with this medication. It was discontinued and replaced with fluoxetine, and the patient was adherent with fluoxetine. No suicide attempts or episodes of self-injurious behavior were listed in the health record. Medical conditions included obesity and knee pain. Within CDCR, the patient had previously received 3CMS and EOP care. At SQ, he was admitted to EOP care from July 27, 2023 through the end of the review period.

The assigned psychiatrist followed the patient at least monthly during the review period and adjusted the patient's antidepressant medication based on the patient's ongoing symptoms. The psychiatrist monitored and addressed the patient's ongoing methamphetamine use. Psychiatric progress notes were adequate, but the patient's diagnoses remained unresolved. One of four PCs followed the patient at least weekly during the review period, with more frequent contacts provided at the patient's request. Many PC encounters were not confidential, either due to the patient's refusal or due to the lack of available confidential treatment space. These encounters were consistent with wellness checks. Confidential encounters occasionally used cognitive-behavioral interventions to address negative thinking and depressive symptoms, but the goal of these sessions was unclear. As documented, most encounters were supportive rather than structured treatment. Between two and eleven mental health groups were offered each month; the patient refused all but two group sessions during the review period. Two follow-up IDTT meetings occurred during the review period; the patient and required staff attended both. In both meetings, the patient was found to meet criteria for consideration of higher level of care due to multiple MHCB admissions, multiple RVR assessments, and high frequency of treatment refusal. Rationale for retaining the patient in EOP care was adequately documented. The case formulation and the patient's strengths, participation in the IDTT meetings, and verbalized treatment goals were all adequately documented. However, no treatment plan was developed. Nine mental health assessments for RVRs were completed by five clinicians during the review period. RVRs alleged fighting (on two occasions), possession of drug paraphernalia, failure to present for count, possession of a cellular telephone component, disobeying an order, battery on a prisoner, theft, and refusing a toxicology screen. The patient refused to participate in most assessments, and no assessments found a nexus between mental health symptoms and the alleged behaviors.

**Findings**

The care provided to this EOP patient was inadequate.

Despite adequate psychiatric care, timely IDTT meetings, and timely PC encounters, the treatment provided did not meet the patient's needs. There was no treatment plan. Many of the PC encounters were nonconfidential and did constitute treatment, and those encounters that were confidential did not appear to provide planned, systematic treatment. The patient attended almost no mental health groups during the review period, and while this was noted during IDTT meetings, his nonparticipation was inadequately addressed. The patient's diagnoses and the nature of his

depressive symptoms were not clarified, and the role of the patient's methamphetamine use in self-medicating and exacerbating depressive symptoms was poorly investigated. The patient's baseline functioning did not improve.

**Patient T**

This 57-year-old EOP patient's healthcare record was selected for review to assess the quality of mental health care provided at SQ. He was diagnosed with major depressive disorder, in partial remission. He was prescribed and adherent with sertraline. Two episodes of self-injurious behavior were listed in the health record. Medical conditions included migraine, mild intermittent asthma, obesity, dyslipidemia, vitamin D deficiency, heartburn, and dizziness. Within CDCR, the patient had previously received 3CMS, MHCB, and EOP care. At SQ, he was admitted to EOP care from August 12, 2021 through the end of the review period.

The assigned psychiatrist saw the patient for monthly follow-up appointments during four of the six months in the review period. No psychiatrist saw the patient during the 106 days between September 6, 2024 and December 20, 2024. The patient's symptoms and responses to medication were adequately monitored, but it was unclear whether he was provided treatment for his reports of anxiety. All psychiatric encounters and most PC encounters were nonconfidential due to the patient's preference of treatment space. PC encounters rarely indicated provision of interventions beyond general support and wellness checks. Only one follow-up IDTT meeting occurred during the review period; it was the first IDTT meeting for the patient in eight months. It was held in absentia due to the patient's refusal and attended by required staff. The patient was not found to meet criteria for a higher level of care. Surprisingly, given his refusal of more than half of offered mental health groups, the patient was not flagged for treatment refusal. The patient's reasons for refusing the IDTT meeting were not addressed. The case formulation was adequate, but patient strengths, verbalized treatment goals, and rationale for EOP care were not documented. No treatment plan was developed.

**Findings**

The care provided to this EOP patient was inadequate.

No treatment plan was developed, and only one IDTT meeting, held well after it was due, occurred during the review period. The patient's refusal to participate and his high frequency of treatment refusals were not identified as challenges or addressed during this meeting. Most treatment was nonconfidential. Psychiatric care did not meet minimum frequency requirements for EOP care, and PC encounters were almost always consistent with either wellness checks or unplanned, supportive counseling. As documented, cognitive-behavioral interventions for the patient's depression were provided only rarely, and interventions for anxiety were not documented.

**Patient U**

This 35-year-old male patient was provided with a diagnosis of schizoaffective disorder, bipolar type. He was fully adherent to his prescribed aripiprazole, levetiracetam, and melatonin. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the

monitoring period. This individual was incarcerated within CDCR for the first time on May 16, 2023 and was placed at the EOP level of care while at the reception center. He was admitted to the MHCB on June 12, 2023 and discharged to the EOP level of care. He continued to move between the EOP and MHCB levels of care, with six MHCB admissions, through June 26, 2024 when he was discharged from MHCB to the 3CMS level of care. He remained at 3CMS for only two days before returning to the MHCB for 26 days and again discharging to the 3CMS level of care. He was admitted to the SQ MHCB from the 3CMS level of care on October 24, 2024 after reporting increased depressive symptoms and thoughts of suicide with intent.

An initial psychiatric assessment was completed on the day of admission and was comprehensive. An initial IDTT meeting was held the following day with an MHPC, psychiatrist, correctional counselor, and the patient in attendance. There was no nursing representative at the meeting. The number of MHCB referrals which occurred within the previous six months warranted consideration of the need for a higher level of care. The rationale for not referring him to a higher level of care was adequate, noting that he was placed within the MHCB and referred for neuropsychological testing and a DDP evaluation; however, no treatment modifications were documented, only routine MHCB treatment. IDTT documentation did not include treatment goals or specific treatment interventions to be provided yet the initial MHPC assessment completed after the meeting included a reasonable and measurable goal with adequate interventions. IDTT meetings were conducted weekly over the following two weeks and while the patient's status was discussed at each meeting, there was no mention of progress toward identified treatment goals. Nursing staff were not present for the meetings.

The patient was seen daily for clinical contacts, often by both a psychiatrist and MHPC, typically in confidential settings unless he refused. Contacts appeared to address his needs; however, psychiatric documentation included large portions of the same text copied note to note. Recreational therapy contacts were conducted briefly at cell front and usually consisted of exchanging books and providing materials to work on in the cell. There was evidence that the patient attended a few NLTGs. Documentation indicated that the patient was to remain in the MHCB until DDP testing was completed. Neuropsychological testing was no longer discussed. On November 6, 2024, a psychiatrist documented that the DDP testing had been completed and results were pending. The patient was agitated and kicking his door on November 11, 2024, reporting paranoid thoughts. The psychiatrist who assessed the patient the following day determined that the behavior was secondary to frustration with remaining in MHCB and not related to mental illness. Results from the DDP evaluation were documented on November 13, 2024 and noted no cognitive deficits or evidence of a developmental disability. The patient was seen for a discharge IDTT on November 13, 2024 with an MHPC, psychiatrist, correctional counselor, and the patient present, but no nursing staff. Content was mostly adequate; however, the modifications in treatment to support the patient in his current level of care rather than referring to a higher level of care continued to be inadequate. The decision was made to discharge the patient to the EOP level of care with adequate rationale. The discharge SRASHE and safety plan were adequate.

**Findings**

Treatment of this patient was adequate; however, there could have been more treatment provided to support the patient's interpersonal and social needs which appeared to precipitate his

decompensation and need for MHCB placement. Nursing staff were not documented as being present during IDTT meetings.

**Patient V**

This 35-year-old male patient was provided with diagnoses of unspecified schizophrenia spectrum and other related disorder, unspecified anxiety disorder, and tardive dyskinesis. He was not consistently adherent to his prescribed olanzapine. He was also prescribed hydroxyzine as needed. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. This patient was incarcerated within CDCR for the third time on June 5, 2024. During both previous periods of incarceration, in 2020 and in 2022, he was treated primarily at the EOP level of care with a single MHCB admission in November 2020. Upon arrival at the reception center in June 2024, he was placed at the EOP level of care. He was admitted to the MHCB at SQ on January 5, 2025. At the time of admission, he had been awaiting transfer to the ICF level of care in the EOP for 25 days and was due for a PC 2602 hearing on January 7, 2025.

On the evening of January 4, 2025, the patient stated he was suicidal and then stated that he may harm others in his dorm after requesting a bed move which was denied. Upon assessment, it was determined that he posed a risk to others due to mental health symptoms and he was admitted to the MHCB level of care. An adequate initial psychiatric assessment was completed on January 5, 2025 which also noted the patient's pending PC 2602 hearing scheduled for January 7, 2025. He was seen by a social worker who completed an assessment and provided adequate rationale for monitoring and privilege decisions. The PC 2602 hearing was held and it was determined that the patient required involuntary medications. A SRASHE was completed on January 7, 2025 and included adequate rationale for risk decisions. The daily contact note for January 8, 2025 included a mental status examination copied exactly from the SRASHE, which was completed a day earlier, without being updated.

An initial IDTT meeting was held on January 8, 2025 without any nursing staff present. The patient refused to attend. Documentation noted that the patient had been accepted to the ICF level of care and was pending transfer. There was one treatment goal created to address depression, which was not in keeping with the reason for his admission to the MHCB nor the findings of the initial assessments which commented on the patient's psychotic symptoms as primary treatment targets. The patient was offered recreational therapy contacts but refused. All daily clinical contacts were held cell front secondary to patient refusal.

The patient was transferred to the ICF level of care on January 10, 2025. The discharge summary authored by a psychiatrist was adequate.

**Findings**

Treatment of this patient was adequate but the treatment plan did not correspond to the treatment targets identified during initial assessments. Nursing staff were not documented as being present during IDTT meetings.

**Patient W**

This 42-year-old male patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and unspecified anxiety disorder. He was prescribed olanzapine, mirtazapine, and hydroxyzine as needed. He refused to take medications daily so had no standing orders. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. This individual was incarcerated within CDCR on five separate occasions beginning in September 2003. He was first placed at the 3CMS level of care in December 2023 and was removed from the MHSDS on July 8, 2004. He did not receive services within the MHSDS during the two subsequent periods of incarceration spanning January through May 2006 and May through September 2008. When reincarcerated for the fourth time in September 2009, he was placed at the 3CMS level of care while in the reception center, was removed from the MHSDS in February 2012, and returned to the 3CMS level of care in February 2013. He had one brief stay within the MHCB level of care, returned to the 3CMS level of care, and was elevated to the EOP level of care from May 2014 through July 2015. He returned to the 3CMS level of care in July 2015 until being released in November of that year. Upon incarceration within CDCR on December 28, 2021, he was placed at the 3CMS level of care. Following admission to the MHCB level of care in June 2024, he was discharged to the EOP level of care. He experienced another MHCB admission in September 2024 before returning to the EOP at SQ.

He was admitted to the MHCB at SQ on February 24, 2025 after reporting somatic delusions, paranoia, and thoughts of suicide. An adequate initial psychiatric assessment was completed on the day of admission, despite the patient refusing to be seen for a confidential session. A confidential MHPC assessment was completed the following day and was adequate. An initial IDTT was held on February 27, 2025 with required staff and the patient in attendance. The content was adequate, including reasonable goals and interventions in the narrative section of the clinical summary. Unfortunately, the treatment plan template included goals from June and September of 2024 which were no longer relevant and did not correspond to the goal described in the narrative section.

The patient was seen for daily clinical contacts, most of which were held in a confidential setting when seen by the MHPC but at cell front secondary to refusals when offered by a psychiatrist. There was little evidence of therapeutic interventions being provided and psychiatric documentation varied little across contacts. A recreational therapist saw the patient at cell front daily and provided materials to use in his cell. There was evidence that the patient was offered NLTGs and clinical groups, but he typically refused to attend. He did attend one NLTG. A discharge SRASHE and safety plan were completed in collaboration with the patient and were adequate. A discharge IDTT was held on March 6, 2025 with required staff and the patient present. There was adequate rationale for discharging the patient to the EOP level of care and the discharge summary was adequate.

**Findings**

Treatment of this patient was adequate, but minimally so. There was limited evidence of interventions being provided in keeping with the treatment plan. Additionally, the treatment plan

included a combination of current goals and goals that were not relevant to the patient during his admission. The patient was offered therapeutic groups.

**Patient X**

This 26-year-old male patient was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was adherent to his prescribed haloperidol, benztropine, and mirtazapine. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. He was incarcerated within CDCR for the first and only time on October 3, 2024. He was placed at the EOP level of care while at the reception center and was admitted to the MHCB on November 20, 2024. From the MHCB, he was placed at the Acute level of care on December 2, 2024, was placed under a PC 2602 order for grave disability, and discharged to the EOP level of care at SQ on January 21, 2025. He was admitted to the MHCB at SQ two days later, after making statements that he was hearing voices telling him to kill himself.

An adequate initial psychiatric assessment was completed on January 23, 2025 despite the patient declining to meet in a confidential setting. An adequate initial MHPC assessment was completed at cell front the following day due to patient refusal. An initial IDTT meeting was held on January 24, 2025 with required staff present; however, the psychiatrist was not the individual who completed the initial assessment and the patient refused to attend. The treatment plan was disjointed. The identified problem of deficits in activities of daily living was unrelated to the short-term goal of identifying physical and psychological warning signs of distress which did not appear to be targeted by the intervention of addressing defeating thinking patterns that contribute to maladaptive behavior. Daily contacts were completed but the patient refused to engage when approached at his cell door. He was mostly noncommunicative but was eating his meals. He had been refusing to shower yet when he agreed to shower, he required verbal prompts to complete the task. On January 30, 2025, it was determined that the patient required a referral to the ICF level of care. The IDTT meeting did not include a nursing representative and the patient refused to attend. An adequate narrative plan was documented to support the patient while awaiting transfer yet the disjoined formal treatment plan remained unchanged. Daily contacts and weekly IDTT meetings were offered until his transfer to the ICF level of care on February 12, 2025. The patient refused all contacts. Both the MHPC and psychiatrist noted that the patient was awaiting a Vitek hearing, yet there was no documentation regarding a hearing prior to his transfer. Additionally, the patient was noted as saying that he wanted to go to the hospital setting.

The patient was offered recreational therapy groups while in the MHCB but refused to attend. Group documentation was often internally inconsistent. For example, one note said the patient "was calm and respectful" and "indicated full understanding of group discussions" while noted that the patient did not attend the group. Another, noted full session attendance for 90 minutes, yet included the following statement, "pt was asleep during rounding."

**Findings**

Treatment of this patient was adequate; however, the treatment plan was disjointed and group documentation was internally inconsistent. Additionally, documentation regarding a Vitek hearing

was confusing and incomplete. Nursing staff were not documented as being present during IDTT meetings.

**Patient Y**

This 34-year-old male patient was provided with diagnoses of amphetamine-type substance-induced psychotic disorder with moderate or severe use disorder and schizophrenia. He was not adherent to his prescribed olanzapine. Psychiatric documentation noted that the patient was prescribed a monthly paliperidone injection, yet there was no evidence of this medication on his medication administration record (MAR). His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. This patient was incarcerated within CDCR on two occasions. His first incarceration occurred from July 2018 through January 2020. During that period, he was placed at the EOP level of care for two weeks before being admitted to the MHCB level of care and transferred to the Acute and then the ICF levels of care through his release. Upon returning to CDCR on October 20, 2023, he was placed at the EOP level of care. He transitioned to the 3CMS level of care in November 2023 and returned to the EOP level of care in May 2024. He was admitted to the MHCB in September 2024, returned to the EOP level of care for one week, and was readmitted to the MHCB level of care at SQ on October 23, 2024 secondary to severe impairment secondary to mental illness.

An initial psychiatric assessment was completed on the day of admission. The patient refused to engage in the assessment but the content was adequate based on observation and record review. An initial MHPC assessment was completed the following day, but it contained significant amounts of information pulled from previous encounters, making it difficult to discern what was current. An initial IDTT meeting was also held on October 24, 2024 with required staff present. The patient's frequency of MHCB admissions required review to determine if a higher level of care was indicated. The rationale for not admitting him to a higher level of care was to monitor him to determine if his presentation was secondary to drug use. There were no reasonable treatment modifications documented to support the patient other than assessment. The treatment goals were to increase his medication compliance and determine if he needed a higher level of care. The interventions were generic.

Documentation indicated the patient attended a full hour-long group related to anger management on October 25, 2025, yet no details were documented. It appeared that this group was conducted in the EOP, making it likely that the documentation was an error. Daily clinical contacts were offered to the patient. Psychiatric contacts were refused and held at cell front, but the MHPC documented confidential encounters. The patient was initially refusing medications but agreed to start taking olanzapine. MHPC documentation did not appear to be updated in light of documentation being provided by psychiatry. The MHPC continued to carry over documentation indicating that substance use may be driving psychosis, while the psychiatrist was documenting a psychotic disorder and considering the need for a PC 2602 order. On October 29, 2024, the patient was referred to the ICF level of care. An IDTT was held the following day with required staff present. Documentation was adequate.

Daily clinical contacts and weekly IDTT meetings continued until the patient was transferred to the ICF level of care at Atascadero State Hospital on November 20, 2024.

**Findings**

Treatment of this patient was adequate; however, improvements in treatment planning and MHPC documentation were needed. Additionally, there were inconsistencies across staff with regard to diagnosis without rationale or documentation of discussion.

**Patient Z**

This 51-year-old male patient was provided with a diagnosis of schizoaffective disorder, depressive type. He was fully adherent to his prescribed olanzapine and benztropine. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. This individual was incarcerated within CDCR on three occasions. During his first two periods of incarceration from November 1994 through September 1996, and from April 1997 through April 1998, he did not receive mental health services.

His current period of incarceration began in October 1998 and he was first placed within the MHSDS at the 3CMS level of care for less than two months in November 1999. He returned to the 3CMS level of care in March 2000 and was elevated to the EOP level of care in April 2000. He was primarily treated at the EOP level of care, with a number of MHCB admissions, before being transferred to the ICF level of care from March 2008 through March 2010. Upon discharge, he was placed at the EOP level of care, transitioned to the 3CMS level of care and experienced two MHCB admission prior to being removed from the MHSDS in February 2017. He was not re-admitted to the MHSDS until being placed at the MHCB level of care on December 1, 2024 after reporting suicidal ideation. He transferred to SQ the following day.

He was seen for an initial psychiatric assessment on December 3, 2024 which was adequate and included reasonable rationale for monitoring and privileges. The psychiatrist started the patient on olanzapine to address psychosis, depression, sleep disturbance, and reduced appetite. An initial IDTT was held on December 5, 2024 with no nursing staff but other required staff in attendance. One treatment goal, to improve hygiene, was documented with adequate interventions. The patient's psychosis was not addressed in the treatment plan nor was the determination that the patient was not able to maintain his own safety. The treatment plan included a diagnosis of unspecified depressive disorder, yet there was no mention of the psychiatrist's primary diagnosis of psychosis or consideration of major depressive disorder with psychotic features.

Daily contacts were completed by either a psychology intern or a psychiatrist and were adequate although no interventions other than medications were documented. Of note, one psychiatrist noted concerns about delirium or stroke and recommended a "full medical workup" which began on December 9, 2024. An IDTT was completed on December 12, 2024 with no nursing staff but other required staff in attendance. The IDTT decided to refer the patient to the ICF level of care with adequate rationale provided. An additional goal to redirect the patient away from delusional topics was added with reasonable interventions. A DDP review was attempted on December 13, 2024 but could not be completed secondary to the patient's acute psychosis. Daily contacts and routine IDTTs continued through the patient's transfer to an ICF bed on December 31, 2024.

**Findings**

Treatment of this patient was adequate. Other than minor discrepancies in diagnosis which were eventually resolved, continuity of care was intact. Nursing staff were not documented as being present during IDTT meetings.

**Patient AA**

This 50-year-old male patient was provided with a diagnosis of polysubstance dependence. He was fully adherent to his prescribed olanzapine, paroxetine, lurasidone, and benztropine. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. This individual was incarcerated for the seventh time within CDCR on June 5, 2023. During prior periods of incarceration, which spanned from 2002 through 2006, he was primarily treated at the 3CMS level of care with a few brief periods of time when he was not enrolled in MHSDS. Upon reincarceration in 2023, he was placed at the 3CMS level of care, was admitted to the MHCB in September 2023, was discharged to the EOP level of care in October 2023. He was admitted to the MHCB at SQ on November 5, 2024 due to paranoia and suicidal thoughts.

An initial psychiatric assessment was completed on the day of admission and noted that the patient was depressed, anxious, paranoia, delusional, and experiencing auditory hallucinations. The psychiatrist documented diagnoses of schizoaffective disorder vs. schizophrenia with a rule out of substance induced psychosis but noted that the patient had not tested positive for drugs recently and did not appear intoxicated upon evaluation. The psychiatrist also noted a history of ADHD, traumatic brain injury, and included a rule out for a primary mood disorder. The patient refused to be seen out of cell secondary to not feeling well yet the assessment was adequate. An initial MHPC assessment was completed the next day, also at cell front and based on record review due to patient refusal secondary to continued illness. The content was mostly adequate; however, there was no diagnostic formulation.

An initial IDTT was held with no nursing staff but other required staff in attendance. The patient attended the meeting. Documentation reflected multidisciplinary input, yet the one treatment goal was superficial, not measurable, and included a vague intervention. The psychiatric IDTT documentation included a more substantial set of goals, but no interventions were listed other than medications. The safety plan reviewed during the meeting had not been updated since 2023. A weekly IDTT meeting was held on November 15, 2024 and resulted in a decision to refer the patient to the ICF level of care. No nursing staff attended the meeting. Rationale for the referral was clear and appropriate. The treatment plan was expanded to include two additional goals with measurable outcomes and vague but related interventions.

The patient was seen daily for clinical contacts. Contacts with both MHPCs and psychiatrists evidenced the use of reality testing and regular assessments of thinking and mood. Recreational therapy contacts were held cell front on occasion. The patient began being offered NLTGs following his referral to ICF and attended the groups offered to him.

**Findings**

Treatment of this patient was adequate, although there was no formal diagnosis in the record. Nursing staff were not documented as being present during IDTT meetings.

**Patient BB**

This 49-year-old male patient was provided with diagnoses of bipolar I disorder, current or most recent episode manic, moderate and schizoaffective disorder. He was fully adherent to his prescribed lamotrigine and ziprasidone. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. This patient was incarcerated within CDCR for the only time on July 24, 2008. He was first placed within the MHSDS at the 3CMS level of care in October 2013. Since that time, he has been treated at all levels of care including 3CMS, EOP, MHCB, Acute, and ICF as well as spending over a year at Atascadero State Hospital from January 2017 through March 2018. He was most recently treated in an inpatient setting at the Acute level of care in March 2020. Since then, he was treated at the EOP level of care, with one MHCB placement in 2021, until August 2024. At that time, he was transitioned to the 3CMS level of care. He was admitted to the MHCB at SQ on January 9, 2025 secondary to presenting as hypomanic with delusional thoughts.

An adequate initial psychiatric assessment was completed with the patient on the day of admission. The following day, an adequate initial MHPC assessment was completed with the patient. The assessments provided a consistent picture of the patient. An initial IDTT was held on January 10, 2025 with no nursing staff or correctional counselor present. The psychiatrist in attendance had not met the patient previously. The patient attended the meeting. IDTT documentation did not reflect recent medication changes made by the psychiatrist. Treatment goals were reasonable and measurable with appropriate interventions; however, the treatment plan form was not utilized. Goals were presented in a narrative form in the clinical summary. Psychiatric documentation completed after the meeting noted additional medication adjustments being made at the meeting.

Daily clinical contacts were offered to the patient; however, a number of different individuals interacted with the patient during his first week at the MHCB level of care. This resulted in the patient growing agitated and suspicious of a psychologist he met for the first time on January 12, 2025. No out of cell groups or recreational activities were documented until January 15, 2025 when the patient was offered NLTGs. He attended the groups offered to him.

A weekly IDTT was held on January 16, 2025. The IDTT documentation did not include the presence of nursing staff, yet a nurse documented having been present at the meeting. The patient was in attendance. The patient was stabilizing and the decision was to discharge the patient to the EOP level of care in another week to ensure stability on ongoing medication adherence. The patient was in agreement but was hoping to go to the 3CMS level of care. Daily clinical contacts continued through his discharge on January 22, 2025 although interventions were not consistently documented. The discharge IDTT was adequately documented and included the presence of all required staff and the patient. The patient's treatment goals were noted as having been met.

**Findings**

Treatment of this patient was adequate. There were some initial challenges in a number of different clinicians and psychiatrists seeing the patient, causing some mistrust. Otherwise, there was continuity of care although clearer evidence of interventions other than medications was needed. Nursing staff were not documented as being present during IDTT meetings.

**Patient CC**

This 38-year-old male patient was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was not prescribed psychotropic medications other than mirtazapine and hydroxyzine as needed. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period. This individual was incarcerated within CDCR for the fourth time on May 18, 2023. During his three prior periods on incarceration, which spanned from 2009 through 2020, he only received services within the MHSDS at the 3CMS level of care from July 2009 through October 2012. Upon his reincarceration, he was not placed within the MHSDS until December 2023 when he was admitted to the MHCB level of care. He was discharged from MHCB and the MHSDS on January 8, 2024. He was readmitted to the MHCB on September 28, 2024, discharged to the EOP level of care for six days, and returned to the MHCB level of care. He was discharged to the EOP level of care on October 22, 2024 and was admitted to the MHCB at SQ on January 27, 2025 after presenting as disruptive, hostile, and hypervigilant.

An initial psychiatric assessment was completed on the day of admission. The patient reported recent methamphetamine use. The assessment was adequate and included a reasonable initial plan of care. An initial IDTT meeting was held on January 29, 2025 with required staff present. The patient's recent MHCB admissions and failure to engage in offered programming triggered the need to review him for a higher level of care. The rationale for not referring him at this initial IDTT and the treatment modifications proposed in lieu of transfer were adequate. Treatment goals and interventions were reasonable. Daily clinical contacts were had with the patient, mostly in confidential settings. The patient was resistant to interventions and refused attempts to start psychotropic medications to address his symptoms of psychosis and paranoia. On February 4, 2025, a psychiatrist attempted to complete an assessment for the need for a PC 2602 order. The patient refused a confidential meeting and became hostile and aggressive at the cell door. The decision was made to pursue involuntary medications.

A follow-up IDTT meeting was held on February 5, 2025 where it was decided to refer the patient to the Acute level of care. Required staff and the patient were in attendance. The patient agreed to the referral to a higher level of care. The rationale for the referral was adequately documented. The patient continued to be seen daily and offered medications, which he consistently refused. He did not engage in therapeutic interactions. He transferred to the Acute level of care on February 11, 2025.

**Findings**

Treatment of this patient was adequate. Staff took the time needed to determine if the patient's presentation was due solely to drug use or indicative of an underlying mental illness. They provided multiple opportunities for treatment engagement, which the patient refused.

**Patient DD**

This 47-year-old male patient was provided with diagnoses of alcohol use disorder and cocaine use disorder, both in sustained remission. He was moderately adherent to his prescribed paliperidone. His case was selected at random for review of patients who were admitted to the MHCB at SQ during the monitoring period.

This individual was incarcerated within CDCR on six occasions beginning in July 2001. During previous periods of incarceration, he was treated at the 3CMS and MHCB levels of care and was also not enrolled within the MHSDS for periods of time. Upon incarceration for his most recent stay, on April 3, 2024, he was placed at the 3CMS level of care. He was discharged from MHSDS for less than a month in June 2024, returning to the 3CMS level of care in July 2024, and elevating to the EOP level of care in August 2024. He was admitted to the MHCB on August 19, 2024, discharged to the EOP level of care for two weeks, and returned to the MHCB on September 12, 2024. He was discharged to the EOP level of care and returned to the MHCB on September 25, 2024 after presenting as disorganized with loose associations and poor hygiene.

An initial psychiatric assessment was completed upon arrival at the MHCB level of care. The patient refused to attend a confidential session with the psychiatrist, so the assessment was based mostly on record review. The psychiatrist noted that the outpatient treatment team had initiated a plan to refer the patient for a 5150 evaluation upon his release, which was scheduled for September 30, 2025. An initial IDTT meeting was held on September 27, 2024 with required staff present. The facility's chief psychiatrist and a senior psychologist specialist were also present. The decision was made to continue with the plan to refer the patient for a 5150 evaluation upon release and attempt to engage in reality testing with the patient until that time. The plan was to continue to encourage medication adherence. Daily clinical contacts were attempted with minimal engagement from the patient. On September 29, 2024, the patient's urine toxicology revealed no illicit substances, further reinforcing the hypothesis that his presentation was secondary to a mental illness. The patient was released on September 30, 2024.

**Findings**

Treatment of this patient was adequate given the short time for treatment in light of his pending release.

**APPENDIX B-26**
**Sierra Conservation Center (SCC)**
**Review Period: November 1, 2024 – April 30, 2025**

**Patient A**

This 35-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of generalized anxiety disorder. At the time of the review, he was prescribed Prozac, Remeron, and Zyprexa.

The patient transferred to SCC on December 19, 2024. Shortly after placement, the patient submitted a request to see mental health. An initial PC assessment was completed. The patient reported disturbed sleep, anxiety, and auditory hallucinations which were attributed to methamphetamine use. He was referred for a psychiatric assessment at his request. The patient's mental health history was noted, but details were not provided. In contrast, the psychiatric documentation noted a history of multiple psychiatric hospitalizations due to auditory hallucinations when actively using and during times of abstinence. The patient had a previous diagnosis of schizophrenia.

The initial IDTT meeting was attended by the assigned clinician and a covering psychiatrist. The documentation was overly brief and did not provide a sufficient, multidisciplinary summary of the patient's treatment history to direct treatment planning. The treatment plan section of the document, the place of record for treatment goals, was blank; thus, there was no documented plan to target identified symptoms or discharge planning for the patient with an upcoming EPRD in October 2025.

Routine psychiatric contacts occurred more frequently than were minimally required. The documentation was thorough and included the patient's symptoms and impact on functioning, specific coping skills, the rationale for medication changes, and medication response. Of note, there was discrepant documentation regarding auditory hallucinations in some psychiatric progress notes.

Primary clinician contacts occurred at least monthly; at times, those contacts occurred weekly. Most of the documentation included a brief summary of the patient and lacked sufficient detail for continuity of care. The plan/disposition section of the PC documentation included a vague plan to use clinical interventions such as assisting the patient in coping with mood disturbance and anxiety; however, therapeutic interventions were not utilized. The documentation indicated the presence of therapeutic rapport with the patient who often requested to see the PC and ultimately disclosed information regarding the presence of psychotic symptoms which prompted a psychiatric referral and antipsychotic medication treatment. Provider assessment regarding the etiology of the patient's psychotic symptoms was not addressed.

The patient was enrolled in criminal thinking and anxiety groups that were facilitated by the recreational therapist.

**Findings**

The treatment provided to this patient was inadequate.

The patient's auditory hallucinations were not sufficiently assessed by either provider. The initial PC assessment and IDTT documentation lacked conceptualization to convey the patient's treatment needs. The patient was routinely monitored by the primary clinician; however, primary clinician documentation did not include the use of needed therapeutic interventions. Diagnostic clarification was also needed. The diagnosis of generalized anxiety disorder was not supported by reported symptoms, and no diagnosis was provided to address the patient's psychotic symptoms.

Despite the omissions noted, the patient was seen frequently by the PC and psychiatrist with access to group treatment and the provision of supportive therapy offered by the nurse practitioner.

**Patient B**

This 38-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. A psychiatric diagnosis was not located in the healthcare record, and the patient was not prescribed psychotropic medication.

The patient transferred to CRC on October 15, 2024. The patient sought mental health treatment at his previous facility in July 2024 due to distress regarding interactions with custody staff. The initial assessment documentation at SCC noted residual stress and a request for supportive treatment.

Upon arrival at SCC, Vistaril was prescribed PRN. The patient refused the initial psychiatric assessment which was completed based on a healthcare record review. He was scheduled for a routine follow-up contact in January 2025, but the patient was at an outside medical appointment. The patient also refused to attend a psychiatric appointment in February 2025; he denied psychiatric symptoms, and Vistaril was discontinued due to nonadherence. At the time of the monitoring visit in June 2025, the patient had not been seen for psychiatric follow-up.

Primary clinician contacts occurred more frequently than minimally required. The documentation of most PC contacts indicated that the patient denied mental health symptoms and had adequate functioning. The documentation indicated routine monitoring of safety concerns, receipt of bad news, family support, and programming; however, there was no clear use of clinical interventions by the PC.

**Findings**

The treatment provided to this patient was inadequate.

Although the patient was not taking the prescribed Vistaril, there was no documentation that he was informed that the medication would be discontinued. Additionally, he was not seen for follow-up by psychiatry after the medication discontinuation. The patient was monitored regularly by the primary clinician, but there was no documentation of supportive therapy. Medical necessity for continued care was not clearly documented. The patient warranted review regarding the need for continued inclusion in the MHSDS.

**Patient C**

This 49-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of adjustment disorder with anxiety and was prescribed Prozac.

The patient was housed at SCC since 2022. The annual IDTT documentation indicated that the assigned providers attended the annual IDTT meeting; however, the patient did not attend, as he had educational assignments that he wanted to complete. The IDTT documentation was incomplete. Specifically, there was no clinical summary, case formulation, or treatment planning documented. The patient did not meet the criteria for consideration of referral to a higher level of care. The patient was maintained at the 3CMS level of care without documented rationale for continuation.

The patient was followed consistently for psychiatric contacts, and psychiatric contacts were provided by the nurse practitioner who noted routine assessment of symptoms, functioning, medication side effects, and response. The primary clinician routinely monitored the patient's symptoms and functioning and utilized motivational interviewing. Overall, the patient was described as stable and was actively engaged in various programs.

**Findings**

The treatment provided to this patient was adequate.

Despite inadequate IDTT documentation, the patient was appropriately monitored by providers, and appropriate clinical interventions were utilized by the primary clinician. The rationale for the provided diagnosis was needed.

**Patient D**

This 43-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of unspecified mood disorder. He was not prescribed psychotropic medication.

The patient was housed at SCC since April 2024, and his EPRD was September 19, 2025. The assigned psychiatric provider, a covering PC, and patient attended the annual IDTT meeting. The IDTT documentation needed improvement. Specifically, the clinical summary section did not provide a sufficient summary of the patient's progress since the previous treatment plan. Further, documentation from the initial treatment plan was copied into the current IDTT document and that information was not noted as historic. Treatment goals were not documented. The patient did not meet the criteria for higher level of care consideration. He was continued at the 3CMS level of care, and the rationale provided was due to consideration of pre-release planning.

Primary clinician routine contacts occurred at least every other month, when the patient consistently presented as asymptomatic. The documentation of those contacts was indicative of a meaningful therapeutic contact when the PC assisted the patient in managing stressors associated with his upcoming prison release including interpersonal stressors and substance use.

**Findings**

The treatment provided to this patient was adequate.

While there was need for improvement in IDTT documentation, the PC documentation indicated that the patient received individualized care. The patient's ongoing stability warranted review for discharge from the MHSDS.

**Patient E**

This 36-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of unspecified anxiety disorder.

The patient was housed at SCC since April 2024. The assigned providers and the patient attended the annual IDTT meeting. The IDTT documentation provided a useful summary of the patient's progress in treatment and an appropriate case conceptualization. The treatment planning goal targeted anxiety which was the focus of PC treatment. The established distress tolerance intervention was not utilized in treatment, but provided interventions were individualized to the patient's needs at the time of each contact.

Most primary clinician contacts occurred monthly, and the documentation was consistently representative of meaningful, therapeutic contacts.

After a period of disturbed sleep in February 2025, the patient submitted a request to see the psychiatric provider. During the consult, he was prescribed Remeron for depression, anxiety, and sleep. During a follow-up contact two weeks later, the patient reported improved sleep, and Remeron was continued for depression, anxiety and sleep. After several incidents of medication refusal, the patient submitted a request to discontinue the medication. Prior to the March 13, 2025 psychiatric contact, the provider discontinued the medication on March 8, 2025 due to nonadherence. During the psychiatric contact, the patient reported that his sleep had improved, and the medication was no longer necessary. He reported mild situational anxiety and denied depression or functional impairments. The documentation stated that psychiatric follow up was no longer needed, as the patient was not prescribed psychotropic medication.

**Findings**

The treatment provided to this patient was inadequate.

The failure of the psychiatric provider to provide required follow up with the patient after medication discontinuation was problematic. Further, the discontinuation of medication prior to the psychiatric contact was also concerning.

**Patient F**

This 48-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of unspecified depressive disorder. He was not prescribed psychotropic medication.

The patient was housed at SCC since 2021. An IDTT meeting was not due during the review period. The October 2024 annual IDTT documentation was reviewed to assess alignment of treatment planning documentation and the provision of treatment. Treatment goals were not documented in the IDTT documentation.

Primary clinician contacts occurred every two to three months when the patient consistently presented with stability. The documentation was indicative of individualized therapeutic sessions, and cognitive behavior therapy was utilized.

**Findings**

The treatment provided to this patient was adequate.

Although documentation of treatment goals needed improvement, the PC documentation indicated that treatment was individualized to the patient's current treatment needs.

**Patient G**

This 42-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. At the time of the review, he was prescribed Vistaril.

The patient transferred to SCC on May 8, 2025. The patient refused both initial provider assessments, and the documentation for those assessments was copied from previous assessments. Neither provider summarized the patient's recent or previous clinical needs to guide treatment planning. At the initial psychiatric assessment, Zyprexa, Trileptal, and Vistaril were reportedly continued; however, an order for the Zyprexa was not located in the healthcare record. Further review indicated that the medication information was copied from a previous assessment.

The initial IDTT documentation was similarly lacking. The clinical summary was limited to information regarding the patient's clinical presentation during the IDTT meeting and a partial copy of the psychiatric provider's outdated initial assessment. There was insufficient information to develop treatment goals to target the patient's current treatment needs. Treatment goals from March 2025 that targeted anxiety and anger were continued without clear rationale.

For reasons that were unclear, the patient was seen for a suicide risk assessment. The documentation of that assessment indicated that the patient was not suicidal but was anxious about the current lockdown. He was assessed with low risk.

According to the medication administration record, Tegretol was discontinued on June 8, 2025 after three consecutive missed doses; however, an in-person evaluation was not documented. As of July 11, 2025, there was no documentation of follow-up psychiatric assessment.

**Findings**

The treatment provided to this patient was inadequate.

There was no useful updated clinical information documented for this patient since his placement at SCC that documented his symptoms, functioning or current treatment needs. The discontinuation of psychotropic medication without a psychiatric assessment was inappropriate. There was insufficient rationale provided for the assessment of low suicide risk. Further, interventions to assist the patient were not offered during that contact, nor was there a timely follow-up clinical contact to address the patient's distress during the lockdown. Lastly, the patient's medication was discontinued without an in-person psychiatric assessment.

**Patient H**

This 66-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided diagnoses of PTSD and unspecified personality disorder; he also had a history of severe alcohol use and schizoaffective disorder. He was not prescribed psychotropic medication. The patient had multiple medical diagnoses that included hearing impairment, hypertension, stage III liver fibrosis, stage III chronic kidney disease, and infarction of the left temporal lobe.

The patient transferred to SCC during November 2024. The patient was appropriately referred to mental health from R&R to assess auditory hallucinations. He refused the mental health contact and subsequent provider initial assessments. Consequently, the assessments were completed based on a healthcare record review and did not include an update regarding the patient's functioning or treatment needs during the past year, including the rationale for discharge from the EOP level of care, even though that clinical information was available elsewhere in the healthcare record.

The patient and assigned providers attended the initial IDTT meeting, when the patient presented with agitation, confusion and fixation on the circumstances of EOP placement one year prior. Consistent with previous contacts, he demanded to speak with mental health leadership. Treatment goals were not developed, but an IPOC for treatment nonadherence was established.

During the review period, the patient had multiple medical needs and a pattern of refusing various medical appointments, including blood pressure checks. Relatedly, per his request, he was seen by medical staff on May 7, 2025 to address pain from a walking boot. During the contact, he became agitated and refused to remove the boot because he believed it would be painful; he then accused the provider of intentionally wanting to inflict severe pain upon him.

In December 2024, the patient was seen by the psychiatric provider due to medication nonadherence. The patient refused the appointment which was conducted at cell front. At the patient's request, Vistaril, Risperdal, and Remeron were discontinued; the rationale for discontinuation was not sufficiently assessed. On the following day, he submitted a request to resume Vistaril. The patient was seen at cell front due to refusal to leave his cell, and he was unwilling to sign a consent form for Vistaril that was not prescribed. Another attempt was made to meet with the patient one week later, but he again refused. There was no documentation of further psychiatric follow-up.

The primary clinician attempted to meet with the patient every two months, but he consistently refused to attend the sessions. Based on brief interactions, his mental status was assessed as unremarkable, and collateral information to assess the patient's functioning was not sought.

During a June 2025 IDTT meeting, the patient was discharged from the MHSDS; that occurred despite a recent referral from the housing officer due to the patient believing that a conversation occurred that did not occur.

**Findings**

The treatment provided to this patient was inadequate.

The decision to discharge the patient from the MHSDS was inappropriate. Further, his clinical presentation warranted further assessment to rule-out cognitive impairment, psychiatric decompensation, or a combination of both. Provider assessment documentation was not sufficiently updated to direct treatment planning or to convey the patient's recent treatment needs, including his functioning at EOP level of care and rationale for removal from the 3CMS level of care. The patient was not appropriately followed by the psychiatric provider after medications were discontinued. His pattern of refusals warranted coordinated care between mental health and medical providers and consultation with custody staff.

**Patient I**

This 40-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was not prescribed psychotropic medication at the time of the review.

The patient arrived at SCC during September 2024 from the reception center, and he was not included in the MHSDS at the time of transfer to the institution. Subsequently, multiple referrals from custody staff were submitted to mental health regarding the patient. According to the initial PC assessment, he had multiple housing changes and poor insight regarding interpersonal difficulties with peers. He was described as irritable and was placed at the 3CMS level of care.

Shortly thereafter, the patient was placed in the RHU due to openly masturbating. The initial RHU IDTT documentation noted the patient's unkempt cell and lack of engagement with staff and indicated consideration of EOP placement. The documentation further noted that the patient did not meet the criteria for grave disability, but he was disorganized. For reasons that were unclear, the patient was continued at the 3CMS level of care.

After a brief RHU stay, the patient transferred to general population. There were two custody referrals for odd and bizarre behavior including showering with his clothes on. At the initial IDTT meeting on December 20, 2024, the documentation indicated a level of care change to EOP; however, there was no clinical rationale provided, and the patient's level of care remained unchanged at 3CMS.

After the initial IDTT meeting, the patient was seen weekly or bi-weekly by the primary clinician for routine contacts. The documentation indicated that the patient needed assistance with basic functioning within the institution. As an example, after several months at SCC, he was unsure how to access soap and did not have or know how to request a state issued ID. He consistently presented as malodorous and made unusual statements. The primary clinician had good rapport

with the patient, identified that he had negative symptoms, and noted that his avoidance of groups would interfere with EOP group attendance.

In late January 2025, the primary clinician referred the patient to the psychiatric provider after he requested medication to help him to relax and asked about the availability of the over-the-counter medication NyQuil. During the psychiatric contact, the patient was described as odd, and he appeared preoccupied. He refused medication treatment. There was no documentation of consultation between the psychiatric provider and the PC or referral to the IDTT to consider higher level of care referral.

Between March and May 2025, there were multiple referrals from custody due to bizarre and confused behavior, poor hygiene, talking to himself, and a belief that there was dog excrement everywhere. The primary clinician documentation on May 2, 2025 indicated a plan to recommend the patient to a higher level of care; he was placed at the EOP level of care during a May 9, 2025 IDTT meeting.

**Findings**

The treatment provided to this patient was inadequate.

This symptomatic patient with impaired functioning did not receive adequate care. The higher level of care referral was long overdue. Since placement at SCC, the patient continued to exhibit signs and symptoms of a severe mental illness with difficulty functioning in his environment.

Although the patient was appropriately identified for a higher level of care in December 2024 when he was in the RHU; it was unclear why the level of care change did not occur. It was also unclear why the level of care change did not occur when he was released to general population shortly thereafter, despite documentation of an EOP level of care change. The patient's prolonged impaired mental status and functioning warranted consideration of intermediate care referral. Further, the transfer to EOP was long overdue, as it did not occur until almost two months after he was referred to the EOP. The patient's functioning also suggested the need for a developmental disability evaluation.

**Patient J**

This 35-year-old patient's healthcare record was reviewed to assess the adequacy of the treatment provided at SCC. The patient was provided a diagnosis of schizoaffective disorder, bipolar type. He was not prescribed psychotropic medication at the time of the review.

The patient transferred to SCC on May 20, 2025 from the reception center. At the time of arrival, the patient was not included in the MHSDS. Two days after placement at SCC, the correctional counselor referred the patient to mental health, as the probation report noted a history of schizoaffective disorder. During the mental health consult, the patient presented with psychotic symptoms. Specifically, he reported delusional thinking and the ability to communicate with extraterrestrial beings. The patient had a history of conservatorship from 2015 to 2021 with multiple psychiatric hospitalizations. The initial provider assessments were completed appropriately. Lithium, Haldol, BuSpar, and Vistaril were initiated. At the initial IDTT meeting, the patient was referred to the EOP level of care.

While awaiting transfer to an EOP institution, timely and supportive primary clinician contacts occurred. Shortly after initiating medications, the patient was medication nonadherent; however, at his request, psychotropic medications were later discontinued. There was limited documentation regarding the rationale for the medication discontinuation or discussion of alternative treatment options.

**Findings**

The treatment provided to this patient was adequate.

This patient was appropriately identified by the correctional counselor and referred for mental health services. The mental health providers promptly evaluated the patient and appropriately referred him to the EOP level of care.

**APPENDIX B-27**
**Valley State Prison (VSP)**
**Reporting Period: August 1, 2024 to January 31, 2025**

**Patient A**

This 26-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility B and diagnosed with unspecified depressive disorder. He was prescribed bupropion, mirtazapine, and oxcarbazepine and was adherent with mirtazapine but not with bupropion or oxcarbazepine. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Medical conditions included opioid use disorder and chronic back pain. He was prescribed amitriptyline by his physician and was adherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had received only 3CMS services, with no higher levels of care. He entered the CDCR on August 30, 2024 and was placed in mainline 3CMS care at VSP on October 14, 2024.

The initial psychiatric assessment was completed timely and adequately through telepsychiatry; the rationale for medication changes was documented clearly. The initial primary clinician assessment was completed late and only minimally updated. A generic case formulation was not updated and did not provide patient-specific information regarding the patient's symptoms. The initial IDTT meeting occurred late. It was attended by the patient and required staff but did not result in the development of a treatment plan. The patient's verbalized treatment goal was documented with one word, "yes." The patient was not found to meet any criteria for a higher level of care, but the rationale for retention at the 3CMS level of care was inadequately documented. The patient was followed frequently and adequately by his assigned psychiatrist during and following the review period, although no efforts to specify the patient's depressive disorder were documented and the encounters were not documented as confidential. The assigned primary clinician met with the patient once. The encounter was confidential but occurred late and was brief. Provision of evidence-based interventions was not documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial primary clinician assessment, initial IDTT meeting, and 90-day primary clinician follow-up appointment occurred late. The initial primary clinician assessment failed to update important clinical information; documentation of the IDTT meeting was cursory and inadequate; and the primary clinician follow-up appointment was brief without evidence of structured treatment. The case formulation was not updated or sufficiently patient-specific to guide treatment. No treatment plan was developed to guide care, and treatment goals were not specified. Psychiatric care was frequent and appeared adequate but did not document that the encounters were confidential.

**Patient B**

This 19-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility D and diagnosed with unspecified anxiety disorder, unspecified depressive disorder, and unspecified trauma- and stressor-related disorder. He was prescribed olanzapine and venlafaxine and was nonadherent with the former and only partially adherent with the latter. Hydroxyzine was prescribed on an as-needed basis for anxiety, and the patient used this medication intermittently. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder but was nonadherent. Medical conditions included opioid and cannabis use disorders. The patient had a history of childhood physical and sexual abuse, community mental health treatment, auditory hallucinations, and substance use. No suicide attempts or self-injurious behaviors were summarized in the health record, but he reported several suicidal episodes during mental health assessments. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He entered the CDCR on July 30, 2024.

The patient was placed in mainline 3CMS care at VSP on September 19, 2024. During the initial health screening he reported attempting suicide within the last 12 months, and an urgent referral to mental health was generated. He was seen for a mental health consult the following day. Documentation was cursory and inaccurate. There was no documentation regarding the patient's reported suicide attempt, and the note indicated the patient was receiving Zoloft when the patient was receiving Zyprexa. A suicide risk evaluation was not completed.

The initial psychiatric assessment was timely, thorough, and completed through telepsychiatry. The initial primary clinician assessment was late. The case formulation was not updated and did not address the patient's reported symptoms of depression and auditory hallucinations. An updated suicide risk assessment was clinically indicated but not completed. The initial IDTT meeting occurred late and was poorly documented. The patient and required staff attended. The patient was not found to meet any criteria for a higher level of care. The IDTT discussion, the patient's strengths, the patient's verbalized treatment goals, and the rationale for retaining the patient in 3CMS care were not documented. No treatment plan was developed. The assigned psychiatrist followed the patient timely and adequately through telepsychiatry, but there was no documentation that encounters were confidential and no resolution of unspecified diagnoses. Rationale for medication changes was clearly documented. The assigned primary clinician saw the patient irregularly but more frequently than required by the program guide. The clinician documented a plan to reassess the patient in one month, but the patient was then not seen for 77 days. During the next encounter, the patient was tearful and reported neurovegetative signs of depression. No referral to the psychiatrist was made. Primary clinician encounters were confidential, but interventions were poorly specified.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial mental health consult failed to inquire about the patient's suicide attempt history. No suicide risk evaluation was completed despite being clinically indicated. The suicide history

section of the health record was not updated to reflect the patient's history of multiple suicide attempts. The initial primary clinician assessment and initial IDTT meeting occurred late. IDTT documentation was deficient, and no treatment plan was developed. The case formulation did not adequately address the patient's depressive symptoms, and there was no attempt to clarify his diagnoses. Although the primary clinician appropriately increased the frequency of individual encounters, services were not delivered as planned. There was a gap of 77 days when the primary clinician's follow-up plan called for an encounter in 30 days. The primary clinician documented significant symptoms of depression during one of the encounters, but no referral to the psychiatrist was made. The patient's suicide risk was inadequately appreciated. Psychiatric care appeared adequate, but documentation failed to indicate if the encounter was confidential.

**Patient C**

This 25-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility B and diagnosed with unspecified anxiety disorder. He was prescribed hydroxyzine and was adherent 88% of the time. No medical problems were listed in the health record, but he was prescribed amitriptyline by a medical provider. The patient had a history of juvenile detention and substance use but no community mental health care. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He entered the CDCR on September 11, 2024.

The patient was placed in mainline 3CMS care at VSP on October 23, 2024. The initial psychiatric assessment was timely and adequate, but documentation did not indicate whether the encounter was confidential or completed by telepsychiatry. The initial primary clinician assessment was timely but did not adequately investigate a potential history of trauma; the case formulation was cursory but nevertheless indicated that the patient may not have been accurately reporting his symptoms. The initial IDTT meeting occurred timely and was attended by the patient and required staff. The patient was not found to meet any criteria for consideration of a higher level of care. IDTT documentation was cursory and did not indicate what occurred in the meeting. No treatment plan was developed, and the rationale for retention in 3CMS care was not documented. The telepsychiatrist followed the patient timely and provided adequate care and documentation, except for failing to indicate whether the encounters were confidential or attempting to specify the patient's diagnosis. The assigned primary clinician saw the patient timely for a follow-up appointment; documentation was brief and generic. The progress note indicated that the patient engaged in activity to address his goals and discussed steps to take to accomplish his goals without specifying these goals.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial primary clinician assessment was inadequate and did not provide an effective case formulation. No treatment plan was developed to guide treatment, and IDTT documentation was cursory and inadequate. Psychiatric care appeared to be adequate and occurred more frequently than required by program guidelines but would have been improved if an effort to specify the

patient's diagnosis was documented and if documentation indicated whether encounters were confidential. The primary clinician follow-up encounter was inadequately documented and provided little patient-specific information.

**Patient D**

This 25-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility D and diagnosed with major depressive disorder, single episode, unspecified, and posttraumatic stress disorder. He was prescribed duloxetine, mirtazapine, and olanzapine and was adherent with these medications. Scheduled mirtazapine was replaced with an order for mirtazapine as needed for anxiety, and he used this medication almost every evening. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. No medical conditions were listed in the health record. The patient had a history of substance use and outpatient psychiatric care in the community. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He entered the CDCR on July 17, 2024.

The patient was placed in mainline 3CMS care at VSP on July 30, 2024. The initial primary clinician assessment occurred timely but was cursory and incomplete. The social history section of the assessment was not complete, and the case formulation was insufficiently elaborated and inadequate to guide treatment. Symptoms were insufficiently explored. The initial psychiatric assessment occurred timely through telepsychiatry and was adequate. The rationale for discontinuing olanzapine was clearly documented. The initial IDTT meeting occurred timely and was attended by the patient and required staff. The patient was not found to meet any criteria for consideration of a higher level of care. Discussion during the IDTT meeting, the patient's strengths, and verbalized treatment goals were not documented. The treatment plan addressed depression as the treatment target, listed CBT without elaboration as the only intervention, and did not include any short-term objectives or long-term goals. Although the treatment plan addressed only depression, the rationale for retaining the patient in 3CMS care indicated that treatment would focus on reducing symptoms of both depression and anxiety. The patient was followed timely by the assigned telepsychiatrist and primary clinician. The patient's response to psychotropic medications and overall emotional stability were adequately monitored. While the primary clinician documented treatment goals of reducing depression and anxiety, the progress notes were brief and did not indicate that evidence-based interventions were provided. They also did not document whether encounters were confidential.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial primary clinician assessment was deficient and incomplete, and the case formulation was inadequate. The treatment plan was incomplete and insufficient to guide treatment. The patient's diagnosis of posttraumatic stress disorder and the relationship between his history of symptoms and substance use were insufficiently explored and addressed. Psychiatric diagnoses

were not updated in the mental health problem section of the health record. Although 3CMS services were provided timely, they did not meet the patient's treatment needs adequately.

**Patient E**

This 35-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility B and diagnosed with an adjustment disorder with mixed anxiety and depressed mood. He was not prescribed any psychotropic medications. Toe pain was the only medical condition listed. The patient had a history of childhood and adolescent physical and sexual abuse, foster care, and placement in group homes. As an adult, he had a history of homelessness and substance use. No suicide attempts or self-injurious behaviors were summarized in the health record, but an attempt to hang himself with a belt in the community was noted in the primary clinician assessment. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He entered the CDCR most recently on August 29, 2024.

The patient was placed in mainline 3CMS care at VSP on October 14, 2024. The initial psychiatric assessment was timely, adequate, and conducted through telepsychiatry. The patient refused the initial primary clinician assessment, which occurred timely and was based on a thorough review of prior records. The case formulation was not updated and insufficient to guide treatment. The initial IDTT meeting occurred late and was attended by required staff but not the patient. The patient was not found to meet any criteria for consideration of a higher level of care, but the rationale for retaining the patient in 3CMS care was not documented. The patient's verbalized treatment goal was documented with one word, "yes." No treatment plan was developed. The primary clinician follow-up encounter was timely, confidential, and documented in detail. Progress note content was consistent with active therapy and focused on topics that were patient-centered but not addressed in the case formulation.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the first follow-up primary clinician encounter was extremely promising, overall care for this patient was deficient. The case formulation that was not updated or adequate to guide treatment, and no treatment plan was developed. The patient's decisions to refuse the initial primary clinician assessment and IDTT meeting were adequately explored. The complexity of the patient's psychotherapy needs was revealed in an excellent primary clinician progress note, but there was no plan to see the patient more frequently than once every 90 days despite clear recognition of the patient's treatment needs.

**Patient F**

This 25-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility D. No diagnosis was listed under mental health problems; diagnoses of unspecified schizophrenia spectrum and other psychotic disorders and unspecified anxiety disorder were included in mental health documentation. He was

prescribed aripiprazole, buspirone, hydroxyzine, mirtazapine, and sertraline, and was adherent with aripiprazole, nonadherent with sertraline, and partially adherent with buspirone, hydroxyzine, and mirtazapine. Hydroxyzine and mirtazapine were also ordered on an as-needed basis for anxiety, and he made variable use of these medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with this medication. Anxiety and opioid use disorder were listed as medical problems. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He entered the CDCR on July 24, 2024.

The patient was placed in mainline 3CMS care at VSP on October 3, 2024. The initial psychiatric assessment occurred timely through telepsychiatry and resulted in several medication changes but no psychiatric diagnosis. The initial primary clinician assessment occurred timely. The social history and mental status sections of the assessment were incomplete, and the case formulation was not updated and did not address the anxiety, depression, insomnia, and auditory hallucinations identified elsewhere in the assessment. A provisional diagnosis of unspecified schizophrenia spectrum and other psychotic disorders was offered. The initial IDTT meeting occurred late but was attended by the patient and required staff. The patient was not found to meet criteria for a higher level of care. IDTT discussion, patient strengths, verbalized treatment goals, and rationale for retention in 3CMS care were not documented. No treatment plan was developed. The patient received follow-up psychiatric care every 15 to 40 days through telepsychiatry. Medication adherence and response to medications were adequately monitored, and rationale for medication changes was documented clearly. The primary clinician saw the patient on one occasion. The encounter was timely and confidential but more consistent with a brief mental status and wellness check than with treatment. The patient reported worsening symptoms of depression and anxiety and requested an appointment with psychiatry. The primary clinician did not document provision of evidence-based care. The patient saw a psychiatrist three days later. Neither the psychiatrist nor the primary clinician attempted to specify the patient's diagnosis.

**Findings**

The care provided to this 3CMS patient was inadequate.

The initial psychiatric assessment included no diagnostic impressions, and the initial primary clinician assessment was incomplete and included an inadequate case conceptualization. The initial IDTT meeting occurred late, was poorly documented, and did not result in the development of a treatment plan. The diagnosis and case conceptualization remained unclear throughout the review period, and treatment was reactive, without a clear goal, rather than planned, proactive, and aimed towards a measurable goal.

**Patient G**

This 19-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility D and diagnosed with adjustment disorder with depressed mood. He was not prescribed any psychotropic medications. Medical conditions included a history of eczema. The patient had a history of substance use and was treated for attention-deficit/hyperactivity disorder in elementary school. No other community mental

health treatment and no suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He entered the CDCR on July 9, 2024.

The patient was placed in mainline 3CMS care at VSP on September 4, 2024. The primary clinician assessment occurred timely, but the social history and mental status sections of the assessment were incomplete, and the case formulation consisted of two generalized sentences that did not address the patient's symptoms. The initial psychiatric assessment was completed by telepsychiatry; it occurred late but was otherwise adequate. The initial IDTT meeting occurred late but was attended by the patient and required staff. The patient was not found to meet any criteria for consideration of a higher level of care. IDTT discussion, patient strengths, verbalized treatment goals, and rationale for retention in 3CMS care were not documented. No treatment plan was developed. During the review period, the primary clinician saw the patient once for a routine follow-up and once for a self-referral. Both encounters were confidential but appeared brief and consistent with wellness checks rather than treatment. During the second encounter the patient requested to be discharged from MHSDS care; he was discharged from mental health services at his quarterly IDTT meeting on March 4, 2025.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the patient may have been appropriately discharged from MHSDS care following the review period, whether discharge was appropriate is unclear. The primary clinician did not adequately assess the patient's mental health needs. Both the initial psychiatric assessment and the initial IDTT meeting occurred late, the case formulation was inadequate, and a treatment plan was entirely absent. Subsequent encounters did not reflect planned or evidence-based interventions. The primary clinician did not document encouragement of treatment engagement, and the patient received only two confidential but brief checks on his functioning and wellness.

**Patient H**

This 66-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility B and diagnosed with alcohol use disorder, severe, in sustained remission. He was briefly prescribed trazadone and was partially adherent with this medication. Through the ISUDT, he was prescribed buprenorphine-naloxone and was adherent with this medication until mid-October, 2024, when he began to refuse it consistently, resulting in its discontinuation. Medical conditions included opioid use disorder, pre-diabetes, hypertension, hyperlipidemia, obstructive sleep apnea, retrolisthesis, history of splenectomy, hepatitis C, and pain of neck, knee, and wrist. He used a cane to ambulate and a C-pap machine to breath while sleeping. The patient had a history of substance use but no community mental health treatment. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He re-entered the CDCR for the fourth time on July 29, 2024.

The patient received mainline 3CMS care at VSP from September 10, 2024 through February 9, 2025, when he was released to parole. The initial primary clinician assessment was timely and thorough but did not result in a case formulation. The initial psychiatric assessment was timely, adequate, completed by telepsychiatry, and resulted in discontinuation of trazadone at the patient's request. The initial IDTT meeting occurred one day late. It was attended by the patient and required staff. The patient was not found to meet any criteria for consideration of a higher level of care. Patient strengths, verbalized treatment goals, and rationale for retention in 3CMS care were adequately documented. The treatment plan identified insomnia as the treatment target and included clinically appropriate short- and long-term goals and interventions. The primary clinician saw the patient for two brief encounters during the review period. On neither occasion were the patient's insomnia, treatment goals, treatment interventions, or upcoming release to parole discussed.

**Findings**

The care provided to this 3CMS patient was inadequate.

No case conceptualization was developed to guide treatment. While the treatment plan was adequate, it was not used to guide treatment and appears to have been disregarded in subsequent encounters with the patient. Communication between ISDUT and mental health providers was not documented, and the meaning of the patient's discontinuation of buprenorphine-naloxone in the context of imminent release to the community was not explored. Psychiatric care appeared adequate, but primary clinician contacts were brief and did not reflect provision of evidence-based care.

**Patient I**

This 19-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility B and diagnosed with adjustment disorder with anxiety, cannabis use disorder, severe, and uncomplicated bereavement. He was not prescribed any psychotropic medications and had no medical conditions identified. The patient had a history of foster care, maternal substance use, homelessness, school suspensions, fighting, treatment for attention-deficit/hyperactivity disorder, and substance use. No suicide attempts or self-injurious behaviors were listed in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He entered the CDCR on August 14, 2024.

The patient was placed in mainline 3CMS care at VSP on September 25, 2024. Both the initial primary clinician assessment and the initial psychiatric assessment were timely and adequate; the psychiatric assessment was completed through telepsychiatry. The initial IDTT meeting occurred timely and was attended by the patient and required staff except for the assigned primary clinician; an alternate clinician participated instead. The patient was not found to meet any criteria for a higher level of care. IDTT documentation was adequate except for providing little to no record of the patient's input. A clinically appropriate treatment plan was developed with measurable long-term goals. Following the initial IDTT meeting, the patient was not seen for an individual primary clinician encounter for 105 days. A timely primary clinician follow-up encounter was scheduled,

but when the patient was unable to attend, no wellness check was provided. When the encounter occurred, the provision of evidence-based interventions consistent with the treatment plan was documented. The quality of the progress note was good, except for failing to indicate whether the encounter occurred in a confidential setting.

**Findings**

The care provided to this 3CMS patient was adequate.

Assessments were timely and adequate. The case formulation was patient-specific and useful for developing a treatment plan. The treatment plan was clinically appropriate, and the treatment provided was consistent with the treatment plan. Failure to complete a wellness check was a weakness, but overall treatment was good. It may have been helpful to consider more frequent primary clinician contacts, as the patient appeared to respond well and demonstrated improved insight.

**Patient J**

This 42-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at VSP. He was housed in Facility D and diagnosed with an unspecified adjustment disorder. He was briefly prescribed benztropine and olanzapine and was partially adherent with these medications until they were discontinued. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was nonadherent with this medication, resulting in its discontinuation. No medical conditions were listed in the health record. The patient had a history of substance use, homelessness, emergency psychiatric hospitalizations when he sought food and shelter by reporting suicidal ideation, and trial competency assessment at Atascadero State Hospital. The patient informed VSP mental health staff that he had reported psychotic symptoms while in jail to obtain psychotropic medications he thought he could sell. A 2013 suicide attempt by hanging was noted in the health record. Within the CDCR, the patient had exclusively received 3CMS services, with no higher levels of care. He re-entered the CDCR on June 25, 2024.

The patient was placed in mainline 3CMS care at VSP on August 20, 2024. The initial primary clinician assessment was timely and confidential but did not result in the development of a case formulation. The initial psychiatric assessment was timely, adequate, occurred by telepsychiatry, and resulted in discontinuation of psychotropic medications at the patient's request. Differential diagnoses of schizoaffective disorder, bipolar type, by history and adjustment disorder with depressed mood and anxiety were offered. The primary clinician noted the patient's self-reported history of a suicide attempt, but no suicide risk evaluation was completed. A plan to see the patient in 90 days was documented. The initial IDTT meeting was timely and attended by the patient and required staff. The patient was not found to meet criteria for consideration of a higher level of care. The IDTT discussion was not documented except for noting that the patient had no verbalized treatment goals. The treatment plan identified depression as the treatment target, provided measurable short- and long-term goals, and included a clinically appropriate intervention. The patient was scheduled timely for primary clinician follow-up encounters but refused both

appointments. No wellness checks were documented, and as of early March 2025, the planned psychiatric follow-up had not yet occurred.

**Findings**

The care provided to this 3CMS patient was inadequate.

No case formulation was developed, and the patient was not adequately followed by either the psychiatrist or the primary clinician. A plan to reassess the patient 90 days after discontinuing olanzapine 10 mg bid had not occurred as of 191 days after the plan was documented, and no wellness checks were conducted following the patient's refusals of primary clinician appointments. Given the patient's history of substance use, homelessness, inpatient psychiatric care, and a suicide attempt, a suicide risk evaluation was clinically indicated but not completed. The patient's diagnosis was inadequately explored and resolved. The treatment plan was a strength but was not used to guide treatment.

**Patient K**

This 45-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient's diagnosis of record was unspecified depressive disorder, yet primary clinicians and psychiatrists consistently documented a diagnosis of schizoaffective disorder. The patient was fully adherent to his prescribed aripiprazole, propranolol, and sertraline with PRNs for melatonin and hydroxyzine.

This patient was incarcerated within CDCR for the first time on May 7, 2018. He was soon placed at the 3CMS level of care with his first MHCB admission occurring in July 2019. He was discharged to the EOP level of care for less than a month before being placed at the ICF level of care in August 2019. He was discharged to the EOP level of care in September 2019. Since then, he was primarily treated at the EOP level of care with three MHCB admissions, all occurring after the patient was reduced to the 3CMS level of care. His longest period of time receiving services at the 3CMS level of care was from September 2023 through November 2024, when he was placed in the MHCB. Upon discharge from the MHCB, he was placed at the EOP level of care at VSP on November 14, 2024.

Five-day follow-up contacts were completed as required upon the patient's arrival to VSP but concerns with documentation of those contacts were noted. While the patient's record did not include a safety plan, all contacts with clinicians indicated that a safety plan was reviewed during the contacts. Additionally, none of the clinicians who conducted the five-day follow-up contacts reviewed the patient's MHCB course of treatment. The fourth daily contact was completed in a nonconfidential location without rationale and noted that the patient had been seen for medication non-adherence earlier in the day yet no plan was developed to address this concern. On the final day, the clinician incorrectly recorded that it was the second day of follow-ups and did not discontinue five-day follow-up contacts, but there were no further follow-up contacts.

An initial psychiatric assessment was completed timely via telepsychiatry and was adequate yet made no mention of the patient's nonadherence to sertraline, despite a clinician documenting that

his non-adherence had been addressed. A timely initial primary clinician assessment was completed and was marginally adequate with a number of sections left blank. The psychiatrist and primary clinician provided a diagnosis of schizoaffective disorder. An initial IDTT was held timely with the patient's assigned clinician, but a covering psychiatrist present. A correctional counselor was also present as was the patient. IDTT documentation was adequate and a treatment plan was developed with appropriate goals and interventions to address the patient's needs. The was no rationale for retaining him at the EOP level of care and no discharge criteria were documented other than noting the patient "may transfer to CCCMS at the next IDTT" without explanation.

The primary clinician saw the patient weekly, with alternating individual and group contacts. The primary clinician also facilitated another weekly group which the patient attended, focusing on stress management. Documentation of groups was generic and individual contacts made no reference to the patient's treatment plan or the provision of clinical interventions. Covering clinicians saw the patient for weekly individual and group contacts in December. The patient appeared to be assigned to a new primary clinician in January 2025 without any evidence of termination or mention of the transition. The newly assigned primary clinician did not evidence adequate review of the patient's record, as the initial contact addressed depression while the patient's treatment plan targeted his psychosis and medication adherence. Subsequent individual contacts reviewed the patient's medication adherence and evidenced some use of interventions, but not those outlined in the treatment plan.

A telepsychiatrist who had not seen the patient previously conducted the patient's routine contact in December and documentation was adequate other than the psychiatrist erroneously noting that the patient was being treated at the 3CMS level of care. The patient's assigned psychiatrist met with him for a routine contact in January with adequate documentation.

Documentation within the patient's record did not evidence 10 hours of treatment being offered weekly.

**Findings**

Treatment of this patient was adequate, but marginally so. Treatment planning and psychiatric contacts were adequate; however, primary clinician documentation of groups and individual sessions did not adequately address the patient's treatment plan or identified needs.

**Patient L**

This 47-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. The patient was fully adherent to his prescribed prazosin but only partially adherent to his prescribed sertraline. This patient had numerous periods of incarceration within CDCR beginning in 2002. Other than a less than two-week period in 2017, the patient had not received services within MHSDS during his previous incarcerations. He was incarcerated most recently in June 2024 and was not enrolled in MHSDS until being placed at the MHCB level of care on August 29, 2024. Upon discharge, on September 12, 2024, he was placed at the EOP level of care at VSP.

The patient was seen for five-day follow-up contacts upon arrival at VSP. Despite the presence of a safety plan developed with the patient upon discharge from MHCB, the clinician conducting the initial contact did not review the patient's safety plan with the patient. In subsequent contacts, the safety plan was reviewed with the patient; however, none of the clinicians reviewed the patient's MHCB admission or course of treatment. An initial psychiatric assessment was completed timely via telepsychiatry. The assessment was adequate and noted the diagnosis of record along with a rule out for PTSD. A timely initial primary clinician assessment was completed adequately by an unlicensed social worker yet was not co-signed by a supervisor. The content was mostly adequate.

An initial IDTT meeting was held five days later than required and included all required staff and the patient. The patient's safety plan was reviewed during the meeting. The treatment plan included realistic goals and appropriate interventions to address the patient's needs. The recommendations provided by the MHCB team were incorporated into the treatment plan. Rationale for retaining the patient at the EOP level of care was adequate; however, there were no discharge criteria. A routine IDTT meeting was held timely and included a review of the patient's functioning and symptoms, but did not specifically address the patient's progress toward identified treatment goals. His treatment participation was reviewed as were his functional impairments.

One week after the initial IDTT, there was a progress note indicating that the patient was reassigned to a new primary clinician, yet this was the only progress note entered by this clinician. Subsequent primary clinician documentation was authored by the patient's originally assigned primary clinician who saw the patient weekly for routine individual contacts. Documentation evidenced the use of appropriate interventions to address the patient's problems identified in the treatment plan. His treatment participation was routinely reviewed.

The patient was seen by his assigned telepsychiatrist at least monthly, often being seen every two weeks during the reporting period in response to referrals and patient requests. Contacts appeared appropriate to address the patient's needs. On September 20, 2024, the patient's medications were abruptly discontinued secondary to a problem with reconciliation and were restarted the following day.

There was evidence that the patient was enrolled in and participated in the EOP orientation group.

**Findings**

Treatment of this patient was adequate and addressed his needs. There was evidence of thoughtful treatment planning, treatment provided to address the patient's needs, and a review of his progress during routine contacts and IDTT meetings.

**Patient M**

This 51-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with diagnoses of borderline personality disorder; posttraumatic stress disorder; schizoaffective disorder, bipolar type; and bipolar I disorder, current or most recent episode depressed, mild. Of note, schizoaffective and bipolar disorders are mutually

exclusive and cannot be provided to the patient simultaneously yet this was not addressed in the patient's record. The patient was fully adherent to his prescribed lithium. The patient was also prescribed prazosin as needed. This patient was incarcerated for the second time within CDCR in February 2019. During his previous period of incarceration, he was either not enrolled in MHSDS or was placed at the 3CMS level of care. In February 2019 he was placed at the 3CMS level of care in reception through March 2024 when he was elevated to the EOP level of care while in restricted housing at San Quentin. He transferred to VSP on May 20, 2024.

Two routine IDTT meeting were held with the patient during the reporting period and were timely. The patient was present for both meetings and while required staff were present for the meeting in August, neither the patient's assigned primary clinician nor assigned psychiatrist were present during the meeting in November; instead covering clinicians attended the meeting. In August, the clinical summary indicated that the patient had not attended at least 50 percent of programming, yet the section required to address higher level of care concerns was blank, as were the patient's strengths and verbalized goals. While the patient's treatment plan was appropriate, targeting anger with a measurable goal and appropriate interventions, there was no mention of the patient's progress toward his goals during either meeting. There were no discharge criteria listed despite indication that the patient wished to transition to the 3CMS level of care. Neither treatment plan provided an adequate assessment of the patient's progress toward treatment goals nor discussed the course of the patient's treatment over the previous 90 days. There was no mention of the patient's diagnoses or the discrepancies in diagnoses.

The patient was not offered weekly contacts with a primary clinician. While individual contacts were offered every two weeks, caseload groups were only offered to the patient four times over the six-month reporting period. Additionally, the patient was seen by at least four different clinicians during the reporting period and continuity of care was not adequately maintained across clinicians. While a few clinicians documented providing treatment interventions to the patient, none of the interventions were in keeping with the patient's treatment plan. One of the patient's primary clinicians documented diagnoses of schizoaffective disorder and schizotypal personality disorder in progress notes without rationale as to why these diagnoses were provided or any recognition that these were not in keeping with his diagnoses of record or with diagnoses provided by other clinicians or psychiatrists.

Psychiatric contacts were generally held at least monthly, but occasionally more often, with the patient's assigned telepsychiatrist. There was one period of time when the patient was not seen for over six weeks between November 27, 2024 and January 13, 2025. Contacts with the psychiatrist were adequate and addressed the patient's needs. The psychiatrist clearly documented the various diagnoses that were being considered for the patient, including rule out diagnoses, but did not clearly identify what symptoms were being considered in support of the diagnostic criteria.

**Findings**

Treatment of this patient was inadequate. While the patient appeared to remain stable during the reporting period, the patient's diagnostic picture was unclear, his treatment plan was inadequate, and the treatment provided by the patient's primary clinicians was not in keeping with requirements and rarely included documentation of any clinical interventions.

**Patient N**

This 41-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with a diagnosis of unspecified depressive disorder. The patient was fully adherent to his prescribed mirtazapine. He was also prescribed hydroxyzine and olanzapine as needed. This patient was incarcerated for the first and only time within CDCR in May 2008. He received mental health services at the 3CMS level of care soon after his arrival through September 2011 when he was removed from the MHSDS. The patient did not receive services again until an MHCB placement in July 2024. Upon discharge, he was placed at the 3CMS level of care for two days prior to returning to the MHCB level of care. He was discharged to the EOP level of care at VSP on July 24, 2024.

The patient was seen for an initial IDTT meeting timely, on August 6, 2024. While his assigned primary clinician was present, the telepsychiatrist was covering for the patient's assigned psychiatrist and had not met the patient previously. A correctional counselor, a supervisor, and the patient were also present for the meeting. Documentation indicated that the patient's safety plan was reviewed during the meeting. The treatment plan included no clinical summary, no patient's strengths, and no patient-verbalized treatment goals. In the case formulation section, there was no case formulation, but instead a narrative regarding a plan to address the patient's substance use, anxiety, and distress using cognitive behavioral therapy. There was no mention of the patient's recent MHCB stay or rationale for the patient's placement at the EOP level of care. The one treatment goal was related to "negative thoughts" and while measurable with reasonable interventions listed, it was unclear how these related to the patient's needs given the absence of other documentation. This was especially concerning given the patient had two MHCB admission in the previous month, one following an incident of self-injury and the other secondary to suicidal ideation.

There were two routine IDTT meetings held during the reporting period, and both were timely and included required participants. The patient was present for both meetings. Documentation for both meetings was inadequate and included no updated information other than a plan to continue to monitor the patient's symptoms and a note that that patient received an RVR for substance use between November 2024 and January 2025. Additionally, the safety plan was removed from the treatment plans without rationale or explanation. This was concerning given that the patient expressed experiencing fleeting thoughts of suicide after receiving an RVR for substance use and reported occasional suicidal ideation during psychiatric contacts. The patient also reported auditory hallucinations to the psychiatrist which were never mentioned in the IDTT documentation.

The patient was generally offered weekly contacts with his primary clinician, alternating between individual and caseload groups. None of the documentation was in keeping with the treatment plan. Individual contacts mostly addressed the patient's expressed concerns of the day, without continuity across visits or keeping with the provisions of the treatment plan. The treatment was appropriate to the patient's expressed needs of the day. Group documentation was void of any information about the patient. On a number of occasions, the patient was noted as having missed individual and group sessions secondary to conflicts with his work schedule and despite

documentation by the primary clinician to correct the scheduling issues, the conflicts continued. The primary clinician completed follow-up suicide risk assessments in keeping with requirements yet in one instance the fact that the patient expressed having experienced suicidal ideation was not adequately addressed.

Psychiatric contacts were generally held monthly, although the patient was not seen for six weeks between July 29, 2024 and September 13, 2024 and again between November 21, 2024 and January 3, 2025. Documentation of psychiatric contacts was generally adequate yet the symptoms reported to the psychiatrist, including auditory hallucinations, panic episodes, and suicidal ideation were not addressed or recognized by the patient's primary clinician nor addressed during treatment team meetings.

**Findings**

Treatment of this patient was inadequate. Documentation regarding the patient's clinical presentation was inconsistent yet there was no indication that the patient's treatment providers recognized these discrepancies nor worked to resolve them. Further, the patient's treatment plan was inadequate and not updated over the course of six months. Primary clinician contacts were not in keeping with expectations and did not provide for continuity of care nor did they address issues identified on the patient's treatment plan. The patient's suicide risk was not adequately addressed.

**Patient O**

This 55-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with diagnoses of major depressive disorder, recurrent episode, severe and opioid use disorder, severe, in sustained remission. The patient was fully adherent to his prescribed aripiprazole and fluoxetine. This patient was incarcerated within CDCR for the first and only time in September 2000. He was first enrolled in MHSDS in March of 2002 at the 3CMS level of care for five months and then returned to the 3CMS level of care again in January 2003 for less than two months. He did not receive MHSDS care again until an MHCB placement in April 2018 following which he was placed at the EOP level of care. He remained at the EOP level of care through October 2020 when he was admitted to inpatient care (MHCB followed by Acute and then ICF levels of care). He was discharged from the ICF level of care in July 2023 and placed at the EOP level of care. He was transferred to VSP on December 11, 2024.

An initial primary clinician assessment was completed timely on December 13, 2024 and noted that the patient presented with significant anxiety, thoughts of suicide, and threats to engage in self-injury should he be transferred. The assessment was mostly adequate; however, the psychologist documented rule-out diagnoses of bipolar disorder, general anxiety disorder, and substance-induced anxiety disorder without explanation. Further, given the patient's reported suicidal ideation and current enrollment in the SRMP, a suicide risk assessment appeared indicated but was not completed. A timely psychiatric assessment was completed three days later and was adequate.

The patient's initial IDTT was held timely with required staff and the patient present with the exception of the psychiatrist in attendance, who was not assigned to the patient. IDTT documentation noted the patient's placement in the SRMP. IDTT documentation was comprised almost exclusively of the information documented in the primary clinician's assessment without any evidence of input from other participants. The treatment goal addressed depression and was measurable with adequate interventions, yet the problem of depression was not documented in the clinical summary as a treatment target resulting in an internally inconsistent treatment plan. The rationale for retaining the patient at the EOP level of care was inadequate.

While the patient was generally seen weekly by his primary clinician, alternating individual and group contacts, there was no evidence that treatment was provided to the patient. Individual contacts reflected status checks with no evidence of clinical interventions being provided and group documentation was copied from session to session with generic information and no individualized documentation.

The patient was seen more often than required for routine psychiatric contacts during the reporting period. During the first contact, the patient reported increased paranoia and the psychiatrist agreed to start an antipsychotic medication yet did not enter an order. The medication was not started until two weeks later when the patient inquired about the lack of initiation of the medication. Other than this lapse, the contacts were adequate and addressed the patient's needs.

**Findings**

Treatment of this patient was inadequate. Treatment planning was poor and did not reflect the findings from initial assessments. Weekly primary clinician contacts were inadequate and did not evidence clinical interventions. Psychiatric contacts were mostly adequate other than a delay in initiating medications. There was inadequate assessment of the patient's suicide risk.

**Patient P**

This 46-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with diagnoses of antisocial personality disorder; amphetamine-type substance induce psychotic disorder; amphetamine-type substance use disorder, severe, in early remission; and opioid use disorder, severe, in early remission. The patient was not prescribed psychotropic medications.

This patient has been incarcerated numerous times since 2000 with two brief (less than two week) placements at the 3CMS level of care in 2004. In 2013, he was placed at the 3CMS level of care for nearly three months, with a brief (two-week) placement at the EOP level of care before returning to the 3CMS level of care for almost one year from June 2013 to April 2014. He was most recently incarcerated on November 12, 2024, was briefly placed at the 3CMS level of care, but moved to the EOP level of care and transferred to VSP on December 23, 2024. This patient was paroled on February 18, 2025 so his case was reviewed through that date.

A timely initial primary clinician assessment was completed but was inadequate. It included substantial information pulled forward from previous assessments making it difficult to ascertain what was determined during the current assessment. The initial psychiatric assessment was timely

and adequate. The telepsychiatrist documented challenges in assessing the patient secondary to his failure to answer questions. The psychiatrist noted that it was difficult to discern if the patient's presentation was due to mental illness or substance use. The psychiatrist recognized the patient's upcoming release date.

An initial IDTT meeting was held a week later than required, on January 14, 2025. Required staff and the patient were present. The treatment plan only mentioned the patient's release date in February 2025, but did not include discussion of release planning needs. The treatment goals and interventions were superficial and generic, referencing sobriety and not receiving RVRs. The patient was seen for routine psychiatric and primary clinician contacts in keeping with requirements. Primary clinician contacts were superficial and did not appear to attempt to understand the patient's needs despite his odd presentation and inappropriate affect. Psychiatric contacts reflected attempts to engage the patient with limited success. There was evidence of pre-release planning which appeared adequate.

**Findings**

Treatment of this patient was inadequate. Despite the patient's short length of stay, there was limited evidence that attempts were made to assess, identify, and address the patient's psychiatric needs prior to his release.

**Patient Q**

This 30-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with a diagnosis of schizophrenia. He was fully adherent to his prescribed aripiprazole. This patient was incarcerated for the first and only time in June 2018 and was placed at the 3CMS level of care within the first three weeks of incarceration. Since then, he has vacillated between the 3CMS and EOP levels of care. He was most recently placed at the EOP level of care at VSP on March 13, 2024.

There were two routine IDTT meetings held with the patient during the reporting period, one in September and one in December. Both were timely and included required staff and the patient except the December meeting included a covering psychiatrist. The documentation was unchanged from September to December, other than a change to the date in the progress section of the treatment plan. It was unclear from the documentation what was being targeted in treatment as various sections of the treatment plan listed different targets including hallucinations, distress caused by hallucinations, activities of daily living, coping skills, and thought distortions. There was no review of patient functioning, participation in treatment, rationale for placement at the EOP level of care, or discharge criteria. The case formulation was inadequate and had not been updated since the patient was placed at the EOP level of care.

The patient was seen nearly weekly by his primary clinician, alternating between individual and caseload groups. Documentation for caseloads groups was wholly inadequate, with the same generic content copied into every note with no information provided regarding the patient. Individual contacts occasionally evidenced the use of treatment interventions to address the patient's current needs, but did not reflect continuity nor were they in keeping with the treatment

plan. Of concern was the lack of evidence of collaboration among the treatment team members. The psychiatrist, who saw the patient monthly, documented that the patient occasionally experienced suicidal ideation and had been non-adherent to his medication for a few days, yet neither of these issues were mentioned or explored by the primary clinician.

**Findings**

Treatment of this patient was inadequate. Treatment planning was insufficient and did not evidence a review of the patient's treatment progress or participation. Caseload group documentation was wholly inadequate and individual primary clinician contacts demonstrated no evidence of continuity across sessions nor evidence of documentation provided by the psychiatrist. The psychiatrist provided adequate and timely care.

**Patient R**

This 46-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with a diagnosis of delusional disorder. The patient was fully adherent to his prescribed olanzapine and fluoxetine. This patient was incarcerated for the third time in October 2024. During his two previous periods of incarceration, he was primarily treated at the EOP level of care, with a 23-day stay at Atascadero State Hospital in 2011 as well as some time at the 3CMS level of care (April to June 2015) before being removed from MHSDS until January 2016 when he returned to the EOP level of care. He had two placements at the MHCB level of care prior to his release in June 2020. He was placed at the EOP level of care at the time of reception for his current period of incarceration and transferred to VSP on November 20, 2024.

An initial primary clinician assessment was completed timely. The content was generally adequate except for the fact that much of the clinical summary was left blank, with only a short description of the patient's needs and mention of treatment targets and interventions. The primary clinician noted that the patient was suffering from psychosis without a formal diagnosis being documented. An initial psychiatric assessment was completed timely and included diagnoses of schizophrenia and "paranoid psychosis." The content of the assessment was adequate. An initial IDTT meeting was held a week later than required. The psychiatrist present for the meeting was not assigned to the patient and had not met the patient previously. IDTT documentation included that the patient had not been attending group programming at the reception center secondary to peer pressure and appropriate interventions were planned to encourage attendance at VSP. The treatment plan was minimal but adequate and provided measurable goals and appropriate interventions.

The patient was not seen by his primary clinician or psychiatrist in keeping with requirements. While primary clinician contacts were generally offered weekly, individual contacts were not consistently offered in confidential locations. Also, covering clinicians saw the patient for a number of weeks due to the absence of his primary clinician resulting in the patient submitting a request to have his primary clinician changed. Caseload group documentation was generic and did not include information specific to the patient. After the initial psychiatric assessment, the patient was not seen again for six weeks and the contact was provided by a covering psychiatrist. Documentation of that contact was adequate.

**Findings**

Treatment of this patient was inadequate secondary to a late IDTT and lack of required confidential treatment contacts with both the primary clinician and the psychiatrist. Continuity of care was also compromised by the primary clinician's absence resulting in the patient requesting a change in primary clinician. Diagnostic clarification was also needed.

**Patient S**

This 60-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with a diagnosis of major depressive disorder, recurrent episode, moderate. The patient was fully adherent to his prescribed escitalopram and aripiprazole. This patient has been incarcerated within CDCR since 1985. He first received services within the MHSDS in November 2003 at the 3CMS level of care through January 2006 when he was removed from the MHSDS. In January 2010, he was placed at the MHCB level of care and other than a four-day placement at the MHCB level of care again in April 2010, he remained at the 3CMS level of care through April 2011 when he was removed from the MHSDS. He returned to the 3CMS level of care on December 31, 2021. He remained at the 3CMS level of care until August 2024 when he was placed at the MHCB level of care. He was discharged to the EOP level of care at VSP on September 5, 2024, was re-admitted to the MHCB in October 2024, and most recently returned to the EOP at VSP on November 1, 2024 upon discharge from the MHCB level of care.

Five-day follow-up contacts were completed with the patient with three being completed by clinicians and two by psychiatric technicians. None of the clinicians were the patient's assigned primary clinician and there was no evidence that these clinicians reviewed the patient's recent MHCB course of treatment. Two of the three clinicians documented reviewing the patient's safety plan during the contact. Overall, documentation was superficial but adequate.

An initial primary clinician assessment was completed timely and was adequate, although the case formulation was not updated. The initial psychiatric assessment was timely and noted that the patient's diagnosis had been changed to "adjustment disorder mood mixed conduct" but also included a list of diagnoses being considered for the patient which were justified adequately. An initial IDTT was held timely with required staff present, other than a covering psychiatrist. The patient was present. The treatment plan focused on the primary clinician's assessment, goals, and interventions, which were adequate; however did not consider the psychiatrist's assessment findings. There was no rationale for placement in the EOP program and no discharge criteria. A routine IDTT meeting was held in January 2025 with a covering psychiatrist but other required staff and the patient present. The documentation was adequate and included a goal to address the patient's substance use which had become an issue for the patient in the preceding months. The clinical summary was not updated and there was no mention of patient's participation in treatment or progress toward treatment goals.

There were only two routine psychiatric contacts during the reporting period with a gap of seven weeks between the contacts. When the patient was seen, documentation was adequate and

appeared to address the patient's needs with thoughtful consideration of medications, their effects, and the patient's substance use. Primary clinician contacts occurred weekly, either in groups or individual contacts, but did not evidence treatment in keeping with the patient's treatment plan. There was no evidence of interventions being provided during sessions.

**Findings**

Treatment of this patient was inadequate. There was no evidence that the treatment outlined in the treatment plan was provided to the patient by the primary clinician and no review of the patient's treatment participation or progress during a routine IDTT meeting. Psychiatric contacts did not occur as required. Diagnostic clarification was also needed.

**Patient T**

This 61-year-old male patient's record was selected at random to assess the quality of care provided in the EOP at VSP. The patient was provided with a diagnosis of schizophrenia and was fully adherent to his prescribed olanzapine. The patient was also prescribed buspirone and hydroxyzine as needed. This patient has been incarcerated since 1985 and has been consistently receiving mental health services since 1988. This patient has four inpatient placements, three of which lasted for over two years. His most recent inpatient placement occurred from January to March 2005 when he was discharged to the EOP level of care. The was a four-day placement at the 3CMS level of care in August 2005 when resulted in an MHCB placement and a return to the EOP level of care. Other than an MHCB placement in November 2014, the patient has remained at the EOP level of care since that time and transferred to VSP on October 5, 2021.

There were three IDTT meetings held with the patient during the monitoring period and all were timely. Required staff and the patient were present for all meetings, except the patient's assigned psychiatrist was not a participant, but instead the meetings were covered by an alternate telepsychiatrist. Documentation from all three meetings was largely unchanged with much of the information being copied from meeting to meeting, including the description of the patient's current symptoms, strengths, and identified goal. While the treatment goal was appropriate and included adequate interventions, there was no evidence that progress toward this goal was assessed at any time, as the progress section was generic and unchanged during the six months reviewed. The clinical summary noted the patient's participation in treatment, medication adherence, and activities of daily living, which were not listed as part of his treatment goals.

The patient was not consistently seen every month by a psychiatrist. In August 2024, the patient was seen following a period of six weeks without a psychiatric contact and again in January 2025, the patient was seen after a lapse of six weeks. The patient was seen by his assigned psychiatrist for most contacts, although a covering psychiatrist saw the patient in August and November 2024. Psychiatric contacts appeared adequate; however, there was no evidence of using sessions to challenge the patient's delusions which was his identified treatment goal.

The patient was seen by his primary clinician every other week for individual sessions, with three exceptions. In September 2024 he was seen for a cell front wellness check by a covering clinician rather than being offered a confidential appointment and in January 2025, his assigned clinician

did not offer full session on two occasions secondary to “scheduling demands related to the recent holidays” and a scheduling conflict where the patient was called to the infirmary. All of the primary clinician contacts reflected status checks with little to no evidence of interventions being provided in keeping with the treatment plan. Additionally, the description of the patient’s current symptoms was copied from note to note and was strikingly similar to the description in the patient’s IDTT documentation. During the weeks the patient was not seen for individual sessions, caseload groups were documented with one exception between November 7th and November 19th when the patient was not seen. The documentation was confusing as it noted the topic for every group as “MH PC Rounding” making it unclear if there was a group session or if rounds were conducted instead. Every session included mostly templated language noting that the group was conducted in both English and Spanish and that patients who did not attend the group were seen non-confidentially “on the yard or in their housing unit.” Individual comments about the patient’s participation or status were minimal from August through October 2024 and then completely absent from subsequent group notes.

**Findings**

Treatment of this patient was inadequate. The patient had chronic and unremitting auditory hallucinations and delusions which were resistant to medications and caused the patient intermittent distress and affected his behavior. Despite this, there was minimal evidence of interventions being provided to the patient to support his well-being beyond the medications provided by the psychiatrist. There was no evidence of individual or group treatment targeting the patient’s needs. IDTT documentation was generic and did not review the patient’s treatment progress or barriers to attaining his goals.

**APPENDIX B-28**
**Wasco State Prison (WSP)**
**Reporting Period: December 1, 2024 – May 31, 2025**

**Patient A**

This 49-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with schizoaffective disorder, bipolar type. He was prescribed chlorpromazine, lithium, olanzapine, and valproic acid and was adherent with these medications. Hydroxyzine and an additional dose of olanzapine were prescribed PRN for anxiety and agitation, respectively; the patient used hydroxyzine frequently and PRN olanzapine infrequently. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included lumbar spondylosis with a history of spinal surgery, hepatitis C, and cannabis, opioid, and stimulant use disorders. Within CDCR, the patient had previously received all levels of care except Acute care. At WSP, he was admitted to MHCB care from April 10, 2025 for significant impairment due to mental illness. He had been nonadherent with medications and personal hygiene, exhibited bizarre behavior, made delusional PREA accusations against Presidents Trump and Obama and others, reported that he had an international embassy card, and asserted that he had not showered because he did not have a towel or his cortex. Once in MCHB care, he was referred to ICF on April 16, 2025, but remained in MHCB care until May 6, 2025.

The initial psychiatric and primary clinician assessments were timely and adequate. The initial IDTT meeting was timely but attended by alternates for the assigned primary clinician and assigned psychiatrist and a correctional counselor who may or may not have been assigned to the patient. The patient refused to attend and was not found to meet criteria for consideration of a higher level of care. The case formulation, patient strengths, patient verbalized goals, and rationale for retention in MHCB care were not documented. No treatment plan was developed. An April 15, 2025, suicide risk evaluation completed as part of the patient's PIP referral was adequate and found the patient at low risk. The mental health consult completed as part of the referral was thorough and adequately documented the rationale for the ICF referral. IDTT follow-up meetings occurred timely, and each adequately documented the patient's functioning and treatment progress; the patient consistently attended these meetings. Documentation for the first follow-up IDTT meeting included minimal descriptions of the patient's strengths and verbalized treatment goals, as well as an underdeveloped case formulation that did not address recent treatment nonadherence. A treatment plan was documented with the goal of improving the patient's hygiene; it addressed no other symptoms and did not include psychiatric care as an intervention. The patient's strengths, verbalized treatment goals, case formulation, and treatment plan were not modified in subsequent IDTT meetings. The treatment team recommended ICF care in a locked dorm; IRU review disagreed and recommended single cell placement due to the severity of the patient's symptoms and increase in hostility. A *Vitek* hearing on April 22, 2025 upheld the ICF referral. By this time, the patient was found to meet three criteria for a higher level of care, and he was found to meet four by the end of his MHCB care. The patient was followed daily by one of six primary clinicians and/or one of four psychiatrists, and on most days, he was seen by both disciplines. Progress notes adequately documented the patient's symptoms and treatment response, but they did not always clearly indicate whether the

encounters were confidential. Olanzapine and lithium were increased in efforts to address persistent psychotic and manic symptoms. Chlorpromazine was eventually added without any progress note documentation regarding this addition; valproic acid was added with adequate documentation. In what appear to be repeated cut-and-paste errors, primary clinician notes consistently indicated that the patient "denied SI/HI and has made [sic] overt gestures of SA's/NSSI," language that muddied the record because in fact the patient engaged in no suicidal spectrum behaviors during MHCB care. Provision of recreational therapy interventions were adequately documented. A primary clinician discharge summary was developed on April 16, 2025, and not updated thereafter. No psychiatric discharge summary was developed.

**Findings**

The care provided to this MHCB patient was adequate.

The patient's referrals, first to MHCB and then to ICF care, were clinically appropriate. In MHCB care, the patient received timely and adequate initial assessments, timely IDTT meetings, a well-justified referral to ICF care, and daily follow-up encounters with a psychiatrist and/or a primary clinician. The patient's course of treatment was clear from the record, and psychiatric care, including ongoing increases to the patient's medications, appeared appropriate. Documentation deficiencies were the primary challenge. The case formulation and treatment plan were inadequate; progress notes did not consistently indicate whether the encounters were confidential; there was no documentation contemporaneous with the addition of chlorpromazine to the patient's medications; and primary clinician notes repeatedly erred in stating that the patient had engaging in suicide attempts or non-suicidal self-injury. Continuity of primary clinicians, and to a lesser extent of psychiatrists, was also weak. However, the overall care was appropriate for the patient's treatment needs, and he showed some improvement over time.

**Patient B**

This 39-year-old transgender (she/her/hers) MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. She was diagnosed with schizophrenia and alcohol and cannabis use disorders, both severe. Under a PC 2602 for involuntary treatment due to grave disability, she was prescribed buspirone, divalproex sodium, hydroxyzine, and olanzapine. She was adherent with these medications. Diphenhydramine and intramuscular haloperidol were ordered as back-up medications for refusal of oral antipsychotic medication, but they were not needed during MHCB care. Additional doses of hydroxyzine and olanzapine were ordered PRN for anxiety and psychosis; the patient used both frequently. Six suicide attempts and two episodes of self-injurious behaviors were listed in the health record. Medical conditions included hyperthyroidism and weight loss. She was not receiving gender-affirming hormone treatment. Within CDCR, the patient had previously received all levels of care except 3CMS care. At WSP she received MHCB care from February 28, 2025 to March 10, 2025 for danger to self, after reporting suicidal ideation and auditory hallucinations, banging her head, punching the walls, and smearing feces while in RHU. A pre-admission suicide risk evaluation found her at high risk, with panic and command auditory hallucinations instructing her to harm herself.

The initial psychiatric and primary clinician assessments were timely and adequate. The case formulation was underdeveloped, generic, inadequate to guide treatment, and failed to address the patient's transgender identity and involuntary treatment. The initial IDTT meeting was timely and attended by the patient, an alternate for the assigned primary clinician, the assigned psychiatrist, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for consideration of a higher level of care. Her strengths and verbalized treatment goals were minimally documented. The treatment plan did not identify any short- or long-term goals and did not address psychiatric care. The patient was followed daily by one of three primary clinicians and/or one of three psychiatrists. Progress notes were adequate, but psychiatric progress notes did not indicate whether the patient was seen in a confidential setting. No recreational therapy interventions were documented. The follow-up IDTT meeting was timely and attended by the patient and required staff, apart from an alternate for the assigned correctional counselor. It resulted in a decision to discharge the patient to EOP care. The clinical summary was thorough, but documentation of patient strengths, verbalized treatment goals, the case formulation, and the treatment plan were unimproved and remained deficient. The discharge suicide risk evaluation was adequate and found the patient at low risk. The accompanying safety plan was collaborative and potentially useful. The primary clinician discharge summary and, in the form of an extended progress note, the psychiatric discharge summary were timely and adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The initial primary clinician and psychiatric assessments were timely and adequate, and subsequent daily progress notes from both disciplines indicated the provision of clinically appropriate care and treatment progress. Active therapeutic interventions were apparent in the primary clinician progress notes. Both the initial and the follow-up IDTT meetings occurred timely and appeared collaborative, and the patient was timely and appropriately discharged to EOP care. Discharge summaries and the discharge suicide risk evaluation were timely and adequate. The major challenges in this patient's care were deficiencies in the case formulation and treatment plan, neither of which were useful or apparently used to guide treatment. Nevertheless, overall treatment was adequate.

**Patient C**

This 70-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with schizophrenia and opioid use disorder. He was prescribed melatonin, mirtazapine, olanzapine, and sertraline, and was adherent with the first three medications and partially adherent with sertraline. Prior to being ordered as a scheduled medication, melatonin was prescribed PRN, and the patient used it intermittently. Through the ISUDT, buprenorphine-naloxone was prescribed for opioid use disorder, and he was adherent with this medication. Three suicide attempts dating between 1997 and 1982 were listed in the health record. Medical conditions at the time of his MHCB care included gastroesophageal reflux disease with esophagitis, mixed hyperlipidemia, opioid use disorder, and abnormal weight loss. Following MHCB care, he was found to have multiple

additional conditions, including kappa light chain disease and cognitive impairment. Within CDCR, the patient had previously received all levels of care. At WSP, he received MHCB care from April 29, 2025 to May 10, 2025 for significant impairment due to mental illness after voicing delusions of mind control, reporting auditory hallucinations, and losing weight due to self-neglect, with an inability to report when he last ate solid food. He was clinically discharged to EOP care at RJD on May 7, 2025, but was not physically transferred to RJD for another three days.

The initial psychiatric and primary clinician assessments were timely but limited, and they did not adequately explore the patient's mental functioning. The initial IDTT meeting was timely and attended by the patient, the assigned psychiatrist, an alternate for the assigned primary clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for consideration of a higher level of care. The case formulation was generic and inadequate. Documentation of the patient's strengths, verbalized treatment goals, and MHCB retention rationale were adequate. The treatment plan was imported without modification from one developed in 2024, and it addressed only old problems that were not part of the current clinical presentation. The patient was followed daily by one of five primary clinicians and/or one of two psychiatrists. Psychiatric progress notes did not indicate whether these encounters were confidential, and some primary clinicians diagnosed the patient with major depressive disorder at the same time psychiatrists were diagnosing schizophrenia. This diagnostic discrepancy was not adequately reconciled. One recreational therapy encounter was documented. He was sent to the emergency room for evaluation after being found with an altered mental status; because this resolved with intravenous fluids, it was suspected that the patient suffered from dehydration. The follow-up IDTT meeting was timely and attended by the patient and required staff. IDTT documentation included a thorough clinical summary with adequate rationale for discharge to EOP care, but the treatment plan was not updated. The discharge suicide risk evaluation found the patient at moderate chronic risk, and a collaborative and useful safety plan was developed. The primary clinician discharge summary was timely, adequate, and recommended that the patient be reevaluated for inclusion in the DDP due to cognitive impairment and his need for reminders.

**Findings**

The care provided to this MHCB patient was inadequate.

The initial assessments failed to explore the patient's mental status with sufficient depth, an important deficiency because the patient had difficulty remembering to eat and drink; he also suffered from altered mental status. While IDTT meetings occurred timely, the case formulation and treatment plan did not adequately address the patient's current treatment needs. Daily follow-up contacts reflected a divergence in diagnostic impressions that was not explored and reconciled. Psychiatric care appeared appropriate, but formal evaluation of the patient's cognitive functioning was clinically indicated and not undertaken. However, it should be emphasized that medical conditions with the potential to contribute to cognitive impairment were not identified until sometime after MHCB discharge, and it is therefore unlikely that a full understanding of the patient's conditions and mental health treatment needs could have been achieved during MHCB care.

**Patient D**

This 32-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with major depressive episode, recurrent, severe with psychotic features versus schizoaffective disorder, bipolar type. He was prescribed olanzapine and was nonadherent with this medication. Hydroxyzine and a single additional dose of olanzapine were prescribed PRN for anxiety and agitation; the patient took the olanzapine dose and used hydroxyzine on one separate occasion. Three episodes of non-suicidal self-injurious behaviors, all in 2020, were listed in the health record. Medical conditions included an unspecified substance use disorder. Within CDCR, the patient had previously received all levels of care and was under a PC 2602 order for involuntary treatment due to grave disability and danger to others from January 11, 2023 to January 11, 2024. At WSP, he received MHCB care due to danger to self and significant impairment due to mental illness from May 10, 2025 to May 19, 2025. He was tangential, delusional, internally distracted, malodorous, depressed, paranoid, anxious, hyperverbal, and agitated prior to admission.

The initial psychiatric and primary clinician assessments were timely; the psychiatric assessment was adequate, but the primary clinician assessment lacked any diagnostic impressions and resulted in a case formulation that was intellectualized, highly abstract, generic, and of little to no value in guiding treatment. A safety plan completed at the same time was neither collaborative nor clinically useful for the patient. The initial IDTT meeting was timely and attended by the patient, the assigned psychiatrist, an alternate for the assigned clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for consideration of a higher level of care. IDTT documentation for the clinical summary, case formulation, patient strengths, and patient verbalized treatment goals were minimally documented, and no treatment plan was developed. The patient was followed daily by one of four clinicians and/or one of two psychiatrists. Progress notes were adequate but did not include any discussion regarding the differential diagnoses. No recreational therapy interventions were documented. The follow-up IDTT meeting was timely and attended by the patient, assigned psychiatrist, an alternate for the assigned clinician, and a correctional counselor who may or may not have been assigned to the patient. The clinical summary, case formulation, patient strengths, and patient verbalized treatment goals were not updated and remained deficient. There continued to be no treatment plan, and there was no documentation addressing the patient's medication nonadherence. While the treatment team determined to discharge the patient to EOP care, the rationale for the discharge was not included in IDTT documentation; a psychiatric note indicated that the patient had met maximum benefit from MHCB and did not meet criteria for a PC 2602 petition. However, the patient remained on suicide precautions with partial issue until the day prior to discharge. The discharge suicide risk evaluation was timely and adequate; the patient was found at low risk. The accompanying safety plan required improvement. The primary clinician discharge summary was cursory and did not adequately discuss the patient's persistent symptoms or medication refusals. The patient required readmission to MHCB care eight days following this discharge.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient received timely assessment and treatment throughout the MHCB stay, the underlying nature of his symptoms remained poorly explored and without any attempts at diagnostic resolution. The patient's medication nonadherence was inadequately investigated and addressed, and in the context of ongoing nonadherence and psychosis, the determination that the patient had achieved maximum benefit and was ready for discharge was inadequately documented. The patient remained on suicide precautions with partial issue until the day prior to discharge, indicating ongoing concerns, the resolution of which was not adequately documented. Adequate psychiatric stabilization was not likely achieved, as evidenced by the patient's readmission to MHCB care eight days following discharge.

**Patient E**

This 40-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with bipolar I disorder, most recent episode manic, severe, with psychotic features. He was prescribed olanzapine and valproic acid and was nonadherent with both medications. Hydroxyzine and an additional dose of olanzapine were ordered PRN for agitation, but the patient did not use either medication. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included asthma and a history of a cyst of the epididymis. Within CDCR, the patient had previously received all levels of care and was treated on an involuntary basis under PC 2602 orders between 2018 and 2022. At WSDP, he received MHCB care from May 6, 2025 to May 22, 2025 for significant impairment due to mental illness. Prior to admission he was unkempt, malodorous, agitated, manic, demanded sugar water and power, and exhibited grandiose delusions, thought disorganization, and word salad.

The initial psychiatric and primary clinician assessments were timely and minimally adequate; the patient declined to participate in either assessment. The initial IDTT meeting was timely and attended by the assigned primary clinician, assigned psychiatrist, and a non-assigned correctional counselor. The patient left the meeting shortly after it started, when his demand for coffee each time he spoke to mental health was denied. He was not found to meet criteria for a higher level of care. The case formulation, patient strengths, verbalized treatment goals, and rationale for retention in MHCB care were not documented. The treatment plan was imported without modification from one developed a month earlier and failed to address psychiatric care or medication nonadherence. The patient was followed daily by one of six primary clinicians and/or one of three psychiatrists. Most contacts occurred at the cell front due to the patient's refusals. Both primary clinician and psychiatric progress notes relied heavily on material copied over from prior notes, and it was not always clear whether symptoms and behaviors being described were current or carried over without modification from one progress note to another. No recreational therapy interventions were documented. Follow-up IDTT meetings were timely, attended by one or more alternates for assigned team members, and by the patient, although only for the first few minutes. During these meetings, the treatment team determined that the patient met one or more criteria for a higher level of care. During the first of these he was appropriately

referred to acute care; a primary clinician discharge summary was developed at this time. The discharge summary inadequately summarized the patient's treatment course and was not updated to address events over the remainder of MHCB care. Subsequent to the discharge summary, a petition for involuntary treatment under PC 2602 was appropriately initiated, and a *Vitek* hearing upheld the referral to acute care. In the follow-up IDTT documentation, the case formulation, patient strengths and patient verbalized treatment goals were updated but minimal. The treatment plan was not updated. The suicide risk evaluation completed in connection with the PIP referral indicated both low and moderate current suicide risk, although the bulk of the evaluation supported moderate risk. The patient's hygiene remained poor and his cell dirty and unkept throughout his MHCB care, and he required treatment for lice. Efforts to encourage hygiene and clean his cell were appropriately documented.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely initial assessments and IDTT meetings and daily follow-up encounters by primary clinicians and/or psychiatrists. The patient was severely manic, psychotic, disorganized, resistant to treatment, and difficult to engage in sensible conversation. The treatment team appropriately diagnosed him, offered appropriate psychiatric care, submitted a clinically indicated PC 2602 petition for involuntary treatment, and appropriately referred the patient to acute inpatient care. There were significant documentation challenges in the patient's care, particularly in the case formulation, treatment plan, and discharge summary, which were deficient. Daily progress notes were overly reliant on material copied from other notes. However, the course of care was clear, clinically appropriate, and resulted in inpatient admission.

**Patient F**

This 51-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with major depressive disorder, recurrent, severe with psychotic features, posttraumatic stress disorder, and alcohol and cannabis use disorders, both severe and in institutional remission. A rule-out diagnosis of delusional disorder was also offered. He was not prescribed any psychotropic medication. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included hypertension, spondylolysis, head injury with loss of consciousness, memory impairment, rupture of anterior cruciate ligament, and meniscus tear. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At WSP, he received MHCB care from February 11, 2025 to February 20, 2025 for danger to self, after presenting as hopeless, severely depressed, and delusional. Hours after the MCHB referral was made, the patient learned that his father had died.

The initial psychiatric and primary clinician assessments were timely and adequate. The initial IDTT meeting was also timely and attended by the patient, assigned psychiatrist, an alternate for the assigned primary clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for a higher level of care. The case formulation was underdeveloped, did not adequately address the patient's history of trauma,

memory loss, and current bereavement, and was of limited use in guiding treatment. Patient strengths, verbalized treatment goals, and rationale for retention in MHCB care were documented minimally but adequately. The treatment plan focused on suicidal ideation, which the patient denied, and did not address severe depression or psychotic symptoms. The patient was followed daily by one of three primary clinicians and/or one of three psychiatrists, and on most days was seen by both disciplines. Progress notes from both disciplines heavily relied upon material copied from earlier notes but adequately tracked the patient's clinical presentation. The patient remained depressed, paranoid, and delusional, but he continued to refuse psychotropic medication, cooperate with verbal treatment, and deny suicidal ideation. He was not found to meet criteria for involuntary treatment under PC 2602. No recreational therapy interventions were documented. The follow-up IDTT meeting was timely and attended by the patient, assigned psychiatrist, an alternate for the assigned primary clinician, and a correctional counselor who may or may not have been assigned to the patient. The treatment plan was updated to indicate that the patient had met his short-term treatment objective; documentation of the patient's strengths, verbalized treatment goals, and case formulation were not updated. The discharge suicide risk evaluation found the patient at moderate risk and included adequate documentation supporting this determination. The accompanying safety plan was collaborative and adequate. The primary clinician discharge summary was timely but did not describe the patient's psychotic features or address the patient's refusal of psychotropic medications. The patient's discharge to EOP care rather than 3CMS care, which he was receiving before the MHCB admission, was appropriate given the severity of his ongoing symptoms.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely and adequate assessments, IDTT meetings, and daily contacts from psychiatrists and primary clinicians. Psychotropic medications were consistently offered and refused, and the patient was not found to meet criteria for involuntary or inpatient treatment. His clinical presentation was adequately tracked and documented. Once he was found not to be in imminent risk, the discharge determination appropriately included referral to a higher level of care, and the discharge suicide risk evaluation and safety plan were timely and adequate. Documentation challenges included an inadequate case formulation, a poorly formulated treatment plan, and an inadequate discharge summary. However, the patient was carefully monitored, received adequate supportive treatment, and remained functional despite his severe symptoms.

**Patient G**

This 29-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with schizophrenia, alcohol use disorder, severe, and sedative, hypnotic, and anxiolytic use disorder, severe. He was prescribed divalproex sodium, haloperidol, and mirtazapine, and he was adherent with these medications. Olanzapine was discontinued at the beginning of his MHCB stay. Hydroxyzine was prescribed PRN for agitation, and he used this medication on four occasions. One suicide attempt by hanging in 2022 was listed in the health record. Medical conditions included a history of

inactive tuberculosis. Within CDCR, the patient had previously received 3CMS, EOP, and MHCB care. At WSP, he received MHCB care from December 15, 2024 to December 23, 2024 for danger to self, after exhibiting significant emotional distress with crying spells and reporting auditory hallucinations and suicidal ideation with a plan and intent to hang himself. This was the patient's fourth MHCB admission since mid-October 2024.

The initial psychiatric and primary clinician assessments were timely and adequate. The initial IDTT meeting was timely and attended by the patient, assigned psychiatrist, and alternate for the assigned clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was found to meet criteria for a higher level of care based on multiple MHCB admissions but was retained in MHCB care for further assessment and stabilization. The case formulation was adequate. Patient strengths, verbalized treatment goals, and rationale for retention in MHCB care were minimally documented. The treatment plan was incomplete, with no interventions listed for one of the identified problems, and it was imported without modification from a prior MHCB stay. The patient was followed daily by one of two primary clinicians and/or one of three psychiatrists. Progress notes from both disciplines heavily relied upon material copied from earlier notes but adequately tracked the patient's treatment response. Unfortunately, the primary clinicians diagnosed major depressive disorder, recurrent, severe with psychosis while the psychiatrists diagnosed schizophrenia; the divergence in diagnoses was not addressed or resolved. No recreational therapy interventions were documented. The follow-up IDTT meeting was timely, attended by the patient, assigned psychiatrist, an alternate for the assigned clinician, and a correctional counselor, and resulted in a determination to discharge the patient to EOP care. The treatment plan was partially updated to indicate he had met one of his short-term objectives; status of progress in meeting his second short-term objective was not indicated. The discharge suicide risk evaluation was timely, found the patient at moderate long-term risk, but adequately documented protective factors and imminent risk as low. The accompanying safety plan was collaborative and adequate. The primary clinician discharge summary was timely and adequate.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely assessments, IDTT meetings, and daily follow-up encounters. Psychopharmacological and psychotherapeutic interventions appeared to be clinically appropriate and effective, the patient's distress abated, and his behavior stabilized. His discharge to EOP care appeared appropriate; following MHCB discharge, he was able to remain in this level of care for more than 90 days, a significant improvement over his frequent re-admissions during the prior quarter. The two major challenges in this patient's care were treatment planning deficiencies and a failure to reconcile divergent diagnostic impressions. Despite these challenges, the patient received the care he needed.

**Patient H**

This 30-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with schizophrenia. He was

prescribed olanzapine, quetiapine, and lurasidone but was nonadherent with all three medications. Hydroxyzine was prescribed PRN for agitation, but he did not use this medication. One suicide attempt and two episodes of self-injurious behaviors were listed in the health record at the time of his MHCB admission. Medical conditions included bilateral optic nerve atrophy and abnormal weight loss. Within CDCR, the patient had previously received all levels of care and had a history of involuntary treatment under PC 2602, with the most recent order expiring in 2023. At WSP, he received MHCB care from March 27, 2025 to April 11, 2025 for significant impairment due to mental illness after becoming medication nonadherent and exhibiting agitated and disorganized behaviors, lack of hygiene, hallucinations, and delusions. Additionally, he had engaged in in-celling fighting on March 26, 2025.

The initial psychiatric and primary clinician assessments were timely and adequate. The initial IDTT meeting was timely and attended by the patient, assigned psychiatrist, and alternate for the assigned clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for a higher level of care during this meeting. The case formulation was adequate, and patient strengths, verbalized treatment goals, and rationale for retention in MHCB care were adequately documented. No treatment plan was developed. The patient was followed daily by one of three psychiatrists and/or one of five clinicians. The patient was electively mute and uncooperative during these encounters, and several occurred at the cell front because the patient declined confidential settings. He consistently denied the need for medication. Three recreational therapy encounters at the cell front were documented, during which the patient engaged minimally. The patient remained unkempt, malodorous, agitated, disorganized, paranoid, psychotic with hallucinations, delusions, and disorganized thinking, treatment nonadherent, and unable to function in the MHCB setting. A clinically indicated petition for involuntary treatment under PC 2602 for grave disability and danger to others was initiated, and a *Vitek* hearing upheld the acute care referral. Follow-up IDTT meetings were timely and consistently attended by the patient. Assigned staff attendance was variable, and no correctional counselor was documented attending the second IDTT meeting. During the first follow-up IDTT meeting, the treatment team determined that the patient met three criteria for a higher level of care and referred the patient to acute care in a locked dorm setting, for treatment of significant impairment due to mental illness and danger to others. In addition, a minimal treatment plan was developed, focusing on taking showers. The suicide risk evaluation completed in connection with the inpatient referral was adequate and found the patient at moderate risk. The primary clinician discharge summary was completed at the time of the PIP referral and not updated to reflect treatment over the next nine days of MHCB care. The treatment plan and description of the course of treatment were not updated during the second follow-up IDTT meeting.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely and adequate initial assessments, timely IDTT meetings, and timely adequate daily follow-ups. The initiation of a PC 2602 petition was timely, and the referral to acute care was clinically indicated. Strong efforts were made to engage the patient in treatment, including offering him a total of three different antipsychotic medications, but he remained

psychotic and disengaged. The case formulation represented a significant strength in the documentation. Heavy reliance on copied material in progress notes, an underdeveloped treatment plan, and a premature discharge summary were areas in which documentation needed to improve. Additionally, the absence of a correctional counselor during the second IDTT meeting was problematic. Nevertheless, the patient's treatment needs and responses were clearly documented, and the patient was appropriately transferred to acute care.

**Patient I**

This 34-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with schizoaffective disorder, depressive type. He was prescribed benztropine, buspirone, citalopram, olanzapine, and risperidone and was consistently adherent with these medications. Hydroxyzine was prescribed PRN for anxiety, and he used this medication once during MHCB care. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included elevated blood pressure without a diagnosis of hypertension, unintended weight loss, and, during MHCB care, risk of hyponatremia secondary to psychogenic polydipsia, along with a facial rash. Within CDCR, the patient had previously received all levels of care except acute care. At WSP, he received MHCB care from January 10, 2025 to January 24, 2025 for danger to self after reporting suicidal ideation with a plan and increased anxiety. He reported that he could neither read nor write.

The initial psychiatric and primary clinician assessments were timely and adequate, apart from the case formulation developed by the primary clinician. This was overly abstract, intellectualized, generic, and of little practical use in guiding treatment. The initial IDTT meeting was timely and attended by the patient, assigned psychiatrist, and alternate for the assigned clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for a higher level of care during this meeting. Patient strengths and verbalized treatment goals were adequately documented, but the rationale for retaining the patient in MHCB care was not. The treatment plan was copied without modification from one developed in December 2024. It included four problem areas, two of which were inappropriately indicated as "done." The plan appropriately addressed anxiety and suicidal ideation but did not address psychosis or psychiatric care. The patient was followed daily by one of five primary clinicians and/or one of three psychiatrists. Progress notes from both disciplines relied heavily on material copied from prior notes, but it was possible to track the course of care. No recreational therapy interventions were documented. The patient continued to exhibit anxiety, depression, impoverished speech and thought content, incoherent speech, possible thought blocking, social withdrawal, intermittent passive suicidal ideation, and poor insight and judgment. He also exhibited excessive water consumption and required water restrictions as a result. Follow-up IDTT meetings were timely and consistently attended by the patient, assigned psychiatrist, and a correctional counselor who may or may not have been assigned to the patient. The assigned primary clinician attended one of these meetings; an alternate attended the other IDTT meeting. During the second follow-up IDTT meeting, the patient was found to meet criteria for a higher level of care and, with his consent, was referred to PIP care for treatment of significant impairment due to mental illness. This referral was originally for acute care but was changed to ICF care after further consultation. The MHCB

treatment team recommended an unlocked dorm environment, but subsequent IRU review correctly concluded that, given the patient's need for water restriction, single-cell placement at ICF was required. The MHCB treatment plan was not updated and did not address cognitive impoverishment, possible thought blocking, or excessive water consumption. The suicide risk evaluation completed in connection with the ICF referral found the patient at moderate risk and indicated that his symptoms required a higher level of care. The primary clinician discharge summary was timely but did not adequately summarize psychiatric care or medication adherence.

**Findings**

The care provided to this MHCB patient was adequate.

The patient received timely initial assessments, IDTT meetings, and daily follow-up encounters. Treatment of his depression, anxiety, thought disorder, and psychogenic polydipsia was appropriate in the context of MHCB care. The patient was appropriately referred to ICF care, with rationale clearly documented. The patient's suicidal risk was adequately assessed and monitored. Documentation challenges included a deficient case formulation and treatment plan, along with overreliance of copied materials in primary clinician and psychiatric progress notes. Despite documentation deficiencies, the patient's treatment and disposition were appropriate.

**Patient J**

This 28-year-old MHCB patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was diagnosed with unspecified bipolar disorder and adult antisocial traits. He was prescribed bupropion, buspirone, divalproex sodium, hydroxyzine, and lurasidone, and was adherent with these medications. An additional dose of hydroxyzine and olanzapine were ordered for anxiety and agitation; he used PRN olanzapine on five of ten days and PRN hydroxyzine on three of five days in MHCB care. Two suicide attempts and seven episodes of self-injurious behavior were listed in the health record. Medical conditions included obesity, asthma, hearing impairment, a history of gastrointestinal disease, allergic rhinitis, hypokalemia, situs inversus viscerum, and multiple self-inflicted wounds. Within CDCR, the patient had previously received all levels of care. At WSP, he received MHCB care from March 11, 2025 to March 21, 2025 for danger to self after ingesting razor blades, reporting suicidal ideation, and being found at risk for unintentional or accidental harm/death. He used hearing aids.

The initial psychiatric and primary clinician assessments were timely and adequate, apart from the primary clinician's underdeveloped case formulation. The initial IDTT meeting was timely and attended by the patient, the assigned psychiatrist, an alternate for the assigned primary clinician, and a correctional counselor who may or may not have been assigned to the patient. The patient was not found to meet criteria for a higher level of care during this first meeting. Patient strengths, verbalized treatment goals, and rationale for MHCB care were minimally documented. The treatment plan was adequate except for failing to include psychiatric care. The patient was followed daily by one of two primary clinicians and/or one of four psychiatrists, except on March 15, 2025, when there was no documentation from either discipline recording an

encounter. The patient remained on 1:1 suicide watch on this date. Progress notes from both disciplines relied heavily on material copied from prior notes, often did not indicate whether the encounter was confidential, and did not demonstrate adequate provision of non-pharmacological interventions or adequate inquiry into personality traits and interpersonal dynamics. The nature of the patient's self-injury remained poorly documented. Psychiatric progress notes indicated in the same note that the patient was diagnosed with unspecified bipolar disorder and with bipolar I disorder, with no explanation. No recreational therapy interventions were documented. The patient continued to voice suicidal ideation, engaged in self-injury once, and exhibited multiple razor blades on other occasions. He remained on suicide watch or suicide precautions throughout MHCB care. The follow-up IDTT meeting was timely, attended by the patient, assigned psychiatrist, an alternate for the assigned clinician, and a correctional counselor. The team found that the patient met three criteria for a higher level of care and, with the patient's consent, referred the patient to acute care for danger to self. The case formulation, patient strengths, patient verbalized treatment goals, and treatment plan were not updated. The suicide risk evaluation completed at the time of the referral found the patient at high risk and provided adequate rationale for this determination. The primary clinician discharge summary was completed at the time the acute referral was made, not when the patient was physically discharged from MHCB care, and while it adequately discussed the patient's behavior and risks, it did not summarize psychiatric care.

**Findings**

The care provided to this MHCB patient was inadequate.

Although the patient received timely and adequate initial assessments and timely IDTT meetings, daily follow-up encounters were not documented on one day of MHCB care, while the patient remained on suicide watch. There was little to no documentation of the non-pharmacological interventions required by the treatment plan. The treatment plan itself failed to reflect psychiatric care, which appeared to be the major intervention provided during MHCB care. The nature of the patient's recurrent self-injurious behaviors was inadequately explored. Documentation of and evidence for the patient's bipolar disorder was unclear, and the antisocial and borderline personality disorder traits that were noted went unexplained and unexplored. The case formulation was impoverished and inadequate. While the referral to acute inpatient care may have been clinically appropriate given the patient's assessed high risk for suicide, there was inadequate exploration of the patient's strengths, protective factors, triggers, and interpersonal risk factors.

**Patient K**

This 57-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility A and diagnosed with persistent depressive disorder and unspecified anxiety disorder. He was prescribed and adherent with buspirone and mirtazapine. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included a seizure disorder, hypertension, hyperlipidemia, diabetes, history of gunshot wounds, chronic kidney disease, and monoparesis of right lower limb. He used a cane to ambulate. Within CDCR, the patient had previously received only

3CMS care. He was transferred to mainline 3CMS care at WSP on September 25, 2024 and remained there through the end of the review period.

During the review period, an alternate for the assigned psychiatrist saw the patient once. This encounter was confidential and adequately documented, but it occurred late, 115 days after the next most recent psychiatric encounter. Following this encounter, no psychiatrist saw the patient through the end of the review period, and as of October 8, 2025, 222 days had lapsed without a psychiatric encounter; the patient remained adherent with buspirone and mirtazapine. Two primary clinicians each saw the patient once during the review period. These contacts were timely; the first was confidential, while the progress note for the second encounter did not indicate where the encounter occurred. The first primary clinician progress note documented the provision of clinically appropriate interventions; the second progress note indicated a plan to do so but did not include documentation that therapeutic interventions were provided during the session. Psychiatric and primary clinician progress notes indicated that the patient suffered from restlessness, fatigue, poor concentration, irritability, obsessive thinking, sadness, hopelessness, poor concentration, excessive worry, insomnia, and low motivation. Symptoms of posttraumatic stress disorder and the patient's concerns that he might have cancer were also noted. Although the patient reported he was emotionally well, he rated both anxiety and depression as a 5 on subjective unit of distress scales ranging from 0 to 10. It should be noted that the most recent IDTT meeting, completed prior to the review period, did not result in any treatment plan.

**Findings**

The care provided to this 3CMS patient was inadequate.

During the review period, there was no treatment plan available to guide treatment. The patient was not followed adequately by psychiatry, and as of early October 2025, no psychiatrist had seen him since February 28, 2025. The primary clinicians' interventions appeared supportive and appropriate to the extent they were provided, but continuity among primary clinicians was poor, and there was no planned and structured approach to treat the patient's anxiety, persistent depression, or posttraumatic symptoms. Although the patient consistently reported that he was emotionally well, the extent of symptoms documented suggests that more frequent and more structured encounters would have been helpful.

**Patient L**

This 25-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility A and diagnosed with posttraumatic stress disorder and unspecified anxiety disorder. He was not prescribed any psychotropic medication. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included obesity, decreased thyroid stimulating hormone, and exercise-induced asthma. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on August 6, 2024 and remained there through the end of the review period.

During the review period, two primary clinicians saw the patient for a total of three encounters. The progress note for the first encounter did not indicate whether the encounter was confidential and did not specify the interventions that were provided during the session. The second and third encounters were documented as confidential, and the primary clinician documented the provision of interventions that were clinically appropriate and consistent with the treatment plan.

**Findings**

The care provided to this 3CMS patient was adequate.

A treatment plan formulated prior to the review period provided adequate and clinically appropriate guidance for treatment, and it was followed during the review period. The patient received timely follow-up encounters from primary clinicians. One of the clinician's progress notes could be improved by indicating whether the encounter was confidential and what interventions were provided in the session, but these elements were clearly present in the other clinician's progress notes. The patient remained stable, interactive, and open during these encounters.

**Patient M**

This 60-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility M and diagnosed with major depressive disorder, recurrent, moderate. Progress notes also listed diagnoses of delusional disorder, persistent depressive disorder, and antisocial personality disorder. He was prescribed and adherent with mirtazapine and sertraline. A scheduled dose of mirtazapine was changed to PRN status between December 16, 2024 and January 9, 2024, and he used the PRN dose regularly during this time. Mirtazapine was re-ordered as a scheduled medication on January 9, 2025 and remained scheduled for the duration of the review period. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included seborrhea, borderline glaucoma, elevated hemoglobin A1c, vitamin D deficiency, and opioid use disorder. Within CDCR, the patient had previously received 3CMS and MHCB care. He was transferred to mainline 3CMS care at WSP on July 26, 2024 and remained there through the end of the review period.

Three psychiatrists each saw the patient once during the review period. These encounters were timely. Progress notes for the first two encounters did not indicate whether the patient was seen in a confidential setting; the third encounter was confidential. Psychiatric documentation was detailed and otherwise adequate, and medication changes were made in response to the patient's requests and changing symptoms. When the patient reported increasing depression, PRN mirtazapine was re-ordered as a scheduled medication, sertraline was added, and the patient was seen for a follow-up appointment in one month. The assigned primary clinician saw the patient twice during the review period. The first encounter was timely, confidential, and resulted in a routine psychiatric referral due to the patient's report of worsening depression and paranoia, which the primary clinician assessed as delusional in nature. The primary clinician provided interventions that were broadly consistent with the treatment plan. The second encounter

occurred late, 121 days after the first encounter. The patient refused this encounter, and a wellness check at the cell front was completed. Documentation included a detailed mental status exam and was adequate.

**Findings**

The care provided to this 3CMS patient was inadequate.

The conversion of scheduled mirtazapine to PRN mirtazapine at the patient's request fell outside the standards of psychiatric care and may have contributed to the subsequent increase in depressive symptoms the patient reported. Fortunately, PRN mirtazapine was discontinued and scheduled mirtazapine was re-initiated during the review period. After the patient described worsening depression and made statements that the primary clinician believed were paranoid and delusional, the primary clinician referred the patient to psychiatry but did not provide timely follow-up. Instead, the primary clinician next attempted to see the patient four months later. Additionally, because the primary clinician believed the patient had become psychotic, an urgent rather than a routine psychiatric referral would have been indicated. The diagnosis of delusional disorder included in progress notes was not adequately assessed or addressed during the review period. The patient did not receive the treatment that his symptoms indicated were needed.

**Patient N**

This 32-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility M and diagnosed with unspecified bipolar disorder and polysubstance [sic] use disorder. Later in the review period, these diagnoses were changed to unspecified mood disorder and generalized anxiety disorder. He was prescribed fluoxetine and trazodone but was nonadherent with both. In early April, 2025, trazodone was converted from a scheduled to a PRN medication for anxiety; the patient used PRN trazodone intermittently for the remainder of the review period. No suicide attempts or self-injurious behaviors were listed in the health record, although a history of rescue from a suicide attempt by hanging at the age of 17 was documented in a primary clinician assessment. Medical conditions included prediabetes and symptomatic irreversible pulpitis. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on December 27, 2024 and remained there through the end of the review period.

The initial primary clinician assessment was timely and, apart from an underdeveloped case formulation, adequate. An accompanying suicide risk evaluation was adequate except for failing to discuss and consider the suicide attempt by hanging recorded in the contemporaneous primary clinician assessment. The patient was found at low risk. The initial psychiatric assessment was also timely, adequate, and noted a family history of suicide not reflected in suicide risk evaluation. The assessing psychiatrist educated the patient about the availability of treatment for substance use disorders. Neither the primary clinician nor the psychiatrist indicated whether the assessments were confidential. The initial IDTT meeting was timely and attended by the patient and staff from required disciplines; at the time of the meeting, no primary clinician or psychiatrist had been assigned to the patient. The patient was not found to meet criteria for a higher level of care. The patient's strengths and verbalized treatment goals were adequately

documented. The treatment plan identified substance use and depression as treatment targets, formulated measurable short- and long-term goals, and identified specific and clinically appropriate interventions. Apart from failing to include psychiatric care, the plan was adequate. The rationale for providing care at the 3CMS level was adequately documented. Following the initial evaluation, two psychiatrists saw the patient a total of three times at monthly intervals. The progress note for the first encounter did not indicate whether the patient was seen in a confidential setting; the second and third encounters were confidential. Psychiatric documentation was generally adequate, although one of the psychiatrists included lengthy boilerplate language that was not specific to the patient. Progress notes did not provide a rationale for changing the patient's diagnosis from unspecified bipolar disorder to unspecified mood disorder and generalized anxiety disorder. A primary clinician saw the patient only once during the review period. This encounter was confidential but late, occurring 123 days after the initial primary clinician assessment. Clinically appropriate interventions were documented. The primary clinician provided diagnoses of major depressive disorder and generalized anxiety disorder. Both psychiatric and primary clinician progress notes documented symptoms of mood swings, irritability, impulsivity, sadness, rushing thoughts, poor concentration, insomnia, and excessive worry.

**Findings**

The care provided to this 3CMS patient was inadequate.

The case formulation was underdeveloped and did not adequately account for the patient's current clinical presentation and treatment needs. The suicide risk evaluation did not account for the patient's past suicide attempt or a family history of suicide and, as such, may have underestimated the patient's suicide risk. The treatment plan did not include psychiatric care as an intervention. Diagnostic concordance among psychiatrists and the primary clinician was poor, and no efforts to reconcile these differences were documented. The patient was not seen timely by the primary clinician.

**Patient O**

This 45-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility M and diagnosed with posttraumatic stress disorder and opioid and methamphetamine use disorders. He was prescribed and adherent with buspirone, guanfacine, mirtazapine, and venlafaxine. Through the ISUDT, he was prescribed and adherent with buprenorphine-naloxone for opioid use disorder. No suicide attempts or self-injurious behaviors were listed in the health record, although two prior suicide attempts were noted in the initial primary clinician assessment. Medical conditions included hyperlipidemia, hypertension, microscopic hematuria, abnormal weight loss, opioid use disorder, and a history of multiple traumatic brain injuries with loss of consciousness and frontal lobe damage. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on December 6, 2024 and remained there through the end of the review period.

The initial primary clinician assessment was timely and largely adequate despite the patient's refusal to participate. A history of recurrent auditory hallucinations following a traumatic brain injury was noted. The case formulation was not developed due to the patient's refusal. An accompanying suicide risk evaluation did not reflect the self-reported suicide attempts noted in the initial assessment and concluded that the patient's risk was low. The initial psychiatric assessment was timely and adequate. It noted a family history of suicide not reflected in suicide risk evaluation. Documentation did not clarify whether the assessment was confidential. The initial IDTT meeting was timely and attended by the patient and staff from required disciplines; at the time of the meeting, no primary clinician or psychiatrist had been assigned to the patient. The patient was not found to meet criteria for a higher level of care. The case formulation was updated to include a social history and results of a record review, but this language did not constitute a case formulation. The patient's strengths and verbalized treatment goals were adequately documented. The treatment plan identified anxiety as the treatment target despite the patient's report of auditory hallucinations and a working diagnosis of posttraumatic stress disorder. The plan did not specify short- or long-term goals or interventions, and it did not reflect psychiatric care. The rationale for providing 3CMS care was adequately documented. Following the initial psychiatric assessment, the patient was next seen by a psychiatrist 130 days later. This encounter was confidential, and in it the patient reported that he was very depressed and requested venlafaxine, which was initiated with a plan to see the patient in 30 days. At the next psychiatric follow-up encounter, 35 days later, the patient was found to be stable, and no treatment changes were made. Psychiatric progress notes were adequate. The primary clinician attempted to see the patient once during the review period, but the patient refused this encounter, and a wellness check was completed at the cell front with thorough documentation. This encounter was timely, and another primary clinician 90-day follow-up did not come due before the close of the review period. Both psychiatric and primary clinician progress notes indicated that the patient suffered from anxiety, hypervigilance, nightmares, insomnia, preoccupation, disorientation, and panic or fear.

**Findings**

The care provided to this 3CMS patient was inadequate.

An adequate case formulation was not developed, and the treatment plan was poorly developed and inadequate to guide treatment given the spectrum of symptoms identified. The suicide risk evaluation did not account for the patient's past suicide attempts or a family history of suicide and therefore may have underestimated the patient's suicide risk. Psychiatrists did not follow the patient timely, and by the time the patient was first seen for a follow-up appointment, he reported a significant increase in depression. Although the primary clinician provided an adequate wellness check after the patient refused a regularly scheduled appointment, the patient was not rescheduled for a primary clinician follow-up sooner than 90 days and thus did not receive any primary clinician treatment during the period reviewed. Given the patient's report of worsening depression to the psychiatrist, increased coordination of care between the psychiatrist and the primary clinician, and increased frequency of primary clinician follow-up encounters, were indicated but did not occur.

**Patient P**

This 47-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility A and diagnosed with unspecified schizophrenia spectrum and other psychotic disorder and a history of cannabis use disorder. Near the end of the review period, these diagnoses were changed to schizophrenia and generalized anxiety disorder. He was prescribed mirtazapine and risperidone and partially adherent with both. For the first ten days of the review period, an additional dose of mirtazapine was ordered PRN for insomnia. This order was discontinued when the scheduled mirtazapine dose was increased. No suicide attempts or self-injurious behaviors were listed in the health record, although the initial primary clinician assessment indicated that the patient had been rescued from a suicide attempt by hanging when the patient was 42 years old. Medical conditions included dyslipidemia and prediabetes. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on September 17, 2024 and remained there through the end of the review period.

During the review period, two psychiatrists saw the patient a total of three times. The first and third encounters were timely, but 122 days lapsed between the first and second psychiatric encounters. All three encounters were confidential and adequately documented, although one of the psychiatrists included lengthy boilerplate language that was not specific to the patient. The primary clinician saw the patient timely and confidentially on two occasions during the review period. Documentation included the provision of cognitive therapy. Using subjective units of distress scales ranging up to 10 in intensity, the patient variously reported his depression and anxiety as 5 to 7; these levels of distress, which were at least moderate, were coupled with narrative statements that the patient was emotionally well. Psychiatric and primary clinician progress notes indicated that the patient suffered from hallucinations, anxiety, sadness, hopelessness, insomnia, poor concentration, and obsessive thinking, with improvement in symptoms during the review period. The most recent IDTT meeting, which occurred prior to the review period, did not result in the development of a treatment plan.

**Findings**

The care provided to this 3CMS patient was inadequate.

The patient's primary diagnosis was unspecified and unclear for much of the review period, and the rationale for changing his psychiatric diagnoses later in the review period were not adequately documented. There was no treatment plan available to guide his 3CMS care. More than 90 days lapsed between psychiatric encounters. The primary clinician's documentation, indicating both that the patient was emotionally well and that the patient was reporting at least moderate levels of depression and anxiety, was confusing and internally inconsistent. Although the patient's symptoms improved, their extent and intensity, along with a diagnosis of serious mental illness, indicated that more frequent contacts were needed to reduce symptoms and maintain functioning.

**Patient Q**

This 34-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility A and diagnosed with unspecified depressive disorder, unspecified anxiety disorder, and cannabis use disorder, severe, in institutional remission. He was not prescribed any psychotropic medications by psychiatry. Through medical services, he was prescribed duloxetine for neck pain but was consistently nonadherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included dyslipidemia, obesity, chronic pain, scabies, and a history of fractured nasal bones. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on July 3, 2024 and remained there through the end of the review period. He was serving life without parole.

During the review period, two primary clinicians attempted to see the patient on four occasions. The patient refused each time. These attempts were timely, and the follow-up wellness checks were adequately documented. The patient's refusal to participate in mental health services was adequately challenged during the first two encounters but not in the last two encounters. Progress notes indicated that the patient had a history of persistent depressive disorder and suffered from sadness, hopelessness, insomnia, excessive worry, and poor concentration. However, the patient consistently denied distress, symptoms, or a desire to participate in mental health services.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although depression and anxiety were appropriately identified as targets for treatment, the patient declined both psychotropic medications and the offered nonpharmacological interventions. Primary clinician efforts to provide the patient with indicated care were timely and appropriate. However, the treatment team did not document a plan to address the patient's disinterest in and refusal of treatment or his denial of symptoms that had been identified by the IDTT. The patient's treatment needs remained unclear during the review period. Either he had symptoms that received no treatment due to the patient's denial and disengagement, or he did not have symptoms and needed to be removed from 3CMS care.

**Patient R**

This 39-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility M and initially diagnosed with unspecified depressive disorder, unspecified anxiety disorder, with consideration of an adjustment disorder and history of polysubstance [sic] use disorder. Later in the review period the diagnoses were changed to major depressive disorder, generalized anxiety disorder, and adjustment disorder. The rationale for these diagnostic changes was not documented. He was prescribed mirtazapine but was nonadherent with this medication about two-thirds of the time, and it was discontinued. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. He was adherent with this medication until mid-March 2025, when it was

suspended after he refused a urine toxicology screen. Buprenorphine-naloxone was not resumed during the review period. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included latent syphilis, dyslipidemia, peripheral neuropathic pain in right arm, opioid use disorder, and a history of being stabbed in the right arm and back. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on December 27, 2024 and remained there through the end of the review period.

The initial psychiatric assessment was timely, minimally adequate, and resulted in reinitiation of mirtazapine at the patient's request to address sleep problems and depression. The initial primary clinician assessment was timely and adequate apart from an underdeveloped case formulation that did not address current symptomatology and failure to provide current diagnostic impressions. An accompanying suicide risk evaluation was adequate and found the patient's risk to be low. The initial IDTT meeting was four days late, attended by the patient and alternates for the assigned clinician and psychiatrist, and a correctional counselor. The patient was not found to meet criteria for a higher level of care. The case formulation was not updated, but the patient's strengths and verbalized treatment goals were adequately addressed. The only component of the treatment plan that was documented were the treatment targets, identified as anxiety and sleep problems; no short- or long-term goals or interventions were formulated. Two psychiatrists each saw the patient once during the review period. These encounters were timely, confidential, and adequately documented, although one of the psychiatrists included lengthy boilerplate language that was not specific to the patient. During the first follow-up encounter, the timing of mirtazapine was changed in an unsuccessful attempt to improve medication adherence. On February 27, 2025, the patient submitted a request to have mirtazapine discontinued and to remove him from 3CMS care. A psychiatrist saw him later that day and discontinued the mirtazapine. This resulted in the patient receiving no psychotropic medications for the final three months of the review period. Although the psychiatrist documented a plan for the patient to be seen in 30 days, as of October 8, 2025, no further psychiatric encounters had been provided since February 27, 2025. A primary therapist attempted to see the patient only once during the review period. This attempt was late, occurring on May 5, 2025, 122 days after the initial primary clinician assessment and 110 days after the initial IDTT. The patient refused the appointment and indicated that he did not want mental health services. A wellness check at the cell front was adequately documented.

**Findings**

The care provided to this 3CMS patient was inadequate.

The case formulation was inadequate to guide treatment, and the treatment plan was not completed. Psychiatric diagnoses varied by provider, and the rationale for diagnostic changes was not documented. A clinically appropriate plan for psychiatry to see the patient 30 days after mirtazapine was discontinued was documented but not fulfilled. The primary clinician did not provide timely follow-up appointments. In a patient diagnosed with major depressive and generalized anxiety disorders, more frequent follow-ups and more thorough inquiry into the patient's refusal of treatment were needed.

**Patient S**

This 27-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility M and diagnosed with major depressive disorder, posttraumatic stress disorder, and methamphetamine use disorder. He was not prescribed any scheduled psychotropic medications. Mirtazapine was prescribed PRN for insomnia, but he did not use this medication, and it was discontinued. No suicide attempts or self-injurious behaviors were listed in the health record, although assessments indicated a history of two suicide inpatient hospitalizations following two suicide attempts. Medical conditions included a skin infection and a history of syphilis. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on August 16, 2024 and remained there through the end of the review period.

During the review period, two psychiatrists each saw the patient once. The first encounter occurred late, 117 days after the next most recent psychiatric encounter, but was confidential and resulted in no treatment changes. Documentation for this encounter contained lengthy boilerplate language that was not specific to the patient. The second psychiatric encounter was timely, resulted in discontinuation of PRN mirtazapine, and was documented in a highly abbreviated note which did not indicate whether the encounter was confidential. A plan for psychiatry follow-up in 30 days was documented, but as of October 8, 2025, had not occurred. The primary clinician offered two follow-up encounters during the review period. These encounters were timely, and the first one was confidential and thoroughly documented, but did not address symptoms of major depressive disorder or posttraumatic stress disorder. The patient refused the second encounter, and a brief wellness check at the cell front was documented. A mental health pre-release planning assessment was adequately documented despite the patient's refusal to participate. It should be noted that the most recent IDTT meeting, which occurred prior to the review period, did not result in the development of a treatment plan.

**Findings**

The care provided to this 3CMS patient was inadequate.

Psychiatric providers did not provide consistently timely follow-up encounters, and no follow-up to reassess psychiatric stability was undertaken as planned. The use of mirtazapine exclusively as a PRN medication fell outside the standards of care. The single primary clinician encounter did not include clear documentation that the patient's major depressive and posttraumatic stress disorders were being treated. As documented, the patient's symptoms and mental status exams were not consistent with active symptoms of either major depressive disorder or posttraumatic stress disorder, and the basis for continuing those diagnoses was unclear. In the absence of a treatment plan, overall direction of treatment was also unclear. The patient was either over-diagnosed or under-treated.

**Patient T**

This 27-year-old 3CMS patient's healthcare record was selected for review to assess the quality of mental health care provided at WSP. He was housed in Facility A and diagnosed with opioid

use disorder. He was not prescribed any psychotropic medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder and was partially adherent with this medication. No suicide attempts or self-injurious behaviors were listed in the health record. Medical conditions included tinea versicolor and opioid use disorder. Within CDCR, the patient had previously received only 3CMS care. He was transferred to mainline 3CMS care at WSP on September 23, 2024 and remained there through the end of the review period.

The primary clinician offered two timely and confidential encounters during the review period. The patient refused the first encounter, and a wellness check was adequately documented. The patient participated in the second encounter, which focused on case management issues and stress reduction strategies. Interventions required by the treatment plan, including DBT for anger management and rational emotive behavior for substance use, were not documented. Both progress notes indicated a confirmed diagnostic history of persistent depressive disorder; during the first session, the patient denied any depressive or anxiety symptoms; during the second, he reported only mild depressive and anxiety symptoms. During the review period, the patient tested positive for cannabis, methamphetamine, and/or alcohol on four occasions; active substance use was not discussed in primary clinician encounters. In early May, 2025, the patient was brought to the TTA by custody staff, who suspected the patient had overdosed on illicit substances. A non-assigned primary clinician completed a suicide risk evaluation in response to this incident. The evaluation was completed in a non-confidential setting that may have limited the patient's self-disclosure. The evaluation was otherwise adequately documented and found the patient at low risk.

**Findings**

The care provided to this 3CMS patient was inadequate.

Although the patient received timely and well-documented primary clinician encounters, the interventions required by the existing treatment plan were not delivered, and the identified treatment targets of anger and substance did not receive adequate mental health treatment. The patient continued to use illicit substances during the review period, and it was unclear whether mental health treatment team members were aware of this behavior. Although the reason the patient refused the first primary clinician encounter was questioned, the patient's disengagement from mental health care was inadequately addressed. The presence of the diagnosis of persistent depressive disorder in primary clinician progress notes was unclear and inconsistent with the patient's clinical presentation and reported symptoms.

**Patient U**

This 60-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. The patient arrived at the WSP reception center on October 3, 2024 from a county jail. He was provided a diagnosis of major depressive disorder, recurrent episode, moderate and was prescribed Remeron and Zoloft. Although the patient had served several CDCR prison terms, this EOP placement was his first contact with the MHSDS. Significant medical concerns included chronic hepatitis C, hypertension, seizures, history of stroke with left

hemiplegia, neuropathy, and stage four liver fibrosis. He utilized a walker and wheelchair for mobility.

The initial PC assessment was completed on December 3, 2024. The patient was initially placed at the 3CMS level of care, but his level of care was increased to EOP due to persistent depressive symptoms and the need for additional support. The patient became tearful during the session and reported that he did not have significant outside support, was transient prior to returning to prison, and he reported significant anxiety and sadness around his medical issues and likely homelessness upon prison release. The assessment was adequately completed.

An initial EOP psychiatric assessment was not documented in the healthcare record.

The initial EOP IDTT meeting occurred on December 12, 2024; a covering PC, the chief psychiatrist, and a CCII attended the IDTT, but the patient refused. The chief psychiatrist did not provide the initial psychiatric assessment; thus, neither clinician knew the patient. The clinical summary, case formulation, and EOP functional evaluation were pulled forward from the initial PC assessment. The patient's diagnosis and medications were not clearly stated or identified. There were no problem areas, treatment goals, interventions, level of care rationale, or discharge criteria documented. The treatment planning documentation was incomplete and severely inadequate.

An IDTT meeting occurred on January 14, 2025; the previously mentioned staff attended as well as the patient. The treatment team reported that the patient was motivated and medication adherent with active participation in treatment including attending EOP groups and individual contacts. Notably, a contemporaneous psychiatric progress note indicated that the patient was not taking Zoloft consistently. The patient was reportedly awaiting transfer to a mainline EOP institution; however, the IDTT had not developed or documented any treatment planning, goals, or interventions to support the patient as he awaited transfer.

A routine psychiatric contact occurred in a confidential setting on December 10, 2024, two days prior to the initial IDTT meeting; however, that contact was not an initial assessment. The psychiatrist noted the patient's depressed mood and anxiety about his health problems. The patient denied delusions, paranoia, and hallucinations and demonstrated fair insight and judgment. He was not medication adherent with Zoloft, so the medication timing was adjusted to encourage adherence. An emergent psychiatric consult occurred on December 31, 2024, after the patient reported nausea associated with Zoloft when it was discontinued. The psychiatric contacts occurred timely.

The patient was seen for weekly PC contacts in a confidential setting while housed in the reception center. The documentation of contacts was updated appropriately, and the PC noted that the patient remained generally stable and denied significant or acute mental health symptoms. Interventions included reflective listening, positive support, and psychoeducation around stress management and coping skills. The patient was often frustrated and saddened by his medical issues, but he was reportedly optimistic and future oriented. The PC reported that the patient attended EOP groups, but there were no EOP group progress notes in the healthcare

record for the period when the patient was housed at the WSP reception center. The documentation indicated that the patient was not offered group therapy.

**Findings**

The treatment provided to this patient was inadequate.

Despite the patient's chronic medical needs and clinically significant increase in depression, he was not provided an adequate treatment plan that provided structure and guidance for the treatment team to best support him as he awaited transfer to his mainline institution. No treatment goals or interventions were developed or implemented by the IDTT. Fortunately, the patient was seen timely for contacts with the assigned providers, and they provided appropriate clinical interventions to support him while he awaited endorsement and transfer. The PC met with the client weekly in a confidential setting and provided adequate support and interventions that were clinically appropriate although not documented in the treatment plan.

**Patient V**

This 45-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. The patient arrived at the WSP reception center on November 21, 2024. He was provided a diagnosis of schizoaffective disorder. He was prescribed Depakote, Haldol, and Vistaril.

The patient arrived at the WSP reception center on November 21, 2024. The initial psychiatric assessment was provided by telepsychiatry on November 26, 2024, and the documentation noted that the patient had recent transferred from a county jail and had recently discharged from Napa State Hospital on August 21, 2024 after competency restoration. He denied acute symptoms, and he requested treatment with the medications that he was prescribed at the county jail; and the psychiatrist prescribed Depakote, Haldol, and Vistaril.

The initial PC assessment occurred in a confidential setting on November 27, 2024. The patient denied any significant mental health concerns and reported that he had not experienced hallucinations for approximately one year, but he also stated that he thought his medications caused his hallucinations. The patient reported increased depression and anxiety but was otherwise reportedly stable.

The initial IDTT meeting occurred on December 4, 2024; a covering PC, the chief psychiatrist, and a CCII attended, but the patient refused. The PC noted that a different PC had completed the initial PC assessment, and the chief psychiatrist did not complete the initial psychiatric assessment; thus, neither clinician knew the patient. The clinical summary and case formulation were pulled forward, the patient's diagnosis and medications were never clearly stated, and there were no treatment goals, interventions, or discharge criteria provided. Treatment planning was grossly inadequate with a significant lack of content and detail provided.

A routine IDTT meeting occurred on January 7, 2025, and the same participants attended the meeting as well as the patient. The patient reported that he was anticipating transfer to his

mainline institution to continue EOP treatment. He was not assigned EOP groups in the reception center, and the PC indicated that the patient would be soon placed in groups. The remainder of the document remained unchanged or incomplete.

The patient was seen for two timely and confidential routine psychiatric contacts. He was medication adherent and reported improvement at the psychiatric contact on December 11, 2024. At the next contact on January 9, 2024, the patient remained medication adherent and denied any side effects or significant symptoms. Although he was seen by a different psychiatrist at each contact, the psychiatric care was adequate for the patient's needs.

Routine PC contacts occurred weekly in a confidential setting by several different clinicians. The patient actively attended and participated in individual contacts with the PC. The quality of the progress notes varied by clinician from poor to adequate, and too much outdated information was often pulled forward without appropriate update. Continuity of care was impaired due to the various clinicians who saw the patient. Despite the poor continuity of care, the patient received appropriate interventions despite the inadequate treatment plan.

The patient transferred to PVSP on February 3, 2025

**Findings**

The treatment provided to this patient was inadequate.

The patient arrived at the WSP reception center with a history of significant mental health concerns and symptoms, and he was not provided an adequate treatment plan that was inclusive of his diagnosis, goals or clinical interventions. He was seen by several different psychiatrists and PCs which impaired continuity of care. The initial and routine psychiatric and PC contacts occurred timely, and the clinicians provided appropriate clinical support and interventions for the patient's needs.

**Patient W**

This 41-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. He was provided diagnoses of schizoaffective disorder, bipolar type and polysubstance abuse. He was prescribed Abilify, Depakote, Remeron, and amitriptyline.

The patient had received mental health services at the 3CMS, EOP, and MHCB levels of care during prior CDCR terms. He arrived at the WSP reception center on December 10, 2024 from a county jail.

The initial PC assessment was completed on December 12, 2024, and the patient reported recent mood lability, sleep disturbance, depression, anxiety, and auditory hallucinations. The assessment noted that the patient reported a history of at least eight suicide attempts; however, he was a poor historian, and the attempts were not verified. The clinical summary was updated appropriately; however, the document was incomplete, as the mental status examination and

EOP functional evaluation were not completed. The PC provided a provisional diagnosis of schizoaffective disorder, bipolar type.

The patient was seen for a confidential initial psychiatric assessment on December 16, 2024. The psychiatrist reported that the patient denied psychotic symptoms and suicidal or homicidal ideation, and he reported irritability due to his return to prison. He was medication adherent and denied side effects. The psychiatrist adding Vistaril for sleep and anxiety; however, the documentation indicated that Vistaril was never initiated.

The initial IDTT meeting occurred on December 19, 2024; the patient, a CCII, and the PC who completed the initial assessment attended. The attendance form indicated that the covering PC was not the assigned PC; and the chief psychiatrist was present, as the patient was not assigned a psychiatrist. The treatment team noted that the patient was stable, had good insight into his mental illness, and was active and motivated in treatment. They noted that the patient met with the PC weekly with medication adherence. He reported poor sleep, nightmares, and auditory hallucinations; he also indicated that Remeron was ineffective. That report conflicted with the initial psychiatric assessment that occurred only three days prior. The PC noted that a psychiatric contact was scheduled in two days. The treatment plan included an IPOC for hallucinations that did not include goals or interventions. The EOP functional evaluation was completed.

At the next IDTT meeting on January 16, 2025, the patient reported normal sleep and appetite, and he was awaiting transfer to the CSATF EOP. The same clinicians and CCII who attended the initial IDTT meeting were in attendance, and the patient had not yet been assigned a psychiatrist. The treatment plan included significant information from past assessments and treatment plans that was not updated and was inadequate.

The patient was seen for the scheduled psychiatric contact indicated in the initial treatment plan, and a routine psychiatric contact did not occur until December 28, 2024. The patient reported doing well, but he also reported significant anxiety, depression, auditory hallucinations, mood swings, and poor sleep. The psychiatrist increased the Depakote dosage. A routine psychiatric contact on February 11, 2025 was well documented, and the patient continued to report bothersome auditory hallucinations. He declined an increase in Abilify, and his medications were continued. The psychiatric care was inadequate, as the medication consultation did not occur as included in the treatment plan, and the psychiatric progress notes appeared to contradict contemporaneous reports in the healthcare record of the patient’s symptoms and clinical presentation.

PC contacts occurred weekly in a confidential setting. The contacts were provided by the same PC with good continuity of care. The progress notes appeared comprehensive; however, the documentation could have been improved, as only a few sentences of the patient’s subjective report were updated at each contact. Additionally, an excessive amount of outdated information was copied and pasted from prior encounters. Despite shortcomings in documentation, the PC and patient developed a strong therapeutic alliance, and the patient appeared to benefit from the contacts and support. He remained stable, and the PC provided psychoeducation and coping skills.

The patient attended EOP groups at the WSP reception center. The group topics included symptom management, mood management, stress management, coping, and daily living skills. Recreation therapists facilitated the groups, and the topics were appropriate and useful. The patient attended most group sessions.

The patient transferred to SATF on February 26, 2025

**Findings**

The treatment provided to this patient was inadequate.

Treatment planning was poorly documented and incomplete. The psychiatric care was inadequate. At the initial psychiatric assessment; the psychiatrist reportedly added Vistaril, but the medication was never ordered or initiated. The patient was never assigned a psychiatrist despite treatment with antipsychotic, mood stabilizing, and antidepressant medications. A psychiatric medication consult did not occur for eleven days after the patient reported that Remeron was ineffective during the IDTT meeting. Treatment planning was inadequate, and no interventions or goals were developed to assist the patient while awaiting endorsement and transfer. PC contacts were adequate overall, and the PC offered appropriate support and interventions; however, the documentation of those contacts was inadequate, as most of the content was pulled forward with only minimal updates.

**Brooks BZ4555**

This 64-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. The patient was provided diagnoses of schizophrenia and major depressive disorder, recurrent episode, moderate. He was prescribed Zyprexa and Remeron.

The patient arrived at the WSP reception center on January 28, 2025. He previously received mental health services at the 3CMS, EOP, and MHCB levels of care.

The initial PC assessment on February 3, 2025 indicated that the patient had received mental health services at the EOP level of care when released from his previous prison term in 2011, and the county jail records noted a history of schizoaffective disorder. The PC noted the patient's fair adjustment; he attended yard and day room, and he attended to his ADLs without assistance. He reported mild to moderate depression, anxiety, hallucinations, and paranoia but denied acute distress or safety concerns.

The initial psychiatric assessment occurred on February 4, 2025 in a confidential setting. The psychiatrist noted that the patient was medication adherent, and he reported that the medications were effective in reducing his auditory hallucinations and depression. A mental health diagnosis was not clearly documented in the initial psychiatric assessment.

The initial IDTT meeting occurred on February 5, 2025; the patient and required participants were in attendance, but neither clinician was assigned to the patient and had not completed the

initial assessments. The patient reported that his mental health symptoms were manageable, and he denied any acute concerns. An IPOC for hallucinations was provided, but no specific treatment interventions or goals were developed. The discharge section recommended medication management and improving coping skills. The patient's diagnosis was not clearly documented in the treatment plan.

A routine IDTT meeting occurred on March 4, 2025; the patient, assigned clinicians, and a CCII attended the meeting. The patient was reportedly stable and medication adherent, and he was attending EOP groups. He denied any acute symptoms or significant concerns. The IPOC for hallucinations included appropriate treatment targets but continued to lack specific interventions or actions to meet those targets.

The patient was seen for one routine psychiatric contact prior to transfer to RJD. The contact on March 7, 2025 occurred timely and noted that the patient remained medication adherent and stable on his medications.

Routine PC contacts occurred weekly in a confidential setting. The contacts were well documented, and continuity of care was adequate. The PC provided the patient with in cell activities and mental health packets upon placement in the EOP. The patient remained generally stable, but his psychotic symptoms increased as his transfer date approached and a covering PC was providing his routine contacts. The PC provided reality testing and explored healthy coping skills to deal with anxiety and racing thoughts.

The patient was assigned to five hours of weekly groups. The groups were facilitated by recreation therapists and a LCSW, and group topics included daily living skills, symptom management, mood management, education, and recreation therapy. The topics were appropriate, and the patient attended all scheduled groups.

The patient transferred to RJD on March 21, 2025.

**Findings**

The treatment provided to this patient was adequate.

The overall care was adequate despite documentation deficiencies in the initial psychiatric assessment and treatment planning. The initial psychiatric assessment and initial treatment plan should have clearly documented the patient's diagnosis. Although an IPOC for hallucinations was appropriate, the initial treatment plan lacked adequate and specific treatment goals and interventions to address those symptoms. Notwithstanding those deficiencies, the provided treatment addressed the patient's clinical needs.

**Patient Y**

This 44-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood; schizoaffective disorder, depressive type; and amphetamine

use disorder, severe, in early remission. He was prescribed Remeron, Zyprexa, Vistaril and Invega.

The patient was not a participant in the MHSDS during his prior prison term. He arrived at the WSP reception center on December 26, 2024.

A confidential initial PC assessment was completed on the day of arrival at the WSP reception center, after an urgent referral was submitted from the R&R screener due to a recent suicide attempt in jail on September 10, 2024 when the patient stabbed himself. He was placed at the EOP level of care upon arrival, and he reported increasing auditory hallucinations. The PC noted the patient's history of chronic serious mental illness including his history of community psychiatric hospital admissions, homelessness, and social security disability income for many years. The assessment included thorough clinical and psychosocial histories but did not adequately describe the patient's specific mental health symptoms or clinical needs to inform treatment planning.

The initial psychiatric assessment was completed on January 7, 2025. The assessment noted that an urgent consult due to hallucinations occurred one week prior, and the patient's medications were adjusted as indicated. The psychiatrist noted the patient's poor grooming and lack of orientation to time and place. The chief complaint section and mental status included contradictory symptoms that would require different treatment approaches; the chief complaint indicated that the patient reported auditory hallucinations and denied delusions, but the mental status indicated that he reported delusions and denied auditory and visual hallucinations. The initial assessment was inadequate due to significant documentation inconsistencies.

The initial IDTT meeting occurred on January 8, 2025; the patient attended, but neither clinician in attendance were assigned to the patient, and he did not have an assigned psychiatrist. The clinical summary and case formulation were pulled forward from the initial PC assessment, but no IPOCs, treatment goals, or interventions were provided. Discharge criteria and level of care rationale were not documented.

An update IDTT meeting occurred on February 4, 2025 that was attended by the patient, a covering PC, the chief psychiatrist and a CCII. The clinical summary was updated and noted that the patient was attending groups, yard, day room, and individual contacts. The patient reported moderate depression and almost daily auditory hallucinations that spoke negatively about him. It was noted that the patient had sporadic medication adherence which likely contributed to his ongoing symptoms. Measurable IPOCs for hallucinations and depressed mood and treatment goals were added that were appropriate, but the treatment plan continued to lack specific interventions to target the patient's decline in ADLs and severe lack of insight.

The patient was seen for a routine psychiatric contact on January 24, 2025. The psychiatrist noted that the patient had refused the evening doses of Remeron and Zyprexa for the past three days but was adherent with his morning doses. The patient reported falling asleep and missing the evening pill calls and did not intend to refuse his medications. The psychiatrist encouraged him to try to remain awake for his evening medications, and the patient agreed. An emergent psychiatric consult occurred on February 5, 2025 due to ongoing evening medication refusals,

and the medications were changed to earlier in the evening to assist in adherence. The patient was not seen for another routine psychiatric contact before his transfer despite an increase in psychotic symptoms and chronic lack of attention to ADLs that resulted in a severe lice infestation.

PC routine contacts occurred weekly in confidential setting. Progress notes were updated adequately, and interventions were included at the PC contacts. Although the PC reported that the patient adjusted well and denied significant concerns; the patient was not medication adherent and demonstrated ongoing difficulty maintaining his ADLs and hygiene. The patient was often malodorous and frequently required reminders to shower. On February 13, 2025, he submitted a medical request due to head lice, and the PC noted that both the patient and his cellmate had severe lice and were quarantined to their cell. The PC notes indicated that the lice infestation continued for over two weeks, and the patient was restricted from attending groups and individual contacts during treatment.

The patient was assigned to appropriate recreation therapist and clinical groups while at the WSP reception center, but his group attendance was poor overall and negatively impacted by his mental health symptoms. He was assigned to symptom management, coping, and mood management groups. The groups were facilitated by recreation therapists and a LCSW, and the group topics were appropriate.

The patient's mental health continued to decline when he transferred to CRC. The initial PC assessment at CRC on March 14, 2025 indicated that he was disheveled, unkempt, malodorous, and reported daily auditory hallucinations. He was admitted to the CIM MHCB only four days later on March 18, 2025.

**Findings**

The treatment provided to this patient was inadequate.

Although the initial assessments, PC contacts, and IDTTs generally occurred timely and were offered in a confidential setting, they were poorly documented and often included inaccurate or contradictory information that negatively impacted the patient's care. The patient demonstrated severe psychotic symptoms, and his overall condition declined during his stay at the WSP reception center; however, the treatment team did not develop specific treatment goals or interventions to address his most pertinent symptoms and his severe decline in ADLs or consider referral to a higher level of care.

The patient had sporadic medication adherence, and an emergent referral was required to have his medication rescheduled. After the schedule was changed, the patient was not seen for follow-up psychiatric contact for over four weeks to assess his adherence and response before he transferred to CRC. His condition continued to decline to the extent that he and his cell were infested with lice and required medical quarantine, yet no additional psychiatric contacts were provided to assess his condition and symptoms. The patient ultimately required MHCB placement upon arrival to CRC due to the lack of adequate mental health care received at the WSP reception center.

**Patient Z**

This 41-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. The patient was provided diagnoses of adjustment disorder with mixed disturbance of emotions and conduct; unspecified depressive disorder; and polysubstance abuse including methamphetamine, opioids, and cannabis. He was not prescribed psychotropic medications. Pertinent medical concerns included possible scabies infection, hypertension, and gastroesophageal reflux disease.

The patient previously received mental health services at the 3CMS, EOP, and MHCB levels of care and most recently paroled at the EOP level of care.

The patient arrived at WSP from a county jail on January 16, 2025. The initial PC assessment occurred in a confidential setting on January 22, 2025. The patient reported increased anxiety, racing thoughts, and depressed mood since he returned to prison, but he was adjusting well and going to yard and day room. He denied any safety concerns and reported adequate coping skills. The EOP functional evaluation indicated that no accommodations were required. The clinical summary and case formulation were updated appropriately and included thorough clinical and psychosocial histories.

The patient was seen for a cell front initial psychiatric assessment on January 28, 2025; as the patient was on medical quarantine, he could not leave his cell. The assessment was well documented and noted that the patient was previously prescribed Wellbutrin in CDCR and Zoloft and Remeron in the community prior to his incarceration. The patient denied acute symptoms and declined medication treatment but requested referral for MAT to address his methamphetamine, opioid, and gambling addictions. His mental status was unremarkable, and he denied suicidal or homicidal ideation. The patient told the psychiatrist he wanted to remain in the EOP, as he found the groups beneficial.

The initial IDTT meeting occurred on January 29, 2025; the assigned clinicians and CCII were present, but the patient refused to attend. The patient was reportedly programming well and denied any mental health concerns. The IDTT did not provide a treatment plan or specify any interventions or supports to address the patient's reported symptoms or to assist in readjustment to incarceration.

An update IDTT meeting occurred on February 25, 2025; the patient, assigned clinicians, and a CCII attended. Much of the treatment plan was pulled forward unchanged. The patient reported that he wanted to learn to cope with depression and anxiety, but no specific treatment goals or interventions were documented. A subsequent update IDTT meeting occurred on March 25, 2025; covering clinicians attended, and the patient refused to attend. The treatment plan remained generally unchanged from the initial treatment plan and was severely inadequate.

The patient was not prescribed psychotropic medications. He declined medication treatment at the initial psychiatric assessment and was seen for a routine psychiatric contact on February 27,

2025. He reported that he was stable, and the psychiatrist noted euthymic mood and unremarkable mental status.

The patient was seen for PC contacts every seven to ten days, but they did not always occur in a confidential setting. The progress notes indicated that the patient's mental status remained normal, and he denied acute symptoms or distress at each contact. The PC documented the provision of psychoeducation and provided the patient with mental health workbooks and activities to complete in his cell. The PC also noted specific clinical interventions including CBT and DBT techniques. Those interventions and strategies were appropriate, were updated at each contact, and should have been included in the treatment plan. Continuity of care was good.

The patient was assigned a recreation therapist and clinical groups facilitated by recreation therapists and a LCSW. Group topics were appropriate and included stress management, life skills, coping, and leisure activities. The patient consistently attended and actively participated in groups.

The patient transferred to SQ on April 4, 2025

**Findings**

The treatment provided to this patient was adequate.

The overall care was adequate despite the inadequate treatment plan documentation. The patient was seen for timely PC individual contacts and appeared to have good rapport with his clinician. The PC progress notes included specific clinical interventions that should have been included in the treatment plan. The interventions were appropriate for the patient's stated treatment goals and concerns, and he remained stable without medications. He attended almost all scheduled groups with active participation. The patient responded well to the PC interventions and groups, and he remained stable until his endorsement and transfer to the SQ mainline EOP.

**Patient AA**

This 38-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. He was provided diagnoses of major depressive disorder, single episode with psychotic features and anxious distress, and unspecified depressive disorder. The patient was prescribed Geodon, Remeron, Vistaril and Trileptal. Pertinent medical concerns included asthma, cellulitis, obesity, and seizure disorder.

The patient previously received mental health services at the 3CMS, EOP, and MHCB levels of care during prior terms. He arrived at the WSP reception center from a county jail on November 26, 2024. He was initially placed in the RHU due to prior max custody status but was quickly moved to the EOP housing unit.

The initial PC assessment occurred in a confidential setting on December 9, 2024. The assessment noted the patient's history of treatment for depression, PTSD, anxiety, and auditory hallucinations. He denied current suicidal or homicidal ideation, but he had a history of two

previous suicide attempts while in CDCR in 2015 and 2016 by hanging; both incidents resulted in minor injury. The mental status examination and EOP functional evaluation were completed appropriately and indicated no significant symptoms or impairments, but the patient was highly preoccupied with restarting Wellbutrin. He reported that Wellbutrin was discontinued at the county jail in retaliation after he argued with a nurse.

The initial psychiatric assessment on December 14, 2024 occurred in a confidential setting. The psychiatrist also reported that the patient was highly preoccupied with receiving treatment with Wellbutrin. He reported severe anxiety, poor sleep, hypervigilance, and low mood despite adherence with Geodon, Remeron and Trileptal. Remeron was discontinued; however, Wellbutrin was not initiated, as the psychiatrist noted that the medication was contraindicated due to the patient's history of seizure disorder.

The initial IDTT meeting occurred on December 18, 2024; a covering PC was present as well as the patient and other required participants. The patient was reportedly active in treatment and attended his EOP groups and individual contacts, but he reported decreased sleep and appetite due to not receiving the correct medications. The treatment plan included an IPOC for depressed mood, but it lacked specific goals and interventions. During the IDTT meeting, the psychiatrist prescribed Wellbutrin after verifying that the medication was prescribed during a previous term. Discharge criteria and level of care rationale were not documented. The treatment planning was severely inadequate.

A weekly PC contact occurred in a confidential setting on December 23, 2024. The patient reported positive mood and improvement since treatment with Wellbutrin. He denied significant concerns and symptoms and reported minimal anxiety and depression. He told the PC that he was adjusting well.

A CIT note dated the evening of December 23, 2024 indicated that the patient reported suicidal ideation and was referred to the WSP MHCB after he reported suicidal ideation with a plan to hang himself due to increased stressors including the recent death of his aunt, recent break up with his girlfriend, and increased anxiety and depression related to a recent yard move. He was subsequently admitted and remained in the MHCB until he discharged back to the WSP reception center EOP on January 2, 2025.

The patient was seen for five-day follow-up contacts upon return to the WSP reception center. The patient remained stable and denied suicidal ideation or distress at each contact. Several contacts were provided at the pill window by psychiatric technicians and were likely inadequate given the setting and lack of confidentiality. An adequate safety plan was initially included in the progress notes but was absent in subsequent notes and was not carried forward in the treatment plan.

No routine psychiatric contacts or consultations occurred between the initial psychiatric assessment, and the emergent psychiatric consult that resulted in the MHCB admission.

A confidential initial PC assessment occurred on January 2, 2025 after the patient returned from the WSP MHCB. The patient told the PC that he was feeling better and was described as future oriented.

A second EOP initial psychiatric assessment was completed on January 6, 2025. The assessment occurred in a confidential setting, and the patient denied any acute symptoms to distress, was medication adherent, denied medication side effects, and his mental status was described as unremarkable.

The patient attended the initial IDTT meeting on January 9, 2025 that included covering clinicians and a CCII. No safety plan was developed despite the recent MHCB admission for suicidal ideation with a plan. The patient's only reported concern was that he was not receiving snacks with his Geodon, and he was told an order had already been placed. The remainder of the document was either pulled forward from the initial PC assessments and prior treatment plan or was not completed.

A routine psychiatric contact and medication consultation occurred in a confidential setting on January 16, 2025. The patient reported increased anxiety, panic symptoms, and worsening mood after he learned that he might transfer to SVSP. He reported that Remeron was no longer effective and requested an increase in Trileptal and treatment with melatonin PRN for sleep. The psychiatrist discontinued Remeron and Vistaril, increased Trileptal, and prescribed melatonin as requested.

The patient attended one to two PC contacts per week between January 2 to February 4, 2025. He denied acute symptoms at each contact and remained generally stable, but he expressed concern about his endorsement to SVSP. The progress notes were inadequate, as most of the notes were carried forward and inclusive of outdated or contradictory information. No specific interventions were provided, and the contacts appeared to be brief check-ins.

The patient attended several EOP clinical and recreation therapist groups while at the WSP reception center. The groups were facilitated by PCs and recreation therapists, and topics included symptom management, coping skills, life skills, and mood management. The patient demonstrated very good attendance with moderate to high levels of participation.

**Findings**

The treatment provided to this patient was inadequate.

The patient reported acute symptoms upon arrival at the reception center and told his clinicians as early as December 9, 2024 that he was prescribed the wrong medications and that he was prescribed Wellbutrin during his previous CDCR term. The medication was not restarted until nine days later at the initial IDTT meeting after the psychiatrist verified his statements. An adequate treatment plan was not developed, despite the ten-day MHCB placement, and a large amount of clinical documentation was carried forward that contained outdated and/or inaccurate information. The group offerings were adequate and beneficial to the patient.

**Patient BB**

This 30-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. He was provided diagnoses of major depressive disorder, recurrent episode, with psychotic features; unspecified bipolar and related disorder; unspecified mood disorder; and other specified depressive disorder. The patient was prescribed Zyprexa, Vistaril PRN, and Remeron.

The patient previously received mental health services at the 3CMS, EOP, and MHCB levels of care; he was released from his last term at the EOP level of care. The patient arrived at the reception center on February 18, 2025.

An initial PC assessment was completed on February 20, 2025 at the podium in the dayroom due to lack of confidential space. The patient denied depression but reported severe anxiety with racing thoughts and excessive worry about leaving prison. He reported that his medications were effective, but he experienced body movements that was possibly a medication side effect. His mental status examination was otherwise normal, and he denied suicidal or homicidal ideation or hallucinations.

The patient was not seen for an initial psychiatric assessment; although psychotropic medication consents for Zyprexa, Vistaril, and Remeron were dated February 22, 2025.

The initial IDTT meeting occurred on February 26, 2025; the patient, a covering PC, the chief psychiatrist, and a CCII attended. The patient was noted with medication adherence. He stated that he wanted to work on improving coping and communication skills, and an IPOC for anxiety was provided that did not include treatment goals or interventions. The treatment plan included anxiety and depression as problem areas, but the goals were generic and did not include any interventions except "CBT and talk therapy to decrease any MH sxs."

An update IDTT meeting occurred on April 1, 2025 that included the patient and two covering clinicians who were different than those at the initial IDTT meeting. The patient denied safety or medication concerns and was reportedly stable. The treatment plan lacked measurable goals or individualized interventions.

An update IDTT meeting on April 29, 2025 included the assigned clinicians and the patient. The treatment team noted that the patient remained stable and medication adherent and was anticipating parole on May 12, 2025.

The patient was not seen for a routine psychiatric contact until April 29, 2025 when he was seen for the first psychiatric contact other than during the initial IDTT meeting. The progress note was very brief and indicated that the patient was medication adherent with rare refusals, and he denied acute symptoms or impairment in functioning. His mental status was unremarkable, and his medications were continued unchanged. Overall, the psychiatric care was severely inadequate due to the lack of initial assessment and routine contacts.

The patient was seen for a routine PC individual contact every one to two weeks. The PC contacts occurred in a confidential office or at the podium in the day room when confidential space was unavailable. The PC progress notes appeared well documented, but much of the content was copied and pasted from previous notes. The patient remained generally stable throughout the review period and was optimistic about his release from prison. The PC noted that he had good coping skills, was medication adherent, and attended most of his groups. Continuity of care was adequate, and the same PC provided most contacts.

The patient attended several EOP clinical and recreation therapist groups. The groups were facilitated by recreation therapists and PCs, and topics included coping skills, symptom management, stress management, and leisure activities. The group topics were appropriate, and the patient attended most of his scheduled groups.

**Findings**

The treatment provided to this patient was inadequate.

The patient was prescribed antipsychotic, antianxiety, and antidepressant medications and was never seen for an initial psychiatric assessment or for timely psychiatric follow-up. It appeared that medication consents were signed, and the medications were continued for approximately two months before a psychiatrist saw the patient. Treatment planning was inadequate and did not include individualized or measurable treatment goals and interventions.

**Patient CC**

This 36-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder; amphetamine-induced bipolar or other related disorder; persistent depressive disorder; opioid use disorder; and amphetamine-type substance use disorder, severe, in early remission. He was prescribed Zyprexa, Remeron, Strattera, and Suboxone.

The patient previously received mental health services at the 3CMS and EOP level of care. He arrived at the WSP reception center on September 17, 2024. He was initially placed at the 3CMS level of care, but his level of care was increased to EOP on December 20, 2024 due to acute and distressing paranoid delusions about witchcraft.

An initial PC assessment was completed on December 24, 2024, but it was unclear whether the setting was confidential. The assessment provided conflicting information and indicated that the patient denied all mental health symptoms and past mental health diagnosis but simultaneously reported current depression and anxiety. The remainder of the assessment was completed appropriately and noted an unremarkable mental status examination.

An initial psychiatric assessment completed on December 28, 2024 noted that the patient was a poor historian who denied problems aside from anxiety. The patient requested an increase in Remeron, and the psychiatrist complied. Neither initial provider assessment documented the

significant symptoms of severe and distressing delusional thinking that led to the patient's EOP placement.

The initial IDTT meeting occurred on December 31, 2024; the patient, covering clinicians, and a CCII attended. The patient reported that his primary goal was to learn to make better decisions, but the remainder of the treatment plan was pulled forward from the initial PC assessment or was not completed. An IPOC was provided for anxiety, but there were no treatment goals or interventions included. The level of care rationale and discharge criteria were also absent.

An update IDTT meeting occurred on February 4, 2025 that included a covering PC, the chief psychiatrist, and a CCII. Although the IDTT documentation noted that the patient was present at the meeting; the clinical summary indicated that the patient did not attend and had refused more than 50 percent of his treatment groups. The PC visited the patient's cell to obtain a signed refusal, and the patient reported that he was stable and was generally disinterested in treatment in the reception center. The remainder of the treatment plan documentation was pulled forward and retained outdated and inaccurate information.

At the update IDTT meeting on March 4, 2025, the clinical summary noted that the patient refused to attend, and the remainder of the document was again pulled forward. The anxiety IPOC indicated that the patient had met several treatment goals; however, it was unclear when the goals were initiated and documented.

The patient was not seen for a routine psychiatric contact until March 7, 2025, over two months after the initial psychiatric assessment. The patient was seen in response to his request that all medication dosages be increased. The patient refused to attend the meeting in a confidential setting, and it appeared that the psychiatrist did not see the patient to provide an assessment and relied solely on a healthcare record review. The psychiatrist increased the patient's medications and ordered follow-up in 30 days. The patient was not seen for subsequent psychiatric contact before he transferred to SATF on April 7, 2025.

Routine PC contacts occurred weekly; the setting was not always confidential, and several contacts occurred at the podium in the day room due to the lack of available confidential space. The patient denied acute symptoms or distress throughout the review period. He occasionally reported tactile hallucinations that were consistent with his delusional beliefs, but his mental status was otherwise normal, and his mood was frequently described as euthymic. The progress notes included updates to the patient's subjective report and mental status observations, but most of the documents were carried forward unchanged each week. Continuity of care was adequate.

The patient attended some offered recreation therapist and clinical groups, but he frequently refused to attend despite encouragement from his PC. The group topics were appropriate and included symptom management, coping skills, life skills, and leisure topics.

**Findings**

The treatment provided to this patient was inadequate.

An adequate treatment plan was never developed, and individualized treatment goals and interventions were never developed or initiated. The initial clinical assessments were incomplete and did not include the clinical reasons that the patient was placed in the EOP and contained contradictory and often outdated clinical information. The psychiatric care was severely inadequate, and the patient was never seen for routine psychiatric contact despite treatment with antipsychotic, ADHD, antidepressant, and antianxiety medications. The PC contacts occurred timely, and the progress notes included clinical observations; however, the documentation was poor, as it included significant outdated information that was carried forward from prior encounters.

**Patient DD**

This 25-year-old EOP patient's healthcare record was reviewed to assess the treatment provided at the WSP reception center. He was provided diagnoses of major depressive disorder, recurrent episode, moderate; bipolar I disorder, mixed, mild; adjustment disorder, with mixed anxiety and depressed mood; and PTSD. He was prescribed Zyprexa, Depakote, and Remeron.

The patient previously received mental health services at the 3CMS, EOP, and MHCB levels of care; he discharged at the EOP level of care when he paroled from his last prison term. He arrived at WSP on December 10, 2024.

The initial PC assessment occurred on December 12, 2024 and documented that the patient reported recent anxiety, depression, sleep disturbance, and auditory hallucinations. The PC also noted his history of one documented suicide attempt in CDCR by overdose of pills in 2022, and the patient reported a recent suicide attempt in the community approximately two months prior by overdose of pills. The PC noted that the patient most recently reported anxiety, depression, and auditory hallucinations and provided a provisional diagnosis of schizoaffective disorder, bipolar type. The remainder of the assessment, including the patient's mental status and the EOP functional evaluation, was not completed.

The initial psychiatric assessment on December 13, 2024 was very brief and did not include adequate clinical observations or history. The psychiatrist reported that the patient was dysphoric with constricted affect and concrete thinking. The patient denied medication side effects, and his medications were increased with follow-up ordered for four weeks.

The initial IDTT meeting occurred on December 19, 2024; covering clinicians attended, but the patient refused to attend. The IDTT noted that the patient was briefly seen in his housing unit when a refusal form was signed. The clinical summary and case formulation were carried forward from the initial PC assessment. An IPOC for hallucinations was initiated, but no formal treatment goals or interventions were documented. The EOP functional evaluation was completed, but the remainder of the document was not completed.

An update IDTT meeting occurred on January 16, 2025; the patient, covering clinicians, and a CCII attended the meeting. The IDTT noted that the patient had been endorsed and was awaiting transfer to his mainline institution. Although the IDTT stated that the patient was active and motivated in treatment, that identical statement appeared in several different patients' treatment

plans and appeared to have been copied and pasted into most patient records after endorsement. Treatment goals, interventions, and discharge criteria were not documented in the treatment plan.

At the final update IDTT meeting on February 11, 2025 prior to transfer, the patient was reportedly medication adherent with fair adjustment to incarceration. He reported distressing but manageable auditory hallucinations, moderate depression and anxiety, and mild to moderate anger. The treatment plan continued to lack measurable goals or interventions.

The patient was seen for two routine psychiatric contacts. The contact on January 6, 2025 did not occur in a confidential setting. The patient reported that the medications were beneficial in addressing his anxiety, depression, and auditory hallucinations; he additionally reported paranoia, flashbacks, anxiety, and mood symptoms, and his medications were increased. At the next psychiatric contact on January 18, 2025, the patient reported ongoing paranoia and flashbacks, but he reported a reduction in auditory hallucinations. The medications were increased again, and the psychiatrist ordered updated laboratory studies. The patient was not seen for another psychiatric contact before transfer to VSP on February 28, 2025.

Routine PC contacts generally occurred weekly; the contacts usually occurred in a confidential setting, and the patient actively participated. Much of the documentation of the contacts included significant amounts of information that was carried forward from previous notes; however, the clinical observations and assessments were updated appropriately at each contact, and the PC included clinical interventions that were not documented in the treatment plan.

The patient attended clinical and recreation therapist groups facilitated by PCs and recreation therapists. The group topics were appropriate and included coping skills, daily living skills, mood management, and stress management. The patient attended most of his groups and demonstrated moderate to high participation.

**Findings**

The treatment provided to this patient was inadequate.

The initial psychiatric and PC assessments were inadequate, as they were overly brief and did not include important clinical and psychosocial background information to inform treatment planning. Treatment planning was severely inadequate and incomplete. Covering clinicians attended the IDTT meetings, and the treatment plans did not include measurable, individualized goals and interventions. The psychiatric care was also inadequate with long lapses between psychiatric contacts that were inappropriate given the patient's ongoing mood and psychotic symptoms. Overall, the routine PC care was adequate, but the quality of documentation was inconsistent. The provided groups were adequate for the patient's needs.