UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

                Plaintiffs,

    v.

GAVIN NEWSOM, et al.,

                Defendants.

No. 2:90-cv-0520 TLN SCR P

FINDINGS AND
RECOMMENDATIONS

## I.    INTRODUCTION

The District Judge has referred objections to the Special Master's Thirtieth Round Monitoring Report—Part B: Special Master's Monitoring Report on the Inpatient Health Care Programs at the California Department of State Hospitals ("30B Report"), ECF No. 8085, to the undersigned for issuance of findings and recommendations. The Special Master filed the 30B Report on December 15, 2023. ECF No. 8085. Defendants filed objections to the 30B Report on January 4, 2024, ECF No. 8106, and plaintiffs filed a response to defendants' objections on January 23, 2024, ECF No. 8117. At a status conference on December 11, 2025, plaintiffs noted the Court had not resolved the objections to the report. Dec. 19, 2025 Order at 1, ECF No. 8839. Thereafter, the District Judge directed the parties to meet and confer and file "a joint statement explaining their current positions regarding the objections they previously submitted to the 30B Report, including whether any party withdraws any objections" and referring any "previously

1

asserted objections" maintained by any party to the undersigned for recommendations regarding their resolution. *Id*. at 2.

Following the referral, after receiving an extension of time, Dec. 23, 2025 Order, ECF No. 8845, on January 16, 2026, the parties filed the required joint statement. ECF No. 8851. The parties agree that the issues that were the subject of court orders recommended by the Special Master should be evaluated and reported on by the Receiver "as part of her first audit" of the Department of State Hospitals (DSH) inpatient programs. *Id*. at 2. In that joint statement, the parties maintain their previously asserted positions with respect to the Special Master's factual findings, as well as their dispute over the standard of review that applies to the Court's assessment of those findings. *Id*. On February 9, 2026, the undersigned ordered the parties to "further meet and confer and file a supplemental joint status report to better specify the disputed issues." Feb. 9, 2026 Order at 1, ECF No. 8857. The parties filed a supplemental joint statement on February 23, 2026. ECF No. 8861.

## II. DISCUSSION

### A. Special Master's Recommendation

#### 1. Positions of the Parties

Based on findings in the 30B Report, the Special Master recommends the court enter an order directing (1) all defendants to "take all necessary steps to prioritize the identification and referral of all appropriate *Coleman* patients to DSH, eliminate any barriers to their admission to DSH hospitals, and end any underutilization of *Coleman*-designated beds"; (2) "DSH-Atascadero undertake all necessary steps to comply with the DSH Staffing Plan to reduce its staffing vacancies to no more than ten percent for the disciplines of psychiatry, psychology, social work, and rehabilitation therapy"; and (3) "all DSH hospitals take the necessary steps to provide patients with sufficient group and individual therapy." ECF No. 8085 at 78.[1]

In their joint statements, the parties agree that the court should not enter the recommended

---

[1] Citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to the page numbers assigned by ECF and located in the upper right hand corner of the page.

orders at this time, and that "the Receiver should evaluate and report on these issues as part of her first audit of DSH." ECF Nos. 8851 at 2, ECF No. 8861.

### 2.  Analysis

In August 2025, the court appointed a Receiver effective September 1, 2025 to assume responsibility for completing implementation of the remedy in this action. *See generally*, *e.g.*, Aug. 27, 2025 Order, ECF No. 8752. Subsequently, the court referred to the Receiver all ongoing tasks previously referred to the Special Master and vacated the Order of Reference appointing the Special Master. *See generally* Dec. 29, 2025 Order, ECF No. 8846. The Receiver is now required to "work closely with the Director of [DSH] within their respective authorities, collaborating as necessary, to facilitation accomplishment of [the Receiver's] duties[.]" Dec. 19, 2025 Order at 4, ECF No. 8843. Going forward, it will fall to the Receiver in the first instance to "audit all aspects of treatment of Coleman class members in DSH[,]" *id.*, and to identify steps required to complete implementation of the remedy in this action. At this stage, the Court should await further findings from the Receiver as part of her first auditing round with respect to what may currently be required to complete a durable remedy at the DSH programs that provide care to class members before entering any additional orders directed to DSH.

### B.  Standard of Review

#### 1.  Positions of the Parties

Defendants assert that the court must apply a *de novo* standard of review to their objections to the Special Master's factual findings consistent with the standard of review set out in Federal Rule of Civil Procedure 53(f)(3). ECF No. 8851 at 2-3. Defendants rely on their December 23, 2024 motion to modify standard of review in the 1996 Order of Reference, ECF No. 640, which has not been adjudicated. *Id.* Defendants also contend that because the court has vacated the Order of Reference effective January 30, 2026, *see* Dec. 29, 2025 Order at 6, ECF No. 8846, the court must apply the standard of review in Fed. R. Civ. P. 53(f)(3) to its current review of the 30B Report. *Id.* at 3. Plaintiffs disagree. *Id.* at 4-6. They argue defendants have not shown any of the Special Master's factual findings are clearly erroneous, that defendants waived their challenge to application of the clear error standard of review set out in the Order of

Reference to review of the 30B Report by not filing their motion to modify until almost a year after the 30B Report was filed, that defendants' motion to modify is without merit, and that the parties have essentially stipulated to application of the clear error standard. *Id*.

### 2. Analysis

The court need not resolve the legal questions presented by the parties' dispute over which standard of review should apply to the court's review of the 30 B Report. For the reasons explained below, under either standard of review defendants' objections fail.

### C. Staffing

#### 1. Positions of the Parties

Defendants object to the Special Master's recommendation that DSH-Atascadero be required to "comply with the DSH Staffing Plan to reduce its staffing vacancies to no more than ten percent in the disciplines of psychiatry, psychology, social work, and rehabilitation therapy[,]" ECF No. 8085 at 78, contending there is no court order or other legal requirement that imposes the ten percent maximum vacancy rate requirement. ECF No. 8106 at 4. In the supplemental joint statement, defendants contend they dispute the Special Master's ten percent vacancy rate cap "as a factual premise" because "[t]he DSH Staffing Plan does not establish or require a ten-percent vacancy threshold; references to '90%' are monitoring descriptors, not mandatory standards, and no court order imposes a vacancy cap on DSH comparable to CDCR." ECF No. 8861 at 4 (citing ECF No. 8106 at 4-5). Defendants also contend the 30B Report "does not demonstrate that DSH is failing to take appropriate steps to maintain adequate staffing [and] [c]onsequently there is no basis for the recommended order." ECF No. 8106 at 5; *see also* ECF No. 8861 at 4 (disputing "characterization" of DSH staffing efforts)

Plaintiffs contend "the Special Master's interpretation of the court-ordered DSH Staffing Plan and related orders involve questions of law, not fact[,]" that the parties have agreed the recommended order should not issue at this time, and that "a ten percent vacancy rate is clearly the appropriate threshold under the Plan and other court orders." ECF No. 8861 at 4 (citing ECF No. 8117 at 4-9). Plaintiffs also contend the characterization of failure to take appropriate steps is defendants, not the Special Master's, and, in any event, that defendants object only to the

4

recommended order and not to any "'specific factual finding.'"  ECF No. 8861 at 4.

### 2.    Analysis

Defendants' staffing objections are without merit.  First, as noted defendants object to the Special Master's recommendation that DSH-Atascadero be required to reduce staffing vacancy rates to no more than ten percent in the disciplines of psychiatry, psychology, social work, and rehabilitation therapy.  To the extent the objection is construed as contention that there is no legal or factual basis for the Special Master's reliance on a ten percent vacancy rate in the DSH Staffing Plan to support his recommendation, it is plainly wrong.  As the Special Master specifically finds in the 30B Report, the court "has recognized that 'a review of the (DSH Staffing) plan shows it assumes that a 10 percent vacancy rate applies.'"  ECF No. 8085 at 13 (quoting Aug. 23, 2023 Order at 12, ECF No. 7923).  The Special Master is correct.  In relevant part, the court found:

> The court-approved 2021 DSH Staffing Plan is based on ratios of staff to the maximum number of designated *Coleman* beds at each DSH Hospital: 256 beds at ASH, 50 beds at CSH, and 30 beds at Patton. ECF No. 7078-1 at 2. A review of the plan shows it assumes that a 10 percent vacancy rate applies, and that DSH has been largely successful in meeting that target. *Id*. at 2. The plan also includes the observation that "due to the relatively small number of *Coleman* class beds at DSH, a single vacant position in any of the *Coleman* units would cause DSH to fall below 90% of required staffing per the 1:35 ratio." *Id*. at 3.

ECF No. 7923 at 12.  Notably, defendants do not object to the Special Master's findings about clinical staffing levels at DSH-Atascadero, which show defendants were not close to a ten percent vacancy rate in any clinical category except rehabilitation therapy, as follows:

- "The senior supervising psychiatrist position has been vacant since 2011."
- "Only two of nine of DSH-Atascadero's psychiatry positions were filled, for a 77 percent vacancy rate[,]" which "was higher than the 67 percent vacancy rate for the prior review period."  Use of five contractors reduced "the functional vacancy rate to 22 percent, which was higher than the 11 percent psychiatry functional vacancy rate reported for the prior review period."
- "Six of nine psychology positions were filled, for a 33 percent vacancy rate, which was higher than the 22 percent psychology vacancy rate of the previous review period."

- "[S]ix of nine social worker positions were filled, for a 33 percent vacancy rate. One social worker was on an extended leave, increasing the functional vacancy rate to 44 percent. These social worker vacancies were appreciably higher than the 11 percent social worker vacancy rate that the prior report identified."

- An 11 percent vacancy rate among rehabilitation therapists increased to a functional vacancy rate of 22 percent due to the extended leave of one rehabilitation therapist.

ECF No. 8085 at 34-35.  The Special Master's recommendation that, in light of these facts, DSH be ordered to comply with its own court-approved staffing is grounded in a court order interpreting the DSH Staffing Plan as containing a ten percent vacancy cap.[2]

Defendants' contention that the 30B Report does not show DSH "is failing to take appropriate steps to maintain adequate staffing[,]" ECF No. 8106 at 5, is not an objection to any factual finding in the 30B Report.  It is an attempt by defendants to introduce a prerequisite for the recommended order, namely the requirement of a finding that DSH has "failed to take adequate steps" to maintain appropriate staffing levels.  Defendants did not raise this precise issue with the Special Master in their objections to the draft 30B Report:  defendants provided the Special Master with a description of DSH's staffing recruitment and retention efforts, *see* ECF No. 8085-1 at 8-9, but they did not contend the Special Master had characterized those efforts in any way, nor did they argue such a finding would be a necessary prerequisite to the recommended order.  *See id.*; *cf.* ECF No. 640 at 8 ("The court will entertain no objection to [a report from the Special Master) unless an identical objection was previously submitted to the special master in the form of a specific written objection[.]")

For the foregoing reasons, defendants' objections arising from the recommended order on DSH staffing should be overruled.

**D.     Quality of Care**

**1.     Positions of the Parties**

Defendants object to several findings in the 30B Report concerning quality of care,

---

[2] As explained above, the court should not act on the recommendation at this time.

including the findings that 22 of 63 patients whose cases the Special master reviewed received

inadequate care; that some patients received inadequate treatment due to a lack of individual

therapy; and that DSH-Atascadero and DSH-Patton offered an inadequate amount of group

therapy.  Defendants also contend the Special Master's finding that only one patient had a

behavioral treatment plan does not show care is inadequate.

Plaintiffs respond that the Special Master's findings following case reviews for individual

patients are fully supported by the record, and defendants did not raise any specific objections to

these cases in their objections to the draft report; defendants' objection to the absence of

individualized therapy resulting in inadequate treatment is a "gross misstatement" of the findings

in the 30B Report; it is undisputed DSH-Atascadero and DSH-Patton provide less group therapy

than required under DSH Standards and court order; and defendants' objection concerning

behavioral treatment plan also misstates the Special Master's findings.

## 2.    Analysis

### a)    Objection to Case Reviews

The Special Master reports that his expert conducted clinical reviews of 63 DSH patients

and found that 22 of those patients, or 35 percent reviewed, received inadequate care.  Defendants

object that those case reviews "reflect differing clinical opinions rather than demonstrable

inadequacy" and "the Report does not identify objective harm, decompensation or adverse

outcomes attributable to the care provided."  ECF No. 8161 at 6.

The Special Master's findings are supported by nearly 100 pages detailing each clinical

review and including specific findings to support each conclusion of inadequate care.  *See* ECF

No. 8085 at 133-227.  The only evidence defendants offer in support of their objection is the

declaration of Dr. Brian Zollweg, DSH Assistant Chief Psychologist.  Decl. of Zollweg, ECF No.

8106-3.  In relevant part, Dr. Zollweg avers that after he received the draft 30B Report he

> reviewed the charts of patients admitted to and discharged from DSH during the
> reporting period.  Based on that review, *Coleman* patients' post-discharge status
> supports the adequacy of treatment DSH provided to those patients.  Of the seventy-
> four *Coleman* patients discharged to a lower level of care during the monitoring
> period, twelve were admitted to a MHCB within thirty days of discharge. Only four
> of those patients were admitted to the MHCB due to genuine psychiatric distress

7

and of those four, only two were admitted to inpatient care (one was admitted to an acute level of care and one was admitted to an intermediate level of care). The other eight patients who were admitted to the MHCB within thirty days of discharge were determined to have used the MHCB for secondary gain, had safety concerns, or had difficulty adjusting to prison due to spending prolonged time in a state hospital setting.

The Special Master's Report includes clinical reviews of patients treated in DSH programs during the monitoring period. (ECF No. 8085 at 133-227.) These reviews include criticisms that focus on individual treatment issues and present clinical opinions that are not supported by patients' charts or the clinical opinions and impressions of my staff.

*Id*. at 2. This evidence is insufficient to call into question the detailed findings of the Special Master. Defendants make no effort to support their conclusory assertion that the Special Master's chart review are unsupported by the patients' charts, nor do they provide evidence of differing clinical opinions for the cases reviewed by the Special Master's expert. In addition, they provide no evidence to support their assertion that a mental health patient's status post-discharge from inpatient care is the sole measure for adequacy of care during the hospitalization. This objection should be overruled.

### b)    Individual Therapy

The Special Master finds that

[l]ike prior reports also indicated, DSH-Atascadero and DSH-Coalinga did not routinely utilize individual treatment with *Coleman* patients, while DSH-Patton regularly used individual treatment. This lack of individual therapy resulted in some patients not receiving adequate treatment.

DSH-Atascadero provided individual therapy to 44 *Coleman* patients, with patients being offered and attending 0.9 weekly hours of individual treatment. DSH-Coalinga provided individual treatment to 12 *Coleman* patients, who were offered and attended an average of 0.5 weekly hours of such treatment. Overall, DSH-Patton offered patients an average of 3.83 weekly hours of individual treatment, with patients attending a weekly average of 2.97 hours of individual treatment.

ECF No. 8085 at 40. Defendants object that the Special Master's determination that a lack of individual therapy resulted in inadequate care for some patients is not supported by any specific patient or chart review, nor is individual therapy required by the Program Guide or any other mental health policy that applies to the DSH programs that treat class members.

This objection is without merit. The Program Guide, defendants' remedial plan for the

8

delivery of constitutionally adequate mental health care to class members, requires defendants to "provide individualized treatment in ICF [Intermediate Care Facility] [inpatient] programs, and that treatment must be drawn 'from a wide variety of treatment modalities, including group and individual psychotherapy[.]'" Aug. 23, 2023 Order at 8, ECF No. 7924 (quoting Program Guide, ECF No. 7333-1 at 108). Moreover, DSH has a continuous quality improvement (CQI) process, which the court has determined to be "fully adequate." *See* Special Master's 29th Round Monitoring Report, Part B, at 29-30, ECF No. 7625, adopted in full by Dec. 20, 2022 Order, ECF No. 7688. The DSH CQI process

> includes definitions of "core groups," "supplemental groups," and "individual therapy" and provides that patients will be offered 20 hours of *treatment* per week, at least ten hours of which are to be "core" treatment. ECF No. 7812-1 at 15. The DSH CQI process requires justification for each patient for whom 20 hours of group per week is not clinically indicated, as well as "objectives and interventions to assist the patient in attending groups." *Id*.

ECF No. 7924 at 4.[3] The minimum ten hours of "core treatment" "consist[s] of Core Groups, Individual Therapy, or Clinical Contacts." ECF No. 7812-1 at 15. Both the Program Guide and the court-approved DSH CQI process require defendants to provide individualized therapy as a treatment option. Moreover, the Special Master's case reviews provide support for his finding that "the lack of individual therapy resulted in inadequate care for some patients." ECF No. 8085 at 40, 167-69 (DSH-Atascadero Patient Y), 191-93 (DSH-Coalinga Patient O). Dr. Zollweg's assertions about Patients Y and O misconstrue the Special Master's findings about those two patients and are insufficient to undermine those findings.[4]

---

[3] These standards are included in the Governing Body Reports for the three state hospitals, attached in Exhibit A to defendants' objections. *See* ECF No. 8106-1 at 17-18, 48, 80.

[4] Dr. Zollweg opines that the Report "provides no rationale or explanation that shows . . . individual therapy was clinically indicated" for Patient Y. ECF No. 8016-3 at 3. In fact, the Special Master finds "more frequent individual treatment should have been considered for this patient given his presenting problems upon admission and lack of engagement with staff and peers on the unit." ECF No. 8085 at 169. Those presenting problems are spelled out in the case review, as are the findings that Patient Y had only minimal interactions with staff and peers. *Id*. at 168. With respect to patient O, Dr. Zollweg interprets the Special Master's case review as recommending individual therapy because Patient O's attendance at group dropped from 100% to 80%. ECF No. 8106-3 at 3. In fact, the Special Master finds that Patient Y "achieved 80 percent group attendance and attended 100 percent of his treatment groups early during the hospitalization" and that "individual therapy contacts with a consistent provider" should have

For the foregoing reasons, this objection should be overruled.

### c)      Group Therapy

The Special Master finds that DSH-Atascadero and DSH-Patton offered an inadequate number of hours of group treatment for inpatient care.  ECF No. 8085 at 39.  He reports that DSH-Atascadero offered a weekly average of 7.5 hours of core groups and a weekly average of 5.9 hours of supplemental groups.  *Id*.  He reports that DSH-Patton offered 9.69 hours per week of core groups and 1.79 hours of supplemental groups.  *Id*. at 40.  Defendants' object to these findings by presenting evidence of patient status following discharge from DSH inpatient care during the monitoring period, specifically, that only 12 of the 74 patients discharged were admitted to MHCBs within 30 days and, of those 12, only four "were admitted to the MHBC due to genuine psychiatric distress."  ECF No. 8106 at 9-10.  Defendants also contend the 30B Report "does not include the full spectrum of the treatment offered."  *Id*. at 14.

Defendants' first contention amounts to an argument that compliance with this requirement should be assessed by evaluation of the post-discharge course of patients discharged from DSH care.  However, they do not point to any part of the remedial plans in this action that support this contention, nor do they make a persuasive argument for adjusting the way compliance has been measured to date.  This part of defendants' objection should be overruled.

The Program Guide and the DSH CQI process both require DSH to provide group therapy as a treatment modality in inpatient programs that treat class members.  *See* ECF No. 7924 at 4, 8.  The DSH CQI process requires DSH to offer, "on average 20 hours of treatment each week."  *Id*. at 4.  "[A]t least 10 [of those hours] will be core treatment consisting of Core Groups, Individual Therapy or Clinical Contacts."  *Id*.

The Governing Body Reports covering the three hospitals during the monitoring period, attached as Attachment A to defendants' objections, show that between July 2022 and December 2022 ICF patients at DSH-Atascadero were offered an average of 7.56 hours of core group and an average of .365 hours of individual therapy.  ECF No. 8106-1 at 31.  Data for average numbers of

been considered to "explore[ ] the underlying reasons for . . . behavioral changes" over the course of the hospitalization. *Id*. at 193.

hours per week for clinical contacts was not available.  The total of core group and individual therapy hours offered to class members in ICF care at DSH-Atascadero averaged 7.925 hours per week, less than the ten hours required by the court approved DSH CQI plan.

The same data for patients at DSH-Patton shows that inmate patients were offered an average of 11.28 hours of core group per week, plus some additional clinical contacts and individual therapy.  ECF No. 8106-1 at 61.  This comports with the requirements of the DSH CQI process.  Defendants' objection should be sustained as to the findings for DSH-Patton and the 30B report deemed amended accordingly.

### d)      Behavioral Treatment Plans

Under the general heading "Other Treatment Issues", the Special Master reports that "[o]nly one hospital patient had a behavioral treatment plan during the review period."  ECF No. 8085 at 50.  Defendants object that "the Report does not provide any authority for such a requirement for every patient" and "there is no basis to support a finding that a lack of a behavioral treatment plan means the treatment is inadequate."  ECF No. 8106 at 16.  However, defendants do not dispute the fact reported by the Special Master:  that only one patient had a behavioral treatment plan during the review period.  The Special Master expressly notes that he "does not seek for *every* patient to have a behavioral plan" and that he "notes the dearth of such plans at all DSH facilities, and its unavailability for patients for whom they may be indicated."  *Id*. at 16.  Elsewhere, the Special Master includes findings of patients whose treatment plans were not updated to address behavioral issues, *see*, *e.g.*, *id*. at 54, and he reports that while DSH-Atascadero "had an updated behavioral plan policy . . . [c]onsistent with the MOU (Memorandum of Understanding between DSH and CDCR), this was not unusual as most patients who required a behavioral plan were referred to a PIP."  *Id*. at 90.

Defendants do not refute the facts reported by the Special Master.  Instead, they assert that the Special Master has determined that every hospital patient must have a behavior plan and that treatment is inadequate in the absence of such a plan.  The Special Master made neither determination.  This objection should be overruled.

11

**E.    Characterization of Suicide Risks**

**1.    Posititons of the Parties**

Defendants object to findings in the 30B Report concerning suicide risk assessment and prevention, contending that "the three cases identified in the Report do not include any suicide attempts or serious self-injury that occurred at DSH or within 30 days of discharge back to CDCR" and that the Special Master failed "to identify any evidence of inadequate suicide risk assessments."  ECF No. 8106 at 16.

Plaintiffs respond that defendants have not specifically identified which three of the four cases discussed by the Special Master are the focus of their objections.  ECF No. 8117 at 17 n.4. They also contend that "[t]he adequacy of a suicide risk assessment is not evaluated solely by whether the patient killed or tried to kill themselves" and they point to both the findings and the detailed chart reviews for each of the patients included in the 30B Report.  *Id*. at 17-18.

**2.    Analysis**

In their entirety, the Special Master's concerning adequacy of suicide risk assessments are as follows:

> While concerns related to suicide prevention were rare across the records reviewed (three cases at DSH-Patton and one case at DSH-Atascadero), the seriousness of concerns in this area warranted discussion within the report.  There were three primary areas of concern: suicide risk assessments not completed as clinically indicated (DSH-Patton Patient D), poor rationale for assessed level of suicide risk (DSH-Atascadero Patient Y), and concerning or unsupported suicide prevention interventions for three DSH-Patton patients (Patient B, Patient D, and Patient E).
>
> For DSH-Atascadero Patient Y, a suicide risk assessment noted that the patient provided "yes" responses to wishing to be dead, active suicidal thoughts, some intent to act, and specific plan to act.  The intensity of suicidal ideation was at the highest possible rating, yet the evaluating clinician rated his suicide risk as moderate without supporting rationale.  In the case of DSH-Patton Patient B, a suicide prevention intervention from the psychiatrist included an attempt to use a non-suicide contract (unsupported clinical intervention) instead of a suicide risk assessment and safety plan (evidence-based intervention) in response to the patient's expressed urges to self-harm.  Fortunately, the patient did not agree to refrain from self-harm on that date, and was appropriately placed on one-to-one direct observation.

For DSH-Patton Patient D, concerns included that on the day of the patient's discharge to an outpatient level of care, the patient reported to the psychiatrist recent thoughts about wristcutting; the patient also presented with current command auditory hallucinations to engage in suicidal behavior, delusional and bizarre statements, visual hallucinations, and negative emotions resulting from being ignored by family for wrongdoing. The statements during this final contact did not result in the completion of a suicide risk assessment or safety plan review. With regard to DSH-Patton Patient E, the patient was placed on direct one-to-one observation for danger-to-self concerns upon arrival; however, those observations were completed by audiovisual surveillance rather than direct observation and the observation period's duration was not documented, so when the patient was transferred to a different unit, the patient was no longer under observation. Additionally, the suicide risk assessment completed the following day assessed the patient's suicide risk as low, despite the very recent suicide observation for danger-to-self concerns.

ECF No. 8085 at 59-60.

The court should overrule defendants' objection. In the supplemental joint statement, defendants clarify for the first time which three of the four cases reported by the Special Master they are objecting to. *See* ECF No. 8861 at 9. As plaintiffs correctly note, defendants did not identify these three cases either in the objections to the draft report they presented to the Special Master or in the objections filed with this court. *See id*. & documents cited therein. As noted above the Order of Reference precludes this court from considering objections not raised in identical form with the Special Master.

Moreover, defendants point to nothing that would make suicide attempts or serious self-injury a necessary prerequisite for suicide risk assessments and they do not explain the relevance of their assertion that none of the three cases "include any suicide attempts or serious self-injury that occurred at DSH or within 30 days of discharge back to CDCR." ECF No. 8106 at 16. The case reviews for all four of the patients referred to in this section demonstrate that each had a history of multiple suicide attempts and suicidal ideation. *See* ECF No. 8085 at 167-69 (DSH-Atascadero Patient Y); 210-12 (DSH-Patton Patient B); 214-17 (DSH-Patton Patients D and E). Patient Y was admitted to DSH-Atascadero for reasons that included "auditory hallucinations to kill himself"; he had at least two prior suicide attempts and "a history of self-injury by hitting himself in the face." *Id*. at 205. Patient B had history of five prior suicide attempts, a serious suicide attempt approximately one month prior to inpatient admission, and a self-harm incident in

13

the same month she was admitted to DSH-Patton. *Id*. at 210. Upon admission to DSH-Patton, Patient D reported symptoms that included "thoughts of cutting her wrists with a razor, and voices commanding her to kill herself." *Id*. at 214. She too had a history of five or six prior suicide attempts and an incident of self-harm. *Id*. Finally, Patient E was transferred from acute inpatient care to intermediate inpatient care to treat several conditions, including suicidal ideation. *Id*. at 215. She had a history of one suicide attempt.

The Program Guide, which is defendants' plan to remediate constitutional deficiencies in the delivery of mental health care to class members, requires suicide risk assessments for inmates referred to health care "because of suicide concerns." ECF No. 7333-1 at 78. The Program Guide also requires that a CDCR suicide risk assessment be included in packets for referrals to inpatient care. *Id*. at 110. The Program Guide sets out clear guidelines for when a Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) must be completed, [citation] and includes a list of risk factors that "shall be used to assess potential risk" including "[s]uicide ideation and/or threats in past" and "[p]revious suicide attempts." *Id*. at 176; *see also id*. at 177-178. Those factors fully support the Special Master's findings concerning all four patients reviewed in this section of the 30B Report.

For the foregoing reasons, this objection should be overruled.

**F.      Referrals to DSH**

**1.      Positions of the Parties**

Defendants object to the Special Master's findings that "'DSH is [not] taking all necessary and required steps under current policies to prioritize the identification and referral of all appropriate *Coleman* patients to DSH,' that there is an underutilization of DSH beds, and that 'all necessary steps have not previously been taken to increase admissions to DSH.'" ECF No. 8861 at 9-10 (quoting ECF No. 8085 at 17-18). Plaintiffs contend the objection is "improper and moot" because it is focused on the Special Master's recommendation for a court order concerning DSH access and not on any specific factual finding. In the alternative, plaintiffs contend "the record demonstrates CDCR and DSH refused to take appropriate steps to reduce barriers to admission, especially during the Report's review period in which the *Coleman* census at DSH-

14

ASH was at an all-time low." ECF No. 8161 at 10 (quoting ECF No. 8117 at 15-17).

### 2.    Analysis

The findings defendants challenge concerning referrals to and bed utilization at DSH are undergirded and fully supported by the Special Master's findings that "a trend identified during the prior reporting period, namely, low referral rates to DSH hospitals and resultant low *Coleman* patient censuses at them continued throughout the review period" and that "during the Thirtieth Round, the use of DSH-Atascadero beds by *Coleman* patients reached historic lows." ECF No. 8085 at 17. Defendants do not challenge those findings. As the district court explained in its November 15, 2023 order, defendants were then "taking some encouraging steps to ensure or revive their robust implementation" of the Least Restrictive Housing (LRH) policy they first implemented in 2015. Nov. 15, 2023 Order at 1-2, ECF No. 8066. That order and the effort it describes fully supports the key components of the challenged findings: during the review period there was an underutilization of DSH-Atascadero low custody beds for class members and that more work was necessary to fully utilize these beds, a key component of the remedial structure in this action.

> The (LRH) policy enhances use of low custody inpatient beds at Atascadero State Hospital (ASH) to treat class members custodially eligible for those beds and keeps high custody inpatient beds available in the California Department of Corrections and Rehabilitation (CDCR) Psychiatric Inpatient Programs (PIPs), as part of an overall effort to reduce or eliminate historically long waitlists for access to high custody inpatient beds. *See* March 24, 2017 Order, ECF No. 5583, at 15.1 The LRH policy is a key component of defendants' comprehensive remedial structure, developed over the past decade in an effort to ensure class members have timely access to necessary inpatient mental health care.

*Id*. That order, which defendants' acknowledge in their objections, *see* ECF No. 8106 at 18, and the effort it describes fully supports the key components of the challenged findings: during the review period there was an underutilization of DSH-Atascadero low custody beds for class members and more work was necessary to ensure full utilization of these beds, which is a key component of the remedial structure in this action. This objection should be overruled.

////

15

## III.    CONCLUSION

Consistent with the foregoing, the undersigned RECOMMENDS that District Judge:

1) Sustain defendants' objection to the Special Master's finding in the 30B Report that DSH-Patton offered an inadequate number of group therapy hours during the monitoring period and deem the 30B report amended to reflect that DSH-Patton offered an adequate number of group therapy hours, specifically an average of 11.281 hours of core group per week plus additional individual therapy and clinical contacts

2) Overrule all of defendants' other objections to the 30B Monitoring Report; and

3) Except as amended by the order of the District Judge, adopt the 30B Monitoring Report in full.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **fourteen (14)** days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

DATED: April 27, 2026

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE

16