MENTAL HEALTH RECEIVER.

# Receiver's Third Quarterly Report

May – July 2026

July 31, 2026

Troy L. Nunley
Chief United States District Judge
United States District Court
Eastern District of California
Robert T. Matsui United States Courthouse
501 I Street
Sacramento, CA 95814

Subject: Submission of the Coleman Receiver's Third Quarterly Report

Dear Chief Judge Nunley,

I respectfully submit this, my third quarterly report since my appointment as Receiver in August 2025. This report summarizes the work of the Office of the Receiver from May through July 2026 and is submitted pursuant to the Court's Order establishing the powers and duties of the Receiver.

This report addresses the status of Action Plan implementation, including key accomplishments this quarter and plans for next quarter, challenges that I have encountered in exercising my powers and duties, and quarterly expenditures.

I appreciate the Court's continued guidance and oversight as we continue implementing the Action Plan and work toward achieving a Constitutionally adequate mental health delivery system.

Respectfully submitted,

Colette S. Peters
Federal Court Receiver Eastern District of California
Mental Health Services Delivery Services
California Department of Corrections & Rehabilitation

# Table of Contents


Message from the Mental Health Receiver

Receiver's Vision and Mission

Status of Action Plan Implementation

Key Accomplishments this Quarter & Plans for Next Quarter

- Goal 1: Improve Mental Health Care Delivery Through Culture Change and Effective Management
- Goal 2: Achieve and Retain a Qualified Mental Health Workforce
- Goal 3: Provide Adequate Care at Every MHSDS Level and Treat Each Patient at the Appropriate Level of Care
- Goal 4: Fully Implement a Suicide Prevention Program
- Goal 5: Complete Development and Implementation of a Quality Assurance Program
- Goal 6: Create Mechanisms to Demonstrate Sustainability of Remedies

Challenges to the Receiver's Execution of Powers and Duties

Quarterly Expenditures

List of Acronyms

Appendix A: Macomber EOP Letter and Peters' Response to Macomber Letter

Appendix B: Tips to the Field

Appendix C: Executive Summaries CQIT Reports, May – July

Appendix D: Unaudited Statements of Revenues and Expenditures

# Message from the Mental Health Receiver

This is my third quarterly report summarizing the work of the Receiver's Office. This quarter represents an important transition for the Receivership. During the first several months of the Receivership, we focused on establishing the Receiver's Office, building the organizational capacity necessary to implement it, assessing our resource needs, and building relationships across CDCR, CCHCS, and with the Parties. With the Court's approval of the Receiver's budget and enactment of the State's 2026 Budget, we now have the resources necessary to implement the Action Plan and continue improving the delivery of constitutionally adequate mental health care throughout the California Department of Corrections and Rehabilitation.

The work described in this report reflects that transition. Across every strategic goal of the Action Plan, we have focused on building systems that improve patient care while creating the structures necessary for sustainability. During this quarter, we strengthened our quality assurance program through continued CQIT implementation, advanced several initiatives to improve recruitment and retention, began expanding communications with staff, launched a comprehensive review of level-of-care decision making, initiated new approaches to sharing best practices across institutions, developed proposals to improve care for patients in restrictive housing, and began preparing to implement Resource Teams and Crisis Intervention Teams. These initiatives differ in scope, but they share a common purpose which is to create a durable, patient-centered mental health system capable of providing constitutional care long after the Receivership concludes.

As our work has progressed, another reality has become increasingly apparent. The primary barriers to further implementation are no longer technical. Rather, they involve the organizational structures, coordination, and information sharing necessary to support systemwide change. Accordingly, this report discusses challenges that directly affect implementation of the Action Plan. While we continue to work collaboratively with Defendants, the Medical Receiver, and other stakeholders to resolve these issues, we address them in this report because of their potential impact on the five- to seven-year timeline in our Action Plan.

Despite these challenges, I remain encouraged by the commitment of so many Department employees to improve the quality of mental health care delivered to patients. I am also grateful for the support of many external partners who are working with us to support implementation of the Action Plan and resolve this longstanding case.

Respectfully,

Colette S. Peters
Federal Court Receiver, Eastern District of California
Mental Health Services Delivery System
California Department of Corrections & Rehabilitation

## Receiver's Vision and Mission

**Vision Statement.** The Office of the Mental Health Receiver will enhance the delivery of mental health care by building a durable, constitutionally adequate, patient-centered correctional mental health care system that promotes dignity, accountability, and health equity, laying the foundation for the successful return of control to the State of California.

**Mission Statement.** In coordination with California Department of Corrections and Rehabilitation (CDCR) leadership, we will deliver a correctional mental health care system where every person with a serious mental health diagnosis receives timely, humane, and evidence-based care, supported by professional integrity, operational transparency, and continuous improvement. While embracing principles of normalcy and humanity, we will enhance existing working and living environments to provide a constitutionally adequate level of mental health care along with work environments that provide meaningful and rewarding careers for clinicians.

# Status of Action Plan Implementation

The Receiver's Action Plan was built around six strategic goals that are designed to achieve constitutionally adequate and durable mental health care delivery.

Goal 1: Improve Mental Health Care Delivery Through Culture Change and Effective Management

Goal 2: Achieve and Retain a Qualified Mental Health Workforce

Goal 3: Provide Adequate Care at Every MHSDS Level and Treat Each Patient at the Appropriate Level of Care

Goal 4: Fully Implement a Suicide Prevention Program

Goal 5: Complete Development and Implementation of a Quality Assurance Program

Goal 6: Create Mechanisms to Demonstrate Sustainability of Remedies

This quarterly report is organized around the Action Plan goals and discusses our ongoing work and accomplishments in relation to the achievement of each goal. Many of the initiatives and accomplishments discussed below support more than one Action Plan goal. Therefore, we have created a new visual representation of this quarter's accomplishments and our plans for next quarter. We hope that this will help readers understand how our actions and priorities contribute to the Receiver's mission to create a mental health delivery system "where every person with a serious mental health diagnosis receives timely, humane, and evidence-based care, supported by professional integrity, operational transparency, and continuous improvement."

# Key Accomplishments This Quarter & Plans for Next Quarter

MENTAL HEALTH RECEIVER.

## Six Action Plan Goals

| GOAL / AREAS OF FOCUS | KEY ACCOMPLISHMENTS THIS QUARTER | PLANS FOR NEXT QUARTER |
|---|---|---|
| **1**<br>**Culture Change & Effective Management**<br>Communications & stakeholder engagement<br>Policy modernization & best-practice sharing<br>Management structure & resources | • Completed stakeholder communications assessment; expanded leadership and patient engagement<br>• Drafted 2 Program Guide sample chapters to facilitate transition to HCDOM; issued 4 of 13 pending policies; developed and released 3 Tips to the Field<br>• Secured $62M and 118.9 civil service positions for Action Plan implementation | • Launch new employee and patient communications<br>• Work with the parties to migrate Program Guide to HCDOM as feasible; issue more Tips to the Field<br>• Continue transition to the CCHCS HCDOM policy review process |
| **2**<br>**Qualified Mental Health Workforce**<br>Recruitment & retention<br>Clinical working environment & conditions | • Initiated comprehensive mental health compensation assessment<br>• Increased internship program budget and positions<br>• Began systemwide treatment space assessment<br>• Made staff bonuses permanent; corrected PD 324 eligibility | • Resolve bonus eligibility<br>• Identify strategies to address hard-to-fill positions<br>• Use data dashboard to track and improve attrition<br>• Develop supervision, hybrid-work and nonclinical-time strategies |
| **3**<br>**Adequate Care At The Appropriate Level**<br>Clinical care & level of care<br>Care environment & restrictive housing | • Launched comprehensive level-of-care evaluation and CSP-SAC single -cell unit<br>• Secured funding for 6 Mental Health Resource Teams and 3 Crisis Intervention Teams<br>• Completed 23 RHU-focused site visits and developed initial diversion/treatment proposals | • Select and train Resource Team and CIT members; begin use-of-force reviews<br>• Launch RHU data collection and strengthen mental health input in RVR/ ICC decisions<br>• Refine RHU housing proposals and seek court approval as needed |

MENTAL HEALTH RECEIVER.

# Six Action Plan Goals

| GOAL / AREAS OF FOCUS | KEY ACCOMPLISHMENTS THIS QUARTER | PLANS FOR NEXT QUARTER |
|---|---|---|
| **4** **Suicide Prevention**<br>Priority suicide-prevention measures<br>Case review & quality improvement<br>Annual suicide reporting | • Updated implementation plan using CQIT compliance data<br>• Advanced statewide work on RHU signage, safety planning, SPRFIT quorum and custody checks<br>• Filed 2022–23 addenda and the 2023 annual report; advanced the 2024 report | • Assess safety-planning policy, forms and training<br>• Strengthen quality improvement plans in Suicide Case Review<br>• Finalize and file the 2024 and 2025 annual suicide reports |
| **5** **Quality Assurance Program**<br>CQIT & field monitoring<br>Data dashboards & patient-wise measures<br>Institution follow-up & DSH oversight | • Completed 15 of 25 CQIT audits and released 9 reports<br>• Finished programming dashboards for 25 key mental health metrics<br>• Institutions began corrective action plans; developed a DSH audit approach | • Complete CQIT testing and recommend final indicators/thresholds<br>• Track remedial actions and resulting compliance improvement<br>• Roll out user-friendly data dashboards<br>• Develop remedy-implementation proposal and initiate DSH auditing |
| **6** **Sustainability Of Remedies**<br>Integrated quality management<br>Institution, regional & central-office accountability<br>Cross-system coordination | • Embedded sustainability into CQIT, dashboards and corrective-action follow-up<br>• Built CDCR capacity for bed-need projections under Receiver oversight<br>• Identified organizational and information-sharing barriers to durable reform | • Use CQIT evidence to define how full implementation will be demonstrated<br>• Strengthen integrated oversight across institutions, regions and headquarters<br>• Resolve structural and coordination barriers that impede sustainability |

# Goal 1: Improve Mental Health Care Delivery Through Culture Change and Effective Management

CDCR has many dedicated employees who strive to provide quality mental health care that meets constitutional standards. However, existing management structures along with a lack of coordination and information sharing can make it difficult for employees and institution leadership to improve patient outcomes and achieve full compliance with court orders.

The Mental Health Receiver is committed to setting a new tone, significantly shifting the culture around providing mental health care, building clear milestones to show progress, and driving continuous improvement and innovation. The Receiver's approach recognizes that agency employees, who will be the drivers of innovation and change, must be encouraged to actively participate in identifying barriers to quality patient care and developing effective solutions to those barriers. In addition, employees and leadership need a clear understanding of the role of the Mental Health Receiver and how her authority intersects with that of the Medical Receiver and the CDCR Secretary.

## Area of Focus 1: Communications and Stakeholder Engagement

***Comprehensive Communications Strategy.*** The Receiver committed to "develop and implement a communications strategy to educate employees and stakeholders about the Receiver's vision, role, goals, objectives, and expectations." Action Plan 1.1.1.

In early June 2026, the Receiver contracted with a communications consultant to refine the existing communications plan and develop an effective implementation strategy that will serve the Receivership for the next several years. This quarter, the consultant completed an initial assessment, which included interviewing dozens of Mental Health Services Delivery System (MHSDS) and CDCR stakeholders to solicit their input about how the Receiver should communicate about her work.[1]

The research identified communications needs arising from the interaction of the Receiver's work with CDCR's existing structures, culture, and operating environment. These are shared challenges rather than the responsibility of any one entity. The Receiver is committed to building and executing a successful communications strategy to create lasting change. The communications plan will address four priorities:

[1] Future phases of the communications assessment will include soliciting input from external stakeholders, counsel for the Parties, and patients.

**1. Clarify roles, ownership and decision-making.** Ensure that stakeholders have a concrete understanding of the Receiver's mandate, how Receiver initiatives relate to existing CDCR and California Correctional Healthcare Services (CCHCS) work, how the Receiver's team will interact with and respond to institution issues, and when and how to engage the Receiver's Office.

**2. Support implementation within institutions.** Statewide direction regarding the mental health program should account for the significant differences in institutional mission, staffing, physical plant, population, and operational capacity. Communications should explain the purpose of each initiative, expected outcomes, affected staff and functions, and where institutions have flexibility in implementation.

**3. Strengthen coordination and information flow.** Use existing CDCR and CCHCS channels for communications, when possible, to engage stakeholders (e.g., clinical, operational, regional, institutional, and patients). The Receiver's Office will engage key stakeholders as early as possible and provide concise, regular updates on priorities, decisions, progress, obstacles and next steps.

**4. Build trust through transparency and follow-through.** Explain how stakeholder recommendations and concerns are considered, including whether they will be addressed and on what timeline. Use consistent communications before and after visits, audits and other engagements, together with opportunities for questions and feedback, to reinforce transparency, build trust, and encourage meaningful collaboration throughout CDCR.

While we continue to develop a comprehensive communications strategy, we are taking initial steps to respond to feedback. We have modified these Quarterly Reports to:

- Refine the structure and formatting to help readers understand the relationship between the Receiver's third-quarter accomplishments and the Action Plan.
- Describe challenges that the Receiver must address to implement the Action Plan.
- Highlight how we took feedback from employees and leadership and converted that into concrete accomplishments during the quarter.
- Recognize staff expertise and contributions that help to improve the delivery of quality mental health care in institutions.

***Making Information Available to Stakeholders and Patients.*** We communicate regularly with CDCR, CCHCS, and MHSDS leadership, the Medical Receiver, the *Armstrong* Court Expert, and counsel for Plaintiffs and Defendants. We now are working to increase communications with our patients.

We value communications and transparency, so we meet and share information with stakeholders on a regular basis. This includes:

- Weekly meetings with MHSDS and CCHCS leadership as well as with the Medical Receiver and the CCHCS executive team. The *Armstrong* Court Expert is represented at the meetings with the Medical Receiver.
- Biweekly meetings with Secretary Macomber, the Medical Receiver, and Undersecretary Toche.
- Biweekly meetings with Undersecretary Toche.
- Monthly meetings with Department of State Hospitals (DSH) leadership.
- Monthly meetings with counsel for Plaintiffs and Defendants as well as a joint meeting attended by both Parties.
- Monthly meetings with other important stakeholders including Division of Adult Institutions (DAI).
- CCHCS monthly CEO call.
- CDCR monthly wardens call.
- We will begin leading monthly meetings with institution Chiefs of Mental Health in August.

During the quarter, we participated in Inmate Advisory Council (IAC) meetings with Region I, Region II, as well as the Central California Women's Facility (CCWF) and the California Institution for Women (CIW). Senior Advisor Jason Williams also participated in an interview with the Mule Creek Post, an incarcerated person newspaper. The article will likely be published later this year.

We have established a Receiver P.O. Box that patients can use to contact us and have posted information about the P.O. Box in all institutions. We have received 113 letters through July 2026. When we receive letters from patients, we screen them and refer mental health concerns for review and action, if applicable. We also track all letters and review them for trends that can inform the Receiver's perspective about critical or repeated issues in patient care.

Explaining our mission, initiatives, and accomplishments to the public, including legislators, family members, and the media, is critical. Therefore, we post our Continuous Quality Improvement Tool (CQIT) audit reports as well as many other reports on Reports & Court Orders - CCHCS. Once we establish a website for the Receiver's Office, we will post these reports there.

## Area of Focus 2: Policy Modernization & Sharing Best Practices

The Receiver's Action Plan recognized that poor communication and lack of information slow CDCR's ability to improve mental health care delivery. During development of the Action Plan, mental health clinicians expressed frustration with a lack of clear, easy-to-understand, and regular communication about issues that impact their daily work. Moreover, it can be difficult for

employees to find and use mental health policies (Program Guide) because they are not integrated into the Healthcare Department Operations Manual (HCDOM).

***Program Guide to HCDOM.*** The Receiver's Action Plan commits to moving Program Guide requirements into the HCDOM within twelve months.[2] Action 1.1.2. This action will help ensure that important policy information is readily available to employees. Because of the evolution of the Program Guide, its incorporation of many later policies and memos, and technology and system changes within CDCR over the course of decades, creating a single cohesive and authoritative statement of policy is both critical and extremely complex.

Over the last four months, we worked closely with CCHCS Policy and Risk Management Services and MHSDS subject matter experts to produce two sample chapters – Chapter 2, Reception Center Mental Health Assessment, and Chapter 10, Suicide Prevention and Response – to demonstrate how the final product will look when all the relevant policies and memoranda are integrated into the HCDOM. That effort has revealed a range of challenges we must navigate to accurately move Program Guide requirements into the HCDOM while creating HCDOM entries that help staff do their jobs well every day. Some of these challenges include:

- Addressing outdated language in a way that is consistent with current clinical practices while not undermining the purpose or intent of Program Guide provisions. This challenge ranges from simple to very complex:
    - The Program Guide contains detailed references to outdated policies and procedures. In some cases, outdated references can easily be replaced by the successor policy or procedure. However, in other cases it is not a one-for-one substitution of a policy title. For example, we must replace language describing documentation in paper records with new language that describes the expectation for how clinicians will record patient information in the Electronic Health Record System (EHRS).
    - The Program Guide uses outdated clinical terminology in some instances. For example, it mentions "Axis I" diagnoses; however, the Diagnostic and Statistical Manual of Mental Disorders (DSM) has not used Axis terminology in over a decade. This will require substantive discussions with subject matter experts (SMEs) and the Parties about how to accurately represent the Program Guide requirement while using updated clinical language.

[2] All timelines in the Action Plan run from November 1, 2025, except for those that are resource dependent, for which timelines begin on July 1, 2026. See ECF No. 8753 at page 7.

- Focusing all stakeholders on moving Program Guide provisions into the HCDOM without making unnecessary substantive changes. Every stakeholder involved in this process has their own ideas about how the Program Guide provisions could be improved. In most cases, this involves changing the substance of the Program Guide by changing specific requirements. The Receiver must ensure that everyone stays focused on the task at hand, which is to faithfully represent the Program Guide requirements in the HCDOM.

- Gathering feedback on provisions of the Program Guide that stakeholders believe are now impeding quality mental health care delivery so that the Receiver can engage with the Parties and the Court about whether any changes are appropriate.

We are evaluating the two draft chapters before sharing them with the Parties for initial feedback. Once we have their feedback, we will provide an update to the Court on the timeline for this initiative. It is possible that we will need more than twelve months to produce a quality product that reflects meaningful input from all SMEs and both Parties and provides the Court with ample opportunity to consider any proposed substantive changes.

***Mental Health Policy Process.*** The Receiver's Action Plan also commits to "assess[ing] the mental health policy development and publication process and decid[ing] whether to adopt some or all of the processes used by medical and dental." We completed this analysis in autumn 2025, well ahead of schedule, and determined that the mental health policy approval process should be incorporated into the CCHCS process used for medical and dental policy development and approval. This decision ensures that all stakeholders can provide input on mental health policies before they are finalized and that new policies are added into the HCDOM so that they can be readily operationalized by institutions.

While we have begun transitioning into the CCHCS policy process, there were 13 policies that were near completion when the Receiver was appointed. Review of mental health policies was previously handled by the Office of the Special Master. We are prioritizing the issuance of these policies before transitioning to the CCHCS policy process. We review each of these draft policies and work with the MHSDS policy team to resolve any questions or comments. We share the draft policies with CCHCS programs and the Parties for review and input. After we have reviewed and incorporated feedback, we approve the final policies.

Of the 13 policies that were pending when the Receiver was appointed, we have issued four policies.[3] We are in the process of reviewing feedback and finalizing another four policies. We plan to share the final five draft policies with the Parties by the end of this year.

---

[3] Policies issued include Keep on Person Medication in Mental Health, Quorum and Membership Guidelines for Meetings of Local Suicide Prevention and Response Focused Improvement Team, Statewide Clozapine Policy and Procedure, and Suicide Watch Volunteer Assignment Procedures for Recreation Therapists and Rehabilitation Therapists.

Once this backlog of policies is complete, we will fully transition to the CCHCS policy review process. Under the new process, the Receiver's Office will have final approval authority over all mental health policies, MHSDS SMEs will still have significant input in developing, updating, and revising policies, and the Parties will continue to have the opportunity to review draft policies and provide feedback.

***Sharing Best Practices for Quality Mental Health Delivery Across CDCR.*** There is no uniform MHSDS mechanism for sharing best practices and lessons learned across institutions. The Receiver's Action Plan recognized that increased information sharing will provide opportunities for clinicians to learn from CDCR peers as well as experts with experience in other corrections and healthcare systems. In the Action Plan, the Receiver committed to "develop a strategy to identify and share best practices that support implementation of remedies and increased adherence to the Program Guide. Complete strategy development within nine months." Action 1.1.3.

As part of the Receiver's Office institution visits and CQIT audits, we are learning about effective approaches that individual institutions take to resolve common problems that plague the delivery of quality mental health care. We are sharing these approaches through Tips to the Field documents and informal technical assistance to institutions. This quarter, we released our first three Tips to the Field. Each of the first three Tips is aimed at a different audience – schedulers, custody, and mental health clinicians – and addresses an opportunity to improve the delivery of mental health care.[4]

Tips to the Field #1 is aimed at employees who schedule mental health appointments. Effective scheduling is critical to improving mental health care delivery because conflicts are a significant cause of refusals, no shows, cancellations, rescheduling, and noncompliance with treatment access indicators. The Tip includes strategies and sample language from a Local Operating Procedure that emphasizes coordination with other disciplines and tools available to schedulers to limit conflicts between mental health appointments and other activities.

Tips to the Field #2 is aimed at custody employees and focuses on increasing employee and patient safety by implementing strategies to ensure visibility into cells. These strategies are critical to the Receiver's suicide prevention efforts because incarcerated people often use paper or other materials to cover windows or cell fronts in ways that limit officers' ability to assess whether the person in the cell is safe. These window coverings can also endanger employees because an officer cannot see whether an individual has a dangerous object before opening the cell door. To increase safety for both patients and employees, the Tip identifies strategies including removing window coverings while patients are out of their cells for appointments and implementing regular verbal reminders for patients to clear windows.

---

[4] See Appendix B.

Tips to the Field #3 is directed to clinical supervisors and clinicians who participate in Interdisciplinary Treatment Team (IDTT) meetings. The Tip is designed to improve the quality of discussion in four areas - clinical case formulation, measurable treatment goals, level of care decision-making, and interactive team discussion - that have been the primary IDTT deficiencies identified in Continuous Quality Improvement Tool (CQIT) audits since February 2026. Unlike the first two Tips, this Tip is formatted as a more expansive field guide. It provides details on what the Receiver's Compliance Team (RCT) is looking for, strategies for achieving compliance, common pitfalls, and examples of what the IDTT discussion should sound like. Because it is a complex issue, we plan to record training for supervisors on how to use the field guide. We have already provided training to the RCT to ensure that auditors understand the information that we are sharing with the field and understand the Receiver's expectations as they are conducting CQIT reviews.

The Receiver's team, in conjunction with MHSDS leadership, is also beginning a monthly meeting with all institutional Chiefs of Mental Health. This forum will serve as an additional method for clinicians to share best practices among institutions.

## Area of Focus 3: Management Structure and Resources for Delivery of Mental Health Services

The Receiver committed to identify an effective structure to supervise the delivery of mental health services and implement that structure. Action Plan 1.2.1. We have been unable to reach agreement on an organizational structure with CDCR and CCHCS. This is discussed in the challenges section of this report.

***Resources for Delivery of Mental Health Services***. The Receiver submits an annual budget request to the Court for approval. This year, the Court approved the Receiver's proposed budget on June 30. The Receiver also works through the annual state budget process to secure funding to support implementation of the Action Plan. The Legislature approved these requests, and they were funded in the 2026 Budget.

| **Enacted Budget** | | |
|---|---|---|
| **July 2026 - June 2027** | | |
| Item Funded | Funding | Civil Service Positions |
| Office of the Mental Health Receiver | $13,772,241 | 0.0 |
| Mental Health Pay Differential (Permanent Bonuses) | $25,300,000 | 0.0 |
| Mental Health Resource Teams | $3,640,000 | 18.9 |
| Crisis Intervention Teams | $7,378,000 | 36.0 |
| CCHCS Office of Legal Affairs | $539,159 | 2.0 |

| | | |
|---|---|---|
| Risk and Policy Management Services | $1,534,094 | 10.0 |
| Statewide Mental Health Program Administrative Managers | $1,452,175 | 8.0 |
| Human Resource Southern Region | $940,350 | 6.0 |
| Human Resource Workforce Development and Talent Management | $1,861,435 | 12.0 |
| Human Resource Regional Hiring Unit | $1,843,056 | 12.0 |
| Information Technology Services Division | $1,947,384 | 10.0 |
| Mental Health Centralized Training & Outreach Coordinators* | $1,991,209 | 4.0 |
| Information Technology Software | $215,009 | 0.0 |
| Lease and Moving Costs | $597,000 | 0.0 |
| **Total** | **$62,011,112** | **118.9** |
| *Seven additional positions will be added in the following year, for a total of 11 positions. | | |

This dedicated funding and the associated positions will support our ability to implement the Action Plan initiatives and improve mental health care for our patients. This is essential to our ability to improve the quality of mental health care throughout the system and resolve this case. We are grateful for the support that the Legislature and Administration provided to our team throughout this budget process.

## Goal 1: Plans for Next Quarter

1. **Employee and patient engagement.** Implement new communication tools designed to further engage employees around ongoing Action Plan implementation. Continue to participate in IAC meetings and enhance communication with patients.
2. **Program Guide to HCDOM transition.** Share sample chapters with the Parties for feedback and determine whether additional time is needed to complete the full transition of the Program Guide to HCDOM.
3. **Release additional Tips to the Field.** Continue development and dissemination of new Tips to the Field to address common barriers to compliance.
4. **Continue transitioning to the CCHCS HCDOM policy review process.** Finalize and issue policies that were pending when the Receiver was appointed.

# Goal 2: Achieve and Retain a Qualified Mental Health Workforce

The Receiver's Action Plan recognizes the critical role that a well-qualified mental health workforce plays in delivering high-quality mental health care. The Action Plan emphasized the importance of 1) adopting a focused, leadership-driven approach to hiring, onboarding, and retention; 2) using new clinician recruitment strategies, including expanding clinical internship programs; 3) addressing issues that undermine clinician retention; and, 4) using data to achieve and sustain MHSDS staffing levels.

## Area of Focus 1: Recruitment and Retention

The Receiver committed to making bonuses permanent and to "assess the need for additional increases in compensation to address hardest-to-fill locations or positions." Action Plan 2.3.2. This quarter, we made progress in several areas and will continue addressing significant compensation, recruitment, and retention issues next quarter.

***Compensation Concerns.*** This quarter, with ongoing engagement and support from the California Department of Human Resources (CalHR), the Receiver resolved two compensation issues affecting many employees. None of this would have been accomplished without CalHR's collaborative approach and support for the Receiver's efforts to address pay concerns impacting MHSDS employees.

- We operationalized the permanent employee bonuses and communicated that development to all employees. The monthly bonus that most MHSDS clinicians receive was originally intended to expire after 12 months. MHSDS clinicians received the 13th month of bonus pay in July 2026. Those monthly payments will continue going forward.

- CalHR approved our request to change how Pay Differential 324 is interpreted. This pay differential has been unavailable to certain civil service psychiatrists, psychologists, and clinical social workers who previously worked at CDCR and returned after a break in service. The exclusion was also applied to clinical interns who left CDCR at the end of their internship and returned to full-time clinical positions. On July 17, 2026, CalHR approved our proposal to change how PD 324 is interpreted. The new interpretation will apply going forward and retroactively. Over fifty employees who were previously ineligible are now eligible for this pay differential. This change will improve CDCR's ability to recruit and retain clinicians, including those who complete internships in CDCR institutions.

We have also initiated a comprehensive assessment of mental health compensation. The current system is overly complicated and does not meet MHSDS needs. We will review all existing mental health pay authorities and then determine how to restructure mental health compensation to address several critical needs, including:

- Incentivizing clinicians to work in institutions rather than transferring to telehealth or headquarters.
- Increasing retention at the hardest-to-fill high-security institutions.
- Attracting experienced, licensed clinicians.
- Retaining clinicians who provide skilled treatment as well as critical supervisory support for practicum students, interns, and unlicensed clinicians.
- Making clinical supervisory positions desirable from a compensation perspective.

***Addressing Hiring Challenges and Concerns.*** This quarter, we took several steps to address Action Plan commitments and hiring concerns that we have heard about from the field. This includes difficulty in hiring supervisors, frustration with a specific hiring process, and changes to the clinical internship program.

Supervisory mental health vacancies at institutions must be filled because those positions play an important role in ensuring quality mental health treatment for all patients. Across institutions, there are dozens of vacancies among Senior Psychologist Supervisors, Senior Psychologist Specialists, Chief Psychologists, and Chief Psychiatrists.

We are using long-term and short-term strategies to address these senior and supervisory vacancies.

- **Long-term strategies**: We are carefully reviewing the MHSDS supervisory model to ensure that it provides adequate supervision of clinical staff. As we identify ideas that can improve clinical supervision, we will discuss them with the Parties.

- **Short-term strategies**: Clinicians may earn *less* money when they promote to supervisor because they are ineligible for compensation that non-supervisory employees earn (e.g., additional/dual appointments, higher rate of pay for on-call time, clinical supervision bonus, etc.). We are working with CalHR to evaluate the possibility of hiring above minimum pay for certain roles and expanding eligibility for certain non-supervisory financial incentives. Removing these financial barriers could assist in recruiting supervisors and specialists. We are also working with CCHCS HR to engage in targeted recruitment for certain supervisory vacancies. For example, earlier this year, we asked CCHCS HR to increase efforts to recruit for vacant chief psychiatrist positions. In recent months, vacancies have decreased from nine to six.

We streamlined the elevation process that institutions use to resolve certain mental health hiring issues. Over the last several months, we received feedback from institution leadership that the system was slow, cumbersome, and confusing. Senior Advisor Laura Harvick worked with MHSDS and CCHCS HR to centralize and streamline the process. Now institutional hiring

authorities and headquarters can more readily communicate, track, and achieve resolution of these issues.

Robust clinical internship programs are an excellent way to recruit new clinicians and keep them motivated as they work toward finishing their degree, completing their required unlicensed hours, and ultimately becoming licensed psychologists. The Receiver has committed to expanding clinical internships for MHSDS. Action Plan 2.2.1. The 2026 budget provides funding and positions that the Receiver will use to expand the internship program from 44 to 66 paid psychologist internships.

We made an additional change that is designed to increase the number of paid psychology interns who join CDCR after they graduate. Psychology interns can now remain employed with CDCR while they apply for a permanent position with the agency. Previously, they had to leave state service at the end of their internship and then apply for a permanent position. This change helps maintain continuity of patient care and strengthens the internship program. Because of this change, 31 of 44 current psychology interns will continue working as interns and then transition directly into roles as unlicensed psychologists once their degrees are conferred.

We continue to work with mental health leadership on strategies for ensuring adequate supervision of interns and unlicensed clinicians. Supervision of interns and unlicensed clinicians is a significant concern for many institutional leaders because they make up about 45% of institution clinicians. While there are existing structures in place to provide remote clinical supervision to unlicensed clinicians, many institution leaders have told us that the lack of onsite supervision makes it difficult for management and unlicensed clinicians to perform their roles. Therefore, in the next quarter, we will continue to explore ways to strengthen supervision and improve patient care.

## Area of Focus 2: Clinical Working Environment and Conditions

The Receiver's Action Plan recognized that working environments – including the condition and availability of treatment and workspace – have a significant impact on clinician retention. The Action Plan commits to addressing office and treatment space availability, expanding hybrid and flexible work options for clinicians, decreasing time spent on non-clinical tasks and assessing the factors that cause some mental health clinicians to fear their patients. Action Plan 2.3.

***Identifying Adequate Work and Treatment Space.*** The Action Plan commits to a comprehensive plan to ensure that all institutions provide adequate work and treatment space for mental health clinicians and programs. Action 2.3.3. The Receiver is using the CQIT auditing process as well as institution visits by Senior Advisor Jason Williams to assess all MHSDS treatment spaces and operations in each CDCR institution in 2026.

As we gather information through CQIT audits and institution visits, we are focused on developing a detailed picture of the nature and scope of space issues throughout the system. This is critical to developing effective strategies for resolving space issues. The CQIT audits have already identified space challenges as a key theme. Some treatment space issues can be resolved at the institution level, including:

- **Confidentiality.** Some treatment spaces are adequate except that they are not fully confidential. In many cases, window frosting or white noise machines could be used to make space confidential.
- **Poor repair/cleanliness.** Many spaces are dirty or in need of repair.

Other challenges are likely beyond the capacity of an institution to address and will require attention from the Receiver's Office. These include treatment that occurs in shared spaces such as dayrooms that are simultaneously being used for other purposes, RHU units that have no confidential treatment space, and rooms that are too small to use for in-person treatment.

We are working with institutions to address cleanliness issues or initiate repairs to mental health units and treatment spaces. While visiting institutions, Senior Advisor Jason Williams provides feedback to institution leadership on space conditions and highlights areas of concern. Institutional leaders have demonstrated impressive results in response to that feedback. For example, Thomas Valdez, Warden (A) at CCI recently led an effort to make much-needed improvements to mental health treatment space. In partnership with the institutions, we are working to ensure that staff and patients work and receive care in clean spaces that are in good repair.

We will continue to collect information about treatment spaces throughout the year and make targeted recommendations about steps that institutions can take to address identified issues. After completion of the audit cycle, we will assess the extent to which treatment space issues require action or support from the Receiver. We continue to oversee the expenditure of mental health fines money that is designated for institutional improvements. In addition to employee bonuses, each institution has a budget that the mental health program can use to purchase supplies (e.g., materials for group and recreational therapy) and items to improve working conditions (e.g., furniture, improvements to treatment and office spaces). During this quarter, we worked with CCHCS to communicate the amounts of unexpended funds for each institution (overall, about half of the fine money remains) and to provide guidance on the types of items that can be purchased with the funds. During site visits, we have heard positive feedback about how fines expenditures are benefiting patient programs and staff morale. Popular items paid for with fines money include:

- Water filters that have been installed near clinical workspaces.
- Golf carts that allow clinicians to move quickly between areas of an institution.
- Standing desks and desk chairs.
- Soundproofing for treatment spaces.
- Group room presentation equipment.
- Recreational therapy supplies.

***Hybrid Work Policy.*** Based on a recommendation by the Receiver, the Court approved a hybrid work policy that was negotiated by the Parties prior to her appointment. Action Plan 2.3.4. On July 1, 2026, Governor Newsom's memorandum directing State employees to return to the office four days a week took effect. We continue to work on implementation of the hybrid work policy, which includes developing guidance for employees that explains the relationship between the RTO requirement and the hybrid work policy. We plan to issue this guidance later this year.

***Clinician Time Spent on Non-Clinical Tasks.*** The Action Plan commits to an assessment of the amount of time that clinicians spend on non-clinical tasks. Action 2.3.5. We have retained a consultant to conduct this assessment and make recommendations for increasing the time that clinicians spend on clinical tasks and decreasing time on administrative duties. The consultant is scheduled to begin conducting interviews with clinicians in August. We anticipate receiving the consultant's recommendations by the end of this year.

***Clinician Fear.*** The Action Plan also includes an assessment designed to increase retention by addressing clinician fear. Action 2.3.1. The Receiver's Office will partner with an outside expert to assess factors contributing to clinician fear and identify strategies for addressing them. Clinician fear, especially of patients, is a serious concern that needs to be addressed to improve morale and create better outcomes for patients and clinicians.

## Goal 2: Plans for the Next Quarter

1. **Resolve eligibility issues related to monthly MH retention bonuses.** Some MHSDS clinicians are ineligible for the monthly retention bonus that has now been made permanent. The Receiver's Office is assessing the possibility of changing eligibility requirements to make at least some of these clinicians eligible for this bonus on a going-forward basis.
2. **Continue with a comprehensive assessment of mental health compensation.** This is a long-term effort that will continue in the next quarter.
3. **Identify strategies to address hard-to-fill positions.** The Receiver's Office will continue to analyze how targeted recruiting and potential compensation changes could be used to address hard-to-fill positions, including supervisors and onsite employees at high-security institutions.

4. **Using data to improve recruitment and retention.** The 2026 budget provided $1.9 million and 12 positions to create a workforce development and talent management unit in CCHCS HR. This unit will be responsible for assessing recruitment, hiring, and retention data that we will use to increase MHSDS staffing levels. During the next quarter, we will begin using a dashboard that this team has developed to track and analyze attrition data.

# Goal 3: Provide Adequate Care at Every MHSDS Level and Treat Each Patient at the Appropriate Level of Care

Goal 3 is to provide adequate care at every MHSDS level and treat each patient at the appropriate level of care. Matching patients with the appropriate level of care is critical for MHSDS systemic efficiency and more importantly, for optimal patient care.

The MHSDS population has steadily grown over the past 25 years. Currently 41% of all CDCR incarcerated persons are also mental health patients. Stakeholders involved in the *Coleman* and *Plata* cases have different views about how to assess and manage the mental health population, particularly those at the Enhanced Outpatient Program (EOP) level of care. In April 2026, Secretary Macomber wrote to the Receiver and requested that she immediately prioritize review of level of care (LOC) designations for EOP patients.[5, 6]

The Receiver responded to the Secretary's letter in June.[7] The Receiver explained her view that the mental health population needs to be reviewed holistically. Focusing only on decreasing the EOP population will not sustainably improve the quality of care across MHSDS. Instead, she committed to reviewing all levels of care to understand the causes of the MHSDS population growth, identify challenges to patients transitioning between levels of care, and make systemic, long-lasting change.

## Area of Focus 1: Clinical Care and Level of Care

The Receiver recognizes the importance of regularly reviewing level of care as part of providing quality patient care. She is taking several steps to assess level of care decision-making and identify ways to improve patient care. The Receiver's approach is designed to develop sustainable solutions that function long after the Receivership concludes.

***Comprehensive Level of Care Evaluation (C-LOC).*** We are starting a comprehensive evaluation to assess whether patients are currently at an appropriate level of care given their clinical presentation. We plan to train staff on Program Guide criteria with a focus on identifying any barriers that prevent an increase or decrease in level of care. Documentation of these clinical judgments will be built into the Master Treatment Plan (MTP) to minimize clinician workload and facilitate efficient data collection and analysis. Specifically, the last section of the MTP will now

---

[5] The Secretary's letter expresses his concern that the size of the EOP population at certain institutions has made it difficult for the Medical Receiver to delegate those institutions back to CDCR and resolve *Plata*.

[6] See Appendix A.

[7] The Receiver's response to Secretary Macomber's letter is also included in Appendix A.

include treatment criteria for EOP/ Correctional Clinical Case Management System (CCCMS) classification, medical necessity options and, when applicable, specific barriers to discharge. This will help clinicians identify Program Guide qualifying criteria while also identifying potential discharge barriers such as housing or safety concerns. In addition to these changes, we made technical changes to the MTP to consolidate redundant questions and auto-populate demographic information, resulting in reduced user clicks.

We also improved the user interface and consolidated the clinical summary and case formulation, resulting in a cleaner look and feel which offers a more logical clinical flow. Overall, these changes will optimize the clinical process and documentation while also collecting data around level of care decisions.

As part of the C-LOC, the Receiver's team is also gathering information from staff and patients about level of care decisions. We will use this information to understand the strengths and challenges associated with current level of care decision-making and identify changes that can be made to improve LOC determinations.

The Receiver is also reviewing mental health population census data to understand the reasons for population growth. As an example, the first available data in 1997 shows a total mental health population of approximately 12,500 individuals, representing 9% of the total 140,000 CDCR population. While the system saw initial increases of, on average 1% in the MHSDS population per year, more recent years have demonstrated steeper growth rates, resulting in an MHSDS population that is now 41% of the total CDCR population.

***Chart audits by the Receiver's Compliance Team***. As a complement to the CQIT auditing process, the RCT is conducting chart reviews to assess LOC decision-making and documentation. The RCT also observes IDTTs during CQIT audits and assesses the quality and appropriateness of LOC decisions in that context. This information will also inform the C-LOC and the Receiver's decisions around next steps.

The Receiver will use the information gathered through all of these efforts to identify challenges to increasing or lowering level of care when clinically appropriate, determine if teams are making level of care decisions that are aligned with policy requirements, and develop strategies for addressing identified challenges.

***CSP-SAC Single Cell Unit.*** In addition to the broader assessment related to level of care, the Receiver is working with leadership at CSP-SAC on a project to support patients in transitioning to the CCCMS level of care from EOP. The goal is to identify space to have a single-cell CCCMS unit. Patients discharging from EOP often express concerns about transitioning to a double cell environment due to safety concerns. By providing a transitional period in single cell housing for these patients, the goal is to support a successful transition out of the EOP program.

***Staffing new units.***[8] The Receiver committed to "develop a procedure to ensure that all new units (e.g., EOP, MHCB, PIP) are staffed appropriately when they open." Action Plan 2.1.2. We have created our own process to evaluate all mission changes involving mental health patients. We visit institutions to evaluate space, discuss potential mission changes with institutional staff, and ensure that there is an acceptable plan in place before the Receiver agrees to any mission changes for mental health units. We also participate in monthly calls about potential mission changes and bi-weekly DAI calls about custody bed needs, all in furtherance of ensuring that adequate staffing and space is available before any mental health-related mission changes. For example, our team was engaged in the decisions about the timeline for converting Valley State Prison housing unit A3 to a 100-bed EOP unit that activated on May 1 and opening a 100-bed CCCMS RHU at Solano on July 1 that is accepting new patients on a rolling basis.

***Bed Need Projections***. CDCR uses projections to plan for anticipated demand for beds across its inpatient and outpatient treatment programs. Generated and published twice a year, the projections estimate need at each level of care. For nearly two decades, the Defendants contracted with outside experts for this service, consistent with outstanding court orders. *See* ECF No. 1998 at 2; ECF No. 3629 at 3; ECF No. 5171 at 4. Over time, CDCR's Office of Research developed the capacity to produce these reports internally. The Office of Research produces projections of population for CDCR to use for its population overall and has tested models to project the beds needed for MHSDS in particular. The expert who previously prepared the projections reviewed the Office of Research plan as did the Parties. After receiving their input, the Receiver recommended that the Court approve shifting responsibility for completing bed need projections to CDCR's Office of Research, under the oversight of the Receiver. This transition will ensure CDCR has the capacity to plan for and meet the needs of incarcerated people with mental health conditions even after the Receivership ends.

## Area of Focus 2: Care Environment and Restrictive Housing

***Launching Mental Health Resource Teams.*** To build patients' social skills and capacity to live in less restrictive environments, the Receiver committed to deploying Resource Teams in inpatient units within CDCR. Action Plan 3.1.1. The 2026 budget provides funding for a phased rollout of Mental Health Resource Teams (MHRTs), beginning at Salinas Valley State Prison, California Health Care Facility, and California Institution for Women. The Receiver's Office is working with CCHCS, DAI, Labor Relations, and an external consultant (Amend at UCSF) to launch mental health resource teams in August 2026. This quarter, the Receiver's Office:

---

[8] This initiative was addressed in Goal 2 of the Action Plan. We discuss it here in the quarterly report because much of the discussion involves mission change in institutions.

- Secured dedicated funding through a joint proposal between the Secretary and Receiver to support six new Resource Teams over two years.
- Entered a contract with Amend to provide training and implementation assistance for the teams.
- Worked with CCHCS, DAI, and Labor Relations to utilize existing position descriptions and post orders to readily begin selection of the Resource Team members.
- Hired David Jantz to work closely with Amend on Resource Team implementation. Mr. Jantz is a seasoned corrections professional with over two decades of experience, including working with correctional facilities to bring principles of normalcy, humanity, and dynamic security to assist employees in working with incarcerated persons who have historically struggled within correctional environments.

***Restrictive Housing.*** The Action Plan recognizes the importance of reducing interactions that can contribute to psychological deterioration in patients. This includes increasing compliance with restrictive housing and use of force policies.

This is a critical initiative because data demonstrate that mental health patients are significantly overrepresented in restrictive housing units (RHUs) within CDCR. As of June 30, 2026, there are approximately 3,600 individuals currently housed within RHU programs.[9] Of those, 67% are MHSDS patients, with a breakdown of 41% CCCMS and 26% EOP. These percentages, when compared to general CDCR population base rates, demonstrate that MHSDS patients are disproportionately housed in a restrictive setting.

Consistent with the Action Plan's commitment to increase compliance with existing remedies regarding segregation, Action 3.2.1, we are gathering information that will help us better understand where and why MHSDS patients are held in RHUs, including RHU overflow units. This, in turn, will inform our understanding of how we may be able to divert more MHSDS patients from these units and how we can more timely provide mental health care to those who do enter restrictive housing. We have begun discussing strategies for diversion and timely treatment with the Parties. Several of these strategies would require Court approval.

We will also use the information to respond to the Court's directive at the June 23 case management conference that the Receiver assess the impact of the new RHU regulations on

[9] This census for RHU programs does not include incarcerated individuals who are currently housed in RHU overflow, that is, individuals who are in units that are not designated RHU units because designated RHU units are full. There are currently over 200 incarcerated individuals in RHU overflow at six institutions (California Correctional Institution, High Desert State Prison, Kern Valley State Prison, California State Prison Los Angeles, Pelican Bay State Prison, and Salinas Valley State Prison), though this data changes on a daily basis.

MHSDS patients.[10] We will report on any impact in the future because the regulation changes are too new to draw conclusions at this time.

We are using three approaches to gather information about current RHU practices: 1) data collection and analysis; 2) CQIT audits; and 3) institution visits.

***RHU population data collection.*** We are collecting data about the number of patients who are housed in restrictive housing, broken down by the number of patients in Hub units designated to provide mental health care and the number of patients who are in non-designated Hub units, including those who have been waiting more than 30 days to receive Program Guide required care. As of July 30, 2026, there were 258 EOP patients in non-Hub restrictive housing awaiting treatment, with 113 waiting more than 30 days; there were 648 CCCMS patients in non-Hub restrictive housing awaiting treatment, with 210 waiting more than 30 days. We are also working with MHSDS and DAI to collect clinical outcome data for patients in restrictive housing such as suicides, self-harm, crisis calls, mental health crisis bed admissions, and additional RVRs while housed there.

***CQIT audits.*** Through CQIT audits, the Receiver's Compliance Team has been observing institutional classification committee (ICC) meetings to assess how custody is considering input from mental health clinicians when deciding whether a patient should go to or remain in RHU. We also use the CQIT audits to examine the quality of mental health assessments designed to divert patients from restrictive housing (or mitigate their sentence for disciplinary infractions) based upon the extent to which their behavior resulted from mental illness. During audits we observe the RHU units and any overflow units to assess conditions and the availability of treatment space in the units.

***Institution Visits.*** As of July 31, 2026, Senior Advisor Jason Williams has conducted 23 site visits. During these visits, Mr. Williams meets with custodial, mental health, and institution leadership to discuss bed capacity, mental health treatment space, RHU overflow, and other issues that relate to providing quality mental health treatment.

---

[10] As described in a May 1 CDCR memo, the new RHU regulations (1) increase RHU term lengths for nine violent offenses, including homicide, attempted homicide, battery and assaults on staff; (2) reinstate RHU terms for incarcerated persons who commit two or more batteries on other incarcerated persons within a 6-month period; (3) reinstate RHU terms for distribution of a controlled substance; (4) reinstate the authority for an Institution Classification Committee (ICC) to assess consecutive or concurrent RHU terms for multiple offenses; (5) allow forfeiture of earned RHU programming credits if an incarcerated person receives additional RHU eligible violations, which can be assessed as consecutive or concurrent; (6) update Administrative RHU terms to provide the initial placement by an ICC; (7) revise privilege groups C and D to impose more structured consequences for disciplinary infractions; (8) update the Authorized Personal Property Schedule for individuals assigned to privilege groups C and D; (9) eliminate restoration of privilege group upon transfer for an incarcerated person who is deemed a program failure and assigned to privilege group C; and (10) grant the authority for staff to impose a 24-hour suspension of communication and entertainment services on incarcerated person tablets.

Based on the information that we have gathered to date, we are exploring several proposals related to restrictive housing. Each of these requires additional discussion with the Parties and may require court approval. As we advance these proposals, we will provide updates in future quarterly reports.

- **Adding RHU EOP and CCCMS beds.** We are exploring opportunities to increase the number of RHU EOP and CCCMS beds available for MHSDS patients to ensure that patients do not wait for extended periods in units that cannot offer mental health services. Our ability to provide treatment is dependent on identifying sufficient clinical staffing and treatment spaces.

- **Treatment in place to decrease transfers.** We are also discussing with the Parties the possibility of treating patients in place, without transfer to existing RHU Hubs. Patients would be clustered within a RHU according to level of care. This strategy would only be implemented in RHUs that have the space and staff necessary to provide required treatment. This would enable immediate treatment without the wait time for transfer. To proceed, the Parties and the Court would need to agree to modify the 2014 segregation remedy that currently limits commingling of general population and mental health patients within RHUs.

- **Diverting mental health patients from RHU.** We are exploring ways to decrease the number of mental health patients in restrictive housing, including:

  - **Strengthening Mental Health Assessments and ensuring they are duly considered.** We will use CQIT responsive action plans and technical assistance to strengthen mental health assessments when they are deficient and ensure that they are being appropriately considered.

  - **Working with custody to address the backlog of safety investigations that result in patients staying in RHU for excessive time periods.** We are coordinating with DAI about strategies to shorten the time it takes to complete a safety investigation when a patient enters restrictive housing because of safety concerns.

  - **Examining the role of mental health clinicians in the restrictive housing ICC process to ensure meaningful review of whether continued restrictive housing is appropriate.** This is a likely area where a Tip to the Field could be helpful and regular local oversight is needed. More broadly, we will consider whether to recommend any enhancements to the current system for mental health input and custody decision making.

- **Facilitating the implementation of Crisis Intervention Teams (CITs).** Through a joint proposal between the Secretary and Receiver, we obtained dedicated funding for CITs at three institutions. CITs are multi-disciplinary groups that respond to patient crises. CITs include representatives from mental health, custody, and nursing. CITs have been shown

to decrease the need for crisis bed admissions and suicide watch, decrease patient transfers, and provide a direct benefit to patients and staff through greater continuity of care, aversion/resolution of patient crises, less disruption to housing units and individuals, fewer transport hours required, and improved staff quality of life. Once implemented, we will be able to examine how CITs can prevent unnecessary escalation and potential uses of force, which can lead to RVRs and restrictive housing for patients.

- **Examining how mental health treatment for patients in RHU can be enhanced to help reduce the likelihood of additional RVRs during and after release from restrictive housing.** In particular, we will examine the effectiveness of behavioral plans for patients with maladaptive behaviors and/or developmental disabilities and consider whether targeted behavioral interventions/behavior plans could improve outcomes for patients.

***Use of Force.*** The Receiver has committed to increasing compliance with existing policies regarding use of force. Action Plan 3.2.2. In April, we became aware of proposed changes to CDCR's use of force policies and regulations. We participated in a meeting to learn about the changes proposed by CDCR and then provided comments on the policies currently under review. We are also reviewing a draft report on use of force prepared by the joint expert appointed in *Armstrong*.

In addition to the ongoing policy review, we have been reviewing specific incidents and following up on use of force issues identified in CQIT audits. We will continue to engage with the Parties, as well as the *Armstrong* Court expert, to ensure communication and collaboration on the use of force issues that intersect the two cases. In the coming months, we anticipate developing a plan for qualitative reviews of uses of force that is informed by information gathered through CQIT audits and policy discussions.

## Goal 3: Plans for Next Quarter

1. **Identify staff and begin training for newly funded Resource Teams and CITs.** This initiative will begin in August, and we will report on progress in our next quarterly report.
2. **Finalize and initiate RHU data collection.** We will work with MHSDS and DAI to establish capacity to periodically report on the location and clinical outcomes of patients in all forms of restrictive housing (including any overflow units).
3. **Review Mental Health Assessment (MHA) data and processes to identify opportunities for improvements that could increase diversion of MHSDS patients from the RHU.** Through CQIT and targeted data system reviews, we will evaluate whether mental illness is appropriately considered during the adjudication of patient rules violations and recommend any appropriate adjustments.
4. **Develop recommendations for how ICC can effectively consider mental health clinician input.** Through CQIT and targeted data system reviews, we will consider whether additional guidance is needed to ensure that mental health clinicians

effectively convey mental health considerations and custody duly considers any mental health recommendations during an ICC.

5. **Continue participating in use of force policy revision discussions.** Formulate use of force review tool and initiate qualitative review of policy adherence for use of force on mental health patients. We will review the *Armstong* expert use of force draft report and provide our comments on the report and suggest any additional policy changes that we believe are warranted. We will develop a tool for use of force review and begin using it to monitor compliance with the use of force remedies in this case.

# Goal 4: Fully Implement a Suicide Prevention Program

The Receiver's Action Plan recognized the importance of fully implementing an effective suicide prevention program, which is critical to patient life and safety. During the quarter, we made strong progress on addressing several outstanding issues that were previously handled by the Special Master. Moreover, we continued to integrate suicide prevention into CQIT audits to provide a comprehensive set of recommendations to each institution leadership team. (See Goal 5 discussion.) The integration of suicide prevention into CQIT audits is an important step toward developing a comprehensive understanding of how well we are providing patient care at each institution.

## Area of Focus 1: Prioritized Implementation Goals and Plans to Resolve Outstanding Suicide Recommendations

We are focusing on implementation of several outstanding suicide prevention recommendations designed to improve patient care and decrease suicide risk. As we make progress addressing these outstanding issues, we will continue to identify issues that contribute to the risk that patients will commit (or attempt to commit) suicide.

During the second quarter, we developed a prioritized implementation plan for all outstanding suicide prevention measures recommended by RCT expert Lindsay Hayes and ordered by the Court. Action Plan 4.1.1. In this quarter, we updated our implementation plan based on compliance data gathered during the CQIT audits. We further refined the implementation action steps based on whether the various measures appear to require institution- or PIP-specific interventions versus systemwide improvements. For institution- or PIP-specific issues, we plan to work from the responsive action plans that institutions provide in follow-up to their CQIT audit reports. Since institutions develop these plans, they should have buy-in from the employees who will implement them, and they should be tailored to site-specific problems. We will continue to review these plans to make sure that we believe they will adequately address identified problems.

For statewide needs, we have identified four issues that need to be addressed.

1. **Standardized intake signage for RHUs.** We are using the Tips to the Field process to provide a standardized intake sign to promote compliance with policy requirements for MHSDS patients in RHUs. The policy requires CDCR to house patients in suicide-resistant intake cells or with a cellmate during their first 72 hours in an RHU.
2. **Safety Planning.** We are working with MHSDS leadership to improve safety planning, which is an important collaborative process in which clinicians identify and implement strategies to protect patients who are at heightened risk of suicide. The process will incorporate institutional and regional feedback regarding safety planning challenges and ideas for possible policy, form, and training enhancements.

3. **Suicide Prevention Response Focused Improvement Team (SPRFIT) Meeting Quorum guidance.** We developed new policy guidance to clarify attendance requirements for institutional SPRFIT meetings.
4. **30-Minute Custody Checks.** We are working with MHSDS and DAI to revamp the audit of custody checks for patients who require 30-minute custody checks following release from a mental health crisis bed or alternative housing placement. The new electronic custody check system will better track these checks, which will assist in identifying and remedying any areas of non-compliance.

## Area of Focus 2: Case Review and Quality Improvement

After there is a completed suicide, a clinician from MHSDS conducts a comprehensive suicide case review (SCR) that includes quality improvement plans (QIPs) for deviations from policy, gaps in policy, or departures from standards of care, with input from psychiatry, custody, and nursing. QIPs are most often directed to specific institutions but may also be directed to headquarters if there is a statewide issue, such as a gap in policy. Several members of the Receiver's team review suicide case reviews and provide feedback and edits on the report and QIPs. In addition to evaluating whether the report addresses all pertinent issues and includes all appropriate issues for QIPs, the Receiver's team is focusing on how QIPs can be strengthened to support continuous quality improvement, such as by providing clearer guidance to institutions about what actions must be taken to prevent recurrence of the identified issue.

## Area of Focus 3: Annual Suicide Reporting

The Receiver continues to work with the Parties to address the backlog of annual suicide reports. During the past quarter, we finalized and filed the 2022 and 2023 Addenda to the Annual Reports on Suicides and the 2023 Annual Report on Suicides, including the 2023 Suicide Case Reports, which were filed under seal. ECF Nos. 8922, 8926. We convened two calls with the Parties to discuss the draft 2024 Annual Report on Suicides and are working with MHSDS staff to edit and finalize that report, which will be filed by September 1.

The 2024 Annual Report on Suicides will be the first report to incorporate a new performance improvement process that is designed to analyze aggregate quality improvement plan data to identify significant repeated issues and present them to MHSDS and custody Mental Health Compliance Team (MHCT) leadership for potential selection for statewide performance improvement projects. These projects will address longstanding systemwide issues that cannot be solved through institution-specific QIPs alone.[11]

---

[11] Notably, any performance improvement project identified through the annual report process will be in addition to other ongoing quality management processes, including the CQIT and regional SPRFIT

## Goal 4: Plans for Next Quarter

1. **Assess safety planning policies and procedures to better improve patient care and improve clinical quality.** We will be continuing a series of meetings with MHSDS leadership in which we are evaluating institutional and regional feedback and CQIT audit data on safety planning to determine whether policy, form, and training changes are necessary.
2. **Strengthen Quality Improvement Plans in Suicide Case Reviews.** In addition to continuing to provide feedback on individual SCRs and QIPs, we will engage with MHSDS leadership on their ideas for enhancing the SCR and QIP process and will also review CCHCS's death review opportunities for improvement process to look for innovations we should consider adopting for SCR QIPs.
3. **Finalize and file 2024 and 2025 Suicide Reports.** In the next quarter, we will fully resolve the backlog of annual suicide reports by filing the 2024 report on September 1 and the 2025 report on October 15.

---

audits and corrective action plans for all suicide prevention remedies; quarterly MHCT audits of custody issues such as quality of restrictive housing unit (RHU) rounds and complete cutdown kit accessibility; and other quality improvement initiatives that custody and mental health leadership have pursued this year, such as improving suicide prevention training for officers to more prominently emphasize the requirement to promptly call 911 when responding to an emergency.

# Goal 5: Complete Development and Implementation of a Quality Assurance Program

Developing an effective quality assurance and improvement program is a critical component of building and sustaining a high-quality mental health delivery system. Quality assurance is the means through which the Receiver will measure program success, identify and address shortcomings, and assess when to recommend returning responsibilities to CDCR.

## Area of Focus 1: Implementing CQIT and Field Monitoring Process

This quarter, we continued CQIT audits and field monitoring by the Receiver's Compliance Team. We have completed 15 of 25 audits since March and have used insights from each audit to refine and strengthen our audit process.

***Building Positive Relationships with Institutional Leaders.*** Institutions have supported the CQIT audit process by providing timely access to staff, records, and other information necessary to complete onsite reviews. We streamlined pre-visit planning to reduce the burden on the institutions, resulting in positive feedback about both the preparation process and the collaborative nature of the audits. At a recent Warden's conference, several wardens described the CQIT audits as constructive, collaborative reviews that support institutional improvement. This collaborative approach is an important element of our ability to identify barriers to compliance and implement sustainable solutions.

***Testing the Provisional Key Performance Indicators (KPIs).*** The Receiver is responsible for testing 250 KPIs that are designed to assess each institution's compliance with the court-ordered remedy. Next year, the Receiver must recommend final indicators and compliance thresholds to the Court. In consultation with the Parties, the Receiver will base her assessment on how well indicators help clinicians and others understand the health of the system, whether adjustments need to be made to the design of specific indicators to improve their impact, and whether other indicators are needed. In order to provide those recommendations, the Receiver needs to review data produced by each indicator.

The task of assessing indicators and ensuring that they work properly is complex. During the first half of the CQIT cycle (February to July), we implemented technical fixes and clarifications to enable the indicators to function properly and produce data for review. Some of these updates include:

- Correcting the technical functioning of the data reporting (e.g., we recently determined that when patients' levels of care were changed without an institution or program change, the system was not calculating the required clinical contacts correctly.)

- Clarifying instructions to auditors to ensure they are capturing the same information when onsite (e.g. clarifying that the restraints audited are clinical restraints, specifying that the heat logs auditors review are the indoor heat logs, and setting more explicit expectations regarding space adequacy and confidentiality).
- A small number of changes either associated with policy updates after consultation with the Parties (e.g. updating the timely clinical follow ups so that the timeline runs based on calendar days after discharge rather than running in 24 hour increments after discharge) or to enable data generation for indicators where the data is not available as defined (e.g. reviewing staff training completion rates using a time period that accounts for available staffing and training records).

The Parties have access to a change log that tracks any changes made to the KPIs and we provide periodic updates to them about changes that we have approved. During the remainder of this year, we will continue to refine that process and consult with the Parties on any substantive updates to the KPIs that are necessary.

There are a small number of KPIs that we cannot test because of changes in processes, tools in the institutions, or policy that make the existing indicator design obsolete and inoperable.

- For example, one indicator assesses completion of a paper form that has recently been transitioned to an electronic version. Some of the questions on the audit no longer make sense now that the electronic version is in use.
- Similarly, there is an indicator that assesses the availability of the RHU orientation guide based on patient interviews. During early audits we found that patients were unsure about what document we were discussing and that the information the RCT gathered was unreliable. Further, the orientation guide is now available on tablets and in paper copies.
- The KPI related to release planning data is also in flux because of changes to the required timelines for release planning activities under CalAIM.[12] Policy revisions are being developed to align requirements and will require revisions to the KPI.

The Quality Management team is working with us to develop proposals for revising the operation of those KPIs to align with current policy and operations and to ensure they capture accurate information. We will discuss these proposals with the Parties. To support ongoing

[12] CalAIM is a set of initiatives from the California Department of Health Care Services, the state department that operates Medi-Cal, the California version of the federal Medicaid program. Specifically, the CalAIM Justice Involved Reentry Initiative provides Medicaid reimbursable services to CDCR incarcerated persons up to 90 days prior to their release from the institution. By improving release planning and the continuity of medical and mental health care services when individuals are released to the community, this project aims to improve overall health outcomes for this population.

oversight of the KPIs and data infrastructure, the Receiver has identified an independent expert to consult with her team as needed. We anticipate entering into a contract with the expert in August.

***Experimenting with revised field monitoring approaches.*** In addition to onsite observations, the RCT conducts staff and patient interviews. For the second half of the audit cycle, we revised the RCT interview tools to improve consistency across staff interviews and make patient interviews more conversational while covering the same topics. These revisions were informed by observations from early audits and feedback from the RCT. The Receiver will evaluate whether the revised tools improve information gathering and make additional refinements as appropriate.

***Developing Chart Reviews to Complement CQIT.*** Existing CQIT KPIs assess certain aspects of clinical quality. In addition, the RCT observes IDTT meetings and treatment groups during onsite audits. To further strengthen assessments of clinical quality, the RCT will conduct chart audits later this year. The chart audits will focus on treatment planning and implementation as well as safety plans. The RCT will use modified versions of existing chart audit tools used by clinical supervisors. Chart reviews will include a sample of charts from across all institutions. Together, these additional assessments will help the Receiver identify any necessary systemwide improvements to strengthen treatment quality.

***Providing Timely Feedback to Institutions.*** We committed to providing timely feedback to institutions so that they can promptly address issues identified during CQIT audits. Our goal was to issue CQIT reports within a month of completing each audit. While we met this goal early in the audit cycle, the average time from audit completion to report issuance has been approximately seven weeks. The compressed audit schedule, the implementation of a new audit process, and data issues identified during report development contributed to these delays. To improve report timeliness, we are hiring a technical writer to assist with report writing and review and reduce the backlog created during the initial phase of the audit cycle. To date, we have issued nine reports. We are finalizing another four and have started work on reports from two recent audits. The regional leads have produced thorough, actionable reports while simultaneously refining the CQIT methodology and report development process. The entire RCT has demonstrated remarkable adaptability as the audit process has evolved, while maintaining its commitment to producing high-quality reports that support institutional improvement.

***Compliance Themes.***[13] More than halfway through the audit cycle, several themes have emerged. Areas of sustained strength include increased clinical staffing, high rates of training compliance, compliance with key custodial obligations including the availability of suicide prevention cutdown tools and appropriate referrals to mental health services, completion of nursing intake screenings, and meaningful patient engagement in group treatment.

[13] The Executive Summaries of the reports issued in May, June, and July are attached at Appendix B.

Persistent challenges remain. Many institutions continue to struggle to provide the required number of timely, confidential mental health treatment hours despite improved staffing levels. IDTT meetings often fail to address required treatment planning content, many treatment spaces remain inadequate or do not provide sufficient confidentiality, and safety plans are not meeting quality expectations. Additional themes emerging during the second quarter of CQIT audits include insufficient clinician engagement in ICCs and inconsistent consideration of clinical assessments in RVR adjudications.

## Area of Focus 2: User-Friendly Data Dashboards and Patient-Wise Data

The Receiver is committed to making CQIT data highly visible and easy-to-use to promote regular, data informed decision-making by institutional leadership and staff. Consistent with Action Plan 5.1.3, we worked with CCHCS to incorporate 25 mental health indicators into existing medical dashboards. The dashboards are ready to be released. In the next quarter, we will roll out the dashboards along with information to help institution leadership use the mental health data on the dashboards.

In addition, flexible scoring is being applied to the court-ordered patient-wise indicators.[14] See ECF No. 8033 at 35. Once complete, we plan to share the data, alongside the event-wise metrics, with stakeholders for feedback in focus groups and onsite at institutions. The patient-wise data will also be available through the Quality Management reporting site alongside the existing event-wise data. Because patient-wise data is unfamiliar to institutional leaders and supervisors, engaging with potential users to learn about how they might employ the data, answer questions, and gather feedback is an important step before the Receiver can make further recommendations about the presentation of the data.

## Area of Focus 3: Institution Follow-Up and Department of State Hospitals Oversight

**Follow Up on CQIT Findings and Recommendations:** Before we released the first CQIT report, the Receiver set clear expectations for institutional leadership about responding to priority recommendations. Action Plan 5.2.2. The first institutions to receive their CQIT reports have submitted responsive action plans and begun work to address the identified deficiencies. Ninety days after submitting their plans, institutions will report their progress on implementation. By 180 days after submission, we expect to receive data showing compliance improvements along with information about how those improvements were made. The Receiver's team will be available to engage with and support institutions as they respond to recommendations. The Quality Management team and regional leads within CCHCS have also developed a process to track all

[14] During data remediation, the Special Master recommend to the Quality Management staff that they suspend development of two patient-wise indicators. The two indicators are MHPC or MHMD Contacts for Patients Returning from a Temporary Departure and Timely Submission of MH RVR MH Assessment Results. The Receiver has not initiated development of those two indicators.

recommendations in the CQIT reports and support institutions in their efforts to improve performance. The Receiver's Office is collaborating with Quality Management on this project. We are encouraged by the initial responses from institutions, and we look forward to concrete progress to address priority recommendations.

***DSH Auditing Plan.*** The Receiver's team and DSH are negotiating updates to the memorandum of agreement and related policies that facilitate admission and treatment of patients at DSH. ECF No. 8829 at 15-16. We have had productive discussions with DSH aimed at bringing the policies in line with current practice, refining processes to ensure all appropriate patients are referred to and treated at DSH, and clarifying the language of all policies to make it easier for staff to understand and implement them.

The Receiver's team has also developed a process to audit "all aspects of treatment of Coleman class members in DSH, including their admission, mental health treatment, discharge, and transfer monitoring of DSH." ECF No. 8843 § II.A. The plan will include yearly auditing of data, and onsite audits at DSH-Atascadero and DSH-Coalinga every other year. The onsite auditing team will consist of DSH headquarters employees (similar to mental health regional staff who are members of the RCTs ) and a number of current external RCT members. As each DSH facility has robust data collection via their DSH Governing Body process, we anticipate leveraging much of this data to avoid creating duplicative data collection processes. To the extent that the auditing team needs additional data, we will work collaboratively with DSH to determine how best to obtain this data.

## Goal 5: Plans for Next Quarter

1. **Complete CQIT testing and recommend final indicators/thresholds.** Over the coming months we will be concluding the planned CQIT testing. We will also begin gathering feedback from stakeholders about the indicators based on the testing so we can develop recommendations regarding final indicators and thresholds for the Court.
2. **Follow up with institutional leaders on remedial actions to improve compliance.** We have begun to receive remedial plans from institutional leadership aimed at addressing the priority recommendations identified in the CQIT reports. In the coming months we will be tracking institutional progress to implement those plans and the impact that the actions have on compliance.
3. **Rollout updated dashboard.** Provide information to help institution leadership use the mental health data on the dashboard.
4. **Develop a proposal for recommending to the Court that CDCR has fully implemented the remedy.** In the coming quarter the Receiver will be using the information gathered during CQIT testing to develop a proposed process.
5. **Initiate DSH auditing.** In the next quarter, we will seek the first document production from DSH so that we can begin oversight activities.

## Goal 6: Create Mechanisms to Demonstrate Sustainability of Remedies

Our Action Plan sets out an aggressive timeline for improving the quality of mental health care delivered to CDCR patients and resolving this case. To create sustainable change, institutions, regional structures, and central office oversight must be well positioned to maintain high-quality mental health service delivery after the Receivership ends. This requires the Mental Health Receiver to thoughtfully and carefully begin integrating the mental health care system with CDCR's overall system for healthcare delivery.

We have already taken several actions to improve internal coordination and collaboration with the goal of achieving sustainable change. Examples of these actions include:

- Creating CQIT auditing and follow up processes that improve feedback to institutions and create clear expectations for how to address audit recommendations. This includes integrating SPRFIT and other audits (e.g., Sustainable Process) with CQIT to create a single, comprehensive report that leadership in institutions, regions, and headquarters can use to understand the challenges at a particular institution.
- Building capacity to identify and address systemwide issues. We have started to address this through Tips to the Field and will expand on this as we implement the suicide prevention performance improvement process.
- Working with MHSDS and CCHCS Quality Management to add 25 mental health indicators to existing medical dashboards. This will make it easier for institution CEOs and other leaders to easily view mental health data alongside medical data.
- Obtained court approval for the CDCR Office of Research to conduct bed need projections rather than continuing to contract out this function. The Office of Research will make projections with oversight from the Receiver.

We have also identified challenges to integration because many different program areas provide mental health services, including MHSDS, CCHCS (e.g., nursing led groups and substance use disorder treatment), and CDCR (e.g., rehabilitative programming). It is not surprising that a large and complex system involves many different program areas providing services to the mental health population. However, this decentralization of these services accentuates the need for high levels of cooperation, collaboration, and information sharing.

## Challenges to the Receiver's Execution of Powers and Duties

In the decades since this case was filed, our understanding of the importance of whole person care and the interconnections between custody, medical, and mental health services in the provision of constitutional care has grown. During that time, CDCR's structure has become more siloed and complex. Authority over healthcare services is divided between the Secretary and two court-appointed Receivers. Their authority is intersecting and has not been clearly articulated so that employees can easily understand the role and responsibility of each. Moreover, the complex and litigious history of this case has taken its toll, leaving distrust and suspicion where there needs to be collaboration and communication. This structural fragmentation and distrust will not help resolve this case. In order to drive lasting change and provide constitutional care, clear organizational structure and strong coordination and information sharing is essential.

The goal of this case is to ensure that patients receive constitutionally adequate mental health care in as timely a manner as possible. The Court appointed a Receiver to accomplish this goal and gave the Receiver the authority to:

- "Provide leadership and executive management of mental health care . . . To this end, the Receiver shall have the authority and, as necessary, the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions necessary to the delivery of mental health care to class members." ECF No. 8754 at 1-2.
- "Exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of MHSDS and provision of mental health services to class members." ECF No. 8754 at 3.

Moreover, the *Coleman*, *Plata*, and *Armstrong* Courts have ordered the Mental Health Receiver, the Medical Receiver, and the Court Expert to coordinate by:

- Working collaboratively, including by routinely sharing information, to address issues that cut across more than one case.
- Communicating decisions on cross-cutting issues to the relevant parties.
- Directing inquiries about specific cases to the appropriate court representative(s).
- Updating the Courts on significant coordination issues and seeking court guidance when necessary.

The court coordination requirement is a longstanding practice in these cases. The current court coordination order was updated to recognize the dissolution of the Office of the Special Master and the appointment of the Mental Health Receiver. While CDCR is not bound by the court coordination agreement, the Court stated its expectation that CDCR, through the Secretary, will

work with the Receiver to facilitate the accomplishment of her duties and to ensure that the agency is well-positioned to retake control of the delivery of mental services at the end of the Receivership.

The Receiver has encountered three related challenges to fully exercising her authority and implementing the Action Plan. The first two challenges relate to organizational structure and the extent of the Mental Health Receiver's authority over certain employees. The third challenge is that coordination, collaboration, and information sharing involving issues that significantly impact mental health have been uneven at best.

***Organizational Structure.*** In the Action Plan, we committed to clarifying management structures to improve mental health care delivery. Action Plan 1.2. Our intention is to produce an organizational chart that accurately represents the authority that the Court gave to the Receiver and gives employees a clear understanding of the Mental Health Receiver's responsibility for:

1. Supervision of mental health care delivery in institutions.
2. Supervision of mental health care functions in headquarters and regions.
3. Oversight of "administrative, personnel, financial, accounting, contractual, legal, and other operational functions necessary to the delivery of mental health care to class members."

We are past due in presenting an organizational structure to the Court because of disagreements with Defendants and the Medical Receiver about points 1 and 3.

***Supervision of Mental Health Care Delivery in Institutions.*** It is our position that the Undersecretary, Healthcare Services reports to the Mental Health Receiver for all issues related to mental health. That is consistent with the structure that existed prior to the Receiver's appointment in which the Undersecretary reported to the Secretary for all issues related to mental health. In discussions to date, Defendants have taken the position that the Receiver's supervisory authority begins with the Deputy Director, Mental Health Services. Within CCHCS, all healthcare field operations are supervised by the Director, Division of Correctional Health Care Services, who reports jointly to the Undersecretary and the Medical Receiver. The Defendants' understanding of the current management structure would leave the Mental Health Receiver with no formal supervisory authority over mental health staff in institutions.

***Oversight of "administrative, personnel, financial, accounting, contractual, legal, and other operational functions necessary to the delivery of mental health care to class members."*** Several CCHCS headquarters offices play critical roles in supporting implementation of the Action Plan. On the current CCHCS organizational chart, these functions appear to report jointly to the Undersecretary and the Medical Receiver. The organizational structure proposed by CDCR and the Medical Receiver does not provide the Mental Health Receiver with any authority over policy or administrative functions (e.g., HR and Fiscal). We discussed this point with the Medical Receiver, and we understand his position to be that the Mental Health Receiver must raise any concerns about cooperation from his staff with him as a court coordination issue. This would

leave the Mental Health Receiver with no direct ability to supervise "administrative, personnel, financial, accounting, contractual, legal, and other operational functions necessary to the delivery of mental health care to class members."

***Coordination, Collaboration, and Information Sharing.*** We are dedicated to improving mental health care at CDCR and working collaboratively with CDCR leadership and the Medical Receiver on a wide number of healthcare and management issues that intersect with the delivery of mental health care. The great majority of CDCR and CCHCS employees have worked with us collaboratively, sharing information, ideas, and strategies for how to improve mental health care delivery on a day-to-day basis.

Despite this, there are several significant examples of lack of coordination, collaboration, and information sharing on issues that impact the provision of mental health services. We have discussed our concerns with CDCR leadership, the Medical Receiver, and Parties. While there has been some recent improvement, we continue to learn of decisions, directives, and actions that have been taken with regard to mental health without our involvement. We discuss one specific example here to illustrate our concern. We have provided a more detailed description of concerns to the Court separately.

Earlier this year, we learned of a proposed CDCR regulation that would, in part, allow staff to issue RVRs to patients who do not attend CBI for which they are enrolled. This prompted an internal agency discussion about whether CBI is mental health treatment or an educational program. We told CDCR and CCHCS leadership that we wanted to be involved in discussions about whether CBI is treatment or programming. In May, we learned that CDCR and CCHCS had decided that CBI is not mental health treatment without consultation with us. We have discussed with CDCR and CCHCS leadership and defense counsel our concerns about the process and substance of that decision. Earlier this week, CDCR informed us that it has decided to move forward with the regulation and that the provision allowing the issuance of RVRs for CBI remains largely the same. This leaves the Mental Health Receiver in the position of having to decide whether to continue to provide credit for CBI as mental health treatment, though CDCR deems it an educational program.

Regardless of the cause of these issues, we are spending unnecessary time each week addressing organizational and coordination issues. This distracts from the critical task of improving the quality of mental health care and resolving this case as quickly as possible.

Prior to filing this quarterly report, we informed CDCR leadership, the Medical Receiver, and counsel for both Parties that we intended to raise these challenges in this report. We will continue working with them to try to reach agreement on an organizational chart and ways to improve coordination and information sharing. If we are unable to reach agreement in the near future, we will return to the Court for assistance.

# Quarterly Expenditures

On March 16, 2026, the Court authorized the Receiver to use accumulated fines in the Special Deposit Fund to fund the Receiver's Office through January 2027. On July 1, 2026, the Court approved the Receiver's Fiscal Year 2026/2027 budget.

## Revenues

Total revenue received for the months of April to June 2026 from the State of California and Mental Health Special Deposit Fund was $3,402,667.

## Expenses

The expenditure summary for the third quarterly report covers April through June 2026. July expenses will not be fully realized until after the submission of this report, so will be included in the next Quarterly Report. The total operating expenses of the Receiver's Office for this period were $2,607,598, detailed in Appendix D, $361,729 less than the projected budget, detailed in Appendix D.

| Acronym List | |
|---|---|
| ASP | Avenal State Prison |
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| BPT | Board of Prison Terms |
| C&PR | Classification and Parole Representative |
| CAL | Calipatria State Prison |
| CC I | Correctional Counselor I |
| CC II | Correctional Counselor II |
| CCAT | Correctional Clinical Assessment Team |
| CCCMS | Correctional Clinical Case Management System |
| CCHCS | California Correctional Health Care Services |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN | Centinela State Prison |
| CEO | Chief Executive Officer |
| CHCF | California Health Care Facility |
| CHSA | Correctional Health Services Administrator |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMH | Chief of Mental Health |
| CNE | Chief Nurse Executive |
| COR | California State Prison, Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CQIT | Continuous Quality Improvement Tool |
| CQI | Continuous Quality Improvement |
| CRC | California Rehabilitation Center |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility |
| D/C | Discharge |
| DAI | Division of Adult Institutions |
| DCHCS | Division of Correctional Health Care Services |
| DOT | Direct Observed Therapy |
| DSH | Department of State Hospitals |
| EHRS | Electronic Health Records System |
| EOP | Enhanced Outpatient Program |
| ERRC | Emergency Response Review Committee |
| FIT | Focused Improvement Team |
| GP | General Population |
| HCPOP | Health Care Placement Oversight Program |
| HDSP | High Desert State Prisons |
| HPS I | Health Program Specialist I |
| HQ | Headquarters |

| | |
|---|---|
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| ISP | Ironwood State Prison |
| ISUDT | Integrated Substance Use Disorder Treatment |
| KOP | Keep On Person |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| LOC | Level of Care |
| LOP | Local Operating Procedure |
| MA | Medical Assistant |
| MAPIP | Medication Administration Process Improvement Plan |
| MCSP | Mule Creek State Prison |
| MH | Mental Health |
| MHA | Mental Health Administrator |
| MHCB | Mental Health Crisis Bed |
| MHPS | Mental Health Program Subcommittee |
| MHSDS | Mental Health Services Delivery System |
| ML | Mainline |
| ML CCCMS | Mainline Correctional Clinical Case Management System |
| ML EOP | Mainline Enhanced Outpatient Program |
| MSF | Minimum Support Facility |
| NA | Nurse Administered |
| NDRH | Non-Disciplinary Restricted Housing |
| NDPF | Non-Designated Programming Facility |
| NKSP | North Kern State Prison |
| OA | Office Assistant |
| OT | Office Technician |
| PBSP | Pelican Bay State Prison |
| PBST | Positive Behavior Support Team |
| PC | Primary Clinician |
| PIP | Psychiatric Inpatient Program |
| PT | Psychiatric Technician |
| PVSP | Pleasant Valley State Prison |
| QIP | Quality Improvement Plan |
| QIT | Quality Improvement Team |
| QMSU | Quality Management Support Unit |
| R&R | Receiving and Release |
| RC | Reception Center |
| RHU | Restricted Housing Unit |
| RHU CCCMS | Restricted Housing Unit Correctional Case Management System |
| RHU EOP | Restricted Housing Unit Enhanced Outpatient Program |
| RHU GP | Restricted Housing Unit General Population |
| RJD | Richard J. Donovan Correctional Facility |
| RT | Recreation Therapist |
| RVR | Rules Violation Report |

| | |
|---|---|
| RVR-MHA | Rules Violation Report – Mental Health Assessment |
| SAC | California State Prison, Sacramento |
| SATF | Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Camp |
| SHO | Senior Hearing Officer |
| SNY | Sensitive Needs Yard |
| SOL | California State Prison, Solano |
| SOMS | Strategic Offender Management System |
| SPRFIT | Suicide Prevention and Response Focus Improvement Team |
| SQRC | San Quentin Rehabilitation Center |
| SRASHE | Suicide Risk and Self Harm Evaluation |
| SRE | Suicide Risk Evaluation |
| SRN II | Supervising Registered Nurse II |
| SRN III | Supervising Registered Nurse III |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| T4T | Training for Trainers |
| TCMP | Transitional Case Management Program |
| TTA | Treatment and Triage Area |
| UM | Utilization Management |
| UOF | Use of Force |
| VPP | Vacaville Psychiatric Program |
| VSP | Valley State Prison |
| WSP | Wasco State Prison |

# Appendix A

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION GAVIN NEWSOM, GOVERNOR

**OFFICE OF THE SECRETARY**
**PO Box 942883**
**Sacramento, CA 94283-0001**

**VIA EMAIL ONLY**

April 23, 2026

Colette S. Peters, Court Receiver
Chambers of Hon. Troy L. Nunley
United States District Court
Eastern District of California
Robert T. Matsui U.S. Courthouse

Dear Receiver Peters,

The California Department of Corrections and Rehabilitation (CDCR) appreciates the cooperative relationship between your office and the Department with the shared goal of improving Mental Health (MH) care and ensuring the sustainable and constitutional delivery of MH care. The Plata Receiver has identified the high number of Enhanced Outpatient Program (EOP) patients at California State Prison, Sacramento (CSP-SAC) and at other institutions, as a barrier to institutional delegation. Violence was also an associated reason for the non-delegation of institutions noting CDCR data supports that higher custody level EOP patients are involved in high levels of violence in CDCR's system.

The purpose of this letter is to request immediate prioritization of the "EOP review" process to ensure patients are housed at the right level of care. There are several critical reasons to prioritize this effort:

- As set forth in your action plan, *we must be able to provide patients with the right level of care in an appropriate environment based on the patient's individual need.* Moving patients to the right level of care where they receive the appropriate level of treatment is the fundamental design of the Mental Health Services Delivery System. When placed at the appropriate level, patients can achieve better access to rehabilitative programming such as education, vocational training, and college, to better equip patients returning home with opportunities for successful re-entry.

- In the recent past, institutional MH leadership teams have reported that 50 percent or more of current EOP patients do not meet criteria for the EOP program. In re-reviewing the MH Program Guide, I can see why some of these leaders have made these statements. The Program Guide sets forth specific treatment criteria the incarcerated person must meet for EOP and includes acute onset or significant decompensation of a serious mental disorder and/or the inability to function in general population based upon the demonstrated inability to program, or the presence of dysfunctional or disruptive social interaction as a consequence of a serious mental

disorder; or an impairment in the activities of daily living. Early iterations of the Program Guide included the criteria of a Global Assessment Functioning (GAF) score of less than 50 although my understanding is that measurement is no longer used in the DSM V. The Program Guide clearly contemplates that EOP is designed for very serious and active psychiatric impairment affecting the incarcerated persons mental state and ability to function day-to-day in our structured setting. Although there are incarcerated persons in our EOP units that meet the criteria, it is doubtful that the majority of the EOP incarcerated persons accurately meet the criteria. When clinicians and Interdisciplinary Treatment Teams (IDTT) place incarcerated persons in the EOP units who do not meet the criteria, it makes the true EOP patients vulnerable to targeting, exploitation, and victimization, which could lead to Restricted Housing Unit (RHU) placements for safety concerns and avoidable Mental Health Crisis Bed (MHCB) and Psychiatric Inpatient Program (PIP) admissions. Without accurate clinical assessments and level of care determinations, a separate housing unit for structured activities for EOP patients is ineffective.

- The prior "EOP Review" focused on reorienting the IDTT members to the specific criteria for EOP level of care set forth in the Program Guide and in so doing resulted in a significant reduction in the EOP population. Since that time, there have been hundreds of clinical staff new to the Department who could benefit from a focused Program Guide treatment criteria review including mental health staff in the telehealth program, some of whom are new to our Department and have never worked at an institution. Should the EOP population return to five percent of CDCR's total population level, a reduction of over 3,000 patients from the EOP to placement into their least restrictive clinical and custodial environment in the Correctional Clinical Case Management System (CCCMS) or General Population (GP) Level of Care (LOC) would occur. The results could lead to reduced EOP RHU, a reduction in unnecessary inpatient admissions, and an overall safer and more therapeutic environment in the EOP units.

- Based on the February 2026 Mental Health clinician Allocated and Filled Report, a similar reduction in the EOP population would result in fill rates largely exceeding 90 percent statewide.

- CDCR is once again experiencing EOP and EOP RHU population overflow issues at several institutions, which is unnecessarily driving additional resources and the need for EOP expansions with few adequate options. Without ensuring the clinical staff are following Program Guide requirements for EOP placement, unnecessary EOP units will need to be activated to house incarcerated people when it is not clinically indicated or beneficial, nor a fiscally responsible use of taxpayer funds.

In prior discussions, the Coleman Receiver team has identified bandwidth issues as a barrier to moving forward with the EOP Review effort. CDCR offers the following plan to assist with moving this effort along with minimal impact to the Coleman Receiver or Mental Health resources:

- IDTT is the appropriate process to review patients for Level of Care determination. Per the Program Guide, IDTTs occur every 90 days for incarcerated persons in the EOP level of care and thus a review of the EOP population could be completed relatively quickly and with no additional local resource needs for the IDTT components. To be clear, this process should also include ensuring patients are moved to higher levels of care when warranted.

- Formal direction should be provided to the field to follow the same/similar process that was utilized in 2017/2018 to ensure the patients currently in the EOP are referred to the appropriate level of care and in line with Program Guide treatment criteria. To be successful, this will require consistent monitoring from regional and headquarters staff to ensure the process is being adhered to as well as documented training and expectations for IDTT participants ahead of the initiative.

- CDCR is willing to work with the institutions to ensure a smooth transition for those moving from the EOP level of care by prioritizing these patients for jobs/assignments, working closely with the patients on safe housing such as Sensitive Needs Yard or Non Designated Programming Facility, retaining the patients in their current facility whenever feasible, offering the patients single cell status for up to 90 days upon discharge from EOP, etc.

To be successful and overcome expected barriers, the following recommendations should be considered:

- Make it clear to clinical staff that they will be supported during this process. Prior history has shown that incarcerated individuals will engage in behaviors to avoid level of care changes such as claiming suicidality or engaging in suicidal gestures for secondary gain (avoiding LOC change), but this does not necessarily mean they should remain at a level of care where they do not belong.

- Training of staff should include strategies for addressing staff push back on a range of issues such as a concern that patients will come right back to the EOP, patients not wanting to leave, "I'll just get another patient", incorrect belief that patients are "safer" in EOP, and training/information on educational/vocational/college opportunities, etc.

- Following LOC changes and transfers to new institutions, patients should be closely monitored, and care team hand-offs should be the norm to assist with continuity of care.

- As noted in your action plan, clinicians expressed concerns that patients' health will deteriorate due to lack of programming in CCCMS, which is why it is important to educate staff on opportunities outside of EOP and benefits to patients upon re-entry back to the community. Also noting that statewide staffing has maintained above 90 percent for psychiatry and improved to 84 percent for clinicians, positioning institutions to provide support for patients between the levels of care.

- Communicating with staff that no staffing reductions or layoffs will occur as a result of this process.

- Expectations should be set that there will be Coleman Receiver, Headquarters and Regional follow-up for institutions failing to conduct the reviews or when questionable outcomes are observed.

- Ensure that the EOP Review becomes a continuous review. Although the 2018 review stopped collecting data in 2019, there are significant benefits to ensuring the review continues even after CDCR collects data on the entire EOP population. First, it provides leadership in Mental Health and CDCR with near real time data on the types of patients being housed in the EOP. Second, it serves as a regular reminder to IDTT clinicians on CDCR's EOP admission and retention criteria.

Immediate Benefits:

- Should the EOP Review generate the expected successes, deactivation of EOP housing units at locations that are barriers to Plata delegation could be prioritized, such as CSP-SAC, Salinas Valley State Prison, and Substance Abuse Treatment Facility.

- Secondarily and equally important, deactivations of EOP housing units could also be prioritized at those institutions who individually may have staffing challenges (fill rates below 90 percent for example), treatment space challenges, and/or low performance measures. As noted in the Kern Valley State Prison CQIT report, insufficient physical infrastructure for group treatment and shortage of RHU EOP beds were structural conditions that exceed the institutions capacity to remedy independently. Also noted in the CQIT report, the Receiver will take the lead in developing and implementing a resolution including population management.

- Theoretically, this process could include the closure of eight 180 designed EOP housing units (640 beds), eight 270 celled facilities (1,200 beds), and eight Level II dorm facilities (800 beds). Noting these are listed as examples only to show the huge impact this would have.

- Collecting data on why patients are in the EOP will aid mental health and CDCR with data-driven policy-making and help address the most significant issues impacting those patients.

This is a tremendous opportunity to rapidly improve patient care, reduce victimization by individuals preying on "true" EOP patients, avoid unnecessary costs to the State of California in times of severe budget challenges, and improve re-entry outcomes for patients in the MH program. CDCR looks forward to collaborating on this issue and to providing an update on the progress via the next Coleman case management statement. Should there be a desire to couple this effort and training to encompass other initiatives such as mandating group refusals in person and standardized groups/times, CDCR stands ready to assist in these efforts as well.

Please let me know if you would like to discuss this issue further.

Sincerely,

DocuSigned by:
Jeff Macomber
5957F5D0C55F473...
Jeff Macomber

cc: Kathleen Toomey, Deputy Coleman Receiver
William Lothrop, Deputy Coleman Receiver
Darci Delgado, Mental Health Expert, Coleman Receiver
Diana Toche, Undersecretary, Healthcare Services
Jason D. Johnson, Undersecretary, Operations

June 18, 2026

Via Email Only

Secretary Jeff Macomber
Department of Corrections and Rehabilitation
Office of the Secretary
P.O. Box 942883
Sacramento, CA 94283-0001

Dear Secretary Macomber:

Thank you for your April 23, 2026, letter requesting immediate prioritization of a review of the Enhanced Outpatient Program (EOP) population to ensure that patients are housed at the appropriate level of care. I appreciate the opportunity to respond to your letter and clarify areas of agreement as well as my perspective on several issues you raised.

Over the last year, you and I have had several discussions about our shared goal of ensuring that our patients receive the appropriate level of mental health treatment, that the state resources are used effectively, and that outcomes continue to improve. As we have discussed, I believe that comprehensively reviewing the Mental Health Services Delivery System (MHSDS) is critical to understanding the factors impacting all levels of care. This cannot be accomplished by focusing only on the EOP population. As part of implementing the Action Plan, my team will take a multi-model approach, examining longitudinal MHSDS trends, interviewing staff and patients, and conducting level-of-care reviews across CCCMS, EOP, PIP and MHCB. I anticipate using this information on an ongoing basis to make system-wide improvements that increase the quality of care while accelerating implementation of court-ordered and court-approved remedies.

I agree that improving mental health treatment includes ensuring each patient is receiving care at the appropriate level. I also agree that the Vess 2019 study provides a useful model for evaluating level of care placement decisions through the Interdisciplinary Treatment Team (IDTT) process.

However, the available evidence does not support the conclusion that a majority of current EOP patients fail to meet EOP criteria. Dr. Vess's 2019 EOP population review report evaluated over 10,000 EOP patients to better understand the population's clinical needs and motivations. Applying Program Guide criteria, Dr. Vess found that only:

> "*...**3%** (of EOP patients) were categorized as having needs and motivations other than mental health. Most of these presented with some form of fear about being in non-EOP housing. These patients will require a collaborative approach*

> *between mental health and custody staff to find viable solutions to the conditions of confinement that motivate these patients to seek and maintain placement in EOP.* ***It should be noted that this subgroup of patients was far smaller than anecdotal reports from the field have suggested****, whereby half or more of the patients in some yards were thought to be in EOP inappropriately*."

Similarly, the Vess evaluation found that, when Program Guide criteria were applied, approximately **17.3%** of EOP patients were reassigned to a lower level of care. While this finding confirms the importance of regularly reviewing level of care decisions, it does not support the conclusion that most EOP patients are inappropriately classified.

If the Department has data that differs from or supplements the findings of the 2019 Vess study, please share those materials with us so that we may consider them as part of our review. Any decisions regarding this issue will be informed by the evidence before us and the requirements of the remedial process.

As for next steps, we have prioritized a comprehensive level-of-care review and anticipate initiating training for this process in summer of 2026. Through increased focus on supervision of the IDTT process, we will evaluate and ensure that each MHSDS patient's level of care is regularly evaluated consistent with Program Guide requirements. This review will directly address your request by assessing whether patients assigned to the EOP level of care continue to meet Program Guide criteria. Consistent with the approach used in the 2019 Vess study, we will collect and analyze data to monitor level-of-care changes that result from these efforts.

By leveraging the existing IDTT process, an approach that you also emphasized in your letter, we expect to minimize additional workload for our clinicians while strengthening clinical supervision and accountability. While regular level-of-care reviews are important, it would be premature to assume that such reviews will result in immediate population reductions. Indeed, additional review may identify patients who require a higher level of care than they currently receive.

As you are aware, the Vess 2019 study took approximately eighteen months to complete. Based on our preliminary assessment, a similarly comprehensive review is likely to require at least one year. Establishing realistic timelines is important both for effective implementation and for setting appropriate expectations with the Court. These tasks could be accomplished more quickly by hiring additional consultants, but we have determined that using the existing IDTT process best meets our needs and avoids unnecessary expenses given the State's current budget constraints.

The Vess 2019 study also underscores the importance of safe custodial environments in supporting appropriate mental health treatment and placement decisions. As the Department continues to evaluate Special Needs Yards (SNY) and Restrictive Housing Unit (RHU) policies,

we should remain attentive to the impact RHU regulations are having on the mental health population's safety and treatment needs. I look forward to continuing our discussions regarding these custody and safety issues, including whether targeted population reduction strategies for members of the *Coleman* class warrant further consideration.

In the near term, I believe it is important to address the ongoing challenges associated with RHU overflow housing and waitlists for transfers to RHU facilities consistent with Program Guide requirements. My team is currently examining the statewide census of EOP and CCCMS RHU patients, with particular attention to patients housed in overflow units where access to mental health care is limited. We intend to explore additional housing options to address overflow while also implementing regular clinical contacts to monitor for decompensation while patients await transfer to appropriate housing.

We look forward to working with the Department to identify the underlying causes of the MHSDS patient census increase and develop solutions that ensure sufficient treatment capacity across all levels of care. I would be happy to discuss our plans with you in greater detail. Thank you again for your letter and for your engagement in these important issues. I look forward to our work together to improve outcomes for the patients we serve.

Sincerely,

Colette S. Peters, Federal Court Receiver
Mental Health Services Delivery System
California Department of Corrections & Rehabilitation

cc: Honorable Troy L. Nunley, Eastern District of California
David Sapp, Legal Affairs Secretary, Office of the Governor
Diana Toche, Undersecretary, Healthcare Services
Jason D. Johnson, Undersecretary, Operations
Sarah M. Brattin, Assistant Secretary/General Counsel
Amar Mehta, Deputy Director, Mental Health Services
J. Clark Kelso, Federal Court Receiver, Plata v. Newsom
Edward Swanson, Federal Court Expert, Armstrong v. Newsom

# Appendix B

MENTAL HEALTH RECEIVER.

TIP 1

# Scheduling Appointments To Limit Conflicts and Increase Attendance

Given the number of appointments that are needed to provide mental health services to our patients at all levels of care, the required timelines for appointments, and the many other programs and services provided within the institutions, scheduling is a critical and challenging task.

When patients attend their appointments as scheduled, that supports their mental health, reduces workload for schedulers who may otherwise need to reschedule appointments, and reduces burden on clinicians who may be required to find patients who did not attend their appointments and engage them cell-front.

Institutions have experimented with many strategies to reduce conflicts and increase attendance. Below is a summary of some strategies that we have identified through our tours as well as language from a local operating policy on scheduling that your institution may wish to consider. Some of you may already follow these strategies.

## Strategies

***Use the Consolidated Patient Provider Calendar:*** All schedulers should already be trained on mandatory use of the Consolidated Patient Provider Calendar (CPPC) before scheduling any appointment. This tool allows you to see the patient's schedule across all disciplines including education/work.

***Never schedule over a preexisting health care appointment.*** When two health care appointments are scheduled at the same time, only the first will generate a ducat.

***Physically seat all the schedulers across all departments in the same location***. This encourages schedulers to build relationships and communicate easily to resolve conflicts. Where that is not possible, provide schedulers from each department contact lists for their counterparts so they know whom to contact if they need to request that an appointment be moved.

***Minimize disruptions to education and work assignments whenever possible.*** This is most likely to result in a completed appointment and lessen frustrations. Patients are reported to be far more likely to return to school/work if appointments are grouped together and scheduled at either the start or end of the work/school day. Mental health appointments should be scheduled before or after school and work assignments whenever possible. If that is not feasible, they should be grouped together at the start or end of the school/work day.

## Sample Local Operating Procedure Language

Staff shall use strategies such as open access, encounter consolidation, consultation, and collaborative planning of the clinical schedule to optimize access to health care services.

The Consolidated Patient/Provider Calendar (CPPC) shall be utilized by Health Care schedulers in order to find optimal appointment times for patients and providers by avoiding and/or minimizing the number of schedule conflicts, which will lead to a more efficient management of institutional resources and fewer disruptions in the rehabilitation schedules of patients.

Health care staff shall ensure appointments are scheduled with a buffer of 0,15, & 30 minute options to allow for patient movement between appointments. If both encounters are within the same building, no buffer is required. If encounters are in different clinics but on the same yard, the 15-minute buffer applies. If the encounter is located in the Central Health Building, the 30-minute buffer applies.

In the event of a scheduling conflict (e.g., two appointments scheduled for the same date/time), the OT/scheduler will attempt to resolve the conflict at the lowest level by contacting the schedulers involved. The schedulers shall collaborate to see if the conflict can be resolved at the lowest level by rescheduling the lower priority appointment. If a resolution cannot be found between the two schedulers, the scheduler shall elevate the issue to their direct supervisor.

***Additional sample LOP provisions***

### Recurring Appointments

Scheduling Support Staff shall use the recurring appointment function when a provider or clinician's order will result in a series of appointments with a specified frequency.

### Increasing Incarcerated Person Show Rates and Clinic Efficiency

When scheduling incarcerated persons, health care staff shall consider incarcerated person preferences regarding access, such as providing appointment times that do not interfere with the incarcerated person's work shifts or classes. Scheduling staff shall utilize the CPPC when scheduling health care appointments, which allows the incarcerated person's preferences to be considered.

### Encounter Consolidation Appointments

To increase clinic efficiency and timely access, Scheduling Support Staff shall review all pending appointments for possible encounter consolidation and discuss with the Care Team at the daily huddle to determine the total time required for the incarcerated person.

### Co-Consultation

Throughout the day, the Care Team shall look for opportunities to collaborate using co-consultation strategies to resolve issues in one encounter that would likely result in a referral to another member of the Care Team, thus eliminating the need for the incarcerated person to return to the clinic for a second time. Co-consults require a note to be completed by all care team members who participate in the co-consultation.

MENTAL HEALTH RECEIVER.

TIP 2

# Strategies for Safely Improving Visibility into Cells

During visits to institutions across the state, the Receiver has identified many cells with limited visibility due to window coverings that incarcerated people have placed on their cell fronts. This lack of visibility into cells creates a safety risk for both patients and staff.

**Maintain Clean and Safe Conditions**
Ensure cells are maintained in a clean, safe, and policy-compliant condition before an incarcerated person is assigned to their cell. During several institutional tours, significant concerns were identified regarding the condition of vacant cells, some of which were observed to be in a state of disrepair or poor cleanliness. Maintaining all cells in accordance with applicable policies and standards at all times promotes safety, supports orderly operations, and reinforces expectations for both staff and the incarcerated population.

**Give Verbal Reminders**
Staff should regularly prompt incarcerated people to remove any window coverings. Continuing to remind incarcerated people to remove any items obstructing visibility is good correctional practice. Regular verbal reminders and clear expectations can help reduce the need for staff intervention and reinforce a safer environment for both the population and staff.

**Capitalize on Existing Opportunities**
One strategy for safely removing window and cell front coverings that partially obscure visibility into the cell without the need for force and cell extraction is to use time when patients are out of their cells for appointments to complete searches and remove coverings. For example, when a patient leaves their cell, custody staff can use those opportunities to improve cell safety. Policy permits staff to inspect property and the cell when the incarcerated person is not present. See Title 15, Section 3287(3).

As a reminder, this strategy is only useful for partial visual barriers, where positive contact can still be established and line-of-sight into the cell is not fully obstructed. If staff's visibility into the cell is completely obscured such that staff cannot confirm a living breathing person, follow relevant policy regarding the use of emergency cell entry and/or controlled use of force, if necessary.

**Commit to Ongoing Effort**
We understand that removing window coverings once will not solve this problem forever. Build multiple strategies along with reiterating clear expectations for removing window coverings into your daily practice. Staff may apply progressive discipline or behavior modification strategies such as tablet suspension when an incarcerated person fails to respond to verbal reminders and is endangering themselves and staff with window coverings.

This work saves lives.

# Appendix C

# Executive Summary

Folsom State Prison (FSP) is a Level II/III institution located in Represa, California. It operates a general population A Yard (Buildings 1, 2, 3, and 5), a Minimum Support Facility (MSF), and a single Restricted Housing Unit (RHU). FSP provides mental health treatment to Correctional Clinical Case Management System (CCCMS) patients across the general population and the RHU. The institution does not operate an Enhanced Outpatient (EOP), Mental Health Crisis Bed (MHCB), or Psychiatric Inpatient Program (PIP); patients requiring these levels of care are transferred to other institutions. During the reporting period (August 2025–January 2026), FSP reportedly processed a higher than expected volume of new arrivals through MSF.

FSP's staffing fill-rate is a foundational strength. All mental health positions are filled with no functional vacancies. All supervisory positions (Chief Psychiatrist, Senior Psychologist Supervisor, and Supervising Psychiatric Social Worker) are staffed. Staff interviews reflected positive engagement, with clinicians citing creative freedom to design treatment programming, responsive leadership, and strong custody-mental health collaboration. Custody and mental health partnership functions are operating: annual Custody Mental Health Partnership Program (CMHPP) training was completed by 99–100% of custody and healthcare staff, weekly supervisory huddles and monthly joint supervisory tours were compliant throughout the reporting period, and all custody staff interviewed could identify Non-Disciplinary Restricted Housing (NDRH) patients and demonstrate knowledge of the mental health referral process.

Medication administration is strong. Overall medication timeliness averaged 94%, with psychiatry-prescribed medications at 97%. No controlled use-of-force incidents were required for involuntary medication. Antipsychotic diagnostic monitoring averaged 91%. MHCB transfers were completed within 24 hours in 100% of cases across all six months. No heat-related illness incidents occurred among Mental Health Services Delivery System (MHSDS) patients on heat alert medications. Psychiatric technician rounds in the RHU met all audit criteria. Patient surveys on A Yard showed universal satisfaction with access to care, treatment planning, and clinician quality.

The deficits documented in this report fall into three categories, each requiring a different remedy.

FSP operates with 2.5 staff psychiatrists on a 2.0 allocation. The FSP leadership team has noted challenges with coverage given the small number of staff and distance of the MSF to the main facility. MSF treatment space is also structurally constrained, with four providers sharing two offices and a pending modular request that has not been approved.

Clinical-quality deficits account for the treatment planning and suicide prevention findings. The Interdisciplinary Treatment Team (IDTT) interactive process standard was met in 31%† of observed IDTTs. Measurable treatment goals were discussed in 1 of 13 IDTTs. Treatment outcomes appeared predetermined in 8 of 13 observed IDTTs. HLOC documentation for patients flagged by the 7388B form was present only 23%† of the time. None of the four patients discharged from MHCB with a Danger to Self referral had the required safety plan in their SRE. Clinical follow-ups and safety plan timeliness both averaged 50%†. These deficits do not require additional resources to fix. They require supervisory oversight, training, and accountability for clinical practice standards.

Operational and configuration issues account for two findings with straightforward solutions. Twelve of 13 non-RHU individual treatment rooms have patient seating that blocks the clinician's exit path, producing a 7%† score on the individual treatment space indicator. This is a furniture arrangement problem remediable without capital investment. ICC clinician participation scored 20%† not because clinicians were absent (they were present at all five ICCs) but because they provided substantive clinical information in only one of five cases. This is a preparation and role-comprehension deficit addressable through training.

## Priority Recommendations

1. **Address Suicide Prevention Clinical Process Deficits**: Of four patients discharged from MHCB with a Danger to Self referral during the audit period, none had the required safety plan in their SRE. Clinical follow-ups averaged 50%† (January at 0%†). Safety plans were signed within required timeframes 50%† of the time (January at 0%†). Two of four MHCB discharges did not receive required post-discharge suicide risk evaluations. SRE mentoring and biennial training averaged 78%, with a December drop to 24%. The eight randomly selected MSF patients who attended the patient survey reported hesitation to disclose crisis symptoms due to fear of being taken out of the program, placed on suicide watch and being placed in a suicide smock.

   Create a procedure to identify and track all patients discharged from MHCB, with due dates for required safety plans, 5-day follow-ups, and 30- and 90-day suicide risk evaluations. Assign responsibility for monitoring completion and reporting missed deadlines. Determine why January produced 0%† on both clinical follow-ups and safety plan timeliness and implement a work plan targeting the identified cause. Investigate MSF patient-reported barriers to crisis disclosure and, if institutional practices create disincentives, develop modifications that reduce barriers while maintaining clinical safety. Track all suicide prevention clinical process indicators monthly and report to the SPRFIT subcommittee until sustained compliance is achieved.

2. **Conduct a Psychiatric Scheduling and Capacity Assessment**: Timely MHMD contacts averaged 57% and declined from 78% to 43% over six months. IDTT timeliness averaged 81% (declining from 95% to 68%), driven in part by psychiatry availability. Primary clinician contact timeliness averaged 82% (declining from 85% to 69% in January).

   Initiate a focused review of MHMD scheduling practices, documenting cancellation and no-show patterns, the volume and impact of MSF intake evaluations on routine contact capacity, and the operational effect of staffing at 2.5 psychiatrists. Identify specific workflow changes that can increase completed contacts within existing capacity. If the assessment confirms the deficit cannot be resolved within current allocation, document the finding and coordinate with the regional mental health administrator and regional chief psychiatrist to pursue alternative solutions. Track MHMD, IDTT, and PC contact completion rates monthly and report to the Mental Health Program subcommittee.

3. **Implement a Structured IDTT Quality Improvement Initiative**: The IDTT interactive process standard was met in 31%† of observed IDTTs. Measurable treatment goals were discussed in 1 of 13 IDTTs. Treatment outcomes appeared predetermined in 8 of 13 cases. Case formulation was inadequate in the majority of observed IDTTs. HLOC documentation for patients flagged by 7388B screening was present 23%† of the time. IDTT Required Staffing averaged 55%, though the trajectory improved from 25% to 70%. The program supervisor was absent from all five RHU IDTTs. MSF patient surveys corroborated the quality concern: only 2 of 8 knew their treatment plan and 3 of 8 agreed with it.

   Begin supervisory observation of IDTTs using CQIT criteria, with direct feedback to the treatment team after each observation. Provide training on case formulation and treatment goal development for all clinical staff, with emphasis on linking treatment goals to diagnosis and functional impairments. Ensure the program supervisor attends or assigns a designee to attend RHU IDTTs. Connect HLOC documentation improvement to this initiative. Track the interactive process indicator through internal supervisory audits.

4. **Reconfigure Individual Treatment Room Layouts**: One of 15 individual treatment spaces met all audit criteria (7%†). The deficit is driven by a single remediable issue: in 12 of 13 non-RHU rooms, the patient is seated between the clinician and the doorway, obstructing the egress path. Two RHU treatment rooms met the safety criterion but were described by staff as lacking sufficient ventilation, citing it is often too cold in the winter and hot and stuffy in summer months. This is the highest-impact, lowest-

cost improvement available: rearranging furniture in rooms where the layout permits would substantially improve the score without capital investment.

Assess all individual treatment rooms where patient seating currently obstructs the clinician's exit path and reconfigure those rooms where the layout permits. Evaluate and address the ventilation deficiency in RHU treatment offices. Track the number of rooms meeting all audit criteria.

5. **Retrain Clinical Staff on ICC Participation and RVR-MHA Recommendation Formulation**: Mental health clinicians were present at all five observed ICCs but provided relevant clinical information in only one (20%†). Clinicians defaulted to stating the patient's level of care or asking generic screening questions rather than presenting the substantive clinical information required by the Program Guide.

   Distribute the Program Guide requirements for clinician participation at ICC hearings to all staff who attend RHU ICCs. Initiate supervisory observation of ICC clinician presentations. Retrain all staff responsible for RVR assessments on mitigation recommendation formulation using statewide standard materials, with emphasis on recommendations that reference penalties within the hearing officer's authority. Conduct supervisory review of sample RVR-MHAs to verify recommendation language is actionable.

# Executive Summary

This report presents the findings of the Comprehensive Quality Improvement Team audit of the Central California Women's Facility (CCWF) for the period September 2025 through February 2026, with an onsite review conducted April 6–9, 2026. The audit evaluated twelve substantive domains of mental health service delivery. CCWF has successfully built the operational infrastructure that forms the base for providing mental health care (training completion, direct-care staffing, crisis transfers, structural compliance in restricted housing). The institution shows deficits, however, in clinical quality, and in the institution's capacity to resolve findings identified in prior audit cycles

**Documentation completeness masks clinical content deficits**: The institution completes clinical documentation using the required templates across psychiatric, psychological, and interdisciplinary domains. However, the clinical content within those templates is deficient. Higher level of care documentation quality was insufficient in 89% of the cases reviewed by headquarters staff. Crisis care, Rules Violation Report (RVR) mental health assessments, and interdisciplinary documentation each met form-completion requirements while the clinical substance fell below audit standards. This is a pattern across disciplines, not a handful of program-specific gaps. This pattern coexists with long-standing vacancies in the supervisory positions most responsible for clinical documentation oversight. Training completion for these activities reached near-universal rates, indicating that the gap between process completion and clinical content is not attributable to untrained staff.

**Efficient crisis operations do not ensure safe transitions**: The Mental Health Crisis Bed (MHCB) processes patients through crisis care at rates that reflect functioning operational infrastructure: daily clinical contacts, transfers, and clinical stay management all exceeded compliance thresholds during the review period. Nonetheless, key aspects of clinical quality of care in crisis services are deficient. Safety plan adequacy at the rescission point (the transition from crisis-level to lower-level care) was very low (3%). MHCB admission and observation orders, discharge summaries, and post-discharge follow-up each fell below compliance standards. Patients remained on suicide precaution at discharge, without clinical justification, a practice previously observed in October 2021 and documented in October 2022.[1] Additionally, patients were held in temporary holding cells beyond the permitted maximum time period, a condition previously observed in July 2025 and documented in December 2025.

**Adequate staffing has not produced timely clinical contacts**: Non-supervisory clinical positions are filled at rates that are near the staffing allocations. However, timeliness of clinical contacts consistently fails to meet compliance thresholds. Psychiatrist (MHMD) contacts, Interdisciplinary Treatment Team (IDTT) timeliness, and primary clinician contacts each fell below threshold during multiple months of the review period, with MHMD and IDTT timeliness failing to meet the compliance threshold in any month. The timeliness failings also impact medication safety: timely response to critical medication non-adherence notifications averaged 13%, and pregnancy monitoring for medications fell below threshold across all three monitored medication classes.

**Sustained operational strengths coexist with unresolved recurring deficits**: CCWF has not experienced an incarcerated person death by suicide in more than 8 years. During the review period, no heat-related illness incidents occurred among patients prescribed heat-alert medications. No clinical seclusion or restraint events occurred. Restricted housing structural indicators achieved full compliance across daily rounds, electronic health record availability, and access provisions. Executive leadership rounding achieved full participation. Enhanced Outpatient (EOP) structured treatment hours exceeded Program Guide minimums, supported by recreation therapy fill rates exceeding allocated positions. Emergent and urgent mental health referrals with completed suicide risk evaluations are at above-threshold rates. These many areas of consistent compliance

[1] The CCWF MHCB was closed for renovations from November 2021 through October 2023. A corrective action plan was assigned to the institution following a headquarters SPRFIT Coordinator site visit in February 2024.

indicate that patient safety, crisis logistics, restricted housing infrastructure, and treatment programming are functioning at or above the level the Program Guide requires.

At the same time, several findings in the current audit were first documented in prior cycles and have not been resolved. Suicide precaution practices, confidential assessment access, temporary holding cell violations, and custody follow-up form deficits each persist from prior audits. The coexistence of sustained strengths with unresolved recurring findings indicates an institution that maintains its areas of performance but struggles to close its areas of deficit.

Four Priority Recommendations follow, addressing the cross-cutting themes developed above: supervisory oversight and documentation quality, MHCB clinical quality at crisis transition points, clinical contact timeliness, and the corrective action process for persistent findings.

## Priority Recommendations

1. **Restore supervisory oversight capacity**: Documentation quality deficits across multiple areas (psychiatry, psychology, interdisciplinary documentation, and sentinel event assessments) result from a shared upstream condition: limited supervisory infrastructure responsible for clinical documentation review. The Chief Psychiatrist position has been vacant since January 2023. Senior Psychologist fill rates stand at 57% and 67%. These vacancies and absences impact compliance in Staffing, Quality of Care, Suicide Prevention, and Sentinel Events. Filling the supervisory gap could advance compliance in multiple areas simultaneously.

   Work collaboratively with the Office of the Coleman Receiver and CCHCS HR to fill these supervisory positions as quickly as possible. Filling these positions will restore supervisory infrastructure sufficient to sustain clinical documentation review across clinical domains to support supervisory oversight, mentorship, and technical assistance sufficient to identify and correct the identified clinical deficits.

2. **Establish MHCB clinical quality**: The MHCB operates at compliance threshold rates for daily clinical contacts, transfer timeliness, and clinical stay management. The clinical quality within those operations is deficient at the points where patients are most at risk. Safety plan adequacy at the crisis rescission point was extremely low (1 of 30 met audit criteria). MHCB admission and observation orders were adequately justified in 20% of reviewed cases. Post-discharge clinical follow-up averaged 43%. The constellation of clinical quality deficits within the crisis care unit, concentrated at patient transition points, raises patient safety concerns.

   Improve clinical practices and documentation and timely post-discharge follow-up for patients admitted to and discharged from the MHCB, with particular attention to safety plan adequacy at crisis transitions and individualized order justification.

3. **Achieve contact timeliness thresholds**: Clinical contact timeliness fell below threshold across multiple contact types during the review period despite non-supervisory clinical fill rates above 85%. MHMD contacts averaged 67%, IDTT timeliness averaged 72%, and critical medication non-adherence response averaged 13%. The persistence of below-threshold timeliness alongside adequate direct-care staffing indicates that the constraint is operational rather than workforce-driven, and that resolution requires coordinated action across scheduling, oversight, and clinical delivery functions.

   Achieve compliance-threshold timeliness for each clinical contact type (including critical medication non-adherence response and post-crisis clinical follow-up) to close gaps between staffing capacity and contact delivery rates.

4. **Implement durable solutions to cross-cycle findings**: Four findings documented in the current audit period were first identified in prior cycles: suicide precaution maintained at MHCB discharge without documented clinical justification (first identified October 2021), denial of confidential assessments in alternative housing (first identified July 2025), temporary holding cell violations beyond the permitted

maximum (first identified July 2025), and custody follow-up form completion at 72% and 68% (first identified May 2023). The persistence across audit cycles indicates that institutional corrective action has not produced a durable resolution, warranting a Priority Recommendation targeting the corrective action process itself rather than the individual clinical findings.

Implement durable resolution and verified closure of findings that have persisted across two or more audit cycles, with specific measurable benchmarks and a timeline for interim review consistent with the remedial action plan requirement, to demonstrate measurable progress toward resolution within the remedial timeline.

# Executive Summary

Sierra Conservation Center (SCC) is a Level I - III institution located in Jamestown. It operates four Level I dorms, three level II dorms, a level III 270 design facility, a general population (GP) Restricted Housing Unit (RHU), and serves as a training facility for incarcerated person training in wildland firefighting techniques for the entire state of California. Sierra Conservation Center jointly operates 26 wildland firefighting camps with Cal Fire and Los Angeles County Fire Department. The facility team provides treatment to approximately 237 MHSDS patients across a Non-Designated Mainline and a General Population Mainline facility and a designated Restrictive Housing Unit (RHU) GP with 12 CCCMS patients as of April 21, 2026. SCC does not operate designated RHU CCCMS, RHU EOP, GP EOP, or MHCB programs; patients requiring these levels of care must be transferred to other institutions.

SCC has a limited mental health mission and has demonstrated many strengths in provision of services to its mental health patients. Institutional strengths are concentrated in mental health staffing, training, custody operations, nursing processes, and mental health access to care. The mental health fill rate was 100% at the time of the audit. Compliance with training for CPR (Cardiopulmonary Resuscitation) and Use of Force in 2025 for custody, mental health, and all other healthcare staff was strong. Annual suicide prevention training completion was 99% for custody, 93% for mental health, and 100% for all other healthcare staff.

CPR mouth shields were carried by all officers observed. Cut-down kits were complete and standardized across all housing units except for one unit in one month. Custody staff demonstrated awareness of mental health referral procedures across all yards, and 128-MH5 referral forms were available in all housing units. Timely Transfer to MHCB was 100% throughout the reporting period (N = 49). Custody and Mental Health Partnership Plan (CMHPP) executive leadership rounding was completed at 100% and supervisory program tours met all requirements.

Nursing reception and receiving (R&R) intakes were completed confidentially and thoroughly, as were Restricted Housing Unit (RHU) pre and post screenings. Psychiatric technician rounds occurred with real-time documentation and patient engagement.

Mental health treatment access data reflect that timelines for access to care were met at or above 90% throughout the reporting period for mental health consults (referrals), psychiatry contacts, and Interdisciplinary Treatment Team (IDTT) meetings. Timelines for primary clinician contacts decreased briefly to 85% in October but otherwise met timelines at or above 90% of the time. SCC mental health treatment space was also sufficient, with staff having individual offices for confidential contacts and a group treatment room that is sufficient in size and is confidential.

The deficiencies documented in this report, such as custody documentation of heat plan activation and provision of alternative activities during heat plan activation, are operational factors within institutional control and can be addressed with local institutional custody leadership. The clinical-quality deficits including Institution Classification Committee (ICC) input, quality of safety plans, timeliness of Suicide Risk Evaluations (SRE), and Interdisciplinary Treatment Team (IDTT) meeting content, are supervision and training problems that the facility can resolve.

The priority recommendations below are organized by urgency and target the areas where patient safety, treatment adequacy, or both are at stake.

## Priority Recommendations

1. **Elevate clinical substance of encounters.** Across the audit period, treatment encounters at SCC met structural compliance benchmarks (IDTT attendance, staffing, and clinical contact timeliness all exceeded thresholds) while the clinical content within those encounters was deficient. Only 17% of observed interdisciplinary treatment team meetings demonstrated interactive process, safety plans contained stock phrasing, and clinicians attended classification committees but provided no relevant clinical information. This pattern spans Quality of Care, Suicide Prevention, and Restricted Housing, with equally strong alignment across all three sections, indicating a systemic gap between procedural infrastructure and clinical practice that no single section-level recommendation addresses.

   Improve clinical substance across treatment encounters (including interdisciplinary treatment team meetings, suicide risk evaluation safety plans, and institutional classification committee participation) to produce documented clinical content that meets programmatic standards and improves the experience of patients receiving care.

2. **Expedite restricted housing transfers**: Transfers of patients with mental health needs to and from restricted housing units did not meet Program Guide timelines during the audit period. Timely CCCMS transfers averaged 42% across 24 patients, and the single EOP transfer exceeded the required timeline. Transfer delays extend the period during which patients in restrictive settings lack timely placement in appropriate care levels. This finding impacts both Restricted Housing and Access to Care sections, and the contributing structural barriers (including custody investigation timelines and bed availability) are partially beyond the institution's direct control.

   Reduce the elapsed time for transfers of patients with mental health needs to and from restricted housing units, addressing the barriers identified during the audit period to achieve timely placement in appropriate care levels.

   <u>Structural Issue</u>: If local efforts are maximized and SCC still fails to meet Program Guide transfer timelines (which preliminary data suggests may occur due to statewide data), SCC leadership should describe all their efforts to the Receiver, and the Receiver will evaluate options including capital investment, population adjustment, program redesign, or other remedies that are outside institutional control.

# Executive Summary

California Institution for Women (CIW) is a multi-mission institution serving female patients across the Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), Acute, and Intermediate Care Facility (ICF) levels of care, with approximately 63% of the incarcerated population enrolled in mental health programming. Services are delivered across a general population program, a restricted housing unit, and a Psychiatric Inpatient Program.

| Facility | Function | Mental Health Program |
|---|---|---|
| Facility A Yard | General Population housing; Restricted Housing Units; unlicensed MHCB | ML CCCMS, ML EOP, RHU CCCMS, RHU EOP, MHCB |
| Central Services Building (CTC/MHCB) | Correctional Treatment Center; Mental Health Crisis Bed | MHCB |
| Central Services Building (PIP) | Psychiatric Inpatient Program | Acute, ICF |

CIW's defining characteristic is a well-resourced program that is not yet consistently converting that capacity into timely and high-quality care. The institution's strengths are real and worth preserving. Non-supervisory clinical staffing is at or above 95% of allocation, psychiatry is at 79% with additional hires in process that will bring it to 100%, and the program operates entirely with onsite personnel without reliance on daytime telemental health. Training compliance exceeds 91% across every required curriculum, including the Custody and Mental Health Partnership Plan, use of force, annual suicide prevention, CPR, suicide risk evaluation, safety planning, and the Suicide Risk Management Program. CIW sustains strong training and educational partnerships for employees, serving as a clinical training site for practicum students, interns, and medical students, and it incorporates mental health considerations thoughtfully into its Rules Violation Report process to balance patient accountability with clinical need.

The deficiencies identified in this report are not driven by staffing of non-psychiatry positions. They are procedural, cultural, and supervisory, and they cluster in the gap between the institution's capacity and its actual performance. Despite clinician staffing above 95%, timely primary clinician contacts averaged 82%, timely Interdisciplinary Treatment Teams (IDTTs) averaged 82%, and timely mental health referrals averaged 81%, with none meeting the required threshold during the review period. Patients in the Psychiatric Inpatient Program did not receive a minimum of 20 hours of treatment weekly, including at least 10 hours of core treatment. IDTT required staffing averaged 56% with no improvement trend, and observed IDTTs demonstrated an interactive clinical process only 43% of the time. Several Custody and Mental Health Partnership Plan (CMHPP) functions deviated from required documentation and attendance. Inpatient restraint practices showed deficits in face-to-face assessment, order-to-implementation timing, checklist use, and documentation across 121 incidents in six months. This volume is significantly higher than that observed at other institutions. Safety plans were signed within required timeframes 51% of the time, and the institution's Suicide Prevention and Response Focus Improvement Team (SPRFIT) governance did not meet audit criteria. The CCCMS restricted housing unit lacks confidential treatment space and one of the group treatment spaces in the EOP RHU is also not confidential.

These areas of concern relate to key themes: suicide prevention infrastructure, inpatient safety, clinical timeliness and treatment adequacy, treatment-team function, CMHPP procedural adherence, and the treatment environment in restricted housing. The Priority Recommendations below address each theme. Most fall squarely within CIW's authority to resolve through supervision, scheduling, and accountability. Because the institution is well-staffed, the principal task is to direct existing capacity at the points where it is not currently reaching patients. Where a recommendation depends on physical plant improvements (e.g., confidential

treatment space in the restricted housing unit) the report identifies the near-term institutional action and flags the capital component as a structural matter for the Receiver to review.

## Priority Recommendations

1. **Strengthen Suicide Prevention Infrastructure – Safety Plan Timeliness, SPRFIT Governance, Clinical Justification of Inpatient Orders, and Discharge Continuity**: The suicide prevention continuum at CIW shows deficits at several clinical junctions. Safety plans were signed within required timeframes an average of 51% of the time (range 38%–67%), and supervisory reviews of MHCB/PIP discharge safety plans averaged 66%. The institution's SPRFIT meetings and minutes did not satisfy all audit criteria in any month, indicating that the governance body responsible for overseeing the prevention program is not functioning as designed. Review of inpatient orders for issue and observation revealed significant challenges in clinical justification. Onsite observation found no discussion of patients at high risk for suicide during the second-watch morning meeting, and the Specialized Bed Complete Care Model (SBCCM) huddle was improperly integrated into that meeting rather than conducted separately as CMHPP policy requires in the outpatient setting. These deficits are notable because CIW's underlying clinical capacity in this domain is strong: SRE mentoring training is at 100%, urgent and emergent referrals were completed timely, and SREs were completed when clinically indicated. The gap is therefore one of timeliness, oversight, and process discipline rather than clinical competence.

   Establish a reliable tracking mechanism for all safety plans, discharge follow-ups, and post-discharge suicide risk evaluations, with assigned responsibility for monitoring completion and escalating missed deadlines. Improve clinical justification of issue and observation orders in inpatient settings. Reconstitute SPRFIT so that meetings and minutes meet all audit criteria, conduct the SBCCM huddle separately from the morning meeting, and ensure high-risk patients are discussed at the second-watch meeting.

2. **Conduct a Focused Quality Review of Inpatient Restraint Use**: Restraint practices in the inpatient setting showed gaps across the full sequence of the intervention: inconsistent face-to-face assessments, delays between the order for restraint and its implementation, absent checklist use, and incomplete documentation. There were 121 restraint incidents over the six-month review period, and more than 60% involved only two patients. That concentration is a central clinical signal: a small number of patients accounting for the majority of restraint events indicates that their individual treatment and behavioral plans, not restraint procedure alone, require review.

   Initiate a focused quality review of restraint use that pairs a procedural component with a clinical one. On the procedural side, require checklist use for every restraint episode, monitor the clinical appropriateness of the interval between the restraint order and patient placement, and audit restraint logs weekly. On the clinical side, conduct an interdisciplinary review of the two patients driving the majority of incidents to develop individualized behavioral and treatment plans aimed at reducing restraint reliance and review the remaining uses of restraints to identify any patterns in use, where alternative approaches should be considered.

3. **Ensure Timely Clinical Contacts and Adequate Treatment Delivery**: The most consequential finding in this report is that no patients in the Psychiatric Inpatient Program consistently received the required minimum of 20 weekly structured treatment hours, including the required 10 hours of core treatment, during the review period; in the non-PIP setting, 63% of patients were offered treatment minimums. The average number of hours of treatment offered to PIP patients was 10.21. Timeliness of routine clinical contact was likewise below the compliance threshold across the board: timely primary clinician contacts averaged 82%, timely IDTTs averaged 82%, and timely mental health referrals averaged 81%, with clinical contact for patients returning from temporary departures at 74%. Because primary clinician, psychologist, and clinical social worker staffing each exceeded 95% throughout the period,

these deficits cannot be attributed to clinical resources; they reflect how existing capacity is scheduled and deployed. Operational interference compounds the problem: appointments cancelled due to custody factors averaged 25% and reached 44% in January 2026.

Conduct a structured assessment of staffing distribution and scheduling practices across all programs, with particular urgency on the PIP treatment-hour deficit, and adjust schedules and workflows so that existing clinical capacity reaches patients within Program Guide timeframes. Coordinate with custody leadership to reduce custody-driven cancellations.

4. **Implement a Structured IDTT Quality Improvement Initiative**: IDTT required staffing averaged 56% over six months with no improvement trend and observed IDTTs demonstrated an interactive clinical process in only 43% of presentations. A specific scheduling defect contributes directly: two programs share an assigned psychiatrist and their IDTTs are scheduled concurrently, which prevents timely starts and consistent psychiatric representation. The most frequent qualitative deficiencies (incomplete case formulation, treatment goals that are not measurable, no level-of-care discussion, and no discussion of Rules Violation Report mental health assessments) are clinical-practice and supervision concerns rather than staffing shortfalls. This recommendation addresses IDTT clinical quality and is distinct from the timeliness deficits addressed in Recommendation 3.

   Assess local barriers to improving IDTT quality, conduct regular supervisory observation of IDTTs, and provide direct feedback to treatment teams. Work with the Receiver's team to implement and distribute improvement tools aimed at IDTT quality improvement (currently being developed by the Receiver's team). Resolve the concurrent-scheduling conflict so that the shared psychiatrist can attend both teams and IDTTs begin on time with full representation.

5. **Adhere to Established CMHPP Policies and Procedures**: Several Custody and Mental Health Partnership Plan functions (including daily huddles, round table sessions, and executive joint rounding) have not consistently followed established policy, used the designated documentation, or sustained required attendance from both mental health and custody staff. CIW has also substituted Patient Advisory Council meetings for the Inmate Advisory Council meetings the CMHPP requires. These are process-fidelity gaps in a partnership structure that is otherwise well-supported by the institution's strong training compliance.

   Bring all CMHPP functions into conformity with policy by requiring the designated documentation forms, mandating attendance at required meetings, clearly defining participant roles in daily huddles and trainings, and restoring the required Inmate Advisory Council meetings.

6. **Establish Confidential Treatment Space in Restricted Housing**: The CCCMS restricted housing program has no confidential treatment space; patients who decline to be seen on the dayroom floor are offered the yard as the only alternative, and the group space, though partitioned, is not confidential to sight or sound. The RHU EOP program has one non-confidential treatment space. The institution's overall rate of group treatment in a confidential setting, 88%, is depressed specifically by these restricted housing deficits, and patients in the CCCMS RHU report dissatisfaction with treatment opportunities in part for this reason. This recommendation has both an institutional and a structural component.

   As a near-term institutional action within CIW's control, identify and convert space, inside or outside the housing unit, where individual contacts and structured group treatment can be conducted confidentially, applying sound-masking and visual barriers where safety protocols and the existing footprint allows. Where confidential space cannot be achieved within the existing footprint, the institution should engage with the Receiver's Office and the Receiver will evaluate options.

# Executive Summary

This report presents findings from the Continuous Quality Improvement Team audit of Pleasant Valley State Prison assessing data from September 2025 through February 2026, with onsite observation April 20–24, 2026. The audit evaluated mental health service delivery across access to care, treatment planning, medication management, suicide prevention, custody partnership, restricted housing, staffing, and institutional oversight. PVSP's performance during this period is defined by central themes: custody partnership operations, access to primary mental health care services both function at consistently high levels while clinical treatment planning, pharmacological monitoring, and suicide prevention processes exhibit deficits that constrain the quality of mental health care delivered to the patient population.

**Treatment planning operates without substantive clinical engagement**. The Interdisciplinary Treatment Team process (the primary mechanism for individualized treatment planning) exhibits deficits across every measured dimension at PVSP. Onsite observation found interactive clinical discussion occurring in 7% of observed IDTTs, with patient attendance at 25% and required staffing at 57% across the audit period. Qualitative observation confirmed that IDTTs at all three levels of care failed to consistently include the case formulation, measurable goal setting, and collaborative decision-making which constitute the core function of the treatment team. Patients across all levels of care lack awareness of the focus of their treatment plans. The pattern is not a documentation gap or a scheduling problem; it reflects a treatment planning mechanism that operates as an administrative process rather than a clinical one.

**Medications requiring therapeutic monitoring were identified with lower than recommended completion rates.** Laboratory monitoring for medications fell below required thresholds during the audit period, with rates ranging from 42% to 73% across lithium, valproic acid, antipsychotic, and antidepressant monitoring components. Lithium and valproic acid carry pharmacological profiles where subtherapeutic levels may compromise treatment efficacy, and supratherapeutic levels may produce toxicity that carries risk. Concurrent deficits in clinician response times to medication non-adherence notifications and incomplete electronic health record documentation compound the monitoring gaps, producing a medication management system in which the clinical infrastructure for detecting and responding to pharmacological risk does not function at required levels.

**Custody partnership with mental health establishes a strong operational foundation for an effective mental health program**. The custody–mental health partnership at PVSP constitutes the institution's strongest performance domain. Custody staff training, mental health referral processes, use-of-force training, environmental safety monitoring, executive leadership engagement, and restricted housing documentation collectively produced twelve findings at or above the compliance threshold, with nine at 100%. Custody-driven appointment cancellations accounted for only 1% of scheduled mental health appointments, confirming that custody operations do not constitute a material barrier to clinical access. The breadth and consistency of this compliance pattern reflect an operational culture in which custody staff are trained, equipped, and actively performing the functions required of the partnership.

**Suicide prevention infrastructure requires strengthening across multiple components**. The suicide prevention framework at PVSP exhibits deficits in safety planning and discharge continuity. Safety plan quality remains critically deficient, with an ongoing corrective action plan in place since August 2024 without documented improvement. MHCB discharge continuity metrics and SPRFIT meeting governance were also noncompliant during the period measured.

The deficiencies in this report fall into three categories, and the path to resolving each one differs. A few barriers are structural and exceed what PVSP can fix alone, including the statewide shortage of designated RHU EOP beds and a physical plant that was not built for the volume and modality of mental health services the Program Guide requires. The institution should maximize compliance within its current constraints and escalate issues to the Receiver when necessary, remedial steps require action by the Receiver. The operational barriers, such as

inaccurate recording of group treatment hours and inconsistent supervisory presence at huddles, can be fixed locally through protocol revision and custody-clinical coordination. The clinical-quality deficits, including IDTT process, laboratory monitoring follow-through, and safety plan individualization, reflect shortcomings in supervision, training, and accountability rather than resource limitations. The three Priority Recommendations below target the clinical-quality themes where treatment adequacy, patient safety, or both are at stake.

The sections that follow present the detailed findings, data tables, strengths, concerns, and recommendations for each program area. The Institutional Operational Perspective provides the factual profile of the institution's mission, population, and physical plant.

## Priority Recommendations

1. **The Interdisciplinary Treatment Team (IDTT) treatment planning function**: The IDTT process at PVSP does not function as a collaborative clinical planning mechanism. Patient attendance averaged 25% and assigned provider attendance averaged 57% while onsite observation documented an interactive clinical process in only 7% of observed IDTTs. Qualitative review across three levels of care identified deficits in case formulation, measurable goal setting, level-of-care justification, and patient engagement. Patients across all levels of care lacked awareness of their treatment plan goals.

   Develop IDTT processes that produce individualized, evidence-based treatment plans through collaborative clinical team discussion with documented patient participation, addressing deficits in attendance, staffing, interactive process, and clinical content quality.

2. **Medication monitoring completion rates**: Laboratory monitoring rates for medications ranged from 42% to 73% during the audit period. Completion rates for valproic acid monitoring were 44% for therapeutic levels and 42% for CBC and CMP laboratory studies. Completion rates for lithium monitoring were 56% for therapeutic levels, 50% for CMP, and 73% for thyroid monitoring. Completion rates for antipsychotic thyroid monitoring were 52%, and antidepressant thyroid monitoring were 62%. Concurrent delays in responses to medication non-adherence and incomplete electronic health record documentation compound these monitoring deficits. Together, these issues affect medication safety, clinical documentation, and patient safety.

   Review and revise the workflow for responding to medication non-adherence notifications to ensure timely clinical follow-up and appropriate documentation. Clarify workflows for identifying patients who require medication monitoring laboratory studies and for ordering and completing those studies. Ensure staff are aware of available resources for tracking monitoring requirements. Prioritize the lowest-performing components first (valproic acid at 42 to 44% and lithium CMP at 50%) and track each component monthly through the Mental Health Program Subcommittee until performance holds above the compliance threshold.

3. **Suicide prevention infrastructure**: The suicide prevention framework exhibits deficits across prevention, intervention, oversight, and continuity of care. Safety plan quality was deemed adequate in 1 of 11 cases reviewed; safety plans were timely signed 78% of the time. MHCB discharge continuity metrics averaged 50%, and SPRFIT meeting governance achieved 0% compliance during the onsite audit. SRE mentoring training averaged 54% for the reporting period but improved to 97% by February 2026. An ongoing corrective action plan addressing safety plan quality has been in place since August 2024 without documented improvement. Problems related to training, safety planning, discharge monitoring, and overall governance of SPRFIT indicate that these processes require more effective administration and oversight.

Implement a comprehensive suicide prevention infrastructure that ensures compliance with safety planning and timeliness, clinician-to-clinician discharge handoffs, institutional oversight requirements, and required clinician training.

# Executive Summary

California State Prison, Solano (SOL) is a Level III, 270-degree design institution located in Solano County. It operates 18 housing units across two Level III Mainline facilities (A and B Yard), one Level II Mainline facility (D Yard), a GP Restricted Housing Unit (RHU), and a nine-bed Mental Health Crisis Bed (MHCB) unit. SOL provides treatment to approximately 430 ML CCCMS patients across three separate clinic locations of the institution. RHU patients are housed on Facility B, Unit 10. The MHCB is centrally located within the institution's Correctional Treatment Center (CTC). The institution does not operate an Enhanced Outpatient (EOP), nor Psychiatric Inpatient Program (PIP); patients requiring these levels of care are transferred to other institutions. SOL was not initially built to service an incarcerated mental health population and is one of few remaining General Population (GP) institutions. There have been recent shifts within its incarcerated demographics involving an increased Security Threat Group (STG) population and an increase in incarcerated people with points at a higher custody level with an override to allow them placement at Solano. Secondary events related to the change in demographics included increased violence on some yards, higher refusal rates of offered mental health treatment services, and increased substance abuse resulting in accidental overdoses and acute psychiatric incidents. These factors necessitated frequent mental health intervention and occasional modified programming. C Yard was deactivated within the first quarter of 2026, resulting in a population reduction of 23%. The institution's overall population decreased from approximately 3,817 residents to 2,960. The population of CCCMS patients also decreased from approximately 635 to 480 within the reporting period.

SOL's staffing fill-rate is a foundational strength. For most of the reporting period, SOL was at 100% or above staffing for all allocated mental health staff clinical positions, including psychiatrists, primary clinicians, and recreation therapists. The single supervisor vacancy reflected on reports was due to the current senior promoting into the chief position after the prior chief's retirement. That vacancy has since been filled, with a start date of June 1, 2026.

Institutional strengths are concentrated in custody operations, emergency preparedness, access to mental health care, mental health staffing, and the MHCB treatment planning and length of stays. Nearly all custody staff completed Use of Force training (99%), and all completed Suicide Prevention training (100%). CPR mouth shields were carried by all officers observed. Cut-down kits were complete and standardized across all housing units. Custody staff demonstrated awareness of mental health referral procedures across all yards, and 128-MH5 referral forms were available in all housing units. All transfers to MHCB, ICF, and Acute programs were completed on time throughout the reporting period.

Excellent teamwork between disciplines was described by staff members. Mental health staff expressed high job satisfaction. Clinical strengths were observed throughout the program. Various clinical groups are offered for the CCCMS population including insight-oriented psychotherapy for non-MHSDS individuals, support related to Board of Parole Hearing concerns, and psychotherapy groups. Patients knew their treatment plans and reported attending treatment regularly. IDTTs, particularly those in the MHCB, included an interactive process with engagement by all team members, clinical case discussion, and discussion of level of care.

The deficiencies documented in this report are driven by a combination of structural, operational, and clinical-quality factors. The structural barriers, including a lack of sufficient treatment space and the statewide RHU CCCMS bed shortage cannot be resolved through institutional corrective action alone, as this is a systemwide issue. The operational barriers (CMHPP rounding attendance and tracking) can be addressed with local institutional leadership and adequate resource allocation. The clinical-quality deficits, including safety plan individualization, are supervision and training problems that do not require additional resources to fix.

This three-part framework matters because the solution path differs for each. Systemwide problems require infrastructure, funding, or population adjustment. Local operational problems require protocol revision and custody-mental health coordination. Local clinical-quality problems require supervisory oversight, training, and

accountability. The five priority recommendations below are organized by urgency and target the areas where patient safety, treatment adequacy, or both are at stake.

## Priority Recommendations

1. **Provide Refresher Safety Planning Training and Initiate Monthly Supervisory Review**: Safety plan quality is a significant clinical deficit identified in this review. Of five discharge safety plans reviewed onsite, three were not individualized to the patient's specific risk factors and relied on stock phrasing, and the SPRFIT report (Appendix B) review found similar results for rescission cases. Safety plans were signed timely 59% of the time, and supervisory review of discharge safety plans was completed in approximately one-third of required cases. An HQ SPRFIT corrective action plan addressing safety plan quality has been open since July 2025. Safety plans at crisis transitions are the primary clinical instrument protecting patients moving from crisis-level to lower-level care.

   Provide refresher training on individualized safety planning to all clinical staff, with mandatory participation for clinicians routinely assigned to emergent referrals and MHCB discharges. Emphasize that safety plans must reflect the patient's specific risk factors, be developed collaboratively with the patient, and not consist of stock phrasing. Initiate monthly supervisory review of a random sample of ten safety plans for rescinded MHCB referrals and patients discharged from mental health inpatient beds who require safety plans, with individual mentoring for plans that do not meet standards.

2. **Improve Sound/Visual Confidentiality in Identified Treatment Spaces**: Onsite assessment found 60%† of group treatment spaces, 38%† of individual treatment spaces, and 20%† of IDTT spaces met all audit criteria. The deficits are concentrated in remediable confidentiality features: windows facing common corridors in ML CCCMS treatment and IDTT spaces, and RHU treatment modules located on the dayroom floor without sound or sight separation. Because SOL was not built for a mental health mission and has had no significant treatment-space construction since opening, near-term gains depend on remediating existing spaces.

   Identify all treatment spaces where confidentiality issues have been documented or reported and implement remedial measures such as placing sound muffling devices, frosting windows where consistent with safety requirements, and scheduling treatment to enable confidentiality in shared spaces. Continue to work with plant operations and the regional team to identify/request additional treatment space if local remedial efforts do not fully resolve the issue.

   **Reconfiguration of individual treatment spaces**: Most ML CCCMS individual treatment offices are configured with the patient seated between the clinician and the exit. This configuration may impede a clinician's ability to safely access the exit during an emergency or incident of workplace violence. Reconfigure individual treatment space so there is safe egress for treatment providers in the event of an emergency or workplace violence. Treatment providers should not be required to go by or around patients to exit an office as this can compromise their safety.

3. **Maintain Recent Improvements in CMHPP Compliance**: CMHPP compliance was a significant operational deficit of the review period: monthly executive leadership joint rounding occurred 38% of the time, no quarterly partnership round table trainings or IAC meetings were completed, and huddle documentation of required attendees was 49%. As of April 2026, SOL began conducting all required CMHPP elements and provided proof of practice; the remaining task is demonstrating that the correction is durable.

   To ensure durability, identify the specific barriers resulting in reporting period non-compliance with CMHPP monthly, quarterly, and IAC meetings. Implement monthly supervisor audits of the areas of CMHPP that were previously noncompliant to ensure recent improvements are maintained.

4. **Improve Mental Health Documentation Quality and Timelines for Uses of Force**: The single audited controlled use-of-force case did not meet mental health documentation requirements. During the review period, 47 of the 78 use-of-force incidents (60%) involved MHSDS patients, despite MHSDS patients representing only approximately 16% of the institution's population. The volume of MH-involved incidents makes complete and timely mental health assessment documentation a patient-safety priority.

   Review Controlled Use of Force audit data and establish a plan to address deficiencies in mental health documentation, including training and target completion dates.

# Executive Summary

North Kern State Prison is one of two male reception centers in CDCR. It houses about 2,600 people, roughly 1,500 of them in the reception center. About 650 people in the reception center and 600 people in the mainline yards are CCCMS patients. The institution also includes a general population restricted housing unit and a ten-bed Mental Health Crisis Bed unit. The Receiver's Compliance Team conducted a review onsite May 11 through 13, 2026, covering October 2025 through March 2026. While onsite, experts also completed a suicide prevention review. Mental health clinical positions were filled above 90% during the period (96% of primary clinicians and 90% of psychiatry), so the deficiencies in this report are not driven by a shortage of clinicians. Most of the identified issues result from systems, scheduling, supervision, and documentation problems.

NKSP is meeting its core reception-center mission, with mental health screening and initial assessments being completed timely. Custody and nursing functions were at or above standard in nearly every area reviewed, custodial leadership is strong and responsive, with good collaboration across disciplines; and executive leadership joint rounding was consistent. The Mental Health Crisis Bed program is a clear strength, with out-of-cell time, yard, showers, and phone access exceeding policy requirements, and that program is supported by two recreation therapists. Suicide prevention practice has improved since the last visit, including the quality of crisis-bed discharge safety plans.

The deficiencies that were identified cluster in a few areas. First, patients are not receiving the required amount of timely, confidential treatment. Timely access to care fell below threshold across the board despite adequate staffing: primary clinician contacts at 82%, psychiatry at 77%, mental health referrals at 65%, and IDTTs at 71%. Structured treatment hours met the minimum in only 53% of patient-weeks, driven by groups that do not start or end on time, frequent cancellations, and check-in practices that do not reflect the time patients spend in treatment. The institution has inadequate scheduling protocols to maximize the use of the treatment and office space it has. This leads to confidentiality and treatment access problems across all yards.

Second, IDTT quality is weak: patients attended 39% of their IDTT meetings, required staff attended 65%, and observed meetings showed an interactive process 52% of the time. Documentation failures compound this, with level-of-care decisions appropriately documented in 67% of flagged cases.

Third, medication safety practices are not working well. Psychiatrist response to medication non-adherence was not timely; doctors took timely action in response to 29% of critical and 41% of non-critical notifications. The institution has no Chief or Senior Psychiatrist to oversee that work, which may contribute to the failures.

Fourth, the suicide prevention process broke down at several of its highest-risk moments. Half the safety plans for rescinded crisis-bed referrals were clinically deficient. Neither crisis-team response observed onsite produced the required suicide risk evaluation. Patients were also held in temporary holding cells beyond the four-hour limit, one for more than eight hours.

There are also two deficiencies identified that may require statewide action to resolve, the shortage of designated RHU EOP beds and a physical plant that may not support current demand. However, NKSP must analyze its ability to transfer EOP patients who need RHU placement as well as the space available within the facility to determine the extent to which they can be remedied within existing resources and make every effort to resolve them. Where the evidence confirms a barrier the institution cannot resolve on its own, the Receiver will engage on the structural component.

The remaining operational and clinical quality deficits can be resolved locally. The priority recommendations below target the operational and clinical-quality themes, where treatment adequacy and patient safety are most directly at stake, and are sequenced so the institution attacks the root causes first. The additional recommendations in each section feed up to them.

## Priority Recommendations

1. **Treatment Space Accounting and Utilization.** NKSP has designated treatment and office space but lacks an adequate system for managing and scheduling its use. This results in treatment access and confidentiality deficiencies across the yards: we observed rooms that are not visually confidential, offices without enough furniture, nonfunctioning alarms, substandard cleanliness, and clinicians competing for rooms with custody. Adequate individual treatment space scored 64% and IDTT space 67%. Substantially improving the space and its use is possible within the existing footprint.

   Conduct a facility-wide treatment-space assessment documenting every individual, IDTT, and group space, the hours each are available for mental health programming, and the staff and times assigned to it. Build a scheduling system that assigns space by clinician and time. Remediate the confidentiality, furniture, alarm, and cleanliness deficiencies within the existing footprint, and escalate any true infrastructure gap to the Receiver.

2. **Scheduling and Timeliness of Clinical Contacts**. Timely access fell below threshold for primary clinician (82%), psychiatry (77%), referral (65%), and IDTT (71%) contacts while staffing was filled above 90%. That combination points to scheduling and workflow challenges, which is what makes this both a priority and something the institution can resolve.

   Schedule all timeframe-bound services ahead of their due dates and complete them as scheduled unless a supervisor approves the cancellation or a Modified Program Order justifies a stoppage. Review clinical caseloads and schedules to ensure necessary coverage. Establish regular supervisory review of treatment timeliness indicators so misses are caught and corrected in the month they occur.

3. **Suicide Prevention Clinical Process & Post-Crisis Continuity**. The suicide prevention process broke down at several of its highest-risk moments: half the safety plans for rescinded crisis-bed referrals were clinically deficient, four lacked adequate justification for the rescission, neither crisis-team response observed onsite produced the required suicide risk evaluation, and patients were held in temporary holding cells beyond the four-hour limit, one for over eight hours. These are points where a missed step may result in irreversible harm.

   Audit the safety plans and justifications for rescinded crisis-bed referrals, the completion of suicide risk evaluations for crisis-team responses, and the holding-cell logs weekly and report monthly to the Mental Health Program Subcommittee through the SPRFIT committee. Retrain relevant staff on the current suicide risk evaluation requirements. Continue audits and reporting until at least ninety days of sustained compliance are observed.

4. **IDTT Quality**. Patients attended 39% of their own treatment-team meetings, assigned psychiatrists and primary clinicians attended 65%, and observed meetings showed an interactive, collaborative process only 52% of the time, with case formulations and higher-level-of-care discussion frequently thin.

   Have supervisors observe IDTTs and use the CQIT criteria to give clinicians direct feedback, , with a focus on encouraging patient attendance and engagement, required-member presence, complete case formulation, and full analysis to support level-of-care decisions. Endeavor to ensure that assigned providers attend their patient's IDTTs.

5. **Clinical Documentation**. Check-in and check-out times did not reliably reflect the time patients spent in treatment, which undermines the accuracy of recorded treatment hours; level-of-care appropriateness was fully documented in 67% of flagged cases; and work and education accommodations were not addressed in the EOP IDTTs reviewed.

   Retrain all clinical staff on documentation standards, including check-in and check-out practices that reflect face-to-face time, and issue a policy memorandum prohibiting the removal of patients from groups for individual sessions unless the program supervisor and Chief of Mental Health approve it. Have

supervisors review documentation quality on a recurring basis until sustained and acceptable improvement is observed, including all higher level of care consideration justifications and rationales for non-referral when patients meet criteria for consideration but are not being referred.

6. **Medication Monitoring and Non-Adherence Response**. Psychiatry response to medication non-adherence notifications was low, at 29% for critical and 41% for non-critical. Diagnostic monitoring was uneven, with AIMS at 66% and therapeutic-level monitoring for mood stabilizers in the 49% to 67% range. The institution has no Chief or Senior Psychiatrist to oversee this work.

   Review non-adherence weekly and report monthly to the Mental Health Program Subcommittee, prioritizing the lowest-performing and/or highest risk components, and put a process in place for cross-covering electronic notifications during absences. As psychiatry leadership is recruited, assign oversight of this review to that role.

# Unaudited Statements of Revenues & Expenditures

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
April 2026 - June 2026

| | Budget | Actuals | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 3,402,667 | 3,402,667 | - |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 3,402,667 | 3,402,667 | - |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 1,658,732 | 1,442,645 | 216,087 |
| Legal and Professional Services | 34,711 | 38,022 | (3,311) |
| Reimburseable Costs | 107,082 | 141,197 | (34,115) |
| Office expenses | 138,530 | 116,227 | 22,303 |
| Insurance | - | 10,162 | (10,162) |
| Contractor Costs | 1,030,272 | 859,345 | 170,927 |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 2,969,327 | 2,607,598 | 361,729 |
| Available Balance | 433,340 | 795,069 | |

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
April 2026

| | Budget | Actuals* | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 1,000,050 | 1,000,050 | - |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 1,000,050 | 1,000,050 | - |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 546,194 | 441,193 | 105,001 |
| Legal and Professional Services | 34,711 | 34,711 | - |
| Reimburseable Costs | 30,000 | 70,502 | (40,502) |
| Office expenses | 46,392 | 34,220 | 12,172 |
| Insurance | - | - | - |
| Contractor Costs | 240,000 | 329,296 | (89,296) |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 897,297 | 909,922 | (12,625) |
| Available Balance | 102,753 | 90,128 | |

**Actuals reflect expenditures paid April 1-30.*

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
May 2026

| | Budget | Actuals* | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 1,121,117 | 1,121,117 | - |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 1,121,117 | 1,121,117 | - |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 556,269 | 506,691 | 49,578 |
| Legal and Professional Services | - | 2,971 | (2,971) |
| Reimburseable Costs | 38,541 | 33,609 | 4,932 |
| Office expenses | 46,069 | 42,783 | 3,286 |
| Insurance | - | 1,846 | (1,846) |
| Contractor Costs | 395,136 | 252,120 | 143,016 |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 1,036,015 | 840,021 | 195,994 |
| Available Balance | 85,102 | 281,096 | |

**Actuals reflect expenditures paid May 1-31.*

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
June 2026

| | Budget | Actuals* | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 1,281,500 | 1,281,500 | - |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 1,281,500 | 1,281,500 | - |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 556,269 | 494,761 | 61,508 |
| Legal and Professional Services | - | 340 | (340) |
| Reimburseable Costs | 38,541 | 37,086 | 1,455 |
| Office expenses | 46,069 | 39,223 | 6,846 |
| Insurance | - | 8,316 | (8,316) |
| Contractor Costs | 395,136 | 277,929 | 117,207 |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 1,036,015 | 857,655 | 178,360 |
| Available Balance | 245,485 | 423,845 | |

**Actuals reflect expenditures paid June 1-30.*