MENTAL HEALTH RECEIVER.

# Receiver's Fourth Quarterly Report

October 30, 2026

TABLE OF CONTENTS

**Message from the Mental Health Receiver**

**Receiver's Vision and Mission**

**Status of Action Plan Implementation**

**Key Accomplishments this Quarter & Plans for Next Quarter**

Goal 1: Improve Mental Health Care Delivery Through Culture Change and Effective Management

Goal 2: Achieve and Retain a Qualified Mental Health Workforce

Goal 3: Provide Adequate Care at Every MHSDS Level and Treat Each Patient at the Appropriate Level of Care

Goal 4: Fully Implement a Suicide Prevention Program

Goal 5: Complete Development and Implementation of a Quality Assurance Program

Goal 6: Create Mechanisms to Demonstrate Sustainability of Remedies

**Challenges**

**Quarterly Expenditures**

**List of Acronyms**

**Appendix A: List of Regular Meetings**

**Appendix B: Fines Spending by Institution**

**Appendix C: Executive Summaries CQIT+ Reports, August-October**

**Appendix D: 2026/2027 Enacted Budget**

**Appendix E: Unaudited Statements, Revenues and Expenditures**

## Message from the Mental Health Receiver

This quarterly report reflects continued progress in implementing the Action Plan. During the past quarter, we moved forward with initiatives designed to strengthen the quality of mental health care, improve workforce stability, enhance communication, and establish sustainable processes for monitoring and improving performance across the Mental Health Services Delivery System (MHSDS) of the California Department of Corrections and Rehabilitation (CDCR).

A central focus of our work has been translating the findings from our monitoring and quality assurance activities into meaningful improvements in patient care. We continued implementing the Continuous Quality Improvement Tool (CQIT+) auditing program, gathered feedback to inform recommendations to the Court on final indicators and thresholds, and worked with CCHCS and institutional leadership to establish a process for implementing and tracking remedial actions that builds on existing quality management frameworks. Institutions are now tracking their progress against priority recommendations and reporting on their efforts to improve performance. At the system level, we reviewed chart audit data on Mental Health Assessments (MHAs), safety planning feedback, suicide case reviews, uses of force, and the quality of mental health input into institutional classification decisions to identify compliance themes common across institutions. These efforts reflect our continued emphasis on using monitoring not simply to identify deficiencies, but to drive measurable and lasting improvements in care.

We also made progress in strengthening the workforce and the organizational structures necessary to sustain these improvements. Resource Team training has been completed at three institutions, accompanied by town halls that drew impressive participation from institutional personnel. We continued examining recruitment and retention strategies, including potential changes to compensation, targeted approaches to hard-to-fill positions, opportunities to reduce burdens on supervisory staff at institutions and increase clinical supervision, and the use of workforce data to better understand and address attrition. In addition, we expanded communication efforts with the MHSDS workforce and shared practical guidance through new Tips to the Field. The Comprehensive Level of Care (C-LOC) evaluation was launched this quarter, with changes to the Mental Health Master Treatment Plan that will decrease clinician workload while also collecting critical level of care information. These initiatives are intended to provide leadership and the MHSDS workforce with clearer expectations, practical tools, and the support necessary to provide consistent, constitutionally adequate mental health care.

At the same time, we continue to improve the information available to guide systemwide decisions and assess progress. We collaborated with CDCR to identify existing data sources and develop reporting capabilities to better understand outcomes for patients in restrictive housing. We also began receiving information from the Department of State Hospitals (DSH) to support our oversight activities. Our continued work to strengthen data collection, analysis, and reporting is essential to identifying areas requiring attention, evaluating the effectiveness of interventions, and ensuring that improvements are sustained over time.

We have made important progress in strengthening collaboration around our oversight responsibilities. Our implementation of the new, Court-approved process for annual suicide reports has cleared the backlog and established a more collaborative forum for reviewing findings,

understanding concerns, and discussing opportunities for improvement. We continue to work with CDCR, California Correctional Health Care Services (CCHCS), the Medical Receiver, and other stakeholders to advance initiatives that support our objectives.

As we continue working to implement the Action Plan, we work closely with mental health leadership. This quarter, Dr. Amar Mehta, the long-time Deputy Director, Statewide Mental Health Program, decided to move to a different position within CCHCS. We are grateful for Dr. Mehta's long and dedicated service to MHSDS and the patients that it serves. We look forward to continuing to work with him in his new role.

Although meaningful progress continues, implementation of the Action Plan remains a substantial undertaking. The work ahead requires continued attention to workforce challenges, the use of reliable information to guide decisions, and the support of all stakeholders to translate individual initiatives into systemwide improvements. Our focus remains on building the capacity, accountability, and institutional practices necessary to provide constitutionally adequate mental health care consistently and sustainably, both during the Receivership and after it concludes.

Respectfully,

Colette S. Peters
Federal Court Receiver
Mental Health Services Delivery System
California Department of Corrections and Rehabilitation

# Receiver's Vision and Mission

### VISION STATEMENT

The Office of the Mental Health Receiver will enhance the delivery of mental health care by building a durable, constitutionally adequate, patient-centered correctional mental health care system that promotes dignity, accountability, and health equity, laying the foundation for the successful return of control to the State of California.

### MISSION STATEMENT

In coordination with CDCR leadership, we will deliver a correctional mental health care system where every person with a serious mental health diagnosis receives timely, humane, and evidence-based care, supported by professional integrity, operational transparency, and continuous improvement. While embracing principles of normalcy and humanity, we will enhance existing working and living environments to provide a constitutionally adequate level of mental health care along with work environments that provide meaningful and rewarding careers for clinicians.

## Status of Action Plan Implementation

The Receiver's Action Plan was built around six strategic goals that are designed to achieve constitutionally adequate and durable mental health care delivery.

**GOAL 1**
Improve Mental Health Care Delivery Through Culture Change and Effective Management

**GOAL 2**
Achieve and Retain a Qualified Mental Health Workforce

**GOAL 3**
Provide Adequate Care at Every MHSDS Level and Treat Each Patient at the Appropriate Level of Care

**GOAL 4**
Fully Implement a Suicide Prevention Program

**GOAL 5**
Complete Development and Implementation of a Quality Assurance Program

**GOAL 6**
Create Mechanisms to Demonstrate Sustainability of Remedies

Each quarterly report is organized around the Action Plan goals and discusses our ongoing work and accomplishments in relation to the achievement of each goal. Many of the initiatives and accomplishments discussed below support more than one Action Plan goal, and patient care and staff safety remain the cornerstones of our work in each area. We hope that organizing this report around Action Plan goals and using visuals to illustrate key concepts will help readers understand how we are advancing the Receiver's mission to create a mental health delivery system where every person with a serious mental health diagnosis receives timely, humane, and evidence-based care, supported by professional integrity, operational transparency, and continuous improvement.

Our team is making excellent progress on Action Plan implementation and has already completed a number of deliverables. We are on track to complete most others deliverables according to the timelines set out in the Action Plan. We will need addition time to complete the following activities:

- Action 1.1.2 includes moving the Program Guide into the HCDOM. This is a complex project, and we do not expect that it will be completed within the twelve months initially proposed. We expect to complete this project by the end of 2027.

- Action 2.3.1 is to assess factors contributing to clinician fear and identify strategies for addressing them. We are contracting with a consultant to conduct this analysis. We expect that the evaluation will be completed by July 2027.

- Action 2.1.4 establishes a consistent onboarding program for all mental health clinicians to ensure that new employees get off to a strong start. This new program will require local leadership involvement in onboarding to ensure that new mental health employees have a positive experience. We expect to complete the program within the next 12 months.

- Action 2.3.2 is an evaluation of compensation concerns. This involves a review of all existing compensation authorities for MHSDS as well as careful consideration of how to address multiple different challenges, including how to incentivize clinicians to work onsite in CDCR facilities. We expect we will have a proposal to discuss with the Court and the incoming Governor's Office in early 2027.

- Action 2.3.4 is to expand use of hybrid and flexible work options for mental health clinicians. We expect to issue guidance policy in the next quarter.

- Action 5.2.4 seeks court approval for a process to recommend when CDCR has fully implemented a remedy. The initial timeline proposed for this action was twelve months; however, there is a related action, 5.1.2, that requires recommending final indicators and compliance thresholds within eighteen months. Because of the interconnected nature of these tasks, we believe that the timeline for Action 5.2.4 needs to be extended to align with the timeline associated with Action 5.1.2.

On September 10, 2026, we notified the Court via email of the need to extend the timelines for Actions 1.1.2, Action 2.3.1, Action 2.3.2, and Action 5.2.4.

## Key Accomplishments This Quarter & Plans for Next Quarter

# Six Action Plan Goals

| GOAL / AREAS OF FOCUS | KEY ACCOMPLISHMENTS THIS QUARTER | PLANS FOR NEXT QUARTER |
|---|---|---|
| **1**<br>**Culture Change & Effective Management**<br>Communications & stakeholder engagement<br>Policy modernization & best-practice sharing<br>Management structure & resources | • Completed Communications Plan; regular communication with employees and stakeholders<br>• Provided Parties for review the draft Program Guide chapter for HCDOM integration; issued 2 pending policies, for a total of 6 of 13; released 2 more Tips to the Field<br>• Began work to hire civil service positions for Action Plan implementation | • Release additional Tips to the Field; develop Receiver's public website; launch monthly newsletter<br>• Finalize first draft Program Guide to HCDOM chapter and share additional chapters with Parties<br>• Participate in CCHCS's onboarding for new institution CEOs |
| **2**<br>**Qualified Mental Health Workforce**<br>Recruitment & retention<br>Clinical working environment & conditions | • Obtained hire above minimum rates for two additional position classifications<br>• Began assessment of supervisory mental health vacancies at institutions<br>• Began assessment of clinician time spent on non-clinical tasks | • Complete the comprehensive assessment of mental health compensation<br>• Continue to assess changes to increase administrative and clinical supervision capacity at institutions<br>• Finalize assessment of treatment space needs based<br>• Finalize contract with consultant to conduct study on clinician fear |
| **3**<br>**Adequate Care At The Appropriate Level**<br>Clinical care & level of care<br>Care environment & restrictive housing | • Initiated Comprehensive Level of Care Evaluation<br>• Began training all staff on new fields with the Mental Health Master Treatment Plan for all outpatient programs (EOP and CCCMS)<br>• Provided Parties with restricted housing plan for review | • Continue with implementation of CLOC; launch Resource Teams; implementation of CITs<br>• Continue to collect and evaluate RHU data<br>• Identify opportunities for improvements that could increase diversion of MHSDS patients from the RHU |

# Six Action Plan Goals

| GOAL / AREAS OF FOCUS | KEY ACCOMPLISHMENTS THIS QUARTER | PLANS FOR NEXT QUARTER |
|---|---|---|
| **4**<br>**Suicide prevention**<br>Priority suicide-prevention measures<br>Case review & quality improvement<br>Annual suicide reporting | • Eliminated the backlog of annual suicide reports<br>• Focused on implementation of several outstanding suicide prevention recommendations<br>• Reviewed institutional implementation of quality improvement plans | • Continue to assess safety planning policies and procedures to better improve patient care and improve clinical quality<br>• Continue to strengthen quality improvement plans in Suicide Case Review<br>• Identify outstanding court-ordered suicide prevention measures and focus implementation efforts |
| **5**<br>**Quality Assurance Program**<br>CQIT & field monitoring<br>Data dashboards & patient-wise measures<br>Institution follow-up & DSH oversight | • Completed 24 of 25 CQIT audits and released 16 reports<br>• Continue to test existing indicators, implement technical fixes, and plan for refinements to the process for the 2027 cycle<br>• Collaborative engagement with institutions around their responsive action plans after receipt of CQIT reports; began implementation of DSH oversight | • Finalize and launch improvements to the CQIT process for 2027<br>• Develop recommendations for final indicators/thresholds<br>• Engage with institutional leaders to support remedial actions<br>• Develop protocols for supplementing CQIT reviews around use of force |
| **6**<br>**Sustainability Of Remedies**<br>Integrated quality management<br>Institution, regional & central-office accountability<br>Cross-system coordination | • Began to integrate SPRFIT and other audits (e.g., Sustainable Process) with CQIT<br>• Integrated key mental health indicators to existing medical dashboards<br>• Formalized process for advocacy responses | • Use CQIT evidence to define how full implementation will be demonstrated<br>• Strengthen integrated oversight across institutions, regions and headquarters<br>• Resolve structural and coordination barriers that impede sustainability |

## GOAL 1

# Improve Mental Health Care Delivery Through Culture Change and Effective Management

CDCR has many dedicated employees who strive to provide quality mental health care that meets constitutional standards. However, existing management structures along with a lack of coordination and information sharing can make it difficult for employees and institution leadership to improve patient outcomes and achieve full compliance with court orders.

The Mental Health Receiver is committed to setting a new tone, significantly shifting the culture around providing mental health care, building clear milestones to show progress, and driving continuous improvement and innovation. The Receiver's approach recognizes that CDCR employees, who will be the drivers of innovation and change, must be encouraged to actively participate in identifying barriers to quality patient care and developing effective solutions to those barriers. In addition, employees and leadership need a clear understanding of the role of the Mental Health Receiver and how her authority intersects with that of the Medical Receiver and the CDCR Secretary.

## Area of Focus 1: Communications and Stakeholder Engagement

### Comprehensive Communications Strategy

The Receiver committed to "develop and implement a communications strategy to educate employees and stakeholders about the Receiver's vision, role, goals, objectives, and expectations." Action Plan 1.1.1.

In the Third Quarterly Report (July 31, 2026), we described the communications needs identified by our communications consultant based on interviews with dozens of MHSDS, CCHCS, and CDCR stakeholders. Based on that research, the Receiver has approved a communications plan that is designed to address four priorities:

1. **Clarify roles, ownership, and decision-making.** Ensure stakeholders have a concrete understanding of the Receiver's mandate, how Receiver initiatives relate to existing CDCR and CCHCS work, how the Receiver's team will interact with and respond to institution issues, and when and how to engage the Receiver's Office.

2. **Support implementation within institutions.** Statewide direction regarding the mental health program should account for the significant differences in institutional mission, staffing, physical plant, population, and operational capacity. Communications should explain the purpose of each initiative, expected outcomes, affected staff and functions, and where institutions have flexibility in implementation.

3. **Strengthen coordination and information flow.** Use existing CDCR and CCHCS channels for communications, when possible, to engage stakeholders (e.g., clinical, operational, regional, institutional, and patients). The Receiver's Office will engage affected

stakeholders as early as possible and provide concise, regular updates on priorities, decisions, progress, obstacles, and next steps.

4. **Build trust through transparency and follow-through.** Explain how stakeholder recommendations and concerns are considered, including whether they will be addressed and on what timeline. Use consistent communications before and after visits, audits, conferences, and other engagements – together with opportunities for questions and feedback – to reinforce transparency, build trust, and encourage meaningful collaboration.

**Approved Communications Plan**

The communications plan establishes a coordinated approach for helping institutional leaders and line staff understand the Mental Health Receiver's priorities, translate them into local action, and see credible evidence of progress.

**Priorities**

The communications plan retains the six Action Plan Goals as the overarching and Court-facing framework while organizing internal communications around four operational priorities:

- Qualified Mental Health Workforce
- Clinical Excellence
- Suicide Prevention
- Quality Assurance

A patient-centered Care Delivery Model built on safety, quality, and workforce well-being, provides the unifying picture of the system our work is intended to build.

**Elements of the Care Model**



**Content and Channels**

The Communications Plan includes an Activation Plan that provides target timelines for our highest-priority communication over the next several months, including activities such as creating a new public Receiver website, creating a regular Mental Health Receiver newsletter, and providing quarterly progress updates with video and supporting materials.




## Making Information Available to Stakeholders and Patients

We communicate regularly with CDCR, CCHCS, and MHSDS leadership; the Medical Receiver; the Armstrong Court Expert; and counsel for Plaintiffs and Defendants. Appendix A contains a list of standing meetings that we host or attend and that we use to share important updates about MHSDS and our work. These forums are also intended to provide opportunities to receive information about emerging issues, policy and operational changes, and other developments that may affect the delivery of mental health care, and to ensure that relevant information is affirmatively shared with the Receivership.

During the quarter, we engaged in several new efforts to educate employees and stakeholders about our work:

**Employees**

- **Monthly Meeting with Chiefs of Mental Health.** In August, we established a monthly meeting with institution Chiefs of Mental Health, which is co-chaired by the Deputy Director of the Statewide Mental Health Program (SMHP) and Dr. Darci Delgado, the Receiver's Senior Advisor, Mental Health. Institution Chiefs of Mental Health have given very positive feedback about the value of those meetings, which have been used to provide statewide updates about MHSDS and the Mental Health Receiver's priorities. Emerging themes include a widespread interest in sharing best practices across facilities and brainstorming solutions to hiring and treatment space limitations.

- **CDCR Annual Warden/Chief Executive Officer (CEO) Conference.** In early October, several representatives of the Receiver's Office spoke at CDCR's Annual Warden/CEO Conference to discuss our ongoing implementation of the Action Plan. Deputy Receiver Bill Lothrop shared a message on behalf of the Mental Health Receiver. Senior Advisor Darci Delgado and acting Deputy Director Jonathan Yip provided an overview of the ongoing Comprehensive Level of Care review, including a robust discussion about the growth in the mental health population and factors that may be contributing to that growth. Senior Advisor Laura Harvick and Dr. Amar Mehta led a discussion on the recruitment and compensation challenges facing MHSDS, the steps being taken to address these issues, and solutions implemented to date. Senior Advisor Gary Ninman and Assistant Deputy Director Steven Cartright presented themes that have emerged through the CQIT+ process and how we are planning for the year ahead.

- **Statewide Mental Health Leadership Conference.** In mid-October, MHSDS held the Statewide Mental Health Leadership Conference, which was attended by over 250 employees including the Receiver and leadership from her office, CDCR, CCHCS, and MHSDS; regional medical and mental health leaders; as well as institution CEOs, Chiefs of Mental Health, Chief Psychiatrists, and Chief Psychologists. The theme – Safe Practice, Secure Care – featured a full day of virtual presentations focusing on safety and violence prevention:

  - Receiver Peters provided opening remarks in which she discussed the importance of safety and security for patients and employees. She described Action Plan implementation to date; our focus on delivering safe, high quality, patient-centered care; and how we use insights from the field to drive quality improvement, better clinical practices, and advances in staff wellbeing.

  - The day included a keynote address from Sarah Desmarais, Ph.D., the President and CEO of Policy Research Associates who – with close to 150 peer reviewed publications – is an international expert on violence risk assessment. Dr. Desmarais delivered remarks entitled *Mental Illness and Violence in Secure Settings: What We Know and What We Can Do*.

  - Multiple shorter presentations highlighted several ongoing mental health initiatives, including CQIT+ audit insights, violence prevention and the use of Crisis Intervention Teams (CITs), mental health recruitment and compensation challenges, and suicide prevention/restrictive housing.

  - Deputy Receiver Kathy Toomey delivered closing remarks, which focused on communications and upcoming activities.

  - In 2027, we plan to host an in-person Day 2 of the Leadership Conference.

- **Receiver Peters Quarterly Video for Staff.** In September, Receiver Peters recorded a video message for all MHSDS staff to share our implementation of the Action Plan as detailed in her Third Quarterly Report. This included working closely with CCHCS on the inclusion of the Program Guide into the HCDOM, significant progress on workforce

compensation, and the release of our first three Tips to the Field. She also shared completed milestones and upcoming areas of focus. The Receiver will continue to provide quarterly video updates directly to staff to keep them informed of our work.

- **Receiver Peters Welcome Video for the Resource Teams.** In September, Receiver Peters welcomed via video the newly established members of our Resource Teams at California Institute for Women (CIW), California Health Care Facility (CHCF), and Salinas Valley State Prison (SVSP). On the first day of foundational training, the Receiver thanked the teams for stepping forward to do such important work. She discussed her core principles of safety, wellness, and humanity, as well as her personal experience seeing the positive impact of Resource Teams in other jurisdictions.

- **Receiver's Office Participation in CCHCS CEO onboarding.** Representatives of the Receiver's Office, including Deputy Receivers Kathy Toomey and Bill Lothrop and Senior Advisor Laura Harvick, will begin participating in CCHCS onboarding for new institution CEOs. This will provide the Receiver's Office with an opportunity to meet new CEOs, discuss the Receiver's Action Plan and activities, and answer questions from CEOs.

**Patients**

We are now working to increase communication with our patients. During CQIT+ audits at each facility, we conduct patient interviews with a randomly selected group of patients from each program operating at the institution. These conversations between the Receiver's Compliance Team (RCT) members, the Receiver's Leadership Team, and patients, provide qualitative feedback on how patients experience care at the facilities, what they value about the treatment they receive, barriers they experience to accessing care, and what they most want to see change. We have gained valuable insights from patients across the state that we will use to improve patient care.

During the quarter, we participated in the Region IV Inmate Advisory Council (IAC) meeting in September.

At the beginning of 2026, we established a Receiver P.O. Box that patients use to contact us by mail. This information is readily available and is posted throughout all institutions. When we receive letters from patients, we review them and refer the mental health concerns for action, when applicable. We also track themes and trends from letters to inform the Receiver's perspective about critical or repeated patient care issues.

**Other Stakeholders and the Public**

Explaining our mission, initiatives, and accomplishments to the public, including legislators, family members, and the media, is critical. Therefore, we post our CQIT+ audit reports as well as many other reports on Reports & Court Orders - CCHCS.

As part of the Action Plan, the Receiver committed to creating a website that will be used to share information with the public. We have begun the process of developing that website. Our tentative launch timeframe is the first quarter of 2027. We anticipate using that website to post our CQIT+ audit reports, quarterly status reports for the Court, Annual Reports on Suicide, and other reports, written messages, video messages, and informational materials regarding ongoing activities and accomplishments.

The Receiver's team continues to engage collaboratively with California Legislative partners. This includes ongoing briefings as well as site visits with legislative staffers to San Quentin (SQ, September 2026) and California Institution for Men (CIM), and CIW (October 2026).

## Area of Focus 2: Policy Modernization & Sharing Best Practices

The Receiver's Action Plan recognized that poor communication and lack of information slow CDCR's ability to improve mental health care delivery. During development of the Action Plan, mental health clinicians expressed frustration with a lack of clear, easy-to-understand, and regular communication about issues that impact their daily work. Moreover, it can be difficult for employees to find and use mental health policies (Program Guide) because they are not integrated into the Health Care Department Operations Manual (HCDOM).

### Program Guide to HCDOM

The Receiver's Action Plan commits to moving Program Guide requirements into the HCDOM within twelve months.[1] Action 1.1.2. This action will help ensure that important policy information is readily available to employees. Because of the evolution of the Program Guide, its incorporation of many later policies and memos, and technology and system changes within CDCR over the course of decades, creating a single cohesive and authoritative statement of policy is both critical and extremely complex.

As discussed in the Receiver's Third Quarterly Status Report, there are a range of challenges we must navigate to accurately move Program Guide requirements into the HCDOM while creating HCDOM text that helps staff do their jobs well every day.[2] Some of these challenges include:

- Addressing outdated language in a way that is consistent with current clinical practices while not undermining the purpose or intent of Program Guide provisions. The nature and scope of this challenge ranges from relatively simple to very complex:

  - The Program Guide contains detailed references to outdated policies and procedures. In some cases, outdated references can easily be replaced by the successor policy or procedure. In other cases, we need to substitute new language corresponding to changed circumstances. For example, technology changes require that we replace language describing documentation in paper records with new language that describes the expectation for how clinicians will record patient information in the Electronic Health Record System (EHRS).

  - The Program Guide uses outdated clinical terminology in some instances. For example, it mentions "Axis I" diagnoses; however, the Diagnostic and Statistical Manual of Mental Disorders (DSM) has not used Axis terminology in over a decade. We need to replace the outdated language without changing the meaning.

---

[1] All timelines in the Action Plan run from November 1, 2025. See ECF 8753 at 7.
[2] For these reasons we have requested an extension of the Action Plan deadline for this activity from the Court.

- Focusing all stakeholders on moving Program Guide provisions into the HCDOM without making unnecessary substantive changes. Every stakeholder involved in this process has their own ideas about how the Program Guide provisions could be improved. In most cases, this involves changing the substance of the Program Guide by changing specific requirements. The Receiver must ensure that everyone stays focused on the task at hand, which is to faithfully represent the Program Guide requirements in the HCDOM.

- Gathering feedback on provisions of the Program Guide that stakeholders believe are now impeding quality mental health care delivery so that the Receiver can engage with the Parties and the Court about whether any changes are appropriate.

During this quarter, we solicited comments from the Parties on a draft of Program Guide Chapter 2, Reception Center Mental Health Assessment. The Parties provided helpful refinements to the proposed HCDOM updates based on their knowledge of the case and case history. Both Parties also recommended that, instead of creating a standalone HCDOM mental health section, we fully integrate mental health policies into the existing HCDOM chapters to promote clarity and efficiency for staff.

Based on feedback from the Parties, we plan to proceed as follows to move this project forward:

- Prepare a revised draft that incorporates the Parties' comments. Our goal is to provide that draft in early November 2026.
- Hold a joint Parties' call to discuss any remaining questions and highlight any outstanding issues in the revised draft of Chapter 2.
- In early November, move on to Program Guide Chapter 3, Correctional Clinical Case Management System.
- After we have incorporated the necessary information from each Program Guide chapter into the HCDOM, we will conduct a comprehensive review for conflicts and inconsistencies.
- We will also provide the Parties with an opportunity to review the final draft and raise any comments or concerns.
- Our goal is to reach agreement with both Parties on the final draft and submit a stipulated agreement to the Court seeking approval of the integration of the Program Guide into the HCDOM.

## Mental Health Policy Process

The Receiver's Action Plan also commits to "assess[ing] the mental health policy development and publication process and decid[ing] whether to adopt some or all of the processes used by medical and dental." We completed this analysis in autumn 2025, well ahead of schedule, and determined that the mental health policy approval process should be incorporated into the CCHCS process used for medical and dental policy development and approval. This decision ensures that all stakeholders can provide input on mental health policies before they are finalized, that new policies are added into the HCDOM, and that policy changes and updates can be readily operationalized by institutions.

While we have begun transitioning into the CCHCS policy process, there were 13 policies that were near completion when the Receiver was appointed. Review of mental health policies was previously handled by the Office of the Special Master (OSM). We prioritized the issuance of these policies before transitioning to the CCHCS policy process. We reviewed each of these draft policies and worked with the MHSDS policy team to resolve any questions or comments. We have now shared almost all of these draft policies with CCHCS programs and the Parties for review and input. After we have reviewed and incorporated feedback, we will approve the final policies.

We have issued six of the 13 policies that were pending when the Receiver was appointed. During this quarter, we issued two policies. The first is the Statewide Clozapine Policy and Procedure, which ensures that staff follow safe prescribing, dispensing, monitoring, and reporting procedures related to clozapine. The second is Quorum and Membership Guidelines for Meetings of Local Suicide Prevention and Response Focused Improvement Team (SPRFIT), which clarifies quorum requirements and designee allowances in local SPRFIT meetings. This will allow institutional SPRFIT committees to adapt to local missions and staffing allocation while still fulfilling their responsibilities. Most of the remaining policies have been circulated in draft form to the Parties and are moving toward finalization.

This quarter we also began the transition to the CCHCS policy review process for new policies, starting with the review of the CIT policy. Under the new process, the Receiver's Office will have final approval over all mental health policies; MHSDS subject matter experts will still have significant input in developing, updating, and revising policies; and the Parties will continue to have the opportunity to review draft policies and provide feedback.

| Policy Name | Status |
|---|---|
| Suicide Watch Volunteer Assignment Procedures for Recreation Therapists and Rehabilitation Therapists | Issued 4/1/2026 |
| Keep on Person Medication in Mental Health | Issued 6/15/2026 |
| Statewide Clozapine Policy and Procedure | Issued 7/23/2026 |
| Quorum and Membership Guidelines for Meetings of Local Suicide Prevention and Response Focused Improvement Team | Issued 7/28/2026 |
| Guidelines for Offenders with a Mental Health Disorder (OMHD) Evaluations Memo | Issued 10/6/2026 |
| QM Change Management Change Oversight (CAPC) Policy | Issued 10/22/2026 |
| Clarification of Clinical Contacts No Show Vs. Refusal of Clinical Contact and MH Appointment Resolution Guidelines Memos | In Progress |
| Mental Health Peer Review Committee Policy | In Progress |
| Out of Cell Activities for Patients on Enhanced Observation in PIP Memo | In Progress |
| Duty to Protect Policy | In Progress |
| Indecent Exposure and Sexual Disorderly Conduct Policy | In Progress |
| MHCB Clinical Follow up Requirements for Discharge and Transfer | In Progress |
| PIP Utilization Management Policy | In Progress |

## Sharing Best Practices for Quality Mental Health Delivery Across CDCR

The Receiver's Action Plan recognized that increased information sharing will provide opportunities for clinicians to learn from CDCR peers as well as experts with experience in other corrections and healthcare systems. In the Action Plan, the Receiver committed to "develop a strategy to identify and share best practices that support implementation of remedies and increased adherence to the Program Guide. Complete strategy development within nine months." Action 1.1.3.

During institution visits and CQIT+ audits, we are learning about effective approaches that individual institutions take to resolve common problems with delivery of quality mental health care. We are sharing these approaches through Tips to the Field documents, the monthly meeting with all institutional Chiefs of Mental Health, and through informal technical assistance to institutions. We have issued five Tips to date, including two this quarter:

- **Considering Mental Health Conditions During Institutional Classification Committee Hearings.** This Tip is intended to strengthen the consideration of mental health needs during Institutional Classification Committee (ICC) hearings. ICCs are critical decision-making settings that impact the incarcerated person's experience within an institution. These committees have considerable power to make decisions about retention in restrictive housing units (RHUs), recommend transfers, and change work and privilege groups. Because the ICC makes such important decisions, it is valuable for the members of the ICC to have a clear understanding of how mental health conditions or symptoms may be impacting incarcerated people discussed in committee. The audience for this Tip includes mental health clinicians who participate in ICCs as well as custody leadership who chair ICC hearings.

- **Addressing Medication Non-Adherence.** This Tip is intended to improve responses to medication non-adherence notifications that psychiatrists receive when patients are not taking their medications as prescribed. Responding to medication non-adherence helps prevent negative medical consequences resulting from missing dosages. It also helps patients understand the impact of missing medications. However, medication non-adherence generates many messages in EHRS, and it can be difficult to manage and track which messages relate to newly identified issues. There may also be confusion over how to respond and document responses in EHRS. The Tip aims to clarify the requirements for responding to the notifications and provide strategies for more efficiently addressing them.

# Area of Focus 3: Management Structure and Resources for Delivery of Mental Health Services

The Receiver committed to identifying an effective structure to supervise the delivery of mental health services and implement that structure. Action Plan 1.2.1. We are working with the Medical Receiver and the Coleman and Plata courts to clarify reporting structures within CCHCS.

## Change of Leadership in MHSDS

Dr. Amar Mehta, Deputy Director, SMHP for the past six years, recently announced his move to a new role within CCHCS. The Deputy Director position is a gubernatorial appointee who is supervised by the Receiver. Therefore, we will work to make a permanent selection to replace Dr. Mehta after the new Governor's Office administration is in place. In the interim, the Deputy Director role is being filled by three Assistant Deputy Directors, SMHP, on a rotating basis. We are working closely with the acting Deputy Director and the MHSDS leadership team to maintain continuity of operations and sustain the department's focus on safe, high-quality, patient-centered mental health care. In late October, the Assistant Deputy Directors sent a message to all employees explaining how they will work together with the Receiver's Office and staff to provide consistent leadership and support over the coming months.

With this unexpected leadership change, the Receiver is re-evaluating the duties of the Deputy Director. For many years, the ongoing litigation in Coleman meant that the Deputy Director was required to spend a significant amount of time focused on legal issues rather than on patient care. Over the last year, through sustained engagement and collaboration among the parties, we have been able to achieve a significant reduction in litigation which now allows us to make patient care the Deputy Director's primary concern. The Receiver will be soliciting input from employees and leaders about how a reenvisioned Deputy Director role can be used to support their work and improve mental healthcare delivery at CDCR.

## Goal 1: Plans for Next Quarter

1. **Program Guide to HCDOM transition.** Complete the Chapter 2 draft and share additional chapters with the Parties for feedback.
2. **Complete transition to CCHCS policy process.** Finalize remaining policies that were pending at the time that the Receiver was appointed and fully transition to CCHCS policy approval process.
3. **Release additional Tips to the Field.** Continue development and dissemination of new Tips to the Field to address common barriers to compliance and best practices.
4. **2027 MH Leadership and Suicide Prevention Conferences.** In early 2027, host the second day of the two-day Leadership Conference in person, in conjunction with the Annual Suicide Prevention Conference.
5. **Public Receiver's website.** Begin development of independent website with a target completion date during the first quarter of 2027.
6. **Launch the Mental Health Receiver Monthly newsletter.** Continuously inform leadership and line staff across the organization about the progress of key projects through a new monthly publication. Target date for first issue: November 2026.
7. **Participation in CCHCS CEO onboarding.** Representatives of the Receiver's Office will continue the new participation in CCHCS's onboarding for new institution CEOs.

GOAL 2

# Achieve and Retain a Qualified Mental Health Workforce

The Receiver's Action Plan recognizes the critical role that a well-qualified mental health workforce plays in delivering high-quality mental health care. The Action Plan emphasized the importance of 1) adopting a focused, leadership-driven approach to hiring, onboarding, and retention; 2) using new clinician recruitment strategies, including expanding clinical internship programs; 3) addressing issues that undermine clinician retention; and 4) using data to achieve and sustain MHSDS staffing levels.

## Area of Focus 1: Recruitment and Retention

The Receiver committed to making bonuses permanent and to "assess the need for additional increases in compensation to address hardest-to-fill locations or positions." Action Plan 2.3.2. This quarter, we made progress in several areas and will continue addressing significant compensation, recruitment, and retention issues next quarter

### Addressing Compensation Concerns

**Hire Above Minimum for Two Additional Classes**

This quarter, with ongoing engagement and support from CalHR, the Receiver's Office obtained approval for a hire above minimum (HAM) rate for marriage and family therapists (MFTs) and clinical counselors (CCs).

This change is significant because it further supports our ability to fill mental health primary clinician (MHPC) positions, an essential role in CDCR institutions. In 2025, prior to the appointment of the Receiver, CDCR/CCHCS adopted the MHPC role. This court-approved position can be filled by psychologists, clinical social workers (CSWs), MFTs, or CCs. Expanding the classifications eligible to serve as MHPCs was intended to increase the pool of clinicians available to provide patients with timely mental health care.

However, MHPC positions have remained difficult to fill and keep filled at some institutions. When the Receiver's Office reviewed the MHSDS compensation structure, we identified a key issue. While both psychologists and CSWs received a HAM, MFTs and CCs did not. This placed MFTs and CCs at a compensation disadvantage and limited the impact of expanding the eligible hiring pool.

Under the new structure, MFTs and CCs are now being paid a starting salary that is equal to the middle range of a CSW salary range. This means that CSWs, MFTs, and CCs receive a comparable starting salary. This change was implemented in August 2026 for more than 70 current MFT and CC clinicians who were hired on or after January 1, 2025. Those clinicians affected by this change received these retroactive payments in the August 2026 pay period.

**Addressing Eligibility Concerns Related to Monthly MHSDS Retention Bonus**
Some MHSDS clinicians are ineligible for the monthly retention bonus that has now been made permanent. The Receiver's Office continues to work with CalHR to assess the possibility of changing eligibility requirements to make at least some of these clinicians eligible for this bonus on a going-forward basis. We are nearing completion of that process and anticipate fully resolving it before the next quarterly status report due on January 31, 2027.

**Comprehensive Compensation Assessment**
We are also working closely with CCHCS HR to conduct a comprehensive assessment of mental health compensation. The current system is overly complicated and does not meet MHSDS needs, particularly with regard to hiring and retaining clinicians at the hardest-to-fill institutions. In October, CCHCS HR provided us with an overview of all existing mental health pay authorities and an initial set of options that could be used to address the Receiver's most significant policy objectives, including:

- Incentivizing clinicians to work onsite in institutions rather than transferring to telehealth or headquarters.
- Increasing retention at the hardest-to-fill high-security institutions.
- Attracting experienced, licensed clinicians.
- Retaining clinicians who provide skilled treatment as well as critical supervisory support for practicum students, interns, and unlicensed clinicians.
- Making clinical supervisory positions desirable from a compensation perspective.

Our goal is to have a new proposed MHSDS compensation structure to discuss with the Court and the incoming Administration in early 2027.[3]

## Hiring and Retaining MHSDS Supervisors in Institutions

MHSDS supervisors at institutions play an important role in ensuring quality mental health treatment for all patients. Across institutions, there are dozens of vacancies among Senior Psychologist Supervisors, Chief Psychologists, and Chief Psychiatrists. It is important that we fill these positions because they perform critical program oversight and administrative supervision of employees in the mental health program.

In addition to filling these critical supervisory positions, institutions also require additional capacity to provide clinical supervision to unlicensed clinicians and interns. Clinical supervision can be provided by licensed clinicians in supervisory or non-supervisory positions.

Below is a summary of the identified challenges to providing both administrative and clinical supervision and possible next steps to resolving these challenges.

[3] We have requested additional time to complete this item. See Status of Action Plan Implementation above.

**MHSDS Supervisory Model**
The current staffing model was adopted in 2009. We are assessing whether the model continues to fully meet MHSDS's staffing needs. Any changes to the 2009 staffing model will require discussion with the Parties and Court approval. As we identify potential shortcomings with the staffing model, we will discuss how to address them with the Parties and seek Court approval if the Receiver believes any changes are necessary.

**Psychologist Supervisors**
There is a shortage of psychologist supervisors in MHSDS. This is a significant problem given the number of unlicensed clinicians in the institutions. Additionally, psychologists provide supervision for MHPCs and recreation therapists (RT) at most institutions, resulting in extremely heavy supervisory caseloads in addition to other required job duties.

The 2009 staffing model allocates supervisors by level of care, and the model is designed to allocate only psychologist supervisors for Enhanced Outpatient Program (EOP), Psychiatric Inpatient Program (PIP), and Mental Health Crisis Bed (MHCB) levels of care. When CDCR adopted the MHPC position, which can be filled by psychologists, CSWs, MFTs, or CCs, the supervisory allocations were not updated to reflect that change. Consequently, while patient care can be provided by any of four clinical positions at the Correctional Clinical Case Management System (CCCMS) and EOP levels of care, the model still allocates psychologist supervisors to provide most administrative supervision.

CDCR does not have enough psychologist supervisors to fill the existing positions allocated by the model. Based on dozens of interviews and conversations with psychologists over the last year, we know that low compensation is a significant factor that psychologists consider when choosing not to promote. Psychologists often earn less money when they promote to supervisor because of the salary structure rules at CDCR and because they are ineligible for compensation that non-supervisory employees earn (e.g., additional/dual appointments, on-call compensation, clinical supervision bonus, etc.). We are evaluating these issues as part of our comprehensive compensation assessment. Removing financial barriers to promotion could assist in recruiting and retaining psychologist supervisors.

**Clinical Social Worker Supervisors**
The 2009 staffing model provides very limited opportunities for CSW upward mobility. Specifically, the model is designed to allocate CSW supervisors only at the CCCMS levels of care. We are discussing with the Parties the possibility of expanding the number of CSW supervisors at institutions that have supervisory psychology vacancies and large numbers of CSWs working in MHPC roles. We would like to try this approach at a small number of institutions to assess whether this helps institutions provide improved administrative supervision for onsite clinicians. Such a change could create greater upward mobility for CSWs and help address the current shortage of psychologist supervisors.

### Upward Mobility and Retention for Recreation Therapists

The 2009 staffing model provides no upward mobility opportunities for RTs. There are approximately 350 RTs working in the MHSDS program in institutions across the state. Therefore, we are exploring the possibility of creating a supervisory RT position. That requires us to identify (or create) a civil service position to which RTs can promote. That would create a path for upward mobility to RTs, potentially increase retention, and decrease the supervisory load on psychology supervisors.

### Chief Psychiatrists

We have been working with CCHCS HR to engage in targeted recruitment for vacant Chief Psychiatrist positions. During this year, vacancies dropped from nine to six. However, two psychiatry Chiefs left CDCR during this quarter, now leaving eight vacancies. We are evaluating the factors that led to those individuals leaving CDCR, so we can identify strategies to increase retention.

## Increasing Clinical Supervision Capacity

Institutions are struggling to provide mandated clinical supervision to unlicensed clinicians and interns. About 44% of onsite institution clinicians are unlicensed. When interns are added, that percentage rises to nearly 48%.

Each unlicensed clinician and intern requires a specific number of clinically supervised hours to obtain a license. Unlicensed psychologists can receive clinical supervision from licensed psychologists. A supervisor of an unlicensed CSW, MFT, or CC may be a licensed clinical social worker (LCSW), licensed marriage and family therapist (LMFT), licensed professional clinical counselor (LPCC), or a licensed psychologist. As of October 2026, MHPC positions filled at institutions include 312 psychologists, 417 clinical social workers, 58 MFTs, and 22 CCs. Of these 809 MHPCs, 362 (44.7%) are unlicensed: 117 psychologists, 207 clinical social workers, 26 MFTs, and 12 CCs. Maintaining such a large unlicensed workforce necessitates substantial licensed clinician resources to provide required clinical supervision and day-to-day oversight, onboarding, training, professional development, mentoring, case consultation, and ongoing performance support to promote competency and progression toward independent licensure. Therefore, licensed clinicians in the classifications authorized to provide clinical supervision are needed across institutions.

Most clinical supervision is provided by MHSDS licensed clinicians in non-supervisory or specialist roles. While many of those clinicians work onsite with their supervisee, the regional mental health teams also provide remote clinical supervision to support institutions.

We are considering various ways to increase clinical supervisory capacity. Specifically, we are considering whether dedicated clinical supervisory positions could be created. We are also looking into whether the $500 monthly stipend for clinical supervision can be expanded. Currently, the monthly stipend is available only to non-supervisory psychologists and LCSWs. Therefore, administrative supervisors as well as all licensed MFTs and CCs are ineligible to receive it.

## Streamlining Hiring Processes

During the last quarter, we streamlined the elevation process that institutions use to resolve certain mental health hiring issues. Those revisions were based on feedback from institution leadership that the system was slow, cumbersome, and confusing. Therefore, we worked with MHSDS and CCHCS HR to centralize and streamline the process. Those changes made it easier for institutional hiring authorities and headquarters to communicate, track, and resolve these issues.

Despite this positive change, the escalation process can still contribute to slow decision-making in the hiring process. Currently, institutions must notify HR and use the formal escalation process if, following an interview, they bypass a candidate that HR deemed minimally qualified. We plan to change this requirement so that higher level review is only required when institutions bypass a candidate who is a licensed clinician.

**Clinical Internships**
Robust clinical internship programs are an excellent way to recruit new clinicians and keep them motivated as they work toward finishing their degree, completing their required unlicensed hours, and ultimately becoming licensed. The Receiver has committed to expanding clinical internships for MHSDS. Action Plan 2.2.1.

As part of her efforts to increase recruitment and retention, the Receiver is establishing the Centralized Training and Outreach Coordination (CTOC) team. This team, which is being phased in through a multi-year Budget Change Proposal, will develop a long-term strategy for internship programs for psychologists, social workers, and recreation therapists. This unit will also develop and coordinate other training opportunities, such as practicum, postdoctoral programs, preceptorships, and residency programs for all mental health clinical staff. The 2026 Budget Act provides four civil service positions and $1.9 million to expand the Mental Health Centralized Training & Outreach Coordinators. MHSDS is recruiting for these positions, which became available in July 2026. This program will standardize and expand internship opportunities across all our institutions for various clinical disciplines. The team will provide administrative and subject matter support to ensure these programs are providing a quality training program. In future years, the team will recruit additional staff to directly supervise and support trainees across the state. Volunteer staff from institutions, regional offices, and Headquarters continue to provide support to existing programs. The Receiver's Office has provided direct support in resolving legal and contractual issues and providing momentum for enhancing didactic training opportunities for both interns and unlicensed staff.

## Area of Focus 2: Clinical Working Environment and Conditions

The Receiver's Action Plan recognized that working environments – including the condition and availability of treatment and workspace – have a significant impact on clinician retention. The Action Plan commits to addressing office and treatment space availability, expanding hybrid and flexible work options for clinicians, decreasing time spent on non-clinical tasks, and assessing the factors that cause some mental health clinicians to fear their patients. Action Plan 2.3.

## Identifying Adequate Work and Treatment Space

The Action Plan commits to a comprehensive plan to ensure that all institutions provide adequate work and treatment space for mental health clinicians and programs. Action 2.3.3. The Receiver is using the CQIT+ auditing process as well as institution visits by Senior Advisor Jason Williams to assess all MHSDS treatment spaces and operations in each CDCR institution in 2026.

As we gather information through CQIT+ audits and institution visits, we are developing a detailed picture of the nature and scope of space issues throughout the system. This is critical to developing effective strategies for resolving space issues. The CQIT+ audits have already identified space challenges as a key theme. At the same time, our reviews have identified some treatment space issues that can be resolved at the institution level, including:

- **Confidentiality.** Some treatment spaces are adequate except that they are not fully confidential. In many cases, window frosting or white noise machines could be used to make spaces confidential.
- **Poor Repair/Cleanliness.** Some spaces are dirty, used for storage of supplies unrelated to MH treatment, or in need of repair, including repair of cooling systems.

Other challenges are likely beyond the capacity of an institution to address and will require attention from the Receiver's Office. These include treatment that occurs in shared spaces such as dayrooms that are simultaneously being used for other purposes, RHU units that have no confidential treatment space, units that have insufficient space to schedule all the required treatment hours, and rooms that are too small to use for in-person treatment.

We are working with institutions to address cleanliness issues or initiate repairs to mental health units and treatment spaces. While visiting institutions, Senior Advisor Jason Williams provides feedback to institution leadership on space conditions and highlights areas of concern. Institutional leaders have demonstrated impressive results in response to that feedback. In partnership with the institutions, we are working to ensure that staff and patients work and receive care in clean spaces that are in good repair.

We will continue to collect information about treatment spaces throughout the year and make targeted recommendations about steps that institutions can take to address identified issues in CQIT+ reports. In the next quarterly status report, we will provide a more comprehensive description of our findings based on the 2026 CQIT+ audit cycle and institution visits. That report will include additional information about treatment space issues that require action or support from the Receiver and strategies that the Receiver has identified in 2027 to begin addressing those issues.

### Mental Health Fines Expenditures

We continue to oversee the expenditure of mental health fines money that is designated for institutional improvements. In addition to employee bonuses, each institution has a budget that the mental health program can use to purchase supplies (e.g., materials for group and recreational therapy) and items to improve working conditions (e.g., furniture, improvements to treatment and office spaces). As of October 13, about 60% of all funding has been spent. Appendix B details status by institution.

During this quarter, we met with CCHCS and CDCR procurement teams to discuss the status of ongoing procurements and any barriers to completing pending purchases. Following are the main points covered during those meetings:

For the second round of fines expenditure (which started in February 2026), CCHCS, with input from the Receiver's office, provided more guidance to the institutions on allowable uses for fines funding as well as the information that the procurement teams need to complete purchases. The feedback from the procurement teams is that the second round has gone more smoothly than the earlier round. Procurement teams are processing purchase requests and coordinating with institutions to obtain any necessary clarifications or additional information to ensure the appropriate items are ordered as soon as possible.

- There are nine institutions that have spent less than 50% of their fines funding. Those institutions all requested to spend funding on certain IT items, specialized booths that can be used for confidential mental health treatment, or modular buildings. Procurement teams continue to work on the purchase of the requested IT items. We are beginning to collect information from institutions and facilities about how they could use and how we can purchase the specialized mental health booths for confidential treatment. Whether booths can be used will likely depend on level of care, custody level, available space at the institutions, approval of the State Fire Marshal, cost, and other factors. As we consider treatment space needs in the next quarter, we will assess whether specialized booths should be part of our overall plan for expanding treatment space. Modular building projects have not been approved because the available funding was insufficient to cover the full cost of the modular buildings as well as associated design and construction costs. Consideration of additional space needs, including modular buildings, will be part of the ongoing space assessment discussed above.

## Hybrid Work Policy

Based on a recommendation by the Receiver, the Court approved a hybrid work policy that relates to telehealth that was negotiated by the Parties prior to her appointment. Action Plan 2.3.4. On July 1, 2026, Governor Newsom's memorandum directing State employees to return to the office four days a week took effect. We continue to work on implementation of the hybrid work policy, which includes developing guidance for employees that explains the relationship between the RTO requirement and the hybrid work policy. Our goal is to issue this guidance in the next quarter.

## Clinician Time Spent on Non-Clinical Tasks

The Action Plan commits to an assessment of the amount of time that clinicians spend on non-clinical tasks. Action 2.3.5. We contracted with an outside firm to assess the "time burdens" encountered by MHSDS clinicians that prevent them from maximizing treatment time with patients. Since starting work in August 2026, the consultants visited CHCF and San Quentin to speak with clinicians and observe their day-to-day work. The consultants also interviewed a total of 29 clinicians representing eight CDCR institutions. We met with the consultants in October to discuss their preliminary findings and project next steps. We anticipate providing a summary of the final report's findings and recommendations in our next quarterly report.

Additionally, in October, we implemented substantive changes to the outpatient Mental Health Master Treatment Plan that will reduce the amount of time it takes clinicians to complete this document. Automation, consolidation, and aesthetic changes will result in an easier to use document that will reduce workload for completion. We have also communicated that a second round of improvements to this and similar clinical documents will be made in the Spring of 2027, and clinicians are already providing feedback for future improvements.

### Clinician Fear

The Action Plan also includes an assessment designed to provide the Receiver with information that will enable her to increase retention by addressing clinician fear. Action 2.3.1. The Receiver's Office is working to finalize a contract with an outside expert to assess factors contributing to clinician fear and identify strategies for addressing them. Clinician fear, especially of patients, is a serious concern that needs to be addressed to improve morale and create better outcomes for patients and clinicians.

## Goal 2: Plans for Next Quarter

1. **Resolve eligibility issues related to monthly MH retention bonuses.** We will report on this in the next quarterly status report.
2. **Complete the comprehensive assessment of mental health compensation.** We are working with CCHCS HR to complete this during the next quarter so that we can discuss it with the Court and incoming Administration early next year.
3. **Continue to assess changes to increase administrative and clinical supervision capacity at institutions.** We anticipate being able to move forward with some of these changes in the next quarter.
4. **Complete filling CTOC positions and launch unit.** We will report on this in the next quarterly status report.
5. **Finalize assessment of treatment space needs based on information gathered in 2026.** We will report on this in the next quarterly status report.
6. **Share summary of consultant recommendations for decreasing clinician time spent on non-clinical tasks.** We will report on this in the next quarterly status report.
7. **Finalize contract with consultant to conduct study on clinician fear.** We anticipate reporting on this in the next quarterly status report.

## GOAL 3

# Provide Adequate Care at Every MHSDS Level and Treat Each Patient at the Appropriate Level of Care

Goal 3 is to provide adequate care to every MHSDS patient. We are striving to ensure the system is treating the right patients, in the right beds, at the right time. Additionally, matching patients with the appropriate level of care is critical for MHSDS systemic efficiency and optimal patient care.

The MHSDS population has steadily grown over the past 25 years. As of early 2026, 41.2% of all CDCR incarcerated persons are mental health patients. The Receiver is engaged in several initiatives to understand the causes of MHSDS population growth, review level of care placements, identify challenges to patients transitioning between levels of care, and make systemic, long-lasting change.

## Area of Focus 1: Clinical Care and Level of Care

The Receiver recognizes the importance of regularly reviewing level of care as part of providing quality patient care. She is taking several steps to assess level of care decision-making and identify ways to improve patient care. The Receiver's approach is designed to develop data-driven, sustainable solutions that function long after the Receivership concludes.

### Comprehensive Level of Care Evaluation

We have initiated the C-LOC evaluation, a multi-pronged, data-driven effort with five complementary components. Each of the five initiatives contributes toward a fuller understanding of how level of care decisions are made within MHSDS, and toward any actions that follow. The goal of C-LOC is to find opportunities to strengthen level of care decisions so that patients are placed at the appropriate level of care.



**Longitudinal Trend Analysis**
The longitudinal analysis looks at over 25 years of MHSDS data and the forces driving change in level of care patterns. This analysis is based on monthly CDCR data from 1997-2026, with a breakdown of total CDCR census as well as population census for General Population, CCCMS, EOP, and inpatient programs. We anticipate sharing a summary of findings in the Receiver's next Quarterly Status Report.

**Mental Health Master Treatment Plan LOC Decision Data Analysis**
The Receiver's team recognizes the critical need for real-time examination of level of care decision-making. In September and October, we introduced new level of care questions into the Mental Health Master Treatment Plan (MH-MTP) for all outpatient programs (EOP and CCCMS).[4] These questions embed Program Guide diagnostic criteria into the MH-MTP while allowing clinicians to categorize patients and identify barriers for care. The inclusion of these questions within the MH-MTP serves multiple purposes: 1) Remind clinicians of the specific Program Guide criteria at every outpatient Interdisciplinary Treatment Team (IDTT); 2) Guide clinicians through thoughtful exploration of the current level of care; 3) Allow for statewide aggregate data collection regarding level of care. As an additional benefit, these level of care decision-making questions were paired with other automation and consolidation efforts that save clinicians time and improve ease of using the form.

In October 2026, we began training all staff on how to use the new fields within the MH-MTP. This training is the first of a larger series of trainings focused on level of care decision-making designed to strengthen practice in this area. In-person and recorded trainings have reached approximately 750 unique individuals. The October MH-MTP training was provided to Regional Headquarters staff, institutional mental health leadership, and line staff clinicians, focusing on the automation and consolidation changes as well as the mechanics of the Program Guide level of care decision prompts.

We will gather this information from all outpatient MH-Master Treatment Plans over the coming year and analyze the data to get a more complete understanding of what is driving placements in each level of care and to identify common barriers to placing patients at the appropriate levels of care for their clinical needs.

Because CCCMS patients are required to have a new Master Treatment Plan developed every year, this timeline will enable us to collect information for patients across all levels of care. We have been explicit with all clinicians and supervisors that this effort is not intended to encourage clinicians to make changes to levels of care they do not believe are clinically appropriate; rather, it is an effort to provide the Receiver with critical information about system needs and challenges.

**Chart Audit Tool (CAT) Audits**
The Receiver's Compliance Team has conducted modified CAT 6 audits that provide a qualitative assessment of the clinical rationale supporting level of care decisions. Auditors reviewed a sample of records from each mental health program at each institution. A minimum of 20 total cases were audited at each institution, with more audits completed at institutions with more mental health programs (e.g., PIP, MHCB, EOP, etc.). In total, the sample included approximately 530 records for

---

[4] The questions embedded in the MH-MTP are from a 2019 analysis that CDCR conducted on level of care decision-making in IDTTs.

2026. The reviews just concluded and the Receiver will be distilling themes from the review to support improvements in treatment overall as well as to understand strengths and weaknesses in the rationales for level of care decision-making across institutions and programs.

**CQIT+ Interdisciplinary Treatment Team (IDTT) Observations**
The CQIT+ audit process includes ongoing observations of IDTTs, which include discussions about the appropriate level of care for each patient. As such, CQIT+ is assessing whether staff are engaging in clinically appropriate level of care discussions. These observations of level of care discussions will aid in ensuring that IDTT monitoring is consistent with Program Guide criteria.

We already share these IDTT observations in our CQIT+ reports and will use the IDTT observations from CQIT+ audits to support the interpretation of data collected through the MH MTPs. We are also reviewing the current components of the ongoing Sustainable Process (SusPro) aimed at ensuring appropriate level of care placement and will identify opportunities to align the Sustainable Process activities to respond to the information gathered through CQIT+.

**Patient and Staff Interviews**
We will be using semi-structured interviews with patients and staff to surface institution-specific and nuanced feedback on level of care practice. Interview questions are focused on individuals' perceptions of MHSDS level of care challenges. We will conduct interviews with a random sample of 3-4 patients and employees at each CDCR facility. We are developing the interview protocol and expect to roll out interviews in winter 2026.

## Area of Focus 2: Care Environment and Restrictive Housing

### Launching Mental Health Resource Teams

To build patients' social skills and capacity to live in less restrictive environments, the Receiver committed to deploying Resource Teams in inpatient units within CDCR. Action Plan 3.1.1.

Working jointly with the CDCR Secretary, the Receiver secured funding for six Mental Health Resource Teams (MHRTs) to provide critical services in PIPs and at California State Prison, Sacramento (SAC), given its complex mission. In 2026, we established teams at CIW, CHCF, and SVSP. In 2027, we will deploy teams at SAC, SQ, and California Medical Facility. Each team includes funding for five correctional officers, one correctional sergeant, and a part-time psychologist.

The Receiver's goal is for the MHRTs to improve the well-being and safety of both employees and incarcerated people. MHRTs are specially trained to achieve this goal. They receive foundational and implementation training and engage in immersive learning opportunities, such as job shadowing, ongoing coaching, and consultation, as well as partnering with institutional leadership.

Potential benefits of MHRTs include:

- Increasing patients' willingness to receive mental healthcare treatment.
- Reducing use of force, staff injuries, and staff assaults.
- Reducing self-harm events and suicide watches.

- Improving wellbeing of staff.
- Reducing Rules Violations Reports.
- Helping patients connect with available mental health resources and engage with their treatment team.

During this quarter, each institution selected its MHRT members and conducted multiple phases of training. Teams spent time understanding the PIP, getting to know key partners and residents, and started to establish a presence at the facility. Teams completed Foundational Training in September to learn the knowledge, skills, and shared approach needed to begin their work within the PIP. In October, teams participated in job shadowing to observe experienced Resource Team members in other states. Resource Teams at CHCF, SVSP, and CIW will officially launch in November 2026.

## Facilitating the implementation of Crisis Intervention Teams (CITs)

Through a joint proposal between the Secretary and Receiver, we obtained dedicated funding for CITs at three institutions: CCWF, LAC and SAC. CITs are multi-disciplinary groups that respond to patients in crisis and address needs that extend beyond the scope of individual treatment providers. Each team includes representatives from mental health, custody, and nursing.

We expect CITs to help us make positive changes by:

- Increasing continuity of care, with fewer transfers and less disruption to housing units and individuals.
- Decreasing rescinded referrals; suicide watch hours.
- Lowering staff overtime and ad-hoc pulls from treatment lines and reducing the time staff spend re-evaluating overnight referrals.
- Standardizing processes so that operations are more consistent and data-informed.

We also plan to examine how crisis clinicians can support de-escalation and prevent unnecessary use of force, which can lead to injuries, RVRs, and restrictive housing for patients.

Twelve teams (36 positions) will roll out at the three institutions on January 1, 2027.

- **SAC has five teams (15 positions).** The CITs will help the institution manage its emergent mental health consults, which were the highest in the state (11,658 from May 2025 through April 2026) and nearly four times the next highest institution.
- **California State Prison, Los Angeles (LAC) has four teams (12 positions).** The CITs will help the institution reduce unnecessary MHCB referrals. LAC had the largest number of MHCB referrals statewide (1,851 from May 2025 through April 2026), and 75% were rescinded.
- **Central California Women's Facility (CCWF) has three teams (9 positions).** From May 2025 through April 2026, CCWF recorded 824 emergent consults and 824 MHCB referrals, a one-to-one ratio that was the highest in the state, with a single crisis-triage clinician. Sixty percent of those referrals were rescinded.

## Restrictive Housing

The Action Plan recognizes the importance of reducing interactions that can contribute to psychological deterioration in patients. This includes increasing compliance with restrictive housing remedies and minimizing MHSDS patients' time in restrictive housing, which is critical to their safety. Compared to non-MHSDS adults in RHU, the rate of suicide among MHSDS patients in RHU is about four times higher (278 versus 68 per 100,000 across 2010-2025), although the cause for this difference is not definitively known and likely involves multiple variables. Additionally, MHSDS patients are nearly five times as likely to commit suicide while in the RHU as compared to the rate in other housing units (278 versus 56 per 100,000 across 2010-2025).

MHSDS patients are significantly overrepresented in RHU. As of October 18, 2026, there were approximately 3,800 individuals housed within RHU programs.[5] Although MHSDS patients make up about 40% of the total population, 65% of RHU adults were in MHSDS (41% CCCMS and 24% EOP). While the overall RHU population has increased by about 200 over the last few months, the percentage of MHSDS patients has decreased slightly from about 67% in June across CCCMS and EOP.

Consistent with the Action Plan's commitment to increase compliance with existing remedies regarding restrictive housing, Action 3.2.1, we have circulated to the Parties a plan for (1) tracking data and assessing the impact of the new RHU regulations on MHSDS patients;[6] (2) strengthening diversion of MHSDS patients from restrictive housing; and (3) increasing timely access to treatment upon admission. If we are able to secure agreement from the Parties on aspects of this plan requiring modification of certain court orders, we hope to facilitate submission of a joint motion to modify those orders.

1. **RHU Population Data Collection.** We are collecting data about the number of patients housed in restrictive housing, broken down by the number of patients in Hub units designated to provide mental health care and the number who are in non-designated Hub units and overflow RHUs, including those who have been waiting more than 30 days to receive Program Guide-required care. We are also tracking clinical outcome data for patients in restrictive housing such as suicides, self-harm, crisis calls, mental health crisis bed admissions, and additional RVRs while housed there.

---

[5] This census for RHU programs does not include incarcerated individuals who are currently housed in RHU overflow, that is, individuals who are in units that are not designated RHU units because designated RHU units are full. There are currently just under 300 incarcerated individuals in RHU overflow at six institutions (California Correctional Institution, High Desert State Prison, Kern Valley State Prison, California State Prison Los Angeles, Pelican Bay State Prison, and Salinas Valley State Prison), though this data changes on a daily basis.

[6] As described in a May 1 CDCR memo, the new RHU regulations (1) increase RHU term lengths for nine violent offenses, including homicide, attempted homicide, battery and assaults on staff; (2) reinstate RHU terms for incarcerated persons who commit two or more batteries on other incarcerated persons within a 6-month period; (3) reinstate RHU terms for distribution of a controlled substance; (4) reinstate the authority for an ICC to assess consecutive or concurrent RHU terms for multiple offenses; (5) allow forfeiture of earned RHU programming credits if an incarcerated person receives additional RHU eligible violations, which can be assessed as consecutive or concurrent; (6) update Administrative RHU terms to provide the initial placement by an ICC; (7) revise privilege groups C and D to impose more structured consequences for disciplinary infractions; (8) update the Authorized Personal Property Schedule for individuals assigned to privilege groups C and D; (9) eliminate restoration of privilege group upon transfer for an incarcerated person who is deemed a program failure and assigned to privilege group C; and (10) grant the authority for staff to impose a 24-hour suspension of communication and entertainment services on incarcerated person tablets.

The following charts illustrate the types of data we are collecting and analyzing:

RHU Population by Level of Care

| Level of Care | Population | Percentage |
|---|---|---|
| CCCMS | 1,570 | 41% |
| GP | 1,320 | 35% |
| EOP | 910 | 24% |
| ICF | 2 | 0% |
| **Total** | **3,802** | **100%** |
| *All MH* | *2,482* | *65%* |

RHU: Rate of Crisis Bed Admission by Level of Care




RHU: Rate of Self Harm by Level of Care



2. **Strengthening Diversion of MHSDS Patients from Restrictive Housing.** Given the data on increased risk of harm to patients in restrictive housing, we are exploring ways to decrease the number of mental health patients there, including:

   – Strengthening Mental Health Assessments and ensuring they are duly considered. We are using CQIT+ findings and responsive action plans, as well as chart audit findings, to identify assessment weaknesses, necessary technical assistance, and potential system enhancements. We are also reviewing data about the extent to which Mental Health Assessment recommendations are implemented, so that we can ensure that they are being appropriately considered. Finally, we are bringing together a group of institutional leaders in conducting MHAs to discuss best practices in training and conducting these assessments.

   – Working with custody to address the backlog of safety investigations that result in patients staying in RHU for excessive time periods. We are coordinating with DAI about strategies to shorten the time it takes to complete a safety investigation when a patient enters restrictive housing due to safety concerns.

   – Issuing guidance to mental health clinicians and custody leadership responsible for facilitating ICC hearings to ensure meaningful review of mental health needs and whether continued placement in the RHU is consistent with those needs. We issued a Tip to the Field regarding effective consideration of patients' mental health symptoms in restrictive housing classification decisions. We also continue to consider whether to recommend any enhancements to the current system for mental health input and custody decision-making.

   – Examining how mental health treatment for patients in RHU can be enhanced to help reduce the likelihood of additional RVRs during and after release from restrictive housing. In particular, we are evaluating where we could pilot implementation of positive behavioral support strategies for patients with maladaptive behaviors and/or developmental disabilities. We need to ensure adequate staffing, training, and support so that this strategy can be successful.

3. **Increasing Timely Access to Treatment upon Admission.** The third aspect of our restrictive housing plan focuses on providing more timely treatment to patients who are not diverted from restrictive housing. As of October 23, 2026, there were 221 EOP patients in non-Hub restrictive housing awaiting treatment, with 139 waiting more than 30 days; there were 517 CCCMS patients in non-Hub restrictive housing awaiting treatment, with 274 waiting more than 30 days.

To address the shortage of restrictive housing beds with ready access to required treatment, we have relied substantially on the extensive work of Senior Advisor Jason Williams, who has conducted over 42 site visits, including 19 visits during the past quarter. During these visits, Mr. Williams meets with custodial, mental health, and institution leadership to discuss bed capacity, mental health treatment space, RHU overflow, and other issues that relate to providing quality mental health treatment. Using this information, we have proposed to the Parties the following steps to increase capacity to provide timely treatment to MHSDS patients in restrictive housing.

- **Add RHU EOP and CCCMS Beds.** We propose to increase the number of RHU EOP and CCCMS beds available for MHSDS patients to ensure that patients do not wait for extended periods in units that cannot offer mental health services. Our ability to provide treatment is dependent on identifying sufficient clinical and custodial staffing and treatment spaces. We plan to increase bed capacity gradually at particular institutions where we have identified adequate space and staffing.

- **Treatment in Place to Decrease Transfers.** We are also discussing with the Parties the possibility of treating patients in place, without transfer to existing RHU Hubs. Patients would be clustered within an RHU according to level of care. This strategy will only be implemented in RHUs that have the space and staff necessary to provide required treatment. Because this model is a change from current practice and will require flexibility and shifts in staffing and space utilization, we would roll this out slowly. Where implemented, this would enable immediate treatment for patients placed into a non-designated RHU without the wait time for transfer. To proceed, the Parties and the Court would need to agree to modify the 2014 segregation remedy that currently limits commingling of general population and mental health patients within RHUs.

## Use of Force

The Receiver has committed to increasing compliance with existing policies regarding use of force. Action Plan 3.2.2. This quarter, we continued to participate in discussions about CDCR's proposed use of force policy and regulation revisions. We also worked with the Armstrong Court expert and CDCR to provide feedback on a draft use of force report prepared by a joint expert appointed in Armstrong. We anticipate that in the next quarter, we will help facilitate discussion between Plaintiffs and Defendants regarding the updated proposed use of force policy and regulation changes. We agree with Defendants' stated goal of reaching consensus on the changes and submitting them to the Court as a proposed stipulated order.

In addition to policy review, we have been reviewing specific incidents and following up on use of force issues identified in CQIT+ audits. We will continue to engage with the Parties, as well as the Armstrong Court expert, to ensure communication and collaboration on the use of force issues that intersect the two cases. In the coming months, we anticipate developing a plan for qualitative reviews of uses of force that is informed by information gathered through CQIT+ audits and policy discussions.

## Goal 3: Plans for Next Quarter

1. **Continue with implementation of CLOC.** The Receiver will share a summary of the findings of longitudinal analysis in the quarterly report.
2. **Launch of Resource Teams.** The Resource Teams will be launched at CIW, CHCF, and SVSP, and we will report on progress in our next quarterly report.
3. **Implementation of CITs.** Hiring will continue for the CITs, with planned deployment by the end next quarter. We will report on progress in our next quarterly report.
4. **Continue to collect and evaluate RHU data.** We will continue to monitor the number, location, and clinical outcomes of patients in all forms of restrictive housing (including any overflow units).
5. **Review MHA data and processes to identify opportunities for improvements that could increase diversion of MHSDS patients from the RHU.** Survey institutional mental health leadership regarding MHA completion and challenges and formulate statewide and institution-specific initiatives to increase MHA quality. Periodically review data regarding the extent to which MHA recommendations are implemented to identify any institutions that may require support or intervention.
6. **Finalize proposal to the Court to modify certain orders to facilitate provision of treatment to additional RHU patients and enhance the Hub Cert Process.** We have worked with the Parties on formulating a proposal to the Court to modify certain orders that limit who can be treated in certain RHUs and revise requirements related to designated RHUs to focus on improving treatment rather than closing them to intake from other facilities.
7. **Work with Parties to finalize draft use of force policy revisions and submit to the Court.** We have collaborated with the Parties and DAI on revisions to the use of force policy and regulations, and we will help facilitate discussion to reach consensus on these changes. In the next quarter, we anticipate submitting them to the Court for approval.

## GOAL 4
# Fully Implement a Suicide Prevention Program

The Receiver's Action Plan recognized the importance of fully implementing an effective suicide prevention program, which is critical to patient life and safety. During the quarter, we eliminated the backlog of annual suicide reports and made substantial progress on advancing compliance with the outstanding court-ordered suicide prevention requirements. Moreover, we continued to integrate suicide prevention into CQIT+ audits to provide a comprehensive set of recommendations to each institution's leadership team (See Goal 5 discussion). The integration of suicide prevention into CQIT+ audits is an important step toward developing a comprehensive understanding of how well we are providing patient care at each institution.

## Area of Focus 1: Prioritized Implementation Goals and Plans to Resolve Outstanding Suicide Recommendations

We are focusing on implementation of several outstanding suicide prevention recommendations designed to improve patient care and decrease suicide risk. As we make progress addressing these outstanding issues, we will continue to identify issues that contribute to the risk that patients will commit (or attempt to commit) suicide.

During the second quarter, we developed a prioritized implementation plan for all outstanding suicide prevention measures recommended by RCT expert Lindsay Hayes and ordered by the Court. Action Plan 4.1.1. In this quarter, we updated our implementation plan based on compliance data gathered during the CQIT+ audits. We further refined the implementation action steps based on whether the various measures appear to require institution- or PIP-specific interventions versus systemwide improvements. For institution- or PIP-specific issues, we plan to work from the responsive action plans that institutions provide in follow-up to their CQIT+ audit reports. Since institutions develop these plans, they should have buy-in from the employees who will implement, and they should be tailored to site-specific problems. We will continue to review these plans to make sure they will adequately address identified problems.

For statewide needs, we are currently addressing three issues:

1. **Model Intake Sign for RHU Intake and Alternative Housing Cells.** We are working with DAI to provide institutions with a model intake cell sign including placeholders for key information about a patient, their needs and privileges, and their RHU admission. Using this consistent signage will provide staff in the RHUs with the information they need to meet the requirement that CDCR house patients in suicide-resistant intake cells or with a cellmate during their first 72 hours in an RHU. The risk of suicide is highest during this 72-hour timeframe. We also plan to issue a standard sign for alternative housing cells, where patients are housed pending evaluation for placement in a mental health crisis bed. This sign would remind staff to consult clinical orders before providing property to the individual housed in the cell.

2. **Safety Planning.** We are working with MHSDS leadership to improve safety planning, which is an important collaborative process in which clinicians identify and implement strategies to protect patients who are at heightened risk of suicide. We are incorporating institutional and regional feedback regarding safety planning challenges and brainstorming ideas for possible policy, form, and training enhancements.

3. **Thirty-Minute Custody Checks.** We are working with MHSDS and DAI to revamp the audit of custody checks for patients who require 30-minute custody checks following release from a mental health crisis bed or alternative housing placement. The new electronic custody check system will better track these checks, which will assist in identifying and remedying any areas of non-compliance.

## Area of Focus 2: Case Review and Quality Improvement

After there is a completed suicide, a clinician from MHSDS conducts a comprehensive suicide case review (SCR) that includes quality improvement plans (QIPs) for deviations from policy, gaps in policy, or departures from standards of care, with input from psychiatry, custody, and nursing. QIPs are most often directed to specific institutions but may also be directed to headquarters if there is a statewide issue, such as a gap in policy. Several members of the Receiver's team review suicide case reviews and provide feedback and edits on the report and QIPs. In addition to evaluating whether the report addresses all pertinent issues and includes all appropriate issues for QIPs, the Receiver's team provides edits to QIPs to ensure clear guidance to institutions about what actions must be taken to prevent recurrence of the identified issue.

The Receiver's team also began taking a closer look at institutional implementation of QIPs. Although MHSDS already has a multidisciplinary team reviewing these responses from a mental health, nursing, and custody perspective, we are providing another level of review, so we can ensure institutions are meeting the letter and intent of their assigned QIPs.

Finally, we have engaged in discussions with CCHCS leadership about processes to ensure maximum collaboration between CCHCS and MHSDS on the review of mental health-related deaths through suicide case reviews and mortality reviews. We will continue these discussions in the upcoming quarter with an eye toward enhanced collaboration.

## Area of Focus 3: Annual Suicide Reporting

During this quarter, the Receiver worked with the Parties to eliminate the backlog of annual suicide reports. We finalized and filed the 2024 and 2025 Annual Reports on Suicides, which incorporate a new performance improvement process designed to analyze aggregate quality improvement plan data to identify significant repeated issues and present them to MHSDS, nursing, and custody Mental Health Compliance Team (MHCT) leadership for potential selection for statewide performance improvement projects. These projects will address longstanding systemwide issues that cannot be solved through institution-specific QIPs alone.[7] Over the next year, we will be

[7] Notably, any performance improvement project identified through the annual report process will be in addition to other ongoing quality management processes, including the CQIT+ and regional SPRFIT audits and corrective action plans for all suicide prevention remedies; quarterly MHCT audits of custody issues such as quality of restrictive housing unit

working with MHSDS, custody, and nursing on performance improvement projects related to (1) ensuring officers bring complete cutdown kits for emergency responses rather than only the cutdown tool, for example, and (2) quality restrictive housing custody checks in which officers ensure people in restrictive housing are alive and well each time they conduct their rounds.

## Goal 4: Plans for Next Quarter

1. **Assess safety planning policies and procedures to better improve patient care and improve clinical quality.** We will be continuing a series of meetings with MHSDS leadership in which we evaluate institutional and regional feedback and CQIT+ audit data on safety planning to determine whether policy, form, and training changes are necessary.
2. **Strengthen Quality Improvement Plans in Suicide Case Reviews.** In addition to continuing to provide feedback on individual SCRs and QIPs, we are reviewing institutional and headquarters responses to QIPs to ensure that responses satisfy the letter and intent of the recommendations.
3. **Enhance collaboration in review of suicides and mental health-related deaths.** We will continue to work with CCHCS and MHSDS to identify opportunities for collaboration in the review of suicides and other deaths involving potential mental health-related issues. This includes evaluating who participates in the reviews and processes for information sharing in the reviews and reports.
4. **Standardize identification of cells used for RHU intake and Alternative Housing.** Ensure RHU intake cells and alternative housing cells have standard signs identifying the special precautions associated with these cells.
5. **Identify outstanding court-ordered suicide prevention measures and focus implementation efforts on those.** Once the 2026 CQIT+ and SPRFIT audits conclude, the Receiver's suicide prevention expert will assess which measures remain outstanding. We will focus our implementation efforts on the remaining measures, providing support to individual institutions where necessary.

---

rounds and complete cutdown kit accessibility; and other quality improvement initiatives that custody and mental health leadership have pursued this year, such as improving suicide prevention training for officers to more prominently emphasize the requirement to promptly call 911 when responding to an emergency.

## GOAL 5
# Complete Development and Implementation of a Quality Assurance Program

Developing an effective quality assurance and improvement program is a critical component of building and sustaining a high-quality mental health delivery system. Quality assurance is the means through which the Receiver will measure program success, identify and address shortcomings, and assess when to recommend returning responsibilities to CDCR.

## Area of Focus 1: Implementing CQIT+ and Field Monitoring Process

This quarter, we continued CQIT+ audits and field monitoring by the RCT. Since March, we have completed 24 of 25 audits in our testing cycle, continuously using insights gained through the audits to refine and strengthen our audit process.

### Building Positive Relationships with Institutional Leaders

Institutions have supported the CQIT+ audit process by providing access to staff, records, and other information necessary to complete onsite reviews in a timely manner. We streamlined pre-visit planning to reduce the burden on the institutions, resulting in positive feedback about both the preparation process and the collaborative nature of the audits. This collaborative approach is an important element of our ability to identify barriers to compliance and implement sustainable solutions. At gatherings, including the recent CEO conference, reactions from institutional leaders to this year's process and reports have been very positive. Leaders across the state have reflected on the experience as being collaborative, timely, and focused on understanding issues to enable problem solving and improvement. They have also shared that during the process, it feels as though everyone is working as one team, with a shared commitment to identifying challenges and resolving them.

### Testing the Provisional Key Performance Indicators (KPIs)

The Receiver is responsible for testing 250 KPIs that are designed to assess each institution's compliance with the court-ordered remedy. Next year, the Receiver must recommend final indicators and compliance thresholds to the Court. As we come toward the end of the testing cycle and have data from nearly all indicators, we have begun the process of determining whether to recommend any changes to the Court. We are gathering feedback from many stakeholders to inform these decisions. In September, we surveyed institutional leaders and the RCT to get their input on strengths and weaknesses of the CQIT+ process, reports, and indicators. Using that information, we held a two-day CQIT+ Retreat in Elk Grove in October. The first day focused on improvements to the CQIT+ process, which will be discussed below. Day two included a comprehensive review of the existing indicators and included representatives from the RCT, MHSDS staff, the external data systems expert that the Receiver recently hired to support her team, and representatives from CCHCS Quality Management. We discussed, for each indicator, the following categories: (1) the indicator is functioning well and providing institutional leaders with useful information about the performance of the mental health system, (2) it could provide more

useful information with modifications, (3) it is not providing useful information to institutional leaders about the performance of the mental health system, or (4) it offers useful operational information but is not necessary to assess the health of the mental health service system. In addition, we identified areas of information we are not collecting that would be valuable when assessing the strength of the system. Now after categorizing the indicators this way, we are going to refine the lists, develop recommendations for modifications to those that may benefit from changes, and develop any proposals for additions. We will then share the proposal with the Parties for input before submitting it to the Court in the spring.

Even as we begin to plan for the future, we continue to test the existing indicators and implement technical fixes and clarifications to enable the indicators to function properly and produce data for review. Some recent updates include:

- Updating definitions to account for changes in the underlying system functioning (e.g., the custody data system no longer codes beds separately for the Acute and ICF programs, so the housing glossary was updated to account for that change and ensure admissions to both programs are accurately captured and trigger the appropriate requirements).

- Developing new reports that make it easier for staff to complete required audits (e.g., creating a report that identifies people who meet the definition of "high refuser," so staff are aware of which patients they should review).

- Adding rules responsive to newly developed policies, such as the recently released clozapine policy.

The Parties have access to a log that tracks any changes made to the KPIs, and we provide updates by email about changes that we are implementing. Where a change is substantive, such as the development of an alternative approach to auditing availability of RHU orientation materials, we provide the Parties with an opportunity to provide feedback in advance of implementing the change. Plaintiffs have sought access to view redlines of the business rules and related documents. While we attempted to provide access to the redlines on SharePoint, we encountered technical challenges with providing this access resulting in view only permissions. We continue to work toward a resolution, and for now, Plaintiffs have access to the documents but without redline.

There are a small number of KPIs that we cannot test because of changes in processes, tools in the institutions, or policy that make the existing indicator design obsolete and inoperable. We have continued to decrease the size of the excluded indicators list throughout the year, but we believe we will be unable to test the following indicators in this initial cycle:

- Indicators awaiting implementation of data rules and reports to identify patients who meet the relevant definitions of the high refusing population.
    - AC2.4: Daily Primary Clinician Interactions – RHU
    - QC4: Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers
    - RH24: High Refusers due to Custody Reasons with Documented Plan of Action

   - RH25: High Refusers for Whom a 128B was Completed.
   - RH26: High Refusing EOP Patients in Restricted Housing for Whom a Meeting Between Mental Health and Custody was Conducted.

- Indicators not passing the verification tests.
   - QC10: Mental Health Primary Clinician Continuity of Care
   - QC11: Mental Health Psychiatrist Continuity of Care

- Indicators paused while we design a new approach to auditing in response to implementation of an electronic tracking system which replaced the paper forms that were previously audited.
   - SP12.1: Custody Follow Ups, Page 1
   - SP12.2: Custody Follow Ups, Page 2

- Indicator related to release planning that must be updated to align with new release planning policy under review.
   - QC5.3: Pre-Release Planning Assessment Form

## Refining Field Monitoring

During our October retreat, we spent one day developing recommendations for improvements to the 2027 CQIT+ process and report. The refinements that we plan to implement in 2027 further the Receiver's goals of providing timely, useful, comprehensive, and concise feedback to institutions. We created a draft audit calendar that promotes long-term sustainability, opportunities to return to institutions between audits to support implementation of responsive action plans, and allows more time for report writing to support earlier release of reports. To improve the utility of the reports for program leaders at institutions, we agreed on a revised report format that includes data broken out by program, where appropriate.

As part of our efforts to bring multiple audit frameworks into a single cohesive report, we also developed a plan for fully incorporating the suicide prevention audit findings into the CQIT+ report and for creating an expanded level of care decision-making section in the report to replace the separate Sustainable Process Reports.

Finally, we reflected on how to most effectively use resources and time on the ground at institutions. In the coming year, we plan to ask RCT members to review more information in advance of getting onsite and to focus the time at the institution on engaging with staff and patients and onsite observations. We tested some of this approach unexpectedly in September, when one scheduled audit was disrupted because of quarantines occurring at the time within the mental health units. The RCT quickly pivoted and completed many audit activities remotely, going onsite over the following weeks to complete remaining audit activities. Through this experience we were able to assess which activities are effectively accomplished remotely and which are best completed at the institution. Revising the quality assurance process in these ways is consistent with the Receiver's commitment to continuous quality improvement at every level of the organization, including in the quality improvement process itself.

## Additional Activities to Complement CQIT+

There are elements of the remedy in this case that are not fully captured by the CQIT+ audits. The Receiver is developing processes to complement CQIT+ to address those areas. For example, the RCT just completed chart audits of a sample of patients from across all programs at every institution with a mental health program.

These chart audits focused on treatment planning and implementation as well as on safety planning. We expect to summarize themes that emerged from those reviews in the January 2027 quarterly report. We are also developing a plan for reviewing use of force and already have begun reviewing selected uses of force during CQIT+ audits and in response to concerns raised by stakeholders.

## Providing Timely Feedback to Institutions

We committed to providing timely feedback to institutions so that they can promptly address issues identified during CQIT+ audits. Our goal was to issue CQIT+ reports within a month of completing each audit. While we met this goal early in the audit cycle, the average time from audit completion to report issuance has been approximately seven weeks. The compressed audit schedule, the implementation of a new audit process, and data issues identified during report development contributed to these delays. To improve report timeliness, in addition to the plans outlined above, we are hiring two technical writers to assist with report writing and review. We are also planning to spread out the audits over a longer period for 2027 allowing more time between audits resulting in faster report publication. To date, we have issued 16 reports. Eight more are under review by the Receiver's Office or in the draft phase with the RCT. The regional leads have produced thorough, actionable reports while simultaneously refining the CQIT+ methodology and report development process. The entire RCT has demonstrated remarkable adaptability as the audit process has evolved, while maintaining its commitment to producing high-quality reports that support institutional improvement.

## Data Expertise

To support ongoing oversight of the KPIs and data infrastructure, the Receiver has identified an independent expert, Richard Buchsbaum, to consult with her team as needed. He has expertise in data system design and management and has supported monitors in other litigation.

## Compliance Themes[8]

As we approach the conclusion of the audit cycle, the themes that emerged early in the year have held true. The system has made significant, though somewhat uneven, gains in clinical staffing. Training rates are also very strong. Many treatment spaces have been found to be adequate and enable confidential contacts. While some of those building blocks for strong performance are in place, we are not seeing consistent access to treatment in a timely manner, some treatment spaces are still not adequate or confidential, and some institutions have very limited space. Cancellations of mental health services, including those due to custody, are also high at many

[8] Appendix C includes the Executive Summaries of the reports issued in August, September, and October.

institutions. Data accuracy and alignment between onsite observations and data drawn from the records also requires attention, particularly as it relates to clinical appointment tracking.

Each finalized CQIT+ report includes a short list of priority recommendations: the actions the Receiver's Compliance Team considers most important for that institution to take in the coming six months to address deficiencies that it has the power to address. This is in response to extensive feedback from institutions that they must prioritize among the many mental health issues that they are asked to address every year. The graph below shows the number of the first 16 finalized CQIT+ reports with at least one priority recommendation on each subject. (Additional institutions may have recommendations on these topics that were not categorized as priority recommendations.) Grouping priority recommendations by subject shows where the audit teams are most often asking institutions to act. Fifteen of the 16 reports carry a priority recommendation on suicide prevention or crisis care; most often directed at the quality of safety plans at crisis transitions and the completion of post-discharge clinical follow-ups. Thirteen have a recommendation on the clinical quality of interdisciplinary treatment team meetings. Ten address treatment space confidentiality and safety, and nine address the timeliness of clinical contacts, in most cases at institutions whose clinical positions are at or near fully staffed. These data describe the subjects of the recommendations, not the severity of the findings or an institution's overall compliance. Note that some important issues, like staffing, are largely managed at a regional or headquarters level and are therefore less commonly found in priority recommendations.



## Area of Focus 2: User-Friendly Data Dashboards and Patient-Wise Data

The Receiver is committed to making CQIT+ data highly visible and easy to use to promote regular, data informed decision-making by institutional leadership and staff. Consistent with Action Plan 5.1.3, we worked with CCHCS to incorporate 25 mental health indicators into existing medical dashboards. The dashboards are now available to staff, and the MHSDS Quality Management leadership presented to institutional leaders on the change and how to use the metrics.

In addition, flexible scoring was applied to the court-ordered patient-wise indicators. See ECF No. 8033 at 35. During the upcoming Receiver's Office meeting with Chiefs of Mental Health, we will share the indicators, explain how they relate to the event-wise indicators, and discuss how they can be used to understand how the facility is functioning. We will continue to seek feedback on the patient-wise indicators as we determine how to present them going forward.

## Area of Focus 3: Institution Follow-Up and Department of State Hospitals Oversight

### Follow Up on CQIT+ Findings and Recommendations

Before we released the first CQIT+ report, the Receiver set clear expectations for institutional leadership about responding to priority recommendations. Action Plan 5.2.2. Thirteen institutions have submitted responsive action plans and began work to address the identified deficiencies. The Director of Health Care Services and the Receiver's Office meet with each institution along with headquarters and regional leaders after they submit their action plans to discuss their plans and gather feedback on the process. Institutions are now beginning to submit their midpoint updates on implementation of responsive actions. We are seeking information on barriers to implementation and needs for support and technical assistance from the Receiver's Office.

The Quality Management team and regional leads within CCHCS are also tracking all recommendations in the CQIT+ reports. Each institution submits monthly updates on their priority recommendation remedial actions on the tracker and addresses the implementation efforts in assigned institutional quality management subcommittees. The goal of integrating the CQIT+ efforts into the existing quality management framework is to promote sustainability and to encourage institutions to use their existing quality improvement tools.

### DSH Coordination and Auditing

The Receiver's team and DSH are negotiating updates to the memorandum of understanding (MOU) and related policies that facilitate admission and treatment of patients at DSH. ECF No. 8829 at 15-16. We are revising the documents to bring the policies in line with current practice, refine processes to ensure all appropriate patients are referred to and treated at DSH, and clarify the language of all policies to make it easier for staff to understand and implement them. We expect that we will be able to circulate drafts of the MOU and related policies to the Parties by the end of the year, so they can be finalized thereafter.

The Receiver's team has also developed a process to audit treatment of Coleman class members at DSH. See ECF No. 8843 § II.A. The plan will include yearly auditing of data from all three facilities that house class members. This month, we received the first production of data from DSH and have begun our review of that information. We anticipate including a summary of that review as an appendix to the January 2027 Quarterly Report along with recent CDCR CQIT+ report executive summaries. We will conduct onsite visits to DSH-Atascadero, DSH-Patton, and DSH-Coalinga every other year. The onsite auditing team will consist of DSH headquarters employees (similar to mental health regional staff who are members of the RCT) and a small number of current external RCT members.

We appreciate the collaborative approach that the DSH team has taken to our work to date.

## Goal 5: Plans for Next Quarter

1. **Finalize and launch improvements to the CQIT+ process for 2027.** We will revise the report format, conduct more review in advance of on-site audits, and further integrate reporting on a number of key aspects of institutional performance in the 2027 cycle.
2. **Develop recommendations for final indicators/thresholds and a process for determining that CDCR has fully implemented the remedy.** Based on the experience from this testing year and feedback we have gathered from stakeholders, we will be identifying any changes that are needed to the indicators and will recommend thresholds to share with the Parties and ultimately with the Court.
3. **Engage with institutional leaders to support remedial actions.** After institutions have received their CQIT+ reports and have begun to implement responsive actions, we will follow up to identify challenges they are experiencing and will support them in resolving barriers or accessing technical assistance.
4. **Develop protocols for supplementing CQIT+ reviews of use of force.** We will plan to review of use of force policy implementation and training to complement existing CQIT+ use of force measures to include in the 2027 cycle.

## GOAL 6
# Create Mechanisms to Demonstrate Sustainability of Remedies

Our Action Plan sets out an aggressive timeline for improving the quality of mental health care delivered to CDCR patients and resolving this case. To create sustainable change, institutions, regional structures, and central office oversight must be well positioned to maintain high-quality mental health service delivery after the Receivership ends. This requires the Mental Health Receiver to thoughtfully and carefully begin integrating the mental health care system with CDCR's overall system for healthcare delivery.

We have already taken several actions to improve internal coordination and collaboration with the goal of achieving sustainable change. Examples include:

- Creating CQIT+ auditing and follow up processes that improve feedback to institutions and create clear expectations for how to address audit recommendations. This year, we began to integrate SPRFIT and other audits (e.g., Sustainable Process) with CQIT+ to create a single, comprehensive report that leadership in institutions, regions, and headquarters can use to understand the challenges at a particular institution by appending the SPRFIT and SusPro reports. In the coming cycle, we plan to fully integrate the suicide prevention, level of care decision-making, and CQIT+ processes.

- Building capacity to identify and address systemwide issues. We have started to address this through Tips to the Field, the suicide prevention performance improvement process, quality improvement plans in suicide case reviews, monthly meetings with the Chiefs of Mental Health, and targeted projects such as implementing changes to the Mental Health Master Treatment Plan to promote stronger level of care decisions, and work to improve access to mental health appointments during modified programs and for patients in restrictive housing.

- Working with MHSDS and CCHCS Quality Management to integrate key mental health indicators to existing medical dashboards. This will keep mental health performance data front of mind for CEOs and make it easier to access mental health data.

- Obtaining Court approval for the CDCR Office of Research to conduct bed need projections rather than continuing to contract out this function. The Office of Research will make projections with oversight from the Receiver.

- Integrating the Program Guide into the HCDOM to align the MHSDS policy process with that used by the medical and dental health programs to provide consistency and sustainability. This will also provide clear guidance to the field on court-approved remedies.

- Working closely with CCHCS on process coordination for advocacy responses.

- Collaborating with DAI on proposed modifications to use of force policy and regulations to ensure that officers are required to attempt to de-escalate when feasible and that

when use of force is used, it is necessary and reasonable. These guardrails should help minimize physical interactions between officers and MHSDS patients that could be harmful to both groups' physical and mental health.

## Challenges

There are myriad challenges facing the Receiver's team as we try to resolve a case of this complexity and history. These challenges often involve organizational structure, information sharing and coordination, and the need to shift long-held views about what is possible and how best to care for and manage the MHSDS population. Each quarter, our team spends significant time responding to these challenges so that we can implement the Action Plan.

Following is a discussion of challenges from this quarter's work with examples illustrating how organizational structure, information sharing and collaboration, and long-standing views about MHSDS overlap to create hurdles that we must address to resolve this case.

**Organizational Structure**
In the decades since this case was filed, our understanding of the importance of whole person care and the interconnections between custody, medical, and mental health services has evolved. We support a whole-person approach to patient care and are pursuing several initiatives to help bridge silos that divide responsibility for care between the Mental Health Receiver, the Medical Receiver, and the Secretary.

To move in this direction, there needs to be clarity as to how the Secretary and two court-appointed Receivers oversee the provision of healthcare. Their authority is intersecting and has not been clearly articulated so that employees can easily understand the role and responsibility of each. We are working with the Medical Receiver and the Coleman and Plata courts to clarify CCHCS reporting structures and organizational charts.

**Information Sharing and Coordination**
As discussed in the last quarterly report, the Receiver has encountered challenges to the execution of her duties, particularly as it relates to information sharing and coordination.

In response, we have instituted new standing meetings and established regular participation in existing meetings to promote earlier engagement around decisions, directives, and actions that should have MHSDS or Receiver's Office involvement. This quarter, we have seen improvement in information sharing and coordination.

**Addressing Long-Standing Views about the Care and Management of the MHSDS Population**
With a case of this length and complexity, it is not surprising that many employees and stakeholders have developed strongly held beliefs about what is required to care for and manage MHSDS patients. Some stakeholders' views align with the Receiver's vision and the Action Plan and are forward-looking, incorporate principles of normalcy and humanity, promote whole person care, and seek to improve patient care and staff safety through positive interventions when possible. Others have strongly-held views that punitive interventions are the primary means for changing patient behavior. We strive to be open to alternative views and ideas while also relying as much as possible on evidence, data, best practices, and research to implement the Action Plan and improve patient care.

As discussed in greater detail below, we invested significant time this quarter on engaging with other stakeholders to identify shared goals and strategies for managing patients with complex healthcare and behavioral needs and patient non-attendance at mental health appointments.

**Addressing Patients with Complex Healthcare Needs**
Over the last year, we have had numerous discussions with the Medical Receiver and CCHCS about complex care initiatives. In December 2025, we agreed to work with the Medical Receiver to improve the quality of care for medically complex patients with serious medical and mental health conditions as well as dangerously decompensating patients. On July 1, the Medical Receiver sent us a paper prepared by his staff (Coordination Proposal: The Complex Care Management Program) that proposed changes to care delivery for the mental health population. More recently, CCHCS briefed us on proposals to address "high utilizers" of institution services, including those whose care requires significant time from medical, mental health, and custody staff.

During this same period, we met with CDCR on many occasions to discuss restrictive housing, use of force, RVRs, and other issues where mental health and custody intersect.

These discussions highlight the need for early information sharing and coordination to develop approaches that are fully informed by the views of mental health, medical, and custody. Recent discussions about these issues also highlighted some substantive policy disagreements, including whether punishment versus positive behavioral interventions are best-suited to promote prosocial patient behaviors.

In light of these discussions, we are actively pursuing two new projects to improve information sharing, coordination and patient care. We chose these projects because they offer promising opportunities to increase coordination with medical and custody, and they align with the goals of the Action Plan, the Program Guide, and other court-ordered remedies that apply specifically to the MHSDS population.

1. **Medically complex patients.** For patients with serious medical and mental health conditions, there is an opportunity for medical and mental health providers to work more closely together to ensure that patients receive appropriate care for their very complex health needs. CCHCS has Care Team Enhanced Conferences (CTEC) which already provide a mechanism for multidisciplinary engagement on complex patients with both medical and mental health needs. We believe that there is an opportunity to work with CCHCS to identify CTEC cases where more in-depth clinical consultation may be needed. We are also assessing whether there are opportunities for enhanced collaboration in mortality reviews and suicide case reviews.

2. **High utilizers.** Patients who are high utilizers of institution services and staff time may claim a healthcare condition (e.g., chest or stomach pain, suicidality, etc.) or engage in self-harming behavior to address an unrelated frustration or problem. These claims can be more prevalent in units where patient movement, property, or communications are restricted, including RHUs, units locked down for security concerns or staffing shortages, or those that offer little access to treatment and programming. Our goal is to collaborate with CCHCS and CDCR to identify the underlying issues that cause patients to behave in this way. Multiple program areas may be needed to address underlying issues. To start, we have created a multidisciplinary team to help SVSP address a high number of chest pain

reports from patients in two EOP housing units. That team will work with institution leadership to identify concrete strategies to decrease unnecessary medical calls while addressing the underlying issues that contribute to this situation.

**Addressing Patients with Behavioral Challenges**

The role of restrictive housing and patient mental health is an issue about which there are many strongly held views that the Receiver must address to fully implement the Action Plan. The Receiver recognizes the impact that isolation can have on those in custody, particularly those in the MHSDS population, as well as CDCR's obligation to provide safe and secure environments for patients and staff. Our team has been working with the Parties to strengthen processes for mental health diversion from RHU settings and increase treatment of patients while there, particularly those who are awaiting transfer to a RHU Hub. We also seek to increase the availability of care to patients in RHUs, prioritize care for RHU patients with the greatest needs, and potentially decrease the need for transfers between institutions.

As part of our ongoing work in this area, we also plan to engage with CCHCS and CDCR about opportunities to use Positive Behavior Support Teams (PBST) to supplement existing mental health treatment. PBSTs allow a patient to be treated in place while augmenting the efforts of current mental health providers. We are currently using this approach on a case-by-case clinical consultation basis and plan to explore broader implementation in the coming months. Restricted Housing Units and Level 4 Enhanced Outpatient Program (EOP) units could benefit from PBST-informed behavioral plans for patients who engage in maladaptive behaviors that are resulting in RVRs or occupying staff resources to the detriment of other patients.

**Patient Non-Attendance at Mental Health Appointments**

For the last several months, we have been exploring the high rate of patient non-attendance at mental health appointments. This is often described as mental health patients refusing to attend individual or group treatment. This year, through CQIT audits and other research, we have collected significant anecdotal information from patients and staff that reveals a much more complicated picture. Myriad scheduling issues may be having a significant impact on appointment attendance, including:

- Conflicts between scheduled treatment and yard, meals, commissary, ICCs, medical appointments, and other activities that require patients to prioritize which activities they will attend.
- Limitations on healthcare escort capacity and local cell and gate unlock procedures can prevent patients from getting to a scheduled appointment, which may then be inaccurately recorded as a refusal.
- Clinical staffing levels and clinician work schedules may result in appointments being clustered on certain days of the week, which increases competition for already limited treatment space and healthcare escorts, constraining access to care.

Since appointment attendance is also a challenge for certain types of medical appointments, we are working with the Medical Receiver and CCHCS to create an appointments working group with participation from mental health, medical, and custody. The group will work together to identify the most common scheduling challenges and develop strategies for resolving them. The first meeting on the working group will be in early November 2026.

## Quarterly Expenditures

On March 16, 2026, the Court authorized the Receiver to use accumulated fines in the Special Deposit Fund to fund the Receiver's Office through January 2027. On July 1, 2026, the Court approved the Receiver's Fiscal Year 2026/2027 budget, detailed in Appendix D. The California State Legislature appropriated $61,929,715 for us in 2026/2027.

### Revenues

Total new revenue received for the months of July to September 2026 from the State of California and Mental Health Special Deposit Fund was $3,000,000.

### Expenses

The expenditure summary for the third quarterly report covers July through September 2026. The expenditures of the Receiver's Office for this period were $2,690,354, which is $732,358 less than the projected budget, detailed in Appendix E.

## List of Acronyms

| | |
|---|---|
| ASP | Avenal State Prison |
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| BPT | Board of Prison Terms |
| C&PR | Classification and Parole Representative |
| CAL | Calipatria State Prison |
| CC | Clinical Counselor |
| CC I | Correctional Counselor I |
| CC II | Correctional Counselor II |
| CCAT | Correctional Clinical Assessment Team |
| CCCMS | Correctional Clinical Case Management System |
| CCHCS | California Correctional Health Care Services |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN | Centinela State Prison |
| CEO | Chief Executive Officer |
| CHCF | California Health Care Facility |
| CHSA | Correctional Health Services Administrator |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMH | Chief of Mental Health |
| CNE | Chief Nurse Executive |
| COR | California State Prison, Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CQIT+ | Continuous Quality Improvement Tool |
| CQI | Continuous Quality Improvement |
| CRC | California Rehabilitation Center |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility |
| D/C | Discharge |
| DAI | Division of Adult Institutions |
| DCHCS | Division of Correctional Health Care Services |
| DOT | Direct Observed Therapy |
| DSH | Department of State Hospitals |
| EHRS | Electronic Health Records System |
| EOP | Enhanced Outpatient Program |
| ERRC | Emergency Response Review Committee |
| FIT | Focused Improvement Team |
| GP | General Population |
| HCPOP | Health Care Placement Oversight Program |

| | |
|---|---|
| HDSP | High Desert State Prisons |
| HPS I | Health Program Specialist I |
| HQ | Headquarters |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| ISP | Ironwood State Prison |
| ISUDT | Integrated Substance Use Disorder Treatment |
| KOP | Keep On Person |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| LMFT | Licensed Marriage and Family Therapist |
| LOC | Level of Care |
| LOP | Local Operating Procedure |
| MA | Medical Assistant |
| MAPIP | Medication Administration Process Improvement Plan |
| MCSP | Mule Creek State Prison |
| MFT | Marriage and Family Therapist |
| MH | Mental Health |
| MHA | Mental Health Administrator |
| MHCB | Mental Health Crisis Bed |
| MHPC | Mental Health Primary Clinician |
| MHPS | Mental Health Program Subcommittee |
| MHSDS | Mental Health Services Delivery System |
| ML | Mainline |
| ML CCCMS | Mainline Correctional Clinical Case Management System |
| ML EOP | Mainline Enhanced Outpatient Program |
| MSF | Minimum Support Facility |
| NA | Nurse Administered |
| NDRH | Non-Disciplinary Restricted Housing |
| NDPF | Non-Designated Programming Facility |
| NKSP | North Kern State Prison |
| OA | Office Assistant |
| OSM | Office of the Special Master |
| OT | Office Technician |
| PBSP | Pelican Bay State Prison |
| PBST | Positive Behavior Support Team |
| PC | Primary Clinician |
| PIP | Psychiatric Inpatient Program |
| PT | Psychiatric Technician |
| PVSP | Pleasant Valley State Prison |
| QIP | Quality Improvement Plan |
| QIT | Quality Improvement Team |
| QMSU | Quality Management Support Unit |
| R&R | Receiving and Release |
| RC | Reception Center |

| | |
|---|---|
| RHU | Restricted Housing Unit |
| RHU CCCMS | Restricted Housing Unit Correctional Case Management System |
| RHU EOP | Restricted Housing Unit Enhanced Outpatient Program |
| RHU GP | Restricted Housing Unit General Population |
| RJD | Richard J. Donovan Correctional Facility |
| RT | Recreation Therapist |
| RVR | Rules Violation Report |
| RVR-MHA | Rules Violation Report – Mental Health Assessment |
| SAC | California State Prison, Sacramento |
| SATF | Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Camp |
| SHO | Senior Hearing Officer |
| SMHP | Statewide Mental Health Program |
| SNY | Sensitive Needs Yard |
| SOL | California State Prison, Solano |
| SOMS | Strategic Offender Management System |
| SPRFIT | Suicide Prevention and Response Focus Improvement Team |
| SQRC | San Quentin Rehabilitation Center |
| SRASHE | Suicide Risk and Self Harm Evaluation |
| SRE | Suicide Risk Evaluation |
| SRN II | Supervising Registered Nurse II |
| SRN III | Supervising Registered Nurse III |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| T4T | Training for Trainers |
| TCMP | Transitional Case Management Program |
| TTA | Treatment and Triage Area |
| UM | Utilization Management |
| UOF | Use of Force |
| VPP | Vacaville Psychiatric Program |
| VSP | Valley State Prison |
| WSP | Wasco State Prison |

# Appendix A

## List of Regular Meetings

**List of Regular Meetings**

- Weekly meetings with MHSDS and CCHCS leadership as well as with the Medical Receiver and the CCHCS executive team. The *Armstrong* Court Expert is represented at the meetings with the Medical Receiver.
- Biweekly meetings with Secretary Macomber, the Medical Receiver, and Undersecretary Toche.
- Biweekly meetings with Undersecretary Toche.
- Quarterly Governing Body meeting
- Monthly meetings with Department of State Hospitals (DSH) leadership.
- Monthly meetings with counsel for Plaintiffs and Defendants as well as a joint meeting attended by both Parties.
- Monthly meetings with other important stakeholders including Division of Adult Institutions (DAI).
- CCHCS monthly CEO call.
- CCHCS Bed Plan Discussion.
- CDCR monthly wardens call.

During this quarter, we also began regularly attending the following meetings:

- Monthly Fiscal, Impact, Resource, Strategy Team (FIRST) Committee
- Monthly Statewide Quality Management Committee
- Quarterly Patient Safety Committee
- Monthly Data Advisory Committee
- IT/CCHCS Data Governance Committee
- Care Team Enhanced Conference (CTEC)

# Appendix B

## Fines Spending by Institution

| | Funding | | | Purchase Orders | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Plant | Supplies | Working Conditions | Total | Supplies | Working Conditions | No Designation | Total | Remaining Balance | % Consumed |
| ASP | $ 100,000 | $ 100,000 | $ 200,000 | $ 65,431 | $ 115,870 | $ - | $ 181,301 | $ 18,699 | 91% |
| CAL | $ - | $ 50,000 | $ 50,000 | $ 6,040 | $ 37,092 | $ 571 | $ 43,703 | $ 6,297 | 87% |
| CCI | $ 100,000 | $ 225,000 | $ 325,000 | $ 205 | $ 28,147 | $ - | $ 28,352 | $ 296,648 | 9% |
| CCW | $ 100,000 | $ 375,000 | $ 475,000 | $ 72,253 | $ 238,311 | $ - | $ 310,564 | $ 164,436 | 65% |
| CEN | $ - | $ 50,000 | $ 50,000 | $ 4,801 | $ 46,762 | $ - | $ 51,564 | $ (1,564) | 103% |
| CHF | $ 100,000 | $ 775,000 | $ 875,000 | $ 77,676 | $ 465,148 | $ - | $ 542,825 | $ 332,175 | 62% |
| CIM | $ 100,000 | $ 400,000 | $ 500,000 | $ 54,616 | $ 68,274 | $ - | $ 122,890 | $ 377,110 | 25% |
| CIW | $ 100,000 | $ 425,000 | $ 525,000 | $ 87,421 | $ 428,979 | $ - | $ 516,399 | $ 8,601 | 98% |
| CMF | $ 100,000 | $ 750,000 | $ 850,000 | $ 170,931 | $ 473,683 | $ - | $ 644,614 | $ 205,386 | 76% |
| CMC | $ 100,000 | $ 500,000 | $ 600,000 | $ 115,986 | $ 281,734 | $ - | $ 397,720 | $ 202,280 | 66% |
| COR | $ 100,000 | $ 425,000 | $ 525,000 | $ 51,744 | $ 339,833 | $ - | $ 391,578 | $ 133,422 | 75% |
| CRC | $ 100,000 | $ 250,000 | $ 350,000 | $ 2,200 | $ 317 | $ - | $ 2,517 | $ 347,483 | 1% |
| CTF | $ 100,000 | $ 75,000 | $ 175,000 | $ 35,795 | $ 97,180 | $ - | $ 132,975 | $ 42,025 | 76% |
| FSP | $ 100,000 | $ 75,000 | $ 175,000 | $ 8,968 | $ 25,144 | $ - | $ 34,112 | $ 140,888 | 19% |
| HDS | $ 100,000 | $ 375,000 | $ 475,000 | $ 13,522 | $ 4,860 | $ - | $ 18,382 | $ 456,618 | 4% |
| ISP | $ - | $ 50,000 | $ 50,000 | $ - | $ 49,974 | $ - | $ 49,974 | $ 26 | 100% |
| KVS | $ 100,000 | $ 425,000 | $ 525,000 | $ 23,672 | $ 350,802 | $ - | $ 374,474 | $ 150,526 | 71% |
| LAC[1] | $ 100,000 | $ 475,000 | $ 575,000 | $ 29,895 | $ 425,264 | $ - | $ 455,159 | $ 119,841 | 79% |
| MCS | $ 100,000 | $ 425,000 | $ 525,000 | $ 64,135 | $ 330,185 | $ - | $ 394,321 | $ 130,679 | 75% |
| NKS | $ 100,000 | $ 325,000 | $ 425,000 | $ 22,011 | $ 247,291 | $ - | $ 269,302 | $ 155,698 | 63% |
| PBS | $ 100,000 | $ 300,000 | $ 400,000 | $ 77,521 | $ 256,906 | $ - | $ 334,427 | $ 65,573 | 84% |
| PVS | $ 100,000 | $ 250,000 | $ 350,000 | $ 8,657 | $ 323,289 | $ - | $ 331,945 | $ 18,055 | 95% |
| RJD | $ 100,000 | $ 475,000 | $ 575,000 | $ 83,142 | $ 460,737 | $ 12,959 | $ 556,839 | $ 18,161 | 97% |
| SAC | $ 100,000 | $ 450,000 | $ 550,000 | $ 31,823 | $ 402,668 | $ - | $ 434,491 | $ 115,509 | 79% |
| STF | $ 100,000 | $ 475,000 | $ 575,000 | $ 155,056 | $ 218,860 | $ - | $ 373,916 | $ 201,084 | 65% |
| SCC | $ 100,000 | $ 75,000 | $ 175,000 | $ 19,131 | $ 84,308 | $ - | $ 103,439 | $ 71,561 | 59% |
| SOL | $ 100,000 | $ 125,000 | $ 225,000 | $ 10,788 | $ 31,748 | $ - | $ 42,535 | $ 182,465 | 19% |
| SQ | $ 100,000 | $ 500,000 | $ 600,000 | $ 37,493 | $ 364,297 | $ 1,613 | $ 403,402 | $ 196,598 | 67% |
| SVS | $ 100,000 | $ 575,000 | $ 675,000 | $ 27,372 | $ 118,139 | $ - | $ 145,511 | $ 529,489 | 22% |
| VSP | $ 100,000 | $ 300,000 | $ 400,000 | $ 37,551 | $ 79,585 | $ - | $ 117,136 | $ 282,864 | 29% |
| WSP | $ 100,000 | $ 375,000 | $ 475,000 | $ 2,057 | $ 159,726 | $ - | $ 161,783 | $ 313,217 | 34% |
| **Total** | **$ 2,800,000** | **$ 10,450,000** | **$ 13,250,000** | **$ 1,397,893** | **$ 6,555,115** | **$ 15,143** | **$ 7,968,151** | **$ 5,281,849** | **60%** |

[1] Includes CDCR overtime costs moved to the Mental Health Special Deposit Fund associated with the installation of items purchased using working conditions improvements funds.

# Appendix C

## Executive Summaries CQIT Reports, August-October

# Executive Summary

California Correctional Institution (CCI) is a multi-mission institution located in Tehachapi, California. It operates 21 housing units across three mainline facilities (Facility A, a Level 3 facility; Facility B, a Level 4 facility; and Facility C, a Level 2 facility). In addition to its general population (GP) program, CCI operates a GP Restricted Housing Unit (RHU) on Facility B (B8), and a 16-bed Outpatient Housing Unit (OHU) on Facility B. CCI provides treatment to mainline Correctional Clinical Case Management Services (ML CCCMS) patients in all three facilities, and to Enhanced Outpatient Program (EOP) patients in Facility A (A7 and A8). CCI's EOP population is a Level 4 population housed on a level 3 NDPF GP/SNY facility. In this way, CCI is able to incentivize patients to program positively, so they are eligible for a behavior override to stay at CCIs level 3 NDPF once they graduate from EOP level of care (LOC). Approximately 54% of the incarcerated population at CCI is enrolled in mental health programming.

CCI had frequently been under Program Status Report (PSR) due to an increase in violence on both Facility A and B within the last quarter of 2025. The most recent 2026 PSRs were mostly driven by security threat group violence, requiring modification to programming.

CCI demonstrated a strong receptiveness to constructive feedback and a commitment to addressing issues identified during the review. In some cases, the team was able to immediately remedy issues we raised. The warden, the CEO, and their leadership team demonstrated a commitment to creating and maintaining a compliant and effective mental health program at CCI.

Institutional strengths are in custody operations, emergency preparedness, CMHPP processes, CIT functioning, and staffing for clinical positions. All custody staff completed Use of Force training (100%), and nursing staff have all completed CPR training (100%). CPR mouth shields were carried by all officers observed. Cut-down kits were complete and standardized across all housing units. Most custody staff understand the mental health referral processes, and MH5 referral forms were available in all housing units observed. Though they failed to conduct the quarterly partnership round tables during the reporting period, measures for executive and CCCMS CMHPP items are largely compliant. CCI recognized and had already implemented a plan to bring CMHPP quarterly round table trainings into compliance before our arrival on-site. For all observed CIT responses, all required members were present, patients were seen in a confidential setting, and all documentation was completed appropriately. CCI increased the fill rate in most mental health classifications over the course of the reporting period, and by the time of our visit, they had an 80% fill rate for primary clinicians and 100% fill rate for psychiatry staff.

Staff reported strong relationships and communication amongst their team. During observations of interactions between the mental health staff and the patients that they serve, patients were treated with respect, were engaged with open-ended questions and were given the opportunity to provide input into their treatment plans. In the ML EOP goals were measurable and the plans were individualized.

The deficiencies documented in this report are driven by a combination of structural, operational, and clinical-quality factors. The structural barriers, including a lack of sufficient treatment space and statewide RHU CCCMS and EOP bed shortage cannot be fully resolved through institutional corrective action alone. The operational barriers (cancellation of appointments due to custody, slow transfer of CCCMS patients who are transitioning from EOP to more appropriate housing) can be addressed with local institutional leadership and adequate resource allocation. The clinical-quality deficits, including deficiencies in IDTT quality and medication safety protocols, are primarily supervision and training issues that can be addressed at the institution level.

The five priority recommendations below are selected because of their urgency and target the areas where patient safety, treatment adequacy, or both are at stake.

## Priority Recommendations

1. **Review and revise internal transfer processes to ensure timely transfer to appropriate housing and treatment settings for MH patients**: Transfers to appropriate CCCMS programs after discharge from EOP LOC are taking an excessively long time. The number of CCCMS patients recently discharged from EOP LOC housed in ML EOP housing units A7 and A8 continues to be a concern. At the start of the audit, 06/02/2026, there were 40 CCCMS patients housed in the ML EOP housing units with lengths of stay ranging from two to 322 days. Twelve or 30% of the CCCMS patients housed in EOP housing have remained in EOP housing for more than 90 days after their level of care changed. Timely transfers to a PIP averaged 33%, and timely transfers to RHU CCCMS averaged 40% over the course of the reporting period.

   Review current practices and identify barriers to the endorsement and timely transfer of patients discharged from EOP LOC and those endorsed to PIP. Remediate any practice barriers to create a more effective transfer process. The Receiver will continue to develop and implement strategies to address the challenge in not achieving timely transfers to CCCMS and EOP RHU beds resulting from insufficient beds for those placements systemwide.

2. **Identify and Remove Barriers to Mental Health Treatment Attendance:** During the reporting period, treatment offered averaged 7% while 61% of IDTTs, 52% of MHMD contacts, and 63% of primary clinician contacts met the applicable timeliness standard. Staff and patients described a layered ducat process wherein the patient needs to both have a ducat and be on a list provided to the Control Booth Officer to access care. While intended to enhance the process of moving patients to appointments as a fail-safe, this has, in practice, provided a barrier to patients arriving at appointments on time or at all.

   Review and either refine or eliminate the layered ducat process so that patients can access their mental health appointments as scheduled.

3. **Ensure Confidential and Safe Mental Health Treatment Spaces**: The onsite audit revealed several treatment spaces with confidentiality limitations and both staff and patients voiced concerns about confidentiality. These issues included treatment space without doors, treatment being provided in a dining hall, treatment being conducted in a space with audio and visual recording, and telepresenters remaining in the room during treatment even when not requested by the clinician. Despite these observed issues, the automated reports on confidentiality indicate that 84% of groups and 100% of IDTTs across the reporting period were held in confidential settings. This indicates that there are problems both with the availability of confidential treatment space and with accurate coding of appointments by staff. The space at Facility A CCCMS is of particular concern, as there are also noted safety issues regarding configuration and barriers to visual inspection by custody officers.

   Make all treatment space confidential and safe either by modifying existing treatment space or identifying alternative spaces. If an exhaustive review of all space and scheduling options reveals that there is inadequate space available to provide confidential treatment, then provide that evidence to the Receiver's Office and seek additional support.

4. **Conduct coaching and supervision to improve IDTT processes across programs**: Although IDTTs were rated positively in some domains, meaningful participation by all members was generally lacking, with an interactive process in only 25% of the IDTTs. Qualitative review identified deficits in case conceptualization, measurable treatment goals, level-of-care justification, and discussion of assignments and accommodations (for EOP patients). These deficits mean that the IDTT did not present a clear picture of the patient, their treatment needs, and how those needs will be met.

Conduct coaching and supervision that produces individualized treatment plans through collaborative clinical team discussion with documented patient participation, addressing deficits in attendance, staffing, interactive process, and clinical content quality.

5. **Develop a Local Process for ensuring Medication Monitoring Compliance and Timely Response to Medication Non-Adherence**: Based upon review of the data for the reporting period, diagnostic monitoring (all) was at 81% for the six-month average. Antipsychotic monitoring was below 85%, with lipid monitoring at 63%, thyroid monitoring at 60%, CBC at 72%, and EKG at 50%. Mood stabilizers monitoring (all) was 69% for the six-month average with particularly low lithium (62%) and valproic acid (66%) level monitoring. Antidepressants monitoring (all) was 78% for the six-month average, with antidepressant thyroid monitoring at 45% for the six-month average. Critical and non-critical medication non-adherence response was 20% and 19% respectively.

   Identify contributing factors to missed medication monitoring requirements and implement workflow changes to address these. Ensure staff are trained in the use of available registries for monitoring and tracking medication monitoring requirements. Identify barriers to a timely response to medication non-adherence and implement workflow changes and staff training as needed.

# Executive Summary

California Health Care Facility (CHCF) is a large, multi-mission institution primarily designated for individuals who are incarcerated and require acute or chronic medical and mental health services. The facility also includes a Mainline (ML) Level II yard. CHCF delivers the full spectrum of mental health care, including Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), Acute Psychiatric Inpatient Program (APP), and Intermediate Care Facility (ICF).

| Facility | Program | Mental Health Level of Care Served |
|---|---|---|
| A yard | MHCB, Prison Work Crew (PWC) | MHCB, GP, CCCMS |
| B yard | Psychiatric Inpatient Program (PIP) | Acute, ICF |
| C yard | Outpatient Housing Unit (OHU) | GP, CCCMS, EOP |
| D yard | Correctional Treatment Center (CTC), Assisted Living Outpatient Housing Unit (ALOHU), Alternative Housing (ATH) | GP, CCCMS, EOP, ICF, Acute, MHCB |
| E yard | ML, Restricted Housing Unit (RHU) | GP, CCCMS, EOP |

Strong performance in several core areas of clinical operations was identified. Access to care indicators demonstrated high timeliness in emergent, urgent, and routine referrals, as well as strong compliance with RHU EOP daily contacts and timely transfers to higher levels of care. Psychiatry showed strengths in diagnostic monitoring performance, exceeding statewide averages for multiple measures. Suicide prevention efforts were bolstered by highly collaborative RHU huddles, strong SPRFIT functioning, near universal completion of required training, and consistent safety planning practices in reviewed cases. Additional strengths were observed in comprehensive IDTTs within MHCB and RHU, and adequate justification for MHCB referral rescissions. Overall, patients report satisfaction with the mental health services provided, and staff morale remains high, notwithstanding the complexity of missions at CHCF.

Despite these strengths, significant deficiencies exist across multiple domains. Access to care performance was hindered by inadequate primary clinician and psychiatry contacts, chronic shortfalls in required treatment hours in ML EOP and PIP, inconsistent use of interpreters, and barriers to maintaining confidentiality during treatment sessions. Psychiatry exhibited substantial gaps in timely contacts, medication nonadherence responses, and required diagnostic monitoring for mood stabilizers. Suicide prevention deficiencies included inconsistent SRE mentoring, incomplete risk documentation in SRMP treatment plans, improper use of holding cell forms, and inconsistent clinician evaluations for patients on suicide precautions in the PIP. Patient care concerns included variable IDTT quality in PIP and EOP settings, resulting in insufficient safety assessments during IDTT, inconsistent collaboration, and unmet staffing benchmarks for IDTT participation.

Across domains, several themes emerged: workflow and procedural reliability are more impactful barriers than staffing. There are several areas with adequate staffing but persistent gaps associated with processes, documentation accuracy, and scheduling systems. Communication breakdowns among clinicians, schedulers, custody staff, and interdisciplinary teams—contributed to gaps in out-of-cell access, treatment planning, timely completion of required contacts, and appropriate use of forms and documentation. Collectively, these themes indicate the need for more reliable operational processes, strengthened quality assurance structures, and greater consistency in implementing established clinical and procedural expectations.

## Priority Recommendations

1. **Ensure Timely Clinical Contacts and Enhance Structured Treatment Hours:** During the review period, primary clinician contacts were completed in accordance with required standards 64% of the time. Psychiatry contacts demonstrated a lower rate of 38%. Timely Psychiatry responses to medication non-adherence notifications averaged 11% for critical medications and 43% for non-critical medications over six months. Structured treatment opportunities in both PIP and non-PIP settings consistently fell below the minimum requirements throughout the review period. Although the PIP provided both core and supplemental treatment, the required minimum hours of treatment were not regularly offered to patients. On average, 1% of patients were offered at least 20 hours of programming, including a minimum of 10 hours of core treatment hours. The ML EOP program similarly did not consistently deliver the required number of treatment hours; only 54% of mainline EOP patients were offered the minimum 10 hours of treatment. Current psychiatrist staffing vacancy rates are at 0%, so staffing shortages do not appear to be driving the gaps in timely psychiatry contacts. Vacancies among psychologists for the inpatient units and specialized areas are at 21%, with the vacancies concentrated in the PIP, which has about 75% of its beds currently full. The vacancy rate for primary clinicians is 32%.

   Establish clear procedural guidelines and regular audits for clinical contacts to address gaps in primary clinician and psychiatry contacts. To ensure consistent and efficient psychiatric care, conduct a review of timely psychiatry contacts, including timely and accurate closure of appointments to ensure data accuracy. Identify factors contributing to delays in responding to medication non-adherence notifications. Ensure that patients in PIP and ML EOP are offered the required treatment hours by expanding group offerings, including clinician-led groups and adjusting scheduling practices as needed.

2. **Maintain Confidentiality of Treatment Space:** Two observed group sessions were conducted with the door open, resulting in a lack of confidentiality for participants. Onsite observation also revealed that an RHU GP screening was conducted without adequate confidentiality; the door remained open. Also, custody officers should not be present during mental health groups or confidential treatment unless serving as certified translators or attending based on a specific security need. When present in treatment, custody officers have a duty to protect patient information.

   Implement a facility-wide standard requiring closed doors for all treatment sessions including but not limited to groups and screenings. Limit custody presence in group treatment and screenings to officers present for approved purposes, such as certified translators.

3. **Strengthen Suicide Prevention Documentation Quality and Communication Strategies in High-Risk Areas:** Suicide prevention documentation was below benchmarks throughout the review period. Chart reviews of patients who experienced emergent and urgent referrals during the review period revealed instances where potential self-harm or intentional overdose was indicated but not explicitly documented as the reason for referral; the required suicide risk assessment (SRE) was completed in 73% of these cases. Of the reviewed master treatment plans for patients enrolled in the suicide risk management program (SRMP), 60% had comprehensive risk documentation addressing the reason for the patient's placement in the SRMP. Clinical follow-ups had a completion rate of 67% over the audit period. In the PIP, 50% of the patients on suicide watch or suicide precaution did not have the required clinical contacts, resulting in orders for observation status being entered without corresponding assessments. Additionally, several patients were discharged from suicide observation without receiving an evaluation from a clinician. For patients placed in temporary holding cells, CHCF was using a non-CDCR authorized "Holding Cell Log" form, which lacked a section for documenting the reason for placement. There was limited access to out-

of-cell activities in MHCB due to a communication breakdown; only 31% of patients housed in MHCB during the onsite audit were offered the required minimum of out-of-cell activities.

Require clinical staff to develop comprehensive risk documentation for every patient, ensuring that interventions and goals directly address the reasons for SRMP placement. Conduct supervisory reviews of SRMP-related treatment plans. Ensure SREs are completed consistently for all applicable referrals. Implement a protocol in which no patient may be discharged from suicide watch or have orders entered without a documented clinician evaluation. Implement the use of the authorized CDCR holding cell log form to facilitate accurate recordkeeping. Improve communication between the IDTT and the housing unit staff, to relay all approved out-of-cell activities; update orders for privileges to include both yard and dayroom, thereby expanding out-of-cell opportunities for MHCB patients.

4. **Implement a Structured IDTT Quality Improvement Initiative:** Only 29% of observed IDTTs demonstrated an interactive process. Instances of misinformation regarding level of care, least restrictive housing, and referrals to the Department of State Hospitals being provided to patients in the PIP's acute and intermediate levels may have adversely affected patient care. There was limited discussion regarding safety planning and self-harm assessments were not conducted when patients reported self-harm during IDTT.

   Implement targeted training for IDTT members and program supervisors in PIP, ML EOP, and CCCMS to promote integrated, collaborative treatment planning and improve communication. Establish routine leadership reviews of IDTT meetings to ensure accurate information is shared with patients and that self-harm assessments are conducted thoroughly when concerns arise. Standardize the process of offering or providing patients with copies of their treatment plans during or immediately after IDTT meetings to increase transparency and patient engagement.

# Executive Summary

California State Prison – Los Angeles County (LAC) is a multi-mission institution serving male patients across several levels of care. Services are delivered across a general population program, a restricted housing unit, and a Mental Health Crisis Bed. The RHU CCCMS population is housed in Z-Unit, and an RHU EOP overflow population is housed in C5. Approximately 64% of the incarcerated population is enrolled in mental health programming.

| Facility | Function | Mental Health Program |
|---|---|---|
| Minimum Support Facility | General Population Housing | ML CCCMS |
| Facility A Yard | General Population Housing | ML CCCMS |
| Facility B Yard | General Population Housing | ML CCCMS |
| Facility C Yard | General Population Housing, RHU EOP Overflow | ML CCCMS, RHU EOP Overflow |
| Facility D Yard | General Population Housing, Enhanced Outpatient Program, Restricted Housing Unit | ML EOP, RHU EOP, ML CCCMS |
| Central Services Building (CTC/MHCB) | Correctional Treatment Center; Mental Health Crisis Bed | MHCB |
| Z-Yard | Restricted Housing Unit | RHU CCCMS |

The audit identified areas of compliance. Custody staff knew when and how to refer patients to mental health, and referral forms were available in every housing unit reviewed. Individual treatment spaces were confidential and adequate in 58 of 61 rooms reviewed. Psychiatric technician rounds in all restricted housing units met every audit criterion, and patients across the institution spoke well of their psychiatrists. Suicide prevention, CPR, use-of-force, and CMHPP training were all at or above 92%. Emergent referrals resulted in a suicide risk evaluation 98% of the time. Transfers to the MHCB and EOP met timeliness requirements in 96% and 100% of cases, respectively. Staff were engaged and well prepared throughout the visit, and the institution corrected several issues while the team was onsite.

The deficiencies fall into six areas. First, treatment planning: IDTTs showed an interactive process in 13% of observations and required staffing in 44%, treatment goals were measurable in 8 of 30 observed IDTTs, higher level of care considerations were discussed in 7 of 30, and only 36% of cases flagged for consideration of a higher level of care and that did not result in a referral had adequate Higher Level of Care documentation to support the decisions. Second, timely access: timely IDTTs (63%), psychiatry contacts (68%), mental health referrals (73%), and primary clinician contacts (77%) were all below threshold, and LAC offered EOP patients with the required number of structured treatment hours in only 59% of the cases. Third, medication management: timely response to non-adherence notifications was 45% for non-critical and 70% for critical medications, and a number of mood stabilizer laboratory monitoring metrics were low, with the six-month average for timely lithium level laboratory monitoring the lowest at 22%.Fourth, MHCB and crisis practices: MHCB patients were offered an average of 33 minutes of yard or dayroom per week against a 10-hour requirement, issue and observation orders lacked justification in all 10 charts reviewed, only 1 of 15 rescinded MHCB referrals had an adequate safety plan, 43 patients were held in temporary holding cells for more than four hours, timely clinical follow-ups were conducted in 45% of cases, and the SPRFIT meeting lacked a quorum in all six months reviewed. Fifth, restricted housing: transfers to RHU CCCMS were timely 42% of the time, patients remained in intake cells past 72 hours because of capacity issues, the C-5 overflow unit provided no yard or telephone unless the patient had tablet access, and the mental health clinician did not provide relevant clinical information in any of the 10 Institution Classification Committees (ICCs)observed. Sixth, RVR mental

health assessments were conducted in a private setting 48% of the time, met documentation requirements 44% of the time, and were requested in a timely manner 37% of the time.

These findings fall into structural, operational, and clinical-quality issues. Structural issues include the shortage of RHU EOP beds that drives overflow housing and long intake stays and the C-5 overflow unit's physical plant. Operational issues include scheduling and escort processes that result in missed appointments and groups, failure of supervisors to review safety plans, and ineffective workflows for non-adherence notifications and RVR assessments. Clinical-quality issues include incomplete treatment planning, level of care decisions, and safety planning. The priority recommendations below address the operational and clinical-quality issues the institution controls and identify the structural barriers the Receiver will address.

## Priority Recommendations

**1. Raise the clinical quality of IDTTs and treatment planning**: Across 30 IDTTs observed in the MHCB, mainline CCCMS, mainline EOP, and both restricted housing programs, there were widespread deficiencies related to an interactive process, staffing, case formulation, treatment goals, and higher level of care appropriateness and documentation as described above. Patients on three yards described goals as general, could not recall an IDTT, or felt the meeting was scripted. Psychiatric input, patient engagement through open-ended questions, and access to the record were consistent strengths to build on.

Bring the quality of every IDTT up to meet the statewide Mental Health Program Guide policy requirements. Standardize case formulation (symptoms, functional impairment, strengths, areas of distress), set measurable goals with specific interventions, and strengthen level of care justification that addresses each HLOC consideration. Maintain a tracking system of the quality of HLOC Considerations documentation assessed by the Inpatient Coordinator (IPC) during monthly local audits to identify barriers and trends, provide feedback to clinicians based on the reviews, and modify interventions as needed. Assign supervisors to observe IDTTs in every program monthly using the statewide criteria and give clinicians individual feedback. Track performance monthly until all IDTTs meet audit requirements.

**2. Provide timely access to clinical contacts, referrals, and structured treatment**: LAC is not currently offering timely access to mental health services, as described above. In the RHU CCCMS, group assignment was made by the office technician and not based on clinical needs. Appointments were cancelled for custody reasons 15% of the time. During the audit we observed that appointments started late or did not occur because patients were not ducated or escorted. Patients on Facility C described referrals as a waiting game and said they had to go man down to be seen.

Map the scheduling, ducat, and escort workflow for mental health contacts, referrals, and groups in each program, fix the points where contacts are lost, and assign a responsible staff person to track mental health treatment timeliness in that program and address barriers to care. Assign patients to groups during IDTT based on their individual clinical needs. Review overdue referrals and contacts daily at the huddle. On a monthly basis, track timely-access and treatment offered indicators until sustained at threshold.

**3. Respond to medication non-adherence and complete mood stabilizer monitoring**: Timely response to non-critical medication non-adherence notifications averaged 45% across 2,925 instances, and timely response to critical notifications averaged 70%. MAPIP data show valproic acid level monitoring at 39%, lithium level monitoring at 22%, and lithium thyroid monitoring at 45%. Psychiatry staff reported that lab draws conducted outside of housing units drive refusals of medication monitoring appointments.

Map the workflow for receiving, triaging, and scheduling non-adherence responses, assign responsibility at each step, and revise procedures so notifications are not lost or delayed. Complete a retrospective review of every patient on valproic acid, lithium, carbamazepine, and oxcarbazepine to confirm required labs are done or scheduled and use the available registries and EHRS reminders prospectively. Address lab draw location to reduce refusals. Track response timeliness and mood stabilizer monitoring monthly by provider until sustained at threshold.

**4. Bring MHCB and crisis-continuum practices into compliance**: MHCB access to the yard and dayroom, issue and observation justification, safety plans, and timely clinical follow ups were all well below the required performance. Patients were held in temporary holding cells for over four hours on many occasions. Other suicide prevention practices, including reviewing serious suicide attempts and meeting quorum in the SPRFIT committee, also were not implemented.

Offer and document a minimum of 10 hours of out-of-cell activity per week for every MHCB patient and have the MHCB supervisor review weekly totals. Require daily, individualized justification for issue and observation levels. Audit records of temporary holding cell stays monthly and address the causes of any stays that extend beyond four hours. Restore SPRFIT quorum, correct designees, and complete case reviews for serious suicide attempts. Track each measure monthly until sustained at threshold.

**5. Reduce stays in RHU to align with policy, resolve overflow conditions, and improve effectiveness of the clinician's role in ICC:** Timely transfers to RHU CCCMS averaged 42%. Patients remained in intake cells past 72 hours in both restricted housing units because of insufficient capacity. One captain reported sending about 10 patients a week to the RHU EOP for safety concerns or pending investigations, and some remained longer than 30 days after having been made NDRH status. The C-5 overflow unit had no intake cells, no Guard One, and no yard or telephone access (except via tablet), and clothing and linen exchange was inconsistent. In all 10 ICCs observed, the mental health clinician did not provide information about the patient's current condition, so the chair did not have a basis for incorporating clinical needs into the decision-making; clinicians treated their role as clearing the patient to proceed with the meeting.

Track intake cell stays over 72 hours daily. Provide yard and telephone access, intake cells or an equivalent safeguard, Guard One, and documented clothing exchange in any unit operating as a RHU. Reduce the length of stay for those patients included in the RHU EOP for protective placement through the classification process. Develop a standardized ICC clinical summary template specifying the minimum information the mental health clinician must present which includes: patient's current participation in treatment, medication compliance, suitability of single celling or double celling, risk assessment of self-injurious or assaultive behavior, status of Activities of Daily Living (ADL), ability to understand Due Process proceedings, likelihood of decompensation if retained in RHU including through review of records of prior RHU placements, recommendations for alternative placement, and any other clinical issues that have impact on patients' mental health treatment. Provide remedial training for the MH clinicians who attend ICCs to improve the functioning of the ICC overall and the quality of input provided to the committee. The Region IV staff can support this training endeavor.

**Structural Issue:** The shortage of RHU EOP beds statewide is outside the institution's control. The Receiver is working to address the insufficient space for treating MHSDS patients who are placed in RHUs. The institution has taken action within its control to relocate patients who were placed in a RHU overflow unit without access to yard or telephones to another unit. If further assistance is needed to support this transition, the institution should document the needs and escalate them through the Receiver's Compliance Team.

# Executive Summary

Mule Creek State Prison (MCSP) is a multi-level, 270-degree design institution located in Amador County. Approximately 2,179 of the 3,707 (59%) incarcerated residents at MCSP are enrolled in mental health programming. At the time of the audit, 779 mental health patients were enrolled in EOP and 1,384 enrolled in CCCMS.

Residents are housed across six large mainline facilities and an eight-bed Mental Health Crisis Bed (MHCB) located within the institution's Correctional Treatment Center (CTC). Enhanced Outpatient Care (EOP) is offered across three mainline facilities (A, B, and D Yard) and Correctional Clinical Case Management System (CCCMS) services are offered across all six mainline facilities (A, B, C, D, E, and MSF). MCSP's Restricted Housing Unit (RHU) is a designated EOP HUB and currently accommodates EOP patients and CCCMS patients awaiting transfer. The RHU (C12) contains 16 intake cells (126-133, 226-233). Thirty cells within Facility C13 are utilized as RHU overflow space (101-115, 201-215). The institution does not operate a Psychiatric Inpatient Program (PIP); patients requiring this level of care are transferred to other institutions. The Alternative Housing Unit (AHU) for patients waiting for licensed mental health bed placement is comprised of prioritized space within C12 (147-150), C13 (113-115, 118-121), two holding modules within the Triage and Treatment Area (TTA), four modules within Receiving and Release (R&R), and two modules within Central Services.

In January and February 2026, there was a conversion of B and C Yard. Specifically, B8 and B9 were converted to Level III NDPF (from Level III SNY previously). C11, C13, C14, and C15 were converted to Level II NDPF (from Level III SNY previously). These conversions resulted in increased intakes into the mental health program.

| Facility | Function | Mental Health Program |
|---|---|---|
| Facility A (Level IV ML) | SNY housing for GP, CCCMS, and EOP (A5 only); five cell housing units (270-degree design). | ML EOP and CCCMS |
| Facility B (Level III ML) | NDPF housing for GP, CCCMS, and EOP (B6 & B7 only); four cell housing units currently (270-degree design); B10 deactivated July 2024. | ML EOP and CCCMS |
| Facility C (Level II ML) | NDPF housing for GP and CCCMS; four ML cell housing units (270-degree design) | ML CCCMS |
| Facility D (Level II ML) | NDPF housing for GP, CCCMS, and EOP (D18 only); three dormitories | ML EOP and CCCMS |
| Facility E (Level II ML) | NDPF housing for GP and CCCMS; three dormitories | ML CCCMS |
| MSF | NDPF housing for GP and CCCMS; one dormitory currently; Dorm #1 deactivated July 2024 | ML CCCMS |

| | | |
|---|---|---|
| CTC | Correctional Treatment Center; contains eight-bed MHCB; AHU comprised of designated space within C12, C13, TTA, R&R, and Central Services | MHCB |
| RHU (C12) | Restricted Housing Unit with both EOP Hub and CCCMS LOC (two tiers; 16 intake cells). 30 cells within C13 are utilized for RHU overflow | RHU EOP Hub |

The review found that MCSP consistently excelled in several areas. Staff in the Restricted Housing Unit Enhanced Outpatient Program (RHU EOP) completed timely primary clinician (PC) and psychiatry contacts 99% of the time during the audit period. The team held interdisciplinary treatment team meetings (IDTTs) on schedule 98% of the time. RHU nursing staff completed screening of people entering the RHU on time at high rates. Staff offered RHU EOP patients 10 hours of structured treatment 96% of the time.

The MCSP quality management (QM) team consistently identifies performance opportunities and initiates improvement plans. One example of the impact of this work is the improving trend in compliance with emergent, urgent, and routine referral timelines. Compliance with referral timelines increased from 77% in December to 89% in May. Additional mental health QM initiatives included reducing custody-related appointment cancellations and securing confidential spaces for urgent and emergent appointments, ensuring patients receive care privately.

Custody knowledge of MH referral processes, adherence to carrying CPR mouth shields, thermometer checks and availability of a thermometer with accurate reading was 100% across all housing units.

Mental health staffing and timely appointments, including those affected by custody cancellations, need improvement. Although staffing for primary clinicians and psychiatrists has increased, recreation therapist staffing dropped from 92% in December to 66% in May, which reduced the ability to hold group treatment hours. MCSP continues to face challenges with onsite primary clinician staffing. Primary clinician staffing averaged 65% across the review period, with about 19% provided by in-person staff, which further limited group treatment hours. MCSP maintains a triage plan tailored to each facility, ensuring EOP primary clinicians conduct contacts every two weeks, while EOP modified patients, SRMP, and ICF level of care patients on EOP D yard receive weekly contacts. Staffing shortages also impacted IDTTs, which were held at the prescribed timelines only 68% of the time during the audit period. Quality management minutes document a backlog caused by previous staffing deficits, but they expect improvement as primary clinician staffing increases.

Appointment cancellations due to custody reasons were at 25% in December 2025, increasing to 43% in February, and improved to 6% or less for three consecutive months but in June 2026 there was another increase in appointment cancellations due to custody to 18%. Quality improvement minutes reflect analysis of the reasons for these cancellations, with workplans intended to address the documented barriers; however, the improvement was not sustained. These findings are consistent with patient reports regarding access to care, where challenges getting to appointments were described on most yards. This is also consistent with data regarding mental health appointment completion data, which show that 65% of scheduled mental health appointments were completed or documented as refused in June 2026.

Additionally, except for RHU EOP patients, most individuals did not feel adequately supported by custody and mental health staff during a mental health crisis. Some patients reported that staff responses to requests for assistance were perceived as dismissive or resulted in being returned to their cells. There were also accounts, particularly on D yard, of behaviors that may discourage patients from seeking treatment. These concerns merit further review and consideration by the institution team.

## Priority Recommendations

1. **Improve attendance at confidential appointments:** Analyze the factors impeding attendance at confidential appointments and develop a plan to increase attendance in confidential settings. Site observations and patient reports indicate that rushed unlock times prevent patients from attending confidential visits, resulting in brief cell-front encounters or missed appointments. Custody reasons contributed to 18% of appointment cancellations during the audit period. The Quality Management team should continue the plan to reduce custody-related cancellations and set clear expectations for standard unlock times—such as a ten-minute unlock for each appointment block—to ensure staff and patients understand these procedures. Mental health and custody staff must receive refresher training, so they consistently offer confidential appointments when possible. To ensure there is accurate data to track and address the issue, include a review of appointment coding and cancellation reasons and train clinicians to ensure they document confidentiality and reasons for non-confidential appointments accurately. Use the findings to develop a workplan as indicated that addresses the primary barriers for completion of confidential appointments.

2. **Develop a Facility-Wide Treatment Space Remediation Plan:** Institution leadership should continue implementing space remediation. Plans for improvements to facility A are in progress pending labor and plant operations approval and completion. Action is recommended to address treatment and office space needs facility wide. This plan should include improvements to confidentiality and safety in identified treatment spaces. Onsite assessment found 79%† of group treatment spaces, 89%† of individual treatment spaces, and 78%† of IDTT spaces met all audit criteria. The deficits are predominately confidentiality and safety. Specifically, the CCCMS IDTT room on facility A has a window where other incarcerated individuals can see into the room. Implement remedial measures to ensure visual confidentiality, such as frosting windows, while maintaining safety requirements. Reconfigure clinical treatment spaces so that the patient is not blocking the egress and ingress route to the room.

3. **Improve quality of safety planning:** Provide refresher training on individualized safety planning to all clinical staff, with mandatory participation for clinicians routinely assigned to MHCB recissions and MHCB discharges. Emphasize that safety plans must reflect the patient's specific risk factors, be developed collaboratively with the patient, and not consist of stock phrasing. Initiate monthly reviews of safety plans for rescinded MHCB referrals and MHCB discharges who require safety plans, with individual mentoring for plans that do not meet standards.

4. **Improve mental health emergent response procedures:** Custody staff demonstrated knowledge of what to do when an incarcerated individual reports they have a mental health emergency, however patients in mainline EOP reported lack of response when reporting a mental health emergency. Institution leadership should further review these patient reports to determine whether staff members are responding as required

by policy. If necessary, develop plans to educate patients and staff about expectations regarding mental health emergencies. Plans should be designed to ensure patients understand expected response times and that staff follow policy regarding responding to mental health emergencies.

# Executive Summary

Pelican Bay State Prison (PBSP) is a multi-level, 180-degree design institution located in Del Norte County. It operates 28 housing units across two Level IV mainline facilities (A and B Yard), one Level II mainline facility (D Yard), a Minimum Support Facility (MSF), one freestanding CCCMS Restricted Housing Unit (RHU), and a 10-bed Mental Health Crisis Bed (MHCB) unit. Approximately 55% of the incarcerated population at PBSP is enrolled in mental health programming. Services are delivered across a Special Needs Yard Enhanced Outpatient Program (SNY EOP) with capacity for 96 patients, a CCCMS Restrictive Housing Unit with capacity for 125 patients, and approximately 1,090 ML CCCMS patients. PBSP's RHU contains nine intake cells (112-115, 188-192) and temporarily houses EOP patients awaiting transfer to an appropriate program. Facility B, Unit 2 is utilized for RHU overflow (101-124, 201-224). The MHCB is located within the institution's Correctional Treatment Center (CTC). The institution does not operate a Psychiatric Inpatient Program (PIP); patients requiring this level of care are transferred to other institutions.

During the review period, Facility A was converted to Level IV General Population (GP) housing on March 23, 2026 (from a previous Level II Non-Designated Programming Facility). Level II CCCMS patients were subsequently transferred to D Yard. On April 6, 2026, Facility B was converted to a Level IV Special Needs Yard (from previous Level IV General Population housing). Level IV GP residents were subsequently transferred to A Yard. Units A1, A2, B7, and B8 were temporarily closed during the review period, pending the installation of updated fire suppression systems.

| Facility | Function | Mental Health Program |
|---|---|---|
| A (Level IV ML) | General Population (GP); eight cell housing units (180-degree design). A1 and A2 temporarily closed | ML CCCMS |
| B (Level IV ML) | SNY housing for GP, CCCMS, and EOP (B1 only); eight celled housing units (180-degree design). B2 is utilized for RHU overflow. B7 and B8 temporarily closed | ML EOP and CCCMS |
| D (Level II ML) | Non-Designated Program Facility (NDPF); 10 cell housing units | ML CCCMS |
| RHU CCCMS | Standalone Restricted Housing Unit for CCCMS; temporarily houses EOP patients pending transfer (nine intake cells) | RHU CCCMS and non-Hub EOP awaiting transfer |
| MSF | General Population; two dormitories | ML CCCMS |
| CTC | Correctional Treatment Center; contains 10-bed MHCB. AHU comprised of designated space within both the CTC (172-176, 178) and Specialty Clinic (102, 155, 153) | MHCB |

The recent conversions of B Yard from a General Population yard to SNY and reopening A Yard as a Level IV General Population yard have been accompanied by a substantial influx of new arrivals, increased Rules Violation Reports (RVRs), safety investigations, and population redistribution. The most significant infrastructure constraint is the shortage and physical limitations of mental health treatment spaces, which limit confidentiality and safe egress for staff. PBSP has responded to increased patient intake by allocating additional resources, but there continues to be a need for expanded and improved treatment areas. The limitations of the existing treatment space have contributed to difficulties in meeting treatment expectations for

CCCMS patients as resources are prioritized for higher acuity patients. Patients with greater functional limitations in EOP require additional resources and frequently refuse program participation or seek placement in MHCB or RHU due to safety concerns.

PBSP's reliance on telehealth creates operational challenges, especially when presenter and clinician schedules do not align. Combined with mission changes and reported custody staffing shortages, access to care—particularly in the CCCMS program—is hindered, leading to frequent appointment cancellations and low rates of timely treatment contacts.

During the observation of IDTTs at PBSP with multiple remote participants, conversation did not flow freely. While IDTTs generally occur as required, treatment goals are often not discussed or documented. Conversations typically center on current symptoms and housing rather than individualized objectives, interventions, or progress toward functional improvement.

Compliance with the Custody Mental Health Partnership Plan (CMHPP) was also lacking, with daily huddles and executive rounding not occurring as required by policy. Given the challenges with timely completion of ducated appointments, the CMHPP, which is designed to improve communication amongst mental health and custody staff, is critical.

Despite these challenges, patients generally reported positive relationships with treatment team members and satisfaction with the quality of clinical interactions. Clinicians demonstrated flexibility in maintaining treatment access during periods of modified programming by utilizing additional treatment spaces, conducting weekend treatment groups, running simultaneous IDTTs to address increased demand, and redistributing patients into alternative groups when cancellations occurred.

Nearly all custody staff completed Use of Force training (99.8%), and all completed Suicide Prevention training (100%). CPR mouth shields were carried by all officers observed. Custody staff demonstrated awareness of mental health referral procedures except in one building, and 128-MH5 referral forms were available in all housing units. All transfers to MHCB, ICF, and Acute programs were completed on time throughout the reporting period.

Overall, PBSP's mission conversions have placed considerable pressure on mental health services and infrastructure. Addressing these challenges is critical to ensuring safe, confidential, and timely care for patients and staff. Priority recommendations focus on expanding treatment space, improving operational efficiency across the institution, and strengthening treatment planning.

## Priority Recommendations

1. **Improve sound/visual confidentiality in identified treatment spaces and reconfigure clinical treatment spaces for safety**: Onsite assessment found 14%† of group treatment spaces, 46%† of individual treatment spaces, and 33%† of IDTT spaces met all audit criteria. The deficits are confidentiality and safety issues. Identify all treatment spaces where confidentiality issues have been documented or reported and implement remedial measures such as placing sound muffling devices, frosting windows while maintaining safety requirements, and scheduling treatment to enable confidentiality in shared spaces. Staff and patient safety are paramount. Clinical treatment spaces need to be reconfigured so that the patient is not blocking the egress and ingress route to the room.

2. **Improve appointment cancellation tracking and adherence to schedules:** Custody driven cancellations averaged 10% over the audit period per the MH reporting system, which was inconsistent with data retrieved from the correctional compliance healthcare access page, where the custody cancellation rate was reported at 1% over the review period. Seventy-nine percent of all scheduled appointments were either seen or declined by patients. Reconcile appointment cancellation reports to ensure accurate accounting for appointment cancellations. Convene a joint meeting between mental health and custody leadership to review communication and documentation regarding appointment cancellations between clinical and custody staff. Develop and implement a protocol to ensure that custody executes priority ducats and clinicians are not cancelling appointments without authorization or an allowable reason.

3. **Assess and develop a workplan to improve access to care**: Performance report data for the six-month reporting period indicate that CCCMS patients saw their PC within required timelines 76% of the time, EOP patients were seen within timelines 94% of the time, and RHU CCCMS patients were seen within timelines 82% of the time. IDTTs were completed within policy timeframes 59% of the time, while psychiatry contacts occurred as required 70% of the time. The quality management committee should conduct an analysis to determine the core reasons for missed timelines for primary clinician, psychiatry, and IDTTs. Implement changes to scheduling, oversight, and other areas responsive to the findings until consistent timeliness is achieved.

4. **Implement an IDTT quality improvement process**: Implement routine supervisory observation of IDTTs using the mental health Continuous Quality Improvement audit tool, followed by direct feedback to treatment team members after each observation. IDTT required staffing averaged 56% over six months with no improvement trend and observed IDTTs demonstrated an interactive clinical process in only 15% of presentations. The most frequent qualitative deficiencies (incomplete case formulation, treatment goals that are not measurable, no level-of-care discussion, and no discussion of Rules Violation Report mental health assessments) are clinical-practice and supervision concerns rather than staffing shortfalls. This recommendation addresses IDTT clinical quality and is distinct from the timeliness deficits addressed in Recommendation 3. The quality improvement process should focus on strengthening treatment planning, ensuring measurable treatment goals are developed and linked to diagnoses and functional impairments, and improving overall consistency across IDTTs. Institution leadership should also evaluate opportunities to strengthen patient engagement in the treatment planning process.

5. **Adhere to established CMHPP policies and procedures**: Several Custody and Mental Health Partnership Plan functions (including daily huddles, round table sessions, and executive joint rounding) have not consistently followed established policy, used the designated documentation, or sustained

required attendance from both mental health and custody staff. Unit custody officers have not regularly attended daily huddles, which is a critical component of CMHPP.

Bring CMHPP functions into conformity with policy by requiring documentation, mandating attendance at required meetings, clearly defining participant roles in daily huddles and trainings, and restoring the required Inmate Advisory Council meetings.

6. **Improve MHCB access to yard activities and Durable Medical Equipment (DME):** PBSP should ensure appropriate access to MHCB out-of-cell activities. Re-evaluate OP 1015 to ensure it supports required access to yard time. Identify cause(s) of limited yard time and inaccurate tracking, implement a plan to address these causes, and review data to determine whether access improves. Restrictions for DME by the mental health treatment team should only be implemented when there is documented evidence that the specific item has been used or attempted to be used for self-injurious behavior. Clinical justification for any DME restriction should be individualized, clearly documented, and regularly reviewed to ensure restrictions remain clinically appropriate and are discontinued when no longer indicated.

7. **Strengthen suicide prevention infrastructure – Suicide Risk Evaluation (SRE) timelines, clinical justification of inpatient orders, and completion of discharge follow ups**: The suicide prevention program at PBSP shows deficits in several areas. Suicide risk evaluations were completed within required timeframes 75% of the time, and discharge follow ups were completed as required 69% of the time. Review of inpatient orders for issue and observation revealed lack of clinical justification. Review of suicide risk management program (SRMP) tracking showed outdated information, indicating that the institution team did not enroll and remove people from the program as required by policy. Establish a reliable tracking mechanism for all discharge follow-ups and post-discharge suicide risk evaluations, with assigned responsibility for monitoring completion and escalating missed deadlines. Improve clinical justification of issue and observation orders in inpatient settings. Establish a formal process to routinely review SRMP enrollment status to ensure patients are appropriately added to and removed from the program based on current clinical criteria.

# Executive Summary

From May 19 – May 22, 2026, the mental health programming at Richard J. Donovan Correctional Facility (RJD) was assessed on-site using the Continuous Quality Improvement Tool, with a focused Suicide Prevention and Response Focused Improvement Team (SPRFIT) assessment occurring just prior from May 14-15, 2026. The CQIT and SPRFIT reviews considered data covering a reporting period of October 1, 2025 – March 31, 2026. The audit evaluated mental health service delivery across access to care, treatment planning, medication management, suicide prevention, custody partnership, restricted housing, staffing, and institutional oversight. This extensive evaluation has identified areas of both strengths and deficits.

Key strengths identified during this review include: effectiveness of observed psychiatric technician rounding, intake screening, and R&R screenings; responsiveness to identified deficiencies; maintenance of suicide prevention and response equipment; housing unit custody staff's knowledge of Mental Health policies and procedures; training compliance; use of CIT and alternative housing; quality of morning meetings, the SPRFIT meeting, and the Mental Health Program Subcommittee meeting; and timely transfers to EOP and MHCB LOC. The mental health department has also steadily increased their fill rate in most civil service classifications over the course of the reporting period.

There were several deficiencies identified during the audit. IDTT quality, overall, is lacking. The RVR process was deficient in several areas, including confidentiality and timeliness of mental health assessments. Use of Force incidents involved mental health patients at a high frequency. A high rate of appointments are cancelled due to custody (13%). Some local operating procedures are inconsistent with statewide policy. Medication non-adherence notification performance is substantially below target. There remain longstanding treatment space concerns in Facility A EOP, Facility B CCCMS, and MHCB. Data entry error and documentation deficiencies were noted in areas such as RHU Hub certifications and controlled uses of force and did not meet requirements in any of the audited months. Moreover, several suicide prevention discharge-continuity indicators (timely clinical follow-ups, supervisory review of discharge safety plans) fell well below requirements.

The deficiencies documented in this report are driven by a combination of structural, operational, and clinical-quality factors. The structural barriers — the MHCB yard configuration that limits out-of-cell activity and the treatment-space limitations in Facility B CCCMS and Facility A EOP — cannot be resolved through institutional corrective action alone. The Receiver will need to address space needs that are beyond the control of the institution. The operational barriers (Facility C movement practices, custody-driven cancellations, local operating procedure misalignment, and data-entry errors affecting the RHU EOP Hub certification) are within institutional control. The clinical-quality deficits — IDTT treatment planning, RVR-MHA processes, medication non-adherence response, diagnostic monitoring, and suicide prevention documentation — are supervision and training problems that do not require additional resources to fix. RJD noted that remedying staffing deficiencies was a priority for the institution and they have made progress in filling state mental health classifications. As the fill rate for mental health clinician positions increases, it is important for the institution to allocate the staff to account for appropriate coverage in each of their mental health treatment programs. The six priority recommendations below are organized by urgency and target the areas where patient safety, treatment adequacy, or both are at stake.

## Priority Recommendations

1. **Conduct a quality review of IDTT processes across programs**: IDTTs were rated positively in some domains, however, the IDTTs generally struggled with lack of participation by members, which could be a function of lack of required staffing (62%), and is evidenced by an observed interactive process only 21% of the time. Qualitative review identified deficits in case conceptualization, diagnostic formulation,

measurable treatment goals, level-of-care justification, and in the EOP programs: discussion of assignments and accommodations. Treatment interventions were difficult to recognize, it was difficult to determine progress for the patients who had an annual IDTT in CCCMS, and clinical summaries were brief. Patients confirmed during interviews that they do not know their treatment plans and that the composition of treatment team members changes frequently.

Develop IDTT processes that produce individualized, evidence-based treatment plans through collaborative clinical team discussion with documented patient participation to ensure that the patient has an understanding of the process and results, addressing deficits in attendance, staffing, interactive process, and clinical content quality. The Region IV Mental Health team can be accessed for support in developing a plan to resolve these deficiencies.

2. **Review and Revise Local Operating Procedures (LOP):** LOPs for Custody and Mental Health Partnership Plan (CMHPP), Clinical Seclusion and Restraint, and High Refuser Processes are not currently compliant with statewide policy and/or are not providing clear direction for staff. The CMHPP LOP omits quarterly round table training in the MHCB on third watch and in the RHU CCCMS and does not include the required documentation upload process. Perhaps as a result of these policy problems, round table training was completed 58% of the time, with required-staff attendance documented in 17%† of audited cases. The clinical seclusion and restraint LOP lacks clear RN assessment requirements (see Patient Safety). The EOP High Refusers LOP does not include reference to the requirement for creation of 128B forms that address the most recent high refusal event or required mental health–custody meetings.

   Revise the CMHPP LOP to include quarterly round tables in all required areas and watches, and use of the correct attendance tracking tool for partnership trainings. Strengthening the CMHPP will support other recommended actions in this report, as concepts such as Effective Communication and De-Escalation Strategies for Mentally Ill Inmate-Patients are included in the training materials. Revise the LOP for clinical seclusion and restraint, to include updates that provide clearer guidance regarding RN assessment requirements when restraints are initiated. Revise the LOPs with regard to completion of 128Bs and required meetings for EOP high refusers in RHU. Once LOPs have been revised, train staff on the revisions with documentation of attendance included.

3. **Introduce Medication Non-Adherence Safeguards:** Timely response to medication non-adherence notifications averaged 31% for critical and 24% for non-critical notifications during the review period.

   Ensure adherence to required appointment and/or documentation requirements for medication non-adherence within the required timeframe. Discontinue the practice of combining non-critical medication non-adherence appointments with routine follow-up when this causes untimely response.

4. **Identify and Remove Barriers to Attending Confidential Mental Health Treatment Services:** Patients on Facility C face movement barriers to attending treatment, with 13% of mental health appointments cancelled due to custody, and onsite ratings of treatment-space confidentiality by the Receiver's Compliance Team diverged from the institution's 99% self-reported confidentiality ratings during their own on-site audits. On facility A, there is a clinical office that is accessed by walking through group treatment space, which disrupts and compromises the confidentiality of groups. Furthermore, treatment happening in either space can be heard from the other treatment space.

   Work with on-site custody partners to review processes that ensure timely movement to treatment activities and confidentiality of treatment spaces.

5. **Strengthen Suicide Prevention Clinical Processes and MHCB Out-of-Cell Access:** Suicide prevention clinical processes show deficits at several crisis-transition points. Suicide Risk Evaluations (SREs) upon MHCB referral for danger to self were completed in 71% of cases (299 of 426); timely

clinical follow-ups happened 34% of the time; safety plans were signed within the required timeframe 73% of the time; and the supervisory-review indicator for discharge safety plans averaged 8%. The onsite review found supervisory reviews were completed on time in all 93 cases examined (see Appendix B); this divergence between the automated indicator and the onsite review requires reconciliation. Appendix B chart reviews similarly found completed follow-ups in sampled cases, indicating documentation-timing and data-capture issues may be depressing automated scores.

No sampled MHCB patient was offered the required ten hours of weekly out-of-cell activity (average three hours), which is intended to support suicide prevention efforts. These deficiencies are driven by structural conditions, wherein the actual yard space is large enough that multiple patients could have out of cell time at once, but the way that it is currently structured, with one large open space and no small management yards for max-custody patients or other separations, only one patient is able to access out of cell/yard time at a time.

With support from the regional SPRFIT coordinator, perform a focused review of the SREs for referrals to MHCB for Danger to Self (DTS), followed by training based on the findings. Identify the source of discrepancies between low automated report numbers and onsite documentation and resolve the discrepancies. Elevate MHCB yard configuration and staffing issues to regional leadership for assistance addressing these issues. If unsuccessful, elevate these issues to headquarters and the Receiver for resolution.

6. **Provide training to mental health staff to ensure a comprehensive review of Use of Force events**: Controlled Use of Force mental health assessments did not meet documentation requirements during the reporting period. Appropriate assessment and documentation of the mental health assessment prior to a controlled use of force provides vital information to staff involved in the use of force when the incidence extends over multiple shifts and to the reviewing officials who assess the appropriateness and may mitigate consequences for the patient.

   Provide mental health staff focused training on completing and documenting the mental health assessment that is performed during controlled use of force incidents, review all documentation for controlled uses of force monthly and report the results to the Mental Health Program Subcommittee until sustained compliance is achieved.

# Executive Summary

Salinas Valley State Prison (SVSP) is a large, multi-mission, high security institution that includes Mental Health services for patients at the following levels of care: Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), and Intermediate Care Facility (ICF).

| Facility/Unit | Program | Mental Health Level of Care Served |
|---|---|---|
| A yard | Non-designated Programming Facility Level III (NDPF-III) | CCCMS, EOP |
| B yard | General Population Level IV (GP-IV) | CCCMS |
| C yard | General Population Level IV (GP-IV) | CCCMS, EOP |
| D yard | Sensitive Needs Yard Level IV (SNY-IV), Restricted Housing Unit (RHU) Overflow, Alternative Housing | CCCMS, EOP, MHCB |
| Building Z9 | RHU | CCCMS |
| Correctional Treatment Center (CTC) | CTC, MHCB | CCCMS, EOP, MHCB |
| Treatment Center (TC) 1 and TC2 | Psychiatric Inpatient Program (PIP) | ICF |

Strong performance was noted in various core areas of clinical operations. Access to Care indicators reflected strong compliance with intake screens, demonstrated awareness among custody staff regarding referral pathways, and efficient transfers to MHCB/EOP. Psychiatry excelled in some facets of diagnostic monitoring, surpassing statewide benchmarks for several performance measures. Primary clinicians consistently exhibited strong clinical expertise and demonstrated a high level of proficiency, particularly in the facilitation of group treatment sessions. In the RHU, PT rounds consistently met audit criteria, RHU screens and pre-screens were thorough, and compliance with basic RHU processes remained high, as evidenced by accurate NDRH identification, prompt ICC processes, and reliable shower access. Suicide prevention initiatives were notably robust, including an effective CIT, collaborative RHU morning huddles, high completion rates for required training, consistently comprehensive MHCB discharge safety plans, and detailed suicide risk management program (SRMP) treatment plans.

Despite these strengths, significant deficiencies persist across multiple domains, which are not attributable to staffing but instead represent ongoing operational workflow gaps. These gaps impede access to timely, adequate, and well-documented care across treatment settings. Access to care performance was adversely affected by inconsistencies in timely psychiatry and primary clinician contacts, as well as insufficient treatment hours offered in PIP, RHU CCCMS, and ML EOP. Psychiatry also exhibited notable shortcomings in responding to medication non-adherence and in completing required diagnostic monitoring for mood stabilizers and clozapine. Suicide prevention efforts were undermined by variability in suicide risk evaluations (SRE) and safety plans, and a lack of clinical follow-up for patients discharged from alternative housing. Additional patient care concerns included suboptimal IDTT quality in ML CCCMS, ML EOP, RHU CCCMS, and MHCB, as well as concerns regarding justifications when not referring patients to higher levels of care.

Several principal themes emerged through the audit. First, operational challenges—such as frequent alarms in D yard, inefficiencies in ducat distribution and patient movement to appointments, and inadequate support from custody—have a more pronounced impact than clinical staffing limitations and substantially impede access to clinical services and treatment. Second, poor cleanliness and overall environment of care undermine patient safety and increase symptom severity. Third, persistent gaps in documentation accuracy continue to present significant challenges.

## Priority Recommendations

1. **Implement a Structured IDTT Quality Improvement Initiative:** Only 15% of observed IDTTs demonstrated an interactive process. There was limited and inconsistent discussion regarding case formulation, measurable treatment goals, higher level of care, medications and their side effects, and safety planning. Patient level of care was discussed only 55% of the time, when the patient was identified as potentially requiring a higher level of care. One IDTT space did not have the capacity to accommodate both onsite and remote members who are required to participate. Although the supervisor was present in the room during the IDTTs observed as part of the onsite audit, the supervisor typically participates remotely, negatively impacting treatment planning.

   Implement targeted training for IDTT members and program supervisors institution-wide to promote an integrated and collaborative approach to treatment planning. Require onsite staff to attend IDTT meetings in person rather than remotely to further enhance the treatment discussion. Provide the IDTT field guide to all clinical staff to offer guidance and illustrate the essential elements of an effective IDTT. Establish routine leadership reviews of IDTT meetings to ensure a thorough discussion of treatment planning, level of care, and safety planning when clinically indicated. Engage the regional team to offer further assistance for the IDTT process by providing training recommendations, curriculum resources, or targeted support in specific areas as needed.

2. **Ensure Timely Clinical Contacts and Maximize Structured Treatment Hour Offering:** The data reflects persistent noncompliance in timely clinical contacts and deficiencies in treatment hours, especially in PIP, RHU CCCMS, and ML EOP. During the review period, primary clinician contacts were completed in accordance with required compliance standards 73% of the time. Psychiatry contacts demonstrated a lower completion rate, at only 57%. Timely psychiatry responses to medication non-adherence notifications averaged 28% for critical medications and 62% for non-critical medications over six months. Structured treatment opportunities in both PIP and non-PIP settings consistently fell below the minimum requirements for every month within the review period. Although the PIP provided both core and supplemental treatment, the required minimum hours of treatment were not regularly offered to patients. On average, 31% of patients were offered at least 20 hours of programming, including a minimum of 10 hours of core treatment. The outpatient programs similarly did not consistently deliver the required number of treatment hours; only 17% of EOP patients were offered minimum required treatment hours. Gaps in the provision of clinical care appear to be driven primarily by inconsistencies in patients' ability to access the treatment location and disruptions due to safety and security protocols.

   Establish a custody and clinical joint quality management project specific to the Mental Health Services Delivery System to identify custody related barriers to mental health treatment access. Using a range of activities such as chart reviews, staff interviews, and observational analyses, develop strategies to resolve each barrier. The project should achieve quality control by following the principles of Lean Six Sigma. Implement the strategies and review rates of treatment at least weekly until compliance is achieved to determine if further modifications of the strategies are needed. Ensure that data entry accurately reflects the reasons for missed appointments to support this review and analysis.

Identify contributing factors to the problems with medication non-adherence responses, with a targeted focus on timely responses to critical medication non-adherence. Implement staff training as needed to facilitate understanding of requirements and develop a plan to address any additional identified barriers.

3. **Conduct a Focused Quality Review of Rules Violation Reports (RVR) and RVR-Mental Health Assessments (MHA):** The onsite audits found that clinicians rarely found that a patient's behavior was strongly influenced by symptoms of mental illness, and therefore few recommendations were made to document the behavior in an alternate manner. RVR-MHAs appeared to be conducted in private settings only 46% of the time; unavailability of custody to escort the patients to a private setting was documented by the clinician in five of 32 reviewed instances. Further, RVRs were sometimes issued for behaviors occurring during emergency forced medication administration, which may unfairly penalize patients experiencing acute medical or psychiatric crises.

   Establish clear guidelines and staff training to ensure RVRs are not automatically issued for behaviors exhibited during emergency forced medication administration, especially when physical force is required for emergent clinical intervention. Conduct a case-by-case assessment to distinguish between conduct directly related to psychiatric emergencies and unrelated infractions and provide documentation to hearing officers when behavior is associated with a psychiatric emergency to prevent issuance of discipline. Provide supervisory support and oversight for clinicians conducting RVR-MHAs, particularly for patients in inpatient settings, to ensure documentation of a nexus between symptoms and behavior when clinically appropriate. Ensure patients are offered private settings for the RVR-MHA interview and prioritize escorting patients for these assessments.

4. **Enhance Suicide Prevention Documentation Quality:** Suicide prevention documentation did not meet benchmarks throughout the review period. Chart reviews of patients who experienced emergent and urgent referrals during the review period revealed instances where potential self-harm or intentional overdose was indicated but not explicitly documented as the reason for referral; the required SRE was completed in only 73% of cases requiring one. Clinical follow-ups following discharge from a higher level of care were completed on time (35%) during the review period. Only 67% of patients rescinded from MHCB level of care had clinical follow-ups for each of the five required days following the rescission. In the MHCB and PIP, 45% of the patients on partial issue had the rationale documented, and there were multiple instances of contradictory psychiatry and MHPC progress notes regarding the required level of observation. Daily MHPC progress notes also contained documentation of observation and issue orders without any verification of a corresponding assessment to support the order. Safety plans developed for patients who were discharged from the PIP and rescinded from MHCB level of care were inadequate.

   Adhere to established policy requiring SRE completion for all applicable referrals including those where self-harm or intentional overdose is suspected. Leverage available mental health reporting tools, including the clinical follow-ups report, to systematically track the timeliness of clinical follow-up appointments, aiming to improve completion rates beyond the current 35% and ensuring all patients rescinded from MHCB level of care receive clinical follow-ups for each of the five required days. Require documentation of rationale for partial issue in all MHCB and PIP cases, ensure cross disciplinary communication to minimize conflicting documentation, and conduct regular supervisory reviews to identify and resolve contradictory progress notes between psychiatry and MHPC regarding level of observation. Ensure that daily MHPC/MHMD progress notes include observation and issue orders supported by a corresponding clinical assessment. Strengthen safety

planning for patients discharged from PIP and rescinded from MHCB level of care by developing individualized, comprehensive plans reviewed and approved by a multidisciplinary team.

# Appendix D

## 2026/2027 Enacted Budget

| **Enacted Budget** | | |
|---|---|---|
| **July 2026 - June 2027** | | |
| Item Funded | Funding | Civil Service Positions |
| Office of the Mental Health Receiver* | $13,690,844 | 0.0 |
| Mental Health Pay Differential (Permanent Bonuses) | $25,300,000 | 0.0 |
| Mental Health Resource Teams | $3,640,000 | 18.9 |
| Crisis Intervention Teams | $7,378,000 | 36.0 |
| CCHCS Office of Legal Affairs | $539,159 | 2.0 |
| Risk and Policy Management Services | $1,534,094 | 10.0 |
| Statewide Mental Health Program Administrative Managers | $1,452,175 | 8.0 |
| Human Resource Southern Region | $940,350 | 6.0 |
| Human Resource Workforce Development and Talent Management | $1,861,435 | 12.0 |
| Human Resource Regional Hiring Unit | $1,843,056 | 12.0 |
| Information Technology Services Division | $1,947,384 | 10.0 |
| Mental Health Centralized Training & Outreach Coordinators** | $1,991,209 | 4.0 |
| Information Technology Software | $215,009 | 0.0 |
| Lease and Moving Costs | $597,000 | 0.0 |
| **Total** | **$61,929,715** | **118.9** |

*Amount updated from previous quarter to tie to court-approved amount.

**Seven additional positions will be added in the following year, for a total of 11 positions.

# Appendix E

## Unaudited Statements, Revenues and Expenditures

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
July 2026 - September 2026

| | Budget | Actuals | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 3,422,712 | 4,762,981 | (1,340,269) |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 3,422,712 | 4,762,981 | (1,340,269) |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 1,939,611 | 1,682,488 | 257,123 |
| Legal and Professional Services | 237,120 | 24,703 | 212,417 |
| Reimburseable Costs | - | 97,479 | (97,479) |
| Office expenses | 116,061 | 70,508 | 45,553 |
| Insurance | - | 5,444 | (5,444) |
| Contractor Costs | 1,129,920 | 809,732 | 320,188 |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 3,422,712 | 2,690,354 | 732,358 |

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
July 2026

| | Budget | Actuals* | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 1,140,904 | 1,423,846 | (282,942) |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 1,140,904 | 1,423,846 | (282,942) |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 646,537 | 519,688 | 126,849 |
| Legal and Professional Services | 79,040 | - | 79,040 |
| Reimburseable Costs | - | 28,742 | (28,742) |
| Office expenses | 38,687 | 32,952 | 5,735 |
| Insurance | - | 3,169 | (3,169) |
| Contractor Costs | 376,640 | 235,864 | 140,776 |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 1,140,904 | 820,414 | 320,490 |
| Available Balance | - | 603,431 | |

**Actuals reflect expenditures paid July 1-31.*

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
August 2026

| | Budget | Actuals* | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 1,140,904 | 1,603,431 | (462,527) |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 1,140,904 | 1,603,431 | (462,527) |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 646,537 | 586,805 | 59,732 |
| Legal and Professional Services | 79,040 | 6,105 | 72,935 |
| Reimburseable Costs | - | 22,240 | (22,240) |
| Office expenses | 38,687 | 22,930 | 15,757 |
| Insurance | - | 1,138 | (1,138) |
| Contractor Costs | 376,640 | 228,509 | 148,131 |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 1,140,904 | 867,727 | 273,177 |
| Available Balance | - | 735,704 | |

**Actuals reflect expenditures paid August 1-31.*

CALIFORNIA CORRECTIONAL MENTAL HEALTHCARE RECEIVER CORPORATION
Unaudited Statement of Revenues and Expenditures
September 2026

| | Budget | Actuals* | Difference Between Budget and Actuals |
|---|---|---|---|
| Revenues | | | |
| Mental Healthcare Special Deposit Fund | 1,140,904 | 1,735,704 | (594,800) |
| General Fund | - | - | - |
| Investment Earnings | - | - | - |
| Miscellaneous Income | - | - | - |
| Total Revenues | 1,140,904 | 1,735,704 | (594,800) |
| Expenditures | | | |
| Prison Mental Healthcare Administration and Oversight: | | | |
| Salaries | 646,537 | 575,995 | 70,542 |
| Legal and Professional Services | 79,040 | 18,598 | 60,442 |
| Reimburseable Costs | - | 46,497 | (46,497) |
| Office expenses | 38,687 | 14,626 | 24,061 |
| Insurance | - | 1,138 | (1,138) |
| Contractor Costs | 376,640 | 345,360 | 31,280 |
| Other | - | - | - |
| Capital Outlay | - | - | - |
| Total Expenditures | 1,140,904 | 1,002,213 | 138,691 |
| Available Balance | - | 733,491 | |

**Actuals reflect expenditures paid September 1-30.*